FILED

1

OCT 2 5 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

WACO DIVISION

UNITED STATES OF AMERICA   *    Criminal Action Nos.
          *   W-99-CR-070(1)&(2)
VS.          *
          *
CHRISTOPHER ANDRE VIALVA and   *   / May 15, 2000
BRANDON BERNARD      *    Waco, Texas
* * * * * * * * * * * * * * *

BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING,

AND A JURY

APPEARANCES:

For the Government:      Mr. James William Blagg,
          Mr. Mark L. Frazier
           -and-
          Capt. Scott L. Frost
          Assistant U. S. Attorneys
          P. O. Box 828
          Waco, Texas   76703-0828

For Defendant Vialva:     Mr. B. Dwight Goains
          Goains & Goains
          Attorneys at Law
          P. O. Box 1200
          Cameron, Texas   76250-1200

           -and-

          Mr. Stanley L. Schwieger
          Attorney at Law
          P. O. Box 975
          Waco, Texas   76703-0975

For Defendant Bernard:     Mr. Russell D. Hunt, Sr.
           -and-
          Mr. Russell D. Hunt, Jr.
          Attorneys at Law
          P. O. Box 726
          Waco, Texas   76703-0726

304

2

Court Reporter:                     Morris W. Bowen, CSR
                                    Official Court Reporter
                                    United States District Court
                                    P. O. Box 1908
                                    Waco, Texas  76703


Proceeding recorded by mechanical stenography, transcript

produced by notereading.

1          MAY 15, 2000 - MORNING PROCEEDINGS

2      (Convened at 8:30 a.m.)

3      (Jury Panel out.)

4          THE COURT:  Counsel, I got a note this morning from

5  Juror Number 93, Shellene Johnson.  She said that on Friday

6  night, her mother-in-law was rushed to the hospital for

7  emergency surgery, she's in intensive care, and she would like

8  to be excused.  I don't know of any way in the world not to

9  excuse somebody in that situation.

10          MR. GOAINS:  We have no objection.

11          THE COURT:  Juror Number 93.

12      (Recessed at 8:31 a.m.)

13                     EX PARTE HEARING

14      (Reconvened at 8:40 a.m.)

15      (Jury Panel out.)

16          THE COURT:  All right.  Outside the presence of the

17  Government attorneys, we need to discuss Defendant Vialva's

18  request for expert assistance, now that the Fifth Circuit has

19  returned its opinion on the Application for Writ of Mandamus, in

20  which the panel states, "We recognize that Petitioner has made a

21  colorable claim regarding a need of additional funds, especially

22  with respect to an expert on future dangerousness for use in

23  preparation of his defense in the capital murder charge levied

24  against him."  Nevertheless - or "Nonetheless, neither before

25  the District Court nor in the Petition for Writ of Mandamus has

4

1    Petitioner been able to document the specificity of the need and

2    reasonableness for the specific amounts requested."  I'm sort of

3    at a loss as to where to proceed from here, except that,

4    obviously, I think your request for additional funds with

5    respect to an expert on future dangerousness needs to be

6    granted, and I don't have in front of me exactly what you

7    requested.

8            MR. SCHWIEGER:  I'd have to grab that at the office,

9    Your Honor, I can have it over the noon hour.

10           THE COURT:  Okay.  Let me just state on the record

11   that your request in your regard is going to be granted.  Now,

12   since this went to the Fifth Circuit, you've made another

13   request for a new neuropsychiatrist.

14           MR. SCHWIEGER:  Yes, sir.

15           THE COURT:  That was $4500, as I recall?

16           MR. SCHWIEGER:  Correct.  If they testify.

17           THE COURT:  If that's granted, when are you going to

18   be prepared to furnish the Government reciprocal discovery?

19           MR. GOAINS:  I'd have to talk with them.  They seemed

20   that they would be -- could be ready fairly quickly, Your Honor.

21   I anticipated that, you know, going forward.

22           THE COURT:  I'm going to grant that motion.  What else

23   does that leave us with?

24           MR. SCHWIEGER:  The mitigation expert in the guilt-

25   innocence phase testimony.

5

1          THE COURT:  Which is already --

2          MR. SCHWIEGER:  Your Honor, the work has already been

3    done, basically.  I am in the process now of getting the summary

4    of their opinions so I can provide it to the Government.

5          THE COURT:  How much additional funds are necessary to

6    do that?

7          MR. SCHWIEGER:  Your Honor, I'm expecting maybe, on

8    the pathologist, maybe another 1,500, and 1,000 on the crime

9    scene expert.

10          THE COURT:  I will grant that.  What else?

11          MR. SCHWIEGER:  Is it possible that we could get the

12    mitigation expert?  That would be Tena Fransis -- basically, to

13    ensure that we have covered all the bases on the mitigation

14    area.

15          THE COURT:  Hasn't she already been paid a ton?

16          MR. SCHWIEGER:  Nearly $6,000.  It's $5,790, from my

17    documents which I received from the Clerk's office, Your Honor.

18          THE COURT:  So, you'll need additional funds just to

19    pay her for her testimony?

20          MR. SCHWIEGER:  There is additional investigation that

21    would be necessary.

22          THE COURT:  Specifically, what?

23          MR. SCHWIEGER:  She stated that she needed to spend

24    more time with the client.  She stated that there were several

25    immediate family members who needed to be interviewed, including

1    four former stepfathers, two maternal aunts who raised

2    Christopher.  She included school teachers, three coaches,

3    neighbors, and mental health professionals who treated him.  She

4    also stated that she would like to investigate any alleged bad

5    behavior from the McLennan County Jail as a precursor for any

6    future dangerousness argument --

7        THE COURT:  Well, now we just talked about future

8    dangerousness.

9        MR. SCHWIEGER:  Yes.  I understood.  But this would

10   also include any type of investigation that would need to be

11   conducted out there.  But the person that's doing future

12   dangerousness, Your Honor, includes, I believe, a look at the

13   federal penitentiary and not -- and forecasting forward, not

14   basically focusing in on any behavior at this point.  But,

15   basically, I think there might be some overlap there, I would

16   agree.

17       THE COURT:  What were you requesting for her in the

18   way of payment?

19       MR. SCHWIEGER:  I think that she stated -- and I'm

20   using her figures, Your Honor, of what would be necessary.  She

21   was requesting $15,000.  Now, whether that's reasonable and

22   necessary, that's her figures, and she stated that's what it

23   would take for her to feel comfortable with the investigation,

24   using her figures.

25       THE COURT:  Well, I'm sure she would love to have

1    $30,000, too.  Talk with her and see what she can do for an

2    additional $3,000.

3              MR. SCHWIEGER:  $3,000?

4              THE COURT:  $3,000, yes.  Now, Mr. Schwieger, these

5    requests are being granted conditioned on you being able to

6    provide the Government reciprocal discovery in a timely manner,

7    so that they'll have time to respond.  That means it needs to be

8    done pretty quickly.

9              MR. SCHWIEGER:  I understand.

10             THE COURT:  Anything else we need to take up ex parte?

11             MR. GOAINS:  No, Your Honor.

12             MR. HUNT, SR.:  No, Your Honor.

13             THE COURT:  Okay.

14        (Hearing at 8:50 a.m.)

15                          *    *    *

16                    VOIR DIRE PROCEEDINGS

17        (Reconvened at 9:30 a.m.)

18        (Jury Panel in.)

19             MRS. FLOWERS:  Jury selection proceedings in Criminal

20   Action W-99-CR-70, styled "United States of America vs.

21   Christopher Andre Vialva and Brandon Bernard."

22             MR. FRAZIER:  Mark Frazier and Scott Frost and Bill

23   Blagg for the United States, Your Honor.

24             MR. GOAINS:  Good morning, Your Honor.  Dwight Goains

25   and Mr. Schwieger for Mr. Vialva.

1      MR. HUNT, SR.:  Good morning, Your Honor.  Russell

2  Hunt and Russell Hunt, Jr. for Brandon Bernard.

3      THE COURT:  Good morning, counsel.  Be seated.

4      Good morning, ladies and gentlemen.  As you just

5  heard, my name is Walter Smith.  I'm one of the ten judges who

6  serve the Western District of Texas.  I'm going to explain to

7  you in a moment what that means.  Do you have the map?

8      SECURITY OFFICER:  Yes, sir.

9      THE COURT:  Let me explain to you just briefly how you

10  got to be here and how the Federal Courts operate, in general.

11  As you are probably aware, if you are called for jury service in

12  State Court in the State of Texas, jurors come from the county

13  in which the Court sits.  That's not the case in Federal Court.

14  The Federal Court System throughout the United States is divided

15  into ninety-four districts.  The larger states, such as Texas,

16  are divided into as many as four districts.  The smaller states

17  might just encompass one district, such as the District of South

18  Dakota.  The four districts of Texas are the Northern, Southern,

19  Eastern, and Western that are depicted on that map the security

20  officer is holding there.  The beige part, or U-shape, is the

21  Western District of Texas.  Except for the District of Alaska --

22  Alaska just comprising one district -- it's the largest

23  geographical district in the United States.  It extends in the

24  north from Hill and Somervell County, all the way south to Bexar

25  County, to San Antonio, as you know, and then goes out west to

1    El Paso, Pecos, and Del Rio.  It includes Midland/Odessa, and

2    Austin.  It is, as you can see, a huge geographical area.

3              Fortunately, for all of us, we don't select juries

4    from the entire district.  If that were the case, then you might

5    have been summoned to appear in El Paso this morning, or you

6    might be sitting next to somebody from Del Rio.  For

7    convenience, and as a practical matter, the district is divided

8    up into divisions.  Those divisions are Austin, Waco, Del Rio,

9    Pecos, Midland, Odessa, and El Paso, and the Waco division

10   consists of thirteen counties that surround McLennan County,

11   where we're now sitting.  All of the registered voters in all of

12   those thirteen counties are in a computer.  That computer

13   happens to be at the University of New Mexico in Albuquerque, I

14   assume, because that facility was the low bidder for providing

15   that service to the Federal Court System, and when we need a

16   jury panel, we tell the people who operate the computer how many

17   people we need, and, on a random basis, from all of those

18   registered voters, those numbered people's names are spit out

19   and you receive a summons to appear.  Then, in normal

20   circumstances, we have a panel that we keep for three months.

21   When we have a trial on a particular Monday morning, the Clerk's

22   office randomly selects the number of people we need, and they

23   are asked to be here on that Monday morning.  This is a little

24   different situation that I am going to explain in a few moments.

25              In any event, that is the way you got to be here.  We

1  continued that random selection basis this morning by assigning

2  you seats as you arrived, so that there would be an absolute

3  random basis for where you're sitting, as just whoever arrived

4  first was assigned a seat in a certain area.

5        What we are about to begin is called the voir dire

6  process of jury selection.  That's a French term that is pretty

7  uniformly mispronounced by Texas judges, especially by me, and

8  it simply means "to tell the truth."  All we're going to ask you

9  to do is to be candid with us.  No one is going to try to pry

10  unduly into your personal affairs or embarrass you in any way.

11  This is going to be a different process than what we usually do

12  in this Court.  The courtroom, to start with, is arranged

13  differently just for this jury selection procedure.  I'm going

14  to, in a moment, introduce to you the attorneys and have them

15  introduce to you their clients, or their case agents, and then

16  we'll proceed.  I'll explain the process before we begin it.

17        The United States Attorney for the Western District of

18  Texas is here this morning.  He lives in San Antonio.  His name

19  is James William Blagg.  Mr. Blagg, would you introduce yourself

20  and your co-counsel, please, sir?

21        MR. BLAGG:  Thank you, Your Honor.  My name is Bill

22  Blagg, ladies and gentlemen, and I am the U. S. Attorney.  This

23  case is being prosecuted by two of my assistants, Mr. Mark

24  Frazier, the lead prosecutor --

25        MR. FRAZIER:  Good morning.

1          MR. BLAGG:  -- and Special Assistant Scott Frost.

2          MR. FROST:  Good morning.

3          MR. BLAGG:  Mr. Frazier will introduce his case

4    agents, Your Honor.

5          THE COURT:  All right.

6          MR. FRAZIER:  Thank you.  Ladies and gentlemen, the

7    case agents that will be seated with the Government during the

8    trial of this case is Dan Chadwick with the FBI -- if you would

9    stand up -- and John Aycock with the Texas Rangers.  Thank you,

10   sir.  That's Mr. Aycock right there, Your Honor.  And that's all

11   we have.  Thank you, Judge.

12         THE COURT:  Thank you, sir.  There are two defendants

13   in this case.  Representing Christopher Vialva are "Stan"

14   Schwieger and Dwight Goains.  Counsel.

15         MR. GOAINS:  Good morning, ladies and gentlemen.  My

16   name is Dwight Goains, and along with "Stan" Schwieger.  We

17   represent Mr. Christopher Vialva.

18         Stand up, Christopher.

19         THE COURT:  Thank you, sir.

20         The other defendant's name is Brandon Bernard.

21   Representing him are Russell Hunt and his son.  Mr. Hunt.

22         MR. HUNT, SR.:  Good morning, ladies and gentlemen.

23   I'm "Russ" Hunt, Sr.  With me is my son, "Russ" Hunt, Jr., and

24   we represent Brandon Bernard.

25         Brandon, would you stand up.  Thank you.

1          THE COURT:  Thank you, sir.

2          Now, most of you are aware, from reading your

3   questionnaire, that this is an unusual case to be tried in

4   Federal Court.  For that reason, things are going to be done

5   differently.  Things have to be done differently.  In this type

6   of case, it's required that there be individual examination of

7   prospective jurors.  What we're going to do is this.  I'm going

8   to go through the ordinary explanation I would give to a panel

9   of prospective jurors in any case involving allegations of

10  criminal conduct, and when I have completed that, then the vast

11  majority of you are going to be excused.  Some of you will be

12  asked to remain, and then you will be brought into the courtroom

13  one at a time and questioned briefly by me and by the attorneys.

14  For that reason, the process of selecting the jury is going to

15  take quite a bit longer than it ordinarily does.  Ordinarily, we

16  are able to select a jury in this court in a couple of hours, or

17  three hours at the most.  That's not going to be the case,

18  obviously, because it takes some time to question each of you

19  individually.

20          The trial will likely not start until -- oh, at the

21  earliest, I would think the latter part of this week, perhaps

22  more likely next week.  So, most of you will be questioned; you

23  will either be excused or told that you will need to return when

24  you're notified.  And then, when enough jurors -- we'll select

25  twelve jurors and four alternates, and once they're selected,

1    then the trial will begin.  We don't anticipate that the trial

2    is going to take an inordinately long time to try, probably a

3    week, or perhaps six trial days.  So, we're not asking you to

4    give us three weeks of your time.  We're asking you to give us

5    today, and then one more day.  Which day, I can't tell you right

6    now, for your individual questioning.  And then, once the jury

7    is selected, about a week for the trial.

8         About -- gosh, I guess it's been ten years ago now, I

9    was attending a judges' meeting in New Orleans, I believe it

10   was, and a lady made a speech.  She was a communications expert,

11   whatever that is, and one of the things she said that impressed

12   me was that about the worst possible way to communicate and get

13   accurate, candid responses from people is to have a middle-aged

14   man, wearing a black robe, sitting up high, looking down at

15   people, and asking them questions.  That impressed me as

16   probably being accurate.  So, on rare occasions, I have not

17   followed that practice, and I'm going to do that now.  I'm going

18   to take off my robe and I'm going to come down there and stand

19   at the lectern and just talk to you, as I ordinarily would, but

20   hopefully it will be a little more informal, and hopefully you

21   will be a little more at ease and we'll get better answers.

22        You see, our purpose is simply this, to select people

23   to serve on the jury who would be appropriate people to serve on

24   this particular case.  Every case is different from every other

25   case, and each of you is different from everybody else in the

1    room, in some respects.  Sometimes, because of our attitudes,

2    our experiences, our education, our beliefs, whatever, we might

3    not be an appropriate person to serve on a particular case.  And

4    that's all we're trying to find out.  I have no doubt that every

5    single one of you would be an appropriate person to serve on a

6    jury in Federal Court in some case.  But this may not be the

7    case.  So, that's all we're trying to find out.  So, let's do

8    that.

9          I even remembered my glasses.  All right.  You all

10   know, because of the questionnaire you were asked to fill out,

11   something about this case.  It is obviously a case involving

12   allegations of serious criminal misconduct.  I'm going to ask

13   the U. S. Attorney's Office, at this point, if they would read

14   the -- if one of them would read the indictment.  And please

15   listen.  This is the formal charge, and then we're going to talk

16   about what an indictment is and what an indictment is not.

17         MR. FRAZIER:  Yes, sir.  If it please the Court:

18         "The Grand Jury charges:

19         "Count One:  On or about June 21, 1999, in the Western

20   District of Texas, Defendants Christopher Andre Vialva, Brandon

21   Bernard, and Tony Sparks, aided and abetted by each other and

22   others known to the Grand Jury, with the intent to cause death

23   and serious bodily harm, did attempt to take and did take a

24   motor vehicle that had been transported, shipped, and received

25   in interstate commerce, namely, a 1989 Buick LeSabre automobile,

1   Iowa License Plate Number 353-EXL, Vehicle Identification Number
2   1G4HR54C5KH455369 from the person and presence of Todd A. Bagley
3   by force and violence, and by intimidation, and did shoot said
4   Todd A. Bagley with a firearm, which resulted in the death of
5   said Todd A. Bagley, in violation of Title 18, United States
6   Code, Sections 2119 and 2.
7       "Count Two:  From on or about June 20, 1999, and
8   continuing thereafter until on or about June 21, 1999, on Fort
9   Hood, Bell County, Texas, in the Western District of Texas, a
10  place within the special maritime and territorial jurisdiction
11  of the United States, and at other places within the Western
12  District of Texas, Defendants Christopher Andre Vialva and
13  Brandon Bernard did knowingly, willfully and unlawfully conspire
14  and agree together, and with other persons known to the Grand
15  Jury, to kill, with premeditation and malice aforethought, Todd
16  A. Bagley and Stacie L. Bagley, by shooting them with a firearm
17  and by setting fire to the vehicle in which the said Todd A.
18  Bagley and Stacie L. Bagley lay, contrary to Title 18, United
19  States Code, Section 1111(a) and (b).
20      "In furtherance of such agreement and conspiracy and
21  to effect the objects thereof, the defendants and co-
22  conspirators committed the following overt acts, among others:
23      "1.  On June 21, 1999, in the Western District of
24  Texas, Christopher Andre Vialva and others took a 1989 Buick
25  LeSabre from Todd A. Bagley and Stacie A. Bagley at gunpoint and

forced Todd A. Bagley and Stacie L. Bagley into the trunk of their Buick LeSabre.

"2.  On June 21, 1999, in the Western District of Texas, Brandon Bernard, driving a getaway car, traveled with Christopher Andre Vialva, who was driving the stolen 1989 Buick LeSabre with Todd A. Bagley and Stacie L. Bagley still in the trunk of the vehicle, to a remote area of Fort Hood, Bell County, Texas, whereupon, the trunk of the 1989 Buick LeSabre was opened and Christopher Andre Vialva shot Todd A. Bagley and Stacie L. Bagley with a firearm.

"All in violation of Title 18, United States Code, Section 1117.

"Count Three:  On or about June 21, 1999, on Fort Hood, Bell County, Texas, in the Western District of Texas, a place within the special maritime and territorial jurisdiction of the United States, Defendants Christopher Andre Vialva and Brandon Bernard, aided and abetted by each other and others known to the Grand Jury, unlawfully and with malice aforethought, did willfully, deliberately, maliciously, and with premeditation, kill Todd A. Bagley by shooting him with a firearm, in violation of Title 18, United States Code, Sections 2, 7(3), 111(a) and (b).

"On or about June 21, 1999, on  Fort Hood, Bell County, Texas, in the Western District of Texas, a place within the special maritime and territorial jurisdiction of the United

States, Defendants Christopher Andre Vialva and Brandon Bernard,

aided and abetted by each other, and others known to the Grand

Jury, unlawfully and with malice aforethought, did kill Todd A.

Bagley by shooting him with a firearm in the perpetration of and

in the attempt to perpetrate an arson and murder, in violation

of Title 18, United States Code, Sections 2, 7(3), 1111(a) and

(b).

    "Count Four:  On or about June 21, 1999, on Fort Hood,

Bell County, Texas, in the Western District of Texas, a place

within the special maritime and territorial jurisdiction of the

United States, Defendants Christopher Andre Vialva and Brandon

Bernard, aided and abetted by each other and others known to the

Grand Jury, unlawfully and with malice aforethought, did

willfully, deliberately, maliciously, and with premeditation,

kill Stacie L. Bagley by shooting her with a firearm and by

setting fire to the vehicle in which said Stacie L. Bagley lay

after having been shot, in violation of Title 18, United States

Code, Sections 2, 7(3), 1111(a) and (b).

    "On or about June 21, 1999, on Fort Hood, Bell County,

Texas, in the Western District of Texas, a place within the

special maritime and territorial jurisdiction of the United

States, Defendants Christopher Andre Vialva and Brandon Bernard,

aided and abetted by each other and others known to the Grand

Jury, unlawfully and with malice aforethought, did kill Stacie

L. Bagley by shooting her with a firearm and by setting fire to

1    the vehicle in which said Stacie L. Bagley lay after having been

2    shot, in the perpetration of and in the attempt to perpetrate an

3    arson and murder, in violation of Title 18, United States Code,

4    Sections 2, 7(3), 1111(a) and (b).

5        A True Bill.  Signed, Foreperson of the Grand Jury.

6        THE COURT:  Thank you, Mr. Frazier.  Now, to each of

7    those charges, each of the defendants has previously entered a

8    plea of not guilty.  That's why we're having a trial.

9        Let me explain to you how that indictment came to be.

10   It was returned, of course, by a Federal Grand Jury.  Some of

11   you may have served on grand juries in State Court.  Federal

12   Grand Juries are somewhat different.  In the first place, there

13   are twenty-three members of a Federal Grand Jury, instead of

14   twelve.  Sixteen have to be present to constitute a quorum, and

15   twelve have to vote in favor of an indictment in order for an

16   indictment to be returned.  So, if all twenty-three members are

17   present, that's just a simple majority.

18       A Grand Jury hears presentations from Assistant U. S.

19   Attorneys, such as these, from federal agents, such as the FBI

20   agent sitting here.  A Grand Jury may hear testimony from

21   witnesses.  It may not.  A Grand Jury very rarely hears from a

22   defendant.  A defendant's attorney is certainly never present.

23   So, what goes on before a Grand Jury is entirely different from

24   what happens during a trial.  A Grand Jury's job is simply to

25   determine whether or not there is probable cause to believe an

1    offense has been committed, not to determine whether anybody is

2    guilty by any standard, be that reasonable doubt, or any other

3    standard.   That's how an indictment comes to be.

4         What's the purpose of an indictment?   It has several

5    purposes.   First and foremost, it's to advise the defendant of

6    what the charge is.   Obviously, it would be totally unfair to

7    charge somebody with income evasion, and they show up for trial

8    and the Government wants to prove they committed robbery.   So,

9    the purpose of the indictment is to advise a defendant of what

10   the specific charge or charges are.   It sets forth all of the

11   elements that the Government has to prove beyond a reasonable

12   doubt.   That's what Mr. Frazier read to you.   I'm going to talk

13   about that at length in just a moment.

14        Equally important as to what an indictment is, is what

15   an indictment is not.   An indictment is not evidence of guilt,

16   and it can't be considered by such as a jury.   That means that

17   if a jury is deliberating and perhaps having a difficult time

18   making a decision, one of the jurors may say, "Well, we haven't

19   even talked about the fact that a Grand Jury returned an

20   indictment in this case.   That means something.   That's some

21   evidence."   At that point, it would be the job of the presiding

22   juror or anyone else to say, "Hold it.   The Judge told us that

23   that indictment is not evidence and we can't consider it as

24   such.   Don't say that anymore."

25        Now, I said that the indictment sets forth the

1    elements that the Government has to prove beyond a reasonable

2    doubt.  That means that when the jury is deliberating, you'll

3    have what's called the Court's Charge, and it will set forth,

4    these are the elements that the Government has to prove for you

5    to find the defendant guilty of this particular count, and it

6    will list them, one, two, three, four, five, or however many.

7    If the jury finds four of five elements beyond a reasonable

8    doubt, but that fifth element, the jury has a reasonable doubt

9    about, then it's the jury's obligation to return a verdict of

10   not guilty.  That could be taken to mean that the jury was

11   eighty percent certain beyond a reasonable doubt.  That's not

12   enough.  The jury has to find every element to be proved beyond

13   a reasonable doubt before a verdict of guilty can be returned.

14   That's a hard burden that the Government has.  Obviously, it's

15   not an impossible burden.  And we'll talk about what that burden

16   is in just a moment.  But as an example, you heard, in each of

17   these counts, Mr. Frazier read that what the Grand Jury alleged

18   happened, happened in the special maritime and territorial

19   jurisdiction of the United States.  You see, that's why we are

20   in Federal Court.  If the acts alleged in this indictment did

21   not occur on property over which the United States has

22   jurisdiction, then this Court has no jurisdiction to try this

23   case.  So, that's one of the elements that the Government has to

24   convince you of beyond a reasonable doubt, that the acts were

25   committed within the special maritime and territorial

1    jurisdiction of the United States, specifically on Fort Hood.

2    If you find, as a jury, that everything the Government has

3    alleged is true beyond a reasonable doubt, except that it didn't

4    happen on Fort Hood, then it would be your solemn duty and your

5    obligation under the law to return a verdict of not guilty.  Do

6    any of you feel you couldn't do that?  Do you have any questions

7    about it?  Okay.

8             All right.  That's what an indictment is, and what an

9    indictment is not.

10            Now, I mentioned that the Government has the

11   obligation of convincing you of all of the elements in the

12   indictment beyond a reasonable doubt.  That is the burden of

13   proof that the Government has to overcome.  It is a heavy

14   burden.  It's not an impossible burden.  It's defined for you as

15   simply beyond -- "a doubt based on reason and common sense."

16   And it's also defined as "a doubt that would make you hesitate

17   in the exercise of your own important affairs."  So, it is, as I

18   said, a heavy burden.  It's not beyond any shadow of a doubt, or

19   any possible doubt, or any doubt, but beyond a reasonable doubt,

20   a doubt based upon reason and common sense.  And, as I said, if

21   you believe that a defendant is probably guilty, or more likely

22   guilty than not, or anything of the sort, but if you don't

23   believe a defendant is guilty beyond a reasonable doubt, then

24   it's your burden and your obligation to return a verdict of not

25   guilty.

1    Let's talk about what "not guilty" means. Many times,
2    particularly if a defendant is a public figure, and a verdict of
3    not guilty is returned, the next thing that happens is that that
4    public figure is standing on the courthouse steps in front of a
5    bunch of microphones, and he or she is proclaiming his or her
6    delight that the jury has found him or her innocent. And that
7    sounds good, and that's probably what I would say, if I were to
8    be in that circumstance. But that's not accurate. The jury has
9    returned a verdict of not guilty, not innocent. Not guilty
10   simply means that the was not convinced beyond a reasonable
11   doubt. Every juror who left that courthouse might have thought
12   that that public figure was probably guilty, more likely guilty
13   than not. But they didn't unanimously find that beyond a
14   reasonable doubt, so a verdict of not guilty was their solemn
15   obligation to return. Do any of you have any questions about
16   that, or not see the distinction between? You're never asked is
17   a person innocent. It's are they guilty, or not guilty. Okay.
18   Every person who is brought into a courtroom for a
19   trial, you, me, these two gentlemen, anybody, must be presumed
20   by the jury to be innocent, or not guilty, until the Government
21   proves otherwise beyond a reasonable doubt. That means that you
22   start off with a level playing field. If you are selected on
23   the jury, you take your seat in the jury box, you are
24   administered the juror's oath, and you look at the defendants,
25   and you say, in my mind, you are not guilty of anything, now,

1    let's see if the Government can convince me otherwise.  That's

2    the presumption of innocence that we're all entitled to.  Do any

3    of you feel you would have difficulty with that or not be able

4    to presume that both of these defendants are not guilty at the

5    start of the trial, until the Government convinces you

6    otherwise?  Anyone have any difficulty with that?  Okay.

7          Let's talk about another right that you and I and

8    every defendant in a criminal case has, and that's the right to

9    remain silent.  You've probably heard of that.  It's guaranteed

10   by the Fifth Amendment to the Constitution of the United States.

11   It's a very important right.  It used to mean, back in the days

12   of our forbearers in England, that ducking stools were not

13   allowed, and thumb screws were not allowed, and then rubber

14   hoses were not allowed, and it meant that the Government or the

15   prosecution cannot call a defendant to the witness stand to

16   testify.  It means simply that a defendant has the right to

17   remain mute and say nothing.  It means more than that.  It means

18   that if a defendant elects not to testify, the jury can't use

19   that against them as any inference or suggestion of guilt -- any

20   evidence of guilt.  Now, that's easy for me to say.  I say it

21   once a week.  But it's not so easy for you to do.  It's not easy

22   for you to not consider the fact that a defendant did not

23   testify.  Why?  Because it's contrary to our ordinary nature.

24   If one of you is an hour late getting home this evening, and

25   your spouse, or whoever is waiting for you, says, "Where in the

1    world have you been?  You were supposed to be here an hour ago."

2    You don't get very far by saying, "I think I'll take my Fifth

3    Amendment right to remain silent.  Thank you very much."  That's

4    not what we do.  We expect people, in our ordinary lives, to

5    explain, if they're accused of something.  And that's fine in

6    our ordinary lives, but in a court of law, a jury cannot do

7    that.

8         Now, I have no idea whether either or both of these

9    defendants are going to testify or not.  It may well be that

10   that decision has not been made.  There's another practical

11   reason why it would be very unfair to use that against a

12   defendant who elects not to testify, and that's this.  I

13   practiced law for a number of years, and I've been a Judge for

14   fifteen years or so, and I know, from my own experience, that

15   many times, the decision as to whether or not a defendant in a

16   criminal case testifies is primarily made by the lawyers.  And

17   the lawyers may well say to their client, "My friend, I believe

18   you're a truth teller, but, in my experience as a trial lawyer,

19   you would do yourself more harm than good by testifying."  And

20   that may not make much sense at first blush.  But think about

21   it.  I have read that one of the most terrifying things that can

22   happen to a human being with no experience is to be forced to

23   stand up in front of a group of people and make a speech, like

24   I'm doing.  I do it all the time, so it doesn't bother me much.

25   But many of you might be absolutely terrified if you were

1    required to stand up here and talk to the whole group.  Well,

2    think about how much more terrifying it might be if your very

3    life was at stake, for instance, or if your freedom was at

4    stake.  If you were not a particularly articulate person, if you

5    were not a particularly educated person, then that is the kind

6    of situation where a lawyer could well say, "I believe you're a

7    truth teller, but, in my experience, you should not take the

8    stand."  So, for that reason, because that decision not to

9    testify could well have been made, in large part, by the lawyer,

10   it would be totally unfair to use that against a person who

11   exercised his or her right, under the Constitution, not to

12   testify.

13           Now, as I said, I have no idea whether either or both

14   of these defendants are going to testify.  But assuming that one

15   or both don't, do any of you feel you would have difficulty in

16   not using that against them in any way?  It's okay if you do.

17   It's normal.  Okay.

18           Now, if you are selected as a juror, you become what

19   we call the sole judges of the credibility of the witnesses.

20   Credibility, of course, simply means believability.  A jury has

21   the right to accept everything a witness says, or none of what a

22   witness says, or any part of what a witness says.  Some of you

23   may feel you don't have the ability to do that, you don't have

24   experience in judging what other people say, how they appear and

25   accepting or rejecting what they say.  But you do.  You do that

1    all the time.  You may have been watching television this

2    morning while you were getting dressed or eating breakfast and

3    there was a commercial on for some new product and you listened

4    and watched out of one ear, perhaps, and you either said to

5    yourself, "That sounds like an interesting new product.  I think

6    the next time I'm in my local grocery store, I'll have a closer

7    look."  Or you might have said to yourself, "That's the silliest

8    sounding thing I ever heard of.  Only a fool would pay good

9    money for that."  You're making the same kind of decision jurors

10   make.  You're using your common sense and your experience.

11   You're listening, you're watching, and you're making a decision.

12   That's all we ask jurors to do.  We don't require that you have

13   experience in doing that, other than the experience of your

14   lifetime, and we certainly don't ask you to leave your common

15   sense and your experience at home when you sit in the jury box.

16          Now, when we talk about credibility, as I said, that

17   means believability, and certainly, a jury has to be ever on

18   guard against somebody committing perjury.  Unfortunately, that

19   happens from time to time in courtrooms.  But that's not all

20   we're talking about, by any means, because what we want a jury

21   to do is to determine the facts.  You have to understand that

22   not only is it possible for people to commit perjury, to tell a

23   deliberate lie under oath, but it's more likely that somebody is

24   going to try to tell you the truth and be wrong.  All of us are

25   fallible.  Our memories can fade.  Three people can observe

1   something happen and come away with three different opinions

2   about what they saw and what happened.  So, that's why we have

3   more than one fact-finder.  We have twelve jurors, because under

4   our system, we believe that if twelve people unanimously agree

5   on what the facts are on what happened, then very likely, that's

6   an accurate determination that's being made.

7        So, that's what we mean by credibility; not only who's

8   telling the truth, but who's got it right.  Do any of you feel

9   you couldn't do that?  From time to time, I have folks tell me

10  that for religious reasons, or other reasons, they can't judge

11  their fellowman, or they just simply cannot make that kind of

12  decision.  Okay.

13       Now, if you're selected as a juror, you are required

14  to take an oath.  That oath is simply that you will a true

15  verdict render, according to the law and the evidence.  Well, we

16  don't expect you to be lawyers.  We don't expect you to have any

17  legal training, we don't require that.  Once a jury is selected

18  and the trial starts, I have two jobs.  One is to make rulings

19  on evidence, to rule on objections and motions made by the

20  lawyers as to whether or not some piece of evidence is

21  admissible, under the rules.  My second job then is to instruct

22  the jury on the law at the end of the trial.  That's done by

23  what we call the Court's Charge.  It's a written legal document

24  that's read to you before you deliberate.  It's a document that

25  you are allowed to take with you to the jury room to use, and

1  it's what the jury must follow in arriving at a verdict.  You

2  determine what the facts are, I tell you what the law is, you

3  put those facts to the law, and you reach a verdict.  We don't

4  allow juries to make a decision based on what they think the law

5  is, or ought to be.  You have to follow the instructions I give

6  you, especially in a case of this nature.  I can't tell you what

7  all those instructions are going to be at this point in time.

8  What I can do is what I'm doing, I'm going over general legal

9  propositions that apply in every case.  But the main part of the

10  Charge is based on the facts.  I haven't heard the facts, just

11  like you haven't heard the facts.  So, I can't tell you now

12  exactly what all of that law is that you're going to be required

13  to follow.  So, it's kind of like asking you to put on blinders.

14  You have to agree that you will follow something that you

15  haven't heard yet.  But that's what every jury does in every

16  case, and it is a requirement, and you have to take an oath that

17  you will do that.  So, if any of you feel you can't do that, or

18  will not do that, now would be the time to let us know.  Okay.

19          MR. HUNT, SR.:  I think we do have one hand, Your

20  Honor.

21          THE COURT:  Yes?

22          PROSPECTIVE JUROR JACKSON:  I just don't feel like I

23  can --

24          THE COURT:  You're Mr. Jackson?

25          PROSPECTIVE JUROR JACKSON:  Yes, I am.

1          THE COURT:  Okay.  What would be the problem, Mr.
2    Jackson?
3          PROSPECTIVE JUROR JACKSON:  I guess I'm just really
4    exhausted right now.
5          THE COURT:  Exhausted from what?
6          PROSPECTIVE JUROR JACKSON:  I've worked like twenty-
7    four hours straight, and I'm not focusing.
8          THE COURT:  What kind of work do you do, Mr. Jackson?
9          PROSPECTIVE JUROR JACKSON:  I'm a wrecker driver.
10         THE COURT:  Okay.  Well, it's not going to be anytime
11   within the next few hours that you'll need to follow that
12   Charge, I can tell you that.  Do you think you're going to get
13   some rest tonight?
14         PROSPECTIVE JUROR JACKSON:  No.  I have to work
15   tonight.
16         THE COURT:  Do you work every night?
17         PROSPECTIVE JUROR JACKSON:  Yes, sir.  I work at
18   night.
19         THE COURT:  Okay.  Mr. Jackson, if you don't feel like
20   you can do what we're asking you to do, then I will excuse you.
21   Thank you, sir.
22         PROSPECTIVE JUROR JACKSON:  Thank you.
23         THE COURT:  The question, specifically, was whether
24   any of you feel you could not or would not follow the Court's
25   Charge that I give you at the end of the trial.  Anyone else

1    have a problem in that regard?   Okay.

2           The other half of the oath you take is that you will

3    follow the evidence.  So, let's talk about what the evidence is

4    and what the evidence is not.  First and foremost, the evidence

5    is testimony from witnesses, those folks who come into the

6    courtroom, sit up here on the witness stand and swear to tell

7    the truth and answer questions from the lawyers.  The lawyers

8    stand here.  The lectern is turned around the other way when we

9    get to that point of the trial.  That's certainly evidence.

10          Exhibits -- written documents, photographs, anything

11   basically that's small enough to be brought through the double

12   doors of the courtroom back there can be admitted as an exhibit.

13   Matter of fact, I recall one trial where we had exhibits that

14   were too large to be brought through the door, and we placed

15   them out there in the parking lot, and the jury all trooped down

16   there and walked around and looked at the exhibits.  Anyway, any

17   tangible item, if it would help the jury make a decision, can be

18   an exhibit, and certainly, that's part of the evidence, too.

19          Any facts that the lawyers agree or stipulate to can

20   be part of the evidence.  I don't anticipate there will be any

21   stipulations in this case, but from time to time, lawyers agree

22   that if a certain person were to come into court and testify,

23   they would testify to thus and so, and that's done because that

24   person may live in the State of Washington and the testimony is

25   not all that important anyway, and so they just save everybody's

1   time and money and agree to what that testimony would be.  As I

2   said, I don't anticipate that would happen in this case.  But if

3   it does, that's part of the evidence, also.

4         Lastly, any applicable presumptions are part of the

5   evidence.  As I said, we don't ask a jury to leave their common

6   sense and their experiences at home when they sit in the jury

7   box.  You may presume things from what you hear.  An example, in

8   a particular case, it could be important as to whether or not a

9   person were able to see something at night in a particular

10  location.  But we don't require an expert to come in, having

11  measured the number of lumens of light that was existent on that

12  particular evening.  You would hear testimony about whether or

13  not the moon was full, whether or not it was cloudy, whether or

14  not there were street lights or other lights around; and based

15  on that, then you could presume, use your common sense and

16  determine in your own mind whether or not a person who testified

17  that under those conditions they saw so and so, was able to do

18  it.  That's what we mean by applicable presumptions.  That's

19  what is the evidence.

20        What's not evidence?  Nothing I say is evidence.

21  Nothing the lawyers say is evidence, unless they're questioning

22  a witness.  At the beginning of the trial, before the first

23  witness is called, the attorneys are given an opportunity to

24  make what's called an opening statement, where they give you an

25  outline or table of contents of what they expect the evidence is

1   going to be, to help you understand it as it is presented.

2   That's important to the trial, but that's not evidence.

3           At the end of the trial, the lawyers make their final

4   summations, or final arguments.  That's their opportunity to try

5   to persuade you to view the evidence as they wish you to view

6   it.  And that's important, too, but that's not evidence.

7           Lawyers have an obligation to their client to make an

8   objection, if they believe evidence is being offered improperly.

9   That's not evidence either.  Sometimes -- well, these lawyers

10  won't do that, but sometimes, especially on TV, you might see a

11  lawyer stand up and, in the guise of making an objection, he

12  tries to make a little speech to the jury, that's not evidence.

13  These lawyers are good lawyers.  They don't try that kind of

14  thing.

15          Certainly, anything you may have seen or heard outside

16  the courtroom is not evidence.  Anything you may see or hear

17  outside the courtroom from this point on is not evidence.  And

18  when we talk to you individually, we'll need to talk to you

19  about what you may have seen or heard about this case before

20  today.  The fact that you have seen or heard something about the

21  case in the media does not disqualify you from serving on a

22  jury, provided that you can put that out of your mind and

23  guarantee us that you'll make a decision based on the evidence

24  you hear in the courtroom and not on anything you may have seen

25  or heard outside the courtroom.  We'll talk to you about that

1    individually.

2           All right.  Do any of you have any difficulty with

3    what is evidence and what is not evidence?  Do you have any

4    questions about that?  Okay.

5           Now, those of you who remember filling out your

6    questionnaires are aware that this is a case where the

7    Government is seeking the ultimate penalty.  The Government

8    wishes to see these two young men executed for the crimes they

9    alleged they committed.  It's the most solemn event that a jury

10   can be faced with.  And that's also something we're going to

11   talk to you about individually.  Here's what you need to

12   understand.  While the jury is not asked, "Do you find --" and,

13   of course, I'm assuming that one or both are found guilty beyond

14   a reasonable doubt.  But assuming that, in a particular case,

15   that a person is found guilty of a capital offense, then the

16   jury is not asked, "Do you find that the defendant should be

17   executed, given the death penalty, given a lethal injection?

18   Yes or no?"  The jury is not asked that.  The jury is asked

19   first to determine whether or not the defendant had the

20   requisite intent to commit a murder.  Then the jury is asked a

21   number of questions involving aggravating and mitigating

22   factors, to answer those questions.  The jury will well

23   understand, if not before, you will now, because I'm going to

24   tell you, that if you answer those questions the way the

25   Government wants you to answer them, then this Court has no

34

1   choice but to sentence the defendants to death.  So, while

2   you're not asked specifically, as a jury, "Do you recommend the

3   death penalty," that's what you, in effect, do.  And you'll be

4   aware of that.  Okay.

5        We talked about the evidence.  Let me advise you that

6   there are two kinds of evidence, "direct evidence" and

7   "circumstantial evidence."  Direct evidence is most commonly

8   direct testimony of a witness to a specific fact.  "On a certain

9   date, I saw so and so."  That's direct evidence.  Circumstantial

10  evidence is evidence from which a jury can find other things.

11  As a simple example, on one of our typical snowy, Central Texas

12  mornings, you look outside your back door and you see rabbit

13  tracks all over the yard.  You didn't see a rabbit, but that's

14  pretty strong circumstantial evidence that, at sometime since it

15  snowed, there was a rabbit running around in your back yard.

16  Both direct evidence and circumstantial evidence have the same

17  weight in a court of law.  That surprises some people.  Some

18  people are under the impression that circumstantial evidence is

19  not as good evidence as direct evidence.  That's not so under

20  the law.  Each type of evidence has the same weight and has to

21  be considered by the jury as having the same weight.

22       What we're going to do now, ladies and gentlemen, is

23  excuse you -- let's see, I forgot to ask Mr. Frazier to read the

24  list of witnesses.  Will you do that, Mr. Frazier?

25       MR. FRAZIER:  Yes, sir.  Jonathan Bair, Rogelio Meraz,

1   James Michael Carlton, Thomas J. Cook, David M. Eller,

2   Christopher Gene Nelson, Kevin W. Schunk, Bruce L. Simon, Alton

3   W. Stuart, Catrice D. Winston, William Hernandez, Duane Bestul,

4   Brenda Henderson, Terry Terrell Brown, Christopher Michael

5   Lewis, Tony Sparks, Gregory Hardin Lynch, Dan Chadwick, Rick

6   Copeland, Rick D. Bagley, Georgia A. Bagley, Charles Woodard,

7   Donna McClure, Sylvia Salyer, Michelle Dade, Cleveland Shinn,

8   Omer Hall, Robert Volk, Clifford Pinkerton, Billy D. Rorie,

9   Sherise Scott, Lisa W. Brown, Blanca M. Zayas, Steven J.

10  Timmerman, Robert J. Rimes, II, Thomas J. Wolfe, Stephen T.

11  Wilson, David Smith, Jeannine Nicosia, Teresa Kirkpatrick,

12  Juneith Steubing, Ernest Rowell, John Aycock, Thomas B. Sing,

13  Charles Meyer, Teresa I. Brauland, Henry V. Amen, Charles

14  Parker, Joyce Marek, Joe Elmer, Dr. J. K. Townsend-Parchmann,

15  Dr. Joni McClain, Matt Gravelle, Evan Rae, Sondra Budge,

16  Patricia A. Retzlaff, Blake Goertz, Ronald D. Crumley, Kathryn

17  Martin, Andrea Latasha York, Ramona Raeshun Berry, Roshan

18  Donahue Rousseau, Ray Pagel, Tiffany Renee Walker, Gary

19  Serwatka, Thomas L. Jones, John Bowman, Caintrea Young, Byron

20  San Marco, Jeff Fholer, Alex Gerhart, Ed Harrington, Gary

21  Orchowski, Christina Spilman, Phillip Jerome Thompson, A. J.

22  Torres, Alan Gawryszewski, Curtis DeMarris Magee, Fancy Jezek,

23  Diana Kay, or Dr. Charles Patterson, as Custodian of Records

24  with the Killeen Alternative School, the same individuals as

25  Custodian of Records for Killeen High School, Mike Varnado,

1    Norma Garza, Robert G. Williams, DDS, Tom Bevel, Ricky Lynch,

2    Billy L. Smith, Sr., M. R. Brown, Johnny F. Wilcox, Jimmy Evans,

3    Kenneth Green, David Vandiver, Charles Redden, Cindy Gerdel,

4    Salvador Buentello, Joe Barbosa, Roger Whitehead, Jeff Booker,

5    Michael Rehfeld, Robert Blossman, Tim Maass, Matt Center, Aaron

6    Phillips, Jonathan L. Fryer, Clandra D. Crawford, a Records

7    Custodian from the United States Army in St. Louis, Missouri,

8    and Christy Fussell, Custodian of Records of Race Trak

9    Petroleum.

10            THE COURT:  Thank you, Mr. Frazier.

11            You'll be glad to know that it's customarily the case

12    that the Government's list of witnesses is a lot longer than the

13    actual number of witnesses that are called during the trial.

14            The question I have, do any of you know any of those

15    folks, or do any of those names ring a bell as someone you know,

16    or might know?  And if you need additional information to find

17    out, we'll certainly get that for you.

18            You're Ms. Cutler?

19            PROSPECTIVE JUROR CUTLER:  Ms. Cutler.

20            THE COURT:  All right.  Who do you know, Ms. Cutler?

21            PROSPECTIVE JUROR CUTLER:  Is that Ray Pagel, Raymond

22    Pagel, from Killeen?

23            MR. FRAZIER:  He's a jeweler, yes, sir, in Killeen.

24            THE COURT:  A jeweler?

25            MR. FRAZIER:  Yes, sir.

1      THE COURT:  Do you know him?

2      PROSPECTIVE JUROR CUTLER:  Yes.

3      THE COURT:  Is he a person you do business with, or a

4   neighbor, or a personal friend, or what?

5      PROSPECTIVE JUROR CUTLER:  Good friend.

6      THE COURT:  Okay.

7      MR. FRAZIER:  He's a records custodian, Your Honor.

8      THE COURT:  Okay.  Ms. Cutler, the question is whether

9   or not you think the fact that you know him would prevent you

10  from serving on this jury?  And I can -- Mr. Frazier just told

11  me that he's a records custodian, and that means that he's just

12  going to come in and say that he is the custodian of certain

13  records that are kept in the normal course of business, and here

14  they are, and so they become part of the evidence.  He's not

15  going to be testifying to something that would be in dispute, I

16  certainly think.  So, do you think that would cause you a

17  problem in that situation?

18      PROSPECTIVE JUROR CUTLER:  No problem.

19      THE COURT:  All right.  Thank you, ma'am.

20      I had some other hands.  You're Ms. Wilkerson?

21      PROSPECTIVE JUROR WILKERSON:  Right.

22      THE COURT:  Who do you know?

23      PROSPECTIVE JUROR WILKERSON:  Okay, I also know Ray

24  Pagel, as a jeweler.  John Aycock, which I believe he's a

25  Ranger.  Brenda Henderson, is she a federal employee at Fort

1    Hood?

2              MR. FRAZIER:  Yes.

3              PROSPECTIVE JUROR WILKERSON:  And real estate?

4              MR. FRAZIER:  Yes.

5              PROSPECTIVE JUROR WILKERSON:  I know Brenda.

6              THE COURT:  Okay.

7              PROSPECTIVE JUROR WILKERSON:  Dr. Patterson, from

8    KISD.

9              THE COURT:  Okay.  Maybe I should have asked you who

10   you don't know.

11             Okay.  We explained the situation with the jeweler.

12   Mr. Aycock was one of the investigating officers, and he will be

13   testifying in that capacity.  How do you know him?  What is your

14   relationship with Mr. Aycock?  Is he just a friend, or what?

15             PROSPECTIVE JUROR WILKERSON:  He's in law -- my

16   husband's in law enforcement.

17             THE COURT:  What does your husband do?

18             PROSPECTIVE JUROR WILKERSON:  He's a highway

19   patrolman, Texas Department of Public Safety.

20             THE COURT:  Okay.  Ms. Wilkerson, I think the fact

21   that you know all those people and the fact that your husband is

22   in law enforcement would probably make it a little bit difficult

23   for you to be an appropriate juror.  Wouldn't you agree?

24             PROSPECTIVE JUROR WILKERSON:  I definitely agree.

25             THE COURT:  I'll excuse you, Ms. Wilkerson.  Thank

1    you, ma'am.

2              PROSPECTIVE JUROR WILKERSON:  Thank you.

3              THE COURT:  Who else knew somebody on the witness

4    list?  Right here.  Okay.  There's a lady right here on the

5    front row.

6              PROSPECTIVE JUROR RICH:  I know Dr. Patterson, also,

7    and Ray Pagel, just from doing business at Pagel's & Sons.  But

8    also, I also knew Todd and Stacie Bagley.  They went to my

9    church.  I knew the victims.

10             THE COURT:  Ms. Rich, I remember seeing that on your

11   questionnaire, and I would expect that would cause you to have a

12   difficult time serving on this jury.  Thank you, ma'am, for

13   being here.  I'll excuse you, also.

14             Who else knows a witness?  Yes, sir?

15             PROSPECTIVE JUROR TYNER:  Dr. Patterson.  I'm a former

16   employee of KISD.

17             THE COURT:  You're Mr. Tyner?

18             PROSPECTIVE JUROR TYNER:  Yes, sir.

19             MR. FRAZIER:  He's a records custodian.

20             THE COURT:  All right.  He, too, is just going to be

21   testifying that he's the custodian of certain records, and then

22   they will be offered into evidence.  So, he won't be testifying

23   to something that would be in dispute or giving an opinion about

24   anything that would be important.  Do you think that would cause

25   you any difficulty?

1          PROSPECTIVE JUROR TYNER:  No, sir.

2          THE COURT:  Thank you, Mr. Tyner.  Yes, Mr. Hobbs?

3          PROSPECTIVE JUROR HOBBS:  I know -- having served on

4    the Temple School Board, I know Dr. Patterson, and I also know

5    Mr. Pagel.

6          THE COURT:  Okay.  Do you think either one of those

7    testifying in the capacity I have described would cause you any

8    difficulty at all?

9          PROSPECTIVE JUROR HOBBS:  If it's just the records, I

10   don't think it should.

11         THE COURT:  Thank you, Mr. Hobbs.  Yes, back there,

12   Mr. Brown?

13         PROSPECTIVE JUROR BROWN:  Yes.  I know a David Eller,

14   but I'm not sure if it's the same one or not.

15         MR. FRAZIER:  A CID Agent at Fort Hood, Your Honor.

16         THE COURT:  He's a criminal investigations

17   investigator at Fort Hood.

18         PROSPECTIVE JUROR BROWN:  No.  But I might add,

19   though, while I'm standing --

20         THE COURT:  Yes, sir.

21         PROSPECTIVE JUROR BROWN:  -- I am an ex-Special Felony

22   Prosecutor for Navarro County, and I think I would have a

23   difficult time being very objective.

24         THE COURT:  I'll excuse you, sir.  Thank you.

25         Who else knows a witness, maybe?  Yes, ma'am?

1    PROSPECTIVE JUROR PAFFORD:  Cindy Gerdel.

2    THE COURT:  Cindy Gerdel.  You're Ms. Pafford?

3    PROSPECTIVE JUROR PAFFORD:  (Nodding head.)

4    THE COURT:  How do you know her?

5    PROSPECTIVE JUROR PAFFORD:   From work, from our

6    employment.

7    THE COURT:  What will she testify about?

8    MR. FRAZIER:  She's with the Department of

9    Corrections.  She's probably a fact witness, not a records

10   custodian.  She's a witness with regard to the crime scene.

11   THE COURT:  All right.  Mr. Frazier says that she

12   would be a fact witness and not a records custodian.  That means

13   that you might well have to make some determination as to

14   whether you won't accept or reject what she says as being

15   accurate or not.  Do you think you could do that, or do you

16   think you would be bound to either believe or disbelieve what

17   she says, regardless of how sensible it might sound?

18   PROSPECTIVE JUROR PAFFORD:  I'm not sure about it,

19   Your Honor.

20   THE COURT:  Well, we need people who are sure, Ms.

21   Pafford.  So, if you think that might cause you some difficulty,

22   I'm going to excuse you.

23   PROSPECTIVE JUROR PAFFORD:  It may.

24   THE COURT:  Thank you, ma'am.  Yes, ma'am?

25   PROSPECTIVE JUROR SCHWARZ:  I know Dr. Patterson.  My

1    husband works at KISD with him.

2             THE COURT:  Are you Ms. White?

3             PROSPECTIVE JUROR SCHWARZ:  Schwarz.  Joann Schwarz.

4             THE COURT:  Okay.  Now, I'm sorry -- you know Dr.

5    Patterson because your --

6             PROSPECTIVE JUROR SCHWARZ:  My husband works in KISD

7    with him.

8             THE COURT:  Okay.  As I've explained, he's just merely

9    going to be a records custodian witness.  Do you think that will

10   cause you any difficulty?

11            PROSPECTIVE JUROR SCHWARZ:  No.

12            THE COURT:  Thank you, ma'am.  Yes?

13            PROSPECTIVE JUROR TALBERT:  I also know Dr. Patterson,

14   I worked for him.

15            THE COURT:  You're Ms. Talbert?

16            PROSPECTIVE JUROR TALBERT:  (Nodding head.)

17            THE COURT:  Do you think that would cause you any

18   difficulty, Ms. Talbert?

19            PROSPECTIVE JUROR TALBERT:  No.

20            THE COURT:  Thank you, ma'am.

21            Yes, sir?

22            PROSPECTIVE JUROR MAYFIELD:  I know Mr. Aycock, with

23   the Rangers.

24            THE COURT:  And you are?

25            PROSPECTIVE JUROR MAYFIELD:  James Mayfield.

1          THE COURT:  It would help if I get the right sheet.

2    Okay.  How do you know Mr. Aycock, Mr. Mayfield?

3          PROSPECTIVE JUROR MAYFIELD:  Just through work.  I

4    worked for the Waco PD for thirty-two years.

5          THE COURT:  Okay.  Do you think that would cause you

6    difficulty in judging his testimony just as you would be able to

7    judge someone you didn't know well?

8          PROSPECTIVE JUROR MAYFIELD:  I don't think so.

9          THE COURT:  You do not think so?

10         PROSPECTIVE JUROR MAYFIELD:  No, sir.

11         THE COURT:  What type of work did you do for the Waco

12   Police Department?

13         PROSPECTIVE JUROR MAYFIELD:  I worked in traffic, and

14   I worked in patrol.

15         THE COURT:  Okay.  Do you think your work as a law

16   enforcement officer would make it difficult for you to make a

17   decision based on the evidence, just as someone who had not

18   worked in law enforcement would be able to?

19         PROSPECTIVE JUROR MAYFIELD:  Not really.

20         THE COURT:  Not really, you don't think it would make

21   it difficult?

22         PROSPECTIVE JUROR MAYFIELD:  I don't think it would be

23   a problem.

24         THE COURT:  All right, Mr. Mayfield, thank you.

25   Anyone else who might know one of the witnesses?

1    All right.  Folks, we're going to excuse you back to

2  where you came from at this point, except for those of you on

3  the first three rows of the left side over here.  Mr. Davis, Mr.

4  Walburn, Mr. Hendricks, Ms. Cutler, Mr. Watkins, Ms. Klotz, Mr.

5  Miller, Mr. Coffin, Mr. Simecek -- Ms. Simecek?  Is that close?

6  Ms. Hutchins, Ms. Hall, Ms. Peters, Mr. Poncik -- Poncik?  Okay.

7  Mr. Ignacio, Ms. Schrader, Ms. Spuckler, Ms. Pate, Ms. Self, and

8  Mr. Kruger.

9    The rest of you we're going to excuse for the day, and

10  the Clerk will explain to you which of you need to be back

11  tomorrow morning, and which tomorrow afternoon, and which

12  Wednesday, and all of that.  But those first three rows, we'll

13  ask you to stay, and we'll begin the individual questioning in

14  just a few moments.

15    Do any of you have any questions you would like to ask

16  me before we excuse you?

17    All right.  We'll see you -- let me say this.  When we

18  bring each of you in for individual questioning, all we really

19  are going to try to do is to clarify some of the things you

20  might have said on your questionnaire that we didn't understand.

21  This is not a test.  This is not any attempt to embarrass you.

22  It's just that some of the things you may have set forth on your

23  questionnaire we didn't fully understand, or they may have

24  raised some question about your ability to serve on this

25  particular case.  So, try not to be concerned about it.  I know

1    it's not an easy thing to do, but it's something that we're

2    required by law to do.

3            Thank you very much for being here this morning.

4    We'll see you again --  I'm sorry?  Yes, Mr. Hobbs.

5            PROSPECTIVE JUROR HOBBS:  One thing that was not

6    brought up, and, like many here, after I got the questionnaire,

7    I kind of dealt (sic) into what information I could find.    I

8    think I'm going to have a very hard time being focused on this

9    trial.  My father was severely burned in February of '99, and I

10   don't -- having gone through eleven weeks at Brook Army Medical

11   and two months at Scott & White, and still taking care of him, I

12   don't think I can stay focused on this trial, sir.

13           THE COURT:  Mr. Hobbs, you're the one who's the judge

14   of that.  I assume, when you say you couldn't stay focused, are

15   you saying you don't think could be objective and view the

16   evidence as someone would who had not had your experience with

17   your father?

18           PROSPECTIVE JUROR HOBBS:  I think I can be objective.

19   What I've had problems this morning, after the attorney read the

20   charge, was, I keep thinking, flashing back to -- my mind

21   wanders off, and I feel like I may miss evidence, and I just

22   really don't want that responsibility.

23           THE COURT:  All right, sir.  I'll excuse you, Mr.

24   Hobbs.

25           PROSPECTIVE JUROR HOBBS:  Thank you, sir.

1              THE COURT:  All right.  The rest of you we'll see -- I

2    do need to tell you that you should, from this point forward, to

3    the best of your ability, remove yourself from any media

4    coverage of this trial.  As I said earlier, the fact that you

5    have read or heard or seen, word-of-mouth, television, newspaper

6    reporting concerning this trial, doesn't disqualify you, so long

7    as you can put that out of your mind.  But it's better to not

8    have anymore to have to ignore than necessary.  So, please try

9    not to read any articles or watch or listen to any television or

10   radio reporting.  Certainly, you should not make any attempt to

11   do your own investigation, and you should not talk with anyone

12   about the facts of this case.  We've not heard the facts.  The

13   facts come from the witnesses.  I've not heard the facts.

14   Sometimes during this process, the lawyers will say to a panel,

15   such as you, you've heard the prosecutor read the indictment.

16   Suppose you were sent out and told to return a verdict at this

17   point, what would your verdict be?  Well, a lot of people say we

18   couldn't do that, we couldn't return a verdict.  Yeah, you

19   could.  It would have to be not guilty, because the Government

20   sure hadn't proved anybody guilty beyond a reasonable doubt.

21   They haven't offered one shred of evidence.  My point is, the

22   decision in this case is going to have to be made by the

23   evidence presented in this courtroom.  So, the more you hear

24   that might be inaccurate, in the first place, that might be

25   different from what you hear in the courtroom, the more

1    difficult it is for you to do that.  So, try to insulate

2    yourself from this point forward from any further media

3    reporting of this case.

4           Thank you very much, and we'll see you again

5    individually.

6           (Recess from 10:35 a.m. until 1050 a.m.)

7           INDIVIDUAL VOIR DIRE OF PROSPECTIVE JURORS

8           THE COURT:  All right.  Let's get back on the record.

9    The first potential juror is Number 21, Perry E. Davis.  Does

10   the Government have any particular areas of concern regarding

11   this individual?

12          MR. FRAZIER:  No, sir.

13          THE COURT:  Mr. Goains?

14          MR. GOAINS:  Yes, Your Honor.  If the Court would

15   please inquire into questions number 120 and 121, and, of

16   course, 54(b), Your Honor.

17          THE COURT:  Just a second.  120, 121 and 54(b)?

18          MR. GOAINS:  54(b), Your Honor.

19          THE COURT:  Well, what specifically about 54(b) would

20   you want me to ask him?

21          MR. GOAINS:  Your Honor, we're just concerned that,

22   basically, you know, what type of crime do they consider

23   appropriate and under basically what -- I don't know if the

24   Court is going to go into these aggravating factors, or any of

25   the mitigating, or --

1       THE COURT:  I'm going to let you all do that.

2       MR. GOAINS:  Okay, Your Honor.

3       THE COURT:  Mr. Hunt?

4       MR. HUNT, SR.:  Yes, Your Honor, I'm concerned about

5   page 23, question F, where he's answered any person who -- he

6   agrees to any person, man or woman, young or old, who commits

7   murder, should pay with his own life.  That sounds like he's

8   saying anything that's a murder, the death penalty is the

9   appropriate punishment, which is a conflict with page 10, answer

10  B.

11      COURT REPORTER:  You all need to speak up a little.

12  With paper rustling and everything, it makes it very difficult

13  to understand everything that's being said.

14      MR. HUNT, SR.:  The thing that I said was that my

15  concern is page 23, answer F, where the juror has answered that

16  they agree that any person, man or woman, young or old, who

17  commits murder, should pay with his own life.  That sounds like

18  they're saying anytime there's a murder, the appropriate

19  punishment is the death penalty, which is a conflict with page

20  10, and I think it's 54(b).

21      THE COURT:  Congratulations, Mr. Davis.  You get to be

22  first.  That's what you get for being here so early this

23  morning.  You were the first one here, I guess.

24          PERRY DAVIS, PROSPECTIVE JUROR, SWORN

25              VOIR DIRE EXAMINATION

PERRY DAVIS - VOIR DIRE (BY THE COURT)                    49

1    BY THE COURT:

2    Q    There were just a couple of things about your questionnaire

3    that caught my attention.  In one place, you said that you

4    believe the death penalty is appropriate for some crimes

5    involving murder, and you could return a verdict in a proper

6    case.  And then, at another place, you said you agreed that any

7    person, man or woman, young or old, who commits murder, should

8    pay with his own life.  So, I guess we are curious as to whether

9    or not those things are in conflict.  Do you believe that anyone

10   who commits any murder, in any manner, under any circumstances,

11   should receive the death penalty, or do you believe that that

12   should be reserved for particularly heinous offense, or what is

13   your attitude about it?

14   A    Well, you know, if it's just out-right cold-blooded, they

15   deserve it.

16            COURT REPORTER:  I'm sorry, sir, you need to keep your

17   voice up.

18            THE COURT:  He said if it's out-and-out cold-blooded,

19   then the death penalty would be deserving.

20   Q    Do you think in terms of premeditation when you think about

21   that, where --

22   A    Yes, sir.

23   Q    -- somebody planned --

24   A    Planned it and acted it out -- acted it all the way out.

25            THE COURT:  All right.  Those were the questions I

1    had.  Mr. Frazier, any questions?

2              MR. FRAZIER:  Yes, sir.  Shall I do these from up

3    here?

4              THE COURT:  Sure.

5              MR. FRAZIER:  Okay.

6              PERRY DAVIS - VOIR DIRE EXAMINATION

7    BY MR. FRAZIER:

8    Q    Mr. Davis, I just have a few questions for you.  They are

9    general questions.

10   A    Okay.

11   Q    I anticipate that at the close of the evidence in this

12   case, when everything is said and done, that you will be given

13   instructions by the Court dealing with these various offenses

14   that the defendants have been charged with, and one of those

15   have to do with certain instructions regarding co-conspirators

16   or co-defendants who act as witnesses, who are witnesses who

17   testify for the Government.  Do you understand what I'm talking

18   about?

19   A    Yes.

20   Q    Those persons are not precluded from testifying.  And I

21   anticipate that the evidence is going to be -- I anticipate that

22   people like that will be testifying in this case.  They are

23   criminals, they are convicted criminals, and they have done some

24   very vile, very heinous acts in this case.  Can you assess their

25   testimony the same as you would any other witness from the

1  outset?  In other words, can you evaluate their testimony, or

2  are you automatically going to disbelieve anything they have to

3  say, simply because they were a participant in the crime?

4  A    I believe I can.

5  Q    Okay.  In other words, you can give them, at least from the

6  outset, the same weight as you would any other witness?

7  A    Yes.

8  Q    Okay.  You would not automatically disbelieve the things

9  they said, simply because they were criminal witnesses?

10  A    No.

11  Q    And again, these are persons who have plea bargain

12  agreements, who have made agreements with the Government, I

13  anticipate, and I anticipate you will hear that some of them

14  have given statements in the past that prove to be false.  Would

15  you still be able to give them the same weight?  And again, no

16  one can tell you --

17  A    Yes.

18  Q    -- the jurors are the only ones who decide the credibility

19  of the witnesses.  That's solely your job.  We just need to make

20  sure, can you, from the outset, give them the same weight as any

21  other witness?

22  A    Yes, I could.

23  Q    Thank you.  Now, I anticipate the Court is going to give

24  you instruction on beyond a reasonable doubt.  The Court has

25  already talked about it a little bit, indicating that it's not

PERRY DAVIS - VOIR DIRE (BY MR. FRAZIER)                    52

1   beyond doubt -- beyond all doubt, or beyond any doubt, but it's

2   a doubt based upon reason and common sense.  That's our standard

3   of proof.  We have to prove our case, and the law requires us to

4   prove it, each element, beyond a reasonable doubt.  And could

5   you still convict the defendants in this case if you believe

6   beyond a reasonable doubt that they committed the crime of

7   capital murder?  Could you do that?

8   A    Yes.

9   Q    Okay.  Would you require the Government to be held to a

10  higher standard, that is, one hundred percent certainty, without

11  any doubt whatsoever, that they committed this offense, simply

12  because it's a capital murder case?

13  A    Yes.

14  Q    In other words, would you hold us to a higher standard, or

15  would you hold us to the standard of beyond a reasonable doubt?

16  A    Beyond a reasonable doubt.

17  Q    Okay.  That was my question.  I thought that was your

18  answer.  I just wanted to make sure that we understood.  And

19  it's the same standard as in any criminal case.  Do you

20  understand that?

21  A    Yes.

22  Q    In other words, if we were here on capital murder, or if we

23  were here on a federal traffic ticket, it's still beyond a

24  reasonable doubt, the standard is the same.  Would you hold me

25  just to that standard --

PERRY DAVIS - VOIR DIRE (BY MR. FRAZIER)                    53

1    A    Yes.

2    Q    -- and nothing higher?

3    A    Just that one.

4    Q    Okay.  Now, if I prove this case beyond a reasonable doubt

5    to you, and if the Government proves each and every element, and

6    then we proceed to the Sentencing Phase, there will be, as the

7    Court told you, evidence regarding aggravating factors of the

8    crime, and then there may be evidence of mitigating factors of

9    the crime and of the individuals themselves who are accused of

10   committing the crime that you'll have to weigh.  Okay?  And

11   before making a decision of whether you recommend, basically,

12   that the sentence be life without possibility of parole, or the

13   death penalty, would you be able to return a verdict, if I prove

14   those elements to you beyond a reasonable doubt, to convict,

15   first of all, and then prove to your satisfaction at sentencing

16   that the aggravating factors outweigh the mitigating factors,

17   would you be able to return a verdict that you knew would result

18   in the execution of both of these defendants?

19   A    Yes.

20   Q    Would you be able to give the death penalty in an

21   appropriate case if you believed it was warranted, despite the

22   age of the defendants, if they were only eighteen or nineteen

23   years old?

24   A    Yes.

25         MR. FRAZIER:  Thank you very much, sir.  That's all we

PERRY DAVIS - VOIR DIRE (BY MR. FRAZIER)                     54

1  have.

2            THE COURT:  Who wants to go next?

3            PERRY DAVIS - VOIR DIRE EXAMINATION

4  BY MR. GOAINS:

5  Q    Mr. Davis, my name is Dwight Goains, and we represent Mr.

6  Vialva.  We want to thank you for your jury service.  Mr. Davis,

7  you know, the Court has gone through with you several

8  constitutional rights that Mr. Vialva has.  Of course, you know,

9  when you come into a jury room, we all have bias and we all have

10 prejudice.  You know, both you and I have one problem, we're

11 both human, correct?

12 A    Yes.

13 Q    Well, in order to be a fair and impartial juror, you have

14 to be able to set aside your bias and your prejudice, and you

15 have to be able to state your verdict clearly on the evidence

16 and not on gory pictures or any bias or prejudice that you might

17 have.  Do you think you can do that?

18 A    Yes.

19 Q    Mr. Davis, you know, I don't have a lot of time, but the

20 Court went through presumption of innocence and burden of proof

21 and how important it was for you to follow the law.  Do you

22 think you can do that?

23 A    Yes.

24 Q    You know, Mr. Davis, one of the reasons that we have this

25 burden of proof beyond a reasonable doubt is because you and I

PERRY DAVIS - VOIR DIRE (BY MR. GOAINS)                    55

1    are both human and we all have bias and we all have prejudice

2    and you know, sometimes it's difficult to put aside maybe some

3    feelings that we have about presumption of innocence and the

4    burden of proof.  So, the courts have said that in order to find

5    someone guilty, they must have the quality of evidence that

6    would convince you beyond a reasonable doubt.  Do you think you

7    can do that?

8    A    Yes.

9    Q    You see, Mr. Davis, in our legal system, there's three

10   burdens of proof.  There's "preponderance of the evidence,"

11   there's "clear and convincing evidence," and then there's the

12   evidence "beyond a reasonable doubt."  Okay?  You see,

13   preponderance of the evidence is not good enough.  Clear and

14   convincing evidence is not good enough.  The Government has got

15   to prove to you beyond a reasonable doubt each and every element

16   of that indictment, or you have to find them not guilty.  Do you

17   think you can do that?

18   A    Yes.

19   Q    Now, sir, just one issue here.  When the Court talked to

20   you, "proof beyond a reasonable doubt, therefore, is proof of

21   such a convincing character that you would be willing to rely

22   and act upon it without hesitation in the most important of your

23   own affairs."  You know, in the most important of our own

24   affairs, you know, if we applied -- you know, sometimes

25   prosecutors will say, "Well, you're a reasonable person, so what

PERRY DAVIS - VOIR DIRE (BY MR. GOAINS)                56

1   do you think is reasonable?"  You see, Mr. Davis, that's not

2   really the test.  It's asking you, have they presented the

3   quality of evidence that you would be willing to rely and act

4   upon in the most important of your own affairs.  Now, you see,

5   both you and I are reasonable people.  But, you see, in our

6   everyday lives, we take chances.  For example, marriage.  If we

7   applied the standard beyond a reasonable doubt, not many of us

8   would probably ever get married.  But, you see, we're willing to

9   take chances, because if it doesn't work out, we can get a

10  divorce.  Correct?

11  A    That's right.

12  Q    You know, let's say buying a house.  We're willing to take

13  chances.  But if it fails, you know, the bank can repossess it.

14  We can sell it.  We have alternatives.  Even for something as

15  major as let's say pulling life support off of a loved one, now

16  that's a major decision, correct?

17  A    Yes.

18  Q    But, you see, you may get four doctors' opinions, and you

19  still may have a reasonable doubt, if you go ahead and let them

20  pull the plug, because the doctors have said that's in the best

21  interest.  But, you see, if you applied the definition of beyond

22  a reasonable doubt, and you would have had a reasonable

23  hesitation, you wouldn't have pulled the plug.  But I guess my

24  bottom line, Mr. Davis, can you understand what a high burden of

25  proof this is?

PERRY DAVIS - VOIR DIRE (BY MR. GOAINS)                    57

1    A    Yes.

2    Q    Will you hold the Government to that burden of proof?

3    A    Yes.

4    Q    Knowing that clear and convincing evidence is not good

5    enough?

6    A    Yes.

7    Q    You can do that?

8    A    Yes, I can.

9    Q    Now, of course, Mr. Schwieger is going to talk to you a

10   little bit about the punishment, but this definition of beyond a

11   reasonable doubt applies both in the guilt phase, as well as the

12   punishment phase.  And can you apply that definition in both

13   areas?

14   A    Yes.

15   Q.   You know, I guess the bottom line, Mr. Davis, is this.  You

16   know, anytime you have a murder case, you have a family that has

17   lost a loved one.  On the other side, if you have someone

18   accused, you have a family that's also got a son or a daughter

19   accused of a serious crime.  I guess the bottom line I'd like to

20   ask you, Mr. Davis, if one of your loved ones was on trial for

21   this type of a capital murder, are you the type of juror that

22   you would want to be sitting on that jury panel?

23   A    Yes.  Probably, yes.

24   Q    And why do you feel that way?

25   A    It's right, you know.

PERRY DAVIS - VOIR DIRE (BY MR. GOAINS)                58

1   Q    Because you think you could be fair and unbiased --

2   A    Yes.

3   Q    And base your verdict strictly on the evidence?

4   A    Yes.

5            MR. GOAINS:  Thank you, Your Honor.

6            THE COURT:  Mr. Hunt?

7            PERRY DAVIS - VOIR DIRE EXAMINATION

8   BY MR. HUNT, SR:

9   Q    Mr. Davis, we were introduced a little bit before.  I'm

10  "Russ" Hunt, Sr., and I just have a couple of questions, or a

11  couple of areas, actually, that I wanted to talk to you about.

12  The first one has to do with something that Judge Smith said,

13  and that has to do with the presumption of innocence; that is,

14  that as you sit here today, the Judge has said you're directed

15  to presume my client -- and my client is Brandon Bernard, the

16  man that is not wearing a coat.  You understand that.  That you

17  are to presume him innocent, as you sit there.  Can you honestly

18  say to the Court right now that you presume that he's innocent?

19  A    Yes.

20  Q    And would you give him that presumption?  Would you follow

21  that through?

22  A    Yes.

23  Q    Good.  That brings me to something else, and that's

24  something that I kind of characterize as overlap.  Because

25  you've seen now that there are two defendants, you've seen that

1    two different people are accused of offenses, that there's four

2    lawyers in here, and, quite frankly, my concern is always that

3    people are going to get things confused, and say, "Well, gosh,

4    one of them did something, therefore, both of them must be

5    guilty." Do you understand my concern?

6    A    Yes.

7    Q    So, I guess what I'm looking for, as far as jurors are

8    concerned, are people who not only understand everything that

9    Dwight just went over -- and that has to do with how strict the

10   burden is -- but that the Government has to prove that both of

11   these individuals individually did something. Do you understand

12   that?

13   A    Yes.

14   Q    Are you the kind of person that can do that? Will you say,

15   "Okay, I understand I have to keep track of all of the facts

16   relative to each of the defendants, understanding that they're

17   not in the same boat at all?" Okay? I don't represent two

18   defendants, I represent one. My son represents that same

19   defendant. We're not here to stick up for anybody else except

20   ours, in the same way that Dwight and "Stan" are here to stick

21   up for their defendant. Do you understand that?

22   A    Yes.

23   Q    Can you do that; and, more importantly, will you do that?

24   That is, will you sit in the jury box -- if you're selected,

25   will you sit and listen to all of the evidence and force Mark to

LASER BOND FORM A    ®    PENGAD • 1-800-631-6989

PERRY DAVIS - VOIR DIRE (BY MR. HUNT, SR.)          60

1   prove his case to you beyond a reasonable doubt as to every one

2   of the elements as to my defendant?

3   A    Yes.

4   Q    Do you have any problem or concern with that?

5   A    No.

6   Q    Okay.  So, you understand the presumption of innocence, the

7   overlap.  And by overlap, I really mean that starting with the

8   first Government's witness, I would expect us, especially on

9   cross-examination, to try to produce evidence that will help you

10  understand where we're coming from.  Do you understand that?

11  A    Yes.

12  Q    So that in a sense, then, the defense case doesn't start

13  after the Government is finished, it starts with that first

14  Government witness.  So, what we're looking for is people who

15  will be totally objective, sort of.  By that, I mean they're not

16  really supposed to be totally objective, exactly, because the

17  Court has instructed you, and you are to presume that the

18  defendant is innocent when you start out.  So, it's more than

19  totally objective.  Do you understand that?

20  A    Yes.

21  Q    Are you that kind of person?

22  A    Yes.

23  Q    And if you are selected on this jury, will you hold Mark to

24  proving his case?

25  A    Yes, I will.

61

1        MR. HUNT, SR.:  Great.  Thanks.

2        THE COURT:  Do you have any questions for us, Mr.

3   Davis?

4        PROSPECTIVE JUROR DAVIS:  No, sir.

5        THE COURT:  All right.  If you will call the code-a-

6   phone each afternoon, you'll be instructed when you may need to

7   return.  Thank you, sir.  You are free to go.

8        (Mr. Davis Excused.)

9        THE COURT:  Mr. Hunt, let's refer to the attorneys by

10   their last name rather than their first name, please.

11        MR. HUNT, SR.:  Yes, sir.  All right.  Your Honor,

12   just procedurally, I assume that after we finish with one, that

13   if we think that there's any basis for a strike for cause --

14        THE COURT:  You would like me to inquire?

15        MR. HUNT, SR.:  Yes, sir.

16        THE COURT:  Any challenge for cause for that juror?

17        MR. FRAZIER:  Not from the Government, no, sir.

18        THE COURT:  Next is going to be James Walburn.  I have

19   noted that in answer to question number 52, he favored the death

20   penalty in cases involving the death of police, law officers, or

21   children, "I do believe there should be or could be the death

22   penalty as punishment."  "Do you believe the death penalty

23   serves any legitimate purpose or purposes in our society?"  He

24   said, "No."  Any other areas of inquiry?

25        MR. FRAZIER:  That was the only area, Your Honor.

1          THE COURT:  I would suggest, by the way, Mr. Goains,

2    that if you want to talk about punishment, that's probably much

3    more valuable than wasting as much time or spending as much time

4    as you did on reasonable doubt.

5          MR. SCHWIEGER:  On this juror, Your Honor --

6          THE COURT:  Yes, sir.

7          MR. SCHWIEGER:  Question 43, he appears to be on some

8    pretty serious medications.

9          THE COURT:  Yes.  As a matter of fact, most of what he

10    takes, I take, too, except for Captopril, whatever that is.

11          Any other areas?

12          MR. SCHWIEGER:  Question 52, Your Honor, I guess, the

13    death penalty, and also question 58.

14          THE COURT:  What about 58?

15          MR. SCHWIEGER:  Basically, I'd like to get into some

16    of the racial aspects there, Your Honor, that asked whether they

17    felt that it has been racially applied or what is their belief,

18    why do you believe that it has not been done in that manner in

19    the past.

20          THE COURT:  You'll have to ask that, Mr. Schwieger.  I

21    don't know how to ask that question.

22          MR. SCHWIEGER:  Number 69, they say that they are

23    regular subscribers to the Killeen Daily Herald, and I would be

24    curious about the media background, if they had followed the

25    case.

63

1    THE COURT:  Okay.

2    MR. HUNT, SR.:  Your Honor, we have no further areas

3    in addition to what Mr. Schwieger has already mentioned.

4    THE COURT:  Okay.  Mr. Bowen, let the record reflect

5    that no one had a challenge for cause for the first juror, Mr.

6    Davis.

7    Let's bring Mr. Walburn in now.

8    THE COURT:  Good morning, Mr. Walburn.

9    MR. WALBURN:  Good morning, sir.

10    <u>JAMES WALBURN, PROSPECTIVE JUROR, SWORN</u>

11    <u>VOIR DIRE EXAMINATION</u>

12    BY THE COURT:

13    Q    I've got a few questions for you, sir.  First of all, we

14    wanted to be sure -- or one of the attorneys wanted to be sure

15    that none of the medications you're taking would cause you any

16    difficulty in serving as a juror, and I replied to them that,

17    except for one of these, I take the same medication, and it

18    doesn't seem to affect me by making me sleepy, or anything of

19    that nature.  Do any of those medications bother you in any way?

20    A    No, sir.

21    Q    All right.  I wouldn't think they would.  Next, in a couple

22    of your answers on the questionnaire, you indicated that you

23    favored the death penalty in cases involving the death of a

24    policeman, a law officer, or children, and you do believe that

25    there could be a death penalty in those cases.  You went on to

JAMES WALBURN - VOIR DIRE (BY THE COURT)                64

1  say that you don't believe the death penalty serves any

2  legitimate purpose or purposes in our society.  Can you

3  elucidate on that a little bit or explain more about how you

4  feel in that regard?

5  A    Well, not really, sir.  In all cases, I don't think the

6  death penalty does serve a purpose.  But if you lock a person up

7  for life, that's about the same story, too, you know.

8  Q    All right.  Are you saying by that, you think that life

9  without possibility of release would be an equivalent punishment

10 to the death penalty?

11 A    Yes, sir.

12 Q    All right.  Are there cases that you can envision where you

13 think the death penalty would be more appropriate than life

14 without possibility of release, or do you think that would apply

15 in all cases?

16 A    It should apply in all cases.

17 Q    All right.  I'm not sure where we're going from there.  Do

18 you think, then, that you would not be able to return a verdict

19 that would result in a death penalty?

20 A    No, sir.  I could return a verdict of the death penalty.

21 It all depends on the evidence and stuff that we're provided.

22 Q    If the facts were appropriate?

23 A    And the facts.

24 Q    All right, sir.  I also noticed that you subscribe to the

25 Killeen Daily Herald.  Did you regularly follow this case when

JAMES WALBURN - VOIR DIRE (BY THE COURT)                65

1    it was reported in the newspaper there?

2    A    The only time I've seen this case in the paper was when it

3    first happened.  And then, after that I didn't, until I got the

4    questionnaire from the court, I didn't have any -- in fact, I

5    had to read it twice to even, you know, recognize the Bagley's,

6    they were the ones involved.

7    Q    Do you think that anything you've read or heard up to this

8    point would be difficult for you to put out of your mind and

9    make a decision based just on the evidence presented here in the

10   courtroom?

11   A    No, sir.  I think I could base it just on the evidence in

12   the courtroom.

13   Q    I always hesitate to say this with reporters in the

14   courtroom, but I don't -- I do it anyway.  You recognize that

15   things you have read or seen in the media can be wrong and

16   inaccurate?

17   A    In certain cases, they can be, sir.

18   Q    And that that's a good reason why we don't let jurors rely

19   on that, but merely on what they see in the courtroom?

20   A    Yes, sir.

21            THE COURT:  All right.  Thank you, sir.  Mr. Frazier?

22            JAMES WALBURN - VOIR DIRE EXAMINATION

23   BY MR. FRAZIER:

24   Q    Mr. Walburn, my name is Mark Frazier.  I'm with the U. S.

25   Attorney's Office here in Waco.  I just have a couple of follow-

1  up questions, and then some other areas I want to cover with

2  you.  Regarding what the Court just covered with you regarding

3  crimes that you believe the death penalty is appropriate for,

4  you had indicated in your questionnaire that there were a couple

5  of different types of crimes, like such as death of law

6  enforcement officers or children, that might be appropriate for

7  death penalty consideration.  Is that --

8  A    Yes, sir.

9  Q    Okay.  Are those the only areas that you believe would be

10 appropriate for death penalty consideration?

11 A    No, sir.

12 Q    Okay.  So, you could consider a wide range of other

13 possibilities, as well?

14 A    That's true, sir.

15 Q    All right.  And you had indicated -- and this is a follow-

16 up of what the Court said, and I just want to make sure I'm

17 clear.  One of the questions has to do with a sentence of life

18 without possibility of release is an option.  You indicated that

19 you could, nevertheless, return a verdict that would result in

20 the death penalty, and that was because you said that, "I do

21 believe some crimes do justify the death penalty, even though a

22 sentence of life without possibility of release if an option."

23 A    That's true, sir.

24 Q    Okay.  So, even if that's an option in any case, regardless

25 of the facts and circumstances, under the appropriate set of

JAMES WALBURN - VOIR DIRE (BY MR. FRAZIER)                67

1   facts or circumstances, you could still return a verdict of

2   death, nevertheless?

3   A    Yes, sir.  You'd have to base it on the facts that got

4   presented in the court evidence.

5   Q    Yes, sir.  That's what I'm referring to when I say, "In an

6   appropriate case."  In other words, if the facts, in your

7   opinion, justify it?

8   A    Yes, sir.

9   Q    Okay.  Now, I want to cover some other general areas with

10  you.  Let me tell you first of all that in this case, I

11  anticipate there are going to be co-defendant or co-conspirator

12  witnesses who will be testifying on behalf of the Government.

13  These are people who I anticipate you will hear have entered

14  into plea agreements with the United States, and I also

15  anticipate that you will hear that some of those persons may

16  have criminal histories, and that they may have even, in fact,

17  as to the investigation of this case, given previous sworn

18  statements that they later admitted were false.  In courtrooms,

19  in Federal Court or State Court, for that matter anywhere, all

20  witnesses start out the same, whether they are a priest or a

21  Judge or a prosecutor or a convicted criminal defendant.  You

22  are entitled to take into account their backgrounds and the type

23  of persons they are in assessing the credibility of those

24  witnesses.  Do you understand what I'm saying?

25  A    Yes, sir.

JAMES WALBURN - VOIR DIRE (BY MR. FRAZIER)                68

1    Q    But that they all have to start out at an even keel.  Would

2    you automatically disbelieve such a witness merely because he

3    was a participant in this crime, committed some very vile acts,

4    would you automatically disbelieve that witness simply because

5    he was a participant in the crime or made a plea bargain

6    agreement with the Government?

7    A    I don't think so, sir.

8    Q    Okay.  Now, understand you're entitled to take it into

9    account, but can you tell us unequivocally at this point that

10   you would be able to give that witness the same weight starting

11   out as you would any other witness?

12   A    It should all be based on the facts as presented to the

13   Court here.

14   Q    Correct.  That's right.  But all I'm saying is, we need to

15   make sure that the jurors on the case don't automatically

16   disbelieve a witness simply because they were a participant in

17   the crime.

18   A    No, sir.  You shouldn't do that.

19   Q    Or had a plea bargain agreement with the Government.

20   A    No, sir.

21   Q    All right.  Thank you, sir.  Now, the Court told you the

22   definition of beyond a reasonable doubt is doubt based upon

23   reason and common sense and that proof of reasonable doubt is

24   proof of such a convincing character that you would be willing

25   to rely and act upon it in the most important of your affairs.

JAMES WALBURN - VOIR DIRE (BY MR. FRAZIER)                69

1    I anticipate that's the instructions you'll be given at the end

2    of the trial in the Court's charge.  Proof beyond a reasonable

3    doubt, as the Court will also tell you, is not proof beyond all

4    doubt or proof beyond a shadow of a doubt.  It's just a doubt

5    based upon reason and common sense.  You understand that's the

6    standard in this case?

7    A    Yes, sir.

8    Q    And that's the standard in every criminal case that's

9    tried.  Would you hold the Government to a higher burden of

10   proof because this is a capital case where a death penalty is

11   involved, and would you hold us to the standard that the Court

12   gives you in its instructions?

13   A    You should be held to the standards that the Court gives

14   you for instructions.

15   Q    Okay.  Do you understand that that burden of proof beyond a

16   reasonable doubt is the same in a capital murder case, just as

17   it would be on a traffic ticket?

18   A    Yes, sir.

19   Q    Okay.  And you would hold us to that same burden and

20   nothing higher, correct?

21   A    Yes, sir.

22   Q    All right.  Now, if we prove this case to you, to your

23   satisfaction beyond a reasonable doubt, and the defendants, or

24   one or more of the defendants, are convicted, depending on the

25   evidence, and that we move to the sentencing phase, as the Court

JAMES WALBURN - VOIR DIRE (BY MR. FRAZIER)                    70

1    told you, we have to -- the Government's burden becomes to prove

2    certain aggravating factors.  The defendants have the

3    opportunity to present certain mitigating factors, which are

4    weighed by the jury in assessing whether they make a

5    recommendation of life without possibility of release or the

6    death penalty in a case.  And that's generally just a very

7    thumbnail sketch of how the process works at sentencing later

8    down the line, assuming one or more of the defendants are found

9    guilty.  If we prove the case to you beyond a reasonable doubt

10   and prove to your satisfaction that the aggravating factors

11   outweigh the mitigating factors, would you be able to return a

12   verdict which would result in the execution of one or both of

13   those defendants?

14   A    Yes, sir.

15   Q    Now, again, as to those aggravating or mitigating factors,

16   would you hold the Government to a higher standard of proof than

17   the law requires?

18   A    No, sir.

19   Q    Okay.  Now, would you be able to give the death penalty, if

20   the facts were appropriate in a case, to a defendant who was

21   only eighteen or nineteen years of age?

22   A    Yes, sir.

23   Q    Did you know the Bagley's, or have you ever heard of the

24   Bagley's before?

25   A    I hadn't heard about them until I read the first article,

JAMES WALBURN - VOIR DIRE (BY MR. FRAZIER)        71

1   you know, they found the car in Fort Hood.  They got car-napped,

2   or something like that.

3   Q    All right.  Do you believe you would be an appropriate

4   juror to serve on this case, sir?

5   A    Yes, sir.

6        MR. FRAZIER:  All right.  Thank you very much.  That's

7   all we have, Your Honor.

8        JAMES WALBURN - VOIR DIRE EXAMINATION

9   BY MR. SCHWIEGER:

10  Q    Good morning, sir.

11  A    Good morning, sir.

12  Q    My name is "Stan" Schwieger.  I represent Mr. Christopher

13  Vialva, and I'd like to take just about five minutes of your

14  time, if I could, to ask you a few questions about the case.

15  First of all, I saw that you spent a lot of time in the Army.

16  Would you describe your service in the Army?

17  A    Most of my service in the Army was just spent in telephone

18  exchanges.  I always worked in communications.

19  Q    Okay.  And you were in the Army for quite awhile?

20  A    About twenty-seven years, sir, I --

21  Q    Was that -- I'm sorry for interrupting you there.  Was that

22  time spent all in Fort Hood?

23  A    No, sir.

24  Q    Where was that spent?

25  A    I've had seven tours in Korea, two in Vietnam and Taiwan,

JAMES WALBURN - VOIR DIRE (BY MR. SCHWIEGER)          72

1    two tours in Germany.  Mostly overseas.

2    Q    Are you familiar with the Fort Hood base?

3    A    Well, somewhat.  I work out there, sir.

4    Q    Okay.  Are you still actively employed with the Army?

5    A    No, sir.

6    Q    Okay.  How long did you work on Fort Hood?

7    A    Well, I was here for a year in 1982, and then I got

8    transferred back overseas.  I came back for retirement in 1985,

9    and retired the following year in '86.

10   Q    Okay.  Part of the case, I believe, some Army

11   investigators, or persons that were involved in the

12   investigation of the alleged offense are going to be employed by

13   the Army.  Is that going to create a problem for you having to

14   sit in potential judgment of those persons?

15   A    No, sir.  I have very little dealings with the Army out

16   there at all, besides just repairing radios and stuff like that.

17   I work for Dynacore, just a repair facility.

18   Q    Okay.  But the fact that these persons might be employed or

19   actively deployed by the Army, at this point, would you lend

20   them more credibility than one who is not, say, a civilian

21   officer?

22   A    No, sir.

23   Q    Okay.  Sir, I'm going to talk to you just a minute about

24   the concept of beyond a reasonable doubt, if I could.  Looking

25   down at your sheet here, I believe it stated that you are

JAMES WALBURN - VOIR DIRE (BY MR. SCHWIEGER)            73

1   married.  Is that correct?

2   A    Yes, sir.

3   Q    Okay.  And you've been married.  Now, sir, when you were

4   potentially taking the vows, did you hesitate when you were

5   walking down the aisle?  Did you have a church marriage, or

6   anything like that?

7   A    No, sir.  We had no church marriage.

8   Q    Okay.  But at the time that you were taking the vows -- and

9   understand the court reporter is taking this down -- did you, at

10  anytime, hesitate, at that point before saying, "I do," or

11  however your marriage was consummated?

12  A    No, sir.

13  Q    Okay.  Have you been a home purchaser, or anything like

14  that?  Have you ever purchased a home?

15  A    Oh, yes, sir.

16  Q    Okay.  And would you consider that to be one of the most

17  important of your own affairs?

18  A    That is important, sir.

19  Q    Okay.  And when you were purchasing that home, did you go

20  through and inspect it and make sure that basically it was a

21  sound place?

22  A    Yes, sir.

23  Q    Okay.  And the reason I'm getting into this is basically to

24  help you define or have a measuring stick of beyond a reasonable

25  doubt, because sometimes when we get the jurors called to go

JAMES WALBURN - VOIR DIRE (BY MR. SCHWIEGER)      74

1   back into the room, it's hard to go back in there without

2   something to measure that concept by.  Is that something you

3   would feel comfortable in measuring that concept by?

4   A    I believe so, sir.

5   Q    I'd like to talk to you for a couple of minutes on the

6   aggravating and mitigating circumstances, and I'd like for you

7   to assume with me in a case that a finding of guilt has been

8   found, at this point.  Now, as the Judge explained to you, the

9   first thing that you're going to have to find is the intent

10  element, and there are four separate intent elements in there.

11  In order for you to then weigh the aggravating and mitigating

12  circumstances, before you get a chance to do that, you must

13  first find the intent element, specifically, that a person

14  specifically murdered, or something like that.  Now, is that

15  something that you would be able to do, as a juror, in this

16  matter?

17  A    Yes, sir.

18  Q    Am I making myself clear?  Sometimes I don't do that very

19  well.  So, if you don't understand what I'm telling you, just

20  please stop me.

21  A    (Nodding head.)

22  Q    Okay.  After that, there will be several issues of what are

23  called aggravating and mitigating circumstances.  Now, the

24  Government, in an aggravating circumstance, must have twelve

25  jurors agree upon that specific aggravating circumstance.  In a

1  mitigating circumstance, any juror could find a mitigating

2  circumstance, and then they are basically weighed, and if the

3  jurors feel that the aggravating circumstances outweigh the

4  mitigating circumstances, then the death penalty is awarded at

5  that point.  Now, you stated, sir, that you felt like that you

6  could give the death penalty to somebody who is eighteen or

7  nineteen years old.  I'd like to ask you the reverse of that

8  question, if I could.  Would you consider that, or would you --

9  let me rephrase that question.  Would that be something you

10  would rule out automatically as a mitigating factor, the youth

11  or age of the person involved as a mitigating factor?

12  A    Well, eighteen or nineteen years old, I consider them an

13  adult.

14  Q    Okay.  Now, would you say then that -- is your answer then

15  that, basically, you would not -- you would automatically not

16  accord that any mitigating weight?

17  A    Yes, sir.

18          MR. SCHWIEGER:  Okay.  Thank you.

19          JAMES WALBURN - VOIR DIRE EXAMINATION

20  BY MR. HUNT, JR.:

21  Q    Good morning, Mr. Walburn.  I'm "Russ" Hunt, Jr.  I'm one

22  of the two attorneys that represent Brandon Bernard, who is the

23  gentleman on your left here sitting right here.  I want to talk

24  to you about a couple of concepts.  The first concept would be

25  the presumption of innocence, and then something I call overlap,

JAMES WALBURN - VOIR DIRE (BY MR. HUNT, JR.)          76

1    which kind of ties back into the presumption of innocence.

2    Something that the Judge said when he was doing his part of the

3    voir dire earlier this morning was that presumption of innocence

4    lasts until the Government has proved its case.  I'd like to

5    think of the presumption of innocence as lasting until the

6    Government has put on all their evidence and the defendants have

7    put on all their evidence, if they have any, because that is the

8    time when the case goes to the jury, and the jury gets to make a

9    decision at that time, after all the evidence is in and all the

10   argument has been done.  So, I want to focus in a little bit on

11   why I think that's very important, and something that has to do

12   with what I call overlap.  Now, the presumption of innocence is

13   a constitutional concept that we have, whereby the Constitution

14   says that everybody on the jury has to presume the person

15   charged is innocent; that is, that they haven't done anything

16   wrong.  Do you understand the presumption of innocence?

17   A    Yes, sir.

18   Q    I know the Judge has been over that with you already, so

19   you've heard about it this morning.  Do you feel like you would

20   have any problem, hearing all the facts that you've heard so far

21   and the -- and the -- I'm sorry -- hearing all the facts that

22   you maybe have read in the newspaper, hearing the indictment

23   having been read to you, would you have any problem, at this

24   point, giving the presumption of innocence, or presuming that

25   Brandon, as he sits over there, is innocent?  Would you have any

JAMES WALBURN - VOIR DIRE (BY MR. HUNT, JR.)    77

1   problem with that at this time?

2   A    No, sir.

3   Q    Okay.  That leads into what I'd like to call overlap.  As

4   you can see, I've gone second this morning.  After Mr. Schwieger

5   has gone, I've gotten to go second.  Frankly, both of the

6   defense attorneys have to go after the Government goes.  So, you

7   can see that the Government gets to present its evidence to you,

8   then Mr. Schwieger's side generally will get to present their

9   evidence to you, then we will have to present our evidence last.

10  So, my concern is that it's very important that everybody on the

11  jury be able to keep an open mind throughout all of the

12  evidence, because, frankly, we're probably going to put our

13  evidence on, if we have evidence, on very last.  Do you think

14  that that would be any kind of a problem for you, to be able to

15  sit and listen through the evidence and hear all the evidence

16  before you make up your mind?

17  A    No, sir.  You should listen to all the facts.

18  Q    I absolutely agree that that's true.  Another concern that

19  I have is that the folks on the jury will see maybe some gory

20  pictures, hear some witnesses who are obviously very upset about

21  the situation, and make up their mind based on the first one or

22  two witnesses.  That's always a concern we have, especially in a

23  murder case like this.  But can you see why it's so important

24  that we get jurors who can listen to all of the evidence and not

25  make up their mind until after they've heard all of the

JAMES WALBURN - VOIR DIRE (BY MR. HUNT, JR.)          78

1   evidence?

2   A     Yes, sir.

3   Q     It sounds like you are going out of your way to give very

4   fair answers and very reasonable answers.  Is that something

5   that you would be willing to do, to wait until you've heard all

6   the evidence to make up your mind?  Is that something you would

7   be willing to do?

8   A     You must hear all the evidence before you make up your

9   mind, be --

10  Q     Absolutely.  I think that's very . . .

11  A     -- guilty or not.

12  Q     I'm sorry.  What was the last thing you said?

13  A     I said it be guilty or not, you know, you have to listen to

14  all the facts.

15  Q     What about in the punishment phase?  Mr. Frazier and Mr.

16  Schwieger have both said that the Government has the burden in

17  the punishment phase, where they have to prove certain

18  aggravating factors in order for the jury to return a verdict of

19  death, or a verdict that would lead to the death penalty.  Would

20  you also be willing to keep your mind open throughout that

21  punishment phase, so rather than making up your mind right at

22  the beginning, right after you've heard the Government's

23  witnesses, or even after you've just heard the guilt-innocence

24  witnesses, would you also carry that presumption and give our

25  side, give Brandon the benefit of the doubt, as it were, until

JAMES WALBURN - VOIR DIRE (BY MR. HUNT, JR.)                79

1    you've heard all of the evidence?  Is that something that you

2    would be willing to do in the punishment phase, too?

3    A    Yes, sir.

4    Q    Okay.  Good.  Something else that that leads me to --

5    that's just real important.  Brandon's attorneys, that is my

6    father and I, and Mr. Vialva's attorneys, we both sit at the

7    same table, but that doesn't necessarily mean -- that certainly

8    doesn't mean that if one defendant is convicted that the other

9    defendant has to be convicted, also.  It also doesn't mean that

10   if one defendant is given the death penalty that the other

11   defendant has to be given the death penalty.  So, do you

12   understand that even though we're linked, in the sense that we

13   sit at the same table, we're not linked in that the jury has to

14   bring back the same verdict on each person?  Do you understand

15   that?

16   A    I understand that.

17   Q    Just as you had tried to be very fair with listening to all

18   the evidence, I'm sure you'd be very fair as to listening to the

19   evidence with a mind toward both of the defendants, both Mr.

20   Vialva and Brandon Bernard.  Is that true?

21   A    That's true, sir.

22   Q    Very good.  Something else that I noticed in your

23   questionnaire is that you marked that you agree that people

24   sentenced to prison do not serve any significant portion of

25   their punishment.  Frankly, there's a -- I think there's a lot

JAMES WALBURN - VOIR DIRE (BY MR. HUNT, JR.)                    80

1    of media coverage about that, where it looks like people get

2    paroled early all the time, people don't serve very much of

3    their sentence.  Is that the impression that you have?  Is that

4    what you meant when you answered that?

5    A    That's what I based it on.

6    Q    Okay.  I think what the Judge said earlier, or maybe what

7    Mr. Frazier said earlier, is that, depending on the

8    circumstances, there could be a sentence in this case of life

9    without parole, and that is to say, in the federal system, if a

10   person gets a life sentence, a life sentence means you'll spend

11   the rest of your life in the penitentiary.  Do you understand

12   that?

13   A    Yes, sir.  That's the federal penitentiary?

14   Q    Exactly.  That's exactly right.  There's not an equivalent

15   sentence available in the state penitentiary.  But in the

16   federal system, life actually means life.  Is that maybe -- and

17   that's not fancy lawyer words, that's realistically, life means

18   life in the federal system.  Does that change anything about

19   your thoughts about what you think about parole and whether

20   people could serve a substantial portion of their sentence?

21   Does that make you feel any differently towards the case?

22   A    No, sir.

23            MR. HUNT, JR.:  Okay.  Thank you very much for your

24   answers.

25            THE COURT:  Mr. Walburn, do you have any questions you

JAMES WALBURN - VOIR DIRE (BY MR. HUNT, JR.)                81

1   would like to ask me?

2          MR. WALBURN:  Not at this time, sir.

3          THE COURT:  All right.  Thank you, sir.  If you'll

4   call the code-a-phone each afternoon, you will find out in that

5   manner if and when you need to return.  Thank you, sir.

6       (Mr. Walburn Excused.)

7          THE COURT:  Any challenges to Mr. Walburn?

8          MR. FRAZIER:  None from the Government.

9          THE COURT:  By the way, the term is "life without

10  possibility of release."

11         MR. SCHWIEGER:  Your Honor, the Defendant, Vialva,

12  would challenge the juror, based upon his answer to the question

13  whether he would consider youth as a mitigating factor or

14  believe that it be listed as a non-statutory mitigating factor,

15  and we would ask the Court to strike the juror for cause on that

16  point.

17         THE COURT:  Okay.  Your motion will not be granted.

18         The next juror is Number 135, Kenneth Hendricks.

19  Kenneth Hendricks.  Any areas?

20         MR. GOAINS:  Yes, Your Honor.  This is one we have

21  filed an objection on, Juror Number 135.  Question number 122,

22  he stated that he has general information from the newspaper and

23  TV news that they were caught by the police because their car

24  was stuck.  132, Your Honor, states that they already have an

25  opinion in the case and they think they are guilty, and also

1    135, Your Honor.

2              THE COURT:  Okay.

3              MR. FRAZIER:  The only other area we would ask is on

4    question number 60, Your Honor, sentence without -- life without

5    the possibility of release, just inquire into that one on number

6    60.

7              THE COURT:  Okay.

8              MR. HUNT, SR.:  Your Honor, we would join in the

9    concern about question number 132.

10             KENNETH HENDRICKS, PROSPECTIVE JUROR, SWORN

11                      VOIR DIRE EXAMINATION

12   BY THE COURT:

13   Q     Good morning, Mr. Hendricks.

14   A     Good morning.

15   Q     How are you this morning?

16   A     Fine, thank you.

17   Q     There are a couple of areas of your questionnaire that I'd

18   like to ask you about.  On one of your questions -- let's see --

19   if a sentence of life without the possibility of release is an

20   option, could you nevertheless return a verdict that would

21   result in the death penalty, and you said, "No," and explained

22   that if there was truly no chance for parole, you would not

23   invoke the death sentence.  Is that still how you feel?

24   A     Yes, sir.

25   Q     All right.  Also, you have indicated that you had received

KENNETH HENDRICKS - VOIR DIRE (BY THE COURT)          83

1   some information from newspapers or TV's, that you were aware

2   the defendants were caught by the police because their car was

3   stuck.  Did you follow the situation pretty closely in the local

4   media?  Where do you live, Mr. Hendricks?

5   A    Temple.

6   Q    Did you follow the situation pretty closely in the Temple

7   paper and the local TV stations?

8   A    Yes, sir.

9   Q    Okay.  Do you feel like you have gained information that

10  would make it difficult for you to set aside and not consider,

11  if you were selected as a juror?  For instance, you indicate you

12  think they're guilty.

13  A    Yes, sir.

14  Q    That's based on what you've seen and read and heard?

15  A    Yes, sir.

16  Q    Do you think it would be difficult for you, as a juror, to

17  set that feeling aside and that information you've already

18  received aside and just make a decision based on the evidence as

19  presented in court?

20  A    I think it would be very difficult for me to do that.

21  Q    Do you?  You did indicate that you followed it pretty

22  closely in the news?

23  A    Yes, sir.

24        THE COURT:  Well, based on your feelings in that

25  regard, Mr. Hendricks, I'm going to excuse you, and maybe we'll

KENNETH HENDRICKS - VOIR DIRE (BY THE COURT)                84

1   find another case down the line for you to serve on sometime.

2   Thank you, sir.

3          PROSPECTIVE JUROR HENDRICKS:  Thank you, sir.

4      (Mr. Hendricks Excused.)

5          THE COURT:  This next lady, Number 167, Teresa Cutler,

6   indicates that she has a vacation planned for June 8th through

7   the 11th.  I wonder if that's risky?

8          MR. HUNT, SR.:  Your Honor, at this point, we've got a

9   lot of people, and I would say, at this point, that's probably

10  too risky.  I'd rather have us not take that chance.

11         THE COURT:  She also says she has obsessive compulsive

12  disorder and sometimes gets sidetracked.

13         MR. HUNT, SR.:  I think that's another valid reason

14  that we'd ask that she be excused.

15         THE COURT:  Any objection to her being excused?

16         MR. FRAZIER:  No, Your Honor.

17         THE COURT:  Next is Number 41, Rodney Watkins.  What

18  areas would you want me to take up with this gentleman?

19         MR. FRAZIER:  Judge, number 60, question 60, about

20  imposition of a life sentence, whether the juror could

21  nevertheless return a verdict that resulted in the death

22  penalty, "It depends on the," -- I can't make that out.  I'm not

23  sure what his answer is to that question.  I just wanted the

24  Court to inquire a little bit further about that.

25         THE COURT:  "Case in hand," I assume.

85

1      MR. FRAZIER:  "Case in hand?"

2      THE COURT:  I think that must be a "c".

3      COURT REPORTER:  Mr. Frazier, you have your head down

4  and you're talking over a box, and you're hard to hear.

5      MR. FRAZIER:  I'll take care of that problem right

6  now.  Sorry about that.

7      COURT REPORTER:  And there's a lot of paper shuffling

8  going on, and you understand that's distracting?

9      MR. FRAZIER:  Yes, sir.  I'll keep my voice up.

10     COURT REPORTER:  Thank you.

11     MR. FRAZIER:  Number 60 was the only area, Your Honor.

12     MR. GOAINS:  54(a), Your Honor.

13     THE COURT:  Okay.  Mr. Hunt?

14     MR. HUNT, SR.:  Your Honor, my concern in question 52,

15  "If you take a life, you give a life," which makes it sound like

16  he is always going to give a death sentence.  And 54(a), which

17  says that he believes that the death penalty is appropriate for

18  all crimes involving murder.

19     THE COURT:  Okay.

20          RODNEY WATKINS, PROSPECTIVE JUROR, SWORN

21               VOIR DIRE EXAMINATION

22  BY THE COURT:

23  Q    Good morning, Mr. Watkins.  How are you?

24  A    Good morning.

25  Q    Mr. Watkins, there are just a couple or three areas I want

RODNEY WATKINS - VOIR DIRE (BY THE COURT)                86

1   to ask you about.  You indicated that you do favor the death

2   penalty as a punishment for crime, and you say, "When you take a

3   life, you give a life."  And then in another instance, you said

4   you believe the death penalty is appropriate for all crimes

5   involving murder.  If you are selected as a juror in this case,

6   if the jury finds one or both defendants guilty, then the jury

7   is asked to consider what we call aggravating factors and

8   mitigating factors.  If you find certain aggravating factors

9   exist, after the jury has found that there was an intent to

10  commit a murder, then the jury is asked to consider certain

11  mitigating factors.  That can involve all sorts of things about

12  a person's background, education, how they were raised, social

13  difficulties, all kinds of things.  And then the jury is asked

14  to weigh those things and determine whether or not the

15  mitigating factors overrule the aggravating factors, if they

16  weigh more.  It concerns me a little bit that if you say you

17  feel the death penalty would be appropriate for any murder, that

18  you might have difficulty in doing that.  I want to be sure you

19  can do that, that you will consider any mitigating factors and

20  not just automatically decide that the death penalty is

21  appropriate if you find somebody is guilty of murder.  Do you

22  think you could do that all right?

23  A     Uh-huh.

24  Q     Do you understand what I'm talking about?

25  A     Yes, sir.  I understand.

RODNEY WATKINS - VOIR DIRE (BY THE COURT)                    87

1    Q    Okay.  Another question you were asked, "If a sentence

2    without life without possibility of release is an option, could

3    you nevertheless return a verdict that would result in the death

4    penalty?"  I think you said, "It depends on the case in hand."

5    Is that what you said?

6    A    Yes.

7    Q    So, it would just depend on the facts of a particular case?

8    A    Yes.

9    Q    Okay.  And you recognize that there might be many cases

10   where the facts would not justify the death penalty, and many

11   cases where the death penalty might be justified.  You

12   understand that?

13   A    Yes.

14   Q    And you judge this case just based on the facts you hear in

15   the courtroom?

16   A    Yes.

17   Q    Have you heard anything about the case before today?

18   A    No, sir.

19   Q    Where do you live, Mr. Watkins?

20   A    About eight miles this side of Palestine.

21   Q    You live about as far away from that area of Fort Hood as

22   you can get, I guess, don't you?

23   A    Uh-huh.

24           THE COURT:  All right.  Thank you, sir.  Mr. Frazier?

25           RODNEY WATKINS - VOIR DIRE EXAMINATION

RODNEY WATKINS - VOIR DIRE (BY MR. FRAZIER)          88

1  BY MR. FRAZIER:

2  Q   Mr. Watkins, my name is Mark Frazier.  I introduced myself

3  earlier to the group.  I'm with the U. S. Attorney's Office.  I

4  just have a few questions.  First of all -- and I think the

5  Court has clarified this well -- but could there possibly be

6  cases in which you find a defendant guilty of capital murder,

7  essentially a premeditated murder, where even though life

8  without possibility of release is an option, you could

9  nevertheless impose the death penalty?  In other words, could

10  you impose the death penalty if the case were appropriate, in

11  your mind?

12  A   Sure.  Yes.

13  Q   Even though there was an option of life without possibility

14  of release?

15  A   The way I see it, if a man's made a serious enough crime to

16  kill or take someone's life, yes, I feel like I could give him

17  the death penalty.

18  Q   All right.  Thank you, sir.  Now, in this case, I

19  anticipate that you -- if you are a juror in this case, I

20  anticipate you're going to hear from witnesses who are going to

21  be co-defendants, that is, people who committed the crime -- or

22  are charged with committing the crime, along with the two

23  defendants who are on trial.  I understand you're going to hear

24  that those people have plea agreements with the United States.

25  You're going to hear about some very vile acts that they

RODNEY WATKINS - VOIR DIRE (BY MR. FRAZIER)                89

1   committed.  When I say "they," I'm talking about the

2   Government's witnesses, people we're going to call as witnesses.

3   And that you may even learn that some of them have given

4   statements in this case early on that they later admitted were

5   false.  Okay?  Would you be able to evaluate that witness the

6   same as any other witness?

7   A    Uh --

8   Q    Now, when I say that -- go ahead.  Give me your answer.

9   A    Well, a man is only as good as his word is.

10  Q    Sure.  And I understand that.  What I'm saying is -- and no

11  one is telling you, first of all, who to believe and who not to

12  believe, because that's not my job at all.  That's strictly the

13  jury's job to make the decision about which witnesses are

14  credible and which ones are not credible.  Okay?  But my

15  question to you is, if you understand, the law requires that all

16  witnesses at the outset or at the beginning start on a level

17  playing field.  You can take into account the fact that they are

18  participants in the crime.  Okay?  You can take into account the

19  fact that they've lied previously in assessing their

20  credibility.  You're entitled to do that.  All I'm asking is,

21  are you automatically going to disbelieve a witness that you

22  know was a criminal participant in a crime, committed some very

23  vile acts themselves, and maybe even given inconsistent

24  statements?  Would you automatically disbelieve that person?

25  A    I probably would.

RODNEY WATKINS - VOIR DIRE (BY MR. FRAZIER)                90

1    Q    Okay.  Would you be able to give that person, from the

2    outset, the same weight as you would any other witness?

3    A    Yes.

4    Q    Okay.  But you're saying that if it came -- you're saying,

5    from the outset, you could give them the same weight, but if you

6    found out that they were criminal co-conspirators, you would not

7    be able to?

8    A    I don't see it.

9    Q    I'm sorry?

10   A    I don't see myself being feeling the same way when I find

11   out they had something to do with it.

12   Q    That they were involved with it, too?

13   A    Yes.

14   Q    All right.  Now, do you understand that in this particular

15   case, the standard of proof, as the Court told you, is beyond a

16   reasonable doubt?

17   A    Yes.

18   Q    Now, that's the same in any criminal case, whether it's a

19   capital murder or a speeding ticket, okay?  Do you understand

20   that?

21   A    Yes.

22   Q    Okay.  Would you hold us to a higher standard of proof in

23   this case simply because it was a capital murder?  In other

24   words, would you be required to be proved beyond all doubt or

25   beyond a shadow of a doubt that the defendants committed the

RODNEY WATKINS - VOIR DIRE (BY MR. FRAZIER)          91

1   crime, or would you hold us to the standard that the Court has

2   set out of beyond a reasonable doubt?

3   A    I wouldn't expect no more than the Court required.

4   Q    Fair enough.  But you, personally, would you, personally,

5   believe that we would be required to prove this case to a higher

6   standard?  In other words, convince you one hundred percent,

7   beyond any doubt, that they are guilty before would return a

8   verdict?

9   A    Oh, true.  I would.

10  Q    But what if the Court told you that you didn't have to be

11  one hundred percent convinced, that you could just be -- that

12  the Government's proof had to be proof beyond a reasonable

13  doubt?  But you can still have a doubt, but the doubt's got to

14  be -- in order for you to acquit them, it has to be a reasonable

15  doubt?

16  A    Yeah.

17  Q    In other words, you could still convict someone in Federal

18  Court, State Court, or anywhere, even if you have a lingering

19  doubt in your minds, but after reviewing and going through all

20  the evidence, you come to believe that that doubt is not

21  reasonable, okay?  Would you still be able to convict a person?

22  A    I really wouldn't know.

23  Q    I'm sorry?

24  A    I really wouldn't know until I went through that situation.

25  Q    Okay.  Well, this is one of those times, unfortunately,

1    where we have to know beforehand.  And I can understand where

2    you're coming from, and I don't have a -- but this is one of

3    those occasions where we have to know beforehand whether the

4    juror would basically hold us to a higher standard of beyond all

5    doubt, or beyond a shadow of a doubt, in returning a verdict of

6    guilt.

7    A    I couldn't guarantee you I could.

8    Q    All right.  If you had to give us an answer now to that

9    question that I just asked, what would your answer be?  I

10   realize that you're -- I sympathize, and I understand what

11   you're saying here.  But if you had to give an answer of whether

12   you would have to be convinced beyond all doubt or beyond a

13   shadow of a doubt now, what would your answer be?

14   A    I would have to be convinced without a doubt.

15   Q    Now, if the facts and evidence prove that the defendants

16   committed this -- or one or more of the defendants committed the

17   crime, and you went through the sentencing phase and weighed the

18   aggravating factors against the mitigating factors and you found

19   that the aggravating factors, or things that made the crime

20   especially serious, outweighed the mitigating factors, or the

21   things that didn't make it as serious, would you be able to

22   return a verdict, knowing that your verdict would result in the

23   execution of one or both defendants?

24   A    Yes.

25   Q    Okay.  Would the age of those defendants make any

RODNEY WATKINS - VOIR DIRE (BY MR. FRAZIER)              93

1   difference, in your mind?

2   A    No.

3            MR. FRAZIER:  That's all we have, Your Honor.  Thank

4   you, sir.

5            RODNEY WATKINS - VOIR DIRE EXAMINATION

6   BY MR. GOAINS:

7   Q    Mr. Watkins, my name is Dwight Goains, and we represent Mr.

8   Vialva.  Mr. Watkins, this trial is going to be what we call a

9   bifurcated trial.  There is what we call the guilt phase, and

10  then if you believe beyond a reasonable doubt, or all twelve of

11  you believe beyond a reasonable doubt that Mr. Vialva is guilty,

12  then we're going to go to the punishment phase.  Okay?

13  A    Okay.

14  Q    Now, it's really important on this definition of beyond a

15  reasonable doubt, because, you see, that definition will apply

16  both in the guilt phase, and it will also apply in the

17  punishment phase.  Now, beyond a reasonable doubt is a very,

18  very high standard.  In fact, it's the highest standard in our

19  legal system.  It's higher than preponderance of the evidence.

20  It's higher than "clear and convincing evidence."  You must

21  believe each element of that indictment beyond a reasonable

22  doubt before you can find a person guilty.  Can you hold the

23  Government to that standard?

24  A    Yes.

25  Q    Now, can you imagine, Mr. Watkins, how important it is for

1  a juror to be unbiased and not prejudice when they make these

2  determinations?

3  A    Uh-huh.

4  Q    Do you feel that you're the type of person that can set

5  aside your bias and your prejudice and base your verdict

6  strictly on the evidence?

7  A    Yes.

8  Q    Now, another very important, Mr. Watkins, is, you noticed

9  we're going to have twelve jurors who actually deliberate to

10  determine the guilt and the punishment.  Now, the reason we have

11  twelve is because each person has to make a determination of

12  whether that burden has been met beyond a reasonable doubt in

13  the guilt phase, if we get to the punishment phase, whether

14  those burdens have been met, and you have to make an independent

15  decision yourself.  Do you feel that you're the type of person

16  that can look at the evidence, make a determination of whether

17  you feel they're guilty or not guilty, or what punishment -- how

18  you should answer those questions?  Can you do that

19  independently?

20  A    Yes, sir.

21  Q    You know, there's always leaders that emerge, and there's

22  nothing wrong with being a leader or a follower, but if we only

23  needed one person to make the decision, then we would only have

24  one person on the jury.  Can you see how important it is for you

25  to make that decision?

RODNEY WATKINS - VOIR DIRE (BY MR. GOAINS)                95

1    A    Uh-huh.

2    Q    Now, you stated on your jury questionnaire that, "I believe

3    the death penalty is appropriate for all crimes involving

4    murder."  Can you tell us a little bit more what you meant by

5    that, Mr. Watkins?

6    A    Well, from the viewpoint that I've had, I had a very best

7    friend of mine was killed, and the person that killed him was

8    out within eighteen months, which I thought at the time she

9    should have gotten more.  But it was different circumstances.

10   Like you say, it's different circumstances with every case.  And

11   I feel like that if you're going kill someone, I don't care who

12   it is, black or white, you should do more than eighteen months

13   -- more than sixteen months.

14   Q    Mr. Watkins, you understand that if we get to the

15   punishment phase, you're going to be asked first if there was

16   any intent, and you have to believed that beyond a reasonable

17   doubt.  Now, if you have a reasonable doubt, you have to answer

18   that there's no intent.  If you believe it beyond a reasonable

19   doubt, you say, "Yes, there was intent."  Now, do you think that

20   you can fairly answer that, based on the evidence, or do you

21   think that your views that you're bringing into the courtroom,

22   you would basically automatically lean toward answering the

23   question that would allow the death penalty?

24   A    I don't know how my views with what I'm bringing into the

25   court would play into the role until I was, like I say, in the

1  situation to where I'd have to find out.  My opinions about what

2  went on then is strongly in my mind, and it stays on my mind all

3  the time, because --

4  Q    But you -- I'm sorry, sir.

5  A    -- because that was a wrongdoing at the time it happened.

6  Q    But you understand, like Mr. Frazier stated, unfortunately,

7  you know, you have to be able to accept -- there's nothing wrong

8  with having those biases and prejudices, because, you know, I

9  have them myself.  We are all human beings.  But when you come

10  into this courtroom, to be fair and impartial, you have to be

11  able to set those biases and prejudices aside and base your

12  verdict strictly on the evidence.  Now, I know it's hard right

13  at this point, but can you do that, or do you think that your

14  answers to these questions is going to be influenced by your

15  bias and your prejudice?

16  A    I can't swear to you it wouldn't.

17  Q    So, you -- let me ask it this way.  Do you think you would

18  lean toward answering the questions in the punishment phase that

19  would allow the death penalty?  Because remember at this point,

20  you've already found beyond a reasonable doubt that the person

21  is guilty of capital murder.

22  A    I imagine it would lean toward it.

23           MR. GOAINS:  Thank you, sir.

24           RODNEY WATKINS - VOIR DIRE EXAMINATION

25  BY MR. HUNT, SR.:

1  Q    Mr. Watkins, I'm "Russ" Hunt, Sr.  We were introduced a

2  little bit.  You understand that I only represent one of the

3  defendants, and that's Brandon Bernard.  Brandon, stand up, will

4  you.  That's my client.  Thank you.  Go ahead and sit down.  The

5  reason I point that out is because it's always a concern, when

6  we have multiple defendants, that the jury's going to get

7  confused about who represents what, and they're going to try to

8  lump them together.  You understand that we have two individual

9  defendants.  The testimony about one isn't the same as the

10  testimony about the other.  Do you understand that?

11  A    Uh-huh.

12  Q    My concern with all of the jurors is, or potential jurors,

13  like yourself, is that we need people that will say, "Hey, if I

14  get selected on this jury, I'm going to keep the acts of one

15  separate from the acts of the other."  Does that make sense to

16  you?

17  A    Yes.

18  Q    If you were selected on the jury, would you do that?

19  A    But is the -- on the time, both of them were together when

20  it happened, wasn't they?

21  Q    Well, you're going to have to wait for the facts to find

22  out who was where.  Okay?  So, my concern is, just because

23  somebody -- just because the newspaper, for example, says,

24  "Well, the facts are that they were both there together, they

25  both did it, they both pulled the trigger."  What if the

RODNEY WATKINS - VOIR DIRE (BY MR. HUNT, SR.)                98

1    newspaper said that?  That's not true, but what if the newspaper

2    said it?  That wouldn't make it true, would it?

3    A    No.

4    Q    So, if you're selected on the jury, what we're looking for

5    is twelve good folks that can keep the facts separate, depending

6    on who did what, and then, if they get to a punishment, they

7    have to keep the punishment facts separate, too.  So, my concern

8    is, can you do that?

9    A    What's good for one is good for the other.  So, --

10   Q    So, are you saying that no matter what the facts are, if,

11   for example, the facts were to show that one person did

12   everything and the other person was still there, then the

13   punishment should be the same for both of them?

14   A    If they was in the process of being together, yes.

15   Q    So, you're saying that if you find out that the facts are

16   that one of them was guilty of cold-blooded murder, then the

17   other man, no matter what his relationship was, he ought to also

18   be killed?

19   A    No, sir.  I'm saying, if he was -- if one man was

20   considered of a cold-blooded murder, and the other one stood

21   there and let it went on, he's just as guilty as the man that

22   pulled the trigger.

23   Q    Okay.  Then the second part of that is the punishment part,

24   because you already know that in Texas -- well, in the United

25   States, this Federal Court, we have what's called a bifurcated

RODNEY WATKINS - VOIR DIRE (BY MR. HUNT, SR.)    99

1   system.  That is, we have guilt-innocence part first, and then

2   we have punishment second.  So, are you saying that, "Okay, if I

3   decided in the guilt-innocence part that the bad buy really was

4   a bad guy, but the other guy didn't do anything, I'm going to

5   convict them both?"  And then when they go in the punishment

6   phase, because of your feeling about the death penalty, they

7   bought ought to be killed.  Is that what you're saying?  And I'm

8   not trying to put words in your mouth.  I need to know what

9   you're saying.

10  A    I'm not trying to say that.  I'm saying -- just like I say,

11  if they are both -- or if one of them was who done the job and

12  the other one was there, I'm still saying they're just as guilty

13  as the other one.  I can't say I'll give that next man anymore

14  leniency than I give this one.

15  Q    Okay.  But my question really is, if you decided that the

16  first person needed to die, does that mean automatically that

17  the second person needs to die, too?

18  A    Not necessarily.

19  Q    Okay.  One of the things that you were asked was, things

20  that had to do with what kinds of things that you might take

21  into consideration as far as what you should consider on how the

22  punishment.  One of those things that you can consider is age.

23  Would you also consider that that might have something to do

24  with how you would punish somebody?

25  A    No, sir.

RODNEY WATKINS - VOIR DIRE (BY MR. HUNT, SR.)    100

1    Q    So, age just wouldn't have anything to do with it at all?

2    A    Not a thing to do with it.

3              MR. HUNT, SR.:  Okay.  Thank you.

4              THE COURT:  Thank you, Mr. Watkins.  If you would call

5    the code-a-phone each afternoon, then you can find out that way

6    when and if you need to come back.  Thank you, sir.

7              PROSPECTIVE JUROR WATKINS:  The code-a-phone number

8    that was on that page?

9              THE COURT:  Yes, sir.

10             PROSPECTIVE JUROR WATKINS:  Thank you, sir.

11        (Mr. Watkins Excused.)

12             THE COURT:  Does anyone not desire to challenge Mr.

13   Watkins?

14             MR. FRAZIER:  I want to see if they want to go first,

15   Your Honor.

16             MR. GOAINS:  Your Honor, if it please the Court, we

17   would challenge this juror for cause.  Your Honor asked him

18   twice whether he would lean toward answering the questions in

19   the penalty phase that would allow the death penalty, and I

20   believe his answer, Your Honor, would prevent or substantially

21   impair his performance, his duty as a juror, under Adams vs.

22   Texas, Fifth Circuit.

23             THE COURT:  Challenge granted.

24             Let's break for lunch until 1:15, counsel.

25        (Recess 11:50 a.m.)

101

<u>MAY 15, 2000 - AFTERNOON PROCEEDINGS</u>

    (Reconvened at 1:15 p.m.)

    THE COURT:  Does the Government have any areas of inquiry for Mrs. Anita Klotz, I assume it is?

    MR. FRAZIER:  Your Honor, 60.

    THE COURT:  60?  What about 60?

    MR. FRAZIER:  She answers the question, "Yes."  Oh, wait a minute.  No, never mind, Judge.  I'm sorry, we -- I was thinking she said, "No," and was giving an inconsistent answer, I'm sorry.  Nothing.

    THE COURT:  Any areas of inquiry for Mrs. Klotz?

    MR. SCHWIEGER:  Yes, Your Honor.

    THE COURT:  Okay.

    MR. SCHWIEGER:  Her employment and her husband's employment with the Department of Criminal Justice.  Her child being employed with the Department of Public Safety.

    MR. GOAINS:  That's 102 and 104, Your Honor.

    MR. SCHWIEGER:  Question 53, the purposes that it serves to relieve cost to citizens, speaking about the death penalty.

    Question 55 answer, "Death penalty should be available in certain murder cases."  We would ask what certain murder cases she's talking about.

    Question 69, it shows that she regularly reads the Temple Daily Telegram.

102

1           Going to page 24, sub (g), "Police officers must be

2     obeyed without question."

3           THE COURT:  What about it?

4           MR. SCHWIEGER:  Well, I would have a question as to

5     whether she would tend to believe a police officer's testimony

6     more at that point.  Nothing further, Your Honor.

7           THE COURT:  Okay.

8           MR. HUNT, SR.:  Your Honor, we would just have one

9     area of questioning, and that is on page 23.  She gave two

10    answers that may be inconsistent.  On question (f), she slightly

11    agrees with the proposition that any person who commits murder

12    should pay with his own life.  But then on question (n), it says

13    that, "Execution of criminals is a disgrace to civilized

14    society."  I'm just wondering if there really is a conflict

15    there, or just appears to be.

16          THE COURT:  Okay.  Ready then for Anita Klotz.

17          <u>ANITA KLOTZ, PROSPECTIVE JUROR, SWORN</u>

18                  <u>VOIR DIRE EXAMINATION</u>

19    BY THE COURT:

20    Q    Good afternoon.  Is it Klotz?

21    A    Klotz.

22    Q    Mrs. Klotz, I've got a few questions to ask you about your

23    questionnaire, or about matters that you have revealed to us.

24    First of all, you and your husband have both, in the past,

25    worked for the Texas Department of Criminal Justice.  Is that

1  correct?

2  A    That's right.

3  Q    What type of work did you do?

4  A    I worked in the medical department at the Texas Department

5  of Corrections.

6  Q    At one of the units in Gatesville?

7  A    The Gatesville unit in Gatesville.

8  Q    The Gatesville unit.  Which one is that?

9  A    That's like the diagnostic unit where they come in from the

10 county.

11 Q    And what type of work did your husband do?

12 A    He was an EMS supervisor.

13 Q    Okay.  And he retired about five years ago?

14 A    Yes.

15 Q    Do you think that the fact that you and he have both worked

16 in that capacity, would it in any way affect your ability to be

17 an appropriate juror in a case such as this?

18 A    Well, after you've worked there in a prison for awhile, you

19 kind of have a feeling, you know.  You know a little bit more

20 about what the system is like and what the people are like.

21 Q    That's exactly what prompts the question.  And I would

22 assume it would also be true that because of that, you develop

23 certain attitudes that other people might not have?

24 A    That's right.  You do.

25 Q    Do you think that would tend to influence the way you would

ANITA KLOTZ - VOIR DIRE (BY THE COURT)                104

1   look at the evidence in a case like this a little bit?

2   A    I think it would a little bit, yes.

3          THE COURT:  I think it would probably be better if I

4   excused you, Mrs. Klotz.  Thank you, ma'am.

5          MRS. KLOTZ:  Okay.  Thank you.

6          THE COURT:  Any objection?

7          MR. GOAINS:  No, Your Honor.

8       (Mrs. Klotz Excused.)

9          THE COURT:  The next one we're going to do is out of

10  order.  It's Mrs. Tolbert, the lady who had to be somewhere

11  tomorrow morning.

12         MR. FRAZIER:  Question number 51, Your Honor, "Do any

13  moral, religious, or personal beliefs prohibit you from sitting

14  in judgment?"  She states she would prefer not to have to sit in

15  judgment of another human being.  I just wanted to see how

16  strong that feeling was.  Other than that, we have no further

17  questions.

18         MR. GOAINS:  Yes, Your Honor.  Also on question 133,

19  asked, "Do you want to serve?"  She said, "No."  And that she

20  has a problem, Your Honor, looking at pictures, and becomes very

21  upset when she watches violent movies.

22         THE COURT:  133?

23         MR. GOAINS:  Oh, I'm on the wrong one, Your Honor.

24  I'm sorry.

25         THE COURT:  I thought so.

1    MR. GOAINS:  Still on 133, Your Honor, she states that

2  her mind and efforts are, "With my --

3    THE COURT:  "Mom."

4    MR. GOAINS:  -- who needs physical care."

5    THE COURT:  Okay.

6    MR. HUNT, JR.:  Your Honor, we would have basically

7  the same questions.  In addition to that, on page 21, I can't

8  tell if she answered and erased question number 127, or,

9  otherwise, I just can't read number 127.  Down here on another

10  question, "Niece's wedding June 2 through 5."  We would like to

11  ask what effect that would have.

12    THE COURT:  Mrs. Tolbert.

13    <u>KATHERINE TOLBERT, PROSPECTIVE JUROR, SWORN</u>

14    <u>VOIR DIRE EXAMINATION</u>

15  BY THE COURT:

16  Q    Good afternoon, Mrs. Tolbert.

17  A    Good afternoon.

18  Q    I've got a couple of things I want to ask you about your

19  questionnaire.  To the question as to whether or not you have any

20  moral, religious, or personal beliefs that would prevent you from

21  sitting in judgment of another human being, you said, "I would

22  prefer not to have to sit in judgment of another human being,"

23  which is perfectly understandable.  But what I need to know is, do

24  you think that would affect your ability to do it, if you were

25  selected as a juror and it became your duty to do that?

KATHERINE TOLBERT - VOIR DIRE (BY THE COURT)          106

1    A    Yes, I could do it.

2    Q    Okay.  Now, the other thing of concern, you said you would

3    not want to serve because your mind and efforts are with your mom,

4    who needs physical care.  I understand that you have to take her

5    to the doctor tomorrow and Wednesday?

6    A    And Wednesday, yes.

7    Q    Is that something that you think would prevent you from

8    paying attention and listening to the evidence?  What exactly is

9    your mother's condition, if I could inquire?

10   A    She has terminal cancer, and the week I received the

11   questionnaire about this, the doctor made the decision that she

12   would need to be in the Hospice Care.  She is deteriorating very

13   rapidly, and my concern even now is greater than when I filled

14   that out that there may be a death.

15   Q    Okay.  And you also indicated that June 2nd to the 5th, your

16   niece is getting married?

17   A    Yes.

18   Q    Where is that?

19   A    She's in Denver.  But, of course, all of that is conditional

20   on my mom's condition.

21   Q    But if you're able to, that's something you certainly want to

22   attend, or plan to attend?

23   A    I would like to very much.

24        THE COURT:  Okay.  I think with those things combined,

25   it would probably be reasonable to excuse Mrs. Tolbert, if nobody

KATHERINE TOLBERT - VOIR DIRE (BY THE COURT)          107

1    has any objection.

2              MR. GOAINS:  No object, Your Honor.

3              MR. HUNT, JR.:  We have no objection.

4              MR. FRAZIER:  No, sir.

5              THE COURT:  Thank you, ma'am, very much.  We appreciate

6    you being here.

7          (Mrs. Tolbert Excused.)

8              THE COURT:  All right.  The next one is Number 3, Linda

9    Peters.  Area of inquiry for Mrs. Peters?  I want to find out what

10   lawyer she worked for.

11             MR. FRAZIER:  No, sir, Your Honor.  I don't have

12   anything.

13             THE COURT:  Mr. Goains?

14             MR. GOAINS:  If it please the Court, this is one we

15   objected to.  In paragraph 132, she states she already has an

16   opinion.  This is the one I misspoke on, Your Honor.  And 133, she

17   said she didn't want to look at pictures or details of a murder.

18   She doesn't watch violent movies.  Our main concern, Your Honor,

19   she has already formed an opinion in this case.  Also, 115 and

20   116, Your Honor.

21             THE COURT:  Okay.

22             MR. HUNT, SR.:  Your Honor, our concern would be page 20,

23   question number 122, the amount of pretrial publicity that has

24   contaminated her, because she seems to know a large amount of the

25   facts.  And we would join in the Vialva objections.

LINDA PETERS, PROSPECTIVE JUROR, SWORN

VOIR DIRE EXAMINATION

BY THE COURT:

Q    Good afternoon, Mrs. Peters.

A    Good afternoon.

Q    Let me ask you first, you indicated that another type of job you've had in the past is as a legal secretary?

A    Yes.

Q    Was that in this area?

A    Yes.  I worked for Naman-Howell.  At the time, it was Naman, Howell, Smith & Chase.  It's since changed its name.

Q    Okay.  Did you work for any particular lawyer or lawyers there?

A    J. Rodney Lee.  And different ones, but he was the longest.

Q    I guess you're aware he's very ill?

A    Yes.

Q    You were asked if you believe that most people charged with having committed a crime are actually guilty of that crime, and you indicated, "Probably."  Would that feeling affect your ability to make a decision based on the evidence, or do you feel that you would have difficulty in affording someone the presumption of innocence?

A    No, I don't think I would have that trouble.

Q    Okay.  You also indicated that you have obtained some information about the facts of the case from news reports.

LINDA PETERS - VOIR DIRE (BY THE COURT)                    109

1    Would that be television, or newspapers, or do you remember?

2    A    Mainly print, probably.

3    Q    Newspapers?

4    A    I have read a good deal on it.

5    Q    The Waco newspaper?

6    A    Uh-huh.  Yes.

7    Q    Do you have any difficulty with the proposition that you

8    simply, as a juror, must make a decision based on the evidence

9    presented in the courtroom and not what might have been in the

10   paper?

11   A    As much as humanly possible, I think I could.

12   Q    Okay.  You also indicated that you had formed an opinion in

13   the case, but then, in explanation, you said that it was

14   particularly upsetting due to the ages of the victims and their

15   Christianity.  What opinion have you formed before today, Mrs.

16   Peters?

17   A    Well, from reading what I did, it seemed that it was just a

18   young, sweet, Christian couple that were -- when they got asked

19   for a ride, that they agreed to take this stranger.  I think

20   they were being a little naive in trying to be Christian when

21   they did it, and it turned out very badly for them.

22   Q    But you haven't, at this point, formed an opinion about

23   whether these two individuals are guilty of that offense, have

24   you?

25   A    I don't know.  I just -- from reading in the paper, the

LINDA PETERS - VOIR DIRE (BY THE COURT)                110

1  circumstances of the case seemed rather tragic.

2  Q    I can understand that.  But, again, you understand that if

3  that's proven beyond a reasonable doubt, then, as a juror, there

4  would be nothing wrong with your having that opinion.  But

5  before the trial starts, you are required to set that aside and

6  kind of start with a blank mind, as it were, and see what

7  evidence is presented during the trial.

8  A    Right.

9  Q    Do you feel like you can do that?

10 A    The circumstances, I know about.  The people involved, I

11 don't know about.

12 Q    Well, you know what you've read --

13 A    Right.

14 Q    -- but you haven't heard any evidence yet.

15 A    Right.

16 Q    So, can you make a decision based on the evidence that's

17 going to be presented in the courtroom without being affected by

18 what you've read in the past?

19 A    I really don't know.

20 Q    It's hard for anybody to know, I suppose, because until you

21 sit through a trial and you hear the evidence, you don't really

22 have anything to compare with what you might have heard before.

23 A    Right.

24 Q    But if you hear testimony that you accept as being accurate

25 and believable and that's different from what you may have read,

LINDA PETERS - VOIR DIRE (BY THE COURT)    111

1    would you have any difficulty in accepting what you heard in the

2    courtroom rather than what you read previously?

3    A    Oh, no.  Oh, no.  I've had enough personal knowledge of

4    things that are in the newspaper that they're not always right

5    anyway.

6    Q    Okay.

7         THE COURT:  Thank you, Mrs. Peters.  Let me see --

8    just a second.  I believe that's all I have.

9         LINDA PETERS - VOIR DIRE EXAMINATION

10   BY MR. FROST:

11   Q    Good afternoon, ma'am.  My name is Scott Frost, and I

12   represent the United States.  Ma'am, I just have a couple of

13   questions.  You talked about the fact of the victims being young

14   folks and them being involved in this and this being a tragedy.

15   I want to ask you a little bit about the defendants in this

16   case, or at least the age of the defendants.  One is nineteen,

17   and one was eighteen at the time of these acts that the

18   Government has alleged had occurred.  How does that make you

19   feel, the age of those individuals?

20   A    That doesn't -- to me, doesn't enter into it.

21   Q    Okay.  So, you would just judge them as you would other

22   individuals?

23   A    Right.

24   Q    Now, one of the things that you -- if the Government proves

25   its case beyond a reasonable doubt on findings and there are

LINDA PETERS - VOIR DIRE (BY MR. FROST)                112

1    convictions on certain charges, you may be required or a jury

2    may be required to determine the appropriate sentence in this

3    case.   One of the things that is a mitigating factor -- what

4    that means is something that you could consider to maybe not

5    impose the death penalty is the age of the defendants.   Would

6    you be able to consider that factor in coming up with an

7    appropriate sentence?

8    A    Oh, yeah.

9    Q    Okay.  Now, the other thing I wanted to talk to you about

10   was, there's a possibility, besides the death sentence in this

11   case, that another possible sentence would be life without the

12   possibility of release.  Would you favor something like that

13   over the death sentence?

14   A    I think it would be according to what was proved.

15   Q    Okay.  So, it would depend on what the Government proved to

16   you and the facts?

17   A    Right.

18   Q    Okay.  Would you have any problem, if the Government proves

19   its case, proves the aggravating factors, would you have a

20   problem with imposing the death sentence in the appropriate

21   case?

22   A    No.

23   Q    Now, in regards to both the facts of whether these

24   individuals did it or not, and also in regards to sentencing,

25   would you require the Government to prove one hundred percent

LINDA PETERS - VOIR DIRE (BY MR. FROST)                113

1   that these are the individuals that did that?  And I see a look

2   in your eye that shows that I didn't ask the question very well.

3   So, let me rephrase it.  The Judge talked to you earlier about

4   beyond a reasonable doubt.

5   A    Right.

6   Q    And he told you that the Government doesn't have to prove

7   to an absolute moral certainty that that's what occurred, but if

8   you had a reasonable doubt as to the fact that these individuals

9   did this, that you would then have to find them not guilty.  Do

10  you remember that?

11  A    Yes.

12  Q    Okay.  What I'm asking you is, would you require the

13  Government, in this particular case, because it's potentially a

14  death penalty case, would you require us to prove more than what

15  would normally be proved in a normal case, beyond a reasonable

16  doubt?

17  A    I think reasonable doubt is enough.

18  Q    Okay.  Thank you.  The other thing, ma'am, I wanted to talk

19  to you a little bit about is, in this particular case, we

20  anticipate that there were some other individuals that were

21  involved, according to the Government.  These individuals are

22  juveniles who may testify in this case, and these individuals

23  were actually involved in parts of this crime.  Those

24  individuals, will you be able to judge them based on their

25  testimony, or the fact that maybe because they were involved,

LINDA PETERS - VOIR DIRE (BY MR. FROST)                    114

1    would you discount them outright because they were involved?

2    A    I don't think they could be discounted.

3    Q    Okay.  Well, what do you think about a person who is

4    involved in a crime and agrees to testify against somebody else

5    who might be involved?

6    A    Well, maybe they have a little conscience.

7    Q    Okay.  Do you have a problem with the fact that maybe the

8    Government might have had to cut those individuals a deal?

9    A    That's not my problem.

10   Q    Okay.  So, you would judge them based on what they testify

11   to?

12   A    I would hope so.

13            MR. FROST:  Okay.  Thank you, ma'am.

14            LINDA PETERS - VOIR DIRE EXAMINATION

15   BY MR. SCHWIEGER:

16   Q    Good afternoon, ma'am.  My name is "Stan" Schwieger.  I

17   represent Mr. "Chris" Vialva.  I'm going to ask you a few

18   questions off the questionnaire.  I don't mean to pry, but there

19   are some things that raised some flags with me, and I'd like for

20   you to clarify them, if you would, please.

21   A    Okay.

22   Q    Knowing what you have read in the media, and your

23   involvement in the church as a woman's ministry -- is that

24   correct?  Would you describe exactly what you do in a woman's

25   ministry?

LINDA PETERS - VOIR DIRE (BY MR. SCHWIEGER)                115

1   A    Oh, it's very informal.

2   Q    Okay.

3   A    I have a title, but basically I just do the things that --

4   since I'm retired, I get women's dinners togethers once a month.

5   I help coordinate who takes food to someone's house, if they're

6   ill.  It's just something that a lot of church people do, and I

7   just happen to be coordinating it.

8   Q    Now, you mentioned that the fact that you've seen in the

9   media that these folks were Christians distresses you some, at

10  some great level.  Is that great?

11  A    To some extent, yes.

12  Q    Okay.

13  A    I can see -- to me -- well, yes.

14  Q    Well, go ahead and explain.

15  A    Well, I was just going to say that I think that,

16  personally, if a stranger came up to me in a town at a 7-11 and

17  asked me for a ride, I, being a Christian, I would say no, but

18  I've lived long enough to know that you don't do that sort of

19  thing.  And I think there were two factors involved with this

20  young couple agreeing to that.  One, they were trying to be

21  Christian.  And, two, they were young and naive.

22  Q    Okay.  You also noted that you are taking allergy

23  medication.  I know that sometimes makes me drowsy.  Is that

24  something that happens to you?

25  A    No.  It's Claritin D.  It doesn't make you drowsy.  In

LINDA PETERS - VOIR DIRE (BY MR. SCHWIEGER)          116

1    fact, it will keep you up, if you don't take it early enough.

2    Q    Let me back up and explain a couple of things that you may

3    need to understand about the way the death penalty would work in

4    this case, if there would be a conviction.  First of all, we

5    have to pass through a hurdle or a gate, which is basically the

6    intent factors, and specifying that you would find one of those,

7    then we would go to the aggravating and mitigating

8    circumstances.  One of the aggravating circumstances that may be

9    applicable in this case would be a multiple murder.

10   Potentially, that's what the Government has stated that they

11   would plead as an aggravating factor in this matter.  You

12   indicated on your questionnaire under question 55 that the death

13   penalty should be available for multiple murders.  My question

14   to you is, is that an automatic finding?

15   A    Oh, no.  I don't think there should ever be an automatic

16   death penalty.  It's according to the circumstances.

17   Q    Okay.  So, in your instance, in a hypothetical case, if one

18   would prove a multiple murder case, that's not an automatic

19   finding that you would make?

20   A    No.

21   Q    You would be able to weigh the mitigating factors?

22   A    No.  The death penalty is never automatic, in my mind.

23   Q    You understand, ma'am -- well, let me back up.  On question

24   91, you indicated that you believe the greater wrong would be

25   for the jury to find a guilty person not guilty.  Why do you

LINDA PETERS - VOIR DIRE (BY MR. SCHWIEGER)          117

1  feel like that?

2  A    I had a lot of problem with that, and I really don't know

3  if that was the correct answer, but I wasn't allowed to leave it

4  blank.  It would be tragic if someone was innocent and went to

5  jail.  But the reason I finally went that way is because if

6  someone is capable of doing an horrendous crime, and you let

7  them go, then that means that you or your family members could

8  be a potential victim.

9  Q    Okay.  Now, I heard a snippet, and I may not have caught

10  the entire jest of the conversation that you were having with

11  the Government, concerning that age does not enter into it.

12  Now, I'm not quite sure exactly the context of what the question

13  was asked.  Could you specify exactly what you mean by that?

14  A    Well, he was asking me if the age of the defendants would

15  bother me, if we found them guilty, and then we had to sentence

16  them to death, and I said no.

17  Q    Okay.  As a potential mitigating factor, it may be possible

18  that the Court could instruct you that you may be able to

19  consider that as a mitigating factor.  Would you automatically

20  rule out age as a mitigating factor?

21  A    I would hope I could take the direction of the Court.

22  Q    Okay.  But understanding that you have to follow the law --

23  I mean, what's your gut feeling on that?  Could you consider it

24  as a mitigating factor?

25  A    Truthfully, I don't think so.

1  Q    Okay.  If, again, for instance, there was some evidence of

2  psychological importance, and whatever that evidence may be in

3  this case, it may be a mitigating factor.  Would you

4  automatically rule out any evidence of psychological -- or like,

5  let's say, for instance, brain damage, or anything like that?

6  Would you automatically rule that out as a mitigating factor?

7  A    No.

8          MR. SCHWIEGER:  Okay.  No further questions.

9          LINDA PETERS - VOIR DIRE EXAMINATION

10  BY MR. HUNT, SR.:

11  Q    Mrs. Peters, we were introduced a little bit ago.  I'm

12  "Russ" Hunt, Sr.  Of course, I have my son, "Russ" Hunt, Jr.,

13  with me.  We both represent Brandon Bernard.

14          MR. HUNT, SR.:  Brandon, stand up, please.  Go ahead

15  and sit down.

16  BY MR. HUNT, SR.:

17  Q    The reason that I'm reintroducing ourselves is because I

18  think it's real important in a multiple-defendant case to be

19  able -- for all the jurors to be able to kind of put all the

20  things together that they have to balance.  The reason I say

21  that is because, if selected as a juror in this case, you're not

22  just going to have to keep track of whether they are guilty or

23  innocent, but instead, it boils down to each individual.  And

24  that's a concern of mine, especially because we're going number

25  two, we're kind of cleanup.  That means that the Government gets

1  to go first, Mr. Vialva's attorneys get to go second, and we go

2  third.  So, my concern is always that the jurors are going to

3  get the evidence confused instead of keeping track of the

4  specific evidence for each of the defendants.  Do you understand

5  where I'm coming from?

6  A    Yes.

7  Q.    And in relation to you and the questions that you filled

8  out in your questionnaire, one of my concerns also is that on

9  your questionnaire, you indicated that you really don't look

10  forward to the idea that you're going to have to hear gory facts

11  and also see gory pictures.

12  A    That's right.

13  Q    A concern of mine always is that I'll get into a trial and

14  the Government or the State goes into gory pictures, and all of

15  a sudden, I see that we've lost two or three of the jurors.

16  They're just not paying anymore attention after that, because

17  they're so grossed out by the facts, and then, for them, the

18  facts get blurred.  Do you understand my concern?

19  A    Yes.  And I could understand the jurors.

20  Q    Certainly.  And that's really what my question, I think, to

21  you is, and that is, understanding that what Judge Smith said

22  when we started out is, that there are some people on the panel

23  that would be great jurors for some cases, but not all cases.

24  This is a case that we're telling you right up front there's

25  going to be gory pictures and there are going to be god-awful

LINDA PETERS - VOIR DIRE (BY MR. HUNT, SR.)    120

1    facts.  Okay?  So, my question is, are you going to be able to

2    say affirmatively to us, "I'll listen to all the facts, no

3    matter of that, and that won't have an affect on my ability to

4    weigh all of the facts?"  That's my real concern.  You might be

5    a great drug juror, but this isn't a drug case.

6    A    Quite truthfully, it's a real concern of mine.  I don't

7    even know if I could look at them.  If they were really gory

8    pictures, I don't -- I think I told you, I don't even watch R-

9    rated movies.

10    Q    Yes, ma'am.

11    Q    If I do, I turn my head.  I don't like to see that stuff.

12    And knowing it was a real person, I really don't know if I

13    could.

14    Q    Okay.  Good.  And that's an honest response, and that's

15    exactly what you put in your thing.  Our concern then is, with

16    the understanding that you might not be the idea juror for this

17    case, we need an answer.  Are you going to be able to say, "Hey,

18    I know that I can continue to weigh all of the evidence, in

19    spite of the fact I know I'm going to have to look at gory,

20    bloody pictures and hear some awful things?"

21    A    Truthfully, I don't think I could.

22    Q    Okay.  Let me tie that into one other area, and that is,

23    that we started out -- or Judge Smith started out with the

24    presumption of innocence.  The difficulty I think that almost

25    any juror has or panelist has that has listened to the facts and

1    read the facts in the newspaper, the alleged facts, is that's

2    going to have a real profound effect on whether or not they can

3    follow the Court's instruction relative to the presumption of

4    innocence, and that is, the Judge says in order to be a

5    qualified juror on this panel, on the jury, you have to be able

6    to say truthfully, "I will afford them the presumption of

7    innocence." In other words, "I will take that stand and I will

8    say I'm going to presume them innocent, no matter what I heard."

9    And, quite frankly, I'm concerned about that, because you know

10   alleged facts. Are you going to be able to do that in this

11   case?

12   A    I've always prided myself on being open-minded. That's

13   being very open-minded.

14   Q    Yes, ma'am. Again, it goes back to whether or not this is

15   the kind of case that you ought to sit on. I'm not saying

16   you're not a good juror for some other case, but my concern is

17   that. Okay?

18   A    I've thought about that, too. It's a concern of mine.

19   Q    Yes, ma'am. So, my concern is, then, what your answer is.

20   Are you saying --

21   A    I -- truthfully, I would try. I would try.

22   Q    But you're saying, "I would try, but I'm not telling you

23   that I know that I can do that." Is that a fair statement of

24   what you're saying?

25   A    That's hard to admit, but that's probably true.

LINDA PETERS - VOIR DIRE (BY MR. HUNT, SR.)                    122

1          MR. HUNT, SR.:  All right.  Thank you.

2          THE COURT:  Thank you, ma'am.  Thank you, Mrs. Peters.

3    You may go.  Wait outside just a moment, would you, please,

4    ma'am.

5          (Mrs. Peters Excused.)

6          MR. FRAZIER:  Judge, I want the brief opportunity to

7    at least try to rehabilitate her, because her statements really

8    only change into the form of the question.  I think that if she

9    were asked questions regarding -- obviously, there are going to

10   be gory photographs and there are going to be very bad facts,

11   but what does that have to do with deciding the guilt or

12   innocence of the person?  Can that be separated?  And I

13   understand where Mr. Hunt is coming from, but I don't think

14   that's been separated in any way yet, and I think that we ought

15   to at least have a chance to rehabilitate her on that.

16         MR. HUNT, SR.:  Your Honor, if I could address that.

17   I think that there's three areas I have concern for.  First, she

18   said, "I can't look at those gory pictures.  If I have to look

19   at the gory pictures, then I'm not going to start considering

20   facts after that."  That's my first concern.  My second concern

21   is presumption of innocence.  Obviously, this lady is a great

22   lady.  She is struggling with that.  But she cannot clearly say,

23   "I can afford the defendants the presumption of innocence.  And

24   then the final thing is a concern about whether or not age is a

25   mitigating factor.

123

MR. SCHWIEGER:  Your Honor, the Supreme Court in Erwin vs. Dowd says self-serving statements of impartiality must often be given little weight.  I think in this instance, Your Honor, the demeanor of the witness spoke louder than the words she was saying.  She was struggling with trying to be fair, but I believe that basically her demeanor indicated that despite her wanting to be fair, the potential of gory pictures and the other evidence in this case, her identification with the witnesses, would lead us to -- that she could not, in fact, grant presumption of innocence.

MR. FRAZIER:  Judge, perhaps this is an area that you need to voir dire the juror further on.  But I think, from her demeanor, that she would be a great juror in the case.  I think the problem here is that the way the question was phrased, she is unable to separate the fact that there are these things that any jurors -- that may shock the conscience of anybody who sits on the jury, may have a problem with.  It's whether they can consider the evidence in the manner in which it's intended to be used and consider the facts.  And I think further voir dire may help clear that up on all three of the areas, especially in the question regarding age as a mitigating factor, because as the Court knows, all that's required is the jury consider it.  A juror is not required to pre-commit beforehand what the juror would or would not do in a particular case.

THE COURT:  The challenge will be granted.

124

1          Okay.  Number 173, Georgia Hall.

2          MR. FROST:  Your Honor, we would ask that the Court

3    inquire as to question 52.  The juror indicated, "May give the

4    death penalty for a cold-blooded murder if proven beyond a

5    shadow of a doubt."

6          THE COURT:  Okay.

7          MR. FROST:  And that kind of relates to 54(c), too.

8    In regards to 58, the juror indicated that they believe the

9    death penalty has been applied in a racially discriminatory

10   manner.  I would just like to know what the basis for that would

11   be.  And in regards to 60, the juror indicated that if the

12   sentence of life without possibility of release is an option,

13   they could not return a death verdict.  I believe that's it.

14         COURT REPORTER:  I'm still having a little trouble

15   hearing you guys when you get your head down and have paper

16   rustling.

17         THE COURT:  Any other areas?

18         MR. GOAINS:  Your Honor, the only area that we might

19   request would be paragraph 122, where she states that she has

20   had some media coverage, and number 95, Your Honor.

21         MR. HUNT, JR.:  On page 9, paragraph 43, she also is

22   taking a number of different medications.  Specifically, I would

23   wonder if the allergy medication she's taking would make her

24   drowsy.

25         THE COURT:  Believe it or not, I take Allegro, too.

LASER BOND FORM A    ®    PENGAD · 1-800-631-6989

1      MR. HUNT, JR.:  And on page 21, paragraph 130, Judge,

2    she indicates there are several things that I think she's saying

3    she's going to do on Memorial Day week.  So, I don't know if

4    she's made plans to be out of town during that week.  It looks

5    like she was planning on going to Kansas for that week.

6          THE COURT:  When is Memorial Day?

7          MR. HUNT, JR.:  The 29th.

8          THE COURT:  Okay.

9          <u>GEORGIA HALL, PROSPECTIVE JUROR, SWORN</u>

10              <u>VOIR DIRE EXAMINATION</u>

11   BY THE COURT:

12   Q    Good afternoon, Mrs. Hall.  How are you?

13   A    Fine.  Thank you.

14   Q    Mrs. Hall, there are a few areas of your questionnaire that

15   I would like to clarify some things on.  First of all, you list

16   some medications that you take?

17   A    Yes.

18   Q    Do any of those tend to make you drowsy in any way?

19   A    No.

20   Q    Okay.  I didn't think so.  You indicated in one of your

21   answers, it says, "Are you in favor of the death penalty as a

22   punishment for crime?"  And you didn't specifically answer, but

23   it says, "Please explain," and you said, "Cold-blooded murder,

24   if proven guilty beyond a shadow of a doubt."

25   A    Uh-huh.

1    Q    Do you understand that that's not the burden the Government

2    has, that it's beyond a reasonable doubt rather than a shadow of

3    a doubt?

4    A    After this morning, I do, yes.

5    Q    Okay.  Do you think you would have any trouble in holding

6    the Government to that burden of beyond a reasonable doubt?

7    A    No.

8    Q    Thank you, ma'am.  You indicated that you do believe that

9    the death penalty is now being or has in the past been applied

10   in a racially discriminatory manner.  Can you explain to me what

11   you base that on and whether you mean now, or in the past, or

12   both?

13   A    I think in the past more than it is now.

14   Q    Okay.  Anything in particular you base that on, something

15   you've read, or just your own experience?

16   A    No.  Just from watching the news media, and this type of

17   thing.

18   Q    Okay.  In another answer, the question was, "If a sentence

19   of life without the possibility of release is an option, could

20   you nevertheless return a verdict that would result in the death

21   penalty," and you said, "No."  Can you explain that to me?

22   A    Sometimes I feel like being locked up for the rest of your

23   life, having to think and meditate on what you've done, could be

24   more of a punishment than the death penalty.

25   Q    Whenever a person is found guilty of a capital offense,

GEORGIA HALL - VOIR DIRE (BY THE COURT)                    127

1    then that is what the jury is required to do.  The only options

2    are life without possibility of release, or death.  In making

3    that determination, the jury first has to determine that the

4    requisite intent was present, and then the jury is required to

5    consider certain aggravating factors, such as, in this case,

6    more than one person died, the particularly vile nature of a

7    crime can be considered an aggravating factor.  The jury is also

8    required to consider mitigating factors, such as the age of a

9    defendant can be a mitigating factor, social history, brain

10   damage in the past, and things of that nature, are things the

11   jury can consider, and the then jury must determine whether or

12   not it wants to recommend the death penalty, or life without the

13   possibility of release.  What I need to know from you is simply

14   this.  Would you be able to consider all of the options the jury

15   has, if a person is found guilty and you are considering

16   punishment?

17   A     I believe I could.

18   Q     All right.  Thank you, ma'am.  You indicated that you, your

19   spouse, or a family member, or a close friend, had been the

20   victim of a crime or witness to a crime or had been especially

21   interested in the outcome of a criminal case, and you referred

22   to the Luby's massacre in Killeen.

23   A     I was one of the lucky survivors.

24   Q     You were in the place when that happened?

25   A     Yes.

GEORGIA HALL - VOIR DIRE (BY THE COURT)                128

1   Q    Do you think that would affect your ability to view and

2   judge the evidence in a case of this nature?

3   A    Maybe a few years ago, but I don't believe so now.

4   Q    Not now?  And you also indicated that you have learned some

5   facts about this case from media coverage.  Did you follow it

6   closely, or just you recall seeing it on television or reading

7   about it in the paper when it happened?

8   A    I heard about it right after it happened, and, no, I have

9   not followed it closely.

10  Q    Okay.  And you understand, of course, that the jury must

11  make a decision based on what they hear in the courtroom and not

12  what they might have read or heard somewhere else?

13  A    Yes, sir.

14  Q    If, during the trial, you hear evidence that you accept as

15  credible and accurate that differs from something you may have

16  read in the past, do you understand you would be bound to accept

17  what you hear in the courtroom and not to consider or rely on

18  what you heard before or read in the paper before?

19  A    Yes, sir.

20  Q    That makes sense to you?

21  A    Yes.

22  Q    Lastly, you indicated that you -- when asked about plans

23  from May 15th to June 15th, you said -- well, just tell me, what

24  are your plans for that week?

25  A    I'd like to go out to western Kansas for that week.  My son

GEORGIA HALL - VOIR DIRE (BY THE COURT)          129

1   is buried there, as well as my mother, and we usually try to

2   spend that week with our grandsons.

3   Q    And when would you be leaving?

4   A    Right now, our plans are to leave around the 24th and come

5   back the 29th.

6   Q    The 24th of May to the 29th?

7   A    Yes.

8   Q    That would be a clear conflict with our schedule, I feel

9   almost certain, would it not?

10           MR. FRAZIER:  I think so.

11           MR. SCHWIEGER:  That would be fine, Your Honor.

12           THE COURT:  Okay.  I don't want you to have to miss

13   that trip, Mrs. Hall.  So, I'll excuse you so you can do that.

14           MRS. HALL:  I appreciate that.

15           THE COURT:  Thank you, ma'am.

16      (Mrs. Hall Excused.)

17           THE COURT:  Next is Number 9, Linda Hutchins.

18           MR. FROST:  Your Honor, we have a question on question

19   52 on the burden of proof.  And question number 43, Your Honor,

20   likewise, it's medication, and I don't know anything about

21   medication.  I'd like that clarified.

22           COURT REPORTER:  I'm sorry.  I cannot hear you all

23   over there.

24           MR. FROST:  I'm sorry.  Question number 43 regarding

25   medication.  I know nothing about that medication.

130

1    THE COURT:  Any other matters?

2    MR. SCHWIEGER:  Your Honor, once again, we have a

3 person who works for the Texas Department of Criminal Justice.

4 That would be question number 8.

5    THE COURT:  Apparently, that was for eighteen months

6 thirteen years ago.  I'll ask about it.

7    MR. SCHWIEGER:  Jumping ahead to question 55, the

8 panel member stated that they believe the death penalty should

9 be available for robbery, including weapons, and if someone dies

10 during a robbery.  I would again like to inquire if that's an

11 automatic thing that they would find.

12    THE COURT:  Okay.

13    MR. SCHWIEGER:  Next, number 60 is just an odd answer

14 to the question.  I think it was misunderstood and needs

15 clarification.  Question 115, stating that she believes that

16 those persons charged with that crime are guilty.

17    THE COURT:  What would you want me to ask her about

18 that?

19    MR. SCHWIEGER:  What's that?

20    THE COURT:  What do you want me to ask her about that?

21    MR. SCHWIEGER:  Well, basically, if she can -- I mean,

22 if she feels like that's true in this case, if -- you know, just

23 some general questions surrounding that feeling.  I've nothing

24 further, Your Honor.

25    THE COURT:  Russell?

1    MR. HUNT, JR.: Your Honor, on page 11, question 56,

2    sandwiched in between the two that Mr. Schwieger had a question

3    about. She said she believes the death penalty should be used

4    more often. I was just wondering what circumstances and why she

5    has that opinion.

6    And then on page 15, question number 89, her

7    impression of prosecutors in general is, "Basically, we might

8    not like them or their job," and I was just wondering if she

9    could clarify what her opinion of prosecutors is.

10    MR. BLAGG: That might help us make a decision.

11    MR. HUNT, SR.: And then on page 23, subquestion (f),

12    I'm not exactly sure what she's saying. She's given a

13    relatively long explanation of whether any person should pay

14    with their life for murder, and I'm not exactly sure what she's

15    saying in her long explanation. She seems to be saying that a

16    person who is acting in self-defense shouldn't pay with their

17    life, but I wonder if that means that's the only time a person

18    could kill someone and shouldn't pay with their life. Those

19    would be all the areas we have, Your Honor.

20    THE COURT: Okay.

21    LINDA HUTCHINS, PROSPECTIVE JUROR, SWORN

22    VOIR DIRE EXAMINATION

23    BY THE COURT:

24    Q    Hi, Mrs. Hutchins. How are you?

25    A    Fine.

LINDA HUTCHINS - VOIR DIRE (BY THE COURT)                    132

1    Q    I've got a question or two I want to ask you.  Let's see,

2    you indicated that you worked for eighteen months for the Texas

3    Department of Criminal Justice?

4    A    Yes, sir.

5    Q    Was that thirteen years ago?

6    A    No, sir.

7    Q    No?

8    A    It was at the BOT.

9    Q    I'm sorry?

10   A    At the BOT building.  I was in Records and Classifications.

11   Q    And how long ago did you work there?

12   A    It will be a year in August.

13   Q    Okay.  And now you're working in home health care?

14   A    No.  I was before I went to work at TDC.  I'm not working

15   anywhere right now.

16   Q    Okay.  Do you think the fact that you have worked for the

17   Texas Department of Criminal Justice would have any effect on

18   your ability to set on a jury in this type of case?

19   A    No, sir.

20   Q    Okay.  You did say you worked in the records department?

21   Did I understand that right?

22   A    (Nodding head.)

23   Q    Okay.  You were asked about the medication you take.

24   Usually, I can tell whether that's the type of medication that

25   would make somebody drowsy, but I don't know what this is.

LINDA HUTCHINS - VOIR DIRE (BY THE COURT)                    133

1   A   Prilosec?  It's for ulcers.

2   Q   Okay.  It doesn't make you sleepy, or anything like that?

3   A   No.

4   Q   Okay.  In one of your answers, you were asked if you were

5   in favor of the death penalty as a punishment for crime, and you

6   said, "Yes."  And then you said, "If the person is found guilty

7   and the crime involves murder, then, yes, but only if there's no

8   doubt that person did the crime."  You heard me explain this

9   morning that the burden of proof the Government has in a

10  criminal case is beyond a reasonable doubt rather than beyond

11  any doubt.  So, do you feel you have any trouble in using that

12  burden of proof and holding the Government to that burden of

13  proof beyond a reasonable doubt?

14  A   No, sir.

15  Q   Do you think you could do that?

16  A   I think I could.

17  Q   Okay.  You were asked what crimes you think the death

18  penalty should be available, and you said murder of children,

19  old people, hate crimes, robbery involving weapons and someone

20  dying during a robbery.  Do you mean by that that in those types

21  of cases, you would think the death penalty would be an

22  automatic punishment, or merely a punishment that you could

23  consider, if it was that kind of crime?

24  A   That's hard --

25  Q   Let me explain to you the way it works.

LINDA HUTCHINS - VOIR DIRE (BY THE COURT)                134

1    A    I'm very nervous.

2    Q    Well, I don't want you to be that way.  Whenever a person

3    is found guilty of a capital offense, then the jury has,

4    effectively, two options, death, or a life sentence without

5    possibility of release.  What the jury does is, first, if they

6    find somebody guilty, then we have additional evidence,

7    additional argument, and the jury goes back to deliberate a

8    second time.  The jury first determines whether or not the

9    defendant being considered had the requisite intent, to intend

10   that someone die.  Then the jury is asked to consider certain

11   aggravating factors and certain mitigating factors, such as the

12   fact that more than one person died can be an aggravating

13   factor.  A person's social background can be a mitigating

14   factor.  All kind of things can be mitigating factors.  So, my

15   question is, I understand that there are just those limited

16   types of offenses where you think the death penalty should be

17   available, but do you mean by that that you would always vote

18   for the death penalty if, perhaps, as an example, in a case

19   where a child was murdered, or would that be the type of case

20   where you would be able to consider both options?

21   A    I would consider.

22   Q    Okay.  Thank you, ma'am.  You indicated you felt the death

23   penalty should be used more frequently as a punishment for

24   crime.  Is that based on any particular experience you've had,

25   or something you've read, or why do you feel that way?

LINDA HUTCHINS - VOIR DIRE (BY THE COURT)                135

1    A    No, sir.  It's not any experience that I've had.  It's just

2    that's just the way I believe.

3    Q    Just your opinion?

4    A    Yeah.

5    Q    Okay.  You were asked if a sentence of life without the

6    possibility of release was an option, could you, nevertheless,

7    return a verdict that would result in the death penalty, and you

8    said, "Yes, if it had to do with children."  Would that be the

9    only type of case, where a child was murdered, that you think

10   the death penalty should be returned, rather than life without

11   the possibility of release?

12   A    No, sir.

13   Q    Okay.  I'm not quite sure I understand your impression of

14   prosecutors, in general.  You said, "There are people who have

15   jobs to do.  We might not like it, but we have to live with

16   their ways and views."  Do you have any negative feelings about

17   prosecutors?

18   A    Negative feelings?

19   Q    Uh-huh.

20   A    No, sir.

21   Q    Okay.

22   A    They're doing their job.

23   Q    Okay.  That's what I thought you meant.  You were asked if

24   you believe that most people charged with having committed a

25   crime are actually guilty, and you said most were.  That doesn't

LINDA HUTCHINS - VOIR DIRE (BY THE COURT)                    136

1   mean, I take it, that you have formed an opinion in this case as

2   to whether or not these two individuals are guilty?

3   A    No, sir.

4   Q    And you will wait and hear the evidence and then make up

5   your mind after you've heard all the evidence, correct?

6   A    Yes, sir.

7   Q    All right.  Okay.  There was a page where you were to

8   indicate whether you agree or disagree or strongly agree, etc.,

9   with certain statements, and one was that, "Any person, man or

10  woman, young or old, who commits murder should pay with his own

11  life."  And you indicated you disagree, and then you said,

12  "Whatever the reason, I say no, in some cases, (rape, robbery,

13  someone protecting their families from bad things.)"  I'm not

14  sure I understand what you're telling us there.

15  A    I'm sorry.  I didn't --

16  Q    Okay.  You said that you disagree with the statement that

17  any person, man or woman, young or old, who commits murder

18  should pay with his own life.  And then you wrote in, "Whatever

19  the reason, I say no, in some cases, (rape, robbery, someone

20  protecting their families from bad things.)"  I'm just not sure

21  I understand what you mean by that.  Let me show you, so you'll

22  know what I'm talking about.

23  A    If it has to do with children -- if it has to do with

24  children or older people, that's when I feel that the death

25  penalty is --

LINDA HUTCHINS - VOIR DIRE (BY THE COURT)          137

1   Q    Appropriate?

2   A    -- appropriate.  Yes.

3           THE COURT:  Thank you, ma'am.  Mr. Blagg?

4           MR. BLAGG:  Thank you.

5           LINDA HUTCHINS - VOIR DIRE EXAMINATION

6   BY MR. BLAGG:

7   Q    Mrs. Hutchins, I think I have very few questions for you,

8   just a couple.  The Judge explained to you what the burden of

9   proof is, proof beyond a reasonable doubt.  That's the burden

10  that the Government has in this case, and has in every case

11  criminal in nature.  Do you agree to hold the Government to that

12  burden of proof?

13  A    Yes, sir.

14  Q    You wouldn't hold us to a higher burden, would you?

15  A    No, sir.

16  Q    Unless the Judge told you to?

17  A    No, sir.

18  Q    I mean, you'd be willing to follow the Judge's instructions

19  on the law, is what I'm getting at?

20  A    Yes, sir.

21  Q    Okay.  Secondly, let me ask you about credibility of the

22  witnesses.  You understand that that's the jury's

23  responsibility, the sole responsibility, to determine the

24  credibility of each and every witness that testifies, to believe

25  some, part, or none of what a witness says?  You understand

LINDA HUTCHINS - VOIR DIRE (BY MR. BLAGG)                    138

1   that?

2   A    Yes, sir.

3   Q    And you understand that there's all sorts of witnesses, law

4   enforcement officers, you could have a minister in a given case,

5   or you could have a criminal, and the jury has to judge that

6   credibility based on those folks, their backgrounds, and what

7   you know about the particular witness?

8   A    Yes, sir.

9   Q    I guess you could have a minister that would lie, and a

10  sinner that could tell the truth, under those circumstances?

11  A    Yes, sir.

12  Q    Do you have any objection, or do you think you could judge

13  the credibility of a person who had been convicted of a crime,

14  who had made a plea bargain agreement with the Government, and

15  who had come forward, taken the oath, and testified?  Do you

16  believe you could fairly judge the credibility of that witness?

17  A    I would surely try.

18  Q    Would you automatically disregard a witness because he has

19  a conviction or because he has a plea bargain agreement with the

20  Government, or would you listen to what he had to say before you

21  determine?

22  A    I would listen to what he had to say.

23  Q    Finally, the burden of proof, as I did say, is upon the

24  Government to prove certain elements of the offense, and if we

25  prove those elements and the jury so finds and the defendant is

LINDA HUTCHINS - VOIR DIRE (BY MR. BLAGG)

1  found guilty, then we would go to a punishment phase.  The Judge

2  explained to you just now that in the punishment phase, the jury

3  would be asked certain questions or asked to judge the evidence,

4  determine the mitigating factors, the aggravating factors.

5  Could you, as a juror, vote for the death penalty, if you

6  believed the Government had proved its case beyond a reasonable

7  doubt?

8  A     Yes, sir.  I could.

9          MR. BLAGG:  Thank you.

10  LINDA HUTCHINS - VOIR DIRE EXAMINATION

11  BY MR. GOAINS:

12  Q     Mrs. Hutchins, my name is Dwight Goains.  Along with Mr.

13  Schwieger, we represent Mr. Christopher Vialva.  Ma'am, I take

14  it that you can see by all these questions that we're trying to

15  find twelve people that can be totally fair and unbiased.

16  A     Yes, sir.

17  Q     Of course, we know that's difficult to do, but, first of

18  all, do you think you're that type of person that can set aside

19  their bias and prejudice and listen to this case on its merits

20  and then what the evidence is?

21  A     Yes, sir, I do.

22  Q     And why do you feel that way, Mrs. Hutchins?

23  A     Because I just believe that we all have rights and wrongs

24  to live by, and I can't judge anybody until I truthfully set in

25  and listen, and, with my own heart, if I feel that that person

1   has done wrong, then, you know, if there's eleven other people

2   up there that's feeling the same way, then that's fine.

3   Q    Ma'am, when we look at bias and prejudice, you know, it's

4   in both phases.  This is a bifurcated trial.  First, we're going

5   to look, and you'll make the determination, whether the

6   Government has presented you the quality of evidence that you

7   would be willing to rely and act upon, without hesitation, in

8   the most important of your own affairs.  Do you understand how

9   high that burden is?

10  A    I think so.

11  Q    Will you make them give you the quality of evidence to

12  prove each and every element beyond a reasonable doubt?

13  A    Yes, sir.

14  Q    Now, the reason that's so important, Mrs. Hutchins, is

15  because when we get over into the -- if we get into the

16  punishment phase, that same beyond a reasonable doubt, as the

17  Judge mentioned, intent has to be proved.  Well, that has to be

18  proved beyond a reasonable doubt, not by a preponderance of the

19  evidence, or clear and convincing evidence, but that intent has

20  got to be proved beyond a reasonable doubt.  Do you think that's

21  fair?

22  A    Yes, sir, I do.

23  Q    Now, the reason that it's so important, Mrs. Hutchins, is,

24  preponderance of the evidence is what we sometimes call the

25  fifty-fifty rule.  That's our lowest burden.  But, you see, when

LINDA HUTCHINS - VOIR DIRE (BY MR. GOAINS)                    141

1   you're answering those questions in punishment, the first two

2   issues, whether there's intent and whether there's an

3   aggravating factor, the burden is on the Government to prove

4   them beyond a reasonable doubt.  Now, a mitigating factor only

5   has to be shown, if you believe it by a preponderance of the

6   evidence, which is the lowest standard.  Okay?  Do you feel --

7   and I know, according to your jury questionnaire, you are a

8   little strong at times on the death penalty.  But do you feel

9   that you could apply those two different standards when you look

10  at intent, when you look at an aggravating factor, it's beyond a

11  reasonable doubt, but a mitigating factor drops down to

12  preponderance of the evidence of whether you found one or not.

13  Do you think you can do that?

14  A    Yes, sir.

15  Q    I guess -- just a couple more questions.  Based on your --

16  paragraph number 53, it says, "Do you believe that the death

17  penalty serves any legitimate purposes," and you said, "Yes.  It

18  keeps that person from being let out to do the crime again, and

19  it's God's rule."  Could you tell us what you mean by that, Mrs.

20  Hutchins?

21  A    If that person is found guilty, then, yes, I believe it.

22  Q    Okay.  Now, you can understand, from our attorney's

23  perspective, does that mean if you find a person guilty --

24  A    Not me.  All of us.

25  Q    Okay.  If the twelve of you find a person guilty of capital

LINDA HUTCHINS - VOIR DIRE (BY MR. GOAINS)    142

1  murder --

2  A    Right.

3  Q    -- then are you automatically going to answer those

4  questions so that they receive the death penalty so they can't

5  get out again and do the crime again?

6  A    I don't want that person out to do a crime again.

7  Q    Okay.  So, are you telling us then that you would lean

8  toward answering those questions in the punishment phase that

9  would result in the death penalty?

10  A    If I felt it in my heart that that person was truly guilty,

11  that I felt it, yes.  I wouldn't want him out again.

12  Q    Okay.  So, would you agree with me, Mrs. Hutchins -- and,

13  believe me, there's no right or wrong answer, because you could

14  be a perfectly good juror in a drug case or a weapons-type case.

15  But are you telling us that if you found someone guilty, the

16  twelve of you found someone guilty beyond a reasonable doubt,

17  then you feel that person then deserves the death penalty?

18  A    Yes.

19           MR. GOAINS:  That's all we have, Your Honor.

20           LINDA HUTCHINS - FURTHER VOIR DIRE EXAMINATION

21  BY THE COURT:

22  Q    Mrs. Hutchins, let me explain something to you, to make

23  sure you understand.  In a capital case, if a person is found

24  guilty of committing capital murder, then the jury has two

25  options, and two options only, ultimately.  One is the death

LINDA HUTCHINS - VOIR DIRE (BY THE COURT)          143

1    sentence, and one is life in prison without the possibility of

2    release.  And that means exactly that, without the possibility

3    of release.  So, if you understood that that option was

4    available and that there would be no possibility that that

5    person would get out and commit the crime again, would you then

6    be able to consider the full range of punishment, or both

7    options?

8    A    Yes, sir.

9              LINDA HUTCHINS - VOIR DIRE EXAMINATION

10   BY MR. HUNT, JR.:

11   Q    Mrs. Hutchins, I want to focus back in on exactly what

12   you've been talking about to the last two folks that have talked

13   to you.  One of your questions indicated that your daughter

14   works for TDCJ, is that correct?

15   A    Yes, sir.

16   Q    And I think you said in your questionnaire that you were

17   concerned that if you -- oh, I'm sorry -- well, I think the

18   thing that that leads us to is, what you had indicated earlier

19   was that your fear would be, or that you have a fear that if you

20   convicted a person, then they would try to -- they might hurt

21   somebody in prison, is that correct?  Is that a fear of yours,

22   from your answers that you gave on the questionnaire?

23   A    Yes, sir.

24   Q    So, if you believe beyond a reasonable doubt that a person

25   was guilty of murder and that person was sent to prison, you, I

LINDA HUTCHINS - VOIR DIRE (BY MR. HUNT, JR)            144

1   believe, indicated that you would be afraid that that person

2   might injure somebody in the penitentiary, is that correct?

3   A    I've seen that happen.

4   Q    But because you worked in the penitentiary?

5   A    True.

6   Q    And you worked in the records department, is that correct?

7   A    Right.

8   Q    Did you have direct contact with the inmates when you were

9   in the records department?

10  A    Yes, sir.  175 of them every day.

11  Q    Was it new people that were coming through all the time, or

12  was it the same people?

13  A    That was on a work program, yes, sir.

14  Q    Okay.  So, I guess my question, what that leads me to is,

15  would you tend to lean towards wanting to give a person the

16  death penalty, because you would be afraid they might injure

17  somebody in the penitentiary?  Is that something that I need to

18  be afraid of?

19  A    No.

20  Q    Okay.  Instead, what the Judge explained to you a little

21  while ago is that, if a person is convicted of one of the

22  capital offenses, then they would be either sentenced to life in

23  prison -- and life in prison in the federal systems means you

24  stay in prison until you die -- or that they would be put to

25  death.  Have you prejudged in any way, at this time, which

LINDA HUTCHINS - VOIR DIRE (BY MR. HUNT, JR)                145

1   direction you would go in, whether it would be life in prison,

2   or whether it would be the death penalty?

3   A    No.

4   Q    Okay.  Mr. Goains was asking you some questions that said,

5   if there was a possibility of that person ever getting out, then

6   you would rather see that they get the death penalty.  Is that

7   correct?

8   A    No.  If that person was not going to be able to get out, I

9   could live with that.

10  Q    Okay.  So, if a person were, let's say, to have to pay with

11  their life for a life they took, that could include getting life

12  in prison, is that correct?

13  A    I'm sorry?

14  Q    I'm sorry.  That was just a real bad question.  Let me move

15  on to a different question.  Another area that I want to ask you

16  about a little bit has to do with the presumption of innocence

17  and it has to do with the fact that Mr. Goains and Mr. Schwieger

18  sit on one side of the same table that my father and I sit at.

19  And we represent Brandon Bernard, who sits right next to Mr.

20  Vialva.  My fear is that because these two people sit right next

21  to each other, and because we sit at the same table as the other

22  lawyers, that a juror might tend to blend the two defendants in

23  their mind and might say, "Well, if one's guilty, then the other

24  person might be guilty."  Can you understand why I might have

25  that concern?  Do I need to be concerned about that in your

LINDA HUTCHINS - VOIR DIRE (BY MR. HUNT, JR)    146

1   mind, or will you be able to segment those two folks out?

2   A    I could --

3   Q    I'm sorry.  You're going to have to answer out loud.

4   A    I'm sorry.  I couldn't talk.  Yes.

5   Q    Okay.  And frankly, another fear of mine is that since you

6   did work in TDC and had so much dealings with people who were

7   guilty and had been sentenced to prison, that you might tend to

8   prejudge people and look at the people who are accused of a

9   crime as being convicted of a crime.  Do I need to be worried

10  about that in your case, ma'am?

11  A    No, sir.

12         MR. HUNT, JR.:  Your Honor, I pass the voir dire.

13         THE COURT:  Thank you, Mrs. Hutchins.  If you will

14  call the code-a-phone each afternoon, that will be the way you

15  will be notified if and when you need to come back.  Thank you,

16  ma'am.

17         MRS. HUTCHINS:  Thank you.

18      (Mrs. Hutchins Excused.)

19         THE COURT:  Any challenges?

20         MR. BLAGG:  No, sir.

21         MR. GOAINS:  Yes, Your Honor.  We will challenge this

22  witness for cause.  Your Honor, she stated that she would lean

23  toward answering the questions in the punishment phase that

24  would allow the death penalty.  We submit to this Honorable

25  Court that that presents a bias or prejudice against Mr. Vialva,

147

1  and that he has a constitutional right, Your Honor, to a fair

2  and impartial trial.

3          THE COURT:  She indicated that before she understood

4  the life sentence without possibility of release concept.  It

5  will not be granted.

6          Okay.  Let's take about ten minutes.

7      (Recess from 2:30 p.m. until 2:40 p.m.)

8          THE COURT:  Number 60, Billie Jean Simecek.

9          MR. FRAZIER:  Judge, just on one area we need inquired

10  on.  Starting with question 51, and several others after that,

11  the juror indicates that she would have a problem sitting in

12  judgment of another human being.  That would be questions 51,

13  59, 60.  And she reiterates that again in questions 133 and 135.

14  They all form around her ability to sit in judgment of another

15  person.  Also, in question 60, she answers the question no, that

16  she could not return a death penalty verdict if a sentence of

17  life without possibility of release is an option.  That's all we

18  have.

19          MR. SCHWIEGER:  The medication, Your Honor, it's high

20  blood pressure medication.  I doubt it has anything to do with

21  anything, but --

22          THE COURT:  What page is that on, "Stan"?

23          MR. SCHWIEGER:  Page 9, question 43, Your Honor.

24          THE COURT:  I don't take Methyldopa.  So, I don't know

25  anything about that.

1    MR. HUNT, SR.:  We don't really have any areas of

2  concern, Your Honor.

3    THE COURT:  Pardon?

4    MR. HUNT, SR.:  We don't have any areas of concern.

5    MR. SCHWIEGER:  We have concerns about 91, just

6  basically what she meant by the answer.  It seems kind of vague.

7    THE COURT:  Well, she simply means she doesn't think

8  either is the greater wrong, that they're equally wrong.

9    MR. SCHWIEGER:  Question 102, her son is a Navarro

10  County Sheriff's Reserve.  Just see if there's any potential

11  there of believing law enforcement more than others.

12    Then question 115, stating that, "Ninety-nine percent

13  of the time, people are actually guilty of the offense."

14    THE COURT:  Actually, it's only about ninety-five

15  percent of the time.

16    MR. SCHWIEGER:  And then on page 23, she made the

17  statement of strongly agreeing that in front of a whipping post

18  would be more effective than death.

19    THE COURT:  Where is that?

20    MR. SCHWIEGER:  That's question (k), Your Honor.

21    THE COURT:  What do you want to know about that?

22    MR. SCHWIEGER:  Well, I guess just why.

23    THE COURT:  Okay.  Billie Jean Simecek, I think is her

24  name.

25    BILLIE SIMECEK, PROSPECTIVE JUROR, SWORN

BILLIE SIMECEK - VOIR DIRE (BY THE COURT)                149

<u>VOIR DIRE EXAMINATION</u>

BY THE COURT:

Q    Good afternoon, ma'am.  Tell me how to pronounce your last name.

A    Simecek.

Q    Simecek.  That's what we all thought, but we weren't sure. Mrs. Simecek, first I want to ask you, the medication you take for your blood pressure, does that in any way make you drowsy or affect you being able to listen and hear?

A    Yes, sir.

Q    It does?

A    It does.

Q    Does it make you drowsy?

A    It has a tendency, if I sit still, I'll doze off.

Q    Okay.  You take that twice a day, I believe?

A    Yes, sir.

Q    Okay.  You indicated that you do have a moral, religious, or personal belief that would prevent you from sitting in judgment on another human being.  Can you explain that to me, please, ma'am?

A    Well, I just don't think I have a right to.

Q    Is that a religious belief you have?

A    Yes, sir.

Q    May I ask what your religion is?

A    Baptist.

BILLIE SIMECEK - VOIR DIRE (BY THE COURT)                    150

1    Q    Okay.  Have you ever served on a jury?

2    A    Minor.  County.

3    Q    A traffic offense, or a misdemeanor?

4    A    No, sir.  Drug possession.

5    Q    Okay.  Did you have any difficulty in doing that?

6    A    Yes, sir.

7    Q    But you did it?

8    A    Yes, sir.

9    Q    Well, do you think you could do it in this case, if you

10   were selected?

11   A    No, sir.  I've really --

12   Q    Ma'am?

13   A    I have really searched, you know, myself, and I really

14   don't want to be in that position.

15   Q    You indicated in another question that you don't know if

16   you could take part in taking someone's life, and that if a

17   sentence of life without the possibility of release was an

18   option, you couldn't return the death penalty.  Obviously, we

19   have to have jurors who are able to at least consider all of the

20   options put before them, and, if a person if convicted of a

21   capital offense, then the only two options a jury has is life

22   without possibility of release, or a death sentence.  And it's

23   the jury's obligation to consider all of the evidence put on by

24   both sides, and then to answer certain questions that can lead

25   to the death penalty being imposed, if they're answered in a

BILLIE SIMECEK - VOIR DIRE (BY THE COURT)                    151

1    certain way.  Actually, the jury recommends whether the death

2    penalty would be appropriate.  Are you saying to me that because

3    of your personal beliefs, you don't think you would be able to

4    consider the death penalty as an option, if you found the

5    defendant guilty?

6    A    No, sir.

7    Q    Let me be sure I understand.  You're not saying that, or

8    you're saying you couldn't?

9    A    I couldn't.

10            THE COURT:  Okay.  I'll excuse you.  Thank you.

11            MRS. SIMECEK:  Okay.

12        (Mrs. Simecek Excused.)

13            THE COURT:  The next one is Number 73, Michael Coffin.

14            MR. FROST:  Your Honor, we have no areas.

15            MR. GOAINS:  Your Honor, we just have some general

16    concerns with 55, 56, number 96, Your Honor, I believe, and 100,

17    he has served on a jury, just to make sure that that will not

18    affect his ability to serve in this case.

19            THE COURT:  You got ahead of me a little bit.  96?

20            MR. GOAINS:  Yes, Your Honor, and 100.

21            THE COURT:  What's your question about the prior jury

22    service?

23            MR. GOAINS:  Your Honor, we just want to make sure

24    that his prior service would not affect his ability in this

25    case.

152

THE COURT:  Mr. Hunt?

MR. HUNT, JR.:  Yes, Your Honor, on page 11, first of all, question 56 indicates that the death penalty should be used more frequently.  I'm just wondering why that's the case.

Then, on page 12, number 69, he indicates that he regularly reads the Temple Telegram.  I'm wondering if he has more facts, if he remembers having gotten some pretrial publicity exposure.

And I'm sorry, Your Honor, back on page 11, question number 60, he wrote, "Yes," crossed that out, "No," crossed that out, and ended up with, "Yes."  I'm wondering if he's equivocating on his answer, or if he just maybe didn't understand that question.

And then, finally, on page 23, question (f), he agrees that any person who commits murder should pay with his own life. I wonder if that's a bias against the life sentence as opposed to the death sentence.

THE COURT:  Okay.  Michael Coffin.

MICHAEL COFFIN, PROSPECTIVE JUROR, SWORN

VOIR DIRE EXAMINATION

BY THE COURT:

Q    Good afternoon, Mr. Coffin.  Let me ask you a few questions about your questionnaire, just to clarify some things, if I can, please, sir.  You were asked at one point, "Do you believe that the death penalty should be used more frequently, less

MICHAEL COFFIN - VOIR DIRE (BY THE COURT)                153

1    frequently, about the same as it has been, or not at all, as a

2    punishment for crime," and you said, "More frequently."  Can you

3    explain to me why you feel that way?  Any particular reason you

4    feel that way?

5    A    I believe the death penalty would be -- would help deter

6    more offensive crimes.

7    Q    Okay.  In another instance, you were asked, "If the

8    sentence of life without the possibility of release is an

9    option, could you, nevertheless, return a verdict that would

10   result in the death penalty?"  You apparently wrote, "Yes,"

11   scratched through it, wrote, "No," scratched through it, and

12   then wrote, "Yes."  Were you having a difficult time making a

13   decision, or you just didn't understand the question the way it

14   was asked the first time, or do you remember?

15   A    At first, I really didn't understand the question.  I

16   reread it and did some more thinking about it and changed my

17   answer, sir.

18   Q    Okay.  You indicated that you do regularly read the Temple

19   Telegram.  Have you read anything about this case, now that you

20   know what the case is about a little more?

21   A    No, sir.  I read about it when it first happened, but I

22   haven't kept up with the case.

23   Q    All right.  And do you understand that if you are selected

24   as a juror and you are listening to evidence and you hear

25   testimony that you find reliable that differs from something you

MICHAEL COFFIN - VOIR DIRE (BY THE COURT)                    154

1    may remember having read in the paper, you would have to rely on

2    the testimony you hear in the courtroom and not what you read in

3    the paper previously?

4    A    Yes, sir.

5    Q    Okay.  Let's see, you did indicate that you served on a

6    drug case in Bell County in 1997.  Was there anything about

7    serving on that particular jury that you think would in any way

8    affect your service on this jury, or serving on any jury in the

9    future?  Sometimes, when people serve on a jury, they're so

10   upset at how much of their time is wasted, or they're upset with

11   the lawyers in general, or they just get such a bad taste in

12   their mouth that they would never be a very good juror again.

13   Did you have any kind of experience such as that?

14   A    No, sir, I didn't.

15   Q    Thank you.  Now, on another instance, you indicated that

16   you agree with the statement that any person, man or woman,

17   young or old, who commits murder should pay with his own life.

18   Do you believe that to the extent that any person -- if you were

19   serving on a jury and a person was convicted of murder that

20   returning the death penalty would be automatic?

21   A    No, sir.  It would all depend on what the evidence would

22   prove.

23   Q    Let me explain to you the way it works.  If a person is

24   found guilty of capital murder in the federal court system, then

25   a second hearing is had and evidence is presented, and then the

1    jury is asked to return and deliberate and first determine

2    whether or not the person being considered had the requisite

3    intent, did they intend that someone die.  And, if they find

4    that that is the case, then the jury is asked to consider

5    certain aggravating factors and certain mitigating factors, and

6    then to balance those factors that they find exist.  Those

7    factors, aggravating factors, can include the fact that more

8    than one person died.  Mitigating factors could include the fact

9    that a person was somewhat mentally retarded, or their social

10   background.  Any number of things could be a mitigating factor.

11   Their age can be a mitigating factor.  And then the jury is

12   asked to balance those things and to recommend that the

13   punishment either be life without possibility of release, or

14   death.  And in the federal system, life without possibility of

15   release means exactly that.  The person will die in prison.

16   That being the way the situation works, do you think you would

17   have any difficulty in considering both options and all of the

18   evidence that would be presented before making the decision on

19   punishment?

20   A    No, sir.  I would not.

21   Q    Would you not be able to consider them at all?

22   A    No.  I would not have a problem.

23        THE COURT:  Okay.  I'm sorry.  I didn't ask the

24   question the way I thought I did, then.  All right.  Counsel?

25        MICHAEL COFFIN - VOIR DIRE EXAMINATION

MICHAEL COFFIN - VOIR DIRE (BY MR. FROST)                    156

BY MR. FROST:

Q    Good afternoon.  My name is Scott Frost, and I represent the United States.  I want to go back just a little bit to the question that Judge Smith asked you in regards to, "If a sentence of life without the possibility of release is an option, could you, nevertheless, return a verdict that would result in the death penalty?"  I think your first answer was that you were confused as to what the question asked, and then, after some deliberation, you may have changed your answer. Could you kind of expand upon that?  What were you thinking about when you changed your answer?

A    Well, when I first read the question, I apparently read it too quickly and didn't really understand it, and then I reread the question more slowly and reconsidered my answer.

Q    Okay.  So, you weren't saying that you were reconsidering whether life without the possibility of release would be something that you would give over death in every case, then?

A    It all depends on what the evidence would prove, in my case, I would think.

Q    Okay.  So, you could consider the possibility of giving somebody the death sentence if the Government, which is us, proves certain factors to your -- beyond a reasonable doubt?

A    Yes.

Q    Okay.  I just wanted to clarify that.  One other consideration that occurs in this case.  As the Judge told you,

MICHAEL COFFIN - VOIR DIRE (BY MR. FROST)                 157

1   you will have -- the Government has the burden to prove

2   aggravating factors, and the defense has the possibility of

3   proving mitigating factors.  Basically, those are things that

4   you could consider in not imposing the death sentence.   One of

5   those things is the age of the individuals.  In this case, one

6   of the defendants was eighteen at the time of this occurrence,

7   and one was nineteen at the time of the occurrence.  You are

8   allowed to consider that in mitigation, but would the fact that

9   they are eighteen or were eighteen and nineteen at the time the

10  Government believes they committed these murders, would you,

11  because of their age, not impose the death penalty solely

12  because of their age?

13  A     No, I would not.

14  Q     And how would that factor in, their age?  Would that factor

15  into your analysis of whether to give them the death penalty or

16  not?

17  A     I'd still think that it's on what the evidence would

18  warrant before I would really change my mind on whether the

19  death penalty is appropriate.

20  Q     Okay.  And what you're saying is, is that it would depend

21  on the facts and the circumstances surrounding the murder

22  itself?

23  A     Right.

24  Q     Okay.  Now, one other thing I wanted to talk to you a

25  little bit about is the fact that in this particular case, we

1  expect that the Government will present some individuals that

2  are juveniles who are going to testify who were actually

3  involved in part of these homicides.  Does that cause any

4  concern for you?

5  A    No, it does not.

6  Q    Would you be able to judge them like you would any other

7  witness?

8  A    Yes, I would.

9  Q    Okay.  And the fact that they were involved in portions of

10  these murders, would you be able to judge them and their

11  credibility based on what you see in the courtroom and the other

12  evidence that's presented to you?

13  A    Yes, I would.

14  Q    Okay.  Would you require, in regards to those witnesses,

15  that the Government somehow produce something more than any

16  other witness, in regards to the evidence?

17  A    I believe I would.

18  Q    Okay.  So, you would like the Government to be able to

19  maybe substantiate some of the things that they're telling you?

20  A    Right.

21  Q    Okay.  And in regards to those particular witnesses, would

22  it trouble you that they may have, at the very beginning of this

23  investigation, lied a little bit to cover up for themselves?

24  A    I don't think so.

25  Q    Would you think it's natural for folks sometimes to maybe

MICHAEL COFFIN - VOIR DIRE (BY MR. FROST)                159

1  fib a little bit at the beginning of something if they are

2  concerned about getting in trouble?

3  A    I believe it's possible, yes, sir.

4         MR. FROST:  That's all the questions I have.  Thank

5  you, sir.

              MICHAEL COFFIN - VOIR DIRE EXAMINATION

7  BY MR. GOAINS:

8  Q    Mr. Coffin, my name is Dwight Goains, and we represent Mr.

9  Vialva.  Just a few questions for you, sir.  Since you've been

10  on a jury before, I take it that these attorneys talked to you

11  about the definition of beyond a reasonable doubt?

12  A    Yes, sir, they did.

13  Q    And do you understand what a high burden that is?

14  A    Yes, I do.

15  Q    Can you assure us that you will put the Government to that

16  burden?

17  A    Yes, sir.

18  Q    Now, in that light, Mr. Coffin, at this time, do you tend

19  to believe that Mr. Vialva is guilty?

20  A    No, sir, I do not.

21  Q    And why is that, sir?

22  A    I haven't heard or seen all of the evidence.

23  Q    Now, when we talk about the punishment phase and we're

24  talking about mitigation evidence, the Government's attorney

25  just asked you about one factor, and that is age.  You see, as

1  far as mitigating evidence goes, we can't commit you whether you

2  would find age, or alcoholism, or drug addiction, or any of

3  those type things, as mitigating; but can you assure us that you

4  will consider all the evidence and then make a determination,

5  say in mitigating evidence, if you believe, by a preponderance

6  of the evidence, that there is a mitigating factor?

7  A    Yes, I would.

8  Q    So, you would look at all the evidence, and then you would

9  make an independent determination?

10  A    Yes, sir.

11  Q    Also, Mr. Coffin, that's really important, too, because we

12  have to have an independent determination.  Now, in your other

13  jury trial, were you the jury foreman, or were you just on the

14  jury?

15  A    I was just on the jury, sir.

16  Q    Okay.  What was that experience like?  I mean, was it

17  favorable, or what did you think of it when you came out of it?

18  A    It was a very interesting case.  I was very happy I got to

19  be picked to be on the jury.  But that's the first drug case

20  I've ever been on.  It was quite interesting.  It was quite an

21  experience.

22  Q    Now, when the prosecutor talked about credibility of

23  witnesses, you know, whether they're what we might call a

24  snitch, or somebody that the Government cuts a deal with in

25  order to get them to testify, or whether they're a police

1   officer, can you understand the importance of starting all

2   witnesses off at the same level?

3   A     Yes, sir, I can.

4   Q     Because, let's face it, although we'd like to think that

5   police officers would always tell the truth, for various reasons

6   or motives, sometimes they might, you might say, slant the truth

7   a little bit.  Would you agree with me?

8   A     Yes, sir.

9   Q     And can you assure us that you will look at each of those

10  witnesses, start them off equally, and, obviously, you can

11  always look at any motives that they may have to testify, what

12  they have to gain to testify, and you, as a juror, that's just

13  going to be one of your jobs, to make a determination of whether

14  you want to believe all they tell you, or part of it, or

15  somewhere in between?

16  A     Yes, sir, I could.

17  Q     Mr. Coffin, do you want to be on this jury?

18  A     I would like to serve, sir.

19  Q     Do you think you can be fair and unbiased?

20  A     Yes, sir.

21  Q     If you had a loved one that was on trial for a serious

22  criminal offense, say a son or a daughter, are you the type of

23  person that you would want on that jury?

24  A     Yes, sir.

25  Q     And why do you feel that way, sir?

MICHAEL COFFIN - VOIR DIRE (BY MR. GOAINS)                162

1    A    I think everybody has the right to be proven innocent or

2    guilty, sir.

3    Q    Now, you understand that's the Government's burden.  You

4    know, I sort of have the easiest job in the courtroom.  I don't

5    have to prove anything, and it rests solely on the Government to

6    prove their case beyond a reasonable doubt.

7    A    Yes, sir.  I understand that.

8    Q    Will you listen to all the evidence?

9    A    Yes, sir, I will.

10   Q    And make your own decisions?

11   A    Yes, sir.

12            MR. GOAINS:  We will pass to Mr. Hunt, Your Honor.

13            MICHAEL COFFIN - VOIR DIRE EXAMINATION

14   BY MR. HUNT, JR:

15   Q    Mr. Coffin, my name is "Russ" Hunt, Jr.  I'm one of the two

16   attorneys who represents Brandon Bernard.

17            MR. HUNT, JR.:  Brandon, would you please stand up.

18   That's Brandon standing up right there.  You can go ahead and

19   have a seat, Brandon.

20

21   BY MR. HUNT, JR:

22   Q    Frankly, Mr. Coffin, I am very impressed with seeing jurors

23   who have crossed out and made a different answer and crossed out

24   the answer and made sure they made up their mind before they put

25   their -- well, when they finally put their answer on the

MICHAEL COFFIN - VOIR DIRE (BY MR. HUNT, JR.)          163

1   questionnaire, so it's real impressive to me to see that you put

2   enough thought into a question that you must have come back to

3   it several times before you gave an answer.  You've been

4   questioned a little bit by several people about your answer to

5   the question about the life sentence without the possibility of

6   release versus the death penalty.  I'm just wondering, what was

7   that kind of thought process you went through when you were

8   trying to answer that question?  If you don't mind sharing that

9   with me, I'd be very interested in knowing that.

10  A    Well, I got to thinking about what the circumstances might

11  have been in the case and the evidence and everybody's

12  testimony, and that's what made me change my answer two or three

13  times.

14  Q    Okay.  Was one of the things you were maybe thinking that

15  maybe life without the possibility of release doesn't really

16  mean that, that maybe the person could be released at some

17  point, and that's just lawyer words that indicate that maybe

18  somebody might get out of jail?  Was that something that you

19  were perhaps thinking about?

20  A    That did kind of cross my mind, yes, sir.

21  Q    Okay.  But you understand now, now that the Judge has

22  explained it, that in a the federal system, it's very different

23  from the state system, that there is no parole, and life without

24  the possibility of release means somebody really does die in

25  prison?  You understand that now?  Right?

MICHAEL COFFIN - VOIR DIRE (BY MR. HUNT, JR.)                    164

1    A    Yes, sir, I do.

2    Q    Great.  I think probably most people don't.  Something else

3    that I think is just real important in this particular case, and

4    it goes back to another real thoughtful answer that you gave

5    when Mr. Goains was asking you questions.  I think he asked you

6    a question about if you had to vote now, how would you vote, and

7    you said, "Well, he's not guilty now."  You would give him -- in

8    relation to Mr. Vialva, you would give him the presumption of

9    innocence, presume that he's innocent, specifically because you

10   said you haven't seen all of the evidence yet.  I think that

11   that's very important, because you picked up on that, even

12   though nobody has really talked about that here today.  The

13   importance, I guess, that I want to bring out is that it's

14   important you hear all the evidence before you make up your

15   mind.  I'm sure they went into that in that other jury trial you

16   were on, is that correct?

17   A    Yes, sir, they did.

18   Q    Was there one defendant or two defendants in that other

19   jury case?

20   A    There were eight, sir.

21   Q    Eight defendants.  All right.  A difficult job to keep the

22   evidence sorted out for multiple defendants, is that a difficult

23   thing for a jury?

24   A    Yes, sir, it's very difficult.

25   Q    Can you explain to me why that's a difficult thing?

MICHAEL COFFIN - VOIR DIRE (BY MR. HUNT, JR.)          165

1    A    Well, it was so complex.  They had so much evidence and

2    different witnesses and everything, and it just was very hard to

3    decide what the verdict would be.

4    Q    All right.  Did the jury make a decision as to all of the

5    defendants?

6    A    Yes, sir, we did.

7    Q    Okay.  I'm sure you did in that case something that you

8    would be willing to do, also, in this case, and that is to pay

9    real close attention to the evidence as it relates to each of

10   the two defendants in this case and not blend them as though

11   they're just one person.  Is that something that you would do

12   for us?

13   A    Yes, sir.

14         MR. HUNT, JR.:  Excellent.  Mr. Coffin, thank you very

15   much for your answers.

16         THE COURT:  Mr. Coffin, I don't have anything further.

17   I appreciate it very much.  If you will, please call the code-a-

18   phone each afternoon.  That's how you will get your instructions

19   about when and if you should return for jury service.  Thank

20   you, sir.

21         (Mr. Coffin Excused.)

22         THE COURT:  All right.  Paul Douglas Miller, Number

23   109.  I assume there are no challenges for cause for Mr. Coffin?

24         MR. SCHWIEGER:  I'm sorry, Judge.  I thought you were

25   having him brought in.

1        MR. GOAINS:  No, Your Honor.

2        MR. FRAZIER:  No, sir.

3        THE COURT:  How about areas of inquiry for Paul

4   Douglas Miller?

5        MR. FROST:  None on this juror, Your Honor.

6        MR. SCHWIEGER:  Question Number 52, Your Honor.  He

7   states that he is in favor of the death penalty as punishment

8   for crime in instances of first degree murder, use of a gun

9   resulting in murder, and cruel murder.  Again, I would like to

10  ask the Court to direct questions to see if this is an automatic

11  type of matter, and basically to tie that in.

12       With question 133, Your Honor, if picked, he could be

13  fair and impartial, but would push for the death penalty if the

14  verdict was guilty.

15       Continuing on to question 85, he states that he -- and

16  it doesn't state who, but it states a family member or close

17  friend has had a bad experience with a person of another race,

18  and shows a couple of folks being robbed.

19       Question 87, it appears my officemate -- not legal

20  partner, but officemate, Nita Fanning, handled his child support

21  matter, and I've officed with Nita approximately seven years.  I

22  don't recall this guy, but I imagine I've ran into him.  I don't

23  know if he's a current client or not.  But if he is, I'm sure

24  I've ran into him.

25       Continuing down to question 90, he states his

167

1    impression of criminal defense attorney is, "Interested in

2    winning at all costs."  I guess I would like to know if there is

3    a bias against criminal defense attorneys.

4             Question 102, he has a brother-in-law with the

5    Pasadena, Texas Police Department.  I would like to know if that

6    would affect his views as a juror.

7             I believe that's all, Your Honor.

8             MR. HUNT, SR.:  Your Honor, my concerns are on page

9    22, 133, which "Stan" has already gone over, and that is his

10   concern about pushing for the death penalty if the verdict is

11   guilty.

12            And then, similarly, on page 14, question 85, it's

13   unclear.  It sounds like he was robbed at gunpoint by Mexican

14   Nationals, and I'm wondering if that's going to have any affect

15   on him.

16            THE COURT:  Paul Douglas Miller.

17        PAUL MILLER, PROSPECTIVE JUROR, SWORN

18             VOIR DIRE EXAMINATION

19   BY THE COURT:

20   Q    Hi, Mr. Miller.

21   A    Good afternoon.

22   Q    There are a few matters concerning your questionnaire that

23   we want to clarify a little bit.  First of all, you were asked

24   if you favored the death penalty as a punishment for crime, and

25   you said, "Yes."  In explanation, you said, "In instances of

PAUL MILLER - VOIR DIRE (BY THE COURT)          168

1    first degree murder, premeditated use of a gun resulting in

2    murder, or a cruel murder."  Are you indicating that those are

3    the types of offenses where you think the death penalty should

4    be considered, or are you saying that you think, in those types

5    of offenses, the death penalty should be automatic?

6    A    I'm not sure if automatic is the correct word, but I think

7    it's highly warranted.

8    Q    Okay.  You were asked if you or a family member or a close

9    friend have ever had a bad experience with a person of another

10   race, and you said, "Yes.  A house robbed by Hispanic male while

11   living in Houston, and robbed at gunpoint by Mexican Nationals

12   while vacationing in Mexico."  Was that something that happened

13   to you, personally?

14   A    Yes, sir.

15   Q    Okay.  Do you think that would have any affect on your

16   ability to consider the evidence and sit in judgment on a case

17   such as this?

18   A    No, sir.

19   Q    Okay.  You also indicated that Nita Fanning has represented

20   you in the past?

21   A    Yes, sir.  My wife and my stepdaughter in a child support

22   case.

23   Q    Okay.  Mr. Schwieger is not Ms. Fanning's partner, but they

24   work in the same office, office together.  Do you know him?

25   A    I've seen him.  And my wife said, "Hey, yeah, I know that

PAUL MILLER - VOIR DIRE (BY THE COURT)                169

1    guy."

2    Q    Okay.  Would that have any affect on your ability to sit on

3    this jury, do you think?

4    A    No, sir.

5    Q    All right.  You also indicated that your general impression

6    of criminal defense attorneys was that they are interested in

7    winning at all costs.  Is that a negative attitude you have, or

8    that could be a positive attitude, I guess, if you think they --

9    if you mean by that that they're willing to work extremely hard

10   and do whatever is available within the legal framework, or you

11   could -- or I suppose someone who said that could mean criminal

12   defense attorneys might tend to sponsor perjury, or something

13   negative.  Can you explain to me how you feel?

14   A    I don't mean to infer that they would sponsor perjury.

15   It's just an impression I have that, if halfway through a case,

16   somebody were to decide that they are representing the wrong

17   person, that they would go ahead with that representation.

18   Q    How do you mean, "Representing the wrong person?"

19   A    In other words, halfway through a case, if they decided

20   that, "Gee whiz, this isn't looking good, perhaps this guy is

21   lying to me," that they'd continue on with that representation

22   and try and win the case anyway, even if they thought that their

23   client was, in fact, guilty.  And there's no inference to be

24   judged to this case for that remark.  That's just kind of the

25   way I feel.

PAUL MILLER - VOIR DIRE (BY THE COURT)                    170

1   Q    Okay.  You indicated you have a brother-in-law who is with

2   the Pasadena Police Department?

3   A    Yes, sir.

4   Q    Would that have any affect on your ability to sit on a

5   criminal jury?

6   A    It shouldn't.

7   Q    I didn't think so, but I needed to ask.  And perhaps of

8   most concern, you were asked if you wanted to serve as a juror

9   on this case, and you said, "If picked."  And then you said, "I

10  could be fair and impartial, but would push for the death

11  penalty if the verdict is guilty."  Let me explain to you how

12  that works in Federal Court.  If a person is convicted of a

13  capital crime, then additional evidence is presented, additional

14  arguments are made, and the jury goes back to deliberate on the

15  punishment.  In doing that, the jury is asked to first determine

16  if the defendant under consideration had the intent that someone

17  die, if they intended for someone to die by the acts they

18  committed.  If the jury finds yes to that question, then the

19  jury is asked to consider certain aggravating and mitigating

20  factors.  An aggravating factor, for instance, can be that more

21  than one person was killed.  Mitigating factors can involve the

22  age of the defendant, social background of the defendant, just

23  any number of things.  And then the jury is asked to weigh those

24  aggravating and mitigating factors, and then recommend whether

25  or not the punishment should be death, or life without

PAUL MILLER - VOIR DIRE (BY THE COURT)                    171

1    possibility of release.  You need to understand that in the

2    Federal System, that means exactly that.  If a person is

3    sentenced to life without possibility of release, they die in

4    prison.  So, understanding how that system works, put your

5    suggestion that you would push for the death penalty in that

6    context, how do you mean you would push for the death penalty?

7    A    Well, perhaps that wasn't correct phrasing on my part.  It

8    was late at night when I finished this.  I would have no problem

9    serving on the jury, and I would have no problem at all being

10   impartial.  However, I would also have no problem voting for the

11   death penalty, if, indeed, a guilty was found.

12   Q    And would you also have no problem in considering both

13   options, life without possibility or release, or death?

14   A    In my particular circumstance, the mitigating circumstances

15   would have to really be -- really be severe, I guess, if that's

16   the right word, because I do believe in the death penalty for

17   those particular offenses.

18            THE COURT:  All right, sir.  Thank you very much.

19   Counsel?

                    PAUL MILLER - VOIR DIRE EXAMINATION

21   BY MR. FROST:

22   Q    Good afternoon, sir.  My name is Scott Frost, and I

23   represent the United States.  I have a couple of questions for

24   you in regards to your background.  I noticed that you indicated

25   that you had taken some psychology classes in college?

PAUL MILLER - VOIR DIRE (BY MR. FROST)                      172

1   A    Yes, sir.  I was an education minor.

2   Q    And what kind of classes were they?

3   A    Just the required general psychology courses in educational

4   psychology.

5   Q    Did you take any classes that involved any type of analysis

6   of criminals, or criminal behavior, or --

7   A    No.

8   Q    Okay.  So, it was just the general psych-101?

9   A    Right.  The required psychology courses.

10  Q    And what was your major in college?

11  A    My major was physical education, and my minor was English

12  literature.

13  Q    And in regards to psychology, have you had any other

14  training or background in psychology, or interactive psychology?

15  A    Just the informal training that twenty-one years as a

16  college baseball coach gives you.

17  Q    In regards to this particular case, we anticipate that some

18  of the individuals that may testify in this case, particularly

19  two juvenile individuals, those individuals actually

20  participated in some parts of this crime.  They actually have

21  been convicted in some of these crimes.  Do you have a concern

22  about those individuals testifying and their testimony?

23  A    I wouldn't say I have a concern, but I would probably have

24  to have irreparable evidence to -- you know -- to actually

25  believe what they said.  In other words, like, you know, this is

PAUL MILLER - VOIR DIRE (BY MR. FROST)                           173

1    a black, and this is a white, or this is a red, this is a blue,

2    and I could see it.  But if they just said, "I believe this,"

3    I'd probably have difficulty believing that they're telling the

4    truth.

5    Q    So, what you're saying is, that besides their testimony,

6    you would want to see some more evidence or some other things

7    that would substantiate what they're telling you, I guess?

8    A    Yes, sir.

9    Q    And in regards to these individuals who may testify, would

10   the fact that they also are criminals, would that make you feel

11   -- or hold that against the Government, in their case, that we

12   have to use those individuals to testify?

13   A    No, sir.  I wouldn't hold it against the Government, no.  I

14   mean, I have my own opinions as to, you know, why somebody would

15   do that.  But I wouldn't hold it against the Government.  I

16   wouldn't think they were trying to, you know, put something over

17   on anybody, or anything.

18   Q    And you said you have your own opinions about why somebody

19   would do that.  Could you share it with us why?

20   A    To get off the hook.

21   Q    Okay.  Maybe to get a lesser sentence, or --

22   A    Yeah.  Precisely.

23   Q    Now, in regards to that same situation where you have

24   individuals that are basically going to maybe rat-out a buddy,

25   do you have a problem with people that are going to testify

PAUL MILLER - VOIR DIRE (BY MR. FROST)                    174

1  against one of their friends?

2  A    Yes and no.  And I know that's not what you wanted to hear.

3  Q    No, that's okay.  Please just explain.

4  A    I would have a problem, because I'm very loyal, and I would

5  have a problem ever turning my back on a friend.  However, I

6  don't have any friends who have been accused of capital murder,

7  either.  So, I wouldn't -- I wouldn't hold it against somebody

8  for doing that.  I just have a hard time believing that somebody

9  could do that.

10  Q    And I understand that.  It's a hard place to be, and we're

11  not in those situations.  But thank you for your answer.  In

12  regards to, again, these same individuals, would you hold it

13  against them and not believe anything they say now, if you found

14  out that maybe at the beginning of this investigation, instead

15  of coming clean with everything that happened, they may have

16  told investigators that were investigating these murders things

17  that weren't exactly the truth, they lied to the folks?

18  A    If they were -- if they were, in fact, involved in the

19  crime, I would have expected them to lie, initially.

20  Q    Okay.  So, that's not something that would be unheard of?

21  A    No.  I would think that would be ordinary.

22  Q    Okay.  In regards to the age of the individuals involved,

23  and particularly, I've already told you there were two juvenile

24  individuals, and then we have the two defendants that are on

25  trial here, one was nineteen at the time, and one was eighteen

LASER BOND FORM A    ®    PENGAD • 1-800-631-6989

PAUL MILLER - VOIR DIRE (BY MR. FROST)                175

1    at the time of these murders.  Would you have a problem with

2    giving someone who is eighteen or nineteen the death penalty in

3    the appropriate case?

4    A    No.

5    Q    Now, as the Judge told you before, you have to take

6    aggravating -- I'm sorry, I can't pronounce that word today --

7    aggravating factors and weigh those against mitigating factors.

8    One of the mitigating factors can be the age of the individual.

9    Do you understand that you can take that mitigating factor and

10   use that in order to maybe not give the death penalty?

11   A    I understand that.  But I do not believe it applies in this

12   case.

13   Q    Okay.  And that's because you want to look at all the

14   evidence and see the facts of the murders?

15   A    Yes, sir.

16           MR. FROST:  Thank you.

17           PAUL MILLER - VOIR DIRE EXAMINATION

18   BY MR. SCHWIEGER:

19   Q    Good afternoon.  My name is "Stan" Schwieger.  I represent

20   Christopher Vialva, the man with the jacket there.  Let me

21   follow up on that last question -- or last answer, because I

22   want to make sure I heard it right.  Sometimes I don't

23   understand well, and I'm not trying to pick on you.  You stated

24   that you do not believe that youth applies in this -- that

25   youth, as a mitigating factor, applies in this case.  Did I

1  misstate your answer, or could you explain that, please?

2  A    No, I don't believe you misinterpreted it.  I believe if

3  you're eighteen or nineteen years old and you're proven to have

4  killed somebody in the first degree, that age is not a

5  mitigating circumstance there, that you should be treated the

6  same as a forty, fifty, sixty-year-old person.

7  Q    Okay.  So, you're saying that if the Judge instructed you

8  that, as a mitigating factor, that's just one that you could

9  consider, you're just not going to consider it in this case?

10 A    That's correct.

11 Q    Okay.  Now, let me ask you a couple of questions.  I'm a

12 baseball fan, but I've been kind of emersed in this.  I don't

13 know how your team did.  You stated that if your team qualified

14 for the national tournament --

15 A    We did not.

16 Q    Okay.  Now, you did also state that you have baseball camp

17 scheduled during June.  Could you tell the Court when those will

18 be?

19 A    Every year during June -- I work at McLennan Community

20 College -- and we sponsor summer league baseball camps for

21 Little Leaguers aged eight to twelve.  Of course, due to the

22 time reference that we have, and we have to get publicity out,

23 and things, those are scheduled for June 5th through the 9th,

24 June 12th through the 14th, and June 19th through the 23rd.

25 Q    And are those something that require your personal

1   attention to those matters?

2   A    My name is on the T-shirt.

3   Q    So, I guess the answer would be yes?

4   A    Yes, sir.

5   Q    Okay.  In your questionnaire, the question was this, "If a

6   sentence of life without the possibility of release is an

7   option, could you, nevertheless, return a verdict that would

8   result in the death penalty?"  And you said, "Yes," and you

9   answered, "They could kill again in prison."  Could you explain

10  your answer on that, please?

11  A    Well, perhaps my answer is media-warped, but you read all

12  the time about the gangs in prison and the fact of all the

13  crimes that are committed in prison, and, you know, I honestly

14  believe the only deterrent is capital punishment, the only true

15  deterrent.

16  Q    Okay.  So, for instance, if there would be an aggravating

17  factor in this matter called future dangerousness -- and as far

18  as we know right now, it's undefined -- but, basically, you

19  would look at that factor, and because of your answer on that

20  question, you would answer at this point, "Yes," if you found a

21  defendant guilty in this case.  Am I assuming that to be

22  correct?

23  A    "Yes," meaning the imposition of the death penalty?

24  Q    Yes.

25  A    Yes, sir.

PAUL MILLER - VOIR DIRE (BY MR. SCHWIEGER)                    178

1   Q    I'm assuming, then, basically, with you, then, that

2   basically, by your answer on the future dangerousness issue,

3   that you've already basically decided -- and don't let me put

4   words in your mouth, I'm just trying to repeat back what I hear

5   -- that you've already decided that if somebody -- if you found

6   somebody guilty of capital murder that they are automatically a

7   future danger.  Would that be a correct statement?

8   A    Yes, I believe it would.

9   Q    Okay.  Tied in with that is your question here on page 20,

10  it's question 119, "Do you believe our penal system is ever

11  successful in rehabilitating persons convicted of a crime," and

12  you answered, "Yes," but you answered, "Only in nonviolent

13  crimes."  Now, could you explain that answer?

14  A    Yes, sir.  You know, I believe if somebody is, you know,

15  experimenting with drugs, or goes in and pulls a verbal heist on

16  a 7-11 clerk, or something like that, something where he is not

17  -- he or she is not prepared to kill somebody.  You know, I

18  believe that if you walk into a store with a gun, you're

19  prepared to kill somebody.  I believe that if it were the

20  former, that they were just a drug offender, or a minor theft,

21  or a break-in to a house, or something without a weapon, and

22  then you go to prison, I believe, you know, that there could be

23  some rehabilitation by the justice system.  I do not believe

24  that, however, when somebody premeditatedly takes another life.

25  Q    Okay.  Assuming with me then that you have found a person

PAUL MILLER - VOIR DIRE (BY MR. SCHWIEGER)          179

1    or persons guilty of capital murder in this case, then is it

2    your disposition then that not only do you believe that they are

3    a future danger, but also that they are non-rehabilitatable, and

4    then incorporating that into the future dangerousness issue,

5    would you also agree with that?

6    A    Yes, sir.

7    Q    Okay.  Agreeing with that, would you then further agree

8    with your statement that you would push for the death penalty,

9    given those circumstances?  In an instance where you found a

10   violent offence, are you then likely to assume or rule out a

11   life punishment in this matter?

12   A    Well, like I said, that was probably a poor choice,

13   semantically.  But I would have no problem recommending or

14   voting to say yes to the death penalty in the jury room, and I,

15   in fact, believe that that's what should happen.

16            MR. SCHWIEGER:  Thank you.

17            PAUL MILLER - FURTHER VOIR DIRE EXAMINATION

18   BY THE COURT:

19   Q    Mr. Miller, is your presence indispensable to these

20   baseball camps you have at MCC?

21   A    I wouldn't say completely indispensable, but it would be

22   better if I'm there, since it is my camp.  But, no, if called, I

23   would serve.

24            THE COURT:  Thank you, sir.

25            PAUL MILLER - VOIR DIRE EXAMINATION

PAUL MILLER - VOIR DIRE (BY MR. HUNT, SR.)                180

1   BY MR. HUNT, SR.:

2   Q    Mr. Miller, I'm "Russ" Hunt, Sr.  Together with my son, we

3   represent Brandon Bernard.

4          MR. HUNT, SR.:  Brandon, would you stand up, please.

5   Thank you.  Go ahead and have a seat.

6   BY MR. HUNT, SR.:

7   Q    The reason that bring that up is because a concern of mine

8   is always that when two defendants are together that the jury is

9   going to lump them together, and if they think one person did

10  something, that punishment all of a sudden is going to spill

11  over to my client.  Do you understand that?

12  A    Yes, sir.

13  Q    That's a concern.  So, what we're all here about is to try

14  to find people that can listen to all of the evidence, that they

15  can start out with a presumption of innocence, and that they can

16  follow that through, and then balance all the evidence they

17  heard.  So, my concern then about you is -- and about every

18  other person that's on the panel -- is that I want to make

19  certain that they are capable of doing that, and that they're

20  willing to do that.  So, I need for you to address that, if you

21  would, please.

22  A    I think that there's two possible scenarios, one in which a

23  person is a party to a crime of this nature and makes no attempt

24  whatsoever to halt it, in fact, goes along with it, even though

25  they weren't the one that actually committed it.  The other

PAUL MILLER - VOIR DIRE (BY MR. HUNT, SR.)    181

1    scenario is, that one was there at a crime being committed and

2    made no attempt to try and stop it out of fear of their own

3    life, or other mitigating circumstances which made them think,

4    "I should stop this, but I'm afraid to," and the evidence and

5    the facts would sway me one way or the other.

6    Q    I see.  So, a mitigating fact then would be, well, if the

7    one person is pointing a gun, and he said, "You either do it or

8    I'll kill you," that would be something you'd consider to be a

9    mitigating factor?

10   A    I would think that would in that case, yes, sir.

11   Q    Okay.  The question that was asked in the questionnaire, I

12   think, that had to do with whether or not you would consider

13   life in prison as opposed to a death sentence, my concern in

14   your answer to that question in number -- I think it was 133 --

15   "I could be fair and impartial," you've heard three times now.

16   A    Uh-huh.

17   Q    Does that mean that you would be leaning toward the death

18   penalty if the defendant had been convicted -- and, of course,

19   we don't get to punishment unless a defendant has been convicted

20   -- does that mean you would be leaning toward the death penalty

21   as opposed to a life sentence?  Is that correct?

22   A    Yes, it is.

23   Q    Okay.  So, leaning means -- a bad word for this is a

24   "bias."  Your bias then would be toward giving a death sentence,

25   if you had convicted someone of a crime, a capital crime, where

1  the only possible punishments were life without release, or

2  death, your bias, your leaning, would be toward giving them the

3  death sentence?  Is that a fair statement?

4  A    Yes, sir.

5  Q    Okay.  One other area of concern that I wanted to address

6  has to do with something that Mr. Frost characterized as people

7  that "rat-out their buddies."  If you were selected on a jury,

8  would you listen very carefully to the testimony of the rat to

9  find out whether or not they were telling the truth when they

10 testified, or whether they were telling the truth when they

11 first gave their statement, so that you then could figure out

12 which was the lie?

13 A    I would certainly try and look at any other evidence that

14 enters into their testimony to see if it would, you know,

15 suggest that they were now telling the truth, or formerly

16 telling the truth.

17 Q    So, you would use all of those abilities to try to examine

18 for yourself, not just accept either the Government's position

19 or the defense position that they're lying.  You would try to

20 tie all the factors together to determine when they were lying?

21 A    That's correct.  You have to understand that I -- you know,

22 for twenty-one years, I've had to do that with guys who says,

23 "No, I wasn't out late.  No, I didn't do this.  Yes, I did do

24 that."  And that's what I have to do with my eighteen and

25 nineteen-year-olds.

PAUL MILLER - VOIR DIRE (BY MR. HUNT, SR.)                    183

1   Q    I understand.  Of course, you understand that the defendant

2   in this case that I represent, Brandon Bernard, certainly isn't

3   here to say, "I'm not guilty."  But if he got convicted in this

4   offense, so that he would have been convicted of a capital

5   murder case -- I'm going back to something -- your bias would be

6   to say, "He needs the death penalty, unless you can come up with

7   some clear and convincing proof that he doesn't."  Is that a

8   fair statement?

9   A    Yes, sir.

10        MR. HUNT, SR.:  All right.  Thank you, sir.

11        THE COURT:  Thank you, Mr. Miller.  If you will call

12  the code-a-phone in the afternoons, that's the way you will get

13  your information about whether you should return.  Thank you,

14  sir.

15        MR. MILLER:  Okay.  Beginning tomorrow, or today, or

16  --

17        THE COURT:  Tomorrow.

18     (Mr. Miller Excused.)

19        THE COURT:  No motions?

20        MR. FROST:  Not from the Government.

21        MR. SCHWIEGER:  On behalf of Mr. Vialva, Your Honor,

22  we would move for a challenge for cause.  I think the last

23  statement kind of summarizes the reason for it, that basically

24  he would need clear and convincing evidence that he should not

25  impose the death penalty.  That, first, violates the burden of

184

1   proof in the matter.  And, secondly, I think that, under Morgan,

2   that basically, he is an automatic death penalty advocate, and

3   basically would vote for the death penalty automatically.  And I

4   think that clearly illustrated that premise right there, Your

5   Honor, that basically he's an automatic vote, and we would move

6   for cause on that basis.

7           MR. HUNT, SR.:  We would certainly join in that, Your

8   Honor.

9           MR. FROST:  Your Honor, in regards to that, the

10  witness did not -- the juror did not state that he would not

11  consider the full range.  That's the question, would he consider

12  life, or would he consider death?  He never said that.  What

13  they tried to do was capture him into saying, "Yes, I believe

14  that in murder cases, or in certain types of cases, that I would

15  lean towards the death penalty."  Well, there's an awful lot of

16  folks that would lean towards the death penalty.  The legal

17  question is whether he would consider the full range of

18  punishment, and he indicated that he would.

19          THE COURT:  I believe he's just a little bit too

20  strong.  Challenge granted.

21          Next is Number 86, Bobby Poncik.  Any areas on this

22  guy?

23          MR. FRAZIER:  Question number 60, again, the question

24  regarding a sentence of life without possibility of release, in

25  returning a death penalty.  The only question the Government had

1    was the explanation, "If the evidence shown no doubt the crime

2    was committed by the individual, then, yes, I could."  Question,

3    first of all, regarding the burden of proof, you know, beyond a

4    reasonable doubt.  And then, second of all, whether that

5    question -- how that ties into the conviction, since, obviously,

6    the question only poses the possibility of these sentences after

7    conviction.  So, I was confused by the answer.  That's all we

8    have.

9            MR. GOAINS:  Your Honor, questions 52 and 53, based on

10   those answers, he's going to automatically vote for the death

11   penalty.

12           Question number 69, he subscribes to the Temple Daily

13   News, just how much he's heard on the case, Your Honor.

14           Also, 108 and 109, just his feelings on law

15   enforcement and whether he will treat all law enforcement as

16   equally as witnesses, Your Honor.

17           And then 130, his plans to be out of the Western

18   District.

19           133, "Do you want to serve on the jury," and he

20   states, "No."  If you would inquire into that, Your Honor.

21           MR. HUNT, JR.:  Your Honor, on page 10, Mr. Goains, I

22   believe, already mentioned questions 52 and 53.  I also don't

23   understand his response on 53, the written description of what

24   he said.  So, if we could inquire as to what exactly he's trying

25   to say there.

1      THE COURT:  Which one?

2      MR. HUNT, JR.:  53, where he says, "I believe if lots

3  of people know if you commit a terrible crime, punishment will

4  be severe (death penalty)."  I'm not saying --

5      THE COURT:  I think that's saying, I believe, "If lots

6  of people". . .

7      MR. HUNT, JR.:  That may be what he's saying.  He may

8  also be saying that if you commit a terrible crime, you should

9  be punished with the death penalty.  I'm just not sure about

10  that.

11      Additionally, on page 23, he strongly agrees that any

12  person who commits murder should pay with his own life.  That's

13  going back to the earlier question --

14      THE COURT:  Which one is that?

15      MR. HUNT, JR.:  Question (f).  That seems to indicate

16  that he would believe that if you commit a murder, you should be

17  punished with death.

18      THE COURT:  Is that it?

19      MR. HUNT, JR.:  Yes, sir.

20      THE COURT:  Bobby Poncik.

21      BOBBY PONCIK, PROSPECTIVE JUROR, SWORN

22      VOIR DIRE EXAMINATION

23  BY THE COURT:

24  Q    Good afternoon.  Is it Poncik?

25  A    Yes, sir.  Poncik.

BOBBY PONCIK - VOIR DIRE (BY THE COURT)                    187

1    Q    How are you?

2    A    Fine.

3    Q    Mr. Poncik, first of all, you indicated that you, or a

4    member of your family, had worked in a mental health facility or

5    a hospital in the past.  Can you explain who and --

6    A    Yes, sir.  That's my father.  He works there now.  He works

7    at MH/MR.

8    Q    All right.  In what capacity?

9    A    He's a supervisor over clients that do certain projects.

10   Q    Is that in this area?

11   A    It's Temple.

12.  Q    Temple.  You indicated in two of your answer that you

13   believe in a tooth-for-a-tooth and an eye-for-an-eye, and I

14   believe it ask do you believe that the death penalty serves a

15   legitimate purpose in our society, and you said, "Yes."  "If so,

16   what purposes or purposes?"  And I think what you're saying, "I

17   believe if lots of people know if you commit a terrible crime,

18   the punishment will be severe."  Is that what your response was?

19   A    Yes, sir.  That's what it was.

20   Q    Okay.  Now, let me ask you this.  When a person is

21   convicted of a capital offense in Federal Court, then the jury

22   hears additional evidence, additional arguments, and then the

23   jury goes out to deliberate a second time on punishment.  What

24   the jury has to determine is, first of all, whether or not the

25   defendant had the intent that somebody die.  Then the jury is

BOBBY PONCIK - VOIR DIRE (BY THE COURT)          188

1  asked to determine if certain aggravating factors exist.  For

2  instance, the Government has alleged, as an aggravating factor

3  in this case, that two people were killed rather than just one.

4  The jury also considers certain mitigating factors that the

5  defense will put evidence on about, such as the age of the

6  defendants could be considered a mitigating factor by the jury.

7  Certain social background factors can be considered in

8  mitigating.  Then the jury is asked to balance those factors,

9  the aggravating ones and the mitigating ones, if any they found,

10  and then determine whether the jury would recommend that the

11  punishment be death or life in the penitentiary without the

12  possibility of being released.  In the federal system, that

13  means just what it says, if a person is sentenced to life

14  without possibility of release, they die in prison.  It's not

15  like the state system, where that rarely happens.  Now,

16  understanding that, do you feel you would be able to consider

17  both options and the evidence that will be presented for your

18  consideration, if you were on the jury and the jury had

19  convicted someone?

20  A    Yes, sir.

21  Q    All right.  In another answer, you were asked, "If a

22  sentence of life without the possibility of release is an

23  option, could you, nevertheless, return a verdict that would

24  result in the death penalty," and you said, "Yes."  Then you

25  said, "If the evidence shows no doubt the crime was committed by

BOBBY PONCIK - VOIR DIRE (BY THE COURT)                189

1    the individual, then, yes, I could."  After hearing my

2    explanation this morning about the burden of proof that the

3    Government has, which is to prove guilt beyond a reasonable

4    doubt and not beyond any doubt, do you understand what the

5    difference is, and do you feel you would have any difficulty in

6    placing the Government in a position of having to prove guilt

7    beyond a reasonable doubt, but not by any doubt?

8    A    Yes, sir.  I understand that.

9    Q    All right.  You indicated that you are a regular reader of

10   the Temple Daily Telegram and the Austin American Statesman.

11   Have you read anything about this case before today?

12   A    Yes, sir, I have.

13   Q    Back when it happened?

14   A    Yes, sir.

15   Q    Would you say you followed it closely, or you just read it

16   when it initially happened, or how would you characterize your

17   --

18   A    Just read it as the ordinary news in the paper every day.

19   Q    Okay.  Do you understand that if you're selected on the

20   jury and you are presented with evidence that you feel is

21   reliable and credible, but that evidence differs from what you

22   may have read initially, that you would be bound to accept what

23   you hear in the courtroom and not rely on what you read in the

24   paper?  Do you understand that?

25   A    Yes, sir, I would.

BOBBY PONCIK - VOIR DIRE (BY THE COURT)                190

1    Q    Okay.  You were asked if you have any strong personal

2    feelings about law enforcement, in general, or police officers,

3    in particular, and you said, yes, that you feel all departments

4    of law enforcement are underpaid.  I need to ask you this

5    question.  When witnesses testify in a trial, the jury almost

6    always learns some things about their background, where they

7    live, where they work, what their educational background is,

8    that kind of thing, and, depending on their purpose for

9    testifying, maybe quite a lot about their educational

10   background, or whatever.  Of course, a jury is entitled to use

11   that information in making a determination as to whether the

12   jury wants to accept what a person says.  A nuclear physicist

13   can be wrong and give an opinion that's wrong.  A minister can

14   be wrong.  A minister could even commit perjury.  It's possible.

15   A person who has been convicted of felonies in the past can be

16   right.  So, what a jury's obligation is in that regard is to

17   take into account all of the factors you learn about that

18   particular person in making a decision about their testimony,

19   but what a jury isn't allowed to do is to decide in advance,

20   "I'm going to accept everything that person says because of who

21   they are," or, "I'm going to reject anything that person says

22   because of what their background is."  Do you understand?

23   A    Yes, sir.

24   Q    Would you have any difficulty with that?

25   A    No, sir.

BOBBY PONCIK - VOIR DIRE (BY THE COURT)                     191

1    Q    Okay.  In this case, the Government intends to call as

2    witnesses persons who, I assume, have been convicted of felonies

3    in the past, and persons who were co-defendants to these

4    defendants, who have entered a guilty plea and entered into a

5    plea bargain with the Government.  Our rules provide for that

6    kind of testimony to be given and for a jury to consider it.

7    The jury is instructed that they have to consider that type of

8    evidence with great caution and greater care than they would

9    ordinary testimony.  But my question is, would you be able to at

10   least consider that type of evidence from a co-defendant, if it

11   were presented?

12   A    Yes, sir, I would.

13   Q    Thank you, sir.  You indicated that you know one or all of

14   the defense attorneys through TV and have heard their names on

15   local newscasts.  Have you formed any opinion about any of them

16   that would have any affect on your ability to make a decision

17   based on the evidence?

18   A    No, sir.  I've just seen them on TV.

19   Q    Okay.  Now, you indicate that you would prefer not to serve

20   on the jury because you are a divorced parent and you get your

21   kids twice during the week, and this would prevent you from

22   doing this.  Can you explain to me why serving on the jury would

23   prevent you from visiting with your kids?

24   A    I get off at four every day, and I pick my kids up from

25   school.  And then my kids have a good relationship with my wife

BOBBY PONCIK - VOIR DIRE (BY THE COURT)                    192

1    now, but I take them to school every morning, and they don't

2    feel comfortable with her taking them to school just quite yet.

3    So, that's the only reason I would have.

4    Q    I understand.  Well, that's an important consideration,

5    certainly.  Let me ask you one other question.  You indicated

6    that you strongly agree that any person, man or woman, young or

7    old, who commits murder should pay with his own life.  I've

8    already explained to you the manner the jury uses in determining

9    what the punishment would be, and you indicated that you could

10   consider the evidence presented, and both options, and weigh the

11   aggravating and mitigating factors, and make a decision.  Your

12   answer to that particular statement, that you strongly agree

13   with that, that doesn't change the fact that you could weigh

14   both options and consider all the evidence, correct?

15   A    Yes, sir.  That's correct.

16        (Hushed conversation.)

17        THE COURT:  Okay, Mr. Poncik, the lawyers have agreed

18   to excuse you so your situation with your children won't be

19   inhibited, if that's what you would like for us to do?

20        PROSEPECTIVE JUROR PONCIK:  Yes, sir, I would.  I

21   appreciate that.

22        THE COURT:  All right, sir.  Thank you for being here,

23   sir.

24        (Mr. Poncik Excused.)

25        THE COURT:  David Santos Ignacio.  Number 147.

1              MR. BLAGG:  Judge, the questions I have are question

2    52, his view of the death penalty --

3              THE COURT:  I'm sorry?

4              MR. BLAGG:  Question 52, his question, his

5    questionnaire on the death penalty, I was hoping you would clear

6    that up, due to that answer.

7              THE COURT:  Okay.

8              MR. BLAGG:  Question 86, he demonstrates a problem

9    that his son had with the law.  I'd like to ask you to make

10   certain that wouldn't affect his service as a juror.

11             Question 87, apparently, his wife has some sort of a

12   Complaint or a lawsuit against the Federal Government.

13             THE COURT:  Against the Federal Government?

14             MR. BLAGG:  EEO, or something like that.  I think it's

15   down at the bottom.

16             THE COURT:  I see.  Down here at the bottom.

17             MR. BLAGG:  The same request, that you verify that he

18   wouldn't be biased against the Government because of that.

19             THE COURT:  Okay.

20             MR. BLAGG:  Question 122, concerning publicity that he

21   has heard of, or read.  If you would hopefully clarify with him

22   whether or not he could set that aside.

23             THE COURT:  Okay.

24             MR. BLAGG:  Finally, Judge, page 23, answer (g), his

25   statement about the death penalty in that regard.  That's all we

1    have.

2            THE COURT:  Mr. Schwieger?

3            MR. SCHWIEGER:  Your Honor, page 2 points out that he

4    currently is employed by the Army at this current time and has

5    been in military service for thirty years.  We would ask that,

6    basically, he be questioned concerning that background, whether

7    he would have leanings toward the CID officers, or anybody else

8    that might be involved with the military in this matter.

9            In addition, it appears that he has participated in a

10   couple of court martials.

11           THE COURT:  Where are you looking?

12           MR. SCHWIEGER:  I'm sorry.  Page 6, Your Honor, five

13   lines down.  Just general background of what occurred in those.

14           Page 9, the panel member has taken some psychology

15   classes at the College of Guam.  We'd like to know exactly what

16   type of college classes and what they touched on.

17           I believe the Government also mentioned, on page 69,

18   he subscribes to the Killeen Daily Herald.

19           He has a side-note, Your Honor, I think juxtaposition

20   of people that he believes he most admires Ronald Reagan and

21   Shania Twain, is kind of interesting.

22           Page 20, question 122, the background of his knowledge

23   on the matter from the media, Your Honor.  And I believe that

24   concludes our questions.

25           THE COURT:  Okay.

195

1        MR. HUNT, JR.:  Your Honor, we believe everything has

2   been covered by the others.

3        THE COURT:  I agree with you.

4            DAVID IGNACIO, PROSPECTIVE JUROR, SWORN

5                    VOIR DIRE EXAMINATION

6   BY THE COURT:

7   Q    Good afternoon, Mr. Ignacio.

8   A    Good afternoon, sir.

9   Q    Let me ask you, first of all, you indicated you've been in

10  the military for thirty years, and you are working at Fort Hood

11  now?

12  A    That's correct, sir.

13  Q    And the Government alleges that the offenses in this case

14  occurred at Fort Hood.  Do you think the fact that you would be

15  familiar with Fort Hood and work there and have been in the

16  military and have probably been around CID investigators a good

17  bit, do you think that would affect your ability to consider the

18  evidence in this case, or affect your service on this jury in

19  any way?

20  A    No.

21  Q    You don't think so?

22  A    No. .

23  Q    You indicated that you served on two special court martials

24  in the past?

25  A    That's correct, Your Honor.

DAVID IGNACIO - VOIR DIRE (BY THE COURT)                196

1    Q    As a panel member.  That's the same as a juror, I assume?

2    A    Similar.

3    Q    Similar?

4    A    Similar to a juror.

5    Q    Okay.  Anything about those two experiences that you think

6    would have any affect on your ability to judge the evidence and

7    sit on a case of this nature?

8    A    No, Your Honor.

9    Q    Okay.  You indicated that you have taken some psychology

10   courses at the College of Guam.  Can you tell me what type of

11   psychology courses those were?

12   A    Just introduction to psychology at the College of Guam

13   about back in 1961.

14   Q    Okay.  You were asked, "Are you in favor of the death

15   penalty as a punishment for crime," and you said, "No."  Then,

16   in parentheses, you said, "It depends on the crime."  And then

17   you said, "If the crime is as serious, like premeditated

18   murder."  What I need to ask you is this.  If you believe that

19   premeditated murder is an offense that could result in the death

20   penalty, do you mean at all by that that if you found someone

21   guilty of premeditated murder, you would think the death penalty

22   should be automatic, or just that it could be considered?

23   A    It could be considered, Your Honor.

24   Q    The way that works, if a jury convicts a person of capital

25   murder in Federal Court, the jury then hears additional evidence

DAVID IGNACIO - VOIR DIRE (BY THE COURT)                197

1    and arguments, and goes back to the jury room to deliberate a

2    second time on punishment, and the jury first is asked to

3    determine whether or not the defendant had the intent that

4    someone die.  If the jury finds that is true, then the jury is

5    asked to consider whether there were aggravating factors, the

6    Government has to prove beyond a reasonable doubt.  As an

7    example in this case, the Government has alleged that the fact

8    that two people died is an aggravating factor.  The jury is also

9    asked to consider mitigating factors that the defense will

10   present evidence on.  Those mitigating factors can include

11   things like the age of the defendants, their social background,

12   any number of things.  Then, of those matters that the jury

13   finds do exist, any aggravating factors and any mitigating

14   factors, then the jury is asked to balance those and determine

15   whether to recommend a sentence of death, or a sentence of life

16   without possibility of release.  In the federal system, that

17   means just that.  If a person is sentenced to life without the

18   possibility of release, they die in prison.  So, understanding

19   how the jury would go about making that decision, do you feel

20   that you could consider all of the evidence on punishment, and

21   both of the options, and weigh those factors, and make a

22   decision in that manner?

23   A    I do.

24   Q    All right, sir.  Thank you.  You indicate that you

25   regularly read the Killeen Daily Herald.  Have you read anything

DAVID IGNACIO - VOIR DIRE (BY THE COURT)                    198

1    about this case in the past, that you recall?

2    A    Yes, sir, and some from the television media.

3    Q    Okay.  Do you understand, sir, that if you hear evidence --

4    if you are a juror and evidence is presented that you find to be

5    reliable and that you want to accept, but it happens to be

6    different from something you may have seen on television or read

7    in the paper, that you would be required to accept what you hear

8    in the courtroom and certainly not what you previously read in

9    the paper or heard on television?  Do you understand that?

10   A    Yes, Your Honor.

11   Q    All right, sir.  You indicate that your son had some minor

12   problem with the law when he was younger.  Is there anything

13   about that experience that would affect you in any way, do you

14   think?

15   A    No, Your Honor.

16   Q    Okay.  And you also indicate that your wife is a

17   complainant in a matter against the Department of the Army for

18   equal opportunity matters.  Can you explain to me a little bit

19   what that's about?

20   A    She brought in a complaint against the U. S. Army.  She

21   feels that she's being -- she feels that she's being harassed

22   because she is a whistle-blower on some sort of transaction

23   which she feels is not appropriate.  It's conducive to fraud,

24   waste and abuse.  But that case is still pending, though.

25   Q    All right.  Is there anything that's happened involving

DAVID IGNACIO - VOIR DIRE (BY THE COURT)                 199

1    that case that would cause you to have ill feelings toward the

2    military, thus, the Government, or anything at all that might

3    affect your ability to sit on the jury in this case?

4    A    No, Your Honor.

5              THE COURT:  Okay.  Thank you, Mr. Ignacio.  I believe

6    that's all the questions I have.

7              DAVID IGNACIO - VOIR DIRE EXAMINATION

8    BY MR. BLAGG:

9    Q    Mr. Ignacio, I'm Bill Blagg.  How are you today?

10   A    Fine.  Thank you.

11   Q.   Is it Sergeant, or is it Mister now?

12   A    Well, I'm a retired Sergeant-Major for thirty straight

13   years.

14   Q    Okay.  Thank you.  And when did you sit on the court

15   martials?  What year was that?

16   A    About two years before I retired.  I retired in '96, and I

17   think it was about '94, in Fort Hood, Texas, and about two cases

18   in Alaska.

19   Q    In Alaska?

20   A    Yes, before 1993.

21   Q    Do you remember what kind of case the last one was?

22   A    One was, I think, child abuse, and the other one was drugs,

23   a case involving drugs.

24   Q    Okay.  Do you remember who investigated those cases?

25   A    Sir?

1  Q    Do you remember who the investigators were?

2  A    No.

3  Q    How about -- have you had some experience or do you know

4  anything about Army CID, Criminal Investigation Division?

5  A    Yes.  Not what they do, specifically, but I know their

6  functions.

7  Q    Okay.  Do you remember if they were involved in the court

8  martials that you sat in?

9  A    No.

10  Q    They were not?

11  A    No, they were not.

12  Q    Do you have any experience with the Army CID directly at

13  all?  Do you know anybody that works in the CID?

14  A    No, sir.  Just for that particular -- like at Fort Hood, I

15  know where the CID office is, but I've never been, you know,

16  gotten involved -- any direct involvement with them.

17  Q    There are going to be witnesses that testify in this case

18  that are members of the Army CID.  That's the reason I asked

19  that question.

20  A    I don't know anybody from that division or department.

21  Q    All right.  Thank you, sir.  You understand -- I think

22  Judge Smith, I think, very clearly explained to you the way that

23  things work.  You read something about this case when it

24  happened, is that correct?

25  A    Yes, sir.

DAVID IGNACIO - VOIR DIRE (BY MR. BLAGG)          201

1   Q    But are you able to be, as a juror, the type of juror that

2   can set that aside and decide this case only by the evidence

3   that's presented in this courtroom over the next couple of weeks

4   in deciding what a fair verdict would be?

5   A    Yes, sir.

6   Q    The burden of proof is upon the Government beyond a

7   reasonable doubt.  Do you recall Judge Smith explaining that to

8   you earlier?

9   A    Yes, sir.

10  Q    And that's the burden, and it's a heavy burden, and the

11  Government accepts that responsibility in proving the case

12  beyond a reasonable doubt.  But that's not the types of things

13  that Judge Smith talked about earlier that you hear on TV

14  sometimes.  Beyond a shadow of a doubt.  A hundred percent.

15  Beyond any doubt whatsoever.  Do you understand that?

16  A    Yes, sir.

17  Q    Now, witnesses come and testify, and one of the juror's

18  most important responsibilities is to look at that witness when

19  they testify, and later on, you go back in the jury room to

20  determine whether or not the jury, as a whole, is going to

21  believe all, part, or none of what that witness testified to.

22  Do you understand that role?

23  A    Yes, sir.

24  Q    It's kind of the same as it was when you were on the

25  military court martials, right?

DAVID IGNACIO - VOIR DIRE (BY MR. BLAGG)                    202

1    A    That's correct.

2    Q    And are you aware that sometimes witnesses come before the

3    Court and testify that may have been convicted of crimes, might

4    have been involved in the crime, might have plead guilty to the

5    crime, may have made a deal with the Government for a plea

6    bargain, and testify?

7    A    Yes, sir.

8    Q    Have you had that in any of your court martials?

9    A    No.

10   Q    Judge Smith would caution any jury that anyone like that, a

11   person who has been convicted or who has a plea bargain

12   agreement, credibility must be judged with great caution,

13   because they were involved in the crime.  Do you think you are

14   the type of juror that could do that fairly?

15   A    I believe so, sir.

16   Q    And would you be the type of juror who would automatically

17   disregard anything that someone who said, like that, that had

18   been involved in the crime, or could you listen to what they say

19   and determine through that, and other evidence, whether or not

20   they're telling the truth?

21   A    Listen and determine whether they are telling the truth,

22   based on the evidence.

23        MR. BLAGG:  Okay.  I think that's all I have, sir.

24   Thank you.

25              DAVID IGNACIO - VOIR DIRE EXAMINATION

DAVID IGNACIO - VOIR DIRE (BY MR. SCHWIEGER)                    203

1    BY MR. SCHWIEGER:

2    Q    Good afternoon, sir.  My name is "Stan" Schwieger.  I

3    represent Mr. "Chris" Vialva.  He's the man in the suit coat

4    back there.  I have been accused of asking questions that don't

5    make sense.  So, if I do that to you, will you please stop me?

6    A    (Nodding head.)

7    Q    Okay.  The first thing I want to touch upon is the last

8    thing the Government was talking about, and that is witness

9    credibility.  I guess the Judge has told you, and the Government

10   has told you, and I would like to tell you again that,

11   basically, you are going to be the person, as you understand,

12   having served on court martials, as the person who's going to

13   make decisions on who is telling the truth and not telling the

14   truth.  Do you understand that, do you, sir?

15   A    Yes, sir.

16   Q    Okay.  And part of the, as the Judge talked about this

17   morning, the Court's Charge, do you recall that, when the Judge

18   said, basically, he's going to give you the law that's

19   applicable to this case.  And part of that law would be that,

20   basically, you are to view -- and I believe this will be

21   included in the Charge -- you are to view with great caution any

22   testimony that's given from a co-defendant who has made a deal

23   with the Government in this case.  Do you understand that?

24   A    That's correct.  Yes.

25   Q    Okay.  Sir, being a juror, would you be able to follow that

DAVID IGNACIO - VOIR DIRE (BY MR. SCHWIEGER)    204

1    responsibility and hold the Government to that standard, that

2    you would view that type of testimony with great caution?

3    A    I will be able to do it.

4    Q    Okay.  Sir, there's been talk about the burdens of proof in

5    this case, and I guess, through your prior service on a court

6    martial -- and I'm unfamiliar with the military wholly.  Is the

7    burden of proof on a court martial beyond a reasonable doubt?

8    A    Yes, sir.

9    Q    Okay.  And are you generally familiar -- and, if you're

10   not, that's basically what the gray sign there reflects

11   basically what we feel the Charge will tell you, again, coming

12   from the Court, what beyond a reasonable doubt means, and that

13   is the kind of doubt that would cause you to hesitate in the

14   most important of your own affairs.  Now, that's applicable to

15   both the guilt-innocence phase and certain issues in punishment,

16   if we get to punishment.  I want to talk to you a little bit

17   about that, if I could.  There is a certain set of issues in

18   punishment, potentially, that are the intent issues, and they're

19   kind of a hurdle or a door that you must cross over before you

20   get to the aggravating and mitigating circumstances.  Again, the

21   Government's burden of proof on that is beyond a reasonable

22   doubt.  Moving on, if the jury would find the intent issue

23   beyond a reasonable doubt, then the jury must be called upon to

24   weigh aggravating and mitigating circumstances in this case.

25   Some aggravating circumstances, as the Judge told you, may be

DAVID IGNACIO - VOIR DIRE (BY MR. SCHWIEGER)          205

1    multiple killings, or heinous, atrocious, and cruel, or several

2    elements.  Again, the jury must find each and every one of those

3    beyond a reasonable doubt, and all twelve jurors must find that.

4    On the mitigating circumstances, that could be something as

5    youth, or brain damage, or a thousand other things that can be

6    mitigating.  In the defense, a single juror can find one of

7    those, and you must find that only beyond a preponderance of the

8    evidence.  Do you understand the concept of a preponderance of

9    the evidence as opposed to burden of proof of beyond a

10   reasonable doubt?

11   A    Yes, sir.

12   Q    Okay.  And, Mr. Ignacio, are you the type of person that

13   could, if you had eleven jurors sitting and staring back at you

14   -- the jury has been out for awhile -- are you the type of

15   person that we could count on to, if you took a stand one way or

16   the other, to maintain that stand, even if everybody is

17   breathing down your neck?  Do you understand what I'm asking?

18   A    Yes, sir.

19   Q    Okay.  What do you think about that?  How would you face

20   that type of challenge, if faced with it?

21   A    I have my own conscience, and I would let the pallet of my

22   soul be my guide.

23   Q    Okay.  What do you mean by that, sir?

24   A    I am free to choose the right from the wrong, and, in my

25   opinion, I feel that being given pressure, if, in my opinion, I

1    know that the facts are presented -- the facts are well

2    presented and it's beyond a reasonable doubt and to common

3    sense, I will go with what my conscience tells me to do, which

4    is the right thing.  I will follow what my conscience tells me

5    and not because people are breathing down my neck.

6                MR. SCHWIEGER:  Thank you, sir.

7                DAVID IGNACIO - VOIR DIRE EXAMINATION

8    BY MR. HUNT, JR.:

9    Q    Mr. Ignacio, my name is "Russ" Hunt, Jr.  I'm one of the

10   two attorneys that represent Brandon Bernard over here.

11               MR. HUNT, JR.:  Brandon, would you please stand up for

12   me?  You can go ahead and have a seat.  This is Brandon, who my

13   father and I represent.

14   BY MR. HUNT, JR.:

15   Q    Frankly, I want to start off with talking about a concern

16   of mine, and that is because Mr. Bernard and Mr. Vialva sit here

17   next to each other, and we sit at the same table with these

18   other attorneys, my fear is always that the folks on the jury

19   are going to start kind of blending the two young men together,

20   so that they think, "Oh, well, what one person did can be always

21   attributed to what somebody else did."  My fear is always going

22   to be that a person on the jury will do that, will blend the two

23   people together and all of the different acts will be kind of

24   blended together, because there will be a lot of witnesses

25   testifying.  I guess my question for you is, if you're on the

DAVID IGNACIO - VOIR DIRE (BY MR. HUNT, JR.)      207

1   jury, do you think you will be able to separate the things that

2   the one person is responsible for as opposed to what another

3   person may be responsible for?  Does that question make sense?

4   A    Yes.

5   Q    Do you think that you'll be able to do that?

6   A    I will be.

7   Q    Can you give me any insight into maybe your work background

8   or something about you that might help you to do that, to kind

9   of segregate people's responsibilities like that?

10  A    Not based on where I work, but based on what is being

11  presented and based on the merits of the case, I must confine my

12  -- whatever decision I have to make based on the specific thing

13  that applies to that particular individual.

14  Q    And will you listen to all of the evidence before you make

15  up your mind one way or the other?

16  A    Definitely.

17  Q    There's a few questions I had about your questionnaire.

18  You indicate that you are a test administrator at Fort Hood.

19  What exactly do you do?

20  A    I am a test examiner, and I conduct tests for soldiers.  I

21  administer the tests about basic education to soldiers going to

22  attend the non-commissioned officer courses, or those soldiers

23  who want to raise their general technical intelligence scores.

24  And I also conduct basic non-commissioned officer mathematics

25  tests.  And I do GIT predictor tests, also.

DAVID IGNACIO - VOIR DIRE (BY MR. HUNT, JR.)                    208

1    Q    You do what predictor tests?

2    A    GIT predictor, which is a general intelligence technical

3    test.

4    Q    Okay.  Do you just conduct the tests, or do you also help

5    educate people to --

6    A    No.  I conduct the tests and then I grade them, and that's

7    my only function there.

8    Q    Okay.  I believe, on page 23 of the questionnaire, there

9    was one question that you had an interesting answer on, and the

10   question was, "Do you agree or disagree with this proposition,

11   that is, that the death penalty cannot be regarded as a sane

12   method for dealing with crime?"  And you agreed with that.  Can

13   you explain why it is that that's your opinion?

14   A    Can you repeat that again, please?

15   Q    Yes, sir.  The question says, "The death penalty cannot be

16   regarded as a sane method for dealing with crime," and you

17   indicated that you agreed with that, that the death penalty

18   cannot be a sane method for dealing with crime.  Can you explain

19   what you meant when you said that?  I'm certainly not

20   disagreeing with you, I'm just trying to figure out what your

21   thoughts about that are.

22   A    At the time when I answered that, that's exactly what I

23   mean.  I agree that the death penalty is really not a sane

24   method.  The only thing that it will accomplish is serve as a

25   deterrence to further crime.  But when I was doing the

DAVID IGNACIO - VOIR DIRE (BY MR. HUNT, JR.)   209

1  questionnaire, that's exactly how I felt.

2  Q   And zeroing in on the word "sane", exactly how does that

3  fit into that picture?  I'm just trying to get an insight into

4  who you are and what your --

5  A   Based on a little bit -- it has to do a little bit with my

6  religious belief.  I'm a Catholic, and we don't believe in

7  killing.  Okay?  But if the law provides for that, then I must

8  support the law, to base it on what is presented -- based on the

9  evidence presented, that proves the case beyond a reasonable

10 doubt -- beyond the reason of a doubt, which is -- and I include

11 also common sense.

12 Q   I believe you're giving a very thoughtful answer, and I

13 appreciate your putting so much thought into the answer.  One

14 other question.  I'm wondering if I should ask you about this or

15 not, but you said one of the last books you read is "Chariots of

16 the Gods."  Frankly, I love to read books like that.  Is that

17 the book where the guy is talking about where the pyramids came

18 from, and that kind of stuff?  Is that the same book I'm

19 thinking of?

20 A   Exactly.

21 Q   Tell me what your impression of that book was.  I tell you

22 why I'm asking you that.  My impression of that author is that

23 he pulls a lot of information from a lot of very broadly-

24 disbursed kind of sources and uses them and ties them and forces

25 them into the story that he really wants to come out of the

1   story, so he can then prove something that he wants to prove.

2   That's my impression of the guy, and I've read several of his

3   books, and I think he does that in all of his books.  My fear is

4   that -- well, not fear, but I'm wondering how that might impact

5   on the way that you would look at a story that was being

6   presented to you in a courtroom.  So, can you tell me what your

7   impression of that particular book is?

8   A    I just like to -- based on what Charles Steniken wrote in

9   that, I like to juxtapose the religious aspect of it, you know,

10  where there was a Moses, and, from that book, he's saying that

11  maybe there was a spaceman that did that, you know, shot

12  something behind his -- behind is neck, and then that spaceman

13  is controlling Moses, telling him to do things and control

14  things and get things accomplished, so that they can produce

15  fuel to fly back.  Because they ran out of fuel, they found out

16  that by controlling Moses, he can get somebody to deal with that

17  fuel and jettison off Earth.  That's basically what I like about

18  it, juxtaposing the two things.

19       MR. HUNT, JR.:  Thank you, Mr. Ignacio.

20       THE COURT:  Mr. Ignacio, thank you very much.  If you

21  will call the code-a-phone number you have each afternoon,

22  starting tomorrow, that's how you will find out when and if you

23  need to return.  Thank you.

24       MR. IGNACIO:  Thank you, Your Honor.

25       (Mr. Ignacio Excused.)

1    THE COURT:  Let's change the order and go to Number
2    161, Dana Pate.  Two of these folks live a long way from the
3    courthouse, and we might as well go ahead and get them on the
4    road.

5    Any challenges to Mr. Ignacio?

6    MR. FRAZIER:  I'm sorry, Your Honor?

7    THE COURT:  Any challenges to Mr. Ignacio?  I can't
8    imagine what it would be.

9    MR. FRAZIER:  I can't think of a legal one, Your
10   Honor.

11   THE COURT:  All right.  How about Mrs. Pate?

12   MR. BLAGG:  Your Honor, question 52 --

13   COURT REPORTER:  Gentlemen, there is too much
14   shuffling, and I just can't hear.

15   THE COURT:  Any area of inquiry?

16   MR. BLAGG:  Sorry, Your Honor.  Question 52.  Question
17   54.  Answers with (d) and (f).  And all of the questions that
18   follow thereafter concerning the death penalty are matters that
19   we have concern with.

20   THE COURT:  Okay.

21   MR. FRAZIER:  Just for the record, Your Honor, this is
22   one in our preliminary motion we moved to challenge for cause.

23   THE COURT:  I understand.

24   MR. HUNT, SR.:  Your Honor, I think that those are the
25   areas that need to be questioned, because if those are

212

1    unequivocal, she's not qualified.

2            THE COURT:  Sure.

3            MR. GOAINS:  Your Honor, 122 and 133.

4            THE COURT:  Okay.  Mrs. Pate.

5            DANA PATE, PROSPECTIVE JUROR, SWORN

6                 VOIR DIRE EXAMINATION

7    BY THE COURT:

8    Q    Good afternoon, Mrs. Pate.  Let me begin by explaining to

9    you the procedure that's used in a capital case in Federal

10   Court.  If the defendant is found guilty of a capital offense,

11   then the jury hears additional evidence, additional arguments,

12   and goes back to deliberate a second time to determine

13   punishment.  There are two options, death, or life imprisonment

14   without the possibility of release.  In Federal Court, that

15   means exactly that, you die in prison.  It's not like in State

16   Court.  What the jury first is asked to determine on the

17   punishment phase is whether or not the defendant had the intent

18   that somebody die.  If the jury finds that is the case, then the

19   jury considers whether or not the Government has proved beyond a

20   reasonable doubt that there are any aggravating factors.  One of

21   the aggravating factors that the Government has alleged in this

22   case is that more than one person died, there were two deaths.

23   The jury considers mitigating factors that the defendants will

24   present.  Those can be any number of things, the age of a

25   defendant, their social background, any number of things that a

DANA PATE - VOIR DIRE (BY THE COURT)                        213

1    jury may consider, if they wish to, as mitigating factors.  Then

2    the jury balances what aggravating factors it has found existed

3    and what mitigating factors it found existed, and then the jury

4    determines whether to recommend that the punishment be death, or

5    life without the possibility of release.  Now, you have

6    indicated in your questionnaire that you are not in favor of the

7    death penalty, and you said, "I do not feel I have the right to

8    judge whether a person lives or dies.  I could not do it."  You

9    also indicated that you could never, regardless of the facts or

10   circumstances, return a verdict which resulted in the death

11   penalty, and that if the facts mandated a verdict that would

12   result in the death penalty, you would ignore the facts and

13   refuse to vote for such a verdict.  Is that still the way you

14   feel today, ma'am?

15   A    No.

16   Q    Ma'am?

17   A    No, it's not.

18   Q    It's not?

19   A    No, because -- this is a real hard thing for me.  No, it's

20   not.

21   Q    Can you indicate what changed your mind?

22   A    Because I've talked to some people, and we've talked about

23   it, and we've discussed it, and I still don't know if I'm right

24   or not, but if the facts were such that they were proven that

25   the defendant would need that verdict, then I would give it.

DANA PATE - VOIR DIRE (BY THE COURT)    214

1    And I didn't think I would come in here and say this, but that's

2    the truth.

3    Q    When you said you have discussed it with folks, have you

4    discussed this particular case --

5    A    No.

6    Q    -- or just the death penalty, in general?

7    A    But I do know about this case, and I know that you said

8    there was nothing about that.  But I do read the Waco paper, and

9    I've kept up with it, and I know -- we didn't discuss it in the

10   room back there, but I do know what the newspaper has said about

11   the case.

12   Q    Okay.  There's nothing wrong with that.

13   A    Right.

14   Q    We don't want jurors who are so disinterested in affairs of

15   the community that they don't read the paper or watch the news

16   on television.  However, this is what we have to be sure of.  If

17   you are selected as a juror and you hear evidence that you

18   believe is reliable, credible and accurate, but it's different

19   from what you read in the newspaper or heard on television,

20   would you have any difficulty in accepting what you hear in the

21   courtroom and forgetting about what you heard to the contrary

22   before you came here?

23   A    No, not if it's reliable.  No.

24   Q    Okay.  Let me ask you another question that's really

25   different.  In this case, the Government has indicated it will

1   call witnesses who have had previous felony convictions, and co-

2   defendants, other people who were charged as being involved in

3   this offense, people who have entered a guilty plea in exchange

4   for a plea agreement.  That is something that is allowed by the

5   rules of Federal Court, and it happens every day.  But when

6   those people testify -- when somebody who was involved as a co-

7   defendant, or somebody who does have a previous conviction, the

8   jury is instructed that they must regard that testimony with

9   greater caution and greater care than you would other witnesses.

10  Do you think you would have any problem with that?

11  A    (Nodding head.)

12  Q    Do you understand that you can accept that evidence, and

13  you would have to consider it.  You can't decide, "Well, I'm

14  just not going to accept anything this person says, because I

15  now find out they had a previous felony conviction."  Just like

16  if a Judge comes in and testifies, you can't say, "Well, I'm

17  going to believe everything he says, because he's a Judge."  So,

18  you have to treat all witnesses the same in regard to taking

19  into consideration who they are and what their background is,

20  just like you would in any other aspect of your life, and then

21  you make a decision if what they say is accurate are true.  You

22  don't think you would have any difficulty doing that?

23  A    No.

24  Q    Let me look just a minute.  Do you have any questions you

25  would like to ask me. Mrs. Pate?

DANA PATE - VOIR DIRE (BY THE COURT)                216

1   A    No.

2              THE COURT:  Okay.  Counsel?

3              DANA PATE - VOIR DIRE EXAMINATION

4   BY MR. BLAGG:

5   Q    Mrs. Pate, how are you today?

6   A    Fine.

7   Q    You are a school counselor, is that correct?

8   A    I am.

9   Q    And I guess you filled this questionnaire out for the Judge

10  several weeks ago.  It says April 18th when you signed it.

11  A    Yes.  Do I have to use this?

12  Q    Pardon me?

13  A    Do I have to use this?

14  Q    I think so.  The court reporter needs to hear you.

15  A    Okay.

16             COURT REPORTER:  And I don't get your head shakes and

17  nods.

18             MRS. PATE:  Excuse me?

19             COURT REPORTER:  I don't get your head shakes and

20  nods.

21             MRS. PATE:  Oh, okay.

22             COURT REPORTER:  So, you need to answer out.

23             MRS. PATE:  Okay.  I didn't know that.  Okay.

24  Q    And did you take long to fill it out when you received it?

25  A    Not long.  I didn't take a lot of -- no, I didn't.

DANA PATE - VOIR DIRE (BY MR. BLAGG)                    217

1   Q    Have you ever served on a jury before?

2   A    Never.

3   Q    Have you ever been called?

4   A    Never.

5   Q    So, this is your first experience?

6   A    This is a first.

7   Q    And when the Judge sent this out to you, did you read it

8   and review it?

9   A    Yes, I did.

10  Q    Did you read and review it carefully?

11  A    I did.

12  Q    And when you answered these questions, "Are you in favor of

13  the death penalty as a punishment for crime," and you responded,

14  "No," back in April?

15  A    Right.

16  Q    And then you (sic) said, "Please explain."  "I do not feel

17  I have the right to judge whether a person lives or dies.  I

18  could not do that."  And then you went on to expound on your

19  feelings.

20  A    Right, because I didn't feel that was my right.  I didn't

21  feel it was my God-given right as a Christian to do that to

22  someone.  But, then, I've talked with people about that, and

23  I've read different things, and I've read in Genesis, and

24  different things like that, and it says that we can do that.

25  This is really difficult for me.  It's very hard to say, "Yes, I

DANA PATE - VOIR DIRE (BY MR. BLAGG)                218

1   believe in this."  But after reading, I feel like it is right.

2   Q    What did you read?

3   A    Genesis 9:6.

4   Q    All right.

5   A    Do you have a Bible?  You can look that up.

6   Q    All right.  Now, you have changed your mind, and you are

7   entitled to do that, and we appreciate you telling us that.

8   A    Right.

9   Q    But are you sure about your feelings?

10  A    No, I'm not.  I cannot be sure.  That's what I said first.

11  I cannot be sure about this.

12  Q    Are you positive that if the Government proves its case

13  beyond a reasonable doubt and the evidence is sufficient and

14  there's no question about it, that you can find a defendant

15  guilty in a case?

16  A    If there's no question, I could.

17  Q    Does it have to be beyond any question whatsoever?

18  A    Beyond any question whatsoever.

19  Q    Like you heard Judge Smith this morning talk to you about

20  what the burden of proof was.

21  A    That's right.

22  q    Do you remember what he told you?

23  A    Yes.

24  Q    Tell me, if you remember.

25  A    Well, that everything has to be proven beyond a reasonable

DANA PATE - VOIR DIRE (BY MR. BLAGG)                    219

1    doubt.  It has to be proven.  You have to prove every single

2    point.  Not just four or five, but every single one.

3    Q    Every single element beyond a reasonable doubt?

4    A    That's right.

5    Q    And would you follow Judge Smith's instructions in that

6    regard?  He's the Judge of the law.

7    A    Yes.  That's what I'm saying.  It would have to be proven

8    that way to me, or I couldn't do it.

9    Q    And if the Government proved its case beyond a reasonable

10   doubt, would you vote guilty?

11   A    Yes.

12   Q    And if the Government proved that the aggravating factors

13   in the punishment phase outweighed any mitigating factors, then

14   you could vote for the death penalty?

15   A    Yes, I could.

16   Q    Even though the defendants were only eighteen and nineteen

17   years of age at the time the crime was committed?

18   A    I'm not considering their age.  I'm considering the crime.

19   Q    But you would be instructed that you should consider their

20   age.

21   A    I would think about it.

22   Q    Can you tell us why you -- I mean, what is it now?  Because

23   you've got two statements, one you gave us back in April, and

24   the one today in court.  We need to know.  We really do.

25   A    I know.  I mean, if you -- I don't know.  I mean, you can

DANA PATE - VOIR DIRE (BY MR. BLAGG)

1    strike me, if you want to.  That would be fine.  But I don't

2    know.  I cannot sit here and tell you.  I'm being honest with

3    you.

4    Q    You do not know what?

5    A    Why I changed.  I told you why I thought I had changed.

6    Q    Okay.  But are you saying that you have changed and you are

7    now for the death penalty and could vote for the death penalty?

8    A    No.  If you prove your case beyond a reasonable doubt,

9    beyond a shadow of a doubt, then I could vote the way that you

10   want us to vote.  That's what I'm saying.

11   Q    For the death penalty?

12   A    For the death penalty.

13   Q    Even for an eighteen and a nineteen-year-old?

14   A    Yes.

15   Q    All right.  And was there anyone else that you talked to

16   about this that led you to change your mind?

17   A    I've read about it.  And just people at school about church

18   things, not about the case.

19   Q    Would you hold the Government, in a death penalty case, to

20   a higher burden of proof than beyond a reasonable doubt?

21   A    What do you mean?

22   Q    Would you make us prove the case beyond any doubt

23   whatsoever?

24   A    Yes.

25   Q    You would hold us to a higher degree of burden of proof?

LASER BOND FORM A    ®    PENGAD • 1-800-631-6989

DANA PATE - VOIR DIRE (BY MR. BLAGG)                    221

1    A    Isn't that what the Judge said earlier, that you would have

2    to prove it totally?

3    Q    Would you hold us to the legal burden of beyond a

4    reasonable doubt, or, in a death penalty case, would you hold us

5    to a higher degree of proof, beyond any doubt whatsoever?

6    A    I thought that's what we're supposed to, beyond any doubt

7    whatsoever.

8    Q    That would be what you would hold us to?

9    A    Isn't that what we were instructed to do?

10   Q    In order to vote for the death penalty?

11   A    Right.

12        MR. BLAGG:   Thank you.

13        DANA PATE - VOIR DIRE EXAMINATION

14   BY MR. GOAINS:

15   Q    Mrs. Pate, my name is Dwight Goains, and we represent Mr.

16   Christopher Vialva.  Ma'am, let me go through a couple of things

17   with you.  We really appreciate your jury service.  Mrs. Pate,

18   let me go over a couple of things with you.  When this Honorable

19   Court gave you the definition of the burden of proof from the

20   Government, he stated that they had to prove each and every

21   element of that indictment beyond a reasonable doubt.

22   A    Right.

23   Q    Now, that's a very high standard.  It's higher than

24   preponderance of the evidence, it's higher than clear and

25   convincing evidence.  But, you see, you know, some people watch

DANA PATE - VOIR DIRE (BY MR. GOAINS)                          222

1    Perry Mason, and they watch these shows where, you know, "I'm

2    going prove it to you beyond a shadow of a doubt.  I'm going

3    prove it to you beyond all doubt."  You see, what Mr. Blagg was

4    trying to get with you is the fact -- see, they don't have to go

5    that high.  They don't have to prove it beyond a shadow of a

6    doubt.  They don't have to prove it beyond one hundred percent

7    doubt.  They just have to prove it beyond a reasonable doubt.

8    And that definition will be given to you by the Court.  Now,

9    here becomes the issue.  First of all, I can tell, because of

10   your religious background, you're going to take your oath

11   seriously.  Is that correct?

12   A    That's correct.

13   Q    And you wouldn't lie?

14   A    No.

15   Q    And you're going to follow the law?

16   A    Yes.

17   Q    If this Honorable Court gave you that definition of beyond

18   a reasonable doubt, is that the definition you would follows?

19   A    If that's what they did, yes.

20   Q    And you wouldn't make it a higher burden, and you certainly

21   wouldn't make it a lower burden?

22   A    Whatever I'm told to do.

23   Q    You will follow the law and do that definition?

24   A    Yes.

25   Q    You see, Mrs. Pate, in order to be fair and impartial --

DANA PATE - VOIR DIRE (BY MR. GOAINS)

1  see, there's nothing wrong with your feelings on the death

2  penalty.

3  A    No, I know it.

4  Q    You know, we have some people come in here and say, "If I

5  find them guilty of capital murder, I'm going to automatically

6  give them the death penalty."  Well, obviously, that person

7  couldn't be fair and impartial.  Now, if someone comes in here

8  and says, "I automatically am never going to give the death

9  penalty," then that wouldn't be fair and impartial to the

10 Government.  So, we need people who will take their oath

11 seriously, who will listen to all the evidence, and base their

12 verdicts on applying that definition of beyond a reasonable

13 doubt after they've heard all the evidence.  Can you do that?

14 A    Yes.

15 Q    You see, you're not going to be asked to actually send

16 someone to be executed.  You are going to be asked some

17 questions.  If you believe beyond a reasonable doubt that

18 someone intentionally killed someone, could you answer that

19 question yes, that they intentionally killed someone, if you

20 believed it beyond a reasonable doubt?

21 A    Yes.

22 Q    And if the Government proved to you an aggravating factor,

23 beyond a reasonable doubt, could you say, "Yes, there's an

24 aggravating factor?"

25 A    If they proved it.

DANA PATE - VOIR DIRE (BY MR. GOAINS)                224

1  Q    Beyond a reasonable doubt.  And could you be fair and
2  impartial?
3  A    I would hope so.  I could not set here and say yes or no to
4  that.
5  Q    And base all your decisions on the evidence and follow the
6  law that the Court gives you?
7  A    I would hope so.
8          MR. GOAINS:  Thank you, ma'am.
9          DANA PATE - VOIR DIRE EXAMINATION
10 BY MR. HUNT, SR.:
11 Q    Mrs. Pate, I'm "Russ" Hunt, Sr.  We were introduced a long
12 time ago.  With me, of course, is my son, Russell, Jr.  We
13 represent Brandon Bernard.
14          BY MR. HUNT, SR.:  Brandon, would you stand up for me?
15 Thank you, Brandon.  You can sit down.
16 BY MR. HUNT, SR.:
17 Q    The reason that I'm introducing him to you is because of a
18 concern that I've got.  My concern is that because there's two
19 defendants, people are going to listen to the evidence and
20 they're going to lump them together and they're not going to
21 say, "Okay, the Government has a burden of proving the evidence
22 against not the two of them, but against each one of them,
23 individually."  Do you understand that?
24 A    Yes.
25 Q    My concern then is, that people won't listen to the

DANA PATE - VOIR DIRE (BY MR. HUNT, SR.)                    225

1   evidence that comes forward and they'll just kind of blend them

2   together.  Where we've got a bifurcated trial system where, in

3   the first part, it's a case of did they commit a crime; and, if

4   the answer is, "Yes, we find them guilty," then they go into the

5   punishment phase, and in the punishment phase, they have to

6   determine an appropriate punishment.  Do you understand that?

7   A    Yes.

8   Q    Carry it forward then to the punishment phase.  If, in the

9   punishment phase, the evidence is different relative to both of

10  those people, if it's different evidence, my concern is always

11  that somebody is going to say, "Well, the bad guy deserves to

12  die, so does the other person."  Now, that's my concern.  Now,

13  take that to you, as the juror.  My concern about you is that,

14  when you filled out the questionnaire, you had not talked to a

15  lot of people about your feelings, and probably had not gone

16  into your feelings, and you said, "No, I don't think that the

17  death penalty is correct."  Now what I'm hearing from you is

18  that, you've talked to a number of different people, and my

19  concern is that you talked to them not just about death penalty,

20  period, but death penalty as it applies to this case.  Is that

21  what I'm hearing from you?

22  A    No.

23  Q    Okay.  So, conversely, are you saying, "No, we talked a lot

24  about the death penalty, but we never, at no time, did we talk

25  about the facts of this particular case?"

DANA PATE - VOIR DIRE (BY MR. HUNT, SR.)

1   A    No, we have not.

2   Q    Good.  Okay.  That's wonderful.  But in talking to them, as

3   I understand it, you've gotten some people's belief that the Old

4   Testament position, basically, an eye-for-an-eye, tooth-for-a-

5   tooth --

6   A    No.

7   Q    -- that's not correct?

8   A    No.

9   Q    Okay.  Then what is correct?

10  A    No.  I'm just not saying that's not what I used to base my

11  decision on.  Not that.

12  Q    Okay.  Can you quote the scripture that you had, because I

13  don't have a Bible with me.

14  A    It just talks about if a man takes a man's life, then we

15  have a right to do the same to them.  It's not anything about an

16  eye-for-an-eye or a tooth-for-a-tooth.

17  Q    Gotcha.  Okay.  My concern then is, then if we go to this

18  case, the Judge is going to give you some very strict rules.

19  He's going to tell you how the jury goes about determining

20  whether or not somebody should live, or whether they should die.

21  My concern is, another response that you had in your

22  questionnaire about not liking the fact that there's going to be

23  gory pictures, there's going to be god-awful facts in this case.

24  A    Right.

25  Q    So, my concern is, are you going to be able to get passed

DANA PATE - VOIR DIRE (BY MR. HUNT, SR.)                    227

1  the pictures and passed the facts and still keep your mind open,

2  understanding that you're going to be asked a very serious

3  question?

4  A    Maybe not.  I don't know.

5  Q    Okay.  See, I guess that's my concern.

6  A    That should be a concern of yours, because I really don't

7  know if I can do that.

8  Q    Good.  Okay.  So, again, my concern then is, are you

9  telling us, "I honestly cannot tell you that I can keep my mind

10  open until we get to the end of this?"  Is that an honest-to-god

11  statement?

12  A    That's honest.  I mean, you know, that wouldn't be for many

13  people.  But, yes, for me, it is honest.

14  Q    Okay.  So, you're saying, "I cannot tell you that I will

15  keep my mind open, especially after I've seen pictures?"  Is

16  that a fair statement?

17  A    That's right.  That's a fair statement.

18  Q    Then my concern goes a step further, and that is, if you

19  aren't able to, if you are blinded by the pictures, and we get

20  to the punishment phase where you're going to have to answer

21  these questions relative to aggravating factors and mitigating

22  factors, that you will not be able to do that, based on the fact

23  that you have --

24  A    Maybe not.  I mean, maybe not.  I don't know.

25  Q    Okay.  Now, you know you, I don't.

DANA PATE - VOIR DIRE (BY MR. HUNT, SR.)

1  A    I've never been here before.  I don't know.

2  Q    Certainly.

3  A    I have no idea.

4  Q    But apparently, that's a concern of yours.  Is that

5  correct?

6  A    It is, very much so.

7  Q    That you will not be able to keep your mind open?

8  A    I don't know.  I don't know.

9  Q    Okay.  I don't think we can get it any clearer than that,

10  can we?

11  A    I'm sorry.  I wish I could, but I can't.

12       MR. HUNT, SR.:  All right.  Thank you.

13       THE COURT:  Thank you, Mrs. Pate.  If you'll call the

14  code-a-phone, starting tomorrow afternoon, that's how you'll be

15  advised if you need to come back, and when.  Thank you, ma'am.

16       MRS. PATE:  Okay.  Thank you.

17       (Mrs. Pate Excused.)

18       MR. BLAGG:  Your Honor, we would move to challenge

19  this juror for cause, based upon her contradictory statements

20  taken under oath, both today and April 18, 2000, when she filled

21  out the court questionnaire, as well as her contradictory

22  positions taken on the burden of proof following the Court rules

23  of the law today in open court.  In that questionnaire, she has

24  clearly said that she could never impose the death penalty under

25  any circumstances, that she didn't have the right to do so, that

1   she would ignore the facts and refuse to vote for the death

2   penalty, and that there are no crimes that merit the death

3   penalty. For those reasons, we would challenge this juror for

4   cause.

5          MR. SCHWIEGER: Your Honor, pursuant to <u>Williams v.</u>

6   <u>Maggio</u> at 679 F.2d 381, the Court in the Fifth Circuit held in

7   an en banc that even though a venireman may equivocate initially

8   exclusion comports with our interpretation of <u>Witherspoon</u> if the

9   juror ultimately concludes that he or she opposes the death

10  penalty irrevocably. That was not the statement from the juror,

11  and we would oppose a challenge for cause.

12         THE COURT: Mr. Hunt?

13         MR. HUNT: I'm vacillating, Your Honor.

14         MR. BLAGG: The bottom line is that the woman could no

15  tell us whether or not she could do what a juror is supposed to

16  do.

17         THE COURT: The Government's challenge will be met and

18  granted.

19         We need to talk real quick about how many people we

20  need to have in tomorrow. We've gone through fourteen today,

21  and it's almost five o'clock. We got started about 11, I think?

22         MR. FRAZIER: 10:45, I think, is when we started, Your

23  Honor.

24         THE COURT: 10:45? You attorneys may have been

25  looking closer at the ones coming up than I have, and you might

230

1  know that there are six that are going to last about two

2  minutes.  I don't know that.

3          MR. HUNT, SR.:  I don't think so, Your Honor.

4          THE COURT:  Okay.  Well, what do you think about

5  having ten come in at nine and fifteen come in at one?

6          MR. FRAZIER:  Yes, sir.

7          THE COURT:  Is that too many?  Better to have too many

8  than not enough.

9          MR. HUNT, SR.:  Better to have too many.

10          THE COURT:  Okay, Number 88 is Ms. Self that we're

11  going to do next.

12          MR. FRAZIER:  Yes, sir.  Again, this is one we

13  challenged for cause initially.  Mrs. Self has indicated she's

14  not in favor of the death penalty.

15          THE COURT:  What page?

16          MR. :  Page 10, questions 51 through 61.  She has

17  indicated, first of all, that she could not sit in judgment of

18  another person, and I believe circled 54(f), that --

19          THE COURT:  She says no there, that she doesn't have

20  any moral, religious, or personal beliefs forbidding her to sit

21  in judgment.

22          MR. FRAZIER:  I'm sorry, Judge.  I'm looking at the

23  wrong question.  I'm looking at in favor of the death penalty,

24  but on 54(f), she indicates that, "Even if the facts mandated a

25  verdict that resulted in the death penalty, I would ignore the

1    facts and refuse to vote for such a verdict."

2              MR. GOAINS:  Your Honor, is this Number 88?

3              THE COURT:  Yes, sir.

4              MR. GOAINS:  Also, Your Honor, we have some concerns

5    on 133.  She says, "I do not know if I could be a fair juror

6    based on the fact that the defendants are African-American, even

7    though I will try not to be prejudice."

8              THE COURT:  Do you want to agree to excuse her?

9              MR. GOAINS:  Yes, Your Honor.

10             MR. FRAZIER:  Yes, sir.

11             THE COURT:  She's excused.  See how quickly this can

12   go if we all work together?  But it might not get us anywhere

13   either.

14             All right, Number 97, John Schrader.

15             MR. FROST:  Your Honor, the only questions we had is

16   in regards to question 89, "Your impression of prosecutors, in

17   general."  I guess number 90, they may kind of blend into each

18   other.

19             THE COURT:  He just doesn't care for lawyers.  What's

20   so difficult about that?

21             MR. GOAINS:  Your Honor, we're concerned with Juror

22   Number 97, on the fact that on paragraph 52, he stated that he

23   was in favor of the death penalty, and basically he would always

24   give the death penalty unless it was self-defense.

25             Also, Your Honor, on paragraph 56, he stated that the

232

1    death penalty should be given more frequently.

2            Question number 95, says, "Have you, your spouse, or

3    any family member been a victim of a crime," and he said, "Yes."

4            Also, Your Honor, on paragraph 130, he talks about

5    having to travel due to the necessity of his job.

6            MR. HUNT, JR.:  Your Honor, our really only question

7    is on page 24, sub part (h), he agrees with the proposition that

8    it is not wrong to lie if it is for a good reason.  I just

9    wonder how that will impact on his judging the testimony of the

10   cooperating co-defendants.

11           <u>JOHN SCHRADER, PROSPECTIVE JUROR, SWORN</u>

12                   <u>VOIR DIRE EXAMINATION</u>

13   BY THE COURT:

14   Q    Good afternoon, Mr. Schrader.  Let me ask you first about

15   your travel plans.  You indicated that in the recent past, you

16   have had to travel, what do you say, on four separate occasions.

17   Do you know anymore about that now than you did when you filled

18   out this questionnaire?

19   A    No, sir.  There's no plans right now that I have that I'll

20   be traveling.

21   Q    Is that the kind of thing that sometimes arises suddenly,

22   and on an emergency basis, you have to go somewhere?

23   A    Yes, sir.

24   Q    If you were on the jury and some problem arose in Abilene,

25   what would happen if you couldn't go?

1   A    They'd send somebody else, they'd have to.

2   Q    All right.  Mr. Schrader, you indicate first that you are

3   in favor of the death penalty, and you say if a person

4   intentionally takes another person's life, you believe they

5   should pay for it with their own life.  However, if in fear of

6   their own life, they take another's, then that could be a

7   different matter.  Are you indicating by that that if someone

8   kills another in self-defense, that would be the only instance

9   in which the death penalty would not be appropriate?

10  A    Not necessarily.  One would be, that I think of an instance

11  of a woman being battered and in fear of her life, you know, at

12  some point after that maybe she would kill the man.

13  Q    Let me explain to you the procedure we follow in capital

14  cases in Federal Court.  If a jury finds a defendant guilty of a

15  capital crime, or the offenses charged in this case, then the

16  jury hears additional evidence and additional argument and goes

17  back and deliberates a second time on the punishment phase.

18  What happens in that phase of the trial is that the Government

19  offers evidence of aggravating factors.  An aggravating factor

20  that the Government has alleged that exists in this case is

21  multiple murders.  There were two people the Government says

22  were killed, and that can be an aggravating factor.  The defense

23  will offer evidence of mitigating factors.  That can be

24  anything, such as the age or youth of the defendants, social

25  backgrounds, or it can be any number of things, depending on the

JOHN SCHRADER - VOIR DIRE (BY THE COURT)                234

1    situation.  The jury is asked to determine if the Government has

2    proved one or more aggravating factors beyond a reasonable

3    doubt, and the defense has proved one or more mitigating factors

4    by a preponderance of the evidence, then those matters that the

5    jury has determined exists, the jury is asked to balance, and

6    then, after balancing all those factors, recommends to the Court

7    whether the punishment be death, or life imprisonment without

8    possibility of release.  The federal system is different from

9    the state system in that regard, in that if a person in a

10   Federal Court is sentenced to life in prison without possibility

11   of release, that means exactly that.  They die in prison.  So,

12   those are the only two options that the jury is left with.  Now,

13   having explained that, my question to you is, do you feel you

14   would be able to consider both of those options and the evidence

15   presented and balance those factors, as I have explained it?

16   A    Yes, sir.

17   Q    Okay.  You indicated that you think the death penalty

18   should be used more frequently than it is.  Is there any

19   particular reason you feel that way?

20   A    I think it's a very good deterrent, sir.

21   Q    All right, sir.  You indicated that you, your spouse, or

22   family member or close friend had been the victim of a crime or

23   a witness to a crime, or had been especially interested in the

24   outcome of a criminal case.  Can you explain what that was?

25   A    You know Kenneth Allen McDuff?

JOHN SCHRADER - VOIR DIRE (BY THE COURT)                235

1    Q    Yes, sir.

2    A    My uncle was the man that was with him the first time.

3    Q    Roy --

4    A    Roy Dale Green.

5    Q    -- Dale Green.  Okay.  I can understand that then.  Is

6    there anything about that experience that you think would affect

7    your ability to make a decision based on the evidence in a case

8    such as this?

9    A    No, sir, I do not.

10   Q    Okay.  You indicated on the last page of your questionnaire

11   that you agree with the statement, "It is not wrong to lie if it

12   is for good reason."  What type of good reason were you thinking

13   about when you answered that question?

14   A    I couldn't even really tell you right now, but there's just

15   some circumstances where you're going hurt the person more if

16   they know the truth.

17   Q    Okay.

18   A    And I'm not talking about something that's real criminal

19   here.  I'm just, you know --

20   Q    Okay.  Let me explain this to you.  In this case, the

21   Government has indicated that they will call witnesses who have

22   felony convictions in their background.  They will call as

23   witnesses co-defendants who were originally charged in this

24   case.  They have entered guilty pleas in exchange for plea

25   agreements, and as a part of their plea agreement, they are

1  required to cooperate with the Government.  Now, the jury will

2  be instructed that they are entitled to consider evidence from

3  those people, but they are to consider it very carefully and

4  treat them differently than they would ordinary witnesses.  Do

5  you think you could do that?

6  A    Yes, sir.

7  Q    First of all, do you think you could listen to what they

8  said and accept it, if you believe other evidence corroborates

9  it and you believe it to be true, even though it's coming from

10  somebody who was originally involved, who originally may have

11  lied when they were first interrogated?  Do you think you could

12  do that?

13  A    Yes, sir.  All I can do is consider the facts as I hear

14  them and make a --

15  Q    All right, sir.  And this answer you had given that it can

16  be all right to lie for a good reason, that's not the type of

17  thing you're talking about, I assume?

18  A    No, sir.

19         THE COURT:  Okay.  Thank you, Mr. Schrader.

20         JOHN SCHRADER - VOIR DIRE EXAMINATION

21  BY MR. FROST:

22  Q    Good afternoon.  My name is Scott Frost, and I represent

23  the United States.  Just a very few questions for you, sir.  In

24  regards to this particular case, the Judge is going to instruct

25  you, as he told you before, that there are some things that you

JOHN SCHRADER - VOIR DIRE (BY MR. FROST)                    237

1    may be able to consider as mitigation in this case.

2    Specifically, one thing that you will be instructed to consider

3    is the ages of the individuals involved.  When this occurrence

4    occurred, one of them was eighteen and one was nineteen.  Now,

5    you are allowed to consider that.  My question to you is, even

6    though the Judge will instruct you to consider that, will the

7    fact that they were eighteen or nineteen when these homicides

8    occurred, will that keep you from voting for the death penalty?

9    A    No, sir.

10   Q    Okay.  And in regards to the age, when the Judge instructs

11   you to consider that, you will consider that, and you are not

12   required to have that be the weighing factor.  Do you understand

13   that?

14   A    Yes, sir.

15            MR. FROST:  Okay.  Thank you, sir.

16            JOHN SCHRADER - VOIR DIRE EXAMINATION

17   BY MR. GOAINS:

18   Q    Mr. Schrader, my name is Dwight Goains, and we represent

19   Mr. Vialva.  As you can tell by our questioning, we're trying to

20   find twelve fair and impartial jurors who can give Mr. Vialva a

21   fair and impartial trial.  Do you think you are that type of

22   person, Mr. Schrader?

23   A    Yes, sir.

24   Q    You know, everyone wants to believe that they're fair and

25   impartial, but, you know, each of us are human and all of us

1  have our prejudices.  How do you feel that you can be fair and

2  impartial?  Do you feel that you could be a good juror in this

3  case?

4  A    Yes, sir, I do.

5  Q    And why do you believe that, sir?

6  A    Because I'll consider the facts.  All of us are human

7  beings.  You all prove to me -- somebody prove to me that the

8  man is guilty, or that the men are guilty.

9  Q    And I can tell by your questionnaire, Mr. Schrader, that

10  that is a very accurate statement, because on paragraph 91, you

11  stated, "Please indicate which of the following you believe

12  would be the greater wrong," and you put, "For a juror to find

13  an innocent person guilty."  Is that correct?

14  A    Yes, sir.

15  Q    So, you would take the guilt phase very seriously?

16  A    Yes, sir.

17  Q    No, Mr. Schrader, I'm sure you can appreciate that not only

18  do we need people to be very serious during the guilt phase, but

19  also during the punishment phase.  Now, you stated in 52, I

20  believe, that you believed in the death penalty, and in number

21  55, you said, "For what crimes do you think the death penalty

22  .should be available," and you put, "Murder."  Now, first of all,

23  Mr. Schrader, there's nothing wrong with your feelings about the

24  death penalty.  We've had people tell us that they could never

25  give the death penalty.  We've had people tell us that they

JOHN SCHRADER - VOIR DIRE (BY MR. GOAINS)          239

1    would always give the death penalty.  But to be fair and

2    impartial, can you -- and I know you stated in self-defense, or

3    maybe if a woman was battered -- but you understand you may hear

4    evidence of a very brutal murder, a capital murder.  In that

5    case, are you automatically going to always lean towards giving

6    that person the death penalty, if it's a brutal murder?

7    A    I would probably lean that way.

8    Q    Okay.  And tell us what you mean by leaning that way.  If

9    you find someone -- let's face it, Mr. Schrader, by the time we

10   get to the punishment phase, you have someone guilty beyond a

11   reasonable doubt, you have stated to us that the Government has

12   met its burden of proof and you believe beyond a reasonable

13   doubt that they have committed the offense of capital murder.

14   So, are you telling us then you would lean toward answering the

15   questions in the punishment phase that would allow the death

16   penalty?

17   A.   Yes, sir.

18   Q    And, in fairness -- and I hate to use the word "bias" or

19   "prejudice," but in that situation, if a person is actually

20   convicted of capital murder, are you telling us that you would

21   have bias or prejudice in favor of the death penalty, and you

22   would lean in that direction?

23   A    I'm just telling you that I would lean in the direction.

24   Q    Very good, sir.  Mr. Schrader, do you feel questions

25   concerning the death penalty tend to restrict the ultimate

JOHN SCHRADER - VOIR DIRE (BY MR. GOAINS)                240

1    punishment to a limited few, or do you feel questions concerning

2    the death penalty should be easily answered to allow the death

3    penalty?

4    A     You need to restate that.

5    Q     Okay.  Do you feel questions concerning the death penalty

6    tend to restrict the ultimate punishment to a limited few, or do

7    you feel questions concerning the death penalty should be easily

8    answered to allow the death penalty?

9    A     I don't feel the death penalty is limited to a few.  Okay?

10   You know -- and you're trying -- let's see if I can understand

11   what you're saying here.  The matter of the death penalty is a

12   very serious matter, in my opinion.  Okay?  So, I wouldn't

13   automatically say the death penalty.  I want to hear all the

14   facts, you know, and hear the burden of proof of guilt and non-

15   guilt.

16   Q     Let me ask it another way.

17   A     All right.  Thank you.

18   Q     Since the Judge told us that it's basically going to be

19   broke down into three parts,  If you find someone guilty beyond

20   a reasonable doubt of capital murder, are you going to tend to

21   always find that they intentionally committed that offense?

22   A     I'm going to ask you to say it one more time.

23   Q     Okay.

24            MR. FROST:  Your Honor, the problem with that question

25   is that one of the elements is intentionally killing somebody.

JOHN SCHRADER - VOIR DIRE (BY MR. GOAINS)          241

1   So, he's asking . . .

2   Q    The bottom line, Mr. Schrader, are you going to lean -- if

3   you find someone guilty beyond a reasonable doubt of capital

4   murder, are you going to lean for the death penalty?

5   A    Yes, sir.

6          MR. GOAINS:  Thank you, sir.

7          JOHN SCHRADER - VOIR DIRE EXAMINATION

8   BY MR. HUNT, JR:

9   Q    Good afternoon, Mr. Schrader.  My name is "Russ" Hunt, Jr.

10  My father and I represent Brandon Bernard.

11         MR. HUNT, JR.:  Brandon, would you stand up, please,

12  sir.  That's Brandon Bernard standing up right there.  You can

13  go ahead and have a seat now.

14  BY MR. HUNT, JR.:

15  Q    And we don't represent the young man that sits next to him.

16  That's Mr. Vialva.  Instead, that's Mr. Schwieger and Mr. Goains

17  who represent him.  And my concerns just starting out in the

18  case is that we're going to have a lot of testimony in the case,

19  there's going to be a lot of people saying similar things that

20  are slightly different, and it will be very easy for jurors to

21  kind of blend all the testimony together, blend the defendants

22  together, and just look at them as two peas in a pod, almost.

23  That's my fear, that a person would get on the jury and do that.

24  My question for you is, do you think you're going to be able to

25  separate the two folks and think, "Now, which person is culpable

JOHN SCHRADER - VOIR DIRE (BY MR. HUNT, JR.)                242

1    and guilty of which acts?  What evidence points towards one

2    person and not another person?"  Is that something that you will

3    be able to do?

4    A    I believe so, sir.

5    Q    Okay.  I want to focus in a little bit on your

6    questionnaire.  There were some very interesting questions, I

7    think, in your questionnaire.  One is that, you say you belong

8    to the American Society for Non-Destructive Testing.  What

9    exactly is that?

10    A    That deals mainly with metals.  My background is welding,

11    the welding industry.  I'm a welding inspector.  Non-destructive

12    testing means you do not destructively test the material.  You

13    find other ways to check to see if it's a good weld or the

14    material is a good weld without destroying it.

15    Q    So you don't cut it apart.  You maybe x-ray it instead?

16    A    That's right, use an x-ray or some other testing method.

17    Q    Okay.  And I think I noticed in your questionnaire that you

18    actually used to work in a prison, teaching welding.  Is that

19    correct?

20    A    That is correct, sir.

21    Q    And you said that you had some experience seeing that

22    sometimes people do get rehabilitated in prison, because you've

23    had experience with that?

24    A    Yes, sir.

25    Q    When you worked with people teaching them welding in

JOHN SCHRADER - VOIR DIRE (BY MR. HUNT, JR.)        243

1  prison, did you know what they were charged with?  Did you know

2  their offenses?

3  A     Not right away.  Sometimes they would just come up and

4  maybe tell you after awhile.  But I never asked.

5  Q     Did any of the people who said they were charged with

6  violent crimes, for instance, were those people ever the people

7  that you felt like maybe were rehabilitated?  Do you remember?

8  A     I think the most violent one that I knew of was a man that

9  assaulted a police officer, and he was a very good student.  My

10  understanding is he's out now.  He spent his time and he's out.

11  I don't know where he's at, but I hope he's doing well.

12  Q     Some of your other questions led me to believe that you

13  consider that sometimes punishment of criminals, people who get

14  convicted of crime, aren't punished harshly enough, they aren't

15  punished long enough.  I think I got that from your

16  questionnaire.  Is that your feeling?

17  A     Probably, yes, sir.

18  Q     I think the Judge went over this earlier, but if a person

19  is convicted of a capital offense in Federal Court, the jury is

20  really going to have two choices, either they're going to

21  recommend that person get the death penalty, or they're going to

22  recommend that person gets the life sentence.  Frankly, a life

23  sentence in federal prison means you leave that federal prison

24  in a box.  You leave there when you're dead, as opposed to the

25  state system where you get a parole after a certain number of

JOHN SCHRADER - VOIR DIRE (BY MR. HUNT, JR.)          244

1   years.  You can leave early.  In the federal system, it's life

2   without the possibility of release for a capital offense.  Do

3   you understand that there's a difference between there?

4   A    Yes, sir.

5   Q    Might that have some kind of an impact or effect on your

6   consideration as to what the appropriate punishment is in a

7   particular case, or in a hypothetical case?

8   A    Well, let me say this.  I don't have a problem with life in

9   prison without the chance of parole over the death penalty.

10  Q    Okay.  Certainly, you would consider life imprisonment

11  without the possibility of release to be a stronger punishment

12  than life imprisonment where you could get parole.  Is that

13  correct?

14  A    Yes.  That's correct.

15  Q    I think you also referred to your feelings about prisons as

16  being very secure places.  Do you mean they secure the outside

17  world from the inmates, or do you also mean that the inmates

18  within that prison are secure from getting at other inmates, for

19  instance?  Is that a clear enough question?

20  A    I think what I meant was, that having walked through a

21  prison and seeing all the safeguards that are there, that it's

22  pretty doggone secure.  Now, I know people can escape and get

23  out, but from what I saw, it's a pretty secure place.

24  Q    Okay.  That's secure where the outside world is secure from

25  the inmates.

JOHN SCHRADER - VOIR DIRE (BY MR. HUNT, JR.)            245

1    A    Okay.

2    Q    What about the inmates?  Do you think, in your experience,

3    did it appear to you that the inmates were secure and that they

4    were cordoned off from other inmates when the prison wanted them

5    to be?

6    A    I would say so, for the most part.

7                MR. HUNT, JR.:  Thank you very much.  We appreciate

8    it.

9                THE COURT:  Mr. Schrader, thank you, sir.  If you will

10   call the code-a-phone, beginning tomorrow afternoon, that's how

11   you get your information about when you might need to return.

12               MR. SCHRADER:  Anytime tomorrow?

13               THE COURT:  No.  After five o'clock.

14               Any challenges?

15               MR. FROST:  Not from the Government, no, sir.

16               MR. GOAINS:  Your Honor, we would challenge this

17   potential juror for cause.  Your Honor, the juror stated that

18   they would always lean toward answering questions in the

19   punishment phase that would allow the death penalty, unless it

20   was self-defense or a battered woman syndrome.  When asked about

21   a brutal murder, Your Honor, they stated that they would lean

22   toward answering those questions that allow the death penalty.

23               We submit to this Honorable Court that the juror is

24   someone who would lean and if someone which is convicted of

25   capital murder, would have a bias or prejudice against our side.

1    Your Honor, in all criminal cases, the United States v. Nowell

2    has stated that doubts about the existence of bias should be

3    resolved against permitting the juror to serve.

4              THE COURT:  Response?

5              MR. FRAZIER:  Yes, Your Honor.  These questions are

6    very similar to the questions that have been propounded by

7    counsel throughout the day, asking for jurors to be excused

8    because of personal opinions.  Very few, if any, of those

9    questions have come from defense counsel asking whether they

10   would follow the law in a particular case.  These jurors, and

11   this juror in particular, is a good example.  Mr. Schrader is

12   one who has indicated very clearly that he would follow the law

13   and the Court's instructions.  Counsel has done nothing more in

14   these cases than to indicate that they are leaning one way or

15   the other, which is nothing more than asking whether they have a

16   pre-commitment to the facts, which is not an appropriate area of

17   inquiry.  We certainly understand that counsel may ask about

18   those things and may want to use that information for making a

19   strike intelligently later on down the line, but it has no

20   bearing whatsoever on whether they will follow the law, and each

21   of those jurors have committed, including Mr. Schrader, are

22   committed to following the law in the particular case.

23             There is no grounds for challenge in this case, and we

24   would ask that it not be granted.

25             THE COURT:  Mr. Schrader indicated that he would

247

1    consider all of the evidence given and consider all the options

2    he had and follow the Court's instructions.  The challenge will

3    not be granted.

4            Next is Number 42.

5            MR. FROST:  Your Honor, the Government has nothing on

6    42.

7            THE COURT:  I had marked Number 122, just to find out

8    what information she has.  Number 129, see if she knows anymore

9    about her husband being out of town.  And 134, the same problem.

10            Any other areas?

11            MR. SCHWIEGER:  Question 55, Your Honor.  I'm not too

12    sure what the answer is on that.  It seems to be that she's

13    including accidental death as a potential death penalty.

14            And question 60.  Question 69, the media.  Question

15    85, on page 14, dealing with a bad experience with a person of

16    another race.

17            With that, Your Honor, on page 20, question 122,

18    indicating some prior knowledge.  I think you indicated 129

19    already, Your Honor, and 134.

20            MR. :  We have no additional areas, Your Honor.

21            THE COURT:  Ms. Spuckler

22            MARY SPUCKLER, PROSPECTIVE JUROR, SWORN

23                    VOIR DIRE EXAMINATION

24    BY THE COURT:

25    Q    Hi, Ms. Spuckler.  I have a few matters I want to ask you

MARY SPUCKLER - VOIR DIRE (BY THE COURT)                    248

1    about your questionnaire to clarify some things, please, ma'am.

2    First of all, let me just explain to you the way the procedure

3    is followed if a jury finds a defendant guilty of a capital

4    offense in Federal Court.  The jury comes back into the

5    courtroom, additional evidence is presented by both sides,

6    additional arguments are made, and then the jury goes out to

7    deliberate on punishment.  The jury is first asked if the

8    defendant had the intent that somebody die.  If the jury answers

9    that, "Yes," then the jury is asked to determine if any

10   aggravating factors exist.  One of the aggravating factors, as

11   an example, that the Government has alleged in this case is that

12   more than one person died, and that that's an aggravating

13   factor.  The defense offers evidence of mitigating factors.

14   That can be any number of things, from the age or youth of the

15   defendants, to their social backgrounds, anything that the jury

16   might consider to be a mitigating factor.  If the jury has then

17   determined that there are both aggravating and mitigating

18   factors proven, then the jury is asked to weigh them, and then

19   to decide whether or not to recommend that the punishment be

20   death, or life without the possibility of release.  You need to

21   understand that in the federal system, unlike the Texas system,

22   a person who is sentenced to death without possibility of

23   release, that's just what the sentence is, they stay in prison

24   until they die.  So, my question is, do you feel that you would

25   be a person who could take into consideration whatever evidence

MARY SPUCKLER - VOIR DIRE (BY THE COURT)                    249

1    was presented regarding those aggravating and mitigating

2    factors, and then weigh them, and then determine what

3    recommendation you think would be appropriate as to one of those

4    two punishments?  Do you feel like that's something you could

5    do?

6    A     Yes, I do.

7    Q     All right.  You indicated that you do believe in the death

8    penalty and that you could return a verdict of death, even

9    though the possibility was there of life without the possibility

10   of release, and you said, "A severe crime deserves a severe

11   punishment," pretty much an eye-for-an-eye philosophy.  Is that

12   a religious belief you have, or is that just a choice of words

13   that you decided to use?

14   A     Well, if I remember, I put it in quotes.

15   Q     You did.

16   A     So, it's not a religious belief in any way, shape, or form.

17   It was just a cliche, if anything.

18   Q     Okay.  That's very descriptive.  You indicated that you are

19   a regular reader of the Killeen Daily Herald.  Have you read

20   about the facts of this case at all?

21   A     Actually, the first time I read about this case was the day

22   I finished filling out that form when there was one individual

23   that plead guilty to car-jacking and that there was another

24   trial set to start on May 15th.  And that's basically it.

25   Q     Okay.  Do you understand that if you hear evidence during

1    the trial that you choose to accept as accurate that's different

2    from something you may have read, that you would be required to

3    take into account what you hear in the courtroom rather than

4    what you read in the newspaper?

5    A    Yes.

6    Q    I know that's a simple-sounding question, but I need to ask

7    it.  In that regard, the Government has indicated that it will

8    call witnesses, both who have prior felony convictions and who

9    were co-defendants in this case, and who have entered into plea

10   agreements and entered into guilty pleas.  In exchange for that,

11   they are going to testify.  Now, the law provides that you may

12   accept that type of testimony, if you choose to, testimony from

13   those types of individuals.  You will be instructed that you

14   must weigh that testimony with greater caution and care than

15   with ordinary witnesses.  What would not be appropriate is for a

16   juror to have the mindset that, "Well, I'm not going to believe

17   anything that type of person says, because that type of person

18   is just trying to save their own skin.  They are a criminal

19   themselves, and I don't care what they say, whether it sounds

20   right or wrong, I'm not going to believe it."  That's not

21   appropriate.  Your job is to listen to what every witness has to

22   say, taking into account all the facts you learn about their

23   background, their education, all of that, and then decide

24   whether you want to accept what they say or not.  Do you think

25   you could do that?

MARY SPUCKLER - VOIR DIRE (BY THE COURT)                    251

1   A    Yes.

2   Q    All right.  You were asked if you had ever had a bad

3   experience with a person of another race, and you indicated that

4   you did have a person of mixed race threaten to kill you.  Do

5   you think that would in any way affect your ability to sit as a

6   juror in a case where the defendants are African-Americans?

7   A    Honestly, I don't, to the extent I knew this individual,

8   and what he did was wrong.  He plead guilty to all of that, and

9   that has nothing to do with these gentlemen.  That was that.

10  Q    One of the oddities of the federal capital structure is

11  that congress decided that jurors, when they have finished their

12  deliberations, have to sign a certificate, certifying that their

13  decision was in no way based upon race, gender -- what, family

14  origins, or whatever --

15          MR. FRAZIER:  Religious beliefs.

16  Q    You wouldn't have any trouble doing that?

17  A    No, I wouldn't.

18  Q    You indicated that you might have a personal problem in

19  serving if your husband was out of town.  Do you know anymore

20  about that possibility than you did when you filled out the

21  questionnaire?

22  A    Yeah.  I know he's not due out 'till the latter part of

23  June.

24          THE COURT:  Okay.  Thank you, ma'am.

25          MRS. SPUCKLER:  Thank you.

1              MARY SPUCKLER - VOIR DIRE EXAMINATION

2    BY MR. FROST:

3    Q    Good afternoon, ma'am.  My name is Scott Frost, and I

4    represent the United States.  First of all, is it your husband

5    or is it you that's the motorcycle enthusiasts?

6    A    Actually, both of us.  I'm the one -- we sold his

7    motorcycle.  I still have my motorcycle.

8    Q    And what kind of motorcycle is that, ma'am?

9    A    A '96 Triumph Adventurer.

10   Q    One of the questions you were asked is whether anyone in

11   your family has been diagnosed with, I guess, a learning

12   disability, and you indicated that your son has been diagnosed

13   as being dyslexic?

14   A    Scott and White Hospital didn't diagnose him as being

15   dyslexic.  The Killeen School District said he is dyslexic.  So,

16   that's why I put that one down.  Scott and White said, roughly

17   three or four years ago -- what, he's in the fourth grade now,

18   so it was three years ago -- that he had a neurological

19   difficulty, that his right brain wasn't speaking to his left

20   brain, which, in turn, he was less coordinated, and everything

21   else.  But he went through therapy that summer, and now he's

22   squared away on that one.  So, the only thing is his dyslexia.

23   Q    I may be confused, or may have confused you.

24   A    I'm confusing.

25   Q    The Killeen School --

MARY SPUCKLER - VOIR DIRE (BY MR. FROST)          253

1    A    The Killeen School District basically said he is dyslexic.

2    Scott and White Hospital said no, at one point in time, he just

3    had his neurological difficulty.

4    Q    Okay.  Do you think he's dyslexic?

5    A    There's something mixed up there somewhere.

6    Q    Sorry to hear that.

7    A    So am I sometimes.

8    Q    Has that affected his ability, do you think, to know right

9    from wrong?

10   A    Not in the least.

11   Q    Okay.  So, in regards to the dyslexia, it may be a problem

12   with him learning things or being able to read something, but it

13   doesn't affect his ability to know whether he shouldn't stay out

14   late at night or do what you tell him?

15   A    Exactly.  The way we explain my son's problem is, he can

16   in-process it, and if it has to -- and if he can explain it

17   verbally, it's great.  If he has to bring it down his arm

18   through his fingers, he loses it.

19   Q    Okay.  Well, sometimes I'm that same way, too.

20   A    You may be dyslexic.

21   Q    Ma'am, the Judge was talking to you earlier about how the

22   federal system works in regards to the death penalty.  What I

23   want to talk to you a little bit about is, in this particular

24   case, the two individuals that are on trial at the time of these

25   murders were eighteen and nineteen years old.  You will be

MARY SPUCKLER - VOIR DIRE (BY MR. FROST)                    254

1    instructed that you can consider, as mitigation, basically

2    something to allow you not to impose the death penalty, the age

3    of the individuals when they committed these offenses.  My

4    question to you is, in regards to the death penalty itself, if

5    you believe the death penalty is warranted, will you still

6    impose that, even though they are eighteen and nineteen years

7    old?

8    A    Yes, I would.

9    Q    Okay.  I saw some hesitation for a little bit.

10   A    I had to sit and sort out the way the question was

11   presented, and then --

12   Q    Well, that may be me.

13   A    Oh, that's not a problem.

14   Q    I guess the bottom line is, would their age keep you from

15   imposing the death penalty, if you felt it was appropriate,

16   based on the crime?

17   A    No.

18   Q    Okay.  In regards to the individuals that the Judge spoke

19   of and that you may have read of, other individuals in this

20   case, the Government may call folks that have been convicted in

21   regards to this particular case and have plead guilty.  In

22   regards to those individuals, if you believe their testimony,

23   and you believe their testimony beyond a reasonable doubt, will

24   you be able to convict these two individuals based on that

25   testimony alone, if you believe that testimony?

MARY SPUCKLER - VOIR DIRE (BY MR. FROST)                255

1    A    Based on that testimony alone, and nothing else?

2    Q    If you believe that testimony beyond a reasonable doubt,

3    yes, ma'am.

4    A    If that is all that is presented and all for me to base it

5    upon, yes, I could.

6    Q    Okay.  One other area, ma'am, that I wanted to address very

7    quickly is in regards to the possibility of life without the

8    possibility of release from prison.  Now, basically, as the

9    Judge instructed you, if an individual is found guilty of a

10   capital offense in Federal Court, there's only two sentences

11   that a jury could recommend.  One is death, one is life without

12   the possibility of release.  Do you feel one way or the other in

13   regards to either one of those sentences?  Would you lean more

14   towards death, or towards the possibility of release -- or life

15   without the possibility of release?  I'm sorry.

16   A    It depends on what the guidelines for each are and what my

17   opinion, based upon the facts, are.

18   Q    Okay.  So, would it be safe to say that you would fully

19   consider the death penalty in the appropriate case?

20   A    Based upon the guidelines given, yes.

21   Q    And you would not have a problem with imposing that if you

22   felt, based on the instructions that the Court would give you

23   and the law and the facts of that case, imposing or at least

24   recommending the death penalty?

25   A    Based upon everything presented and the facts that I have

1  heard and seen, if a member of the jury, I would have no

2  problems.

3  Q   Okay.  It may be my questions, and it may just be that it's

4  late in the day.

5  A   Well, that, too, you know.

6        MR. FROST:  Thank you, ma'am.

7        MARY SPUCKLER - VOIR DIRE EXAMINATION

8  BY MR. SCHWIEGER:

9  Q   Good afternoon, ma'am.  My name is "Stan" Schwieger.  Along

10  with Mr. Goains, I represent Mr. "Chris" Vialva.  He's the

11  gentleman in the suit coat back there.  It's getting later, and

12  I'm getting tired, so, if I wander off and don't ask a question

13  in the manner in which you can understand, will you stop me,

14  please?

15  A   Okay.

16  Q   Now, I want to go back to the eye-for-an-eye question.  I

17  know that you stated that was a philosophy and it was a cliche,

18  but I'd like for you to explain that to me.  What do you mean by

19  you believe in that philosophy?

20  A   This may take me awhile to get the words in my head

21  straight, because the cliche is actually the easiest thing for

22  me to say.  If someone does a very severe crime, they shouldn't

23  get a pat on the wrist if they're found guilty of it, or they

24  shouldn't get the forty lashes with a wet noodle, and, "Don't do

25  it anymore," like parents sometimes do to their children.  If

1    they do something terrible, the punishment should be terrible.

2    Q    Okay.  Would you consider a terrible punishment to be life

3    imprisonment?

4    A    Yes, I would consider that a terrible punishment, as well.

5    Q    Okay.  If a terrible crime was presented to you, would you

6    be able to weigh the aggravating factors, not knowing what they

7    are, understanding that, at this point, along with the

8    mitigating factors, or is it basically what you're saying is, is

9    that the Government has proven a really horrible crime and that

10   I should punish them for that crime no matter what the

11   mitigating factors would be?

12   A    Mitigating factors -- correct me if I'm wrong in my little

13   brain over here.  Mitigating factors are basically the

14   explanation as to why or that cause?

15   Q    Excuse me for speaking lawyer, but, yes, you have a good

16   grasp on it, basically.

17   A    Now, rephrase the question again, because I've --

18   Q    Okay.  You stated that -- basically, you said that a severe

19   crime should be treated severely.  In this matter, you will be

20   called upon to weigh aggravating factors and mitigating factors.

21   Are you going to ignore the mitigating factors in saying, "Look,

22   the Government has proven a severe crime, I don't care what the

23   mitigating factors are in this matter, I want to punish somebody

24   severely for this offense?"

25   A    Oh, no.  I'd be able to weigh them.

1    Q    Okay.  So, you are saying, if mitigating factors were

2    proven in this matter, and you believed the mitigating factors,

3    that you would not vote for a death penalty if you were given

4    whatever mitigating factors you believed outweigh the

5    aggravating factors?

6    A    If I understand your question correctly, the answer to that

7    is yes, that if I weighed everything based upon what I was told

8    and everything that I heard, seen -- wait -- have heard, have

9    seen -- that I'd be able to weigh it all in one fell-swoop.

10   Q    In going over with the Government, you stated your son has

11   what are termed neurological problems, or whatever.  Sometimes

12   jurors go out and research an area heavily, or, you know, have

13   done that.  Is that your experience?  Have you done that with

14   your son, investigated the type of --

15   A    With my son, yes.

16   Q    Okay.  Now, given the fact that potentially in this case,

17   and we don't know what the mitigating factors are, but

18   potentially, let's say that Dr. X from our side, the defense

19   side, says, "This is a mitigating factor," he's a psychologist,

20   or a neuropsychologist, and testifies to that aspect.  Your

21   research, be it as it may, conflicts with that.  Are you going

22   to be able to put that out of your mind and weigh only the

23   evidence in this matter of which would be presented by either

24   the Government or the defense?

25   A    What I read on my son wasn't necessarily written by

MARY SPUCKLER - VOIR DIRE (BY MR. SCHWIEGER)          259

1    authorities.

2    Q    Okay.

3    A    Does that answer the question?  I'm assuming, also, it's a

4    case of -- I'm assuming the individual who would be speaking

5    would be an authority on the subject, and he would have up-to-

6    date information, as opposed to the information I got on my son,

7    which was like four or five years old.

8    Q    I guess what I'm saying is, if you have specialized

9    knowledge, or if you have done research in the area, are you

10   going to be able to set that aside, or say, "Look, I know this

11   guy's wrong, and, you know, there's no way that I'm going to

12   believe anything that he says."

13   A    Oh, no, I'd believe him, because I'm not the authority,

14   based on what I read.

15           MR. SCHWIEGER:  Okay.  Thank you.

16           <u>MARY SPUCKLER - VOIR DIRE EXAMINATION</u>

17   BY MR. HUNT, SR.:

18   Q    Ms. Spuckler -- it's Spuckler?  Is that correct?

19   A    Right.

20   Q    I'm "Russ" Hunt, Sr.  Together with my son, "Russ" Hunt,

21   Jr., we represent Brandon Bernard.

22           MR. HUNT, SR.:  Brandon, stand up, will you?  Go ahead

23   and have a seat.

24   BY MR. HUNT, SR.:

25   Q    The reason that I'm reintroducing all of us is because I

1    think it's real important in a case where there's co-defendants

2    for each of the jurors to be able to understand that those two

3    people aren't linked together, that is, the Government has the

4    responsibility of proving not just one of them, but each one of

5    them, as an individual, did something wrong.  Do you understand

6    that?

7    A    They are not Siamese twins.

8    Q    Exactly.  Exactly.  So, my concern with all of our

9    perspective voir dire people is that we want people to

10   understand that and people that will commit to say, "Hey, I'm

11   going to listen to the evidence for each of these people

12   individually.  I'm not going to say they are one person.  I'm

13   taking knowledge of the fact that each one of them is

14   individual."  And that there's different acts that each of them

15   is going to be accused of, and that's going to carry through not

16   just for the guilt-innocence part, where a jury has to decide

17   whether or not they're guilty, and, if they are guilty, what

18   they're guilty of, but it also carries forth to the punishment

19   phase -- the punishment phase where, again, all the aggravating

20   and mitigating factors have to come in.  And as I understand

21   what you're saying, because you've said this now three times, if

22   you are selected on the jury, what your are going to do is,

23   you're going to listen to all of the facts, and then you're

24   going to weigh all of those factors.  And I just want to

25   sprinkle in one little thing, and that is, not just to them, the

1   defendants, but to each of the defendants, and you're going to

2   have to keep all those balls up in the air at the same time.

3   Does that makes sense?

4   A    Yeah, it does.

5   Q    And will you do that, if you are selected on this jury?

6   A    I could handle that.

7   Q    Good.  Okay.  Now, a real serious question.  What's a '96

8   Triumph Adventurer?  I have a '98 VFR, and I don't know what a

9   Triumph Adventurer is.

10  A    Triumph motorcycles are back.  Didn't you know that?

11  Q    Well, is it a cruiser bike?

12  A    Did you know what the T-Birds were, the Triumph

13  Thunderbirds?

14  Q    Yes.

15  A    It's one of the takeoffs of the Thunderbird.  It's the one

16  with the bobtail back.  It's more like one of the cruisers, I

17  guess you'd call it.

18  Q    Good.  You will devote as much attention to the facts in

19  this case as you would to carefully riding your motorcycle?  Is

20  that a fair statement?

21  A    Yes, sir.

22        MR. HUNT, SR.:  Okay.  Thanks.

23        THE COURT:  Thank you, ma'am.  If you will call the

24  code-a-phone each afternoon after five, beginning tomorrow,

25  that's how you find out if you need to return.  Thank you, ma'am

262

1    very much.

2              MS. SPUCKLER:  Thank you, sir.

3         (Ms. Spuckler Excused.)

4              THE COURT:  Any challenges?

5              MR. FROST:  No, sir.

6              MR. SCHWIEGER:  No, Your Honor.

7              THE COURT:  All right.  The last one for today then is

8    Number 126, Calvin Kruger.

9              MR. :  Yes, sir, Judge, we have no areas.

10             MR. GOAINS:  Your Honor, paragraph 122, yes, he has

11   heard some facts in the newspaper, accounts of the incident.

12             Paragraphs 55, 53, and 52 --

13             THE COURT:  Hold on.  Slow down.  Okay.  55?

14             MR. GOAINS:  Yes, Your Honor, and 53.

15             THE COURT:  What question do you want me to ask him

16   about 55?

17             MR. GOAINS:  Your Honor, on 52, 53, and 55, whether if

18   someone is found guilty of murder, if they're going to

19   automatically vote for the death penalty.  Also, Your Honor, on

20   paragraph 100, I believe he's been a juror in a criminal case,

21   and just verify that he's had no bad experiences, Your Honor.

22             MR. HUNT, JR.:  Your Honor, to add to Mr. Goains'

23   areas --

24             THE COURT:  If he's correct that he served as a juror

25   in a murder case in the 54th District Court in 1982, that may

1  have been a case I presided over.  Sorry.  Go ahead.

2          MR. HUNT, JR.:  Just to add to Mr. Goains' areas, on

3  page 23, paragraph (f), this juror agrees that any person who

4  commits murder should pay with his own life.  I think that would

5  be tied back to page 10, paragraph 52.

6          THE COURT:  Okay.  Is that it?  Mr. Kruger.

7          CALVIN KRUGER, PROSPECTIVE JUROR, SWORN

8                  VOIR DIRE EXAMINATION

9  BY THE COURT:

10 Q    Hi, Mr. Kruger.  We appreciate the fact that you've been

11 here a long time, and we'll do this as quickly as we can.  I

12 need to ask you some questions about a few of the answers you

13 have put on your questionnaire.  But before I do that, let me

14 explain to you the procedure that's followed in a capital case

15 in Federal Court, if the defendant is found guilty.  After that

16 happens, after a jury has found the defendant guilty beyond a

17 reasonable doubt, of the facts charged, the offense charged,

18 then the jury comes back into the courtroom, additional evidence

19 is presented, additional arguments are made, then the jury goes

20 out to deliberate a second time on punishment.  The jury is

21 first asked whether or not the defendant acted intentionally,

22 did the defendant intend that someone die?  If that is answered

23 yes, then the jury is asked to consider whether or not the

24 Government has proved any aggravating facts beyond a reasonable

25 doubt.  As an example of an aggravating fact that the Government

CALVIN KRUGER - VOIR DIRE (BY THE COURT)                264

1    has alleged in this case, it is that two deaths occurred,

2    multiple deaths.  The jury is asked to determine if any

3    mitigating facts exist.  Those are matters that the defense will

4    present evidence of, and those could be such things as the youth

5    of the defendants, or their social background, any number of

6    things.  If the jury has determined that both one or more

7    aggravating facts and one or more mitigating facts do exist in

8    the case, then the jury is asked to weigh those aggravating and

9    mitigating facts and then determine whether to recommend that

10   the sentence be death, or life in the penitentiary without

11   possibility of release.  You need to understand that in the

12   federal system, that means exactly what it says, life without

13   possibility of release, a person stays in prison until they die.

14   Now, you have indicated in your questionnaire that you do favor

15   the death penalty and that that should be a possibility or would

16   be appropriate when someone takes another life.  Understanding

17   how the process and the procedure works, I want to know are you

18   telling me that you think, in your mind, the death penalty

19   should be automatic whenever anyone is convicted of any murder?

20   A    No.

21   Q    All right.  Do you think you would have any trouble or

22   problem in going about the process that I've described in

23   considering all of the evidence of the mitigating and

24   aggravating factors in weighing them, and then deciding what to

25   recommend?

CALVIN KRUGER - VOIR DIRE (BY THE COURT)        265

1    A    No, I wouldn't.

2    Q    All right, sir.  You indicated that you served as a juror

3    in a criminal case, a murder case, in 1982 in the 54th District

4    Court?

5    A    Yes, sir.

6    Q    Do you remember who the Judge was in that case?

7    A    Carl Anderson.

8    Q    Okay.  That wasn't in 1982 then.

9    A    It was the early eighties.  I was guessing at '82.

10   Q    I became the Judge of that court in November of 1980, is

11   the reason I know that.

12   A    I wasn't sure of the year.  I just guessed.

13   Q    Was it a capital murder case, or just a murder case?

14   A    Just a murder case.

15   Q    Okay.  Were you the presiding juror, or foreman, by any

16   chance, or just a member of the jury?

17   A    I was a member of the jury.

18   Q    Okay.  You indicated that you have learned some facts about

19   this matter from TV and newspaper accounts of the incident.

20   What newspaper do you read, if you read a regular newspaper?

21   A    The local one, yes.

22   Q    The Waco Tribune-Herald?

23   A    Uh-huh.

24   Q    And is it that and the local TV stations where you've

25   gotten the information you've gotten?

1    A    Right.

2    Q    The question I need to ask you, sir, is this.  If you are

3    on the jury and evidence is presented that you find to be

4    reliable and accurate, but it's different from something you may

5    have read or heard preceding the trial, would you be able to set

6    aside what you had learned from the media and make your decision

7    based on the evidence you hear in the courtroom?

8    A    Yes, I could, sure.

9    Q    Okay.  You indicate that you agree with the statement that

10   any person, man or woman, young or old, who commits a murder

11   should pay with his own life.  Again, you're not saying by that,

12   are you, that that would be automatic if someone is convicted of

13   a murder, you would be able to weigh all of the evidence and

14   make a determination as to what was appropriate, as I've

15   explained the process?

16   A    Yes.

17              THE COURT:  All right.  Thank you, sir.

18              CALVIN KRUGER - VOIR DIRE EXAMINATION

19   BY MR. FRAZIER:

20   Q    Good afternoon, Mr. Kruger.  My name is Mark Frazier.  I'm

21   with the U. S. Attorney's Office here in town.  I just have a

22   few follow-up question for you.  In this particular case, I

23   anticipate you're going to hear testimony from juvenile co-

24   defendants, that is persons who committed the crime, or

25   allegedly committed the crime along with these defendants who

1   are going to be on trial.  I anticipate you are going to hear

2   evidence that they have entered plea bargain agreements where

3   they plead guilty to lesser charges, and that they have the

4   expectation of getting some type -- or hope of getting some type

5   of lesser sentence in their case.  I anticipate you're going to

6   hear evidence that they did some very vile acts themselves as

7   part of this crime.  The law allows for witnesses like that to

8   testify in a criminal case.  In fact, if you believe their

9   testimony beyond a reasonable doubt, you can convict one or both

10  of these defendants over here, if you believe their testimony

11  proves each of the elements beyond a reasonable doubt.  Do you

12  understand that?

13  A   Yes.

14  Q   Okay.  The inquiry I need to make at this point is

15  regarding those witnesses.  All witnesses start out on a level

16  playing field and an even keel, whether they are co-defendant

17  criminal witnesses, whether they are police officers, whether

18  they are ministers, whatever the case may be.  No one is

19  afforded more or less credibility simply because of their

20  position in life, whether they be a criminal, a Roman Catholic

21  priest, or whatever the case may be.  Do you understand that?

22  A   Sure.

23  Q   However, now, you can take their background into

24  consideration in assessing what you choose to believe in their

25  testimony, because it's the juror's job to determine solely the

1   credibility of the witnesses.  My question to you is this, would

2   you automatically disbelieve such a witness simply because he

3   was a co-defendant participant in the crime?

4   A    No.

5   Q    Okay.  Would you convict one or more of the defendants, if

6   you believed that witness' testimony beyond a reasonable doubt,

7   that it proved each of the elements of the crime?

8   A    No.

9   Q    You would not be able to convict?

10  A    I didn't understand your question.  Would you repeat it?

11  Q    I'm sorry.  That's because I changed gears on you on the

12  questions.  The first question was having to do with

13  automatically disbelieving the testimony.

14  A    Sure.

15  Q    And would you automatically disbelieve their testimony

16  simply because they were co-defendants?

17  A    No.

18  Q    And the next question -- and this shifts gears a little bit

19  -- is, if I prove to you through that one witness, through that

20  cooperating co-defendant, to your satisfaction, each and every

21  element of the crime, that is, I prove it beyond a reasonable

22  doubt through that witness, would you be able to convict the

23  defendant on trial?

24  A    Yes.

25  Q    Now, would you likewise be able to apply that same standard

1    to witnesses -- because I anticipate you're going to hear that,

2    in fact, some of these witnesses gave previous false statements

3    during the investigation of this case -- would you still be able

4    to listen to their testimony and not automatically disbelieve

5    it?

6    A    Yes.

7    Q    All right.  Thank you.  Now, if we prove this case, sir,

8    beyond a reasonable doubt, which the Court has told you is the

9    legal standard, would you hold the Government to a higher burden

10   than beyond a reasonable doubt simply because this is a case

11   where the death penalty could be imposed?

12   A    No.

13   Q    All right.  Thank you.  If we prove the case to your

14   satisfaction beyond a reasonable doubt, and you have weighed the

15   aggravating factors against the mitigating factors and find out

16   that your recommendation should be the death penalty, would you

17   be able to impose that on one or both of these defendants?

18   A    Yes.

19   Q    Would the age of those defendants make any difference in

20   your mind at all?

21   A    No.

22   Q    All right.  The fact that they were eighteen or nineteen at

23   the time they committed the crime, would that prohibit you from

24   giving them the death penalty, if you believed it was warranted?

25   A    No.

1    MR. FRAZIER:  All right.  I believe, Your Honor,

2  that's all we have.  Thank you very much, sir.

3           CALVIN KRUGER - VOIR DIRE EXAMINATION

4  BY MR. GOAINS:

5  Q    Mr. Kruger, my name is Dwight Goains.  Along with Mr.

6  Schwieger, we represent Christopher Vialva.  We also appreciate

7  your time today.  Now, Mr. Kruger, as you can imagine, we're

8  trying to find twelve fair and impartial jurors to hear this

9  case, and we're looking for jurors who can base their verdicts

10  on the evidence.  You know, as the Court brought out, you know,

11  it's evidence that you hear in this courtroom, whether it be a

12  person testifying, or some exhibit, or some other document that

13  the Court has properly admitted into evidence, that you will

14  base your verdict strictly on the evidence that you've heard and

15  on the documents or exhibits brought into evidence?  Do you feel

16  that you can do that, sir?

17  A    Yes.

18  Q    Now, you stated that you have heard some newspaper

19  accounts.  From hearsay, or otherwise, have you formed a

20  conclusion as to the guilt or innocence of Mr. Vialva?

21  A    No, I have not.

22  Q    Very good.  You see, Mr. Kruger, we're looking for people

23  that can make their own decision, that can follow the law, and

24  that will make the Government prove the case beyond a reasonable

25  doubt.  Do you feel that you're that type of person?

1   A    Yes.

2   Q    Mr. Kruger, just in a few short words, can you tell us why

3   you feel that you would be a fair and impartial juror in this

4   case?

5   A    Because I consider myself a person who does not judge

6   anyone.  I keep an open mind.  I would be able to listen to both

7   sides and then make a determination.

8   Q    Very good, sir.  Now, this is a bifurcated trial.  So, if

9   you believe beyond a reasonable doubt all the elements in the

10  indictment, you're going to find the person guilty.  Now, if you

11  do that, we're going to go into the punishment phase.  Can you

12  be the same fair and impartial juror in the punishment phase?

13  A    Yes.

14  Q    Now, I noticed on your jury questionnaire, you stated,

15  basically, that you thought the death penalty was for murder.

16  But as Judge Smith asked you, are you stating that you would

17  automatically -- by the time we get to the punishment phase, you

18  have found someone guilty beyond a reasonable doubt of capital

19  murder.  Are you automatically going to vote in a way that would

20  result in the death penalty, or you can consider all of the

21  evidence?

22  A    I could consider all of the evidence.

23  Q    Very good, sir.  One question, Mr. Kruger.  When Mr.

24  Frazier asked you about this one witness, and if you believed

25  that one witness beyond a reasonable doubt, you stated that you

CALVIN KRUGER - VOIR DIRE (BY MR. GOAINS)                272

1    could find that person guilty if you believed him beyond a

2    reasonable doubt, is that correct?

3    A    That is correct.

4    Q    If you had one reasonable doubt about his testimony, could

5    you find that person not guilty?

6    A    Yes.

7    Q    Okay.  And just real briefly.  In this punishment phase, as

8    the Court stated, first we look, whether beyond a reasonable

9    doubt, there was intent.  Then we look if there's any

10   aggravating factors, and you have to find that beyond a

11   reasonable doubt.  Now, the mitigating factor is the lowest

12   standard.  To find a mitigating factor, it's only by

13   preponderance of the evidence, or what we call the fifty-fifty

14   rule.  But to be fair and impartial, we can't really tell you

15   what mitigating evidence is, but it may be, let's say, the

16   person's age.  It may be drug addiction, alcoholism, a low IQ, a

17   poor upbringing.  Now, we're not asking you to commit to whether

18   you would find any of those mitigating, but we are asking you,

19   would you at least consider any evidence in those areas and make

20   a determination whether by preponderance of the evidence you

21   found that to be mitigating or not.

22   A    Yes, I could.

23   Q    One last question, Mr. Kruger.  If one of your loved ones

24   was on trial for a serious offense, such as capital murder, are

25   you the type of person that you would want to see on the jury

CALVIN KRUGER - VOIR DIRE (BY MR. GOAINS)          273

1    panel?

2    A    Would you repeat that, please?

3    Q    If you had a loved one, let's say your son, had been

4    indicted by a Federal Grand Jury and they were going to trial

5    for capital murder, are you the type of person that you would

6    want to see on the jury, setting judgment on your son?

7    A    Absolutely.

8    Q    Because you can be fair and impartial?

9    A    Sure.

10           MR. GOAINS:  Thank you, sir.

11              CALVIN KRUGER - VOIR DIRE EXAMINATION

12   BY MR. HUNT, JR:

13   Q    Mr. Kruger, I'm ""Russ"" Hunt, Jr.  I'm one of the two

14   attorneys that represent Brandon Bernard.

15           MR. HUNT, JR.:  Brandon, would you please stand up?

16   That's Brandon Bernard right there.  You can go ahead and have a

17   seat, Brandon.

18   BY MR. HUNT, JR.:

19   Q    Brandon is sitting next to the other co-defendant.  That's

20   Mr. Vialva.  My father and I represent Brandon, and these other

21   two attorneys on the other side of the table represent Mr.

22   Vialva.  There's something that I want to make real clear that's

23   probably just as clear as day, is that even though they are

24   sitting next to each other, even though we are sitting at the

25   same table with the other lawyers, our interests are really

1  totally different.  In other words, there's going to be a lot of

2  evidence that comes into the trial, but the jury is going to

3  have to make a decision as to each defendant, individually, as

4  to which crime or crimes they may not be guilty of.  Do you

5  understand that?

6  A    Sure.

7  Q    Okay.  That's just a fear of mine going into any kind of a

8  trial with multiple defendants, is that a jury will tend to

9  blend the actions of the two folks together rather than paying

10  real close attention to what each person is accountable for.

11  Does that makes sense?

12  A    Sure.

13  Q    Is that something that you feel like you will be able to do

14  in a long trial like we're going to have?

15  A    Yes.

16  Q    Okay.  I appreciate that answer.  I want to focus in on

17  some other questions on your questionnaire.  You indicated that

18  you were in that murder case in the early eighties.  Do you

19  remember who the prosecutor was?

20  A    Lynn Malone.

21  Q    Okay.  Did he have a partner with him, or did he try it by

22  himself?

23  A    It seems like there was one or two other people with him.

24  Q    Okay.  Do you remember any of the facts and circumstances

25  of that case?

CALVIN KRUGER - VOIR DIRE (BY MR. HUNT, JR.)                275

1   A    Some of it, yes.

2   Q    I noticed you all gave the person forty years.  Do you

3   remember off the top of your head or anything that strikes

4   about that as to why it was a forty-year sentence as opposed to

5   some other sentence?

6   A    No.

7   Q    That was a long time ago.  I wouldn't be surprised why you

8   wouldn't remember.  Also, on page 20 of the questionnaire, you

9   indicated that, yes, you do believe that the penal system can

10  rehabilitate people, and that you've seen that many people

11  change their lives around after they've been involved in the

12  penal system.  Why is that?  Can you share some of your

13  experiences and your beliefs with us?

14  A    Well, I had a cousin, a second cousin, that did some things

15  that, to me, you know, were pretty bad, and he went in, and when

16  he came out, to me, he was a different person.  So, it did

17  change him to a better person.  I mean, he did get some help

18  there.

19  Q    So, it certainly is possible that if a person goes to the

20  penitentiary, they could change their life around, you're

21  saying?

22  A    Sure.

23  Q    Okay.  And you have had a personal experience with seeing

24  that happen?

25  A    That's right.

CALVIN KRUGER - VOIR DIRE (BY MR. HUNT, JR.)                  276

1   Q    I imagine that certainly at the time when you were on the

2   other murder jury, probably nobody explained anything to you

3   about parole, and probably they didn't even talk about that in

4   trial.  Is that correct?  Nobody really talked about that?

5   A    I don't recall it.

6   Q    I think the Judge has already been over this, but I just

7   want to make it real clear.  In a federal capital case, if a

8   person is convicted, the jury has really two decisions to make,

9   or a decision of two choices to make, life or death.  Life means

10  life behind bars, you die in prison, you never get out of

11  prison.  Death means the person has to be put to death -- versus

12  our state system, which doesn't have an equivalent life without

13  parole or life without the possibility of release.  First of

14  all, do you understand that that's different in our federal

15  system than it is in the state system?

16  A    Yes.

17  Q    Also, a person would go into a federal penitentiary instead

18  of a state penitentiary for that kind of a case.  Do you

19  understand that?

20  A    Uh-huh.

21  Q    Does that impact at all your decision process on whether

22  you think a life sentence or a death sentence would be more

23  appropriate; and, if so, could you explain how that might impact

24  your decision?

25  A    I don't think it would.

LASER BOND FORM A  ⑱  PENGAD • 1-800-631-6989

CALVIN KRUGER - VOIR DIRE (BY MR. HUNT, JR.)                277

1    Q    Okay.  Would you think that a life without the possibility

2    of release sentence is a harsher sentence than a life sentence

3    where a person could get paroled, for instance?

4    A    No.

5    Q    Okay.  They're both equally extremely difficult cases?

6    A    Right.

7    Q    Okay.  Something else that I noticed on the last page, or

8    next to the last page of your questionnaire, there was one

9    question where they asked, "Do you agree that life imprisonment

10   is more effective than the death penalty," and you said that you

11   somewhat disagree with that, that life imprisonment is more

12   effective than the death penalty.  Can you just explain your

13   thoughts on that subject?

14   A    When you say more effective, I meant like possibly, you

15   know, not being able to get a parole.  That's what I was

16   referring to when I wrote that.

17   Q    Can you explain that a little bit more?

18   A    Well, in other words, to me, if he does not get any type of

19   rehabilitation, it would be hard to spend the rest of your life

20   there without knowing that you've got some type of -- to look

21   forward to -- some type of help.

22   Q    But if it was possible that a person could get some type of

23   help, then that person might be rehabilitated, even if they're

24   serving a life sentence?

25   A    Yes, yes.  That's what I'm trying to say, yes.

CALVIN KRUGER - VOIR DIRE (BY MR. HUNT, JR.)                    278

1    Q    I appreciate that.  Another thing that you said on the same

2    page is that, "Any person who commits murder should pay with his

3    own life."  My question for you is, I can think of maybe two

4    meanings for paying with your own life.  One would be the death

5    penalty, and one would be spending the rest of your life in the

6    penitentiary.  Do you disagree with that, or agree with that, or

7    what are your thoughts about that?

8    A    I agree.

9          MR. HUNT, JR.:  Thank you very much.

10          THE COURT:  Mr. Kruger, that ends our day.  If you

11    would please call the code-a-phone each afternoon after five,

12    beginning tomorrow, that's the way you will find out if you need

13    to return.  Thank you very much for being here today.  Sorry we

14    had to keep you so late.

15          MR. KRUGER:  No problem.

16    (Mr. Kruger Excused.)

17          THE COURT:  Off the record.

18    (Off-the-Record Discussion.)

19          THE COURT:  How about we recess until nine o'clock in

20    the morning, counsel.

21          Oh, does anyone want to challenge Mr. Kruger?

22    (No response.)

23          COURTROOM DEPUTY:  I guess not.

24    (Recessed at 6:00 p.m.)

279

<u>I N D E X</u>

<u>MAY 15, 2000</u>

Ex Parte Hearing (Court and Counsel for Defendants .........    3

<u>JURY SELECTION PROCEEDINGS</u>

Court's Instructions to the Jury Panel .....................    8

<u>INDIVIDUAL VOIR DIRE OF PROSPECTIVE JURORS</u>

<u>PERRY DAVIS:</u>

    Voir Dire Examination by the Court ....................   48
    Voir Dire Examination by Mr. Frazier ..................   50
    Voir Dire Examination by Mr. Goains ...................   54
    Voir Dire Examination by Mr. Hunt, Sr. ................   58

<u>JAMES WALBURN:</u>

    Voir Dire Examination by the Court ....................   63
    Voir Dire Examination by Mr. Frazier ..................   65
    Voir Dire Examination by Mr. Schwieger ................   71
    Voir Dire Examination by Mr. Hunt, Jr. ................   75

<u>KENNETH HENDRICKS:</u>

    Voir Dire Examination by the Court ....................   82

<u>RODNEY WATKINS:</u>

    Voir Dire Examination by the Court ....................   85
    Voir Dire Examination by Mr. Frazier ..................   88
    Voir Dire Examination by Mr. Goains ...................   93
    Voir Dire Examination by Mr. Hunt, Sr. ................   96

<u>ANITA KLATZ:</u>

    Voir Dire Examination by the Court ....................  102

<u>KATHERIN TALBERT:</u>

    Voir Dire Examination by the Court ....................  105

280

**LINDA PETERS:**

    Voir Dire Examination by the Court ..................... 108
    Voir Dire Examination by Mr. Frost .................... 111
    Voir Dire Examination by Mr. Schwieger ............... 114
    Voir Dire Examination by Mr. Hunt, Sr. ............... 118

**GEORGIA HALL:**

    Voir Dire Examination by the Court ..................... 125

**LINDA HUTCHINS:**

    Voir Dire Examination by the Court ..................... 131
    Voir Dire Examination by Mr. Blagg .................... 137
    Voir Dire Examination by Mr. Goains .................. 139
    Further Voir Dire Examination by the Court ............ 142
    Voir Dire Examination by Mr. Hunt, Jr. ............... 143

**BILLIE SIMECEK:**

    Voir Dire Examination by the Court ..................... 149

**MICHAEL COFFIN:**

    Voir Dire Examination by the Court ..................... 152
    Voir Dire Examination by Mr. Frost .................... 155
    Voir Dire Examination by Mr. Goains .................. 159
    Voir Dire Examination by Mr. Hunt, Jr. ............... 162

**PAUL MILLER:**

    Voir Dire Examination by the Court ..................... 167
    Voir Dire Examination by Mr. Frost .................... 171
    Voir Dire Examination by Mr. Schwieger ............... 175
    Further Voir Dire Examination by the Court ............ 179
    Voir Dire Examination by Mr. Hunt, Sr. ............... 179

**BOBBY PONCIK:**

    Voir Dire Examination by the Court ..................... 186

**DAVID IGNACIO:**

    Voir Dire Examination by the Court ..................... 196
    Voir Dire Examination by Mr. Blagg .................... 199
    Voir Dire Examination by Mr. Schwieger ............... 202
    Voir Dire Examination by Mr. Hunt, Jr. ............... 206

281

DANA PATE:

    Voir Dire Examination by the Court ..................... 212
    Voir Dire Examination by Mr. Blagg ..................... 216
    Voir Dire Examination by Mr. Goains ..................... 221
    Voir Dire Examination by Mr. Hunt, Sr. ................. 224

JOHN SCHRADER:

    Voir Dire Examination by the Court ..................... 232
    Voir Dire Examination by Mr. Frost ..................... 236
    Voir Dire Examination by Mr. Goains ..................... 237
    Voir Dire Examination by Mr. Hunt, Jr. ................. 241

MARY SPUNKLER:

    Voir Dire Examination by the Court ..................... 247
    Voir Dire Examination by Mr. Frost ..................... 252
    Voir Dire Examination by Mr. Schwieger ................. 256
    Voir Dire Examination by Mr. Hunt, Sr. ................. 259

CALVIN KRUGER:

    Voir Dire Examination by the Court ..................... 263
    Voir Dire Examination by Mr. Frazier .................. 266
    Voir Dire Examination by Mr. Goains ..................... 270
    Voir Dire Examination by Mr. Hunt, Jr. ................. 273

LASER BOND FORM A   ®   PENGAD · 1-800-631-6989