0684-99-CID034-34987

STATEMENT OF BROWN, TERRY TERRELL
TAKEN AT Building 2200, Fort Hood, Texas 765 DATED 22 Jun 1999 CONTINUED.

--------------------------------------------------------------------
**AFFIDAVIT**
--------------------------------------------------------------------

I, TERRY T. BROWN
HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1 AND
ENDS ON PAGE 03.  I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT
MADE BY ME.  THE STATEMENT IS TRUE.  I HAVE INITIALED ALL CORRECTIONS AND
HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT.  I HAVE
MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT
THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR
UNLAWFUL INDUCEMENT.


_____
(Signature of Person Making Statement)

　　　Subscribed and sworn to before me, a person authorized by law to
administer oaths, this 22 day of JUN, 1999 at Building 2200, Fort Hood,
　　　　　　　　　　　　　　　　　　　　　　Texas 765


_____
(Signature of Person Administering Oath)

SA ROGELIO J. MERAZ
_____
(Typed Name of Person Administering Oath)

ARTICLE 136 (b)(4) UCMJ
_____
(Authority To Administer Oaths)


WITNESS:

_____
_____
_____


**0338**

Exhibit: _____          INITIALS  _____          PAGE  3 OF 3

FOR OFFICIAL USE ONLY

585

JUVENILE VOLUNTARY STATEMENT OF Terry T. BROWN, 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, 1551-1 Safi Road, Fort Hood, TX 76544:

About 1230, 22 Jun 99, Brandon and I picked up Chris LEWIS and Chris Vialva in Brandon's car from a house in Longbranch housing area. We drove around for awhile and went to the Dollar General store then between 1600 and 1700 we went the Mickey's gas station located down the street from Killeen High School across from longbranch park. Brandon and I went into the Laundermate and Brandon and Chris Lewis and Chris VIALVA went into the store. We stayed there for about 5-10 minutes then went out to Brandon's car. Brandon and I looked for Chris and Chris and did not see them. Brandon and I left Mickey's without Lewis or Vialva and traveled to Winn Dixie grocery store to fill out applications. Brandon took me to Billy Roy's house on 2002 Hill Street, Killeen, TX. About 1840, Lewis contacted me and told me he was in Copperas Cove and needed some help, I told him to meet me at Bill's house. About 1911, 22 Jun 99, I went outside and met Lewis and Vialva outside down the street from Bill's house. Vialva was driving a Red Delta 88, automobile with Iowa plates, and Lewis was the passenger. I asked Vialva what was wrong and and he told me that there was two bodies in the trunk. I asked the people in the trunk if they were O.K. and a female informed me that she needed to use the restroom. I asked them what there names were and the female stated that her name was Stacy. The male told me what his name was but I can't remember it. I asked them what they knew and the female stated that she could not remember anything. I told them that we would take them to the park then call the police and tell them where they were. I told both Lewis and Vialva to take them to the park and leave them there and we would call the police. They agreed and left. I went back into the house and Brandon called me and I told him to come and get me and he said that he would be right there. Brandon showed up and picked me up in about 2-5 minutes and we to the park and drove around the park twice but did not see them. We saw them finally and I got out and went over to Vialva who was in the driver's seat. I told him to get out of the car and we would call the police. Vialva stated that they (the victims) knew too much and that he needed to burn the vehicle because they had left fingerprints. I told Vialva that the people did not have to die and he told me that he needed to burn the car because they had left too many fringerprints in the car. Vialva told us to follow him. There was a friend of mine named Joey Pressley who was in the car when we were at the park. When I returned back to the car I told Brandon to drop Joey off then we would ride with Lewis and Vialva who were waiting for us down the road. After we dropped Joey up we met up with Lewis and Vialva on a street off of Westcliff Road and then we both drove off . We drove to Old Nolanville road and we stopped at the cattle guard and I saw Vialva and Lewis drive the car off the road towards a big hill off the road. Brandon and I got out of the car and walked towards the location where the vehicle was. While I was walking towards the car I could hear both the man and the woman scream out that "Jesus Loves Them" I could see that the trunk was shut. Vialva was outside of the car behind the trunk and was yelling at the man and woman to be quiet. I stopped because I could not take it anymore and I turned around and started to walk back towards Brandon's car. When I got there Brandon was already waiting at the car. Once I arrived at the car I heard two gun shots. About 5-10 seconds later Lewis arrived at the car. About 10-15 seconds later Vialva showed up at the car. We got back into Brandon's car and Brandon took off driving. The next thing I know Brandon's car went off the road and into the ditch. We tried to push the car out but we were unsuccessful. A white guy and a black guy showed up and assisted us with pushing the car but we were unsuccessful. A little while later a white guy in a two tone truck showed up police us out. That's when the police showed up and place us into had cuffs.

0342

Terry Brown

FOR OFFICIAL USE ONLY

EXHIBIT

RIGHTS WARNING PROCEDURE/WAIVER CERTIFICATE

For use . . . form, see AR 190-30; the proponent agency is ODCSOPS

## DATA REQUIRED BY THE PRIVACY ACT

|  | |
|---|---|
| . . . Y: | Title 10, United States Code, Section 3012(g) |
| . . . NCIPAL PURPOSE: | To provide commanders and law enforcement officials with means by which information may be accurately identified. |
| . . . OUTINE USES: | Your Social Security Number is used as an additional/alternate means of identification to facilitate filing and retrieval. |
| . . . SCLOSURE: | Disclosure of your Social Security Number is voluntary. |

| LOCATION | 2. DATE | 3. TIME | 4. FILE NO. |
|---|---|---|---|
| *CID, FORT HOOD, TX* | *22 Jun 99* | *0750* v8 | |

| NAME (Last, First, MI) | 8. ORGANIZATION OR ADDRESS |
|---|---|
| *LEWIS, CHRISTOPHER M.* | *2403 SIMONE DR* |
| SSN | *KILLEEN, TX 76543* |
| 7. GRADE/STATUS | |
| *CIV / JUV* | |

## PART I - RIGHTS WAIVER/NON-WAIVER CERTIFICATE

### Section A.   Rights

The investigator whose name appears below told me that he/she is with the United States Army *CRIMINAL INVESTIGATION COMMAND AS A SPECIAL AGENT* and wanted to question me about the following offense(s) of which I am suspected/accused: *MURDER, ARSON, KIDNAPPING, CONSPIRACY !!!*

Before he/she asked me any questions about the offense(s), however, he/she made it clear to me that I have the following rights:

I do not have to answer any questions or say anything. *CL*

Anything I say or do can be used as evidence against me in a criminal trial. *CL*

(For personnel subject to the UCMJ) I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me during questioning. This lawyer can be a civilian lawyer I arrange for at no expense to the Government or a military lawyer detailed for me at no expense to me, or both.

- or -

. . . civilians not subject to the UCMJ I have the right to talk privately to a lawyer before, during, and after questioning and to have a lawyer present with me . . . questioning. I understand that this lawyer can be one that I arrange for at my own expense, or if I cannot afford a lawyer and want one, a lawyer will be appointed for me before any questioning begins. *CL*

If I am now willing to discuss the offense(s) under investigation, with or without a lawyer present, I have a right to stop answering questions at any time, or speak privately with a lawyer before answering further, even if I sign the waiver below. *CL*

**COMMENTS** (Continue on reverse side)

*PARENTAL CONSENT FORM ATTACHED*

### Section B.   Waiver

. . . understand my rights as stated above. I am now willing to discuss the offense(s) under investigation and make a statement without talking to a lawyer first and without having a lawyer present with me.

| WITNESSES (If available) | 3. SIGNATURE OF INTERVIEWEE |
|---|---|
| 1a. NAME (Type or Print) | |
| *Victoria Lewis* | *Chris Lewis* |
| 3. ORGANIZATION OR ADDRESS AND PHONE | 4. SIGNATURE OF INVESTIGATOR |
| | *David M. Elletz* |
| 2a. NAME (Type or Print) | 5. TYPED NAME OF INVESTIGATOR |
| | *DAVID M. ELLETZ, SPECIAL AGENT* |
| b. ORGANIZATION OR ADDRESS AND PHONE | 6. ORGANIZATION OF INVESTIGATOR |
| | *38TH MP (CID)* |
| | *FORT HOOD, TX 76544.* |

### Section   C.   Non-waiver

1. . . . do not want to give up my rights:
   ☐ I want a lawyer.      ☐ I do not want to be questioned or say anything.

0344

2. SIGNATURE OF INTERVIEWEE

FOR OFFICIAL USE ONLY

ATTACH THIS WAIVER CERTIFICATE TO ANY SWORN STATEMENT OR FORM 2820 SUBSEQUENTLY EXECUTED . . .

582

SWORN STATEMENT

-------------------------------------------------------------------

File Number : 0684-99-CID034-34527
Location    : Building 2200, Fort Hood, Texas 765
Date        : 22 Jun 1999                    Time: ~~2750~~ 1406 Ch
Statement Of: LEWIS, CHRISTOPHER MICHAEL
SSN         :                               Grade/Status: Civilian
Org/Address : 2403 SIMONE DR, KILLEEN, TX 76543

-------------------------------------------------------------------

I, CHRISTOPHER M. LEWIS, WANT TO MAKE THE FOLLOWING STATEMENT UNDER OATH:
About three days ago my dad kicked me out of the house, because
I came home late one too many times. The past couple days I've
been staying at friends' houses. Yesterday, 21 Jun 99, around
1100, I went to my friend Tom's house. I don't know his last
name. He lives in some apartments called the Mediteranian or
something like that off of 60th Street, Killeen, TX, with his
mom. Anyway, I got to Tom's house around 1100, and he let me
sleep there for a bit. A girlfriend of his, Tatianna, came by
with her sister while I was there. Around 1530 I woke up. We
played Blitz for a while (it's a Sony Playstation game). They
said they were going to go somewhere, so I said I was going to
leave and go to the nearby store. The store was a little Fina
Store on Bundrant Street. I bought a soda and a pack of gum.
The shopkeeper was an older Hindu type man. He had a thick
mustache and a slight beard, both of which had some grey hair.
I left the store and started walking down Westcliffe. Chris
VIALVA (I'm not sure how to spell his last name) came pulling up
alongside me in a maroon Buick car. Chris asked me if I wanted
ride. I could see Terry BROWN and Brandon BERNARD ("Dip")
~~e~~ in Brandon's car at the Mickey's Store on Westcliffe,
~~waiting~~ for Chris. Chris asked me if I wanted a ride. I asked
him where to, and he said he was going to his cousin's house,
just down the street a ways. I asked him if he'd give me a ride
back, and he said he would. I got in the car, and asked him
where he got the car from. Chris just started laughing. We
pulled up to the Mickey's store. I asked Chris what he was
doing and he said he was just getting some lighter fluid for a
barbecue. He went in to the store and came back out with two
bottles of barbecue lighter fluid. The bottles were blue
plastic with red tops. While I was waiting in the car, we were
parked about three spaces away from Terry and Brandon. I think
I said "what's up" to them. After Chris got in the car we
pulled away. I asked him why he needed all that barbecue fluid.
Chris said his family likes to get together a lot and cook
barbecue. We drove towards Nolanville, with Terry and Brandon
following us. We turned down a dirt road that looked to me like
no-one lived there. I asked Chris if he was sure his cousin
lived out here. He said his cousin lived at the end of
road. Then we turned off the road and up a steep hill that was
all bumpy and rocky. As we were driving up the hill I heard a
female voice in the trunk of the car saying "oh my lord, please
help me !" I looked at Chris and asked him who was back there.
Chris pulled out a Glock 9mm pistol, held it up, and said he had
to handle his business. Chris stopped at the top of the hill
and turned off the car. A male voice in the trunk asked "are
you going to kill us ?" I was shocked, and looked at Chris. He
didn't say anything. He just reached down under the drivers
seat, pulled out the bag with the two bottles of lighter fluid,
and lit a cigarette with a disposable lighter. I think Chris

0345

Exhibit: _____          INITIALS _Ch_          PAGE 1 OF 6

FOR OFFICIAL USE ONLY

588

0684-99-CID034-34527

STATEMENT OF LEWIS, C.M.
TAKEN AT Building 2200, Fort Hood, Texas 765 DATED 22 Jun 1999 CONTINUED.

had a white lighter, but he might have been holding Bernard's green one.  I don't remember.  Chris had stuck the gun back into the front wasteband of his pants.  Chris got out of the car and started pouring the lighter fluid on the hood of the car.  Chris continued pouring lighter fluid on the rest of the car.  I was still sitting in the passenger seat of the car.  The female banged on the trunk, and asked if anyone was there. I said "yea." She asked me if I saw the bible on the back seat of the car.  I said yea, and she asked me if I was a Christian. I said no, but I used to go to church.  She asked me to read a certain paragraph out of Isaiah to her.  I started reading it to her, and she said that the paragraph was telling me what God wanted me to do.  It was something about "thou shalt not kill." The guy asked me if I had ever been to the GC Crew Church by Ellison High.  I told him I had.  He said he and his wife used to work there, and we had something in common.  Chris kept asking them if they could come up with some money.  The man said their checks would bounce, and said God gives them anything they need.  He said something about how they were down here from Ohio to tell people about going to church.  The woman asked me to read a different paragraph to her from the next page.  I read that, and she said "see, that's how life should be." The paragraph was about how we should all be equal. All this time, Chris was squirting lighter fluid on the car, and then he told me to get out of the car.  He squirted lighter fluid inside the car, and I had to get out of the way before he sprayed it on the seat I had just been sitting in.  When the man heard Chris telling me to get out of the car, he said "if you all are going to kill us, leave the Bible in the car." I got out of the car and closed the door and went up to the front of the car.  Chris had opened the hood and was spraying a bunch of lighter fluid in the engine compartment. There was a knocking on the trunk.  Chris got mad and said "Bitch, quit knocking on the trunk, I'm about to let you out." Her husband started talking about God to Chris, and how God loved us, and he loved us.  Chris didn't want to hear that, and started spraying lighter fluid all over the trunk.  About then, Terry and Brandon were walking up the hill and were about half way to us.  When Terry and Brandon got up to us, Chris told us to pop the trunk.  They said they didn't have the keys.  Chris called us all scared.  I told Chris he didn't have to do this. Chris said they heard his name.  Chris said this was just business, because they didn't have any money.  The lady heard this, and said she could get him some money on Wednesday, because that's when her husband got paid.  I started walking down the hill.  I didn't want to be around.  I looked back just as Chris popped the trunk open.  He shot the man in the center of his forehead. The man's body jumped.  Then Chris shot the woman in the side of the head and she jumped too.  He shot them one after the other with no hesitation.  Terry was standing by Chris, near the left rear quarter panel of the car.  Brandon had been standing on the right side of the car, but was right behind me by the time I turned around.  As soon as Chris shot the man and the woman, Brandon took off jogging down the hill.  When we got to the bottom of the hill, Chris started trying to rush everyone get into the car and leave.  I looked back, and could see the front seats of the car were on fire.  I don't know exactly what

