

**Failure to Preserve Objection to Indictment**

31. Mr. Bernard's counsel unreasonably failed to make appropriate and necessary constitutional objection to the indictment, the first superseding indictment, or the second superseding indictment on the grounds that the grand jury was required to find or allege intent factors and at least one of the statutory aggravating factors that the Government had identified in its notice of intent to seek the death penalty and was required to prove to the petit jury in order to authorize the maximum sentence (*i.e.*, death) upon conviction.

32. At least by the time Mr. Bernard went to trial in May 2000, reasonably effective defense counsel in a federal capital case would have been aware that there existed colorable grounds for a Fifth Amendment challenge to the Government's then-existing practice of not seeking grand jury indictment on aggravating factors. The legal basis for this Fifth Amendment challenge was apparent from the Supreme Court's March 1999 decision in *Jones v. United States*, 526 U.S. 227 (1999), and its November 1999 grant of certiorari in *Apprendi v. New Jersey*. Defense attorneys in other federal capital cases around the country in 1999-2000 were making such Fifth Amendment objections. The standard of practice for defending capital cases obliged Mr. Bernard's counsel to preserve such an objection to the second superseding indictment for purposes of subsequent legal review.

Declaration of David A. Ruhnke
Page 14 of 82

882

## Failure to make opening statement at the guilt-innocence phase

33. Counsel performed deficiently in failing to make an opening statement at the guilt phase of trial. While failure to make an opening statement is not *per se* deficient performance under *Strickland*, in the factual context of this case counsel's decision to waive opening at the guilt phase was objectively unreasonable.

34. First, no physical or forensic evidence established the respective roles played by, or the acts committed by, the persons alleged to have been involved in the carjacking and murder. As a result, the Government's case at the guilt phase rested almost entirely on the credibility of the testimony of Lewis and Brown, the co-defendants who had pleaded guilty and were cooperating with the Government in hopes of obtaining leniency in their own cases. Lewis and Brown had participated in the key events of the carjacking and murder, and Mr. Bernard's trial counsel knew, or reasonably effective counsel would have known, that their testimony would form the linchpin of the Government's case.

35. Prior to trial, Mr. Bernard's counsel were aware, or reasonably effective counsel would have been aware, that both Lewis and Brown had made numerous statements regarding the events of the carjacking and murder, and that each of their statements contained inconsistencies and contradictions when compared to that defendant's own prior statements and to the other cooperating co-defendant's statements. Thus, prior to trial, Mr. Bernard's counsel were aware, or reasonably effective counsel would have been aware, that no matter what version of events the Government promised to

Declaration of David A. Ruhnke
Page 15 of 82

883

prove in opening statement or what version of events Brown and Lewis actually recounted in their testimony at trial, Mr. Bernard's trial counsel would be able to show the jury that both Brown and Lewis had previously made statements that were at odds with their trial testimony and whatever theory the Government advanced. Under the prevailing professional norm of defense representation in existence in 1999-2000, it was understood that in such a case, it is essential for defense counsel to make an opening statement that alerts the jury to the known problems with the credibility of the testifying co-defendants.

36. Prior to trial, Mr. Bernard's counsel were aware, or reasonably effective counsel would have been aware, that both Lewis and Brown had obtained significant benefits in their plea agreements by being permitted to plead guilty to reduced charges rather than facing first-degree murder charges, which would have carried a mandatory life sentence without possibility of release. The range of actual imprisonment each faced could have been calculated with reasonable confidence under the United States Sentencing Guidelines. Their actual guideline ranges were approximately 20 years for Brown and approximately 27 years for Lewis, given their criminal histories and the facts to which they had admitted in pleading guilty. Given that the Government's case against Bernard would stand or fall on the credibility of the allegations leveled by Lewis and Brown, reasonably effective counsel would have taken the opportunity to develop in detail, through cross-examination and through independent evidence if necessary, the presumptive applicable Guideline ranges for Brown and Lewis, and

Declaration of David A. Ruhnke
Page 16 of 82

884

would also have made clear to the jury that there was no realistic possibility, given the operation of the Guidelines, that either would face a life sentence.

37. In addition, reasonably effective counsel would have understood the importance of having the jury appreciate the significance of the fact that, under the plea agreements entered by Lewis and Brown, the Government would have the sole discretion to determine whether they had testified truthfully and whether their testimony had substantially assisted the Government in prosecuting Mr. Bernard.

38. These matters are sufficiently complex and unfamiliar to lay jurors that there is a corresponding need for trial counsel to explore them at the earliest opportunity in the case.   Reasonably effective counsel accordingly would have included them in an opening statement at the guilt phase.

39. Prior to trial, Mr. Bernard's counsel were aware, or reasonably effective counsel would have been aware, that cooperating co-defendant Terry Brown had been using illegal drugs on the day of the offense and that he had a long history of drug use. Brown's drug use included heavy consumption of drugs that distort and interfere with one's perceptions and memory.  Because of the importance of Brown's testimony to the Government's case, reasonably effective counsel would have advised the jury in an opening statement of the nature, extent, and effects of Brown's drug use during the events in question.

40. Attorneys might reasonably disagree about how much detail regarding these issues trial counsel might choose to include in his opening statement.  There can be no

Declaration of David A. Ruhnke
Page 17 of 82



disagreement, however, that it fell below prevailing professional norms for defense counsel in a federal capital case in 1999-2000 to fail to make *any* opening statement at all where the prosecution's case rested exclusively on the credibility of cooperating co-defendants who had previously made numerous inconsistent statements and were testifying in hopes of leniency. This conclusion is strengthened by the fact that Mr. Bernard's counsel had not subpoenaed any witnesses and did not intend to introduce any evidence at the guilt phase. Under such circumstances, reasonably effective defense counsel would have made an opening statement to preview the flaws in the credibility of Lewis and Brown that would be demonstrated through cross-examination during the Government's case-in-chief.

Declaration of David A. Ruhnke
Page 18 of 82

886

**Failure to cross-examine Terry Brown effectively**

41. Counsel performed deficiently in cross-examining cooperating co-defendants Terry
    Brown and Chris Lewis.  As noted, the Government's entire case rested on the
    testimony of Lewis and Brown, and no physical evidence corroborated their accounts.
    Accordingly, no reasonable attorney would have failed to recognize, in preparing for
    trial, that it would be vital to undercut their credibility in the eyes of the jurors.  This
    was, in fact, the only route to raising reasonable doubt about Mr. Bernard's guilt.

42. Under such circumstances, reasonable counsel would have taken advantage of every
    available opportunity to impeach Lewis and Brown's trial testimony with prior
    inconsistent statements, to demonstrate their bias and motivation to testify in a
    manner consistent with the Government's (current) theory, and to raise any other fact
    or circumstance that would undermine their credibility with the jury.  Counsel
    inexplicably failed to employ the extensive available proof that Lewis and Brown
    were lying – *i.e.,* their own prior statements, both sworn and unsworn, that
    contradicted their trial testimony.  Counsel also failed to cross-examine Lewis and
    Brown on the benefits they expected to receive as a result of cooperating with the
    Government, including the likely application of the federal Sentencing Guidelines to
    their cases and the Government's exclusive power to determine whether Lewis and
    Brown  had discharged their part of the "deal" so as to be entitled to those benefits.
    Counsel also failed to cross-examine Brown regarding the drug use he admitted
    during his testimony at trial, and its effect on his ability to recall the many important

887

parts of the Government's case to which he was a vital, or indeed the only, witness. In each of these ways, counsel fell below an objective standard of reasonableness in presenting Mr. Bernard's defense.

43. First, counsel performed deficiently in cross-examining Lewis and Brown regarding their own prior inconsistent statements. To appreciate the deficiencies in counsel's performance in this regard, it is essential to keep in mind throughout that if counsel's overarching goal was to undercut the credibility of Brown and Lewis – which was the only goal reasonably effective counsel could have identified in the circumstances of this case – there was  effectively no risk associated with bringing to the jury's attention prior statements by either Lewis or Brown that otherwise might have appeared superficially damaging to Mr. Bernard – *e.g.*, that although Lewis and Brown testified at Mr. Bernard's trial that they did not see who set fire to the Bagleys' car (a version nominally favorable to Mr. Bernard), they had earlier testified under oath that they saw Mr. Bernard set the fire, at Vialva's direction (a version nominally less favorable to Mr. Bernard).  Reasonable defense counsel would make clear to the jury that counsel is not vouching for the truth of either version, but simply confronting the Government's witnesses with their prior statements to show that they are mistaken, lying, or have no independent recall of what actually happened.  In that event, there is no downside to multiplying the number and variety of prior inconsistent statements before the jury.

44. In the same fashion, in a prosecution based exclusively on the testimony of

Declaration of David A. Ruhnke
Page 20 of 82

888

cooperating co-defendants, there is almost no inconsistency "too trivial" to form the basis of impeachment with a prior inconsistent statement. There was no basis for the jury to find reasonable doubt about Mr. Bernard's guilt of premeditated murder unless they had doubt about whether to believe Lewis and Brown. Under those circumstances, it was vital for defense counsel to bring to the jury's attention any prior inconsistency that added to the list of reasons to disbelieve Lewis and Brown.

45. In briefly cross-examining Terry Brown, Mr. Bernard's counsel did not ask a single question regarding any of Mr. Brown's prior statements. Other than eliciting from Mr. Brown the admission that he did not tell Mr. Bernard that Vialva planned to kill the Bagleys, defense counsel's examination did not impeach either Brown's credibility or the substance of his testimony for the Government. The cross-examination of Brown by counsel for Vialva addressed only the statements made by Brown on the day after the murders. In those statements, Brown variously denied responsibility altogether, claimed he was at Mr. Bernard's car when the shootings occurred, and claimed that Mr. Bernard was also at his own car when the shootings took place at the Bagleys' vehicle. Vialva's counsel did not ask any statements regarding any statements Brown made after the day immediately following the murders. Although Brown was briefly questioned about his plea agreement, neither Mr. Bernard's counsel nor counsel for Vialva elicited any information about the difference between the Guideline sentencing range for first-degree murder and the lower Guideline sentencing range for second-degree murder.

Declaration of David A. Ruhnke
Page 21 of 82

889

46. By the time of trial, Mr. Bernard's counsel possessed, or reasonable counsel would have possessed, other information which could have impeached Brown in a number of critical respects, including but not limited to the following.

47. Brown testified at trial that he poured lighter fluid on his shirt in order to help save the Bagleys. FBI agent Chadwick had testified at the preliminary hearing and stated in a sworn affidavit that Brown told Chadwick that he had poured lighter fluid on the shirt to use it to set the fire. These earlier statements by Brown were made at a time before he was cooperating with the Government. Introducing these statements would have both impeached Brown's self-serving explanation at trial and also undercut the prosecutor's argument that once Brown started cooperating, he started "telling more on himself."

48. Brown testified at trial that either he or Chris Lewis opened the trunk of the car before Vialva shot the victims. Reasonably effective counsel would have impeached Brown with his statement at his plea of guilty, made under oath, that Vialva himself opened the trunk before he shot the victims. This inconsistency would not only have cast serious doubt on the truth of Brown's entire version of events, but would also have suggested that in order to please the government Brown was now attributing to Mr. Bernard actions Brown had earlier, and under oath, attributed to others.

49. Brown testified at trial that he went back inside the convenience store where the lighter fluid was purchased because Mr. Bernard needed something to light his cigarettes. Reasonably effective counsel would have impeached Brown with his

Declaration of David A. Ruhnke
Page 22 of 82

890

earlier statement to investigators, after he had begun to cooperate, that he had gotten the matches in order to ignite the lighter fluid. This inconsistency would have both shown that, far from "telling more on himself," Brown was attempting to minimize his own guilt; it would also have demonstrated, again, that Brown was incapable of telling a consistent, credible story.

50. Brown testified at trial that he did not see who set the Bagleys' car on fire but that Mr. Bernard was the only person who could have started the fire. Reasonably effective counsel would have impeached Brown with his sworn statement at his plea of guilty that Mr. Bernard set the Bagleys' car on fire by lighting a match.

51. Brown testified at trial that he accompanied Lewis, Sparks, Vialva and Bernard to Greg Lynch's home to get the .40 caliber Glock handgun with which Vialva eventually shot the Bagleys. Reasonably effective counsel would have impeached Brown with his sworn statement at his guilty plea hearing that he was not among the people who went to Lynch's home.

52. Brown testified at trial that only he and Mr. Bernard poured lighter fluid on the car. Reasonably effective counsel would have impeached Brown with his sworn statement from his guilty plea hearing that Vialva also poured lighter fluid on the car.

53. Brown gave no testimony at trial that Chris Vialva ordered either Brown or Mr. Bernard to pour lighter fluid on the car. Reasonably effective counsel would have impeached Brown with his sworn statement from his plea of guilty, in which he stated that Vialva, after shooting the Bagleys, ordered him (Brown) to pour lighter

fluid on the car and ordered Mr. Bernard to start the fire.

54. Brown testified at trial that he and Mr. Bernard, after coming out of the Mickey's convenience store to find Vialva, Sparks, and Lewis missing, had filled out and submitted job applications at the Winn-Dixie grocery and then, of their own volition, went to their respective homes. Reasonably effective counsel would have impeached Brown with his sworn statement from his plea of guilty, in which he claimed that he and Bernard went to their homes to "await further instructions."

55. Brown testified at trial that Mr. Bernard parked his own car down the hill from where Vialva drove the Bagleys' because Mr. Bernard could not get his car up the hill. Reasonably effective counsel would have impeached Brown with his sworn statement from his plea of guilty, in which he testified that Mr. Bernard parked his car "on the main road to enable a quick getaway."

56. At trial, Brown testified that he had had no idea what was supposed to happen if Sparks, Vialva, and Lewis succeeded in securing a ride from a prospective carjacking victim. Reasonably effective counsel would have impeached Brown with his sworn statement from his plea of guilty, in which he testified that he and Mr. Bernard were waiting in Mr. Bernard's car with the understanding that they were to follow whatever vehicle was to be carjacked. Again, highlighting this conflict would have demonstrated for the jury both that Brown's story was constantly changing and that at trial Brown was actually admitting *less* about his own involvement than he had previously.

Declaration of David A. Ruhnke
Page 24 of 82

57. At trial, Brown denied having any idea what range of sentencing he might be facing under the federal Sentencing Guidelines, or indeed knowing anything about what sentence he might receive except that he hoped or believed it wouldn't be death. Reasonably effective counsel would have impeached Brown with the fact that at his guilty plea, under oath, after the court had carefully explained and outlined how the Sentencing Guidelines operate, Brown specifically confirmed that he had discussed the Guidelines with his lawyer, that he knew how they would probably affect his case, and that he had no questions on that issue for the court.

58. Much as I observed earlier with respect to the many important points that could have been made in an opening statement at the guilt-innocence phase, it may be the case that reasonable defense counsel might have chosen to forego impeaching Brown with one or two of the many available inconsistencies with which his credibility could have been dramatically attacked.  I do not believe, however, that Mr. Bernard's defense counsel performed reasonably in failing to confront Brown with any of these inconsistencies.  This is particularly true, in my view, with respect to the statements of fact that Brown affirmed under oath during his own plea hearing. Counsel evidently made no informed strategic judgment not to use those statements, because counsel never even had them transcribed.

59. In sum, in reading the transcript of Brown's testimony after reviewing Brown's various other statements, one is struck by the fact that Bernard's counsel never made it clear to the jury that Brown had made multiple inconsistent statements about

Declaration of David A. Ruhnke
Page 25 of 82

893

numerous important details of his story, and that Brown continued to do so even after deciding to cooperate with the Government. If only because introducing those statements would have directly rebutted the Government's claim that Brown was "telling the whole truth" after he decided to cooperate, reasonably effective counsel would have made certain to cross-examine Brown about them in detail.

**Failure to cross-examine Chris Lewis effectively**

60. As with their cross-examination of Terry Brown, Mr. Bernard's attorneys unreasonably failed to question Chris Lewis about prior statements which would have demonstrated that his trial testimony was unreliable and inconsistent with his earlier accounts.

61. At trial, in response to questioning from the Government on direct examination, Lewis stated that he did not know who had opened the trunk of the Bagleys' car before Vialva shot the victims. Lewis was impeached with his prior statement from June 22, 1999, in which he had stated that Vialva himself opened the trunk before he shot the Bagleys. However, Lewis rehabilitated himself with the claim that his June 22, 1999 statement was a lie and just designed to blame Vialva. Reasonably effective counsel would have also impeached Lewis with his sworn statement from his plea of guilty, made at a time after he had decided to cooperate and had signed a plea agreement (*i.e.*, at a time when, according to the Government, he had "come around" and was telling the truth about everything) in which he stated – consistent with his June 22, 1999 statement – that Vialva himself opened the trunk before shooting the

894



Bagleys.

62. At trial, Lewis gave an elaborate account of how, on the night before the day the Bagleys were killed, he had the .22 pistol concealed in his shoe and then tossed it into the bushes when the police arrived. Reasonably effective counsel would have impeached Lewis with both his sworn statement at his guilty plea hearing, in which he stated that Vialva threw the .22 into the bushes, and with his prior statement to investigators that it was Sparks who threw the .22 into the bushes.

63. At trial, Lewis testified that he did not see anything about how the fire started after the Bagleys were shot. Reasonably effective counsel would have impeached Lewis not only with his initial account, in which he stated that Vialva set the car on fire himself, but also with his sworn statement from the guilty plea hearing, in which he stated that Mr. Bernard set the car on fire with a match at the direction of Vialva.

64. At trial, Lewis implicated Mr. Bernard in efforts to dispose of the evidence, testifying that Mr. Bernard threw the .22 pistol into the woods once the foursome realized they could not drive away from the scene. Reasonably effective counsel would have impeached Lewis with both his earlier sworn statement that Vialva threw the .22 into the woods, and with his failure ever to mention in any earlier statement or interview that Mr. Bernard threw the .22 into the woods.

65. At trial, Lewis stated that Brown was present with, and talked to, Greg Lynch when the .40 Glock firearm was obtained from Lynch. Reasonably effective counsel would have impeached Lewis with his sworn statement on plea of guilty that Brown was not

895

even present when the .40 Glock was obtained from Lynch.

66. At trial, Lewis gave no testimony that Mr. Bernard and Brown were to go to their homes to "await further instructions."  Reasonably effective counsel would have impeached Lewis with his sworn statement on plea of guilty that this is what they did.

67. At trial, Lewis gave a dramatic account of  how, at Long Branch park, Brown screamed at Vialva that the Bagleys did not have to die and Vialva screamed back that they must be killed.  Reasonably effective counsel would have impeached Lewis with the fact that he had failed to offer any such account of any such incident in any of the numerous interrogations conducted before trial by investigators.  Reasonably effective counsel would also have cross-examined Lewis regarding his apparently newly minted testimony that Mr. Bernard had approached the Bagleys' car to ask for a cigarette – which likewise appears nowhere in any of Lewis' earlier versions – or the evident contradiction between this claim and Brown's testimony that Mr. Bernard never left his own car, as well as with Brown's testimony that Mr. Bernard already had cigarettes of his own (for which he, according to one of Brown's versions of his story, needed matches).   Cross examination on this issue was especially important because Lewis' account of the claimed shouting match at Long Branch park was the only evidence presented at trial that Mr. Bernard knew in advance about a plan to murder the Bagleys.

68. Reasonably effective counsel would also have impeached Lewis and Brown with the

Declaration of David A. Ruhnke
Page 28 of 82

894

Government's own admissions.    Such evidence would have shown that the Government had assured the court on two separate occasions (on the date in December 1999 when Brown and Lewis pleaded guilty, and on the date in April 2000 when Sparks pleaded guilty) that it would prove at trial a particular set of facts which could only have come from Brown and Lewis – and was now presenting a different set of facts coming from the same witnesses.

69. Reasonably effective counsel would also have elicited available testimony to disprove the Government's claim that Brown and Lewis's testimony had not been shaped by investigators in any way.  Reasonably effective counsel would have called the Government's own investigators to acknowledge that in their own reports, they admitting having declined to take written statements from both Brown and Lewis after they had given proffers with their attorneys present, because the investigators and/or their superiors believed that Brown and Lewis were not telling the whole truth.  Similarly, reasonably effective counsel would have presented evidence to show that when the Government first sought an indictment, which was after both Brown and Lewis had given proffers, FBI agent Chadwick had recounted the "story" of the offense in a way that was fundamentally based on the same June 22, 1999 statement from Chris Lewis that the Government at Mr. Bernard's trial disparaged as a lie.

70. Reasonably effective counsel could further have shown that when FBI agent Chadwick testified at the December 14, 1999 grand jury session, he gave an account of what Vialva said at Long Branch park that directly contradicted Lewis's testimony

897

at trial, and that agent Chadwick (who, again, was basing his grand jury testimony about the events of the crime on interviews of Lewis and Brown) said nothing about Mr. Bernard's having been informed of any plan to kill the Bagleys. The transcript of Chadwick's December 14 grand jury testimony confirms that reasonably effective counsel could also have elicited from agent Chadwick that Lewis had told him he (Lewis) poured lighter fluid on the Bagleys' car, in contrast to his denial of that fact at his guilty plea hearing and at Mr. Bernard's trial.

**Failure to dispute misleading suggestion regarding Terry Brown's ineligibility for the death penalty**

71. Mr. Bernard's counsel did not contest the Government's suggestion that cooperating co-defendant Terry Brown was not eligible for the death penalty. Under Texas law, Brown, being 17 years old, was eligible for the death penalty if prosecuted in state court. Texas has both sentenced 17-year-olds to the death penalty in recent years and has actually executed a number of offenders for capital crimes they committed at age 17. According to testimony the Government sponsored at Mr. Bernard's trial, State authorities had concurrent jurisdiction over the location on Fort Hood where the murders were committed. If that is correct, reasonable counsel would have made sure the jury understood that an additional benefit Brown was obtaining by virtue of being prosecuted solely in federal court was that he was being spared the death sentence he could potentially face in a state prosecution.

**Failure to cross-examine Brown and Lewis about the potential reduction in sentence they stood to gain by testifying for the Government**

Declaration of David A. Ruhnke
Page 30 of 82

868

72. Counsel failed effectively to cross-examine cooperating co-defendants Brown and Lewis with respect to the probable sentences they faced under the U.S. Sentencing Guidelines, the potential for a reduction in those sentences as a result of their cooperation with the Government in prosecuting Mr. Bernard, and the terms of their plea agreements under which the Government would have final and unreviewable discretion to determine whether they had testified "truthfully" as required by those agreements. Reasonable counsel in any federal case, capital or non-capital, is obliged to acquaint the jury with the operation of the Guidelines and how they may affect the length of the sentence that may be imposed on a cooperating Government witness, at least where – as here – the witness' primary motive in cooperating is evidently to reduce his own sentencing exposure. In this case, defense counsel's failure to cross-examine on these subjects permitted the Government to suggest through its witnesses, falsely, that the sentences Brown and Lewis would receive for their own roles in the carjacking and murder of the Bagleys were entirely up to the sentencing judge. That false impression prejudiced Mr. Bernard.

**Failure to cross-examine Brown about his admitted drug use and to investigate and present other evidence of Brown's drug use**

73. Counsel failed to impeach cooperating co-defendant Terry Brown with his admission at trial that he was using drugs on the day of the offense. Greg Lynch testified without contradiction that Terry Brown was smoking marijuana on the day of the crime. Brown omitted this fact from his own testimony, but had admitted in an earlier statement to investigators that he had smoked marijuana with Lynch on the

Declaration of David A. Ruhnke
Page 31 of 82

899

day of the crime. Reasonably effective counsel would have cross-examined Brown about his use of marijuana, because it might well have persuaded the jury that Brown's claim to recall many important facts about the offense (who did what, who said what to whom, who was present when things were said, what happened in what order) was too unreliable to trust.

74. In addition, Mr. Bernard's counsel unreasonably failed to investigate and develop other available evidence that Brown was a frequent user of drugs which could affect his perceptions and memory. Had counsel performed a reasonably effective investigation into the facts and circumstances of the offense, they would have learned that in the weeks before the offense, Brown consumed numerous drugs including "acid," PCP, cocaine, and marijuana dipped in embalming fluid. All these drugs distort one's memory and perceptions. Indeed, an epidemiological report from the Texas Commission on Alcohol and Drug Abuse notes that "toxic psychosis, hallucinations and delusions" are "common effect[s]" of marijuana dipped in embalming fluid. Persons who have smoked it see "things that aren't there," and experience an "altered reality" similar to "tripping" on LSD. In addition, persons who have smoked the combination frequently experience emotional turbulence including feelings of "panic, paranoia, [and] disorientation," as well as "intense anger." One of its signal consequences is memory disruption or loss. Reasonably effective counsel would have developed and presented this information, both through cross-examination of Brown regarding the drugs he took and their effects on him, and

Declaration of David A. Ruhnke
Page 32 of 82

900

through independent evidence to show how profoundly these drugs may have altered or distorted Brown's perceptions and memory of the events he claimed to recall in his testimony.

## Failure to conduct other reasonably necessary investigation regarding Government witnesses

75. Post-conviction investigation suggests that a reasonable investigation would have uncovered additional facts helpful to Mr. Bernard's defense. For example, Brown has stated in an affidavit that he would have told Mr. Bernard's trial counsel, had they spoken to him, that he suffers from a serious mental illness and was being administered psychotropic medication by jail staff at the time of his testimony against Mr. Bernard. Reasonably effective counsel would have discovered this information through investigation or through pre-trial motions seeking disclosure of the existence of such circumstances, and would have presented it to the jury through cross-examination of Brown and independent evidence if necessary. Similarly, it is my understanding that Greg Lynch has recently acknowledged that after the crime, Brown told him (Lynch) that he (Brown) set the fire that consumed the Bagleys' car. I believe that reasonably effective trial counsel would have interviewed Lynch prior to trial, and presumably would then have had Lynch's statement to impeach Brown and to challenge the reliability of the Government's claim that Mr. Bernard was solely responsible for the fire.

76. Similarly, it is my understanding that Tony Sparks has stated in a recent interview that he would have been willing to speak with Mr. Bernard's attorneys or their

Declaration of David A. Ruhnke
Page 33 of 82

901

representative prior to trial, and would have told them that there was no conversation at Long Branch Park about killing the Bagleys. Such testimony would have directly impeached the testimony of Chris Lewis, which was the only evidence at trial that Mr. Bernard knew in advance that the Bagleys were to be killed. Counsel performed deficiently in failing to interview Sparks.

## Failure to take reasonable steps to exclude irrelevant and highly inflammatory evidence concerning gangs

77. In a pretrial hearing, counsel for co-defendant Vialva's moved to prohibit evidence of gang membership. The Government asserted that it needed to introduce gang evidence because all four defendants were "members of the same gang and they planned this crime together. And the fact that they are members of the same or associated with the same gang is probative to show association." The court deferred ruling on the motion, stating that it understood the government's position but thought that "gang membership or activity or association [might] be so prejudicial" that it needed to "know more about the specific evidence" before ruling. Mr. Bernard's counsel did not file any *in limine* motion on gang evidence and did not join Vialva's motion.

78. Immediately before opening statements and before any evidence had been taken, Vialva's lawyers again raised the issue. The court then indicated that it would not exclude the evidence of gang association, ruling that "when the Government alleges a conspiracy," "any kind of association that belongs to the defendants [sic] is admissible and it is not more prejudicial than probative." Mr. Bernard's counsel

Declaration of David A. Ruhnke
Page 34 of 82

902

offered no argument but did join in the objection by Vialva's counsel. When the Government's attorney in his opening statement first mentioned the defendants' alleged gang association, counsel for Vialva objected. The Court overruled the objection but noted that Vialva would "have a running objection on that throughout the trial." Mr. Bernard's lawyers did not object.

79. The trial evidence did not establish that the carjacking and murders involved gang activity, and no evidence was presented that the motive or opportunity for the crime was gang-related. While the evidence supported a conclusion that the participants in the crime belonged to different subsets of self-styled "Bloods," it did not show in any way that this membership either instigated or facilitated the crimes. Although the Government professed that the gang evidence was intended to show the "association" of the alleged participants, its questioning of witnesses far exceeded that purpose.

80. For example, the Government asked co-defendant Terry Brown "what it means to be in a gang," as well as eliciting from him details including: the territory supposedly controlled by the 212-Piru "Bloods," the clothing they wore, other gangs operating in Killeen on their own "turfs," including the "Crypts [sic], Folks, and Vice-Lords;" that it was "common for there to be violence and fights between gangs and gang members," and that such violence usually followed "disrespect" shown by a member of one gang toward a member of another gang. The Government similarly questioned Chris Lewis at length about gangs, including: rivalries with other gangs, the meaning of "PIRU" (according to Lewis, it stood for "Pimps In Red Uniforms"), whether gang

Declaration of David A. Ruhnke
Page 35 of 82

903

members were reluctant to "rat" on other gang members, and whether gang members "commit crimes together, certain crimes together, if they choose to do that."

81. The Government did not confine its questions to establishing that the participants in the carjacking-murder were gang members, as it had originally represented to the Court in seeking approval to offer the evidence. The Government questioned many other witnesses (*e.g.*, Greg Lynch, Ramona Berry, Greg Rousseau, and Billie Rorie) about whether they were gang members. The government elicited information about topics such as getting "jumped into" a gang, and that a "Bloods" gang member might need a gun because he feared the "Crips." Similarly, when the Government elicited from Ricky Lynch that Vialva had phoned him after the crimes, asking, "Do people think I'm real?", the Government tried to insinuate that this statement had something to do with Vialva's gang membership, even though Lynch insisted that Vialva's comment meant nothing to him and even though Lynch did not say Vialva ever mentioned the gang to him.

82. In other words, gang evidence suffused the entire guilt-innocence phase. Mr. Bernard's attorneys did not object to any of this evidence. Nor did Mr. Bernard's attorneys seek any limiting instructions on the gang evidence and none were given, either at the time the evidence was introduced or in the court's instructions at the close of the case. Mr. Bernard's counsel did not object to any of these questions or answers, despite the fact that they all concerned matters other than "mere association," the Government's ostensible basis for introducing the evidence.

901

Reasonably effective counsel would have objected that the Government was introducing evidence far beyond anything it needed to show the defendants' "association," and that the additional evidence was far more prejudicial than probative, and would have sought limiting instructions to attempt to ameliorate the extraordinarily prejudicial impact of such extensive testimony about gangs.

83. While the risk of "guilt by association" is great whenever evidence of gang membership or affiliation is in the picture, the circumstances of this case present an even greater likelihood of prejudice. At least one of the jurors who sat in the case, Paula Lenox, had expressed during *voir dire* her fear that jury service in the case would be "very stressful," probably because she doubted that she and her "family … would be safe from other gang members if the death penalty is chosen," and was "concerned for retaliation" because of having read in the newspapers that the crime was committed by "gang members."

### Failure to Object to Irrelevant and Extraordinarily Prejudicial Testimony About Todd and Stacy Bagley

84. Defense counsel also unreasonably failed to object to irrelevant and extraordinarily prejudicial testimony about the victims that was offered and admitted at the guilt-innocence phase of trial. Mr. Bernard's attorneys took no steps to prevent or ameliorate the impact of this inflammatory evidence, failing to make any in limine motions, to object during trial, or to request curative or limiting instructions. Reasonably effective counsel would have been aware that the horror of the Bagleys' deaths presented a real danger that the terrible facts of the crime alone would drive

the jury toward conviction. In such circumstances, it is even more important than in the typical case for defense counsel to take every available step to keep irrelevant and inflammatory evidence from getting before the jury. Mr. Bernard's counsel failed in that duty.

85. For example, the Government questioned Chris Lewis at length about what the Bagleys had said to him while they were imprisoned in the trunk of their car. Lewis first testified that the Bagleys told him that God got "them different items and about how he gave people different stuff, too." The Government followed up by asking Lewis, "[W]hat did you take it to mean when they said God had gotten them stuff?," to which Lewis answered, "That they were blessed, sir." The Government echoed his response: " That they were blessed." The Government also brought out that the Bagleys had asked what church Lewis and Sparks attended, and further elicited testimony from Lewis about when he had attended Grace Christian Church, where the Bagleys worshiped. Lewis was also led to recount statements from the Bagleys in which they said that they did not have a lot of money and that friends had given them money for car tires, which the Government followed up by asking, "Was that at the same time they were telling you that God provided for them what they needed?"

86. Perhaps the most striking testimony was offered when the Government questioned Lewis about how Mr. Bernard's car had gotten stuck in the ditch as they attempted to leave the scene, asking him three times how it ended up there. Lewis' response: "God put it there, sir." The Government emphasized the supernatural intervention,

Declaration of David A. Ruhnke
Page 38 of 82

recounting Lewis' description: "You pulled up, turned around, and then the car felt like it was in neutral and then it just slid off." Lewis repeated, "It felt like someone pushing it, sir," to which the prosecutor asked, "Was there anybody out there pushing it?" Lewis admitted there was not.

87. The Government elicited testimony from Terry Brown about what Stacie Bagley said just before the trunk opened and Vialva shot her: "Jesus loves you," and "Jesus, take care of us." Brown added that Vialva responded, "Shut the fuck up, bitch, I'm about [to] open the trunk and I don't want to hear that shit." Similarly, the Government elicited testimony from Billie Rorie that Stacie Bagley, locked in the trunk, had asked the boys whether they "believe[d] in Christianity," to which Tony Sparks had retorted, "I don't give a fuck, because we [are] thugs."

88. The Government also elicited testimony about the Bagleys' religious beliefs and their character from friends of the Bagleys. Robert Rimes testified about his relationship with the Bagleys at Grace Christian Church, ostensibly to establish that the Bagleys were engaged in ministering to youths and thus explain why they would have offered a ride to Vialva, Lewis, and Sparks. Vialva's counsel objected that Mr. Rimes' testimony would constitute irrelevant victim impact evidence; the court agreed. Mr. Bernard's attorney did not join in the objection. Despite the court's ruling, the Government thereafter elicited testimony from Mr. Rimes that he met the Bagleys at a "home group Bible study" and that the Bagleys attended a week long revival service just before the murders. Mr. Rimes also testified that he took the Bagleys to lunch

907

and that they talked about "their families and why they were there that week," and that the Bagleys "kind of opened the door to their life to be me briefly," talking of their possible plan to open "a Christian gym." Although the court sustained an objection to this question, no request was made to strike the testimony or seek a curative instruction.

89. Directly following Mr. Rimes testimony, the government put on Pastor Timmerman, who testified that he knew the Bagleys through the church. Pastor Timmerman identified two pictures of Todd and Stacie Bagley taken at Sea World, saying that this was how they had looked just prior to June 21, 1999.

90. The Government waited to offer the in-life photographs of the victims, however, until Stacie Bagley's father Charles Woodward testified. First, the Government established that Mr. Woodward worked as a criminal investigator for the Texas Department of Criminal Justice and had previously worked for twenty years on the Killeen Police Department. The Government next elicited testimony that Stacie was the Woodwards' only child, and then had Mr. Woodward identify a watch that had belonged to Stacie. Finally, the Government questioned Mr. Woodware about the Sea World photographs, including the fact that Mr. Woodward and his wife had paid for the trip, which took place just a few days before June 21, 1999, because they "wanted to do something special for them."

91. None of this testimony was relevant to the guilt-innocence phase, regardless of whether any of it might have constituted appropriate "victim impact" testimony at the

908

punishment phase.  Reasonably effective counsel would have recognized it as highly prejudicial and taken appropriate steps to protect Mr. Bernard from its poisonous effect by, *e.g.*, filing motions in limine, making objections at trial, or asking for curative or limiting instructions.

### Failure to take reasonable steps to protect Mr. Bernard's rights when evidence arose of possible extraneous influences on the jury

92. The trial record reflects that, before it summoned the jury into the courtroom for closing arguments at the guilt phase, the trial court stated that, earlier that morning, "a juror said as they came past where some people were out on the sidewalk . . . some person they described as a 'Black lady,' said to them, 'Someone is going to die in that trial today.'  So, if you notice some extra security or something today, that will be the reason."  Mr. Bernard's trial counsel did not respond.  The jury was summoned and trial proceeded.

93. Reasonably effective counsel would have viewed these allegations as raising a distinct risk that one or more jurors had been exposed to an extraneous influence that might influence their decision with respect to either Mr. Bernard's guilt or his eventual sentence.  Under such circumstances, reasonably effective counsel would have objected to proceeding unless and until a proper inquiry could be made into the nature and extent of the contact with the jurors and their reaction to it.  Reasonably effective counsel would have requested the opportunity to examine the juror(s) involved regarding the facts of the incident.  Reasonably effective counsel would also have asked that the Court place on the record the names of the jurors involved, what

Declaration of David A. Ruhnke
Page 41 of 82

909

they had told the Court about the incident, what it had asked them in response, and what instructions, if any, it had given them regarding the incident (*e.g.*, not to disclose it to jurors who were not aware of it, or discuss it with any who were aware of it). Reasonably effective counsel would also have objected to the presence of a "noticeable" increase in courtroom security without the Court's having considered alternative means to the same end, such as the presence of court security officers not identifiable as such.

94. Reasonable counsel would have been concerned about the possible influence of such an incident on the jurors. In numerous capital cases, reviewing courts have found that third-party contact with jurors can taint their deliberations, especially as to the appropriate punishment in a particular case. Given the information disclosed by the trial court, particularly the fact that in response to the concerns aired by these jurors it had apparently ordered "extra security" that might be apparent (since the Court acknowledged counsel might "notice" the increased security, which appears to be the reason it advised counsel of the incident in the first place), reasonable counsel would have been concerned about the likely prejudice to Mr. Bernard and would have taken steps to minimize that risk.

**Failure to provide effective assistance during closing argument at the guilt-innocence phase**

95. Counsel failed to object to the Government's misstatement of the evidence during closing arguments at the guilt phase. The following examples are illustrative of counsel's failures in this regard.

Declaration of David A. Ruhnke
Page 42 of 82

910

96. Prosecutor Frazier unequivocally stated in argument that Mr. Bernard was guilty and particularly culpable because he had lit a match and set the car on fire: "He lit that match. And, at that point, there is no distinction between lighting that match and pulling that trigger." Reasonably effective counsel would have objected to this argument as improper because no evidence supported either of these statements; no one testified that a match had ignited the fire, and both Brown and Lewis denied having seen the fire start.

97. Similarly, reasonably effective counsel would have objected when the prosecutor argued that the physical evidence supported the testimony of Brown and Lewis. Even if the physical evidence was consistent with some parts of their testimony (*e.g.*, even if the person who shot the Bagleys was standing at the passenger side rear of the trunk), it could not and did not corroborate their claims about which defendant did what (*e.g.*, that the person standing in that location was Vialva). Permitting the prosecutor to make such a misleading argument imperiled Mr. Bernard's right to a fair assessment of the evidence, and reasonably effective counsel would have objected.

98. Counsel performed deficiently in failing to object to prosecutor Frazier's argument that Lewis and Brown had no opportunity to concoct their stories and that they had been housed in separate wings of the same facility, as Lewis had testified without rebuttal that he and Brown had been together every day while housed in the same facility. Because Lewis and Brown's credibility was indispensable to the

Declaration of David A. Ruhnke
Page 43 of 82

91

Government's case, reasonably effective counsel would have been especially vigilant for improper arguments attempting to bolster it.

99.  Similarly, counsel performed deficiently in permitting prosecutor Frazier to argue without objection that there was no evidence that anyone had told the Government's witnesses what to say and that the Government's witnesses had denied any such coaching: "Did you ever hear any evidence or testimony that any investigator coached anybody and told them what to say.  Of course not."  Reasonably effective counsel would have objected because this argument was contrary to the evidence; Brown testified that CID agents told him what happened and that he "just confirmed, basically, whatever [they] said."  As far as the Government's investigators went, they did not deny any such coaching took place, because they were not asked if it had.

100.  On another occasion, prosecutor Frazier specifically told the jury that Brown had told Mr. Bernard about a plan to murder the Bagleys, arguing, "Terry Brown himself [testified] that after they left Long Branch Park, he told Brandon Bernard what the plan was," and adding that Mr. Bernard "deliberately associated himself with a plan and acted on that plan to kill Mr. Bagley."  This argument was directly contradicted by Brown's testimony on cross-examination that he had not told Mr. Bernard about a plan to murder but only about a plan to burn the car.   Reasonably effective counsel would have objected to this argument.

101.  Similarly, reasonably effective counsel would have objected when prosecutor Frazier argued that Mr. Bernard was guilty because he knew about and had agreed to

Declaration of David A. Ruhnke
Page 44 of 82

912

participate in a plan to go pick up Vialva, Lewis, and Sparks after they had completed the carjacking, and that this plan did not change when the group pulled into the Mickey's. This argument was rebutted by Brown's unequivocal statement on direct examination that there had been no discussion about what he and Mr. Bernard were to do if a carjacking occurred, and his further testimony that he had no idea what he and Mr. Bernard should do in that event.

102.    The prevailing standard of practice does not oblige counsel to object anytime there is a colorable legal basis to do so, because the decision whether to lodge an objection must be informed by considerations such as the potential effect on the jury. In these instances, however, making an objection would not have directed the jury's attention to improper or inadmissible evidence potentially prejudicial to Mr. Bernard, because the entire point of the objection is that the Government was *misstating* the facts that were properly in evidence. Particularly where the Government's witnesses themselves lacked credibility due to their motive to testify favorably to the prosecution and their own involvement in the gang, it was essential for defense counsel not to permit the Government's counsel to misstate the testimony and thereby effectively substitute himself as a more credible witness supporting the prosecution's theory of the case. This is especially true when the misstatements were made during the Government's final argument, to which defense counsel would have no opportunity to respond.

Declaration of David A. Ruhnke
Page 45 of 82

913

**Failure to conduct an adequate investigation into potentially available and relevant mitigating circumstances**

103.    Counsel failed to conduct an investigation into all potentially available and relevant mitigating circumstances.  The standard of practice for defending capital cases in 1999-2000 required counsel to investigate the client's complete social history, beginning before the time of conception and continuing to the time of trial, employing the services of appropriately qualified persons where necessary.    The standard of practice in 1999-2000 obliged counsel to investigate, *inter alia*, the client's medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, and neurological damage or neuropsychological impairment); family and social history (including family trauma such as physical or emotional abuse, domestic violence, familial instability, neighborhood environment and peer influence); other traumatic events such as exposure to criminal violence or the loss of loved ones; experiences of racism or other social or ethnic bias; cultural or religious influences; failures of government or social intervention (*e.g.*, failure to intervene or provide necessary services, placement in poor quality foster care or juvenile detention facilities); educational history (including achievement, performance, behavior, and activities); special educational needs; employment and training history (including skills and performance, and barriers to employability); and prior juvenile and adult correctional experience (including conduct while under supervision, in institutions of education or training, and regarding clinical services).

104.    Reasonably effective counsel in 1999-2000 would have understood that much of

914

the investigation that must be elicited for the penalty phase investigation is very personal and may be extremely difficult for the client, or other witnesses who may possess relevant information, to discuss.   Obtaining such information typically requires overcoming considerable barriers, such as shame, denial, and repression, as well as other mental or emotional impairments from which the client may suffer.  For this reason, the assistance of a person specially trained in recognizing and overcoming such barriers, and has the skills necessary to help the client cope with the emotional and psychological impact of such painful disclosures, is invaluable in conducting this aspect of the investigation.

105.    As a practical matter, conducting the type of mitigation investigation demanded by the prevailing standard of practice in 1999-2000 required counsel to locate and interview the client's immediate family members and virtually everyone else who knew Mr. Bernard and his family, including neighbors, other relatives, teachers, clergy, case workers, doctors, correctional officers (including probation or parole officers or supervisors), and others.  It also required counsel to seek and obtain all available documentary records concerning the client's educational history, work history, medical history, family history, etc., as well as comparable records of other family members where they reflect information relevant to the client's own social history.  Such records include school records, juvenile court records, medical records, military records, employment records, criminal and correctional records, family birth, marriage, divorce, or death records; and so forth.

Declaration of David A. Ruhnke
Page 47 of 82

95

106.    Mr. Bernard's attorneys do not appear to have conducted any such investigation into potential mitigating circumstances. Their penalty-phase investigation appears to have been limited to having Criterion Investigations interview a list of persons provided by Mr. Bernard's mother. Many of those people report almost no personal knowledge of Mr. Bernard, or at most a vague recollection that he was a "good boy" when he was younger. This type and scope of investigation into potential mitigating circumstances was wholly inadequate and fell below the minimum standard of practice for defending capital cases in 1999-2000.

107.    At the same time, at least some of the persons interviewed by Criterion Investigations attested to events and circumstances that would have alerted reasonably effective counsel in 1999-2000 to the need for additional investigation into certain areas, such as the relationship between Mr. Bernard's parents, his relationship with his father, and so on. Counsel did not conduct any such follow-up investigation. Indeed, based on the statements of some of these witnesses, it is not at all clear why they were not called to testify at the punishment phase, rather than the witnesses who did testify. The files of Mr. Bernard's counsel give no indication that counsel exercised any informed judgment in the selection of which witnesses would be called to testify.

108.    Jail records reflect that trial counsel visited Mr. Bernard only eleven times in the approximately one year between his arrest and the beginning of his trial. Under the prevailing standard of practice, Mr. Bernard's attorneys were obliged to engage in a

Declaration of David A. Ruhnke
Page 48 of 82

916

continuing interactive dialogue with him concerning all matters that might reasonably be expected to have a material impact on the case. Close and frequent contact with the client is essential to create and maintain a relationship of trust, which in turn is indispensable to the task of investigating and developing potential mitigating evidence for presentation at the penalty phase. Moreover, reasonably effective counsel in 2000 would have understood that significant racial and cultural barriers stood in the way of forming a relationship of trust with their client, such that a substantial investment of time would be necessary to create a fully functional attorney-client relationship.

109.    Any reasonably competent attorney handling a capital case in 1999-2000 would have recognized that the preparation of a social history is a vastly time-consuming and often delicate process. For that reason, Mr. Bernard's original attorney, Russell Hunt, Sr., performed deficiently both in failing to initiate such an investigation immediately upon his appointment in June 1999, and in failing promptly to seek the appointment of second-chair counsel to assist him. It is no excuse that Mr. Hunt may have believed, however sincerely, that a plea deal would ultimately be struck with the Government under which Mr. Bernard would avoid the death penalty. Counsel in a capital case have a duty to begin preparing for two potential cases – guilt and penalty – from the earliest moments of their entry into a potential capital case. Once the death penalty is a potential punishment, as it was from the day Mr. Hunt was appointed as counsel for Mr. Bernard in June 1999, the prevailing standard of

Declaration of David A. Ruhnke
Page 49 of 82

917

practice requires counsel to prepare for a death penalty trial.

110.    A reasonably competent attorney would have been aware that 18 U.S.C. § 3005 entitled Mr. Bernard to two attorneys and would have requested the appointment of co-counsel as quickly as possible upon entry into the case.  It should be noted that by late July, Vialva already had two attorneys representing him. The extremely limited time Mr. Hunt, Sr., spent on Mr. Bernard's case strongly suggests there was a need for second counsel much sooner than February, when Mr. Hunt, Sr., finally filed such a motion.  At a minimum, Mr. Hunt, Sr., was obliged to advise Mr. Bernard that he had a right to the appointment of second counsel under § 3005, and failed to do so.

111.    In addition, investigation must be substantially complete before trial to inform counsel's decisions during jury selection.  Defense counsel in this case appear to have anticipated that Mr. Bernard would be convicted of a death-eligible offense.  If that were the case, their primary goal in selecting the jury would be to look for jurors who might be persuaded not to impose the death penalty.  If counsel has only a vague idea during jury selection what kind of information about the client's character and background the defense will present at sentencing, and, indeed, has no idea what witnesses will testify for the defense and what their manner and the content of their testimony will be, counsel will have a difficult time performing the essential task of attempting to seat jurors who might respond personally to those witnesses and their stories.  At a minimum, counsel whose penalty-phase investigation and presentation are unfinished during *voir dire* will be handicapped in exercising peremptory

Declaration of David A. Ruhnke
Page 50 of 82

918

challenges to remove jurors who pose too great a risk of unfairness toward the defendant's case. Attempting to accomplish that task "in the dark," without a substantially completed mitigation investigation or any idea what evidence counsel would present at the penalty phase, was objectively unreasonable.

**Failure to adhere to standard of practice with respect to the selection and use of mental health experts for the defense**

112.    On May 22, 2000, counsel had Mr. Bernard evaluated by psychologist Dr. James Shinder. For several reasons, counsel's actions in this regard fell below the minimum standard of practice.

113.    First, reasonably effective counsel would have been aware that a minimally adequate mental health evaluation cannot be accomplished in the absence of a thorough social history investigation.   This is because the results of such an investigation may be necessary for the evaluating expert to provide context for interpreting, *e.g.*, current or prior test data or information obtained in clinical interviews.   The standard of practice for defending capital cases in 1999-2000 required counsel to conduct such an investigation before deciding what kind of experts to employ in the first place.  Reasonably effective counsel would have been aware of this norm, as it had been reflected in professional journal articles as well as in every reputable training program for capital defense attorneys since at least the mid-1990's. *See, e.g.,* Liebert & Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J. FORENSIC PSYCHIATRY 4:43 (1994) (thorough social history is prerequisite for reliable mental health evaluation). Mr.

919

Bernard's attorneys fell below the standard of practice in engaging an expert without first having compiled the necessary body of information about their client's background and history.

114.    Second, it appears that counsel decided to have Dr. Shinder evaluate Mr. Bernard "to specifically assess [his] intelligence quotient" and "to determine his overall psychological functioning." The former concern (allegedly regarding Mr. Bernard's I.Q.) is difficult to understand except as it reflects counsel's failure to spend much time with their client or obtain any of the many available records documenting his academic performance, which is not suggestive of significantly sub-average overall intellectual functioning. The latter goal (of determining Mr. Bernard's "overall psychological functioning") suggests that counsel may have been attempting to determine whether Mr. Bernard was suffering from a mental disease or defect, an inference strengthened by the fact that Dr. Shinder concludes his report by stating a number of diagnostic impressions indexed to the Diagnostic and Statistical Manual of Mental Disorders. Seeking such an examination suggests that Mr. Bernard's counsel were laboring under a misguided and needlessly narrow conception of what might be relevant as a mitigating factor at the penalty phase, and one entirely at odds with the prevailing standard of practice for defending capital cases in 1999-2000. The

115.    Moreover, even if there were a reasonable strategic justification for having Mr. Bernard submit to a psychological evaluation of this type, counsel performed deficiently in waiting until trial had begun to undertake such an important task. The

Declaration of David A. Ruhnke
Page 52 of 82

920

report reveals many potentially mitigating facts which would require additional investigation and development before counsel could make an appropriate judgment about whether to introduce them at the penalty phase, and by the time counsel obtained this information there was insufficient time to accomplish the careful and thorough investigation and deliberation required by the prevailing standard of practice. Of course, reasonably effective counsel would have previously been aware of these facts, having uncovered them in a properly conducted social history investigation of Mr. Bernard.

116. 

117. Having failed to conduct a thorough investigation into Mr. Bernard's background and history, counsel apparently were unaware that his background includes certain facts and circumstances which would have alerted reasonably effective counsel in 1999-2000 to the need to have Mr. Bernard evaluated by a qualified neuropsychologist. For example, the fact that Mr. Bernard had experienced several head traumas, including two that resulted in his being rendered unconscious (one of

Declaration of David A. Ruhnke
Page 53 of 82

921

those occurring in the spring of 1999), was a clear indicator of a need for neuropsychological evaluation. Similarly, the fact that Mr. Bernard had regularly smoked marijuana dipped in formaldehyde or embalming fluid would have suggested to reasonably effective counsel in 1999-2000 that neuropsychological evaluation was in order. Such an evaluation would have shown that Bernard suffers from neuro-cognitive dysfunction which, along with all the other mitigating circumstances counsel failed to develop or present, would have been reasonably likely to result in a life sentence at the punishment phase.

118.     The potential significance of neuro-psychological dysfunction as a mitigating circumstance was well known and widely recognized in the capital defense community by the mid-1990's. Every national capital defense training program I recall from that era included at least some attention to the importance of seeking neuro-psychological assessment for clients whose histories included circumstances like those in Mr. Bernard's. It was, and is, understood that being alert to such signs is an obligation of reasonably effective *defense counsel* – not simply a area of concern that may be delegated to other members of the defense team.

**Failure to make an opening statement at the penalty phase**

119.    Counsel performed deficiently in failing to make an opening statement at the penalty phase. The prevailing norm of capital defense representation in 1999-2000 required that trial counsel develop and prepare an appropriate case in mitigation prior to trial, so that mitigating evidence would be available to present in the event the

Declaration of David A. Ruhnke
Page 54 of 82

922

client was convicted of an offense that could carry the death penalty. While the specific content of such a case in mitigation would necessarily vary from case to case, the standard of practice indisputably required trial counsel to be prepared to present the defendant's case in mitigation when the penalty phase arrived. The prevailing norm of capital defense representation in 1999-2000 also obliged trial counsel to take advantage of all appropriate opportunities to explain to the jury why death was not the appropriate punishment for the particular client. Mr. Bernard's counsel's failure in this regard is particularly notable, given that Vialva's attorneys made an opening statement, which may well have communicated to the jury that there was even less to be said on Mr. Bernard's behalf than on Vialva's.

120.    In short, it was objectively unreasonable for trial counsel not to know at the outset of the penalty hearing what mitigating evidence they intended to present and what relevance it had to the appropriateness of a life sentence for their client. Reasonably effective counsel, knowing in advance what evidence they intended to present in mitigation, would not forfeit the important opportunity to outline that case for the jury. In addition, reasonably effective counsel in 1999-2000 would have understood the need to make an opening statement at the penalty phase to "set the tone" for that portion of the proceedings, by explaining that the jurors' task was different – to decide the appropriate punishment, rather than simply determining whether the Government had proven certain facts, as in the guilt phase. It is important that counsel ensure, to the extent possible, that the jurors assume a different

923

mind-set with respect to the purpose of the penalty phase than they had assumed during the first phase of trial. By failing to make an opening statement at the penalty phase, Mr. Bernard's attorneys unreasonably abandoned a valuable opportunity to give the jury essential guidance in its sentencing task.

**Failure to prepare witnesses actually called to testify at the penalty phase, and to exercise due care in the selection of those witnesses**

121.    Counsel failed to prepare the witnesses they actually called to testify at the penalty phase. At least some of those witnesses report that counsel did not explain to them the purpose of their testimony, what they would be asked on direct examination, or what they might be asked on cross-examination. At most, it appears that counsel may have stated to the witnesses as a group, immediately prior to their testimony, that they were being called to testify about Mr. Bernard's character. Failing to prepare witnesses individually for their testimony, and to do so sufficiently in advance of the penalty phase to exercise reasonable professional judgment about whom to call and whom not to call, fell below the prevailing standard of practice in 2000.

122.    Counsel failed to exercise due professional care in the selection of which witnesses would be called to testify at the penalty phase. Several of the witnesses called to testify on Mr. Bernard's behalf report that their attendance as witnesses at the penalty phase was solicited by Mr. Bernard's mother, rather than by defense counsel. They were not subpoenaed. The prevailing standard of performance in 2000 required counsel to select their witnesses with care and not to delegate to any person outside the defense team the responsibility for communicating with those

Declaration of David A. Ruhnke
Page 56 of 82

924

witnesses and securing their attendance in court via subpoena.

123.    Mr. Bernard's counsel failed to prepare the witnesses they actually called to testify at the penalty phase, and examined those witnesses in a manner that was objectively unreasonable and deficient.  Reasonably effective counsel were obliged to prepare the witnesses they would call on Mr. Bernard's behalf by explaining to them the purpose of their testimony or what they would be asked on direct or cross-examination.  Counsel had not interviewed these witnesses and had no idea what they might know that would be relevant to Mr. Bernard's case in mitigation.  Counsel's examination of each witness followed the same pattern: a handful of questions directed to identifying the witness and establishing how long they had known Bernard, followed by a open-ended plea that the witness come up with something helpful, *e.g.*:

> [T]his part of the trial is really for a very specific purpose, and that's for these twelve good folks here on the jury to decide whether to give Brandon Bernard the death penalty, or life in prison without the possibility of release.  What kinds of things can you – what kind of information can you give to the jury that you think would help them in making that decision about Brandon Bernard?

(to Billy Spiller).  Counsel's examination of every defense witness followed this pattern.

124.    Counsel's failure to prepare their mitigation witnesses individually for their testimony, and to do so sufficiently in advance of the penalty phase to exercise reasonable professional judgment about whom to call and whom not to call, fell below the prevailing standard of practice in 2000.  Reasonably effective counsel

Declaration of David A. Ruhnke
Page 57 of 82

925

would have interviewed the witnesses in advance, identified the information they possessed which counsel wanted to elicit before the jury, and then structured the examination to elicit that information. Counsel appear to have chosen instead simply to call the witnesses to the stand, without knowing what they might say, and hope they might volunteer something to "help" the jury make its sentencing decision. Counsel's actions in this regard fell below the prevailing standard of practice in 1999-2000.

125.    Counsel also failed to exercise due professional care in choosing to call Billy Spiller and Isolde Rorie-Cody as defense witnesses at the punishment phase. Because counsel had never interviewed these witnesses or performed any meaningful investigation, counsel had no idea that Spiller and Rorie-Cody's own children were members of the same youth gang as Mr. Bernard. The credibility of both witnesses was devastated when the Government elicited this admission on cross-examination. Reasonably effective counsel would have been aware of this fact and would have either (1) developed this fact on direct examination as part of a broader mitigating explanation for how young African-American men became involved in gang activity in Killeen, or (2) chosen not to call these witnesses at all.

**Failure to develop and present readily available mitigating evidence concerning Mr. Bernard's successful adjustment to incarceration and his prior positive response to intensive supervision as a juvenile probationer**

126.    Counsel performed deficiently in failing to investigate, present and argue available, affirmative evidence of Mr. Bernard's successful adjustment to

Declaration of David A. Ruhnke
Page 58 of 82

926



incarceration while awaiting trial, as well as his positive response to intensive supervision as a juvenile probationer. Reasonably effective defense counsel would have understood that evidence tending to show that a defendant has lived peacefully and productively in a structured environment like jail can persuade jurors to impose a sentence less than death. Moreover, reasonably effective defense counsel would have been aware that experience and research both indicate that capital jurors regard the defendant's possible future dangerousness as a vital consideration in choosing between life imprisonment and the death penalty. *See, e.g.*, Blume, *et al.*, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 CORNELL L. REV. 397, 398-99 (2001). Indeed, the Government in this case had given notice that it would seek to prove as an aggravating factor that Mr. Bernard was "likely to commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others." Reasonably competent capital defense counsel in 1999-2000 would have looked for such evidence. Nothing in the files of Mr. Bernard's trial counsel, much less in the case they presented at the penalty phase, indicates that trial counsel undertook any investigation in this area.

127.    The records of the McLennan County Jail documenting Mr. Bernard's pre-trial incarceration reflect that although he spent nearly a year in custody there, he was disciplined for misbehavior on only two occasions, and that neither incident involved violence against another inmate or against correctional staff. The two disciplinary reports do not reflect that Mr. Bernard possessed contraband or weapons, or that his

Declaration of David A. Ruhnke
Page 59 of 82

927

misbehavior was in any way gang-related. The latter point is vital because the Government's primary argument that Mr. Bernard would be dangerous in prison if not put to death rested on the claim that prisoners who had been gang members in the "free world" would inexorably be drawn into gang-related violence in prison once incarcerated. Reasonable counsel would have developed and presented this evidence through Mr. Bernard's records and the testimony of jail personnel.

128.    In addition, reasonably competent counsel would have investigated whether lay witnesses might also be able to testify to Mr. Bernard's successful adjustment to incarceration. Had Mr. Bernard's counsel done so, they would have found such witnesses. For example, Michael Cherry, then a fellow jail inmate and now an ordained minister, would have testified, *inter alia*, that Mr. Bernard was deeply remorseful and ashamed about his role in the crime; that Mr. Bernard was an active and enthusiastic participant in the jail Bible study group; that Mr. Bernard had a positive influence on the behavior of other inmates; that Mr. Bernard expressed concern about his family, including especially his younger brother Max, and how his actions had hurt them; that Mr. Bernard was haunted by the photographs of the victims that he saw during trial; and that Mr. Bernard was distraught that his involvement in the crime was going to result in his being separated forever from his own children. Comparable testimony was available from Rev. Jackie Hetzel, a "free world" minister who came into the jail to minister to the prisoners there and who had frequent contact with Mr. Bernard. Reasonable counsel in 1999-2000 would have

been aware that life verdicts in other federal capital trials around the country have demonstrated the effectiveness of presenting such evidence, which both displays the defendant's positive human qualities and shows the jury that he would not pose a threat of violence to other inmates or correctional staff if his life were spared.

129.    In addition, reasonably effective counsel would have investigated Mr. Bernard's juvenile criminal history and examined whether any comparable evidence existed with respect to those adjudications.  Had counsel conducted such an investigation, they would have discovered that juvenile probation officer Novotny Baez, who had supervised Mr. Bernard about two years before the Bagley murders, found that he generally responded very positively to supervision.  Ms. Baez would have testified, *inter alia*, that Brandon, who was on "intensive supervision," duly reported to her 2-3 times per week and was always at home when she made her unannounced visits to the family home once each week; that nothing about his character suggested a capacity for violence; that she felt extremely safe around Brandon and would have gone with him anywhere unaccompanied; that he was quiet, respectful, and well-mannered; that he had a calming presence; that she never thought twice about making her visits to the family home late at night, because she was completely confident that Brandon posed no threat to her; and that during this period of intensive supervision Brandon kept curfew, went to school as required, and worked regularly and successfully at a local Burger King restaurant.  Perhaps equally important, Ms. Baez could have testified that although the juvenile court originally ordered that Mr. Bernard reside in

Declaration of David A. Ruhnke
Page 61 of 82

929

the "Catch-22" residential facility in Brownwood for a full year, he was released after only six months despite the fact that he still had treatment needs.

130.    While it is my opinion that counsel in any death penalty case is obliged to develop and present available *"Skipper* evidence," counsel's failure to develop and present such evidence in Mr. Bernard's case is especially noteworthy because the Government had given formal notice that it would ask the jury to sentence Mr. Bernard to death based on the non-statutory aggravating factor of future dangerousness.  The Supreme Court emphasized in *Skipper v. South Carolina,* 476 U.S. 1 (1986), that evidence of a defendant's successful adjustment to prison can powerfully rebut a prosecutorial claim of future dangerousness.  Knowing that future dangerousness would form an important part of the Government's case for the death penalty, counsel were under a special obligation to develop and present available evidence that Mr. Bernard had successfully responded to supervision in the past and to incarceration prior to trial.

**Counsel's other errors and omissions in defending Mr. Bernard at the penalty phase**

131.    Mr. Bernard's attorneys also performed deficiently with respect to rebutting and explaining the evidence offered in aggravation by the Government.  To take one example, the Government presented evidence that Mr. Bernard had gotten in trouble at school, allegedly for provoking a conflict with another student by directing the latter's attention to the Mr. Bernard's gold teeth, which bore the letters "C.K." (allegedly an abbreviation for "Crip Killer," *i.e.,* a member of a Bloods gang).

Declaration of David A. Ruhnke
Page 62 of 82

930



Reasonably effective counsel would have been aware through investigation that shortly after and in response to this incident, Mr. Bernard went to his family dentist and had these gold caps replaced with plain ones, with no letters on them. That fact is documented by Mr. Bernard's dental records and could have been presented to rebut the inference that Mr. Bernard was incorrigible or a willfully "hard-core" gang member, and to disprove Ranger Aycock's claim that he saw the "C.K." on Mr. Bernard's teeth when he was arrested after the murders.

132. Defense counsel performed deficiently with respect to cross-examining Terry Brown at the penalty phase regarding his claim that he, Vialva, and Bernard, as the "Kick-Door Boys," had committed a large number of residential burglaries. These burglaries were an important part of the Government's case for Bernard's "future dangerousness." Reasonably effective counsel would have conducted an independent investigation into these allegations to determine if there were any documents or other records concerning these burglaries that implicated Bernard, which counsel unreasonably failed to do. Reasonably effective counsel would have impeached Brown with his sworn statement from his plea of guilty, in which he stated that the "Kick-Door Boys" consisted of himself, Vialva, and *Tony Sparks*, rather than Bernard.

133. Reasonably effective counsel would also have objected to the form of many of the prosecutor's questions and much of Brown's testimony. The absence of any objections from defense counsel made it possible for Brown from time to time to

931

testify in the form of a narrative, without having to respond to questions from the Government, and also allowed the prosecutor to frame many of his questions to lead Brown to the desired response, including by asking the same question repeatedly when Brown failed to answer as the prosecutor hoped. While reasonable lawyers might disagree about whether to interpose such objections generally, in this case I believe that any reasonable lawyer would have chosen to maintain an aggressive stance toward Brown. He was a cooperating co-defendant and much of his testimony was devastating for Bernard. Perhaps most important, Brown was not a skillful witness; when he was not being led by the prosecutor or permitted to testify in the form of a narrative, he appears to have been far less capable of testifying as the Government desired. Reasonable defense counsel would have pressed Brown, through interposing appropriate objections, to come up with his story on his own.

134.    Counsel also performed deficiently by permitting Government witnesses to exaggerate the length and seriousness of Mr. Bernard's prior criminal history, and to speculate about facts concerning which there was no proof they had personal knowledge. For example, witness Jeff Fholer was allowed to testify that Mr. Bernard at age 15 committed "several" burglaries in July 1995, while the truth was that he committed only two burglaries in July 1995. Police officer John Wedge testified that Mr. Bernard was involved in a burglary in January 1998; although some jurors might have understood from the context of his testimony that Wedge had misspoken and meant "January 1995," defense counsel failed to correct that misstatement explicitly,

Declaration of David A. Ruhnke
Page 64 of 82

932

leaving jurors who might not have been following the testimony closely to add a nonexistent burglary to Mr. Bernard's record.  Police officer Alex Gerhardt testified that although Mr. Bernard and his cousin Melsimeon Pollock were apprehended after one burglary with a single Nintendo game cartridge in their possession, they had had "plans to take other things."  The Government elicited from Gerhardt that one person victimized in a burglary by Mr. Bernard had been next door "helping a neighbor out" at the time of the burglary – a fact both irrelevant and unsupported by any evidence. Similarly, Ranger Aycock testified without objection that Mr. Bernard and Melsimeon Pollock committed "numerous" burglaries when Bernard was fifteen (the actual number of burglaries was three). Reasonably effective counsel likewise would have objected to Aycock's utterly speculative testimony that "some" of the so-called "Kick-Door Boys" (which, according to the version of events promoted by the Government at trial, included Mr. Bernard) "may have been" involved in other burglaries that did not involve the rest of the "Kick-Door Boys."

135.    Counsel unreasonably failed to object to speculative hearsay testimony from sheriff's investigator David Wical concerning an incident in which someone apparently rang the doorbell of a local woman and then got into a vehicle and drove away after she looked out.    While the Government later elicited testimony from Terry Brown designed to suggest that the incident was a narrowly averted residential burglary by the "Kick-Door Boys," it failed to present any substantial or reliable evidence from which a reasonable juror could conclude that the event alleged by

933

Wical was the same one claimed by Brown. By introducing the claim through Wical, however, the Government was able to imbue the story with the credibility of a law enforcement officer, rather than presenting it solely through the testimony of a compromised and unreliable cooperating co-defendant. Reasonably effective counsel would have objected to Wical's testimony.

136.    Counsel also performed deficiently in failing to challenge the testimony of Government witness John Bowman, called to testify that Vialva and Bernard had engaged in confrontations with other students at school as a result of their identification with the 212 PIRU gang. Reasonably effective counsel would have objected to Bowman's irrelevant testimony that Hispanic teenagers affiliated with the "Thirteeners" gang, "if they [go] to the penitentiary, [would] be Mexican [M]afia associate kids." No evidence had been presented to show that Bowman was qualified to testify about what gang, if any, Hispanic teenagers might join if sent to prison, and any such testimony was both grossly speculative and irrelevant by its own terms. Moreover, this testimony was highly prejudicial to Bernard, as it provided specious corroboration for the testimony of Dr. Richard Coons that a teenager who belonged to any gang in the "free world" would necessarily associate himself with a gang in prison. Reasonably effective counsel would have asked for a <u>Daubert</u> hearing to test Bowman's qualifications to make any such "expert" pronouncements, about these matters and others related to Bowman's asserted specialized knowledge about gangs, such as his global claim that "violence" is the "likely result[] of showing disrespect to

other gang members."

137.    Counsel also performed deficiently in cross-examining Bowman about the particulars of the incident in which Mr. Bernard was issued a citation for provoking another student by showing him Mr. Bernard's gold teeth, which bore the letters "C.K." ("Crip Killer.") In questioning Bowman, defense counsel suggested that Mr. Bernard had told the officer that "C.K." were his girlfriend's initials. Bowman denied ever having been told that, although he stated that Mr. Bernard "apparently" had made such a claim in an informal hearing at school after the incident. Defense counsel never introduced any evidence to show that Bernard ever had a girlfriend with the initials "C.K." Reasonably effective defense counsel would have known through investigation that Bernard never had a girlfriend with those initials. Introducing the suggestion through cross-examination of Bowman both created an expectation in the jury that such proof might be forthcoming; when it was not, the jury could only have drawn the conclusion that Mr. Bernard had lied in his campus-level hearing (and presumably to defense counsel as well). Reasonably effective counsel would not have pursued such a line of questioning without any factual basis for doing so, and an attorney who had reasonably investigated and prepared for trial would have known that no such factual basis existed.

138.    Counsel performed deficiently in failing to object to narrative testimony from Ranger Aycock, based on hearsay, concerning how the murder weapon originally came into Mr. Bernard's possession. Counsel performed deficiently in failing to

Declaration of David A. Ruhnke
Page 67 of 82

935

object to irrelevant and prejudicial hearsay testimony from Ranger Aycock regarding the gang affiliation of the "Bell brothers," as well as to Aycock's wholly unsupported claim that Mr. Bernard and the "Bell brothers" were "rivals" and "had problems."

139. Counsel also performed deficiently in failing to object to testimony by Aycock about his conversations with other members of the 212 PIRU gang and/or other persons, in which Aycock described having asked those persons for their opinions "rating" the four persons "charged in this crime" (apparently Vialva, Bernard, Lewis, and Brown). This testimony was objectionable on multiple grounds (*e.g.,* hearsay, inadmissible opinion, irrelevant, unduly prejudicial, etc.) and reasonably effective counsel would have objected to it.

140. Reasonably effective counsel would have objected to Aycock's long hearsay narrative regarding what he was told by James Presley with respect to a fatal shooting on December 31, 1998, at which Vialva was alleged to have been present. That irrelevant narrative also contained prejudicial and inflammatory characterizations of the shooting victim in that incident, whom Aycock claimed was "as square a fellow as you ever saw," with "no gang connection" and "no criminal history," and wholesale speculation about what thoughts ran through the mind of the deceased during the incident (*e.g.,* "he didn't know exactly how to react to it"). This testimony was prejudicial because it had nothing to do with Bernard and because it paralleled the elaborate overall comparison the prosecution was developing between the lawless defendants on one hand versus the law-abiding ("square") Bagleys on the other.

Declaration of David A. Ruhnke
Page 68 of 82

934

Reasonably effective counsel would also have known that Bernard was living with his relatives hundreds of miles away in Michigan at the time of that shooting on December 31, 1998, and would have made the jury aware of that fact.

141.    In cross-examining Aycock at the punishment phase, counsel amazingly invited a lengthy and damaging narrative including hearsay testimony supposedly expressing the views of other gang members concerning Vialva, Bernard, Lewis, and Brown, by giving Aycock an open-ended invitation to "[g]o ahead" and say whatever he liked. Then, in response to defense counsel's question about Terry Brown, Aycock volunteered non-responsive hearsay that Bernard "would assist and help and would not run from a fight," a characterization both false and directly at odds with testimony the defense later presented from its own witness Matthew Mitchell.

142.    As all these examples illustrate, Mr. Bernard's attorneys stood mute in the face of a great deal of extraordinarily prejudicial evidence to which any reasonable lawyer would have objected.  Notwithstanding the fact that 18 U.S.C. § 3593(c) provides that the Federal Rules of Evidence do not apply at the punishment phase of a federal capital trial, there are available legal grounds for pursuing the same goal of keeping unreliable and prejudicial testimony away from the jury.  The federal statute itself provides that evidence may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.  This is a familiar test and in fact is more generous than Rule 403 itself, under which the probative value must be "substantially" outweighed by unfair prejudice before the

Declaration of David A. Ruhnke
Page 69 of 82

937

evidence is inadmissible. In addition, the Eighth Amendment requires "heightened reliability" in capital sentencing proceedings, which may provide an independent legal basis for objection or for limiting instructions.

143.    In my own experience, federal district judges very often continue at the penalty phase to evaluate the admissibility of evidence largely on the basis of the same interests and policies reflected by the Rules of Evidence; indeed, the record of Mr. Bernard's trial reflects that the trial judge on several occasions during the punishment phase sustained conventional evidentiary objections by the Government to testimony offered by the defense, so there is no reason to believe he would have treated Mr. Bernard's lawyers any less fairly had they voiced comparable objections.

144.    Mr. Bernard's counsel took none of these steps, nor even appear to have considered them in preparing for trial. At the same time, nothing I have seen indicates counsel had any informed strategic reason for failing to challenge the introduction of the kinds of evidence described in the above examples, and no such reason readily comes to mind. Counsel's inaction in this regard fell below the prevailing standard of capital defense practice in 1999-2000.

**Failure to take steps to challenge or limit the Government's presentation of "victim impact" evidence at the punishment phase**

145.    Counsel failed to file appropriate *in limine* motions to limit the nature and extent of the "victim impact" evidence the Government would be permitted to introduce at the penalty phase. In 2000, the prevailing standard of practice for counsel defending capital cases required that counsel ascertain what, if any, "victim impact" evidence

the prosecution intended to introduce and evaluate all available strategies for contesting the admissibility of such evidence. In numerous federal capital cases prior to 2000, district judges had been persuaded to limit the type and amount of "victim impact" evidence the Government would be allowed to present at the penalty phase. Reasonable counsel would have been aware of this fact. In this case, counsel were aware that the potential victim impact witnesses had expressed very strongly the view that the death penalty was the appropriate sentence. For example, Donna McClure (mother of Stacie Bagley) had included in her written victim impact statement the phrase "Although it saddens me I know the death penalty is right." Likewise, Georgia Bagley (mother of Todd Bagley) included in her written statement the phrase, "I ask that they receive no mercy. Please <u>please</u> give them the death penalty. Todd and Stacie's blood cries out from the grave and just as they pleaded for their lives and did not receive mercy they now plead for justice – Hear their cries and avenge their blood." Rick Bagley (father of Todd Bagley) included in his written statement the phrase, "Once again I ask that you will impose the maximum penalty on the defendants." Reasonable defense counsel would have recognized that the testimony of witnesses with such an emphatic view as to the appropriate punishment, whether or not they would be allowed expressly to testify to those views at the penalty hearing, presented a significant risk of rendering Mr. Bernard's penalty hearing fundamentally unfair, and would have attempted to limit the scope and character of the "victim impact" statements to be offered.

Declaration of David A. Ruhnke
Page 71 of 82

93A

146.   Counsel failed to object to "victim impact" testimony that exceeded the scope of such evidence permissible under *Payne v. Tennessee*.   As the Fifth Circuit acknowledged in its opinion on direct appeal, part of the testimony of Donna McClure was irrelevant and might have been excluded upon a timely objection, and other "victim impact" testimony was admitted that improperly characterized the defendants and their offense. Mr. Bernard's counsel performed deficiently in failing to make appropriate and necessary objections to exclude such testimony.

147.   Counsel failed to object to evidence that was irrelevant under <u>Payne</u> and which, even if marginally relevant, was so inflammatory that it should have been excluded. For example, witness Anastasio Torres, himself a police officer with the Killeen ISD, was allowed to recount without objection a conversation about Todd Bagley's having considering becoming a police officer, including how Stacie Bagley had expressed her desire that Todd "[not] get involved in any of that violence that's out there," to which Torres had responded that violence could happen anywhere, but that if Todd pursued a career in law enforcement he would be "trained" and could "spot bad things" and "protect [her]."

148.   This testimony was objectionable and reasonable counsel would have objected to it.   Torres' testimony, at least as to his speculation about how Todd, properly "trained," might have responded to "bad things" and "protect[ed]" Stacie, was speculative, irrelevant, and highly unfairly prejudicial. It contributed significantly to the Government's overall campaign to paint the deaths of the Bagleys as a

940

particularly cruel irony – as with the Government's argument that the Bagleys were victimized precisely *because* they had "reached out" to the defendants – both in the beginning (in agreeing to give them a ride, failing to "spot" the "bad thing" that was about to ensnare them) and at the very end (as they went to their deaths singing hymns).

149.   Counsel unreasonably failed to object to "victim impact" testimony that had the obvious effect of communicating to the jury that the victims desired a death sentence for Bernard. For example, Georgia Bagley was permitted to address the jury directly, rather than answering questions from the prosecutor, and stated, "Please, I beg you, let justice be done for my children." Reasonably effective counsel would have objected to this improper testimony before Ms. Bagley took the stand (since counsel had been provided with a copy of the statement Ms. Bagley was allowed to read to the jury) and sought to exclude it.

150.   Counsel unreasonably failed to object to testimony from Rick Bagley that characterized the defendants as "brutal" and lacking "guts." Counsel failed to object to leading questions from the prosecutor on direct examination that had the effect of permitting the prosecutor to add his personal credibility to the witnesses' characterizations. For example, the Government asked one witness, "Tell us about Todd's character. Was he the type of person that would throw himself totally into whatever he was asked to do? In other words, whether it be in the military, or any other type of endeavor, that he gave it his all, it was a hundred and ten percent for

Declaration of David A. Ruhnke
Page 73 of 82

941

him, or nothing?").   Counsel failed to object, at both phases of trial, to the prosecution's improper use of testimony about the victims' lack of concern for material possessions to encourage the jury to compare the moral worth of their lives to that of the defendants'.

151.    In short, any reasonable capital defense lawyer in 1999-2000 would have recognized and anticipated that "victim impact" evidence poses a terrific threat to the fairness of the punishment phase.   Such evidence can – as it appears to have done here – effectively replace the moral inquiry properly understood to lie at the heart of capital sentencing with an emotional outpouring of sympathy for the deceased and unbridled righteous fury at the defendants.   Because the constitution imposes no *per se* bar to the admission of such evidence, it is defense counsel's duty to insist that the trial judge monitor the scope and character of such evidence to prevent the punishment phase from degenerating into a referendum on the respective value of the lives of the victims on the one hand and the defendants on the other.   Mr. Bernard's attorneys took no steps whatsoever in that regard, and in so failing to act fell below the prevailing standard of practice for attorneys defending capital cases in 1999-2000.

**Failure to take any steps to keep the jury from considering against Mr. Bernard evidence offered against co-defendant Vialva**

152.    Counsel failed to seek appropriate limiting instructions to ensure that the jury would not consider evidence against Mr. Bernard that was nominally offered by the Government against co-defendant Christopher Vialva.   Federal criminal prosecutions

942

routinely involve the joint trial of co-defendants, and the standard of practice requires counsel to object and/or seek appropriate limiting instructions to cabin the jury's consideration of evidence offered against other defendants but not against one's own client.

153.    In this case, for example, the Government presented at the penalty phase the testimony of psychiatrist Dr. Richard Coons, who stated that he had "examine[d] … the offense report records and the medical records as [to] Christopher Vialva," and who proceeded to testify at length about his opinion regarding "Mr. Vialva's future dangerousness." Mr. Bernard's counsel evidently understood Dr. Coons' testimony to be offered only against Mr. Vialva, because they conducted no cross-examination of Dr. Coons.

154.    Under such circumstances, however, the standard of practice required that Mr. Bernard's attorneys also seek appropriate limiting instructions to inform the jury that Dr. Coons' testimony could not be considered against Mr. Bernard. In the absence of such an instruction, there was no legal bar against the jury's doing so, or the Government's arguing for the death penalty for Mr. Bernard based on facts that came into evidence through Dr. Coons, as it did. For example, Dr. Coons testified that a person who "was capable of planning a situation that [would] place other people in danger," who could commit "theft for [his] own benefit," who could participate in "deliberation about the execution of people, … discussing it with co-conspirators and making a decision to execute people," would be "highly dangerous" and "does not

Declaration of David A. Ruhnke
Page 75 of 82

943

have a conscience," and thus "would present a significant danger in the penitentiary system." According to other evidence presented by the Government in the course of the trial, each of these descriptions could also apply to Mr. Bernard. Reasonably effective counsel would have sought limiting instructions to keep the jury from considering Dr. Coons' testimony against Mr. Bernard, and their failure to do so creates a high likelihood that the jury treated his opinion as applying not only to Mr. Vialva but also to Mr. Bernard.

155. Similarly, Dr. Coons testified that "[i]f [someone is] a member of a gang on the outside, they'll be a member of the gang inside." The Government had laid no foundation to show that Dr. Coons had any professional expertise related to gangs or prisons, or that he had any basis of knowledge whatsoever for offering such an opinion. Regardless of whether this testimony was nominally offered against Mr. Vialva, it had an immediate and prejudicial relevance to Mr. Bernard and Mr. Bernard's attorneys should have objected to it; if the court admitted it over their objection, they should have sought an instruction limiting its consideration to Mr. Vialva.

156. The harm from counsel's failure to make appropriate objections and seek limiting instructions is apparent from, *inter alia*, the Fifth Circuit's opinion on direct appeal, which found the evidence of Mr. Bernard's "future dangerousness" to be legally sufficient in part based on Dr. Coons' testimony regarding gang membership inside and outside of prison, which the Fifth Circuit treated as testimony offered against Mr.

Declaration of David A. Ruhnke
Page 76 of 82

944

Bernard.  *See United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2002).

157.    In addition, and for the same reasons, Mr. Bernard's counsel performed deficiently in not requesting an instruction to preclude the jury from considering the testimony of Anthony Davis against Mr. Bernard.

158.    On the whole, counsel's deficient performance indicates a complete lack of appreciation of the dangers of a joint penalty phase.  Reasonably effective counsel would have sought an instruction directing the jury not to consider against Mr. Bernard for any purpose the testimony of Dr. Mark Cunningham, whether on direct or cross-examination, or the testimony of Anthony Davis or Dr. Coons.

**Failure to object to prejudicial and improper closing argument by the Government at the punishment phase**

159.    Counsel failed to object to improper argument by the Government during closing argument at the punishment phase.  For example, counsel failed to object when the Government's attorneys repeatedly expressed their personal belief that they had proven their case, and attempted to impart their personal prestige to the Government's case. *See, e.g.*, Tr. 3200 ("we believe we have met the intent factors"), 3204 ("we believe we have [proved our case]"); 3210 ("This case is important. That's why we had all the evidence.  That's why we took our time to show you everything, to let you know all the evidence").

160.    Counsel also unreasonably failed to object to arguments that were themselves based on earlier, improper testimony.  For example, the Government argued at the punishment phase that "they almost got away with it, but something put them in the

Declaration of David A. Ruhnke
Page 77 of 82

945

mud." The latter reference to "something"'s having "put them in the mud" was a direct reference to the improper, inflammatory and irrelevant testimony of Chris Lewis at the guilt phase that "God" had pushed Mr. Bernard's car into the ditch, presumably to ensure their arrest, prosecution, and condemnation. This argument was objectionable and highly, unfairly prejudicial.

161.    Counsel unreasonably failed to object when the Government made arguments that were unsupported by the evidence and/or misstated or mischaracterized the evidence. For example, the Government repeatedly stated in argument, as it had been proven by the evidence, that Bernard set the fire. The Government also argued that Bernard poured lighter fluid on or in the trunk, which was directly contrary to the testimony of Terry Brown that Bernard sprayed lighter fluid only into the passenger compartment of the car. Similarly, the Government mischaracterized Brown's testimony about what Bernard knew about the "plan" after the meeting at Long Branch Park. This argument was impossible to square with Brown's actual testimony – that Bernard was told that the car would be burned, but *not* that Vialva intended to kill the Bagleys. The Government also, without objection, argued that the jury should "recognize" Bernard for having "assist[ed]" Vialva in Vialva's desire to be "top gangster." No evidence supported the argument that Bernard had engaged in any actions whatsoever with the intent of promoting Vialva's reputation as a "gangster." The Government claimed that Bernard's mitigation witness Matthew Mitchell never testified that Bernard said "that he was sorry for what he did." In fact, Mitchell had testified that

Bernard told Mitchell that his lawyers had instructed him not to talk about the crime with anyone.

162.    Reasonably effective defense counsel, in my view, would object to flat misstatements of the evidence in the Government's closing argument, at least where the factual matters misrepresented by the prosecutor are highly material, as they were in these instances.

163.    Perhaps most important, counsel were totally unprepared to respond to what the Government expressly called the central theme of its closing argument, *i.e.*, that Mr. Bernard was responsible for his own "choices" in taking part in the crime, and should be punished accordingly. Specifically, the Government repeatedly and emphatically rejected the suggestion by Mr. Bernard's counsel and his mitigating witnesses that Mr. Bernard was a "follower." Reasonably effective counsel would have known, having obtained the transcripts of the plea hearings of Lewis and Brown, that both Brown and Lewis affirmed under oath that Mr. Bernard set fire to the car only because he was directed to do so by Vialva, and that Vialva had generally issued directions to the others during the events of the crime.

**Counsel's failures, considered cumulatively, were prejudicial at both phases of trial**

164.    Based on my experience and training in defending capital cases, it is my opinion that counsel's numerous errors and omissions were prejudicial to Mr. Bernard at both phases of trial, in the sense that I find that they undermine confidence in the reliability of the verdict finding him guilty of a death-eligible offense and the jury's

Declaration of David A. Ruhnke
Page 79 of 82



verdict at sentencing.

165.    The only evidence of Mr. Bernard's knowing and intentional participation in a premeditated killing (both that he knew about the plan to kill the Bagleys, and that he took any action at the scene of their deaths that contributed to the murder) came exclusively from Brown and Lewis. Their credibility would have been completely undermined by a reasonably effective cross-examination, undertaken using all the available ammunition reasonable defense counsel could have assembled. In addition, the extraordinarily prejudicial impact of the introduction at the guilt phase of extensive and irrelevant evidence about gangs and about the character and religious devotion of the victims, all of which would have been challenged by reasonably effective counsel, supports this conclusion. I believe it is impossible to have confidence that the jury would have found all the elements necessary to expose Mr. Bernard to a death sentence if counsel had performed in accordance with the existing standard of practice in 1999-2000.

166.    With respect to the penalty phase, my view regarding the prejudice that resulted from counsel's deficient performance is informed by the report prepared for Mr. Bernard's post-conviction counsel by mitigation specialist Jill Miller, M.S.S.W. In my opinion and based on my experience, Ms. Miller's report reflects the information that would have been gathered in the course of any reasonably competent investigation of this case, had trial counsel conformed to the existing standard of practice. That report reliably indicates that there was a wealth of readily available

Declaration of David A. Ruhnke
Page 80 of 82

948

mitigating evidence which reasonably effective counsel would have developed and presented. Not only would this evidence have provided an independent basis for imposing a life sentence, but it would have dramatically undercut the Government's case in aggravation and thereby further altered the balance of sentencing factors to be considered by the jury. While a reasonably effective attorney would not necessarily have presented every detail included in Ms. Miller's report, Mr. Bernard's counsel were in no position to make informed strategic choices of any kind at the punishment phase because their wholesale failure to investigate left them ignorant of all the potentially relevant facts which reasonably competent counsel would have had in their possession.

167.     This fully developed portrait stands in stark contrast to the meager and misleading sketch of Mr. Bernard presented at the punishment phase of his trial. It is precisely the kind and quantity of evidence that, in my experience, can persuade a jury to spare the life of a youthful defendant like Mr. Bernard even when he has taken part in a terrible and tragic crime. In my opinion, if counsel had conducted an appropriate investigation into mitigating circumstances and presented the full picture of Mr. Bernard's life story to the jury that held his fate in its hands, there is a reasonable likelihood that at least one juror would have concluded that a sentence of life imprisonment without the possibility of release was the appropriate punishment.

Declaration of David A. Ruhnke
Page 81 of 82

949

I declare under penalty of perjury that the foregoing is true and correct.

Executed on *June 8, 2004*

_David B. Ruhnke_

DAVID A. RUHNKE

Declaration of David A. Ruhnke
Page 82 of 82

950



## RUHNKE & BARRETT
### ATTORNEYS AT LAW

DAVID A. RUHNKE
  MEMBER N.J. AND NEW YORK BARS
  davidruhnke@ruhnkeandbarrett.com
JEAN DESALES BARRETT
  MEMBER N.J. AND COLORADO BARS
  jeanbarrett@ruhnkeandbarrett.com

47 PARK STREET
MONTCLAIR, NEW JERSEY 07042
(973) 744-1000
FAX: (973) 746-1490

## Resume of Death Penalty Experience – David A. Ruhnke
### (Revised June 2004)

**Education**:    B.A., English Literature, Dartmouth College, 1965

J.D. *cum laude*, Seton Hall University, 1975
Class rank -1/250

**Work History**:

| | |
|---|---|
| 1965-1967: | Management trainee<br>Prudential Ins. Co. of America<br>Newark, New Jersey |
| 1967-1969: | Peace Corps Volunteer<br>Republic of the Philippines |
| 1969-1970: | Instructor of English<br>East-West Cultural Institute<br>Chiba City, Japan |
| 1970-1972: | Free-lance journalist/photographer<br>Part-time construction worker |
| 1972-1975: | Summer employment while in law school included project to revise New Jersey child-abuse legislation (summer, 1973) and law clerk in Office of the Federal Public Defender for the District of New Jersey (summer, 1974) |
| 1975-1976: | Law clerk to Hon. Lawrence A. Carton, Jr., Presiding Judge, Appellate Division of the New Jersey Superior Court |
| 1976-1983: | Assistant Federal Public Defender for the District of New Jersey |
| 1983-present: | Partner, Ruhnke & Barrett, Montclair, New Jersey |

951

Teaching:              Adjunct faculty member, Seton Hall University Law School, teaching primarily Criminal Law and Criminal Procedure (inactive at present).

Bar
Admissions:
                       State of New Jersey, 1975
                       State of New York, 1984
                       District of New Jersey, 1975
                       Eastern District of New York, 1983
                       Southern District of New York, 1983
                       First Circuit 2004
                       Third Circuit, 1977
                       Second Circuit, 1993
                       Tenth Circuit, 1997
                       United States Supreme Court, 1983

Memberships: American Bar Association New Jersey Bar Association; National Association of Criminal Defense Lawyers; Association of Criminal Defense Lawyers of New Jersey (Past President and chair of death-penalty committee); New Jersey State Bar Association, Criminal Law Section (former trustee); former member, Death Penalty Subcommittee, Federal Defender Advisory Committee, Administrative Office of the United States Courts (Defender Services Division).

FEDERAL DEATH-PENALTY CASES (trial level):[1]

- *United States v. Bing Yi Chen* (S.D.N.Y. 2003). Court-appointed by Hon. Deborah K. Batts, U.S.D.J. Double homicide in context of large-scale drug-dealing. Pending authorization decision.

- *United States v. Christian DelRosario* (S.D.N.Y. 2003). Court-appointed by Hon. Gerard E. Lynch, U.S.D.J. Double homicide in context of large scale drug-dealing. Pending authorization decision.

- *United States v. Albert Burgos* (S.D.N.Y. 2003). Court-appointed by Hon. Loretta A. Preska, U.S.D.J. Single murder occurring in context of drug-dealing and gang activity. Pending authorization decision.

- *United States v. Freddy Abad* (S.D.N.Y. 2002). Court-appointed by Hon. George P. Daniels. Indictment alleges single murder, accompanied by torture and home invasion, of reputed drug dealer in unsuccessful effort to steal drugs and money.

---

[1]The date shown is the year of entry into the case as retained or appointed counsel.

952

Death penalty was not sought after it was demonstrated the defendant was mentally retarded.

- *United States v. John Petrucelli* (S.D.N.Y. 2002). Court-appointed by Hon. Thomas P. Griesa. Defendant accused of single murder occurring in 1995 in an organized crime context. United States did not request authorization to seek the death penalty.

- *United States v. Gary Lee Sampson* (D.Mass. 2001). Court-appointed by Hon. Mark L. Wolf, U.S.D.J. Defendant guilty of committing three murders in Massachusetts and New Hampshire while on run from bank robbery prosecution. Case tried from September through December 23, 2003. Death verdict. Pending appeal.

- *United States v. Michael O'Driscoll* (M.D.Pa. 2001). Court-appointed by Hon. Malcolm Muir, Senior Judge. Prisoner kills fellow prisoner at the United States Penitentiary, Allenwood. Defendant alleged to have a long and serious history of violence, including prior murder. Case authorized for capital prosecution. On March 4, 2003, non-unanimous jury returned life verdict.

- *United States v. Elijah Bobby Williams* (S.D.N.Y. 2000). Court-appointed by Hon. Naomi Reice Buchwald, U.S.D.J. Case brought pursuant to the Federal Death Penalty Act of 1994 and involves an allegation of a triple homicide occurring in the context of large-scale drug trafficking and racketeering. Case authorized for capital punishment, over contrary recommendation of United States Attorney. Pending trial March 2005.

- *United States v. Khalfan Khamis Mohamed* (S.D.N.Y.1999). Court-appointed by Hon. Leonard Sand, U.S.D.J. Case brought pursuant to Federal Death Penalty Act of 1994 and charged the defendant with participation in the August 1998 bombings of the American Embassies in Kenya and Tanzania, allegedly at the behest of the lead defendant, Usama Bin Laden. Case began trial January 3, 2001. Defendant convicted of the murder of 11 people in the bombing of the embassy in Dar es Salaam. On July 10, 2001, at severed penalty-phase, non-unanimous jury returned life verdict. Capital co-defendant also received a life verdict. Defendant withdrew appeal of underlying conviction.

- *United States v. Anthony Greco* (S.D.N.Y. 1999). Court-appointed by Hon. Lawrence McKenna. Case brought pursuant to Federal Death Penalty Act of 1994. Alleged single murder in organized crime context. United States did not seek capital authorization.

- *United States v. John Tibbs* (D.Mass. 1999). Court-appointed by Hon. Nancy Gertner, U.S.D.J. Drug "kingpin" case. Single murder. Department of Justice did

953

not authorize for capital prosecution.

- *United States v. Lee Arthur Taylor* (D.Mass 1999). Court-appointed by Hon. Nancy Gertner, U.S.D.J. Drug "kingpin" case. Single murder. Department of Justice did not authorize for capital prosecution.

- *United States v. Joseph Calco* (E.D.N.Y. 1999). Court-appointed by Hon. Edward R. Korman, U.S.D.J. Three murders set in organized crime/narcotics trafficking context. Defendant entered into cooperation agreement with the United States and death-penalty not sought.

- *United States v. Gurmeet Singh Dhinsa* (E.D.N.Y. 1998). Retained as co-counsel to Gerald Shargel, Esquire. Brought pursuant to Federal Death Penalty Act of 1994. Millionaire Sikh businessman charged with two murders-for-hire to silence witnesses to fraudulent scheme. Convicted after eight-week trial. Penalty phase ended in unanimous life verdict.

- *United States v. Clarence Heatley* (S.D.N.Y. 1996). Court-appointed by Hon. Sonia Sotomayor, U.S.D.J. Drug "kingpin" case. Nineteen murders. Death penalty authorized for Heatley and co-defendant. Both capital defendants plead out to life sentences.

- *United States v. Moses Clary* (D.N.J. 1996). Court-appointed by Hon. Joseph Rodriquez as co-counsel to Federal Public Defender. Brought pursuant to Federal Death Penalty Act of 1994. Bank-robbery shoot-out at suburban shopping mall. Two bystanders and one perp killed. Security guard wounded. (Guard killed one by-sander; dead perp killed other. Clary is the survivor.) Death-penalty authorized. Plead to life sentence.

- *United States v. David Paul Hammer* (M.D. Pa. 1996). Court-appointed by Hon. Malcolm Muir, U.S.D.J. Case brought pursuant to Federal Death Penalty Act of 1994. Prison killing at U.S.P./Allenwood. Defendant charged with strangling cellmate. Defendant confessed in grisly detail, said he did not fear the death-penalty and that, given the opportunity, he would kill again. Was serving equivalent of life sentences from Oklahoma. In federal custody as "transfer" since Oklahoma could not keep him from running economic and other scams from Oklahoma State Prison. IQ of 138. Death-penalty authorized and death verdict returned 7/98. Client withdrew appeal in order to speed his execution. *United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000). Client changed mind again and execution date of 11/15/00 was vacated. Petition for post-conviction relief is presently pending at the district court level.

- *United States v. Chen* (E.D.N.Y. 1995). Court-appointed by Hon. Edward R.

954

Korman, U.S.D.J. Case brought pursuant to Federal Death Penalty Act of 1994. Charged rape/torture/shooting death of Chinese immigrant held captive for ransom and/or repayment of fees owed to smugglers. Department of Justice authorized capital prosecution in summer of 1996. Plead guilty to life sentence.

- *United States v. Christopher Green* (D.N.J. 1995). Court-appointed by the Hon. Joseph H. Rodriguez, U.S.D.J., as co-counsel to Federal Public Defender. Case brought pursuant to Federal Death Penalty Act of 1994. On March 21, 1995, Christopher Green, a 29 year-old man with no criminal record, entered a small postal sub-station in Montclair, New Jersey and announced a robbery. After receiving approximately $5,000, he ordered the five people in the post office — two postal employees and three customers — to the ground and methodically shot each in the head with a 9mm pistol loaded with "Black Talon" bullets. Four of the individuals died instantly; the fifth survived made a full recovery. After several negotiating sessions, the United States Attorney dropped her request for the death penalty and, on June 8, 1995, Green entered a guilty plea to the indictment and was sentenced to a life sentence without parole on September 22, 1995.

- *Moore v. Reynolds* (W.D.Ok 1994). Court-appointed by Hon. Robin J. Cauthron, U.S.D.J., to represent death-sentenced Oklahoma inmate on federal habeas. Petition denied January, 1997. Decision affirmed by divided panel of Tenth Circuit. *Moore v. Reynolds*, 153 F.3d 1086 (10th Cir. 1998). Supreme Court denied *certiorari*. Board of Pardon and Parole refused clemency. Client executed 6/3/99.

- *United States v. Tyrone Walker* (N.D.N.Y. 1994). Court-appointed by Hon. Thomas J. McAvoy, Chief Judge. Drug "kingpin" case. Case went to trial from October 1995 to February 1996. Convicted. At penalty, jury found defendant responsible for two additional murders. Jury returned a non-unanimous life verdict.

- *United States v. Michael Murray* (M.D.Pa. 1993). Court-appointed by Hon. Sylvia H. Rambo, Chief Judge. Drug "kingpin" case. Young client (19) charged with drug-related shooting of 20 year-old drug-dealer. Alleged "kingpin," although charged with having ordered killing, did not face death penalty. Case plead out on June 16, 1994 after one week of jury selection to max 27-year sentence. Unfortunately, the trial judge rejected the plea bargain and in late June, 1995 the defendant was permitted to retract his guilty plea. The case was scheduled to go to trial on July 21, 1995. Defense counsel sought Justice Department review of the decision to seek the death penalty and, over the objection of the local United States Attorney, Attorney General Reno withdrew capital authorization. The case went to trial as a non-capital murder case and defendant was convicted and sentenced to life imprisonment. Murder conviction reversed by Third Circuit 1/3/97. *United States v. Murray*, 103 F.3d 310 (3d Cir. 1997) (Trial court erred in admitting second murder on 404(b)

q55

basis); *but see, United States v. Murray,* 144 F.3d 270 (3d Cir. 1998) (Permissible to re-sentence defendant to life sentence on drug counts without conducting new trial on reversed murder charge).

- *United States v. Dandeny Munoz-Mosquera* (E.D.N.Y. 1993). Court-appointed by the Hon. Sterling Johnson. Drug "kingpin" case. Defendant alleged "assassin" for the Medillin Cocaine Cartel; co-defendant was the late Pablo Escobar, alleged head of the cartel and then a fugitive in the Republic of Colombia. The capital count charged mid-air bombing of a domestic Colombia airliner (Avianca Airlines) in which 110 people — including two American citizens — were killed. The United States Attorney in Brooklyn eventually declined to seek Justice Department authorization and the case went to trial as non-capital prosecution.

- *United States v. Thomas Pitera* (E.D.N.Y. 1992). Court-appointed by the Hon. Reena Raggi, U.S.D.J. Drug "kingpin" case. First such prosecution in Eastern District of New York., Case alleged nine murders set in context of organized-crime RICO and CCE. Client was 38-year old alleged male [you have made] member of Bonnano organized crime family. At conclusion of guilt-phase, jury convicted client of seven homicides. At death-penalty phase, divided jury returned life verdict.

- *United States v. Bilal Pretlow* (D.N.J. 1992). Court-appointed by the Hon. Harold A. Ackerman, U.S.D.J. Drug "kingpin" case. First such case in District of New Jersey. After several weeks of trial, 21-year old client committed suicide by hanging self in jail cell.

STATE DEATH-PENALTY CASES (trial level):

- *State v. James Minett* (New Jersey Superior Court 1996). Murder-for-hire of defendant's girlfriend. Shooter cooperated and testified. Life verdict spring 1998. Conviction affirmed on appeal. Pending federal habeas filing.

- *State v. William David Jones* (New Jersey Superior Court 1995). Designated counsel by Public Defender. On July 19, 1995 defendant was arrested for knife-, bat- and pitchfork-slaying of acquaintance. Related charge of sexual assault. Case tried in fall of 1999 into early 2000. Jury convicted of capital murder after seven days of deliberations. Jury deliberated slightly over one hour after three-day penalty-phase presentation and did not find any aggravating factors. Guilt-phase verdict pending appeal.

- *State v. Eddie Lee Oliver a/k/a Al Damany Kamau* (New Jersey Superior Court 1993). Designated counsel by the Office of the Public Defender. Defendant charged with June 3, 1993 murder of a Newark Police Officer as he waited to testify in the

a56

hallway outside a courtroom on the 11th floor of the Essex County Courthouse in Newark, New Jersey. In the ensuing escape attempt, a sheriff's officer was shot in the chest. Defense was insanity. Jury convicted after five days of deliberations but, after two days of penalty deliberations, returned a non-unanimous verdict rejecting death penalty.

- *State v. Anthony McDougald* (New Jersey Superior Court 1990). Designated counsel by the Office of the Public Defender. This was a double-murder by stabbing of the parents of the 13-year old girlfriend of 27-year old defendant. After the murder, he inserted baseball bat into the vagina of the mother with the comment that this was in retaliation for her having given birth to the 13-year-old. Aggravating factors are that the murders were outrageously and wantonly vile and that there were committed to avoid prosecution for another offense. (The statutory rape of the 13-year-old.) This case was a penalty-only re-trial after the New Jersey Supreme Court affirmed the murder convictions but vacated the death verdict. See *State v. McDougald*, 120 N.J. 523, 577 A.2d 419 (1990). On November 18, 1995, following six weeks of jury selection and a two-week trial, the jury returned a verdict for life.

- *State v. Bryan Coyle* (New Jersey Superior Court, 1991). Designated counsel by the Office of the Public Defender. This was a shooting death of the husband of a woman with whom defendant was romantically involved. Aggravating factors were that defendant has a prior murder conviction and that the filling was outrageous and wantonly vile in that it was a killing committed purely for the pleasure of killing. First jury convicted and imposed death sentence. This was a re-trial following the New Jersey Supreme Court's reversal of both the guilt- and penalty- phase verdicts. See *State v. Coyle*, 119 N.J. 194, 574 A.2d 951 (1990). After plea negotiations, prosecution withdrew aggravating factors and defendant plead guilty to murder and was sentenced to 30 years.

- *State v. Julius Boeglin* (New Jersey Superior Court 1990). Retained as counsel to handle pre-trial motions and jury-selection only. Aggravating factors are murder-by-hire and avoiding detection for another offense. Allegations were defendant — the son of a millionaire industrialist — paid another to kill victim for informing on defendant's drug activities. Case went to trial with substituted counsel and jury returned verdict of non-capital murder.

- *State v. James Jerald Koedatich* (New Jersey Superior Court, 1990). Designated counsel by the Office of the Public Defender.) Case involved the kidnaping, sexual assault and stabbing murder of an 18-year old adopted Korean girl. Aggravating factors were the defendant's two prior murder convictions; that murder was committed in a manner that was outrageous and wantonly vile; that murder was committed for the purpose of escaping detection for the other felonies; and that

951 c

murder was committed in the course of certain other felonies. This was a penalty-phase only re-trial. Because of the massive publicity, venue was moved out of the county where the crime occurred to a rural adjacent county. Trial took place in the summer of 1990. Jury selection took approximately five weeks. There was one week of penalty-phase evidence. Jury was unable to agree unanimously on whether the death penalty should be imposed and, therefore, as required by New Jersey law, defendant was sentenced to life imprisonment.

- *State v. Eneida Berrios* (New Jersey Superior Court, 1983). Designated counsel by the Office of the Public Defender. Case involved the arson-murder of a six-year old child motivated by an argument between two families in the City of Newark. Building was set on fire in the middle of the night. Child was trapped. Aggravating factors were that defendant hired the arsonist and that the murder was outrageously and wantonly vile. Case tried in 1986. Defendant found not guilty at conclusion of guilt phase.

## APPELLATE DEATH-PENALTY EXPERIENCE

- *State of Delaware v. Thomas Capano*, 781 A.2d 556 ((Del.Supreme Ct. 2001). Retained as appellate co-counsel to politically prominent attorney found guilty of murdering his girlfriend (appointments secretary to the Governor of Delaware) and disposing of her body at sea. Sentenced to death. Conviction and sentence of death affirmed by Delaware Supreme Court. *Certiorari* petition pending in United States Supreme Court raising *Apprendi* challenge to Delaware capital punishment scheme. Outcome of case will be controlled by analysis of the United States Supreme Court's decision in *Ring v. Arizona*. Case is now in state post-conviction at the trial level.

- *State v. John Martini, Sr.*, 144 N.J. 603, 678 A.2d 164 (1996). Martini was New Jersey's first potential "volunteer" for execution. Served as counsel to *amicus curiae*, the Association of Criminal Defense Lawyers of New Jersey, taking the position that an otherwise competent defendant may not waive a state court post-conviction challenge to a death sentence where the attorneys handling the case are of the view that there are meritorious issues to be presented. Court accepted that argument. Societal interest in reliability of death sentences outweighs individual defendant's wish to forgo post-conviction review. *State v. Martini*, 144 N.J. 603, 678 A.2d 164 (1996).

- *State v. Marshall*, 130 N.J. 109, 613 A.2d 1059 (1992). *Marshall* was the first death sentence affirmed by the New Jersey Supreme Court. See, 123 N.J. 1, 586 A.2d 85 (1991). (Defendant was convicted of hiring others to murder his wife for insurance proceeds and was subject of book and made-for-TV movie entitled "Blind Faith.") In this aspect of *Marshall*, served as counsel to *amicus curiae*, the American Civil

Liberties Union of New Jersey, concerning the methodology to be employed by the New Jersey Supreme Court in carrying out statutorily-mandated proportionality review.

- *State v. Koedatich*, 112 N.J. 225, 548 A.2d 939 (1988). Defendant originally tried and sentenced to death in 1984. Firm became involved in the case on direct appeal to the New Jersey Supreme Court. Above-cited opinion affirmed defendant's underlying convictions by 4-3 vote but unanimously vacated the death penalty. See also, *State v. Koedatich*, 118 N.J. 513, 572 A.2d 622 (1990). State appealed trial court's decision to grant motion striking two of four aggravating factors on ground that previous penalty-phase jury had not been able to reach a unanimous finding that those aggravating factors existed. The New Jersey Supreme Court, in another 4-3 opinion, reversed the trial court and re-instated the dismissed aggravating factors which were then presented to the jury when the penalty-phase was re-tried in the summer of 1990. Jury returned life verdict.

## OTHER RELEVANT EXPERIENCE

- Qualified and testified as expert witness in area of effective assistance of counsel in handling guilt- and penalty-phases of capital-murder cases: *State v. Jermaine Wright* (Delaware Superior Court 1994); *Hooks v. Ward*, (U.S. Dist. Ct., W.D.Ok. 1997); *State v. Jackson*, (Delaware Superior Court 1998); *Mollett v. Ward* (U.S. Dist. Ct. W.D.Ok. 2000); *State v. Donald Loftin* (N.J. Superior Court 2004).

- April, 2004. Faculty Member, Capital Trial Advocacy Program, Plano, Texas. Small group leader and plenary presentations on mitigating evidence and future danger.

- March 2004. Faculty member and presenter Life in the Balance program, Memphis, Tennessee. Presented small group and plenary sessions on mitigation, closing instructions and penalty-phase summation.

- February 2004. Presentation at the mid-winter meeting of the Association of Criminal Defense Lawyers at San Antonio,. Texas, "Putting a Human Face on the Despised."

- July 2003. Presentation, the Airlie Conference, 2003 NAACP Legal Defense Fund, Inc. Capital Punishment Conference, Warrenton, Virginia: "What we are Learning About Mitigation: Findings from the LifeVote Project."

- March 2003. Faculty member at Federal Strategy Session and Life in the Balance programs, Austin, Texas.

959

- February 2003.   Faculty Member, Virginia Death Penalty College, Richmond, Virginia.

- October 2002. Presentation to First Circuit Judicial Conference, Chatham, MA. "The Ability of the Federal Courts to Handle Cases of International Terrorism."

- August 2002.   Faculty member, National Death Penalty College, Santa Clara University Law School, Santa Clara, CA

- April 23, 2002, Presentation, Internal Law Society, Suffolk University Law School, Boston, "International Law Issues Arising from the Embassy Bombing Case."

- National Seminar for Federal Defenders, Philadelphia, March 13-15, 2002. Presentation, "Mitigating Evidence in Death Penalty Cases."

- 2002 Federal Capital Defense Strategy Session, Kansas City, MO, March 8, 9, 2002. Presentations:  Discussion Leader, Caucus of First, Second and Third Circuits; "Political and Terrorist Prosecutions," (with Jerry Zerkin and David Bruck); "Mitigation: Federal Jury Findings" (with Margaret O'Donnell and William Brennan); "Ethical Considerations in Federal Capital Cases" (with Carol Kolinchak and David Lewis); "Litigating Racial, Ethnic and Geographic Diversity" (with Sam Gross and Tim Sullivan); "Mitigation that Opens the Door" (with Jerry Zerkin, David Bruck and Mark Cunningham).

- Faculty Member, South Carolina Bar Association's 17th Annual Update on the Criminal Law, Charleston, South Carolina January 2002, Panel, "The Criminal Law in the Aftermath of September 11."

- Faculty Member, Capital Trial Advocacy Program, Austin Texas, January 2002. Small group leader and plenary presentation, "Thinking About, Discovering and Presenting Mitigating Evidence"

- Faculty member, National Death Penalty College, Santa Clara University Law School, Santa Clara, CA, August 2001.

- Daylong seminar, "Saving Lives in a New Millennium," co-sponsored by the Association of Criminal Defense Lawyers of New Jersey and the ABA Death Penalty Representation Project, moderator and speaker, "Capital Cases – Answering the Hardest Question," East Brunswick, N.J., March 17, 2001

- Presentation, Federal Death Penalty Strategy Session, "Volunteers – Dealing With the Client Who has Lost the Will to Fight," Albuquerque, NM, March 3, 2001

- August 2000.  Presentation, the Airlie Conference, 2000 NAACP Legal Defense Fund, Inc. Capital Punishment Conference, Warrenton, Virginia: "Jury-Selection in Capital Cases."

- Faculty Member, Clarence Darrow Darrow Death Penalty College, University of Michigan Law School, Ann Arbor, MI, May 2000

- Presentation, Federal Death Penalty Strategy Session, "The Department of Justice and the Authorization Process," Crystal City, MD, March, 2000.

- Faculty member, National Death Penalty College, Santa Clara University Law School, Santa Clara, CA, August 1999.

- Presentation to Federal Defense Investigators Conference, New Orleans, LA, May 1999, "Investigating Mitigating Evidence."

- Life in the Balance, Atlanta, GA, May 1999 (National Legal Aid and Defenders Association), faculty member. Presentation at special federal death-penalty seminar and on "What to do When a Client Volunteers for Execution?" and "Opening Address to the Jury at a Penalty Phase."

- American Academy of Forensic Psychology, Philadelphia, PA, April 1998, co-presenter, with Alan Goldstein, Ph.D., of day-long presentation: "The role of the Forensic Psychologists in a Death-Penalty Case."

- American Academy of Forensic Psychology, Palm Springs, CA, January 1998, co-presenter, with Alan Goldstein, Ph.D., of day-long presentation: "The role of the Forensic Psychologists in a Death-Penalty Case."

- American Academy of Forensic Psychology, New Orleans, LA, January 1997, co-presenter, with Alan Goldstein, Ph.D. and Jean D. Barrett, Esquire, of day-long presentation: "The role of the Forensic Psychologists in a Death-Penalty Case."

- Life in the Balance, Dallas, TX, March 1997 (National Legal Aid and Defender Association), faculty member. Presentations on "Cross-examining the Government's Expert;" "Working with Expert Witnesses;" "Brainstorming the Case;" and "Direct Examination of Penalty-Phase Witnesses."

- Presentation, seminar sponsored by Federal Judicial Center, "Appellate Capital Case Issues: the Attorney's Perspective," Miami, FL, August 5, 1996.

- Presentation, "Death is Different," at training seminar sponsored by New York Capital Defender Organization, Rochester, NY, March 1996.

- Presentation, the Airlie Conference, 1996 NAACP Legal Defense Fund, Inc. Capital Punishment Conference, "Hard Lessons Learned from Federal Death Penalty Cases," July 26, 1996 at Georgetown University, Washington, D.C.

- Presentation, "Death is Different," at training seminar sponsored by New York Capital Defender Organization, White Plains, NY, October, 1995.

- Presentation, "Counsel in Federal Death Penalty Cases," 1995 meeting of Federal Defenders and Resource Center Directors, Marco Island, FL, January 1995.

- Presentation, "Why Death is Different," New York Association of Criminal Defense Lawyers, N.Y.U. Law School, New York, NY, February 1995.

- Presentation, "Opening Arguments in a Death Penalty Case," Life in the Balance (National Legal Aid and Defender Association), Austin, TX, March 1994.

- Presentation, "The Federal Death Penalty," July 1994 Capital Punishment Conference, NAACP Legal Defense Fund, Inc., Warrenton, VA.

- Presentation, "Litigating the Federal Death Penalty Case," Ohio Association of Criminal Defense Lawyers, Columbus, OH, December 2, 1994.

- Presentation, "Opening and Closing in Theme," 1993 Capital Punishment Conference, NAACP Legal Defense Fund, Inc., Warrenton, VA.

- Keynote speaker and panel member, "Saving Client's Lives in the 90's." Day-long seminar presented by the Association of Criminal Defense Attorneys of New Jersey, New Brunswick, N.J., Spring 1993.

# EXHIBIT 13



1

**JILL MILLER, MSSW**

Forensic Social Work Services        6701 Seybold Road, Suite 122
Madison, Wisconsin  53719
(608) 271-0227
FAX (608) 271-0491

## REPORT

**TO:**        Attorneys Rob Owen & Robert Gombiner
**RE:**        U.S. v. Brandon Bernard, No. W-99-CR-070
Results of Social History Investigation
**DATE:**      June 4, 2004


Brandon Bernard is currently under sentence of death for his role in the  car-jacking murders of Todd and Stacie Bagley, which occurred on Ft. Hood, in Bell County, Texas on June 21, 1999.  The trial in this case began on May 15, 2000, with jury selection.  The government began it's case in chief  on May 24, 2000.  On June 1, 2000, the jury returned guilty verdicts on all counts charged against Brandon Bernard and his co-defendant, Christopher Vialva.  The penalty phase began on June 8, 2000.  On June 12, 2000, the jury recommended, by unanimous verdict, that Bernard be sentenced to life imprisonment without the possibility of release for the murder of Todd Bagley, and that he be sentenced to death for the murder of Stacie Bagley.   Brandon Bernard remains confined at the United States Penitentiary in Terre Haute, Indiana during the pendency of his post-conviction proceedings.  Christopher Vialva was also sentenced to death in the same trial.  Co-defendant Tony Sparks was sentenced to life in prison, and co-defendants Terry Brown and Christopher Lewis, who were juveniles at the time of the offense, are serving sentences in facilities of the US Bureau of Prisons.  This report is prepared in support of Brandon Bernard's application for post-conviction relief.


## SOCIAL HISTORY

### Early Family History: 1949 - 1980

Brandon Anthony Micah Bernard was born on July 3, 1980, in San Antonio, Texas, to Thelma Johnson Bernard and Kenneth Bernard.  He is the first of their three children.  Thelma Johnson was born on February 2, 1952,

2

in Hayti, Missouri to Versia Mitchell Johnson and L.T. Johnson. She was the eighth of sixteen children born to the Johnsons; and had eight brothers and seven sisters. The Johnson family lived in a poor, rural area in the boot heel of Missouri, and worked as sharecroppers and migrant workers during Thelma's childhood. Thelma recalled that they picked and chopped cotton in Missouri, and went to Michigan in the summers, where they picked blueberries and cherries. She attended school in Michigan during the fall, and in Missouri during the spring. Thelma's sister, Mary Pollock, who is twenty months younger, said that she and Thelma would drive the tractor together as children. She noted that picking cotton was hard, and they didn't like it. Chopping the cotton was easier. Martha Johnson, Mary's twin, said that the large family always had food to eat. They had a large garden. Their mother canned food and sewed their clothes... "we managed." She noted that they did receive government commodities at times.

Versia Johnson is described has having been a strong-willed, "tough", and "God fearing" woman. She was a Seventh Day Adventist and raised her children in that faith. Thelma noted that there were some Native American blood on her mother's side of the family, and also described her maternal great, great grandfather as being very light-skinned... "he could pass as white." He is the ancestor who moved the family to Missouri. Mary Pollock said that their mother was a tough disciplinarian and would whip her children for infractions. Noting that her mother "had babies every two years....got tired", Mary said that her parents' marriage was strained. They would frequently argue. Thelma reported that her father was abusive towards her mother. She witnessed her father hitting her mother, and was determined to never be victimized in a similar fashion. The senior Johnsons separated and were divorced when Thelma was still a child. It appears that financial pressures and the abuse were factors in the divorce, though Martha Johnson thought that her father might also have been seeing another woman. Thelma said that on one occasion, when her father had hit her mother, her older brothers threatened to beat him. He left, and subsequently divorced Versia. Mary reported that her parents marriage was always stormy, and they separated and reconciled several times before finally divorcing.

Thelma is described by her sister Mary as having been a good student, and as always having been independent and strong-willed.... "she wanted to be in charge." Martha said that she always looked up to Thelma and described her as a person who always took care of her responsibilities. Martha said that Thelma was a loving and kind sister. Thelma reported that she started working - apart from the farm work she had always done with her family - at age fifteen, taking a job at the local high school. After graduating from high school in May, 1970, she enrolled in at Oakwood College in Huntsville, Alabama. She worked and had loans to help pay for college. Mary noted that Thelma, having grown up as a middle child in a poor family,



3

was determined to escape her family's situation. She went to school in Huntsville for two years, then went to live with her older sister, Versia Howard, in Michigan, where she worked in a factory for a year before returning to college. Thelma graduated from Andrews University in Berrien Springs, Michigan, with a degree in nursing in August, 1975. She then went to work at Borgess Hospital, in Kalamazoo, Michigan. She was working at the hospital and living with her sister when she met Kenneth Bernard in late 1975.

Kenneth Bernard was born on April 13, 1949 to Mary Paige Bernard. He does not know who his father was and doesn't know where the Bernard name came from. Mary Paige had been adopted by Leola and William Paige. Kenneth knows little about his mother's early life. He is the oldest of six boys born to his mother. A sister died at birth. One brother is deceased, and the others still reside in New Orleans. Mary Paige was described as an alcoholic. Kenneth can remember his mother drinking. He believes that his deceased brother Gerald also had problems with alcohol. Stating that his mother "had issues of her own", Kenneth said that Mary Paige "sold her body." He noted that his mother was out a lot at night, and often brought men home.

Kenneth can remember that as a child, he and his mother lived in a small apartment above a bar. He slept in the same bed as his mother. She would bring men home and into the bed with him, where she would have sex. He and his brothers were removed from his mother's custody by the state when Kenneth was about seven years old. They were placed in a foster homes. Kenneth was placed with three of his brothers; the other two were in a different home. Kenneth's foster parents were named Boudreau. Kenneth thought that he lived with the foster family until he was about twelve years old. At that time, his brother Gerald wanted to leave. Gerald argued with the foster parents. Kenneth and his brothers were then sent to live with a maternal aunt, Annie Paige. Kenneth saw little of his mother when he was in foster care, but recalled that when he did see her, "she was a loving parent...she just couldn't take care of us." Mary Paige died of complications of alcoholism when Kenneth was about ten years old.

While the foster family had been kind to Kenneth and his brothers, his aunt was described as strict and abusive. She would whip Kenneth and his brothers with a strap. Kenneth said that his uncle was also mean. Annie Paige had children of her own, and Kenneth felt that she favored her children over Kenneth and his brothers. She often kept Kenneth out of school and made him care for the younger children. He said that he loved school, but struggled to learn because he missed so much school. Kenneth recalled that he got behind in his school work, and had to repeat a couple grades. He persevered and graduated from high school in 1969, at age twenty. None of his brothers finished high school. Kenneth thought it was possible his

brothers had learning problems. It appears that Kenneth may have some learning problems, as well. He reports having memory problems, particularly short term, but also had great difficulty in reporting the ages or birth years of his brothers.

Upon graduation from high school, Kenneth enlisted in the Navy. He trained at Sacramento, California, and was stationed in Memphis, Tennessee and Pensacola, Florida before taking an early discharge in 1971. Kenneth worked for a time in the shipyards in New Orleans before going through a period during which he admits that he wasn't working and that he was smoking marijuana. He had a son by a woman he knew in New Orleans. He had no real involvement in this child's life. Finally, Kenneth said, an uncle persuaded him that he needed to straighten out his life. He moved with the uncle to Michigan in 1975, where he got a job on the loading dock at an electrical plant. He also began taking classes at a local community college. He met Thelma Johnson through a friend. Kenneth recalls that, at the time, he felt Thelma "had a spiritual outlook" and might help him in his life. The two began dating.

Thelma recalls that when she met Kenneth, he seemed like a nice and polite young man. He would not talk about his early life, though she knew he had been in foster care and that he didn't know his father's name. In early 1977, Thelma became pregnant by Kenneth Bernard. She decided to have an abortion. Kenneth said that he didn't want the abortion, but decided to support Thelma in her decision. He felt that she didn't want to tell her mother, who would be upset due to their religious beliefs and the fact that Kenneth and Thelma weren't married. Kenneth stated that Thelma's mother was very controlling of her daughters, and didn't approve of Kenneth, who she referred to as "the devil." Kenneth felt that Thelma did whatever her mother told her to do. Thelma reported that she wasn't ready to be a mother. She knew that Kenneth didn't want the abortion, but she went ahead and had it. Later that same year, both Thelma's sister Cora, with whom she was living at the time, and Kenneth's uncle, with whom he lived, decided to move. Kenneth and Thelma decided to marry. Kenneth had lost his job at the electrical plant at that time, but Thelma was still working as a nurse. They were married on August 14, 1977. Thelma recalls that when she married Kenneth, remembering how her father had treated her mother, she told him that he better never hit her.

Prior to her marriage to Kenneth, Thelma entered the Army Reserves. She entered as an officer with the rank of 2nd Lieutenant. In March, 1978, Thelma Bernard decided to apply for active duty in the military. She said that Kenneth tried to discourage her, but she did it anyway. She said that one of the reasons she requested active duty in the Army was to get away from Kenneth. She reported that there was an incident with Kenneth that



contributed to her decision. She and Kenneth were arguing, when he threw water at her. She didn't tell Kenneth her reason for entering the military for many years. Kenneth reported that he and Thelma did have some differences early in their marriage. She accused him of being bossy; and he didn't like her telling him what to do. He also said that Thelma's mother interfered in the marriage.

Thelma left Michigan for Army training in June, 1978, leaving Kenneth behind. After completing her officer's training in mid July, she was assigned to Brooke Army Medical Center (BAMC) at Ft. Sam Houston in San Antonio, Texas. She was promoted to 1st Lieutenant at that time. Thelma's military records indicate that she was a Clinical Staff Nurse at BAMC. Her performance evaluations during her first fifteen months there were positive, and noted that she worked many hours of overtime voluntarily, and performed "her assigned responsibilities in an exemplary manner." She was described as "highly efficient" and as having "infectious enthusiasm for nursing." She was promoted to the rank of Captain on December 20, 1979. Kenneth joined Thelma in San Antonio in 1979. Within a few months, she became pregnant with Brandon. Thelma noted that she was using birth control pills at the time she became pregnant; the pregnancy was not planned.

## Early Childhood: 1980-1992

Medical records indicate that Brandon Anthony Micah Bernard was born at 5:37 p.m. on July 3, 1980, at Brooke Army Medical Center, Ft. Sam Houston, Texas. His birth weight was 6 pounds, 1½ ounces. He was described as generally healthy, with an Apgar score of 9. Records note that Thelma had a prolonged labor, 17+ hours, and suffered from pre-eclampsia (high blood pressure). Noting that the pre-eclampsia had been diagnosed in the later weeks of her pregnancy, Thelma said that her pregnancy was closely monitored during the final weeks, and labor was induced. She reported that she worked as a nurse at the hospital right up to the day of delivery. Thelma and Brandon were discharged from the hospital on July 6, 1980.

Thelma reported that Brandon was a generally healthy, though colicky infant. He was irritable and cried a lot. His developmental milestones were normal. He walked at about 10 months of age; said words at about 11 months; and was toilet trained at 18 months. He did sustain a head injury when he was a year old. Thelma said that he rolled off a bed onto a concrete floor. She took him to Brooke Army Medical Center, where his skull was x-rayed, with negative results, and he was sent home. Kenneth worked during the time they were in San Antonio. Thelma returned to duty following Brandon's birth. He was cared for by a babysitter. Her performance evaluations continued to be very positive, noting her high standards,

9168

discipline, integrity, loyalty, and "outstanding leadership abilities."

Thelma was transferred to Ft. Wainwright, outside Fairbanks, Alaska, in February, 1982. The family lived in a duplex on the base, near Bassett Army Community Hospital, where Thelma worked as a Clinical Staff Nurse. Kenneth did some part-time roofing and contracting work and took classes in architectural engineering at a local community college during the three years that they lived in Alaska. Brandon was cared for by a babysitter. Brandon has few memories of his time in Alaska, other than that it "was nice" and he liked the snow. He does remember that he got his dog, Peabody, while they lived there. Kenneth admitted that there was a strain in his and Thelma's marriage during this period. He felt she didn't support his efforts to get a college education; she felt he wasn't contributing enough to the support of the family or Brandon's care. Kenneth said he felt like "she was the husband and I was the wife." Thelma continued to receive very positive evaluations of her military performance. Records noted her "outstanding duty performance, leadership and organization skills...strong sense of responsibility. She was described as highly skilled, dedicated and respected.

Brandon experienced some health problems in Alaska. At age two he was reportedly diagnosed with asthma. He also suffered another head injury at about age two. Thelma stated that they lived in a two story townhouse. Brandon was watching television on the second floor. She said she heard a thump; went outside; and found Brandon unconscious on the ground. She took him to the emergency room at Bassett Hospital, where he was treated and released. They knew she was a nurse, and instructed her to observe him for complications of concussion. Brandon said that he had been watching Batman and decided to try to copy him, when he fell from the window. It is doubtful that he actually remembers this; he was probably told. Medical records reveal that Brandon was admitted to BAMC on April 26, 1986, at age four years, nine months for treatment of left otitis media (ear infection) and pneumonitis (inflammation of the lung caused by virus or allergic reaction). Records indicate possibility of asthma. Pneumonia was confirmed by x-ray. He was treated with medication and discharged on April 28, 1984.

In late 1984, Thelma was given a transfer by the Army to Ft. Hood in Killeen, Texas. Kenneth reported that he was the one who wanted the transfer, and that Thelma didn't want to go to Texas. She accused him of trying to manipulate her in the matter. Kenneth further noted that Thelma was unhappy about the move, and that it caused her to be "difficult...her moods were difficult." It appears that the marital relationship continued to be strained. The family left Alaska at the end of November, 1984, and drove to Texas, stopping at Disneyland along the way. Brandon remembers this trip. Kenneth recalls that Peabody rode in the back seat with Brandon, adding that Brandon was very attached to his dog. Thelma reported for duty



at Ft. Hood on January 14, 1985.

Thelma was stationed at Darnell Army Medical Center at Ft. Hood. Kenneth eventually got a part-time job driving a school bus, and enrolled in classes at the local community college. There were extended periods of time during which Kenneth did not work. Brandon was placed in day care until he started school in the fall of 1986. Kenneth reported that he and Thelma argued about who should take care of Brandon. Thelma felt that he should, since he wasn't working full time. He felt she wasn't being supportive of his efforts to continue his education. When they arrived in Killeen, the family lived for a short time on the base until the new home they purchased at 1712 Wickfield Way was completed. The family attended two different local Seventh Day Adventist Churches, one on Clear Creek Road and one on Rancier Street.

Brandon's asthma problems became worse after the family moved to Texas. He reportedly was taken to the emergency room at Darnell Army Medical Center (DAMC) several times for treatment of asthma attacks. On April 15, 1986, Brandon was admitted to the hospital after being taken to the emergency room following a severe asthma attack. Records note that he was in respiratory distress, and was anxious and mildly dehydrated. They further note that he had been taking Theodur, and another asthma medication. Problems indicated in the records were: respiratory distress due to asthma; anxiety; and potential deficit in nutritional status. His low weight was apparently a concern. Brandon was initially treated with IV medication. He has a memory of this hospitalization. Apparently something was wrong with the IV hookup and his arm bled profusely. He saw the blood coming out onto the bedding, and said, "it was scary." Brandon was discharged from the hospital on April 17th, with prescriptions for Alupent and Theodur, both for treatment of asthma. He recalls that he took asthma medication throughout his childhood and adolescence.

Thelma had some health problems following the move to Killeen, as well. She reported that in 1985, she fainted and had a seizure. At the time, it was discovered that she had a tumor on one ovary, for which she underwent surgery. She also had high blood pressure. Thelma noted that heart problems and diabetes run in her family. Military records indicate that she had difficulty maintaining the weight requirement during this period; she was overweight. The military eventually waived the weight requirement. Her performance evaluations in 1985 and 1986 rated her as "a superb clinician", and described her as conscientious, responsible, enthusiastic, self-directed and highly motivated. Evaluations, citing her outstanding performance, recommended that Thelma be given the opportunity to attend the Advanced Course at the Academy of Health Science and to complete her Master's Degree in nursing. She did attend the Advanced Course, completing it in

8

November, 1986.

Brandon was enrolled in the first grade at the Seventh Day Adventist Academy in Killeen on August 25, 1986. The Academy was a small, parochial school with between 50 and 100 students total in the 1st through 8th grades during the time Brandon attended. Class sizes varied from 5 or 6 to 10 to 12 students. They had only three teachers at the school, so there were multi-grade classes, generally with three grade levels in one room. The teacher would call children up to a table in the front for individual help. Debbie King, a fellow member at the Seventh Day Adventist church that the Bernards attended, also volunteered at the school. She described it as a pretty structured school with small classes, but also said that staff at the school were not adept at detecting learning problems that students might have had. She felt there were a number of students in the school with learning disorders or attention deficit disorder (with or without hyperactivity) that were not diagnosed and did not receive help.

Records indicate that Brandon was an average to above average student during his early years at the academy. He received all Satisfactory marks during his first grade year (1986-87), and a mix of Satisfactory and Excellent marks for the second and third grades. His first grade teacher was Mona Rae Ferris and his second grade teacher was Carolyn Stewart. Brandon's third grade teacher, Viddena Cruz, commented on his first quarter report card that Brandon was having difficulty in some subjects. He improved during the year. Achievement testing on several occasions generally yielded grade level scores, except for early in his third grade year (9-1988) when he scored below grade level.

Brandon and his family attended church every week, though Kenneth didn't always attend with them. The practice of Seventh Day Adventists is to observe the Sabbath from Friday evening until Saturday evening. Brandon regularly attended Saturday school, which is similar to the Sunday School offered by most Protestant churches. Brandon's mother remained a devout practitioner of the faith. Kenneth was less involved. Both Debbie King and Bonnie Wainwright, fellow church members, commented on the family's involvement in the church and Brandon's behavior. He was described as a quiet, polite and well-behaved child.

Thelma Bernard was transferred to a post at Ft. Fitzsimmons in Aurora, Colorado for several months in 1987, where she was the Head Nurse on the hematology and oncology wards. She also took graduate courses while in Colorado. She continued to be described in military evaluations as an outstanding clinician, who was exceptionally competent and intensely dedicated. Brandon remained at home with his father during the spring, but spent the summer months with his mother in Colorado. He was in a summer

971

day care program there.  Thelma was pregnant with her second child at the time.  Kenneth, stating that the marriage continued to be strained, said that he didn't feel that they should have a child at that time.  He said it was Thelma's decision to get pregnant, despite his feelings.  He said that his courses were difficult, and he was feeling that he couldn't handle the additional stress.  In September, 1987, Thelma applied for discharge from the regular Army, and appointment to the Ready Reserve.  Her discharge was effective November 30, 1987, with the reason for separation listed as "failure of selection for permanent promotion."    Thelma returned to Killeen in late 1987, and was reassigned to the 94th General Hospital, Mesquite, Texas, as a member of the Army Reserve.  She was promoted to Major effective December 1, 1987.  Thelma gave birth to a daughter, Quiona, on December 21, 1987.  In early 1988, Thelma began working at Scott & White, a medical clinic in Killeen.  She worked as a nurse for the Scott & White Insurance plan.

Brandon, though generally healthy, continued to have problems with asthma during his elementary school years.  He was frequently seen at the Scott & White Clinic for asthma attacks.  Brandon recalled that when he had serious attacks, he would have difficulty breathing, which was scary.  His asthma was generally managed with medication, both pills and an inhaler.  On one occasion, in March, 1990, Brandon was taken to the clinic following an attack that occurred because he had gone off his medication.  Records indicate that  he had run out of Theodur, and his parents hadn't obtained the medication he needed.

During these formative years of Brandon's it is clear, according to all concerned - Brandon, Thelma and Kenneth - that there was continuous strain in the Bernard marriage and tension in the household.  The parents did not communicate well, and held negative views of one another.  Thelma stated that she felt that she had to be the primary breadwinner; she felt that Kenneth didn't contribute adequately to the financial support of the household, nor did he help out enough at home.  Stating that she usually had to send Brandon to a babysitter, Thelma, referring to Kenneth, said, "I didn't know what he did" with his time.  He did attend school on a part-time basis.  She noted that he struggled with his course work and frequently had to repeat classes.  Thelma feels Kenneth may have a learning problem.  She also noted that Kenneth had a temper and often exhibited mood swings.  Conversely, Kenneth felt that Thelma didn't support his efforts to continue his education.   He admitted that school was difficult for him and that he struggled with his classes.  He said that Thelma was often gone, sometimes working two jobs, going to school  or just out.  Kenneth said that he and Thelma argued about his perceived lack of support from her.

Brandon described his mother as a very religious and resourceful woman, noting that she worked and went to graduate school while he was

growing up. He said he felt close to her and always felt he could talk to her. Brandon said that he always tried to listen to his mother and do what she asked. He said he didn't feel close to his father, and wasn't really able to talk to him. He remembers that things seemed tense in the home and that his parents frequently argued. Brandon reported that his father was verbally abusive towards his mother. Kenneth yelled at Thelma and called her names. Calling it "emotional abuse", Brandon said that his father tried to make his mother feel bad about herself. Brandon thought it was possible that his father had low self-esteem, and that he was bothered by the fact that Thelma was working and going to graduate school, while he struggled with his community college courses and only worked part-time. While Thelma was extremely successful in her professional/military life, where she was described as a highly skilled manager and exceptionally competent nurse, who had good rapport with staff and patients, she had less success in managing relationships in her personal life.

Brandon remembered a particular incident between his parents that he described as traumatizing. He recalls that it happened in the living room. He father was wrestling with his mother. He then held her down on the floor, so that she couldn't move and had difficulty breathing. She was crying and asking Kenneth to stop. Brandon said that he was very upset by the incident..."I was crying a lot that day...it really affected me." Brandon reported that he is very claustrophobic, adding that he felt this incident had something to do with it. Thelma remembered the incident, as well. She confirmed that Brandon has been claustrophobic since about age six or seven, but said she didn't know why.

Brandon saw himself as having been a quiet child and somewhat of a loner. He said that he was pretty active and energetic, and couldn't sit still for very long. Thelma thought that Brandon was a bit hyperactive as a child. She said he liked to be on the go, and had some problems with concentration and focus at school; he was easily distracted. Thelma had a theory that Brandon had some level of Down's Syndrome because his little finger curved in. Thelma, noting that a relative of Kenneth's has Down's Syndrome, still holds this idea about Brandon, even though he clearly is not retarded, which is a characteristic of Down's Syndrome. She said that she told Brandon of this belief as he was growing up. Brandon reported that his mother told him, when he was a child, that she thought he had Down's Syndrome, and he believed it. He stated that he believed there were different forms of Down's Syndrome, not all including mental retardation. He felt that if he had it, it just resulted in some type of learning disability.

The two parents also had very different parenting styles, and did not appear to communicate or agree on rules and discipline. This led to unpredictability and inconsistency in expectations for Brandon. While Thelma

973

agrees that she was probably too lenient with Brandon, she said she felt Kenneth was too rigid, demanding and strict.  Brandon said that this was one of the things his parents argued about.  Thelma said that Brandon was a generally well-behaved child who was respectful towards his parents and minded them.  Everyone interviewed described Brandon in this way.  Yet, it appears he was harshly punished by his father for infractions that would seem minor by most people's standards.  Thelma seldom punished Brandon and claims to not know much about Kenneth's discipline, stating that she wasn't home much.

Brandon described his father as having been "mean....really strict", adding that Kenneth had a temper.  He said he got "whuppings" a lot, and cited as an example of the types of things for which he could be whipped with a belt a time when he had been eating lemon and salt.  There was no explanation for what was wrong with this.  Another time, he recalled, he had some Nickleodeon slime that his mother had won.  He wanted to play with it and his father didn't want him to.  Brandon said that his father, "caught me with it...whupped me real bad with a belt...on my bare butt." He said his father used a cowboy belt with a large metal buckle.  Brandon commented that his father was moody, and that he "took his anger out with a belt."  He also called Brandon names, including "stupid", "ignorant" and "lazy."  When asked how things were during the period in 1987 when his mother was in Denver, and he was home alone with his father, Brandon responded, "the same...he was mean."  Brandon said that his father drank during these years (mid 1980's into early 1990s).  He drank beer on a daily basis.  Brandon described him "a mellow drunk", and said that beatings were not related to drinking.  Kenneth admitted that he drank beer, but denied abusing alcohol.

Thelma denied knowing about the beatings, but then said that she knew Kenneth had a temper and believed that he could've whipped Brandon. She noted that Kenneth "had a thing about doing chores around the house." If things weren't done to his liking or when he wanted them done, he would punish Brandon.  She agreed that Kenneth was verbally abusive, both to her and to Brandon.  Thelma said that Brandon was afraid of his father, and would often withdraw from him.  If his father yelled, Brandon would flinch or step back.  She also said that if she tried to intervene in Kenneth's discipline of Brandon, he'd tell her to stay out of it.

Kenneth admitted that he "was on Brandon a lot" and that he used a belt to punish him.  He said that he didn't want Brandon out in the neighborhood.  He did make him stay in the house a lot and made him do chores.  He said he would punish Brandon if Brandon didn't do what he asked.  While he admitted to spanking Brandon with a belt, he said that he didn't mean to harm him.  Then he said that he was "always careful about where I whipped him" (where on the body), and denied "brutalizing him."

974

Kenneth said that he and Thelma argued about his discipline of Brandon. Dettrick Spiller, a neighborhood child and friend of Brandon's, who lived across the street from the Bernards, recalled that Brandon had to stay in the house a lot when other children were able to be outside playing. He described Kenneth Bernard as "loud" and "strict", and said that there were many times when he could hear Kenneth yelling at Brandon and could hear the sound of the belt. When asked how frequently he would hear this, Spiller responded that it occurred about once a week or so. Dettrick said that Brandon wouldn't talk about it.

Brandon said that Kenneth's other form of punishment was worse than the "whuppings", which, he said "at least would end." The other "punishment" was confining him to his room for long periods of time. Brandon remembered one time when he was confined to his room for three months, only being able to come out for school and meals. Brandon had to do a lot of chores at home, and if they weren't done when his father wanted them done, he'd be punished. Chores included such things as cleaning his room and the bathroom, doing the dishes, vacuuming, mowing the lawn, and taking out the trash. As he got older, he had to take care of his younger siblings. Kenneth admitted that he kept Brandon in the house a lot and made him do a lot of chores. He said that if he grounded Brandon, Thelma would argue with him. He felt she didn't back him. She felt he was too strict.

Brandon did have friends in the neighborhood and at school, including Dettrick Spiller, Michael Voegele and Matthew Mitchell. The latter two attended the Seventh Day Adventist Academy with Brandon. Michael Voegele met Brandon when they were in the second grade together at the Academy. He said that Brandon had "a different family life than I did...I was more spoiled." Voegele said that Brandon was a disciplined child who had respect for his parents. Brandon never got into trouble at school. Voegele said that Brandon was quiet and well-behaved. He said he and Brandon enjoyed playing basketball together. Voegele thought that Brandon might have had some learning problems, and recalled that Brandon sometimes had difficulty understanding things in school. Matthew Mitchell also met Brandon in elementary school. He recalled that Brandon loved to play with his friends. He described Brandon as a child who was "never one to go against the grain...would go along." He followed the lead of others. Dettrick Spiller was a friend from the neighborhood. Spiller said that he met Brandon in the 4th grade, when he and his family moved across the street from the Bernards. Dettrick and Brandon enjoyed playing street football and basketball. Spiller described Brandon as kind and funny.

Brandon sometimes visited maternal relatives in Missouri in the summers. His grandmother and his Aunts Martha and Ellen still lived together in Hayti, Missouri, where Thelma had grown up. Brandon thought

975

he did this for about three or four summers, stating that he usually stayed for a couple months. He said he enjoyed spending time there, and playing with his many cousins. Brandon added that his family also frequently visited maternal relatives in Missouri on holidays. While he was close to his maternal grandmother, Versia Johnson, he described her as a pretty strict disciplinarian who could be "mean." He said that she whipped him with a belt or wooden spoon, striking him on his butt, hand, legs or arms. Brandon added that his grandmother didn't like his father because Kenneth was not as devoted a member of the church as she was. She called Kenneth "the devil."

Brandon's fourth grade teacher at the Academy was James Starr. He had Mr. Starr for three years, the fourth through the sixth grades. Brandon did well during those years in performance classes, such as Art, Music, and Physical Education. He also did well in Bible class. His grades in language based classes, such as English, Reading and Spelling, began to deteriorate, as did his performance in Mathematics.. He received some D's and F's in these classes in the fourth and fifth grades. Teacher comments indicate problems with organization of work and time. Mr. Starr declined to promote Brandon from the fifth grade in May, 1991, until he completed a summer school course in English. Thelma reported that Brandon's teacher wanted to retain Brandon in the fifth grade, but she and Kenneth opposed the decision after Brandon "cried and cried." They persuaded the school to promote him to the sixth grade. Thelma acknowledged that school was a struggle for Brandon after that, though his grades for the sixth grade did improve somewhat. Brandon was prescribed glasses for reading in about 1991. He said he had blurry vision and that his eyes crossed. It is significant that during this period, when school performance deteriorated, there was a great deal of tension in the Bernard home due to marital difficulties between Kenneth and Thelma.

In about 1990, when Brandon was ten years old, his dog Peabody was struck by a car and killed. Brandon said it happened one morning before school. He saw Peabody laying on the street. They tried to get him to the veterinarian, but it was too late. Both Thelma and Kenneth said that Brandon was very attached to the dog, and it was a difficult loss for him.

Thelma became pregnant again in the fall of 1990. She said that her marriage to Kenneth was pretty rocky at the time. She reported that Kenneth wanted her to have an abortion, but she didn't want it. Kenneth agreed that things were difficult in the marriage during this period. He just referred to Thelma's pregnancy as "that decision...she blamed me." He claimed that he did want the baby, but that Thelma accused him of not wanting another child. During her pregnancy, Thelma's Army unit was called up for Desert Storm. She was unable to go due to being pregnant. Max Bernard was born to Thelma and Kenneth on June 10, 1991. Thelma's

mother spent the summer with the Bernards, helping to care for the new baby. During that period, Versia Johnson, who was diabetic, suffered kidney failure and had to go on dialysis. Stating that Thelma "was always off doing her Army thing", Kenneth said that Thelma didn't seem to want to take care of Max. He said that she was never very involved in the care of her children.

Following the birth of Max, Thelma took a position at Central Texas College as a lab coordinator. She remained in the Army Reserves, with duty as a head nurse in the emergency room at Darnell Army Medical Center. Performance evaluations continued to be very positive. She had previously been promoted to the rank of Major, in 1989. Kenneth continued to take courses at Central Texas College. Thelma noted that he had difficulty with his studies, and often had to repeat classes. Kenneth reported having memory problems and possible learning problems. He said that he was able to eventually get an associate's degree (two year), but was never able to finish his bachelor's degree. He felt he never got the encouragement he needed from Thelma. Thelma reported that Kenneth blamed her for his inability to complete his college education. Feeling that Kenneth was doing enough to help with the children, Thelma enrolled Brandon in a babysitting class at Ft. Hood. He began caring for Quiona and Max after school.

Thelma stated that Kenneth was very moody and angry during this period. She said he yelled a lot and had a temper. One time, during an argument, she said, "he hit me upside the face....and threatened to do it again if I made him angry." Kenneth said that he and Thelma just didn't communicate. Fellow church members felt that Kenneth might have had self-esteem issues, due to the fact that Thelma was the primary breadwinner, and he was often unemployed or only employed part time. Kenneth said that it was true that Thelma supported the family and he didn't earn much. He agreed that this was a source of tension in the marriage.

The family remained active in the Seventh Day Adventist Church during these years, though Kenneth was less involved than Thelma and the children. Brandon attended regular church services and Sabbath School on Saturdays. He often played basketball at the church on Saturday evenings. He participated in Pathfinders, a church youth group that did outdoor activities, including camping and hiking trips. Church members described Brandon as a very polite and respectful child who was generally quiet and reserved. He often helped out at the church including with such things as setting up for, or cleaning up after, fellowship dinners. Members said that Brandon would always do whatever was asked of him. He did not initiate activities and was described as a follower. He never got in trouble at church, the church school or church activities. Matthew Mitchell, a friend, noted that there was a school bully; when this youngster picked on Brandon, Brandon would just walk away. He wouldn't fight. Bonnie Wainwright, a church member and


977



volunteer at the school, commented on this, as well. She said that if other kids were instigating trouble, or provoking Brandon, he just backed up and left. She described Brandon as "a mild-mannered and sweet kid."

## Pre-Adolescence and Adolescence: 1992-1998

In June, 1992, Thelma experienced serious blood pressure and heart problems. She had to have open heart surgery to correct an atrial septal defect (hole in the heart). Brandon remembers visiting his mother in the hospital, stating, "it was traumatizing." His mother was sedated and had IV tubes in her arms. Quiona and Max were sent to spend the summer with maternal relatives in Missouri. Brandon remained at home to help take care of his mother during her recuperation. He recalled that his mother came home "with all those staples in her."

In August, 1992, Brandon withdrew from the Seventh Day Adventist Academy and enrolled in the seventh grade at Rancier Middle School, part of the Killeen Independent School District. He said that he wanted to go there so that he could play football. Medical records from Scott & White Clinic indicate that he had an athletic physical on August 4, 1992. He was not on medication for asthma at the time, and was described as healthy and "doing well." According to school records, Brandon was tested at Rancier in September, 1992. He passed the standardized math and writing tests, but did not pass the reading test. Achievement testing was generally in the average range on sub-tests, but language scores were low.

On September 7, 1992, an incident occurred in the Bernard home that led to the arrest of Kenneth, and the Bernards' subsequent divorce. Brandon recalls that his mother had come home with some new clothes for him. She wanted him to try them on. Kenneth insisted that Brandon wash the dinner dishes first. An argument ensued. Brandon said that his mother told his father that she would do the dishes later. He insisted they be done immediately. Thelma recalled the argument somewhat differently, saying that Kenneth wanted her to "put up the spaghetti sauce" from dinner, and she refused. Stating that she decided she "was going to go outside the bonds of marriage", Thelma said she told Kenneth she wouldn't pay his school bills anymore. Kenneth's version is that he did want Brandon to do the dishes, and put away the spaghetti sauce, and Thelma said it could wait. He wanted it done immediately. Kenneth said they argued; he grabbed Thelma and tried to pull her into the kitchen. Thelma said she grabbed a can of mace while Kenneth was pulling her into the kitchen. They struggled and he struck her in the chest. She noted that she had open heart surgery only three months before this incident. She fell to the floor and threatened to spray Kenneth with the mace. According to Thelma, Kenneth grabbed the can and sprayed her. Stating that Thelma had sprayed the mace on him first, he said, "that invoked a problem ...I didn't think...grabbed the mace...I was angry."

978

Brandon reported that he heard the noise of the argument and struggle coming from the kitchen. He went out of his room and saw his mother on the floor. His father was outside of the house, coughing. He went outside. Thelma said that Brandon grabbed the younger children and took them outside. She described him as being "very upset." She said that she then went into the bedroom and phoned the police. Brandon recalled that the police came to the house and arrested his father. Police department records indicate that Kenneth was taken into custody and charged with Assault with Bodily Injury; he was held in the Bell County Jail. He appeared in court on September 18, 1992, and pled guilty to the charge. He was sentenced to 20 days in jail, plus fine and costs. With good time credit, he was released that same day. He reportedly left the jail and went right to the house on Wickfield. Thelma stated that he broke a window to get into the house, while no one was home. Kenneth said that he went to the house to try to talk to Thelma and that she reported that he had threatened to kill her.

Following this incident, Kenneth said he got an apartment. At some point around this time, he lost his part-time job as a bus driver for the Killeen Independent School District. Kenneth said that he and Thelma had what he described as "a little mutual fund", which appears to have been a savings account. He took the money. He admitted that he then was "following her around asking for money...I had to eat, pay the rent."

On November 5, 1992, Thelma Bernard petitioned the court in Bell County for a protective order. The order applied to her and the three minor children, Brandon, Quiona and Max. The Court found that acts of family violence had occurred and were likely to occur in the foreseeable future. Kenneth was prohibited from committing family violence; communicating with Thelma or the children; and going within 1000 feet of the home or Thelma's place of employment. The order was granted for one year, to November, 1993.

On October 23, 1992, Brandon was seen at Scott & White Clinic for asthma problems. Records note that he was given a prescription for Theodur which he "needs today." Around this same time, he withdrew from Rancier Middle School and returned to the Seventh Day Adventist Academy to complete the seventh grade. His teacher was Rick Marasco. Brandon said that following the incident at home in September, and his parents' separation, he started having problems with schoolwork. His grades began to fall. He said his mother decided to put him back in the Academy.

Rick Marasco, who now works for the Killeen Independent School District, had known the Bernard family through the church and the school. He said that he knew that Kenneth had been a very strict parent, and that

979

Thelma was less so, though he described her as a conscientious parent who wanted her son in church school. After Kenneth left the home, Marasco noticed some changes. He felt that there was less structure in the home and that Brandon "watched way too much TV", something that would not have been allowed when Kenneth was in the home. Marasco described Brandon as "a neat kid...likeable." He said Brandon always did what he was asked, and was well-liked by his classmates. He added that Brandon was "a follower."

School records reveal that during the remainder of seventh grade (1992-93 year), Brandon's grades were primarily C's, with a few D's. He did better in performance classes, such as Art, Music, Computer Science and Physical Education. He received B's in Citizenship. Marasco said that Brandon behaved well at school and did not cause problems. He recalled that Brandon had difficulty with Math, and that low grades were due to not completing work or being disorganized. He thought that Brandon may have had some learning problems that weren't detected by the small church school.

Kenneth stated that he wanted to talk to Thelma about their situation. He was upset that she remained in the home with all their belongings, and he couldn't go there. He said he got the idea of getting the video camera and filming when he went to talk with her. It appears, from records, that before doing this, he broke into the house and took a number of items. On December 30, 1992, Thelma contacted the police department to report a burglary at the home and to report that Kenneth had violated the protective order. The police report indicates that a window had been broken at the home and that items, including a TV, VCR and camera, fish tank and other household goods, were missing. When the police arrived at the home, Kenneth was outside with the video camera. Kenneth admits that he had taken the items from the home, and that he was entering the home while filming with the camera when the police arrived. They took the camera and gave it to Thelma, then took him into custody for violation of the protective order. Kenneth appeared in court on February 3, 1993, and pled guilty to Violation of a Protective Order. He was sentenced to 45 days in jail, fined $100 and ordered to pay costs of $132. He had remained in custody since his arrest on 12-30-92, and was given credit for that time. At the time of his arrest, he was listed as unemployed. He was released from custody on the day of his plea and sentencing. He was not charged with the Burglary.

Following this incident, Thelma decided to file for divorce. Records indicate that a petition for divorce was filed in Bell County Court on January 6, 1993. Thelma alleged cruel treatment by Kenneth. Kenneth cross-complained alleging "discord or conflict of personalities." Thelma was granted the divorce and a decree was entered on July 16, 1993. Thelma admitted that during this period, between the separation and the divorce, she

went through some depression. She felt that Kenneth, prior to their separation, had periods of depression, as well. She said that his drinking had escalated in the months preceding the separation. Brandon said he was upset by his parents' divorce, and he worried about his father. He knew his father didn't have a job, and said that he "pictured him on the street....in a box...I didn't know how he was going to survive."

Brandon's fears were not unfounded. Kenneth reported that following his release from jail in early February, 1993, he lived in a homeless shelter in Copperas Cove for a few weeks. He said he tried unsuccessfully to get some money from Thelma. When he could no longer stay in the Copperas Cove shelter, he went to a shelter in Temple, the Home of Hope, which was run by the Catholic Church. He said that he remained in that shelter for about seven months, until late 1993. He was required to look for work, and finally got a job as a bus driver for the Temple Independent School District. He was eventually able to get his own apartment in Temple. He had no contact with his children during this time. Brandon said that he was greatly affected by the divorce and the fact that he didn't see his father or even hear from him. He said that there were times that he felt something bad might have happened to his father.

After Kenneth left the home, Brandon had to take on complete responsibility for Quiona and Max from after school until his mother got home from work. Max was in day care until entering school, so, at first, he primarily cared for Quiona. He recalled that when she was about five or six years old, in about 1993, she wandered away from the house one day, and was gone for a couple hours. He finally found her about two blocks away from their home. Thelma said she remembered this incident vaguely, and that Quiona had been found a couple streets over.

In the summer of 1993, Brandon, Quiona and Max were sent to their maternal relatives in Missouri. Martha Johnson, a maternal aunt, recalled that the children spent several weeks that summer in the home of Versia Johnson, their grandmother. Martha and Ellen Johnson, Thelma's sisters, lived in the home, as well. Versia, who had a history of kidney problems and was on dialysis, became very ill that summer. She reportedly had a stroke and had to be hospitalized for a time. Martha reported that Brandon behaved very well in the home and helped take care of Quiona and Max for the summer.

Brandon entered the eighth grade at the Academy in August, 1993. His teacher was once again Rick Marasco. He attended until January 3, 1994, when he withdrew to transfer back to Rancier Middle School. His grades for the first half of the year were primarily C's and D's, with better grades in performance classes. Marasco said that Brandon continued to behave well,

981

but seemed a bit "pensive."   He knew that the parents had divorced. Marasco noted that Brandon had nice friends at the school, including Matthew Mitchell and Michael Voegele.   Mitchell said that Brandon was quiet and didn't talk about his parents' divorce.  He kept his feelings in.  Mitchell recalled that there was another student in the eighth grade that used to bully Brandon and beat him up.  He said that Brandon wasn't a fighter and never reacted.  He would just shrug it off.  Both Mitchell and Voegele had made plans to go away for high school to a Seventh Day Adventist boarding school.  Thelma wanted Brandon to remain at home.  She had him transferred to Rancier for the second half of eighth grade in order to help him make the transition to public high school.  Brandon's performance for the second half of eighth grade was poor.  His grades in language based classes were very low: 71 in English; 70 in Reading; 68 in US History; and 71 in Science.  His best grade was in Athletics (89).  He did pass the standardized tests in Writing, Reading and Math, and was promoted to the ninth grade.

In the summer of 1994, before the start of the school year, Thelma and the children attended a family wedding in Michigan.  Her sister, Mary Pollock, was there with her three children, Salukis, Melsimeon and Naomi.  Mary had split up with her husband at the time.  Melsimeon, who is ten months older than Brandon, noted that he and his family had not been allowed to visit the Bernard home while Kenneth was still living there.  Thelma and Mary agreed, while at the wedding, that Melsimeon would return to Killeen with Thelma, and live with her family.  He enrolled in school in Killeen.  Later in the fall, Mary and her other two children went to live with Thelma and her family in Killeen.  Mary was unemployed for some time when she first lived there.

Brandon entered the ninth grade at Killeen 9th Grade Center on August 17, 1994.  He had a sports physical at Scott & White Clinic on August 24th, 1994.  Records indicate that he was healthy and his asthma was controlled by Theodur and a Ventolin inhaler.  Brandon's grades for the fall semester were very poor.  He barely passed Biology and World History, earning grades of 70 in each, the lowest passing score.   Susan McLaughlin, Brandon's Algebra teacher, noticed that his grades seemed to deteriorate in the late fall, after his cousin Melsimeon came into the home.   She could not recall any behavioral problems on Brandon's part at that time.  Brandon said that he found the transition to public school difficult.  The classes were large and there were too many distractions.  He said it was hard to concentrate and focus in class, and that he had trouble sitting still.  Brandon said that he continued to enjoy sports, particularly football and basketball, which he played at school or at church.  By this time, it had been two years since Brandon had any contact with his father.

After Brandon left the Academy and transferred to public school, he spent less time with his church school friends, and more time with peers from

the neighborhood.  One of them was Dettrick Spiller, who lived across the street.  Brandon reported that when they were in the ninth grade, they started a neighborhood group.  They called themselves, at first, The King of Spades.  He said it was just a group of kids who hung around together in the neighborhood.  Dettrick described the group the same way, and said they later called themselves the 415s.  They were a loosely formed group of neighborhood friends.

In November, 1994, Thelma was promoted to the rank of Lieutenant Colonel in the Army Reserves.  Her performance evaluations had continued to be extremely positive.  She was described as responsible and dedicated.  She was assigned as a medical surgical nurse in the emergency room at Darnell during 1992 and 1993.  She was encouraged by her superiors to seek further education including her Master's degree in Nursing.  By spring of 1994, she was assigned as a teacher to Nursing Education and Staff Development, and had enrolled in a graduate nursing program.

Melsimeon (hereafter Mel) said that Brandon had friends in the neighborhood, including Dettrick Spiller, when he (Mel) first arrived.  He said that Brandon and Dettrick would "talk about doing stuff", e.g. stealing or getting into trouble, but didn't do it.  Mel said that he had the courage... "I was about doing it."  He said that he didn't have any money, because his mother wasn't working, and he wanted money.  Mel suggested that he and Brandon  do something to get some money for Mel, adding, "I needed money ...Brandon didn't...he needed a friend, so he helped me."

Records indicate that on January 6, 1995, Brandon and his cousin, Melsimeon Pollock, entered the home of Kye Sun Laguerre and attempted to commit theft.  They reportedly had gone to see a friend, who wasn't home.  They went in the house and took Mrs. Laguerre's purse.  A petition was filed in Juvenile Court alleging that Brandon was delinquent, based on this offense.  Friends noted that Brandon's trouble began after Mel moved into the home.  Matt Mitchell described Mel as "hyper" and "slick", and as "not the best influence" on Brandon.   Dettrick Spiller described Mel as "goofy...loud", adding that Mel might come up with some idea to get money, and Brandon would go along.  Mel admitted that this was probably true.  He did say that when he did something wrong, his mother would discipline him.  Thelma, on the other hand, might yell at Brandon, but then she would go out and buy him something.  Brandon was involved in another incident in January, with Mel, in which he was picked up for shoplifting bolt cutters.  This occurred on January 20, 1995.  Brandon said that he wanted to use the bolt cutters to break into a swimming pool so he could go swimming.  There is no record of this being referred to juvenile court.  Thelma did take him out of Killeen 9th Grade Center at that time.  Records indicate he was withdrawn on January 23, 1995 at the request of his mother.  The reason given was that he would

be home schooled. There is no indication that any home school program was provided.

Both Brandon and Mel admit that during early 1995 they were doing some drinking and smoking some marijuana. Brandon said he also started smoking cigarettes during this time. Michael Voegele said he knew Mel from church, and knew that Mel smoked marijuana. He noted that Brandon never got into trouble until Mel came to live with Brandon's family. He said that Brandon never drank or used marijuana until he was with Mel. Dettrick Spiller said the same thing. Mel does not disagree, and admits that he and Brandon were doing some drinking and using some marijuana in early 1995. He stated, "when I came, I gave him the courage to do this stuff."

In the spring of 1995, Kenneth Bernard ran into Thelma at the local bank. He recalls that she was holding Max in her arms. He said that he hadn't seen his children since the fall of 1992. When asked why he made no effort to see them, he said first that Thelma had hid the children from him. When it was pointed out that they lived in the same house that he had left in 1992, he then pointed to the protective order and said he couldn't go there. The order had expired in November, 1993. Kenneth said that he and Thelma began talking. Thelma told him that Brandon was getting into trouble with his cousin.

Bonnie Wainwright, a fellow church member of the Bernards, noticed some things about Brandon during this period, in the months after Mel had begun living in the home. Mel and his family attended the same church. She described Mel as "kind of arrogant...charming", and said she tried to talk to him about getting into trouble. Wainwright said that she talked to Thelma at this time, telling her that she should make Mary and her children move out... "I told her Mary's kids were causing problems...she just looked at me and smiled ...didn't get it about how Brandon was getting into stuff...getting into trouble with Mel." Stating that Mel was "the biggest part of Brandon's problems, Wainwright said that Brandon would never have done these things on his own. She felt that Thelma was too busy to get involved in Brandon's situation.

Bonnie Wainwright said that when she saw Brandon at church during this time, she always hugged him. She noted that one time, when she hugged Brandon, he smelled of tobacco... "I talked to him about it...asked him to quit ...he was looking down....couldn't look me in the eyes." Stating that he seemed depressed, Wainwright said, "I saw this lost person....it made me sad...his spirit was down...there was a sadness, a weight." She thought the divorce of Brandon's parents had an effect on him... "like all kids, it takes their security away...tears the foundation of the family apart...he did look depressed after the divorce." Wainwright recalled seeing Kenneth again in

984

early 1995, after not seeing him for over two and a half years... "he looked so thin....he looked terrible."

On March 9, 1995, Brandon got into trouble with his cousin Mel again. The two broke into the local Army Surplus store during the night and stole some knives. A petition was filed in Juvenile Court alleging that Brandon was delinquent, based on this offense. At that time, Thelma asked Kenneth if Brandon could live with him. She felt that he would be less likely to get into trouble if he was not in Killeen and not around his cousin Mel.

Brandon moved to his father's apartment at 904 West Avenue E in Temple in March of 1995. He said that it was a tiny one bedroom apartment, and he slept on the couch in the living room. His father was a part-time bus driver for the Temple school district at the time. Brandon recalled that money was tight, and he and his father would eat dinner every night at Martha's Kitchen, a soup kitchen that was across the street from the shelter at which Kenneth had lived in 1993. Brandon enrolled at Temple High School on April 4, 1995. His grades improved for the remainder of the semester, and were generally in the mid to high 80's, with a 100 in physical education.

Following the juvenile court petition in March, 1995, Brandon was referred by Bell County Juvenile Probation for psychological evaluation. The evaluation was conducted on May 22, 1995 by Dr. Frank Pugliese, Ph.D. Pugliese met with both Brandon and Thelma. Thelma described Brandon as being a generally well-behaved and compliant child who began to get into trouble after his cousin Mel moved into the home. She reported that Brandon had become more distant and uncommunicative. After the March burglary, Thelma stated that she had decided to separate Brandon from his cousin, and had sent him to live with his father. She noted that Brandon's problems had motivated Kenneth to become re-involved in his life. Thelma told Pugliese that she and Kenneth were contemplating reconciliation and were communicating regularly regarding Brandon. She added that Kenneth was monitoring Brandon's activities very closely.

Brandon is described in Dr. Pugliese's report as a quiet and reserved youth who was responsive in the evaluation process. He expressed positive feelings about his parents, and said that his father was much stricter than his mother. Testing indicated that Brandon usually used good judgement; was responsive to the needs and concerns of others; was usually compassionate and empathetic; and had appropriate regard for the authority of his parents. Other tests revealed age appropriate qualities of youthfulness, e.g. some self-centeredness, and a need for recognition and attention from peers. Pugliese noted that Brandon could be impulsive without structure. He was described as easily influenced by others, and has having a desire to win approval and attention that could outweigh his use of good judgement,

985

leading him to yield to pressure from peers. There were no indications of strong anti-social tendencies. Dr. Pugliese recommended intensive supervision and counseling.

A Court Report, with social history information and recommendations, was prepared on June 12, 1995. The report noted that Brandon's aunt, Mary Pollock, and her children, including Mel, had been living in the home; and that Mel was Brandon's co-defendant in the offenses. For this reason, according to the report, Brandon had gone to live with his father. Records indicate that Brandon was not considered to be a danger; had the support of both parents; and was cooperative in the interview. Kenneth's history of violence towards Thelma was noted in the records. The caseworker, Joel Salas, recommended that Brandon be placed on probation, in the care of his father, with conditions including curfew, random urine screens, and restitution, and that he not associate with Melsimeon Pollock. Brandon appeared in Juvenile Court for adjudication and disposition on the January and March petitions on June 27, 1995. The Court adjudicated him delinquent, placed him on one year probation, and ordered his removal from the home. This had already been done, when he moved from his mother's home to his father's apartment in Temple. The court ordered intensive supervision with conditions including counseling, attendance at school, curfew, and restitution. He was ordered not to associate with Mel.

On July 4th, while visiting his mother's home in Killeen for the holiday, Brandon and his cousin Mel were taken into custody and charged with two counts of burglary of a habitation. Brandon had just turned fifteen years old. Police were dispatched to a burglary in progress, and Brandon was apprehended while fleeing. According to testimony in Brandon's penalty phase, he told the police about the other burglary, which they had not known about, and in which he had taken a Nintendo game. They were held in the Bell County Detention Center. A petition was filed with the Court on July 5, 1995, alleging delinquent conduct.

A report was prepared for the Court, and was dated July 14, 1995. It included updated social history information. By that time, Thelma had left her job at Central Texas College, and was not working. She was enrolled in a master's degree program in Nursing. Caseworker Joel Salas recommended that Brandon be placed on probation for two years, initially in the Intensive Supervision Program, and that he: submit to random urine screens; voluntarily participate in Operation Outreach and counseling; pay restitution; and not associate with Melsimeon Pollock unless supervised by parents. The Juvenile Probation file contains information from the Bell County Juvenile Detention Center indicating that during the entire time Brandon was in the facility, from July 4 to August 3, 1995, he was on thirty minute watch, and that he behaved well. No reason is given for the thirty minute watch, though

the probation agent stated that it was generally used when there was a risk of suicide attempt. Brandon said he didn't know why he was on thirty minute watch. He said he had no conduct problems while in detention.

Brandon was adjudicated delinquent in a hearing on July 20, 1995. His dispositional hearing was held on July 27, 1995. Bonnie Wainwright, a church friend of the family, worked for the Juvenile Court in Bell County at the time. She remembered that she would see Brandon in the hallway outside the court whenever he had hearings. She recalled that she hugged Brandon and urged him to listen to the Judge. The Court ordered that Brandon be placed on probation for two years, initially in Intensive Supervision. He was ordered to refrain from associating with Mel and to complete his high school education. He was further ordered to voluntarily place himself in the Catch 22 residential program in Brownwood, Texas until he was satisfactorily discharged. He was to remain in detention until he was transferred to Catch 22. At the same time, Melsimeon Pollock was placed by the Court at Mineral Wells, a family run group home.

Catch 22 in Brownwood was a community residential living facility licensed by both the Texas Department of Protective and Regulatory Services and the Texas Juvenile Probation Commission. It was operated by Dan and Melba Barger. The initial contract request for Brandon was for one year, until August, 1996. He was placed at the facility on August 3, 1995. The Bargers described the facility as an open campus housed in apartment buildings that had six apartments. Two youths were housed in each apartment, with staff residing in a separate unit. Brandon was fifteen years old at the time. He described Catch 22 as a sort of independent living program. During the time he lived there, he had one roommate who was fifteen, and another who was fourteen. Brandon said that all the boys living in the facility usually ate together and sometimes had group meetings. There were times when he had to buy his own food and cook it. The residents attended public school in Brownwood. There is no indication that Brandon received any counseling services during this placement.

Brandon was enrolled in Brownwood High School on August 23, 1995. He attended until January 26, 1996, at which time he was discharged from Catch 22, and returned to his father's home. His grades were very low. He failed Spanish, and had grades in the low 70's for most other classes, except for Physical Education, in which he had a 90. Dan Barger said that his wife had regular contact with the schools in which residents were enrolled. Brandon had no behavioral problems at school. He described Brandon as "a normal kid", adding that he was nice-looking and athletic. He did not have any significant problems in the facility. Monthly progress reports to Bell County Juvenile Probation indicate that he made progress in the program, though he had not met his treatment needs at the time he was released in

987

January, 1996, after less than six months in the program. Novotny Baez, a Juvenile Probation Agent in Bell County, who supervised Brandon upon his return to his father's home in Temple, noted that it wasn't unusual for juveniles to be discharged early, prior to meeting treatment goals, and that it was generally a money issue. Though a one year placement had been requested, the county only contracted for six months. The cost of the program was $58.08 per day. The Catch 22 program no longer exists.

Brandon returned to Temple, Texas at the end of January, 1996. His father was still living in the small apartment on West Avenue E, where Brandon again slept on the couch. Brandon enrolled in the 10th grade at Temple High School on January 30, 1996, taking only four classes. His performance for the spring semester was very poor. He failed Algebra and English for the semester. He did, however, attend regularly. Kenneth was still working as a bus driver for the schools. He later obtained a full time job in maintenance for the Temple Independent School District. Brandon said that his father remained a strict disciplinarian. However, he did not whip Brandon as much as he had previously, and relied more on grounding. His father had firm rules about curfew, schoolwork and chores. Kenneth noted that he had clear and firm expectations, and "demanded" compliance... "If I said food was at 7:00, if he came in five minutes later, food was gone." Brandon would not be allowed to eat until the following day if he was even a few minutes late for dinner.

Novotny Baez was Brandon's probation agent for Intensive Supervision in Temple. She reported that Brandon did well on supervision. He had to report to her office two or three times a week, which he always did. She made random home visits once a week. Brandon was always there. Ms. Baez described Kenneth as very polite and very involved as a parent ... "(he) seemed to really care." Kenneth maintained regular contact with Ms. Baez and discussed any concerns with her. She described Brandon as "really quiet, respectful and mannerful", adding that he had "a safe, calming presence." She recalled that she often made her home visits late at night, and always felt safe with Brandon. Probation records indicate that Brandon looked for work in the spring of 1996. He started working at a furniture factory, but was not called back after the first day. Ms. Baez said that she knew that Brandon's parents were divorced, and she had very little contact with Thelma Bernard. Brandon was able to visit his mother on weekends and holidays. Thelma was working at Scott & White Clinic at the time, and remained in the Army Reserve, where she continued to perform well.

In 1996, after Brandon returned to his father's home, Kenneth informed Brandon of some health issues he (Kenneth) had. He had been diagnosed as HIV+ and as having Hepatitis C. Kenneth stated that he contracted these conditions from a woman he had been involved with. The

986

woman died in late 1998. He told Brandon, but has still not told his other two children. He is on medication, and is doing well. Brandon was under the impression that his father had been infected while in jail. Displaying little knowledge of HIV and Hepatitis, Brandon said that when he learned of his father's condition, he wondered if he could get sick, too. He thought it was contagious. He never talked to anyone about it. Late in 1996 or early 1997, Kenneth, having obtained the maintenance job in the Temple schools, with better pay, moved into a larger apartment on Main Street in Temple. Brandon was able to have his own room.

Brandon was still in the 10th grade when he returned to Temple High School for the 1996-97 school year on August 14, 1996. His grades were very low and he was frequently absent the fall semester and the first part of the second semester. On December 16, 1996, Brandon was seen by his pediatrician, Dr. Truman Douty, at Scott & White Clinic in Killeen. He had been with his mother for the holidays. Dr. Douty referred Brandon for a psychological consult due to "stress." An appointment was made with a psychologist at the clinic, but was cancelled twice by Thelma. Stating that she now regrets this, Thelma said Brandon didn't want to go, so she didn't make him. She also didn't want him to be labeled. Thelma said that she did see signs of depression in Brandon at the time. He was sleeping a lot, lost weight and looked tired. He told her he would be all right... "I listened to him."

Brandon was withdrawn from Temple High School on February 20, 1997, due to truancy problems and was court ordered to a GED program operated by the Temple Independent School District. He began attending the program in about March, 1997. His teacher was Mattie Adams. Ms. Adams reported that she had two sessions of classes a day, with about 30 to 35 students in a session. While Brandon was required to attend only one session a day, he often came to both. Most of the students in the program had attendance problems in school. Ms. Adams stated that during the time that Brandon was in her program, she saw no signs of gang involvement. She was familiar with the indicators and did have students she knew to be gang-involved. Adams said that she never had problems with Brandon. His father was very concerned about his progress in the program and maintained regular contact with Ms. Adams, checking on attendance and class work.

Mattie Adams described Brandon as one of the better students in the program at that time. He had a good attitude, was responsible, behaved well, and participated in class. She did say he was a quiet youth. Adams noted that she pre-tested Brandon when he entered the program. He then knew what he needed to work on in order to pass the GED test. She recalled that he "just needed to remediate", and did pretty well in the class. He attended until the end of the school year. Adams said that Brandon had

989

friends in Temple and seemed to associate with "the better students who stayed out of trouble." She recalled that Brandon was working at Burger King during this time. Brandon did start working at a Burger King located in a gas station in Temple in about April, 1997. He worked there until returning to Killeen in June, earning a total of $1590.30. Probation records noted this job, as well. Brandon continued to comply with the rules and conditions of probation, and had no problems.

In late spring, 1997, an incident occurred between Brandon and his father that led to his moving back to his mother's home. The incident happened at the Seventh Day Adventist Church in Temple. A number of members of the Killeen Church were there, as well, and witnessed the incident. Kenneth stated that Brandon and Mel had gone outside of the church and were in the parking lot. Kenneth went out and told Brandon to get back inside. They began arguing. The argument continued as church members were walking down the street from the church to a recreation center. Kenneth said that the argument escalated into a physical altercation. Brandon reported that his father swung at him. Kenneth admitted his role in the fight, stating, "I probably instigated it...hit him on the back of the head...we started tangling up...I was in a really angry mood." Debbie King said that church members had to separate the two. Max ran into the church and told Thelma what was happening. Kenneth said that Thelma decided that Brandon should go home to Killeen with her. Thelma confirmed this, stating she decided that Brandon should live with her again. Brandon saw little of his father after this time. Brandon stated that he had never felt very close to his father. He said they really couldn't communicate, and that his father was just primarily a disciplinarian. Debbie King, who was there, said that she didn't feel that Brandon wanted to be living with his father.

By the time Brandon returned to Killeen, Mel Pollock and his family had moved out of the Bernard home, but were still living in Killeen. They lived in a trailer. Brandon, then sixteen, began spending time with Mel again. He also re-connected with Dettrick Spiller, his friend from the neighborhood. Noting that his father had always been very strict, Brandon stated that things "were a lot looser" at his mother's. She was working at Metroplex Hospital and was still active in the Reserves. There was little discipline in the home. Kenneth said that he would hear that Brandon would come home late, and Thelma wouldn't do anything about it. She bought him whatever he wanted. According to Kenneth, if he didn't have money, Thelma wouldn't tell him to get a job. She just gave him money. He did work briefly, at some point in 1997, for West Telemarketing, earning $183.18.

Brandon had completed his GED preparation program in Temple. He had planned to take the test in Temple, but then moved back to Killeen. He applied to take the test at Central Texas College in Killeen on July 17, 1997.

990

His scores on the various sub-tests were all in the 50's. A minimum score of 40 on each test is required. He passed and was awarded his Certificate of High School Equivalency on July 29, 1997. His two years of probation were completed at about the same time.

Though he had earned his GED, Brandon wanted to get a high school diploma. He wanted to go to college and felt that it would be easier to do so if he had a regular high school diploma. He enrolled in the twelfth grade at Killeen High School on August 13, 1997. A couple weeks later Mel left Killeen and went to stay with his father. He was gone only a few weeks, but it was during that time that Brandon began spending time with other youths who lived in the neighborhood and went to the high school, and who had formed a loosely organized "gang." Brandon said that when he returned to Killeen, Dettrick Spiller and his other friends from the neighborhood had started a new group, and were calling themselves the 415s. While they said it was a "gang", it was just a group of friends from the Heather Glen and Long Branch neighborhoods who hung out together. They didn't really have any structure or rules, and weren't affiliated with any national gang. Mel said that they were just "neighborhood wannabes...no way close to a real gang...not organized." Another group of Brandon's friends, including Joey, James and Prince Presley, called themselves the 212 PIRUs. Brandon said he was a part of the 415s, but also spent time with 212s.

Stating that Brandon had never been involved with any gang or similar group in Temple, Kenneth said he knew about the 415s. He, too, viewed it as just a bunch of kids from the neighborhood who hung out together. Dettrick Spiller said that Brandon became involved with the 415s after he came back to Killeen. He described it as "just a bunch of guys hanging out together...a loose group of kids." They gave themselves a name and picked colors, choosing red. Spiller said it wasn't organized and wasn't formally linked to any national group. Though they referred to themselves, at times, as "Bloods", they were not really formally affiliated. Spiller described them all as kids "looking for attention, looking for love, wanting to be a part of something." Old friends of Brandon's from the church school noticed a difference in Brandon when he returned to Killeen from Temple. Matt Mitchell said that Brandon dressed more "hip", and seemed to be "hooked up with the wrong crowd." Michael Voegele said that Brandon was hanging out with guys from his neighborhood... "they'd wear colors...it was a neighborhood thing, the Long Branch area....not an organized gang." He said he started hearing that Brandon was drinking and using marijuana.

Two of Brandon's friends that fall (1997) were Antonio Jackson and Terry Brown. Jackson said that he met Brandon in the neighborhood in 1997. He knew Mel, as well. He said that Brandon was a part of the 415s, but also spent time with the 212s, a group started by the Presleys. While

992

they said they were "Bloods", they weren't really affiliated with them.  Like the others, Jackson said that the groups weren't really organized... "just a bunch of kids hanging around together...no rules or anything...just a loose association...we were all wannabes"  He said that they did all drink and smoke marijuana.  With respect to Brandon, Jackson said that "even when Brandon was part of it, he wasn't...that wasn't his nature."  Terry Brown reported that he moved to Killeen from Omaha, Nebraska, in the fall of 1997, and met Brandon at school.  He recalled that Brandon was with his cousin Mel at the time he met him.  Brown noted that he had been in a gang in Omaha. He said that while Brandon was part of the 415s, most of the guys they hung around with were 212s... "it was a made-up gang...the Long Branch and Heather Glen areas of Killeen were where the 212s and 415s were."  They were neighborhood kids, not connected to any national gang.  Brandon, Mel and Dettrick, according to Brown, were 415s.

Others in the community were aware of these neighborhood groups. Rick Marasco, who had been Brandon's teacher at the Academy, and is now teaching for the Killeen Independent School District, said that they weren't really organized gangs, but, rather, were neighborhood groups in the Long Branch area of Killeen.  There were groups in other parts of the city, as well. Brad Hobbs, another teacher who had Brandon in class in 1998, described the groups as "little gangs...neighborhood things."  He said that they did wear colors, recalling that Brandon wore red.  Hobbs noted that the "gangs" haven't been around for the last four or five years, and seemed to be more prevalent in the mid to late 1990s.  Novotny Baez, who has been a juvenile probation officer in Bell County for a number of years, said that the "gang" issue was somewhat related to the large military presence in the area.  There were always a lot of families coming in and out, including a lot of different nationalities and cultures.  Adolescents sometimes brought the practice with them when they moved in from areas where they had been associated with a gang.  Baez said that, in her experience, they kids were "wannabes....we saw the clothes, bandanas, shirts...the identification...they wanted you to know who they were...it wasn't formalized."

The gang identification system in the Killeen Police Department was not well-organized until late 1999.  They did have a more informal system for identifying possible gang members before that time.  There were several criteria that could lead to one's name being listed on their cards.  They included such things as: self admission; identification by a reliable informant; association with known gang members; display of gang affiliation; and presence in known gang hang-outs.  Terry Brown reported that there was a man from the police department who would ride around the neighborhood in an old car.  Whenever he saw some youths standing around together, he would take their pictures with a camera he carried.  He would see juveniles in a car and pull them over.  Terry experienced this and said Brandon did, as



well. The man would have them get out of the car, take their photo, and let them leave. He never asked if they were gang members. Reportedly, if a youth had two pictures taken on two separate days, he was considered affiliated.

Brandon withdrew from Killeen High School on November 13, 1997. The reason given on the withdrawal form was that he would be attending either Alternative School or Central Texas College. His grades at the time were poor; he was flunking Algebra. On January 5, 1998, he enrolled in Killeen Alternative Center, an alternative program run by the Killeen Independent School District for students who had excessive absences or other problems in the regular school setting. He attended that Alternative Center until March 12, 1998, at which time he transferred back to Killeen High School.

Brandon continued to have problems with his asthma, and to take asthma medication. He also used Albuteral, an inhaler. Medical records from Scott & White Clinic indicate that his asthma was flaring in the spring of 1998. He was seen in the clinic for breathing problems on April 10, 1998. Brandon was in a car accident on May 18, 1998, and was taken by ambulance to Metroplex Hospital. According to the records, he was a passenger in the back seat of a vehicle when it was struck on the side by another vehicle. He was wearing a seat belt at the time. He sustained a cervical injury and arrived at the hospital immobilized and wearing a cervical collar. X-rays were negative for cervical fracture. He denied any loss of consciousness. He was given Naprosyn, a pain killer, and Flexiril, a prescription muscle relaxant, and released to home.

During this period, the 1997-98 school year, Brandon continued to be actively involved in his church and to help care for his younger siblings. He said that even though he was 'in the streets" with his friends, he obeyed the Friday night to Saturday night Sabbath in his church... "that was my choice." Terry Brown, who was spending a lot of time with Brandon during this period, agreed, stating, "he (Brandon) went to church faithfully, every Saturday...I hated that...that's the time you want to go out...he would leave his friends on Friday night...there was no talking him out of it." Brandon continued to volunteer at his church. He was involved in Pathfinders, a youth group, in which he collected and distributed food to the needy. Debbie King ran the church youth group for a time. She said that she saw Brandon at church, and he was always polite and respectful. King recalled that Brandon wanted to be in the church choir. Members were required to show up for all practices in order to perform. Brandon wasn't always at practice, so he wasn't allowed to perform. Brandon did help people around his neighborhood, generally with yard work.

093

Terry Johnson became the pastor of Brandon's church in January, 1998. He remembered meeting Brandon and his family at a church potluck dinner shortly after he arrived. He said that Brandon seemed very quiet. Pastor Johnson recalled that Matthew Mitchell expressed some concerns to him about the people with whom Brandon was involved. Johnson also knew Mel, and said that Brandon's cousin "could be inappropriate." He felt that Mel had influence over Brandon, adding that Mel would come up with ideas and Brandon was a follower. Mel did continue to get into trouble during this period. He had arrests for Assault with Bodily Injury on December 9, 1997; and Evading Arrest on March 21, 1998.

Brandon spent a lot of time with his sister and brother. He took care of them after school, usually from 3:00 until about 6:00 p.m., when his mother would get home. He said that he made them do their homework and chores before they could play or watch television. They didn't watch much TV as Thelma wouldn't subscribe to cable. Quiona and Max both commented on Brandon's babysitting of them. They said he would make them behave, but was also fun. He played with them. After school, they had to do their chores and homework. Then he would play with them or take them to the park. Max recalled that Brandon took them roller-skating and played basketball with him. Quiona was active in sports, and he would go to her games.

Antonio Jackson lived in the Bernard home for a while in 1998, after being kicked out of his aunt's home. He said that Brandon watched his sister and brother "all the time...any time his mother was gone...he loved them, was real good to them." Jackson said that Thelma took him to church and helped him get a job. He noted that Brandon had a good relationship with his mother, and was "real respectful to his family." Terry Brown also spoke of Brandon's care for his siblings. He said that Brandon would have to pick them up from school at the Seventh Day Adventist Academy, and take them home. Brandon had a car that his mother had bought for him. He agreed that Brandon made them do their chores and homework before they could play. Brown said that all of Brandon's friends knew his mother and liked her, adding that Thelma was very religious and would "just preach at us all day."

As stated above, Brandon re-enrolled at Killeen High School on March 16, 1998. He was frequently absent, and no grades are recorded. He was withdrawn from the school on May 16, 1998, with the reason given that he was going to New Orleans, Louisiana. Brandon's father had relatives in New Orleans. Brandon went to spend a few weeks with them at that time. Just before leaving for New Orleans, Brandon was involved in the car accident described above. Kenneth said they sent Brandon to New Orleans because he wanted Brandon to get to know his paternal relatives. Terry Brown thought that Thelma had sent Brandon, possibly to get him away from the negative influences in his life. He stayed about a month, and returned to

Killeen in late June.

Brandon's use of alcohol and drugs escalated after his return to Killeen from Temple, where his father had been better able to control his behavior. He admits that by early 1998, he was using marijuana every day. He was drinking off and on, primarily on weekends. He generally drank malt liquor, binging on weekends. Dettrick Spiller confirmed Brandon's use, stating that they used marijuana and drank together. Mel said the same thing, though he saw less of Brandon after moving to Austin with a girlfriend in 1998. Terry Brown said that during 1997 and 1998, they primarily used marijuana and alcohol, but admitted that they tried powder cocaine a few times. Thelma admitted that she suspected marijuana use on Brandon's part, but did nothing about it. Brandon said his mother did know about his alcohol use, as he came home drunk one night. Looking back, she feels that Brandon was depressed during this period. He was quiet and slept a lot. He kept his feelings in and didn't talk to her about what was going on his life. She didn't confront him. Thelma said she had begun seeing Kenneth again by late 1997, and was talking about reconciling with him. Brandon didn't want her to do that.

In July, 1998, Prince and James Presley told Brandon that they were driving to Georgia to visit relatives. They invited him to go along. Thelma said that she and Kenneth agreed to let Brandon go, as there were maternal relatives in Atlanta that Brandon could visit. Antonio Jackson went on the trip, as well. On July 23, 1998, the four were taken into custody in Macon, Georgia, when it was discovered that the vehicle the Presleys were driving was stolen. All four youths were wearing red colors at the time, and had a photo album in the car which allegedly contained photos with gang identification colors and symbols. Brandon recalled that they had taken the pictures for fun when they were at a party. Thelma went to Georgia and bailed Brandon out of jail. He and Antonio Jackson were not charged in this incident, as it was determined that they did not know that the vehicle, a Jeep Cherokee, was stolen. Brandon returned to Killeen with his mother.

Matthew Mitchell recalls seeing Brandon shortly after his return from Georgia. He had heard about the incident, and was concerned about Brandon. He was extremely active in the church at the time, and had returned to Killeen for the summer from the church boarding school he had been attending. He said that he confronted Brandon about what he was involved in... "I preached to him...I was begging him to turn over his life....he was listening...struggled ...wanted to, but never made the decision." Mitchell said that this conversation took place at church... "I was on fire, and talked to him." He sensed that Brandon did want to change, and said that Brandon responded, "I'm tired...it's tiring being out there...I don't know how to get out of it...how to escape."

995

Brandon admits he was getting tired of things, and that he realized he was just drifting. He said that he tended to go along with the group, and agreed that he was a follower. He said he wanted to fit in, so if someone wanted to do something, he just went along. Brandon stated that he still had the desire to go to college, but felt that he had plenty of time. He did want to get a regular high school diploma first. He admitted that his alcohol use escalated over the summer. He was drinking Old English and Cisco, a liquor sometimes referred to as "liquid crack." He described Cisco as pretty strong, and said he would often get drunk. Finally, he thought of enlisting in the military as a way to get out of the situation and straighten his life out. He reported that he went to the Army recruitment office, near the Killeen Mall, and tried to enlist. It appears that he tried to do this in late summer of 1998, after he turned eighteen. Brandon said that his mother tried to discourage him from enlisting. He said that he was denied because of his juvenile record. Thelma, on the other hand, said that she and Kenneth thought it was a good idea, and that he might "get re-directed" in the Army. She believed he was denied because of his asthma.

Brandon re-entered Killeen High School on October 13, 1998. He was in the 12th grade. He attended less than one month, withdrawing on November 3, 1998, to move to Michigan. One of his teachers that fall was Brad Hobbs, who had Brandon in his shop class. Hobbs remembered Brandon, and said that he was a quiet student who never caused problems in class. He did well during the short time he was in the class.

In the fall of 1998, Thelma and Kenneth decided to send Brandon to live with maternal relatives in Kalamazoo, Michigan. They were concerned about the people he was spending time with and did not want him to get into trouble. Brandon said that one of the reasons he left for Michigan was that the Killeen Schools were going to place him back at the Alternative Center. He moved to Michigan and quickly found a job at Meijer's, a discount store. Records indicate that he applied for the job on November 5, 1998; was interviewed on the 10th; and starting working there on the 22nd. Brandon said that he worked third shift as a stocker in housewares. He worked at Meijer's until December 30, 1998, after which he just didn't go back. He was officially terminated on January 14, 1999. He earned a total of $1082.83 at this job. While in Michigan, he enrolled in night school at Paw Paw Adult & Community Education.

## Circumstances Leading to Offense: 1999

Brandon said that he left the job and Michigan when he learned that his girlfriend, Shay Grimstead, was pregnant with his child. He went to New York, where she was living at the time, to see her and to see if she needed

anything.  His plan was to go back to Killeen to get his car, and return to New York to be with her.  When he got to Killeen in early to mid January, his car was not working.  His decided to get a job so that he could save money, buy a car and go to New York.  Shortly after he got back to Killeen, his maternal grandmother, Versia Johnson, died.

When he got back to Killeen in early 1999, Brandon quickly re-connected with old friends, including Terry Brown, Antonio Jackson and Chris Vialva.   Antonio Jackson said that they were drinking every day. Dettrick Spiller, stating that he had taken a different road than Brandon, said he didn't see much of Brandon in 1999.  Spiller is married, a father, working, and living in a new home.  He said he knew that Brandon was with Terry Brown and Chris Vialva, and heard about their alcohol and drug use.  Mel, Brandon's cousin, had a girlfriend and was living in Round Rock.  He didn't see much of Brandon during this period, either.  Mel said that Brandon was spending time with Terry Brown and was "high all the time."  Brandon admits that his drinking and drug use escalated in early 1999.  He was drinking and using marijuana on a daily basis, and was frequently drunk.  Mel said that he tried to talk to Brandon, but "he didn't listen."

Brandon did look for work.   He went to Adecco Services, Inc., a temporary employment agency.   Adecco placed him in a job at Dell Computers.  He worked there on an as-needed basis.  Records indicate that Brandon worked 15.75 hours at Dell the weeks of March 3rd and April 1st, and 26.75 hours the week of April 5th.  His gross pay was $379.96.  He was a forklift operator and materials handler; he put computer chips and parts at the front of the assembly line.  At some point that spring, Brandon also worked for Spherion Corporation, earning a total of $441.62. He described this is a factory job in Temple, at a company that made chairs.  Brandon said that he used some of his earnings to send money to Shay Grimstead, who was pregnant with his child and living in North Carolina at the time.  Thelma helped Brandon get a car.  Kenneth, noting that most of Brandon's friends didn't have cars, did not approve of Thelma's actions in getting a car for Brandon.  He noted that Brandon's friends would rely on him for rides, and felt that Brandon was easily taken advantage of in this.  Brandon noted that he "had the only car....when someone needed a ride, I would just go." Kenneth continued to feel that Thelma was too lenient with Brandon, and that she exercised no discipline or control over him.  He said that he and Thelma argued about this.

Brandon still wanted to obtain a regular high school diploma.  He said that he didn't want to go back to Killeen High School, where he felt he would be labeled as a gang member.  His mother helped him get a small apartment at  1306 W. Stan Schlueter Loop, which was in the Ellison High School district.  He enrolled in the 12th grade at Ellison High School on March 16,

997

35

1999, after applying there on March 8th.  On about March 20th, while on a trip to Houston with friends, Brandon decided to get a couple of gold teeth.  He had the initials "CK" engraved on the teeth.  Thelma noted that Kenneth had gold teeth when Brandon was young.

On March 25, 1999, there was an incident outside Ellison High School. Brandon stated that there was an altercation between two groups near the bus stop.  He walked over to where it was occurring.  According to the testimony of Officer John Bowman, who testified in the penalty phase of the trial, one youth was "throwing (gang) signs" at Brandon.  Brandon rubbed his gold teeth.  Bowman said that he saw Brandon do this, and pulled him aside to warn him.  He took a photo of Brandon's teeth.  Brandon was referred to the school office, and was immediately suspended for displaying what was referred to as gang paraphernalia (the teeth).  Bowman said that Brandon was referred to the Killeen Alternative Center.  He was formally withdrawn from Ellison High School on April 8, 1999.

The day after the incident at Ellison High School, Brandon went to his family dentist, Dr. Wayne Pundt, and had the initials "CK" removed from his teeth.  Dr. Pundt's records confirm this, and indicate that he converted the teeth to open-faced crowns, removing the initials, on March 26, 1999.

Brandon's daughter by Shay Grimstead, Kiara, was born on March 29, 1999.  Shay was living in Mt. Vernon, New York at the time.  She later went, with Kiara, to live with relatives in North Carolina.  Brandon did not see his daughter until after he had been arrested in this case.

In late March, 1999, Brandon was involved in an incident at Ft. Hood, in which he sustained a head injury.  A dispute broke out between two groups at a party, and blows were exchanged.  Terry Brown, who was at the party, reported that they had been drinking a lot that day.  They had started drinking at Brandon's apartment before going to the party.  He said they were drinking 40 ounce bottles of Old English malt liquor, mixed with gin. Later, at the party, they also had a blunt of marijuana dipped in cocaine. Brandon admitted that he was drunk at the party and could not remember much of what occurred.  Brown said that they were "acting the fool" with females at the party when James Presley got into an argument with someone.  A fight broke out.  Terry had gone to the car to get more gin. When he returned, he saw Brandon unconscious on the ground, with blood on his forehead.  Antonio Jackson said that someone had picked Brandon up and slammed his head on the cement.  He had witnessed the incident, and said that Brandon was knocked unconscious.  Brandon just remembered that he "blacked out", and "the next thing I knew I was in the hospital."   Brandon was taken by ambulance to Darnell Army Medical Center, where he was treated and released to his mother.

098

Brandon made one last effort to complete high school by enrolling in the Killeen Alternative Center on April 9, 1999. He attended only a week, withdrawing on April 15, 1999, with the reason given that he was going to get a job. Records indicate that he was doing well in the school. They used a point and privilege system. He earned the highest level of points possible, 26, in each class, and was given the highest privileges. Brandon stated that he still had the desire to earn a high school diploma and attend college. He felt that he still had time, even though he wasn't making much progress towards his goal. He did tell people, including his mother, that he wanted to be a neurosurgeon. He displayed little understanding of what was involved in pursuing such a career. When asked why he wanted to do this, he responded that he had read a book about a Seventh Day Adventist who had been a neurosurgeon, who was able to help a lot of people. He thought he would like to do that. He also said he wanted to fly a fighter plane. Brandon said that around this time, he "was getting tired of hanging around the streets...wanted to go to college...just couldn't do it, couldn't take the steps.' He felt "lost...just caught up, swept along." He wanted out of his situation, but just didn't seem able to take the steps to do it.

Brandon's drug use escalated around April, 1999. He began using cocaine heavily. Brandon was seeing Terry Brown and Antonio Jackson every day. He also spent time with Chris Vialva. In April, the three (Brandon, Brown and Jackson) obtained some powder cocaine. According to Brandon, they sniffed it every day for a couple weeks or so. Antonio Jackson confirmed this, stating, "we were on cocaine real bad...snorting as much as we could." He said that he and Brandon became more agitated. Vialva, according to Jackson, was using drugs, too, though not as much cocaine as Brandon, Jackson and Brown were using. Brandon was also abusing alcohol and using marijuana regularly during this period.

Around this time, Sherise Scott informed Brandon that she was pregnant, and said that it was his child. He had known Sherise for a while, and did spend some time with her, including at her mother's house. Sherise's mother was a known cocaine user. She also had boyfriends who abused drugs. Brandon said that when Sherise told him she was pregnant, "I wasn't sure." He stated that he only had sex with her one time, and had used a condom. He said he accepted her assertion that it was his child because he "didn't want her to go through it by herself...didn't want the child to not have a father." Terry Brown knew about Sherise's pregnancy, and said that Brandon seemed to accept that the child was his. He said that Brandon tried to be supportive of Sherise. Sherise's daughter, Tinea, was born in December, 1999, while Brandon was awaiting trial in this case. It is entirely possible that the child is not his.

Terry Brown testified at trial that he, Chris Vialva and Brandon

committed at least twenty-five residential burglaries in the Killeen area between April, 1999 and mid June, 1999. According to Terry Brown, he and Chris Vialva began doing the burglaries in late April and Brandon started doing burglaries with them in about May. Terry said that the burglaries were his (Terry's) idea, which Antonio Jackson confirms. Terry Brown further stated that Brandon was primarily a driver, and would generally sit in the car while Terry and Chris broke into the homes. Brandon was the only one who had a car. According to Terry, they always knocked first, to make sure no one was home, and would gain entry by kicking in the door. Terry said that Chris Vialva even had t-shirts made up with the name "Kick Door Boys" on them. Testimony at trial indicated that the authorities had evidence that two residential burglaries were committed on May 24, 1999, and that Brandon and Terry Brown were present with Chris Vialva when Christ attempted to pawn items taken in those two burglaries. Brandon admitted having committed some burglaries with Terry Brown and Chris Vialva, but stated that the it was not as many as Terry reported, and that the burglaries took place over a period of two weeks or so in late May.

Brandon was involved in a motor vehicle accident on May 25, 1999. His car was struck from behind by a school bus. He did not seek medical attention immediately. Medical records from Scott and White Clinic indicate that he came into the clinic the day after the accident, on May 26, 1999, with a complaint of pain in his neck. He was examined and prescribed Advil 3 (Advil with codeine) three times a day, for pain, and Flexiril, a muscle relaxant, also three times a day. Thelma stated that she filled the prescriptions and that Brandon did take the Flexiril and Advil. He was also on medication for his asthma, including pills and an inhaler. In June, Thelma used the insurance settlement from the accident to get Brandon a car, a Buick Park Avenue.

During May and June, 1999, up until the time of the offense on June 21, 1999, Brandon was drinking heavily and using a number of different drugs. While his primary drug of choice was marijuana, he also used cocaine, acid and
embalming fluid. Marijuana laced with embalming fluid was popular in the street. It was often referred to as "wet" or "water", and sometimes as "fry." They also did "primo", which was marijuana laced with cocaine. Antonio Jackson said that Brandon started doing "water" in late May or early June, with Terry Brown. Terry Brown admitted that he and Brandon were using marijuana with embalming fluid, and said they were on it every day in the weeks before the offense. He acknowledged this use in his pre-sentence report and to the psychologist who evaluated him in July, 1999.

Brandon and Terry were also drinking heavily on a daily basis. They generally drank malt liquor, E & J Brandy, and Cisco, which is fortified wine,

1000



with a high alcohol content.  Brandon admits that they were "getting drunk every night", and that he drank more than Terry, Antonio or Chris Vialva.  Antonio Jackson went to jail in early June.  Brandon continued to abuse alcohol and drugs, primarily with Terry Brown.  He said that "wet" made him high for a long time, and he would become disoriented.  It made him feel "crazy...real high, then down, then back up...strange."    Matthew Mitchell recalled that he ran into Brandon one day, and that Brandon was talking about doing "wet."  He said that Brandon "smelled like it...was talking loud, acting weird."  His impression was that Brandon was doing this frequently.

Brandon said that he was feeling tired by the middle of June.  He wanted to get away from the scene.  He recalls that his mother tried to talk to him about what he was doing... "I didn't listen....thought I was doing petty little things...didn't see breaking into houses and stealing stuff as serious....thought it was mischief."  Now, he said, he understands it was serious.  He talked to his cousin Mel about finding a job.  Mel was living in Round Rock, near Austin.  On the Friday before the offense, Brandon went to Round Rock to interview, along with Mel, for a job at Dell.  They were in a minor motor vehicle accident that day.   Brandon did not need medical treatment.  He planned to go back to Round Rock for a job interview the following week.

On the day of the offense, June 21, 1999, Brandon was drinking and smoking marijuana.  Terry Brown stated that they did some "wet" that day.  Brandon admits to drinking and using drugs that day.  He picked up Terry at about 11:00 a.m..  They drank and smoked marijuana together.  Sometime in the afternoon, Brandon went to Sherise's house.  He said that Sherise's mother's boyfriend gave him something to drink.  He didn't know what it was, but said that he drank a couple cups of the liquid, and it made him tipsy.  That evening he met the co-defendants at Long Branch Park, and followed the Bagley car to Ft. Hood, where Todd and Stacie Bagley were killed.

## Pre-trial Confinement

Brandon was taken into custody at the scene of the crime, and was initially held at the CID offices at Ft. Hood.  He was then transported to the Bell County Jail in Belton, before being transferred to the  McLennan County Jail in Waco, where he remained until the conclusion of his trial and sentencing.  An arrest warrant was issued on June 23, 1999, and he was initially indicted on July 13, 1999.  A second superseding indictment was filed on March 28, 2000; and the notice of intent to seek the death penalty was filed on March 30, 2000.

Brandon was visited regularly by his parents, and had visits by relatives, pastors of his church and other spiritual advisors.  He said that Shay Grimstead went to the jail one time with his daughter Kiara.  Sherise

1001

Scott gave birth to Tinea on December 5, 2000, and, according to Brandon, she took Tinea to visit him at the jail several times. Brandon's childhood friend, Matthew Mitchell, visited a couple times, once with the pastor from Brandon's church. Mitchell testified that Brandon had expressed remorse during a visit, though he (Brandon) was precluded by his attorney from discussing any details of what had occurred. Antonio Jackson reported being in touch with Brandon while he was in the jail, and said that Brandon "was praying...telling me to go to church...he talked about his kids...wanted me to send them books on religion."

Brandon reported that he got along well with the staff at the jail and had no serious problems. Records include two conduct reports. The first one was dated October 15, 1999, and was for using a stinger to start a fire. He had rigged up a "stinger" using a razor and tissue, which was inserted in an electrical plug to light a cigarette. He received five days segregation for this. On December 24, 1999, Brandon received a conduct report for standing on a chair and cursing. He received three days segregation and loss of all privileges for this report. He had no conduct reports after that time.

Medical records from the jail indicate that Brandon had complaints of pain in his neck and shoulders in July and August, 1999. They cited his previous motor vehicle accident. He asked for the Flexiril he had been prescribed, and which Thelma said she took to the jail, but was given Tylenol instead. A note in the records dated November 10, 1999 indicates that Brandon was depressed. He also reported being claustrophobic. He declined transfer to the medical unit at that time, and said he would let staff know if the depression became worse. Brandon admits to experiencing depression in the jail in the fall of 1999.

Soon after admission to the McLennon County Jail, Brandon met Michael Cherry, an inmate housed in his same unit. Cherry was leading Bible studies on the unit at the time. Michael Cherry is now an ordained minister and conducts a prison ministry. He said he noticed that Brandon would stand nearby when he was conducting Bible studies. He seemed to be listening. Then, one day, Brandon asked if he could join the group. He was a regular member after that. Pastor Cherry and Brandon developed a close relationship during the time that Brandon was in the jail. Cherry felt that Brandon was able to open up to him about his feelings.

Pastor Cherry reported that Brandon was generally well-behaved in the jail. He said that Brandon never got into any fights or confrontations. He participated in Bible studies, read the Bible, played basketball and tried to stay occupied in positive activities. He noted that there were no organized programs on the unit, and no jobs for inmates. Cherry recalled that Brandon asked his mother to bring his Bible to the jail so he would have it for Bible

1000

studies. Pastor Cherry commented that Brandon had a positive influence on other young inmates in the jail... "guys who were prone to violence, agitation...he tried to get them to mellow out."

Brandon talked with Cherry about his concern for his family and his worries about his younger brother. Brandon worried about the emotional toll the case was having on his mother. He was concerned that his brother Max might get "off track" and get into trouble. Cherry recalled that one time Brandon had received a letter from his brother, in which Max wrote "something upsetting....(about) gangs...it freaked Brandon out." Brandon didn't want Max to follow in his footsteps. Pastor Cherry said that he had the impression that Brandon's relationship with his father was "distant."

Pastor Terry Johnson of the Seventh Day Adventist Church in Killeen visited Brandon a little over a week after the offense. He visited on a couple other occasions. Other pastors from the church, Adam Andreassen and Vandeveegate, also visited. Pastor Johnson recalled that Brandon told him he was reading the Bible and "trying to find the roots he had lost for a time." He said that Brandon talked about Pastor Cherry and the Bible studies group. He was enjoying reading the Bible with understanding of what he read. Johnson noted that Matthew Mitchell came with him on one of his visits, and Brandon and Matthew spoke about the Bible at length. Johnson said that Brandon, while he couldn't discuss his legal situation, did express regrets about the mistakes he had made and the people he had been involved with. While Brandon couldn't talk about the offense, Johnson stated that his impression was that Brandon was remorseful. He noted that Brandon was very concerned about the judgement of the church, and wrote a letter in which Pastor Johnson felt Brandon's feelings of remorse came through. Johnson noted that the desire to make amends is an important part of remorse. Pastor Johnson read the letter to the church board and to the church congregation. The letter reads as follows (typed exactly as written):

Dear SDA Church,

    I'm writing to let you know that I'm sorry to Disappoint you. I've been in your church for almost my whole life. I've grown up with most of the church family. But some where in my life It took a turn for the worst. Some where in my life Satan took my mind for a ride. Through all this the lord has been able to sit me down and tell me that I'm going in the wrong direction. I hope my exsperience of being around the wrong crowd has showed that It doesn't madder how much you go to church and around church members, if you don't give your life to Christ and really mean it you can still be consumed by the devil. I wish that It didn't take

an exsperience like this for me to know what Path I'm to take. Even though me and my family really can't afford to get me a good lawyer, so I have to deal with this court appointed lawyer. But, with ya'll prayers from the whole church can help me in my quest to deliverance. And that helps me come to the reason of my letter. At your prayer time I would like you to pray as a congregation for me to get through this mishap. So that I can make amend with my family and church friends. To show everyone that I can be successfull and that I've changed and have finally grown up. And also, so I can make those that love me and care proud. Finally, I hope that I have been an example to any young people out there trying to be a ganster or trying to fit in with these in crowd. The bottom line is be yourself and don't let anyone else push you to do something you don't want to. Because this I can assure you is not the place to be. Well I got to go and I hope you have a happy Sabbath.

Brandon

Pastor Johnson said that the church members were glad that Brandon had written the letter. Debbie King remembered the letter being read to the congregation. She said that they did pray for Brandon at their Saturday services. When asked about the letter, Brandon said he just felt that he wanted to express his feelings to the church. He felt he had embarrassed his family and the church.

Pastor Cherry stated that he believed that Brandon was very remorseful for his actions. While Brandon couldn't discuss details, he did tell Cherry that he regretted his mistakes. He said that he knew the victims were God's servants and felt very bad about their deaths. Brandon also felt bad about the pain he had caused his family, and about decisions he had made that would separate him from his own children. Stating that Brandon was "absolutely very sorry" for his involvement and knew how wrong it was, Cherry said that he and Brandon "prayed for the families of the victims." They prayed individually and in the Bible studies group. Cherry added that Brandon's faith was genuine... "he drew strength and courage from God." Brandon stated that he felt bad about what had happened in the offense. He understood that many people had been hurt. When he found out the couple was involved as youth leaders in their church, he called their deaths "a real tragedy...I'm sorry they're gone ...sorry for their families."

## ASSESSMENT

Brandon Bernard is a twenty-three year old African-American man who is currently under sentence of death, pursuant to conviction for a federal capital offense, and who is confined in the federal death unit at the United States Penitentiary in Terre Haute, Indiana. He was eighteen years old at the time of the instant offense. He had no other adult convictions or arrests, though he did have two adjudications of delinquency for the commissions of burglaries at ages fourteen and fifteen. He has no prior history of violent or assaultive offenses. His actions as a party to the instant offense contributed to the tragic deaths of Todd and Stacie Bagley. He has expressed remorse and regret for his involvement in this offense.

Brandon's young age at the time of the offense was a major contributor to his involvement, i.e. his actions were, to a great extent, products of the qualities of youthfulness, including lack of maturity, poor judgement, vulnerability to peer pressure and impulsiveness. No one who knew him, adults or peers, viewed him as a young man who would harm others. Brandon was raised in a devout Christian home, and remained active in his religious practices throughout his childhood and adolescence. He had an understanding of right and wrong. He had a commitment to education, as evidenced by his earning his high school equivalency, continuing efforts to obtain a high school diploma, and desire to attend college. He had limited work history. He was described by all as a follower, who was easily led by others and prone to suggestion. Like all adolescents, he was influenced by peers, and by a need for acceptance, approval and a sense of belonging. There are indications that he may have had learning problems, and that he suffered from depression.

Family disintegration as he entered adolescence; disparate parenting practices between his father and mother; low self-esteem, anxiety and depression all were likely contributors to his abuse of alcohol and drugs. This use further impaired his judgement, decision-making and problem solving ability. In the months preceding the offense, Brandon was under mounting stress. This stress contributed to escalating use of alcohol and drugs. Brandon made a generally positive adjustment during pre-trial incarceration, and had a number of ties to conventional norms that would have indicated positive rehabilitative potential.

Parents are the most powerful influences for the developing child. Each of Brandon's parents had developmental experiences of their own that affected the way in which their personalities were formed and the way in which they parented Brandon. Thelma Johnson Bernard was the middle child of sixteen in a poor family of migrant farm workers. She had a strong religious upbringing in the Seventh Day Adventist Church. Thelma was driven to escape the poverty of her upbringing by obtaining an education and having a successful career. She was described by all as a strong-willed and

1005

ambitious woman, though also as kind and loving. The victim of harsh physical discipline in her childhood and the witness of violence towards her mother by her father, Thelma eschewed physical punishment of her own children. She was an overly lenient parent who exercised few controls over Brandon. She was frequently absent from the home, due to work, duties in the Army Reserve, and enrollment in graduate training. When home, she failed to discipline or control Brandon during his adolescence, when his father, the primary disciplinarian, was no longer in the home. She enabled Brandon to the extent that she bought him cars and other material things, and did not make him work to earn them.

Kenneth Bernard had a difficult and traumatic childhood. He never knew the identity of his father. His mother was an alcoholic and a prostitute. He was removed from his mother's care by the state when he was a young child and placed in foster care. Later, he lived in the home of a maternal aunt, who was a harsh disciplinarian. Kenneth exhibits indicators of low cognitive functioning and learning disability. He also reports having difficulty with short-term memory. He suffers from low self-esteem which appears to be primarily due to learning problems and inability to compete, in terms of education and career, with his wife. He has had extended periods of unemployment and underemployment, though he has maintained his maintenance job with the Temple Independent School District for a number of years. Having experienced little in the way of positive modeling for parenting, Kenneth was rigid and harsh in his child-rearing practices.

During Brandon's childhood, the Bernard marriage was almost continuously strained. There was little communication between the parents, and frequent disagreements. Each blamed the other for problems. Thelma, who was the primary breadwinner, felt that Kenneth didn't fulfill his responsibilities at home, particularly when it came to care of the children. Kenneth felt that Thelma didn't support his efforts to get an education. The two had very different parenting styles, which can be problematic for children. While Thelma was overly lenient, Kenneth was overly harsh. He engaged in harsh physical discipline of Brandon, bordering on abuse, and often for very minor infractions. Brandon said that he never felt close to his father, and didn't feel he could talk to him. When parents disagree about expectations and discipline, it can be confusing for the developing child, who needs consistency and predictability.

In 1992, when Brandon was on the verge of adolescence, the tension between his parents erupted into a physical confrontation that led to Kenneth's removal from the home. Brandon remembered this fight as being about him, and likely felt responsible for the breakup of his parents' marriage. He didn't see his father for more than two and half years, and worried about him. He feared that his father was homeless or worse. These

1206

are difficult feelings for a child to handle. Brandon was not able to talk about them with anyone. Fellow church members noticed that Brandon seemed more withdrawn and sad following his parents separation. After Kenneth left the home, Brandon had to take on a lot of responsibility for the care of his younger siblings. He was, by all accounts, a responsible care-giver to Quiona and Max.

During Brandon's early adolescence, a number of factors, in addition to the divorce of his parents and absence of his father, had negative consequences for him. He was transferred by his mother to public school. He left the small, structured and protected environment of the church school for the larger public school system, where he struggled, particularly in language based classes, and seemed to have difficulty with attention and concentration. This change in schools contributed to a change in peer groups. He saw less of his friends from the church school, most of whom went away to a boarding high school run by the church, and began spending time with other youth from the neighborhood. Then, his cousin Mel came to live with Brandon's family. Brandon had not been in any trouble in the community prior to the time Mel came into the home. Mel admits to being a negative influence and the prime mover behind the burglaries that he and Brandon committed, and which led to the 1995 referrals to Juvenile Court.

Brandon's juvenile offenses, at age fourteen and fifteen, led initially to a move from his mother's home to his father's, who had come back into Brandon's life at that time; then to placement in a residential facility in Brownwood. He was transferred from the Killeen 9th Grade Center to Temple High School, then to Brownwood High School. This was the beginning of numerous changes in high schools for Brandon, making it difficult for the schools to recognize and assist him with learning problems, and for Brandon to earn his high school diploma. Catch 22, the program in which Brandon was placed by Bell County, did not appear to be appropriate for his age and needs, and provided little in the way of rehabilitative services. He had just turned fifteen years old and was placed in type of independent apartment living arrangement, with some supervision and few services. He was never provided with the counseling services ordered by the Court. Nevertheless, he did not have behavioral problems while in Catch 22, and was discharged from the program after only six months. Records indicate that his treatment needs had not been met.

Brandon returned to his father's home, and to Temple High School, in early 1996. For about seventeen months, while he lived with his father, he avoided further legal difficulties and earned his GED. He worked at a job in Temple. Kenneth Bernard kept a tight rein on Brandon, and maintained regular contact with his school and probation officer. Brandon complied with all rules and seemed to do well. He was apparently, however, still

1007

experiencing some emotional distress, possibly depression, as his pediatrician referred him for psychological evaluation due to "stress" in late 1996. Thelma cancelled the appointment.  Unfortunately, in late spring of 1997, a dispute between Brandon and his father at a church event led Thelma to decide that Brandon should return to live with her.

Back in his mother's home, with few rules or controls, Brandon, then almost seventeen years old, re-connected with old friends from the neighborhood.  By that time, Dettrick Spiller, Mel Pollock and some others had started a loosely formed  gang  called the 415 Tree Tops (or just 415s). Brandon associated with them.  Others of his friends were in a group called the 212 PIRUs, which had reportedly been started by the Presleys, also friends of Brandon's.  As stated above, all, including the former members of the groups, teachers from the community, and Brandon's probation officer, characterized these groups as gang "wannabes", essentially comprised of kids from one or more neighborhoods - in this case, Heather Glen and Long Branch - who hung around together, and adopted colors and symbols of national gangs.  Though they called themselves "Bloods", there is no evidence that they were formally organized or had any formal affiliation with a national gang.  Even the officers who testified at Brandon's trial about gangs presented no evidence that the 415s or 212s were formally affiliated with any national gang.

Young people become involved in gangs for a number of reasons, including for: a sense of family, belonging or acceptance; protection in the community; subsistence; respect; and as a response to peer pressure. Persons tend to join in adolescence, which is a time of identity formation, with issues of masculinity and self-esteem; and a time of life characterized by risk-taking, impulsivity, vulnerability to peer pressure, problems with judgement and problem-solving, and a need for a sense of belonging or group identity (see below).  For minority youth, identity development in an atmosphere or environment that has so many negative images of them, so many insults to their sense of self, is particularly difficult.  Gang membership offers them a sense of acceptance, respect and self-esteem.

The U.S. Department of Justice, through the Office of Juvenile Justice and Delinquency Prevention (DOJ - OJJDP), has studied gangs for a number of years.  It has sponsored the annual National Youth Gang Survey, conducted by the National Youth Gang Center, since 1995, in an effort to track the development and characteristics of gangs across the country.  Their studies indicate great differences between the traditional early onset gangs in large urban areas, such as the Bloods and Crips of Los Angeles, and the Gangster Disciples, Vice Lords or Latin Kings of Chicago, and later onset gangs in less urban areas.    OJJDP has published a number of reports and

1008

studies related to gangs in the U.S., which provide useful information in more accurately portraying the youth gangs in existence in Killeen at the time of this offense.  They note the problem of popularly held, media-influenced misconceptions about modern day youth gangs outside central urban areas, stating that the public continues to perceive youth gangs and gang members in terms of the media stereotype of the Crips, Bloods or Gangster Disciples rather than in terms of current scientific data.  These misconceptions have unnecessarily fueled the public's fears.

Research and studies indicate that in less urban areas, gangs developed during the 1980's and 1990's.  While many of these groups took on the names or symbols of the older, more formally structured gangs of large urban areas, they were not actually affiliated with them, and did not share the same characteristics.  By 2001, 65% of cities with a population of 50,000 to 99,999 reported gang presence in their communities (Killeen's population in 1999 was about 85, 000).   These tended to be the later onset type of local gangs and have been described as modern day "hybrid" gangs.  They tend to: have younger members, with most members being fifteen to seventeen years old; have both male and female members; be racially mixed; have unclear rules or codes of conduct; and have symbolic associations with more than one well-established gang.  They are less likely to be involved in drug dealing or gang-related homicides, and more likely to be involved in property crimes. Most adolescents do not remain in these gangs for long periods of time, and generally leave after adolescence.  Contrary to popular myth, in these later onset, hybrid gangs, lifetime membership is not the practice, and it is easy to leave.  Many of these groups adopt colors or symbols of different national gangs, or have members who switch from one gang to another.  This is evident in the 415s and 212s, which called themselves Bloods (a Los Angeles gang) and wore the color red, but also used symbols of the Gangster Disciples, or People Nation from Chicago.  True, traditional, organized gangs would not have this mix of colors and symbols.

The expanded presence of gangs outside of large urban areas has been viewed as a function of the relocation of young people from central cities to smaller cities, which is sometimes called gang migration.  In most cases, there is little or no real connection between local groups with the same name, and national, urban gangs.  Law enforcement professionals, according to studies, may have difficulty differentiating among local gangs that have adopted the names, colors or symbols of national gangs, but have no real connection with them.  Several persons interviewed in this case pointed to the fact that Ft. Hood, located on the boundary of the Killeen city limits, contributed to a great deal of transiency in the population and the migration of gangs into the area.  Teachers interviewed indicated that these gangs seemed to have been a phenomenon of the mid to late 1990's in Killeen, and are not viewed as a serious problem today.  The school system no longer

1009

provides gang training for its teachers and staff.

During the remainder of 1997 and all of 1998, Brandon spent time with these friends. His alcohol and drug use increased during this period. His primary drug of choice was marijuana, which he used on a regular basis. Despite the fact that he earned his GED in the summer of 1997, Brandon made repeated efforts to obtain his high school diploma. He had the desire to eventually attend college, and felt that a regular high school diploma would enhance his chances of getting into college. He made little progress towards this goal, but, rather, just seemed to drift, spending his time with friends in the community. Some efforts were made by Brandon, and by his parents, to extract him from this situation. He tried to enlist in the military. His parents sent him to visit relatives in Louisiana for a few weeks. Finally, they sent him to live with relatives in Michigan. He did work and attend school in Michigan, but the pregnancy of a girlfriend led him back to Killeen. He had planned to stay only a short time, but instead remained. Within a few months of his return in early 1999, he was involved in the instant offense.

During the first few months of 1999, Brandon experienced a number of stressors. He returned to Killeen concerned about how he could handle the responsibilities of parenthood. Shortly after his return, his maternal grandmother died. He had spent a great deal of time in her home during his childhood. He was still determined to earn a high school diploma, but felt he couldn't do it at Killeen High School, where he felt he would be labeled. In order to enroll at Ellison High School, he rented a small apartment in the Ellison district. He did this with his mother's help, but was ill equipped to live on his own. Left to his own devices, and subject to the vulnerabilities of youth, his drug and alcohol use escalated. He began using cocaine heavily in the spring, along with regular use of alcohol and marijuana. He tried other substances, including marijuana dipped in embalming fluid, a substance that can have a damaging effect on the brain (see below; also affidavit of Michael Gelbort, Ph.D.). His daughter by Shay Grimstead was born in late March, 1999. Though he said he looked forward to having a child, he clearly felt the pressures of parenthood at such a young age, and with little ability, financially or emotionally, to take on such responsibility.

In late March, Brandon sustained a serious head injury, resulting in a loss of consciousness. He had several prior head injuries, including two as a very young child. Shortly after this, he was informed by Sherise Scott that she was pregnant with his baby. While there is a question as to whether this is really his child, Brandon decided to accept Sherise's assertions. This created added pressures for him. He was injured in a motor vehicle accident in late May, 1999, less than one month before the offense. He was prescribed Flexiril and Advil 3 for treatment of neck pain. Brandon held two short term jobs in the spring of 1999, but was unable to maintain them. He

1010

was feeling pressure to find work in the weeks preceding the offense. His alcohol and drug use escalated, and he became involved, along with Terry Brown and Chris Vialva, in some burglaries in the Killeen area. He was generally the driver; the others entered the residences and took items.

During the weeks preceding the offense, Brandon was taking Theodur, in pill form, and Alupent, in an inhaler, for treatment of his asthma; and had been prescribed Flexiril and Advil 3 for injuries sustained in the car accident. He was also heavily abusing drugs and alcohol. He regularly consumed malt liquor, Brandy and Cisco, a fortified wine with a high alcohol content. On occasion, he drank gin. He regularly smoked marijuana, and at times, marijuana dipped in embalming fluid. He also smoked cigarettes. Theodur and Alupent are bronchodilators, which can have interactive effects with other drugs, including alcohol. Flexiril is a muscle relaxant which can also have interactive effects, including with alcohol and other central nervous system depressants, e.g. marijuana. Flexiril can enhance the effects of alcohol. Advil 3 is an analgesic pain reliever containing codeine. Codeine is derived from opium/morphine, and also has an additive effect to central nervous system depressants such as alcohol and marijuana. Codeine is contraindicated for head injury. All of these substances can act to impair brain functioning. They can impair judgement, memory, concentration and cognitive functioning; they can inhibit emotional control and increase risk-taking behavior.

One of the most dangerous substances Brandon used during this period was marijuana dipped in embalming fluid. This trend began on the east coast in the 1980's and was reported in Texas in the early 1990's. A report prepared by the Texas Commission on Alcohol and Drug Abuse in 1998, noted that adolescent use of marijuana had escalated in Texas during the early to mid 1990's, as had smoking of cigarettes. Marijuana and cigarettes were viewed as "gateway" drugs that led to increased use of other illegal drugs, including what became known as "fry" or "wet", marijuana cigarettes or tobacco cigarettes soaked in embalming fluid, and often laced with PCP. Embalming fluid is a compound of formaldehyde, methanol, ethyl alcohol or ethanol, and other solvents. The fluid found on the streets often also contained PCP. Most buyers were unaware of that fact. PCP (Phencyclidine) is a dissociative anesthetic with hallucinogenic properties. The effects of use of embalming fluid include bronchitis, body tissue destruction, brain damage, lung damage, impaired coordination, and inflammation of the throat and esophagus.

Brandon's use and abuse of these substances appears to have been a function of several factors. It was certainly a part of adolescent experimentation and a product of peer influence. It was also a form of self-medication for underlying low self-esteem, anxiety and depression. The

use of these substances, with their concomitant effects, combined with Brandon's young age, were contributors to his actions in the offense.

Brandon was youthful at the time of the instant offense, only eighteen years old. Youthfulness has historically been considered mitigating as to punishment in capital cases. This is because it is understood that youth is a time in life when a person is still developing and maturing. Many of the characteristics of youth, that contribute to impulsive and risky behavior, are products of a stage in life that the person will mature out of. Adolescents have not yet developed the psychological, cognitive and emotional characteristics of mature adults. They are more impulsive, and less capable of controlling their behavior or thinking in terms of long-term consequences. They have problems with judgement and problem-solving. Stress interferes with their capacities, especially for good decision-making, more-so than with adults. A very small percentage of youths who commit violent behavior by age 18 go on to commit violent crimes as adults. Most youths arrested for a violent offense do not engage in further violence.

Adolescents mature gradually and unevenly. Chronological age does not necessarily correspond with maturity, and is not a reliable indicator of development due to the great variations among individuals. [Note: much of this information regarding adolescent development is based on the work of Thomas Grisso, Ph.D. and Marty Beyer, Ph.D., psychologists with expertise in adolescent development and behavior.] Each adolescent develops at his or her own pace. Boys mature more slowly than girls. The maturation process involves cognitive development, identity formation, developing competence, moral development, and physical development. Even late in their teens, young people have difficulty employing mature cognitive strategies and engaging in rational decision-making. Adolescents are often surprised by the outcomes of their actions, and view as "accidental" unintended consequences. Adolescents often do not plan, or follow through with a plan, and can get caught up in unanticipated events. Risk-taking behavior is common at this stage of development, and reduces the ability to use mature and rational cognitive strategies. Learning difficulties and substance abuse can further compromise their judgement, decision-making and problem-solving ability. These capabilities evolve throughout adolescence and are often not adequately developed until a person is well into his or her twenties.

Adolescence is a time of identity development. Family, culture, peers and gender affect one's definition of self. While the core of a child's sense of belonging comes from family, during adolescence peers take on an increasingly important role. Identifying with peers is an important part of self definition. Adolescents need to feel that they belong and fit in. Group membership adds to their sense of belonging. Peers are often more unconditionally accepting, and less critical, than parents. Peers have a great

1012

influence on day to day choices during adolescence. Boys are generally more susceptible to peer pressure than girls.   Experiences with racism, including negative media images of one's race, can affect self-image and susceptibility to peer pressure. Adolescents who have painful or difficult experiences and feelings will often turn to substances to numb their feelings.

Adolescents need to experience success to feel good about themselves, and to be able to resist negative peer pressure. Many teens develop anxiety because they don't feel competent, or don't feel they can meet the expectations of adults, including parents.   Teens respond better to encouragement rather than punishment. They do not respond to structure in which they don't have a choice, and can resist and rebel against limits which they perceive of as unfair or too restrictive.   They need a combination of nurturing and reasonable limits, with opportunities for choice and success in order to grow into healthy functioning and responsible adults.

The physical changes of puberty also can affect adolescents in may ways.  Boys reach puberty later than girls.  Differences in the onset and rate of physical development can affect self-confidence and identity.  Neurological and biochemical functioning can affect adolescent behavior.  In recent years, studies have shown that the adolescent brain is far from mature.  The brain is generally not fully developed until well into the twenties.  Boys brains tend to develop later than girls.   Different parts of the brain develop at different rates.  One of the last parts to develop is the prefrontal cortex, that part of the brain responsible for emotional controls, judgement and decision-making. [Note: see, for example, U.S. News & World Report: August 9, 1999.]  The connections between neurons that affect emotional skills, and physical and mental abilities are still being forged throughout adolescence.   Until the prefrontal cortex is fully formed, in a process called "pruning", most teens don't have the brain power they need to exercise good judgement, or gain access to critical memories and emotions that help them in rational decision-making.   In addition, levels of serotonin appear to decline temporarily in most adolescents, making them more prone to act impulsively. The brain's capacity for growth through adolescence indicates that even troubled teens can still learn restraint, judgement and empathy.  For all these reasons, which relate to a stage in human development out of which persons mature, youthful defendants have been deemed less morally culpable as it relates to punishment, as their actions are, to a great, extent, a product of that time in life.

There are a number of indicators in Brandon's history that he had rehabilitative potential and the capacity to make a positive adjustment to incarceration.   Brandon did not have a history of violent or assaultive behavior prior to the instant offense.  He was viewed as someone who would, under normal circumstances, not harm others. Psychological testing at age fifteen, in 1995, indicated that he was responsiveness to the needs and

1013

concerns of others; was compassionate and empathetic in relationships; and had appropriate regard for authority.  Ties to conventional norms are indicators of rehabilitative potential. In Brandon's case, this includes: strong religious upbringing and faith; positive motivation for education as evidenced by earning his GED, efforts to obtain a high school diploma, and the desire to attend college; and positive attachment to his family.  His family has remained attached to and supportive of him. His parents have reconciled and remarried; they were together at the time of his trial.  They communicate better, including about child rearing, and Kenneth has mellowed in his disciplinary practices.  Except for a couple of minor infractions, which were early in his pre-trail confinement and typical for his age, Brandon made a generally positive adjustment to incarceration. He was respectful of rules and staff, did not engage in confrontations, and made constructive use of his time. He regularly attended Bible studies, and counseled with the pastor from his church and other spiritual advisors.  He would have been expected to continue to make a positive adjustment to incarceration in the federal prison setting.  Brandon has a clear understanding of right and wrong, and appreciates the wrongfulness of his actions in this offense.  He has expressed remorse and a desire to make amends to his church and family.  As Pastor Johnson pointed out, the desire to make amends is an important aspect of remorse.

## SOURCES

Brandon Bernard
Thelma Bernard, mother
Kenneth Bernard, father
Quiona Bernard, sister
Max Bernard, brother
Mary Pollock, maternal aunt
Melsimeon Pollock, maternal cousin
Martha Johnson, maternal aunt
Novtony Baez, former juvenile probation officer
Dann Barger, former director of Catch 22
Melba Barger, former staff of Catch 22
Rick Marasco, former elementary teacher
Brad Hobbs, high school teacher
Susan McLaughlin, high school teacher
Mattie Adams, GED teacher
Rev. Terry Johnson, former pastor at Seventh Day Adventist Church
Debbie King, fellow church member
Bonnie Wainwright, fellow church member
Pastor Michael Cherry
Terry Brown, co-defendant
Matthew Mitchell, friend

1014

Michael Voegele, friend
Dettrick Spiller, friend
Antonio Jackson, friend
Alice Brown, mother of Terry Brown
Richard Hoppe, investigator
Carolyn Hoppe, investigator
Dr. Michael Gelbort, neuropsychologist
Rob Owen, attorney

Memoranda re: interviews by Investigator Royce Rutherford with:
  Terry Brown
  Tony Sparks
  Christopher Lewis
  Greg Lynch


## Records and Documents

Indictment, Second Superceding
Notice of Intent to Seek the Death Penalty
Motions
Portions of the trial transcript, including testimony of Terry Brown and Chris
  Lewis
Penalty Phase transcript
Victim Impact statements
Investigation reports by the Texas Department of Public Safety, Texas
  Rangers Division
Trial court docket
Special Findings Form (verdict sheet)
McLennon County Jail records
Investigative Report by Criterion Investigations
File of trial attorneys, Russell Hunt & Russell Hunt, Jr.
Birth record, Brooke Army Medical Center
Medical records, Bassett Army Medical Center
Medical records, Darnel Army Medical Center
Metroplex Hospital records
Scott and White Clinic records
Dr. Wayne Pundt, dental records
School records:
  Seventh Day Adventist Academy
  Rancier Middle School
  Killeen 9th Grade Center
  Killeen High School
  Temple High School
  Brownwood High School

1015

Ellison High School
Killeen Alternative Center
GED Certificate
Juvenile Court files
Bell County Juvenile Probation files
Psychological evaluation by Dr. Frank Pugliese (1995)
Psychological evaluation James Shinder, Ph.D. (2000)
Social Security Itemized Statement of Earnings
Meijers, employment records
Adecco Services, Inc., employment records
Military records, Thelma Bernard
Macon Police Department Incident Report
Criminal history records re: Melsimeon Pollock
Presentence Investigation Report re: Terry Brown
Psychological evaluation of Terry Brown by James Shinder, Ph.D.
Plea and sentencing transcripts for Terry Brown, Tony Sparks and
    Christopher Lewis
Brandon Bernard's letter to his church
Family photos and film
Divorce records, Thelma and Kenneth Bernard
Arrest and Court records re: Kenneth Bernard
Protective order granted to Thelma Bernard against Kenneth Bernard
"Inside the Teen Brain"; U.S. News & World Report; August 9, 1999
Report of the Texas Commission on Alcohol and Drug Abuse: "Fry": A Study
    of Adolescents' Use of Embalming Fluid with Marijuana and Tobacco
    (1998)
"Embalming Fluid-Soaked Marijuana: New High or New Guise for PCP?",
    article found on internet
"Highlights of the 2001 National Youth Gang Survey", U.S. Department of
    Justice, Office of Juvenile Justice and Delinquency Prevention
"Modern-Day Youth Gangs"; U.S. Department of Justice, Office of Juvenile
    Justice and Delinquency Prevention
"Hybrid and Other Modern Gangs"; U.S. Department of Justice, Office of
    Juvenile Justice and Delinquency Prevention
"Juvenile Competency: Presenting the Lives of Juveniles in a Capital Case",
    materials presented at Life in the Balance XI, death penalty conference
    sponsored by the National Legal Aid and Defender Association (1999);
    includes materials by Thomas Grisso, Ph.D. and Marty Beyer, Ph.D.
Declaration of Michael M. Gelbort, Ph.D.

1014

**JILL MILLER, MSSW**

Forensic Social Work Services    6701 Seybold Road, Suite 122
E-mail: jillemiller@sbcglobal.net   Madison, Wisconsin  53719
(608) 271-0227
FAX (608) 271-0491

## RESUME

## CURRENT POSITION

1984-present     Forensic Social Work Services.  Private practice in forensic social work, providing consultation and expert witness services to attorneys and courts in criminal, juvenile, family and other civil proceedings.   Specializing in social history investigations and psycho-social assessments; the development of treatment and rehabilitation plans for sentencing and dispositional hearings; preparation for the penalty phase of capital murder cases; and analysis of penalty phase preparation and presentation in post-conviction capital cases.  Primary focus in recent years has involved work on capital cases, at the trial and post-conviction levels; and in state, federal and military cases.  Sole proprietorship; opened in January, 1984.  Previously engaged in limited private practice from 1973 to 1976, and 1978 to 1983.

## LICENSE

Licensed as a Clinical Social Worker, State of Wisconsin, License Number 1662.

## EDUCATION

1983              Completed 20 hour training program on Mediation in Divorce and Family Disputes.

1973-74           Doctoral student, University of Wisconsin-Madison, School of Social Work.  Emphasis on legal aspects of social work practice and welfare economics.

1971              Masters of Science Social Work, University of Wisconsin-Madison.  Field placements at Legal Services

1017

Center and Dane County Mental Health Center. Thesis research on attitudes of welfare recipients toward welfare rights organizations. Recipient of HEW Social and Rehabilitation Services Training Grant.

1967        Bachelor of Arts Degree, major in Social Work, University of Wisconsin-Madison. Recipient of UW-Madison tuition scholarship during all semesters

1963-64        Attended Carroll College, Waukesha, Wisconsin. Recipient of tuition scholarship as National Merit finalist

## EMPLOYMENT HISTORY

1973-85        Clinical Assistant Professor, School of Social Work, University of Wisconsin-Madison. Taught courses in Social Work Advocacy and the Law, Social Work Methods, and Field Experience. Supervised field course units at the Wisconsin State Public Defender Office, Youth Policy and Law Center, Legal Services Center of Dane County, Dane County Juvenile Court, Wisconsin Indian Legal Services and Wisconsin Council on Criminal Justice. Areas of expertise included law and legal skills for social workers, advocacy, criminal and juvenile justice, and policy development.

1979-84        Client Services Director, Office of the State Public Defender, Wisconsin. Position entailed responsibility for the social work services of the statewide public defender system and other administrative responsibilities. Duties included development of positions, hiring, training, supervising, legislative monitoring, development of resource materials, consultation with trial offices throughout the state, development of student placements, and other duties as determined by the State Public Defender. Special assignments included: coordinating the representation of unaccompanied Cuban minors placed in Wisconsin after the Mariel boat-lift; conducting a study of the issue of recoupment from parents for the costs of legal representation of their minor children; and developing and directing a joint training program with the Division of Corrections on probation and parole revocation procedures. In addition, provided services to attorneys on selected cases.

1976-78        Associate Director, Youth Policy and Law Center, statewide public interest agency in Wisconsin. Agency involved child

1018

Page 3

advocacy and policy reform in the state's juvenile justice system. Responsibilities included administrative duties, fund-raising, supervising intern program, personnel and affirmative action, and involvement in substantive issues. Special projects included state budget issues, detention practices, dispositional alternatives, correctional practices, mental health issues and legislative monitoring. Involved in the drafting and passage of a new state juvenile code. Co-founder of agency.

1975     Instructor, University of Wisconsin Extension course on Law and Social Work.

1974-75     Program Co-director of U.S. HEW-funded project on "Legal Training for Child Welfare Workers", sponsored by the University of Wisconsin Center for Social Services. Program involved workshops on legal aspects of substantive areas in child welfare field, production of eight videotape programs to be used as training tools in agencies, and production of training manual. Co-authored grant proposal.

1974     Instructor, University of Wisconsin Extension course on Law and Social Work

1973     Instructor, University of Wisconsin Extension course on Juvenile Justice

1971-73     Staff Social Worker, Legal Services Center of Dane County, Madison, Wisconsin. Supervisor of social services in juvenile, criminal and civil programs of agency; caseload in Juvenile Defender Program; liaison field instructor for graduate students of the University of Wisconsin-Madison School of Social Work.

1971-72     Staff, Emergency Mental Health Services; twenty-four hour suicide and crisis intervention service operated by the Dane County Mental Health Center, Madison, Wisconsin. Part-time position.

1970-71     Teaching Assistant, School of Social Work, University of Wisconsin-Madison. Assisted in teaching of undergraduate field experience and social work methods course at the Dane County Department of Social Services.

1019

Page 4

1967-70          Undergraduate Counselor, School of Social Work,
                 University of Wisconsin-Madison.  Provided academic counseling
                 to undergraduate students; prepared timetable of courses;
                 assisted during registration; contributed to preparation of school
                 bulletin; and performed other duties as required by the Director
                 of the School of Social Work.

## PROFESSIONAL MEMBERSHIPS

1998 - present   The American Academy of Experts in Traumatic Stress;
                 Board certified in Forensic Traumatology  (January, 1999)

1995 - present   National Association of Sentencing Advocates; member of
                 Conference Committee for 2004 annual conference; past member of
                 Policy Committee  and Mitigation committee; past co-ordinator of
                 mentor project

1992 - 2000      National Organization of Forensic Social Work; also a
                 member from 1986 to 1989; Elected member of Board of Directors
                 (1993 - 1996); Secretary of Board of Directors (1995 - 1996)

1980 - present   National Legal Aid & Defender Association.   Elected
                 member of Defender Council (1993 - 1998, and 1983 - 1990); elected
                 member of Board of Directors (1986 - 1990);  chairperson of Social
                 Services Section and co-chairperson of Death Penalty Litigation
                 Section; founder of Social Services Section; Chairperson of Defender
                 Council (1996 - 1998); past member of Executive Committee,
                 Conference and Awards Committee, Membership Committee, and
                 Nominating and Resolutions Committee at various times.

## AWARDS

2000             Recipient of "Life in the Balance" Achievement Award,
                 presented annually to a lawyer or mitigation specialist by
                 the National Legal Aid & Defender Association in
                 recognition of contributions to capital defense
                 representation

1999             Recipient of award for "Outstanding Contributions to the
                 Profession", annual award by the National Association of

1620

Page 5

> Sentencing Advocates, for dedication in the advancement
> of sentencing advocacy

## PROFESSIONAL SERVICES

2002    Consulted on the updating and revision of "Guidelines for the Appointment and Performance of Counsel in Capital Cases", American Bar Association; adopted by ABA in February, 2003

1997    Appointed member of Working Group for the U.S. Department of Justice, Bureau of Justice Assistance and Bureau of Justice Statistics co-sponsored national study of indigent defense systems.

1995-96    Member of Blue Ribbon Advisory Committee appointed by the National Legal Aid & Defender Association under a grant from the U.S. Department of Justice, Bureau of Justice Assistance. Committee composed of experienced academics and practitioners who were knowledgeable about the criminal justice system, particularly the defense function. Purposes of the committee were to identify successful models of indigent defense programs, alternative initiatives crucial to the improvement of the criminal justice system, and areas of indigent defense representation that required further research and development.

1993-96    Board Member, Consortium for the National Equal Justice Library.

1990-92    Consultant, National Legal Aid & Defender Association, for Mitigation Specialists Training Project and Mitigation Affidavit Project.

1991    Consultant to the Missouri State Public Defender System; provided training for mitigation investigation staff.

1990-91    Consultant to the Illinois Capital Resource Center, provided two sixteen-hour training programs for mitigation staff.

1986-89    Consultant, Project FIT (Families in Transition), an intensive in-home treatment program for adolescents and their

1021

Page 6

families, operated by Family Services, Madison, Wisconsin

1988            Consultant to State of Florida, Department of Health and Rehabilitation Services.  Prepared training monograph for state juvenile court workers titled "The Social Worker in Court: Case Preparation and Testifying."

1983-89        Task Force on Women in the Criminal Justice System, Wisconsin Women's Network.  Member and legislative coordinator.

1979-86        Mental Health Association in Wisconsin.  Member, Board of Directors; chairperson of the Public Policy Committee and the Child Advocacy Committee; treasurer.

1983-84        Judicial Council, State of Wisconsin, General Projects Committee.  Represented the Office of the State Public Defender at meetings to study the issue of recoupment from parents for the costs of legal representation of their children and appellate procedures in state courts.

1978-84        Project TRY Advisory Committee.  TRY (Treatment and Rehabilitation for Youth) was an intense treatment program for delinquent children in need of mental health treatment in a secure setting.

1981-82        Committee on Revision of Administrative Rules Governing Child Welfare Institutions.  Appointed by Secretary of the Wisconsin Department of Health and Social Services.

1980-82        Consultant, ABT Associates, private consulting firm in Cambridge, Massachusetts.  Consulted on federally-funded project to develop program model materials on social services in public defender offices.

1980            Consultant, to Briarpatch (runaway center in Madison, Wisconsin) on the development of a group home for Cuban juveniles.

                Consultant to University of Kentucky School of Social Work on the development of social work field placements in legal settings.

1b22

Page 7

| | |
|---|---|
| 1978-79 | Consultant and Research Associate, Youth Policy and Law Center. |

1979        Foster Care Monitoring Project, Advisory Committee, joint project of the Wisconsin Department of Health and Social Services and the University of Wisconsin-Milwaukee.

Consultant to research project on issues in mental health, conducted by Dr. Dave Gustafson, Center for Health Sciences, University of Wisconsin

1977-79      Juvenile Grievance Procedure Implementation Committee, state committee appointed by Wisconsin Division of Corrections to implement a grievance mechanism in juvenile correctional programs.

1976-79      Law-Related Education Advisory Committee, committee established to oversee project co-sponsored by Wisconsin Department of Public Instruction and State Bar of Wisconsin, to establish law-related education in the state's secondary and middle schools.

1975-79      Wisconsin Civil Liberties Union, Children's Rights Committee.

1977-78      Juvenile Detention Implementation Committee, co-chairperson.  State committee established by the Wisconsin Department of Health and Social Services to implement the recommendations of the Juvenile Detention Study.

Juvenile Grievance Procedure Committee.  State committee appointed by the Wisconsin Division of Corrections to study the need for a grievance procedure in juvenile correctional programs and to establish guidelines for the development of a procedure.

Prison Health Care Advisory Committee.  State committee appointed by the Wisconsin Department of Health and Social Services to study and make recommendations on health care programs in adult and juvenile correctional facilities.

1023

Page 8

> Title XX Advisory Committee.  Committee appointed by the Wisconsin Department of Health and Social Services to develop Title XX plan for the state.

1975-76        Joint Legislative Committee on Institutional Closings. Committee mandated and appointed by the Wisconsin Legislature to study the closing of the Wisconsin School for Girls and the Wisconsin Child Center, and to develop plans for alternate placements of the juveniles.

1972-75        Board of Directors, Briarpatch; Madison, Wisconsin agency serving runaway youths and their families.

1972-73        Consultant to Jonah House, a group home for emotionally disturbed adolescents in Madison, Wisconsin.


**TRAINING, WORKSHOPS AND SPEECHES**

2004        Faculty, Annual Conference of the National Association of Sentencing Advocates; Milwaukee, Wisconsin

Coordinator and faculty, Death Penalty Mitigation Institute; sponsored by the National Association of Sentencing Advocates; Milwaukee, Wisconsin

Faculty, Life in the Balance XVI, annual death penalty conference sponsored by the National Legal Aide and Defender Association; Memphis, Tennessee

2003        Faculty, Annual Conference of the National Association of Sentencing Advocates, presentation on 'Mitigation A to Z: A Primer"; Albuquerque, New Mexico

Faculty, Making the Case for Life VI: Mitigation Investigation in Capital Cases", death penalty training sponsored by the National Association of Criminal Defense Lawyers; Memphis, Tennessee

Presenter, "Strengthening the Guiding Hand of Counsel: Reforming Capital Defense Systems", conference on the

1024

Page 9

American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, sponsored by the ABA Death Penalty Representation Project and Hofstra University School of Law

2002    Faculty, "Making the Case for Life V: Mitigation Investigation in Capital Cases", death penalty training sponsored by the National Association of Criminal Defense Lawyers; Raleigh, North Carolina

Faculty, "Defending Complex Cases", Naval Justice School; Newport, Rhode Island

Faculty, "Life in the Balance XIV", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Kansas City, Mo.

2001    Faculty, "Life in the Balance XIII", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Albuquerque, New Mexico

Faculty, "Capital Litigation Defense Course", sponsored by the Naval Justice School; Newport, Rhode Island

2000    Faculty, "Making the Case for Life IV: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Houston, Texas

Trainer, "Death Penalty Defense Workshop", sponsored by the Office of the State Appellate Defender - Death Penalty Trial Assistance Division; Chicago, Illinois

Faculty, "Life in the Balance XII", annual death penalty conference sponsored by the National Legal Aid and Defender Association; Washington, D.C.

Faculty, Annual Conference of the National Association of Sentencing Advocates; San Diego, California; also, co-coordinator and faculty, Death Penalty Institute, held in conjunction with annual conference

1025

Page 10

| | |
|---|---|
| 1999 | Faculty, "Making the Case for Life: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Boise, Idaho |

Faculty, Death Penalty Training Seminar, sponsored by the Florida Association of Criminal Defense Lawyers; Haines City, Florida

Faculty, Annual Conference of the National Association of Sentencing Advocates; Miami, Florida

Faculty, "Life in the Balance XI", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Atlanta, Georgia

1998        Faculty, "The Fight for Life: Mitigation That Wins", sponsored by the Tennessee Association of Criminal Defense Lawyers and The Tennessee District Public Defenders Conference; Nashville.

Trainer, Annual Conference of the National Association of Sentencing Advocates; Washington, D.C..

Faculty, "Life in the Balance X", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Philadelphia, Pennsylvania.

Faculty, "Making the Case for Life: Mitigation Investigation in Capital Cases", sponsored by the National Association of Criminal Defense Lawyers; Scottsdale, Arizona.

Trainer, Death Penalty Seminar sponsored by the Federal Defender Office of Washington & Idaho; Boise, Idaho

1997        Trainer, Annual Conference of the National Legal Aid & Defender Association; St. Louis, Missouri.

Trainer, Annual Conference of the New Mexico Public Defender; Glorietta, New Mexico.

Trainer, Nebraska Commission on Public Advocacy;

Page 11

presented day-long training program on mitigation in capital cases for staff of the Major Case Resource Center; Lincoln, Nebraska.

Faculty, "Life in the Balance IX", annual death penalty conference sponsored by the National Legal Aid & Defender Association.

1996

Trainer, Annual Conference of the National Legal Aid & Defender Association; Las Vegas, Nevada.

Faculty, "Understanding Violence: Prevention Strategies and Mitigation Training", seminar sponsored by the Center for Death Penalty Litigation, the Carolina Justice Policy Center, and the UNC-Chapel Hill School of Social Work; Chapel Hill, North Carolina.

Faculty, "Life in the Balance VIII", annual death penalty conference sponsored by the National Legal Aid & Defender Association; St. Louis, Missouri.

Trainer, Client Services Workshop, Office of the State Public Defender; Madison, Wisconsin.

1995

Trainer, Annual Conference of the National Legal Aid & Defender Association; New Orleans, Louisiana.

Trainer, Indiana Public Defender Council, Sentencing Training; Indianapolis, Indiana.

Trainer, "The Defense of Drug Cases", National Legal Aid & Defender Association regional conference; Baltimore, Maryland.

Trainer, Annual Conference of the National Association of Sentencing Advocates; Chicago, Illinois.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Reno, Nevada.

Faculty, "Life in the Balance VII", annual death penalty conference sponsored by the National Legal Aid & Defender

1027

Page 12

Association; Kansas City, Missouri.

1994        Trainer, Annual Conference of the National Legal Aid & Defender Association; Washington, D.C..

Speaker, University of Wisconsin-Madison Law School, course on Capital Punishment.

Trainer, NAACP Legal Defense and Education Fund; annual Capital Punishment Conference; Warrenton, Virginia.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Atlanta, Georgia.

Faculty, "Life in the Balance VI", annual death penalty conference sponsored by the National Legal Aid & Defender Association; Austin, Texas.

1993        Trainer, Annual Conference of the National Legal Aid & Defender Association; Albuquerque, New Mexico.

Trainer, Defender Association of Philadelphia; day-long training for homicide unit; Philadelphia, Pennsylvania; April, 1993.

Faculty, "Life in the Balance V", annual death penalty conference sponsored by the National Legal Aid & Defender Association; New Orleans, Louisiana; March, 1993.

1992        Trainer, Annual Conference of the National Legal Aid & Defender Association; Toronto, Ontario, Canada; October, 1993.

Trainer, Criminal Defense Conference, the Wisconsin State Public Defender; Oconomowoc, Wisconsin; October, 1992.

Faculty, Death Penalty Seminar, sponsored by the Indiana Public Defender Council; Indianapolis, Indiana.

1991        Trainer, Annual Conference of the National Legal Aid & Defender Association; Portland, Oregon.

1028

Page 13

Faculty, "Mitigation Specialists Training", sponsored by the National Legal Aid & Defender Association, the Missouri Capital Punishment Resource Center, and the National Association of Social Workers - Missouri Chapter; St. Louis, Missouri.

Faculty, "Life in the Balance III", annual death penalty conference sponsored by the National Legal Aid & Defender Association; New Orleans, Louisiana.

Trainer, Annual Conference of the National Organization of Forensic Social Work; Washington, D.C.

1990    Trainer, Annual Conference of the National Legal Aid & Defender Association; Pittsburg, Pennsylvania.

1989    Trainer, Annual Death Penalty Seminar, sponsored by the Office of the State Appellate Defender; Collinsville, Illinois.

1988    Trainer, Annual Conference of the National Legal Aid & Defender Association; San Diego, California.

1987    Trainer, "Critical Issues in Juvenile Justice: A Working Conference", sponsored by the Wisconsin Department of Health and Social Services; Madison, Wisconsin.
Trainer, Annual Death Penalty Seminar, sponsored by the Office of the State Appellate Defender; Chicago, Illinois.

Trainer, "All About Families Conference", sponsored by the Wisconsin Child Advocacy Project; Madison, Wisconsin.

1986    Trainer, Annual Conference of the National Legal Aid & Defender Association; Atlanta, Georgia.

Speaker, Milwaukee Young Lawyers Association.

Trainer, Regional Conference of the National Defender Investigator Association; Madison, Wisconsin.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

1029

Page 14

Speaker, Criminal Law Section of the Dane County Bar Association; Madison, Wisconsin.

1985    Trainer, Annual Conference of the National Legal Aid & Defender Association; also, coordinator of day-long training program for social services personnel in defender offices and private practitioners providing sentencing services to attorneys; Washington, D.C.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Speaker, University of Wisconsin-Madison School of Social Work, Spring Symposium; Madison, Wisconsin.

1984    Trainer, American Bar Association, Annual Program Meeting; Chicago, Illinois.

Trainer, Annual Conference of the Office of the State Public Defender; Milwaukee, Wisconsin.

Trainer, Jefferson County Human Services Department and county law enforcement personnel.

Trainer, Eau Claire, Wisconsin region of Social Services Departments; Eau Claire, Wisconsin.

Speaker, Criminal Law Section of the Dane County Bar Association; Madison, Wisconsin.

1982    Trainer, Annual Conference of the National Legal Aid & Defender Association; Boston, Massachusetts.

1981    Trainer, Annual Conference of the National Legal Aid & Defender Association; San Francisco, California.

Faculty, Annual Conference of the Office of the State Public Defender; Madison, Wisconsin.

Trainer, First Annual Juvenile Court Intake Training Seminar, sponsored by the Wisconsin Juvenile Court Intake Association; Madison, Wisconsin.

1030

Page 15

Trainer and coordinator; Client Services Spring Workshop, Office of the State Public Defender; Madison, Wisconsin.

1973-80        Trainer and speaker at numerous programs in Wisconsin on Legal Skills for Social Work, Sentencing, Child Advocacy, Mental Health, Juvenile Justice, and Child Abuse and Neglect.

## PUBLICATIONS, PROFESSIONAL PAPERS & MEDIA PRODUCTIONS

2003        Author of article, "The Defense Team in Capital Cases", Hofstra Law Review; summer, 2003; Volume 31, No. 4, page 1117

1991-96        Contributed several newsletter articles to "Capital Report", newsletter of the Death Penalty Litigation Section of the National Legal Aid & Defender Association; articles covered various topics relating to the death penalty and mitigation, including articles on mentally retarded capital defendants, Fetal Alcohol Syndrome and Effects, and cultural and environmental mitigation; several articles have been reprinted in newsletters published by state defender programs, resource centers, and criminal defense attorney associations.

1981-82        Developed a series of videotape programs on "Probation and Parole Revocation Procedures in Wisconsin", as part of the Joint Training Program on Probation and Parole Revocation Procedures, funded by the National Institute on Corrections. Directed the development of the training manual to be used in conjunction with the tapes; authored the grant proposal.

1980        Paper presented before the 1980 Program Meeting of the Council on Social Work Education, on "The Social Worker as Client Advocate: Teaching Advocacy in a Legal Setting"; Los Angeles, California.

1979        Article published in the <u>Journal of Education for Social Work</u> (Fall, 1980), titled "Teaching Law and Legal Skills to Social Workers"; also presented as a paper before the 1979 Annual Program Meeting of the Council on Social Work Education; Boston, Massachusetts.

1031

Page 16

| | |
|---|---|
| 1978 | Paper prevented to the Prison Health Care Advisory Committee, state of Wisconsin, title "Health Care Needs in Juvenile Correctional Facilities." |
| 1977 | "Children in Jail and Detention", report to Acting Governor Martin Schreiber, state of Wisconsin, on the need for non-secure temporary care alternatives for juveniles. |
| 1974 | Developed and produced a series of eight videotape programs titled "Legal Training for Child Welfare Workers", used as training aids in social service agencies and social work classes; wrote grant proposal for development of training program, videotapes, and training manual; co-directors of program. |

## RESEARCH

| | |
|---|---|
| 1980-81 | "Study of Recoupment From Parents for Costs of Legal Representation for Their Children", study mandated by the Wisconsin Legislature in Chapter 356, Laws of 1979. Study included analyzing statutes from other states on recoupment and parental responsibility for costs of legal representation of their children; surveying policies and practices in a number of public defender systems in the country; researching case law on the issue; and conducting a survey of parents of juvenile clients regarding their ability to pay and attitudes towards recoupment. Resulted in legislative provision for recoupment in Chapter 20, laws of 1981. |
| 1977-78 | Conducted study of all juveniles present in Wisconsin juvenile correctional institutions on June 30, 1977. Variables included age, sex, race, county of residence, committing offense(s), prior offense history, prior services and placements, history of running away from placement, and recommendations of Juvenile Offender Review Board. Data was used by state officials for future planning of juvenile correctional programs. |

1032

**GRANTS**

1973-1982      Authored or co-authored grant proposals resulting in over $550,000 in grant awards for various projects, including for: the establishment of the Youth Policy and Law Center, a statewide public interest agency involved in juvenile justice policy issues in Wisconsin; a staff social worker position at the Legal Services Center of Dane County, in Madison, Wisconsin; a joint training program on probation and parole revocation procedures for the Department of Corrections and the Office of the State Public Defender; a project to train child welfare workers in the state of Wisconsin on law and legal skills; projects for the representation and resettlement of unaccompanied Cuban minors in Wisconsin; and a project to provide special services to indigent minority and veteran defendants through the Office of the State Public Defender.

**OTHER ACTIVITIES**

Testified before committees of the Wisconsin legislature on numerous occasions since 1976 on issues related to juvenile justice, mental health, and state funding for human services.

Served on oral examining boards for state and county positions in Wisconsin approximately twelve times since 1975.

Participated in the drafting and passage of several pieces of legislation in Wisconsin, including the Children's Code revision (1978), the Mental Health Act, bills related to the criminal justice and human services systems, and state budget proposals.

Guest speaker on numerous occasions in classes at the University of Wisconsin-Madison.

Along with husband, own and operate a Christmas tree farm in western Wisconsin.

1033

# EXHIBIT 14

1034

FILED

APR 1 1 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. W-99-CR-70(2) |
| | § | |
| BRANDON BERNARD | § | |

## SUGGESTED ADDITIONS TO DRAFT JUROR QUESTIONNAIRE

*TO THE HONORABLE WALTER S. SMITH, JR., UNITED STATES DISTRICT JUDGE FOR THE WESTERN DISTRICT OF TEXAS, WACO DIVISION:*

Now comes **BRANDON BERNARD**, one of the Defendants in the above-styled and numbered cause ("Defendant"), by and through his court-appointed attorney Russell D. Hunt, Sr. ("Attorney Hunt"), and files this his response to the Court's draft Juror Questionnaire which was filed on April 5, 2000.

I.

Present Question 120 leaves blank the names of the victims. Defendant would respectfully request that the names of the victims (Todd A. Bagley and Stacie L. Bagley) be inserted into Question 120.

II.

Present Questions 123 asks prospective jurors whether or not they know U. S. Attorney for the Western District of Texas, Bill Blagg or any other members of his staff. Defendant respectfully requests that the names of the two Assistant United States Attorneys who will be prosecuting this case (Mark L. Frazier and Scott L. Frost) be added by name to Questions 123.

III.

Defendant would also respectfully request that the names of the Government's primary investigating agents be included in a question similar to the present Question 123. These names should certainly include the primary FBI Agents and Texas Rangers who are serving as Case Agents.

IV.

Defendant would additionally respectfully request that the Court include a section on Gang

Membership and/or Activity.  It is my understanding that attorneys for Co-Defendant Vialva have

submitted suggested questions in this regard.

**WHEREFORE, PREMISES CONSIDERED,** Defendant respectfully requests that the above

suggested additions be made to the draft Juror Questionnaire and for whatever other relief the Court feels

appropriate.

Respectfully submitted,

Russell D. Hunt, Sr.
State Bar No. 10289200
P.O. Box 726
Waco, Texas  76703-0726
(254) 753-3738
Fax (254) 753-8118
**ATTORNEY FOR DEFENDANT
BRANDON BERNARD**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above foregoing Motion has been mailed to Mark Frazier,
Assistant United States Attorney,  Western District of Texas, Waco Division,  Rod Goble, attorney for
Co-Defendant Tony Sparks; and Stan Schweiger, attorney for Co-defendant Christopher Vialva, on April
11, 2000.

RUSSELL D. HUNT

Page 2

103⁴
13⁵

# EXHIBIT 15

1037

FILED

JUN 1 3 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

UNITED STATES OF AMERICA          §
                                  §
vs.                               §          CRIMINAL ACTION W-99-CR-070
                                  §
CHRISTOPHER ANDRE VIALVA (1) and  §
BRANDON BERNARD (2)               §
                                  §

JURY NOTE NUMBER  3

Work  until  7:00 PM

_____

_____

_____

$Calvin\ Kruger$
PRESIDING JUROR
6/12          4:50
DATE and TIME

* * * * * * * * *

COURT'S RESPONSE:

_____

_____

_____

_____

_____

WALTER S. SMITH, JR
UNITED STATES DISTRICT JUDGE

_____
DATE and TIME

1038

FILED

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

JUN 1 3 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
DEPUTY CLERK

UNITED STATES OF AMERICA                §
                                        §
vs.                                     §
                                        §          CRIMINAL ACTION W-99-CR-070
                                        §
CHRISTOPHER ANDRE VIALVA (1) and        §
BRANDON BERNARD (2)                     §

JURY NOTE NUMBER  4

Can we see autopsy report
On Stacie Bagly?

_Calvin Kringa_
PRESIDING JUROR

6/12     6:20
DATE and TIME

. . . . . . . . . .

COURT'S RESPONSE:

This autopsy report was not offered into
evidence.

_Walter S. Smith Jr._
WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE

6:25 p.m.     6/12/00
DATE and TIME

1039

FILED

JUN 1 3 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

UNITED STATES OF AMERICA          §
                                  §
vs.                               §
                                  §          CRIMINAL ACTION W-99-CR-070
                                  §
CHRISTOPHER ANDRE VIALVA (1) and  §
BRANDON BERNARD (2)               §

JURY NOTE NUMBER 5

Need to return 9:00 AM 6/13

_____
Calvin Kruger
PRESIDING JUROR
6/12          6:55
_____
DATE and TIME

• • • • • • • • • •

COURT'S RESPONSE:

_____

_____

_____

_____

_____


_____
WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE


_____
DATE and TIME

1040



**FILED**

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

JUN 1 6 2000

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
    DEPUTY CLERK

UNITED STATES OF AMERICA          §
                                  §
vs.                               §
                                  §
CHRISTOPHER ANDRE VIALVA (1) and  §
BRANDON BERNARD (2)               §

CRIMINAL ACTION W-99-CR-070

JURY NOTE NUMBER 6

We have reached a verdict

_Calvin Kruger_
PRESIDING JUROR

6-13-00        11:12
DATE and TIME

*  *  *  *  *  *  *  *  *

COURT'S RESPONSE:

_____
WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE

_____
DATE and TIME

1641
2,10

# EXHIBIT 16

1042

```
[VLST] Action [PA] (INquire  s NeXt)                              ITATION LIST
  106080   BERNARD,BRANDON              R/S: B/M DOB:  7/03/1980  Age:  23
CID [ 106080]  Date [       ]  Time [      ]
Codes: Vist
Code    Date       Time    Visitor                    Relation    Contact?
 [ ]  [ 6112000] [111656] RUSS HUNT                    ATTY          Y
 [ ]  [ 6072000] [ 82355] PASTOR ELMER HETZEL          PASTOR        N
 [ ]  [ 6062000] [ 95721] MATTHEW MITCHELL             PREACHER      N
 [ ]  [ 6062000] [ 95707] TERRY JOHNSON                PREACHER      N
 [ ]  [ 6062000] [ 95624] ADAM ANDRESSES               PREACHER      N
 [ ]  [ 6052000] [135036] BERNARD KENNETH              DAD           N
 [ ]  [ 6052000] [134902] THELMA BERNARD               MOTHER        N
 [ ]  [ 6042000] [141909] RUSS HUNT                    ATTY          Y
 [ ]  [ 6032000] [134640] THELMA BERNARD               MOTHER        N
 [ ]  [ 6032000] [134628] KENNETH BERNARD              DAD           N
 [ ]  [ 5272000] [142306] ELLEN JOHNSON-MISSOURI       SUNT          N
 [ ]  [ 5272000] [140214] THELMA BERNARD               MOTHER        N
 [ ]  [ 5212000] [155936] RUSSELL HUNT SR              ATTORNEY      N
 [ ]  [ 5202000] [144518] THELMA BERNARD               MOTHER        N
 [ ]  [ 5142000] [180126] RUSS HUNT                    ATTORNEY      Y
 [ ]  [ 5132000] [130945] THELMA BERNARD               MOTHER        N
 [ ]  [ 5122000] [ 92547] ELMER HETZEL                 PASTOR        N
                                                [01060802000506131001]
 Next [MORE] Operands [                                            ]

RCV              |   |FORM|      |LTAI|      |Col  3|Row  6|Page  1|RC09
```

1043

```
[VLST] Action [PA] (Inquire Adds Next)                              ITATION LIST
  106080   BERNARD,BRANDON           R/S: B/M DOB: 7/03/1980  Age: 23
CID [ 106080]  Date [ 5062000]  Time [131001]
Codes: Vist
Code    Date        Time    Visitor                    Relation    Contact?
[ ]  [ 5062000]  [131001]  KENNETH BERNARD              FATHER       N
[ ]  [ 5062000]  [130938]  THELMA BERNARD               MOTHER       N
[ ]  [ 5022000]  [ 81144]  PASTOR HETZEL                PREACHER     N
[ ]  [ 4292000]  [134809]  THELMA BERNARD               MOTHER       N
[ ]  [ 4152000]  [131905]  THELMA BERNARD               MOTHER       N
[ ]  [ 4092000]  [151920]  RUSSELL HUNT                 ATTRY        Y
[ ]  [ 4072000]  [ 81954]  REV HETZEL                   PASTOR       N
[ ]  [ 4042000]  [ 92920]  RUSS HUNT SR.                ATTORNEY     Y
[ ]  [ 4012000]  [131737]  THELMA BERNARD               MOTHER       N
[ ]  [ 4012000]  [131720]  KENNETH BERNARD              FATHER       N
[ ]  [ 3292000]  [ 94808]  ELMER HETZEL                 PASTOR       N
[ ]  [ 3192000]  [104750]  RUSS HUNT SR.                ATTNY        Y
[ ]  [ 3132000]  [130742]  CARLENE ELMORE   L. KENTUCKY  AUNT        N
[ ]  [ 3132000]  [130725]  THELMA BERNARD               MOTHER       N
[ ]  [ 3132000]  [103400]  ADAM ANDREASON               PREACHER     N
[ ]  [ 3132000]  [103344]  TERRY JOHNSON                PREACHER     N
[ ]  [ 3132000]  [ 93747]  ELMER HETZEL                 PREACHER     N
                                               [010608020000308080402]

 Next [MORE] Operands [                                            ]

RCV            |   |FORM|      |LTAI|       |Col  3|Row  6|Page 1|RC09
```

```
 [VLST] Action [PA] (INquire PAs NeXt)                              ITATION LIST
  106080   BERNARD,BRANDON                   R/S: B/M DOB:  7/03/1980  Age:  23
CID [ 106080]  Date [ 3082000]  Time [ 80402]
Codes: Vist
Code   Date       Time    Visitor                         Relation    Contact?
 [ ] [ 3082000] [ 80402] VANDEVEEGAITE                     PASTOR      N
 [ ] [ 2262000] [131726] SYLVIA BUSH SOUTH CAROLINA        AUNT        N
 [ ] [ 2262000] [131717] THELMA BERNARD                    MOM         N
 [ ] [ 2252000] [ 93235] RUSS HUNT                         ATTORNEY    Y
 [ ] [ 2192000] [141400] THELMA BERNARD                    MOTHER      N
 [ ] [ 2102000] [132135] THELMA BERNARD                    FRIEND      N
 [ ] [ 2052000] [131702] THELMA BERNARD                    MOTHER      N
 [ ] [ 2052000] [131539] KENNETH BERNARD                   FATHER      N
 [ ] [ 1222000] [142350] THELMA BERNARD                    MOTHER      N
 [ ] [ 1222000] [100027] RUSS HUNT                         ATTORNEY    Y
 [ ] [ 1102000] [135652] LAWRENCE JOHNSON--OUT OF TOWN      UNCLE       N
 [ ] [ 1102000] [135626] THELMA BERNARD                    MOTHER      N
 [ ] [ 1082000] [130709] KENNETH BERNARD                   FATHER      N
 [ ] [ 1082000] [130556] THELMA BERNANRD                   MOTHER      N
 [ ] [11241999] [133543] THELMA BERNARD                    MOTHER      N
 [ ] [11201999] [132535] THELMA BERNARD                    MOM         N
 [ ] [11131999] [ 13242] BERNARD,THELMA                    MOTHER      N
                                                  [010608019991106135040]
 Next [MORE] Operands [                                                 ]

 RCV              |   |FORM|     |LTAI|      |Col  3|Row   6|Page 1|RC09
```

```
  [VLST] Action [PA] (Inquire this Next)                                    ITATION LIST
   106080   BERNARD,BRANDON              R/S: B/M DOB:  7/03/1980   Age:  23
CID [ 106080]  Date [11061999]  Time [135040]
Codes: Vist
Code   Date       Time      Visitor                        Relation      Contact?
 [ ]  [11061999] [135040]  THELMA BERNARD                  MOTHER         N
 [ ]  [11061999] [135023]  KENNETH BERNARD                 FATHER         N
 [ ]  [10021999] [132032]  THELMA BERNARD                  MOTHER         N
 [ ]  [ 9251999] [135725]  THELMA BERNARD                  MOTHER         N
 [ ]  [ 9181999] [133421]  THELMA BERNARD                  FRIEND         N
 [ ]  [ 9161999] [132804]  JOHN AYCOCK                     DPS            Y
 [ ]  [ 9161999] [132729]  RUSS HUNT & DANIEL CHADWICK     ATTY&FBI       Y
 [ ]  [ 9061999] [131351]  RUSS HUNT SR                    ATTY           Y
 [ ]  [ 8301999] [142613]  CAROLYN HOPPE                   INVESTIGATOR   Y
 [ ]  [ 8211999] [141949]  THELMAL BERNARD                 MOTHER         N
 [ ]  [ 8141999] [140326]  KENNETH BARNARD                 FATHER         N
 [ ]  [ 8141999] [140312]  THELMA BERNARD                  MOTHER         N
 [ ]  [ 8131999] [150736]  HUNT,RUSS                       ATTY           Y
 [ ]  [ 8071999] [131555]  THELMA BERNARD                  MOTHER         N
 [ ]  [ 8011999] [134946]  RUSS HUNT SR                    ATTY           Y
 [ ]  [ 7311999] [135439]  THELMAL BERNARD                 MOTHER         N
 [ ]  [ 7281999] [103607]  ADAM ANDREASSEN                 PASTOR         N
                                                           [010608019990724140816]
 Next [MORE] Operands [                                                    ]

RCV              |   |FORM|      |LTAI|        |Col  3|Row  6|Page 1|RC09
```

1046

```
[VLST] Action [PA] (INquire PRis NeXt)                              ITATION LIST
   106080    BERNARD,BRANDON           R/S: B/M DOB:  7/03/1980  Age:  23
CID [ 106080]  Date [ 7241999]  Time [140816]
Codes: Vist
Code    Date       Time    Visitor                   Relation    Contact?
 [ ]  [ 7241999] [140816] THELMA BERNARD              MOTHER        N
 [ ]  [ 7211999] [100408] TERRY JOHNSON               PASTOR        N
 [ ]  [ 7171999] [140622] THELMA BERNARD              MOTHER        N
 [ ]  [ 7121999] [144624] THELMA BERNARD              MOM           N
 [ ]  [ 6301999] [ 94722] TERRY JOHNSON               PASTOR        N
 [ ]  [ 6271999] [144013] RUSS HUNT SR                ATTY          Y
 [ ]  [ 6251999] [135522] KENNETH BERNARD             FATHER        N
 [ ]  [ 6251999] [135158] BERNARD THELMA              MOTHER        N
 [ ]  [         ] [       ]
 [ ]  [         ] [       ]
 [ ]  [         ] [       ]
 [ ]  [         ] [       ]
 [ ]  [         ] [       ]
 [ ]  [         ] [       ]
 [ ]  [         ] [       ]
 [ ]  [         ] [       ]
                                          [                        ].
 Next [VLST] Operands [                                            ]

RCV              |   |FORM|     |LTAI|      |Col  3|Row  6|Page 1|RC09
```

# EXHIBIT 17

1048

## DECLARATION OF MICHAEL M. GELBORT, PH.D.

Michael M. Gelbort, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.      I am a psychologist, licensed to practice in Illinois (#071-004000), Indiana (#20040461), and Texas (#3237, inactive). I am also a Diplomate in Forensic Neuropsychology of the American Board of Psychological Specialties (identification number 7666). I maintain a private practice specializing in clinical psychology and neuropsychology. A copy of my current *curriculum vitae* is attached to this Declaration as Exhibit A and is incorporated here by reference for all purposes.

2.      I received my B.A. degree with honors, with a double major in psychology and general sciences, from Grinnell College in Grinnell, Iowa, in 1977. I received my Ph.D. in Clinical Psychology with a minor in Applied Human Neuropsychology from Texas Tech University in 1984. From 1984 to 1985, I held a post-doctoral fellowship in Neuropsychology and Medical Psychology at the Rehabilitation Institute of Chicago, and a faculty appointment at Northwestern University Medical School.   From 1985 to 1989, my primary employment was as Chief Psychologist and Director of Neuropsychology at the Institute for Rehabilitation and Research at the Medical Center in Houston, Texas. While in Houston, I was also a Clinical Assistant Professor at the Baylor College of Medicine.

3.      I am a member of the American Psychological Association, the International Neuropsychological Society, and the American Congress of Rehabilitation Medicine.

**DECLARATION OF MICHAEL M. GELBORT, PH.D.**
**PAGE 1**

4.      At the request of counsel for Brandon Bernard, I conducted a comprehensive neuropsychological assessment of Mr. Bernard at the United States Penitentiary in Terre Haute, Indiana, on May 10, 2004.

5.      The purpose of the present examination was to determine whether Mr. Bernard has neuropsychological dysfunction and to specify the severity, nature, and possible consequences of any such impairment.  Clinical neuropsychological testing assesses the behavioral expression of an individual's brain function.   Appropriately interpreted, neuropsychological assessment is a fundamental part of a reliable and comprehensive clinical evaluation of brain integrity and functioning.

6.      Based on my interview and examination of Mr. Bernard, and my review of his history, I have formed opinions regarding his neuropsychological condition, including the nature, extent and duration of his impairments, which I hold to a reasonable degree of certainty based on the standards of my profession.  This declaration, *inter alia*, summarizes those opinions.

7.      Mr. Bernard's history contains "marker variables," historical symptoms and signs which correlate with neuropsychological impairment and/or neurological impairment or nervous system dysfunction.  These symptoms, when described by patients or family members, or discovered by health care professionals, clinically give rise to (or "trigger") a need for further evaluation to better understand the extent and nature of the deficits so as to document and understand the pathology, as well as to permit doctors to appropriately treat the condition and reverse or rectify the damage as best as they are able.  The relevant marker variables in Mr. Bernard's case include a

**DECLARATION OF MICHAEL M. GELBORT, PH.D.**
**PAGE 2**

100

history of head injuries, including at least two incidents in which he lost consciousness, as well as extensive alcohol and drug use.

8.      In evaluating Mr. Bernard, I employed a series of formal, standardized evaluation techniques which were available and clinically warranted at the time of his pre-trial and trial proceedings (roughly from June 1999 to June 2000), and which remain in widespread use today as well-accepted tools used by mental health professionals to assess neuropsychological impairment.

9.      Mr. Bernard's performance on these tests indicates mild neurocognitive dysfunction. While the degree of impairment is in the mild range, it is clinically significant that Mr. Bernard consistently scored lowest on tests measuring one particular area of brain functioning.  This "clustering" of scores permits a high degree of confidence both that the test results are reliable and that they reflect an impairment that has significance for Mr. Bernard's functioning in the world, as described more fully below.

10.      Mr. Bernard scored lowest on tests requiring focused attention to detail, including tests of short-term memory and information processing efficiency, in contrast to his average or above-average performance on measures reflecting his ability to form overall impressions or grasp the "big picture."  The more complicated and detail-oriented the task, the more compromised Mr. Bernard's performance.  It may be inferred generally from these results that Mr. Bernard's ability to confront and solve complex problems, especially when under time constraints or in emotionally charged situations, is impaired.  Although he possesses grossly average reasoning ability and judgment, the pattern of Mr. Bernard's test performance suggests that he is not always uniformly

**DECLARATION OF MICHAEL M. GELBORT, PH.D.**
**PAGE 3**

1051

capable of applying those faculties to solve problems successfully or make socially appropriate decisions in the real world, at least not in circumstances where his time to evaluate his options is compressed. Given a large number of trials or a large amount of time to solve a complex problem, Mr. Bernard will likely eventually reach a reasonably acceptable or adaptive decision – but he presents a high risk of making at least some mistakes in the process of reasoning his way through to a solution.

11.    I cannot state with absolute confidence that Mr. Bernard's impairment resulted from a particular injury. However, the nature and degree of his impairment is consistent with the type of sequelae that might result from a head injury such as Mr. Bernard apparently suffered in March or April of 1999. Around that time, Mr. Bernard was involved in a fight in which his head was struck on concrete, causing him to lose consciousness, as a result of which he was transported to a hospital emergency room for treatment. The impaired brain functioning reflected in Mr. Bernard's performance on the May 10, 2004 evaluation may have originated in that event. If that is correct, it is possible that in June 1999 Mr. Bernard's degree of impairment was somewhat greater than it is now. At a minimum, his impairment at that time would have been at least as significant as it is now (*i.e.*, I know of no reason to conclude that Mr. Bernard's performance in the May 10, 2004 evaluation reflects a deterioration in brain functioning that post-dates the offense).

12.    The validity of a neuropsychological evaluation depends on the effort that the individual puts forth during the evaluation. Nothing about Mr. Bernard's performance on the tests I administered suggested lack of effort or malingering. Indeed, the way in which his lower scores

**DECLARATION OF MICHAEL M. GELBORT, PH.D.**
**PAGE 4**

1052

clustered, in contrast to his average or above-average scores on tests assessing other areas of neurocognitive functioning, make it highly unlikely that Mr. Bernard was "faking bad" in the specific areas in which his scores consistently were relatively low. As a consequence, I have a high degree of confidence that his test results represent a valid profile.

13.    In 1999-2000, it was widely understood among persons knowledgeable about brain science that brain development does not correspond neatly or precisely to chronological age. While interest and research into this subject have certainly burgeoned since that time, it was known in 1999-2000 that the brain does not necessarily attain a fully mature level of organization or function by age eighteen.  As a result, some deficits in brain development and functioning may exist throughout an individual's late adolescence and even into his early twenties. Such deficits are not due to injury or damage or congenital impairment, but simply to the pace at which the physical structures of the brain assume their mature form.

14.    With respect to these changes, it was understood in 1999-2000 that the prefrontal cortex is among the last areas of the brain to mature, and in many persons may not be fully developed by age eighteen.  This area includes those centers within the brain which are responsible for abstract reasoning, judgment, the ability to understand "if – then" relationships or to plan adaptive and socially acceptable/adaptive behavior, and to anticipate the consequences of ones' actions.  These aspects of neurocognitive functioning are sometimes called "executive functions" because they play a supervisory role -- monitoring, initiating, inhibiting, and shifting of behaviors and cognitive sets. These are the brain centers and abilities needed to exercise judgment, to plan independently and

**DECLARATION OF MICHAEL M. GELBORT, PH.D.**
**PAGE 5**

1053

successfully, and to autonomously make and implement decisions which are goal-directed, appropriate, and conform to societal expectations.

15.      It appears that Mr. Bernard was evaluated on May 22, 2000, during his capital trial, by psychologist James N. Shinder. Dr. Shinder's report reflects some of the marker variables indicating a need for reliable neuropsychological evaluation, including the fact that Mr. Bernard had sustained a head injury followed by loss of consciousness and had smoked marijuana soaked in embalming fluid. Dr. Shinder's report reflects that he administered only the following tests to Mr. Bernard: the Bender Visual Motor Gestalt Test, the Memory Bender Test, the Kaufman Brief Intelligence Test, the Wide-Range Achievement Test – Revised (Level III), the Thematic Apperception Test, and the Minnesota Multiphasic Personality Inventory – Second Edition. It is not clear whether, in administering these tests, Dr. Shinder was attempting to assess Mr. Bernard's cognition. The tests Dr. Shinder administered to Mr. Bernard are not ones which an appropriately qualified expert would use for that purpose, because they are not useful, informative, or definitive testing procedures with respect to brain function. Nothing about Mr. Bernard's performance on the tests administered by Dr. Shinder is inconsistent with Mr. Bernard's performance in the May 10, 2004 neuropsychological evaluation.

16.      Information indicates that Mr. Bernard, both around the time of the offense and on the day of the offense itself, consumed alcohol and used drugs. It appears that he often drank alcoholic beverages high in alcohol content, such as malt liquor (sometimes mixed with other spirits, *e.g.*, gin) and fortified wine. He also apparently regularly smoked marijuana cigarettes that had been dipped in formaldehyde or embalming fluid. Almost universally, the influence of such substances has a

**DECLARATION OF MICHAEL M. GELBORT, PH.D.**
**PAGE 6**

1054

destructive impact on the brain's performance. The use of marijuana and embalming fluid, in particular, presents a long-term risk of brain damage due in part to the presence in embalming fluid of organic solvents such as methyl alcohol.

17.     In sum, the results of my May 10, 2004 neuropsychological evaluation suggest that at the time of the offense in June 1999, Mr. Bernard was less capable than a *normal* individual – one operating with an undamaged brain whose structures had assumed their fully mature form, and free from the debilitating influence of drugs and alcohol -- would have been to respond sensibly to the perceived crisis surrounding how to resolve the carjacking-kidnapping. The specific nature of Mr. Bernard's neurocognitive deficits would have undermined his ability to solve what presented itself to him as a complex and emotionally charged problem demanding immediate resolution. Mr. Bernard is someone who can work his way to an acceptable answer to such a problem if the circumstances permit him multiple opportunities to make mistakes and then correct them, or a substantial amount of time to evaluate alternative courses of action. When the circumstances are not so forgiving, however, Mr. Bernard's neurocognitive impairment creates a risk that Mr. Bernard will fail to reason his way to an appropriate decision, or defer to others who take command of the situation.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   <u>MAy 27, 2004</u>   (date).

<u>Michael M. Gelbort</u>
Michael M. Gelbort

**DECLARATION OF MICHAEL M. GELBORT, PH.D.**
**PAGE 7**

1055

# EXHIBIT A

*Curriculum vitae* of Michael M. Gelbort, Ph.D.

# VITA

## MICHAEL MAYER GELBORT

Suite 1621
30 North Michigan Avenue
Chicago, Illinois 60602
312.321.9406

Suite 270
1051 Essington Road
Joliet, Illinois 60435
815.741.2221

Fax:  815.741.5171

### Education

Post-Doctoral Fellowship, Neuropsychology and Medical Psychology.
    Rehabilitation Institute of Chicago, 1984-1985.

Ph.D., Clinical Psychology (APA approved program), August, 1984.
    Department of Psychology, Texas Tech University, Lubbock, Texas.
    Minor:  Applied Human Neuropsychology

B.A., Double Major:  Psychology and General Sciences, with Honors.
    May, 1977.  Grinnell College, Grinnell, Iowa.

### Clinical Experience

CLINICAL AND
NEUROPSYCHOLOGIST,
PRIVATE PRACTICE

Chicago Area, Illinois.  1989-present.

Neuropsychological and psychological evaluations of inpatients and outpatients.  Clinical consultations, evaluation, and intervention.  Services provided in physical rehabilitation and psychiatric inpatient units, as well as in the office.

CONSULTANT

Cornerstone Services, 1994-present.

Provide psychological evaluations for residents from this facility which services 250 mentally retarded individuals.

CHIEF PSYCHOLOGIST
DIRECTOR,
PSYCHOLOGICAL
SERVICES

The Institute for Rehabilitation and Research, 1985-1989.

Responsible for provision of psychological services as required by patients in the Head Injury and stroke programs in particular, and serving persons with spinal cord injuries, multiple sclerosis, amputation, pain, and other disabled patients in general in a major regional dedication rehabilitation hospital.  Duties included both neuropsychological and personality assessment, treatment planning,treatment, and consultation to the Interdisciplinary

1057

Treatment Team.  Patients served included both inpatients and outpatients in each phase of rehabilitation.  The position included hospital administrative duties including directing the Psychology Department, program development, and research involvement. The department had three Ph.D. level psychologists, two psychometrists, and support personnel.

CLINICAL ASSISTANT
PROFESSOR

Baylor College of Medicine, Department of Rehabilitation, 1985-1989

PRIVATE PRACTICE

Houston, Texas.  1986-1989.

Evaluation and treatment of outpatients and inpatients in a private practice setting.  Patients most typically suffered from neurotic or characterological difficulties or had a physical disability.  The practice also involved consultation to rehabilitation units in acute care hospitals, as well as disability evaluations for a variety of referral sources.

POST-DOCTORAL
FELLOW IN MEDICAL
PSYCHOLOGY

Rehabilitation Institute of Chicago,  1984-1985.

Provision of psychotherapy and counseling to spinal cord injured, head injured, and amputee patients and their families in both inpatient and outpatient settings.  Member of an Interdisciplinary Team charged with coordination and provision of rehabilitative treatment.  Responsible for ordering and interpreting Neuropsychological assessment batteries.

FACULTY
APPOINTMENT:
LECTURER STATUS

Northwestern University Medical School;  Department of Psychiatry and Behavioral Sciences, 1984-1985.

Lectured and performed supervision of doctoral students in Northwestern University's Medical School program in Clinical Psychology.  Lectured Northwestern University medical students. Member of Admissions Committee group responsible for rating application materials of those applying for admission to the Doctoral Program in Clinical Psychology.

NEUROPSYCHOLOGICAL
CONSULTANT

From the Department of Psychology to the Department of Medical-Surgical Neurology, Texas Tech University School of Medicine, 1982-1984

Administration and interpretation of neuropsychological screening and complete batteries as referred by two neurosurgeons and two



1658

neurologists in a major regional teaching hospital. Techniques included both Halstead-Reitan and Lurian batteries, as well as an extensive number of other assessment measures. Patients were both inpatients and outpatients and ranged from one to ninety years of age. The test batteries were idiographically designed to answer questions regarding range and extent of dysfunction and rehabilitation placement.

**NEUROPSYCHOLOGICAL CONSULTANT**    Texas Rehabilitation Commission, Lubbock, Texas, 1983-1984.

Administration and interpretation of approximately forty-five Luria-Nebraska Neuropsychological Batteries and additional academic achievement tests to college age students being evaluated for the diagnosis of learning disability.

**PSYCHOLOGY INTERN**    Milwaukee County Mental Health Complex (APA approved program), Milwaukee, Wisconsin, 1981-1982.

Administration and interpretation of psychological test batteries on a wide spectrum patient population; provision of inpatient and outpatient psychotherapy to adults and children; performance of intake interviews and assessments; attendance at and presentation of seminars.

**PSYCHOLOGIST**    Developmental Disabilities Center, Texas Tech University, Lubbock, Texas, 1980-1981.

Assessment of developmental delays and psychological/ neuropsychological functioning of newborns to three-year-olds; input to a Multidisciplinary Team; Clinic Administrator and administrator/interpreter of psychological assessments for Screening Clinic for school-age children; coordinator of feedback and recommendations to parents; language learning disability evaluator.

**STUDENT THERAPIST**    Texas Tech University Psychology Clinic, Texas Tech University, Lubbock, Texas, 1977-1981.

Provision of outpatient psychotherapy, as well as performance of intellectual and personality assessments to adults and children.

**RESIDENTIAL LIVING SUPERVISOR**    Lubbock Regional MH/MR Center, Transitions II Halfway House, Lubbock, Texas, 1979-1981.


1059

|                                | Employed interpersonal interventions and behavioral modification programs to aid newly released prisoners and parolees to reintegrate into community living. Participated in administrative decision making and program development. |
|--------------------------------|---|
| STUDENT THERAPIST SUPERVISOR   | Texas Tech University Psychology Clinic, Texas Tech University, Lubbock, Texas, 1980-1981. |
|                                | Provision of individual supervision to second year practicum students on their outpatient cases. This experience was supervised by a faculty psychologist. |
| PSYCHOLOGY EXTERNSHIP          | V.A. Mental Hygiene Clinic, Lubbock, Texas, 1980-1981. |
|                                | Provision of psychotherapy and psychological assessment to outpatient veterans. |

## Research

A Neuropsychological Investigation of Two Subtypes of Dyslexia in College Students. Doctoral dissertation completed June, 1984.

A Brief Lurian Evaluation for Hospital Use with Head Trauma Victims. Unpublished, performed in cooperation with J. Thomas Hutton, M.D.

The Rey Complex Figure Test: Does it Really Measure Visual Memory? Unpublished research.

Functional Electrical Stimulation in Multiple Sclerosis Patients with Chronic Foot Drop. Paper co-authored with E. Simon Sears, M.D., presented at the 111th Annual Meeting of the American Neuropsychological Association, October 6, 1986.

Toward an Understanding of Violence: Neurobehavioral Aspect of Unwarranted Physical Aggression: Aspen Neurobehavioral Conference Consensus Statement. Neuropsychiatry, Neuropsychology, and Behavioral Neurology Vol. 14, No. 1. 2001 Lippincott, Williams, and Wilkins, Inc., Philadelphia

## Presentations

Psychological Issues and Rehabilitative Treatment of Patients with Amputations. Continuing Education Course, Rehabilitation Institute of Chicago, Illinois, 1984.

Incidence of Closed Head Injury in Spinal Cord Injured Patients. Spinal Cord Injury Conference, Chicago, Illinois, 1985.

1060

Contracting with Patients and perspectives of the Rehabilitation Process;  Continuing Education Courses, The Institute for Rehabilitation and Research, Houston, Texas, 1985, 1986, 1987, 1988.

Rehabilitation Options in Texas.  Presented at the 1987 Texas Head Injury Foundation state meeting, Houston, Texas, 1987.

Professional Support Group;  Current Issues.  Presented at the 1988 Texas Head Injury Foundation state meeting, Austin, Texas, 1988.

Psychological Issues in Rehabilitation of Traumatically Injured Persons.  Presented at the First Annual Seminar on Rehabilitation for the Clergy, Houston, Texas, 1988.

Neuropsychological Characteristics of Death Row Inmates.

MMPI-2 Characteristics of Criminal Offenders.

## **Professional Affiliations**

American Psychological Association,
    Student Affiliate, 1977-1980,
    Associate Member, 1980-1984,
    Member, 1985-present.

International Neuropsychological Society,
    Member, 1986-present.

American Congress of Rehabilitation Medicine,
    Member, 1986-present.

American Association of Spinal Cord Injury Psychologists and Social Workers, 1987-present.

Member, State of Illinois Head and Spinal Cord Injury Advisory Council, 1990-present.
    Secretary of Council, 1996-1997.

National Surveyor, Commission on Accreditation of Rehabilitation Facilities, 1993-present.

Member of the Board of Directors, Illinois Head Injury Association, 1993.

Member of Professional Advisory Board, Brain Injury Association of Illinois, 1994-present.

Vice-Chair, Brain Injury Association of Illinois, 1994-present.

## **Certificate and Licensure**

Licensed Clinical Psychologist, State of Illinois, #071-004000

1661

Licensed Psychologist and Health Service Provider in Psychology, State of Indiana, #20040461

Certified and Licensed Psychologist, State of Texas, #3237

Certified, National Register of Health Service Providers in Psychology, #35237

Diplomate in Forensic Neuropsychology, American Board of Psychological Specialties, Identification Number 7666

# EXHIBIT 18

1043

Date:::June 8, 2000

## Character Witness List
## for Brandon Anthony Micah Bernard

Billy Spiller (254) 690-4488
Shemirell Robles (254) 628-9815
Jimmy Olarte (254) 634-2896
Sody Cody Isolde (254) 690-7766  *Isolde Roxie-cody*
Oliver Cole (254) 690-7243
Sherise Scott (254) 501-4128
Milton Rios (254) 526-3254
~~Michael Voegele (254) 680-3072~~
Thelma Bernard (254) 690-1601
~~Matthew Mitchell (254) 699-3044~~


Submitted by Thelma Bernard

*Thelma Bernard*

1044

# EXHIBIT 19



DS6-6

## MC LENNAN COUNTY JAIL FACILITY
## NOTIFICATION OF DISCIPLINARY HEARING

CID# 106080
CELL# F-1

Bernard, Brandon _____ you are hereby notified that a disciplinary hearing to determine whether there
INMATE
is evidence to believe that you have committed a rule violation(s), will be held at least 24 hours after this notification.

During this hearing you have the right to be heard, and present evidence and witnesses. Reasons for any limitations placed on testimony of
witnesses, would be if it were unduly hazardous to institutional safety and correctional goals.

You may request assistance in preparing your case from a member of the Corrections Staff, or another prisoner as determined by the
Disciplinary Officer. You may call witnesses. List witnesses on this form. The Disciplinary Board will limit the number of witnesses called,
if their testimony is deemed repetitive. Failure to list witnesses will result in none being called in your behalf.

If the Disciplinary Board determines evidence of guilt, you may receive a maximum of thirty (30) days in disciplinary separation (Major
Violations), fifteen (15) days (Minor Violations), denied any or all privileges, and/or loss of county "good time" where applicable.

You are entitled to appeal disciplinary actions to the Jail Administrator, in writing, within twenty-four (24) hours of the hearing completion.

You are alleged to have committed the following Facility rule violation(s).
*(A) Denotes major violations.  (B) Denotes minor violations.  Example: Rule (#A2)
# A20 # A36 # B21 #_____#_____#_____#_____#_____#_____#

Incident Date: 10-15-99   Time: 21:00   Destruction of Co. Property
                                        Tampering with Any Plumbing,
                                        Water, Elect, or TV Fixture

You may waive your right to appear before the Disciplinary board hearing for any rule violation(s). If you waive this right, the Disciplinary
Board may render a decision and your punishment well be assessed as: 5 Days Segregation W/loss of All Privileges
Place your initials here if waiving the formal hearing: BB

Brief description of incident: inmate Bernard, Brandon stating fires with saran
in Elaine plug.

                                        Manufacturing or Useage Stinger W/O
                                        Authorization

1. WITNESS _____   3. WITNESS _____

2. WITNESS _____   4. WITNESS _____

Date Given to Inmate 10-15-99, (time) 22:00, Inmate Signature X Brandon Bernard

by (Officer Signature) Clayton Herington, Assisting Officer _____

## DISCIPLINARY BOARD'S PROCEDURE AND DETERMINATION

10-20-99                               1325
DATE OF HEARING                        TIME

DECISION: Inmate waived his right to a Disciplinary Hearing
And accepted 5 Days Segregation WithLoss of All participlegs
RTP on 10-24-99

Jimy Stone          M. Strickland          _____
MEMBER              MEMBER                 MEMBER
DISCIPHEAR.DOC                                          JS.

No Prior Seg. Time.

1064

APR-05-2004  02:47                                                        254 757 0644   P.03

McLENNAN COUNTY MEDICAL / INCIDENT REPORT

Bernard, Brandon          B          M      106080              E 1
Name of Inmate          Race      Sex     Cid #           Cell Location

10-15-99              21:00              E wing
Date of Incident       Time of Incident    Location of Incident

Incident/Medical: On above date and time I Clayton Herington was waking E wing. At approximetly 21:00 hours I noticed sparks coming from tank E1. Inmate Bernard, Brandon cid # 106080 was starting a fire with a stinger in the electrical pluge by the TV.

at this time I told said inmate to get his belongings that he was going to segregation. Jailer Coburn and myself took said inmate to Dseg cell 6 #562. Disciplinary form was given and no further action was taken at this time.

EOR
EOR                  EOR
EOR
EOR


Clayton Herington                          CLAYTON HERRINGTON (Jailer)
Signature of Reporting Officer             Name of Reporting Officer and Rank

_____ sgt                                _____
Sgt. on Duty/or Supervising Officer        Witnessing Officer

Copy of Incident Report and Disciplinary Report to be delivered to the inmate within 24 hours of
preparation and at least 24 hours prior to a hearing. Confirmation of Service and Receipt of
Service is to be filled out when served. If additional space is needed, use back of Incident Report.
If more than one inmate is involved, use additional sheets.

J-24

APR-05-2004  02:48                                                          254 757 0644    P.04

*(federal prison)*

## MC LENNAN COUNTY JAIL FACILITY
### NOTIFICATION OF DISCIPLINARY HEARING

CID# 106080
CELL# -C.L.-

**Bernard, Brandon**, you are hereby notified that a disciplinary hearing to determine whether there
INMATE
is evidence to believe that you have committed a rule violation(s), will be held at least 24 hours after this notification.

During this hearing you have the right to be heard, and present evidence and witnesses. Reasons for any limitations placed on testimony of witnesses, would be if it were unduly hazardous to institutional safety and correctional goals.

You may request assistance in preparing your case from a member of the Corrections Staff, or another prisoner as determined by the Disciplinary Officer. You may call witnesses. List witnesses on this form. The Disciplinary Board will limit the number of witnesses called, if their testimony is deemed repetitive. Failure to list witnesses will result in none being called in your behalf.

If the Disciplinary Board determines evidence of guilt, you may receive a maximum of thirty (30) days in disciplinary separation (Major Violations), fifteen (15) days (Minor Violations), denied any or all privileges, and/or loss of county "good time" where applicable.

You are entitled to appeal disciplinary actions to the Jail Administrator, in writing, within twenty-four (24) hours of the hearing completion.

You are alleged to have committed the following Facility rule violation(s).
*(A) Denotes major violations  (B) Denotes minor violations. Example: Rule (#A2)
#A23  #A25  #~~A~~  #B9  #B13  #____  #____  #____  #____  #____  #____

Incident Date: 12-24-99    Time: 0:10

| You may waive your right to appear before the Disciplinary board hearing for any rule violation(s). If you waive this right, the Disciplinary Board may render a decision and your punishment well be assessed as: _Deemed guilty, lock in Sever tank CI_ Place your initials here if waiving the formal hearing: |
|---|

Brief description of incident: _Inmate stated cursing when I turned the tv off_
_a 000 hours. He refused to stop standing on the table, I asked him_
_several time to stop cursing and standing on the table but wouldn't._

1. WITNESS_____    3. WITNESS_____

2. WITNESS_____    4. WITNESS_____

Date Given to Inmate 12-24-99 (time) 01:57, Inmate Signature X Brandon Bernard

by (Officer Signature) Clayton Henington, Assisting Officer_____

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
### DISCIPLINARY BOARD'S PROCEDURE AND DETERMINATION

12-27-99                                                              1400
DATE OF HEARING                                                      TIME

DECISION: 3 days DSg LO.A.P. Return to Pop. 12-29-99
Return to CI.                                    Insolence toward staff

_[signature] Sgt Armstrong_          _[signature] Kathy Neals_          _____
MEMBER                               MEMBER                            MEMBER
DISCIHEAR DOC

~~B~~ ~~Sets~~ ~~No Dispt~~ - 10-20-99  5days starting fine w/stinger  _[mark]_

1048

## MCLENNAN COUNTY MEDICAL/INCIDENT REPORT

Bernard, Brandon    B.    M    106080    C 1
Name _____  Race ___  Sex ___  CID # _____  Cell Location
12-24-99    0:10    C wing 1
Date of Incident    Time of Incident    Location of Incident

Incident/Medical: On above date and time I officer
Clayton Henington turned T.V off in C wing at 001
hours. At this time inmate Bernard, Brandon #106080
started cursing talking bad about my mother. I told
Said inmate that if he did not stop he would go
to segregation. Inmate Bernard said fuck you and
got on the table. At this time I explain to him that
the T.V. would be left on all night Friday and
Saturday night. Said inmate said fuck that and
your mom you turned the T.V's off 5min it's early. When
I turned the T.V's off it was 001 hours by my watch.
At this time I told Inmate Bernard that there would
be no more talk out of him. Said inmate continued

Clayton Henington _____    CLAYTON HEFFINGTON (Jailer)
Signature of Reporting Officer    Name of Reporting Officer and Rank

Sgt. K _____    B.M. _____
Sgt. on duty/or Supervising Officer    Witnessing Officer

Copy of Incident Report and Disciplinary Report to be delivered to the inmate within 24 hours of
preparation and at least 24 hours prior to a hearing. Confirmation of Service and Receipt of
Service is to be filled out when served. If additional space is needed, use back of Incident Report. If
more than one inmate is involved, use additional sheets.

J-24

1069

## MCLENNAN COUNTY MEDICAL/INCIDENT REPORT

Name: Bernard, Brandon    Race: B    Sex: M    CID #: 106080    Cell Location: C1

Date of Incident: 12-24-99    Time of Incident: 0:10    Location of Incident: C wing cell 1

Incident/Medical: to curse me. I told said inmate to get his stuff that he was going to segregation. Inmate Bernard, Brandon stated what if I dont I told him that, that would not be a problem that there were enough officers here that we could get him out. Said inmate gave no more problem's and came out of cell C1. Inmate Bernard was taken to segregation I seg cell 10. Disciplinary was given to said inmate witch consist of ① A23 Refusal to obey the orders of any staff member ② A25 Insolence toward any staff member ③ B9 Conduct which disrupts or interferes with the orderly operation of the facility ④ B13 Using abusive or obscene language. There was no further action taken at this time E O R    E O R

Signature of Reporting Officer: E O R Clayton Harrington

Name of Reporting Officer and Rank: E O R Clayton Harrington (Jail

Sgt. on duty or Supervising Officer: Cpl. J. Clark

Witnessing Officer: B/-E

Copy of Incident Report and Disciplinary Report to be delivered to the inmate within 24 hours of preparation and at least 24 hours prior to a hearing. Confirmation of Service and Receipt of Service is to be filled out when served. If additional space is needed, use back of Incident Report. If more than one inmate is involved, use additional sheets.

J-24

1070

# EXHIBIT 20

1071

*Wayne E. Pundt, D.D.S.*

421 NORTH 38TH STREET
KILLEEN, TEXAS 76543
—
TELEPHONE: (817) 634-0234
254

March 19, 2004

Mr. Robert C. Owens
Attorney at Law
P.O. Box 40428
Austin, TX 78704

RE:  Brandon Bernard

Dear Mr. Owens,

As you have requested, I am sending all information I have from treatment on Brandon

Bernard. He had the  initial "CR" in gold crowns that I converted to open-faced crowns. I

think the "CR" is the initials for a gang. I have original color photos in his chart.

Sincerely,

Wayne E. Pundt  D.D.S.

WP/ba

1672





1073

TIME 11:40 AM

**Wayne E. Pundt, DDS**

DATE 3/17/04

## ACCOUNT HISTORY REPORT
### FOR
2877:  KENNETH BERNARD
From Mar 26, 1999 To Mar 26, 1999

| Current Account Aging: | |
| --- | --- |
| Current | $0.00 |
| 30 Day | $0.00 |
| 60 Day | $0.00 |
| 90 Day | $0.00 |
| Contract | $0.00 |
| Balance Due | $0.00 |
| Estimated Ins | $0.00 |
| Balance Due Now | $0.00 |

| Date | Name | Provider | Type | Description | Debit | Credit | Balance |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | >>>>>>> Sum of all account activity prior to Mar 26, 1999 | | | ($25.00) |
| 3/26/99 | BRANDON BERNARD | 1 | Service | 02330 Composite 1 Surf. Tooth 8  Surface F | $35.00 | | $10.00 |
| 3/26/99 | BRANDON BERNARD | 1 | Service | 02330 Composite 1 Surf. Tooth 9  Surface F | $35.00 | | $45.00 |
| | | | | >>>>>>>> Sum of all account activity after Mar 26, 1999 | ($45.00) | | $0.00 |
| | | | | | $25.00 | $0.00 | $0.00 |

1074

# EXHIBIT 21

1075

Debriefing on 11-5-89 w/ Aycock, FBI · ATF

Burglaries

Did a # of burglaries
Villona · Brandon pawned the property at some shops in Temple

Terry got a 9mm from one of the burglaries — black
  Gave this gun to Dip for $50
    Dip paid his court costs so he sold it to him  (Bernard)
    - This gun came from a house of black male · white woman.


Terry put lighter fluid in the trunk right after the shooting — then
Brandon threw the match through the front window of passengers seat.


                Villona
✓  ① Coldy pulled directly — probably used gun from pawn shops — Willow Springs
        Terry was in a different car.
        Someone else may have gotten hit.

〰️ ② Fight at carnival · Terry was beating guy w/ sledgehammer — from Willow
        Springs — Bf. Richard was beat w/ bat

—✓  ③ Burglaries of habitation in Heather Glen area towards ????
        Few in Willow Springs
        Few in Ff Head area in Country.

✓  ④ Pawned a few things at Da ????? in R.Nm.

                                                    10 ??

⑤ Pawned few things at Action Pawn on Hood Road by Willow Springs

⑥ Did a drive by shooting w/ Kayla — Terry shot at guy named Killer

⑦ Was at a fight one time: he pumped a shotgun at Willow Springs crowd but didn't shoot.

1077

## PHONE CALL

FOR Rob
M. Mr. Gamble
OF
PHONE 254 534 0857 FAX
MESSAGE Jerry wants to
talk to you
DATE 2/22 TIME 9:3 A.M.
☑ RETURNED YOUR CALL
☐ TELEPHONED
☑ PLEASE CALL
2/23 — Talked at 1:30
☐ WILL CALL AGAIN
☐ CAME TO SEE YOU
☐ WANTS TO SEE YOU
SIGNED
Adams 1154

*(vertical note left side)* Phone call — Jerry to call Mr. Gamble

## PHONE CALL

FOR Rob
M. Mrs. Brown
OF
PHONE 254 539 0598 FAX
DATE May 4 date
MESSAGE Investigators were there
with Terry Brown when
she went to visit him this
afternoon. Why weren't
you there?
Terry wants to see you.
SIGNED
☐ TELEPHONED
☐ RETURNED YOUR CALL
☑ PLEASE CALL
☐ WILL CALL AGAIN
☐ CAME TO SEE YOU
☐ WANTS TO SEE YOU
Adams 1154

## PHONE CALL

FOR Rob
M. Byron Sanmarco
OF ATF
PHONE 512 349 4545 FAX
DATE 5/5 TIME 10:00 A.M.
MESSAGE re: Terry Brown
wants to interview
him 9:30 Tues.
T/c re: case
SIGNED
☐ TELEPHONED
☐ RETURNED YOUR CALL
☑ PLEASE CALL
☐ WILL CALL AGAIN
☐ CAME TO SEE YOU
☐ WANTS TO SEE YOU
Adams 1154

## PHONE CALL

FOR Rob
M. Mrs. Brown
OF
PHONE 254 534-6587 FAX
MESSAGE Gamble Brown
DATE 8/12 TIME 1:40 A.M.
☐ TELEPHONED
☐ RETURNED YOUR CALL
☑ PLEASE CALL
☐ WILL CALL AGAIN
☐ CAME TO SEE YOU
☐ WANTS TO SEE YOU
SIGNED
Adams 1154

*(vertical note left side)* 254 690-7766 staying with friends

## PHONE CALL

FOR Rob
M. Byron Sanmarco
OF ATF
PHONE 512 349 4545 FAX
DATE 5/9 TIME 828 A.M.
MESSAGE T/c re:
Terry Brown
SIGNED
☐ TELEPHONED
☐ RETURNED YOUR CALL
☑ PLEASE CALL
☐ WILL CALL AGAIN
☐ CAME TO SEE YOU
☐ WANTS TO SEE YOU
Adams 1154

## PHONE CALL

FOR Rob
M. John Aycock
OF Rangers
PHONE FAX
DATE 5/23 TIME 9:46 A.M.
T/c at John re: case
MESSAGE tonight
FBC Bagby case
Terry Brown
M. Johnson, Scott Frost
+ Agent from Austin to
interview him
wherever Terris incarcerated
SIGNED
☐ TELEPHONED
☐ RETURNED YOUR CALL
☑ PLEASE CALL
☐ WILL CALL AGAIN
☐ CAME TO SEE YOU
☐ WANTS TO SEE YOU
Adams 1154

1078



# EXHIBIT 23

1079

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF TEXAS

3                  WACO DIVISION

4   UNITED STATES OF AMERICA   *
                               *
5                              *
    VS.             * CRIMINAL ACTION NO. W-99-CR-61
6                              *
7   CHRISTOPHER MICHAEL LEWIS(2)*   March 22, 2001

8   BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING
                  SENTENCING PROCEEDINGS

9   APPEARANCES:

10  For the Government:      Mark Frazier, Esq.
                            Assistant United States Attorney
11                          PO Box 828
                            Waco, Texas  76701
12
    For the Defendant:      Ronald H. Moody, Esq.
13                          204 North 6th Street
                            Waco, Texas  76701
14
    Court Reporter:      Kristie M. Davis
15                       United States District Court
                         PO Box 20994
16                       Waco, Texas  76702-0994

17

18     Proceedings recorded by mechanical stenography, transcript

19   produced by computer-aided transcription.

20

21

22

23

24

25

1080

2

1   (March 22, 2001, 10:09, defendant present.)

2       MS. WILLIS:  Sentencing proceedings in Criminal Action

3   No. W-99-CR-61 styled United States of America vs. Christopher

4   Michael Lewis, Defendant No. 2.

5       MR. FRAZIER:  Mark Frazier for the United States, Your

6   Honor.

7       MR. MOODY:  Ron Moody for the defendant, Your Honor.

8       THE COURT:  Good morning, counsel.

9       MR. MOODY:  Good morning, Your Honor.

10      THE COURT:  Mr. Lewis, you appeared before the Court on

11  December the 16th of 1999 and entered a guilty plea.  Have you

12  had an opportunity to review the presentence report in your

13  case?

14      THE DEFENDANT:  Yes, sir.

15      THE COURT:  Have you read it and discussed it with

16  Mr. Moody?

17      THE DEFENDANT:  Yes, sir.

18      THE COURT:  Do you have any comments or corrections

19  concerning the report that you'd like to call to my attention?

20      THE DEFENDANT:  No, sir.

21      THE COURT:  Then the Court will initially adopt --

22  Mr. Moody, there are no matters that need to be ruled on?

23      MR. MOODY:  No, Your Honor.  There are not.

24      THE COURT:  The Court will initially adopt the

25  recommendation of the probation office that the offense level

1081

3

1   in this case is 36, the criminal history's two.  The range is

2   thus 210 to 262 months.

3       Mr. Frazier?

4       MR. FRAZIER:  Your Honor, we filed a motion for downward

5   departure in this case pursuant to Section 5K1.1.  That's based

6   on his cooperation in the Christopher Vialva and Brandon

7   Bernard cases.  That is only for a two-level downward departure

8   to place this defendant in the range between 168 to 210 months.

9   That's all we have other than argument as to the appropriate

10  sentence in this case which we will raise with the Court at the

11  appropriate time.

12      THE COURT:  Any response, Mr. Moody?

13      MR. MOODY:  No, Your Honor.

14      THE COURT:  The Court will grant the government's motion

15  and depart downward two levels to a level 34 which results in a

16  range of 168 to 210 months.

17      Mr. Lewis, do you have anything you would like to say in

18  your own behalf or in mitigation of punishment?  If you care

19  to, this would be your opportunity to do that.

20      THE DEFENDANT:  To the Bagley family, who it may concern,

21  I am Chris Lewis.  I'm here to say that I am an obedient and

22  upright person.  My parents did not raise me this way.  I chose

23  to be in the wrong place at the wrong time.  So now I am here

24  paying consequences for the crime I had a part in.  I'm here to

25  ask for your forgiveness so I can recuperate my life as well as

108

4

1    you because I have dreams and ambitions to be fulfilled.

2        Since I've been incarcerated for the last year and a half,

3    I had nothing but time to think about the loss of your family

4    members and the sleepless nights I've had.  Have pity and mercy

5    upon me for being a human soul.  I have mistakes and

6    shortcomings and now I'm here to face the truth and reality.

7    There's no way I can bring back the pain and help the pain that

8    I caused to your family or I had a part in.  I wish I could

9    turn back the hands of times and change some of the things that

10    happened.  I just pray and hope the best for your family.  I

11    pray upon the Court that you have mercy upon me.

12        THE COURT:  Mr. Moody?

13        MR. MOODY:  Your Honor, if it please the Court, I'd have

14    to agree with Mr. Swanton that this is a terrible tragedy and

15    there's really no way to explain it.  Mr. Lewis did testify for

16    the government.  I believe his testimony was very critical in

17    the death sentences that were -- the death penalties that were

18    found against Mr. Vialva and Mr. Bernard.  It's hard to say

19    that he is entitled to anything, Your Honor, but I really feel

20    like that if the Court would consider the mid range of the

21    guidelines, I think that would be appropriate.  We would

22    respectfully request that, Your Honor.

23        THE COURT:  Do the victims wish to exercise their right of

24    allocution in this case?

25        MR. FRAZIER:  No, Your Honor, for the same reasons as

1083

5

1  stated in Mr. Brown's case.

2      THE COURT:  Do you have any comments you'd like to make?

3      MR. FRAZIER:  Yes, Your Honor.  Just very briefly.  As we

4  all know the facts of this case, they are probably the most

5  horrible that have ever been presented at least in the time

6  that I've been here, but in spite of the fact of the horrible

7  nature of these facts and the things that Mr. Lewis, Mr. Brown

8  and the other defendants did, the fact remains that without, as

9  Mr. Moody said, their cooperation, the appropriate penalty for

10  the main perpetrators in this crime could not have been gotten.

11  We ask the Court to take that in consideration.  We believe

12  that the culpability of Mr. Lewis is similar to that of

13  Mr. Brown in this case based on the facts and ask the Court to

14  sentence the defendant appropriately.  We leave it to the

15  Court's discretion as to what the Court thinks is appropriate.

16  Obviously the family members have expressed in their letters

17  their wishes for sentence and have made that known to the

18  Court.  We ask the Court to take his cooperation into account

19  in making the sentence if the Court deems appropriate.  That's

20  all we have.

21      THE COURT:  Mr. Moody, do you know of any legal reason why

22  sentence should not be imposed this morning?

23      MR. MOODY:  No, Your Honor.  I do not.

24      THE COURT:  Then as to Counts 1 and 2 the Court will

25  impose a period of incarceration of 188 months.  As to Count 3,

1084

6

1   the statutory maximum is 180 months.  All of those three

2   sentences will run concurrently.  As to Count 4, a period of

3   incarceration of 60 months which will run consecutively to the

4   sentence imposed in Counts 1, 2 and 3.  Five years of

5   supervised release as to Counts 1 and 2.  Three years of

6   supervised release as to Counts 3 and 4, all to run

7   concurrently.  No fine will be imposed as again there is

8   restitution in the amount of $22,769.18 to be shared and owed

9   equally by Mr. Brown, Mr. Sparks and Mr. Lynch.  There is $400

10  in mandatory assessments under the Victims of Crime Act in this

11  case, and I·neglected to mention there's $300 in mandatory

12  assessments under the Victims of Crime Act in Mr. Brown's case.

13       This, too, is a case where an appeal was waived.  Are

14  there any counts or information or indictments to be dismissed?

15       MR. FRAZIER:  The original information as to this

16  defendant, Your Honor, we move to dismiss it.

17       THE COURT:  That will granted.

18       Anything further, Mr. Moody?

19       MR. MOODY:  No, Your Honor.

20       THE COURT:  You may the excused.

21       (Hearing adjourned at 10:15)

22

23

24

25

1085

7

1   UNITED STATES DISTRICT COURT)

2   WESTERN DISTRICT OF TEXAS  )

3

4      I, Kristie M. Davis, Official Court Reporter for the

5   United States District Court, Western District of Texas, do

6   certify that the foregoing is a correct transcript from the

7   record of proceedings in the above-entitled matter.

8      I certify that the transcript fees and format comply with

9   those prescribed by the Court and Judicial Conference of the

10  United States.

11     Certified to by me this 25th day of March 2004.

12  _____

13        KRISTIE M. DAVIS
          Official Court Reporter
14        P.O. Box 20994
          Waco, Texas 76702-0994
15        Telephone No.:  (254) 754-7444
          kristie_davis@txwd.uscourts.gov
16

17

18

19

20

21

22

23

24

25

1086

# EXHIBIT 26

1087

# AFFIDAVIT OF LUCIEN B. CAMPBELL

BEFORE ME, the undersigned authority, personally appeared LUCIEN B. CAMPBELL, who upon his oath states that the following is true and correct:

1. I am the Federal Public Defender for the Western District of Texas. I have held that position since August, 1975.

2. I was never contacted by any Magistrate Judge or District Judge regarding a recommendation for counsel to represent Brandon Bernard at trial in the capital case of <u>United States v. Brandon Bernard</u>, W-99-CR-070 (2).

3. I would not recommend an attorney for appointment in a capital case if, after consultation with the attorney, I formed the opinion that his other professional commitments would prevent him from being able to actively represent the interests of his prospective client from the time of appointment.

4. If I had been contacted regarding my recommendation for appointment of counsel and/or co-counsel for Mr. Bernard, I would have attempted to locate counsel who would meet the requirements of 18 U.S.C. § 3005 and 21 U.S.C. § 848(q), as illuminated by other available guidance, even if that meant looking outside the Waco Division of the Western District of Texas, or even outside the Western District of Texas.

FURTHER AFFIANT SAYETH NOT.

I have read the foregoing affidavit. I state, under penalty of perjury, that it is true and correct.

ALBERT MIRELES JR
Notary Public
State of Texas
My Commission Expires
March 31, 2007

Signed and sworn before me this 26th day of _____, 2004.

_____
Lucien B. Campbell

_____
Notary Public, State of Texas
My commission expires: 3-31-2007

1088

# EXHIBIT 27

1089

JUROR NO. **126**                         Carvin Krusen

# JUROR INFORMATION SHEET

## INSTRUCTIONS:

On May 15, 2000, the federal court for the Waco division of the western district of Texas will begin jury selection for a trial in which the United States is seeking the death penalty as to the Defendants, Christopher Andre Vialva and Brandon Bernard.

Because the ultimate penalty is being sought, the jury selection process is somewhat different than in other cases. In other death penalty cases, this process has sometimes lasted several weeks. The enclosed questionnaire is designed to significantly shorten and simplify the selection process and save you a great deal of time.

It may seem to you that the questions pry unduly into your personal life and beliefs. If you prefer not to answer a question, indicate why and then leave it blank. You may well be asked that question when you appear for jury selection, however.

When the government seeks the death penalty, <u>and</u> the jury unanimously finds a defendant guilty of the murder charged, then the jury is asked to make findings regarding aggravating and mitigating circumstances, the answers to which could result in the judge being required to sentence that defendant to death. For that reason your answers concerning your beliefs and attitudes towards the death penalty are very important.

The Court's task is to select a jury composed of appropriate persons to decide this case. An appropriate person is one who is able to make decisions based on the evidence presented, without regard to previous experiences, attitudes, biases or prejudice.

**PLEASE RETURN THE JUROR INFORMATION SHEET IN THE ENCLOSED ENVELOPE BEFORE APRIL 24, 2000. IF YOU ARE UNABLE TO READ OR WRITE IN ENGLISH WELL ENOUGH TO UNDERSTAND AND COMPLETE THE QUESTIONNAIRE, PLEASE INDICATE THAT AND RETURN IT UNANSWERED. DO NOT ALLOW ANYONE TO HELP YOU ANSWER THE QUESTIONNAIRE.**

**YOUR RESPONSE TO THIS QUESTIONNAIRE WILL BE USED BY THE JUDGE AND THE ATTORNEYS ONLY, AND WILL NOT BE REVEALED TO THE PUBLIC OR THE MEDIA.**

**YOUR ANSWERS TO THESE QUESTIONS ARE BEING GIVEN UNDER OATH.**

**PLEASE PRINT YOUR ANSWERS.**

**INTRODUCTORY**

1. NAME: CALVIN D. KRUGER

   AGE: 55    DATE OF BIRTH: 12-23-44

   BIRTHPLACE: MALONE, TEXAS    SEX: M

2. RESIDENCE (CITY OR COUNTY IF A RURAL RESIDENCE):
   6711 Wiethorn Dr - WACO, TEXAS 76710

3. LENGTH OF TIME AT PRESENT ADDRESS: 2 1/2 yRS

4. SINCE 1980 WHAT OTHER CITIES HAVE YOU LIVED IN AND FOR HOW LONG DID YOU LIVE IN EACH CITY?
   DALLAS, TEXAS    1 Year
   SAN ANTONIO, TEXAS    3 months

**EMPLOYMENT**

5. PLACE OF EMPLOYMENT: Summers Electric

6. JOB TITLE OR DESCRIPTION: Construction Sales

7. LENGTH OF PRESENT EMPLOYMENT: 6 yRS

8. PLEASE LIST YOUR OCCUPATION OR EMPLOYMENT FOR THE PAST TEN (10) YEARS: Electrical Const. Sales

9. WHAT OTHER TYPES OF JOBS HAVE YOU HELD?
   None

2

1091

## FAMILY

10.    MARITAL STATUS: (circle appropriate answer(s))

    a) Married
    b) Single
    c) Separated
    d) Divorced
    e) Spouse Deceased
    f) Previously Divorced (how many times ) _____
    g) Living With Someone

11.    NAME OF SPOUSE: _____

12.    SPOUSE'S EMPLOYER: _____

13.    SPOUSE'S JOB TITLE OR DESCRIPTION: _____

14.    LENGTH OF SPOUSE'S PRESENT EMPLOYMENT: _____

15.    PLEASE LIST YOUR SPOUSE'S OCCUPATION OR EMPLOYMENT FOR THE PAST TEN (10) YEARS:

_____
_____
_____
_____

16.    PLEASE INDICATE THE APPROXIMATE TOTAL ANNUAL GROSS INCOME OF YOUR HOUSEHOLD (Circle One):

    a) Under $10,000        b) $10,000 to $30,000
    c) $30,000 to $50,000    d) $50,000 to $70,000
    e) $70,000 to $100,000    f) Over $100,000

3

1097

17.    PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR CHILDREN
AND STEPCHILDREN, IF ANY:

Age                    Male/Female                    Occupation/School

_____

_____

_____

18.    IF YOU HAVE GRANDCHILDREN, HOW MANY? _____

19.    PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR PARENTS
AND/OR YOUR STEPPARENTS:

Father/Stepfather:

Age: _____

City of Residence: _____

Occupation/Employment (if retired occupation before retirement):

_____

Mother/Stepmother:

Age: _____

City of Residence: _____

Occupation/Employment (if retired occupation before retirement):

_____

Were your parents ever divorced? _____No_____

20.    PLEASE PROVIDE THE FOLLOWING INFORMATION ABOUT YOUR BROTHERS
AND SISTERS, IF ANY:

Sex: _____    6 Brothers & Sisters

Age: _____

School or Occupation: _____

4

1501

1093

## EDUCATION

21. PLEASE INDICATE THE HIGHEST LEVEL YOU ACHIEVED IN SCHOOL:

_12 yr Graduate_

22. NAMES OF ANY TECHNICAL OR TRADE SCHOOLS ATTENDED; NAMES OF ANY COLLEGE AND GRADUATE SCHOOLS YOU HAVE ATTENDED, TOGETHER WITH MAJOR SUBJECT AND DEGREES RECEIVED, IF ANY:

23. PLEASE INDICATE THE HIGHEST LEVEL YOUR SPOUSE ACHIEVED IN SCHOOL:

24. NAMES OF ANY TECHNICAL OR TRADE SCHOOLS YOUR SPOUSE ATTENDED; NAMES OF ANY COLLEGE AND GRADUATE SCHOOLS YOUR SPOUSE HAS ATTENDED, TOGETHER WITH MAJOR SUBJECT AND DEGREES RECEIVED, IF ANY:

25. ARE YOU OR YOUR SPOUSE PRESENTLY ENROLLED AS A STUDENT? IF SO, PLEASE GIVE DETAILS:

## MILITARY

26. HAVE YOU EVER SERVED IN THE MILITARY? _Yes_

27. IF SO, PLEASE GIVE THE FOLLOWING INFORMATION:

Branch: _ARMY_

Years of Service: _1_

Did you enlist? _No_    Re-enlist? _NO_

Highest Grade or Rank Attained: _E1_

Duties: _____

5

1094

Did you serve in combat? __No__

Year Discharged: __1965__

Type of Discharge: __GeNeRAL - HoNoRAbLe CoNDiTioNs__

Did you participate in any Courts martial? __NO__

If yes, please explain: _____

_____

_____

Did you ever serve in the military police? __NO__

28.    HAS YOUR SPOUSE EVER SERVED IN THE MILITARY? _____

29.    IF SO, PLEASE GIVE THE FOLLOWING INFORMATION:

Branch: _____

Years of Service: _____

Did your spouse enlist? _____    Re-enlist? _____

Highest Grade or Rank Attained: _____

Duties: _____

Did your spouse serve in combat? _____

Year Discharged: _____

Type of Discharge: _____

Did your spouse participate in any Courts Martial? _____

If yes, please explain: _____

_____

_____

Did your spouse ever serve in the military police? _____

6

1095

## RELIGION

30.  RELIGIOUS PREFERENCE: LutheRAN

Name and Location of Church, Temple, Synagogue or Other Religious Organization with which you are affiliated, if any: St MARK - WACo, TX

How often do you attend? 2-3 per Month

Past or present church offices held: _____

Have there been any recent changes in your religious activities? NO

If so, please explain: _____

31.  HAVE YOU STUDIED FOR THE MINISTRY, PRIESTHOOD, RABBINIC ORDER, OR ANY OTHER CLERGY POSITION? No

32.  WERE YOU RAISED IN A RELIGION DIFFERENT FROM THE ONE YOU NOW PRACTICE? NO

If so, please explain: _____

33.  DOES YOUR SPOUSE PRACTICE A RELIGION DIFFERENT FROM YOURS? _____

If so, please explain: _____

34.  DO YOU CURRENTLY, OR HAVE YOU IN THE PAST, SUPPORTED, OR ROUTINELY WATCHED OR LISTENED TO ANY RADIO OR TELEVISION MINISTRY? Yes

If so, please indicate which ministry: LutheRAN HouR

## POLITICAL

35.  PLEASE INDICATE YOUR POLITICAL PREFERENCE, IF ANY? (Circle One)

(Democrat)
Republican
Independent
Other _____

7

1094

Does your spouse have a different political preference? _____

If so, please explain: _____

36.    DO YOU IDENTIFY WITH OR SUPPORT A POLITICAL PARTY?    **Yes**

If so, which one? (Circle one)

(Democrat)        Republican
Independent       Other: _____

Is your spouse a member or supporter of a different party? _____

If so, please explain: _____

37.    DO YOU CONSIDER YOURSELF TO BE POLITICALLY CONSERVATIVE, MODERATE OR LIBERAL?    **Moderate**

Does your spouse have a different political philosophy? _____
If so, please explain: _____

38.    HAVE YOU EVER SOUGHT OR HELD A POLITICAL OFFICE?    **No**

39.    HAVE YOU OR YOUR SPOUSE EVER WORKED IN A POLITICAL CAMPAIGN FOR A CANDIDATE OR FOR A POLITICAL GROUP, SEEKING CHANGE IN A LAW OR IN ENFORCEMENT OF A LAW?    **No**

If so, please describe: _____

40.    DO YOU BELONG TO ANY GROUP OR ORGANIZATION ACTIVE IN POLITICAL, LAW ENFORCEMENT, CRIME PREVENTION OR REHABILITATIVE MATTERS? (*i.e.* Mothers Against Drunk Driving, the American Civil Liberties Union, Alcoholics Anonymous, NarcAnon, Cocaine Anonymous or any related or similar groups)    **No**

If yes, please describe: _____

_____

## PHYSICAL/MEDICAL

41.    DO YOU HAVE ANY DIFFICULTY IN READING OR WRITING?    **No**

If so, please explain: _____

8

1097

42.  DO YOU HAVE ANY DIFFICULTY IN SIGHT OR HEARING, OR DO YO
     ANY OTHER DISABILITY OR DISEASE THAT WOULD MAKE JURY SE
     HARDSHIP FOR YOU? _____No_____

     If so, please explain: _____

43.  ARE YOU CURRENTLY TAKING ANY MEDICATION? _Yes_

     If so, please give the type of medication and the reason you take it: _Eye D
     _____GlauComA_____

44.  ARE YOU OR ANY OF THE MEMBERS OF YOUR FAMILY CURRENTL
     TREATED FOR A MEDICAL ILLNESS WHICH WOULD PREVENT OR
     YOUR JURY SERVICE? _No_

     If so, please explain: _____

45.  HAVE YOU OR ANY FAMILY MEMBERS EVER UNDERGONE COUN
     TREATMENT, OR HOSPITALIZATION FOR PSYCHIATRIC, EMOTIONAL,
     BEHAVIORAL, OR SUBSTANCE ABUSE PROBLEMS? _No_

     If so, please give details (including the name of the hospital and/or doctor/couns
     _____

46.  DO YOU HAVE A FAMILY MEMBER, FRIEND, OR OTHER PERSON WIT
     YOU ARE ASSOCIATED WHO HAS BEEN DIAGNOSED AS ME
     RETARDED OR AS HAVING A LEARNING DISABILITY? _____

47.  HAVE YOU OR A MEMBER OF YOUR FAMILY EVER WORKED IN A
     HEALTH FACILITY OR HOSPITAL? _____

48.  DO YOU OR YOUR SPOUSE PERSONALLY KNOW ANY PSYCHIATR
     PSYCHOLOGISTS? _____

     If so, please describe: _____

49.  HAVE YOU EVER TAKEN ANY COURSES IN THE FIELDS OF PSYCHL
     PSYCHOLOGY? _____

     If so, please describe: _____

9

1506    1098

50. DO YOU HAVE ANY BIAS IN FAVOR OF, PREJUDICE AGAINST, OR ANY FIXED OPINIONS CONCERNING PSYCHIATRIC OR PSYCHOLOGICAL TESTIMONY?
_____NO_____

If so, please explain: _____

### CAPITAL PUNISHMENT/DEATH PENALTY

51. DO YOU HAVE ANY MORAL, RELIGIOUS, OR PERSONAL BELIEFS THAT WOULD PREVENT YOU FROM SITTING IN JUDGMENT OF ANOTHER HUMAN BEING?
_____NO_____

52. ARE YOU IN FAVOR OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME?
_____Yes_____

Please explain: _When Someone takes another_
_Life ;_
_____

53. DO YOU BELIEVE THAT THE DEATH PENALTY SERVES ANY LEGITIMATE PURPOSE OR PURPOSES IN OUR SOCIETY? _____Yes_____

If so, what purpose or purposes do you believe that it serves? _Helps ~~eliminate~~ deter_
_death crimes ;_

54. WITH REFERENCE TO THE DEATH PENALTY, WHICH OF THE FOLLOWING FIVE STATEMENTS BEST REPRESENT YOUR BELIEFS; (circle one)

   a. I believe that the death penalty is appropriate for all crimes involving murder.

   (b.) I believe that the death penalty is appropriate for some crimes involving murder and I could return a verdict which resulted in the death penalty in a proper case.

   c. Although I do not believe that the death penalty ever ought to be invoked, as long as the law provides for it, I could return a verdict which resulted in it, under the proper set of circumstances.

   d. I could never, regardless of the facts and circumstances, return a verdict which resulted in the death penalty.

   f. If the facts mandated a verdict that would result in the death penalty, I would ignore the facts and refuse to vote for such a verdict.

10

1507

1099

55. FOR WHAT CRIMES DO YOU THINK THE DEATH PENALTY SHOULD BE AVAILABLE? _____ MURDER _____

_____

56. DO YOU BELIEVE THAT THE DEATH PENALTY SHOULD BE USED MORE FREQUENTLY, LESS FREQUENTLY, ABOUT THE SAME AS IT HAS BEEN, OR NOT AT ALL, AS A PUNISHMENT FOR CRIME?
About The Same ; _____

57. DO YOU AND YOUR SPOUSE HAVE CONFLICTING BELIEFS REGARDING THE USE OF THE DEATH PENALTY AS A PUNISHMENT FOR CRIME? _____

If yes, how do they conflict? _____

_____

58. DO YOU BELIEVE THAT THE DEATH PENALTY IS NOW BEING, OR HAS IN THE PAST BEEN, APPLIED IN A RACIALLY DISCRIMINATORY MANNER? _____ No

If yes, please explain: _____

_____

59. DO YOU HAVE ANY MORAL OR RELIGIOUS BELIEFS THAT WOULD PREVENT YOU FROM RETURNING A VERDICT WHICH WOULD ULTIMATELY RESULT IN THE DEATH PENALTY? _____ No _____

If yes, please explain: _____

_____

60. IF A SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF RELEASE IS AN OPTION, COULD YOU NEVERTHELESS RETURN A VERDICT THAT WOULD RESULT IN THE DEATH PENALTY? _____ NO _____

Please explain: _____

_____

61. DO YOU HAVE ANY OTHER FEELINGS ABOUT THE DEATH PENALTY THAT YOU CAN SHARE? _____ No _____

Please explain: _____

_____

11

1100

**PERSONAL**

62. DO YOU OR THE MEMBERS OF YOUR IMMEDIATE FAMILY OWN A PET(S)?
    _No_

    If so, what kind? _____

63. WHAT KIND OF VEHICLE DO YOU DRIVE? _1995 CADILLAC_

64. WHAT KIND OF VEHICLE DOES YOUR SPOUSE DRIVE? _____

65. TO WHICH CIVIC CLUBS, SOCIETIES, PROFESSIONAL ASSOCIATIONS, OR OTHER ORGANIZATIONS DO YOU BELONG?
    _____
    _____
    _____

    Please indicate office held, if any: _____
    _____
    _____

66. DO YOU CONTRIBUTE MONEY OR SERVICES TO ANY CHARITABLE ORGANIZATION(S)? _NO_

    If so, please describe: _____
    _____

67. ARE YOU OR YOUR SPOUSE A MEMBER OF (OR HAVE YOU EVER BEEN A MEMBER OF) ANY NEIGHBORHOOD, LOCAL, STATE OR NATIONWIDE CRIME PREVENTION WATCH ORGANIZATION? _NO_

    If yes, please describe: _____

68. WHAT ARE YOUR HOBBIES? _Fishing, TRAveling_
    _____

69. DO YOU SUBSCRIBE TO AND/OR REGULARLY READ A NEWSPAPER? _Yes_

    If yes, which one(s): _WACo TRibune HeRALD_

70. WHAT IS THE LAST MOVIE YOU SAW AND ENJOYED?
    _Double JepoRAdy_

71. WHAT ARE YOUR FAVORITE TELEVISION SHOWS, OR WHICH SHOWS DO YOU REGULARLY WATCH? *NBC News, Will & Grace, All Sports, A&E Network*

72. WHAT WAS THE LAST BOOK YOU READ? _____

73. WHAT IS YOUR *LEAST* FAVORITE TYPE OF READING MATERIAL? *Trade Magazines*

74. HAVE YOU EVER READ A BOOK ABOUT A MURDER TRIAL? *No*

Which book or trial? _____

75. WHAT IS YOUR FAVORITE RADIO STATION? *KVIL - Dallas*

76. DO YOU SUBSCRIBE TO OR REGULARLY READ ANY MAGAZINES? *Yes*

If so, which one(s)? *Time & Sports Illustrated*

77. HAVE YOU EVER WRITTEN A LETTER TO THE EDITOR? *No*

If so, about what subject? _____

78. DO YOU OR HAVE YOU DISPLAYED A BUMPER STICKER ON YOUR CAR? *No*

If yes, what was the message? _____

79. HAVE YOU EVER BEEN OPPOSED TO ANY GOVERNMENT ACTION? *No*

If so, did you express your opposition? _____

If yes, how did you express your opposition? _____

80. HAVE YOU EVER OWNED PERSONALIZED LICENSE PLATES? *No*

If yes, what was the message? _____

81. LIST FIVE INDIVIDUALS WHO ARE PUBLICLY KNOWN WHOM YOU MOST RESPECT: *Colin Powell, Al Gore, Hillary Clinton, Billy Graham, Larry King*

13

1102

The Defendants in this case, Mr. Vialva and Mr. Bernard are African-American. The alleged victims are white. It is essential, if a just trial is to be had, that the jurors selected not be influenced by any bias or prejudice, attitude or belief involving a fellow human's race.

Each of us is the product of our upbringing, environment, heritage, education and life experiences. The following questions may not be easy for you to answer. Please give thoughtful answers, and try to be as honest and candid as you can.

An appropriate juror in this regard is one who has no, or can set aside and ignore, any bias in favor of or prejudice against any race or group of people of a particular ethnicity.

82. ARE YOU A MEMBER OF ANY GROUP OR ORGANIZATION THAT PROMOTES A PARTICULAR RACE OR THAT BELIEVES A PARTICULAR RACE IS EITHER SUPERIOR OR INFERIOR TO ANOTHER?   NO

If so, please identify the group(s) to which you belong: _____

_____

83. DO YOU BELONG TO ANY PRIVATE ORGANIZATION(S) THAT EXCLUDES MEMBERSHIP TO PERSONS OF A PARTICULAR RACE?   No

If so, please identify such organization(s): _____

_____

84. DO YOU FEEL, FOR ANY REASON RELATED TO THE RACE OF THE DEFENDANTS AND THE VICTIMS THAT YOU WOULD NOT BE AN APPROPRIATE PERSON TO SERVE ON THIS JURY?   No

If yes, please explain: _____

_____

85. HAVE YOU, A FAMILY MEMBER OR CLOSE FRIEND EVER HAD A BAD EXPERIENCE WITH A PERSON OF ANOTHER RACE?   No

If yes, please explain: _____

_____

14

1103

## CRIMINAL JUSTICE SYSTEM/LAW ENFORCEMENT

86. HAVE YOU, YOUR SPOUSE, ANY FAMILY MEMBER, OR CLOSE FRIEND EVER BEEN ACCUSED, ARRESTED, INDICTED, CHARGED BY ANY MEANS, OR CONVICTED (including probation, deferred adjudication, conditional discharge, etc.) OF A CRIME OTHER THAN A TRAFFIC TICKET? _____ No

If yes, please give details: _____
_____
_____
_____

87. HAVE YOU, YOUR SPOUSE, OR ANY FAMILY MEMBER EVER USED THE SERVICES OF AN ATTORNEY FOR ANY REASON? Yes

If yes, please give details and name of attorney: DWI (Attorney Deceased)

88. DO YOU, YOUR SPOUSE, OR ANY FAMILY MEMBERS KNOW OR HAVE ANY FRIENDS WHO ARE ATTORNEYS? No

If yes, please give attorneys' names and the types of practice they have:
_____
_____
_____

89. WHAT IS YOUR IMPRESSION OF PROSECUTORS IN GENERAL?
_____ No opinion _____

90. WHAT IS YOUR IMPRESSION OF CRIMINAL DEFENSE ATTORNEYS IN GENERAL?
_____ No opinion _____

91. PLEASE INDICATE WHICH OF THE FOLLOWING YOU BELIEVE WOULD BE THE GREATER WRONG (Circle one):

a. For a jury to find a guilty person not guilty?;

(b.) For a jury to find an innocent person guilty?

15

1104

92. PLEASE RANK IN ORDER OF IMPORTANCE TO YOU THE FOLLOWING PURPOSES FOR PUNISHMENT IN A CRIMINAL CASE (Please indicate 1st, 2nd and 3rd):

Punishment/retribution  _3_
Deterrence/prevention  _1_
Rehabilitation/reform  _2_

93. DO YOU KNOW ANYONE WHO HAS BEEN IN JAIL, OR WHO HAS BEEN TO PRISON, OR WHO IS IN PRISON? _Yes_

If yes, please give details: _Second Cousin - Rape_

94. HAVE YOU OR ANY MEMBER OF YOUR FAMILY EVER BEEN ASSOCIATED OR WORKED WITH ANY PROGRAM INVOLVED WITH THE PREVENTION OF CRIME, THE APPREHENSION OR PUNISHMENT OF OFFENDERS, OR THE REHABILITATION OF PERSONS CONVICTED OF A CRIME? _No_

If yes, please give details: _____

95. HAVE YOU, YOUR SPOUSE, ANY FAMILY MEMBER OR CLOSE FRIEND EVER BEEN THE VICTIM OF A CRIME, A WITNESS TO A CRIME, OR BEEN ESPECIALLY INTERESTED IN THE OUTCOME OF ANY CRIMINAL CASE (either personally or through the media)? _No_

96. HAVE YOU EVER VISITED ANY FEDERAL, STATE OR COUNTY COURTHOUSE BEFORE? _Yes_

If yes, for what reason: _Civil & Criminal Trials_

97. HAVE YOU EVER USED THE SERVICES OF THE UNITED STATES ATTORNEY'S OFFICE OR ANY OTHER PROSECUTOR'S OFFICE (for example: hot checks, child support)? _No_

If yes, please give details: _____

_____

98. HAVE YOU OR YOUR SPOUSE EVER SERVED ON A GRAND JURY? _No_

If yes, please give details: _____

16

1105

99.  HAVE YOU OR YOUR SPOUSE EVER BEEN A JUROR IN A CIVIL CASE? **Yes**

If yes, please give details: **Traffic Case**

100.  HAVE YOU OR YOUR SPOUSE EVER BEEN A JUROR IN A CRIMINAL CASE? **Yes**

Is Yes, who (i.e. you, your spouse, or both)? **Myself**

When? **1982**    What type of case? **Murder**

Were you/spouse the foreperson? **No**  What Court was it in? **54th (?)**

Did the jury reach a verdict? **Yes**  What was your verdict? **~~████~~ Guilty**

Was the jury called upon to assess punishment? **Yes**

What was the punishment assessed? **40 yrs**

Is there anything about your/your spouse's experience as a juror in that case which would affect your service in this case? **No**

If yes, please give details: _____

101.  WAS THERE ANYTHING ABOUT YOUR PRIOR JURY SERVICE THAT LEFT YOU WITH NEGATIVE FEELINGS OR THAT UPSET YOU? **No**

If yes, please explain: _____

102.  HAVE YOU, YOUR SPOUSE, A RELATIVE OR CLOSE FRIEND, PRESENTLY OR IN THE PAST, BEEN AN EMPLOYEE OF A LAW ENFORCEMENT AGENCY OR ORGANIZATION? (Example: city, county, state or federal police officer; constable; deputy sheriff; ranger; Texas Department of Public Safety officer; auxiliary or reserve of any such organization or agency?) **No**

If so, please give name and describe: _____

17

103. HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER APPLIED FOR A JOB IN LAW ENFORCEMENT? ___No___

If so, please describe: _____

104. HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER BEEN CONNECTED WITH LAW ENFORCEMENT IN ANY OTHER WAY? ___No___

If so, please describe: _____

105. HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER STUDIED LAW? ___No___

If yes, please give details: _____

106. HAVE YOUR OR YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER HAD AN UNPLEASANT EXPERIENCE INVOLVING LAW ENFORCEMENT? ___No___

If yes, please give details: _____

107. HAVE YOU, YOUR SPOUSE, A RELATIVE, OR CLOSE FRIEND EVER WORKED AS A SECURITY GUARD OR FOR A SECURITY SERVICE? ___No___

If so, please give details: _____

108. DO YOU HAVE ANY STRONG PERSONAL FEELINGS ABOUT LAW ENFORCEMENT IN GENERAL, OR POLICE OFFICERS IN PARTICULAR? ___No___

If yes, please explain: _____

109. WHAT IS YOUR PERSONAL OPINION ABOUT THE CRIMINAL JUSTICE SYSTEM AND THE WAY IT WORKS?

WorKS FiNe as it is Now Applied;

18

1107

110. DO YOU BELIEVE THAT THERE ARE ANY CHANGES WHICH WE COULD MAKE IN OUR CRIMINAL JUSTICE SYSTEM WHICH WOULD MAKE IT MORE EFFICIENT IN DEALING WITH THE PROBLEM OF CRIME? _No_

If so, what changes could be made? _____
_____
_____

111. DO YOU BELIEVE THAT TRIAL BY JURY IS A GOOD SYSTEM FOR THE TRIAL OF CRIMINAL CASES? _Yes_

What factors about the jury trial system make you feel this way? _Jury is made from all types of people._

112. DO YOU BELIEVE THE QUESTION OF PUNISHMENT, ONCE A PERSON HAS BEEN FOUND GUILTY OF A CRIME, SHOULD BE DECIDED BY A JUDGE OR BY A JURY? _Jury_

113. DO YOU BELIEVE THAT THE DEATH PENALTY SHOULD BE ASSESSED BY A JUDGE OR BY A JURY? _Jury_

Why do you believe this method is more appropriate? _More than one person makes decision._

114. DO YOU BELIEVE THAT A PERSON WHO IS CHARGED WITH COMMITTING A VIOLENT CRIME SHOULD BE ALLOWED TO BE RELEASED FROM CUSTODY ON A REASONABLE BAIL PENDING THE TRIAL OF THAT CASE? _No_

115. DO YOU BELIEVE THAT MOST PEOPLE CHARGED WITH HAVING COMMITTED A CRIME ARE ACTUALLY GUILTY OF THAT CRIME? _Yes_

116. DO YOU BELIEVE THAT MOST EYEWITNESSES TO VIOLENT CRIMES ARE GENERALLY RELIABLE IN THEIR RECOLLECTIONS OF THE FACTS? _Yes_

117. HAVE YOU EVER BEEN ACCUSED OF DOING SOMETHING THAT YOU DID NOT DO? _No_

If yes, please explain: _____
_____

118. HAVE YOU EVER VISITED INSIDE A PRISON OR A JAIL? _No_

If yes, what was your impression? _____

19

1516

1108

119.   DO YOU BELIEVE OUR PENAL SYSTEM IS EVER SUCCESSFUL IN REHABILITATING/REFORMING PERSONS CONVICTED OF CRIME? ___Yes___

Please explain your answer: MANy change their lives AROUND,

120.   DO YOU BELIEVE THAT INNOCENT PEOPLE EVER ACTUALLY GET CONVICTED OF CRIMES? ___Yes___

121.   DO YOU BELIEVE THAT THERE IS MORE, LESS, OR ABOUT THE SAME AMOUNT OF VIOLENT CRIME IN OUR AREA AS THERE WAS TEN YEARS AGO? ___Less___

If you believe there is more or less crime now, for what reason do you believe there has been a change? More crime prevention & LAw enForcement

## CASE SPECIFICS

122.   DO YOU KNOW OR BELIEVE YOU KNOW, ANYTHING ABOUT THE FACTS OR PURPORTED FACTS OF THIS CASE, EITHER FROM THE NEWSPAPER, TV OR OTHER SOURCES? ___Yes___

If so, what facts or purported facts and from what source: TV, Newspaper accounts of incident.

123.   THE DEFENDANTS IN THIS CASE ARE REPRESENTED BY THE FOLLOWi ATTORNEYS: DWIGHT GOAINS, STAN SCHWIEGER, RUSS HUNT, SR AND RU HUNT, JR.  DO YOU KNOW OR HAVE YOU HEARD OF ANY OF THE DEFENS ATTORNEYS? ___NO___

If yes, how do you know them or what have you heard about them? ———

124.   DO YOU KNOW BILL BLAGG, THE UNITED STATES ATTORNEY FOR THE WESTERN DISTRICT OF TEXAS, ASSISTANT UNITED STATES ATTORNEY MARK L. FRAZIER, ASSISTANT UNITED STATES ATTORNEY SCOTT L. FROST OR ANY OTHER MEMBERS OF THE UNITED STATES ATTORNEY'S STAFF? ___NO___

20

1109

If so, please list their names and in what capacity you know them: _____

125.    DO YOU KNOW OR THINK YOU MIGHT KNOW THE DEFENDANTS IN THIS CASE? __NO__

If yes, in what capacity? _____

126.    DID YOU KNOW TODD A. BAGLEY AND/OR STACIE L. BAGLEY? __NO__

If yes, in what capacity? _____

127.    HAVE YOU EVER BEEN TO OR RESIDED IN IOWA? __NO__

If yes, why, when, and how long were you there? _____

128.    DO YOU KNOW JUDGE WALTER SMITH OR ANY OF THE COURT PERSONNEL? __NO__

If so, please list their names and in what capacity you know them: _____

129.    DO YOU CURRENTLY HAVE ANY PERSONAL PROBLEMS THAT WOULD PREVENT YOU FROM GIVING YOUR FULL ATTENTION TO THE TESTIMONY DURING THE TRIAL? __NO__

If yes, please explain: _____

130.    IF YOU HAVE ANY PLANS TO BE OUT OF THE WESTERN DISTRICT DURING THE PERIOD FROM MAY 15 TO JUNE 15, 2000, PLEASE INDICATE THE DATES AND THE REASON FOR YOUR ABSENCE(S): _____

21

4 10

131.  HOW DO YOU FEEL ABOUT BEING ASKED TO ANSWER THE QUESTIONS CONTAINED IN THIS JUROR INFORMATION SHEET?

No opinion;

132.  HAVE YOU, FROM ANY SOURCE, FORMED AN OPINION IN THIS CASE?  No

Please explain what opinion you have: _____

133.  DO YOU WANT TO SERVE AS A JUROR IN THIS CASE? _____

Please explain: _____

134.  IS THERE ANY INFORMATION ABOUT YOU WHICH YOU FEEL THE JUDGE AND THE ATTORNEYS SHOULD KNOW IN REFERENCE TO YOUR ABILITY TO SERVE AS A JUROR IN THIS CASE THAT HAS NOT BEEN SET FORTH ABOVE?  No

If yes, please explain: _____

135.  DO YOU BELIEVE THAT THERE MAY BE ANY REASON WHY IT WOULD BE DIFFICULT OR IMPOSSIBLE FOR YOU TO BE COMPLETELY FAIR AND IMPARTIAL IN THIS CASE?  No

If so, what reason is there? _____

136.  IS THERE ANY QUESTION AND ANSWER ANYWHERE IN THIS QUESTIONNAIRE THAT YOU WOULD LIKE TO REMAIN PRIVATE?  No

If yes, please tell us the number of those questions: _____

137.  Is there any matter you would prefer to discuss privately with the Judge?  No

If yes, please explain: _____

22

1519

**DIRECTIONS**: Below you will find a number of statements expressing different attitudes toward the Death Penalty. Please use the numbers 1-6 below to indicate your agreement and/or disagreement with each statement.

1. Strongly Agree
3. Slightly Agree
5. Disagree
2. Agree
4. Slightly Disagree
6. Strongly Disagree

6  A. The death penalty is wrong.

2  B. The death penalty is the best crime preventative.

6  C. The death penalty is absolutely never justified.

1  D. I think the death penalty is necessary.

6  E. I wish the death penalty were not necessary.

2  F. Any person (man or woman; young or old) who commits murder should pay with his own life.

6  G. The death penalty cannot be regarded as a sane method for dealing with crime.

6  H. The death penalty is wrong, and it is unnecessary even in our imperfect civilization.

5  I. The death penalty has never been effective in preventing crime.

1  J. We must have the death penalty for some crimes.

6  K. I think the return of the whipping post would be more effective than the death penalty.

6  L. The death penalty is not necessary to modern civilization.

4  M. Life imprisonment is more effective than the death penalty. 7

6  N. Execution of criminals is a disgrace to a civilized society.

5  O. The death penalty gives the criminal what he deserves.

5  P. The State cannot teach the sacredness of human life by destroying it.

6  Q. It doesn't make any difference to me whether we have the death penalty or not.

6  R. The death penalty is justified only for premeditated murder.

**DIRECTIONS**: Please indicate whether you agree or disagree with the following (Place either an "A" (Agree) or a "D" (Disagree) in the space provided beside each comment:

D    a. Black males commit most of the violent crimes in our society.

D    b. Today's welfare society is the major cause of crime.

D    c. People in prison live a better-quality life than most of the taxpayers who support their lifestyle.

D    d. Death by lethal injection is too good/easy for people convicted of capital murder.

D    e. There are too many technicalities in the law that allow guilty people to go free.

D    f. The law should concern itself more with victims of crime than with those accused/convicted of crimes.

D    g. Police officers must be obeyed without question because they have society's best interests at heart.

D    h. It is not wrong to lie if it is for a good reason.

D    i. Only a guilty person would object to a warrantless search of their home, car, or person.

A    j. People sentenced to prison do not serve any significant portion of their punishment.

D    k. Parolees are the major cause of crime in today's society.

A    l. It is morally wrong to be racially prejudiced.

D    m. Black people who kill white people have received harsher punishment in the past than blacks who kill blacks.

A    n. The high incidence of violent crime in the United States is largely attributable to the fact that this country is a 'melting pot' for different cultures, races and religions.

A    o. Eyewitness testimony is the strongest evidence that could be offered to prove who committed a crime.

A    p. Minorities blame too many problems on racial discrimination.

24

1521

1113

## DECLARATION

I declare under penalty of perjury that the information I have provided in this Juror Information Sheet is true and correct. Executed on this the ___*18*___ day of ___*ApRiL*___, 2000.

Juror's Signature: ___*Calvin D. Kruger*___

1114

# EXHIBIT 28



## DECLARATION OF KEVIN McNALLY

1. I currently serve, along with David Bruck of the South Carolina Bar, and Richard Burr of the Texas Bar, as Federal Death Penalty Resource Counsel. We assist court-appointed counsel and defenders representing clients who face the federal death penalty. The Resource Counsel Project has provided these services since January, 1992. Our responsibilities include the monitoring of federal capital prosecutions throughout the United States in order to help ensure the delivery of adequate defense services to indigent capital defendants in such cases.[1]

2. In order to carry out the duties entrusted to us, the Federal Death Penalty Resource Counsel Project maintains a comprehensive list of federal death penalty prosecutions and information regarding Criminal Justice Act appropriations in these cases. The Project accomplishes this by obtaining indictments, pleadings of substance (including sealed documents), notices of intent to seek or not seek the death penalty, and by telephonic or in-person interviews with defense counsel or consultation with chambers. This information is regularly updated, and is checked for accuracy with defense counsel. The Project's information regarding federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts.

3. In the course of our duties, the Project has collected the following information regarding all federal death penalty prosecutions pursuant to 21 U.S.C. § 848(e) *et seq.* and 18 U.S.C. §3591, *et seq.*

4. "Of the 682 defendants reviewed under the Department's death penalty decision-making

---

[1]The work of the Federal Death Penalty Resource Counsel Project is described in the report prepared by the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998), at 28-30. www.uscourts.gov/dpenalty/1COVER.htm [The Spencer Sub-Committee]. The Sub-Committee report "urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project ..., which has become essential to the delivery of high quality, cost-effective representation in death penalty cases ...." *Id.* at 50.

1116

procedures in the period 1995 to 2000, 134 (20%) were White, **324 (48%) were Black**, and 195 (29%) were

Hispanic. (Sept. 12 report at 6.)" "The Federal Death Penalty System: Supplementary Data, Analysis and

Revised Protocols for Capital Case Review," United States Department of Justice, Part II, Sec. A  (June 6,

2001). http://www.usdoj.gov/dag/pubdoc/deathpenaltystudy.htm. The Department of Justice Supplemental

Report identified a "broader pool of cases involved 973 defendants, in comparison with the 682 defendants

in the cases submitted to the departmental review procedure...Of the 973 defendants in the broader class ...

**42%(408) were Black**..." *Id.*

     5.  The DOJ Survey reports that from 1995 - 2000, Attorney General Janet Reno approved 159

defendants for a capital prosecution.  71 (or **45%) of those defendant were black**.  Department of Justice,

*Survey of the Federal Death Penalty System (1988-2000)* (2000) Tables 2A and 2B.

http://www.usdoj.gov/dag/pubdoc/dpsurvey.html.

     6.  There have been 318 defendants authorized for a federal capital prosecution.  164 of those 318

(or **52%)  have been black** defendants.

     7.  In the overall pool of 440 defendants that Attorney General Ashcroft has reviewed, there are **199**

**(or 45%) black** defendants.  The chances of a black defendant's facing the federal death penalty after

having had his or her case reviewed by Attorney General are **29%;** for all other defendants, the chances are

**22%.**  8.  Of the 109 defendants that Attorney General Ashcroft has authorized for a capital prosecution,

**57 (or 52%) are black** defendants.   Of those 109, Attorney General Ashcroft has required capital

prosecutions for 41 defendants, **26 (or 63%) are black** defendants.

     9.  Of the 38 defendants who have been sentenced to death,[2] **23 (or 61%) are black.**

     10.  Of the 30 defendants currently on death row, **20 (or 67%) are black** defendants.

---

[2]In addition to the 30 men currently on death row, 1 was granted clemency by the President, 4 death sentences were vacated and the death penalty request withdrawn or the notice of intent dismissed by the Court, and 3 men were executed.

1117

11. This case related information was compiled in the ordinary course of business of the Federal Death Penalty Resource Counsel Project and is accurate to the best of my knowledge.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this ____5th____ day of June, 2004.

Kevin McNally

1118

# EXHIBIT 29

1119

## DECLARATION OF KEVIN McNALLY

Kevin McNally hereby declares under penalty of perjury, 28 U.S.C. § 1746, that the following is true and correct:

1. With David Bruck of South Carolina and Richard Burr of Houston, Texas, I currently serve as Federal Death Penalty Resource Counsel (FDPRC). The purpose of this project, which is funded by the Defender Services Division of the Administrative Office of the United States Courts, is to assist court-appointed and defender attorneys with the defense of federal death-penalty cases at the trial, appellate, post-conviction and clemency stages of such cases. I have served in that capacity since the inception of the Resource Counsel Project in January, 1992. The responsibilities of the FDPRC include the monitoring of federal capital prosecutions throughout the United States, in order to ensure the delivery of cost-effective and adequate defense services to indigent capital defendants in such cases.[1] This includes the collection of data on the utilization of the federal death penalty, both as to prosecutions brought under the 1988 so-called "Drug Kingpin" death penalty statute, 21

---

[1] In May 1998, the role of the Federal Death Penalty Resource Counsel Project was described, at pp. 28-30, in a report prepared by a Judicial Conference Subcommittee on Federal Death Penalty Cases. That report (commonly called the Spencer Committee Report) "urge[d] the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project . . . which has become essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." *See,* "Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation," (May 1998), at p. 50. The Report is available online at http://www.uscourts.gov/dpenalty/. The Report's recommendations were later adopted by the Judicial Conference of the United States.

1120

U.S.C. § 848(e) *et seq.,* and those brought pursuant to the "Federal Death Penalty Act of 1994." 18 U.S.C. §3591 *et seq.*

    2. In order to carry out my responsibilities, the FDPRC maintains a comprehensive list of all federal death penalty prosecutions and information regarding each defendant. This information is regularly updated, and is checked for accuracy whenever possible against any available United States government information regarding federal capital prosecutions and/or with defense counsel in those cases. The Project's information regarding practices in federal capital prosecutions has been relied upon by the Administrative Office of the United States Courts, by the Federal Judicial Center and by various federal district courts. The Project also attempts to collect penalty-phase verdict sheets reflecting the actual findings of federal juries at the penalty phase of aggravating and mitigating circumstances.

    3. I have been asked by counsel for Brandon Bernard to provide information to the Court regarding certain of the data that the Project has collected. I am prepared to testify as a witness as well. The areas I was asked to provide data concern: (1) the frequency with which the federal death penalty has been sought and imposed since 1988; (2) the race of the defendants as to whom a capital prosecution has been authorized; and (3), the frequency with which the federal death penalty is authorized and imposed on a regional basis.

1121

# I.

# FREQUENCY WITH WHICH THE FEDERAL DEATH PENALTY IS SOUGHT AND IMPOSED

4.  The Project has collected information regarding all federal executions and all potential and actual federal death penalty prosecutions initiated pursuant to 21 U.S.C. § 848(e) *et seq.*, enacted in 1988, and/or 18 U.S.C. §3591, *et seq.*, enacted in 1994.

5.  Based on the Project's figures, as well as the reports published by the Department of Justice in September 2000 and June 2001, it appears that the "pool" of potential capital defendants in the system since 1988 totals 2,056.[2] This figure is current as of June 5, 2004. This consists of 52 cases reviewed prior to the 1995 Death Penalty Protocols put into place by Attorney General Reno,[3] 682 reviewed by Ms. Reno after the Protocols went into effect, 440 reviewed by Attorney General Ashcroft, and an additional 231 cases identified by United States Attorneys as potential capital cases that were never submitted for review.[4] The Project has identified additional cases that fall into this later category, *i.e.*, cases that were never

---

[2]Of these 2,056 defendants, 211 are currently pending review by the Department of Justice, bringing the total defendants reviewed to 1,845.

[3]Prior to the Protocols, which went into effect on January 27, 1995, the Attorney General reviewed only reviewed those cases in which a United States Attorney requested permission to seek the death penalty. Potentially capital cases where the local determination was not to seek the death penalty were not reviewed by Main Justice. The major 2001 change wrought by the Protocols was a requirement that *all* potential death-penalty cases, whether the United States Attorney wished to pursue the death penalty or not, be submitted to Main Justice for review and ultimate decision by the Attorney General.

[4]*See* the discussion of this figure at n. 10 of the June 2001 Supplemental Justice Department Study.

3

submitted for review and/or charged as capital offenses even though there was justification for doing so.

6. From this group of 1,845 potential capital defendants, a total of 318 defendants have actually been authorized for capital prosecution. Thus, the Department of Justice has authorized capital prosecutions in approximately 17% (318/1,845) of the cases in which the penalty could have been sought. To date, juries have sentenced 38 defendants to death. Four death sentences have been set aside on appeal. Three defendants have been executed. One defendant was granted clemency[5] There are 30 defendants presently on the federal death row under an active sentence of death whose cases are in various stages of review via direct appeal or post-conviction proceedings brought pursuant to 28 U.S.C. § 2255. There are 64 cases presently pending or in trial.

## II.

## RACE OF DEFENDANTS AUTHORIZED FOR FEDERAL CAPITAL PROSECUTIONS

7. The racial composition of the pool of 318 defendants whose cases were authorized for a federal capital prosecution is as follows: (1) African-American, 164 (52%); (2) Latino, 56 (18%); (3) Caucasian, 80 (25%); and (4), "other," 18 (5%). These figures are current as of May 31, 2004.

---

[5] Two federal executions took place in the year 2001 (Timothy McVeigh and Juan Garza) and one in the year 2003 (Louis Jones). Messrs. McVeigh and Jones were executed pursuant to the Federal Death Penalty Act of 1994. Mr. Garza was executed pursuant to the 1988 enactment, 21 U.S.C. § 848(e).

4

1123

## III.

## **REGIONAL VARIATIONS**

8.  Based on figures compiled by the Death Penalty Information Center (current as of May 31, 2004) the states which currently lead the nation in post-*Gregg* executions are Texas (322), Virginia (91), Oklahoma (73) and Missouri (61).  The states whose federal districts have the most authorized federal death penalty prosecutions (including pending cases) are Virginia (39), New York (30), Texas (22) and Missouri (21).  Federal districts in the following states have had more than one federal death sentence returned by juries: Texas (9), Missouri (6), Virginia (4), Georgia (3), Louisiana (2), Arkansas (2) and North Carolina (2).  Of the 38 federal death sentences imposed by juries since 1988, 30 have come from the traditional "death belt" states.  By way of contrast, there have been six federal death-penalty cases tried in New York State involving a total of nine defendants as follows: three trials in the Eastern District of New York, one in the Southern District of New York (two capital defendants) and two in the Northern District of New York (two capital defendants in each case).[6]  No federal jury sitting in New York State has returned a death verdict, including the one case tried, *United States v. Bin Laden, et al.*, a case where two of the four defendants tried faced the death penalty for their roles in the simultaneous terrorist bombings of United States embassies in East Africa resulting in hundreds of deaths, thousands of injures, and the destruction of two United States Embassies.

---

[6]These are figures current as of the date of this declaration.

9. I have also been asked by counsel for Brandon Bernard to provide information on the number of authorized federal death penalty cases, since 1988, by the state in which each such prosecution was brought. According to the Project's records, the following compilation accurately sets forth the particular state in which each of the 318 federal death penalty cases authorized since 1988 was prosecuted:

> Alabama (5), Alaska (1), Arizona (5), Arkansas (5), California (15), Colorado (6), Connecticut (3), DC (11), Florida (11), Georgia (7), Hawaii (1), Illinois (12), Indiana (4), Iowa (4), Kansas (4), Kentucky (3), Louisiana (7), Maryland (12), Massachusetts (4), Michigan (15), Mississippi (3), Missouri (21), New Jersey (2), New Mexico (6), New York (30), North Carolina (10), Oklahoma (4), Pennsylvania (11), Puerto Rico (17), Tennessee (12), Texas (22), Vermont (2), Virginia (39), West Virginia (4).

I declare, under penalty of perjury, that the foregoing is true and correct. Executed on June 5th, 2004.

_____
KEVIN McNALLY

6

1125