# Letter to Seventh Day Adventist Congregation

## From SUBJECT

Investigators note: The original was read to the congregation by Pastor Johnson. Copy of letter faxed to this office by SUBJECT'S mother.

631

**COPY**

Dear SDA church,

I'm writing to let you know that I'm sorry to Disappoint you. I've been in your Church for almost my whole life I've grown up with most of the church family. But some where in my life It took a turn for the worst. Some where in my life Satan took my mind for a ride. Through all ~~my~~ this the lord has been able to sit me down and tell me that I'm going in the wrong direction. I hope my exsperience of being around the wrong crowd ~~xxxxx~~ has showed that It doesn't madder how much you go to church and around church members, if you don't give your life to christ and really mean it you can still be consumed by the devil. I wish that It didn't take an exsperience like this for me to know what Path I'm to take. Even though me and my family really can't afford to get me a good lawyer, so I have to deal with this Court appointed lawyer.

2632

But with ya'll prayers from the whole church can help me in my quest to deliverance. And that ~~the comman of my father~~ helps me come to the reason of my letter. ● At your prayer time I would like you to pray as a congregation for me to get throu this mishap. So that I can make amend with my family and chure friends. To show everyone that I can be success full and that I'u changed and have finally grown up. And also, so I can make those that love me and care proud. Finally, I hope that I have been an example to any young people out there trying to be gonster or trying to fit in wit these in crowd. The bottom lin is be yourself and don't let anyone else push you to do someth you don't want to. Because this I can assure you is not the place to be. Well I got to go and I hope you have a happy sabbath.

Brandon



**Criterion Investigations**
1010 Timmons Drive
Copperas Cove, TX 76522
Phone/Fax: (254)542-5777

# Confidential

| | |
|---|---|
| To: Russ Hunt | From: R. A. Hoppe |
| Company: Attorney | Company: Criterion Investigations |
| Fax Number: 1-254-753-8118 | Fax Number: (254)542-5777 |

Message:

Russ,
Attached please find my Interim Report #3, dated September 6, 1999. I am continuing to work the names provided by Thelma Bernard. I have completed an additional three which are not on this report, but will be on the next interim. Several of the remaining interviewees are not returning phone calls.

I am also building a consolidated report, which I can furnish to you periodically, or on completion of the investigation.

If there is anything else I can do, or if you have further guidance, just let me know.

Keep smiling!

Carolyn



FAX (254) 526-3018
PHONE (254) 519-8111

## Scott & White Health Plan
## Metroplex Choice

Facsimile Transmission Form

Date of Transmission: _July 16, 1999_

Number of Pages (including cover sheet): _10_

TO: _Mr. Russell D. Hunt_

FROM: _Thelma Bernard, BSN, RN, CCM_ (Brandon)

COMMENTS: ① The forms from The 3 FBI Agents ② A Listing Of Names of People to call. ③ Update Lesting of persons to Contact to follow. _Thelma_

### CONFIDENTIALITY NOTICE!!

The documents accompanying this telefax transmission contain confidential information, belonging to the sender, that is legally privileged. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or the taking of any action in reliance on the contents of this information is strictly prohibited. If you have received this telefax in error, please notify us by calling the telephone number provided above immediately to arrange for return of the original document to us.

U35



1. Carolyn Morris
2. Dr. Rodney Morris } 254-690-6648

3. Dr. Charles Mitchell
4. Phyllis Mitchell
5. Matthew Mitchell } 254-699-3044

6. Dr. Barry Siebenlist
7. Joni Siebenlist } 254-699-4135

8. Patsy Autmon
9. Jim Autmon
10. Ashley Autmon
11. Candice Autmon } 254-690-5749   11

12. Kathryn Bradley } 254-690-2914

13. Fred Covington
14. Viviana Covington } 254-542-5250

15. Darrell Cross
16. Billie Cross } 254-939-3226

634

17. Tom Riddle } 254-628-2172
18. Sandy Riddle

19. Milton Rios } 254-526-3254
20. Modesta Rios

21. Luis Robles
22. Margarita Robles } 254-628-9815
23. Shemirell Robles

24. Eddie Smith } 254-939-5988
25. Bonnie Smith

26. Chaplain Theodore Stewart } 254-699-4960
27. Lorraine Stewart

28. 29. Chaplain Don & Nancy Troyer } 254-577-4824

30. Wynetta Vick } 254-690-5215
31. Warren Voegele } 254-699-0278

4437
4257



㉜ Paul Erb
㉝ Juliet Erb ⟩ 254-526-0283

㉞ Ken Finch
㉟ Pam Finch ⟩ 254-698-3866

㊱ Karl Forster
㊲ Ruth Forster ⟩ 254-690-6650
㊳ H. Lynn Forster

㊴ Dr. Monty Gohn
㊵ Rosalyn Gohl ⟩ 254-699-3777

㊶ Ruel Hawkins
㊷ Murcia Hawkins ⟩ 254-519-5767

㊸ Pastor Terry Johnson ⟩ 254-616-6895
㊹ Dr. Ed Kemper
㊺ Marilyn Kemper ⟩ 254-690-7704

4258

638



46) Bill King
47) Debbie King      } 254-526-5791

48)
49) Chaplain Garry & Yvonne Losey
                     254-542-5550

50) Phillip Marley
51) Linda Marley      } 254-634-2295
52) LaNeece Marley

53) Dr. JACquelene McIntyre
        254-519-3934

54) Stan Michael
55) Kelly Michael    } 254-699-7570

56) Monique Parthow  } 254-699-7572

57) Mary Pollock
58) Naomi Pollock    } 254-554-7062

59) Dr. Wayne Pundt
60) Mary Ellen Pundt  } 254-699-2957

4259

639



(61) Bonnie Wainwright ⟩ 254- 939- 7997
(62) Allen Wainwright ⟩

(63) Marty Wall
(64) Sheri Wall ⟩ 254- 554- 8774

(65)(66) Dr. Dale and Jane Ziesmer ⟩ 254 780-2345

(67) Tammy GoodLoe ⟩ 210 - 662- 6787
(68) Mary Littles ⟩ 254- 554-
(69) Pastor Roger Johnson ⟩ 817 - 551 - 0966
(70) Louis Solomon ⟩ 254- 698- 6852
(71) Myrna Solomon ⟩ 254- 698- 6852

(72) Bobbie Hill ⟩ 254 - 554 - 38%

(73) Shanise Scott
(74) Ms Louvivian Scott ⟩ 254 - 501 - 9847

(75) Nancy Voegele ⟩ 254-699-1362

(76) Rosie Mitchell ⟩ 901-345- 1118

(77) Rene
The/Simeon Pollock ⟩ 512- 733-2323

4260

1040

(78) Ellen Johnson    > 573-359-2454
(79) Martha Johnson    573-359-2454
(80) Lawrence Johnson )
(81) Versia Howard > 616-236-5987
(82) Thelma S
(83) Jerome        >
(84) Carolyn Gatlin > 254-634-1576
(85) Marie Jackson      699-4684
(86) Lorraine Boyd/Thames      634-6716
(87) To be cont'd.

I will be faxing you more Names.

Thelma Bernard

(89) Sherise Scott —

4261

# RUSSELL D. HUNT
## *Attorney at Law*

**BOARD CERTIFIED IN CRIMINAL LAW**
TEXAS BOARD OF LEGAL SPECIALIZATION
AND
NATIONAL BOARD OF TRIAL ADVOCACY

August 30, 1999

Mr. Mark Frazier
Assistant U. S. Attorney
P. O. Box 828
Waco, Texas 76703-0828

     Re:   ***Brandon Bernard***

Dear Mark:

I am responding to your request that I provide you with a written communication that outlines the basis for our opposition to your suggestion that the Government seek the death penalty in the case of Brandon Bernard.

As you are aware, Mr. Bernard was not the shooter in this action. Instead, both of the victims were shot by co-defendant Chris Vialva.

We believe that the evidence will show that Mr. Bernard was not the instigator of this action, nor was he the leader. I believe all of the evidence will show that Vialva was the instigator and leader.

I further believe that the evidence will show that Mr. Bernard and at least one of the juveniles tried to persuade Vialva to release the victims unharmed. We believe that evidence will show that Mr. Bernard believed that Vialva would release the victims until the moment that Vialva shot them both.

Mr. Bernard is not a leader and has even been characterized by his former high school principal, Corbett Lawler, as a "non entity." Mr. Lawler was quoted by the *Austin American Statesman* as saying that Bernard is "never at the front of anything" and is instead "almost defined by the group he is with."

ALICO Building
Suite 1202
425 Austin Avenue
Waco, Texas 76701
*254/753-3738*
*Fax 254/753-8118*

4264

Post Office Box 726
Waco, Texas 76703-0726
*RHuntAtty@aol.com*
*RussHuntAtty@abanet.org*
*www.rhuntlaw.com*



Mr. Mark Frazier
Re: *Brandon Bernard*
August 30, 1999
Page 2

As I have informed you, the Court has appointed Criterion Investigations to work with me in preparing mitigating evidence on behalf of Mr. Bernard. Mr. Bernard's mother has provided us with the names of at least eighty people who will be willing to come to court and testify that Mr. Bernard is not violent and would not initiate an incident such as this.

As I have also informed you, Mr. Bernard stands ready to enter a plea to his involvement in this matter and testify to the actions of Mr. Vialva. Mr. Bernard has given a complete statement to the police and is not trying to escape responsibility for his involvement in the matter. I would urge you to avail yourself of his cooperation instead of seeking his death.

There can be no question that a horrible crime was committed. I implore you to spare the life of Brandon Bernard.

Please contact me if you need additional information in order to assist you in determining a future direction.

Sincerely,

RUSSELL D. HUNT

RDH/ppr

ALICO Building
Suite 1202
425 Austin Avenue
Waco, Texas 76701
254/753-3738
Fax 254/753-8118

4265

Post Office Box 726
Waco, Texas 76703-0726
*RHuntAtty@aol.com*
*RussHuntAtty@abanet.org*
*www.rhuntlaw.com*



U. S. Department of Justice

United States Attorney
Western District of Texas

---

700 S. University Parks
Suite 770
Waco, Texas 76706

(254)750-1580
Fax: (254 750-1599

August 17, 1999

RECEIVED
AUG 2 0 1999

Russell D. Hunt
Attorney at Law
P.O. Box 726
Waco, TX 76703-0726

RE:    Unites States v. BRANDON BERNARD
       W-99-CR-070(2)

Dear Mr. Hunt:

As you know, an indictment has been filed charging your client, Brandon Bernard, with an offense subject to the death penalty. We would like to provide you with the opportunity to present to this office any reasons why the death penalty should not be sought. Although the decision belongs to the Department of Justice, it is my intention to recommend to the United States Attorney that the death penalty be sought, based upon the facts at hand.

If you would like to make such a presentation orally, please confer with your client and provide to my secretary suggested dates that are convenient for you.

It would be helpful if, in advance of your presentation, you provide us with a written submission covering your key points, their factual basis, and any supporting documentation which you wish to submit. Please transmit any written submission to me by September 7, 1999, or as soon thereafter as possible.

In the event that you prefer to make your presentation solely in writing, or prefer to make no presentation, please send me a letter to that effect.

Respectfully,

JAMES WILLIAM BLAGG
United States Attorney

By:    MARK L. FRAZIER
       Assistant United States Attorney

4266

copy

THE UNITED STATES DISTRICT COURT FOR

THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

*[handwritten: From Stan Schwieger]*

*[stamp: RECEIVED JUL 0 6 1999]*

| | | | |
|---|---|---|---|
| ED STATES OF AMERICA | ) | W99-73M | |
| Plaintiff | ) | Preliminary and Detention | |
| vs. | ) | | |
| STOPHER ANDRE VIALVA and ████████ | ) | June 24, 1999 | |
| Defendant | ) | | |

A p p e a r a n c e s:

For the Plaintiff:  Bill Johnston
                    Assistant U.S. Attorney
                    700 East San Antonio, #200
                    Waco, Texas

For the Defendant,  Stanley Schwieger
Chris Vilva:        Attorney at Law
                    P. O. Box 975
                    Waco, Texas  76703

For the Defendant,  Russell Hunt, Sr.
Brandon Bernard:    Attorney at Law
                    Waco, Texas

Transcriber:        Ernest C. Swanson
                    Federal Transcribers of El Paso
                    10125 Palmetto Drive
                    El Paso, Texas  79925

     The above-styled and numbered cause came on for a

detention hearing on June 24, 1999, before the Honorable

Dennis G. Green, Magistrate Presiding, in the United States

Court House, Waco, Texas.

2

3                                  I N D E X

4

5    DANIEL W. CHADWICK:
      Direct Examination by Mr. Johnston........... 3
6     Cross Examination by Mr. Hunt................ 20

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Be seated, please.

2          THE CLERK:   W99-73M, the United States of America

3   vs Christopher Andre Vialva, Defendant Number One, and

4   Brandon Bernard, Defendant Number Two.

5          MR. JOHNSTON:  Bill Johnston for the United States.

6          MR. SCHWIEGER:  Stan Schwieger for Defendant Number

7   One, Your Honor.

8          MR. HUNT:  Russell Hunt for Defendant Number Two,

9   Your Honor.

10          THE COURT:  Both sides ready to proceed?

11          MR. JOHNSTON:  We are, Your Honor.

12          MR. SCHWIEGER:   Yes, Your Honor.

13          MR. HUNT:  Yes, sir.

14          THE COURT:   Go ahead and call your first witness.

15          MR. JOHNSTON:  Yes, Your Honor.  We'll call Special

16   Agent Chadwick.  As we do, we'd ask the Court to take

17   judicial notice of the cover sheet of the complaint and the

18   attached affidavit that are on file, for the limited purpose

19   of this hearing.

20          THE COURT:  Any objection, Mr. Hunt?

21          MR. HUNT:  None, Your Honor.

22          THE COURT:  All right.

23

24

25

4276

3

1   DANIEL W. CHADWICK, PLAINTIFF'S WITNESS, SWORN,

2                    DIRECT EXAMINATION,

3   By Mr. Johnston:

4   Q.  Please state your name and how you're employed.

5   A.  Daniel W. Chadwick.  I'm a Special Agent with the Federal

6   Bureau of Investigation.

7   Q.  How many years have you been with the FBI?

8   A.  Over ten years.

9   Q.  And how many years have you been in law enforcement

10  altogether?

11  A.  Over 13.

12  Q.  As a part of your function with the FBI, among others,

13  can you state whether or not you have primary responsibility

14  for the Waco FBI office in dealing with criminal activity at

15  Fort Hood, Texas?

16  A.  Yes, sir; I do.

17  Q.  Do you have enough experience to know, experience with

18  Fort Hood to know whether or not it is a base that is mostly

19  exclusive federal jurisdiction?

20  A.  Yes, sir; I do.

21  Q.  And is it?

22  A.  Yes, sir.

23  Q.  Can you state the relative size of Fort Hood, just for

24  the record, in terms of -- compared to other bases and so

25  forth?

1    A.   Yes, it's second largest post in the United States.

2    Q.   Okay.  And in connection with that, are there certain

3    boundaries and markers and maps that aid you in knowing what

4    is and what is not Fort Hood territory?

5    A.   Yes, sir.

6    Q.   And is there an area which is a part of Fort Hood known

7    as Blora, which is the Belton Lake recreation area?

8    A.   Yes, sir.

9    Q.   I would ask you then if you received some sort of call or

10   notification that something rather serious had occurred on

11   Fort Hood on June 21st, 1999?

12   A.   Yes, sir, I received a call at approximately 11:30 or so

13   that night.

14   Q.   What was the essence of the call and what did you do?

15   A.   That they had discovered a car that had been burned, and

16   that there were bodies in the trunk.  And at that time, I

17   went ahead and got ready and headed out to Fort Hood.

18   Q.   Where did you arrive and go to when you got to Fort Hood?

19   A.   I went to the Criminal Investigative Divisions office

20   located there on Fort Hood.

21   Q.   What was the summary of what you were told as you

22   arrived, in terms of what they had found?

23   A.   Okay.  They had the burned-out vehicle that was located

24   on Fort Hood that contained two bodies in the trunk, and that

25   there was a vehicle that had become stuck in the mud a short

1   distance from this burned-out vehicle, and that there were

2   four subjects that were associated with that vehicle.

3   Q.  That were found there?

4   A.  Yes, sir; that were found there.

5   Q.  In connection with the questions that I'll ask you over

6   the next few minutes about the case, I would ask you this

7   predicate question:  Is the investigation continuing?

8   A.  Yes, sir; it is.

9   Q.  Can you state whether or not there is much more work to

10  be done?

11  A.  Yes, sir.

12  Q.  Is it possible that some of the answers you give will be

13  either modified or expanded upon in the days and weeks to

14  come?

15  A.  Yes, sir; it would be expected.

16  Q.  Are there even folks down in the Killeen area now working

17  vigorously on this?

18  A.  Yes, sir.

19  Q.  Rather than asking you sort of from the unknown first

20  moments on, I'll ask you, based on what you know now --  And

21  what you know now, is it correct that that's based on a

22  number of interviews you and others have done?

23  A.  Yes, sir.

24  Q.  Can you state whether or not you or someone advised all

25  four of those subjects that were found near that car stuck in

1    the mud of their rights?

2    A.   Yes, sir.

3    Q.   Did you or others try to speak to all four?

4    A.   Yes, sir.

5    Q.   And did three of the four speak with you in varying

6    details?

7    A.   Yes, sir.

8    Q.   And is it correct --  Who is the one that didn't speak

9    with you in any detail?

10   A.   To me or to any other investigator was Chris Vialva.

11   Q.   Otherwise, did you get, first of all, from the other

12   three, and then from citizens and other witnesses, a

13   presentation more or less of what had happened?  Obviously

14   there's more to go.  Is that correct, sir?

15   A.   Yes, sir.

16   Q.   Now, to get specific.  Did you speak with Terry Brown and

17   Brandon Bernard to know what they did in connection with the

18   two Chris's on the day in question?

19   A.   Yes, sir; I did.

20          MR. JOHNSTON:  Your Honor, may I just stop here.  I

21   want to make sure I'm covering something.  Your Honor,

22   throughout the testimony, both of mine and possible cross

23   examination, we'll be mentioning the names of four

24   individuals.  And so the record is complete, we'll be using

25   their names.

1          But I would ask the Court to admonish, if the Court

2    would, the gallery, that the names, which I'll state now of

3    Chris Lewis and Terry Brown are the names of juveniles,

4    which, stating for clarity of the record, but otherwise

5    should not be divulged publicly.

6               THE COURT:    Federal law prohibits the divulging

7    of the names of a juvenile or the photographing of a

8    juvenile.  So if there are any members of the press in here,

9    you're not to do that.  If the names are inadvertently

10   mentioned or mentioned directly, as Mr. Johnston has done,

11   you're not to mention those in your news articles.  You can

12   refer to them as juveniles 1 and 2, or however you want to

13   identify them, but you're not to identify them by name.

14              Go ahead, Mr. Johnston.

15   Q.  Thank you, Your Honor.  Henceforth, even for the record,

16   since I've mentioned the names once, I'll use initials TB and

17   you'll know who I'm speaking of, and the initials CL, and

18   you'll know who I'm speaking of, is that correct?

19   A.  Yes, sir.

20   Q.  All right.  From TB and CL, who are male juveniles, did

21   you learn, during the day or late afternoon of June 21st,

22   1999, what they were all doing?

23   A.  Yes, sir.

24   Q.  At some point, was there some decision to do something on

25   the part of all four individuals?

652

1   A.  Yes, sir.

2   Q.  And can you describe what each one did in the late

3   afternoon, I guess, of June 21st, '99?

4   A.  Starting with the ride?

5   Q.  Yes, getting a ride to somewhere.

6   A.  Okay.  At some time, approximately early afternoon, Mr.

7   Bernard and TB gave Chris Vialva and CL a ride to the IGA,

8   which I believe is a store, a regular store-type building

9   with the purpose of Chris Vialva and CL robbing somebody.

10  Q.  Okay.  Was the intention that, according to what you're

11  saying, CL and Chris Vialva, was their purpose in robbing

12  someone made known to TB and to Mr. Bernard?

13  A.  Yes, sir.

14  Q.  So what did Mr. Bernard and TB then do?  Did they carry

15  them somewhere?

16  A.  They carried them to that location and dropped them off.

17  Q.  All right.  Now, you know from CL and others what

18  transpired thereafter.  I would ask you to pick up the story

19  right then.  They were dropped off in the area of a little

20  shopping center in Killeen by TB and by Mr. Bernard.  What

21  happened then?

22  A.  Okay.  CL advised that they had noticed a couple out by a

23  pay phone at a Mickey's Convenience Store, and advised that

24  Chris Vialva walked up to them and asked them for a ride.

25  Once Chris Vialva and CL got into the victim's car, Chris

4282

6 5.3

1    Vialva then pulled a gun on them and directed them to some

2    type of remote, slightly remote wooded area, which at that

3    point he put the two victims inside the trunk of the car.

4    Q.  When you say "he", who is he?

5    A.  Chris Vialva.

6    Q.  Do you know whether or not at that point there were

7    firearms involved in brandishing or otherwise?

8    A.  Yes, sir.

9    Q.  By whom and what were they?

10   A.  Chris Vialva is the one that had drawn a gun and that's

11   what he used to demonstrate that he wanted to take them to

12   this remote area.

13   Q.  So the gun was displayed even before they were put in the

14   trunk?

15   A.  Yes, sir.

16   Q.  And then were they, at gun point, ordered into the trunk

17   of their own vehicle?

18   A.  Yes, sir.

19   Q.  Would you please state what happened then?

20   A.  Okay.  It's a little sketchy.  It appears that_they were

21   then driven around some of the areas in Killeen, and then

22   even over to the Coppers Cove area where it was either a

23   money card or an ATM-type card, trying to get cash, using

24   that, over in the Coppers Cove area.

25   Q.  All right.  And whose credit or debit card were CL and

4283

1   Chris Vialva trying to use?

2   A.   The victims' debit card.

3   Q.   All right.   Through your investigation with some help

4   from the Secret Service in terms of pulling records, did you

5   learn that there was a convenience store where that card was

6   attempted to be used?   Was there some record of it?

7   A.   Yes, sir.

8   Q.   What sort of time period are you speaking of that the

9   victims were actually in the trunk while this car was being

10  driven to Killeen, Coppers Cove and elsewhere?

11  A.   To my knowledge as of right now, it appears that it was

12  at least a period of three or four or more hours that this

13  was going on.

14  Q.   During that time, from CL or others, do you know whether

15  or not the victims were crying out, were asking for help or

16  trying to negotiate their way out of the trunk?

17  A.   Yes, sir, they were constantly pleading to be let out,

18  just to let them go.   That was pretty much constant where it

19  even appears other people may have heard that.

20  Q.   You had mentioned at the outset of this that TB and the

21  adult, Mr. Bernard here, dropped the other two off and they

22  said they were going to rob someone.   At some point, did they

23  get back together with this stolen vehicle with the victims

24  in the trunk and TB and Mr. Bernard?

25  A.   Yes, sir, they did link back up.

u55

1    Q.   About when and where, if you know?

2    A.   As far as a direct time, it's going to be later on in the

3    evening.   TB was staying at an individual's house by the name

4    of Billy.   It's going to be in the general vicinity of

5    Billy's house is where they linked back up.

6    Q.   In Killeen, you believe or another town?

7    A.   Killeen, Texas.

8    Q.   At this point, were the four together or separate?

9    A.   The four were pretty much together at this point.

10   Q.   Did one of the four cause the four to get back together?

11   In other words, how did this come about that you had two,

12   according to your testimony, in the stolen car and you had

13   two that dropped them off?   How did they get back together

14   and for what purpose, if they said?

15   A.   From what I understand, Chris Vialva had made a call to

16   TB and made the statement that "we need some help.  We've got

17   a situation where we need some help."   They then went through

18   the process of linking back up together, CL, Chris Vialva and

19   the victims' car linked back up with Bernard and TB in

20   Bernard's car for the purpose of providing whatever help that

21   they were needing, which became apparent a little bit later

22   on.

23   Q.   All right.   In addition to the help in performing some

24   act, was it a get away car so to speak?

25   A.   Yes, sir.

1    Q.  Now, in connection with this time frame after they got

2    together, can you state whether or not a discussion then

3    ensued about a plan that went together with the robbery

4    itself, a plan to do something else?

5    A.  Yes, sir.

6    Q.  Tell us about that discussion.

7    A.  Okay.  A discussion came about on what to do with the

8    vehicle.  And then there was some discussion about the

9    victims.  The main concern was with the vehicle.  Chris

10   Vialva was very concerned because he felt like his prints

11   were all over the vehicle.  Within this discussion, it came

12   up about the need to go ahead and burn the car rather than

13   just leave it somewhere.

14   Q.  Was there some direction given or statement made about

15   some act to burn the car, some help to turn the car?

16   A.  Yes.

17   Q.  What was said and done?

18   A.  As far as --

19   Q.  Getting something to help burn the car.

20   A.  All right, yeah.  Chris Vialva had directed Bernard and

21   TB to obtain some type of, either gas -- I think specifically

22   he asked them to obtain gas to do this.  Once TB and Bernard

23   arrived at the store, they determined that the best thing

24   that they could afford to get was going to be lighter fluid.

25   Q.  Can you state whether or not it was made known to these

167

1   two, to TB and to Bernard, that the accelerant that they

2   might buy, if they did, was to burn this car.   Was it made

3   known?

4   A.   Yes.   That's the discussion that was going around, and

5   they knew that they were going to buy this to burn the car.

6   Q.   Bernard, do you see him in Court?

7   A.   Yes, I do.

8   Q.   Would you point him out, please.

9   A.   He's sitting on the right-hand side of the two

10  defendants.

11  Q.   Right.   Did you advise him of his constitutional and

12  statutory rights concerning self-incrimination, you or

13  someone?

14  A.   Yes, sir.

15  Q.   After being so advised, and now talking about this issue

16  of the accelerant, did he make a statement to you about his

17  role in that?

18  A.   Yes, sir.   He advised me that he was the one that had

19  purchased the lighter fluid from the Mickey Store.

20  Q.   Do you know where he got the money, according to him?

21  A.   He didn't really say where he got the money.   I learned

22  from somebody else that --

23  Q.   One of the other defendants?

24  A.   One of the other defendants, that Chris Vialva had given

25  TB the money, and that TB then turned the money over to Mr.

658

Bernard.

Q.   All right.  Is there some evidence of the purchase of a

couple of cans of lighter fluid in Killeen or Coppers Cove or

some place?

A.   Yes, sir.  Some investigators have a copy of a cash

register receipt showing the purchase of two cans of lighter

fluid.

Q.   On the date and in the time frame that we're talking

about --

A.   On the date and the time frame that we're looking at.

Q.   What happened after the lighter fluid was purchased by

the two?

A.   They then -- it's unsure if they drove around a little

bit more, but they basically started heading out towards

where this remote area is in Fort Hood with both cars, the

get-away car and then the victims' car, and went to the

remote area, where at that point, Chris Vialva drove the car

up --

Q.   When you say "the car", do you mean the victims' car?

A.   The victims' car.  He was driving the victims' car.  He

drove the victims' car up this -- you really wouldn't call it

a road.  It's kind of like a side passage off of another

gravel-type road.  And that's where they then stopped the

vehicle.  Then at that time they proceeded to go ahead and

start pouring this lighter fluid over different portions

659

1    inside the car and over different portions of the car.

2    Q.   Where were the victims?

3    A.   The victims were still in the trunk.

4    Q.   At this point in that remote area, according to CL and

5    possibly others, did the victims begin some very specific

6    requests and discussion from inside the trunk?

7    A.   Yes.   The victims were asking, "Can you see the bible in

8    the car?   Would you please get the bible in the car..."

9              MR. JOHNSTON:   May I approach the witness?

10             THE COURT:   Yes, sir.

11   Q.   If you need to refer to a statement, CL, I'd ask you to

12   do so, but I'd ask you to continue your answer.

13   A.   Okay.   The female victim asked if they saw the bible on

14   the back seat of the car.   CL said yes.   She asked CL if he

15   was a Christian.   And he said no, that he used to go to

16   church.   And she specifically asked him to read a certain

17   paragraph out of Isaiah which he started reading to her.

18   Then she was telling him that that paragraph is telling him

19   what God wants him to do about this situation.   Something to

20   the effect, "thou shall not kill."

21   Q.   Were the victims trying very hard to keep the attention

22   of these fellows?

23   A.   Yes.

24   Q.   Talking and beating on the trunk?

25   A.   Yes.   Yes, sir.

1   Q.   And did Mr. Vialva make a response, sir?

2   A.   While he was pouring some of the lighter fluid on the

3   car, they're still beating on the trunk and he said, "Bitch,

4   quit knocking on the trunk.   I'm going to let you out."

5   Q.   Mr. Vialva said this?

6   A.   Mr. Vialva said this.

7   Q.   What did Mr Vialva then do?

8   A.   Shortly after this point, the trunk was opened up and Mr.

9   Vialva shot both victims.

10  Q.   You've talked to CL?

11  A.   Yes, sir.

12  Q.   You've talked to TB?

13  A.   Yes, sir.

14  Q.   You've talked to Mr. Bernard here?

15  A.   Yes, sir.

16  Q.   What have all three told you about who fired the deadly

17  shots?

18  A.   Chris Vialva.

19  Q.   After the victims were shot, was the trunk apparently

20  shut back, sir, or do you know?

21  A.   To my knowledge, the trunk was shut back.

22  Q.   And what happened then?

23  A.   Then they lit the lighter fluid, which started the car

24  burning.   And then they departed.

25  Q.   Was Stacy Bagley the female victim?

4290

1   A.   Yes, sir.

2   Q.   And her husband, Todd?

3   A.   Yes, sir.

4   Q.   Did the medical examiner find that she had, in Dallas,

5   some sort of bullet wound to the face?

6   A.   Yes, sir.

7   Q.   Not the brain but the face?

8   A.   From what I understand, between the nose and the mouth is

9   where it entered.

10  Q.   What else did the medical examiner find in looking at her

11  closely in the upper body?

12  A.   From what I understand, they found soot in the throat

13  area.

14  Q.   And what conclusion did he say --

15  A.   That she was still alive when the car was burning.

16  Q.   The medical examiner or the preliminary information about

17  Mr. Todd Bagley, where was his injury, sir?

18  A.   To my knowledge, I believe it was the side of the head.

19  Q.   What did the four defendants try to do then after the

20  shooting and the fire started?

21  A.   Then they tried to get into Bernard's car and then leave

22  the area.  In the process of attempting to leave the area,

23  the car became stuck in the mud.

24  Q.   Can you state whether or not, through happenstance or

25  otherwise, maybe a citizen or some other person, came by

1    about that time?

2    A.  Yes, sir.

3    Q.  A couple of individuals had stopped to see if they needed

4    help in getting the car unstuck.  In the process of pulling

5    up and asking them for help, they noticed that the four

6    subjects were like taking their clothes off, or exchanging

7    maybe shirts and were acting in a pretty agitated manner, and

8    that people were taking things out of the car and throwing

9    them off into the woods.

10   Q.  What are the things found in the woods that apparently

11   had been thrown there by somebody?

12   A.  Yes, sir, there was.

13   Q.  For instance, what was found in the woods near the car?

14   A.  A 40 caliber pistol, which we believe to be the murder

15   weapon, a 22 caliber pistol, some lighter fluid cans, I

16   believe some article of clothing, the victims' ID's were

17   found in the general area.  And from what I understand, even

18   one of the subject's ID's was found in the wooded area.

19   Q.  The citizen that saw this activity you described after he

20   stopped and tried to help them, did he have some familiarity

21   with some of the defendants?

22   A.  Yes, sir.  One of them --

23   Q.  One of the citizens or --

24   A.  One of the citizens had familiarity with at least three

25   of the individuals that were with this car.

1    Q.   Had seen them before?

2    A.   Had seen them before and knew of them.

3    Q.   Of the ones he knew and was somewhat familiar with the

4    way they looked and so forth, can you state whether these two

5    are two of them?   These two defendants.

6    A.   Yes, sir.

7    Q.   Do you have evidence that these two defendants before the

8    Court today are members of any sort of organized criminal

9    activity or gang?

10   A.   Yes.   There's indications that they're associated with a

11   gang that's located in the Killeen area.

12   Q.   What sort of information do you have about their

13   involvement and the activity of the gang, if any?

14   A.   I'm aware that they're in a gang database that's

15   maintained by the Killeen Police Department.

16   Q.   Do you know whether there's any evidence of other

17   criminal activity involving these defendants that may be

18   gang-related?

19   A.   Yes, sir.   There's some stuff that being made known.   It

20   appears that Chris Vialva, for sure, or at least, and

21   possibly some of the others, were involved in another type of

22   violent act that's related with gang-type activity.

23   Q.   Recently, sir?

24   A.   Yes, sir.   Recently.

25   Q.   Did you or others have an opportunity --  Stacy Bagley,

4293

1    who's her daddy?  Who's her father?

2    A.   Charles Woodard.

3    Q.   Is law enforcement familiar with him?

4    A.   Yes, sir.

5    Q.   Why?

6    A.   It's my understanding that he's a retired Killeen Police

7    Department Officer, and he is also now working for Internal

8    Affairs for the Texas Department of Corrections at the Hughes

9    unit in Gatesville.

10   Q.   Did you or someone speak with him and the family to learn

11   about where Stacy Bagley and Todd Bagley had come from in

12   that vehicle?

13   A.   Yes, sir.  They came from Iowa.

14   Q.   All right.  And although it seems very technical, had

15   that vehicle --  Was it even registered in Iowa?

16   A.   Yes, sir.  It had Iowa license plates.

17   Q.   To the extent you can today, can you say it crossed state

18   lines before it came to Texas and had recently done so?

19   A.   Yes, sir.

20            MR. JOHNSTON:  I pass the witness at this time.

21            MR. SCHWIEGER:  I have no questions, Your Honor.

22            THE COURT:  Mr. Hunt.

23                      CROSS EXAMINATION,

24   By Mr. Hunt:

25   Q.   Agent, I'm Russ Hunt, and I represent Mr. Bernard.  I

4294

1   have a few questions that I want to ask you because there are

2   some things that I didn't understand, and I want to make sure

3   that you can help me with them.  You said that the

4   investigation was continuing, that there was more work to be

5   done.  Can you give me a summary of what kind of work needs

6   to be done?  You said more work needed to be done.

7   A.   A summary of --

8   Q.   Yeah, can you tell me in general terms what that means?

9   A.   A lot of interviews.  We've got a lot of lab work that

10  we're waiting to get back.  I mean, there's quite extensive

11  amounts of evidence that has been recovered from both the

12  crime scene and from other areas that we have to process and

13  determine whether it's relevant or not.

14  Q.   Okay.  I'm going to try not to be confusing, but I'll try

15  to do this chronologically to follow your testimony.  You

16  said that this episode started out in the early afternoon of

17  the 21st, is that correct?

18  A.   That's to the best of my knowledge.  Some time during the

19  early afternoon is when this would have started, yes, sir.

20  Q.   Okay.  And you said that CV and CL went to the IGA Market

21  in order to rob somebody.

22  A.   No, sir.

23  Q.   That's not correct?

24  A.   I thought you said TB.

25  Q.   I'm calling Vialva CV.

4295

1   A.   All right.

2   Q.   Again, I don't mean to be confusing.

3   A.   I haven't referred to him with initials.   He's an adult.

4   Q.   Exactly.   They went to IGA in order to rob someone, is

5   that correct?

6   A.   Yes, sir.

7   Q.   Can you tell me the source of your information for saying

8   that?

9   A.   Yes, sir.   Bernard.

10   Q.   Okay.   Then some time after that --   Okay.   So that then

11   Bernard and TB carried them to the IGA.   Was it Bernard that

12   was driving in the car?

13   A.   Yes, sir.

14   Q.   During your testimony, you've made reference to two guns,

15   one a 40 and the other one a 22.   Who had the 22?

16   A.   To my knowledge, as far as when the 22 was being ditched,

17   it was in the possession of Chris Vialva when it was pitched

18   into the woods.   We're working on other information that

19   might come about that CL might have been carrying that 22,

20   but it has not been firmed out yet.

21   Q.   Is there anything that would indicate to you so far that

22   Mr. Bernard at any point had either of those two guns?

23   A.   No, sir.

24   Q.   You said that during the time that the victims were being

25   driven around, that there was apparently an attempt to use

1   their credit cards, is that correct?

2   A.   Some type of money, ATM cash, check card, or whatever.

3   Yes, sir.

4   Q.   Do you know if there are any photographs from any of

5   those ATM machines to show who was using it or who was

6   attempting to use it?

7   A.   No, sir, not to my knowledge as of yet.  I mean, a lot of

8   this stuff is still being processed and being gone through.

9   Q.   Certainly.  So something like that might develop, but as

10  of right now, you're not aware of it?

11  A.   Well, I mean, with as many cameras as we have, as far as

12  the different areas that we're looking at, I cannot

13  specifically recall if it was the fact that that particular

14  ATM might not have had a camera or they're still trying to

15  review the tape.  I just couldn't say for sure.

16  Q.   Okay.  When the victims were then taken out into the

17  woods, this is after the credit cards had been used, can you

18  tell me who was in which car?

19  A.   When they were being taken to the woods?

20  Q.   Yes, sir.

21  A.   Chris Vialva and CL were in the victims' car.  Bernard

22  and TB were in Bernard's car.

23  Q.   I assume that Bernard was driving his own car?

24        MR. JOHNSTON:  Excuse me.  I'm going to object,

25  only for clarification both for you and Mr. Hunt and ask

4297

1    whether or not we mean into the woods the final time or just

2    to have them placed in the trunk.

3    Q.  Okay, let's split that up because --  Let's go first to

4    having them placed in the trunk.  Did that involve just the

5    victims' car --

6    A.  I'm sorry.  To my knowledge, that was only the victims'

7    car.  Chris Vialva and CL were the ones that were being given

8    a ride by the victims.  They're the ones that directed them

9    to this area.  I have no information that Bernard's car was

10   at that location.

11   Q.  Okay.  Then the second time the two cars are together is

12   when there's two cars going out into the woods to the place

13   where the car was ultimately found, is that correct?

14   A.  Yes, sir.

15   Q.  Can you tell me --  You've already told me that Vialva

16   was driving one and Bernard is driving the second one.  Do

17   you know which one was in the lead?  Was Vialva's car in the

18   lead and Bernard following him?  Or do you know?

19   A.  Going on what I'm recalling, the way I remember it was

20   that Chris Vialva was in the lead car as they were heading

21   out there, and that Bernard was following in his car.

22   Q.  Okay.  Do you have any information that would indicate

23   that Bernard knew that Vialva's plan was to kidnap anyone or

24   to take them out and kill them prior to the cars being out in

25   the woods on Fort Hood where the one car was burned?

1  A.  My indication is that Bernard knew that they were going

2  to rob somebody.

3  Q.  But not that he knew that they were going to kidnap

4  anyone?

5  A.  I have no information that states that.

6  Q.  And not that he knew they were going to kill anyone?

7  A.  Whether or not he could surmise it or whether he had

8  direct knowledge that that's what was going to end up

9  happening?

10 Q.  Yes.

11 A.  I mean, I don't think anybody had stated "we're going to

12 go kill them."

13 Q.  Okay.  Apparently then the pleading that was being done

14 by the victims was by the victims to the occupants of their

15 car which would have been Vialva and the other juvenile, is

16 that correct?

17 A.  To them.  And I mean, other people could hear them.  I

18 mean, at one time we had Bernard's car and the victims' car

19 in close proximity, and they're able to hear the victims

20 pleading at that time.

21 Q.  Did you get that from Bernard, the juvenile or both in

22 Bernard's car?

23 A.  No, I got that from TB.  I would have to research some

24 more to see, I mean, if that was also something Bernard was

25 telling me, although I know Bernard had heard these people

1   because that was the indication that was given to me as the

2   reason he knew there was people in the trunk.

3   Q.  You said that prior to the cars going out to Fort Hood

4   that Bernard or the juvenile that he was with were called by

5   Vialva in order to seek help.  Do you have any indication

6   that they knew what "help" meant?  Do you have anything that

7   would indicate to you that at that point they knew Vialva

8   meant, "I'm going to take somebody out into the woods"?

9   A.  When the phone call was made to TB?

10  Q.  Yes, sir.

11  A.  I have no indication that they knew at the time the phone

12  call was made exactly what kind of help was being asked of

13  them, no, sir.

14  Q.  The discussions relative to burning the car, prior to the

15  car being burnt, were those discussions centered around

16  destroying fingerprints as opposed to "get rid of these

17  victims"?

18  A.  Yes, sir.

19  Q.  Okay.  I'm going to move to a different subject.  Can you

20  tell me who warned Mr. Bernard of his rights, the rights to

21  an attorney, the rights to not have to talk to anybody?

22  A.  At the time I took the statement from him?

23  Q.  The first time.

24  A.  I couldn't give you a name.  I could find out the name.

25  I don't know the name off the top of my head, no, sir.

4300

1   Q.  Do you know whether it was an FBI agent or some police

2   officer?

3   A.  I believe it was a CID agent.

4   Q.  Do you know where that took place?

5   A.  I'm under the impression that it took place at the CID

6   office.

7   Q.  Okay.  Was he warned again some time after that by

8   someone?

9   A.  Yes, sir; he was.

10  Q.  And who would that be by?

11  A.  That would have been by Judge Cook.

12  Q.  Okay.  Do you know when that took place?

13  A.  Again, I could get an exact time, but the approximate

14  time would be around, probably sometime between 2:00 and

15  3:00.  Or maybe a little bit earlier.

16  Q.  There was some discussion about the two cans of lighter

17  fluid, and whether or not the two cans of lighter fluid were

18  going to be because they couldn't afford to buy gasoline?  Is

19  that because they didn't have anything to carry the gasoline

20  in?

21  A.  That was part of the cost.  They were considering having

22  to buy a container to put the gas in.

23  Q.  Do you know who it was, or was it everyone that spread

24  the lighter fluid around the car in order to torch the car?

25  A.  As far as actually, directly putting the lighter fluid

1    onto the car, Chris Vialva and CL were doing that.  It

2    appears that TB may have put some of this lighter fluid on an

3    article of clothing to also be used to help start the fire.

4    Q.  What was Mr. Bernard's part in this?

5    A.  I have no indication that Mr. Bernard was putting any

6    lighter fluid on the car.

7    Q.  Okay.  Who actually lit it?

8    A.  It's not exactly --  Either Chris Vialva or CL is going

9    to have been the ones that lit the car.

10   Q.  When was the first indication that any of the people, any

11   of the four people arrested, intended to kill the two

12   victims?  When is the first indication by anybody?  Was it

13   when Vialva fired on them or did anyone know before he did

14   that that that's what was going to happen?

15   A.  Early on, once the two cars had gotten together, from

16   what was being discussed, it appeared that that was an option

17   that Chris Vialva was considering.  That was an option early

18   on into the ordeal, that that was how the problem was going

19   to be solved.

20   Q.  Okay.  Was the first time then that that was the option

21   that he took, was it obvious to everyone when he actually did

22   it, or did he reach a conclusion, "I'm just going to have to

23   kill then", and then minutes later opened the trunk and

24   killed them?

25   A.  Okay, restate your question.

u73

1   Q.  Yeah.  I'm looking for when it was obvious to everyone

2   that that was the option that Vialva chose, that he was just

3   going to kill them.

4   A.  Well, obviously when --  I mean, to my knowledge, I guess

5   when he opened up the trunk and killed them, that's when the

6   final determination, that was the way it was going to be

7   handled, I guess.

8   Q.  Sure, but he didn't announce beforehand, ten minutes

9   beforehand, "Well, I'm just going to have to kill them.

10   We'll open up the trunk and I'll kill them"?

11   A.  No.  To my knowledge, and again I would have to review to

12   see exactly what went with who, but it was apparently to a

13   couple of the others involved, I'm not for sure which ones,

14   that this was going to be a likely result.  We even have -- I

15   have TB advise that that's why he went along was because he

16   was hoping that maybe they could change that result.

17   Q.  Okay.  Change it.  In other words, talk Vialva out of it?

18   A.  And keep it from happening.

19   Q.  Okay.  All right.  Did Bernard say anything about that

20   relative to whether he thought that that was a possibility?

21   A.  Directly or implied, I mean I cannot recall.  I mean, I

22   have the impression that he knew that that was a possibility

23   of what was going to happen.

24   Q.  Okay.  You said that a citizen knew at least three of

25   them and he knew of them.  Which of the four did the citizen

1    not know?

2    A.   CL.

3    Q.   He said that the citizen knew of them.   What does that

4    mean?

5    A.   I believe he went to the same school that they had been

6    attending.   Had seen them around in common places where

7    people would associate with each other.

8    Q.   Okay.   You indicated that they were in some way

9    associated in a criminal organization gang.

10   A.   Yes, sir.

11   Q.   Is there a name for that gang?

12   A.   I've heard the name.   I do not recall exactly what the

13   name is.   I've been told it's some loose association or type

14   of association with the Bloods, but again, I do not recall

15   exactly what the name of the gang was, or how they have it

16   listed in the database, anyway.

17   Q.   And is that all four of them or is that less than four of

18   them?   I'm specifically, obviously interested in Mr. Bernard.

19   A.   That's Mr. Bernard and two others.

20   Q.   Okay.   Bernard, Vialva and one of the other juveniles?

21   A.   TB.   Yes.

22   Q.   You also indicated that they had been involved in some

23   other violent activity.   Can you tell me what that is?

24   A.   That's something we're working on right now, trying to

25   figure exactly what it was.   To my knowledge, it's some type

4304

Chadwick - Cross by Mr. Hunt

1   of shooting assault, I believe involving a car, and it

2   happened in Killeen, Texas.

3   Q.   Was anyone killed?

4   A.   I can't remember if they were killed or just wounded.   I

5   don't have that knowledge in hand before me right now.

6            MR. HUNT:   Thank you, Agent.   We'll pass the

7   witness.

8            MR. JOHNSTON:   No further questions of this

9   witness.

10           THE COURT:   Okay, you can step down, sir.

11           MR. JOHNSTON:   Your Honor, I was going to call Mr.

12   Reyna, but I believe what I'll do is, ask the Court to take

13   judicial notice of the pretrial services report that Mr.

14   Reyna prepared on both defendants.   We would so move.

15           THE COURT:   Any objection to the pretrial?

16           MR. HUNT:   None, Your Honor.

17           THE COURT:   It's admitted.

18           MR. JOHNSON:   The United States rests.

19           THE COURT:   Any information from the Defendants?

20           MR. SCHWIEGER:   We rest, Your Honor.

21           MR. HUNT:   Similarly, we have nothing to present,

22   Your Honor.

23           THE COURT:    Concerning the preliminary examination

24   portion, I find there is probable cause to bind the

25   Defendants over to the grand jury.

4305

 1                  Concerning the Government's request for detention,

 2      is there any argument from either side?

 3                  MR. JOHNSTON:  We rely on the record, Your Honor.

 4                  MR. SCHWIEGER:  We have no argument, Your Honor.

 5                  MR HUNT:  No, Your Honor.

 6                  THE COURT:   Mr. Vialva and Mr. Bernard, I find

 7      that based on the evidence presented that you both present a

 8      serious threat to the community.  Because you are both facing

 9      a potential death penalty, because of the severity of the

10      sentence, obviously you present a risk of flight, and because

11      of the other indications in the pretrial report.

12                  Mr. Vialva, it indicates that you're on probation

13      in Bell County, both felony and misdemeanor, and you're on

14      bond at the same time.  Because of the fact that you failed

15      to comply with the conditions of bond and bail, I find that

16      there are no conditions or combination of conditions that

17      could be used to insure your appearance in court and the

18      safety of the community.

19                  Mr. Bernard, because of the information, the

20      totality of the information presented during the testimony of

21      the Special Agent, I find that there are also no conditions

22      that would insure your appearance or the safety of the

23      community.

24                  I'm going to remand both of you to the custody of

25      the United States Marshals.  They'll take you back to the

4306

1    McLennan County Jail.  You'll be held there without bond

2    pending trial or disposition in this case.  Is there anything

3    else that we need to take up at this time, Mr. Hunt?

4            MR. HUNT:  Nothing, Your Honor.

5            THE COURT:  All right, if you'll go with the

6    Marshals, we'll stand in recess.

7                        * * * * *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                    TRANSCRIBER'S CERTIFICATE

5

6          I, Ernest C. Swanson, Official Transcriber for the

7    Western District of Texas, Waco Division, do hereby certify

8    that I listened to the cassette recording that was made in

9    magistrate court in the above styled cause, that I

10   transcribed what I heard from said tape, and that the above

11   and foregoing transcript is true, correct and complete to the

12   best of my ability.

13         Signed by me this the 30th day of June, 1999.

14

15

16   _____

17                    Ernest C. Swanson

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CRIMINAL NO. W-99-CR-70(2) |
| | § | |
| BRANDON BERNARD | § | |

## MOTION FOR APPOINTMENT OF CO-COUNSEL IN DEATH PENALTY CASE

*TO THE HONORABLE WALTER S. SMITH, JR., UNITED STATES DISTRICT JUDGE FOR THE WESTERN DISTRICT OF TEXAS, WACO DIVISION:*

Now comes Defendant, **BRANDON BERNARD**, by and through his undersigned Counsel Russell D. Hunt ("Attorney Hunt"), and files this Motion for appointment of co-counsel, and in support would show the following:

I.

Defendant, BRANDON BERNARD, has been indicted with the following counts:

A. *Count One*: A violation of 18 U.S.C. §§ 2, 2119 (1998) "Carjacking" and "Aiding and Abetting," which resulted in the death of Todd A Bagley; and,

B. *Count Two*: "Murder" and "Conspiracy to Commit Murder, a violation of 18 U.S.C. §§ 1111, 1117 (1998)"

The indictment was filed on July 13, 1999. Violations of 18 U.S.C. § 1111 and § 2119 provide for life imprisonment and/or the death penalty. A violation of 18 U.S.C. § 1117 (1998) solely provides for a sentence "for any term of years or for life."

II.

18 U.S.C. § 3005 (1998) requires the appointment of two counsel in all potential capital cases.

III.

18 U.S.C. § 3005 (1998) provides in part that the Court "shall promptly upon the Defendant's request, assign two (2) such counsel, of whom at least one (1) shall be learned in the law applicable to capital cases." Defendant now makes such a request.

4580

## IV.

Attorney Hunt was appointed by the Honorable United States Magistrate Dennis Green to represent Defendant on June 23, 1999. Attorney Hunt has state death penalty experience, in that he has tried as first chair/primary attorney three cases in which the State sought the death penalty. He has also prosecuted one state death penalty case. In addition, Attorney Hunt has tried as first chair/primary attorney several state murder cases in which the State waived or did not seek the death penalty. Attorney Hunt is "learned in the law applicable to capital cases." *See* 18 U.S.C. § 3005 (1998).

## V.

Attorney Hunt would represent to this Honorable Court that he was informed by the Mr. William Johnson of the United States Attorney's Office that the Government intends to seek the death penalty in this matter.

## VI.

In January 1995, the United States Department of Justice (DOJ) promulgated a formal "protocol" describing the manner in which the Attorney General would review federal death penalty cases to determine whether to file a notice of intention to seek the death penalty. Initially, the local United States Attorney reviews the case and makes a non-binding recommendation to the Justice Department about whether the death penalty should be sought.

Generally, the Attorney General has followed the recommendations against seeking the death penalty, but has overridden such recommendations in at least two cases. The Death Penalty Review Committee offers defense counsel the opportunity to present information in writing and in a face to face meeting in Washington, D.C.

The DOJ authorization process has two important implications for the costs of defense representation in federal capital cases. First, because any case involving an offense punishable

Page 2

681

by death remains a potential death penalty case until a final decision is made by the Attorney General, a longer authorization process increases the length of time that the defendant remains statutorily entitled to at least two lawyers who are compensated at a higher hourly rate. The second cost implication of the authorization process is that it creates another forum in which defense counsel must advocate on behalf of the client facing a possible death sentence. One of Defense counsel's most important functions is to present information first to the local U. S. Attorney and then to the Justice Department that would justify a lesser sentence. Effective advocacy requires counsel to explore all of the issues that are likely to enter into the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors.

Because development of mitigating information early in the case may convince the prosecution that the death penalty should not be authorized, delaying preparation for the penalty phase is likely to increase the number of cases authorized, and therefore the total costs. In a small number of instances, judges were reluctant to approve expenditures related to the penalty phase until an authorization decision was made. However, if the result of such a decision is that a case is authorized which should not be, this approach may cost more money that it saves, for cases that are never authorized cost much less money than cases that are authorized, even if a guilty plea to a sentence less than death eventually is negotiated. *See Federal Death Penalty*

Page 3

*Cases: Recommendations Concerning the Cost and Quality of Defense Representation,*

Subcommittee on Federal Death Penalty Cases, Committee on Defender Services, Judicial

Conference of the United States, pp 19-21, May 1998.

VII.

Current counsel has spoken to Russell D. Hunt, Jr. ("Attorney Hunt Jr."), whose office is located

in Round Rock, Texas.   Attorney Hunt Jr. was employed by Attorney Hunt for approximately five years

until October 1, 1999, at which time Attorney Hunt Jr. began his own law practice.  Attorney Hunt Jr. has

tried over two dozen state felony cases, and has served as second or third chair with Attorney Hunt in at

least two state capital cases in which the death penalty was sought.

VIII.

Attorney Hunt has spoken with Attorney Hunt Jr. and he has agreed to accept appointment in this

case should the Court make such appointment.

**WHEREFORE,** Defendant prays that the Court order the relief hereinabove requested.

Respectfully submitted,

Russell D. Hunt
State Bar No. 10289200
P.O. Box 726
Waco, Texas  76703-0726
(254) 753-3738
Fax (254) 753-8118
**ATTORNEY FOR DEFENDANT
BRANDON BERNARD**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a copy of the above foregoing Motion has been mailed to Mark Frasier,
Assistant United States Attorney,  Western District of Texas, Waco Division,  Rod Goble, attorney for

Page 4



Co-Defendant Tony Sparks; and Stan Schweiger, attorney for Co-defendant Christopher Vialva, on February 25, 2000.

_____
Russell D. Hunt

# EXHIBIT 2



```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE WESTERN DISTRICT OF TEXAS
 2                          WACO DIVISION

 3  _____

 4  UNITED STATES OF AMERICA,  )
                               )
 5  VS.                        )
                               )
 6  CHRISTOPHER ANDRE VIALVA    )
    and BRANDON BERNARD         )
 7                             )

 8

 9  ....................................................

10  GRAND JURY TESTIMONY OF DANIEL CHADWICK

11  ....................................................

12

13

14              BE IT REMEMBERED that on the 13th day of

15  July, 1999, at 10:28 AM, in the United States Courthouse,

16  Waco, Texas, the United States Grand Jury No. 99-7-6

17  convened, there being twenty-two (22) Grand Jurors

18  present, at which time the following proceedings were had

19  and adduced as hereinafter set forth:

20

21

22

23

24

25
```

```
 1                          APPEARANCES

 2

 3  FOR THE GOVERNMENT:

 4      MR. WILLIAM W. JOHNSTON
        CHIEF ASSISTANT UNITED STATES ATTORNEY
 5      700 South University Parks Drive
        Suite 770
 6      P. O. Box 828
        Waco, TX  76706

 7

 8

 9

10

11                          INDEX

12

13  Appearances . . . . . . . . . . . . . . . . . .   2

14  DANIEL CHADWICK
        Examination by Mr. Johnston . . . . . . .   7
15
    Reporter's Certificate  . . . . . . . . . . .  58
16

17

18

19

20

21

22

23

24

25
```

```
 1              MR. JOHNSTON:  If you will, remain standing
 2  and raise your right hand.
 3              (The witness was sworn.)
 4              GRAND JURY FOREMAN:  Have a seat.
 5              MR. JOHNSTON:  Members of the Grand Jury,
 6  the federal law concerning what's known as carjacking is
 7  found at Title 18, United States Code, Section 2119, and
 8  it provides, "Whoever with intent to cause death or
 9  serious bodily harm takes a motor vehicle that has been
10  transported, shipped, or received in interstate or
11  foreign commerce from the person or presence of another
12  by force and violence or by intimidation or attempts to
13  do so shall be fined or imprisoned," in accordance with
14  the title.  If serious bodily injury occurred, that
15  section applies.
16              If death results, another penalty applies.
17  Title 18, United States Code, Section 1111 provides
18  that, "Murder is the unlawfully killing of a human being
19  with malice aforethought.  Every murder perpetrated by
20  poison, lying in wait, or any other kind of willful,
21  deliberate, malicious, or premeditated killing or
22  committed in the perpetration or attempt to perpetrate
23  any arson, escape, murder, kidnapping, treason,
24  espionage, sabotage, any aggravated sexual abuse or
25  sexual abuse, burglary or robbery, or perpetrated from a
```

```
 1  premeditated design unlawfully and maliciously to effect
 2  the death of any human being is murder in the first
 3  degree."
 4              Section 1117 is a conspiracy statute, and,
 5  in other words, you have the substantive crimes, but some
 6  crimes it's a crime to conspire to do that crime, like
 7  you had a drug case here earlier, and conspiracy to do a
 8  drug crime is just the same as if you'd done the drug
 9  crime.  Similarly, here now Section 1117 provides if
10  two or more persons conspire to violate Section 1111,
11  which we just mentioned, and one or more such persons
12  do any overt act to effect the object of the conspiracy,
13  he shall be punished by imprisonment, as described.
14              The proposed indictment for you is against
15  two individuals.  The proposed indictment is United
16  States of America versus Christopher Andre Vialva --
17  V--I--A--L--V--A -- and Brandon Bernard.
18              It's proposed for your consideration in
19  Count One that, "On or about June 21, 1999, in the
20  Western District of Texas, Defendants" -- Vialva and
21  Bernard -- "aided and abetted by each other, with
22  intent to cause death or serious bodily injury (sic),
23  did take a motor vehicle that had been transported,
24  shipped, or received in interstate commerce, namely,
25  a 1989 Buick LeSabre automobile, Iowa License Plate
```

5

1 Number 353-EXL, VIN 1G4HR54C5KH455369 from the person or
2 presence of Todd A. Bagley by force and violence, or by
3 intimidation, and did shoot Todd A. Bagley with a
4 firearm, which resulted in the death of Todd A. Bagley,
5 in violation of" -- "2119 and 2."
6            Count Two is a conspiracy to murder count.
7 Count Two alleges that, "From on or about June 20, 1999
8 and continuing thereafter until June 21, 1999, at
9 Ft. Hood, Bell County, in the Western District of
10 Texas, a place within the special maritime and
11 territorial jurisdiction of the United States,
12 Defendants" -- Vialva and Bernard -- "did knowingly,
13 willfully and unlawfully conspire and agree together and
14 with other persons, to kill, with premeditation and
15 malice aforethought, Todd A. Bagley and Stacie L. Bagley,
16 by shooting them with a firearm, contrary to Title 18" --
17 "Section 1111."
18            In these type of conspiracies, we have to
19 allege one or more overt acts.  We've alleged two.  "In
20 furtherance of such agreement and conspiracy and to
21 effect the objects thereof, the defendants and
22 co-conspirators committed the following overt acts, among
23 others:
24            1. On June 21, 1999, CHRISTOPHER ANDREW
25 VIALVA and others took a 1989 Buick LeSabre from Todd A.

6

1 and Stacie L. Bagley at gunpoint, and forced the Bagleys
2 into the trunk of their Buick LeSabre.
3            2. On June 21, 1999, BRANDON BERNARD,
4 driving a getaway car, traveled with CHRISTOPHER ANDREW
5 VIALVA, who was driving the stolen 1989 Buick LeSabre
6 with the Bagleys still in the trunk of the vehicle, to a
7 remote area of Ft. Hood, Texas, where VIALVA opened the
8 trunk and shot Todd A. and Stacie L. Bagley with a
9 firearm.  All in violation of Title 18, US Code" --
10 "1117."
11            The last count is a murder count against
12 Vialva -- I'm sorry -- the last two counts,
13 Counts Three and Four, one for each victim.  "On or
14 about June 21, 1999, on Fort Hood, Bell County, Texas,
15 in the Western District of Texas, a place within the
16 special maritime and territorial jurisdiction of the
17 United States" -- Vialva -- "with premeditation and
18 malice aforethought, did knowingly, willfully" -- "kill
19 Todd A. Bagley, by shooting him with a firearm."
20
21            Count Four, same date, June 21st, same
22 allegations, that Vialva with premeditation and malice
23 aforethought killed Stacie Bagley by shooting her with a
24 firearm.  It's a four-count proposed indictment.
25            DANIEL CHADWICK,

7

1            EXAMINATION
2 BY MR. JOHNSTON:
3      Q.  State your name and how you're employed.
4      A.  I'm Daniel W. Chadwick.  I'm a Special Agent
5 with the Federal Bureau of Investigation.
6      Q.  And how many years have you been with the FBI?
7      A.  Over ten years.
8      Q.  Okay.  Now you're actually situated in the
9 Waco, Texas, office?  Is that correct?
10     A.  Yes, it is.
11     Q.  But do you have an area that you work, spend a
12 lot of time working?
13     A.  Yes, sir, the Fort Hood area in Bell County.
14     Q.  All right, and Fort Hood, most folks here are
15 familiar with Fort Hood, but, for the record, Fort Hood
16 is a very large military base?  Is that correct?
17     A.  Yes, sir, it is.
18     Q.  And most of that base is -- am I correct that
19 most of it is within the Special Maritime -- all of it
20 is within the Special Maritime jurisdiction or
21 territorial jurisdiction of the US, but most of it is
22 exclusively US?  Is that correct?
23     A.  Yes, sir.
24     Q.  By that we mean that any crimes that occur
25 there must be prosecuted in federal court?

8

1      A.  Yes, sir.
2      Q.  Okay.  Did you receive a call sometime on
3 June 21st, '99, from authorities at Fort Hood, Texas,
4 that something had happened?
5      A.  Yes, sir.  Approximately at 11:30 on June 21st,
6 I received a call from the duty agent with the Criminal
7 Investigation Division at Fort Hood, CID, and they
8 informed me that they had located a burned vehicle out
9 on the -- on the base and that it had bodies in the
10 trunk.
11     Q.  Okay, and did they indicate to you that there
12 had been some subjects that had -- were found in that
13 area?
14     A.  Yes, sir.  They had -- potentially, at that
15 time, they were looking at four subjects and two
16 potential witnesses that were in the area of the burned
17 vehicle that other local law enforcement officers had
18 come across when they were responding to the smoke that
19 the car was making.
20          MR. JOHNSTON:  Okay.  Members of the Grand
21 Jury, what I think I'll do, I'll ask a few questions
22 from the agent's perspective as to what he learned, and,
23 obviously, it was somewhat -- you know, through a glass
24 darkened, they weren't quite sure what they had, but
25 then I'm going to, in just a couple of minutes, jump

1 into what they know from what the witnesses have told
2 them, so I hope that won't confuse that.
3    Q. (BY MR. JOHNSTON)  So early on in the
4 investigation, there were -- is it correct that, in
5 responding to the smoke of the fire, there was law
6 enforcement and then fire control officers there?
7    A. Yes, sir.
8    Q. And there were -- was it apparent that there
9 was another vehicle that these four had tried to leave
10 in, but it got stuck or something?
11    A. Yes, sir.  The car that was being driven by
12 Brandon Bernard --
13    Q. Okay.
14    A. -- had gotten stuck, and there was four
15 individuals associated with that car.
16    Q. Okay, and now are they the four individuals
17 that were -- as we jump ahead now, were involved in
18 various degrees in the abduction, killing, and
19 destroying of evidence in connection with the offense?
20    A. Yes, sir, they were.
21    Q. All right.  Now were these four suspects taken
22 to the military police or the criminal investigation
23 building there at Fort Hood?
24    A. Yes, sir, they were.
25    Q. And at some point before statements were

1 elicited, were they advised of their rights concerning
2 self-incrimination?
3    A. Yes, sir, they were.
4    Q. And did three of the four -- have three of the
5 four spoken with you in various degrees?
6    A. Yes, sir, they have.
7    Q. All right.  Now somewhat omnisciently and to
8 give a basis for this, you have since this occurred
9 spoken at length with Christopher Lewis?  Is that
10 correct?
11    A. Yes, sir.
12       MR. JOHNSTON:  And I'm going to make a
13 note on the record -- it's not so much for the Grand
14 Jurors but for the record -- that during the questioning
15 over the next few minutes here, I'm going to be
16 referencing some juveniles by name, and that -- this
17 record is protected under, of course, the Grand Jury
18 rules, and at this point, these juveniles -- their names
19 would not become public.  In the event they are
20 transferred to adult status and presented to you, they'd
21 be adults for all purposes, but at this point the record
22 will reflect their names, and we need to talk about
23 this, but their names are confidential, otherwise.  You
24 would be the only folks that would be allowed to know
25 about that.

1       Is there chalk back there?  I just don't
2 want to confuse you with all of these names.  That's
3 okay.
4       There are four names that I want you all
5 to try to separate in your mind, the roles of these four
6 people, and I'll just sort of help you imagine it.  At
7 the top, you can give the name Christopher Vialva
8 V--I--A--L--V--A.
9    Q. (BY MR. JOHNSTON)  Christopher Vialva, is it
10 correct, Agent, is nineteen years old?
11    A. Yes, sir.
12    Q. And you're going to present evidence he was
13 the -- the killer, the gunman?
14    A. Yes, sir.
15    Q. All right.  Now underneath Christopher Vialva,
16 there's Brandon Bernard, and Brandon Bernard, Agent, he
17 is eighteen, correct?
18    A. Yes, sir.
19       MR. JOHNSTON:  And, Members of the Grand
20 Jury, those are probably the only two adults that you
21 will hear on this case, unless it's more tangentially
22 related.
23    Q. (BY MR. JOHNSTON)  Is that correct?
24    A. Yes, sir.
25    Q. The other -- that's two of four.  The other two

1 is, first of all, Terry Brown?
2    A. Yes, sir.
3    Q. Is that correct, and Terry Brown is seventeen
4 years of age?
5    A. Yes, sir.
6    Q. And, lastly, Christopher Lewis, and
7 Christopher Lewis is fifteen years of age?
8    A. Yes, sir.
9    Q. All right, so you have Vialva and Bernard,
10 Brown and Lewis.  You have two Chris's, Chris V. and
11 Chris L.  All right, and each of these all had street
12 names or nicknames, as well?  Is that correct?
13    A. Yes, sir, that's correct.
14    Q. And to cut to the chase on some of their -- on
15 why they run together and why some of these
16 relationships exist, can you state whether or not you
17 have strong evidence that they are members of a criminal
18 organization or a gang?
19    A. Yes, sir, we do.
20    Q. And do they claim it, even?
21    A. Yes, sir, they do.
22    Q. In search warrants, have you found
23 paraphernalia concerning gang membership?
24    A. Yes, sir.
25    Q. What do they call themselves, among other



1 things?

2    A.  Two, one, two (2-1-2) Piru Bloods, basically an

3 offshoot, I guess, of the -- the West Coast Bloods.

4    Q.  Okay, and do they do things -- do they

5 commit -- do you have evidence that they commit crimes

6 together?

7    A.  Yes, sir.

8        MR. JOHNSTON:  All right, and, Members of

9 the Grand Jury, we're not asking you, you know, to

10 consider someone bad just because they're in a gang.

11 That's up to you to decide that, but it may bear on

12 their -- their willingness to associate together, their

13 willingness to cover for each other and to commit crimes

14 together that they are in a -- in a gang.  That's a

15 minor point of this whole thing, but I wanted to

16 admonish you.  You know, we shouldn't just immediately

17 say, "Oh, they're a bunch of criminals."  That's just

18 not the case when someone is in a gang, but if --

19    Q.  (BY MR. JOHNSTON)  For relationships, it's

20 important to this case?  Is that correct?

21    A.  Yes, sir.

22    Q.  All right.  Now let's -- let's now tell the

23 story.  What -- what really happened, as far as we know

24 at this point, based on the evidence you've gathered

25 from -- that is, physical evidence, the discussions

---

1 you've had with other police officers, with CID, but

2 based at its core on a Christopher Lewis statement?  All

3 right, and we'll go off from there, and we'll tell you

4 why we -- why we believe it in different respects, but,

5 if you would, what -- what was it that the folks were

6 doing on the 20th and 21st that eventually led to this

7 encounter with the Bagleys?

8    A.  Okay.  We'll -- we'll start with on the 20th.

9 Some of the times are going to be just approximations or

10 estimations that we have not been able to pin down as

11 well as we would like to yet.  Most of it started on

12 the 20th when there was, at least, three of the guys

13 that we're talking about -- Chris Vialva was stating

14 that he needed money and was wanting to do a robbery to

15 get money.  Himself, Christopher Lewis, and Tony Sparks

16 actually even went out that night, which I believe

17 would be a Sunday night, the night before on the 20th,

18 to -- to do -- to do that with a robbery.  They had had

19 a .22 caliber pistol that they had taken with them.

20 Unfortunately, Killeen police officers had stopped them

21 for curfew violations, since two of them were juveniles.

22 Tony Sparks is a juvenile, and they got stopped for the

23 curfew violations.  They, basically, told Chris Vialva

24 that he could go home, and then they called the parents

25 of Tony Sparks and released Christopher Lewis and

---

1 Tony Sparks into their parents' custody.

2    Q.  And you've mentioned a new name, which is

3 pretty closely related to this case, which is

4 Tony Sparks, correct?

5    A.  Yes, sir.

6    Q.  And we'll talk about his role later and what

7 you may be doing apart from the Grand Jury concerning

8 him, but was there a firearm -- on the night of

9 the 20th, did they have a firearm available to them?

10    A.  They had a .22 caliber.

11    Q.  What did they do with it?

12    A.  When the -- the police officer had approached

13 them, they -- they dumped the firearm into the bushes,

14 some bushes there, just to get rid of it.

15    Q.  Did something happen in the meantime with

16 weather conditions and the firearm?

17    A.  I guess there was some rain.  It rained that

18 night or --

19    Q.  Or something?

20    A.  -- or heavy dew.  Anyway, the firearm had

21 gotten wet when they went back to retrieve it the next

22 day, the next morning, I believe, which would have been

23 Monday morning, and Christopher Vialva was a little

24 upset, because it appeared that it wasn't working very

25 well.  At this time, we had a fairly large group.  I'd

---

1 have to -- to look to see all the names, but they were

2 at -- I'm trying to remember what --

3    Q.  To the extent you recall --

4    A.  -- whose house --

5    Q.  That's all right.  One of them -- one of the --

6    A.  They were at one of their -- they were at one

7 of the homes.

8    Q.  This is now the daytime on the 21st?

9    A.  This is the daytime on the 21st.

10    Q.  Go ahead.

11    A.  We have Christopher Lewis, we have Christopher

12 Vialva, we've got Tony Sparks, and later on that morning

13 or early afternoon Bernard -- Brandon Bernard and

14 Terry Brown come over to this same house, and between

15 that time Chris Vialva had went out and retrieved

16 the .22 and, again, as I stated earlier, was unhappy

17 with the condition of the .22, because it had gotten

18 wet, and so he was in the process of making arrangements

19 to go ahead and get another weapon that belonged or

20 appeared to belong to Brandon Bernard which was a .40

21 caliber Glock, and they went over to another

22 individual's house.

23    Q.  Let's go ahead and stop there and talk about

24 the .40 caliber just a moment.

25    A.  Okay.

17

1    Q.  If you would, tell the Grand Jurors, based on
2 the investigation you've done, along with the Federal
3 Bureau of Alcohol, Tobacco and Firearms in tracing that
4 gun from its original manufacture and first sale
5 through -- or particularly through the report of stolen
6 gun, where do you think that .40 came from?
7    A.  Okay.  The .40 caliber was stolen from a
8 soldier that was stationed at Fort Hood at -- the best
9 guess is at a house in Killeen --
10    Q.  Keep going.  Excuse me.
11    A.  -- from a -- from this soldier's vehicle, and
12 we don't know what happened to it from where it got --
13 exactly who may have stolen it and -- and how it got
14 to -- ended up getting to -- another guy that's
15 associated with this guy ended up having this weapon,
16 and I think we have one of the -- one of the Presley
17 brothers, which is another -- a new name but is also
18 part and associated in the hierarchy -- the upper
19 echelon of the hierarchy of the gang.
20    Q.  It went to Bernard's hands?  Is that right?
21    A.  Right.  He purchased it, basically, for
22 Brandon Bernard, and it -- it got to Brandon Bernard,
23 and then the -- a day or two before the 21st, which was
24 the day of our incident, they had loaned it to another
25 individual, because he was getting threats from another

18

1 gang in Copperas Cove.
2    Q.  And this was Mr. Greg Lynch?
3    A.  This is Mr. Greg Lynch.
4    Q.  Okay, another juvenile associated with the
5 gang?
6    A.  Yes, sir.
7    Q.  Okay, and then the .40 caliber then on
8 the 21st, on or about the 21st, ended up in the hands of
9 Chris Vialva?
10    A.  Yes, sir, it did.
11    Q.  Okay, and is that the firearm that most likely
12 caused the death of the Bagleys?
13    A.  Yes, sir.
14    Q.  Okay.  Now during the day of the 21st, now
15 going toward afternoon, can you state whether or not
16 there was any more discussion among the group about
17 their intention to rob --
18    A.  Yes, sir.  They -- I mean they specifically
19 left the house with the intent, and the four -- we've
20 got five individuals --
21    Q.  Okay.
22    A.  -- that left the house with the specific intent
23 on robbing somebody.
24    Q.  And would you state who those five were, and
25 now this is the afternoon of the 21st.

19

1    A.  Christopher Vialva, Brandon Bernard, Tony
2 Sparks, Terry Brown, and Christopher Lewis.
3    Q.  Okay.  Has Bernard admitted being present like
4 that and knowing about the intended robbery --
5    A.  Yes, sir, he has.
6    Q.  -- after being advised of his rights?
7    A.  Yes, sir.
8    Q.  Okay, and has Christopher Lewis acknowledged
9 that and put both Bernard and Vialva and these others
10 doing this?
11    A.  Yes, sir.
12    Q.  Okay.  Go ahead, please.  After they -- we're
13 where they talked about it.  What did they physically do
14 toward -- toward their goal?
15    A.  From -- from that -- from that point, they
16 first went to a Winn-Dixie that's located in Killeen,
17 fairly close to -- actually fairly close to Fort Hood
18 and one of the -- the gates entering into Fort Hood and
19 decided at that point that that was a little bit too
20 close to -- to where there might be police, or -- or
21 whatever was going through their heads, they became
22 uncomfortable in the Winn-Dixie area.
23           At that time, they left and went to an IGA
24 shopping center, which was a little bit more on the
25 outskirts of town and -- I say "on the outskirts," but

20

1 it's away from the center of everything, so they went to
2 this shopping center.  They sat out at the IGA shopping
3 center for a while looking for targets, did not find
4 anything, I guess, that -- that they felt comfortable
5 with, and at this point they went across and down the
6 street a little bit to a Mickey's convenience store, and
7 at that point, as they drove into the convenience store
8 and they pulled off to the side of the convenience store
9 away from the front of it, there's also a
10 laundromat/washateria located next to the store.  It
11 appears that they saw Todd talking on the telephone and
12 figured that that might be a good subject.
13    Q.  And to get there, did Brandon Bernard and maybe
14 others drop Vialva and Sparks and Lewis off?
15    A.  Yes, sir.
16    Q.  And did Bernard know he was dropping them off
17 to rob someone?
18    A.  Yes, sir, and, in fact, himself, Brandon
19 Bernard, and Terry Brown, when they parked there, they
20 went ahead and went into the laundromat and was playing
21 some video games while the two Chris's and Tony Sparks
22 were going to end up taking somebody.
23    Q.  All right.  Now let's talk about Todd and
24 Stacie Bagley here just a minute here.  Todd Bagley, is
25 it correct, had been in the United States Army stationed

**21**

1 at Fort Hood, Texas?
2    A.  Yes, sir.
3    Q.  And Stacie is the daughter of a -- not that
4 this is relevant for your consideration but just to put
5 it -- is the daughter of a former Killeen police
6 officer?
7    A.  Yes, sir.
8    Q.  So she was raised in Killeen?
9 .  A.  Yes, sir.
10    Q.  Is it correct she met -- maybe in the Killeen
11 area or at some point met Todd Bagley?
12    A.  Yes, sir.
13    Q.  They were involved in activities there in
14 Killeen, you know, home and church life and so forth,
15 but then moved to Iowa?  Is that correct?
16    A.  Yes, sir, it is.
17    Q.  About when did they move to Iowa?  Do you know?
18    A.  To the best of my knowledge, it's -- they'd
19 been there for -- I don't know -- within the past
20 year --
21    Q.  Okay.
22    A.  -- or so.  I'm not -- I'm not for sure.
23    Q.  And did they have a couple of reasons to come
24 back down and visit the Killeen area during this time in
25 June?

**22**

1    A.  Yes, because, well, her father lives in the
2 Killeen area.
3    Q.  And was there also a camp meeting or revival
4 meeting at their previous church?
5    A.  Yes, sir.  They had come down to see their
6 dad -- or her dad and had went to their church and,
7 basically, had discovered that their church was holding
8 this revival for the next week, so instead of leaving
9 that Saturday before the Monday, they had decided to
10 stay an additional time because of being with their
11 friends and worshipping with their friends during the --
12 the revival meeting that the church was having that
13 week.
14    Q.  Okay, and the --
15        MR. JOHNSTON:  Technically, Members of the
16 Grand Jury, we do have to prove the vehicle had some
17 effect on interstate commerce, and it may be that at a
18 later time we prove it was -- exactly where it was
19 manufactured, the Buick, but if it traveled from down
20 finding that you may find, if it traveled from state to
21 state, it's sufficient.
22    Q.  (BY MR. JOHNSTON)  And can you state whether or
23 not their vehicle was registered in Iowa?
24    A.  Yes, sir.
25    Q.  And had they driven it down from Iowa to Texas

**23**

1 before, obviously, this incident occurred?
2    A.  Yes, sir, they did.
3    Q.  And is it -- does it still bear the Iowa
4 registration and so forth?
5    A.  Yes, sir, it does.
6    Q.  Okay.  Now -- so would you please pick up the
7 story again when Todd Bagley and Stacie Bagley were in
8 an area near a Mickey's convenience store, in the same
9 area near a washateria, and the subjects, as you've
10 described, had the intention to rob, please?
11    A.  Okay.  At this point, from what it appears,
12 Tony Sparks approached Todd Bagley after he got off the
13 phone and asked him for a ride, and it looks like Todd
14 went back to his car where his wife was sitting in the
15 car and said something to her, I guess, and then looked
16 back at them and -- and waved or somehow said, "Yeah,
17 we'll give you a ride."
18    Q.  Who was -- then who -- who were the ones that
19 wanted a ride then?
20    A.  Tony Sparks, Christopher Lewis, and Christopher
21 Vialva --
22    Q.  Okay.
23    A.  -- and they were the ones that got into the
24 car --
25    Q.  Okay.

**24**

1    A.  -- with the Bagleys.
2    Q.  And based on what Christopher Lewis has
3 described to you in lengthy discussions, did they really
4 want a ride?
5    A.  Oh, no, sir.
6    Q.  Okay.  Go ahead.  What happened next?
7    A.  Okay.  They gave -- they asked Todd where he
8 was going, and he had pointed off in a direction down
9 Rancier, and they said, "Well, that's where we're going,
10 too," to some type of -- I think it was like an uncle's
11 house that they claimed that they were needing to be
12 driven to.
13    Q.  What happened then?
14    A.  Okay.  From that point, they gave the Bagleys
15 some directions as far as driving through some of the
16 residential streets, and then at one point, Christopher
17 Vialva announced that there was a change of plans and
18 drew out the .40 caliber and put it to Todd's head
19 and -- and claimed again that there was a change of
20 plans, and the exact words -- they conveyed the fact
21 that, "This is a robbery" --
22    Q.  Okay.
23    A.  -- and, at that point, Tony Sparks also
24 withdrew the .22 revolver, which was the revolver that
25 had been wet and had been recovered --

**053**

25

1   Q.  Was that a Jennings .22?
2   A.  That's what we recovered, yes, sir, a Jennings.
3   Q.  Okay.  Is that an automatic or a revolver, the
4 Jennings?
5   A.  I -- I'm sorry, an automatic.
6   Q.  Okay.  Go ahead.  Then after they had drawn the
7 weapons, what happened next, sir?
8   A.  Okay.  From that point, they then directed them
9 to a remote area that was not real far off, which was
10 basically a dirt road, and got them out to that area.
11 Christopher Vialva and Tony Sparks then withdrew Todd
12 and Stacie from the vehicle and placed them into the
13 trunk of the vehicle at that time.
14   Q.  Was it at this point or later where they took
15 some of their personal possessions, rings, watches, and
16 so forth?
17   A.  Yes, sir.  While they were putting them in the
18 trunk, they took their rings and took his watch.  Of
19 course, they had the -- the purses and the wallets, I
20 think, from -- before they got into the trunk which were
21 still in the car, and, again, the time frame that we --
22 that we've -- the best guess that we've got for this is
23 anywhere from the 3:30 to approximately right before the
24 four o'clock time frame when they actually took them.
25   Q.  Okay, and what then happened with them and the

26

1 car, and not -- obviously, I'm not going to ask you
2 every detail, but if you can sort of take us through as
3 the time went on that evening.
4   Q.  Okay.  The -- the first thing it -- that it
5 appears they did is they did go to an ATM machine and
6 then start -- had gotten -- of course, had the ATM card,
7 had gotten a code --
8   Q.  This was Todd and Stacie Bagley's ATM card?
9   A.  -- ATM card, yes, sir --
10   O.  Go ahead.
11   A.  -- and -- and were trying to make some
12 withdrawals.  It doesn't appear that they were
13 successful at that time making withdrawals.  There was
14 numerous conversations going on, mainly a lot between
15 Christopher Vialva and the victims that were in the
16 trunk, and anytime that he was displeased with them, he
17 would do -- he would shake the car around, you know,
18 twist -- twist the wheel and make it go back and forth,
19 so they'd roll around in the trunk, or if he was very
20 upset, he would slam on the brake which, again, would
21 make them roll around in the trunk area of the car.
22   Q.  Okay, and can you state whether or not -- as
23 bizarre as it may sound, but over the period of several
24 hours, there were conversations between the Bagleys and
25 the occupants of the vehicle?

27

1   A.  Specifically, it appears that whenever
2 Chris Vialva got out of the car to either go into the
3 residence -- they stopped at his residence several times
4 and -- and other places -- that Christopher Lewis, to
5 the -- to the most extent, Christopher Lewis would talk
6 to the victims in the car, and the victims in the car,
7 again, were basically, you know, begging for their life
8 as far as trying to convince them that this was a bad
9 thing and that they needed to let them go, would ask
10 them if they believed in God, did they go to church and
11 things along those lines and -- but to no avail in the
12 end.
13   Q.  Okay, and give us an idea -- instead of sort of
14 hijacking these people and taking them to the woods, for
15 lack of a better term, were they sort of paraded around
16 town while in the trunk?  Where did the individuals go,
17 and who did they run into?  Did they run into different
18 people?
19   A.  My description is I -- I call it a "trophy
20 ride" --
21   Q.  All right.  Go ahead.
22   A.  -- because it appears, again -- I mean they
23 were trying to get cash out of the cash machine.  They
24 even, it appears, went to a pawn shop to try to pawn her
25 wedding ring, but in-between some of those driving -- I

28

1 mean going to those specific places, they were driving
2 around their neighborhoods where the -- the gang --
3 their -- their gang, I guess, has the predominant number
4 of its members or people that associate with it are --
5 are in this particular neighborhood, and they -- they
6 were kind of driving around and even sometimes would
7 come back around if they saw a couple of people that
8 they knew.
9   Q.  And would they stop the car and talk and have
10 discussions with people while the Bagleys were in the
11 trunk?
12   A.  Yes, sir, they -- they did.  Specifically, they
13 stopped at one house where -- to the point where the
14 individuals at that house became aware that, yes, they
15 were in a stolen car and that there were actually people
16 in the trunk of the car.
17   Q.  Did this go on for -- for several hours?
18   A.  Again, from the best -- our best ability of
19 trying to pin the times down, we -- we've got
20 between 3:30 and 4:00 when the people were taken and
21 placed into the trunk to the last part of their ride
22 which would have been starting about -- right at shortly
23 after 8:00, so we have, you know, four, four-and-a-half
24 hours where they were pretty much just being driven
25 around in the back of this trunk.

**054**

**29**

1  Q.  Now can you state whether or not -- and I don't
2 know how to ask you at what point -- whether or not at a
3 point and continuing thereafter Chris Vialva and others
4 began having a discussion about, "Now what do we do," or
5 "What do we do with them now," that eventually led to a
6 plan?  Can you describe that briefly, please.
7  A.  Yes, sir.  I mean it's -- it's -- we're still
8 trying to determine exactly at what point this happened.
9 We eventually have Chris Vialva with Tony Sparks and
10 Chris Lewis, who were in the -- the victim's car,
11 finally linking back up with Terry Brown and Brandon
12 Bernard in -- in Bernard's car and --
13  Q.  And was Bernard summoned; in other words, "Hey,
14 we need you again; we need your help"?
15  A.  Right.  There were some phone calls that were
16 made, and -- and the fact -- or the -- the expression
17 being, you know, "All right, it's" -- "it's come to a
18 point where we need some help on figuring out what we're
19 going to do" --
20  Q.  Go ahead, please.
21  A.  -- and at that point -- I mean there was a lot
22 of discussions, but most of the discussions were, "We
23 need to burn the car," because Christopher Vialva was
24 very worried about fingerprints being on the car, and --
25 and he just -- he just wanted to burn the car.

**30**

1  Q.  Were there statements made like, "Now they know
2 too much," or "They've seen us," or "They know" --
3  A.  Christopher Vialva was, also, worried about the
4 fact that he had seen -- that they had seen him, and he
5 did not believe them when they said that they wouldn't
6 tell anybody, and -- and so even in some discussions
7 with some of the other guys that were involved in this,
8 he said, "Well, you know, I've got to kill them,
9 because" -- "because they had seen me."
10  Q.  Okay, and so what plan was come up with, and
11 who played what role in the plan to burn --
12  A.  Okay.  They -- they decided that they were
13 going to burn the car.  While they were riding around,
14 they had -- had stopped on a residential street and --
15 and where Christopher Vialva gave Terry Brown the money
16 to purchase gas or lighter fluid, some -- some type of
17 flammable fluid, to -- to burn the car, and Terry Brown
18 at this point went off with Brandon Bernard, and they
19 went to a Mickey's convenience store.  Terry Brown gave
20 the money to Brandon to actually make the purchase.
21 Brandon felt like he didn't have enough money to
22 purchase a gas container and gas, so he ended up getting
23 the charcoal lighter fluid.
24  Q.  It was like a can or a bottle of some sort of
25 lighter fluid?

**31**

1  A.  Yes, sir.  He got two cans of the -- the
2 barbecue-type that -- that you use to start barbecue
3 briquettes.
4  Q.  And was their mission -- did it separate them
5 from Vialva and the others momentarily?
6  A.  Yes, sir, it did.
7  Q.  All right, and have -- well, I'll -- I'll -- in
8 a minute, I'm going to mention some corroborating facts.
9 I'll ask you to -- go ahead, and then what happened
10 next?
11  A.  And from that point, then they linked back up
12 with Christopher Vialva and Christopher Lewis.  Before
13 they got to this point where they actually bought the
14 lighter fluid, we know for sure that -- again, I had
15 mentioned Tony Sparks.  Well, Tony Sparks had been let
16 out of the car before this point where they bought the
17 lighter fluid, because he was on juvenile probation and
18 had to be home at eight o'clock, so they had let him out
19 and then -- and to go back home, so at the -- at the
20 point where the lighter fluid was -- was being purchased
21 to -- to burn the car, we have Christopher Lewis and
22 Christopher Vialva, who are in the victim's car, and we
23 have Brandon Bernard and Terry Brown who are in
24 Brandon's car.  Okay, after they met back up with
25 Christopher Vialva with the lighter fluid, they then

**32**

1 started driving off at -- basically, they went outside
2 of town and ended up on Fort Hood territory, which was a
3 pretty -- it's a pretty desolate type with no houses
4 around or anything, and the deal is is like when you
5 take the -- this -- it's called Quarry Road.  There's
6 fences on both sides of it until you get across into the
7 Fort Hood ground or, you know, reservation.  Then the
8 Fort Hood side is -- is opened up, and you cross a
9 cattle guard to get into there.
10  Q.  And even by their own acknowledgment, were
11 Bernard and Brown serving as getaway car and getaway car
12 driver, so to speak?
13  A.  Yes, sir.  That's -- that's what their purpose
14 was going out there was to provide them a -- for a means
15 of getting back --
16  Q.  And had -- and --
17  A.  -- to Killeen.
18  Q.  All right, sir, and did they provide -- bring
19 with them in their vehicle the lighter fluid?
20  A.  Yes, sir.  They had the lighter fluid.
21  Q.  Please go ahead as to what happened once they
22 got out on Fort Hood.
23  A.  Okay.  Christopher Vialva had saw -- about --
24 basically, as soon as you cross this cattle guard,
25 there's a rough clearing, almost -- it kind of looks

---

**Page 33**

1 like there might have been a road at one time that went
2 up a hill off of the main gravel road that they were on,
3 and so he took the victim's car, drove all the way up to
4 the top of that and parked or -- or -- to a point and
5 wasn't total -- at the total top but stopped the car at
6 a little clearing area at that point. Of course, he
7 thought that was a pretty fun ride and was wanting to do
8 it again, because it was pretty bumpy and big rocks and
9 everything, and it was a pretty bumpy ride up.
10    Q.  What happened then?
11    A.  At that point, Christopher Lewis and
12 Christopher Vialva got out of the car.  Terry Brown and
13 Brandon Bernard who -- Brandon Bernard had parked his
14 car down on the bottom with the -- the gravel road, and
15 they were walking up towards where Christopher Vialva
16 had parked the victim's car.  They were carrying --
17 Brandon Bernard, I believe, was the one carrying the
18 lighter fluid.  They got up to the victim's car, and
19 then it appears Christopher Vialva and Brandon Bernard
20 started pouring the lighter fluid inside the car and
21 the -- and in the engine compartment and different parts
22 of the car, and Terry Brown helped them pour a little
23 bit of the lighter fluid on, also.
24    Q.  And at this point, obviously, the victims knew
25 that they had stopped and it had been bumpy.  Can you

**Page 34**

1 state whether or not there was any more discussion or
2 outcry from the victims?
3    A.  The victims -- I think Stacie was saying, you
4 know, something to the effect of, "Are you going to let
5 us out or, you know, let us go," or whatever and --
6    Q.  Did this -- I'm sorry.  I'm sorry.  Was there
7 some discussion about directing one of the Defendants
8 for a Bible in the car?  Do you -- do you recall that
9 or --
10    A.  The -- at -- at one time, it appeared that
11 somebody had been directed to read to them from out of
12 the Bible but --
13    Q.  Okay.  We're not sure exactly when --
14    A.  Well, we don't know if that actually happened
15 now.
16    Q.  Okay.
17    A.  It -- there was -- there was some -- numerous
18 statements that were being said at first to try to make
19 each -- certain people look better, and it appears that
20 it might have been one of those statements.
21    Q.  Okay.  Would you state then to the certainty
22 that you have at this time what statements were made by
23 the victims once the car stopped.
24    A.  Well, that -- that they were -- you know,
25 again, they were really interested in -- in being let go

**Page 35**

1 or just being left there and, you know -- but -- but not
2 being killed, and Christopher Vialva got pretty upset at
3 this point and supposedly had slammed the trunk a couple
4 of times and -- and said, "Bitch, shut up; I'm fixing to
5 let you out," and was at this point or shortly right
6 after that point, after some discussion on trying to get
7 several of them to open up the trunk, Christopher Vialva
8 finally -- he had the keys -- opened up the trunk, and
9 it was at that point, when he opened up the trunk, that
10 he shot Todd.  It appears he shot Todd first, and then
11 he shot Stacie.
12    Q.  Where did the bullet hit Todd?
13    A.  Todd was shot in the side of the head, and
14 Stacie was shot in the front of the face; I believe
15 under the nose, between the nose and the mouth.
16    Q.  Okay, and what happened then?
17    A.  At that point, Christopher Vialva shut the
18 trunk back again, and then it appears Christopher Vialva
19 was the one that went ahead and -- and lit the -- or put
20 the car on fire.  It's not known exactly -- we don't
21 know if it was by lighter or some type of material that
22 he might have had lighter fluid on.
23    Q.  All right.  I'm not going to make a pathologist
24 out of you --
25    A.  Okay.

**Page 36**

1    Q.  -- but I'll ask you a couple of questions.  The
2 injury to Todd Bagley, what -- did it appear to hit --
3 that may have affected his brain, was hit in the side of
4 the head?
5    A.  Yes, sir.
6    Q.  Whereas -- can you state whether or not the
7 injury to Stacie was not immediately fatal?
8    A.  It doesn't appear so.
9    Q.  Is there some evidence --
10    A.  Yeah, specifically, they -- when they did the
11 autopsy, they found some soot in the throat which gives
12 you the indication that she was still breathing when the
13 car was on fire, because, otherwise, she wouldn't have
14 had the soot in her throat.
15    Q.  All right, and then in their attempt to get
16 away, what happened?
17    A.  As they went back down to the car,
18 Brandon Bernard's car, which, again, was down at the
19 bottom of the hill, the fastest way, I mean it appears
20 that they figured, was to turn around and go back the
21 same way, but it had been raining off and on all day
22 or -- well, at least, in the afternoon in Killeen that
23 day, and so when they swerved a little bit to try to
24 make a turnaround, because it's a pretty narrow dirt
25 road, at that point they ended up getting stuck on the

**37**

1 side of the road.
2    Q. All right, and did it so happen, sir, that
3 within just minutes some innocent passersby happened to
4 be on that road?
5    A. They -- they were -- the initial vehicle was a
6 truck that had stopped with two individuals in that
7 truck --
8    Q. All right.
9    A. -- and one of them knew or -- that knew the
10 three subjects.
11    Q. Okay. Now you're talking about Mr. Cleveland
12 Shinn?
13    A. Yes, sir.
14    Q. Okay. Now Mr. Cleveland Shinn and -- and a
15 childhood friend of his were in a truck in that area,
16 correct?
17    A. Yes, sir.
18    Q. And from all you know, Mr. Cleveland Shinn is
19 a -- a good fellow? Isn't that right?
20    A. Yes, sir.
21    Q. And Cleveland Shinn from just being, is it
22 correct, from -- from school at Killeen -- is it Ellison
23 they went --
24    A. I believe it was at -- it was at school where
25 he knew the --

**38**

1    Q. Yeah.
2    A. -- the guys from.
3    Q. Had seen some of them there and about town and
4 so forth?
5    A. Yes, sir.
6    Q. And so of all people in the world to catch or
7 see these people out where this car was on fire,
8 Cleveland Shinn was there? Isn't that right?
9    A. Yes, sir.
10    Q. And three of the four he knew of? He didn't
11 know Chris Lewis, the younger one? Is that correct?
12    A. Yes, sir.
13       MR. JOHNSTON: All right, all right.
14 Members of the Grand Jury, I'm just going to ask a few
15 more questions about this, and I'm going to miss a lot
16 of detail, but my intent is to give you some examples of
17 why the agent believes this is what happened independent
18 of what anybody said.
19    Q. (BY MR. JOHNSTON) For instance, you had
20 indicated that Terry Sparks -- I mean -- Tony Sparks --
21    A. Yes, sir.
22    Q. -- was present for the robbery but later went
23 home, correct?
24    A. Yes, sir.
25    Q. And did Chris Lewis tell you that some

**39**

1 arrangement was made at some point concerning the
2 victim's jewelry with Tony Sparks?
3    A. Yes, sir. It appears that he had -- you know,
4 Tony Sparks said, "I'll have the jewelry," because,
5 again, Chris Vialva had kept ahold of the .22, so
6 Chris Vialva had his .22, and he had stated that he
7 would hold onto the jewelry, and then if he didn't give
8 it back to them that night, that he would try to pawn
9 the stuff --
10    Q. Okay.
11    A. -- and get what he could.
12    Q. And sort of like a picture puzzle with a lot of
13 pieces missing at first, you just didn't know who all
14 was involved? Isn't that correct?
15    A. Yes, sir.
16    Q. And it's still being made more clear even
17 today? Isn't that right?
18    A. Yes, sir, it is.
19    Q. But a few days into this, was it apparent that
20 Tony Sparks played some role, that at some point it
21 was --
22    A. Yes, sir. We had had some other potential
23 witnesses that -- we were getting indications there was
24 more than the four people in these two vehicles --
25    Q. Okay.

**40**

1    A. -- and, at one point, we had even heard the
2 name Tony Sparks mentioned --
3    Q. Okay.
4    A. -- as being one of the individuals in the car.
5    Q. But at a point days into this investigation, is
6 it correct that a search was done of his home pursuant
7 to a consent?
8    A. Yes, sir.
9    Q. And, sir, if you would, tell the Members of the
10 Grand Jury what was found in a coat pocket in a closet
11 at Tony Spark's home.
12    A. There was a lady's watch that was located in
13 his coat pocket in his closet that was subsequently
14 identified by the victim's, Stacie Bagley's, father as
15 being her watch.
16    Q. Did he have a specific recollection? You've
17 seen his statement, have you, or have you seen his
18 statement?
19    A. From?
20    Q. From Woody.
21    A. Oh.
22    Q. And he was rather specific about saying he'd
23 seen her with it, knew when he'd last seen her with it
24 and so forth?
25    A. Yes, sir.

1    Q.  Okay, and is it correct -- and I think your
2  testimony pointed out -- that at a point during this
3  carjacking or hijacking they had tried -- someone had
4  tried to go to a pawn shop with a ring or something?
5    A.  Christopher Vialva, once he had found out from
6  Todd Bagley what his wife's wedding ring was worth --
7  approximately twenty-seven hundred dollars ($2,700.00)
8  is what we were -- what we're finding out -- had
9  attempted to take it to a pawn shop, and there was one
10 in Killeen that he had actually went to and had went
11 inside and attempted to pawn this.
12    Q.  Can you state whether or not anyone working at
13 the pawn shop has identified Vialva?
14    A.  Yes, sir.  The pawn shop owner -- I believe
15 it's the owner of the pawn shop -- was working at that
16 particular time and had picked Christopher Vialva out of
17 a lineup as being the individual that had come in and
18 attempted to pawn a woman's wedding ring, and he had
19 stated that, you know, he thought something was fishy
20 with the ring and knew it was worth well over two
21 thousand dollars ($2,000.00) and only offered him a
22 couple of hundred knowing that the guy probably wouldn't
23 take that, which Christopher Vialva didn't, and he left
24 the store.
25    Q.  All right.  Another example, you said that the

---

1 subjects attempted to use an ATM or one of these debit
2 or credit card machines to get currency?
3    A.  Yes, sir.
4    Q.  And have you located ATM records which show, in
5 fact, that card -- or several attempted uses and only
6 one successful use or something like that of the card
7 during the evening?
8    A.  Yes, sir.  We still -- we've got -- we've got,
9 at least, two different ATM's, the Air Field Plaza ATM,
10 which was the first place that they attempted to use the
11 card, and then I believe there's a Race Track ATM in
12 Copperas Cove, which is where they drove and also
13 attempted to use the card.
14    Q.  Okay.  You indicated that Chris Lewis and
15 others had told you a .40 caliber was used in this
16 offense and described -- and you've told the Grand
17 Jurors how the .40 caliber got in the hands of the
18 Defendants.  Were there .40 caliber casings found, sir?
19    A.  Yes, sir.  There were two of them in the trunk.
20    Q.  And do you know whether toolmark experts who
21 can -- can look at a firearm and -- and how -- when a
22 round leaves a firearm, it leaves scrapings or
23 toolmarks -- whether or not any examination has been
24 done comparing the .40 caliber firearm which was found
25 versus the shell casings?

---

1    A.  Yes, sir.  There was an examination done,
2 and -- and these experts believe that those two shell
3 casings were cycled through the .40 caliber that we did
4 find at the -- at the crime scene.
5    Q.  All right, and do you have a number of
6 individuals, some friends and gang members, some
7 citizens, who saw these individuals we've been talking
8 about that evening in their -- in that car, that Iowa
9 car, at different places?
10    A.  Yes, sir.  We have three females that saw -- of
11 course, their stories vary exactly -- you know, I mean
12 remembering who they saw in the car --
13    Q.  Sure.
14    A.  -- but that was at one point, because one of
15 the females was Brandon Bernard's girlfriend, who he had
16 stopped by and, in fact, it appears, had spoken to his
17 girlfriend's mom, with Chris Vialva behind him in the
18 victim's car, and then, of course, with the victims in
19 the trunk at this time.
20    Q.  So a number of witnesses that saw the various
21 things, and are you still working on that part of the
22 case?
23    A.  Yes, sir, we -- we are.
24    Q.  And, for that matter, is there just quite bit
25 more work to do on the case?

---

1    A.  Yes, sir, there is.
2        MR. JOHNSTON:  And, Members of the Grand
3 Jury, all you're allowed to do at this point is charge
4 adults in this.  Now --
5    Q.  (BY MR. JOHNSTON)  But are you taking other
6 proceedings against juveniles?
7    A.  Yes, sir.
8    Q.  Two, so far?
9    A.  Two, so far, and --
10    Q.  Maybe two more in a day or two?
11    A.  We fully expect two more in a day or two.
12    Q.  Okay.  In fact, most -- you've already charged
13 as juveniles Tony (sic) Brown and -- and Chris Lewis,
14 correct?
15    A.  Yes, sir.
16    Q.  And then you're, hopefully, charging soon Lynch
17 and Sparks?
18    A.  Yes, sir.
19        MR. JOHNSTON:  And, at any rate, Members
20 of the Grand Jury, in the event the District Judge,
21 Judge Smith, rules that these juveniles should be
22 handled as adults, we would anticipate coming back to
23 you with an indictment which would include them as
24 adults.  At this point, all we're allowed to do under
25 the law is present to you the two adults, which would be

15

1 Vialva and Bernard.
2    Q.  (BY MR. JOHNSTON)  And without going into great
3 detail, has Bernard essentially admitted his involvement
4 in varying degrees, obtaining the lighter fluid,
5 dropping the men off to rob, and so forth?
6    A.  Yes, sir.
7    Q.  And other details have been provided by other
8 witnesses, including Lewis?
9    A.  Yes, sir.
10    Q.  And Mr. Vialva, as is his right, has not spoken
11 with you about the offense?
12    A.  No, sir.
13        MR. JOHNSTON:  And that should not be
14 considered in any -- any way against him.  All right,
15 Members of the Grand Jury, that's -- we have another
16 witness or two on this, one of the Texas Rangers who's
17 assisting the agent, and then there may be some
18 witnesses who may have observed something, but do you
19 have any questions of the overall case from the FBI
20 agent?
21        GRAND JURY FOREMAN:  How old is -- I'm
22 sorry.  How old is Tony Sparks?  What is his age?  I
23 didn't get it.
24        THE WITNESS:  I'd have to -- I believe
25 it's sixteen.  I'm not for sure.  It's either fifteen or

16

1 sixteen, but I believe it's sixteen.
2        MR. JOHNSTON:  Ma'am, and then sir.
3        GRAND JUROR:  On the -- the Piru Bloods,
4 is that what you called it?
5        THE WITNESS:  Piru, yes, ma'am.
6        GRAND JUROR:  Piru, do you all know how
7 many is in the gang?
8        THE WITNESS:  They have some -- some rough
9 estimates.  We've -- again, unfortunately, with that
10 particular gang, you have a lot of, quote, "Blood
11 elements" that -- that are associated with the Blood
12 gang from the West Coast, but they might call themselves
13 a little bit something different, and -- and it's just
14 kind of hard to track, but we -- we do have a -- you
15 know, I've seen an approximation.  I think it could be
16 as many as fifteen to sixteen people --
17    Q.  (BY MR. JOHNSTON)  Of the sort of running
18 group, core group?
19    A.  Right.
20        GRAND JUROR:  Do you think it's a higher
21 level of ranking in with those gangs to commit a -- you
22 know, a murder or just a robbery?
23        MR. JOHNSTON:  Is there a hierarchy within
24 the gang?
25        GRAND JUROR:  Is there a higher ranking?

17

1 I mean because there are different ranks in different
2 gangs.
3        THE WITNESS:  This is -- several times, it
4 appears things were -- were described -- I'm having a
5 tough time, and I used to work these things, but -- on
6 the Safe Streets end, but if you just pop out of the
7 culture for a year or two, the    the language changes
8 so much, but it appears that they were very --
9 Christopher Vialva was very proud of himself for
10 "hitting a good lick," as they call it, with -- with the
11 theft and -- the theft of the vehicle, the theft -- you
12 know, the robbing of these people and the fact that
13 these people were in the trunk and that several other
14 gang members had, basically, told him the same thing,
15 Billy Rorie being one of them, which was another house
16 he had stopped at during his travellings and -- and who
17 also became aware of the fact that there were people in
18 the trunk of this car, and so I -- I mean as far as him
19 thinking that this was elevating himself, did this make
20 him bigger and higher within the gang hierarchy?
21        GRAND JUROR:  Like an initiation-type
22 thing?
23        THE WITNESS:  Yes.  I mean he was already
24 in the gang, but one of the other individuals that
25 appears, that's going to be in one of the vehicles at

18

1 one time or another during this ordeal for the -- the
2 Bagleys, was a guy by the name of Joey Presley, who it
3 appears to be not -- not the top level but right under
4 the top level of -- in the leadership.  In other words,
5 middle management, I guess you'd call it.
6    Q.  (BY MR. JOHNSTON)  And you're still working on
7 understanding the gang?
8    A.  Yes, sir.
9        MR. JOHNSTON:  Okay.  Sir, you had a
10 question, as well?
11        GRAND JUROR:  I have about four questions.
12 One of them was related to the lighter fluid.
13        THE WITNESS:  Yes.
14        GRAND JUROR:  Was there a witness that
15 could identify an individual --
16        MR. JOHNSTON:  Oh, I'm sorry.  I forgot
17 that.
18    Q.  (BY MR. JOHNSTON)  Identified one of the two
19 men in the store; is that correct, the clerk where the
20 lighter fluid was purchased?
21    A.  Okay, we -- we --
22    Q.  Sorry.
23    A.  -- got a tape that we believe -- due to the --
24 the cost of the lighter fluid and the fact that that was
25 all that was purchased, they gave us a --

Case 6:99-cr-00070-ADA    Document 377-3    Filed 06/14/04    Page 68 of 251

49

1    Q. A register tape; you mean?
2    A. -- a register tape from the cash register that
3 gave us the time of 8:03. I think it was -- I believe
4 it was right around the 8:03 time frame when the stuff
5 was purchased. The individual that purchased it was not
6 picked up -- picked out of a lineup, but Terry Brown was
7 picked up out of a lineup as being in the store at that
8 time off -- from the counter.
9            GRAND JUROR: The other one was the ATM
10 card. Was there any type of videos taken of the
11 individuals trying to use the card?
12            MR. JOHNSTON: Let me help answer that.
13 That's -- all of those things were worked on pretty
14 quickly, and you won't believe the number of places
15 where there was no film in the camera, over and over and
16 over.
17    Q. (BY MR. JOHNSTON) Isn't that correct? I
18 mean --
19    A. Yes, sir.
20    Q. -- at -- at the convenience stores, at ATM's
21 and so forth?
22            GRAND JUROR: Were they successful at
23 using the cards any place?
24            THE WITNESS: At one place, which was a
25 Race Track in Copperas Cove, which doesn't have the deal

50

1 in the camera, so --
2    Q. (BY MR. JOHNSTON) There's a gentlemen today --
3 I don't know who he is -- who may have video that
4 helps --
5    A. We do have -- we have a chance that we -- we --
6 in fact, he's got the video tapes from the Air Field
7 Plaza, and from a couple of the Mickey's stores that we
8 have identified, we've gotten the Mickey's stores' tapes
9 for the tape that -- for the lighter fluid purchase.
10 Somebody didn't rewind the tape all the way that
11 morning. The tape cut off at five o'clock in the
12 afternoon, and we've got the purchase at being at
13 eight o'clock, but, again, this guy has the ATM tape for
14 the machine that's at Mickey's, so those are something
15 that we're just now getting ahold of from the ATM
16 machines, and -- and so, hopefully, we're going to get
17 something from there. We do have the Mickey's tape
18 where the abduction took place, although they never
19 went -- actually went into the Mickey's. Once we did
20 a -- we walked through pretty good with Christopher
21 Lewis on exactly what happened and where people were at.
22 Now we're going to be able to go back to the Mickey's
23 tape and see if we might not be able to pick some of the
24 people out actually in front of the store. It's not --
25 it's not a real good angle, but -- but now that we know

51

1 where they -- they were when they were waiting for Todd
2 to get off the phone, we've got some hopes that we might
3 be able to pick that out.
4            MR. JOHNSTON: Okay. I want to take up
5 the subpoena issue with you when you've completed your
6 questions. You had something else?
7            GRAND JUROR: Yeah, a couple more real
8 quick. On Fort Hood, most places, you know, where you
9 go into a reservation like that, there's a guard on
10 duty. Evidently, they didn't go through a guarded area?
11 Is that correct?
12            THE WITNESS: There's no guard on duty
13 any -- on any of the gates.
14            MR. JOHNSTON: Fort Hood is a really open
15 base.
16            THE WITNESS: The -- only place where
17 you'll even see a MP car is at a visitor's center that's
18 at the main gate that goes into Fort Hood.
19            THE WITNESS: And the last one I had was
20 the individuals who were in the trunk there, were they
21 tied and gagged, or were they just in there loose?
22            THE WITNESS: They were just loose in the
23 trunk. To -- to the best of our knowledge, they were
24 loose in the trunk.
25            THE WITNESS: That's all I had.

52

1            MR. JOHNSTON: Thank you. Yes, sir.
2            GRAND JURY FOREMAN: As best -- as near as
3 you can tell, about what time were they shot and the car
4 burned?
5            THE WITNESS: Okay. Well, we're looking
6 at right around the 8:30 time frame, might have been --
7 well, 8:30 is -- is when we -- it appears we start
8 having people show up, so maybe a few minutes before
9 that.
10            MR. JOHNSTON: Okay. Ma'am, what's --
11            GRAND JUROR: You had said that there were
12 witnesses. Were there witnesses to the burning of the
13 car and the shooting or just --
14            MR. JOHNSTON: Just the four, ma'am.
15            THE WITNESS: Just -- just the four.
16            MR. JOHNSTON: In other words, of the
17 four --
18            THE WITNESS: Okay, other witnesses is
19 what I thought.
20            MR. JOHNSTON: Of the four, three have
21 given statements in varying degrees?
22            GRAND JUROR: Okay. I've got it.
23            MR. JOHNSTON: Any other questions? Yes,
24 ma'am.
25            GRAND JUROR: Were drugs involved in this?

060

W98

53

1 Were they using drugs while this was going on?
2         THE WITNESS:  It doesn't appear -- I mean
3 we -- you know, in two of the search warrants, we
4 found -- we found evidence of marijuana, one in one of
5 the subject's room and one in a -- in a sibling's room,
6 but as far as this incident, as far as being drug-crazed
7 or anything, no, ma'am.
8         MR. JOHNSTON:  Ma'am.
9         GRAND JUROR:  Why was -- do you know why
10 Cleveland Shinn was in the area if this was a -- more of
11 a desolate area.
12         THE WITNESS:  They -- from what I
13 understand, the -- the individual that was driving the
14 truck, it was a new truck for him, and, basically, they
15 were going to take advantage of the mud.
16     Q.  (BY MR. JOHNSTON)  And that was a good question
17 that a lot of them had early on, "Who is this guy, and
18 why is he here," but is it correct that you all have
19 tried to pretty thoroughly check out Cleveland through
20 his -- his --
21     A.  Both those --
22     Q.  -- the family he lives with and just the
23 parents --
24     A.  Both those individuals -- we held onto the two
25 until well into the -- when we finally -- we were

54

1 starting to get some of the -- of the subjects
2 themselves that started telling us, and we're -- we're,
3 basically, confirming their story of the reason why --
4 of what time they got out there.  Now we didn't take it
5 for granted that they had just -- had shown up later.
6         GRAND JUROR:  They just confirmed they saw
7 these four in the area?
8         THE WITNESS:  Well, also, Mr. --
9         MR. JOHNSTON:  More than that.  I didn't
10 get into that.
11         THE WITNESS:  Right.  Mr. Shinn had saw
12 them changing clothes when they first drove up, had also
13 witnessed several of them throwing things off into the
14 wooded area.
15     Q.  (BY MR. JOHNSTON)  And you found evidence had
16 been discarded where Shinn said?
17     A.  And we did.  We found the -- we found the two
18 handguns.  We found the lighter fluid -- the -- the cans
19 of lighter fluid.
20     Q.  In fact, was Shinn there at some distance away?
21 He-- he was not where the burning car was?  Is that
22 correct, but where the car was stuck?
23     A.  He was where the car was stuck.
24     Q.  And he and this other fellow were in the truck,
25 and at some point, after they'd already seen these guys

55

1 changing clothes and throwing stuff, did a Nolanville
2 police officer drive up?
3     A.  Right.
4     Q.  And did Shinn observe these guys go nuts trying
5 to get rid of stuff and change?
6     A.  Yes, sir.  When --
7     Q.  Okay.
8     A.  I mean these people were, basically -- I mean
9 were just -- just had -- the one time when you wouldn't
10 want every good Samaritan in the area to come by, I mean
11 literally they had -- there was people -- again, it's --
12 it's -- when I say it's a desolate area, there's not a
13 whole lot of stuff around it, but, on the other hand,
14 it's a backwards way to get to places like BLORA, which
15 is a recreation center for the army that they have on
16 Lake Belton.  It's a back way to kind of get in there,
17 and -- and then there was -- I mean we had two MP
18 lieutenants, female lieutenants, that were driving by
19 and actually drove by all these people.  They -- they
20 even had noticed some burning, you know, up off on the
21 hillway, because they were going to go meet with one of
22 their husbands who was out in the field that day, and
23 then we had the -- the Nolanville police officer, and
24 then we had one of the game wardens that also showed up
25 shortly after the Nolanville police officer.

56

1         MR. JOHNSTON:  These guys weren't getting
2 out?  There was people that showed up, and then you've
3 got law enforcement involved and they saw the fire, and
4 these guys were just stuck which -- thank the Lord.  Did
5 you have a question, too, ma'am?  I'm sorry.
6         GRAND JUROR:  My question was about the
7 handgun.  Were you able to retrieve fingerprints from
8 the gun?
9         THE WITNESS:  No, ma'am, not to my -- I --
10 I know it's been -- it's still in the lab and -- and
11 probably still being processed, but to my knowledge no
12 fingerprints have been taken off the handgun.
13         MR. JOHNSTON:  Okay.  Before we let you
14 go, I need to cover a sort of technical matter.
15     Q.  (BY MR. JOHNSTON)  You have -- with the power
16 of this Grand Jury, you have had a number of subpoenas
17 issued --
18     A.  Yes, sir.
19     Q.  -- for financial records from ATM's and for
20 video tapes and so forth, correct?
21     A.  Yes, sir.
22     Q.  And to the extent those have been served, have
23 they been complied with so far?  People have given
24 you --
25     A.  Yes.

57

1    Q.  -- have been very helpful, in fact?
2    A.  Yes, sir.
3    Q.  And do you have a need to maintain that
4 evidence for your investigation?
5    A.  Yes, sir, I do.
6        MR. JOHNSTON:  Members of the Grand Jury,
7 if there's no objection   and noting none -- then
8 you'll be allowed to maintain that evidence pursuant to
9 the Grand Jury's power of subpoena.
10       THE WITNESS:  Okay.
11       MR. JOHNSTON:  All right.  We'll let you
12 go.  We have more on this case, but -- thank you, sir.
13       GRAND JURY FOREMAN:  Thank you.
14       (The testimony of DANIEL CHADWICK was
15 concluded at 11:28 AM.)
16
17
18
19
20
21
22
23
24
25

58

1                    CERTIFICATE
2
3        I certify that these are the original notes
4 and records recorded by me of the testimony taken and
5 the proceedings held in the case of United States v.
6 Christopher Andre Vialva and Brandon Bernard, before the
7 Grand Jury held in United States District Court, Western
8 District of Texas on July 13, 1999.
9
10
11 Date:  1-06-00
12 Official Reporter:  _____
13         THERESA J. POPEJOY
            Texas CSR 756
14          Expiration Date:  12/31/01
            Esquire Deposition Services
15          510 N. Valley Mills Drive
            Suite 406
16          Waco, TX  76710
            (254)772-8729
17
18
19
20
21
22
23
24
25

# EXHIBIT 3

701

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

```
_____
                        )
UNITED STATES OF AMERICA, )
                        )
VS.                     )
                        )
CHRISTOPHER ANDRE VIALVA )
and BRANDON BERNARD     )
_____)
```

*****************************************************

GRAND JURY TESTIMONY OF DANIEL CHADWICK

-----------------------------------------

BE IT REMEMBERED that on the 14th day of December, 1999, at 11:13 AM, in the United States Courthouse, Waco, Texas, the United States Grand Jury No. 99-7-6 convened, there being twenty (20) Grand Jurors present, at which time the following proceedings were had and adduced as hereinafter set forth:

---

APPEARANCES

FOR THE GOVERNMENT:

MR. SCOTT L. FROST
CAPTAIN, U.S. ARMY
SPECIAL ASSISTANT UNITED STATES ATTORNEY
FORT HOOD TEXAS
761st Tank Battalion Avenue
Building 209
Fort Hood, Texas  76544
Phone:  (254)287-1106
DSN:  737-1106
FAX:  (254)288-7318

INDEX

Appearances . . . . . . . . . . . . . . . . . .   2
DANIEL CHADWICK
    Examination by Mr. Frost . . . . . . . . . .   4
Reporter's Certificate . . . . . . . . . . . . .  26

---

(The witness was sworn.)

GRAND JURY FOREMAN:  Thank you.  Have a seat.

CAPTAIN FROST:  As Mr. Johnson told you earlier, what this case is is basically the homicide case that happened out on Fort Hood.  We are asking you to return a superseding indictment in regards to an individual who was a juvenile at the time of the offense. He has been certified by the Court to be tried as an adult, and, therefore, we are re-presenting most of the facts of the case to you, because we have to re-indict basically all the individuals.

The individuals who we have involved are Mr. Vialva who is a -- not a juvenile, Mr. Bernard, Brandon Bernard, and then Mr. Tony Sparks.  Mr. Sparks's participation in this crime is, basically, in regards to the carjacking.  Agent Chadwick is going to focus primarily upon Mr. Sparks's conduct.  If there's anything that you have any additional questions on, we can go over that, but we're going to try to limit it to particularly what Mr. Sparks did.  Mr. Sparks is the new individual in the superseding indictment.  The rest of the indictment is the same.  The only charge that we are asking you to indict Mr. Sparks on is the carjacking offense that resulted in death.

---

DANIEL CHADWICK,
having been first duly sworn, testified as follows:
EXAMINATION
BY CAPTAIN FROST:

Q.  Would you state your name for the record.

A.  Daniel W. Chadwick.

Q.  And who do you work for, Mr. Chadwick?

A.  The FBI.

Q.  And how long have you done that?

A.  For approximately eleven years.

Q.  And how did you become involved in the investigation and the homicides?

A.  I received a call from the Fort Hood Criminal Investigative Division, and they had informed me that they had -- were out on the scene where there was a car that had been stolen, and it was burned and that they had four people detained that they suspected might have -- might have had something to do with it, and then in route out there I received another call, and they informed me that they had found a couple of bodies in the trunk of the car once they got the fire put out, and I went out there and linked up with them, and that's where I first met Chris Vialva, Brandon Bernard, Christopher Lewis, and Terry Brown at that time.  We were not aware of Tony Sparks at that time.

5

1 Q. And could you start -- your investigation,
2 obviously, went from there, and the FBI was the lead
3 agency in this investigation?
4 A. Yes, sir.
5 Q. Could you tell the Grand Jury basically what,
6 to this point, some of your investigation has shown in
7 regards to the conduct of the individuals prior to the
8 homicide.
9 A. Okay. This event actually -- as we learned
10 once we started into the investigation, actually started
11 on the -- the Sunday night, the prior -- the prior
12 Sunday night which would have been June 20th, of this
13 year, and that was where Christopher Vialva, Christopher
14 Lewis, and Tony Sparks had conspired to go out and
15 hijack or carjack somebody, because they were needing
16 some money. There was -- from the way I understand,
17 there was a party or something that was going to be
18 going on within the next night or two down in Austin,
19 and they were looking for, you know, to get some
20 additional money, so they could go down and go to this
21 party, so they left out from one of the one -- of the
22 houses that night, the -- the -- on the 20th.
23 Q. And what did they have in their possession when
24 they went out to commit this carjacking?
25 A. They -- they had -- Tony Sparks had a .22

6

1 caliber automatic or semi-automatic that he had
2 acquired, and that's what they were going to use to do
3 this robbery. Sparks had to wait -- Sparks, because of
4 prior incidents he was involved in, was on a juvenile
5 probation curfew of -- of eight o'clock PM, so in route
6 to where they -- you know, they didn't have any specific
7 place or target in mind, but -- so they were walking to
8 wherever they were going to -- figured out that they
9 could get a victim. They were stopped by a police
10 officer. Basically, I believe Killeen has a juvenile
11 curfew law that they have, and the police officer had
12 stopped them. When the police officer stopped them,
13 Christopher Vialva had the .22, and he had ditched it
14 into some bushes that were -- that was right there in
15 that area. During that -- this police stop, the police
16 officer found out that Christopher Lewis and Tony Sparks
17 were, indeed, juveniles and in violation of the -- the
18 curfew law, and so he had -- the officer had contacted
19 Tony Sparks's mom to come pick those two up.
20 Christopher Vialva was released to go on his way,
21 because, again, he was an adult, so that kind of ended
22 the -- the night's activities, based on that stop.
23      All right. The next day, Christopher
24 Vialva, Terry Brown, Tony Sparks, Brandon Bernard, and
25 Christopher Lewis ended up meeting at Tony -- I believe

7

1 it was -- Tony Sparks's house, and they -- I mean they
2 showed up at different times, and they started talking
3 about doing another carjacking. Christopher Vialva and
4 Brandon Bernard ended up going back to retrieve the .22
5 caliber semi-automatic that Vialva had dumped the night
6 before, and upon retrieving it and it had been sitting
7 out all night, were not real happy with the -- how
8 the -- the way the weapon was functioning or, you know,
9 appeared to be wet and damp, and they weren't real
10 confident in that weapon, so they made arrangements to
11 get back -- one of the other guys, Brandon Bernard, had
12 a .40 caliber that another individual -- all these guys
13 were involved or associated with a gang. I mean there's
14 different variations or cells of this gang, but,
15 basically, Blood's, and another guy had a .40 caliber
16 semi-automatic handgun that belonged to Brandon Bernard,
17 because he was expecting to be hit from some other gang
18 in Copperas Cove, so they gave him a call once they
19 returned -- you know, when they were at Tony Sparks's
20 house. Tony Sparks, actually, initiated the call to
21 this guy to try to get this gun back, because they were
22 going to need it, and the guy, basically, didn't want to
23 give it up, because, again, he was -- felt like somebody
24 was going to come after him, so he didn't want to give
25 it up. He hung up on Sparks. Christopher Vialva called

8

1 him right back and, basically, told him, "Hey, we're on
2 a mission for money; we need the gun," which he agreed,
3 "Okay," to give the gun back, so Tony Sparks, Brandon
4 Bernard, Christopher Lewis, Terry Brown, and Chris
5 Vialva went over to this guy's house. His name was
6 Greg Lynch, went to his house in Brandon Bernard's car
7 to pick up the .40 caliber, which they retrieved, and
8 then went about trying to find a place to be able to
9 commit their carjacking.
10      They first went to a Winn-Dixie
11 shopping -- or store that was there in Killeen, Texas.
12 Vialva advised them that they needed to move on, that
13 the people that shopped at that particular store
14 probably wouldn't have any money on them anyway, so they
15 then went to an IGA Shopping Center where there's an IGA
16 store in there, attempted several times to get somebody
17 to give three of them a ride, and the three were Tony
18 Sparks, Christopher Lewis, and Chris Vialva. Terry
19 Brown and Brandon Bernard stayed back in Bernard's car,
20 basically, acting like lookout's, just kind of watching
21 there to make sure no police had shown up.
22      After they struck out with, it appears,
23 four or five different people, they ended up getting
24 back into Brandon Bernard's car, and they all drive over
25 to a Mickey's convenience store that was, basically,

703

1 across the street and down a little ways, and as they
2 were pulling into the parking -- the parking lot and
3 they exited the car, Brandon Bernard and Terry Brown
4 went inside to a laundromat that was attached next to
5 the store, and Christopher Vialva, Christopher Lewis,
6 and Tony Sparks went to the front of the store, and at
7 that point -- at that store, they have a pay phone on
8 the outside of the store. Todd Bagley was talking on
9 the phone, and they identified him as a potential
10 target. Once he got off the phone, Tony Sparks asked
11 him if he would give them a ride. They made -- you
12 know, made up some relative's house, and Todd Bagley
13 went and asked him wife, and they agreed to go ahead and
14 give them a ride.
15         Just for kind of background, the Bagleys
16 were -- were fairly religious-type people, and they
17 were -- their folks that lived in Killeen, and they had
18 only reason why -- I mean they were -- they came from, I
19 believe it was, Illinois.
20    Q. Iowa.
21    A. Iowa, excuse me, and they were down visiting
22 their -- their folks that lived in Killeen, and they had
23 learned that their church was having a revival, and they
24 decided to stay a few days just so they could attend the
25 revival to see some of their friends and stuff that they

1 had left, and I mean who knows what was going through
2 their mind when they -- you know, they agreed to give
3 these guys a ride, and from what we've learned, I mean
4 some of the talk was -- was asking these guys did they
5 go to church and -- and things of this nature, and this
6 was even before the -- the carjacking took place.
7         Anyway, they ended up giving Vialva,
8 Sparks, and Lewis a ride, and as they were driving
9 and -- and Vialva was, you know, giving them some
10 directions and once they got back into some
11 neighborhood, Vialva and Sparks pulled out their guns.
12 Vialva had the .40 caliber. Sparks had his .22 caliber
13 back, and they had advised the Bagleys, Todd and Stacie
14 Bagley, that the plans had changed.
15         They then directed them to a remote area,
16 still pretty much inside the Killeen city limits, but it
17 was -- it was a remote area right on the edge of the
18 city limits, and at that point they had to -- of course,
19 they had taken their -- her purse and -- and his wallet
20 and stuff and took her -- the watches from both of them
21 and the rings, and when they got to the remote area,
22 Vialva and Sparks exited the car and had the Bagleys get
23 out of the car and went around and put them into the
24 trunk. They put Stacie Bagley into the trunk first, and
25 then they put Todd Bagley into the trunk.

1         From that point, they -- they drove to try
2 to go to an ATM machine to -- to get money. They
3 attempted a couple of times and were not successful.
4 They also went to a pawn shop where Vialva went inside
5 the pawn shop, because Todd Bagley had told him that his
6 wife's wedding ring was worth quite a bit of money, and
7 they -- he attempted to pawn it in the pawn shop. He
8 wasn't happy with the price that the guy was wanting to
9 give him, and so he came back into the car. They
10 stopped and ate lunch. Sparks and Lewis went inside
11 to -- to get something to eat, and Vialva stayed outside
12 in the car with the -- the victims still in the trunk.
13         Again, you have to remember this is
14 June 21st. It was kind of raining, you know, a major
15 part of that day, but it was still pretty hot and kind
16 of muggy. They, basically, drove these people around
17 for about four hours. They ended up going to Copperas
18 Cove. They went two times. One time they went,
19 realized they didn't have what they needed, didn't have
20 Christopher Vialva's ID, which he needed to try to pawn
21 anything, and then they came back, and they got his ID,
22 and then they drove to Copperas Cove a second time where
23 they were finally successful in obtaining forty dollars
24 ($40.00) out of an ATM machine with using the Bagley's
25 ATM card.

1         At that point, is when they called back
2 and got ahold of Terry Brown and said, "Listen, you
3 know, we did the carjacking" -- well, you know, they
4 didn't basically say "carjacking" on the phone. They
5 didn't really want to talk about it on the phone, just
6 said for Brown to met them someplace else, that they
7 needed some help, so they drove back to Killeen, ended
8 up meeting Brown at a spot that they had talked about,
9 picked him up, drove him around and -- and was trying to
10 figure out what they were going to do. Brown was
11 advising them that all they needed to do was just park
12 the car at the -- there was a Long Branch Park, which
13 was a -- kind of meeting area for this gang, and just
14 told them to park it there and that he would call the
15 police, and they could come out and get the car and --
16 and, you know, let the people out, and Vialva had pretty
17 much -- was starting to talk at this time about that he
18 was really worried about his prints being all over the
19 car and that he really felt like he needed to burn the
20 car, and -- and that's where he was starting to talk
21 about, you know, doing some violence towards the Bagleys
22 themselves.
23         They let Brown back off again back at the
24 house where Brown was staying at, ended up doing some
25 more driving around. They had told Brown that they

13

1 would met -- you know, they would meet in like thirty
2 minutes or so.  Brown ended up calling Bernard to come
3 over and pick him up, and Brown had advised Bernard
4 that -- what Vialva and Sparks had done and
5 that they were going to need some help, and Bernard,
6 along with another -- another guy called Joey Presley,
7 came over, picked up Brown.  They went towards the
8 Long Branch Park area where at that time they observed
9 Vialva, Sparks, and Lewis in the Bagleys' car, ended up
10 meeting up with the car.  They parked kind of close
11 together.  Brown went over to the car where -- and
12 started talking to Vialva, Sparks, and Lewis, and that's
13 where it was being decided that, "Yes, we've got to burn
14 the car, and I'm going to" -- Vialva was talking about
15 going ahead and killing the Bagleys.
16          During this whole time, of course, you
17 know, I mean the Bagleys were -- were talking through
18 the back of the trunk.  Stacie had actually -- had
19 removed the speaker -- apparently, removed the speaker
20 from -- from the rear area, so she could hear and be
21 heard easier, and, in fact, when she was found, she
22 still had the speaker in her hands, and, again, they
23 were pleading.  They were -- I mean they even went to
24 the point where they were telling them, "Listen, you
25 know, we're expecting a paycheck.  We'll write you a

14

1 check, and just hold onto it, and then when we get the
2 money" -- "you know, when we get our paycheck, we'll put
3 it in the bank, and you can cash it.  We won't" -- you
4 know, they said they wouldn't call the cops, or they --
5 they wouldn't identify them, and they were constantly,
6 basically, pleading for their life.  I mean there was
7 numerous times when Stacie was saying, again, you know,
8 she was -- you know, that she was hot, that she needed
9 to go to the bathroom and -- and, basically, was told,
10 you know, "You just have to wait."  Again, we -- we
11 still don't have -- I mean we don't have an exact time
12 line, but from the best that we've been able to figure,
13 they were in this trunk until -- before they were shot
14 and killed, for approximately four hours.
15          Anyway, so they link back up at the Long
16 Branch Park.  Sparks, Lewis, and Vialva stay in the
17 Bagley's car.  It's Bernard -- Bernard, Brown, and
18 Presley are in Bernard's car.  They drive off from the
19 park, Bernard leading in his car.  Vialva is following
20 in the Bagleys' car, and they have -- they end up
21 dropping Tony Sparks and Joey Presley off.  They dropped
22 Sparks off first, I believe, and then they dropped
23 Presley off, and the reason why they had to drop Sparks
24 off was because, with the violation of his probation the
25 night before, he was really concerned about making sure

15

1 he was home at eight o'clock that night so, in case they
2 called to check to see if he was at home or not, he
3 would be at home.
4     Q.  And he was actually on juvenile probation?
5     A.  Right.  Now -- yeah, was --
6     Q.  He wasn't just --
7     A.  This was the juvenile probation that he'd
8 violated the night before, had got caught violating it,
9 so, again, that's why he was extra-concerned about
10 making sure he was home at eight o'clock, because he, I
11 guess -- I mean opinion -- you know, felt -- I guess he
12 felt like that they were going to call to check up to
13 make sure that he was obeying the terms of his
14 probation, so, anyway, they dropped him off, and then
15 they dropped Joey Presley off.
16     Q.  Now when they dropped him off, he knew full
17 well, though, that -- what their intentions were?
18     A.  He -- he knew exactly what they were going to
19 do, because they had talked about it when Brown had come
20 over to the car.  They had talked about that Vialva
21 had -- had said that he was going to have to burn the
22 car and that he was going to kill the Bagleys, and
23 from -- after they dropped Sparks off and Presley off,
24 Bernard started heading out of Killeen and was going
25 towards the Fort Hood area --

16

1     Q.  Now prior --
2     A.  -- over --
3     Q.  -- to that --
4     A.  I -- I'm sorry.
5          CAPTAIN FROST:  Go ahead.
6          THE REPORTER:  Well, can -- I need more
7 paper, if you don't -- I'm sorry.  Okay.
8     Q.  (BY CAPTAIN FROST)  Officer Chadwick, let's go
9 back just a little bit.  Bernard and Brown leave the
10 group of -- of the other individuals, and they do
11 something.  Can you tell us --
12     A.  Okay.
13     Q.  -- a little bit about that.
14     A.  All right.  Before they started heading out, as
15 they -- as they were driving down the street, Vialva had
16 gotten the attention of Brown and Bernard in the -- in
17 the front car, so they had stopped.  Brown went back
18 there.  Vialva said, "We need to get some gas," so he
19 gave Brown ten dollars ($10.00) to go purchase the gas
20 that they were going to use to burn the car with,
21 because Vialva really didn't want to go in the victim's
22 car, because, again, they were in the trunk, and -- and
23 he was, I guess, concerned about them making some noise.
24 Just -- just one of the things that Vialva had done --
25 again, this is with Vialva -- as he was driving the car,

**17**

1 whenever he felt like they were making too much noise in
2 the back -- I believe the term was "swinging and
3 banging" -- he would start jerking the -- the wheel back
4 and forth or slamming on the brakes knowing that he was,
5 you know, tumbling them around in the trunk.
6        Okay. Anyway, so he gave Brown the ten
7 dollars ($10.00). Brown and Bernard went to another
8 Mickey's convenience store there in Killeen and went
9 inside the store, determined that they'd have to buy a
10 gas container to carry the gas in. They didn't have
11 enough money to get both the container and the gas, so
12 they made the decision to go ahead and get charcoal
13 lighter fluid, which they purchased two cans of charcoal
14 lighter fluid, which, you know, we -- we have the cash
15 ticket showing a price that would equal the amount of
16 two cans of charcoal lighter fluid and a package of
17 candy which we were told that Brown had also thrown in,
18 a pack of candy, to buy at that time. We, also, have
19 Brown during that same time frame on the video --
20 videotape walking down one of the aisles where he had
21 gave the money to Bernard to actually purchase the
22 charcoal lighter fluid while he went back to the
23 bathroom area.
24        Anyway, after they purchased the lighter
25 fluid, they got back in Bernard's car and ended up going

**18**

1 back to the area where they had left -- had left Vialva,
2 linked back up with Vialva, took back -- now they took
3 off going outside of Killeen, heading towards the Fort
4 Hood area, and Bernard had -- was going to go towards
5 the Lake Belton area, which was a popular place for
6 these guys to go sometimes. I guess a lot --
7     Q. Now --
8     A. -- of them had -- excuse me?
9     Q. Go ahead.
10    A. Oh, a lot of them, you know, were -- were
11 military dependents and things and -- and Lake BLORA --
12 I guess it's the BLORA Recreation Park was a place that
13 they liked to go to, so they started heading in that
14 area, which meant that they turned down a road called
15 Quarry Road. As they were going down Quarry Road, they
16 passed a cattle guard, which once they passed that
17 cattle guard, actually took them into the Fort Hood
18 Reservation.
19        Bernard was leading. I believe Brown had
20 turned around and looked and saw that, shortly after
21 crossing the cattle guard, Vialva had taken off -- off
22 this -- this road, which is basically a -- kind of like
23 a gravel road, had -- he had turned off the gravel road
24 and was just going off into the -- the woods. They came
25 back around. What it actually was is pretty much like a

**19**

1 washed-out old road that was going up the side of the
2 hill. Bernard attempted to follow him in his car,
3 determined that it would ruin his car, so he backed back
4 down and parked back on Quarry Road, and Bernard and
5 Brown ended up walking up to the spot where Vialva had
6 stopped and parked the Bagleys' car, and they were
7 carrying the charcoal lighter fluid.
8        Once they got up to the car, Brown, Lewis,
9 and Bernard started pouring lighter fluid inside the car
10 and outside of the car, and at this time Vialva put a
11 little -- it was like a half -- something like you might
12 wear skiing. I'd call it a "gator-type ski mask" deal.
13 It's not -- it's just a half-face, and he had put that
14 on his face and instructed one of the individuals to
15 open the trunk. About this time, one of the Bagleys
16 were -- was -- was talking, you know, "What's" --
17 "What's happening," or something to that nature, and
18 basically Vialva told them, "Shut up, bitch. I'm fixing
19 to let you out."
20        The trunk opens up. He shoots -- I
21 can't -- I'm trying to remember which one he shot first.
22 He ends up shooting each one. He shot Stacie, I
23 believe, in the front of her face, and he shot Todd in
24 the side of his head, once each with the .40 caliber
25 Glock he was carrying. At that time, one of the

**20**

1 individuals adds some more lighter fluid to the trunk.
2 They shut the trunk, and then Brandon Bernard sets the
3 car on fire with a match.
4        At this time, they go down the hill. The
5 car catches on fire. They go down the hill. They all
6 get into Brandon Bernard's car and attempt to -- to
7 leave the area. In their attempt to leave, they ended
8 up getting stuck. Again, it had been raining, and their
9 tires started spinning, and they got stuck, and so they
10 were trying to get their car out, and in the attempts of
11 freeing their car, I'm sure they thought everybody in
12 the world was stopping by to ask them to help.
13        They first had a -- a truck stop by that
14 had a -- two individuals, one who had -- who knew or
15 was, I mean, you know, vaguely familiar with three of
16 the individuals that -- that were in the car. I think
17 the only one he didn't really know was Lewis, and so
18 they stopped and asked them, and -- and they were
19 starting to try to help them. They had observed the
20 defendants, or subjects, throwing items into the woods
21 and several other people came by and stopped to see if
22 they needed help or could try to help them, and,
23 eventually, somebody had stopped to -- and was able to
24 get them out.
25        In between this time of them first getting

21

1 being stuck and actually getting out, two of the
2 individuals that stopped were MP lieutenants that had
3 tried to see if they needed help. They had, also,
4 observed, I believe, the smoke or the car burning up on
5 the hill or the smoke coming from that area and had
6 called in a fire, so we have the game warden, and the
7 Nolanville Police Department had received -- received
8 these calls of smoke or fire, and they had gone to check
9 that out, and right about the time that this individual
10 got Brandon Bernard's car unstuck, the police show up,
11 and they observe the car burning up on the hill.
12          They detain the people that are there at
13 the scene. They detain all four, Sparks, Brown -- I
14 mean not Sparks; excuse me. Brown, Lewis, Vialva, and
15 Bernard are detained there at the scene, and then that
16 goes to where I was called in. They put the fire out,
17 and then observed -- and found the bodies in the car,
18 and they, basically, detained them and took them back to
19 the CID Office located on Fort Hood.
20     Q.  Now was there an autopsy done on Todd and
21 Stacie?
22     A.  Right.
23     Q.  And could you tell us the results of those.
24     A.  The autopsy that was done showed that Todd
25 Bagley had died from the gunshot wound. The one on

22

1 Stacie, she died from the gunshot wound and -- I mean
2 the best way I can describe it is -- also from the smoke
3 inhalation. In other words, she was still alive when
4 the car was being burned, and although the gunshot wound
5 would have killed her, either one of the -- the things
6 would have ended up killing her.
7     Q.  Now where all this occurred, the actual killing
8 and the burning of the vehicle, that occurred on
9 Fort Hood?
10     A.  Yes, sir.
11     Q.  And that's on -- that's part of federal
12 jurisdiction, is part of this special maritime and
13 territorial jurisdiction of the federal government?
14     A.  Yes, sir, it is.
15     Q.  And the vehicle that Todd and Stacie Bagley
16 were driving, that was registered in Iowa?
17     A.  Yes, sir.
18     Q.  And it was actually driven from Iowa to Texas?
19     A.  Yes, sir. The -- the -- one last thing that I
20 can think of is we never recovered any of the jewelry.
21 We recovered some -- one of the ATM cards, the driver's
22 license. Also, the items that we found in the woods
23 where the two guys that first showed up on the scene had
24 told us to look where they saw these guys throwing
25 stuff, we found the .22 caliber, the .40 caliber. We

23

1 found Vialva's ID card where he had thrown it into the
2 woods. We found a T-shirt. We also found the two empty
3 cans or -- or the two cans of charcoal lighter fluid
4 that had been used, although we didn't find -- we didn't
5 find any of the jewelry, except later during a consent
6 search that Killeen Police Department was doing on Tony
7 Sparks's house on a totally pretty much unrelated
8 matter, they found a woman's watch in a jacket pocket of
9 his that was hanging, I guess, in his closet, which was
10 later identified by Stacie's father as being her watch,
11 so -- and that was -- that was done, I think, like a
12 week or so after the incident had occurred and --
13     Q.  So Mr. Sparks is the only individual besides, I
14 guess, Mr. Presley and Mr. Lynch who were not actually
15 apprehended with the vehicle itself?
16     A.  Right, and -- and to our knowledge the reason
17 why we didn't find any of the jewelry around the car
18 or -- or in the woods that had been where the rest of
19 their possessions had been thrown off that -- that the
20 people that had was because, basically, he was wearing all
21 the jewelry when he got out of the car. He had --
22 except for the -- for Todd's watch, we believe they
23 threw that watch out -- somebody -- one of the
24 individuals threw that watch outside the car and that --
25 but he was wearing the rings that he had taken, and he

24

1 was wearing Stacie's watch when he got out of the car
2 and -- which -- which explains why we couldn't find any
3 of the jewelry, and we -- I mean we did a pretty
4 exhaustive search of that area, and -- and from what we
5 understand, when he got out, I mean, basically, the
6 statement was to Vialva that they would link back up
7 later and decide how to handle pawning of the jewelry
8 and -- which, of course, never happened, since they were
9 caught at the scene.
10          CAPTAIN FROST:  That's all I have for
11 Agent Chadwick. Does anybody have any questions?
12          GRAND JUROR:  What had Sparks done to be
13 on juvenile probation?
14          THE WITNESS:  That particular probation,
15 I -- I'm not -- to tell you the truth, I'm not for sure.
16 I'd have -- I'd have to look it up. I mean he had
17 numerous incidents that he was either involved in or
18 suspected of being involved in. He was -- he was a part
19 of the Kick Door Boys, I believe. Yeah, they -- and
20 that was a little group, a sub-group of the gang, that
21 went around doing daytime burglaries, and they even --
22 the the -- the hard-core members of the Kick Door Boys even
23 went to the mall and -- had themselves shirts
24 printed up with the "Kick Door Boys" on it, and their MO
25 basically would be to go to a door, either knock on it

25

1 or had somehow determine that there shouldn't be anybody
2 home, and once they determined that nobody was home,
3 then they'd go around to the back or a side door and
4 kick the door in and then burglarize the house, which
5 was actually how both of the handguns were acquired that
6 they acquired, didn't come from those burglaries, but
7 like they had acquired guns from these burglaries that
8 they used to trade for the guns they ended up having,
9 the .40 caliber Glock and the .22 caliber.
10          CAPTAIN FROST:  Does anybody else have any
11 other questions?  Okay, Agent Chadwick.  As I stated
12 before, we're asking you to return a superseding
13 indictment in regards to Christopher Vialva, Brandon
14 Bernard, and Mr. Tony Sparks.  Tony Sparks is only
15 listed in Count One, which is the carjacking count,
16 which is basically the taking of a motor vehicle that's
17 been transported in interstate commerce from the
18 possession of Todd Bagley.  Does anybody have any
19 questions about that or in regards to this case?  Okay,
20 thank you.
21          GRAND JURY FOREMAN:  Thank you.
22          (The testimony of DANIEL CHADWICK was
23          concluded at 11:47 AM.)
24
25

26

1                         CERTIFICATE
2
3          I certify that these are the original notes
4 and records recorded by me of the testimony taken and
5 the proceedings held in the case of United States v.
6 Christopher Andre Vialva and Brandon Bernard, before the
7 Grand Jury held in United States District Court, Western
8 District of Texas on December 14, 1999.
9
10
11 Date:  1-07-00
12 Official Reporter:  _____
13
            THERESA J. POPEJOY
            Texas CSR 756
14          Expiration Date:  12/31/01
            Esquire Deposition Services
15          510 N. Valley Mills Drive
            Suite 406
16          Waco, TX  76710
            (254) 772-8729
17
18
19
20
21
22
23
24
25

# EXHIBIT 4

## Curriculum Vitae

**Thomas B. Sing**
**840 East Adler Rd.**
**Boerne, TX. 78006**
**Off. (830) 249-9721 Fax. (830) 249-8027**

### FOREWORD

As a certified master fire and arson investigator (CFI) I am employed with the **Texas State Fire Marshal's Office** as a Deputy Marshal, assigned to the investigations division of this state law enforcement agency. As a criminal investigator I have over sixteen years of experience, having assisted local, state, and federal authorities with investigations throughout the State of Texas. These investigations have produced convictions that have confined offenders in both state and federal penitentiaries. I have testified in both State District and Federal District Courts as an expert witness in cases ranging from arson, serial arson, organized crime, burglary, burglaries with intent to comit felonies, retaliation against state witnesses, insurance fraud, murder and capital murder.

### PROFESSIONAL EMPLOYMENT

| | |
|---|---|
| June 1992 to present | **Texas State Fire Marshal's Office**, Austin, TX Appointed as a Deputy Marshal in the fire and arson investigation division. Currently assigned to the SFMO Area Office - Boerne, TX. Primarily handles assignments in 126,000 sq. miles of central and South Texas. Team Leader of two SFMO task Forces. The Major Incident Fire / Arson Task Force and Explosive Investigation Task Force. |
| September 1978 to June 1992 | **Balcones Heights Fire Department**, San Antonio, TX. Assigned to various shifts through out career with the department. Originally assigned to fire suppression as an engineer / paramedic. Later assigned to investigations after law enforcement and fire / arson investigation training. |
| August 1982 | **Balcones Heights Fire Dept.**, San Antonio, TX. Assigned as fire / arson investigator with the rank of Lieutenant. Conducted and assisted in investigations originating on assigned shift. |
| December 1985 | **Balcones Heights Fire Dept.**, San Antonio, TX. Assigned as fire / arson investigator with the rank of Captain. Conducted investigations that originated on assigned shift. Supervised officers assigned to the investigations division of the dept. |
| January 1975 to September 1978 | **Castle Hills Fire Department**, San Antonio, TX. Held rank of fire fighter. Conducted fire suppression duties as assigned by shift commanders. In 1977 promoted to the rank of Engineer and assigned as apparatus operator. |

710

**EDUCATION**

| | |
|---|---|
| 1970 to 1974 | **Robert E. Lee High School**, San Antonio, TX. Graduated in 1974 |
| 1974 | **San Antonio Fire Training Academy**, Basic Fire Fighter Training School. |
| 1974 to 1982 | **San Antonio College**, Fire Science Department, Associates Degree in Fire Science Technology |
| 1982 | **Alamo Area Law Enforcement Academy**, San Antonio, TX. Basic Law Enforcement Training. |
| 1982 | **Alamo Area Law Enforcement Academy**, San Antonio, TX. Basic fire / arson investigation training. |
| 1993 | **University of Houston**, Houston, TX., Kinesic Examination School, interview and interrogation, handwriting and behavioral analysis training. |
| 1994 | **North Texas Association of Fire and Arson Investigators**: Advanced fire / arson investigation with emphasis in origin and cause examination. Lead instructor John DeHann |
| 1995 | **San Antonio Police Academy**, Police Instructor Training School. |
| 1996 | **Federal Bureau of Investigation**, Quantico, Va., Post Blast Investigation School. Lead Instructor Wallace Higgins; FBI Bomb Data Center |
| 1997 | **Bureau of Alcohol, Tobacco & Firearms**, through Glencoe, GA., conducted in Kerrville, TX. Post Blast Investigation School. Lead Instructor Marshall Littleton; ATF National Response Team |
| 1997 | **Wayland Baptist University**, San Antonio, TX. Double major in Criminal Justice and Fire Science. Currently enrolled as a upper division student, having completed course work in Fire Science major. Currently enrolled completing second major course work in Criminal Justice |
| 1998 | **Public Agency Training Council**, San Antonio, TX. Electrical Fire Cause Investigation Course. Lead Instructors: Ray Powell and Steve Riggs |
| 1998 | **Laboratory for Scientific Interrogation**, Phoenix, AZ. Scientific Content Analysis (SCAN) technique for statement analysis and interview/interrogation. Developed by Mr. Avinoam Sapir, Israel Police Polygraph Unit, Tel-Aviv, Israel. Course taught in the U.S., Canada, Israel, U.K., and Australia by: Avinoam Sapir |

711

## PUBLICATIONS

January 1996

Certification Curriculum Manual, Basic Fire and Arson Investigator, Texas Commission on Fire Protection. From Winter of 1994 through Spring 1995 co-author of the certification curriculum and manual; conducting research of reference materials and developing learning objectives for prospective investigators

## AWARDS

1992 through 1998

Various commendations from Texas Cities, Counties and State and Federal Law Enforcement Agencies

1993

Awarded by peers as the Fire / Arson Investigator of the year. Awarded through the Texas Commission on Fire Protection

1998

Letter of Commendation from the National Response Team of the BATF for assistance given the NRT on several major fire scenes with in Texas.

## LICENSES

Master Certification

Fire Fighter; Texas Commission on Fire Protection

Master Certification

Fire Safety Inspector; Texas Commission on Fire Protection

Master Certification

Fire and Arson Investigator; Texas Commission on Fire Protection

Advanced License

Texas Peace Officer; Texas Commission on Law Enforcement Officer Standards and Education

Basic License

Police Instructor; Texas Commission on Law Enforcement Officer Standards and Education

Commissioned

Texas State Police Officer; Deputy Marshal, Texas State Fire Marshal's Office, Austin, Texas

## TEACHING

Investigations

Department of Public Safety Law Enforcement Academy, Austin, TX.

Fire and Arson Investigation

Various Law Enforcement Academies across the State of Texas.

Post Blast Investigation

Kerrville, TX, fall of 1997, teaching techniques of scene investigation with agents of the ATF / San Antonio, TX

710

Fatality Investigations                     Various Law Enforcement Academies through out
                                            the State of Texas

☐
## ASSOCIATIONS
☐
South Central Texas Arson Investigators
Association

International Association of Arson Investigators;
member number 20580

Central Texas Association of Fire & Arson
Investigators.

Texas State Arson Investigators Association

713

0.13869":1'

Thomas B. Sing, Deputy Marshal
SFMO - Area Office - Boerne
SFMO - Case #: 99-414-06
Victims Vehicle
US Army CID Impound Lot Bldg. 2200

1989 Buick LaSabre
Iowa License/ 353EXL
Vin# 1G4HR54C5KH455369



Injuries
V1 - Todd Bagley / 1 - gunshot wound
to head

V2 - Stacey Bagley / 1 - gunshot wound
to head. smoke
inhalation &
thermal burns

V2    W/F
Stacey Bagley
V1    W/m
Todd Bagley

714

0.13869":1'

Thomas B. Sing, Deputy Marshal
SFMO - Area Office - Boerne
SFMO - Case #: 99-414-06

Victims Vehicle
US Army CID Impound Lot Bldg. 2200

1989 Buick LaSabre
Iowa License/ 353EXL
Vin# 1G4HR54C5KH455369



Engine Compartment

① V-6 w/ Aluminum head fuel lines with minor melting

② Radiator - Minimal melt to aluminum.

③ Battery - intact w/ minimal melting toward fire wa...

④ Electrical Ignition Module - no melting, an...

⑤ Forward plug wire assembly - minimal melt and are intact

⑥ Plug wires intact w/ thermal damage towa... firewall.

715

0.13869":1'

Thomas B. Sing, Deputy Marshal
SFMO - Area Office - Boerne
SFMO - Case #: 99-414-06
Victims Vehicle
US Army CID Impound Lot Bldg. 2200

1989 Buick LaSabre
Iowa License/ 353EXL
Vin# 1G4HR54C5KH455369



Ⓐ Rubber Tire Intact
  w/ minimal thermal dome

Ⓑ Shocks Intact with n:
  damage

Ⓒ Heat Line 14" from ground
  Interior of door intact

Ⓓ Heat Line 11½" from ground
  Interior of door intact

Ⓔ Tire Intact - no damage

Ⓕ Evidence of forced entr
  by Fire Dept

Ⓖ Tires rubber burne awa
  towards passenger compar

Ⓗ Heat Line to floor pa
  Interior of door heavily
  damaged by thermal eff

Ⓘ Heat Line 9" from groun
  Interior of door has
  aluminum parts still in

Ⓙ Tire rubber remaining
  sides and bottom

Ⓚ Forward head liner
  support in place and
  retaining tensile streng

Ⓛ Rear head liner suppor
  sagging and loss of te
  strength due to thermal
  exposure

716

0.13869":1'

Thomas B. Sing, Deputy Marshal
SFMO - Area Office - Boerne
SFMO - Case #: 99-414-06
Victims Vehicle
US Army CID Impound Lot Bldg. 2200

1989 Buick LaSabre
Iowa License/ 353EXL
Vin# 1G4HR54C5KH455369



Passenger Compartment

Ⓐ Seat heavily damaged by thermal effects, near back of seat remains up right

Ⓑ Seat heavily da. area thermal effects. Back o seat has failed at bracket and fallen floor pan of rear se.

Ⓒ Rear seat consumed by thermal effects. Springs have lost tensi strength

Ⓓ K-9 "Goldi" alerts to area of debris in floor pan. Sample secured from area of alert.

717

0.13869":1'

Thomas B. Sing, Deputy Marshal
SFMO - Area Office - Boerne
SFMO - Case #: 99-414-06
Victims Vehicle
US Army CID Impound Lot Bldg. 2200

1989 Buick LaSabre
Iowa License/ 353EXL
Vin# 1G4HR54C5KH455369



Ⓐ Area of origin for interior compartment fire.

Ⓑ Exterior of vehicle on top of hood. Indication of ignitable fluid

Ⓒ Rear deck of trunk e exterior of vehicle. Indication of ignitable fluid placed on exter of vehicle.

Ⓓ Unaffected painted exte surface of trunk deck adjacent to apparent ignitable liquid pour pattern.

718

# State Fire Marshal's Office

| | |
|---|---|
| Report | X |
| Supplement | ___ |
| Continuation | ___ |
| Photo Index | X |

Case #:    99-414-06                    Investigator:    Thomas B. Sing

Initial Report: page 1 of 1

**Investigation – Photograph log – page 1**
**Investigator: Thomas B. Sing**
**Case Number 99-414-06**

**Frame Number:**                              **Description of Frame:**

**Roll # 1**

R1-1) View from top of hill near fire scene. Frame is West of Quarry Road, which is at the far side of the photo.

R1-2) South to North view of ground where vehicle was resting.

R1-3) View of second fire investigation and close up of restaurant.

R1-4) View of crime scene as the vehicles debris to be collected near roadway.

INV16 (Rev. 9/96)

719

0.08706":1'                                                    1/1

Thomas B. Sing, Deputy Marshal
SFMO - Area Office - Boerne
SFMO Case #: 99-414-06

Quarry Road, Ft. Hood, TX
Arson & Murder / Crime Scene



Bush

Tree

Brush Pile



North

Ft. Hood Property Line

Quarry Road

Diagram - C

Scene

720

Thomas B. Sing, Deputy Marshal
SFMO - Area Office - Boerne
SFMO Case #: 99-414-06

Quarry Road, Ft. Hood, TX
Arson & Murder / Crime Scene

K-9 Alerts & Evidence Collected



North



Ft. Hood Property Line

Quarry Road

0.12603":1'                                                    1/1



Thomas B. Sing, Deputy Marshal
SFMO - Area Office - Boerne
SFMO - Case #: 99-414-06
Victims Vehicle
US Army CID Impound Lot Bldg. 2200

722

**Texas State Fire Marshal's Office**
**Investigation Divsion**
**Evidence Inventory**

**Itemized List:**
**Item Number: CORRECTED COPY (09-22-99)**

The following three samples were secured on June 23, 1999, at the crime scene located West of Quarry Road North of FM 439 on the Fort Hood military reservation. The victim's vehicle had been removed from the crime scene prior to the SFMO examination. Deputies of the SFMO examined the physical location of the crime scene for possible evidence relating to the cause of the vehicle fires ignition.

1.  One-gallon metal can containing soil secured approximately 34' South of Oak Tree on driver's side of vehicle in the area of the left rear quarter panel was located. Sample secured by Deputy Marshals Joe Elmer (SFMO – HQ, Austin) & Joe Finck (SFMO – Area Office, Belton). Sample secured as a result of indication from K-9 "Goldi".

2.  One gallon metal can containing soil secured approximately 30' South of Oak Tree on the drivers side of the vehicle in the area of the center post which separates the front seat and rear seats of the passenger compartment. Sample secured by Deputy Marshals Joe Elmer (SFMO – HQ, Austin) & Joe Finck (SFMO – Area Office, Belton). Sample secured as a result of an indication from K-9 "Goldi".

3.  One-gallon metal can containing soil secured approximately 18' South of Oak Tree on the driver's side of the vehicle in the area of the front bumpers location. Sample secured by Deputy Marshals Joe Elmer (SFMO – HQ, Austin) & Joe Finck (SFMO – Area Office, Belton). Sample secured as a result of an indication from K-9 "Goldi".

The following evidence was secured on June 23, 1999, as a result of the examination of the victim's vehicle. This examination was conducted at the Criminal Investigation Division Offices impound parking lot located at Fort Hood, Building # 2200 near the evidence building # 2205, Fort Hood, Killeen, Texas.

4.  One gallon metal can containing remains of carpet, headliner, foam seats, secured in the floor board of the left side rear passenger compartment immediately behind the drivers seat. The vehicle is identified as the victims vehicle, Iowa LP 353-EXL; 1989 Buick LaSabre. Evidence sample secured as the result of an indication from the K-9 "Goldi" and was secured by Deputy Marshal Thomas B. Sing (SFMO-Area Office, Boerne)

Deputy Marshal Thomas B. Sing secured the following evidence by utilizing sterile syringes and needles to secure two samples of fluid from two containers identified as charcoal lighter fluid. The US Army CID secured these containers as evidence investigators on the night of the initial crime scene investigation.

The two "charcoal lighter" containers were released by the US Army CID unit into the custody of the Department of Public Safety for analysis for latent prints. The sample of fluid collected by Deputy Sing was secured in order analyze and verify the contents of the containers.

5.  One glass vial of unknown fluid secured from evidence secured by Ft. Hood CID under MPR/CID control number 0684-99-CID034, DOC# 482/99 at 0939 hrs on 22 June 99. Marked as item number 5 of 6. Transferred into DPS custody on 06-23-99. Sample secured by Thomas B. Sing by using a sterile syringe and sterile needle.

723

# Texas State Fire Marshal's Office
## Investigation Divsion
## Evidence Inventory

## Itemized List:

6.  One glass vial of unknown fluid secured from evidence secured by Ft. Hood CID under MPR/CID control number 0684-99-CID034, DOC# 482/99 at 0939 hrs on 22 June 99. Marked as item number 4 of 6. Transferred into DPS custody on 06-23-99. Sample secured by Thomas B. Sing by using a sterile syringe and sterile needle.

7.  T-shirt secured by Ft. Hood CID investigators on 22 June 99. Transferred to the SFMO custody on 06-24-99.

8.  One large container with male boots & fire debris released to Deputy Thomas Sing (SFMO, Area Office, Boeme) by the US Army CID on 6-24-99.

9.  One large container of fire debris, vehicle parts, victim clothing secured by US Army CID from the trunk of the victims vehicle on 22 Jun 99. Release to the custody of the SFMO Deputy Thomas Sing on 06-24-99.

10. One large can containing debris from the female victim, shoes, vehicle carpet, debris. Secured as US Army item 1 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

11. One can containing clothing from female victim, shirt, debris. Secured as US Army item 2 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

12. One can containing clothing from female victim. Secured as US Army item 3 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

13. One can containing paper. Secured as US Army item 7 of 13.

14. One paper bag containing 2 cans secured by US Army CID marked as item 10 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

For cross-reference purposes the DPS laboratory case numbers are as follows:
L-272876 – Austin DPS Lab
L-6W8135Z – Waco DPS Lab

Thomas B. Sing, #3150
Deputy Marshal, Investigations Division
Texas State Fire Marshals Office
Area Office, Boeme

124

**Texas State Fire Marshal's Office**
**Investigation Division**
**Evidence Inventory**

## Itemized List:

Item Number:

The following three samples were secured on June 23, 1999, at the crime scene located West of Quarry Road North of FM 439 on the Fort Hood military reservation. The victim's vehicle had been removed from the crime scene prior to the SFMO examination. Deputies of the SFMO examined the physical location of the crime scene for possible evidence relating to the cause of the vehicle fires ignition.

1. One-gallon metal can containing soil secured approximately 34' South of Oak Tree on driver's side of vehicle in the area of the left rear quarter panel was located. Sample secured by Deputy Marshals Joe Elmer (SFMO – HQ, Austin) & Joe Finck (SFMO – Area Office, Belton). Sample secured as a result of indication from K-9 "Goldi".

2. One gallon metal can containing soil secured approximately 30' South of Oak Tree on the drivers side of the vehicle in the area of the center post which separates the front seat and rear seats of the passenger compartment. Sample secured by Deputy Marshals Joe Elmer (SFMO – HQ, Austin) & Joe Finck (SFMO – Area Office, Belton). Sample secured as a result of an indication from K-9 "Goldi".

3. One-gallon metal can containing soil secured approximately 30' South of Oak Tree on the driver's side of the vehicle in the area of the front bumpers location. Sample secured by Deputy Marshals Joe Elmer (SFMO – HQ, Austin) & Joe Finck (SFMO – Area Office, Belton). Sample secured as a result of an indication from K-9 "Goldi".

The following evidence was secured on June 23, 1999, as a result of the examination of the victim's vehicle. This examination was conducted at the Criminal Investigation Division Offices impound parking lot located at Fort Hood, Building # 2200 near the evidence building # 2205, Fort Hood, Killeen, Texas.

4. One gallon metal can containing remains of carpet, headliner, foam seats, secured in the floor board of the left side rear passenger compartment immediately behind the drivers seat. The vehicle is identified as the victims vehicle, Iowa LP 353-EXL; 1989 Buick LaSabre. Evidence sample secured as the result of an indication from the K-9 "Goldi" and was secured by Deputy Marshal Thomas B. Sing (SFMO-Area Office, Boerne)

Deputy Marshal Thomas B. Sing secured the following evidence by utilizing sterile syringes and needles to secure two samples of fluid from two containers identified as charcoal lighter fluid. The US Army CID secured these containers as evidence investigators on the night of the initial crime scene investigation.

The two "charcoal lighter" containers were released by the US Army CID unit into the custody of the Department of Public Safety for analysis for latent prints. The sample of fluid collected by Deputy Sing was secured in order analyze and verify the contents of the containers.

725

# Texas State Fire Marshal's Office
## Investigation Division
### Evidence Inventory

**Itemized List:**

5.  One glass vial of unknown fluid secured from evidence secured by Ft. Hood CID under MPR/CID control number 0684-99-CID034, DOC# 482/99 at 0939 hrs on 22 June 99. Marked as item number 5 of 6. Transferred into DPS custody on 06-23-99. Sample secured by Thomas B. Sing by using a sterile syringe and sterile needle.

6.  One glass vial of unknown fluid secured from evidence secured by Ft. Hood CID under MPR/CID control number 0684-99-CID034, DOC# 482/99 at 0939 hrs on 22 June 99. Marked as item number 4 of 6. Transferred into DPS custody on 06-23-99. Sample secured by Thomas B. Sing by using a sterile syringe and sterile needle.

7.  T-shirt secured by Ft. Hood CID investigators on 22 June 99. Transferred to the SFMO custody on 06-24-99.

8.  One large container with male boots & fire debris released to Deputy Thomas Sing (SFMO, Area Office, Boerne) by the US Army CID on 6-24-99.

9.  One large container of fire debris, vehicle parts, victim clothing secured by US Army CID from the trunk of the victims vehicle on 22 June 99. Release to the custody of the SFMO Deputy Thomas Sing on 06-24-99.

10. One large can containing debris from the female victim, shoes, vehicle carpet, debris. Secured as US Army item 1 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

11. One can containing clothing from female victim, shirt, debris. Secured as US Army item 2 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

12. One can containing clothing from female victim. Secured as US Army item 3 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

13. One can containing paper. Secured as US Army item 7 of 13.

14. One paper bag containing 2 cans secured by US Army CID marked as item 10 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

For cross reference purposes the DPS laboratory case numbers are as follows:
L-272876 – Austin DPS Lab
L-6W8135Z – Waco DPS Lab

*Thomas B. Sing*

Thomas B. Sing, #3150
Deputy Marshal, Investigations Division
Texas State Fire Marshals Office
Area Office, Boerne

726

# State Fire Marshal's Office

Report     X

Supplement     ___

Continuation     ___

Photo Index     ___

Case #:     99-414-06                    Investigator:    Thomas B. Sing

Initial Report: page 1 of 9

## Synopsis:

On Monday, June 21, 1999, at approximately 8:30 PM, Thomas L. Jones, Sergeant, Nolanville Police Department was on routine patrol near Quarry Road and FM 439, Bell County, Texas. Sgt. Jones reported seeing a column of smoke and responded to the area to determine the cause of the observed smoke. At approximately 8:38 PM Sergeant Jones located a vehicle fire approximately 280' West of Quarry Road in Fort Hood, a US Army military reservation. Sgt. Jones notified the Bell County Sheriffs Dispatcher who dispatched the Nolanville Fire Department to fight the vehicle fire. The involved vehicle is a 1989 Buick LaSabre displaying an Iowa license plate, 353-EXL.

Sgt. Jones and Thomas Yoder, patrol officer, Nolanville Police Department, observed a second vehicle approximately 150' North of the fire scene on Quarry Road. The vehicle was apparently stuck in the ditch on the east side of the road. Sgt. Jones and Officer Yoder identified four juvenile subjects with the impaired vehicle and all were detained for military police units as possible witnesses to the vehicle fire.

Additional witnesses arrived at the fire scene and advised officers of suspicious activities of the four juveniles prior to arrival of the officers. (see copy of Nolanville Police Department narrative supplement, dated June 21, 1999)

The Nolanville Volunteer Fire Department responded and extinguished the vehicle fire. During over haul procedures fire fighters opened the trunk of the vehicle. Upon doing so fire fighters observed the bodies of two unidentified people. The victims were later identified as Todd A. Bagley and his wife, Stacey L. Bagley. Military C.I.D. investigators were summoned to the scene and a homicide investigation was initiated. Investigation revealed the incident involved non-military personnel and the FBI was notified. Special Agent Daniel Chadwick of the FBI Waco office was assigned to respond to Killeen and conduct the investigation. Agent Chadwick and US ARMY CID, special agents secured evidence at the scene and removed the victims vehicle to an impound yard at building 2200, CID HQ, Fort Hood, Killeen, Texas.

On Tuesday, June 22, 1999, John Aycock, Sergeant, Texas Rangers, Temple, TX received a request from the US Attorney in Waco, TX to assist the homicide investigation. Investigation determined the Bagley's had been abducted, forced into the trunk of their vehicle. The abductor's attempted to use the victim's credit and ATM cards at various locations, after which the actors drove the vehicle onto the military reservation, allegedly shot the victims in the trunk and then set fire to the vehicle. Ranger Aycock contacted SFMO HQ's Austin to request assistance in conducting an examination of the vehicle to determine the origin and cause of the fire.

On Tuesday, June 22, 1999, Richard Beals, supervisor, Investigations Division SFMO, contacted me, Thomas B. Sing, Deputy Marshal, CFI, Investigations Division, Area Office – Boerne, and assigned me to assist in the fire and homicide investigation being conducted. Beals also advised that Deputies Joe Elmer, P.E. & CFI, Joe Finck and Michael Rehfeld, canine handler with K-9 "Goldi" were to respond to Killeen. These deputies would assist the investigation; however, I was assigned as lead investigator for the SFMO.

On Wednesday, June 23, 1999, the SFMO investigation team conducted examinations of the initial crime scene (murder & fire scene), victim's vehicle (fire vehicle) and finally under orders of a federal search warrant the suspect vehicle. (see federal search warrant). Upon conclusion of the examinations I determined the origin and cause of the vehicle fire. Investigation revealed the fire was Incendiary in nature.

INV16 (Rev. 9/96)

727

# State Fire Marshal's Office

|  |  |
|---|---|
| Report | X |
| Supplement | ___ |
| Continuation | ___ |
| Photo Index | ___ |

Case #:    99-414-06                              Investigator:   Thomas B. Sing

Initial Report: page 2 of 9

## Description of Property:

The fire scene is located approximately 48' North of the property line of Bell County and Fort Hood Military Reservation. From Quarry Road the fire scene is situated approximately 280' West of the road.

The involved property is a 4 door; 1989 Buick LaSabre bearing Iowa LP 353-EXL; Maroon in color; VIN# 1G4HR54C5KH455369.  The vehicle is registered to Rick and Georgia Bagley, 557 Hamilton, Ottumwa, Iowa, expiring November 1999.

The suspect vehicle is identified as a 1983 Buick Park Avenue bearing TLP/ B18-PWK, VIN/1G4AW69Y4DH510580, registered to Thelma L. Bernard, 1712 Wickfield Way, Killeen, TX 76543; expiring March 2000

Both of the above described vehicles were removed from the original crime scene and secured at the impound lot at CID headquarters, Bldg. 2200 & Bldg 2205, Fort Hood, Killeen, Bell County, Texas.

## Examination of Crime Scene:

The investigation team that conducted examinations of the crime scene, burned vehicle and suspect vehicle consisted of the following personnel and/or agencies. SFMO -- Thomas Sing (CFI & lead investigator), Joe Elmer (CFI & P.E.), Joe Finck & Michael Rehfeld (Canine handler & K-9 "Goldi"); DPS - John Aycock (Texas Ranger) & DPS Mobile Crime Lab Personnel.

## Quarry Road Fire Scene

On Wednesday, June 23, 1999, after assembling at Ft. Hood, the investigation team proceeded to the location of the crime scene on Quarry Road. The crime scene is approximately 280' West of Quarry Road and 48' North of the property line for Fort Hood and is situated in the military reservation on federal property.

Upon arriving at the crime scene I observed that scene security is being provided by corrections officers of the Texas Department of Criminal Justice (TDCJ).

Agents of the US ARMY Criminal Investigation Division and special agents of the Federal Bureau of Investigation (FBI) during the late evening and early morning hours of June 21 & 22, 1999 originally examined the crime scene. Further examination on this date (06-23-99) is for additional evidence in relation to the homicides and/or possible arson involving the victim's vehicle.

Deputy Marshal Michael Rehfeld utilized his canine "Goldi" at this location to search for possible locations of ignitable liquids. The K-9 indicated & alerted in three locations in the vicinity of the victim's vehicle.

INV16 (Rev. 9/96)

728

## State Fire Marshal's Office

| | |
|---|---|
| Report | X |
| Supplement | ___ |
| Continuation | ___ |
| Photo Index | ___ |

Case #:  99-414-06                          Investigator:  Thomas B. Sing

Initial Report: page 3 of 9

- Indication 1 – located approximately 34' south of Oak Tree on the driver's side of the vehicle in the area of the left rear quarter panel is located. A soil & debris sample was secured and placed into a new, unused, one-gallon metal container by deputy marshal's ELMER and FINCK. Upon collection the sample was photographed and secured as evidence to be submitted to the SFMO Arson Laboratory – Austin, TX for analysis. (see supplement report of Joe Elmer)

- Indication 2 - located approximately 30' south of Oak Tree at the driver's side in the area near (below) the center post that separates the front and rear seats of the vehicle's passenger compartment. A soil & debris sample was secured and placed into a new, unused, one-gallon metal container by deputy marshal's ELMER and FINCK. Upon collection the sample was photographed and secured as evidence to be submitted to the SFMO Arson Laboratory – Austin, TX for analysis. (see supplement report of Joe Elmer)

- Indication 3 - located approximately 18' south of Oak Tree at the driver's side of the vehicle in the area the front bumper would be placed. A soil & debris sample was secured and placed into a new, unused, one-gallon metal container by deputy marshal's ELMER and FINCK. Upon collection the sample was photographed and secured as evidence to be submitted to the SFMO Arson Laboratory – Austin, TX for analysis. (see supplement report of Joe Elmer)

REHFELD utilized the K-9 "Goldi" in an area perimeter search around the vehicle's position and that in an area where investigators had collected two containers on the night of the offense. (see Marshal Rehfeld's supplement report under SFMO, K-9 case number K99-261-06)

During examination of the fire scene I observed a partially smoked cigarette in approximate location of the front drivers door. The cigarette had been stepped on in an apparent action to extinguish the cigarette after being dropped on the ground. The cigarette was photographed in the position found and secured as evidence by personnel of the Department of Public Safety Mobile Crime Lab. This evidence will be submitted for analysis to the DPS Laboratory. ( see DPS crime lab report and analysis report)

I also observed a package of cigars near the trunk area of the victim's vehicle also photographed and secured as evidence by the DPS crime lab personnel. ( see DPS crime lab report)

### VEHICLE EXAMINATION/ US ARMY CID HQ, FT. HOOD, IMPOUND LOT:

Upon completion of the Quarry Road examination, on 06-23-99, investigator's returned to the impound lot at US ARMY, CID, HQ, Fort Hood, Killeen, TX, Bldg # 2200.

At the impound lot I observed the following:

- a secure location to which both the victims and suspects vehicles had been stored.

INV16 (Rev. 9/96)

729

## State Fire Marshal's Office

| | |
|---|---|
| Report | X |
| Supplement | ___ |
| Continuation | ___ |
| Photo Index | ___ |

Case #:    99-414-06                    Investigator:  Thomas B. Sing

Initial Report: page 4 of 9

The vehicles are identified as follows:

1.  **VICTIM'S vehicle** – identified as a 1989 Buick LeSabre, maroon in color, displaying Iowa LP/ 353-EXL, registered to Rick and Georgia Bagley, 557 Hamilton, Ottumwa, IA 52501-4556. Secured into evidence by US ARMY CID & FBI agents on 06-21-99. Vehicle is severely damaged by fire and heat. It is initially observed resting on an asphalt parking area between bldg. 2200 & bldg 2205, US ARMY CID HQ, FT HOOD, Killeen, TX. Victims identified as Todd A. Bagley; w/m; dob/ 04-28-73 and Stacey L. Bagley; w/f; dob/ 04-01-71, were found badly burned with head wounds apparently from a large caliber weapon inside of the trunk area of the burned vehicle on 06-21-99 after the Nolanville VFD had extinguished the fire.

2.  **SUSPECT'S vehicle** – identified as 1983 Buick 4 door, displaying TLP/ B18-PWK, registered to Thelma L. Bernard, 1712 Wickfield Way, Killeen, TX 76543. Secured into evidence by US ARMY CID & FBI agents on 06-21-99. I observed it resting in an asphalt parking lot area between bldg.'s 2200 & 2205, US ARMY CID HQ, FT HOOD, Killeen, TX. Examination is pursuant to a search warrant obtained by Special Agent Daniel Chadwick. (see search warrant & Affidavit – US District Court, Western District of Texas, signed on 06-23-99 by US Magistrate Dennis G. Green)

On June 23, 1999, investigators examined the remains of the victims vehicle in the impound lot of ARMY CID. The VIN number was located on the vehicle and is observed as follows; 1G4HR54C5KH455369. The examination was conducted and the findings of the exam, beginning at the vehicles' front are as follows:

- Minimal damage to the aluminum radiator from exposure to flames and heat
- Engine is a side mount V-6 and exhibits minimal melting from heat exposure to the aluminum valve covers and fuel lines.
- Battery is intact and does not exhibit signs of electrical activity. The case of the battery is intact with the firewall side exhibiting minor melting to the upper plastic thereby exposing the cell fins.
- Plug wires and cables are intact with slight damage to those facing the firewall.
- The electronic ignition module was located and did not show signs of electrical activity and is intact.
- Lower water hoses are intact with minimal damage due to exposure to heat.
- The upper portions of the front tires are damaged, however, the rubber facing the passenger compartment are intact continuing to show the tread of the tire. The portion of the front tires in contact with the ground is undamaged.

As all thermal damage is produced from a source of heat above the upper portions of the engine and the engine compartment, it is my opinion; the fires ignition was not from a source in the engine compartment.

- The exterior metal skin of the engine compartment hood is heavily oxidized and there is indication of an ignitable liquid having been applied to the exterior surface of the hood.
- The front passenger door exterior metal is oxidized to approximately 14" above ground level and exhibits damage to a lesser degree below the lower portions of the heat stressed area of the door panel.
- The rear passenger door exterior metal is oxidized to approximately 11 ½" above ground level and exhibits damage to a lesser degree below the lower portions of the heat stressed area of the door panel.
- The front driver's door exterior metal is oxidized to approximately 9" above ground level and exhibits severe damage to the lower portions of the heat stressed area of the door panel.

INV16 (Rev. 9/96)

130

# State Fire Marshal's Office

Report        X
Supplement    _____
Continuation  _____
Photo Index   _____

Case #:    99-414-06                    Investigator:  Thomas B. Sing

Initial Report: page 5 of 9

- The rear passenger door behind the driver's area is oxidized to the floor pan exhibiting severe damage to the lower portions floor pan and exposed portion of the unibody area of the passenger compartment.
- The interior of the passenger compartment revealed upon examination that the headliner supports forward of the rear seat is intact and not sagging due to heat stress.
- The rear headliner supports are sagging and distorted from exposure to heat and flames.
- The back support section of the driver's seat is severely oxidized and has failed collapsing to the rear into the rear floorboard.
- The back support section of the front passenger seat is severely damaged from heat stress and is heavily oxidized however is remaining fixed in its position of the front seat.
- The rear seat of the passenger compartment is heavily damaged and the components of the seat having been consumed by the heat and flames. The springs have annealed their tensile strength and are flat in the floor pan of the rear compartment.
- The exterior metal skin of the rear deck of the trunk indicates a presence of an ignitable liquid having been applied to the area aft of the passenger compartment on the driver's side of the vehicle.
- Immediately adjacent to this ignitable liquid pattern is the vehicles exterior painted surface with no indication of having been damaged by heat.
- The passenger side rear tire is not damaged by the thermal effects of the fire thereby placing the heat forward of this area of the vehicle.
- The drivers side rear tire exhibits damage to the forward side of the tire or towards the passenger compartment of the vehicle.
- Upon inspection all door of the passenger compartment indicate to have been  in the closed position during the fire.
- The interior portions of the trunk exhibited effects form heat exposure but not from direct exposure to flames. They're recognizable personal effects of the victims, which were secured as evidence. These personal effects are soaked in body fluids and are in the early stages of putrefaction and may have lost evidentiary value.

Deputy Marshal Rehfeld utilized the K-9 "Goldi" inside of the victim's vehicle. The K-9 indicated in an area immediately to the rear of the driver's seat in the vehicles floor pan. Deputy Marshal Joe Elmer recovered a sample of debris from the rear floorboard passenger side of the passenger compartment. He placed the sample into a new, unused, metal container that was sealed and secured as evidence.

## Summary of Examination:

It is my opinion the fire that completely destroyed the vehicle originated in two separate areas of the vehicle. The indication of an ignitable liquid on the exterior surface of the engine compartment hood and exterior surface of the rear deck of the trunk are evidence of one area of origin of the fire. A second area of origin is located with in the passenger compartment in the area of the rear passenger seat in the floor pan immediately to the rear of the driver's seat. All indications are that the heat and flames moved up, out and away from this area of the vehicle. No accidental sources of ignition were revealed and it is my opinion the ignition of this fire is Incendiary in nature. The ignition was the intentional act to damage and/or destroy the vehicle. The two victims located with in the vehicle were determined at autopsy to have suffered gunshot wounds to the head. The death of Todd Bagley was determined to have been the result of wounds received from the projectile entering the brain.

INV16 (Rev. 9/96)

131

## State Fire Marshal's Office

Report    X
Supplement  _____
Continuation _____
Photo Index  _____

Case #:    99-414-06                    Investigator:  Thomas B. Sing

Initial Report: page 6 of 9

The death of Stacie Bagley, although having suffered a mortal gunshot wound to the face, was determined to have been the result of exposure to thermal and inhalation effects of the fire and with the trunk deck in the closed/locked position during the fire thereby preventing any possibility of escape.

In conclusion, investigation revealed the following offenses having been committed:

- Arson – 1st degree
- Murder – 1st degree (Todd Bagley, victim)
- Capital Murder - arson & offense resulting in death during commission of another felony  (Stacie Bagley, victim)
- Agg. Kidnapping – abducted during carjacking in Killeen, TX
- Carjacking resulting in arson and death (title 18, federal crimes against USA)

The suspect vehicle was examined pursuant to a search warrant issued by US Magistrate Dennis G. Green, US District Court, Western District of Texas, Waco, TX. (see search warrant) The K-9 "Goldi" was utilized with in the vehicle once opened, however did not indicate with in the vehicle. Investigation did not reveal any further evidence as pertaining to the vehicle fire.

Agencies involved in this inquiry and respective investigators are listed as follows:

- BATF-Austin FO – Charles Mier (SA); Byron San Marcos (SA); Gary Orchoski (RAC)
- DPS / Crime Lab – Austin Office / Mike Colley (photography); Gene Henderson (Video); Charles Parker (Latents)
- DPS / Crime Lab – Waco Office / Blake Goertz (serology); Joyce Marek (evidence technician)
- DPS / Texas Rangers Co "F" – Temple / John Aycock
- TDCJ / Internal Affairs / John Moriarty (Chief of Operations)
- SFMO / Thomas Sing (CFI); Joe Elmer (PE); Mike Rehfeld (K-9); Joe Finck (deputy)
- US ARMY, CID / FT HOOD- Jonathan Bair (SA)
- FBI / Waco – Daniel Chadwick (SA)

During the course of this investigation DPS Mobile Crime Lab personnel photographed & diagrammed the crime scene and subject vehicles. Copies will be furnished to the SFMO for this file at a later date from the Crime Lab offices, DPS – HQ,  Austin.

## Suspects:

1) Christopher Andre Vialva; b/m; dob/ 05-10-80; add/ 2808 Kim Drive, Killeen, TX 76543; ph/ 254-628-8197; ssn/ 391-8225
2) Christopher Michael Lewis; b/m; dob/ 03-12-84; add/ 2403 Simone Dr, Killeen, TX 76543; ph/ 254-554-3859; ssn/ 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
3) Terry Terrell Brown; b/m; dob/ 08-31-81; add/ 155 Safi Rd, apt #1, Ft. Hood, TX 76544; ph/ 254-539-0598; ssn/ 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
4) Brandon Am Bernard; b/m; dob/07-03-80; add/ 1712 Wickfield Way, Killeen, TX 76542; ph/ 254-690-1601;ssn/ 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

INV16 (Rev. 9/96)

132

# State Fire Marshal's Office

| | |
|---|---|
| Report | X |
| Supplement | ___ |
| Continuation | ___ |
| Photo Index | ___ |

Case #:    99-414-06_____        Investigator:  Thomas B. Sing_____

Initial Report: page 7 of 9

All the above suspects were detained, subsequently arrested and placed in federal custody by special agents of US Army Criminal Investigations Division and FBI.

## Evidence:

The following three samples were secured on June 23, 1999, at the crime scene located West of Quarry Road North of FM 439 on the Fort Hood military reservation. The victim's vehicle had been removed from the crime scene prior to the SFMO examination. Deputies of the SFMO examined the physical location of the crime scene for possible evidence relating to the cause of the vehicle fires ignition.

1. One-gallon metal can containing soil secured approximately 34' South of Oak Tree on driver's side of vehicle in the area of the left rear quarter panel was located. Sample secured by Deputy Marshals Joe Elmer (SFMO – HQ, Austin) & Joe Finck (SFMO – Area Office, Belton). Sample secured as a result of indication from K-9 "Goldi".

2. One gallon metal can containing soil secured approximately 30' South of Oak Tree on the drivers side of the vehicle in the area of the center post which separates the front seat and rear seats of the passenger compartment. Sample secured by Deputy Marshals Joe Elmer (SFMO – HQ, Austin) & Joe Finck (SFMO – Area Office, Belton). Sample secured as a result of an indication from K-9 "Goldi".

3. One-gallon metal can containing soil secured approximately 18' South of Oak Tree on the driver's side of the vehicle in the area of the front bumpers location. Sample secured by Deputy Marshals Joe Elmer (SFMO – HQ, Austin) & Joe Finck (SFMO – Area Office, Belton). Sample secured as a result of an indication from K-9 "Goldi".

The following evidence was secured on June 23, 1999, as a result of the examination of the victim's vehicle. This examination was conducted at the Criminal Investigation Division Offices impound parking lot located at Fort Hood, Building # 2200 near the evidence building # 2205, Fort Hood, Killeen, Texas.

4. One gallon metal can containing remains of carpet, headliner, foam seats, secured in the floor board of the left side rear passenger compartment immediately behind the drivers seat. The vehicle is identified as the victims vehicle, Iowa LP 353-EXL; 1989 Buick LaSabre. Evidence sample secured as the result of an indication from the K-9 "Goldi" and was secured by Deputy Marshal Thomas B. Sing (SFMO- Area Office, Boerne)

Deputy Marshal Thomas B. Sing secured the following evidence by utilizing sterile syringes and needles to secure two samples of fluid from two containers identified as charcoal lighter fluid. The US Army CID secured these containers as evidence investigators on the night of the initial crime scene investigation.

The two "charcoal lighter" containers were released by the US Army CID unit into the custody of the Department of Public Safety for analysis for latent prints. The sample of fluid collected by Deputy Sing was secured in order analyze and verify the contents of the containers.

INV16 (Rev. 9/96)

133

# State Fire Marshal's Office

Report    X
Supplement    ____
Continuation    ____
Photo Index    ____

Case #:    99-414-06

Investigator:  Thomas B. Sing

Initial Report: page 8 of 9

5. One glass vial of unknown fluid secured from evidence secured by Ft. Hood CID under MPR/CID control number 0684-99-CID034, DOC# 482/99 at 0939 hrs on 22 June 99. Marked as item number 5 of 6. Transferred into DPS custody on 06-23-99. Sample secured by Thomas B. Sing by using a sterile syringe and sterile needle.

6. One glass vial of unknown fluid secured from evidence secured by Ft. Hood CID under MPR/CID control number 0684-99-CID034, DOC# 482/99 at 0939 hrs on 22 June 99. Marked as item number 4 of 6. Transferred into DPS custody on 06-23-99. Sample secured by Thomas B. Sing by using a sterile syringe and sterile needle.

7. T-shirt secured by Ft. Hood CID investigators on 22 June 99. Transferred to the SFMO custody on 06-24-99.

8. One large container with male boots & fire debris released to Deputy Thomas Sing (SFMO, Area Office, Boerne) by the US Army CID on 6-24-99.

9. One large container of fire debris, vehicle parts, victim clothing secured by US Army CID from the trunk of the victims vehicle on 22 Jun 99. Release to the custody of the SFMO Deputy Thomas Sing on 06-24-99.

10. One large can containing debris from the female victim, shoes, vehicle carpet, debris. Secured as US Army item 1 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

11. One can containing clothing from female victim, shirt, debris. Secured as US Army item 2 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

12. One can containing clothing from female victim. Secured as US Army item 3 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

13. One can containing paper. Secured as US Army item 7 of 13.

14. One paper bag containing 2 cans secured by US Army CID marked as item 10 of 13. Released to SFMO Deputy Thomas Sing on 6-23-99.

For cross-reference purposes the DPS laboratory case numbers are as follows:
L-272876 – Austin DPS Lab
L-6W8135Z – Waco DPS Lab

On June 24, 1999, I obtained a copy of the evidence log, consisting of 2 pages, prepared by US Army CID, Ft. Hood, TX. Reference number 0684-99-CID033. (see copy of Evidence / Property Custody Document)

On June 24, 1999, I also received a compact disc (CD) containing crime scene photos (21-22 June 1999) containing 188 Kodak DCS-520 Raw Camera Files in "Camera" folder and 188 JPEG files in "JPGS" Folder. This CD being provided by US Army CID as contained in their investigative file. (see CD)

INV16 (Rev. 9/96)

734

# State Fire Marshal's Office

| Report | X |
|---|---|
| Supplement | ____ |
| Continuation | ____ |
| Photo Index | ____ |

Case #:  99-414-06                                    Investigator:  Thomas B. Sing

Initial Report: page 9 of 9

## SFMO – Laboratory Submission & Analysis Reports:

On Friday, June 25, 1999, I traveled to the SFMO Arson Laboratory, and submitted evidence transferred into my custody by US ARMY CID. SFMO Chemists will analyze the evidence submitted. (see submission document)

On Monday, July 19, 1999, received a supplement report from Deputy Marshal Joe Elmer concerning his activities in assisting in this investigation. Elmer reports that on June 24, 1999, he traveled to the SFMO Arson Laboratory, Austin, TX and submitted evidence in his custody for analysis. (See supplement & submission documents of Joe Elmer)

On Monday, July 19, 1999, received two analysis reports dated July 2, 1999 from SFMO Chemist Sondra Budge referring to evidence submitted by deputy Elmer and myself. (see analysis reports)

Investigation continues and the case is Active.

INV16 (Rev. 9/96)

135



# Texas Department of Insurance

333 Guadalupe Street  P.O. Box 149104  Austin, Texas 78714-9104
512/463-6169



John  Aycock                                                        09/07/1999
Texas Rangers
6612 South General Bruce Dr.
Temple, TX 76502

Subject:  Lab case:    AL-99-647        Offense date:   06/21/1999
          Your case:   L6W-81352        County:         Bell

Offense(s):     Homicide
Victim(s):      Todd  Bagley, Stacie  Bagley
Suspect(s):     Christopher A. Vialva, Christopher M. Lewis, Terry T. Brown, Brandon  Bernard
Date received:  09/01/1999
Shipper:        In person by
Package tracking: John Aycock
Evidence submitted and laboratory results:

| Item: 1/3A | **Results: Gasoline** |
|---|---|
| Package: | Plastic bag |
| Description: | Quilt |
| Origin: | Trunk of Buick LaSabre™ |

| Item: 2/9 | **Results: Gasoline** |
|---|---|
| Package: | Plastic bag |
| Description: | Carpet |
| Origin: | Trunk of Buick LaSabre™ |

| Item: 3/10 | **Results: Ethanol** |
|---|---|
| Package: | Paper bag sealed with plastic wrap |
| Description: | Piece of clothing |
| Origin: | Trunk of Buick LaSabre™ |

| Item: 4/AE1 | **Results: Negative** |
|---|---|
| Package: | Paper sack |
| Description: | Red shoes |
| Origin: | Terry Brown |

| Item: 5/AE2 | **Results: Negative** |
|---|---|
| Package: | Paper sack |
| Description: | Green pullover shirt |
| Origin: | Terry Brown |

| Item: 6/AE3 | **Results: Negative** |
|---|---|
| Package: | Paper sack |
| Description: | Red Dickies™ pants |
| Origin: | Terry Brown |

736

AL-99-647                                                                              Page 2

| Item: | 7/25 | **Results: Negative** |
|---|---|---|
| | Package: | Paper sack |
| | Description: | White and red shoes |
| | Origin: | Brandon Bernard |

| Item: | 8/26 | **Results: Negative** |
|---|---|---|
| | Package: | Paper sack |
| | Description: | Jacket |
| | Origin: | Brandon Bernard |

| Item: | 9/27 | **Results: Negative** |
|---|---|---|
| | Package: | Paper sack |
| | Description: | White undershirt/T-shirt |
| | Origin: | Brandon Bernard |

| Item: | 10/28 | **Results: Negative** |
|---|---|---|
| | Package: | Paper sack |
| | Description: | Rustler$^{TM}$ blue jeans |
| | Origin: | Brandon Bernard |

| Item: | 11/29 | **Results: Negative** |
|---|---|---|
| | Package: | Paper sack |
| | Description: | Reebok$^{TM}$ shoes |
| | Origin: | Christopher Vialva |

| Item: | 12/30 | **Results: Negative** |
|---|---|---|
| | Package: | Paper sack |
| | Description: | White undershirt/T-shirt |
| | Origin: | Christopher Vialva |

| Item: | 13/31 | **Results: Negative** |
|---|---|---|
| | Package: | Paper sack |
| | Description: | Dockers$^{TM}$ pants |
| | Origin: | Christopher Vialva |

| Item: | 14/33 | **Results: Negative** |
|---|---|---|
| | Package: | Paper sack |
| | Description: | Bugle Boy$^{TM}$ shorts |
| | Origin: | Christopher Lewis |

| Item: | 15/34 | **Results: Negative** |
|---|---|---|
| | Package: | Paper sack |
| | Description: | White T-shirt |
| | Origin: | Christopher Lewis |

| Item: | 16/35 | **Results: Negative** |
|---|---|---|
| | Package: | Paper sack |
| | Description: | Pair of socks |
| | Origin: | Christopher Lewis |

7937

AL-99-647

**Item: 17/36          Results: Negative**
    Package:      Paper sack
    Description: Boxers/underwear
    Origin:        Christopher Lewis

---

**Item: 18/37          Results: Negative**
    Package:      Paper sack
    Description: Nylon Do-Rag
    Origin:        Christopher Lewis

---

Key to results:
Accelerants were detected in one or more items.

ETHANOL:  Ethanol was chromatographically detected.

GASOLINE:  A gasoline was chromatographically detected.  Examples of a gasoline include all grades and brands of automobile gasoline.

NEGATIVE: No common commercially available flammable or combustible (ignitable) liquids were chromatographically detected.  The absence of detectable levels of accelerants can be due to several factors, including destruction by the inherent nature of fire, evaporation prior to collection and analysis, fire suppression activities, or lack of use of accelerants.  The absence of accelerants does not necessarily exclude the possibility of arson.

Disposition

This evidence is retained in the laboratory evidence vault.  If arrangements can be made to pick up the evidence, please do so as soon as possible.  Otherwise, the evidence will be returned via UPS at a later date.

Sincerely,

Sondra Budge
Criminalist

738

# EXHIBIT 5

1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL ACTION NOS. |
| | * | W-98-CR-121(2), |
| | * | W-99-CR-043(1)&(2) & |
| | * | W-99-CR-061(1)&(2) |
| VS. | * | |
| | * | |
| JOHN JOSEPH BOJO, JR., | * | |
| RONNIE JOHNSON, | * | |
| JAMES EDWARD DEAVER, | * | |
| TERRY TERRELL BROWN and | * | December 16, 1999 |
| CHRISTOPHER MICHAEL LEWIS | * | Waco, Texas |

* * * * * * * * * * * * * * *

BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING

REARRAIGNMENT PROCEEDINGS

APPEARANCES:

For the Government:         Ms. Juanita Fielden,
                           Mr. Mark L. Frazier and
                           William W. Johnston
                           Assistant U.S. Attorneys
                           P.O. Box 828
                           Waco, Texas  76703


For Defendant Bojo:        Mr. John R. Donahue
                           Attorney at Law
                           1701 Austin Avenue
                           Waco, Texas  76701


For Defendant Johnson:     Mr. Russell D. Hunt, Sr.
                           Attorney at Law
                           P.O. Box 726
                           Waco, Texas  76703


For Defendant Deaver:      Mr. Stanley L. Schwieger
                           Attorney at Law
                           501 Franklin Avenue, Suite 500
                           Waco, Texas  76701


For Defendant Brown:       Mr. Robert T. Swanton, Jr.

740

2

```
                                   Attorney at Law
                                   P.O. Box 266
                                   Waco, Texas  76701

For Defendant Lewis:               Mr. Ronald H. Moody
                                   Attorney at Law
                                   204 North 6th Street
                                   Waco, Texas  78701


Court Reporter:                    Morris W. Bowen, CSR
                                   Official Court Reporter
                                   United States District Court
                                   P.O. Box 1908
                                   Waco, Texas  76703
```

Proceedings recorded by mechanical stenography, transcript

produced by notereading.

741

3

1        DECEMBER 16, 1999 - PROCEEDINGS

2        (Convened at 1:15 p.m.)

3              COURTROOM DEPUTY:  Arraignment or rearraignment

4   proceedings in Criminal Actions W-98-CR-121(2), styled U.S.A.

5   versus John Joseph Bojo, Jr.

6              MR. JOHNSTON:  Mark Frazier is present for the United

7   States.

8              MR. DONAHUE:  John Donahue for Mr. Bojo, Judge.

9              COURTROOM DEPUTY:  W-99-CR-043(1), U.S.A. versus

10  Ronnie Johnson.

11             MR. JOHNSTON:  Mark Frazier is present for the United

12  States.

13             MR. HUNT:  Russell Hunt for the Defendant, Your Honor.

14             COURTROOM DEPUTY:  W-99-CR-043(2), U.S.A. versus James

15  Edward Deaver.

16             MR. SCHWIEGER:  "Stan" Schwieger for the defense, Your

17  Honor.

18             MR. JOHNSTON:  And Mark Frazier again for the United

19  States.

20             MS. FIELDEN:  Juanita Fielden.

21             MR. JOHNSTON:  Oh, I'm sorry, Ms. Fielden.

22        (Mr. Frazier enters courtroom.)

23             COURTROOM DEPUTY:  W-99-CR-061(1), U.S.A. versus Terry

24  Terrell Brown.

25             MR. FRAZIER:  Mark Frazier for the United States, Your

4

1  Honor.

2          MR. SWANTON:  "Rob" Swanton here for Mr. Brown, Judge.

3          COURTROOM DEPUTY:  And W-99-CR-061(2), U.S.A. versus

4  Christopher Michael Lewis.

5          MR. FRAZIER:  Mark Frazier for the United States.

6          MR. MOODY:  "Ron" Moody for the Defendant, Your Honor.

7          THE COURT:  Cause Number W-98-CR-121, Defendant (2),

8  is styled U.S.A. versus John Joseph Bojo, Jr.  Is that the way

9  to pronounce your name, sir?

10          DEFENDANT BOJO:  Yes, sir.

11          THE COURT:  How old are you, sir?

12          DEFENDANT BOJO:  I'm 51, sir.

13          THE COURT:  And what is your educational background?

14          DEFENDANT BOJO:  I'm a college graduate, sir.

15          THE COURT:  Thank you.

16          W-99-CR-043, Defendant (1), is styled U.S.A. versus

17  Ronnie Johnson.  Is that your name, sir?

18          DEFENDANT JOHNSON:  Yes, sir.

19          THE COURT:  How old are you, Mr. Johnson?

20          DEFENDANT JOHNSON:  Thirty-four.

21          THE COURT:  And what is your educational background?

22          DEFENDANT JOHNSON:  Tenth grade.

23          THE COURT:  W-99-CR-043, Defendant (2), is styled

24  U.S.A. versus James Edward Deaver.  Is that your name, sir?

25          DEFENDANT DEAVER:  Yes, sir.

743

5

1          THE COURT:  What is your educational background?

2          DEFENDANT DEAVER:  G.E.D.

3          THE COURT:  Thank you.

4          W-99-CR-061, Defendant (1), is styled U.S.A. versus

5   Terry Terrell Brown.  Is that your name, sir?

6          DEFENDANT BROWN:  Yes, sir.

7          THE COURT:  How old are you, Mr. Brown?

8          DEFENDANT BROWN:  Eighteen, sir.

9          THE COURT:  And what is your educational background?

10         DEFENDANT BROWN:  (Inaudible.)

11         THE REPORTER:  I'm sorry?

12         DEFENDANT BROWN:  Still in high school.

13         THE COURT:  W-99-CR-006, Defendant (12) -- I mean (2)

14  -- excuse me -- is styled U.S.A. versus Christopher Michael

15  Lewis.  Is that your proper name, sir?

16         DEFENDANT LEWIS:  Yes, sir.

17         THE COURT:  How old are you, Mr. Lewis?

18         DEFENDANT LEWIS:  Fifteen.

19         THE COURT:  Sir?

20         DEFENDANT LEWIS:  Fifteen.

21         THE COURT:  What is your educational background?

22         DEFENDANT LEWIS:  Ninth grade.

23         THE COURT:  Thank you.

24         Do each of you understand that if you enter a guilty

25  plea, I'm going to ask you some questions about the offense or

744

6

1    offenses you're pleading guilty to, and if you answer those

2    questions under oath, in open court and in the presence of your

3    attorney, your answers could be used against you in a

4    prosecution for perjury or false statement if your answers are

5    not true?

6              Do you understand that, Mr. Bojo?

7              DEFENDANT BOJO:  Yes, sir.

8              THE COURT:  Do you, Mr. Johnson?

9              DEFENDANT JOHNSON:  Yes, sir.

10             THE COURT:  Mr. Deaver, do you?

11             DEFENDANT DEAVER:  Yes, sir.

12             THE COURT:  Mr. Brown, do you?

13             DEFENDANT BROWN:  Yes, sir.

14             THE COURT:  Mr. Lewis, do you?

15             DEFENDANT LEWIS:  Yes, sir.

16             THE COURT:  Mrs. Flowers.

17         (Defendants sworn.)

18             THE COURT:  Do any of you attorneys have any concern

19    regarding your clients competence to stand trial and enter a

20    plea this afternoon?  And by being competent, I, of course, mean

21    having both a factual and a rational understanding of these

22    proceedings.

23             Mr. Donahue, do you have any such concerns regarding

24    your client?

25             MR. DONAHUE:  No, Judge.

7

```
 1          THE COURT:  Mr. Hunt, do you?

 2          MR. HUNT:  I do not, Your Honor.

 3          THE COURT:  Mr. Schwieger, do you?

 4          MR. SCHWIEGER:  No, Your Honor.

 5          THE COURT:  Mr. Swanton, do you?

 6          MR. SWANTON:  No, sir.

 7          THE COURT:  Mr. Moody, do you?

 8          MR. MOODY:  No, Your Honor.

 9          THE COURT:  Do any of you Defendants suffer from any
```

10  mental or physical impairment which would have any effect on

11  your ability to fully understand the charge against you or the

12  basis and consequences of a guilty plea?

```
13          Mr. Bojo?

14          DEFENDANT BOJO:  No, sir.

15          THE COURT:  Mr. Johnson?

16          DEFENDANT JOHNSON:  No, sir.

17          THE COURT:  Mr. Deaver?

18          DEFENDANT DEAVER:  No, sir.

19          THE COURT:  Mr. Brown?

20          DEFENDANT BROWN:  No, sir.

21          THE COURT:  Mr. Lewis?

22          DEFENDANT LEWIS:  No, sir.

23          THE COURT:  Have any of you ever had a physical
```

24  injury, such as a head or a brain injury, that might affect your

25  memory or your judgment in any way?

8

1          Mr. Bojo?

2          DEFENDANT BOJO:  No, sir.

3          THE COURT:  Mr. Johnson?

4          DEFENDANT JOHNSON:  No, sir.

5          THE COURT:  Mr. Deaver?

6          DEFENDANT DEAVER:  No, sir.

7          THE COURT:  Mr. Brown?

8          DEFENDANT BROWN:  No, sir.

9          THE COURT:  Mr. Lewis?

10         DEFENDANT LEWIS:  No, sir.

11         THE COURT:  Are any of you this afternoon under the

12    influence of any medicine or drugs that might have such an

13    effect on you?

14         Mr. Bojo?

15         DEFENDANT BOJO:  No, sir.

16         THE COURT:  Mr. Johnson?

17         DEFENDANT JOHNSON:  No, sir.

18         THE COURT:  Mr. Deaver?

19         DEFENDANT DEAVER:  No, sir.

20         THE COURT:  Mr. Brown?

21         DEFENDANT BROWN:  No, sir.

22         THE COURT:  Mr. Lewis?

23         DEFENDANT LEWIS:  No, sir.

24         THE COURT:  Have each of you received a copy of the

25    document which charges you?  In three cases, that is a

747

9

1 superseding indictment and in two cases, that is a superseding

2 information.  In any event, regardless of the type of document

3 that charges you in this offense, have you read the document or

4 had it read to you and discussed with your attorney the charges

5 that you face?

6          Have you done those things, Mr. Bojo?

7          DEFENDANT BOJO:  Yes, sir.

8          THE COURT:  Mr. Johnson, have you?

9          DEFENDANT JOHNSON:  Yes, sir.

10          THE COURT:  Mr. Deaver, have you?

11          DEFENDANT DEAVER:  Yes, sir.

12          THE COURT:  Mr. Brown, have you?

13          DEFENDANT BROWN:  Yes, sir.

14          THE COURT:  Mr. Lewis, have you?

15          DEFENDANT LEWIS:  Yes, sir.

16          THE COURT:  Do you understand what you're charged

17 with, Mr. Bojo?

18          DEFENDANT BOJO:  Yes, sir.

19          THE COURT:  Do you, Mr. Johnson?

20          DEFENDANT JOHNSON:  Yes, sir.

21          THE COURT:  Do you, Mr. Deaver?

22          DEFENDANT DEAVER:  Yes, sir.

23          THE COURT:  Do you, Mr. Brown?

24          DEFENDANT BROWN:  Yes, sir.

25          THE COURT:  Do you, Mr. Lewis?

748

10

1          DEFENDANT LEWIS:  Yes, sir.

2          THE COURT:  Do any of you have any questions you would

3    like to ask me about what you're charged with?

4          Mr. Bojo?

5          DEFENDANT BOJO:  No, sir.

6          THE COURT:  Mr. Johnson?

7          DEFENDANT JOHNSON:  No, sir.

8          THE COURT:  Mr. Deaver?

9          DEFENDANT DEAVER:  No, sir.

10         THE COURT:  Mr. Brown?

11         DEFENDANT BROWN:  No, sir.

12         THE COURT:  Mr. Lewis?

13         DEFENDANT LEWIS:  No, sir.

14         THE COURT:  Have each of you discussed with your

15   attorney, not only what you're charged with, but also any

16   defenses that you might be able to raise if you elected to go to

17   trial?

18         Have you done those things, Mr. Bojo?

19         DEFENDANT BOJO:  Yes, sir.

20         THE COURT:  Have you, Mr. Johnson?

21         DEFENDANT JOHNSON:  Yes, sir.

22         THE COURT:  Mr. Deaver, have you?

23         DEFENDANT DEAVER:  Yes, sir.

24         THE COURT:  Mr. Brown?

25         DEFENDANT BROWN:  Yes, sir.

11

1          THE COURT:  And Mr. Lewis?

2          DEFENDANT LEWIS:  Yes, sir.

3          THE COURT:  Mr. Bojo, you are charged in a one-count

4  superseding information with Fraudulent Interstate Transaction

5  in the Sale of Securities, in violation of Title 15, United

6  States Code, Sections 77(q)(A) and 77x.  The maximum punishment

7  that can be assessed a person convicted of that offense is five

8  years of incarceration, followed by three years of supervised

9  release, a fine of up to a quarter of a million dollars and a

10  $100 mandatory assessment under the Victims of Crime Act.  Do

11  you understand those possible maximum punishments?

12          DEFENDANT BOJO:  Yes, sir.

13          THE COURT:  Mr. Frazier, has there been a plea

14  agreement in this case?

15          MR. FRAZIER:  Yes, Your Honor, there has.

16          THE COURT:  The substance of it?

17          MR. FRAZIER:  The Defendant has agreed to enter a plea

18  of guilty to the superseding information charging him with a

19  Fraudulent Interstate Transaction in the Sale of Securities.  In

20  exchange for his plea, the United States agrees to dismiss the

21  original indictment as to this Defendant only.  Further, the

22  United States agrees to refrain from prosecuting the Defendant

23  for other Title 15 and 18, United States Code, violations of

24  which we are now aware which may have been committed by the

25  Defendant in the Western District of Texas.  The Defendant

750

12

1  agrees to cooperate fully and give a complete and truthful

2  statement to law enforcement and the Probation Department and

3  also agrees to testify when required before the Court at any

4  trial on the merits or other proceedings.  Upon his complete and

5  truthful cooperation, the United States agrees to inform the

6  Court of that cooperation and may file a Motion For Downward

7  Departure under Section 5K1.1 of the Sentencing Guidelines.  The

8  Defendant understands that the United States has sole discretion

9  to determine whether his assistance is substantial for purposes

10  of filing this motion, and he has no promises regarding what his

11  sentence will be.  He has also agreed to waive his right to

12  appeal and post-conviction writs or remedies that he may have

13  from the judgment and sentence of this Court, save and except

14  for limited circumstances that are set out in the written Plea

15  Bargain Agreement.

16          THE COURT:  Mr. Donahue, is that an accurate summary

17  of the plea agreement?

18          MR. DONAHUE:  It is, Judge.

19          THE COURT:  Mr. Bojo, do you understand the plea

20  agreement and approve of it?

21          DEFENDANT BOJO:  Yes, sir, I do.

22          THE COURT:  Do you also understand that you have the

23  right to plead not guilty to this charge or to continue in that

24  plea if you've already entered it?

25          DEFENDANT BOJO:  Yes, sir.

751

13

1              THE COURT:  Then with those understandings, to the
2     charge of Fraudulent Interstate Transaction in the Sale of
3     Securities, as alleged in the Superseding Information, how do
4     you wish to plead, guilty or not guilty?
5              DEFENDANT BOJO:  Guilty, Your Honor.
6              THE COURT:  Would you read the charge, please, Mr.
7     Frazier?
8              MR. FRAZIER:  Yes, Your Honor.  The United States
9     Attorney charges:
10              "From on or about June 1996, the exact date being
11     unknown, until on or about September 9th, 1996, in the Waco
12     Division of the Western District of Texas, Defendant John Joseph
13     Bojo, Jr., in connection with the offer and sale of securities,
14     that is, written investment agreements, profit contracts and
15     promissory notes, by the use of transportation and communication
16     in interstate commerce, directly and indirectly, did obtain
17     money by an omission to state a material fact necessary in order
18     to make the statements made, in light of the circumstances under
19     which they were made, not misleading, in that the Defendant
20     failed to disclose and make known to persons from whom he
21     solicited and received money for investment in a trading program
22     the fact that he had previously been convicted of the federal
23     felony offenses of securities fraud, mail fraud and interstate
24     transportation of stolen property, during representation to
25     those persons that their money was not at risk of loss if given

752

14

1   to him, in violation of Title 15, United States Code, Sections

2   77(q)(a)(2) and 77x."

3           THE COURT:  Is that the offense to which you're

4   pleading guilty, Mr. Bojo?

5           DEFENDANT BOJO:  Yes, sir, it is.

6           THE COURT:  And is that what you did?

7           DEFENDANT BOJO:  Yes, sir.

8           THE COURT:  What would the Factual Basis be, Mr.

9   Frazier?

10          MR. FRAZIER:  Your Honor, the United States would

11  prove that the Defendant, John Joseph Bojo, Jr., met Austin and

12  Mildred Cooper of Waco, Texas, in June -- on June -- in June of

13  1996 and began soliciting money from them for investment in a

14  trading program being managed by his co-Defendant, John Marshal

15  Rubien of New York.  The Defendant Bojo explained to the Coopers

16  that this trading program was a way in which investors could

17  reap enormous returns on their investment.  The Defendant

18  explained that banks in Europe traded their debt, enabling these

19  banks to adjust their assets and liabilities, just as the

20  Federal Reserve does for American banks.  Investors were needed

21  to accumulate assets to leverage these trades, which would be

22  conducted by co-Defendant John Marshal Rubien.  Bojo explained

23  to the Coopers that a $50,000 investment would reap a $20,000

24  return on their money.  Bojo also assured the Coopers that their

25  money was safe and risk free, because the debt transaction

153

15

1  happens simultaneously.  These representations were made to the

2  Coopers while they were here in Waco, Texas, in the Western

3  District of Texas, and were made via Southwestern Bell

4  Telephone, a communication instrument in interstate commerce.

5       The Coopers agreed to invest money with the Defendant

6  Bojo, and on September 9th, 1996, they gave him two cashier's

7  checks drawn on their accounts at the First National Bank of

8  Waco in the amounts of 15,000 and $35,000.  This money was

9  turned over to the Defendant, John Joseph Bojo, based on their

10 prior conversations with him and assurances made by him that

11 their money would be safe with him and not at risk of loss.  On

12 that date, the Defendant sent these checks to co-Defendant John

13 Marshal Rubien via commercial carrier, that is, UPS.  The

14 Coopers also signed investment agreements regarding their

15 investment into this trading program and were given copies of

16 trading profit contracts and promissory notes by Defendant John

17 Joseph Bojo, Jr., as assurances that their investment was

18 secure.

19       At no time did the Defendant inform the Coopers that

20 he had previously been convicted of the federal felony offenses

21 of Securities Fraud, Mail Fraud and Interstate Transportation of

22 Stolen Property in Cause Number CR-86-041A in the Northern

23 District of Ohio, Eastern Division, in April of 1986.  Had this

24 been made known to the Coopers, they would not have invested

25 their money with the Defendant.  In fact, the trading program

754

16

1  run by co-Defendant John Marshal Rubien did not exist, and his

2  scheme was nothing more than a ponzie scheme designed to defraud

3  investors of their money.

4        THE COURT:  Mr. Bojo, do you have any disagreement

5  with that Factual Summary?

6        DEFENDANT BOJO:  No, sir.

7        THE COURT:  All right.  Mr. Johnson and Mr. Deaver,

8  you are each charged in a second superseding indictment in Count

9  Three with the offense of Conspiracy to Possess Amphetamine With

10 Intent to Distribute it, a violation of Title 21, United States

11 Code, Sections 841(a)(1) and 846.  The maximum punishment that

12 can be assessed a person convicted of that offense is 20 years

13 of incarceration, followed by three years of supervised release,

14 and a fine of up to a million dollars and a $100 mandatory

15 assessment under the Victims of Crime Act.

16        Do you understand that possible punishment range, Mr.

17 Johnson?

18        DEFENDANT JOHNSON:  Yes, sir.

19        THE COURT:  Do you, Mr. Deaver?

20        DEFENDANT DEAVER:  Yes, sir.

21        THE COURT:  Has there been a plea agreement in Mr.

22 Johnson's case, Mr. Frazier -- I'm sorry -- Ms. Fielden?

23        MS. FIELDEN:  Yes, sir, there has.

24        THE COURT:  Are there differences in the two plea

25 agreements?

17

1        MS. FIELDEN:  They are identical as to all of the

2   Factual Basis.

3        THE COURT:  All right.

4        MS. FIELDEN:  The plea agreement in each case, Your

5   Honor, is that the Defendants agree to enter a plea of guilty to

6   Count Three of the Second Superseding Indictment charging them

7   with Conspiracy to Possess With Intent to Distribute

8   Amphetamine, a Schedule III Controlled Substance.  In exchange

9   for a plea of guilty, the Government agrees to dismiss the

10  original and superseding indictments at the time of sentencing

11  as to both Defendants.  The Government will also refrain from

12  prosecuting the Defendant under other Title 18 and 21 violations

13  known to the Government at this time.  They both agree to

14  debrief and give a complete and truthful statement to law

15  enforcement officials and testify if necessary.  In exchange,

16  the Government may file a motion pursuant to 5K1 of the

17  Sentencing Guidelines.  That's under the sole discretion of the

18  Government.  In exchange, they will also waive all rights to

19  appeal.

20       THE COURT:  Mr. Hunt, is that an accurate summary of

21  the plea agreement?

22       MR. HUNT:  It is, Your Honor.

23       THE COURT:  Do you agree, Mr. Schwieger?

24       MR. SCHWIEGER:  Yes, I do, Your Honor.

25       THE COURT:  Mr. Johnson, do you understand the plea

754

18

1  agreement?

2          DEFENDANT JOHNSON:  Yes, sir.

3          THE COURT:  And approve of it?

4          DEFENDANT JOHNSON:  Yes, sir.

5          THE COURT:  And do you, Mr. Deaver?

6          DEFENDANT DEAVER:  Yes, sir.

7          THE COURT:  Then do you also -- do each of you also

8  understand that you have the right to plead not guilty to this

9  charge or to continue in that plea if you've already entered it?

10         Do you understand that, Mr. Johnson?

11         DEFENDANT JOHNSON:  Yes, sir.

12         THE COURT:  Do you, Mr. Deaver?

13         DEFENDANT DEAVER:  Yes, sir.

14         THE COURT:  Then to the charge of Conspiracy to

15 Possess Amphetamine with Intent to Distribute it, as alleged in

16 Count Three of the Second Superseding Indictment, how do you

17 wish to plead, Mr. Johnson, guilty or not guilty?

18         DEFENDANT JOHNSON:  Guilty.

19         THE COURT:  And you, Mr. Deaver, how do you wish to

20 plead, guilty or not guilty?

21         DEFENDANT DEAVER:  Guilty.

22         THE COURT:  Would you read Count Three of the Second

23 Superseding Indictment, please, Ms. Fielden?

24         MS. FIELDEN:  Yes, sir.  Beginning -- or "Commencing

25 on or about January 1st, 1994, the exact date to the Grand Jury

757

19

1   unknown, and continuing until on or about April 13th, 1999, in

2   the Western District of Texas and diverse other places,

3   Defendants Ronnie Johnson and James Edward Deaver and other

4   persons both known and unknown to the Grand Jury did unlawfully,

5   willingly and intentionally combine, conspire, confederate and

6   agree together and with each other to possess with intent to

7   distribute a quantity of methamphetamine (sic), a Schedule III

8   Controlled Substance, contrary to Title 21, United States Code,

9   Section 841(a)(1), in violation of Title 21, United States Code,

10  Section 846."

11          THE COURT:  Is that the offense you're pleading guilty

12  to, Mr. Johnson?

13          MR. HUNT:  Your Honor, I believe that Ms. Fielden

14  misspoke when she said "methamphetamine."  It says

15  "amphetamine."

16          MS. FIELDEN:  If I did, it is amphetamine, Your Honor.

17          THE COURT:  All right.  And is that the offense you're

18  pleading guilty to, Mr. Johnson?

19          DEFENDANT JOHNSON:  Yes, sir, Your Honor.

20          THE COURT:  And is that what you did?

21          DEFENDANT JOHNSON:  Yes, sir.

22          THE COURT:  Who said, "No, sir"?

23          DEFENDANT JOHNSON:  Not me.

24          THE COURT:  Sir?

25          DEFENDANT JOHNSON:  I said, "Yes, sir."

758

20

1          THE COURT:  All right.  And, Mr. Deaver, is that the

2   offense you're pleading guilty to?

3          DEFENDANT DEAVER:  Yes, sir.

4          THE COURT:  Is that what you did?

5          DEFENDANT DEAVER:  Yes, sir.

6          THE COURT:  The Factual Basis in both cases, Ms.

7   Fielden?

8          MS. FIELDEN:  The Government would prove that on or

9   about May 28th, 1998, James Edward Deaver, James Raymond Deaver

10  and Nina Baughman were arrested in California in possession of

11  approximately five pounds of methamphetamine and/or amphetamine,

12  which was concealed in a spare tire in the back of their van.

13  Eddie Deaver contacted Ronnie Johnson and requested that Johnson

14  go to California and arrange bond for the three individuals and

15  hire attorneys for their defense.  Johnson agreed to assist the

16  Deavers and Baughman and he and his brother, Danny Johnson,

17  traveled to California and paid for their bonds and their

18  attorneys.  In exchange for this help, Johnson received

19  approximately one pound of methamphetamine or amphetamine from

20  James Raymond Deaver.

21          In October 1998, a state search warrant was executed

22  on Johnson's residence and agents recovered a receipt from

23  Deaver's attorney reflecting that James Raymond Deaver and Danny

24  Johnson had delivered a shoe box containing unknown contents to

25  the attorney.  Johnson acknowledged to Officer TFO Gary Medford

759

21

1  that this shoe box contained cash currency which was to be used

2  for their legal fees.  Agents also recovered a small quantity of

3  methamphetamine, drug ledgers, scales, glass pots and baggies.

4        On March 26th, 1999, a federal search warrant was

5  executed on the residence of Ronnie Johnson located at 16

6  Briarwood, Belton, Texas.  Agents recovered additional documents

7  relating to the California arrest of the two Deavers and Nina

8  Baughman, including bond papers, copies of cashier's checks and

9  forfeiture papers.

10        On the same date, March 26th, 1999, a federal search

11  warrant was executed on the residence of James Edward Deaver,

12  located at 1118 South 47th Street, Temple, Texas.  Agents

13  recovered methamphetamine, drug ledgers, scales, glass pots,

14  baggies and numerous firearms.  Nina Baughman would testify that

15  she accompanied James Raymond Deaver and James Edward Deaver on

16  several occasions to California to purchase either

17  methamphetamine or amphetamine.  Some of these drugs were

18  supplied to Ronnie Johnson for distribution.

19        She would further testify that after the May 1998

20  arrest, she and James Raymond Deaver and Ronnie Johnson traveled

21  to California several times and purchased methamphetamine or

22  amphetamine in quantities of from one to five pounds.  Both

23  James Edward Deaver and Ronnie Johnson stipulated that they

24  purchased methamphetamine and/or amphetamine from individuals in

25  California for distribution in the Central Texas area.

760

22

1          THE COURT:  Mr. Johnson, do you have any disagreement

2   with that Factual Summary?

3          DEFENDANT JOHNSON:  No, sir, Your Honor.

4          THE COURT:  Mr. Deaver, do you?

5          DEFENDANT DEAVER:  No, sir.

6          THE COURT:  Mr. Brown and Mr. Lewis, you are each

7   charged in Counts One and Two of a Superseding Information with

8   Aiding and Abetting in Second Degree Murder Within the Special

9   Maritime and Territorial Jurisdiction of the United States.

10  Count One alleges the murder of Todd A. Bagley and Count Two

11  alleges the murder of Stacy L. Bagley, a violation of Title 18,

12  United States Code, Section 1111(d).  The maximum punishment

13  that can be assessed a person convicted of that offense is life

14  incarceration, five years of supervised release and a fine of up

15  to a quarter of a million dollars.

16         Each of you is charged in Count Four with Possession

17  of a Firearm in Furtherance of a Crime of Violence, a violation

18  of Title 18, United States Code, Section 924(c)(1).  The maximum

19  punishment that can be assessed a person convicted of that

20  offense is five years of incarceration, which would be

21  consecutive to any other term of imprisonment imposed, three

22  years of supervised release and a fine of up to a quarter of a

23  million dollars.

24         Mr. Brown, you are also charged in Count Four with

25  Possession of a -- I'm sorry.  Those are the three counts in

761

23

1  which you are charged.  Mr. Lewis is also charged in Count Three

2  with Aiding and Abetting in the Taking of a Motor Vehicle That

3  had Been Shipped in Interstate Commerce From the Person or

4  Presence of Another by Force of Violence or by Intimidation With

5  the Intent to Cause Death or Serious Bodily Injury, in violation

6  of Title 18, United States Code, Sections 2 and 2119.  The

7  maximum punishment that can be assessed a person convicted of

8  that offense is 15 years of incarceration, followed by three

9  years of supervised release and, again, a fine of a quarter of a

10  million dollars.  In addition, there would be a $100 mandatory

11  assessment under the Victims of Crime Act for each count, being

12  a total of $300 in Mr. Brown's case and a total of $400 in Mr.

13  Lewis' case.  Do each of you understand the maximum possible

14  punishments you face?

15          Do you, Mr. Brown?

16          DEFENDANT BROWN:  Yes, sir.

17          THE COURT:  Do you, Mr. Lewis?

18          DEFENDANT LEWIS:  Yes, sir.

19          THE COURT:  Have there been plea agreements in these

20  cases, Mr. Frazier?

21          MR. FRAZIER:  Yes, Your Honor, there have.

22          THE COURT:  Are they different or --

23          MR. FRAZIER:  They're substantially identical.  As to

24  both Defendants, Your Honor, as this Court is aware, orders have

25  already been entered transferring both prosecutions to adult --

762

24

1  juvenile -- juvenile to adult prosecution for criminal purposes,

2  and because of that, the Government has entered plea agreements

3  with both Defendants to enter to the counts that have just been

4  indicated to the Defendants by the Court for the second degree

5  murders of both Todd and Stacy Bagley, for possession of a

6  firearm in furtherance of a crime of violence, and as to Chris

7  Willis for carjacking and aiding and abetting, in violation of

8  18 U.S.C., Section 2119 and 2.

9          In exchange for these pleas, the United States agrees

10 to dismiss the Superseding Information at the time of sentencing

11 as to the Defendants.  And further, the United States agrees to

12 refrain from prosecuting the Defendants for other Title 18,

13 United States Code, violations of which we are now aware which

14 may have been committed by these Defendants in the Western

15 District of Texas.

16         The Defendants agree to submit to a polygraph

17 examination, if requested by the United States, and to give full

18 cooperation in connection with such examination.

19         Further, the Defendants agree to cooperate fully and

20 give a complete and truthful statement to law enforcement and

21 the Probation Department.  They also agree to testify when

22 required before the Court at any trial on the merits or other

23 proceedings.

24         The Defendants understand that in the event they

25 violate any term of this agreement, any statement which they

25

1  give to law enforcement or prosecutors may be used as evidence

2  against them at trial.

3      Both Defendants agree to waive their appellate rights

4  and any rights of writ -- or post-conviction writ or remedy that

5  they may have from the judgment and sentence of this Court, save

6  and except for very limited circumstance that are set out in the

7  written Plea Bargain Agreement.

8      This is a summary of each agreement, Your Honor, that

9  have both been signed by all of the parties and filed with the

10 Court.

11     THE COURT:  Is that an accurate summary of the plea

12 agreement, Mr. Swanton?

13     MR. SWANTON:  Yes, sir.

14     THE COURT:  And do you agree it is an accurate

15 summary, Mr. Moody?

16     MR. MOODY:  Yes, Your Honor.

17     THE COURT:  Mr. Brown, do you understand the plea

18 agreement and approve of it?

19     DEFENDANT BROWN:  Yes, sir.

20     THE COURT:  Mr. Lewis, do you understand the plea

21 agreement and approve of it?

22     DEFENDANT LEWIS:  Yes, sir.

23     THE COURT:  Do each of you also understand that you

24 have the right to plead not guilty to all of these charges or to

25 continue in such a plea if you've already entered such a plea?

26

1            Do you understand that, Mr. Brown?

2            DEFENDANT BROWN:  Yes, sir.

3            THE COURT:  Do you, Mr. Lewis?

4            DEFENDANT LEWIS:  Yes, sir.

5            THE COURT:  Then, Mr. Brown, to the charge of Aiding

6    and Abetting in Second Degree Murder, as alleged in Counts One

7    and Two, how do you wish to plead as to Count One, guilty or not

8    guilty?

9            DEFENDANT BROWN:  Guilty.

10           THE COURT:  And as to Count Two, guilty or not guilty?

11           DEFENDANT BROWN:  Guilty.

12           THE COURT: And as to the offense of Possession of a

13   Firearm in Furtherance of a Crime of Violence, as alleged in

14   Count Four, how do you wish to plead, guilty or not guilty?

15           DEFENDANT BROWN:  Guilty.

16           THE COURT:  Then, Mr. Lewis, as to the offenses of

17   Aiding and Abetting in Second Degree Murder, as alleged in

18   Counts One and Two, how do you wish to plead as to Count One,

19   guilty or not guilty?

20           DEFENDANT LEWIS:  Guilty.

21           THE COURT:  And as to Count Two, how do you wish to

22   plead, guilty or not guilty?

23           DEFENDANT LEWIS:  Guilty.

24           THE COURT:  As to Count Three, alleging Aiding and

25   Abetting in the Taking of a Motor Vehicle That had Been Shipped

27

1  in Interstate Commerce From the Person or Presence of Another by

2  Force or Violence or by Intimidation With the Intent to Cause

3  Death or Serious Bodily Injury, how do you wish to plead, guilty

4  or not guilty?

5          DEFENDANT LEWIS:  Guilty.

6          THE COURT:  And as to the offense alleged in Count

7  Four, Possession of a Firearm in Furtherance of a Crime of

8  Violence, how do you wish to plead, guilty or not guilty?

9          DEFENDANT LEWIS:  Guilty.

10          THE COURT:  Would you read the appropriate counts,

11  please, Mr. Frazier?

12          MR. FRAZIER:  Yes, Your Honor.

13          The United States Attorney charges in the Second

14  Superseding Information, Count One:

15          "On or about the 21st day of June 1999, on the Fort

16  Hood Military Reservation in Bell County, Texas, in the Western

17  District of Texas, a place within the special maritime and

18  territorial jurisdiction of the United States, Terry Terrell

19  Brown and Christopher Michael Lewis, with malice aforethought,

20  did unlawfully kill Todd A. Bagley by shooting Todd A. Bagley

21  with a firearm and did aid and abet other persons in the

22  commission of this offense, in violation of Title 18, United

23  States Code, Sections 1111 and 2."

24          Count Two alleges:  "That on or about the 21st day of

25  June 1999, on the Fort Hood Military Reservation, Bell County,

28

1  Texas, in the Western District of Texas, a place within the

2  special maritime and territorial jurisdiction of the United

3  States, Terry Terrell Brown and Christopher Michael Lewis, with

4  malice aforethought, did unlawfully kill Stacy L. Bagley by

5  shooting Stacy L. Bagley with a firearm and did aid and abet

6  other persons in the commission of this offense, in violation of

7  Title 18, United States Code, Sections 1111 and 2."

8           Count Three alleges --

9           THE COURT:  Read Count Four next, please, sir.

10          MR. FRAZIER:  Yes, sir.  Count Four alleges:  "That on

11  or about the 21st day of June 1999, in the Western District of

12  Texas, Defendants Terry Terrell Brown and Christopher Michael

13  Lewis did unlawfully and knowingly possess a firearm, to wit: a

14  Jennings Model J-22, .22-caliber pistol, bearing serial number

15  253510, in furtherance of a crime of violence for which a person

16  may be prosecuted in a court of the United States, to wit:

17  Carjacking and Aiding and Abetting, contrary to Title 18, United

18  States Code, Sections 2119 and 2, and in violation of Title 18,

19  United States Code, Section 924(c)(1)."

20          THE COURT:  Are those the things you did, Mr. Brown?

21          DEFENDANT BROWN:  Yes, sir.

22          THE COURT:  And are those the things you're pleading

23  guilty to?

24          DEFENDANT BROWN:  Yes, sir.

25          THE COURT:  And Count Three, Mr. Frazier.

767

29

1          MR. FRAZIER:  Yes, Your Honor.  "On or about June
2    21st, 1999, in the Western District of Texas, Defendant
3    Christopher Michael Lewis, with intent to cause death and
4    serious bodily harm, did take a motor vehicle that had been
5    transported, shipped and received in interstate commerce,
6    namely, a 1989 Buick LeSabre automobile, Iowa license plate
7    number 353 EXL, VIN Number 1G4HR54C5KH455369, from the person
8    and presence of Todd A. Bagley by force and violence and by
9    intimidation and did aid and abet other persons in the
10   commission of this offense, in violation of Title 18, United
11   States Code, Section 2119 and 2."
12          THE COURT:  And are all of those offenses the offenses
13   you're pleading guilty to, Mr. Lewis?
14          DEFENDANT LEWIS:  Yes, sir.
15          THE COURT:  And are those the things you did?
16          DEFENDANT LEWIS:  Yes, sir.
17          THE COURT:  And would the Factual Basis be nearly the
18   same, Mr. Frazier?
19          MR. FRAZIER:  Yes, Your Honor, it's identical.
20          The United States would prove that on June 21st, 1999,
21   in Killeen, Bell County, Texas, Christopher Andre Vialva, Tony
22   Sparks and Christopher Lewis, three individuals associated with
23   a local gang known as the 212 PIRU, P-i-r-u, Bloods and further
24   identified as the 'kick door boys,' planned to carjack someone.
25   Vialva, Sparks and Lewis went out during the evening hours to

768

30

1    commit this carjacking but were thwarted when they were detained

2    by the Killeen Police Department for violation of the City of

3    Killeen's juvenile curfew law.  Sparks and Lewis, juveniles,

4    were detained until Sparks' mother came and picked both Sparks

5    and -- picked up both Sparks and Lewis.  Vialva was released,

6    since he was an adult.  When a patrol car initiated the stop,

7    Vialva threw a .22-caliber semi-automatic pistol, which had been

8    provided by Tony Sparks, into the bushes.  The group formed a

9    plan whereby one member would approach a victim and ask for a

10   ride for himself and the others.  Once in the victim's car,

11   directions would be given to the driver as if the group were

12   going to a relative's house.  En route, a gun would be produced

13   and the victim would be ordered to drive to a remote location,

14   where they would be robbed.  The group intended to carjack

15   victims who appeared to have money and/or ATM cards, as the

16   victims would be required to give up their access codes so that

17   checking accounts could be emptied at an ATM machine.

18           In the early afternoon of June 21st, 1999, Vialva,

19   Sparks and Defendant Lewis requested and received the assistance

20   of Brandon Bernard and Terry Brown -- Defendant Terry Terrell

21   Brown in completing their planned carjacking (both of whom were

22   also associated with the group known as the 212 PIRU Bloods.)

23           To carry out this plan, Vialva and Bernard went and

24   retrieved a .22-caliber semi-automatic pistol, which was

25   discarded the night before.  Because Sparks and Vialva believed

769

31

1  that the .22 would not function properly, since it had been wet

2  with dew the night before, they enlisted the help of Bernard to

3  get a Glock .40 caliber handgun he had loaned to a juvenile days

4  before.  Bernard, Sparks, Vialva and Lewis then went to the

5  juvenile's residence, where they informed him of their plans.

6  The juvenile then provided the Glock .40 caliber to the group

7  for use in the carjacking.

8        Bernard and Brown then agreed to assist Lewis, Sparks

9  and Vialva by driving them to an IGA supermarket to locate a

10  carjacking target.  Bernard and Brown were then to follow

11  Vialva, Sparks and Lewis after they got into the victim's car,

12  where the plan was to rob the victims and take them to an ATM

13  machine to withdraw money.  Bernard and Brown maintained

14  surveillance while Vialva, Sparks and Lewis attempted to carjack

15  someone.  Although several potential victims were approached,

16  none offered the group a ride.

17        Bernard and Brown then drove the others to a second

18  target location at a convenience store and laundromat.  Vialva,

19  Sparks and Lewis went to the front of the convenience store to

20  search for another victim while Bernard and Brown went inside

21  the laundromat.  Within a short period of time, Sparks, Vialva

22  and Lewis made contact with Todd Bagley, who was using a pay

23  phone located outside of the convenience store.  Todd Bagley was

24  asked to give the three a ride to another location, which he did

25  after conferring with his wife, Stacy Bagley.  After agreeing to

32

1  give them a ride in the vehicle, Vialva, Sparks and Lewis

2  entered the rear passenger compartment of the Bagleys' vehicle,

3  sitting behind the Bagleys.  The Bagleys' motor vehicle was

4  registered in the state of Iowa and had been manufactured

5  outside of the state of Texas.  While Vialva, Sparks and Lewis

6  were leaving -- who were leaving with the Bagleys, Bernard and

7  Brown became occupied inside the laundromat and did not see them

8  leave.  When they exited the laundromat, since they did not see

9  Vialva and the others, according to their prior plan, they drove

10 to several ATM locations searching for Vialva and the others.

11 Bernard and Brown, not locating Vialva and the others, went back

12 to their residences to wait for further instructions from

13 Christopher Vialva.

14        While the Bagleys were following directions given by

15 Vialva, Sparks and Lewis, Vialva and Sparks produced two semi-

16 automatic handguns, where they pointed them at the Bagleys.

17 Vialva had stated that "the plan had changed."  Vialva then

18 forced the Bagleys to drive to a semirural location at the edge

19 of Killeen and stop.  Vialva and Sparks then robbed the Bagleys

20 at gunpoint of their money, wallets, purse, ATM card,

21 identification and personal jewelry.  Vialva and Sparks then

22 forced the Bagleys into the trunk of their own vehicle at

23 gunpoint.  Vialva and Sparks re-entered the Bagleys' vehicle

24 with Sparks in possession of the Bagleys' jewelry, and

25 Christopher Vialva drove away in the Bagleys' car, where he then

33

1  went to a couple of ATM locations in Killeen, attempting to use

2  the Bagleys' ATM card to withdraw cash with negative results.

3          During this time, Lewis possessed a .22-caliber pistol

4  described in Count Four of the Second Superseding Information in

5  furtherance of the carjacking crime.  Lewis received the firearm

6  from Tony Sparks and possessed it.  Lewis carried the firearm

7  during the crime.  His possession of the firearm offered further

8  protection to the group and allowed the group to further

9  intimidate, not only the Bagleys, but any others, including law

10  enforcement who might cross their path.

11          After driving around the Killeen and Copperas Cove

12  areas for several hours, Christopher Lewis called co-Defendant

13  Brown from Copperas Cove and advised him that they, meaning

14  Christopher Vialva, Tony Sparks and himself, needed help.

15  Christopher Vialva and the others then left Copperas Cove to go

16  back to Killeen and linked up with Defendant Brown.

17          Mr. Brown got into the Bagleys' vehicle with

18  Christopher Vialva and Tony Sparks and Christopher Lewis and

19  conversed with the Bagleys and Mr. Vialva drove away.  Mr. Brown

20  advised Vialva that he should just leave the Bagleys' vehicle

21  and park some place with the Bagleys in the trunk and that Brown

22  could call the police and let them know where the vehicle was

23  located.  Vialva advised that he could not do that, since the

24  car had his fingerprints all over it and he needed to burn it.

25          During this time, Brown possessed the .22-caliber

34

1  pistol described in Count Four of the Second Superseding

2  Information in furtherance of the carjacking crime.  Brown

3  received the firearm and carried it for a time during the

4  abduction and carjacking of the Bagleys.  Brown's possession of

5  a firearm offered further protection to the group and allowed

6  the group to further intimidate, not only the Bagleys, but any

7  others, including law enforcement who would cross their path.

8          The group later met again, at which time Christopher

9  Vialva insisted that they had to burn the Bagleys' vehicle and

10  kill the Bagleys to eliminate witnesses and evidence.  Mr.

11  Brown, however, suggested for the second time that Vialva simply

12  abandon the vehicle somewhere.

13          At this time, both vehicles left, drove by Brandon

14  Bernard's girlfriend's house, and then went to drop off Tony

15  Sparks, who had to be home for his 8:00 p.m. juvenile probation

16  curfew, and the other person -- and then the other person who

17  was in the vehicle with them, close to their respective

18  residences.  Vialva then waved Bernard over and Brown got out of

19  the vehicle, went to the Bagleys' vehicle, where Christopher

20  Vialva gave him $10 and told him to buy some gasoline to burn

21  the Bagleys' vehicle.  Brandon Bernard and Terry Brown entered

22  the store, and since they did not have enough money to get a gas

23  container, Bernard purchased two cans of lighter fluid.  Bernard

24  and Brown then linked back up with Vialva and Lewis.  Bernard

25  then drove off headed toward Lake Belton with Vialva following

773

35

1  the Bagleys' vehicle.  They drove onto the Fort Hood Military

2  Reservation, which is under special maritime and territorial

3  jurisdiction of the United States, at which point Vialva drove

4  the vehicle off the road into a washed out dirt road and parked

5  the victims' vehicle up a hill off the main road.  Mr. Bernard

6  parked the getaway vehicle on the main road to enable them to

7  get a quick getaway and walked with the co -- with Defendant

8  Brown up to the victims' car with the charcoal lighter fluid.

9       Mr. Vialva and Christopher Lewis got out of the

10  Bagleys' vehicle and then Brandon Bernard, Terry Brown and

11  Christopher Lewis poured gas -- poured lighter fluid on and

12  inside of the Bagleys' vehicle.  The Bagleys were making some

13  noises in the trunk of the vehicle and Vialva stated, "Shut up,

14  bitch, I'm fixing to let you out," where he then put on a mask

15  over his face, walked to the trunk, and when he opened it, he

16  took the .40 caliber pistol and shot Todd Bagley in the head and

17  Stacy Bagley in the face.  Before the trunk was shut, and at the

18  direction of Vialva, Brown poured some lighter fluid into the

19  trunk area.  At the direction of Christopher Vialva, Bernard

20  then lit a match and threw it inside the vehicle, which ignited

21  the fire in the vehicle.

22       Mr. Lewis, Christopher Vialva, Brandon Bernard and

23  Terry Brown ran to the getaway car and tried to turn around;

24  however, the getaway car became stuck in the mud.  A citizen

25  driving past the location noticed the stuck car and stopped to

36

1  assist but also noticed that all four individuals were changing

2  clothes and throwing items from the stuck car into the woods.

3  It then became apparent to passers-by that a fire was burning

4  just up the hill from where the four were stuck.  This, it was

5  later learned, was the Bagleys' vehicle.

6          The Fort Hood Fire Department, a local police officer

7  and a game warden responded to the fire.  The local police

8  officer retained the four individuals when he learned that two

9  bodies had been found in the trunk of the burning car.  Officers

10 of the Fort Hood Military Police, Criminal Investigation

11 Division, arrived at the scene and arrested the four.

12          The autopsy results on the four or on both Todd -- or

13 rather, the autopsy results on Todd and Stacy Bagley indicated

14 that both died from gunshot wounds to their head.  In addition,

15 Stacy Bagley has an additional cause of death of smoke

16 inhalation.

17          THE COURT:  Mr. Brown, do you have any disagreement

18 with the Factual Summary?

19          DEFENDANT BROWN:  No, sir.

20          THE COURT:  Mr. Lewis, do you?

21          MR. MOODY:  Your Honor, on that, Mr. Lewis just -- the

22 only thing that Mr. Lewis disagrees with is the statement where

23 it's alleged that he poured lighter fluid on or inside the

24 Bagley vehicle.  He has denied that since the inception and

25 still -- that is still his position.  Other than that, I don't

37

1 believe he has any other disagreement.

2          THE COURT:  Is that correct, Mr. Lewis?

3          DEFENDANT LEWIS:  Yes, Your Honor.

4          THE COURT:  I mentioned to each of you that a part of

5 the punishment that could be assessed would include a period of

6 supervised release.  That means if any person is actually

7 incarcerated as a result of a federal conviction, once they are

8 released they have to live under the supervision of the

9 Probation Department for a period of time.  That's very much

10 like being on probation, in that you have to live up to certain

11 terms and conditions, such as not violating the law or using

12 controlled substances.  It's also very much like probation in

13 that, if you do violate a term or condition of supervised

14 release, it can be revoked and you can be sentenced to a second

15 period of incarceration that could be as long as the time period

16 of supervised release.

17          Do you understand that, Mr. Bojo?

18          DEFENDANT BOJO:  Yes, sir.

19          THE COURT:  Do you, Mr. Johnson?

20          DEFENDANT JOHNSON:  Yes, sir.

21          THE COURT:  Mr. Deaver, do you?

22          DEFENDANT DEAVER:  Yes, sir.

23          THE COURT:  Mr. Brown, do you?

24          DEFENDANT BROWN:  Yes, sir.

25          THE COURT:  Mr. Lewis, do you?



38

1          DEFENDANT LEWIS:  Yes, sir.

2          THE COURT:  Each of you, as a part of your plea

3   agreement, has waived your right to appeal except in very

4   limited instances.  You need to understand that once your plea

5   agreement is accepted by the Court, that becomes a permanent

6   condition and you can't later change your mind and decide that

7   you want to appeal your sentence after all or file some other

8   type of application to post-conviction relief.

9          Do you understand that, Mr. Bojo?

10         DEFENDANT BOJO:  Yes, Your Honor.

11         THE COURT:  Do you, Mr. Johnson?

12         DEFENDANT JOHNSON:  Yes, sir.

13         THE COURT:  Do you, Mr. Deaver?

14         DEFENDANT DEAVER:  Yes, sir.

15         THE COURT:  Mr. Brown?

16         DEFENDANT BROWN:  Yes, sir.

17         THE COURT:  And Mr. Lewis?

18         DEFENDANT LEWIS:  Yes, sir.

19         THE COURT:  Mr. Bojo, Mr. Brown and Mr. Lewis, the

20   offenses to which you are each pleading guilty are all

21   classified as felonies under federal law.  That means that you

22   have the right to have the matters presented to a federal grand

23   jury for the return of an indictment before going to trial or

24   entering a guilty plea.  That is a right you may waive, if you

25   wish, and proceed on the information that's been filed.

39

1          Is that what you wish to do, Mr. Bojo?

2          DEFENDANT BOJO:  Yes, Your Honor.

3          THE COURT:  And you, Mr. Brown?

4          DEFENDANT BROWN:  Yes, sir.

5          THE COURT:  And you, Mr. Lewis?

6          DEFENDANT LEWIS:  Yes, sir.

7          THE COURT:  Before accepting your guilty pleas, then

8  there are a number of rights I need to advise each of you and a

9  number of questions I need to ask you.  If you don't understand

10 any of these things, feel free to consult with your attorney, at

11 any time.

12         First of all, have each of you had an ample

13 opportunity to discuss your case with your attorney and are you

14 satisfied with his representation of you?

15         Mr. Bojo?

16         DEFENDANT BOJO:  Yes, Your Honor.

17         THE COURT:  Mr. Johnson?

18         DEFENDANT JOHNSON:  Yes, sir, Your Honor.

19         THE COURT:  Mr. Deaver?

20         DEFENDANT DEAVER:  Yes, sir.

21         THE COURT:  Mr. Brown?

22         DEFENDANT BROWN:  Yes, sir.

23         THE COURT:  Mr. Lewis?

24         DEFENDANT LEWIS:  Yes, sir.

25         THE COURT:  Do each of you understand that under the

40

1   Constitution and the laws of the United States, you are entitled

2   to a jury trial on the charges you face?

3          Do you understand that, Mr. Bojo?

4          DEFENDANT BOJO:  Yes, Your Honor.

5          THE COURT:  Do you, Mr. Johnson?

6          DEFENDANT JOHNSON:  Yes, sir.

7          THE COURT:  Mr. Deaver?

8          DEFENDANT DEAVER:  Yes, sir.

9          THE COURT:  Mr. Brown?

10         DEFENDANT BROWN:  Yes, sir.

11         THE COURT:  Mr. Lewis?

12         DEFENDANT LEWIS:  Yes, sir.

13         THE COURT:  At a trial and at every stage -- excuse me

14  -- during a trial, you would be presumed to be innocent.  The

15  Government would have the obligation of proving your guilt

16  beyond a reasonable doubt using competent evidence before you

17  could be found guilty, and you would never have to prove that

18  you are innocent.  Also during a trial, the witnesses for the

19  Government would have to come into court and testify in your

20  presence.  Your attorney would have the right to cross-examine

21  those witnesses, to object to their evidence and to offer

22  evidence on your behalf.  You would have the right to testify

23  yourself, if you wished, but you couldn't be forced to, and if

24  you elected not to testify, then the fact that you did not

25  couldn't be used against you in any way as any suggestion or

41

1    inference of your guilt.

2            Do you understand those rights that you have, Mr.

3    Bojo?

4            DEFENDANT BOJO:  Yes, Your Honor.

5            THE COURT:  Do you, Mr. Johnson?

6            DEFENDANT JOHNSON:  Yes, sir.

7            THE COURT:  Mr. Deaver?

8            DEFENDANT DEAVER:  Yes, sir.

9            THE COURT:  Mr. Brown?

10           DEFENDANT BROWN:  Yes, sir.

11           THE COURT:  Mr. Lewis?

12           DEFENDANT LEWIS:  Yes, sir.

13           THE COURT:  If you continue in your guilty plea and I

14   accept your guilty plea, then you will waive your right to a

15   trial and those other rights I just discussed, there will be no

16   further trial and I will enter a judgment of guilty and sentence

17   you on the basis of your guilty plea after considering the

18   Pre-Sentence Report.

19           Do you understand that, Mr. Bojo?

20           DEFENDANT BOJO:  Yes, Your Honor.

21           THE COURT:  Do you, Mr. Johnson?

22           DEFENDANT JOHNSON:  Yes, sir.

23           THE COURT:  Mr. Deaver?

24           DEFENDANT DEAVER:  Yes, sir.

25           THE COURT:  Mr. Brown?

42

1          DEFENDANT BROWN:  Yes, sir.

2          THE COURT:  And Mr. Lewis?

3          DEFENDANT LEWIS:  Yes, sir.

4          THE COURT:  Having discussed your rights with you, do

5    you still want to plead guilty, Mr. Bojo?

6          DEFENDANT BOJO:  Yes, Your Honor.

7          THE COURT:  Do you, Mr. Johnson?

8          DEFENDANT JOHNSON:  Yes, sir.

9          THE COURT:  Do you, Mr. Deaver?

10          DEFENDANT DEAVER:  Yes, sir.

11          THE COURT:  Mr. Brown, do you?

12          DEFENDANT BROWN:  Yes, sir.

13          THE COURT:  Mr. Lewis, do you?

14          DEFENDANT LEWIS:  Yes, sir.

15          THE COURT:  Are you pleading guilty freely and

16    voluntarily, Mr. Bojo?

17          DEFENDANT BOJO:  Yes, sir.

18          THE COURT:  Mr. Johnson?

19          DEFENDANT JOHNSON:  Yes, sir.

20          THE COURT:  Mr. Deaver?

21          DEFENDANT DEAVER:  Yes, sir.

22          THE COURT:  Mr. Brown?

23          DEFENDANT BROWN:  Yes, sir.

24          THE COURT:  Mr. Lewis?

25          DEFENDANT LEWIS:  Yes, sir.

43

1         THE COURT:  Are you pleading guilty because you are

2   guilty and for no other reason, Mr. Bojo?

3         DEFENDANT BOJO:  Yes, Your Honor.

4         THE COURT:  Mr. Johnson?

5         DEFENDANT JOHNSON:  Yes, sir.

6         THE COURT:  Mr. Deaver?

7         DEFENDANT DEAVER:  Yes, sir.

8         THE COURT:  Mr. Brown?

9         DEFENDANT BROWN:  Yes, sir.

10        THE COURT:  Mr. Lewis?

11        DEFENDANT LEWIS:  Yes, sir.

12        THE COURT:  Has anyone threatened you, coerced you or

13  forced you in any way into pleading guilty, Mr. Bojo?

14        DEFENDANT BOJO:  No, sir.

15        THE COURT:  Mr. Johnson?

16        DEFENDANT JOHNSON:  No, sir.

17        THE COURT:  Mr. Deaver?

18        DEFENDANT DEAVER:  No, sir.

19        THE COURT:  Mr. Brown?

20        DEFENDANT BROWN:  No, sir.

21        THE COURT:  Mr. Lewis?

22        DEFENDANT LEWIS:  No, sir.

23        THE COURT:  You said "no, sir," or "yes, sir"?

24        DEFENDANT BROWN:  No, sir.

25        THE COURT:  No one has threatened you or coerced you

44

1   or forced you into pleading guilty?

2           DEFENDANT BROWN:  No, sir.

3           THE COURT:  All right.  Punishment in these cases will

4   be determined by what we refer to as the "Federal Sentencing

5   Guidelines."  That means that once your guilty plea is accepted,

6   your case is referred to a probation officer to prepare a

7   Pre-Sentence Report.  The most important part of that report is

8   the officer's recommendation as to the appropriate Guideline

9   range for punishment.  That's based on a formula that takes into

10  account the offense or offenses to which you're pleading guilty

11  and also any criminal history that you might have.  The results

12  of that formula are then expressed in a range of months.  As an

13  example of a range of months that I'm not suggesting would apply

14  in any of these cases, but merely as an example, a range in a

15  particular case might be 70 to 87 months.  That would mean that

16  I would have the right to sentence that particular defendant to

17  70 months in prison or 87 months in prison or any number of

18  months between 70 and 87, but only in exceptional circumstances

19  would I have the right to depart downward and sentence that

20  person to less than 70 months or to depart upward and sentence

21  that person to more than 87 months.

22          Do you understand how that method of determining

23  punishment essentially works, Mr. Bojo?

24          DEFENDANT BOJO:  Yes, sir.

25          THE COURT:  Do you, Mr. Johnson?

45

```
 1              DEFENDANT JOHNSON:  Yes, sir.

 2              THE COURT:  Mr. Deaver, do you?

 3              DEFENDANT DEAVER:  Yes, sir.

 4              THE COURT:  Mr. Brown, do you?

 5              DEFENDANT BROWN:  Yes, sir.

 6              THE COURT:  Mr. Lewis, do you?

 7              DEFENDANT LEWIS:  Yes, sir.

 8              THE COURT:  Have each of you discussed with your

 9    attorney how the Sentencing Guidelines might affect your case?

10              Have you done that, Mr. Bojo?

11              DEFENDANT BOJO:  Yes, Your Honor.

12              THE COURT:  Have you, Mr. Johnson?

13              DEFENDANT JOHNSON:  Yes, sir.

14              THE COURT:  Have you, Mr. Deaver?

15              DEFENDANT DEAVER:  Yes, sir.

16              THE COURT:  Mr. Brown, have you?

17              DEFENDANT BROWN:  Yes, sir.

18              THE COURT:  Mr. Lewis, have you?

19              DEFENDANT LEWIS:  Yes, sir.

20              THE COURT:  Do any of you have any questions you would

21    like to ask me about the Sentencing Guidelines?

22              Mr. Bojo?

23              DEFENDANT BOJO:  No, sir.

24              THE COURT:  Mr. Johnson?

25              DEFENDANT JOHNSON:  No, sir.
```

46

1          THE COURT:  Mr. Deaver?

2          DEFENDANT DEAVER:  No, sir.

3          THE COURT:  Mr. Brown?

4          DEFENDANT BROWN:  No, sir.

5          THE COURT:  Mr. Lewis?

6          DEFENDANT LEWIS:  No, sir.

7          THE COURT:  Has anyone made any promise to any of you,

8  other than the promises the Government has made in the plea

9  agreement, that has caused you to plead guilty?

10          Mr. Bojo?

11          DEFENDANT BOJO:  No, sir.

12          THE COURT:  Mr. Johnson?

13          DEFENDANT JOHNSON:  No, sir.

14          THE COURT:  Mr. Deaver?

15          DEFENDANT DEAVER:  No, sir.

16          THE COURT:  Mr. Brown?

17          DEFENDANT BROWN:  No, sir.

18          THE COURT:  Mr. Lewis?

19          DEFENDANT LEWIS:  No, sir.

20          THE COURT:  Other than discussions you've had with

21  your attorney concerning the Sentencing Guidelines, has anyone

22  made any prediction, prophecy or promise to you as to what your

23  sentence will be, Mr. Bojo?

24          DEFENDANT BOJO:  No, Your Honor.

25          THE COURT:  Mr. Johnson?

47

1      DEFENDANT JOHNSON:  No, sir.

2      THE COURT:  Mr. Deaver?

3      DEFENDANT DEAVER:  No, sir.

4      THE COURT:  Mr. Brown?

5      DEFENDANT BROWN:  No, sir.

6      THE COURT:  Mr. Lewis?

7      DEFENDANT LEWIS:  No, sir.

8      THE COURT:  Then the Court finds as to each of you

9  that your plea is freely and voluntarily made, that each of you

10  fully understands the charges and penalties, that each of you

11  understands your constitutional and statutory rights and desires

12  to waive them, that each of you is competent to stand trial, and

13  that there is a factual basis for each plea.  Based on these

14  findings, I accept your guilty pleas and find you guilty.

15      These cases will now be referred to the Probation

16  Office to prepare Pre-Sentence Reports.  Copies of those reports

17  will be available to each of you and to your attorney and to the

18  Government to review at least 35 days before sentencing.  If you

19  have objections to the report, they should be filed with the

20  probation officer not more than ten days after you receive your

21  copy.

22      Does the Government have any objection to Mr. Bojo

23  remaining free on his current conditions of release pending

24  sentencing?

25      MR. FRAZIER:  No, Your Honor.

48

1        THE COURT:  That will be so ordered.

2        Anything further in any of these cases, Counsel?

3        MR. DONAHUE:  No, sir.

4        MR. FRAZIER:  I do have one matter, Your Honor.

5        THE COURT:  Yes, sir.

6        MR. FRAZIER:  The Factual Basis on Mr. Brown and Mr.

7   Lewis, there's one part where inadvertently in the printed

8   portion, it mentions the name of the juvenile and I'll ask, at

9   this point, if we could amend our Factual Basis by deleting that

10  name.  I did not read that name, but --

11       THE COURT:  I assumed that's what the problem was.

12       MR. FRAZIER:  Yes, sir.  We'd just move to delete that

13  in places where the name of that juvenile appears, and I believe

14  it's only on page 3 of the Factual Basis.

15       THE COURT:  I assume no objections, Counsel?

16       MR. SWANTON:  No objection, Your Honor.

17       THE COURT:  You may certainly do that.

18       MR. FRAZIER:  That's all we have.

19       THE COURT:  Thank you, Counsel, you may be excused.

20       MR. HUNT:  Thank you, Your Honor.

21       (Adjourned at 2:25 p.m.)

49

THE STATE OF TEXAS      )

THE COUNTY OF SMITH   )

    I, Morris W. Bowen, former Certified Shorthand Reporter in in and for the State of Texas and former Official Court Reporter for the United States District Court, Western District of Texas, Waco Division, do hereby certify that the foregoing pages 3 thru 48 constitute an accurate and complete transcript of my shorthand notes in the above entitled and numbered cause on the dates reflected therein, and that such transcript was prepared under my direction and supervision.

    I Certify that the transcript fees charged and page format used comply with the requirements of the United States Courts and the Judicial Conference of the United States.

    TO CERTIFY WHICH, witness my signature set hereto in the City of Arp, County of Smith, State of Texas on this the 5th day of April       A.D., 2004.

Morris W. Bowen
14980 East Lake Circle
Arp, Texas  75750

788

# EXHIBIT 6

789

1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

WACO DIVISION

UNITED STATES OF AMERICA     *     CRIMINAL ACTION NO.
                           *     W-99-CR-070(3)

VS.                          *
                           *     April 17, 2000
TONY SPARKS                *     Waco, Texas
* * * * * * * * * * * * * * * *

BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING

REARRAIGNMENT PROCEEDINGS

APPEARANCES:

For the Government:            Mr. Scott L. Frost
                           Assistant U.S. Attorney
                           P.O. Box 828
                           Waco, Texas  76703

For the Defendant:             Mr. Rodney S. Goble
                           Attorney at Law
                           P. O. Box 266
                           Waco, Texas  76701

Court Reporter:               Morris W. Bowen, CSR
                           Official Court Reporter
                           United States District Court
                           P.O. Box 1908
                           Waco, Texas  76703

Proceedings recorded by mechanical stenography, transcript

produced by notereading.

2

1            APRIL 17, 2000 - REARRAIGNMENT PROCEEDINGS

2            COURTROOM DEPUTY:  Rearraignment Proceedings in

3    Criminal Action No. W-99-CR-070(3), styled U.S.A. v. Tony

4    Sparks.

5            MR. FROST:  Scott Frost for the United States, Your

6    Honor.

7            MR. GOBLE:  "Rod" Goble for Tony Sparks, Your Honor.

8            THE COURT:  Good afternoon, Counsel.

9            This is Cause No. W-99-CR-070, Defendant Three,

10   styled U.S.A. v. Tony Sparks.  Is that your proper name, sir?

11           THE DEFENDANT:  Yes, sir.

12           THE COURT:  How old are you, Mr. Sparks?

13           THE DEFENDANT:  Sixteen.

14           THE COURT:  What is your educational background?  How

15   far did you go in school?

16           THE DEFENDANT:  To the tenth.

17           THE COURT:  All right.  Do you understand, Mr.

18   Sparks, that if you enter a guilty plea I'm going to ask you

19   some questions regarding your guilty plea, and that if you

20   answer those questions under oath, in open court and in the

21   presence of your attorney, your answers could be used against

22   you in a prosecution for perjury or false statement if your

23   answers are not true?  Do you understand that?

24           THE DEFENDANT:  Yes, sir.

25           THE COURT:  All right.

791

3

1          (Defendant sworn.)

2          THE COURT:  Mr. Goble, do you have any concerns at

3    all regarding your client's competence this afternoon?

4          MR. GOBLE:  No, Your Honor, I do not.

5          THE COURT:  Do you believe he has both a factual and

6    a rational understanding of these proceedings?

7          MR. GOBLE:  Yes, sir, I do.

8          THE COURT:  Mr. Sparks, do you suffer from any mental

9    or physical impairment which would have any effect on your

10   ability to fully understand the charge against you or the basis

11   and consequences of a guilty plea?

12         THE DEFENDANT:  No, sir.

13         THE COURT:  Have you ever had a physical injury, such

14   as a brain or a head injury, that might effect your memory or

15   your judgment in anyway?

16         THE DEFENDANT:  No, sir.

17         THE COURT:  Are you this afternoon under the

18   influence of any medicine or drugs that might have such an

19   effect?

20         THE DEFENDANT:  No, sir.

21         THE COURT:  Have you received a copy of the Second

22   Superseding Indictment that names you?

23         MR. GOBLE:  I received a copy, Your Honor, and we

24   have discussed the copy of the Indictment.  I quite frankly am

25   not sure if a copy was delivered to Mr. Sparks, but we have

792

4

1  reviewed it together.

2          THE COURT:  And, Mr. Sparks, you have discussed it

3  with Mr. Goble to the extent that you feel that there's no

4  question but that you understand the charge against you?

5          THE DEFENDANT:  Yes, sir.

6          THE COURT:  Have you discussed with him not only the

7  charge against you but also any defenses that you might be able

8  to raise if you elected to go to trial?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  Do you have any questions you'd like to

11  ask me about the charge against you?

12         THE DEFENDANT:  No, sir.

13         THE COURT:  Has there been a plea agreement in this

14  case?

15         MR. FROST:  No, Your Honor, there has not.

16         THE COURT:  Then, Mr. Sparks, do you understand that

17  you have the right to plead not guilty to this charge, or to

18  continue in that plea if you have already entered such a plea?

19         THE DEFENDANT:  Yes, sir.

20         THE COURT:  The charge, Mr. Sparks, is Armed

21  Carjacking Resulting in the Death of Another, and Aiding and

22  Abetting in that Attempt, in violation of Title 18, United

23  States Code, Sections 2119 and Section 2.  The maximum possible

24  punishment that can be assessed a person convicted of that

25  offense is life in prison, followed by five years of supervised

193

5

1  release, a fine of up to a quarter of a million dollars, and a

2  $100 mandatory assessment under the Victims' of Crime Act.

3          Do you understand that possible maximum punishment?

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  Then understanding that, to the charge of

6  Armed Carjacking, Resulting in the Death of Another, and Aiding

7  and Abetting in that offense, as alleged in the Second

8  Superseding Indictment, how do you wish to plead, guilty or not

9  guilty?

10          THE DEFENDANT:  Guilty.

11          THE COURT:  Would you read the charge, please, Mr.

12  Frost.

13          MR. FROST:  Your Honor, the Grand Jury charges:

14          "That on or about June 21st of 1999, in the Western

15  District of Texas, the defendants, Christopher Andre Vialva,

16  Brandon Bernard and Tony Sparks aided and abetted by each other

17  and others known to the Grand Jury, with intent to cause death

18  and serious bodily injury, did attempt to take and did take a

19  motor vehicle that had been transported, shipped and received

20  in interstate commerce, namely, a 1989 Buick LaSabre

21  automobile, Iowa license plate number 353-XEL, vehicle

22  identification number 1G4HR54C5KH455369 from the person and

23  presence of Todd A. Bagley by force and violence and by

24  intimidation, and did shoot said Todd A. Bagley with a firearm,

25  which resulted in the death of said Todd A. Bagley, in

794

6

1    violation of Title 18, United States Code, Section 2119 and 2."

2            THE COURT:  Is that the offense to which you're

3    pleading guilt, Mr. Sparks?

4            MR. GOBLE:  Yes, sir.  There is some confusion, I

5    think, on Mr. Sparks' part that we have discussed at length.

6    Mr. Sparks believes that he was involved in the carjacking and,

7    obviously, a death did result in the event.  He did not shoot

8    Mr. Bagley, and of course, the Government's evidence shows that

9    he was dropped off at his house a couple or three hours prior

10   to the actual shooting.  And I know that the language in the

11   Indictment has presented a problem with Mr. Sparks because of

12   that.  So, Tony asked me to explain it that way.

13           Have you and I talked about the Aiding and Abetting

14   and what that means?

15           THE DEFENDANT:  Yes, sir.

16           MR. GOBLE:  And essentially you understand what you

17   are being charged with?

18           THE DEFENDANT:  Yes, sir.

19           MR. GOBLE:  And at the time of the actual carjacking

20   you had a weapon with you, is that correct?

21           THE DEFENDANT:  Yes, sir.

22           MR. GOBLE:  And "Chris" Vialva was the one that

23   essentially had the plan and made the decision at a point later

24   on that the individuals would be killed, is that correct?

25           THE DEFENDANT:  Correct, sir.

795

7

1        MR. GOBLE:  Okay.  So, you have had an explanation

2   regarding what the Indictment is and what you're charged with?

3        THE DEFENDANT:  Yes, sir.

4        MR. GOBLE:  Do you understand those charges?

5        THE DEFENDANT:  Yes, sir.

6        MR. GOBLE:  And do you want to plead guilty to that

7   charge, or would you rather go to a jury trial?

8        THE DEFENDANT:  Plead guilty.

9        THE COURT:  Mr. Sparks, after hearing that

10   explanation from your attorney, based on what he just said and

11   the charge that the United States Attorney has read, is that

12   the offense you're pleading guilty to?

13        THE DEFENDANT:  Yes, sir.

14        THE COURT:  And is that what you did, those things he

15   charge you with?

16        THE DEFENDANT:  Yes, sir.

17        THE COURT:  All right.  Factual Basis?

18        MR. FROST:  Your Honor, had this case proceeded to

19   trial, the United States Attorney for the Western District of

20   Texas was prepared to prove and would prove beyond a reasonable

21   doubt that on June 20th of 1999, in Killeen, Bell County,

22   Texas, Christopher Andre Vialva, Tony Sparks and Christopher

23   Lewis, three individuals associated with a local gang known as

24   the "2-1-2 Piru Bloods," and further identified as "Kick Door

25   Boys," planned to carjack someone.  Vialva, Sparks and Lewis

794

8

1  went out during the evening hours to commit this carjacking but

2  were thwarted when they were detained by Killeen Police

3  Department for violation of the City of Killeen's juvenile

4  curfew law.

5          THE COURT:  I'm sorry.  They were what?

6          MR. FROST:  "Thwarted."

7          THE COURT:  "Thwarted."

8          MR. FROST:  Thank you, Your Honor.

9          THE COURT:  All right.

10          MR. FROST:  It's been a long day.

11          MR. GOBLE:  I had difficulty with that also.

12          MR. FROST:  Sparks and Lewis, both juveniles, were

13  detained until Sparks' mother came and picked up both Sparks

14  and Lewis.  Vialva was released, since he was an adult.  When

15  the patrol car initiated the stop, Lewis threw a .22-caliber

16  semi-automatic pistol provided by Sparks into the bushes.

17          The group, Vialva, Sparks, Lewis, Brown and Bernard

18  formed a plan whereby one member would approach a victim and

19  ask for a ride for himself and the others.  Once in the

20  victim's car, directions would be given to the driver as if the

21  group were going to a relative's house.  En route, a gun would

22  be produced and the victim would be ordered to drive to a

23  remote location, where they would be robbed.  The group

24  intended to carjack victims who appeared to have money or ATM

25  cards, as the victims would be required to give their access

747

9

1  code so their checking accounts could be emptied at an ATM

2  machine.

3        In the early afternoon of June 21st, 1999, Vialva,

4  Sparks and Lewis requested and received the assistance of

5  Brandon Bernard and Terrell Brown in completing this planned

6  carjacking (both of whom were also associated with the 2-1-2

7  Bloods.)

8        To carry out this plan, Vialva, Lewis and Bernard

9  went and retrieved the .22-caliber semi-automatic pistol

10  discarded the night before.  The group believed the .22 would

11  not function properly, since it had been wet with dew from the

12  night before.  They enlisted the help of Bernard to get a Glock

13  .40 caliber handgun he had loaned to Gregory Hardin Lynch a

14  juvenile, days before.  Bernard, Sparks, Vialva and Lewis then

15  went to the Gregory Hardin Lynch's residence, where they

16  informed him of their plan.  Gregory Hardin Lynch then provided

17  the Glock .40 caliber to the group for use in the carjacking.

18        Bernard and Brown then agreed to assist Lewis, Sparks

19  and Vialva by driving them to an IGA supermarket to locate a

20  carjacking target.  Bernard and Brown were then to follow

21  Vialva, Sparks and Lewis after they got the victims' car, where

22  the plan was to rob the victims and take them to an ATM machine

23  to withdraw their money.  Bernard and Brown maintained

24  surveillance while Vialva, Sparks and Lewis attempted to

25  carjack someone.  Although several potential victims were

798

10

1    approached, none offered the group a ride.

2            Bernard and Brown then drove the others to a second

3    target location at a convenience store and laundromat.  Vialva,

4    Sparks and Lewis went to the front of the convenience store to

5    search for another victim while Bernard and Brown went inside

6    the laundromat.  Within a short period of time, Sparks, Vialva

7    and Lewis made contact with Todd Bagley, who was using a pay

8    phone located outside of the convenience store.  Sparks was the

9    first person to approach Todd and ask him for a ride.  Todd

10   Bagley was asked to give the three a ride to another location.

11   Todd Bagley conferred with his wife, Stacy Bagley, who was

12   inside their vehicle parked at the convenience story.  The

13   Bagleys agreed to give Vialva, Sparks and Lewis a ride to their

14   vehicle, at which time -- in their vehicle, at which time,

15   Vialva, Sparks and Lewis entered the rear passenger compartment

16   of the Bagleys' vehicle, sitting behind the Bagleys.

17            The Bagleys' motor vehicle was registered in the

18   state of Iowa and was manufactured outside of the state of

19   Texas.

20            While Vialva, Sparks and Lewis were leaving with the

21   Bagleys, Bernard and Brown had become occupied inside the

22   laundromat and did not see anyone leave.  When Bernard and

23   Brown exited the laundromat, they did not see Vialva and the

24   others, according to their prior plan.  They drove to several

25   ATM locations searching for Vialva and the others.  Bernard and

799

11

1  Brown, not locating Vialva and the others, went back to their

2  residences to wait for further instructions from Vialva.

3          According to the previous group plan, Vialva and

4  Sparks produced two semi-automatic handguns.  Vialva pointed

5  one of the handguns at Todd Bagley and stated that the plan

6  "had changed."

7          Vialva then forced the Bagleys to drive to a

8  semirural location at the edge of Killeen and stop.  While

9  Vialva held a gun on Todd and Stacy Bagley, Vialva and Sparks

10  robbed their Bagleys of their money, wallets, purse, ATM card,

11  identification and personal jewelry.  The Bagleys were then

12  forced into the trunk of their own vehicle at gunpoint.  Vialva

13  and Sparks re-entered the Bagleys' vehicle with Sparks in

14  possession of the Bagleys' jewelry.  Vialva drove away in the

15  Bagleys' car, where he then went to a couple of ATM locations

16  in Killeen, attempting to use the Bagleys' ATM card to withdraw

17  cash, with negative results.

18          After driving around Killeen and Copperas Cove areas

19  for several hours, Lewis called Brown from the location and

20  advised him that they, Vialva, Sparks and himself, needed help.

21   Vialva and the others then left Copperas Cove and drove back

22  to Killeen and linked up with Defendant Brown.

23          Brown got into the Bagleys' vehicle with Vialva and

24  the others, conversed with the Bagleys, and Vialva drove away.

25   Brown advised Vialva that he should just leave the Bagleys'

800

12

1   vehicle in a park some place with the Bagleys in the trunk and

2   that Brown could call the police to let them know where the

3   vehicle was located.  Vialva advised that he could not do that,

4   since the car had his fingerprints all over it and he needed to

5   burn it.

6          The group later met, at which time, Vialva insisted

7   that they had to burn the Bagleys' vehicle and kill the Bagleys

8   to eliminate witnesses and evidence. Brown, however, suggested

9   for the second time, that Vialva simply abandon the vehicle

10  somewhere.

11         Both vehicles drove by Bernard's girlfriend's house,

12  and then went to drop off Sparks, who had come home for his

13  8:00 p.m. juvenile curfew, and then the other persons close to

14  their respective residences.

15         Vialva then waved Bernard over and Brown got out of

16  the vehicle, went to the Bagleys' vehicle, where Vialva gave

17  him $10 and told him to buy some gasoline to burn the Bagleys'

18  vehicle.  Bernard and Brown entered the store, and since they

19  did not have enough money to get a gas container, Bernard

20  purchased two cans of lighter fluid.  Bernard and Brown then

21  linked back up with Vialva and Lewis.

22         Bernard then drove off heading toward Fort Hood and

23  Lake Belton with Vialva following the Bagley vehicle.  They

24  then drove onto the Fort Hood Military Reservation, which is

25  under special maritime and territorial jurisdiction of the

13

1    United States, at which point Vialva drove the vehicle off the

2    road onto the washed out dirt road and parked the Bagley

3    vehicle up on a hill off the main road.  Bernard parked his

4    vehicle on the main road to enable a quick getaway and walked

5    with Brown to the Bagley's car with the charcoal lighter fluid.

6

7            Vialva and Lewis got out of the Bagley vehicle and

8    then Bernard, Brown and Lewis poured the lighter fluid on and

9    inside of the Bagley vehicle.  The Bagleys were making some

10   kind of noises in the trunk and Vialva said, "Shut up, bitch,

11   I'm fixing to let you out here," where he then put a mask over

12   his face, walked to the trunk, opened it and took out a .40

13   caliber pistol and shot Todd Bagley in the head and Stacy

14   Bagley in the face.  Before the trunk was shut, and at the

15   direction of Vialva, Brown poured more lighter fluid into the

16   trunk area.  At the direction of Vialva, Bernard then lit a

17   match and threw it inside of the vehicle, which ignited the

18   fire in the vehicle.

19           Lewis, Vialva, Bernard and Brown ran to the getaway

20   car and tried to turn around; however, the getaway car became

21   stuck in the mud.  A citizen who was driving past the location

22   noticed the stuck car and stopped to assist.  The passer-by

23   stated that all four individuals were changing clothes and

24   throwing items from the stuck car into the woods.  It then

25   became apparent to the passer-by that a fire was burning just

14

1    up the hill from where the four were stuck.  This, it was later

2    learned, was the Bagleys' vehicle.

3         Your Honor, that's a summary of the Factual Basis,

4    which is on file with the Court.

5         THE COURT:  Mr. Sparks, do you have any disagreement

6    with that Factual Summary?

7         THE DEFENDANT:  No, sir.

8         THE COURT:  Before accepting your guilty plea, then,

9    I need to explain to you some of the rights you have.  If you

10   don't understand any of these things, if you need to consult

11   with Mr. Goble, at any time, feel free to do so.

12        First of all, I mentioned to you that a part of the

13   punishment that could be imposed in this case would include a

14   period of supervised release.  That means that once a person is

15   incarcerated as a result of a federal conviction, when they are

16   released they have to live under the supervision of a probation

17   officer for a period of time.  That's very much like being on

18   probation, in that you have to live up to certain terms and

19   conditions, such as not violating the law or using controlled

20   substances.  It's also like probation, in that if you do

21   violate a term or condition of it, then you can be revoked and

22   you can be sentenced to a second period of incarceration that

23   could be as long as your entire period of supervised release.

24        Do you understand that also?

25        THE DEFENDANT:  Yes, sir.

803

15

1        THE COURT:  Have you had a ample opportunity to

2    discuss your case with Mr. Goble and are you satisfied with his

3    representation of you?

4        THE DEFENDANT:  Yes, I am, sir.

5        THE COURT:  Do you understand that under the

6    Constitution and the laws of the United States you're entitled

7    to a jury trial, if you wish?

8        THE DEFENDANT:  Yes, sir.

9        THE COURT:  At a jury trial and at every stage of the

10   proceedings against you you have the right to be represented by

11   an attorney.  If you can't afford to pay an attorney to

12   represent you through a trial, then one would be appointed to

13   represent you at no cost to you.  Do you understand that also?

14       THE DEFENDANT:  Yes, sir.

15       THE COURT:  During a trial you would be presumed to

16   be innocent.  The Government would have the obligation of

17   proving your guilt beyond a reasonable doubt using competent

18   evidence and you would never have to prove that you were not

19   guilty.  Also during a trial the witness for the Government

20   would have to come into court and testify in your presence,

21   your attorney would have a right to cross-examine those

22   witnesses, to object to their evidence, and then offer evidence

23   on your behalf.  You would have the right to testify yourself,

24   if you wished, but you couldn't be forced to, and if you elect

25   not to testify, the fact that you did not couldn't be used

16

1   against you in anyway.

2           Do you understand those rights that you have if you

3   elected to go to trial?

4           THE DEFENDANT:  Yes, sir.

5           THE COURT:  If you continue in your guilty plea and I

6   accept your guilty plea, you will waive your right to a trial

7   and all of those other rights I just discussed, there will be

8   no other trial, and I will enter a Judgment of Guilty and

9   sentence you on the basis of your guilty plea, after

10  considering a Pre-Sentence Report.

11          Do you understand that also?

12          THE DEFENDANT:  Yes, sir.

13          THE COURT:  Having discussed your rights with you do

14  you still want to plead guilty?

15          THE DEFENDANT:  Yes, sir.

16          THE COURT:  Are you pleading guilty freely and

17  voluntarily?

18          THE DEFENDANT:  Yes, sir.

19          THE COURT:  Are you pleading guilty because you are

20  guilty and for no other reason?

21          THE DEFENDANT:  Yes, sir.

22          THE COURT:  Has anyone threatened you, coerced you,

23  or forced you in anyway into pleading guilty?

24          THE DEFENDANT:  No, sir.

25          THE COURT:  Punishment in this case, Mr. Sparks, will

17

1    be determined by what we refer to as the "Federal Sentencing

2    Guidelines."  That means that once your guilty plea is accepted

3    you case is referred to a probation officer, who will prepare a

4    Pre-Sentence Report.  The most important part of that report is

5    the officer's recommendation as to the appropriate Guideline

6    range for sentencing.  That's based on a formula that takes

7    into account the offense you're pleading guilty to and the

8    relevant conduct surrounding that offense.  It also takes into

9    account any criminal history that you might have.  The result

10   of that formula is then expressed in a range of months.  As an

11   example of a range of months -- that I'm not suggesting would

12   apply to this case, but only as an example --a range in a

13   particular case might be 121 to 151 months.  That would mean

14   that I would have the right to sentence that person 121 months

15   in prison, or 151 months in prison, or any number of months

16   between 121 and 151, but only in exceptional circumstances

17   would I have the right to depart downward and sentence that

18   person to less that 121 months, or to depart upward and

19   sentence that person to more than 151 months.

20          Do you understand how that method of determining

21   punishment essentially works?

22          THE DEFENDANT:  Yes, sir.

23          THE DEFENDANT:  Have you discussed with Mr. Goble how

24   the Sentencing Guidelines might apply to your case?

25          THE COURT:  Yes, sir.



18

1          THE DEFENDANT:  Do you have any questions you would

2    like to ask me about that?

3          THE DEFENDANT:  No, sir.

4          THE COURT:  And other than those discussion you've

5    had with Mr. Goble about the Sentencing Guidelines, has anyone

6    made any prediction, prophecy or promise to you as to what your

7    sentence will be?

8          THE DEFENDANT:  No, sir.

9          THE COURT:  Would you like to withdraw your guilty

10   plea, at this point, or would you like to continue in your

11   guilty plea?

12         MR. GOBLE:  Go ahead say "guilty," or do you want to

13   say, "not guilty."

14         THE DEFENDANT:  Guilty.

15         THE COURT:  You want to continue in your guilty plea?

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  Then the Court finds that your pleas is

18   freely and voluntarily made; that you fully understand the

19   charge and penalties; that you understand you Constitutional

20   and Statutory rights and desire to waive them; that you're

21   competent to stand trial; and that there is a factual basis for

22   your plea.

23         Based on these findings, I accept your guilty plea

24   and find you guilty.

25         This case will now be referred to a probation officer

802

19

1    to prepare a Pre-Sentence Report.  A copy of that report will

2    be available to you, Mr. Sparks, and your attorney, Mr. Goble,

3    and to the Government to review at least 35 days before

4    sentencing.  If there are objections to the report they should

5    be filed with the probation officer not more than 10 days after

6    you receive your copy.

7              Is there anything further in this case this

8    afternoon, Counsel?

9              MR. GOBLE:  Not from the defense, Your Honor.

10             MR. FROST:  Not from the Government, Your Honor.

11             THE COURT:  Then, Counsel, you may be excused, and

12   the Court will stand in recess.

13             MR. GOBLE:  Thank you.

14             MR. FROST:  Thank you, Your Honor.

15         (Hearing closed.)

808

20

THE STATE OF TEXAS    )

THE COUNTY OF SMITH    )

    I, Morris W. Bowen, former Certified Shorthand Reporter in in and for the State of Texas and former Official Court Reporter for the United States District Court, Western District of Texas, Waco Division, do hereby certify that the foregoing pages 2 thru 19 constitute an accurate and complete transcript of my shorthand notes in the above entitled and numbered cause on the dates reflected therein, and that such transcript was prepared under my direction and supervision.

    I Certify that the transcript fees charged and page format used comply with the requirements of the United States Courts and the Judicial Conference of the United States.

    TO CERTIFY WHICH, witness my signature set hereto in the City of Arp, County of Smith, State of Texas on this the 5th day of April _____ A.D., 2004.

Morris W. Bowen
14980 East Lake Circle
Arp, Texas  75750

LASER BOND FORM A  ® PENGAD • 1-800-631-6989 • www.pengad.com

809

# EXHIBIT 7

1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF TEXAS

3                    WACO DIVISION

4    UNITED STATES OF AMERICA   *
                                *
5    VS.                        *
                                * CRIMINAL ACTION NO. W-99-CR-61
6                                *
7    TERRY TERRELL BROWN (1)    *   March 22, 2001

8    BEFORE THE HONORABLE WALTER S. SMITH, JR., JUDGE PRESIDING
                    SENTENCING PROCEEDINGS

9    APPEARANCES:

10   For the Government:     Mark Frazier, Esq.
                            Assistant United States Attorney
11                           PO Box 828
                            Waco, Texas  76701
12
     For the Defendant:     Robert T. Swanton, Jr., Esq.
13                           Norwest Plaza
                            1105 Wooded Acres, Suite 630
14                           Waco, Texas  76710

15   Court Reporter:       Kristie M. Davis
                            United States District Court
16                           PO Box 20994
                            Waco, Texas  76702-0994
17

18      Proceedings recorded by mechanical stenography, transcript

19   produced by computer-aided transcription.

20

21

22

23

24

25

811

2

1  (March 22, 2001, 10:01, defendant present.)

2     MS. WILLIS:  Sentencing proceedings in Criminal Action

3  No. W-99-CR-61 styled United States of America vs. Terry

4  Terrell Brown, Defendant No. 1.

5     MR. FRAZIER:  Mark Frazier for the United States, Your

6  Honor.

7     MR. SWANTON:  Rob Swanton for Mr. Brown, Your Honor.

8     THE COURT:  Good morning, counsel.

9     MR. SWANTON:  Good morning, Judge.

10     MR. FRAZIER:  Good morning.

11     THE COURT:  Mr. Brown, you appeared before the Court on

12  December the 16th of 1999 and entered a guilty plea.  You're

13  here this morning for sentencing.  Have you had an opportunity

14  to review the presentence report?

15     THE DEFENDANT:  Excuse me?

16     THE COURT:  Have you had on opportunity to review the

17  presentence report?

18     THE DEFENDANT:  Yes, sir.

19     THE COURT:  Have you read it and discussed it with

20  Mr. Swanton?

21     THE DEFENDANT:  Yes, sir.

22     THE COURT:  Do you have any comments or corrections to the

23  report that you'd like to call to my attention?

24     THE DEFENDANT:  No, sir.

25     THE COURT:  Mr. Swanton, are there matters that need to be

812

3

1   ruled on this morning?

2      MR. SWANTON:  Judge, I don't believe so.  I think they've

3   all been taken care of.  There was a typographical error that

4   has been taken care of, and that's really the only point that I

5   raised.

6      THE COURT:  All right.  Then the Court will adopt the

7   recommendation of the probation office that suggests the

8   offense level category in this case is 34, the criminal history

9   category is one.  The range as to Counts 1 and 2 is thus 151 to

10  188 months.  The range as to Count 4 is a statutory maximum of

11  60 months.

12      Does the government have any motions or anything in this

13  case?

14      MR. FRAZIER:  No.  No motions in this case, Your Honor.

15      THE COURT:  Then, Mr. Brown, do you have anything you

16  would like to say in your own behalf or in mitigation of

17  punishment?  If you care to, this would be your opportunity to

18  speak.

19      THE DEFENDANT:  Your Honor, I would like to first start

20  off by saying that I'm sorry for the pain that I've caused to

21  all the families and friends of Todd and Stacy Bagley and

22  everyone else involved in this.  I know my actions are -- I'm

23  ready to accept the responsibility for those actions.  I would

24  like to tell the family and friends of Todd and Stacy Bagley

25  that I'm sorry for the loss they suffered and ask that I can be

813

4

1   forgiven by them one day.  I would like the family to know that

2   I did conversate several times with Stacy Bagley and made

3   several attempts to save her life.  Throughout the time I spoke

4   with Stacy Bagley, she was calm by speaking to me about the

5   Lord and herself as well.  The conversation I had with her

6   sticks with me to this day.  Although I could never -- although

7   I could never feel the pain of her parents, I also suffer not

8   because the time I have to do but because I told -- I told her

9   she wouldn't die and I feel I let her down.  I know I let her

10  down, but because of the impact the situation along with her

11  conversation had on me, I have also found the Lord Jesus.  For

12  the first five months I was incarcerated I spent on segregation

13  and -- but that was a blessing because it gave me time to stop

14  and think about life and building a relationship with God.

15  While in seg I wrote a letter to both families involved.  I'm

16  not sure if they received them, but inside the letters I

17  described all the things I've been going through.  I let them

18  know that by Todd and Stacy Bagley's strong will and trust in

19  God I was converted.  I've been living a better life and have

20  repented for my sins.  I realize that although I may not be

21  able to go home for awhile, I have God's promise of eternal

22  life.  Stacy say the least one like the day she left this earth

23  and that was mine.  Although I don't understand why this had to

24  happen, I do know that the Bible says that all things work

25  together for good to them that love God to them who are called

814

6

1  suffered a loss, too.  For the most part, we were all juveniles

2  just beginning life.  The years we were missing now are crucial

3  and I understand all this is to -- I understand that we must

4  accept responsibilities, but I ask you to take all this into

5  consideration upon sentencing.  I had a child born during my

6  absence.  I'm currently engaged and I have two family and

7  friends that want to see me come home one day.  I feel I was

8  not in my right mind due to all the drugs I involved myself

9  with, but with the changes I made and plan to make, I feel I

10  would do 100 percent better when I'm -- if I'm granted another

11  chance one day.  Times are changing fast.  I pray the Court and

12  family has mercy on all of us involved.  I too suffer sometimes

13  when I think of what I could have or should have done, but I

14  realize there's no taking back yesterday.  Just making a better

15  tomorrow.

16      Thank you for your time and patience.

17      THE COURT:  Are there any victims who wish to exercise

18  their right of allocution, Mr. Frazier?

19      MR. FRAZIER:  Your Honor, I have asked the families of

20  Todd and Stacy Bagley if they wish to do that and they've

21  indicated to me that their letters that are attached to the

22  presentence reports appropriately portray their feelings and

23  declined the opportunity.

24      THE COURT:  All of those letters as well as letters from

25  friends and family of the defendant have been read and

815

7

1  considered by the Court.

2     Mr. Swanton, do you know of any legal reason why sentence

3  should not be imposed this morning?

4     MR. SWANTON:  I know of no legal reason, Judge.

5     THE COURT:  Any comments you wish to make?

6     MR. SWANTON:  Judge, just briefly if I may.  Judge, I know

7  there aren't any words strong enough to offer comfort to the

8  family.  This is a crime that was without purpose, without any

9  sort of justice or just reasoning behind it.  In looking at

10  Mr. Brown, I would ask the Court to look at the cooperation

11  that he has provided to the government in the prosecution of

12  this case, ask the Court to consider what he's done with his

13  life since this offense, and consider the fact that he may be a

14  changed person, Your Honor.  And in light of that, I would ask

15  the Court to consider looking at the lower end of the guideline

16  range in sentencing Mr. Brown.

17     THE COURT:  All right.  Do you know of any legal reason

18  why sentence should not be imposed this morning?

19     MR. SWANTON:  I do not, Your Honor.

20     THE COURT:  Then as to Counts 1 and 2 the Court will

21  impose a period of incarceration of 188 months to be run

22  concurrently with each other.  As to Count 4, a period of

23  incarceration of 60 months to run consecutively with Counts 1

24  and 2.  Five years of supervised release as to each of Counts 1

25  and 2, three years of supervised release as to Count 4 to run

8

1   concurrently all of them.  No fine will be imposed because

2   there is restitution in the amount of $22,769.18 to be owed by

3   and shared by Defendants Lewis and Sparks and Lynch.

4       This is a case where an appeal was waived.  Are there any

5   counts to be dismissed, Mr. Frazier?

6       MR. FRAZIER:  Just the original indictment against the

7   defendants as we proceeded on the second -- or original

8   information since we proceeded on the second superseding in

9   punishment.

10      THE COURT:  That motion will be granted.

11      Anything further, Mr. Swanton?

12      MR. SWANTON:  That's all we have, Your Honor.

13      THE COURT:  You may be excused.

14      MR. SWANTON:  Thank you, Judge.

15      (Hearing adjourned at 10:09)

16

17

18

19

20

21

22

23

24

25

817

9

1    UNITED STATES DISTRICT COURT)

2    WESTERN DISTRICT OF TEXAS  )

3

4    I, Kristie M. Davis, Official Court Reporter for the

5    United States District Court, Western District of Texas, do

6    certify that the foregoing is a correct transcript from the

7    record of proceedings in the above-entitled matter.

8    I certify that the transcript fees and format comply with

9    those prescribed by the Court and Judicial Conference of the

10   United States.

11   Certified to by me this 25th day of March 2004.

12

13        KRISTIE M. DAVIS
          Official Court Reporter
14        P.O. Box 20994
          Waco, Texas  76702-0994
15        Telephone No.:  (254) 754-7444
          kristie_davis@txwd.uscourts.gov
16

17

18

19

20

21

22

23

24

25

818

# EXHIBIT 9

819

>> Table of Contents

# FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION

Prepared by

**Subcommittee on Federal Death Penalty Cases**
**Committee on Defender Services**
**Judicial Conference of the United States**

**Honorable James R. Spencer, Subcommittee Chair**
**Honorable Robin J. Cauthron**
**Honorable Nancy G. Edmunds**

**May 1998**

The recommendations in this report were adopted by the Judicial Conference of the United States on September 15, 1998

>> Table of Contents

# FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION

## TABLE OF CONTENTS

**Executive Summary**

**Introduction**

**I. Analysis & Findings**

    **A. Number and Overall Cost of Federal Death Penalty Cases**

        1. **The Decision to Prosecute in Federal Court**
        2. **The Decision to Authorize the Death Penalty**
        3. **The Decision to Go to Trial**

    **B. Factors Affecting the Scope and Cost of Defense Representation**

        1. **Death Penalty Cases Involve Two Trials**
        2. **Complexity of the Guilt Phase**
        3. **Scope of the Penalty Phase**
        4. **Special Obligations of Counsel in a Death Penalty Case**

            a. **Consultation with the Client**
            b. **Motions Litigation**
            c. **Jury Selection**

        5. **Effect of Prosecution Resources**
        6. **Effect of the Authorization Process**
        7. **Importance of Experts and their Cost**

    **C. Factors Affecting the Availability, Cost and Quality of Counsel**

        1. **Importance of "Learned" Counsel**
        2. **Federal Death Penalty Resource Counsel Project**
        3. **Consultation Prior to Appointment of Counsel**
        4. **Availability and Recruitment of Qualified Lawyers**

            a. **Federal Defender Organizations**
            b. **Panel Attorneys**

        5. **Adequacy of Compensation to Attract Qualified Counsel**
        6. **Number of Counsel**

    **D. Efforts to Control the Cost of Representation**

**Conclusion**

## II. Recommendations & Commentary

1. **Qualifications for Appointment**

   **a.** Quality of Counsel
   **b.** Qualifications of Counsel
   **c.** Special Considerations in the Appointment of Counsel on Appeal
   **d.** Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings
   **e.** Hourly Rate of Compensation for Counsel

2. **Consultation with Federal Defender Organizations or the Administrative Office**

   **a.** Notification of Statutory Obligation to Consult
   **b.** Consultation by Courts in Selecting Counsel
   **c.** Consultation by Federal Defender Organizations and the Administrative Office in Recommending Counsel

3. **Appointment of More Than Two Lawyers**

4. **Appointment of the Federal Defender Organization**

   **a.** FDO as Lead Counsel
   **b.** FDO as Second Counsel

5. **The Death Penalty Authorization Process**

   **a.** Streamlining the Authorization Process
   **b.** Court Monitoring of the Authorization Process

6. **Federal Death Penalty Resource Counsel**

   **a.** Information from Resource Counsel
   **b.** Technology and Information Sharing

7. **Experts**

   **a.** Salaried Positions for Penalty Phase Investigators
   **b.** Negotiating Reduced Rates
   **c.** Directory of Experts

8. **Training**

9. **Case Budgeting**

   **a.** Consultation with Prosecution
   **b.** Prior to Death Penalty Authorization
   **c.** After Death Penalty Authorization
   **d.** Advice from Administrative Office and Resource Counsel
   **e.** Confidentiality of Case Budgets
   **f.** Modification of Approved Budget
   **g.** Payment of Interim Vouchers
   **h.** Budgets in Excess of $250,000

Case 6:99-cr-00070-ADA     Document 377-3     Filed 06/14/04     Page 193 of 251

      **i. Death Penalty Not Authorized**
      **j. Judicial Conference Guidelines**
      **k. Judicial Training for Death Penalty Cases**

10. **Case Management**

      **a. Non-lawyer Staff**
      **b. Multi-defendant Cases**

          **i. Early Decision Regarding Severance**
          **ii. Regularly Scheduled Status Hearings**
          **iii. "Coordinating Counsel"**
          **iv. Shared Resources**
          **v. Voucher Review**

11. **Availability of Cost Data**

**Appendix A: Recommendations**

**Appendix B: Sources & Methodology**

***Appendix C: Supporting Data*** *(Not Available Online)*

823

# EXECUTIVE SUMMARY

This report addresses the cost, availability and quality of defense representation in federal death penalty cases and recommends steps which should be taken in order to keep expenditures in these cases within reasonable limits. It has been prepared by the Subcommittee on Federal Death Penalty Cases of the Judicial Conference Committee on Defender Services. The report was prompted by judicial and congressional concerns about the costs involved in providing defense services in federal death penalty cases and is the product of extensive study and data collection.

Federal death penalty prosecutions are large-scale cases that are costly to defend. They require more lawyers, working more hours, at a higher hourly rate than other federal criminal matters. The number of federal death penalty prosecutions has grown dramatically in the last several years, and their impact on the defender services appropriation cannot responsibly be ignored. The judiciary has a duty to ensure that its funds are spent wisely, and to identify the best ways to provide cost-effective representation in these challenging cases.

To this end, the Subcommittee has thoroughly examined the nature of defense representation in federal death penalty cases. Part I of this report sets forth the Subcommittee's analysis and findings, which are based upon qualitative and quantitative information gathered from many sources. This part of the report describes the number of federal death penalty cases and the cost of defending them, and discusses the characteristics of federal death penalty cases and the special duties they impose on defense counsel. This information is essential to a full understanding of the recommendations set forth in Part II of the report. Also contained in Part I are data on the expense of prosecuting federal death penalty cases, which have been provided by the Department of Justice.

In general, the Subcommittee on Federal Death Penalty Cases has concluded that judges assigned to federal death penalty cases have been appropriately conscious of the need to monitor defense costs and that, for the most part, their efforts to control expenses have been successful. In the vast majority of cases, moreover, judges have been able to appoint well-qualified lawyers with sufficient experience in death penalty litigation to make cost-effective decisions about the resources required to present a defense. Overall, the average cost of representation in each major category of federal death penalty cases is reasonable in relation to the obligations imposed on defense counsel and the costs of prosecuting such cases. Nevertheless, the Subcommittee believes the additional cost-containment measures proposed in its recommendations should be implemented.

Among the most important findings presented in Part I of the report are the following:

1. The number of federal prosecutions in which an offense punishable by death is charged, and to which special statutory requirements for the appointment and compensation of counsel apply, increased sharply after the 1994 Federal Death Penalty Act increased the number of federal crimes punishable by death.

- Number of defendants charged with offenses punishable by death (by year of indictment):
  1991 -- 12
  1992 -- 45
  1993 -- 28
  1994 -- 45
  1995 -- 118
  1996 -- 159
  1997 -- 153

2. The cost of defending cases in which the Attorney General decides to seek the death penalty for commission of an offense potentially punishable by death (authorized cases) is much higher than the cost of defending cases in which the Attorney General declines to authorize the death penalty for an offense punishable by death. The number of authorized cases has increased since 1994.

- Number of cases where the Attorney General has authorized seeking the death penalty, by year in which the authorization decision was made (figures provided by the Department of Justice):

    1990 -- 2
    1991 -- 6
    1992 -- 16
    1993 -- 5
    1994 -- 7
    1995 -- 17
    1996 -- 20
    1997 -- 31

- Average total cost per representation of a sample of cases in which the defendant was charged with an offense punishable by death and the Attorney General did not authorize seeking the death penalty (1990-1997): **$55,772**
- Average total cost per representation of a sample of cases in which the defendant was charged with an offense punishable by death and the Attorney General authorized seeking the death penalty (includes cases resolved by guilty plea as well as cases resolved by trial) (1990-1997): **$218,112**

3. The cost of defending a federal death penalty case that is resolved by means of a trial is higher than the cost of defending a case that is resolved through a guilty plea, even though many guilty pleas are entered after most of the preparation for trial has been completed. The number of federal death penalty trials, and the number of individual defendants tried on capital charges, has increased since the federal death penalty was revived by Congress in 1988.

- Number of federal death penalty trials/defendants, by calendar year:

    1988 -- 0
    1989 -- 0
    1990 -- 1 trial, 1 defendant
    1991 -- 4 trials, 5 defendants
    1992 -- 1 trial, 1 defendant
    1993 -- 3 trials, 7 defendants
    1994 -- 1 trial, 3 defendants
    1995 -- 4 trials, 7 defendants
    1996 -- 5 trials, 7 defendants
    1997 -- 8 trials, 11 defendants

- Average total cost per representation of a sample of authorized federal death penalty cases resolved through a guilty plea (1990-1997): **$192,333**

- Average total cost per representation of a sample of authorized federal death penalty cases resolved through a trial (1990-1997): **$269,139**

Case 6:99-cr-00070-ADA     Document 377-3     Filed 06/14/04     Page 196 of 251

4. The costs of *defending* federal death penalty cases appear to be reasonable in relation to the costs of *prosecuting* such cases. The Department of Justice collected data regarding its prosecution costs in a sample of authorized cases, including some that went to trial and some that ended in guilty pleas. These cost data <u>did not include</u> non-attorney investigative costs or the value of services provided to the prosecution by law enforcement agencies.

- Average total cost of <u>prosecuting</u> an authorized federal death penalty case (based on a sample of cases resolved by guilty plea and by trial selected by the Department of Justice; does <u>not</u> include any non-attorney investigative costs or the costs of expert and other assistance provided by law enforcement agencies; figures provided by the Department of Justice): **$365,000**

5. The overall cost of providing representation in federal death penalty cases is due to the growing number of such prosecutions (in particular the growing number of trials), the special duties of counsel in federal death penalty cases, and the higher hourly rate paid to counsel. The number of cases depends upon prosecutorial decisions, over which the judiciary has no control. The special obligations of counsel are due to a combination of those responsibilities inherent in any capital case and the unusual complexity of many federal death penalty prosecutions, particularly drug conspiracy cases. The higher maximum rate for counsel in federal death penalty cases is actually lower than the market rates charged by the lawyers appointed in federal death penalty cases, and is required in order to assure an adequate supply of qualified lawyers. Generally, courts have succeeded in appointing counsel with the experience and judgment needed to make prudent use of resources in defending federal death penalty cases. Federal defender organizations are not at this time ready to assume a major portion of the responsibility for representation in federal death penalty cases, so that courts must continue to appoint panel attorneys and must offer an adequate rate of compensation.

In Part II of this report, the Subcommittee recommends additional steps designed to contain and reduce the cost of capital defense representation. In the death penalty area in particular, cost-effectiveness is inseparable from high quality representation: assuring appropriate resources for the defense at the trial stage minimizes the risk of time-consuming and expensive post-conviction litigation later on. Therefore, in addition to recommendations designed to monitor and limit expenditures, the Subcommittee has proposed a number of measures intended to assure the appointment of well-qualified counsel and to make other improvements in the delivery of defense services. The most significant of the Subcommittee's recommendations can be summarized as follows:

- Courts should assure the appointment of highly qualified counsel whenever the defendant is charged with an offense punishable by death. The hourly rate authorized for compensation of counsel in federal death penalty cases should remain high enough to attract a sufficient number of qualified attorneys. **Recommendation 1.**

- Courts should consult with the local federal public defender, or, in districts not served by a federal public defender, with the Administrative Office of the U.S. Courts to identify counsel. In districts served by a community defender organization, courts should consult with the community defender organization. **Recommendation 2.**

- Courts should not appoint more than two lawyers to represent a defendant in a federal death penalty case except in exceptional circumstances; however, courts should authorize appointed counsel to utilize the services of other lawyers to assist them on a more limited basis when this would contain costs or when additional staff might be required to meet time limits. **Recommendation 3.**

- Courts should appoint federal defender organizations as lead or second counsel in federal death

penalty cases only if the federal defender organization has staff with the appropriate qualifications and experience and other resources sufficient to undertake the representation without unduly disrupting the operation of the office. **Recommendation 4.**

- The Department of Justice should streamline the review of federal death penalty cases so that cases in which a request for the death penalty is very unlikely will be reviewed more quickly. An earlier decision not to seek the death penalty will reduce the length of time the case must be treated as a federal death penalty case where the defendant is entitled to two lawyers who may be paid at a higher hourly rate. Expediting review of cases in which a request for the death penalty is unlikely, such as cases in which the local United States Attorney strongly recommends against seeking the death penalty, will significantly reduce defense costs without diminishing the usefulness of centralized review. **Recommendation 5.**

- The Administrative Office of the U.S. Courts should continue to support the Federal Death Penalty Resource Counsel Project, which has become essential to the delivery of high quality, cost-effective defense representation, and it should consider expanding the availability of model pleadings and other information needed by counsel in federal death penalty cases through the use of technology. **Recommendation 6.**

- Federal defender organizations should consider creating salaried positions for penalty phase investigators who would coordinate preparation for the penalty phase in federal death penalty cases at a lower cost than a mitigation specialist retained as an expert at an hourly rate. Lawyers should be encouraged to negotiate reduced rates with experts. Also, information about qualified experts in fields often involved in federal death penalty cases and about the rates they charge should be made available to counsel. **Recommendation 7.**

- The Administrative Office of the U.S. Courts should continue to support training for counsel in federal death penalty cases. **Recommendation 8.**

- Courts should require lawyers to develop case budgets to ensure the most effective and economical use of resources. Case budgeting should be done both before the prosecution makes a decision whether it will seek the death penalty and after, if the death penalty is authorized. Case budgets should be reviewed if circumstances change. The Judicial Conference should develop guidelines for case budgeting, and judges and lawyers should be trained in the budgeting process. **Recommendation 9.**

- In multi-defendant federal death penalty cases, courts should consider making early decisions about whether to sever non-capital defendants from defendants facing capital charges. Courts should also consider using case management techniques to diminish the cost of document production and distribution and to reduce duplication of effort among defense counsel. **Recommendation 10.**

- The Judiciary should improve its capacity to track costs in federal death penalty cases. **Recommendation 11.**



# INTRODUCTION

This report responds to judicial and congressional concerns about the cost of providing representation in federal death penalty cases. Congress revived the death penalty for federal crimes in 1988, authorizing capital punishment for "drug kingpin" murders.[1] In 1994, Congress expanded to fifty the number of federal crimes punishable by death.[2] The portion of the Defender Services appropriation allocated to federal death penalty cases has increased over the past decade, especially since fiscal year (FY) 1995. Federal death penalty cases consumed almost six percent of the Defender Services obligations for payments to panel attorneys for fiscal year 1997, although they comprised approximately 0.3 percent of the caseload.[3]

In order to understand better the reasons for the high cost of representation in federal death penalty cases in comparison to non-capital cases, Judge Emmett Ripley Cox, the Chair of the Judicial Conference Committee on Defender Services, in May 1997 appointed a Subcommittee on Federal Death Penalty Cases to study the judiciary's current approach to the appointment and compensation of counsel in these cases, its success in recruiting qualified attorneys, and the quality and cost of services provided. Judge Cox named three members of the Committee on Defender Services to the Subcommittee: Judge James R. Spencer, of the Eastern District of Virginia, Chair of the Subcommittee; Judge Robin J. Cauthron, of the Western District of Oklahoma; and Judge Nancy G. Edmunds, of the Eastern District of Michigan. Norman Lefstein, Dean of the Indiana University School of Law at Indianapolis, was selected to serve as the Subcommittee's chief consultant.

The Subcommittee gathered both qualitative and quantitative information about federal death penalty cases. Dean Lefstein and his staff[4] conducted extensive interviews with lawyers and judges representing a wide range of perspectives, and covering more than half of the judicial districts in which a federal death penalty prosecution has been authorized. The Subcommittee's staff also reviewed articles and reports concerning representation in death penalty cases, including the recent Report on Costs and Recommendations for the Control of Costs of the Defender Services Program prepared by Coopers & Lybrand Consulting. Additionally, staff compiled a database containing cost information regarding federal death penalty cases from 1990, the year the first post-*Furman* federal death penalty case was authorized, to the end of fiscal year 1997. The Subcommittee's staff analyzed these data by correlating cost information with descriptive information (case demographics), and by comparing costs in federal death penalty cases with costs in non-capital homicide cases. The Subcommittee also obtained information concerning the time spent by attorneys in federal defender organizations (FDOs) on representation in federal death penalty cases and the costs incurred by local United States Attorney's Offices in prosecuting them. Because of the small number of federal death penalty cases that have been reviewed on direct appeal or in post-conviction proceedings, the quantitative analyses in this report focus on representation at the trial stage, and therefore do not reflect the overall cost of representation in a case in which a death sentence is imposed.[5]

The Subcommittee's findings are set out in Part I of this Report. The Subcommittee has proposed eleven recommendations to enhance the judicial administration of federal death penalty cases. These recommendations, supported by commentary, are set out in Part II. The recommendations alone are reproduced in Appendix A. The Subcommittee's methodology and the sources consulted are described in Appendix B. Additional statistical and other supporting data are contained in Appendix C.

## I. ANALYSIS AND FINDINGS

In general, the high cost of providing representation in federal death penalty cases is a result of the heavy demands these cases place on the time and skill of counsel and the growing number of federal criminal cases in which the defendant faces a potential sentence of death. The cost of representation in each federal death penalty case depends upon several elements: the number of hours each attorney must work to discharge his or her ethical obligation to the client; the hourly rate at which the attorney is compensated; and the nature, type, and cost of investigative and expert services reasonably required. To understand *why* federal death penalty cases cost so much, and how these costs may be controlled consistent with constitutional and statutory mandates, requires first and foremost an understanding of the characteristics of federal death penalty cases and the special responsibilities of defense counsel appointed to such cases.

## A. Number and Overall Cost of Federal Death Penalty Cases.

The total cost of providing representation in federal death penalty cases depends upon the number of such cases, as well as the cost of representation in each case. As described more fully below, special standards affecting the cost of representation apply to all federal criminal cases in which an offense charged is punishable by death, whether or not the prosecution ultimately decides to seek the death penalty.[6] Although many factors affect the cost of representation, two particularly significant ones are the prosecution's decisions whether to seek the death penalty and whether to accept a plea agreement to a sentence less than death.[7]

**1. The Decision to Prosecute in Federal Court.** The total number of federal death penalty cases depends, in the first instance, on the decision to prosecute an offense in federal rather than in state court. [8] The number of federal prosecutions including an offense punishable by death has increased dramatically, particularly since the enactment of the Federal Death Penalty Act as part of the 1994 crime bill. No exact count of federal death penalty cases filed nationwide by United States Attorney's offices since 1988 is available; a reasonable estimate,



Federal Death Penalty Cases By Year of Indictment

however, is 560 cases[9] over the period 1991 to 1997, increasing from 12 cases in 1991, to 118 in 1995, 159 in 1996, and 153 in 1997.[10]

The average total cost per federal death penalty representation in a sample of cases prosecuted from 1990 to 1997 (including cases in which the prosecution ultimately declined to seek the death penalty) was $142,000.[11] However, the prosecution's decision to seek the death penalty -- as would be expected -- makes a substantial difference in the cost of representation, so

that this overall average is not useful in assessing the resources required for a case in which the prosecution does decide to seek the death penalty.

**2. The Decision to Authorize the Death Penalty.** The cost of representation in a federal death penalty case depends heavily upon whether the prosecution does or does not seek the death penalty. (See Charts C-4, C-5, and C-6, comparing the total costs and elements of total cost of cases in which death penalty authorization was granted with those in which it was denied.) While the decision to charge an offense punishable by death is made by a local U.S. Attorney, no federal prosecutor may actually seek the death penalty unless specifically authorized to do so by the Attorney General of the United States.

**Authorized Cases by Calendar Year of Decision**



The Attorney General has authorized seeking the death penalty in a total of 111 cases between 1988 and December 1997.[12] The average total cost (for counsel and related services) of authorized cases in the Subcommittee's sample was $218,112, as compared to $55,772 for cases in which the death penalty was never authorized; the average total cost of cases in which the prosecution was authorized to seek the death penalty, but later formally withdrew its request before trial was $145,806. The number of cases in which the Attorney General authorized seeking the death penalty rose from two cases in 1990 to 31 cases in 1997. Twenty-two cases in which the prosecution has been authorized to seek the death penalty were pending as of December 1997.



**3. The Decision to Go to Trial.** The third prosecutorial decision affecting the cost of representation is the decision whether to enter into a guilty plea agreement with the defendant or to try the case. (See Table C-7 and Chart C-8.) Of the 111 defendants against whom the Attorney General has sought the death penalty, the total number of defendants *tried* on capital

charges in federal court was 41 through December 1997. The average total cost for authorized cases ending in capital trials was $269,139,[13] as compared to $192,333 for authorized cases

resolved by a guilty plea. To date, nineteen defendants have been sentenced to death; one death sentence was later overturned on appeal and the case remanded for resentencing.

**B. Factors Affecting the Scope and Cost of Defense Representation.**

**1. Death Penalty Cases Involve Two Trials.** Federal law provides for a two part (bifurcated) trial in a capital case. [14] In the first part, the guilt phase, the jury is asked to determine whether the prosecution has proven, beyond a reasonable doubt, that the defendant has committed a crime punishable by death. If a conviction is returned on a capital count, then in the second part, the penalty phase, the jury must first determine whether the prosecution has proven additional facts (aggravating circumstances) in order to satisfy threshold requirements for imposing the death penalty. If so, the jury considers evidence offered by the prosecution to justify the death penalty, including aggravating circumstances in addition to those required for the threshold finding, and evidence the defense offers as a reason not to sentence the defendant to death (mitigating circumstances).

Lawyers in a death penalty case must prepare for both trials, and must develop an overall strategy that takes the penalty phase into account even in the guilt phase. This means that the way the defense proceeds differs from a non-capital case in important ways beginning with jury selection. For example, facts that make no difference in the determination of guilt or innocence may become very important to the jury's assessment of the defendant's culpability in the penalty phase. Lawyers interviewed by the Subcommittee, for instance, described cases in which both the prosecution and the defense invested substantial resources in obtaining expert opinions concerning the precise manner of the victim's death, even though this would not affect the guilt phase verdict, because of the importance of this information to the determination of the appropriate penalty.


**2. Complexity of the Guilt Phase.** Federal death penalty cases generally are highly complex criminal prosecutions, even without taking the penalty phase into account. As a representative of the Department of Justice remarked at a meeting with Subcommittee staff to discuss compilation of cost data, federal death penalty cases have more in common with complex drug conspiracy cases than with non-capital federal homicide cases,[15] many of which are comparatively simple cases brought in federal court only because they occurred on federal land. (See Table C-7.)

Most cases in which the prosecution has sought a death sentence have invoked the "drug kingpin" provision of the 1988 Anti-Drug Abuse Act, 21 U.S.C. § 848(e). This statute authorizes the death penalty for intentional killings in furtherance of a "continuing criminal enterprise" (CCE), or serious drug offense, and for intentional killings of law enforcement officers to avoid prosecution for a drug offense. CCE cases, together with prosecutions of drug organizations under the RICO death penalty provision added in 1994, comprised approximately 62 percent of the authorized federal death penalty cases through December 1997.[16] CCE and RICO cases typically involve investigations stretching over years, and encompassing numerous acts of violence. They often include several homicide charges, many witnesses, and evidence in the guilt phase derived from wiretaps, video surveillance, informants, and experts. The magnitude of some of these cases is illustrated by a judge's estimate that the prosecution listed 500 potential witnesses in one case, and another judge's estimate that the prosecution disclosed 30,000 pages of documents in discovery.

Another reason drug conspiracy cases are so complex is that they often involve many defendants joined in a single indictment. Multi-defendant cases generally tend to cost more to defend, per defendant, than single defendant cases.[17] This effect may be magnified in a case in which some defendants face the death penalty and other defendants face only non-capital charges, as the difference in the potential penalty may produce significant differences in strategy both before and during trial.

In most cases, judges have severed defendants facing capital charges from those facing only non-capital charges,[18] with the expectation that this will, among other things, reduce the overall cost of representation. Severance practices with regard to defendants facing *capital* charges have varied. Some judges have followed the more common state practice and tried each defendant separately. Others have severed only the penalty phase trials, so that the same jury determined the penalty for each defendant, but in separate hearings. Others have conducted joint penalty phase trials.

Drug conspiracy cases (including both CCE and RICO prosecutions) are the most expensive federal death penalty cases to defend. The total cost of representation in drug conspiracy cases in which the prosecution authorized seeking the death penalty averaged $244,185,[19] or nearly 12 percent more than the average total cost of all authorized cases. (See Table C-7 and Chart C-8.)

**3. Scope of the Penalty Phase.** Evidence in the penalty phase of a federal death penalty trial typically includes a wide range of information about the defendant, the victim, and the nature of the offense that is not admissible in the guilt phase. Defense counsel in a federal death penalty case must investigate and prepare to respond to information offered by the prosecution to justify a death sentence. Federal law allows prosecutors to offer reliable information in the penalty phase, even if it does not satisfy the normal rules of evidence.[20] Although the prosecution must prove certain aggravating circumstances spelled out by statute, it is not limited to proving these factors. Defense counsel must therefore investigate and prepare to meet potential "non-statutory aggravating circumstances," such as an allegation that the defendant will be dangerous in the future. The penalty phase of a federal death penalty case therefore may include yet another "trial" in which the jury is required to determine whether the defendant is responsible for crimes in addition to those charged in the indictment. In one federal


death penalty case, for example, the government attempted to prove the defendant committed another murder in the penalty phase, even though charges against him for that crime had been dismissed in a state court proceeding. Mini-trials of other criminal charges can be costly in terms of time and resources to prosecute and defend.

In addition to defending against the prosecution's case for a death sentence, counsel must also plan and present a case for a lesser sentence. In order to effectuate the defendant's constitutional right to present any information in mitigation of sentence, counsel must conduct a broad investigation of the defendant's life history. "Although it makes no express demands on counsel, the [right to offer mitigating evidence] does nothing to fulfill its purpose unless it is understood to presuppose the defense lawyer will unearth, develop, present and insist on consideration of those 'compassionate or mitigating factors stemming from the diverse frailties of humankind.'"[21] Indeed, one of the most frequent grounds for setting aside state death penalty verdicts is counsel's failure to investigate and present available mitigating information.[22] The broad range of information that may be relevant to the penalty phase requires defense counsel to cast a wide net in the investigation of any capital case.[23]

**4. Special Obligations of Counsel in a Death Penalty Case.** The nature of a criminal prosecution in which the defendant's life is at stake transforms counsel's role from start to finish. The quality of defense counsel's work must always remain in accord with the gravity of the proceeding. The special obligations of counsel appointed to a federal death penalty case are reflected in a comparison of hours billed in capital as compared to non-capital homicide cases.[24] The average number of hours billed in non-capital homicide cases from FY 1992 to FY 1997 was 117, as compared to 962 in a sample of federal death penalty cases (including cases never authorized). The average number of hours billed in authorized cases was 1,464. While representation in a federal death penalty case differs from representation in a non-capital federal criminal case in many ways, there are several particularly notable differences.

| Average Number of Attorney Hours Billed in Capital and Non-Capital Homicide Cases | | | | |
|---|---|---|---|---|
| | Case Type | In Court Hours | Out of Court Hours | Avg. Total Attorney Hours Per Representation |
| Non-Capital | Homicides | 18 | 100 | 117 |
| Capital | Auth. Denied | 38 | 391 | 429 |
| | Auth. Granted | 231 | 1,233 | 1,464 |
| | Capital Trial | 409 | 1,480 | 1,889 |
| | Plea | 61 | 1,201 | 1,262 |
| | Drug Cases | 277 | 1,343 | 1,619 |

**a. Consultation with the client.** An important element of death penalty representation is the



establishment of a professional relationship with the client.[25] Although it is important in every case, lawyers emphasized that consultation with the client is vastly more time consuming and demanding in a death penalty case for several reasons. First, the nature of the penalty phase inquiry requires a relationship which encourages the client to disclose his or her most closely guarded life history with the lawyer. Experiences of mental illness, substance abuse, emotional and physical abuse, social and academic failure, and other "family secrets" must be revealed, researched and analyzed for the insight they may provide into the underlying causes of the client's alleged conduct. The establishment of trust and confidence is also vitally important if the lawyer is to convince the defendant to consider an offer to plead guilty, especially because what is offered is likely to be life imprisonment without the possibility of parole. Accepting such a "deal" requires tremendous faith in counsel. Another reason the attorney-client relationship is particularly time-consuming stems from the enormous stress that the risk of a death sentence imposes on both the client and the lawyer; special care must be taken in order to avoid a rupture of the professional relationship that would force counsel to withdraw, delaying the trial.

**b. Motions Litigation.** The relative novelty of the federal death penalty laws, particularly those enacted in the 1994 crime bill, means that many legal issues concerning the interpretation and constitutionality of those statutes have not been authoritatively resolved. To date, the circuit courts of appeals have decided only a handful of federal death penalty cases. Lawyers and judges agree that these issues are time-consuming to litigate. Several judges commented that they, or their law clerks, devoted months of preparation to a federal death penalty case. Defense lawyers have an ethical obligation to raise challenges to the manner in which both the guilt and penalty phases of the trial are conducted, because if an issue is not raised at trial, the defendant generally cannot benefit, even if a ruling by a higher court subsequently favors the defense position.[26] Consequently, newer statutes tend to produce more constitutional and interpretive issues than statutes that have already been the subject of extensive appellate and Supreme Court consideration. Many issues may arise in a single case. In one multi-defendant case, for example, a judge estimated that 2,800 legal pleadings had been filed by the parties.

**c. Jury Selection.** The lawyer in a death penalty case also has additional responsibilities in jury selection. Because the same jury will generally decide the penalty phase as a well as the guilt phase, the court must determine whether jurors should be disqualified because their views about the imposition of the death penalty, for or against, would make them unable to follow the law governing penalty phase deliberations. Typically the "death qualification" inquiry is conducted on an individual basis. The usual voir dire in a federal criminal case is conducted by the judge, with limited participation by counsel. In death penalty cases, however, the lawyers generally participate in drafting questionnaires for prospective jurors, and take part in questioning the venire. Jury selection takes much longer in federal death penalty cases than in non-capital federal criminal cases both because the total number of jurors questioned is larger to allow for those who may be excused due to the death qualification inquiry, pretrial publicity or other factors related to the nature of the case, and because of the more extensive questioning of each individual prospective juror. For example, one judge who ordinarily selects a jury for a criminal case in an afternoon reported that it took three weeks to complete jury selection in a federal death penalty case.

As part of its recent study of the Defender Services program, Coopers & Lybrand reviewed records of federal death penalty cases (including cases that were not authorized and cases resolved by guilty plea) from FY 1995 to FY 1997, and found a similar distribution of attorney hours for each year.[27] In-court hearings, including trials, comprised 14%. The largest components were legal research (20%) and reviewing documents (16%). Legal research and writing is of great importance in federal capital cases because the federal death penalty statutes have not been definitively construed.[28] Judges as well as lawyers reported they had to devote extraordinary amounts of time to the analysis of legal issues in federal death penalty cases. Conferences with the client comprised 9% of attorney hours, reflecting the time required to establish and sustain a professional relationship in a federal death penalty case.[29]

Another element, not directly captured in the available payment data, is the additional in- and out-of-court attorney time associated with jury selection in a death penalty case.

**5. Effect of Prosecution Resources.** Coopers & Lybrand found that "[t]he prosecution's resources are a key driver of capital representation costs."[30] Interviews with lawyers and judges confirmed this. Judges generally reported that prosecution resources in death penalty cases seemed unlimited. Typically, at least two and often three lawyers appeared for the prosecution in federal death penalty cases, who were assisted in court by one or more "case agents" assigned by a law enforcement agency. Investigative work and the preparation of prosecution exhibits for trial, including charts, video and audiotapes, is generally performed by law enforcement personnel. Law enforcement agencies also performed scientific examinations and provided expert witnesses at no direct cost to the prosecution. In some cases, which arose from joint state and federal investigations, state law enforcement agencies contributed resources to the prosecution effort.

At the request of the Subcommittee, the Department of Justice gathered cost information concerning 21 of 24 completed federal death penalty prosecutions in which the Attorney General had decided to seek the death penalty after January 1995.[31] Some of these prosecutions involved more than one defendant. The set of cases included some cases that were resolved by guilty pleas and some cases that went to trial. The Department of Justice reported an average total cost per prosecution of $365,296, but this figure does not include the cost of investigation or the cost of scientific testing and expert evaluations performed by law enforcement personnel.[32] The average cost of payments to private retained experts (such as psychiatrists or other experts not employed by a government agency) was $30,269 per prosecution.

**6. Effect of the Authorization Process.** Another obligation unique to federal capital cases is advocacy on behalf of the client in the Justice Department death penalty authorization process. In January 1995 the Department promulgated a formal "protocol" describing the manner in which the Attorney General would review federal death penalty cases to determine whether to file a notice of an intention to seek the death penalty.[33] Initially, the local United States Attorney reviews the case and makes a non-binding recommendation to the Justice Department about whether the death penalty should be sought. Generally, the Attorney General has followed recommendations against seeking the death penalty, but has overriden such recommendations in at least two cases. All cases are reviewed by a committee of senior Department of Justice officials, who submit their views to the Attorney General, who then makes the final decision. The Death Penalty Review Committee offers defense counsel the opportunity to present information in writing and in a face-to-face meeting in Washington, D.C.[34]

The Department of Justice authorization process has two important implications for the cost of defense representation in federal capital cases. First, because any case involving an offense punishable by death remains a potential death penalty case until a final decision is made by the Attorney General, a longer authorization process increases the length of time that the defendant remains statutorily entitled to at least two lawyers who are compensated at a higher hourly rate. (See Section C.5, infra.) A number of judges reported "riding herd" on the authorization process by requiring reports from the prosecution or setting deadlines to expedite a final decision. All other things being equal, including the number of capital prosecutions ultimately approved, a shorter authorization review process would mean lower defense costs.

The second cost implication of the authorization process is that it creates another forum in which defense counsel must advocate on behalf of the client facing a possible death sentence.[35] One of defense counsel's most important functions is to present information first to the local United States


Attorney and then to the Justice Department that would justify a lesser sentence. Effective advocacy requires counsel to explore all of the issues that are likely to enter into the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors. Although the written and oral presentations made to the Death Penalty Review Committee are not as detailed or comprehensive as a penalty phase presentation to a jury, counsel must conduct a wide-ranging preliminary investigation of facts relevant to sentencing *before* the Justice Department makes the decision whether to file a notice seeking the death penalty, if it is to have an effect on the authorization process.

It was impossible to quantify the effect of defense participation on the death penalty review process in terms of outcome and cost. Department of Justice officials said they view the participation by defense counsel as valuable, and that they encourage oral and written presentations. Defense lawyers offered divergent opinions about the value of participating in the central Department of Justice review, but the majority made presentations and would do so in future cases.

Because development of mitigating information early in the case may convince the prosecution that the death penalty should not be authorized, delaying preparation for the penalty phase is likely to increase the number of cases authorized, and therefore increase total costs. In a small number of instances, judges were reluctant to approve expenditures related to the penalty phase until an authorization decision was made. However, if the result of such a decision is that cases are authorized which should not be, this approach may cost more money than it saves, for cases that are never authorized cost much less than cases that are authorized, even if a guilty plea to a sentence less than death eventually is negotiated. This is illustrated by a comparison of the average total cost of cases in which the prosecution declines to seek the death penalty in the first instance ($55,772), as compared to the average total cost of cases in which the prosecution grants authorization, and then withdraws it ($145,806), and the average total cost of cases ending in guilty pleas ($192,333). (See also Recommendation 5, "The Death Penalty Authorization Process," in Part II of this report.)

**7. Importance of Experts and their Cost.** Another factor affecting the cost and complexity of capital cases is the importance of expert testimony in both the guilt and penalty phases. Payments to experts are a substantial component of defense costs in federal death penalty cases. Coopers & Lybrand found that about 19% of payments for representation in federal capital cases for FY 1997 went to services other than counsel: primarily experts and investigators.[36] This figure may understate the total spending on these services, because some of these costs are included as reimbursable expenses on attorney vouchers, rather than in separate vouchers submitted by the expert or investigator.

As with attorney compensation, there were significant differences between cases in which the Attorney General authorized seeking the death penalty, and those in which the death penalty was not authorized. (See Chart C-10.) The average amount spent on non-attorney compensation in cases in which authorization was *denied* was $10,094, as compared with $51,889 in cases in which authorization to seek the death penalty was *granted*.

| Average Amount of Non-Attorney Compensation in Capital and Non-Capital Homicide Cases | | | |
|---|---|---|---|
| | Case Type | Avg. Amount of Non-Attorney Comp. | Avg. Total Cost of Representation |
| | | | |


|  |  |  | (Attorney and Non-Attorney) |
|---|---|---:|---:|
| Non-Capital | Homicides | $ 1,515 | $ 9,159 |
| Capital | Auth. Denied | $10,094 | $ 55,773 |
|  | Auth. Granted | $51,889 | $218,113 |
|  | Capital Trial | $53,143 | $269,139 |
|  | Plea | $51,028 | $192,333 |
|  | Drug Cases | $52,218 | $244,186 |

In general, both the prosecution and the defense rely more extensively on experts in death penalty cases than in other federal criminal cases. Although prosecution forensic science experts typically are salaried employees of law enforcement agencies, the defense generally must hire experts who charge an hourly rate for their services. In the guilt phase, the prosecution is likely to call experts to testify about scientific analyses, such as DNA profiling, ballistics comparisons, or hair, fiber, or metallurgical evidence that may connect the defendant to a crime. Other types of experts common in large drug conspiracy cases include experts in the interpretation or authentication of audiotapes, and experts in the structure of drug organizations. To assure the reliability of this evidence and the manner in which it is presented to the jury, defense lawyers must consult with experts in these fields as well.

The defense depends on experts to develop information relevant to sentencing, even before the prosecution makes a final decision about whether to seek the death penalty.

"Because the first job of the defense is to convince the Department of Justice not to certify the case as a capital case, mitigation expenses, including the use of increasingly specialized experts, are increasing and are occurring early in the process."[37] Both the prosecution and the defense also typically hire experts to evaluate the defendant's mental condition in order to develop evidence related to culpability and future dangerousness relevant to the penalty phase. (See Charts C-11 and C-12, comparing expert and investigative costs in federal death penalty cases and non-capital federal homicide cases.)

Two important categories of expert services frequently used in federal death penalty cases but not in non-capital federal criminal cases are mitigation specialists and jury consultants. Mitigation specialists typically have graduate degrees, such as a Ph.D. or masters degree in social work, and have extensive training and experience in the defense of capital cases. They are generally hired to coordinate an investigation of the defendant's life history, identify issues requiring evaluation by psychologists, psychiatrists or other medical professionals, and assist attorneys in locating experts and providing documentary materials for them to review. Although most often they assist counsel in assembling and interpreting the information needed in the penalty phase of a capital case, in some cases mitigation specialists are also called to testify about their findings.

Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase. Judges generally agreed with the importance of a thorough penalty phase investigation, even when they were unconvinced about the persuasiveness of particular mitigating evidence offered on behalf of an individual defendant. The

work performed by mitigation specialists is work which otherwise would have to be done by a lawyer, rather than an investigator or a paralegal. Because the hourly rates approved for mitigation specialists are substantially lower than those authorized for attorneys,[38] the appointment of a mitigation specialist or penalty phase investigator generally produces a substantial reduction in the overall costs of representation.

Jury consultants provide a range of services in federal death penalty cases. They assist in drafting questionnaires for prospective jurors to aid in the jury selection process. The use of questionnaires has become standard in federal capital cases as a way to streamline and expedite the process of jury selection. In addition, in some cases jury consultants are retained to organize and interpret the results of jury questionnaires, advise attorneys about follow-up questions to be asked during the in court voir dire, and to advise the attorneys about whether or not to strike a particular juror. Jury consultants are routinely retained in high stakes civil litigation, and have been engaged by the prosecution in federal death penalty cases. Most of the attorneys interviewed by the Subcommittee were emphatic about the value of jury consultants, and regarded the availability of a jury expert as a top priority. However, some lawyers were willing to forego a jury consultant in order to assure judicial approval of other needed services. Judges generally indicated greater willingness to approve jury consultants when the prosecution retained a jury consultant than when the prosecution did not. (See also Recommendation 7, "Experts," in Part II of this report.)

## C. Factors Affecting the Availability, Cost and Quality of Counsel.

**1. Importance of "Learned" Counsel.** Since the first Judiciary Act in 1789, federal law has required the appointment of "learned" counsel in a capital case. Currently, 18 U.S.C. § 3005 explicitly requires the appointment of two lawyers, at least one of whom is learned in the law related to capital punishment. An American Bar Association study several years ago summarized the special demands on counsel in a capital case:

> Counsel must not only be able to deal with the most serious crime--homicide-- in the most difficult circumstances, but must also be thoroughly knowledgeable about a complex body of constitutional law and unusual procedures that do not apply in other criminal cases. Bifurcated capital cases involve two trials with two different sets of issues. Investigation must often be conducted in several states, and, in some cases, in foreign countries. And penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history.[39]

In interviews, judges and lawyers attested to the importance of the statutory "learned counsel" requirement. A number of judges, particularly those with experience reviewing state death penalty trials in federal habeas corpus proceedings underscored the importance of "doing it right the first time," i.e., minimizing time-consuming post-conviction proceedings by assuring high quality representation in federal death penalty cases at the trial level.[40] Similarly, a former Florida Attorney General testified before an American Bar Association Task Force studying representation in state death penalty cases that, "[b]eyond peradventure, better representation at trial and on appeal will benefit all concerned."[41]

Federal death penalty cases require knowledge of the extensive and complex body of law governing capital punishment *and* the intricacies of federal criminal practice and procedure. Neither one alone is sufficient to assure high quality representation. Lawyers and judges recounted cases in which seasoned federal criminal lawyers who lacked death penalty experience missed important issues. For example, one judge described a situation in which experienced and highly esteemed felony trial lawyers who had no capital experience simply did not know how to pursue the mitigation investigation required by the



case. After many months had been invested, the court appointed an experienced capital litigator from outside the jurisdiction as "learned counsel." A series of mental health tests arranged by this attorney resulted in a decision by the Justice Department to withdraw the request for the death penalty on the eve of trial. The judge credited the "learned counsel" with obtaining that result, which the judge believed could have been achieved much earlier. On the other hand, differences between state and federal practice place a lawyer who may have prior capital experience but no prior federal criminal trial experience at a disadvantage. The federal sentencing guidelines, speedy trial act, rules of evidence and procedure, and the specifics of the federal death penalty law play an important role in representation. Also, because federal death penalty cases frequently involve complex drug conspiracies, familiarity with this specialized area of practice is often desirable. When lawyers with experience in both the federal trial and death penalty arenas cannot be found, some courts have attempted to combine strengths by appointing a team which includes an experienced federal criminal practitioner and an experienced state court capital litigator.

Judges praised the quality of the representation provided by the lawyers they appointed as higher than the ordinary standard of practice in federal criminal cases. Judges familiar with state death penalty trials found that the quality of representation in federal death penalty cases was superior to the norm in state death penalty cases as well. In a few cases, judges expressed disappointment with the quality of representation, but in these instances they generally had replaced the lawyers whose performance they considered deficient.

After having handled their first federal death penalty case, a number of learned counsel have accepted subsequent appointments to such cases. This is a significant trend and one which the judiciary should seek to perpetuate. Judges and lawyers agreed that counsel with federal death penalty experience were more efficient than lawyers without such experience. The availability of these highly skillful and knowledgeable lawyers has been an important resource, particularly in districts that lack attorneys with death penalty trial experience. (See Section C.4.b, infra.) In contrast, in federal capital habeas corpus cases, very few lawyers have been willing to accept repeat appointments, so that the learning curve remains steep (and therefore time-consuming and costly) in almost every new case. The continued willingness of these learned counsel to accept appointments in federal death penalty cases is an important element of any strategy for managing the costs of representation while maintaining quality.[42] (See also Recommendation 1, "Qualifications for Appointment," in Part II of this report.)

**2. Federal Death Penalty Resource Counsel Project.** The federal defender program has no systemic counterpart to the Criminal Division of the Department of Justice, which centrally supports the work of federal prosecutors nationwide. While a U.S. Attorney's Office bringing a federal death penalty prosecution can obtain training, advice, legal research and brief-writing assistance, sample pleadings and supplemental staffing from the Justice Department,[43] the private panel attorneys defending federal death penalty cases are, for the most part, sole practitioners or partners in small law firms comprised of fewer than half a dozen attorneys. Furthermore, although federal defender organizations are centrally funded, the representation they provide is entirely de-centralized. In order to improve the quality of representation and the cost effectiveness of defense services, in FY 1992 the judiciary established the Federal Death Penalty Resource Counsel Project (RCP). The RCP currently consists of three experienced capital litigators who support the work of appointed counsel and provide advice to the Administrative Office of the U.S. Courts on a part-time basis.[44] The Resource Counsel Project has become essential to the delivery of high quality, cost-effective representation in federal death penalty cases.

Dividing the work regionally, Resource Counsel are available to provide assistance to defense counsel in every federal death penalty case. Judges, defense counsel, Administrative Office staff and Department of

Justice death penalty policy makers praised their efforts and effectiveness. Resource Counsel's legal advice and pleadings have prevented lawyers from having to "reinvent the wheel" in every case. They have provided substantial assistance to courts and counsel in developing and implementing case budgeting procedures. They have assisted the Administrative Office and federal public defenders in discharging their statutory responsibilities to recommend qualified counsel for appointment. They have provided training opportunities for counsel. In addition, by monitoring prosecution decisions and following developments in this important area, they have provided critical statistical information and policy advice to the Administrative Office. (See also Recommendations 6, 8 and 9 ("Federal Death Penalty Resource Counsel," "Training," and "Case Budgeting") in Part II of this report.)

**3. Consultation Prior to Appointment of Counsel.** Since 1995, federal law has required the court, before appointing counsel in a federal death penalty case, to consult with the federal public defender for the district, or, if there is no federal public defender (or the defender has a conflict), with the Administrative Office of the United States Courts. This statutory requirement has generally, although not universally, been honored. In a very few cases, judges have appointed counsel without formally consulting either the federal public defender or the Administrative Office. For the most part, judges have taken a case-by-case approach to seeking advice about the appointment of counsel, although in one district the court directed the federal public defender to provide a list of lawyers qualified to handle federal death penalty cases instead of consulting as each case arose. In districts not served by a federal public defender, judges have consulted with the Administrative Office, which generally refers the court to one of the three Federal Death Penalty Resource Counsel, who provide training and support to lawyers handling federal death penalty cases nationwide.[45] The consultation process assists judges in identifying qualified lawyers to appoint to federal death penalty cases. (See also Recommendation 2, "Consultation with Federal Defender Organizations or the Administrative Office," in Part II of this report.)

**4. Availability and Recruitment of Qualified Lawyers.** A defendant charged with an offense punishable by death is entitled to two lawyers by statute. (18 U.S.C. § 3005.) A judge assigned a federal death penalty case may appoint private lawyers compensated on an hourly basis ("panel" attorneys) or, in a district served by a federal defender organization,[46] the court may appoint a lawyer employed by the FDO together with a panel attorney.[47] For the reasons discussed below, panel attorneys have been appointed in the vast majority of federal death penalty cases.

**a. Federal Defender Organizations.** Federal defender organizations are not currently able to provide representation in a large proportion of federal death penalty cases.[48] A few federal defender offices employ lawyers with prior death penalty experience gained in state court, but most do not. Indeed, lawyers in federal defender offices may also lack significant experience trying homicide cases, because few such cases are brought in the federal courts. Even federal defenders with extensive federal criminal experience feel themselves unqualified to provide representation without the participation of a "learned" counsel with capital case experience. Trial experience in non-capital cases is no substitute for the training required to prepare for the penalty phase of a capital case and to develop an overall trial strategy that integrates both phases. In almost all instances in which a judge has appointed a federal defender organization as counsel, the FDO has been joined by a panel attorney with death penalty experience.

Another obstacle to relying on federal defender organizations to provide representation in a larger proportion of federal death penalty cases is the effect of an appointment on the defender office as a whole. Death penalty cases consume resources: the time of experienced lawyers and supervisors, investigators, and support staff; and budgetary allocations for experts. Defenders reported to the Subcommittee that the time commitment involved in handling a death penalty case was disruptive, especially in districts in which it was difficult for the federal defender organization to compensate for

841

the appointment in the death penalty case by reducing the number of non-capital cases assigned to the office. Lawyers assigned to federal death penalty cases generally transferred their existing cases to other attorneys and reduced or eliminated their intake of new cases. Especially in smaller offices, where the added caseload had to be divided among fewer lawyers, death penalty cases interfered with the office's ability to fulfill its obligations to other clients.

**b. Panel Attorneys.** To date, courts generally have been able to locate and recruit a sufficient number of qualified lawyers to meet the need for representation. In some areas of the country, particularly those with state death penalty statutes, a substantial number of lawyers have developed experience defending capital cases. Not all of these lawyers, however, are fully qualified to provide representation in *federal* death penalty cases, because of unfamiliarity with important aspects of federal criminal practice. In other areas, especially those in which there is not a state death penalty statute, courts have been unable to recruit qualified lawyers from within the district, and have appointed lawyers with death penalty experience from other states. The Subcommittee found that judges who appointed counsel from outside their districts in order to meet qualification standards experienced a very high degree of satisfaction with the representation provided in their cases.[49] Typically, these judges had appointed one of the small (but growing) number of litigators who have provided representation in two or more federal death penalty cases. Both the appointing judges and the local counsel reported a range of resulting benefits, including the on-the-job training of the local co-counsel.[50] (See also Recommendation 4, "Appointment of the Federal Defender Organization," in Part II of this report.)

**5. Adequacy of Compensation to Attract Qualified Counsel.** Current federal law authorizes an attorney in a federal death penalty case to be paid up to $125 per hour.[51] At present, this maximum hourly rate appears adequate. Several years ago, the Judicial Conference reported that, "[w]hile many courts find the quality of panel attorneys [in non-capital cases] to be very high, serious funding difficulties and inadequate compensation hamper many courts in their ability to recruit and retain experienced attorneys as members of the CJA panel."[52] If the "real" (inflation-adjusted) hourly rate were to decline substantially, as it has for non-capital federal criminal representation, fulfillment of the judiciary's statutory and constitutional obligations to appoint qualified counsel might be jeopardized.[53]

Panel attorneys who are qualified for appointment to a federal death penalty case are generally among the most experienced and respected criminal practitioners. Consequently, many of them command high fees for retained criminal work and, in some instances, for civil litigation. Without exception, lawyers appointed in federal death penalty cases reported earning hourly rates from private clients that are much higher than (and often double) the maximum rate that may be paid for their representation in a federal capital case. Although the hourly rates of compensation in federal capital cases are higher than those paid in non-capital federal criminal cases,[54] they are quite low in comparison to hourly rates for lawyers generally, and to the imputed hourly cost of office overhead.[55] Most of the lawyers interviewed said they would not be willing to accept appointment to federal death penalty cases at the hourly rates which are authorized for non-capital representation.

One of the reasons it is sometimes difficult to recruit qualified counsel for a federal death penalty case is that lawyers in federal death penalty cases have to decline work they would otherwise accept while the capital case is pending. A single death penalty case can preclude a lawyer from accepting any other clients for a significant period.[56] Especially in the months preceding trial, defending a death penalty case often consumes all of an attorney's time. A lawyer's unavailability can significantly damage the network of referrals and name recognition vital to sustaining a small practice. One judge in a district with a very active criminal defense bar found that several lawyers declined appointment to a capital case because of the anticipated length of the trial and the effect the case would have on their retained

842

practice.

A number of lawyers recounted the detrimental effect of a single capital case on their practices. "You do lose business. People know you're busy and don't call," said one attorney who was interviewed. Another lawyer described the effect of a lengthy death penalty case involving a drug conspiracy on his practice as "devastating." Some lawyers also feel they lose potentially lucrative white-collar business once they become categorized as death-penalty lawyers. Lawyers also believe they lose future clients because of lack of exposure. One lawyer who had been devoting all of his professional time to a large, multi-defendant case recounted running into a journalist who said he had thought the lawyer must have left town because he had not seen him at the state courthouse for so long.

Another factor discouraging lawyers with active practices from accepting appointment to a federal death penalty case is a reluctance to become economically dependent on the timely payment of vouchers. Although generally lawyers did not complain about the timeliness of payments, in more than one case a long delay in the approval of vouchers forced lawyers to borrow money to pay office expenses. (See Recommendation 1(e), "Hourly Rate of Compensation for Counsel," in Part II of this report.)

**6. Number of Counsel.** Since the First Judiciary Act in 1789, federal law has provided for the appointment of a minimum of two lawyers per defendant in a capital case. Judges have generally appointed two lawyers in federal death penalty cases, although there have been rare instances in which the court has not done so until after the prosecution has filed notice of its intention to seek the death penalty, effectively delaying defense preparation. In a few cases, a judge has formally appointed more than two lawyers. This usually has occurred because the judge was dissatisfied with one or more of the lawyers originally appointed, but felt the overall ability of the defense team to meet statutory time limits and to provide an effective defense would be better accomplished by adding a new lawyer with needed skills rather than by replacing the lawyer originally appointed.

The defense team in federal capital cases may include paralegals, investigators and less experienced lawyers, generally billing at an hourly rate substantially below that of lead counsel. The additional lawyers who work on the case generally are not formally appointed, but rather are authorized by the court to work on limited and discrete tasks. When these assistant counsel are used effectively, total costs of attorney compensation are reduced, because the average hourly rate is reduced. For example, one appointed lawyer, who was authorized by the court to receive the statutory maximum of $125 per hour, hired a less experienced lawyer at $45 per hour to listen

to thousands of hours of wiretap tapes and identify the important parts, thus achieving substantial

savings.[57] (See Recommendation 3, "Appointment of More than Two Lawyers," in Part II of this report.)

### D. Efforts to Control the Cost of Representation.

Judges presiding over federal capital cases have been mindful of the need to closely monitor and control costs, and have pursued several strategies to this end. Probably the paramount concern has been to appoint responsible, trustworthy and experienced lawyers who will themselves exercise judgment about the reasonableness of costs. After closely reviewing vouchers, the judges interviewed indicated their satisfaction with the integrity of the lawyers they had appointed. In a very few instances, judges removed the lawyers who had first been appointed to the case, sometimes by a different judicial officer. The most common reason for removal was lack of death penalty experience evidenced in the lawyers' failure to identify and focus on the more promising lines of investigation, thus wasting resources.

Judges have used a variety of techniques to control costs. Many judges, particularly those presiding over cases filed in the last two years, have established budgets for the cost of defense representation. In one complex multi-defendant case, a judge directed the clerk of court to develop a computer program to assist in the tracking of expenditures. Other judges recounted denying or reducing requests for experts, and asking counsel to determine whether a qualified expert could be found at a lower rate or to persuade the expert to reduce the requested fee.

Judges also authorized the hiring of paralegals to reduce the costs of coordinating and distributing materials among defense counsel in multi-defendant cases.

Interviews with lawyers also revealed a reassuring degree of restraint. A number of lawyers recounted decisions not to request funds for certain experts or services, and almost all of them negotiated reduced rates or obtained some services from experts on a pro bono basis, recognizing that by reducing costs whenever possible, it would be easier to obtain judicial approval for other needed services. In multi-defendant cases, lawyers, both on their own and with judicial prompting, coordinated discovery and motions practice, thereby reducing the

potential for duplicative work. (See Recommendations 9 and 10 ("Case Budgeting" and "Case Management") in Part II of this report.)

## CONCLUSION

The recommendations set forth in Part II of this report should be adopted by the Judicial Conference of the United States and implemented by the judiciary.

## II. RECOMMENDATIONS AND COMMENTARY

### 1. Qualifications for Appointment.

a. Quality of Counsel. Courts should ensure that all attorneys appointed in federal death penalty cases are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding type of litigation. High quality legal representation is essential to assure fair and final verdicts, as well as cost-effective case management.

b. Qualifications of Counsel. As required by statute, at the outset of every capital case, courts should appoint two counsel, at least one of whom is experienced in and knowledgeable about the defense of death penalty cases. Ordinarily, "learned counsel" should have distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals, or post-conviction review that, in combination with co-counsel, will assure high quality representation.

c. Special Considerations in the Appointment of Counsel on Appeal. Ordinarily, the attorneys appointed to represent a death-sentenced federal appellant should include at least one attorney who did not represent the appellant at trial. In appointing appellate counsel, courts should, among other relevant

factors, consider:

    i. the attorney's experience in federal criminal appeals and capital appeals;
    ii. the general qualifications identified in paragraph 1(a), above; and
    iii. the attorney's willingness, unless relieved, to serve as counsel in any post-conviction proceedings that may follow the appeal.

d. <u>Special Considerations in the Appointment of Counsel in Post-Conviction Proceedings.</u> In appointing post-conviction counsel in a case where the defendant is sentenced to death, courts should consider the attorney's experience in federal post-conviction proceedings and in capital post-conviction proceedings, as well as the general qualifications set forth in paragraph 1(a).

e. <u>Hourly Rate of Compensation for Counsel.</u> The rate of compensation for counsel in a capital case should be maintained at a level sufficient to assure the appointment of attorneys who are appropriately qualified to undertake such representation.

## Commentary

As Recommendation 1(a) indicates, the first responsibility of the court in a federal death penalty case is to appoint well-trained, experienced and dedicated defense counsel. Federal law requires the appointment of two counsel to represent a defendant in a federal death penalty case, of whom at least one must be "learned in the law applicable to capital cases." 18 U.S.C. § 3005. Additional requirements relating to counsel's experience are codified at

21 U.S.C. § 848(q)(5)-(7). Legislatures, courts, bar associations, and other groups that have considered the qualifications necessary for effective representation in death penalty proceedings have consistently demanded a higher degree of training and experience than that required for other representations. Such heightened standards are required to ensure that representation is both cost-effective and commensurate with the complexity and high stakes of the litigation. The standards listed in Recommendations 1(b) - (d) are designed to assist courts in identifying the specific types of prior experience which have been deemed most valuable in the experience of the federal courts thus far. They emphasize the importance of bringing to bear both death penalty expertise and experience in the practice of criminal defense in the federal courts.

Recommendation 1(b) calls for the appointment of specially qualified counsel "at the outset" of a case, because virtually all aspects of the defense of a federal death penalty case, beginning with decisions made at the earliest stages of the litigation, are affected by the complexities of the penalty phase. Early appointment of "learned counsel" is also necessitated by the formal "authorization process" adopted by the Department of Justice to guide the Attorney General's decision-making regarding whether to seek imposition of a death sentence. (See United States Attorney's Manual § 9-10.000.) Integral to the authorization process is a presentation to Justice Department officials of the factors which would justify not seeking a death sentence against the defendant. A "mitigation investigation" therefore must be undertaken at the commencement of the representation. Since an early decision not to seek death is the least costly way to resolve a potential capital charge, a prompt preliminary mitigation investigation leading to effective advocacy with the Justice Department is critical both to a defendant's interests and to sound fiscal management of public funds.

Trial courts should appoint counsel with "distinguished prior experience" (Recommendation 1(b)) in death penalty trials or appeals, even if meeting this standard requires appointing a lawyer from outside

the district in which a matter arises. The preparation of a death penalty case for trial requires knowledge, skills and abilities which are absent in even the most seasoned felony trial lawyers, if they lack capital experience. An attorney knowledgeable about the nature of capital pretrial litigation, the scope of a mitigation investigation and the impact of the sentencing process on the guilt phase is indispensable and generally produces cost efficiencies. The costs of travel and other expenses associated with "importing" counsel from another jurisdiction can be minimized with careful planning by counsel and the court. With appropriate forethought, investigations, client counseling, court appearances and other obligations can be coordinated to maximize the efficient use of counsel's time and ensure cost-effectiveness.

Recommendations 1(c) and (d), with respect to the appointment of appellate and post-conviction counsel, respond to the requirement of 21 U.S.C. § 848(q) that representation in death penalty cases continue through post-conviction proceedings. Because trial counsel ordinarily will be precluded by a conflict of interest from representing the defendant in a post-conviction proceeding under 28 U.S.C. § 2255, continuity of representation and the efficient use of resources generally will best be achieved by appointing, at the appellate stage, at least one new lawyer who may continue to provide representation in any post-conviction proceedings. This should promote continuing representation by a lawyer who is already familiar with the record. In determining which, if any, of a death-sentenced defendant's prior counsel to appoint as post-conviction or appellate counsel, courts should consult with those counsel, the district's federal defender organization and/or the Administrative Office (See Recommendation 2).

Recommendation 1(e) reflects the fact that appropriate rates of compensation are essential to maintaining the quality of representation required in a federal capital case. The time demands of these cases are such that a single federal death penalty representation is likely to become, for a substantial period of time, counsel's exclusive or nearly exclusive professional commitment. It is therefore necessary that the hourly rate of compensation be fair in relation to the costs associated with maintaining a criminal practice. Federal statute currently provides for an hourly rate of up to $125 (21 U.S.C. § 848 (q)(10)(A)), which the Subcommittee finds to be adequate at the present time. However, this figure should be reviewed at least every three years, to ensure that it remains sufficient in light of inflation and other factors. (See 18 U.S.C. § 3006A(d)(1).)

## 2. Consultation with Federal Defender Organizations or the Administrative Office.

a. Notification of Statutory Obligation to Consult. The Administrative Office of the U.S. Courts (Administrative Office) and federal defender organizations should take appropriate action to ensure that their availability to provide statutorily mandated consultation regarding the appointment of counsel in every federal death penalty case is well known to the courts. (See 18 U.S.C. § 3005.)

b. Consultation by Courts in Selecting Counsel. In each case involving an offense punishable by death, courts should, as required by 18 U.S.C. § 3005, consider the recommendation of the district's Federal Public Defender (FPD) (unless the defender organization has a conflict) about the lawyers to be appointed. In districts not served by a Federal Public Defender Organization, 18 U.S.C. § 3005 requires consultation with the Administrative Office. Although not required to do so by statute, courts served by a Community Defender Organization should seek the advice of that office.

c. Consultation by Federal Defender Organizations and the Administrative Office in Recommending Counsel. In discharging their responsibility to recommend defense counsel, FDOs and the Administrative Office should consult with Federal Death Penalty Resource Counsel in order to identify attorneys who are well qualified, by virtue of their prior defense experience, training and commitment, to serve as lead and second counsel.

## Commentary

Since 1994, courts have been required to consider the recommendation of their federal public defender organization[58] or the Administrative Office regarding the appointment of counsel in each federal death penalty case. The Administrative Office has notified courts of this relatively recent innovation, and it has been largely followed and yielded results satisfying to judges, defense counsel and prosecutors. In a small number of cases, however, the Subcommittee found that courts had ignored or been unaware of the consultation requirement. For that reason, Recommendation 2(a) suggests that the Administrative Office take further steps to ensure that all courts are familiar with their obligations in this area and with the nature of the assistance which will be provided to them upon their request (see Commentary accompanying Recommendation 2(c)).

Recommendation 2(b) reflects the Subcommittee's view that recommendations concerning appointment of counsel are best obtained on an individualized, case-by-case basis. The relative infrequency of federal death penalty appointments, and the typically swift response which any court requesting a recommendation can expect, makes lists or "panels" of attorneys both unnecessary and, in some respects, impractical. Currently, within approximately 24 hours of receipt of a request, the Administrative Office or federal defender provides the court with the names of attorneys who not only are qualified to serve as counsel but who also have been contacted and indicated their willingness to serve in the particular case.[59] These individualized recommendations help to ensure that counsel are well-suited to the demands of a particular case and compatible with one another and the defendant. Case-specific consultation is also required by existing Judicial Conference policy (see paragraph 6.01B of the Guidelines for the Criminal Justice Act (CJA Guidelines), Volume VII, Guide to Judiciary Policies and Procedures, explaining the 18 U.S.C. § 3005 consultation requirement and suggesting that in developing a recommendation, consideration be given to "the facts and circumstances of the case.")

Recommendation 2(b) also suggests that in districts served by a Community Defender Organization (rather than a Federal Public Defender Organization) courts extend the statutory requirement and seek the recommendation of the head of that organization about appointment of counsel in federal death penalty cases. The omission of specific reference to Community Defender Organizations in the statute is not explained in any legislative history, and consultation with a Community Defender Organization is likely to be as valuable as consultation with a Federal Public Defender Organization.

To assist federal defender organizations and the Administrative Office in discharging their responsibility to recommend counsel, the judiciary has contracted with three Federal Death Penalty Resource Counsel, experienced capital litigators whose work is described in Section C.2 of Part I of this report. Recommendation 2(c) recognizes the value of the assistance provided by Resource Counsel and urges federal defenders and the Administrative Office to continue to work closely with them. Resource Counsel are knowledgeable about and maintain effective communication with defense counsel nationwide. Their ability promptly to match attorneys with cases is of great value to the judiciary.

## 3. Appointment of More Than Two Lawyers.

Number of Counsel. Courts should not appoint more than two lawyers to provide representation to a defendant in a federal death penalty case unless exceptional circumstances and good cause are shown. Appointed counsel may, however, with prior court authorization, use the services of attorneys who work in association with them, provided that the employment of such additional counsel (at a reduced hourly rate) diminishes the total cost of representation or is required to meet time limits.


## Commentary

The norm in federal death penalty cases is the appointment of two counsel per defendant. More than two attorneys should be appointed only in exceptional circumstances. Courts contemplating the appointment of a third counsel might consider contacting the Administrative Office for information and advice about whether circumstances warrant such appointment. Notwithstanding this suggested limit on the number of attorneys charged with responsibility for the defense in its entirety, courts are encouraged to permit appointed counsel to employ additional attorneys to perform more limited services where to do so would be cost-effective or otherwise enhance the effective use of resources. For example, in many federal death penalty cases the prosecution provides to defense counsel an extensive amount of discovery material which must be reviewed for relevance and organized for use by the defense. Providing legal assistance to appointed counsel at a lower hourly rate may prove economical or it may be a necessity in light of court deadlines. This is consistent with existing Judicial Conference policy with respect to all Criminal Justice Act representations (see CJA Guideline 2.11A), and is emphasized here because of its cost containment potential in capital litigation.

## 4. Appointment of the Federal Defender Organization (FDO).

a. <u>FDO as Lead Counsel.</u> Courts should consider appointing the district's FDO as lead counsel in a federal death penalty case only if the following conditions are present:

  i. the FDO has one or more lawyers with experience in the trial and/or appeal of capital cases who are qualified to serve as "learned counsel"; and

  ii. the FDO has sufficient resources so that workload can be adjusted without unduly disrupting the operation of the office, and the lawyer(s) assigned to the death penalty case can devote adequate time to its defense, recognizing that the case may require all of their available time; and

  iii. the FDO has or is likely to obtain sufficient funds to provide for the expert, investigative and other services reasonably believed to be necessary for the defense of the death penalty case.

b. <u>FDO as Second Counsel.</u> Courts should consider appointing the district's FDO as second counsel in a federal death penalty case only if the following conditions are present:

  i. the FDO has sufficient resources so that workload can be adjusted without unduly disrupting the operation of the office, and the lawyer(s) assigned to the death penalty case can devote adequate time to its defense, recognizing that the case may require all of their available time; and

  ii. the FDO has or is likely to obtain sufficient funds to provide for the expert, investigative and other services reasonably believed to be necessary for the defense of the death penalty case.

## Commentary

Federal defender organizations have provided representation in only a small number of the federal death penalty cases filed to date. In many cases, representation by defender organizations has been precluded because of conflicts of interest which arise because the organization has represented either another



defendant or a witness in the case. Even where the defender organization is not disqualified by a conflict, however, there are good reasons to proceed with caution in making appointments in this area. A decision to appoint a defender organization either as lead or as second counsel in a capital case should be made only after consideration of the factors identified in this Recommendation and consultation between the court and the federal defender.

Recommendation 4(a) is intended to inform courts, which are accustomed to relying on federal defenders to undertake the most difficult representations, that few federal defender attorneys currently possess appropriate qualifications and experience to act as lead counsel in a federal death penalty case. Because violent felony offenses, particularly homicides, rarely are prosecuted in the federal courts, there is little opportunity for federal court practitioners to learn even the fundamentals relevant to the guilt phase defense of a federal death penalty case. Unless they gained such experience in state court before joining the defender organization, most federal defender attorneys have little to no experience defending a homicide case; of those who did bring with them such state court background, few have capital experience.

Notwithstanding these considerations, however, there is much to be gained from the involvement of a defender organization in the defense of a federal capital case. Recommendation 4(b) suggests pairing a defender organization as co-counsel with an experienced capital litigator, an approach which has successfully been employed in some cases. In these cases, the defender organization has benefitted from the expertise of the "learned counsel" and gained valuable capital litigation experience as well. At the same time, the "learned counsel" has benefitted from the institutional resources and local court expertise of the defender staff. Whether as lead or second counsel[60], a federal defender organization should not be required to undertake more than one federal death penalty representation at a time unless the head of the organization believes such an arrangement is appropriate. Recommendations 4(a) and (b) acknowledge that capital cases inevitably and seriously disrupt the normal functioning of an office. To undertake too much death penalty litigation would seriously threaten the effective performance of a defender organization's overriding responsibility to provide representation to a substantial number of financially eligible criminal defendants in its district each year.

**5. The Death Penalty Authorization Process.**

a. Streamlining the Authorization Process. The Department of Justice should consider adopting a "fast track" review of cases involving death-eligible defendants where there is a high probability that the death penalty will not be sought.

b. Court Monitoring of the Authorization Process. Courts should exercise their supervisory powers to ensure that the death penalty authorization process proceeds expeditiously.

**Commentary**

A decision not to seek the death penalty against a defendant has large and immediate cost-saving consequences. The sooner that decision is made, the larger the savings. Since the death penalty ultimately is sought against only a small number of the defendants charged with death-punishable offenses, the process for identifying those defendants should be as expeditious as possible in order to preserve funding and minimize the unnecessary expenditure of resources. Recommendation 5(a) calls upon the Department of Justice to increase the speed with which it makes decisions not to authorize seeking the death penalty. Recommendation 5(b) urges judges to oversee the authorization process by monitoring the progress of the decisionmaking and imposing reasonable deadlines on the prosecution in this regard. Courts should also ensure that the prosecution's timetables allow for meaningful advocacy

by counsel for the defendant.

## 6. Federal Death Penalty Resource Counsel.

a. <u>Information from Resource Counsel.</u> In all federal death penalty cases, defense counsel should obtain the services of Federal Death Penalty Resource Counsel in order to obtain the benefit of model pleadings and other information that will save time, conserve resources and enhance representation. The judiciary

should allocate resources sufficient to permit the full value of these services to be provided in every case.

b. <u>Technology and Information Sharing.</u> The Administrative Office should explore the use of computer-based technology to facilitate the efficient and cost-effective sharing of information between Resource Counsel and defense counsel in federal death penalty cases.

### Commentary

Recommendation 6(a) urges the judiciary and counsel to maximize the benefits of the Federal Death Penalty Resource Counsel Project (described in Section C.2 of Part I of this report), which has become essential to the delivery of high quality, cost-effective representation in federal death penalty cases, and to ensure the Project's continued effectiveness.

Recommendation 6(b) recognizes that recent innovations in computer technology are making it increasingly easy and inexpensive for individuals who are geographically dispersed to share information. The Administrative Office should explore the feasibility and cost-effectiveness of using computer and other technology to enhance the delivery of support to appointed counsel in federal death penalty cases.

## 7. Experts.

a. <u>Salaried Positions for Penalty Phase Investigators.</u> The federal defender program should consider establishing salaried positions within FDOs for persons trained to gather and analyze information relevant to the penalty phase of a capital case. FDOs should explore the possibility that, in addition to providing services in death penalty cases to which their FDO is appointed, it might be feasible for these investigators to render assistance to panel attorneys and to other FDOs.

b. <u>Negotiating Reduced Rates.</u> Counsel should seek to contain costs by negotiating reduced hourly rates and/or total fees with experts and other service providers.

c. <u>Directory of Experts.</u> A directory of experts willing to provide the assistance most frequently needed in federal death penalty cases, and their hourly rates of billing, should be developed and made available to counsel.

### Commentary

Penalty phase investigators, or "mitigation specialists," as they have come to be called, are individuals trained and experienced in the development and presentation of evidence for the penalty phase of a capital case. Their work is part of the existing "standard of care" in a federal death penalty case. (See


Section B.7 of Part I of this Report.) Because the hourly rates charged by mitigation specialists are lower than those authorized for appointed counsel, employment of a mitigation specialist is likely to be a cost-effective approach to developing the penalty phase defense.

Mitigation specialists are, however, in short supply. In most of the federal death penalty cases the Subcommittee examined, penalty phase investigators were not available locally. Courts thus were required to pay for the costs of travel and related expenses in addition to paying the mitigation specialist's hourly rates. Recommendation 7(a) suggests ameliorating this problem by employing and training persons for this work in federal defender organizations. Because of the cost containment potential, the feasibility of having these salaried employees work not only on cases to which their federal defender organization is appointed, but on others within their region, should be explored as well.

Recommendation 7(b) encourages counsel to negotiate a reduced hourly rate for expert services whenever possible. Private experts must be employed in death penalty cases, but the cost of their services can and should be contained. When asked to provide services for the defense of an indigent criminal defendant, many experts are willing to accept fees lower than their customary hourly rates for private clients. In addition, courts and counsel should agree in advance to a total amount which may be expended for a particular expert. If it appears that costs will exceed the agreed-upon amount, counsel should return to the court for prior authorization to secure them. If travel costs are to be incurred, government rates should be obtained.

## 8. Training.

<u>Federal Death Penalty Training Programs.</u> The Administrative Office should continue to offer and expand training programs designed specifically for defense counsel in federal death penalty cases.

### Commentary

All of the defense counsel interviewed by the Subcommittee stressed the importance of participating in specialized death penalty training programs. Although the individuals appointed as "learned counsel" comprised a highly experienced group of lawyers, they nevertheless continued to attend training programs to update and refine their skills and knowledge, and emphasized that they availed themselves of such opportunities whenever possible. There are, however, very few training programs anywhere in the country specializing in the defense of death penalty cases, and there is only one -- an annual one-day program organized by the Federal Death Penalty Resource Counsel Project and funded by the Administrative Office -- focusing entirely on federal death penalty representation. Almost all of the defense counsel the Subcommittee interviewed had attended this program and identified it as a significant resource. With the case law relatively undeveloped and so many issues being litigated for the first time, the opportunity for counsel to benefit from the research of others and to share information and ideas was considered especially important and cost-effective. The Administrative Office and Federal Death Penalty Resource Counsel should ensure that training opportunities continue to meet the needs of appointed counsel in this area.

## 9. Case Budgeting.

a. <u>Consultation with Prosecution.</u> Upon learning that a defendant is charged with an offense punishable by death, courts should promptly consult with the prosecution to determine the likelihood that the death penalty will be sought in the case and to find out when that decision will be made.

b. <u>Prior to Death Penalty Authorization.</u> Ordinarily, the court should require defense counsel to submit a



litigation budget encompassing all services (counsel, expert, investigative and other) likely to be required through the time that the Department of Justice(DOJ) determines whether or not to authorize the death penalty.

c. Under Death Penalty Authorization. As soon as practicable after the death penalty has been authorized by DOJ, defense counsel should be required to submit a further budget for services likely to be needed through the trial of the guilt and penalty phases of the case. In its discretion, the court may determine that defense counsel should prepare budgets for shorter intervals of time.

d. Advice from Administrative Office and Resource Counsel. In preparing and reviewing case budgets, defense counsel and the courts should seek advice from

the Administrative Office and Federal Death Penalty Resource Counsel, as may be appropriate.

e. Confidentiality of Case Budgets. Case budgets should be submitted ex parte and should be filed and maintained under seal.

f. Modification of Approved Budget. An approved budget should guide counsel's use of time and resources by indicating the services for which compensation is authorized. Case budgets should be re-evaluated when justified by changed or unexpected circumstances, and should be modified by the court where good cause is shown.

g. Payment of Interim Vouchers. Courts should require counsel to submit vouchers on a monthly basis, and should promptly review, certify and process those vouchers for payment.

h. Budgets In Excess of $250,000. If the total amount proposed by defense counsel to be budgeted for a case exceeds $250,000, the court should, prior to approval, submit such budget for review and recommendation to the Administrative Office.

i. Death Penalty Not Authorized. As soon as practicable after DOJ declines to authorize the death penalty, the court should review the number of appointed counsel and the hourly rate of compensation needed for the duration of the proceeding pursuant to CJA Guideline 6.02.B(2).

j. Judicial Conference Guidelines. The Judicial Conference should promulgate guidelines on case budgeting for use by the courts and counsel.

k. Judicial Training for Death Penalty Cases. The Federal Judicial Center should work in cooperation with the Administrative Office to provide training for judges in the management of federal death penalty cases and, in particular, in the review of case budgets.

## Commentary

The Judicial Conference has endorsed the use of case budgets to manage the cost of capital habeas corpus cases. (CJA Guideline 6.02.F.) Case budgets for federal death penalty cases are designed to serve purposes similar to those accomplished by case budgets for capital habeas corpus cases. A complete case budget will require the lawyer to incorporate cost considerations into litigation planning and will encourage the use of less expensive means to achieve the desired end. For example, a budget might request appointment of an expert to perform a task that could be accomplished by a lawyer, justifying the request by showing that the expert's work will produce a corresponding reduction in the attorney hours required.

Submission and review of a budget will also assist the court in monitoring the overall cost of representation in the case, and determining the reasonableness of costs. Case budgets are increasingly being requested by courts or submitted by lawyers in federal death penalty cases. Most judges and lawyers interviewed by the Subcommittee were receptive to the idea of case budgeting, provided that persons with expertise in the defense of federal death penalty cases were available to assist in the development or the review of a case budget. Recommendation 9(d) encourages courts and counsel to seek such assistance from the Administrative Office and Federal Death Penalty Resource Counsel.

Because of the unpredictability of pretrial litigation, it is impractical to require counsel to budget for an entire case from start to finish. At a minimum, the budgeting process should be in two stages, as suggested in Recommendations 9(b) and (c). The first stage begins when the lawyer is sufficiently familiar with the case to be able to present a budget reasonably related to the anticipated factual and legal issues in the case and continues until the Department of Justice makes its decision as to whether it will seek the death penalty. If a death penalty notice is filed, a further budget should be prepared. The court may require a single budget from authorization to trial, or a series of budgets covering shorter increments of time. If the prosecution will not seek the death penalty, Recommendation 9(i) calls for the court to review the case in accordance with CJA Guideline 6.02.B(2), to determine whether the number or compensation of counsel should be reduced.

Because case budgeting is time consuming, and because federal death penalty cases in which the prosecution decides not to seek the death penalty cost much less than cases in which the death penalty is authorized, it may not be cost-effective for counsel to prepare a case budget if authorization is improbable. For this reason, Recommendation 9(a) encourages courts to inquire of the prosecution whether authorization is unlikely. Furthermore, inquiring into the date by which the authorization decision will be made will provide information about how long a period the initial budget should cover, which will assist courts in reviewing budgets.

If a significant mitigation investigation is to be undertaken, the Subcommittee recommends that a budget be developed for this work.

Recommendation 9(e) calls for case budgets to be submitted ex parte and maintained permanently under seal. A case budget requires defense counsel to spell out the overall litigation plan for the case. Consequently, it is an extremely sensitive document and contains privileged information. This approach is consistent with Judicial Conference policy regarding capital habeas case budgets. (CJA Guideline 6.02F.)

Review of case budgets greater than $250,000 by the Administrative Office should assist courts in determining whether the cost of representation is reasonable in light of experience in other similar cases and in identifying areas in which expenses might be reduced.

**10. Case Management.**

a. Non-Lawyer Staff. Where it will be cost-effective, courts should consider authorizing payment for services to assist counsel in organizing and analyzing documents and other case materials.

b. Multi-defendant Cases.

 i. Early Decision Regarding Severance. Courts should consider making an early decision on severance of non-capital from capital co-defendants.

853



ii. <u>Regularly Scheduled Status Hearings.</u> Status hearings should be held frequently, and a schedule for such hearings should be agreed upon in advance by all parties and the court.

iii. "<u>Coordinating Counsel.</u>" In a multi-defendant case (in particular a multi-defendant case in which more than one individual is eligible for the death penalty), and with the consent of co-counsel, courts should consider designating counsel for one defendant as "coordinating counsel."

iv. <u>Shared Resources.</u> Counsel for co-defendants should be encouraged to share resources to the extent that doing so does not impinge on confidentiality protections or pose an unnecessary risk of creating a conflict of interest.

v. <u>Voucher Review</u>. In large multi-defendant cases, after approving a case budget, the court should consider assigning a magistrate judge to review individual vouchers. The court should meet with defense counsel at regular intervals to review spending in light of the case budget and to identify and discuss future needs.

## Commentary

Recommendation 10(a) recognizes that the large volume of discovery materials and pleadings associated with a federal death penalty case may make it cost-effective for courts to authorize (and appointed counsel to employ) the services of law clerks, paralegals, secretaries or others to perform organizational work which would otherwise have to be performed by counsel at a higher hourly rate. (See also Commentary accompanying Recommendation 3, endorsing the practice of authorizing counsel to obtain the services of additional attorneys under appropriate circumstances.) Judicial Conference policy provides that, in general, appointed counsel may not be reimbursed for expenses deemed part of their office overhead (CJA Guideline 2.28); however, unusual expenses of this nature may be compensated (CJA Guideline 3.16). The Guidelines suggest that in determining whether an expense is unusual or extraordinary, "consideration should be given to whether the circumstances from which the need arose would normally result

in an additional charge to a fee paying client over and above that charged for overhead expenses" (CJA Guideline 3.16).

Recommendations 10(b)(i) - (iv) address some of the particular management burdens associated with multi-defendant federal death penalty cases. Special efforts are required to ensure the orderly administration of justice in these matters, which tend to become costly and cumbersome for courts and counsel.

Recommendation 10(b)(i) suggests that courts make early decisions concerning severance of non-capital from capital co-defendants. In general, capital cases remain pending longer than non-capital cases and involve far greater amounts of pre-trial litigation. Separating the cases of non-capital co-defendants, where appropriate, may lead to swifter and less costly dispositions in those cases. The earlier such a decision is implemented, the greater will be the cost savings.

Recommendation 10(b)(ii) suggests that courts schedule frequent status hearings so that discovery and other matters may proceed efficiently and so that problems may be noted early and swiftly resolved. If the schedule for such status hearings (on a monthly or other basis) is agreed upon in advance, then all parties can plan accordingly and valuable time will not be wasted while counsel and judges try to find a mutually convenient time for their next meeting.

Recommendation 10(b)(iii) suggests that, if all counsel agree, courts consider designating the attorneys for one defendant as "coordinating counsel." Coordinating counsel might be responsible for arranging the efficient filing and service of motions and responses among the co-defendants, scheduling co-counsel meetings and court dates, facilitating discovery, or any other tasks deemed appropriate by counsel and the court. In multi-defendant cases where the federal defender organization represents a defendant eligible for the death penalty, courts should (taking into account the views of the federal defender) consider designating the FDO as coordinating counsel because of its institutional capabilities. In the event that a panel attorney is designated as coordinating counsel, the additional time and resources demanded by this role should be compensated.

## 11. Availability of Cost Data

The Administrative Office should improve its ability to collect and analyze information about case budgets and the cost of capital cases.

Commentary

Only because there have been a comparatively small number of federal death penalty cases was it possible to assemble -- by painstaking manual collection -- the cost data relied upon by the Subcommittee. This process was necessitated by the limitations of the only available information source, the CJA payment system. The Administrative Office is in the process of replacing that system. Given the heightened significance of capital case costs to the federal defender program, the Administrative Office should give priority to ensuring that its new system will provide capital case data which is accurate, reliable and accessible. In addition, the Administrative Office should continuously track capital case costs so that the impact of appellate and post-conviction litigation can be analyzed, trends in case costs can be readily identified, and appropriate cost-containment mechanisms can be developed.

---

Footnotes

1. 21 U.S.C. § 848, *codifying* Pub. L. 100-690, 102 Stat. 4382 (1988). The Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238 (1972), had invalidated the previously existing federal death penalty statutes.

2. Pub. L. 103-322, 108 Stat. 1959 (1994).

3. Coopers & Lybrand Consulting, Report on Costs and Recommendations for the Control of Costs of the Defender Services Program (C&L) at Appendix Table 0.1 (Jan. 28, 1998).

4. Dean Lefstein was assisted by Lisa Greenman, Attorney Advisor in the Defender Services Division of the Administrative Office of the U.S. Courts, and David Reiser, a consultant to the Division. In addition, Kathleen O'Connor, Budget Analyst, and Sylvia Fleming, Systems Support Analyst, assisted in the quantitative analysis.

5. Cost averages reported here do not include estimates of the cost of representation in cases in which a federal defender organization (FDO) served as sole or co-counsel. The available data were inadequate to make reliable estimates of the cost of work performed by FDO attorneys and staff, and using panel attorney payments alone in cases in which FDOs served as co-counsel would have understated the actual cost of representation. Because panel attorneys, rather than FDOs, have provided representation in the vast majority of cases, the actual payments approved for panel attorneys are a better source of information on the cost of representation than estimates of FDO costs. The cost averages in this report also do not include expenditures attributable to the case that arose from the bombing of the federal building in Oklahoma City. Payment information related to the defense of that extraordinary case remains under seal pursuant to court order. However, the data

855

available to the Subcommittee affords an adequate basis for assessing the cost of the typical range of federal death penalty cases.

6. See 18 U.S.C. § 3005 (requiring appointment of two lawyers, including at least one "learned" counsel); 21 U.S.C. § 848(q) (setting higher maximum hourly rate for capital cases, establishing special qualifications for appointment, and setting special threshold for review of services other than counsel). These standards are discussed more fully in Sections B.7 (expert services), C.1 (learned counsel), C.5 (compensation of counsel), and C.6 (number of counsel).

7. Other factors considered by the Subcommittee included regional variations and variations over time. Although there have been too few federal death penalty cases to draw any statistically meaningful conclusions about whether the cost of representation varies regionally, the data which do exist suggest that there are not substantial differences such as those which have been noted in federal capital habeas corpus cases. Also, while annual costs of representation have varied -- probably as a result of the number of new cases for which few vouchers have yet been approved in a given fiscal year -- the average total cost per representation has remained stable and even declined from year to year. (See Appendix C, Chart C-1.) One possible explanation is that the proportion of highly complex drug conspiracy cases has declined, so that the average federal death penalty case is slightly less complex and expensive.

8. There is a small category of offenses over which the federal government has exclusive criminal jurisdiction. See 18 U.S.C. §§ 7, 13. Such cases cannot be prosecuted in a state court. However, most of the offenses charged in federal death penalty cases could also be prosecuted in a state court. Of the federal death penalty cases filed to date, it is uncertain precisely how many could have been prosecuted as *capital* cases in state court, because not all state laws provide for the death penalty, and the statutory standards for death penalty prosecutions vary from state to state. Interview data indicate, however, that the vast majority of federal death penalty cases could also have been prosecuted as state capital cases.

9. This estimate is based on cases tracked by the Federal Death Penalty Resource Counsel Project, which is described in Section C.2, *infra*.

10. Since January 1995, the Justice Department has reviewed all federal death penalty cases in order to monitor and centralize decisionmaking as to those cases in which the death penalty will be sought. Prior to that time, there was centralized review only of cases in which the local U.S. Attorney requested permission to seek the death penalty, and there was no requirement that the Attorney General review cases in which the local United States Attorney did not request such authorization. (The Department of Justice reports that 46 such cases were reviewed by the Attorney General from 1990 to 1994, of which 36 were authorized.) Between January 1995 and December 1997, the Attorney General reviewed 162 federal death penalty cases in which she did not seek the death penalty; however, this statistic cannot be extrapolated to determine the likely number of unauthorized cases for the period from 1988 to 1995, because fewer federal offenses were punishable by death before the enactment of the 1994 crime bill.

11. The sample consists of 78 authorized federal death penalty cases, 58 cases in which authorization was denied, and 7 cases in which the authorization decision was still pending. The $142,000 figure reflects the average (mean) total cost of vouchers approved for the representation of a single defendant prior to the end of FY 1997. Because federal death penalty cases typically extend over more than one fiscal year, *total* costs are more helpful in analyzing costs and making recommendations for case budgeting and other controls than *annual* costs. The distribution of costs for a representation on an annual basis may reflect more about how quickly vouchers are submitted and approved in a particular case than about the reasonable cost of the work required in the case in any given year. Average cost statistics reported are based on the total of payments made through the end of FY 1997, and may not be complete for any given case. The Subcommittee's sample over-represents the proportion of federal death penalty cases in which authorization was granted; therefore the average cost of the cases in the sample is greater than the average total cost of all federal death penalty cases.

12. This number was provided by the Department of Justice in a letter to the Honorable William Terrell Hodges, Chair of the Executive Committee of the Judicial Conference of the United States, dated April 14, 1998. The Department provided the Subcommittee with a list identifying 113 authorized cases through December 12, 1997.

13. The "capital trials" in the Subcommittee's sample include one case in which defendants were acquitted of capital charges, and which therefore did not include a penalty phase, and one case in which the government withdrew its request for the death penalty mid-trial, because these cases were prepared and litigated through the guilt phase as capital cases, even though there was no penalty phase. Two cases resolved by guilty pleas after the commencement of jury selection but before the presentation of evidence have not been classified as capital trials, although in these cases the vast majority of costs associated with the trial of a federal death penalty case had been incurred.

14. See 21 U.S.C. § 848(i) (separate sentencing hearing); 18 U.S.C. § 3593(b) (same). All post-*Furman* state death penalty laws likewise provide for a bifurcated sentencing proceeding.

15. A report by the General Accounting Office (GAO) prepared shortly after the revival of the federal death penalty examined existing data concerning the additional costs associated with a death penalty prosecution. GAO, Limited Data Available on Costs of Death Sentences (Sept. 1989). Subsequently, the State Justice Institute sponsored a study responding to some of the GAO's methodological critiques of earlier studies. Phillip J. Cook & Donna B. Slawson, The Cost of Processing Murder Cases in North Carolina (1993). Cook and Slawson found that both the prosecution and the defense devoted much more time to a capital murder trial than to a non-capital murder trial, and that the capital trials lasted much longer. Id. at 61.

16. Source: Federal Death Penalty Resource Counsel Project data. In addition, some of the federal death penalty prosecutions not brought under the CCE or RICO provisions also involve drug conspiracies. For example, one prosecution under the civil rights law arose from a federal investigation into a related drug conspiracy. Another case in which the capital charge was based on a kidnapping statute also grew out of a drug conspiracy, as did a robbery case.

17. C&L at IV.81.

18. Source: Federal Death Penalty Resource Counsel Project data.

19. The number of representations in other offense categories was too small to generate meaningful averages; however, the average cost per representation in each category was lower than the average for drug cases.

20. As a result, the scope of the penalty phase in a federal capital case may be even wider than it is in states that adhere to the rules of evidence in the penalty phase.

21. Louis D. Bilionis & Richard A. Rosen, Lawyers, Arbitrariness and the Eighth Amendment, 75 Tex. L. Rev. 1301, 1316-17 (1997) (citing Woodson v. North Carolina, 428 U.S. 280, 304 (1976) (opinion of Stewart, Powell, & Stevens, JJ.).

22. Recent decisions illustrating this point include: Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997); Hall v. Washington, 106 F.3d 742 (7th Cir. 1997); Emerson v. Gramley, 91 F.3d 898 (7th Cir. 1996), cert. denied, 117 S.Ct. 1260 (1997); Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995), cert. denied, 117 S.Ct. 273 (1996); Hendricks v. Calderon, 70 F.3d 1032 (9th Cir. 1995), cert. denied, 116 S.Ct. 1335 (1996); Clabourne v. Lewis, 64 F.3d 1373 (9th Cir. 1995); Antwine v. Delo, 54 F.3d 1357 (8th Cir. 1995), cert. denied, 116 S.Ct. 753 (1996); Baxter v. Thomas, 45 F.3d 1501 (11th Cir.), cert. denied, 116 S.Ct. 385 (1995); Jackson v. Herring, 42 F.3d 1350 (11th Cir.), cert. denied, 116 S.Ct. 38 (1995).

23. See ABA Guideline 11.8.3; New York Guideline 10.3.

24. Cook and Slawson found an enormous difference in the amount of time defense counsel devoted to a non-capital murder case as compared to a capital murder case in their study of North Carolina cases. The Costs of Processing Murder Cases in North Carolina at 61. (See note 15, *supra*.)

25. See ABA Guideline 11.4.2.

26. In other words, lawyers have to raise issues that may previously have been decided against them in their district or circuit. If they fail to do so, they will be barred by procedural default from obtaining relief from a death sentence, even if the Supreme Court later finds their positions meritorious. *See* Hitchcock v. Dugger, 481 U.S. 393 (1987) (upholding challenge to application of Florida death penalty statute that had been repeatedly rejected by the circuit and district courts).

27. C&L at IV.50. Prior to 1994, attorneys did not categorize their hours on vouchers, so reliable data concerning the attorney workload do not exist prior to FY 1995.

28. It is too early to tell from the data whether attorney time associated with legal research and writing will decline as unresolved issues are decided by the appellate courts.

29. Comparable data are not available for non-capital homicides, or other non-capital cases, because the voucher form used in non-capital cases does not break down attorney hours into these categories.

857

30. C&L at IV.22.

31. The Department did not identify cases by name; therefore it was impossible to compare the cost of prosecution and defense in specific cases.

32. In addition, the Department's estimate of its personnel costs for each prosecution was based on the share of attorney and non-attorney staff salary and benefits devoted to each prosecution, and therefore did not include "overhead" costs.

33. Department of Justice, United States Attorney's Manual § 9-10.000.

34. In some districts, U.S. Attorney's offices have also implemented a similar process for obtaining defense counsel's input into the decision regarding whether or not to recommend authorization to the Attorney General.

35. Another, less important, cost factor is the direct cost of participating in the authorization process. This includes the attorney time devoted to drafting a written submission to the Death Penalty Review Committee and the costs of travel to and from Washington to meet with the Committee. The CJA payment system does not separately track these costs.

36. C& L at IV.49. For non-capital homicides, the portion of payments for services other than counsel was approximately 16.2% in FY 1997, and 18% over the period FY 1992-97. The distribution of these costs was different from that in capital cases. Investigators were used much more frequently in federal death penalty cases (88/136) than in non-capital homicides (128/639 from FY 1992-1997). In those cases in which investigators were hired, the average cost was $22,438 for death penalty cases, compared to $3,502 for non-capital homicide cases. Psychologists were also hired much more frequently (50/136 versus 62/639). The average spending for each case in which a psychologist was hired was $8,723 for death penalty cases compared to $1,382 for non-capital homicide. Similarly, "other" experts were hired in 94/136 federal death penalty cases versus 78/639 non-capital homicides, with an average cost in each case in which an "other" expert was hired of $21,928 in death penalty cases versus $3,980 for non-capital homicides.

37. C&L at IV.24. See ABA Guideline 11.8.3 (preparation for the sentencing phase should begin immediately upon counsel's entry into the case).

38. The precise amounts and hourly rates paid to mitigation specialists in all cases could not be determined, because the standard death penalty expert expense form does not include a distinct code for mitigation specialist or the equivalent, who are therefore coded "other." It was possible, however, to tie CJA payment system information to other data concerning the use of mitigation specialists for several cases. Hourly rates paid to mitigation specialists in those cases ranged from $35 to $80 per hour.

39. American Bar Association, Toward a More Just and Effective System of Review in State Death Penalty Cases, 40 Am. U. L. Rev. 1, 63 (1990).

40. Id. at 65, 69, 70.

41. Id. at 70.

42. See Judicial Conference of the United States, Committee on Defender Services, Subcommittee on Death Penalty Representation at 5 (1995) (discussing the problem of constant reinvention of the wheel in capital habeas cases).

43. In fact, the Justice Department is in the process of enhancing the support already available to prosecutors in federal death penalty cases. Although in the past the Criminal Division did not have a designated death penalty unit, approximately eight new attorney positions are to be dedicated exclusively to assisting U.S. Attorney's Offices involved in federal death penalty prosecutions.

44. The Federal Death Penalty Resource Counsel Project is modeled on the CJA Panel Attorney Resource Counsel program, in which, in a limited number of federal districts which are not served by a federal defender organization, a private panel attorney provides, on a part-time, hourly fee basis, training and advice to appointed counsel and serves as a liaison with the court and the Administrative Office when necessary. The Federal Death Penalty Resource Counsel Project should not be confused with the former Post-Conviction Defender Organizations, or Death Penalty Resource Centers, which were fully staffed law offices providing representation and other services in death penalty habeas corpus proceedings arising from state

858

court death sentences, and which no longer receive any federal funding.

45. See Section C.2, supra.

46. There are two types of FDO. A federal public defender (FPD) is a federal agency staffed by federal employees. A community defender organization (CDO) is a non-profit agency funded by a grant from the judiciary. The fifty FPD offices serve 58 of the 94 federal districts. Thirteen CDOs serve an additional 15 districts.

47. In a small number of cases, courts have appointed two attorneys from an FDO as counsel and have not appointed a panel attorney. There has been one capital trial in which representation was provided exclusively by the FDO. In all other cases in which the death penalty was authorized, a panel attorney was appointed together with the FDO.

48. In many federal death penalty cases, conflict of interest rules have precluded the FDO from accepting appointment. These conflicts typically arise because the FDO has previously represented a co-defendant or witness in the case, and are particularly common in multi-defendant prosecutions.

49. Although 21 U.S.C. § 848(q)(5) requires appointment of at least one attorney who has been admitted to practice *in the court in which the prosecution is to be tried* for not less than five years, the statute provides an exception, for good cause, which permits the court to appoint instead "an attorney whose background, knowledge, or experience would otherwise enable him or her to properly represent the defendant, with due consideration to the seriousness of the possible penalty and to the unique and complex nature of the litigation. 21 U.S.C. § 848(q)(7).

50. Concerns have been raised, however, about whether lawyers from out-of-district might be less effective than local attorneys in jury trials. Those interviewed disagreed about this point, and it may be more true in some areas than in others. At one extreme, there were those who believed it would be disadvantageous to appoint a lawyer from *a larger city within the same district* to a case in a more rural area. It may also be, as some interviewees suggested, that familiarity with the local jury pool is especially important in a capital case, and that counsel without local trial experience is more likely to need an expert to assist in jury selection. See Section B.7, *supra*.

51. 21 U.S.C. § 848(q)(10)(A). There is no statutory maximum for cases filed prior to April 24, 1996, however Judicial Conference guidelines recommend an hourly rate ranging between $75 and $125 per hour. Courts authorized rates higher than $125 per hour only in a handful of federal death penalty cases filed before the enactment of the statutory maximum. Coopers & Lybrand attributed a substantial portion of the increase in the cost per federal death penalty representation to a "real increase in [hourly] rates." (C&L IV.37). This conclusion, however, is not correct, as it was based on a projection from the *highest* hourly rates paid in a case during a fiscal year, rather than the average rate paid per hour billed over the fiscal year. Using the latter method, the average hourly rate fluctuated from year to year. FY 1991: $115.82; FY 1992: $108.22; FY 1993: $99.44; FY 1994: $79.92; FY 1995: $88.16; FY 1996: $113.84; FY 1997: $108.84. Calculating average hourly rates billed *per representation* showed a similar pattern of fluctuation, rather than a consistent rise in the hourly rate of attorney compensation. Therefore, it cannot be said that the rate of attorney compensation accounted for a significant portion of the overall increase in spending on federal death penalty cases.

52. Report of the Judicial Conference of the United States on the Federal Defender Program at 12 (1993).

53. The national average (mean) billing rate for law firm *associates*, as of January 1, 1997, was $134 per hour. The median billing rate for associates was $125 per hour, which means that half of the country's non-partner lawyers (who typically have less experience than qualified federal death penalty lawyers) bill at a higher rate than the highest rate that may be authorized for a lawyer capable of undertaking the most challenging criminal representation. Altman, Weil, and Pensa, The 1997 Survey of Law Firm Economics at II-3 (1997). For small firms, the mean for associates was $127 per hour, and the median was $125 per hour. For partners in small firms -- the most comparable source for the rate panel attorneys in capital cases would command in the private market, the mean was $169 per hour, and the median was $160 per hour. Id. at II-6. For lawyers with at least five years of experience, the minimum required by statute, the mean billing rate was $150 per hour, with a median of $145. For lawyers with 15 years of experience -- much more typical of the lawyers considered qualified for federal death penalty cases -- the mean was $179 per hour, and the median was $175 per hour. Id. at II-9. The 1996 national average hourly cost of office overhead, assuming 1800 billable hours yearly, was $64.3 per hour. Id. at VII-5. In some areas, billing rates and overhead costs are much higher than the national average, yet the maximum rate for representation in a federal death penalty case is limited to $125 per hour.

54. The maximum rate which may be paid to appointed counsel in non-capital cases is $75 per hour. Although the Judicial



Conference has approved this rate for all districts, funding has been provided by Congress only for 12 districts (or portions of districts) at this rate. The remaining districts are limited to $45 for out-of-court work and $65 for in court work.

55. These factors are relevant to the determination of a reasonable rate of compensation for legal representation under the ABA Model Rules of Professional Conduct and caselaw interpreting federal "fee-shifting" statutes. See Model Rules of Professional Conduct 1.5(a)(1), (3) and (7).

56. See Model Rules of Professional Conduct 1.5(a)(2) (inability to accept other employment is a factor in setting reasonable fee).

57. In the sample of federal death penalty cases assembled for this report, there were two cases in which a total of five lawyers were compensated, however in both cases some of the lawyers were replaced by others, so that no more than three lawyers worked on the case at one time. In eight cases, four lawyers were compensated, however in some of these cases lawyers replaced others who had been removed. In 12 cases three lawyers were compensated. In the remaining 95 cases (81% of the total), only two lawyers were compensated.

58. A district court which chooses to provide representation through a federal defender organization may elect one of two organizational models. A Federal Public Defender Organization (FPDO) is a federal agency, headed by a Federal Public Defender who is selected by the Circuit Court of Appeals. The attorneys and other staff of a federal public defender organization are government employees. A Community Defender Organization (CDO) is a not-for-profit corporation governed by a board of directors and led by an executive director. Both types of organization are funded and administered by the federal judiciary pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A. The term "federal defender organization," or "FDO," as used in this report, includes both organizational models.

59. The distinction between being qualified to serve and willing to do so is significant. Most defense counsel interviewed by the Subcommittee indicated that they would not be willing to accept appointment to more than one federal death penalty case at a time. Furthermore, since accepting a federal death penalty appointment requires a substantial time commitment which may ultimately cause the attorney to become entirely unavailable for any other fee-generating work, appointment to such a case is not lightly undertaken.

60. In a very small number of cases, federal defender organizations have served as both lead and second counsel, without the assistance of a panel attorney; such appointments should not be made unless the federal defender believes it is in the best interests of the client and the organization.

# EXHIBIT 10



# DECLARATION

I, Terry Terrell Brown, being of lawful age, declare under penalty of perjury, that the following is true and correct:

1) My name is Terry Terrell Brown and I am 22 years old.

2) I am making this declaration voluntarily. I have not been threatened, coerced or promised anything by anyone. I understand this declaration may be used in legal proceedings concerning Christopher Vialva.

3) In June, 1999, I was staying at 2002 Hill Street, Killeen, Texas with Billy Rorie. My mother was living on base at Fort Hood at 155-1 Safi Road.

4) During the Juneteenth Celebration, on June 19, 1999, I was drinking and took a hit of acid. I continued using drugs and drinking until my arrest on June 21. The morning of the 21st, I smoked a stick of "wet" - a marijuana cigarette dipped in embalming fluid. I had two of these and smoked both that day. I stayed high all day.

5) I stayed up all night almost every night. I got up at 7:00 a.m. on June 20 and did not go to sleep again until 6:00 a.m. on June 21. On June 21, Brandon Bernard picked me up after summer school just shortly before noon. I didn't go to sleep again until after I was arrested and nodded off in the patrol car. During this time when I was using drugs I didn't eat much, and mostly just snack cakes. At the time I got arrested I had at most five hours sleep, little to eat, and I was high.

6) While I was at the CID Office somebody questioned me. I don't remember what time it was or how long I had been there, but it was before I talked to my mom. At the time my mother was living not five minutes away from the CID Office. At the time I gave the statement at CID the officers were telling me they knew Vialva did it all and that I was down the hill from the car. They told me about the two shots.

7) I went in front of a Justice of the Peace later in the day on June 22. I can't remember the time and I can't remember anything about what happened. I don't remember if we were still at CID or if we went to the Juvenile Annex.

8) They took me to McLennan County but because I was 17 I stayed in the holding tank. I don't remember eating anything. All I did was sleep. I don't remember how long I was there. Finally, they took me to the juvenile facility on Rancier in Killeen.

*Declaration of Terry Terrell Brown*

9)     About a week and half later, Dan Chadwick and Ranger Aycock came to the juvenile facility with an ATF agent, someone from CID, my lawyer, and my mom. At that point, they started telling me details from start to finish. They told me Vialva had blood on his shoe.

10)    I was contacted several more times during the next two months. Ranger Aycock and Agent Chadwick kept bringing me details, asking me to confirm what had happened. They already knew about me pointing the gun. At some point, the jail put me on medication for bipolar disorder. I got word from Brandon Bernard that everybody was pleading guilty. Based on that, I decided to lay out what I had done and plead guilty. My lawyer told me I needed to tell everything I'd ever done so no more charges could be brought up on me. Ranger Aycock brought up the Kick Door Boys so I knew someone had told about that.

11)    Right before Vialva and Bernard's trial, they brought me down to the federal building in Waco. The DA, who was a young guy, ran through my testimony with me. My lawyer was present for that meeting. I was basically confirming what they were telling me.

12)    At no time did any of the lawyers representing Vialva or Bernard try to contact me. My lawyer never even mentioned anything about them wanting to talk to me. I would have talked to them. When I was on the witness stand, Vialva's lawyers never asked me about using drugs on the day of the event. I would have told them the truth if they would have asked me.

13)    When I was on the witness stand and lawyers were asking me about times, conversations, and what was happening, I told them I wasn't listening even though I had a watch and I was present during conversations. The truth is I was high and really wasn't paying attention. To this day I still can't remember specific times and details.

14)    I feel they coerced my statement from me by bringing everything to me as reality. They didn't ask my version of what happened, they basically told me everything. There were things they brought to my attention that I wasn't present for like the pawn shop, the ring being found in Sparks' house, the food shop they stopped at, and conversations they had with other people throughout the day. The way they presented it to me, it would be in my best interest to go along with them and anything short of murder would be taken care of for me.

*Declaration of Terry Terrell Brown*

      I declare under penalty of perjury that the foregoing declaration, consisting of 14 paragraphs on six handwritten pages, is true and correct. I have compared the handwritten version of this declaration with the typewritten version and noted the addition of "When I was on the witness stand" at the beginning of the fourth sentence of paragraph 12, I affirm under penalty of perjury that this typewritten declaration in true and correct. Executed this ___29___ day of April, 2004, in Pollock, Louisiana.

*and the omission of "me" in the same sentence. A typographical error in paragraph 5, "each" instead of "ext", has been corrected.*

                                    *Terry Brown*
                                    Terry Terrell Brown

Witnessed by:

*Ranada Gentry* 4/29/04
Ranada Gentry

# EXHIBIT 11



## DECLARATION OF GREGORY HARDIN LYNCH

Gregory Hardin Lynch, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.     My name is Gregory Hardin Lynch. I am over the age of eighteen. I live in Killeen, Texas. I am making this statement voluntarily. No one has threatened me in any way to get me to make this statement. No one has given or promised me anything in return for making this statement. I understand that this statement may be used in legal proceedings involving Brandon Bernard.

2.     I was never contacted by Brandon Bernard's attorneys prior to Brandon Bernard's trial. If I had been contacted, I would have told them the information contained in this statement. I would have spoken to Brandon Bernard's attorneys even if my own lawyer had advised me not to do so.

3.     After I was arrested, I was locked up with Chris Lewis and Terry Brown in juvenile detention. At some point, we were separated. Before that, however, we had conversations about what happened on the night of the murders. Both Chris Lewis and Terry Brown told me that Chris Vialva had gone crazy that night. From my conversations with Chris Lewis and Terry Brown, it was my impression that no one other than Chris Vialva knew that the couple was going to be murdered before Chris Vialva actually shot them.

4.     Terry Brown told me that at the scene of the murders, before Chris Vialva had shot the couple, Terry Brown told Chris Vialva to just let the people go. According to Terry Brown, this made Chris Vialva very angry and he started waving the .40 Glock around. After that, according to

**DECLARATION OF GREGORY HARDIN LYNCH**
**PAGE 1**

*IT IS MY UNDERSTANDING GL FROM WHAT I WAS TOLD THAT*

Terry Brown, Chris Vialva shot the victims. ██████████████ Chris Vialva shot the

Bagleys, Terry Brown then lit the car on fire.

I have been given an opportunity to read the foregoing declaration, with paragraphs numbered 1 through 4, and to make any corrections I wanted. I declare under penalty of perjury that this declaration is true and correct.

Executed on **05-27-04** (date).

Greg Lynch

**DECLARATION OF GREGORY HARDIN LYNCH**
**PAGE 2**

8e7

# EXHIBIT 12

868

## DECLARATION OF DAVID A. RUHNKE

David A. Ruhnke, pursuant to the provisions of 28 U.S.C. §1746, makes the following sworn declaration:

### Qualifications of Declarant

1.  My name is David A. Ruhnke. I have been a practicing attorney for nearly 29 years and practice almost exclusively in the area of criminal defense. I graduated from law school in 1975, clerked for one year, and then went to work in the Office of the Federal Public Defender for the District of New Jersey. In 1983, after seven years with the Federal Defender, I went into private practice and founded the law firm that is now known as Ruhnke & Barrett. I am in partnership with my wife, Jean D. Barrett. Since entering private practice in 1983, I have devoted a substantial part of my professional life to defending capital murder cases in both state and federal court. A copy of a current resume, setting forth my general background and my experience in capital cases, is appended to this declaration as Appendix A and is incorporated by reference.

2.  To date I have tried 12 capital cases to a verdict, six in the New Jersey Superior Court and six in various United States District Courts. In addition to capital cases which actually went to trial, I have been involved in numerous other potentially capital cases, as set forth particularly in the attached resume, that were negotiated to a sentence of less than death without a trial or where, in the federal arena, the Attorney General of the United States decided not to authorize a capital prosecution.

Declaration of David A. Ruhnke
Page 1 of 82

3.  I lecture frequently on the defense of capital cases.  I also regularly attend seminars and conferences on the subject of the death penalty, and related topics, in order to stay current in this field.  I was a member of the faculty of the initial Capital Trial Advocacy Program held in Austin, Texas, in January 2002, under the sponsorship of the Center for American and International Law.  I also served as a member of the faculty for that program in March of this year in Plano, Texas.  I have been asked to return next year and deliver the keynote address.

4.  Based upon on my experience and background, including regular and frequent contact with attorneys handling capital cases all around the country, I am familiar with the prevailing professional norms of capital representation.  I am familiar, as well, with the Guidelines adopted by the American Bar Association (ABA) for such representation, both as originally formulated in 1989 and as revised last year. Because the relevant events of this case took place in 1999-2000, any citations to the ABA Guidelines will be to the version in effect at that time, although I view the 2003 revision as more of an up-date than a totally new look at the responsibility of defense counsel in capital cases.

5.  On five prior occasions, I have been qualified to testify as an expert witness regarding attorney performance in defending capital cases.

**Basis and Standards for Review**

6.  I have been asked to render an opinion whether, in the matter of *United States v. Brandon Bernard*, No. W-99-CR-070(2) (W.D. Tex.), defendant Bernard's attorneys

Declaration of David A. Ruhnke
Page 2 of 82

810

provided effective assistance of counsel. More specifically, I have been asked to assess whether trial counsel's performance "fell below an objective standard of reasonableness ... under prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668 (1984); *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003). I have also considered the "prejudice" prong of the *Strickland* inquiry, *i.e.*, whether there is a reasonable probability that, had counsel not performed deficiently, the outcome of the proceeding would have been different.

7. My opinions here pertain only to trial counsel's acts and omissions in this particular trial. The first part of the *Strickland* analysis, *i.e.*, whether a minimum standard of performance was violated, involves an objective assessment of the particular challenged facet of representation, and not an evaluation of the lawyer's general competence, professionalism, dedication, or reputation. Otherwise competent, experienced, and highly-respected attorneys can and do make mistakes which either alone or in combination may seriously undermine confidence in the verdict in a particular case. This is particularly true in capital cases, where courts have recognized that a single error or omission can amount to a denial of constitutionally adequate representation. I have tried at all times to distinguish between minimum standards of attorney performance and optimal representation. When I express the opinion that a particular act or omission by Mr. Bernard's counsel was ineffective or deficient, I mean that it fell below minimum standards of attorney performance.

Declaration of David A. Ruhnke
Page 3 of 82

871

**Documents Reviewed**

8.  In preparing to render an opinion, I have reviewed the following materials: the pleadings and orders filed in the case; the transcript of testimony from both the guilt and punishment phases of trial; the files apparently maintained by Bernard's trial counsel; the Fifth Circuit's opinion affirming Bernard's conviction and sentence; plea and sentencing transcripts for Tony Sparks, Chris Lewis, and Terry Brown; pre-sentence investigation report for Terry Brown; report of psychological evaluation of Terry Brown by Dr. James Shinder; grand jury testimony of FBI Special Agent Chadwick; affidavits from Terry Brown; report of fire investigator Thomas Sing; affidavit of Dr. Michael Gelbort, and a June 2, 2004 draft social history report and assessment by mitigation specialist Jill Miller, M.S.S.W.

**Summary and Scope of Opinion**

9.  Upon reviewing the materials described above, and considering them in light of the applicable legal standard, it is my opinion that Mr. Bernard did not receive effective assistance of counsel as guaranteed by the Sixth Amendment, based on the acts and omissions of trial counsel described in this declaration, and the likely cumulative prejudice that resulted to Mr. Bernard.

10. The instances of deficient performance and resulting prejudice set out below may not constitute a complete list of the Sixth Amendment violations in Mr. Bernard's trial. I continue to review information provided by Mr. Bernard's current counsel, and have not yet formed an opinion respecting whether other specific acts or omissions of

Declaration of David A. Ruhnke
Page 4 of 82

872

counsel in this case constituted deficient performance under *Strickland*, or prejudiced the outcome of either phase of trial.

11. I am prepared to supplement these findings if requested to do so, and to testify to these opinions at a hearing if one is ordered by the Court.

**Failure to Investigate in Preparation for the Guilt-Innocence Phase of Trial**

12. The time records submitted by Mr. Bernard's lead trial counsel Russ Hunt, Sr., reflect that during the first four months he represented Mr. Bernard (*i.e.*, from his appointment on June 23, 1999 to October 23, 1999), Mr. Hunt, Sr. ████████████



13. Similarly, from October 24, 1999 to May 3, 2000, Mr. Hunt, Sr., ████████████

14. During the same time period, his investigator, "Criterion Investigations," ████

15. Second-chair counsel Russ Hunt, Jr., was appointed in March 2000, and from then until mid-May 2000 ████████████

Declaration of David A. Ruhnke
Page 5 of 82

873

████████████████████████████████████████████████n

████████████████████████████████

16. As a result, during the entire period of pre-trial preparation, from June 1999 to May
2000, Mr. Bernard's defense team collectively ██████████████████████
███████████████████████████████. While of course every case
is different, based on my experience defending capital cases I believe it is
exceedingly unlikely that an adequate investigation of a capital murder case,
inquiring into issues relevant to both phases of trial, could be conducted in that
amount of time.

17. Similarly, records reflect that the total number of hours spent on Mr. Bernard's case
by both his attorneys before trial began (*i.e.*, by Mr. Hunt, Sr., from the date of
appointment through May 3, 2000, and by Mr. Hunt, Jr., from his appointment in
March 2000 through May 14, 2000)███████████████████████
███████████████████████████████
███████████████████████████████
████████████████████

18. By way of contrast, according to the authoritative 1998 report of the Subcommittee
on Federal Death Penalty Cases of the Committee on Defender Services of the
Administrative Office of the U.S. Courts, *Federal Death Penalty Cases:*
*Recommendations Concerning the Cost and Quality of Defense Representation*, the
average amount of time billed by defense counsel in federal capital cases that

Declaration of David A. Ruhnke
Page 6 of 82

874

proceeded to trial was 1,889 hours, representing 409 hours of in-court time and 1,480 hours of out-of-court time. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████

19. Mr. Bernard's counsel failed to investigate in preparation for the guilt-innocence phase of his trial. The standard of practice for attorneys defending federal capital cases in 1999-2000 required counsel to undertake a thorough and independent investigation of the facts and circumstances of the offense. By "independent," I mean that it is objectively unreasonable for defense counsel to rely solely on the information provided by the Government through formal or informal discovery, rather than conducting their own investigation. It was also understood in 1999-2000 that reasonably effective counsel could not rely exclusively on their client as a source of information that might be relevant to a defense at either phase of a capital trial. Under prevailing professional norms of defense representation in 1999-2000, it was understood that counsel had a duty to conduct an investigation into the offense regardless of any statement or admission by the client concerning the facts of the alleged crime or what might otherwise appear to be strong or even overwhelming evidence of guilt.

20. Mr. Bernard's trial counsel performed deficiently in failing to obtain the services of

Declaration of David A. Ruhnke
Page 7 of 82

875

an investigator for the guilt phase.  Counsel was appointed June 23, 1999.   Counsel waited about six weeks before filing a motion seeking funds for an investigator.  In that motion, counsel noted that there were a large number of witnesses in the case and three co-defendants as well as a large amount of physical evidence.  Once counsel had access to the services of an investigator, however, counsel did not direct the investigator to inquire into any area of the case related to the offense or the co-defendants.  Instead, counsel appears simply to have had the investigators ("Criterion Investigations") interview persons named on a list of names provided by Mr. Bernard's mother.  Many of these interviews were conducted by telephone.  This investigation had little relevance to the issues that would arise at the guilt phase of trial.

21. In addition to failing to ensure that their investigator conducted an appropriate independent investigation, Mr. Bernard's counsel unreasonably failed to conduct any investigation in preparation for the guilt phase on their own, including specifically failing to interview the co-defendants and other witnesses (such as Greg Lynch, Tony Sparks, or Joey Presley).   Counsel unreasonably failed to obtain copies of the transcript of the plea hearing of cooperating co-defendants Lewis and Brown, or of Tony Sparks. Counsel never made any efforts, as reasonably effective counsel would have, to obtain the pleadings or transcripts for either the detention hearings or the juvenile transfer proceedings for Lewis or Sparks, nor to obtain the juvenile records of Lewis or Sparks.

Declaration of David A. Ruhnke
Page 8 of 82

874

22. Counsel unreasonably failed to investigate evidence that would have shown that Lewis and Brown had opportunities to communicate with one another prior to trial. Counsel unreasonably failed to conduct any investigation into evidence that might undermine the credibility of Lewis or Brown, such as Brown's mental illness and history of frequent drug use, or Lewis' prior criminal conduct. There is good reason to conclude that such investigation would have been fruitful, as Brown has indicated in an affidavit that he would have been willing to speak with Bernard's attorneys even if his own lawyers advised against it, and the affidavit reflects extensive drug use by Brown around the time of the crime.

23. Reasonably effective counsel in 1999-2000 would have sought the assistance of an independent arson expert or fire investigator to examine the evidence relating to the fire that consumed the Bagleys' car. In this case, questions relating to the fire (*e.g.*, where and how it started, where and how quickly it burned, etc.) were critically important to determining such issues as Mr. Bernard's intent with respect to the victims' deaths, as well as several of the statutory and non-statutory aggravating circumstances the jury would likely have to determine if the case reached a penalty phase (such as whether the murder was committed in an "especially heinous, cruel, or depraved" manner, or whether there was "substantial planning and premeditation" to cause the Bagleys' deaths, or whether Mr. Bernard was likely to be a future danger to the lives and safety of others).

24. Reasonably effective counsel would have obtained the services of an independent

Declaration of David A. Ruhnke
Page 9 of 82

877

arson expert or fire investigator to review the evidence with respect to these questions. I am advised that the report of fire investigator Thomas Sing, which apparently was in the file of counsel for co-defendant Vialva but not in the file provided to Bernard's current counsel by his trial counsel, contains Sing's expert opinion about the car fire. The report states that "It is my opinion the fire that completely destroyed the vehicle originated in two separate areas of the vehicle. The indication of an ignitable liquid on the exterior surface of the engine compartment hood and exterior surface of the rear deck of the trunk are evidence of one area of origin of the fire. A second area of origin is located with in [sic] the passenger compartment in the area of the rear passenger seat in the floor pan immediately to the rear of the driver's seat." If true, this demonstrates that had Mr. Bernard's counsel obtained the assistance of an independent arson expert or fire investigator, they could have raised serious and important doubts about the Government's theory that the fire had a single origin and Mr. Bernard was solely responsible for setting it. Indeed, reasonably effective counsel would have used Sing's own report to show the jury that the "single point of origin" theory was not consistent with the physical evidence.

**Failure to advocate meaningfully to persuade the Government not to seek the death penalty against Bernard**

25. Reasonably effective counsel in a federal capital case in 1999-2000 would have understood the importance of aggressively pressing the Government in an attempt to influence its decision about seeking the death penalty. In my view, counsel's actions in this case during the pre-authorization period do not reflect that kind of zealous

878

advocacy.

26. From the moment he was appointed, lead counsel Russ Hunt, Sr., knew that the Government might seek the death penalty for Mr. Bernard and that the authority to do so rested with the Attorney General. He also knew, or should have known, that it was his duty to try to demonstrate to both the local U.S. Attorney and then to the Attorney General why a sentence less than death was appropriate for Mr. Bernard. Indeed, in a motion seeking appointment of co-counsel filed on February 25, 2000 – only about 30 days before the Government formally announced its decision to seek the death penalty, which may well have been reached some time earlier – Mr. Hunt wrote that "[o]ne of defense counsel's most important functions is to present information first to the local U.S. Attorney and then to the Justice Department that would justify a lesser sentence [than death]. Effective advocacy requires counsel to explore all of the issues that are likely to enter into the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors."

27. While Mr. Hunt's motion correctly described the obligations of counsel at the pre-authorization stage of a potentially capital federal prosecution, it was objectively unreasonable to wait eight months after appointment to file such a motion. This conclusion is strengthened by the fact that the local United States Attorney had, on August 17, 1999, written a letter to Mr. Hunt in which he indicated his intention to recommend to the Justice Department that it authorize him to seek the death penalty

Declaration of David A. Ruhnke
Page 11 of 82

against Mr. Bernard, and invited Mr. Hunt to respond in writing or orally.

28. Nothing indicates Mr. Hunt made an oral presentation to the local United States Attorney. On August 31, 1999, Mr. Hunt sent a 1½ page letter to the Government stating that Vialva had instigated and led the crime, that Mr. Bernard had attempted to persuade Vialva to release the victims unharmed, and that Mr. Bernard was not a leader. In support of these claims, Mr. Hunt referenced an unspecified article from the local newspaper quoting the opinion of a local high school principal that Mr. Bernard was a "follower." Mr. Hunt also stated that Mr. Bernard's mother had given him a list of at least 80 people who would say that Mr. Bernard was not violent and would not have initiated the murders. Finally, Mr. Hunt offered to have Mr. Bernard cooperate and testify about Vialva's actions.

29. At the time Mr. Hunt wrote this letter, two months after his appointment, reasonable counsel would have been well underway in conducting the extensive mitigation investigation required by the existing standard of practice. All it appears Mr. Hunt had done was engage "Criterion Investigations" to interview the witnesses named on the list provided by Thelma Bernard. Counsel does not appear to have gathered any documentary evidence whatsoever about Mr. Bernard's social history. ████████ ████████████████████████████████████████ ████████████████████████ Nothing in the records I have reviewed indicates that counsel's preparation had advanced by January or February 2000, when Mr. Hunt appears to have participated in a telephone conversation with attorneys

Declaration of David A. Ruhnke
Page 12 of 82

from the Justice Department in Washington, D.C., purportedly to permit defense counsel to be heard on the question of why the Government should not seek the death penalty against Mr. Bernard.

30. Counsel's performance in all these respect was deficient. Based on my review of the mitigating evidence a properly conducted investigation would have produced, I believe that Mr. Bernard suffered prejudice from trial counsel's failure to advocate effectively for Mr. Bernard during the authorization process. The Government officials who ultimately made the decision to authorize the death penalty did so without receiving vital input about the Government's case and Mr. Bernard's background. In my opinion, a reasonable probability (as that term is used in *Strickland*) exists that if those officials had been made aware of the complete picture, they would have declined to authorize a death penalty prosecution against Mr. Bernard.

Declaration of David A. Ruhnke
Page 13 of 82