Exhibit: _____         INITIALS _Ch_         PAGE  2 OF 6

FOR OFFICIAL USE ONLY

0346

589

0684-99-C1DD34-34922

STATEMENT OF LEWIS, C.M.
TAKEN AT Building 2200, Fort Hood, Texas 765 DATED 22 Jun 1999 CONTINUED.

sed to light the fire.  It might have been the cigarette he had lit when he first got out of the car.  I didn't want to get in the car, and told Chris he should just shoot me now, because I was going to end up in jail for a long time for this. Brandon came over to me and told me to just get in the car.  I was standing by the back right door. Chris was getting into the front passenger seat.  He turned to face me and started pointing the Glock 9mm at me and saying I was stupid, and calling me a "Ho." I was weaving back and forth to keep the gun from pointing at me. Chris was waving the gun back and forth across my chest. We all got in the car with Brandon driving. Brandon tried turning the car around to face back out towards the cattle guard.  As he did so, the car slid off the side of the road and got stuck in the mud.  He got on the gas, but it just got more stuck.  Chris jumped out of the car and was saying "damn, damn, I can't get caught like this." Terry and I got out too, and started helping Chris try to push the car forward. Brandon was driving to drive the car forwards. Chris said something about "damn, I can't do nothing." I just looked at him.  Brandon told Chris if he wasn't trying to make money, we wouldn't be out here like this. Chris said he was trying to get on his "paper chase." We were standing there bickering back and forth, and Chris saw some lights coming up the road.  Chris had run down the hill with both of the lighter fluid bottles in his hands.  He had one kind of wrapped within a T-shirt in his left hand, and the other in his right hand.  He dropped the bottles on the ground next to e car.  I remember thinking we might have run them over.  When is saw the lights coming, he started panicking, and tossed one of the bottles to me, saying "hurry up and throw it." I said no, and threw it back to him. I didn't touch the bottle, because by then I had the white T-shirt in my hands.  I had cut my hand while we were trying to push the car out.  Terry slammed the door on my hand and it cut the back of my right hand.  So, I threw the bottle back at Chris, he made a clicking sound with his lips like he was disappointed in me. I asked him if he was trying to get my prints on the bottles. He threw the bottles into the woods.  As we were trying to push the car out, these two guys showed up in an S-10 with a "69" sticker on it.  They asked if we needed some help. Brandon asked if they had ropes or chains.  The white guy said he had folks down the street, and he could get some chains there.  We had them try to help us push the car out.  Chris pulled the Glock out of his right front pocket and gave it an underhanded toss into the woods alongside the road during this time.  He had a .22 pistol in his left pocket, which he also pulled out and threw into the woods.  The Glock was black and the .22 was silver and black. Chris saw a big 440 truck coming up the road, so he told them they didn't need to go get any chains. The truck guy had some chains, so he started lining his truck up, and Brandon started getting the car ready to be pulled out.  The guy driving the 440 truck was hispanic, with a thick mustache.  He had blue jeans and a grey cowboy shirt.  The truck was blue with white stripes running upwards from the back wheels to the tailgate, and a big white stripe across the hood. There was a big "440" on the tailgate. truck pulled us out just as the Nolanville Police showed up. ouple females pulled up in a late model Suzuki sport utility

Exhibit: _____          INITIALS C.L.          PAGE 3 OF 6

FOR OFFICIAL USE ONLY

Sgu

0684-99-CID034-34527

STATEMENT OF LEWIS, C.M.
TAKEN AT Building 2200, Fort Hood, Texas 765 DATED 22 Jun 1999 CONTINUED.

...ehicle, and started asking a lot of questions. The one chick
said they were undercover MP Officers. The Nolanville Policeman
told the guy in the truck to park over on the other side of the
road. The Fort Hood Game Warden guy showed up in his big gray
pickup.  The cops talked to the truck guy for a second, then let
him leave. While this was going on, Chris was telling us to say
we had been coming back from Harker Heights, and were taking
Terry home to his parent's house on Fort Hood. The boys in the
S-10 truck were up the road a few yards, sitting in their truck.
The Nolanville Cop talked to the boys in the S-10 truck and then
let them go.  They came back a while later in a car, and the
Game Warden talked to them. The firetrucks arrived a few minutes
later, and went up the hill. The cops and game warden had been
asking us about the burning car, and we said we didn't know
anything about it.  We told them the story about Harker Heights
and going to Terry's house.  The MP lady was asking us about
where we were coming from and where we were going to, and saying
we were getting caught up in our own lies. The cops and Game
Warden were talking about the burning car being an insurance
job.  Then the fire department said something to them over the
radio, and they got real serious from there. They searched us
and stuck us in the back seats of the MP cars. I had been
shaking and got real scared and started crying, and the cops and
the female MP Officer came over and asked me what I was scared
about, and told me to relax.  After that you guys showed up, and
here we are.

Can you better describe Tom's apartment, or provide a phone
   ..ber  for him ?
A:  He doesn't have a phone.  His is the building within the
complex just before you come to the pool, on the right side of
the pool. Its on the second floor. You get to the top of the
stairs, go left, and follow it all the way around the building
to kind of a dark hallway. His is the building just before you
come to the pool, on the right side of the pool.  Its on the
second floor. You get to the top of the stairs, go left, and
follow it all the way around the building to kind of a dark
hallway.
Q:  What time would you say it was that you got in the car with
Chris ?
A: I'd say it was getting near dark, probably about 1930.
Q:  What did Chris or either of the other two say about where,
when, and how Chris abducted the people ?
A:  Nothing.  A few weeks ago he was talking about how he was
going to do something like this, but I thought he was just
talking.  He said he would ask someone for a ride.  After they
let him in their car he'd pull his gun on them and tell them
there was a change of plans.  He'd take all their money and
credit cards, and force them to drive to an ATM machine and give
him their PIN number.  If they gave him the wrong number twice,
he'd shoot them.
Q:  Did anyone take any property from the people in the trunk,
or the car for that matter ?
A:  I think Chris had taken their Visa cards or ATM cards
already, because when we were on top of the hill he said
   ...ething about how he was going to kill them because they
   ..n't have any money.  I told him I thought it was wrong that

Exhibit: _____          INITIALS _C_.h_          PAGE  4 OF  6

FOR OFFICIAL USE ONLY

0348
591

0684-99-C1D034-34527

STATEMENT OF LEWIS, C.M.
TAKEN AT Building 2200, Fort Hood, Texas 765 DATED 22 Jun 1999 CONTINUED.

. was going to kill them just because they didn't have any
money. Chris started chuckling.
Q: What did Chris use to start the fire in the car ?
A: I don't know. After he shot them, I took off running down
the hill. When I got to the bottom I looked up the hill and saw
that the front seat of the car was on fire.
Q: If you had already started down the hill before he shot
them, how were you able to see him shoot them in the head ?
A: The hill drops off kind of gradually at the top, and then
gets steep. I was standing right by the edge of where
it transitions from shallow slope to steep. That's how I knew he
had reddish hair and she had blonde hair.
Q: How do you think it was possible that Chris was holding two
bottles of lighter fluid in his hands, unlocking the trunk, and
pulling a pistol at the same time.
A: I don't know, I just know he had them in is hands when he got
down to the car.
Q: When you were driving down the dirt road just before turning
up the hill, did Chris stop at the base of the hill for any
reason ?
A: No. He sped up when we approached the hill.
Q: Why didn't you do something more to stop Chris from shooting
and lighting those people on fire ?
A: I tried to talk him out of it, but it was obvious he already
had his mind made up.
Q: During our previous conversation on this incident, you
mentioned something about there only being two bullets in Chris'
Glock pistol. How did you know this, and when did you find out ?
A. As we were heading up the hill, just after the lady yelled
out and I asked Chris who that was in the back of the trunk,
Chris pulled out his Glock, cocked it back, and said he had two
bullets, one for each of them.
Q: Who owned the Glock pistol and the .22 pistol ?
A: I don't know who owned them, but Chris had them.
Q: Who was driving the other car ?
A: Brandon
Q: How well do you know Chris, and what is the nature of your
relationship ?
A: I see him just about every day, as he lives just around the
corner from me. We're not best friends or anything like that,
but we know eachother pretty well.
Q: How do you know the pistol Chris used was a Glock ?
A: I know what a Glock looks like because I see them in
magazines, and Chris showed it of and said it was a glock.
Q: Who was standing closest to Chris when he fired the shots ?
A: Terry.
Q: During the course of our contact and interview, have you
been provided adequate opportunities to rest, eat, drink, and use the
restroom ?
A: Yes.
Q: Is there anything you'd like to add to this statement ?
A: No.
Q: Is there anything you can think of that I haven't asked,
that would help shed some light on what happened ?
    Not that I can think of.  ///END OF STATEMENT///

Exhibit: _____        INITIALS _CL_        PAGE 5 OF 6

FOR OFFICIAL USE ONLY

0349

592

0684-99-CID034-34557

STATEMENT OF LEWIS, C.M.
TAKEN AT Building 2200, Fort Hood, Texas 765 DATED 22 Jun 1999 CONTINUED.

---

## AFFIDAVIT

---

I, CHRISTOPHER M. LEWIS
HAVE READ OR HAVE HAD READ TO ME THIS STATEMENT WHICH BEGINS ON PAGE 1 AND
ENDS ON PAGE 06.  I FULLY UNDERSTAND THE CONTENTS OF THE ENTIRE STATEMENT
MADE BY ME.   THE STATEMENT IS TRUE.  I HAVE INITIALED ALL CORRECTIONS AND
HAVE INITIALED THE BOTTOM OF EACH PAGE CONTAINING THE STATEMENT.  I HAVE
MADE THIS STATEMENT FREELY WITHOUT HOPE OF BENEFIT OR REWARD, WITHOUT
THREAT OF PUNISHMENT, AND WITHOUT COERCION, UNLAWFUL INFLUENCE, OR
UNLAWFUL INDUCEMENT.


(Signature of Person Making Statement)

    Subscribed and sworn to before me, a person authorized by law to
administer oaths, this 22 day of JUN, 1999 at Building 2200, Fort Hood,
                                    Texas 765


(Signature of Person Administering Oath)

SA DAVID M. ELLER

(Typed Name of Person Administering Oath)

ARTICLE 136 (b)(4) UCMJ

(Authority To Administer Oaths)


WITNESS:

_____

_____
_____



**0350**

Exhibit: _____          INITIALS _C.L._          PAGE  6 OF 6

FOR OFFICIAL USE ONLY

593



EXHIBIT

| AGENTS ACTIVITY SUMMARY (CID Regulation 195-1) | Control Number 0684-99-CID034-34927 |
|---|---|

| TIME, DATE, AND AGENT | SUMMARY OF INVESTIGATIVE ACTIVITY |
|---|---|
| 10, 22 Jun 99, NELSON | SA NELSON was informed by SAC to accompany SA CHADWICK to the Justice of the Peace, and have Master BROWN magistrated by Mr Bill COOKE. BROWN was sleeping in the CID lobby prior to notifying him that we were going to the JOP office. |

About 1030, 22 Jun 99, SA NELSON and SA CHADWIK departed the CID office enroute to the JOP office. SA CHADWICK purchases BROWN a cheeseburger and soda prior to getting to the JOP office.

About 1115, 22 Jun 99, JOP magistrates BROWN in an office. SA CHADWICK and SA NELSON are not present when BROWN is magistrated. Mr COOKE informed SA NELSON and SA CHADWICK that BROWN has agreed to talk.

Between 1145-1600, 22 Jun 99, SA NELSON and SA Chadwick interview BROWN and take a statement. (See AAS 1100, 22 Jun 99). SA NELSON and SA CHADWICK return to CID office with BROWN.

About 1730, 22 Jun 99, SA NELSON and SA HOCHADEL, this office, depart CID office with LEWIS enroute to Bell County Juvenile detention Center, Killeen, TX. During the transport of LEWIS he makes statements of how robbery, kidnapping, and murder of victims occurred. LEWIS stated VIALVA used victims ATM card at the 7-11 located adjacent to the Fort Hood East Gate on W.S. Young St. SA NELSON provided info to SA CHADWICK.

Prior to leaving the building BROWN was brought a hamburger and shake by his mother. From 1730-1910, 22 Jun 99, BROWN was either sleeping or eating until SA NELSON was notified BROWN wanted to see him.

About 1910, 22 Jun 99, Inv Maurice BELL, this office, notified SA NELSON that BROWN wanted to talk to him. BROWN began to infom SA NELSON that he had not been totally truthful in his previous statements and wanted to do so now. (See AAS 1910, 22 Jun 99)

Between 1930-2200, 22 Jun 99, SA NELSON re-interviewed BROWN on and off approximatley 12 times. BROWN would provide additional information about the incident each time SA NELSON went back into the room. After BROWN provided SA NELSON with additional information he would ask SA NELSON if he could think about a particular incident and SA NELSON would leave the room. Upon SA NELSON's return, BROWN would provide the info consistent with BERNARD's statement.

About 2200, 22 Jun 99, SA NELSON allowed BROWN's mother to visit his mother.

About 2230, 22 Jun 99, SA NELSON left the building.

0530

**REPORT OF INVESTIGATION**

| RANGER: CA01001990720135535F | Div File No: | STATUS: ACTIVE |
|---|---|---|
| TYPE: CRIMINAL | RF-1999-00318 | BY: JOHN AYCOCK, SGT. 1001 |

1. **CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX**
2. **BELL COUNTY, FT. HOOD, TX, US**
3. **STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971,**
4. **06/21/1999      ( Monday )**

Heights, Texas.

**1.97** This writer would later check with ATF Special Agent Charles MEYER regarding the Harker Heights shooting evidence. Although cut off, the gun was just over the legal length for a weapon.  It was noted that VIALVA was convicted in that case.

**1.98** Other information would surface that the .40 caliber weapon recovered by the U.S. Army was stolen in a burglary of a motor vehicle on 5/8/99 in Killeen.  The victim of that theft was Ernest ROWELL.  In checking the report in reference to ROWELL, this writer suggested ROWELL be re-interviewed, and he has been twice since that request.  The re-interview process revealed that ROWELL had his handgun inside his vehicle (which was the Glock found at the murder scene) and at the same time had in his vehicle a subject by the name of Ronald BELL, who goes by the name of "Little Twin".  BELL is an associate of the "Bloods" gang. Investigators would later receive information that would indicate that Ronald BELL stole the Glock pistol, transferred it to James PRESLEY, who in turn transferred it to Sherwin SIMPLE in Temple, Texas.  The Glock pistol then made it's way back to Killeen into the possession of James PRESLEY, then to Brandon BERNARD, to Gregory LYNCH, and from LYNCH back to BERNARD and Christopher VIALVA.  The ultimate use of this stolen weapon being the homicides, where it was recovered.

**1.99** On 06/22/99 after 10:00PM, this writer and members of the TDCJID, to include canine handlers Johnny WILCOX and Jimmy EVANS from Palestine, Texas, went to the scene of these murders.  WILCOX had collected the underwear of the four (4) suspects in this case, and the purpose for going to the site was to use an individually scented tracking dog to possibly track the scent from each of the suspects underwear on a given route on the crime scene. The following scenario occurred at the times given.

**1.100** At 10:20PM TDC dog, Bonnie, being handled by Jimmy EVANS and without any prior knowledge of routes to be looked at, scented off of the underwear of Christopher VIALVA.  Bonnie started at the area near the burned car site, made two (2)

08/25/1999 3:56:14 PM

*DPS SENSITIVE*

594

REPORT OF INVESTIGATION

| :ANGER: CA01001990720135535F | Div File No: RF-1999-00318 | STATUS: ACTIVE |
| TYPE: CRIMINAL | | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971,
4. 06/21/1999      ( Monday )

circles toward the trunk (or where it would have been when recovered), tracked down the right hand side of a gravel road on a hillside, turned left at the bottom of the gravel road, went to a spot where the suspects' car was stuck in the ditch, crossed the road, went north of some crime scene tape, and stopped her tracking in an area of a bar ditch.

1.101   At 10:35PM Bonnie took a scent from the underwear of Christopher LEWIS, made 1 1/2 circles around the area of the burned car site, went down a gravel hill on the roadway, made a left hand turn at an intersection road at the bottom of the hill, went to the area in the ditch where the suspects' car was stuck, then crossed the road into the ditch to the west of where the car was stuck.

1.102   At 10:55PM Bonnie scented off of the underwear worn by Brandon BERNARD, was unable to obtain a complete scent near the area where the car was burned, however, picked up a scent at a large rock without any difficulty at all, went down the bottom of the hill as the other scents had led the dog, to a cattle guard, then turned left and went to the area where the suspects' car was stuck in the ditch.

1.103   At 11:12PM Bonnie scented off of the underwear of Terry BROWN, picked up BROWN's scent 1/3 way up the hill toward the burned car, went straight down the middle of the gravel road to an intersecting road at the cattle guard, turned left and stayed almost in the center of the roadway, until she stopped where the suspects' car had been stuck in the ditch.

1.104   As a result of the above, investigators felt confident in placing all four (4) of the suspects on the mountain in the area of the burned car, with VIALVA and LEWIS' scents being the strongest, as depicted in the manner in which Bonnie picked up the scents.

1.105   Scent is described as the lasting odor of a human that is individual to each human. Certain characteristics of scent can be tracked by an animal trained to detect scent, and handled by a person trained with the animal for the detection of the scent. Scent can vary due to weather conditions, winds, fertilizer, rain, heat, chemicals, water

08/25/1999 3:56:14 PM

TR-1 (Rev. 01/98)           *DPS SENSITIVE*

592

REPORT OF INVESTIGATION

| RANGER: CA01001990720135535F | Div File No: RF-1999-00318 | STATUS: ACTIVE |
|---|---|---|
| TYPE: CRIMINAL | | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971,
4. 06/21/1999    ( Monday )

that all three (3) males were too young to be out that late and in a curfew violation situation.

1.153  Upon making contact with the three (3) males, they were identified as Christopher VIALVA (who is an adult and was released), Christopher LEWIS, and Tony SPARKS.  The officer made contact with Tony SPARKS' mother, Danielle BROWN.  The officer had Danielle BROWN come to the area and take SPARKS and LEWIS with her and leave the area.  The two (2) males were written up as a curfew violation by the Killeen Police.

1.154  This writer will note that once arriving back at SPARKS' residence, Ms. BROWN would not let Christopher LEWIS stay there.  Investigators have information that SPARKS gave LEWIS bedding from out of the back window of SPARKS' home, and LEWIS burglarized a vacant house (that was for sale) next door and spent the night there.  This writer and Detective M.R. BROWN discovered footprints on top of an air conditioning system that was adjacent to a window in the locked vacant house.  This would corroborate Christopher LEWIS' story to the FBI about his whereabouts that particular night, after he and SPARKS had been picked up for curfew violation.

1.155  Investigators also know from information given in a debriefing by LEWIS, that at the time the Killeen police officer made contact with the three (3) males ( VIALVA, LEWIS, and SPARKS) that SPARKS was armed with a .22 caliber, semi-automatic, chrome plated handgun, which he tossed into the brush.  This gun would later be recovered by LEWIS and VIALVA.  However, due to the fact that the gun had set in the brush overnight, was extremely dirty and not functioning well, LEWIS would describe that they needed another weapon.  A .40 caliber Glock would be obtained, as will be described later in this report.

1.156  It should be noted that a .22 Jennings, semi-automatic handgun, with an obliterated serial number, was recovered at the murder scene, fully loaded with a clip of ammunition.  Also, recovered at the murder scene was an empty Glock semi-automatic .40 S&W handgun.  RORIE, in his second statement, would tell investigators that Christopher VIALVA told him that they only got $40.00 cash from the victims.

08/25/1999 3:56:16 PM

**REPORT OF INVESTIGATION**

| RANGER: CA01001990720135535F | Div File No:<br>RF-1999-00318 | STATUS: ACTIVE |
|---|---|---|
| TYPE: CRIMINAL | | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971,
4. 06/21/1999     ( Monday )

2.5 Terry Brown, Cause #W99CR061, Carjacking, and Conspiracy to Commit Murder.

2.6 Tony SPARKS, Cause #W99CR072, charged 07/14/99 for Carjacking.

2.7 Gregory LYNCH, Jr., Cause #W99CR071, charged 07/14/99 for Possession of a Stolen Firearm.

2.8 The above individuals remain incarcerated in the McLennan County Jail, Waco Juvenile Detention Center, or the Bell County Juvenile Detention Center unable to make bond at the writing of this report.  They all have attorneys appointed for them.

2.9 On 07/26/99 this writer, ATF Agent MEYER, FBI Agent CHADWICK, and CID Agent BAIR met Terry BROWN at the Juvenile facility in Bell County, along with his attorney.  BROWN gave information regarding this case.  According to BROWN, he and his mother previously had a bad argument and he was residing with Billy RORIE at RORIE's home in Killeen.  At some point in time, BROWN stated that he met VIALVA, LEWIS, SPARKS, and Brandon BERNARD at the house of Tony SPARKS.  He would state that this could be confirmed by the fact that a black Jetta vehicle, with Christopher LEWIS' girlfriend, came to the residence for a period of time.

2.10 According to BROWN, he was in a different room of the house part of the time.

2.11 According to Brown, once the group had gone to the Dollar General Store parking lot, he learned about the robbery plan.  He stated that VIALVA did not like the area where the group lived, because no one in that neighborhood had any money.  VIALVA wanted to hijack someone with money.

2.12 At the Mickey's store on Rancier, BROWN stated that he and BERNARD parked at the west end of the laundromat, facing the laundromat.  VIALVA, LEWIS, and SPARKS left.  BROWN stated that he went to the bathroom, and when he came out, VIALVA, LEWIS and SPARKS were gone.  BROWN said he and BERNARD went to an ATM machine near a storage area on Zephyr Road to see if VIALVA and the others were there, but they were not.

08/27/1999 2:11:18 PM

0802

*599*

REPORT OF INVESTIGATION

| RANGER: CA01001990720135535F | Div File No: | STATUS: ACTIVE |
|---|---|---|
| TYPE: CRIMINAL | RF-1999-00318 | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971,
4. 06/21/1999     ( Monday )

2.13  According to BROWN, BERNARD dropped BROWN off at RORIE's
house, and BERNARD left.  BROWN said he received telephone
call's at RORIE'S house, telling him that the group were in
Copperas Cove, but had a problem and needed help.  A meeting
place was set up near a rocky place off of Polk Street,
where the group used to go to smoke marihuana.

2.14  BROWN stated that he had asked RORIE to walk with him to
find BERNARD, but that by the time RORIE got ready to walk,
BROWN left without RORIE.  According to BROWN, he met up
with VIALVA, LEWIS, and SPARKS in the victims' automobile,
and actually talked to Stacie BAGLEY.  BROWN stated that he
rode a distance with the group, with the two (2) victims in
the trunk, and at the time Stacie BAGLEY told BROWN that her
husband needed to use the bathroom.  According to BROWN,  he
(BROWN) was taken back to RORIE's house, dropped off there,
and later the group came back and met with BROWN and RORIE.

2.15  BROWN told investigators that LEWIS was calling BERNARD's
name, where people could hear it.  BROWN admitted that he
saw both of the handguns.  The .22 semiautomatic handgun
that LEWIS possessed was given to BROWN for examination, and
BROWN returned it to LEWIS.  Then BROWN examined the .40
caliber Glock that VIALVA had in his possession, and
returned it to VIALVA.

2.16  According to BROWN, Tony SPARKS was wearing Stacie BAGLEY's
wedding ring on one of his fingers and her watch on his
wrist.

2.17  BROWN stated that BERNARD and Joey PRESLEY were together
from the time that BERNARD left Sherise SCOTT's house and
came to get BROWN.  According to BROWN, they went to the
pavilion by the swimming pool and the victim's car came by
shortly, driven by VIALVA, with LEWIS and SPARKS in the
BAGLEY's car.  At this time at the swimming pool, VIALVA
would state that he (VIALVA) had to burn the car, because
there were too many prints on it and people knew too much.

2.18. According to BROWN, the group rode around for a period of
time, and Joey PRESLEY wanted to go all the way with the
others, but was forced by BROWN to get out of the car near
his home, because of an argument between BROWN and PRESLEY

TR-1 (Rev. 01/98)                    *DPS SENSITIVE*

REPORT OF INVESTIGATION                                        Page 5 of 19

| RANGER: CA01001990720135535F | Div File No: | STATUS: ACTIVE |
|---|---|---|
| TYPE: CRIMINAL | RF-1999-00318 | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971,
4. 06/21/1999      ( Monday )

regarding BROWN wanting PRESLEY to go home.

2.19  BROWN stated that SPARKS was dropped off before PRESLEY,
because SPARKS had a curfew that could be checked on by a
probation officer.

2.20  BROWN would tell investigators that VIALVA said he (VIALVA)
had only got $40.00 from a quick cash place and was upset
over it.  According to BROWN, LEWIS had the credit cards in
his possession, and BROWN stated that he saw the checkbook
and noted the victims' address in Iowa.  BROWN would
corroborate that both cars went by Sherise SCOTT's house,
and after a short period of time both cars passed by Sherise
SCOTT and some girls that SCOTT was walking with.  BROWN
said that SCOTT yelled at "Dip" (BERNARD), who was driving
his own automobile, and SCOTT told BERNARD not to get into
any trouble.

2.21  BROWN told investigators that he saw the victims' Bible on
the floorboard of the car.

2.22  BROWN stated that PRESLEY was not dropped off until after
the group had seen Sherise SCOTT and the other girls that
were walking.  BROWN said that VIALVA had asked for gasoline
to burn the car, and that VIALVA gave BROWN a ten (10)
dollar bill.  BROWN said he (BROWN) and BERNARD went to the
Mickey's store on West Cliff, went inside, and were going to
buy gasoline to put into some type of container, but picked
out charcoal lighter fluid instead.  According to BROWN, he
went to the bathroom and BERNARD purchased the lighter
fluid.  BROWN stated that when he came out of the bathroom,
he purchased a piece of candy, also paid for with the $10.00
given to BROWN and BERNARD by VIALVA.  He said when they got
outside the store, he realized that they did not have
anything with which to light the lighter fluid, and he re-
entered the store to purchase matches, but was given some by
the store personnel.

2.23  According to BROWN, they were in the store for approximately
five (5) minutes, including the amount of time BROWN went
into the store for the matches.  BROWN stated it was
BERNARD's idea to put gasoline in a water container, but
that idea was discarded, and the charcoal lighter fluid was

08/27/1999 2:11:18 PM

0804

REPORT OF INVESTIGATION

| ANGER: CA01001990720135535F | Div File No: | STATUS: ACTIVE |
|---|---|---|
| TYPE: CRIMINAL | RF-1999-00318 | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971,
4. 06/21/1999       ( Monday )

purchased instead.

**2.24**  BROWN stated that he and BERNARD went to Cora Street, and after a while met up with VIALVA and LEWIS. The group traveled out Hwy.439 to Ft. Hood.

**2.25**  BROWN said that he and BERNARD were leading the way in BERNARD's vehicle, with LEWIS and VIALVA following in the victims' car. VIALVA and LEWIS had already dropped off SPARKS at SPARKS' residence.

**2.26**  Investigators were told by BROWN, that when the two cars crossed the cattle guard, VIALVA immediately turned left in the victims' car and went up the mountain. BROWN said that he and BERNARD could not get BERNARD's automobile up the mountain, because it was a big car.

**2.27**  BROWN said that he and BERNARD carried the lighter fluid up the hill, to use to burn the car. He said that BERNARD squirted the fluid on the front of the car, and that he (BROWN) intentionally squirted the fluid on a T-shirt and the left rear portion of the car, where the car was sitting in the bushes.

**2.28**  BROWN stated that VIALVA was giving orders as to where to put the lighter fluid.

**2.29**  BROWN would state that an argument ensued as to who was going to push the button to open the trunk of the car, but that once the button was pushed and trunk opened, VIALVA told both victims that they weren't getting loose, and then VIALVA shot both victims.

**2.30**  BROWN stated that in leaving the burning car, LEWIS was in front going down the hill, BROWN was next in line, BERNARD was behind BROWN, and VIALVA was last. When the male victim was shot in the head by VIALVA, he (BROWN) saw blood squirting out of the male's head, and the blood fell back into the male victim's ear. BROWN stated he did not see who actually lit the fire.

**2.31**  BROWN said that a cover story had been arranged, that the group was to state to anyone that asked that VIALVA, LEWIS,

08/27/1999 2:11:18 PM

TR-1 (Rev. 01/98)                **DPS SENSITIVE**

*le02*

**REPORT OF INVESTIGATION**

| RANGER: CA01001990720135535F | Div File No: | STATUS: ACTIVE |
|---|---|---|
| TYPE: CRIMINAL | RF-1999-00318 | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971,
4. 06/21/1999    ( Monday )

and BERNARD were taking BROWN home on Ft. Hood, and they had left from "Paul's" house. "Paul" was a person living in Copperas Cove.

**2.32** BROWN told investigators that when the group's get-away vehicle got stuck, he got a green shirt from LEWIS and gave LEWIS an undershirt that BROWN had on.

**2.33** BROWN would state that the lighter fluid was on the back seat area of the suspects' car, and the Glock handgun was seen on the floorboard of the car. He stated that when another car stopped, he put the Glock underneath the seat of the suspects' car. BROWN stated that the track of the gun was from Ronald BELL (who stole it), to BERNARD who loaned it to Greg LYNCH, BERNARD got it back from LYNCH, and it was then used in these murders. According to BROWN, he had the Glock for one day at RORIE's house, because the police were going to BERNARD's house, because BERNARD's sister had reported a bicycle stolen and the police were due to show up there. According to BROWN, he saw several bullets in the gun. He said the bullets had a needle-like thing in the end of the bullet, and that he noticed they were large bullets. BROWN said that LEWIS had the .22 semiautomatic handgun at RORIE'S house.

**2.34** BROWN stated that when running off of the mountain from the burning car to the suspects' car, VIALVA was about ten (10) feet away from the victims' car, with BERNARD being five (5) feet in front of VIALVA, and BROWN being 20 feet in front of BERNARD, and LEWIS being in the lead leaving the mountain.

**2.35** BROWN said that prior to the kidnapping, a male named "Ricky" was in BERNARD's car. "Ricky" lives on Hill Street and was dropped off at RORIE's house (which is also on Hill Street) sometime around 12:00 noon.

**2.36** According to BROWN, VIALVA, LEWIS and SPARKS came by RORIE's house about 7:12PM with the victims in the trunk.

**2.37** Some questions that investigators asked BROWN were left with BROWN. It should be noted that prior to end of this interview, FBI Agent CHADWICK and CID Agent BAIR had to leave the interview, due to the fact that CHADWICK was

08/27/1999 2:11:18 PM

603

REPORT OF INVESTIGATION                                                    Page 8 of 19

| ANGER: CA01001990720135535F | Div File No: | STATUS: ACTIVE |
|---|---|---|
| TYPE: CRIMINAL | RF-1999-00318 | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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  W/F, 04/01/1971, 2
4. 06/21/1999     ( Monday )

leaving town that particular day.

**2.38** On 07/26/99 this writer had contact with Pat RETZLAFF with the Waco DPS Laboratory.  This writer was informed that the Dallas Forensic Lab had been checked and only the female victim was missing a tooth, and it was an incisor tooth. This tooth was the only tooth found by investigators, and it was found in the victims' car.  RETZLAFF agreed to mail the tooth to the Dallas Lab for analysis in reference to this case.

**2.39** RETZLAFF informed this writer that she had found a minute portion of blood on a T-shirt, which at the time of seizure had belonged to Christopher LEWIS.  This writer passed on information to the U.S. Attorney's Office, that a blood sample from LEWIS would be necessary in order to eliminate the victims' blood against the blood found by RETZLAFF on the T-shirt.

**2.40** RETZLAFF informed this writer that she had not found additional blood on any of the other clothing of the suspects and would prepare to send the clothing to the Arson Lab for their analysis as to accelerants.

**2.41** This writer and ATF Agent MEYER traveled on 07/22/99 to Macon, Bibb County, Georgia, to further this investigation.

**2.42** This writer had knowledge that on 07/24/98 James PRESLEY, Prince PRESLEY, Brandon BERNARD, and Antonio JACKSON had been arrested in Macon, Georgia, in possession of a stolen Jeep Cherokee from Killeen, Texas and a .44 magnum handgun. During that arrest, a photo book was seized and entered into evidence by an Officer GORBOWSKI, along with the .44 Ruger magnum handgun, a red shirt, bandannas, and .44 caliber magnum bullets.

**2.43** On 07/15/99 James PRESLEY was re-arrested in Macon, Georgia in possession of a Buick automobile, which had been turned in as stolen by it's owner, Sherwin SIMPLE, from Temple, Texas.

**2.44** Investigators had discussed going to Macon, Georgia to interview James PRESLEY as to his knowledge in this case,

09/05/1999 12:03:07 PM

0807    leo4

# TEXAS DEPARTMENT OF PUBLIC SAFETY
## TEXAS RANGER DIVISION

Page 1 of 3

.PORT OF INVESTIGATION

> THIS REPORT IS THE PROPERTY OF TEXAS DPS-TEXAS RANGER DIVISION. NEITHER IT NOR ITS CONTENTS MAY BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED.

1. CAPITAL MURDER  IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY,  FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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  W/F, 04/01/1971,
4. 06/21/1999      ( Monday )

| | | | |
|---|---|---|---|
| REPORT BY: | JOHN AYCOCK, SGT. 1001 , TEMPLE | FILE STATUS: | ACTIVE |
| DIVISION: | RF-1999-00318 | TYPE: | CRIMINAL |
| RANGER: | CA01001990720135535F | | |

## SYNOPSIS:

13   09/22/1999 Approved by : 4424 CLETE BUCKALOO, LT., 09/30/1999 C.B.

This report was written on 09/15/99.

On 09/14/99 this writer and FBI Agent Dan CHADWICK met with Terry BROWN and his lawyer at the Juvenile Detention Center in Belton, Texas.  BROWN was re-interviewed.

## DETAILS:

13.1   On 09/14/99 writer and FBI Agent CHADWICK met with Terry BROWN at the Juvenile Detention Center in Belton, Texas for the purposes of BROWN debriefing to officers as to the occurrences of the BAGLEY murders.

13.2   BROWN, in addition to what was already said in a previous interview, stated that Tony SPARKS had made contact with Gregory LYNCH and got the pistol.  Then BROWN talked with LYNCH and smoked some of LYNCH's dope, prior to going with the others in reference to a hijacking scheme.  BROWN told investigators that LYNCH was knowledgeable as to the crime, but BROWN did not know exactly what LYNCH was aware of.

13.3   BROWN admitted that he and Brandon BERNARD watched LEWIS, VIALVA and SPARKS attempt to pick up two (2) or three (3) victims at the IGA Food stores in Killeen, prior to the BAGLEYS being hijacked.

13.4   BROWN admitted that he was given the .22 caliber handgun in the car at Billy RORIE's residence.  He stated that while driving down the street with VIALVA, LEWIS and SPARKS, he held the gun on the back seat area and made the statement, "If you're gonna to kill them, you want me just to do it

09/30/1999 12:08:20 PM

TR-1 (Rev. 01/98)          *DPS SENSITIVE*

REPORT OF INVESTIGATION

| NGER: CA01001990720135535F | Div File No: RF-1999-00318 | STATUS: ACTIVE |
| .E: CRIMINAL | | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971,
4. 06/21/1999    ( Monday )

now?".

**13.5** BROWN stated that he did the above to get a response from persons in the car, and had no intention of killing the BAGLEYS at this point.

**13.6** BROWN admitted that he poured a volatile chemical on top of, and inside, the back seat area of the victims' car.

**13.7** BROWN admitted that he attended an end of school party at Blora on Ft. Hood. He stated that at the party Eric SMITH was armed with a dark colored .9mm semi-automatic handgun, and Tony SPARKS was armed with the .22 chrome plated automatic handgun.

**13.8** BROWN identified Eric SMITH by photographs shown to him by this writer.

**13.9** Eric SMITH is the same person that has been interviewed by writer and ATF Agent MEYER, with a statement taken.

**13.10** Some other details of involvement were recalled by BROWN as has been reported earlier by this writer.

**13.11** At the conclusion of the above interview, BROWN and his attorney were approached regarding BROWN voluntarily surrendering a tube of blood. BROWN signed the consent to search. A purple topped tube of blood was drawn from BROWN, and taken into custody by FBI Agent CHADWICK for deliverance to the DPS laboratory in Waco. Writer has knowledge that it was submitted by CHADWICK to the DPS lab.

09/30/1999 12:00:10 PM

*DPS SENSITIVE*

**TEXAS DEPARTMENT OF PUBLIC SAFETY**
**TEXAS RANGER DIVISION**

Page 1 of 4

R̲ ̲ ̲ORT OF INVESTIGATION

┌─────────────────────────────────────────────────────────────────┐
│ THIS REPORT IS THE PROPERTY OF TEXAS DPS-TEXAS RANGER DIVISION. NEITHER IT NOR ITS CONTENTS │
│ MAY BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED. │
├─────────────────────────────────────────────────────────────────┤
│ 1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX │
│ 2. BELL COUNTY, FT. HOOD, TX, US │
│ 3. STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971, │
│ 4. 06/21/1999    ( Monday ) │
└─────────────────────────────────────────────────────────────────┘

| | |
|---|---|
| **REPORT BY:** JOHN AYCOCK, SGT. 1001 , TEMPLE | **FILE STATUS:** ACTIVE |
| **DIVISION:** RF-1999-00318 | **TYPE:** CRIMINAL |
| **RANGER:** CA01001990720135535F | |

**SYNOPSIS:**

15  09/23/1999 Approved by : 4424 CLETE BUCKALOO, LT., 09/30/1999  C.B.
This report was written on 09/17/99.

On 09/17/99 writer went to Waco, Texas, made contact with
Christopher LEWIS, and executed a consent to search for
LEWIS' blood.  A purple top tube of blood was taken to the
DPS Laboratory in Waco, where it submitted for analysis and
preservation.

On 09/17/99 writer traveled to Killeen, where Eric SMITH
was contacted and questioned regarding the .22 handgun,
that ultimately was possessed by SPARKS and used in the
murders of the BAGLEYS.  Eric SMITH was subpoenaed by a
Federal Grand Jury for 10/12/99.

Writer made contact with Ronald BELL in Killeen at his
mother's address, and questioned BELL regarding the .40
caliber Glock weapon used in the murders by Christopher
VIALVA.  BELL confessed to stealing the weapon.  He stated
that he had traded the weapon with James PRESLEY for a .9mm
handgun, prior to the murders.

Ronald BELL was subpoenaed to a Federal Grand Jury on
10/12/99.

**DETAILS:**

15.1 On 09/17/99 writer traveled to Waco, Texas to the Juvenile
Justice Center and made contact with a nurse at that
location.  Writer then had Chris LEWIS summoned to the
nurses station.  LEWIS and writer discussed a consent to
search for blood, that had been previously discussed with

**REPORT OF INVESTIGATION**

| IGER: CA01001990720135535F | Div File No: | STATUS: ACTIVE |
|---|---|---|
| . .PE: CRIMINAL | RF-1999-00318 | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER  IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY,  FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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  W/F, 04/01/1971,
4. 06/21/1999      ( Monday )

LEWIS.  LEWIS gave his written consent for the drawing of
blood, and had a purple top tube of blood drawn by the nurse.

**15.2** LEWIS was specifically asked about the conversation he had
with Gregory LYNCH on the telephone from Tony SPARKS'
residence.  LEWIS recalled a conversation and stated that
VIALVA and SPARKS had talked to LYNCH regarding taking a .40
caliber Glock back from LYNCH, to use in this crime.  The
.40 caliber Glock had originally been possessed by Brandon
BERNARD and been lent to LYNCH by BERNARD.

**15.3** LEWIS stated that he, SPARKS, VIALVA and BERNARD were
present in the residence, and BERNARD was drinking a wine
cooler while the conversation was taking place.

**15.4** LEWIS recalled that BROWN had ridden with the others to
LYNCH's home, made contact with LYNCH, and brought the gun
back to the car.

**15.5** Writer took the purple top tube of LEWIS' blood from the
Juvenile Justice Center and submitted it to the DPS
laboratory in Waco for analysis and preservation.

**15.6** On 09/17/99 writer traveled to Killeen, where contact was
made with Eric SMITH.  SMITH was questioned regarding a .22
caliber semi-automatic chrome-plated handgun that Tony
SPARKS used in this crime.  SMITH again stated the gun was
stolen and he had not traded the gun for another gun, that
he did not own a .9mm handgun and never had.  Writer
subpoenaed SMITH to a Federal Grand Jury in Waco for
10/12/99.

**15.7** Writer received a phone call from Killeen detectives and was
informed that Ronald BELL was currently at his mother's
residence, at 1307 Quail Drive, Apt. A, in Killeen, Texas.
Writer was also told that BELL had recently moved to live
with his sister, and a permanent address for him would be
1718 Northside Drive, Val Dosta, Georgia.

**15.8** Writer made contact with Ronald BELL's mother at their
residence in Apt. A in Killeen.  Writer and a Killeen police
officer were invited into the apartment, sat in the
apartment for a period of time discussing various things

09/30/1999 12:00:47 PM

TR-1 (Rev. 01/98                    **DPS SENSITIVE**

605

REPORT OF INVESTIGATION                                          Page 2 of 2

| RANGER: CA01001990720135535F | Div File No: | STATUS: ACTIVE |
| TYPE: CRIMINAL | RF-1999-00318 | BY: JOHN AYCOCK, SGT. 1001 |

1. CAPITAL MURDER IN COMM OF CITED OFFENSES 19.03(a)(2) PC FX
2. BELL COUNTY, FT. HOOD, TX, US
3. STACIE LYNN WOODARD BAGLEY, SS#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 W/F, 04/01/1971,
4. 06/21/1999   ( Monday )

**18.3** After this meeting, writer, MEYER, and CHADWICK drove to Killeen and interviewed Terry BROWN. Details of BROWN's prior interviews were discussed with him and his attorney.

**18.4** Investigators also interviewed Gregory LYNCH. LYNCH's information given to investigators was either previously known by a co-conspirator and previously told to investigators, or was in denial of information previously told to investigators.

**18.5** LYNCH revealed to investigators that Tony SPARKS informed him (LYNCH) that jewelry had been given to Sherman SIMPLE, for the purpose of disposing the jewelry. At this time, it is not known if SIMPLE knew where the jewelry came from, if he actually received the jewelry from SPARKS, or regarding any disposition of the jewelry that SIMPLE may have obtained.

**18.6** In the future, writer and MEYER will attempt to locate SIMPLE for the purpose of either interviewing him or subpoenaing him to a Federal grand jury.

*END OF REPORT*

TR-1 (Rev. 01/98                    *DPS SENSITIVE*              12/06/1999 2:52:31 PM

1259

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

exact time but stated  Nolanville Police pulled up asking them to step away from the car.  SUBJECT stated he gave his drivers license and name to the officers, and was informed they were being detained on suspicious activity.  SUBJECT recalled by this time there was smoke coming from the stolen vehicle and Nolanville Police had stated the four men would have to stay and talk to the Military Police.  SUBJECT recalled a fire truck approached them about the same time the Military Police cars arrived.  The fireman went to extinguish the fire in the car, and upon opening the trunk found the two victims.  SUBJECT stated he and Vialva were placed in the police car and Brown and Lewis stood outside the patrol car.  SUBJECT stated they were all detained, separated and then taken to Military Police Headquarters for questioning.  SUBJECT stated he had been in possession of the Glock .40 caliber pistol until the week end prior to the car jacking.  Vialva had asked to borrow the gun, SUBJECT recalling Vialva had been recently thrown out of his house and just figured he needed it to get some fast cash.  SUBJECT recalled he had come into possession of the hand gun when "some guy" passed it to him in a crowd of people.  SUBJECT stated he ordinarily did not spend a lot of time around Vialva, and stated Brown had been contacted when Vialva could not reach SUBJECT at his residence, thus the reason Brown was involved in the incident.  No further information.

## INTERVIEW THELMA BERNARD

(2.2)  August 16, 1999.  Interviewed Thelma Bernard,  SUBJECT'S Mother, 1712 Wickfield Way, Killeen, TX.  Bernard stated most of the names of the list released to this firm were from the church, Seventh Day Adventist, 4700 East Rancier, Killeen, TX.  Some of the names were also of co-workers at Metroplex Hospital,2201 South Clear Creek, Killeen, TX.  The final few on the list of contacts were family members.  Thelma stated  the family has been in the Killeen area since 1985 and most of these people had been around SUBJECT as he was growing up.  Thelma stated SUBJECT had completed his high school GED, and was in line for a job in Round Rock, TX working at a computer assembly plant.  Thelma stated he had used her car to go to the initial physical exam and but was in an accident and was informed upon arriving late to the physical he would not be able to start his job until the following week.  Thelma recalled SUBJECT was going to put in applications around the local area to keep busy until his permanent position was open to him.  Thelma fondly recalled SUBJECT was always telling her "I'm staying out of trouble, Mom."  Thelma stated as a younger child SUBJECT attended the private school at the Seventh Day Adventist church, but then transferred to the public schools around the 9th grade.  Thelma recalled SUBJECT was a quiet child and was always willing to do what ever anyone else had an interest in.  No further information.

## INTERVIEW MATTHEW MITCHELL

(2.3)  August 17, 1999. Matthew Mitchell, Rt. 11 Box 81, Killeen, TX.  Matthew Mitchell stated he went to school with SUBJECT from the 1st - 8th grade at the Seventh Day Adventist private school.  Matthew recalled SUBJECT was a nice kid always joking around, never causing fights or trouble in school.  Matthew recalled the school bully often picked on the kids and stated when it was SUBJECT who was getting it, SUBJECT would take the abuse and just walk away.  Matthew recalled in the 9th grade he went to a boarding school and SUBJECT went to public school in the Killeen area.  Matthew recalled seeing SUBJECT around town or in church and noticed a change in SUBJECT.  Matthew went on to explain SUBJECT did not act different, but the physical appearance

*"Let the Truth Be Known"*

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

was very apparent.  Matthew stated he knew peer pressure was probably the reason for the changes, as if SUBJECT was trying to find his place.  Matthew recalled SUBJECT would not initiate conversation of activities but would be the first to "go with what ever anyone wanted to do." Matthew stated SUBJECT was not the kind of individual to take control of a situation. Matthew recalled seeing SUBJECT in church occasionally, and would try to talk to him about where his life was going, and recalled SUBJECT would show interest in what he was saying, but felt he would not follow through on his own.  No further information.

## INTERVIEW PHYLLIS MITCHELL

(2.4) August 17, 1999.  Interviewed Phyllis Mitchell, Rt. 11, Box 81, Killeen, TX.  Phyllis Mitchell recalled SUBJECT as being the polite, quiet type.  Phyllis stated she has four sons and would find things for her sons to do, in fact often to include SUBJECT.  SUBJECT and her youngest son Matthew were very close in school. Phyllis would try to include SUBJECT as often as possible to give Matthew someone his own age to be around.  Phyllis recalled taking the boys to the church on Saturday evening to play on the basketball court.  Phyllis stated SUBJECT was not disrespectful and you could see some of the things that were asked of SUBJECT to do was not exactly what he wanted to do, but SUBJECT would always comply using Ma'am or Sir when addressing any adult. Phyllis recalled SUBJECT was one of the kids who always wanted to be accepted always looking for his place in life.  Phyllis stated before SUBJECT turned 16 it was easy to read him, but after getting older SUBJECT was the one who was laid back  and you knew he would never initiate a battle but would probably eventually join one if everyone else was in it. No further information.

## INTERVIEW MILTON RIOS

(2.5)  August 18, 1999.  Interviewed Milton Rios, Rt.. 1, Box 119-36, Killeen, TX.  Milton stated he had been the director for the youth group Path Finders.  Rios stated this is a co-ed group for the youth of the church involving the kids in campouts and outdoor activities.  Rios recalled SUBJECT was in Path Finders and did not recall any thing out of the ordinary about SUBJECT. Rios stated he had no more trouble with SUBJECT as a young man than any of the other kids he worked with in his two years as director.  Rios stated he would often see SUBJECT in church as a young adult, saying he would often be in the back of the sanctuary.  Rios stated SUBJECT would speak to people of the congregation only if that person would start a conversation.  Rios recalled SUBJECT to be the kind of person who would be in the shadows and not in the highlights.  Rios recalled any time a group of kids would want to do something SUBJECT was willing to go with them but would not be the one to make the suggestion. No further information.

## INTERVIEW MODESTA RIOS

(2.6) August 18, 1999. Interviewed Modesta Rios, Rt. 1, Box 119-36, Killeen, Tx.  Modesta stated she had been the assistant to her husband Milton in the two years he was involved with the Path Finders youth group. Modesta stated SUBJECT was always quiet and very respectful toward her or any other adult.  Modesta recalled SUBJECT as being an easy going child and that he continued this behavior as a young adult.  Modesta stated he was always polite when spoken to at

*"Let the Truth Be Known"*

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

church, but would not be the first one to start a conversation or even acknowledge your presence verbally. No further information..

## INTERVIEW WARREN VOELELE

(2.7)  August 19, 1999.  Telephone interview Warren Voegele, 513 White Oak Lane, Harker Heights, TX.  Voegele recalled first meeting SUBJECT when he was around age 5 or 6.  Voegle stated at age 9 SUBJECT and his son were classmates and also shared some outside interests such as basketball and Tae Kwan Do.  Voegele stated he had been SUBJECT's Sabbath School Teacher during his 2nd - 4th years at school.  Voegele recalled SUBJECT never caused him and difficulties, being a quiet and reserved individual.  Voegele went on to describe SUBJECT as not being gregarious or effervescent.  Voegele stated even as SUBJECT grew up and continued to frequent the church SUBJECT continued to be independent never in a leadership role.  Voegele stated SUBJECT acted as if he was looking for something coming to church, maybe just time with things he had been familiar with in the past, or under the encouragement of his mother. No further information.

## INTERVIEW PASTOR JOHNSON

(2.8)  August 19, 1999. Phone interview Pastor Terry Johnson, Seventh Day Adventist Church.  Pastor Johnson stated he had been pastor of this church for the last several years and felt the only information he could relay was his last several visits with SUBJECT since his arrest. Johnson stated SUBJECT is a good person at heart and is now becoming aware of his involvement in the crime. Johnson stated he has spoken with several members of the church since SUBJECT'S arrest and most of them noticed a difference in SUBJECT after he left the private school at the church and went into the public schools.  Johnson stated the offer had been made for full tuition to the Bernard family for SUBJECT, but Mr. and Mrs. Bernard wanted to send him to public school to "toughen him up."  No further information.

## CONTACT LUIS ROBLES

(2.9)  August 19, 1999.  Received a phone call from Luis Robles acknowledging the request to speak with them about SUBJECT.  Robles stated he would have to contact this office after speaking with his wife and daughter is they would be willing to speak in SUBJECT'S behalf.  Robles stated his daughter had gone to Killeen High with SUBJECT and had some mixed feelings about talking to this firm.  No further information.

## CONTACT MARILYN KEMPER

(2.10)  August 19, 1999. Received phone call from Marilyn Kemper.  Mrs. Kemper stated she and her husband, Ed only knew SUBJECT through his mother, Thelma.  Kemper went on to explain they had no personal contact with SUBJECT and did not feel they could relay any other information. No further information.

## INTERVIEW OF FRED AND VIVIANA COVINGTON

(2.11)  August 19, 1999, interviewed Fred and Viviana Covington at their residence, 3006 Homer Circle, Copperas Cove, TX 76522.  Interviewees informed the investigator that they knew SUBJECT's mother, Thelma Bernard, very well, they did not know SUBJECT.  They have known

*"Let the Truth Be Known"*

3396

6/2

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

SUBJECT's family since they began attending the same church.  They have only been introduced to SUBJECT once, and have had not interaction with him.  They stated that SUBJECT does not always attend church, and when he does, he sits with his family.  They stated that he appeared to be a quiet boy, and they have never heard of SUBJECT being in any trouble until his arrest for participation in this murder.  They had no further information.

## INTERVIEW MARY POLLOCK

(2.12)  August 20, 1999.  Phone interview Mary Pollock, SUBJECT'S Aunt.  Pollock stated SUBJECT was an average kid and stated in her opinion SUBJECT was in the wrong place at the wrong time.  Pollock stated SUBJECT "does not have the mindset to do anyone any harm.  Pollock stated SUBJECT'S Mother was the kind of person who instilled values in her children and taught them to be kind to everyone.  Pollock stated she and her daughter, Naomi, had lived in the Bernard home for several years, 1994-1998,  after SUBJECT'S father left the home.  Pollock stated SUBJECT did not have many friends over to the house, recalling she had informed him a friend on occasion could come over, but she (Aunt) would not tolerate a bunch of kids in the home at any one time.  Pollock stated she helped care for the younger sister and brother and SUBJECT was old enough to take care of himself.  Pollock stated SUBJECT "was a low key dude" and definitely the kind of kid who would do anything anyone wanted just to be accepted.  Pollock stated there were always big family gathering and SUBJECT was always respectful around adults.  No further information.

## INTERVIEW NAOMI POLLOCK

(2.13)  August 20, 1999.  Phone interview Naomi Pollock, SUBJECT'S cousin.  Naomi state SUBJECT was the kind of guy who never had much to say.  SUBJECT was not the talkative kind and would not, or could not, initiate a conversation.  If SUBJECT was spoken to first he would be receptive to the conversation and then relax.  Naomi stated SUBJECT as well as herself did not have friends come to the house while living with Bernards.  Naomi recalled this was as the request of both her mother, Mary and her Aunt Thelma.  No further information.

## CONTACT STAN MICHAEL

(2.14)  August 20, 1999.  Received phone call from Stan Michael.  Mr. Michael stated he and his wife, Kelley, both work at the church school that SUBJECT'S younger brother and sister attend.  Michael stated they have had no association with SUBJECT and could provide no information about him. No further information.

## INTERVIEW DR. BARRY SIEBENLIST

(2.15)  August 20, 1999.  Interviewed Dr. Barry Siebenlist, Rt. 12, Box 28, Killeen, TX.  Dr. Seibenlist recalled seeing SUBJECT in church and stated he worked with Thelma Bernard at Metroplex Hospital.  Dr. Siebenlist stated he did not have much personal contact with SUBJECT other than seeing him at the church, some of the activities sponsored by the church family and on the basketball court on Saturday evenings.  Dr. Siebenlist stated there was nothing about SUBJECT that impressed him in a positive or negative way.  Siebenlist recalled SUBJECT to be a quiet sort, and did little to make himself stand out.  Siebenlist stated he did not recall an instance when speaking to

*"Let the Truth Be Known"*

6

3397

lo/3

September 9, 1999
SUBJECT: Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

SUBJECT that there was any disrespect shown either to himself or anyone else. No further information.

## INTERVIEW JONI SEIBENLIST

(2.16) August 20, 1999. Interviewed Joni Siebenlist, Rt. 12. Box 28, Killeen, TX. Joni stated having older children then SUBJECT could not recall having any extended contact with SUBJECT. Joni stated she knew SUBJECT and could recall seeing him at church, but did not have him in any of her Sabbath Classes. Joni stated in the past her and her husband would bring some of the young people from the church to help around their land. Joni did not recall having SUBJECT come to their home on any occasion. No further information.

## INTERVIEW LOU VIVIAN SCOTT

(2.17) August 20, 1999. Interviewed Lou Vivian Scott, 1804 Duncan, Killeen, TX. Scott recalled SUBJECT to be a very respectful individual, always responding with ma'am or sir. He stated SUBJECT was the type of person who would do anything for anyone, asking nothing in return. Scott recalled asking Bernard for rides to work, or to the store and SUBJECT would not question and just be willing to help anyway he could. Scott stated she sometimes felt SUBJECT got some kind of gratification helping others, often not thinking about the consequences of his actions. He stated SUBJECT was a follower, always looking for something to make him feel like he was important and belonged somewhere. No further information.

## INTERVIEW SHARISE SCOTT

(2.18) August 20, 1999. Interviewed Sharise Scott, 1804 Duncan, Killeen, TX. Scott stated she and SUBJECT had dated off and on since 9th grade. Scott stated things became serious around the spring of 1999, and will be having SUBJECT'S child around Thanksgiving. Scott recalled most of their activities outside of the school consisted of Bar-B-Ques, going to teen clubs in the local area, or going to friends' houses and just talking or watching TV. Scott stated SUBJECT had never been mean toward her, in fact admitting she often was hard on SUBJECT. Scott stated the had spent some time around Viallva and Lewis, describing Viallva as the type of individual that would not let anyone tell him what to do. Lewis was described as being the type to be afraid of everything. Scott recalled the third male arrested in the car jacking was an individual known only as LaKirt. Scott recalled SUBJECT and Terry Brown were inseparable, often teasing SUBJECT that Brown was "the other girlfriend." Scott stated it was all in fun and SUBJECT and Brown took the teasing as it was meant. Scott stated if she ever needed to reach SUBJECT for any reason, he could be found at Browns, and if anyone needed to get Brown the same was true. Scott recalled in school, SUBJECT was the person you would always see getting out of the way of the other kids, or the last in line just to keep from upsetting someone. Scott stated it was apparent to her that SUBJECT was not sure of what he wanted to do with his life, always trying something different to see if it was going to be something SUBJECT would like or be good at. No further information.

## INTERVIEW DR. CHARLES MITCHELL

(2.19) August 20, 1999. Interviewed Dr. Charles Mitchell, Rt. 1 Box 81, Killeen, TX. Dr. Mitchell recalled he had known SUBJECT since and his son Matthew had gone to school with

*"Let the Truth Be Known"*

3398

414

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

SUBJECT. Mitchell stated he and his wife would often take their sons to the basketball court at the church on Saturday evenings.  SUBJECT would come and play. Mitchell stated there were no problems encountered while SUBJECT was on the court.  Mitchell stated even in a friendly game it sometimes gets a little rough, and someone might get elbowed or shoved and tempers would flare. Mitchell stated the use of the basketball court was not just for the youth in the church, and was an open invitation to anyone that wanted to come and share in the game.  Mitchell stated there would be kids from all walks of life out there playing basketball, and you could pick out the ones that might cause problems, SUBJECT did not fall into that category. Mitchell recalled even after SUBJECT stopped coming to the church on a regular basis, SUBJECT was always a good sportsman on and off the court.   Mitchell recalled SUBJECT to be generally quiet, never cursing or starting fights on the court.  Mitchell stated in the number of years he had been around SUBJECT he could positively state SUBJECT was a follower, and did not recall any instance where SUBJECT would initiate anything. Mitchell stated if one of the kids, or a group of kids wanted to go and do something, SUBJECT would go along.  Mitchell recalled only one time seeing SUBJECT "loosing it" stating the youth choir had gone to perform at another church.  SUBJECT and his father had gotten into an argument and some of the church members had to break up the confrontation.  Mitchell stated he did not know what the argument had been about, but recalled it occurred after SUBJECT'S parents had divorced. Mitchell stated he saw a change in SUBJECT after the separation, recalling SUBJECT was more withdrawn. Mitchell recalled he noticed physical changes in SUBJECT, like dressing to fit in with the crowd, different hair styles, and just an overall attempt to be accepted.  Mitchell recalled an article in the Killeen Daily Herald shortly after SUBJECT's arrest in which one of SUBJECT's teachers was interviewed, that the all around summary of the teachers association with SUBJECT was very true to his character.  Mitchell recalled portions of the article, saying SUBJET was a quiet kid who never caused trouble, was always in the shadows, and never brought attention to himself, but was willing when called upon to participate. No further information.

## CONTACT ROSALYN GOHL
      (2.20)  August 20, 1999.  Received a phone call from Rosalyn Gohl.  Gohl stated neither her or her husband, Monty, had much personal contact with SUBJECT.  Gohl recalled seeing him in church with his family, and occasionally coming on his own. Gohl stated her son, TJ, would have more information on SUBJECT since the two boys had gone to school together. Gohl stated TJ was no longer living at home and  could be contacted at (817) 468-3087. Gohl stated TJ would be working all the following week and could be reached at this number the last week of August. No further information.

## INTERVIEW MONIQUE PARTLOW
      (2.21)  August 20, 1999. Interviewed Monique Partlow, 1313 Jefferies Ave, Killeen, TX. Partlow stated she had been SUBJECT'S Sabbath teacher and did spend some time in the Bernard home on the weekends.  Partlow went on to explain SUBJECT was friendly and respectful toward everyone.  Partlow stated SUBJECT was not outspoken, but would converse with anyone who initiated a conversation.  Partlow stated SUBJECT did not exhibit the forceful or leadership qualities you see in some of the young people, instead SUBJECT would hold back and go with the flow.

### *"Let the Truth Be Known"*

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

Partlow recalled a cousin, Mel Simion, and SUBJECT spent a lot of time together, and SUBJECT was not the one who assumed the leadership position in this relationship. No further information.

## INTERVIEW DEBBIE KING

(2.22) August 20, 1999. Interviewed Debbie King, 16 Lonely Oak, Killeen, TX. King stated his relationship with SUBJECT was through the Seventh Day Adventist Church. King stated she was a volunteer teacher and often helped in the classroom when SUBJECT attended the private school. King stated most of her association with SUBJECT revolved around a youth choir. King was the director and worked with 16-18 kids in the choir for approximately a year. King recalled SUBJECT joined the group, but later left the choir because he missed required practices. King stated SUBJECT would go to as many performances as he could in support of the other kids. King recalled SUBJECT would help set up the sound system, or helping setting up and tearing down tables for fellowship dinners at the church. King stated SUBJECT was a very polite young man and would do anything that was asked of him, but would not be the one to suggest things. King recalled a performance of the choir at a church in Temple, recalling an argument between SUBJECT and his father. King stated men from the church had to separate the two, and felt it should have been the fathers responsibility to keep the disagreement from getting out of hand. King recalled SUBJECT was approximately 15 or 16 at that time, stating this was around the time SUBJECT'S parents had split. King stated SUBJECT'S father was living in Temple and SUBJECT did not have constant contact with him. King recalled SUBJECT would often frequent the church gym and did not recall any problems with him. King referred to a letter that was written to the church soon after SUBJJECT was arrested. King stated the contents of the letter really touched her and could see a positive affect of many of the members of the congregation. King recalled in the letter SUBJECT felt remorse for his actions and encouraged the youth of the church to keep in close contact with God, not letting someone else make decisions in their lives. King stated Pastor Johnson only read portions of the letter to the congregation and that Johnson may still have the letter. King stated her husband, Bill, did not have a lot of contact with SUBJECT, but told her he did recall seeing SUBJECT in church, and recalled his assistance in setting up the sound equipment for choir performance. Bill King was not available for an interview. No further information.

## CONTACT LINDA MARLEY

(2.23) August 23,1999. Phone contact with Linda Marley revealed neither she or her husband, Phillip, knew SUBJECT. Marley stated they knew who SUBJECT was and had seen him in church on a regular basis. Marley stated her daughter LaNeese went to school with SUBJECT and might have more information on SUBJECT. Marley stated LaNeese is a senior at Killeen High School and would contact this office after 7:00 p.m. for an interview. No further information.

## INTERVIEW WYNETTA VICK

(2.24) August 23, 1999. Interviewed Wynetta Vick, 1110 Farhills Dr., Killeen, TX. Vick stated she and her husband came form Germany and have been in the Killeen area since 1984. Vick recalled, while attending the Seventh Day Adventist Church, seeing SUBJECT and his family at that time. Vick stated SUBJECT was a quiet child. Vick recalled helping in the youth activities of the

*"Let the Truth Be Known"*

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)

(Cause # W-99-CR-070(2))

church and SUBJECT was in some of her classes.  Vick stated SUBJECT was not a leader, definitely a follower, doing as he was told by his peers.  No further information.

## INTERVIEW TOM RIDDLE

(2.25)  August 24, 1999. Interviewed Tom Riddle, Metroplex Hospital, 2201 S. Clear Creek, Killeen, TX.  Riddle stated he knew who SUBJECT was through working with his mother, Thelma, and attending the same church. Riddle stated he had not heard anything negative about SUBJECT and, based on his own limited association with SUBJECT, found him to be very quiet. Riddle stated SUBJECT was never the type of person to draw attention to himself and would not stand out in a crowd.  Riddle stated his wife , Sandy, declined to give an interview.  No further information.

## CONTACT BILLIE CROSS

(2.26)  August 24, 1999.  Phone contact with Billie Cross revealed the couple did not feel they knew the SUBJECT well enough to provide information. No further information.

## FOLLOWUP CALL FROM LINDA MARLEY

(2.27)  August 24, 1999. Linda Marley contacted this office stating her daughter, LaNeese, declined to be interviewed about SUBJECT.  No further information.

## INTERVIEW JULIE ERB

(2.28)  August 24, 1999.  Interviewed Julie Erb, 1110 Farhills Drive, Killeen, TX.  Erb stated she was a teacher at the Seventh Day Adventist School for the last two years.  Erb stated SUBJECT'S younger brother, Max, was in her classroom and found Max looked up to his older brother.  Erb recalled numerous times SUBJECT came to pick up his brother and sister from school SUBJECT was gentle and kind to the younger children.  Erb stated when she started a conversation with SUBJECT he would answer her, and then a conversation might follow.  Erb stated SUBJECT avoided talking to adults, only giving the impression he did not have a lot of self confidence.  Erb stated when this firm called about setting up interviews her husband, Paul, mentioned he only knew SUBJECT by sight and did not feel he could give a statement. No further information.

## INTERVIEW CAROLYN MORRIS

(2.29)  August 25, 1999.  Interviewed Carolyn Morris who contacted this office stating neither her or husband Rodney had spent much time around SUBJECT.  Morris stated she was familiar with the Bernard family and the standards their mother had for the children.  Morris recalled what little time she was around SUBJECT was through church activities.  Morris recalled SUBJECT to be a quiet child, and easily led.  Morris stated her daughter, Jessica could give a better account of the life style of SUBJECT outside of the church..  No further information.

## INTERVIEW JESSICA MORRIS

(2.30) August 25, 1999.  Interviewed Jessica Morris. Morris stated as smaller children SUBJECT was the type of person who was always cutting up looking for a laugh.  Morris stated SUBJECT was a kind and gentle young man and still showed those traits when he got older.  Morris recalled after SUBJECT turned 15 or 16 she noticed a definite change in SUBJECT'S behavior.

*"Let the Truth Be Known"*

10

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

Morris recalled SUBJECT was running with the wrong crowd and was easily influenced.  Morris stated SUBJECT was never a dangerous person, but was capable of following the crowd just to be accepted.  Morris stated she did not run with the same group of kids as SUBJECT in school, but saw SUBJECT occasionally.   Morris did not recall  hearing of any problems at Killeen High School involving SUBJECT. No further information.

**ATTEMPTED CONTACT EDDIE AND BONNIE SMITH**
(2.31)  August 26, 1999.  Using  the telephone number for Eddie and Bonnie Smith, (254) 939-5988, which was provided to this office by SUBJECT'S mother, found this to be disconnected and no longer in service. No further information.

**INTERVIEW T.J. GOHL**
(2.32)  Interviewed T.J. Gohl.  Gohl is no longer living in the Killeen area and will start college in Keen, TX this fall.  Gohl stated he grew up with SUBJECT and they were close friends since they were both 8 years old.  Gohl stated SUBJECT was a great guy and wanted very much to be liked.  Gohl recalled they parted ways, he going to a boarding school and SUBJECT going to public school the two were not as close friends.  Gohl stated it was if SUBJECT had to be "one of the gang" and when the two would see each other around the holidays, Gohl stated SUBJECT had changed.  Gohl recalled SUBJECT had a real passion about playing basketball.  Gohl recalled one of the reasons SUBJECT had gone to the public schools was to be more involved in basketball.  Gohl recalled SUBJECT'S Mother also wanted this for her son.  Gohl stated there was not an opportunity to be noticed if you were good at athletics and going to a private school such as the Seventh Day Adventist School. Gohl recalled upon his return to the local area for holidays and vacations from boarding school he would see SUBJECT occasionally at church.  Gohl stated there was an outward appearance change in SUBJECT, but Gohl still could see SUBJECT as his closest friend.  Gohl recalled the last contact he had with SUBJECT was around Thanksgiving or Christmas of 1998.  Gohl stated there had been general conversation between the two young men and recalled there still were outward appearance changes in SUBJECT. Gohl stated he could not believe SUBJECT was capable of harming anyone, but could be involved with the type of people that were capable of doing so. No further information.

**INTERVIEW LUIS ROBLES**
(2.33)  August 26, 1999.  Interviewed Luis Robles, Rt. 3, Box 213, Killeen, TX.  Robles stated he had known SUBJECT for approximately 10 years.  Robles stated the main contact with SUBJECT was through the church.  Robles recalled he was the director of Path Finders, a church youth group, for several years and had most of his contact with SUBJECT at that time.  Robles recalled camping and hiking trips with the kids around the ages of 12-14, recalling SUBJECT was the type of kid that would "go with the flow."  Robles stated if there had been a problem that came up on any of these trips the problem would be discussed with all of the kids, and then he would take the offender aside and talk to them alone.  Robles stated he never had any problems with SUBJECT other then usual kid stuff, and stated SUBJECT was not a discipline problem in the years Robles worked with SUBJECT.  No further information.

*"Let the Truth Be Known"*

11

618

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

## INTERVIEW MARGARITA ROBLES

(2.34)  August 26, 1999.  Interviewed Margarita Robles, Rt. 3, Box 213, Killeen, TX. Robles stated she assisted her husband in Path Finders during his several years as director of the youth group.  Robles recalled SUBJECT as being a quiet child, doing normal things kids do, but had no real concerns about SUBJECT or his behavior.  Robles recalled even as SUBJECT grew older he still remained quiet and withdrawn.  Robles stated when SUBJECT did come to church she would make an effort to speak to SUBJECT.  SUBJECT in turn would then say hello, never starting the conversation with an adult or even kids in his own age group.  Robles stated SUBJECT to be a quiet, polite, yet reserved sort of young man. No further information.

## INTERVIEW SHEMIRALL ROBLES

(2.35)  August 26, 1999. Interviewed Shemirall Robles, Rt. 3, Box 213, Killeen, TX. Robles stated she had gone to private school with SUBJECT until the eighth grade.  Robles stated SUBJECT was two years older than her and the two were not really friends.  Robles recalled while attending public school, she would occasionally see SUBJECT.  Robles stated SUBJECT was the kind of person who would "go along" not caring what would happen if he did not voice opposition to his friends.  Robles did not see SUBJECT for a period of time thinking SUBJECT was out of school.  Robles recalled seeing SUBJECT in her History class.  Robles did not associate with the type of people SUBJECT hung around with in school.  No further information.

## INTERVIEW JANE ZIESMER

(2.36)  August 27, 1999.  Interviewed Jane Ziesmer.  Ziesmer stated she and her husband were acquainted with SUBJECT and his family through the church.  Ziesmer recalled the only thing that stood out in her mind about SUBJECT was when SUBJECT'S parents separated it had been a hard time for him.  Ziesmer stated SUBJECT was not the kind of kid to take charge of his life. Ziesmer stated she was in charge of the church directory and might be able to suggest some of the people in the church that might have had a closer relationship with SUBJECT. Ziesmer suggested asking Thelma Bernard about interviewing Gerald Murasky, recalling she spoke to him several times about SUBJECT.  Ziesmer also suggested T. J. Gohl and Matthew Mitchell, recalling these young men would have grown up with SUBJECT. No further information.

## CONTACT PATSY AUTMON

(2.37)  August 27, 1999.  Spoke to Patsy Autmon. Autmon stated other than seeing SUBJECT in church there was no personal association with SUBJECT. Autmon went on to state her two daughters, Ashley and Candice had gone to school with SUBJECT and may have had a more personal relationship with SUBJECT. No further information.

## INTERVIEW JIM AUTMON

(2.38)  August 27, 1999. Interviewed Jim Autmon.  Autmon stated he had spoken to SUBJECT on numerous occasions.  Autmon stated SUBJECT was a "laid back kind of kid" constantly moving by himself.  Jim stated SUBJECT was upset about his parents and their decision to separate.  Jim recalled SUBJECT was always looking for someplace where he belonged, and felt this was due to the separation, almost as if SUBJECT felt neither parent would be there for him.  Jim

*"Let the Truth Be Known"*

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

went on to explain SUBJECT turned to rebellion after the separation as it was a way of getting his parents attention.  Jim stated SUBJECT was basically a good kid, but still was a "blind child" looking in the wrong places for approval.  Jim recalled SUBJECT was not sure of his direction and did not know how to make decisions on his own.  No further information.

## INTERVIEW ASHLEY AUTMON

(2.39)  August 27, 1999. Interviewed Ashley Autmon.  Ashley stated she had gone to school with SUBJECT from 3rd to 6th grade in private school.  Ashley stated during that time SUBJECT was an outspoken individual and would talk to everyone, often the center of attention, cutting up and making people laugh.  Ashley stated after going to public school, SUBJECT was not as outgoing. Ashley stated they would occasionally see each other on campus and then occasionally at church. Ashley recalled SUBJECT was not as outgoing and pretty well stayed out of the limelight, always attempting not to be noticed.  Ashley stated they remained friends but did not spend extended hours around each other as most friends would. Ashley stated the friendship was more along the lines of an occasional greeting.  Ashley stated her sister no longer lived in Killeen and was attending school in Keen, TX.  No further information.

## CONTACT LORRAINE STEWART

(2.40)  August 30, 1999. Contacted Lorraine Stewart.  Stewart stated she did not personally know SUBJECT and could not provide any information about him other then she had seen SUBJECT in church.  Stewart stated her husband was the Chaplain at Metroplex Hospital and would have him contact this office at his earliest convenience. No further information.

## INTERVIEW CHAPLAIN DON TROYER

(2.41)  August 31, 1999. Interviewed Chaplain Don Troyer.  Troyer stated he was a Military Chaplain and also associate pastor of the Seventh Day Adventist Church. Troyer recalled he was contacted by Pastor Johnson after SUBJECT'S arrest.  Johnson requested he visit SUBJECT. Troyer stated he attempted to contact SUBJECT and was told by the police SUBJECT could not have any contact visits with anyone until in-processing was completed. Troyer stated he did not know SUBJECT personally and has not spoken to him even since his arrest. No further information.

## CONTACT NANCY TROYER

(2.42)  August 31, 1999. Nancy Troyer stated she did not know SUBJECT and could not submit to an interview. No further information.

## INTERVIEW KARL FORSTER

(2.43)  August 31, 1999. Interviewed Karl Forster. Karl stated SUBJECT was the kind of kid who was always looking for excitement and would follow anyone who could provide it.  Forster stated he was SUBJECT'S Sabbath School teacher and always tried to talk to SUBJECT when he noticed things changing in his life.  Forster stated SUBJECT was basically a good kid, also a smart kid, but could be easily influenced and the "pull of the world" was much too strong for SUBJECT to resist. Forster recalled after the break up between SUBJECT'S mother and father, SUBJECT took it really hard.  Forster noticed a definite change in SUBJECT.  Forster stated SUBJECT occasionally

*"Let the Truth Be Known"*

6020

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

attended church, but like most young people friends were more important than church.  Forster recalled seeing a sharp decrease in SUBJECTS involvement with the church and the youth of the church.  Forster recalled thinking the church would have been of more support and a positive influence on SUBJECT'S life, but like most youth all you can do is make the invitation. No further information.

**INTERVIEW RUTH FORSTER**
(2.44) August 31, 1999. Interviewed Ruth Forster. Ruth stated she did not have a lot of contact with SUBJECT, but stated what time she was around him SUBJECT seemed to be a good kid.  Ruth recalled SUBJECT made some changes when he went to public school and was easily influenced by the kids.  Ruth recalled SUBJECT to be respectful and a pleasant young man. Ruth stated she had been aware of the problems in the family and SUBJECT had a lot of adjusting to do when he was growing up.  Ruth recalled SUBJECT as a smaller child had been a nice young man changing into an angry young man looking for somewhere to belong.  No further information.

**INTERVIEW LYNN FORSTER**
(2.45) August 31, 1999. Interviewed Lynn Forster.  Lynn recalled when they were younger, SUBJECT was quite the show-off and was often the center of attention, always making jokes and calling attention to himself. Lynn stated she knew SUBJECT mostly from contact at church.  Lynn recalled around 15-16 years of age, SUBJECT stopped coming to church as frequently giving the impression he was really looking for some place to belong.  Lynn stated SUBJECT became withdrawn and very quiet in his later teen years, not as outgoing as she remembered in grade school. No further information.

**INTERVIEW BONNIE WAINWRIGHT**
(2.46)  September 1, 1999.  Interviewed Bonnie Wainwright.  Wainwright stated she had been acquainted with SUBJECT since he was 4-5 years of age.  Wainwright recalled SUBJECT to be a good kid who just made the wrong decision, or no decisions at all.  Wainwright stated she substituted at the church school and watched SUBJECT changing and growing through the years. Wainwright stated the separation between SUBJECT'S parents around the age of 16 really had an effect on SUBJECT.  Wainwright stated it appeared to have a definite negative effect on SUBJECT and he always looked depressed. Wainwright stated she was employed at the Juvenile Department in Belton and made a special effort to look out for SUBJECT.  Wainwright recalled SUBJECT would answer her questions on how things were going but did not offer any additional information. Wainwright stated it probably was an embarrassment to SUBJECT, therefore he would not discuss any problems he had. Wainwright stated this did not stop her from showing an interest in SUBJECT. Wainwright recalled SUBJECT would stay away from church when there were more problems at home.  Wainwright stated SUBJECT could easily be influenced by others, recalling a cousin, Mel Simion, had moved in with the family.  Wainwright would not divulge her source, stating Simion was very outgoing.  Wainwright went on to state Simion was not the kind of influence she would expose to a stronger person, let alone SUBJECT, who was having enough changes to deal with in his life. Wainwright recalled Simion moved from the Bernard home approximately 2 years ago. Wainwright

*"Let the Truth Be Known"*

14

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

stated her husband in now working in Houston and would not be available for an interview.  No
further information.

## CONTACT KEN  FINCH

(2.47)  September 1, 1999. Ken Finch contacted this office stating he knew Thelma and her
children only because he worked with Thelma Bernard at Metroplex Hospital and through church.
Ken Finch stated Thelma was a wonderful woman and a good worker, but had no personal contact
with her children.  Ken stated when his family had received the message about the interview, his wife
Pam, could not recall other than church and church functions that she had any other contact with
SUBJECT. No further information.

## INTERVIEW MARY ELLEN PUNDT

(2.48)  September 2, 1999. Interviewed Mary Ellen Pundt. Mary stated knew SUBJECT
through Path Finders in church and was involved in camping trips and backpacking with the youth
group. Mary stated she often gave SUBJECT rides home from youth activities, and recalled that
SUBJECT was not an outgoing kid, mostly staying to himself.  Mary stated SUBJECT was definitely
a follower and did not start anything as far as she could remember. Mary recalled seeing a definite
change in SUBJECT after the divorce of his parents.  Mary stated SUBJECT desperately tried to fit
in but just got into the wrong crowd. No further information.

## INTERVIEW WAYNE PUNDT

(2.49)  September 2, 1999. Interviewed Wayne Pundt. Wayne stated he was involved with
the church youth and specifically recalled one incident that summed up his evaluation of SUBJECT.
Wayne stated he was involved in taking some of the youth on a trip to Six Flags. Wayne stated
SUBJECT and his father rode in his car.  Wayne recalled SUBJECT was humble and quiet and could
not help noticing his father took every opportunity to be the one in charge. Wayne recalled
SUBJECT as a person who would not "step up" or bring unwanted attention to himself. No further
information.

## ATTEMPTED CONTACT CHAPLAIN GARRY & YVONNE LOSEY

(2.50)  September 2, 1999. Attempted to contact Chaplain Losey at the number provided.
The number had been disconnected and was no longer in service.  Contact Jane Ziesmer, Seventh
Day Adventist church directory assistant. Jane stated the Losey family no longer lived in the Killeen
area and had moved to Virginia. No further information.

## INTERVIEW RUEL HAWKINS

(2.51)  September 3, 1999. Interviewed Ruel Hawkins.  Hawkins stated he was the youth
leader at the church and had the closest contact with SUBJECT at that time.  Hawkins stated he had
known SUBJECT since 1992 or 1993. Hawkins stated SUBJECT was very quiet and laid back.
Hawkins being involved with the youth at the basketball court on Saturday evenings, recalling
SUBJECT was always there. Hawkins stated SUBJECT would be the first to arrive and often the
last one to leave.  Hawkins stated the court was opened on Saturday to get the youth in the
community as well as the church youth an opportunity to get off the streets. Rules and regulations

*"Let the Truth Be Known"*

15

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

applied to everyone to include no cursing, or fighting.  Hawkins stated SUBJECT had the potential to be a leader but personally thought SUBJECT was a follower. Hawkins stated SUBJECT was in the developmental stage of his life when the separation between his parents upset everyone. Hawkins stated SUBJECT was the kind of person who smiled a lot, was quiet, and lacking in wisdom fell in with the wrong crowd.  Hawkins recalled on Saturday evening SUBJECT would come to the court with some of his "brothers" and Hawkins could not help but notice SUBJECT was the tag along, even though SUBJECT had every right to come to the gym. Hawkins stated there had been several occasions he had talked to SUBJECT and his cousin, Mel Simion, about life. Hawkins stated he grew up in a rough neighborhood and was aware of the pressure the black youth have to endure. Hawkins recalled telling them it was not enough to be successful and have a few dollars in your pocket, you also had to take charge of your life.  Hawkins recalled this was something SUBJECT was having a hard time grasping, and could see the problems that came from following. Hawkins stated SUBJECT did not have it within himself to harm anyone and like a fish caught in a net could not escape before it was to late. No further information.

**INTERVIEW MARCIA HAWKINS**

(2.52) September 2, 1999.  Interviewed Marcia Hawkins.  Hawkins stated she had assisted her husband at the gym on Saturday evenings and recalled SUBJECT was there on a regular basis. Hawkins stated she never had a one on one relationship with SUBJECT.  Hawkins recalled SUBJECT was always a polite young man and was active in the church and youth activities when he was younger.  Hawkins stated as SUBJECT got older the attendance seemed to change from frequent to occasional. Hawkins stated she would speak to SUBJECT when he was at church and stated his reception was always positive, but a conversation was never started by SUBJECT. No further information.

**INTERVIEW TAMMY GOODLOE**

(2.53) September 5, 1999. Interviewed Tammy Goodloe.  Goodloe stated she and Thelma Bernard have been close friends for over 10 years. Goodloe stated they were both single parents trying to raise children by themselves. Goodloe stated her son and SUBJECT were the same age and the families spent as much time together as was possible.  Goodloe stated SUBJECT was a typical kid, quiet and at times through his teen years rebellious. Goodloe went on to explain SUBJECT knew the difference between right and wrong and could not make the conscious choice of hurting someone. Goodloe stated SUBJECT was never disrespectful and never put his Mother down. When SUBJECT was asked by his mother to do something, Goodloe stated SUBJECT would just do it and never pout, back talk or question her.  Goodloe stated she had some problems with her son and the two mothers would often discuss problems.  Goodloe recalled both women agreed their sons needed a male role model  with a strong hand, and there may have not been some of the problems of making positive decisions in their lives.  Goodloe stated SUBJECT was a youth who had some trouble and made some mistakes in his life, getting mixed up with the wrong people.  Goodloe summed up SUBJECT'S character as submissive. No further information.

*"Let the Truth Be Known"*

623

September 9, 1999
SUBJECT: Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

### 3rd ATTEMPTED CONTACT DR. JACQUELINE McINTYRE

(2.54) September 5, 1999. 1st attempt: August 18, 1999, no answer. 2nd attempt: August 30, 1999, no answer. September 5, 1999, on the 3rd and final attempt to contact Jacqueline McIntyre at the number received from Thelma Bernard, a male answered the phone stating McIntyre no longer had this telephone number. No further information.

### INTERVIEW JOHN SEARS

(2.55) September 6, 1999. Interviewed John Sears. Sears stated he attended the same church as Thelma Bernard and had known SUBJECT since 1980. Sears stated he could not say anything outstanding about SUBJECT, other than he attended church and was a quiet young man. No further information.

### INTERVIEW FELICIA SEARS

(2.56) September 6, 1999. Interviewed Felicia Sears. Sears stated she was a personal friend of Thelma Bernard working with her for several years. Sears stated even though she attends the same church as the Bernard family, she has had no personal contact with the children, and could not give any specifics on SUBJECT. No further information.

### INTERVIEW JIMMY OLARTE

(2.57) September 6, 1999. Interviewed Jimmy Olarte. Olarte recalled meeting SUBJECT in 1993. Olarte stated SUBJECT was a quiet sort and the two would often play basketball together on Sunday mornings. Olarte stated SUBJECT was a normal person like anyone else and they did not have much contact other than on the court or at church. Olarte stated SUBJECT has the potential to be a leader, but up to this point in his life had not taken charge of his life or his destiny. Olarte stated his wife, Evelyn had less contact with SUBJECT than he did, and could not give a statement. No further information.

### INTERVIEW BUENA OLARTE

(2.58) September 7, 1999. Interviewed Buena Olarte. Olarte stated she had no personal dealings with SUBJECT. Olarte stated she was more familiar with SUBJECT'S mother and knew she was a good Christian women and SUBJECT came from a good family. Olarte stated SUBJECT acted like a regular kid and only saw him a church activities. Olarte recalled her brother-in-law, Jimmy, had spent time around SUBJECT and would be able to relate more information. Olarte stated her husband attends classes in the evening and would be available for an interview on September 8th after 8:00 p.m. No further information.

### INTERVIEW ISOLDE CODY

(2.59) September 7, 1999. Interviewed Isolde Cody, Billy's Mother (see para. 2.1, SUBJECT'S interview, August 13, 1999) Cody stated she had known SUBJECT for approximately 2 years. Cody works at Ellison High School and stated she was not aware of any problems with SUBJECT'S behavior while attending school. Cody stated SUBJECT, her son Billy and Terry Brown spent a lot of time at her home. Cody stated SUBJECT was a lot closer to Brown than her son, but

*"Let the Truth Be Known"*

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

the three would go to teen parties or spend time watching TV in her home.  Cody stated SUBJECT was his own person, and was always courteous and polite around her. No further information.

## INTERVIEW MARVA SOLOMON

(2.60) September 7, 1999. Interviewed Marva Solomon. Solomon recalled meeting SUBJECT around 1994 after moving from California.  Solomon stated they had no children of their own and would take time to speak to the young people of the church.  Solomon stated SUBJECT was a respectable and well mannered young man always showing interest in the Scriptures.  Solomon stated SUBJECT was from a close knit family and was a regular kid. Solomon's husband, Louis works nights and would be available for an interview September 8th in the afternoon. No further information.

## ATTEMPTED CONTACT NANCY VOEGELE

(2.61) September 7, 1999. Attempted to contact Nancy Voegele at the number released to this firm by Thelma Bernard.  A male answered the phone stating there was no Nancy that lived at that address. No further information.

## INTERVIEW BOBBIE HILL

(2.62)  September 7, 1999. Interviewed Bobbie Hill. Hill stated she had been friends with SUBJECT'S mother for approximately 5 years, but only knew SUBJECT through his attendance at church. Hill stated SUBJECT was a good kid. No further information.

## INTERVIEW PASTOR ROGER JOHNSON

(2.63)  September 7, 1999. Interviewed Pastor Roger Johnson.  Johnson stated he spent more time with Mr. and Mrs. Bernard than with SUBJECT. Johnson recalled meeting SUBJECT once and that he was a polite young man.  Johnson declined to make any other comments stating, "any thing I would say would be second hand information." No further information.

## CONTACT ROSIE MITCHELL

(2.64) September 7, 1999.  Contacted Rosie Mitchell.  Mitchell did not recall any Bernard family in Killeen, TX.  No further information.

## INTERVIEW BILL SPILLER

(2.65)  September 7, 1999. Interviewed Bill Spiller.  Spiller stated he had known SUBJECT since 7th or 8th grade, recalling all of the neighborhood kids would play basketball in his driveway. Spiller stated SUBJECT was no trouble at all, other than typical kids horseplay. Spiller stated his son Dettrick and SUBJECT were around the same age, and spent a lot of free time together.  Spiller stated SUBJECT was never a "hard charger" and was perfectly content to do what the other kids wanted to do.  Spiller recalled after his son graduated from high school and started working in Austin, SUBJECT did not come around as often.  No further information.

*"Let the Truth Be Known"*

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

## INTERVIEW MARTHA JOHNSON

(2.66)  September 7, 1999. Interviewed Martha Johnson, SUBJECT'S Aunt. Johnson stated SUBJECT was a good kid and since the age of 14 had spent several summers at her home in Missouri.  Johnson stated SUBJECT would spend time working in the garden, mowing the yard or doing other chores around their home.  Johnson stated SUBJECT was easy to be around and was a well mannered young man.  Johnson recalled fun things for the kids to do and even though SUBJECT was much older than his brother and sister, appreciated the Aunt's efforts to do things for them.  Johnson stated, "you know how teenagers can be sometime. Not real happy about the things adults plan for them to do."  Johnson recalled SUBJECT never made her feel guilty nor made her upset about anything they did while visiting over the summer. No further information.

## ATTEMPTED INTERVIEW ELLEN JOHNSON

(2.67)  September 7, 1999. Attempted to interview Ellen Johnson, SUBJECT'S Aunt. Martha, Ellen's sister, stated Ellen did not have anything to say, because she had not been informed this office was going to contact her for an interview. No further information.

## INTERVIEW GERALD MURASKY

(2.68)  September 7, 1999.  Interviewed Gerald Murasky.  Murasky stated he went to school with SUBJECT'S father at Central Texas College.  Murasky recalled SUBJECT was very young at that time and Murasky watched him grow.  Murasky stated he is also a member of the Seventh Day Adventist Church in Killeen and is familiar with the Bernard family.  Murasky stated SUBJECT is an "at risk kid" and very child-like in his attitude toward life.  Murasky went on to explain SUBJECT had good qualities but was a kid wanting to be a part of something, and was incapable of doing something on his own to harm anyone. Murasky stated when you are around someone for a long time you notice things that are not as obvious to other people. Murasky recalled seeing SUBJECT on the television after his arrest, noticing SUBJECT had a look of fear on his face.  Murasky stated the other male arrested had a look of defiance and Murasky stated he would not even want to be in the same room as this individual even if he was behind bars or handcuffed.  Murasky stated SUBJECT would make a point to come to the balcony of the church and talk with him.  Murasky explained he assisted with the sound system or lighting during church services, and was not on the ground floor with the rest of the members of the church.  Murasky recalled SUBJECT was the type of person who would make a point to be at the back of the sanctuary, "out of sight, out of mind" not wanting to draw attention to himself.  Murasky recalled members of the congregation would speak to SUBJECT and then SUBJECT would respond, but Murasky did not recall SUBJECT initiating up a conversation.  Murasky stated everyone is capable of making choices, recalling SUBJECT never made the attempt to come off as "Mr. Macho" instead waiting for someone to lead him or direct him. No further information.

## INTERVIEW BRENDA TIRADO

(2.69)  September 8, 1999. Interviewed Brenda Tirado.  Tirado stated she had known SUBJECT for several years and had met SUBJECT through the church.  Tirado recalled SUBJECT as being just one of the kids, stating he was always polite and loved to play basketball. No further information.

### *"Let the Truth Be Known"*

19

626

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

## INTERVIEW MRS. ADAMS

(2.70)  September 8, 1999.  Interviewed Mrs. Adams, Adult Education Teacher. Adams stated she had met SUBJECT when by court order was required to complete his GED.  Adams stated SUBJECT was a well mannered and polite young man.  Adams stated SUBJECT completed the required work in less time than it takes most students.  Adams stated SUBJECT was in her class 3 hours per day for approximately 4 months, and not once did she have to correct or discipline SUBJECT, stating he was a model student.  Adams recalled SUBJECT pretty much stayed to himself, and she did not ever see SUBJECT strike up any new friendships. Adams stated some of her students will feel a kinship with someone else who is in the same situation, but SUBJECT was there to get his degree and that is what he did.  Adams stated it depends on the students entry level determining the length of time to complete the course, recalling STUDENT was an intelligent young man, completing the course in a remarkably short period of time. No further information.

## INTERVIEW DETTRICK SPILLER

(2.71)  September 8 1999. Interviewed Dettrick Spiller.  Spiller stated he and SUBJECT had gone to school together from the 4th - 6th grade.  Spiller stated SUBJECT was a fun person to be around and was the kind of person who was hard not to like. Spiller recalled they worked at several restaurants together, both wanting to have their own pocket money and to learn to manage what they earned. Spiller stated both he and SUBJECT came from families in which parents ruled with a firm hand and promoted down strong values.  Spiller recalled SUBJECT stayed mostly to himself, only coming over to play basketball. Spiller stated he had gone to Ellison High School and SUBJECT to Killeen High School.  Spiller stated as they parted ways and went to different schools they also did not see as much of each other except on the basketball court. Spiller stated SUBJECT was not as out going, but the two did not feel close enough to discuss or establish what caused the change in SUBJECT. No further information.

## INTERVIEW MARY LITTLE

(2.72)  September 8, 1999. Interviewed Mary Little. Little state she was a close friend of the Bernard family for approximately 4 years. Little recalled there was a time when she did not have transportation to get to work and Thelma Bernard or SUBJECT would drive her to work.  Little stated SUBJECT would do odd jobs around her home, also watching her 6 and 10 year old children. Little stated SUBJECT was a typical teenager, but exceptionally quiet. Little stated she did not have many occasions to see SUBJECT around kids of his own age, but from her personal experiences with SUBJECT stated he was well mannered and a very reliable person for his years. No further information.

## INTERVIEW MINTA McKINNEY

(2.73)  September 8, 1999. Interviewed Minta McKinney. McKinney stated she met the Bernard family approximately 1 year ago when she started going to the same church.  McKinney stated SUBJECT was a quiet young man, very respectful, not giving her the impression he was a rebellious person. No further information.

*"Let the Truth Be Known"*

le27

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

## INTERVIEW LOUIS SOLOMON

(2.74)  September 8, 1999. Interviewed Louis Solomon. Solomon stated he and his wife became acquainted with the Bernard family when they moved to Texas in 1994.  Solomon stated he could say the family was a close knit family and the parents were the kind of people who taught their children values and respect. Solomon state SUBJECT was a quiet boy, was pleasant to talk to and had a good disposition.  Solomon stated he could see SUBJECT was close to his father, and after the separation SUBJECT became more withdrawn.  Solomon stated SUBJECT was always pleasant but just did not seem as happy.  Solomon stated SUBJECT was a regular at the church gym and always was a pleasure to watch on the court. Solomon stated he was a typical teenager, but did not start or get involved in arguments on or off the court. Solomon stated the court was used by church kids as well as kids from the community, and sometimes things could get out of hand in the heat of a game. Solomon stated he would occasionally see SUBJECT at a local store.  Solomon recalled observing SUBJECT being just as polite and courteous as he was at the church.  Solomon stated he had on other occasions seen other kids in public places of whom he could not speak so highly.  No further information.

## CONTACT LEVI OLARTE

(2.75)  September 8, 1999. Contacted Levi Olarte.  Olarte stated he attended the same church as the Bernard family but did not personally know SUBJECT. Olarte recalled seeing SUBJECT in church, but had no personal contact with him. No further information.

## INTERVIEW OLIVER COLE

(2.76)  September 8, 1999. Interviewed Oliver Cole. Cole stated he lived just down the street from the Bernard family and recalled when SUBJECT was a young man would stop and talk to him while Cole was working in his yard.  Cole stated SUBJECT was always a polite young man.  Cole stated as SUBJECT got older he would be driving by his home and would wave, but did not make it a point to stop and talk.  No further information,

## INTERVIEW MARTY WALL

(2.77)  September 8, 1999. Interviewed Marty Wall. Wall stated he belongs to the Seventh Day Adventist Church and knew SUBJECT from going to the same church.  Wall recalled playing basketball with SUBJECT, but could not make any personal reference to SUBJECT'S character. No further information.

## CONTACT SHERI WALL

(2.78)  September 8, 1999. Contacted Sheri Wall. Wall stated she was aware SUBJECT attended her church, but would be unable to make comments about SUBJECT as she did not personally have any contact with him. No further information.

## CONTACT LAWRENCE JOHNSON

(2.79)  September 8, 1999. Contacted Lawrence Johnson, SUBJECT'S Uncle. Johnson stated he lived in Indiana had did not have any contact with SUBJECT. "I live in Indiana and they live in Texas. What do I know of the boy?"  No further information.

*"Let the Truth Be Known"*

3412

September 9, 1999
SUBJECT:  Consolidated Investigative Report, re: BERNARD, Brandon (Case # 90801)
(Cause # W-99-CR-070(2))

## INTERVIEW VERSIA HOWARD

(2.80)  September 8, 1999. Interviewed Versia Howard, SUBJECT'S Aunt.  Howard stated she lived in Michigan and had spent 3 months around SUBJECT just this last year. Howard recalled SUBJECT did not spend the 3 months around kids his own age instead helping Howard with her new grand child and doing chores around her place.  Howard stated SUBJECT is a helpful young man always willing to do for other people.  Howard stated SUBJECT had a lot going for him but was on the quiet side. No further information.

## INTERVIEW MARIE JACKSON

(2.81)  September 8, 1999. Interviewed Marie Jackson.  Jackson stated she had not been around SUBJECT for the last 5 years. Jackson recalled meeting SUBJECT and his family at the church.  Jackson recalled SUBJECT was a polite young man, always respectful toward her.  Jackson stated she moved and is now attending the church on Clear Creek instead of the one located on Rancier.  No further information.

## CONTACTED LORRAINE BOYD-THOMAS

(2.82)  September 8, 1999. Contacted Lorraine Thomas. Thomas stated she would not give an interview over the phone without looking at credentials.  Thomas agreed to an interview on September 9, 1999 at her home in Killeen. No further information.

## INTERVIEW LORRAINE BOYD-THOMAS

(2.83)  September 9, 1999.  Interviewed Lorraine Thomas.  Thomas stated she had known SUBJECT and his family for the last nine years.  Thomas stated most of her association with SUBJECT was through the church.  Thomas recalled her daughter went to school at the Killeen Jr. Academy with SUBJECT.  Thomas stated SUBJECT was a typical teenager, and was always polite around her.  Thomas stated she also watched SUBJECT'S younger brother, Max, and would occasionally see SUBJECT when he would come to pick up his brother.  Thomas recalled around the age of 17 or 18 SUBJECT was going to public school and saw noticeable changes in SUBJECT. Thomas stated the changes were not extremely bad, but they were not something the church would have approved of. Examples: baggy clothes, jewelry, & extreme haircuts.  Thomas would ask SUBJECT what was going on in his life, and SUBJECT would answer "just hanging out."  Thomas stated SUBJECT was not a bad kid, just did not know where he was heading.  No further information.

## LIST OF PERSONS NOT INTERVIEWED

(2.84)

| | |
|---|---|
| Thelma and Jerome Carter | Rene Barrick |
| Mel Simion Pollock | Carolyn Gatlin |
| Dannata Thompson | |

Attempts to contact these individuals was not successful.  Either the phone had been disconnected, or they did not return my calls.  This completes the list supplied to this firm by SUBJECT'S mother, Thelma Bernard. No further information.

*"Let the Truth Be Known"*

3413
629