# AMENDED MOTION TO VACATE, SET ASIDE, OR CORRECT JUDGMENT AND SENTENCE
# BY A PERSON IN FEDERAL CUSTODY  (28 USC 2255)

**FILED**

DEC 0 8 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
        DEPUTY CLERK

Name:  Brandon Bernard

Prison Number:  91908-080

Place of Confinement:  United States Penitentiary,  Terre Haute, Indiana

United States District Court for the Western District of Texas

Case No: W- 99- CR-70 (2)


## UNITED STATES OF AMERICA

   v.

## BRANDON BERNARD

Petitioner Brandon Bernard, by and through his attorneys, Robert C. Owen and Robert H. Gobminer, files this amended motion to set aside or correct judgment and sentence by a person in federal custody. This amended motion contains all of the facts, allegations, and exhibits in petitioner's 18 U.S.C. § 2255 motion previously filed and petitioner continues to assert all of the claims contained in the previously filed Section 2255 motion.  The amendments are to grounds 3 and 4 and are found at pages 5 through 16 of the amended motion.  Additional exhibits 30 through 36 are listed on page 16 and are filed along with this amended motion.

### Motion

1. Name and location of court which entered the judgment of conviction under attack:
United States District Court for the Western District of Texas (Hon. Walter S. Smith, Jr.).

2. Date of Judgment of Conviction:  June 16, 2000

3. Length of Sentence:   Counts 1, 2 and 3,  life imprisonment without possiblity of release;
Count 4, death.

4. Nature of Offense Involved:   carjacking, conspiracy to commit murder,  first degree murder
(two counts).

5. What was your plea?   Not guilty as to all counts

6. Kind of trial:  Jury

416



7. Did you testify at trial:  No

8. Did you appeal from the judgment of conviction?  Yes

9. If you did appeal, answer the following:
   (a) Name of court:  United States Court of Appeals for the Fifth Circuit
   (b) Result:  Judgment and Sentence affirmed
   (c) Date of result:  July 19, 2002.

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or motions with respect to this judgment in any federal court:  Yes

11. If your answer to 10 was "yes", give the following information:
   (a) Name of court:  United States Supreme Court
   (2) Nature of Proceeding:  Motion to grant writ of certiorari
   (3) Grounds Raised:  Fifth Amendment violation for failure to include aggravating factors in indictment;  Eighth Amendment violation for improper harmless error analysis;  Eighth Amendment and statutory violation for death sentence based on an arbitrary factor

12. Grounds on which petitioner claims he is being held unlawfully:

1. Petitioner received ineffective assistance of counsel during the time from his counsel's appointment until the time of trial in violation of his rights under the Sixth Amendment to the United States Constitution.

2. Petitioner received ineffective assistance of counsel during the guilt phase portion of his trial in violation of his rights under the Sixth Amendment to the United States Constitution.

3. Petitioner received ineffective assistance of counsel during the penalty phase portion of his trial in violation of his rights under the Sixth and Eighth Amendments to the United States Constitution.

4. Petitioner was deprived of his right to due process and a fundamentally fair trial under the Fifth, Sixth and Eighth Amendments to the United States Constitution due to prosecutorial misconduct.

5. Petitioner was deprived of his right to counsel under the Fifth and Sixth Amendments to the United States Constitution and 18 USC Section 3005.

6. Petitioner was deprived of his right to a fair trial under the Fifth and Sixth Amendments to the United States Constitution due to the inclusion of a biased juror in his jury.

7. Petitioner was deprived of his rights under the Fifth, Eighth and Fourteenth Amendments to the United States Constitution because of racial bias during the death penalty

authorization process and because of the rarity with which the federal death penalty is imposed.

8.   Petitioner was sentenced to death in violation of the Fifth, Sixth and Eighth Amendments to the United States Constitution because the indictment did not include the mental state elements and aggravating factors necessary to make him death-eligible.

9. The manner of execution prescribed for petitioner – lethal injection – violates petitioner's rights under the Eighth Amendment to the United States Constitution.

10.   The cumulative effect of the errors in petitioner's trial and sentencing violates the Fifth, Sixth and Eighth Amendments to the United States Constitution.

**The facts in support of these claims are set forth in full in the attached memorandum of facts and law and the exhibits thereto, which are incorporated here by reference.**

13.    Each claim in this petition is based on evidence outside the trial record and thus could not have been raised on direct appeal.  To the extent that any claim in this petition could have been raised on direct appeal, petitioner asserts that his appellate counsel's failure in that regard constituted ineffective assistance of counsel in violation of the Constitution.

14. Do you have any petition or appeal now pending in any court as to the judgment under attack:  No

15.   Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

    (a) At preliminary hearing:  Russell D. Hunt,  700 South University Parks Drive, Suite 690,  Post Office Box 726, Waco, Texas 76703
    (b) At arraignment and plea:  Russell D. Hunt
    (c) At trial:  Russell D. Hunt and Russell D. Hunt, Jr., P.O. Box 1758, Georgetown, Texas 78627
    (d) At sentencing:  Russell D. Hunt and Russell D. Hunt Jr.
    (e) On appeal:  Robert C. Owen, Owen & Rountree LLP, PO Box 40428, Austin, Texas 78704  and Walter M.. Reaves, Jr., P.O. Box 55, West, Texas 76991.
    (f) In any post-conviction proceeding:   Robert C. Owen and Robert H. Gombiner, Federal Public Defender's Office, 1601 Fifth Ave., Suite 700, Seattle,  Washington 98101.

16. Were you sentenced on more than one count of an indictment, or or more than one indictment, in the same court and at approximately the same time?  Yes (sentenced on all four counts of indictment)

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?  No.

Wherefore, movant prays that the Court grant him all relief to which he may be entitled in this proceeding.

_____
Robert C. Owen

_____
Robert H. Gombiner

<strong>MEMORANDUM OF FACTS AND LAW IN SUPPORT OF MOTION</strong>

## I. FACTUAL BASIS FOR PETITION

The facts in this petition derive from current counsel's own investigation, the files provided to current counsel by petitioner's trial counsel and by trial counsel for co-defendant Terry Brown, documents provided by current counsel for co-defendant Christopher Vialva, and the transcripts and court records of the proceedings.

Based on current counsel's investigation and a review of the documents in counsel's possession, petitioner believes that the government possesses additional documents and information relevant to his claims for relief in this proceeding, or other claims for relief he has not alleged due to continuing suppression of such evidence. Although the government announced prior to trial that it had an "open file" policy, the government has refused to allow current counsel to review its files for this case.

Petitioner has moved for permission to conduct discovery and anticipates that the discovery process will disclose additional evidence that will require amending the present petition.

<strong><u>Amendment to Motion</u></strong>

### I.        Amendment to Ground 3

Petitioner amends Ground 3 of the petition alleging ineffective assistance of counsel during the penalty phase portion of his trial in violation of the Sixth Amendment as follows:

Defense counsel failed to call numerous available witnesses who would have provided extensive and detailed testimony in mitigation on Mr. Bernard's behalf, the substance of which is reflected in the report of mitigation specialist Jill Miller, M.S.S. W. *See* Exhibit 13.   Such

5

1194

witnesses included, but were not limited to the following:

Dann and Melba Barger, directors of the Catch-22 residential treatment facility in Brownwood where Brandon was sent after his juvenile adjudication, were available to testify in mitigation. They would have testified, inter alia, that Brandon was well-behaved and trustworthy during his time at Catch-22, and that they recalled no problems with him. They would have testified that because Catch-22 was an "open facility," residents had a significant amount of freedom; they could walk into the community, where they attended school, and could also mix in the school's common areas, such as the family room. Mr. and Mrs. Barger would have testified that Brandon was an athletic young man who loved to play basketball and was well-liked by the other residents. They would have testified that Mr. Bernard's time at Catch-22 was "normal and smooth," with "no significant problems."

Mattie Adams, who taught Brandon in a court-ordered GED diploma program, was available to testify in mitigation. Ms. Adams would have testified, inter alia, that Mr. Bernard was one of her better students and participated willingly in class, and that she found him to be responsive, attentive, and well-behaved. She would have testified that he was not disruptive in class and that she never had any reason to think that he was capable of violence. She would have testified that Mr. Bernard's father Kenneth stopped by the class often to check on Mr. Bernard's attendance and progress, and that he showed an unusual and commendable degree of interest in Mr. Bernard's work toward his G.E.D.

Bonnie Wainwright, a member of Mr. Bernard's Seventh Day Adventist church congregation, was available to testify in mitigation. Ms. Wainwright would have testified, inter alia, that she was aware of the problems that arose when Mr. Bernard's aunt Mary Pollock and her children, including especially Melsimeon, moved into the Bernard home. Ms. Wainwright

6

would have testified that she tried to warn Mr. Bernard's mother Thelma that Mary's children were causing trouble and that Melsimeon was leading Mr. Bernard into misbehavior he would not have gotten into on his own. Ms. Wainwright would have testified that Mr. Bernard was a "sweet, mild-mannered kid" and that his descent into delinquency was spurred on by Melsimeon. Ms. Wainwright also would have described the continuous and sometimes explosive tension in Mr. Bernard's parents' marriage, and how it affected the way Kenneth and Thelma related to one another and to Brandon. She would have testified that as Mr. Bernard grew into adolescence and his parents' marriage disintegrated, she could see that he was wrestling with depression; she would have described seeing him as a "lost person" whose "spirit was down" and who struggled with a "weight of sadness," withdrawing from the church community even as he continued to attend services, and rarely flashing the "nice smile" that she remembered from when he was younger.

Melsimeon Pollock, Mr. Bernard's cousin, was available to testify in mitigation. Mr. Pollock would have testified, inter alia, that he was the instigator in the burglaries that he and Mr. Bernard committed together, and that he felt Mr. Bernard was "easily taken advantage of." He would also have testified that Mr. Bernard was non-violent and unlikely intentionally to hurt anyone. He would have testified that the "gang" in which he and Mr. Bernard both took part was only loosely organized and lacked any enforced discipline, such that participants often left the "gang" for their own reasons without reprisal. He would have testified that Mr. Bernard fell into depression as a result of his parents' divorce and that Mr. Bernard was evidently lonely and withdrawn. He would have testified that he was aware that Mr. Bernard, in the months immediately before the murders, was smoking marijuana laced with embalming fluid, and that Mr. Bernard's drug use appeared to escalate as he spent more time with Terry Brown. He would

1194

also have testified, however, that Mr. Bernard tried to take steps to separate himself from the "bad crowd" with which he was hanging around, including trying to obtain legitimate employment and provide some support for his children, whom he loved very much.

Mr. Bernard's aunt Mary Pollock was available to testify. Ms. Pollock would have testified, inter alia, about the longtime strife in the Bernards' marriage and how it affected the family, including a fierce argument between Brandon and his father at church in Temple and how it degenerated into a physical struggle.

Mr. Bernard's friend Michael Voegele was available to testify. Mr. Voegele would have testified, inter alia, that Mr. Bernard didn't get in trouble, drink alcohol, or use drugs until his cousin Melsimeon moved in. He would have testified that Mr. Bernard loved and respected his parents, and that Mr. Bernard often seemed depressed and withdrawn after his parents separated and he no longer had much contact with this father. Mr. Voegele would have testified that many of the teens from Mr. Bernard's neighborhood successfully left their youth gang involvement behind as they grew older.

Debbie King, a longtime family friend and member of their church, was available to testify. She would have testified that, inter alia, she was aware of the extreme tension in the relationship between Mr. Bernard and his father after Mr. Bernard's father went to jail for physically assaulting Mr. Bernard's mother when Mr. Bernard was twelve years old. She would have described how, a couple of years later, Mr. Bernard and his father came to blows in the church parking lot and had to be separated by other members of the church. She would have told how Melsimeon Pollock was continuously in trouble and asserted a strong influence over Mr. Bernard, and that the kids with whom Mr. Bernard hung out as a teenager were involved in drinking and using drugs. Ms. King would also have testified that Mr. Bernard as a child loved

sports and dreamed of being a basketball star. She would have testified about the letter Mr. Bernard wrote to the church congregation while he was in jail awaiting trial, in which he expressed deep shame and remorse for his actions and exhorted the other young people in the church to avoid his example. She would have confirmed that the congregation still loved Brandon, felt that his life was valuable and worth saving, and believed that he was a fundamentally good person who had been led astray in adolescence.

Brad Hobbs, a vocational teacher from the alternative school Mr. Bernard attended, would have testified, inter alia, that he remembered Mr. Bernard as a teenager who never caused any trouble in his shop class, but who was extremely "closed down" and "quiet," and who seemed unable to "open up."

Rick Marasco, who taught Mr. Bernard in middle school at Killeen Seventh Day Adventist Academy, was available to testify. He would have testified, inter alia, that young Brandon had a warm personality and was obedient and well-liked by his classmates, although he sometimes seemed "pensive." Mr. Marasco would have testified that Brandon's school records show that he needed additional help to succeed in certain areas, and that his performance suggested he might have had some learning problems. Mr. Marasco would also have testified that he saw Brandon as a follower. Mr. Marasco would have testified that although he met with both Mr. and Mrs. Bernard about their son's progress, he did not meet with them together. Mr. Marasco would have testified that he felt there might be some tension between the Bernards, and that Mr. Bernard was somewhat isolated from the rest of the people in the church.

Matthew Mitchell, who was called to the witness stand but whom Mr. Bernard's attorneys did not prepare for his testimony, could have offered significant mitigating evidence if he had been properly interviewed and prepared. Inter alia, Mr. Mitchell could have testified that he was

aware of the strife between Mr. Bernard's parents and saw how the turbulent home environment it created affected Mr. Bernard. Mr. Mitchell would have testified that Brandon, who had always been full of smiles and laughter, seemed "sick," solemn and quiet after his father left the family. Mr. Mitchell would have testified that after his parents split up, Mr. Bernard acted different. He could have testified that Mr. Bernard's walk, look, and behavior all changed after the arrival of his cousin Melsimeon Pollock, as a result of his cousin's influence. Mr. Mitchell would have testified that Mr. Bernard was "obviously" using alcohol and drugs by his mid-teens, and that Mr. Mitchell encountered him at least once when his behavior and demeanor suggested he had been smoking marijuana soaked in formaldehyde.

Pastor Terry Johnson, who led the Killeen Seventh Day Adventist Church, was available to testify. Pastor Johnson would have testified, inter alia, that even in 1998-99 he was aware of the continuing deep conflict between Mr. Bernard's parents. He would have described Mr. Bernard's father Kenneth as unable to communicate his feelings, lacking coping skills and self-esteem. Pastor Johnson would have testified that Mr. Bernard seemed quiet and isolated from the social fabric of the congregation. Pastor Johnson would have testified that he attributed the fact that Mr. Bernard was still struggling in his late teens to his having endured the upheavals of early adolescence while his parents went through a painful separation and divorce. Pastor Johnson would have testified that the influence of Melsimeon Pollock on Mr. Bernard in his early teens was destructive, because Mr. Pollock was uncontrolled and Mr. Bernard, beset by a powerful need to belong and feel accepted, was definitely a follower. Pastor Johnson would have testified that he visited Mr. Bernard on a number of occasions while Mr. Bernard was in jail awaiting trial, and that Mr. Bernard was full of remorse for his involvement in the crime. Pastor Johnson would have testified that Mr. Bernard in jail was diligently studying the Bible

1199

and trying to find his lost roots in the church. He would have testified that Mr. Bernard expressed deep regret for the things he had done and for having been involved with the wrong people. He would have testified that Mr. Bernard was very concerned about the judgment of the Seventh Day Adventist congregation, and because of those feelings wrote a letter to the church expressing his remorse and asking for forgiveness. Pastor Johnson would have testified that Mr. Bernard's letter of apology, which was read both to the church board and to the congregation as a whole, was well-received by the church, and left its membership united in their love and support for Mr. Bernard.

Mr. Bernard's father Kenneth Bernard was available and willing to testify. Had he been called, he would have testified that, inter alia, his marriage with Mr. Bernard's mother Thelma was marked by long years of turbulence and strain, and that the home environment in which Brandon grew up was full of arguments and tension. He would have testified that many of these arguments involved Brandon and how he would be raised, including how strictly he would be disciplined. Kenneth would have acknowledged that his own methods of discipline were fairly inflexible and that sometimes the physical punishment he inflicted on Brandon, including whipping him with a belt, bordered on mistreatment. He would have described the anger Brandon felt toward him after he went to jail for physically assaulting Brandon's mother after an explosive argument in the family home, and how it opened a gulf between them for the rest of Brandon's adolescence. He would also have testified that after he left the family, he spent several months living in a homeless shelter and had no contact with Thelma or the children, including Brandon. He would have testified about how, after reinitiating contact with the family, he started a fight with Brandon at church and how that only worsened the relationship between them. Kenneth Bernard's testimony would have helped the jury understand the

11

difficulties Brandon faced growing up in such a troubled household and why Brandon blamed himself for the rupture in his parents' marriage, and how those experiences contributed to the depression and isolation Brandon endured as a teenager. At the same time, Kenneth Bernard would also have testified about Brandon's positive qualities - that he was kind, funny, loved his brother and sister and took care of them in the afternoons after school, and that he worked hard to obtain his G.E.D. diploma.

Mr. Bernard's younger brother and sister, Quiona and Max, were also available to testify. They would have testified, inter alia, that Brandon was likeable and trustworthy, and that he had always taken good care of them when they were in his charge. Quiona would have testified that Brandon took her roller skating and to the park, and accompanied her to her volleyball games to take photographs of her. She would have testified that she never saw him hurt anybody and that he encouraged her to mind her mother and do well in school. Max would have testified that he liked to wrestle with his older brother and go places with him, and that they had often played basketball together. Both would have testified that Brandon loved them and that they loved him.

Mr. Bernard's mother Thelma, whom Mr. Bernard's attorneys called to the witness stand but did not prepare for her testimony, could have offered significant mitigating evidence if she had been properly interviewed and prepared. Inter alia, Mrs. Bernard would have testified about the tension and arguments that roiled the household when Brandon was young. She would have testified that Kenneth Bernard was verbally abusive toward her and the children, including Brandon, and that in the early 1990's Kenneth sometimes drank to excess, compounding the conflict in the home. She would also have testified that she was absent from the home a great deal when Brandon was young, due to her job obligations with the military.

She would have testified that it was only when Melsimeon Pollock arrived in the

Bernards' home that Brandon began to get in trouble. She would have testified that Brandon was very angry with his father after his parents split up, owing in part to his father's assault on Thelma, and that it was very difficult for Brandon to develop a close relationship with his father during those years. She would have testified that Brandon displayed many symptoms of depression during his high school years, and that he kept his feelings bottled up inside. She would have testified that Brandon was deeply affected by the death of his grandmother, to whom he had been very close, in 1999.

Mrs. Bernard would have testified that Brandon tried unsuccessfully to enlist in the military and later tried to get out of Killeen by moving to live with relatives in Michigan, and that while he was there he worked steadily and stayed out of trouble. Thelma Bernard would also have testified that Brandon loved his own children and wanted to be a responsible father to them. She would also have testified that Brandon often was asked to take care of his younger brother and sister, and that he was trustworthy and reliable in doing so.

Reverend Jack Hetzel, an ordained minister for more than sixty years who counseled Mr. Bernard while he was in jail awaiting trial, was available to testify. See Exhibit 32. Rev. Hetzel would have testified, inter alia, that he first visited with Mr. Bernard when he had been in jail for about six weeks. On their very first meeting, Mr. Bernard asked Rev. Hetzel how he could possibly get forgiveness for what had happened. Rev. Hetzel probably visited with Mr. Bernard on thirty to forty occasions. Mr. Bernard repeatedly expressed remorse and shame for his involvement in the crime, as well as speaking of his love for his family and hopes for the future. Mr. Bernard expressed a desire to join the ministry and work with teenagers like himself, counseling them about the evils of drugs and how easy it was to fall in with the wrong crowd. Rev. Hetzel would also have testified that Mr. Bernard took a correspondence Bible study course

13

and conscientiously completed the assignments. He would also have testified that Mr. Bernard told him he wanted to reach out to the victims' families and apologize for their loss, but did not know how to do so and did not want to add to their pain. Rev. Hetzel would also have testified that Mr. Bernard on the whole made a positive adjustment to being in jail, and that in Rev. Hetzel's frequent contact with correctional staff at the jail no one ever said anything negative about Mr. Bernard. Rev. Hetzel would have testified that he believed Mr. Bernard had a good heart and his life was worth saving.

## II.    Amendment to Ground 4

Petitioner amends Ground 4 of his petition alleging prosecutorial misconduct in violation of the Fifth, Sixth and Eighth Amendments as follows:

The government knew that key witness Terry Brown was suffering from a serious mental illness at the time of the murders of Stacie and Todd Bagley and that he continued to suffer from this mental illness during the time between his arrest and his testimony at trial and at the times that he gave statements to government agents. The government further knew that Mr. Brown was suffering from a serious mental illness at the time that he testified. The government did not reveal any of this information to Mr. Bernard's defense counsel in violation of the Constitution of the United States and <u>Brady v. Maryland</u> and its progeny.

The government knew that key witness Terry Brown was receiving psychotropic medications, including Wellbutrin and Depakote, and was under their influence at (1) the time of the murders of Todd and Stacie Bagley, (2) during the time from his arrest to his testimony at trial, and (3) during his testimony at trial. The government did not reveal this information to Mr. Bernard's defense counsel in violation of the Constitution of the United States and <u>Brady v. Maryland</u> and its progeny.

14

1203

Exhibits 30 and 31 support these allegations.

The government knew that during a psychiatric evaluation ordered by the Court in connection with Terry Brown's juvenile transfer hearing that Mr. Brown made statements which contradicted his statements to investigators and his testimony at trial. The government failed to disclose this information to the defense in violation of the Constitution of the United States and Brady v. Maryland and its progeny. Exhibit 22, previously filed under seal, supports this allegation.

Key government witness Chris Lewis was also the subject of a court ordered psychological evaluation in connection with his transfer proceeding. The defense does not know the contents of the evaluation but believes that the government did have a copy of the evaluation and that the evaluation contained information which the government was obliged to disclose to Mr. Bernard's attorneys pursuant to Brady v. Maryland and its progeny but that it did not do so.

The defense further alleges that government agents interviewed Joey Presley prior to Mr. Bernard's trial and that Mr. Presley provided information which would have exculpated Mr. Bernard and that the government failed to disclose this information to counsel for Mr. Bernard in violation of the Constitution of the United States and Brady v. Maryland and its progeny.

Mr. Presley was present at the rendezvous in Long Branch Park between the victims' car (containing the victims, Mr. Vialva, Mr. Lewis, and Mr. Sparks) and Mr. Bernard's (containing Mr. Bernard, Terry Brown, and Mr. Presley). Mr. Presley could have impeached Christopher Lewis' claim that during that brief meeting, Mr. Vialva screamed that he intended to kill the Bagleys. The government knew that Mr. Presley had confirmed that no such screaming match took place and the Mr. Bernard, contrary to the version of events presented by the government at

15

trial, remained in his own car the whole time rather than walking up to the victims' car to participate in the discussion about what was to be done. See T. 2831 (testimony of Ranger Aycock that Joe Presley "was in Brandon Bernard's vehicle during some parts of this crime" and "had knowledge" about what transpired).

The Probation Department presentence report prepared for Terry Brown in connection with his plea of guilty to second degree for the deaths of Todd and Stacie Bagley also supports petitioner's Brady claims. The report has been previously filed under seal as Exhibit 24.

Filed along with the amended motion are the following exhibits:

30. Medical Records of Terry Brown.

31. Affidavit of Terry Brown.

32. Declaration of Rev. Jack Hetzel.

33. Declaration of Milton Rios.

34. Declaration of Jimmy Duran Olarte.

35. Pictures of petitioner and family.

36. Color Photographs of Mr. Bernard's teeth from family dentist, Dr. Wayne Pundt.

These exhibits are in addition to (1) the exhibits filed together with petitioner's initial redacted Section 2255 motion and (2) the exhibits filed under seal pursuant to the Court's order.

## II.    INTRODUCTION

On the morning of June 21, 1999, Brandon Bernard ("Petitioner") was an 18 year old from a religious family who lived with his mother and needed to find a job. By nightfall, he had been arrested for the murders of Todd and Staciee Bagley. A year later, a jury had convicted him of murder and sentenced him to death based on the implausible and inconsistent, but largely uncontested, testimony of two of his associates, Terry Brown and Christopher Lewis.

16

This petition shows how a series of constitutional violations transformed Brandon Bernard from a troubled adolescent with genuine promise for rehabilitation into a condemned prisoner awaiting execution at the hands of the federal government.  The goverment charged that Mr. Bernard played a central role in a horrible crime; that he helped plan a carjacking; that he knew in advance of a plan to kill carjacking victims Todd and Stacie Bagley; and that although he did not actually shoot the Bagleys, he set fire to their car while they were in its trunk and Stacie Bagley was still alive, though unconscious.  No physical or forensic evidence or objective witnesses supported these claims.  Instead, the goverment relied on the word of Terry Brown and Christopher Lewis, accomplices in the murders who agreed to cooperate with the government in exchange for lenient treatment  In the penalty phase of Mr. Bernard's trial, the government demonized Mr. Bernard as a violent and menacing gang member likely to be a future danger and contrasted his character with the exemplary lives of the victims.  The government secured a conviction for Mr. Bernard and sent him to death row because of the synergistic effect of prosecutorial misconduct and ineffective performance by Mr. Bernard's court-appointed counsel.

Petitioner demonstrates that during the guilt phase,his lawyers failed to effectively challenge the evidence supplied by Mr. Brown and Mr. Lewis and to expose the inconsistent and implausible nature of their stories.  Counsel also failed to object to the goverment's introduction of irrelevant and prejudicial evidence about gangs, as well as evidence designed to generate sympathy for the victims and anger at the defendants.  The goverment, for its part,  put before the jury a deliberately misleading impression of the credibility of Brown and Lewis, and of their prior statements, while suppressing crucial impeaching evidence about them.  Counsel's ineffectiveness and prosecutorial misconduct conspired to produce an unreliable result.

17

At the penalty phase Mr. Bernard's lawyers, due to failures of investigation and preparation, offered only perfunctory mitigation and did not present readily available evidence that would have given the jury reasons to spare Mr. Bernard's life. Failures of investigation and preparation also prevented counsel from adequately contesting the government's evidence in aggravation and from excluding unfair victim impact testimony. These failures produced an unreliable sentence.

The following pages include many specific legal claims for relief from the judgment. At heart, however, this is a simple case. Mr. Bernard did not get the fair trial to which the United States Constitution entitles every accused person because his lawyers did not discharge their duty to defend him, and because in its eagerness to obtain a conviction and death sentence the government did not play by the rules.

## III.    COUNSEL FAILED TO PROVIDE EFFECTIVE REPRESENTATION AT THE GUILT-INNOCENCE PHASE.

Mr. Bernard's lawyers failed to adequately prepare and investigate. At trial they failed to adequately cross examine and failed to prevent the introduction of prejudicial and irrelevant evidence. Consequently, the government's case and its star witnesses' credibility were not meaningfully disputed, and the government's campaign to inflame the jury proceeded unhindered.

### A.    The Government's Case

According to the government, Mr. Bernard agreed on the morning of June 21, 1999 to participate in a carjacking with Mr. Lewis, Mr. Brown, Tony Sparks and Christopher Vialva. Although Mr. Bernard and Mr. Brown did not participate in the actual carjacking, they rejoined Vialva, Lewis and Sparks after the Bagleys had been placed in the trunk of their own vehicle.

The government claimed that Mr. Vialva decided that the Bagleys had to be killed and their vehicle burned, and that this decision was communicated to the other participants, including Mr. Bernard. Therefore, the government contended, Mr. Bernard's foreknowledge that the Bagleys were to be killed made him guilty of premeditated murder.

After learning of Mr. Vialva's plan to kill the Bagleys and burn their car, the government further alleged, Mr. Bernard and Mr. Brown purchased lighter fluid. They first dropped off Mr. Sparks and Joey Presley, another person alleged to have been present at Long Branch Park when Mr. Vialva communicated his intent to kill the Bagleys. Then, Mr. Vialva, Mr. Lewis, Mr. Brown and Mr. Bernard proceeded to Fort Hood with Mr. Vialva and Mr. Lewis in the Bagleys' car and Mr. Bernard and Mr. Brown in Mr. Bernard's vehicle.

In a remote section of Fort Hood, Mr. Vialva drove the Bagleys' car up a hill while Mr. Bernard parked his car below. According to the government, Mr. Bernard and Mr. Brown then carried lighter fluid up the hill. Mr. Bernard helped pour lighter fluid on the Bagleys' car. He then opened the trunk of the car using the trunk opener in the glove compartment and Mr. Vialva shot the Bagleys. The car was then set on fire by Mr. Bernard. He set the car on fire not knowing if the Bagleys were dead or alive. Evidence showed that Stacie Bagley was alive, although unconscious, when she was burned to death.

At trial both Mr. Lewis and Mr. Brown denied having seen Mr. Bernard open the trunk or set the car on fire. The government, however, argued that Mr. Brown's testimony established that Mr. Bernard was the only person in the position to open the trunk and the only person who could have set the fire. *See* T. 2688 ("Brandon Bernard had to have opened the trunk from the remote inside the vehicle"); T. 2687-88 ("Brandon Bernard is the only individual standing on this side [indicating] of the vehicle, the only individual who was in position to start the fire").

The government argued that this conduct, which the prosecutor attributed to Mr. Bernard alone, made him just as culpable as Mr. Vialva and more culpable than the others.  T 2688.

After the Bagleys had been shot and their car set on fire,  Mr. Bernard  ran with the others back to his own car and attempted to escape, but his car slid into a ditch and became stuck.  Two young men out "mudding" in their truck came across Mr. Lewis, Mr. Bernard, Mr. Brown and Mr. Vialva standing by the stuck car and noticed some of them changing clothes and throwing items into the woods.  Shortly thereafter,  firemen putting out the car fire discovered the Bagleys' bodies and Mr. Lewis, Mr. Bernard, Mr. Brown and Mr. Vialva were all arrested.

**B.     The Government's Case Rested On the Testimony of Mr. Brown and Mr. Lewis**

The foregoing scenario and the most damning allegations against Mr. Bernard depended almost entirely on the testimony of Mr. Brown and Mr. Lewis.   At trial, the government presented no proof other than the testimony of Mr. Brown and Mr. Lewis that

(1)  Mr. Bernard agreed in advance to participate in a carjacking;

(2)  he was ever told in advance that Mr. Vialva intended to kill the Bagleys;

(3)  he poured  lighter fluid on the Bagleys' car;

(4)  he opened the trunk of the vehicle; and

(5) he set the Bagleys' car on fire.

The evidence included no statements made by Mr. Bernard or Mr. Vialva  and the government refrained from calling either Tony Sparks or Joey Presley as witnesses.   No physical evidence showed what, if anything,  Mr. Bernard had done in connection with either the homicides or the car being set on fire, and there were no objective eyewitnesses to either event.   Instead, the evidence of what Brandon Bernard knew in advance about the homicides and arson, and what he

1209

did in connection with the homicides themselves, came only from the mouths of Mr. Brown and Mr. Lewis. The importance of their testimony cannot be overstated.[1]

### C.      Failure to Effectively Impeach Terry Brown and Chris Lewis

Effectively impeaching Chris Lewis and Terry Brown had to be the linchpin of Mr. Bernard's defense. If the jury believed Brown and Lewis then Mr. Bernard's conviction was a certainty; if it disbelieved them the government's case collapsed. The testimony from the cooperating co-defendants was not just the icing on a cake made up of more reliable evidence. Instead, the complete lack of eyewitness testimony, admissions from Mr. Bernard, testimony from other participants, or forensic evidence showing what Mr. Bernard had done, forced the government to rely entirely on Mr. Brown and Mr. Lewis. The task for Mr. Bernard's lawyers was to demonstrate why their dramatic but uncorroborated account could not be trusted.

Mr. Bernard's attorneys could have met this challenge but did not. Their failure to obtain and master the prior statements of Mr. Brown and Mr. Lewis, their failure to investigate and interview witnesses, their failure to utilize the government's own admissions, and their failure to effectively cross examine Mr. Brown and Mr. Lewis individually and cumulatively constituted ineffective assistance of counsel. Mr. Bernard was prejudiced because his counsel unreasonably failed to tear away the veil of credibility from Mr. Brown and Mr. Lewis and reveal their testimony as inconsistent and implausible.

### 1.      The Evidence Available to Mr. Bernard's Counsel

A large amount of material with which to impeach Mr. Brown and Mr. Lewis was readily available to the defense. The following review of evidence which the defense actually

---

[1] See United States v. Bernard, 299 F.3d 467, 468 n.1 (5th Cir. 2003) (recognizing central nature of testimony of Mr. Brown and Mr. Lewis).

1210

possessed, or which was readily discoverable, shows that almost every significant aspect of Mr. Brown's and Mr. Lewis' trial testimony could have been effectively impeached.

### a.    Prior Statements of Terry Brown In Possession of Defense

Terry Brown was first interviewed on June 22, 1999 at 2:00 a.m.  At 5:42 a.m. on June 22nd he signed under oath a typed statement denying any involvement whatsoever in the crimes and offering an elaborate explanation of his innocent activities.  Ex. 1 at 336-38.[2]

Approximately eight hours later, after waiving his Miranda rights, Mr. Brown signed a second written statement. Ex. 1 at 342.  This time Mr. Brown said that he did not know who shot the victims but that he was not the shooter.  Id.  Mr. Brown claimed in this statement that Mr. Vialva was standing by the trunk of the Bagleys' car yelling at the Bagleys to be quiet.  Id. Mr. Brown was lower down on the hill; in this account he claimed that he had stopped walking toward the Bagleys' car and turned back toward Mr. Bernard's car because "he couldn't take it anymore." Id.  Mr. Brown swore that when he returned to Mr. Bernard's car, Mr. Bernard was already waiting there.  Id.  While Mr. Brown and Mr. Bernard were at Mr. Bernard's car, Mr. Brown heard two gun shots.  Id.  About 5-10 seconds later, Mr. Lewis arrived at Mr. Bernard's car;  about 10-15 seconds later Mr. Vialva appeared.  Id.

A few hours later, at 7:10 p.m. on June 22, Mr. Brown asked the police if he could make *another* statement. Ex. 1 at 530.  He stated that he had not been entirely truthful in his prior statement.  Id.  Mr. Brown now claimed that just before the Bagleys were killed, he had soaked his shirt with lighter fluid and after the murders had given it to Chris Lewis along with the

---

[2] Exhibit 1 comprises documents from the files of Mr. Bernard's lead trial counsel Russ Hunt, Sr.  Each page of these documents bears a sequentially stamped number, usually located at the lower left- or right-hand corner.

lighter fluid container. Id. Mr. Brown again denied knowing who had shot the victims. Id.

Between 7:30 and 10:00 p.m. on June 22, Agent Nelson interviewed Mr. Brown about 12 times. Mr. Brown "would provide additional information about the incident each time Mr. Nelson went to talk to Brown." Ex. 1 at 530. In a statement that Mr. Brown gave at about 8:00 p.m., Mr. Brown said that Mr. Vialva told him he needed to burn the car because there were fingerprints on it. Id. Mr. Brown admitted that he had purchased lighter fluid along with Mr. Bernard. Id. In the statement Mr. Brown now said that he had seen Chris Vialva shoot Todd Bagley in the head but that he turned his head and did not see Mr. Vialva shoot Stacie Bagley. Id.

In none of the many statements Mr. Brown gave on June 22, 1999 did he claim that Brandon Bernard had anything to do with either pouring lighter fluid on the Bagleys' car or setting it on fire.

### b.    Post-Cooperation Statements

By or before July 19, 1999, Mr. Brown decided to cooperate with the government. On July 26, 1999, Mr. Brown participated in a proffer session with his attorney present. The government reports of this proffer state that Mr. Brown claimed that he and Mr. Bernard carried lighter fluid to the Bagleys' car, but that only Mr. Bernard put lighter fluid on the car while he (Mr. Brown) merely poured lighter fluid onto his shirt. The agents interviewing Mr. Brown did not take a written statement because they "believed Master Brown was not completely truthful in all his testimony." Ex. 1 at 276. Sergeant Aycock and Agent Chadwick were present at the interview. Ex. 1 at 275.

Ranger Aycock also wrote a report about the proffer, which Mr. Bernard's attorneys possessed at the time of trial. Ex. 1 at 802-07. According to Ranger Aycock, Mr. Brown said

23

that when he and Mr. Bernard met with Mr. Lewis, Mr. Sparks and Mr. Vialva at Long Branch Park. Id. Mr. Vialva said he had to burn the car because it had too many prints on it. Id. Mr. Brown also stated that when he bought the lighter fluid, he realized that they did not have anything with which to ignite it, so he went back to the store to get matches. Id. at 804.

Ranger Aycock's report also notes that Mr. Brown asserted that he squirted lighter fluid both on his shirt and on the left rear part of the car, while Mr. Bernard squirted lighter fluid on the front of the car. Mr. Brown said that Mr. Vialva gave orders as to where to place the lighter fluid. Ex. 1 at 805.

The report from Ranger Aycock further notes that Mr. Brown said that after the victims were shot, everyone left. Ex. 1 at 805-06. According to Mr. Brown, Mr. Lewis left first, Mr. Brown next, Mr. Bernard behind Mr. Brown, and Mr. Vialva last. Id. Mr. Brown did not know who lit the fire. Id. Ranger Aycock's report mentions no indication from Mr. Brown that Mr. Bernard was standing next to the car when the fire was set. Id.

On September 14, 1999, Mr. Brown was again interviewed by government agents. In this session he admitted for the first time that while in the Bagleys' car with Mr. Lewis, Mr. Sparks and Mr. Vialva, he (Mr. Brown) was handed the .22 and said, "If you're gonna kill them, you want me to just do it now?" Ex. 1 at 859-60. Mr. Brown now admitted to pouring a "volatile chemical" on the top of the Bagleys' car and inside its back seat area. Ex. 1 at 860.

Mr. Brown also stated that, when he went with Mr. Vialva, Mr. Lewis, Mr. Sparks and Mr. Bernard to get a gun from Greg Lynch, he had smoked dope with Greg Lynch. Ex. 1 at 859.

On November 5, 1999, Mr. Brown was again interviewed with his attorneys present. The report of this interview states only that "details of Brown's prior interviews were discussed

24

1213



with him and his attorneys." Ex. 1 at 1259.

The file turned over to present counsel by Mr. Hunt, Sr., contains no further government reports of any statements made by Mr. Brown prior to trial.

### c. Statements of Christopher Lewis in Possession of Defense

Chris Lewis was interviewed on June 22, 1999 by Special Agent Eller. He signed, under penalty of perjury, a six-page single-spaced typewritten statement. In addition, he drew a diagram Agent Eller's assistance to pinpoint the locations of participants, vehicles, and victims at the time of the shooting. Ex. 1 at 344-51.

Mr. Lewis' initial account was extremely detailed. He described how Mr. Vialva first poured lighter fluid on the hood of the car and then squirted lighter fluid into the seat where Mr. Lewis had just been sitting. Id. Mr. Lewis also stated that Mr. Vialva opened the hood of the car and squirted lighter fluid into the engine compartment and then also sprayed lighter fluid all over the trunk. Ex. 1 at 346.

According to Mr. Lewis, it was Mr. Vialva who opened the trunk of the car and Mr. Vialva who set the car on fire. Id. Mr. Lewis said he did not know what Mr. Vialva used to ignite the flames but that "it might have been the cigarette that he had lit when he first got out of the car." Ex. 1 at 347.

Mr. Lewis stated that as soon as the Bagleys were shot, Mr. Bernard started "jogging down the hill." Id. According to Mr. Lewis' initial statement, when Mr.Vialva got back to Mr. Bernard's car, he (Mr. Vialva) was carrying both the .22 and the .40 Glock. It was Mr. Vialva who threw both guns into the woods. Id. at 347.

Mr. Lewis also explained how Mr. Bernard's car became stuck in the ditch. "Brandon tried turning the car around to face back out toward the cattle guard. As he did so, the car slid

off the side of the road and got stuck in the mud." Ex. 1 at 347.

Mr. Lewis' diagram depicts Mr. Brown and Mr. Vialva being the two individuals nearest the car at the time of the shooting. The diagram shows Mr. Lewis and Mr. Bernard further away. Ex. 1 at 351.

On July 2, 1999, Mr. Lewis gave a proffer to the government with his attorney present. According to the CID report of this proffer, Lewis "omitted several facts concerning the events of 21 Jun 1999 and failed to fully confess his involvement." Ex. 1 at 276.

On July 6, 1999, Mr. Lewis was again interviewed. This time, he admitted having been in the Bagleys' vehicle from the time of the carjacking to the time of the murders. At the request of FBI Agent Chadwick no sworn statement was taken from Lewis. The reports do not further detail what Mr. Lewis said. Ex. 1 at 276-77.

On July 8, 1999, Mr. Lewis accompanied agents along the route taken during the carjacking. The CID report does not include any specifics about what Mr. Lewis said, except that he told agents where Mr. Sparks had thrown Todd Bagley's watch. Ex. 1 at 277-78.

On September 17, 1999, Mr. Lewis was again interviewed. On this occasion, he told the agents that Terry Brown was the person who had gotten the .40 Glock from Greg Lynch and brought it back to the car. Ex. 1 at 874.

In a debriefing on some unspecified date, Mr. Lewis told investigators that Tony Sparks threw the .22 into the bushes on the night of June 20, 1999 and that Mr. Lewis and Mr. Vialva had retrieved the gun from the bushes where it was thrown. Ex. 1 at 750.

In none of the statements provided to the defense or in his statement on plea of guilty did Mr. Lewis ever say that while at Long Branch Park, Mr. Vialva screamed that the Bagleys had to be killed after Mr. Brown screamed that the Bagleys did not have to die. Indeed, none of Mr.

26



Lewis' statements indicates that Mr. Vialva said *anything at all* while at Long Branch Park.

### d. Testimony of Government Agents in Possession of Mr. Bernard's Counsel

On June 23, 1999, FBI Agent Chadwick submitted a sworn complaint against Mr. Vialva and Mr. Bernard. In the complaint he stated that Terry Brown had poured lighter fluid on his shirt and then handed it to another unnamed person so the fire in the car could be started.

Agent Chadwick testified at a preliminary hearing on June 24, 1999, and at the time of trial the defense possessed a transcript of that hearing. At the preliminary hearing, Mr. Chadwick told the court

(1) that he had no evidence that Brandon Bernard had started the fire and that the fire must have been started by either Mr. Lewis or Mr. Vialva (Ex. 1 at 4302);

(2) that he had no evidence that after the murders Mr. Bernard possessed either the .22 or the .40 Glock (Ex. 1 at 4296);

(3) that no one had told Mr. Bernard in advance that a murder was to take place ("I mean, I don't think anybody had stated, 'we're going to kill them.'") (Ex. 1 at 4299) ;

(4) that Chris Vialva and Chris Lewis put lighter fluid on the car and that Terry Brown might have put lighter fluid on his shirt to help start the fire (Ex. 1 at 4202-03);

(5) that nothing indicated Mr. Bernard had put lighter fluid on the car (R 4302); and

(6) that Christopher Vialva himself opened the car trunk before he shot the Bagleys. Ex. 1 at 4303. Mr. Chadwick based his testimony on interviews conducted with Mr. Lewis, Mr. Brown and Mr. Bernard. Ex. 1 at 4280.

### 2. Testimony Available to Mr. Bernard's Counsel and in Possession of Mr. Vialva's Lawyers But Not in Files of Mr. Bernard's Counsel at Time of Trial

The files obtained by undersigned counsel from Mr. Bernard's trial attorneys contain no

1214

grand jury testimony. However, petitioner has obtained from current counsel for Mr. Vialva copies of grand jury testimony in the files of Mr. Vialva's trial counsel.

Agent Chadwick testified at a grand jury proceeding on July 13, 1999. In his sworn testimony, given after both Mr. Brown and Mr. Lewis had given proffers to the government, Agent Chadwick stated that Mr. Vialva opened the trunk of the Bagleys' car using the car keys and that it was Mr. Vialva who "appear[ed]" to have set the car on fire. Exhibit 2 at 56. Agent Chadwick stated it was not known how the car had been set on fire: "It's not known exactly – we don't know if it was by lighter fluid or some type of material that he might have had lighter fluid on." Id.

Mr. Chadwick again testified before the grand jury on December 14, 1999 in connection with a superseding indictment against Tony Sparks. At this proceeding, Mr. Chadwick testified that Mr. Brown, Mr. Lewis and Mr. Bernard had all poured lighter fluid on the Bagleys' car. Exhibit 3 at 45. He also stated that a person whom he did not name had poured lighter fluid into the trunk after the Bagleys were shot and that Mr. Bernard had set the fire with a match. Id. at 45.

Mr. Chadwick testified that it was Mr. Vialva who had "ditch[ed]" the .22 caliber gun on the night of June 20th and that it was Mr. Vialva and Mr. Bernard who went back to get it later. Ex. 3 at 42.

At neither grand jury proceeding did Mr. Chadwick's account of the events leading up to the murder include any claim that Mr. Vialva and Mr. Brown had engaged in a screaming match at Long Branch Park over the Bagleys' fate. Nor is there any testimony that Mr. Bernard ever knew in advance that the Bagleys were to be killed.

Arson investigator Thomas Sing provided a lengthy report giving his expert opinion

about the car fire.   Exhibit 4.   Mr. Sing's report states his opinion that "the fire . . . originated in two separate areas of the vehicle.  The indication of an ignitable liquid on the exterior surface of the engine compartment hood and exterior surface of the rear deck of the trunk are evidence of one area of origin of the fire.   A second area of origin is located with in [sic] the passenger compartment in the area of the rear passenger seat in the floor pan immediately to the rear of the driver's seat."   Id. at "Page 5 of 9."  Counsel for Mr. Vialva possessed  this report at the time of trial, but it is not included in the file furnished to undersigned counsel by Mr. Hunt.

### 3.   Evidence Available But Not in Files of Mr. Bernard's Counsel

#### a.      Transcripts of Guilty Pleas for Mr. Brown and Mr. Lewis

On December 16, 1999, Mr. Brown and Mr. Lewis entered pleas of guilty.  The pleas were entered at the same time in a joint proceeding which involved three other defendants in unrelated matters.  Two of the other defendants were being represented by Mr. Schweiger and Mr. Hunt, Sr., respectively, and as a result both Mr Schweiger and Mr. Hunt, Sr., were  present when Mr. Brown and Mr. Lewis pled guilty.

Mr. Brown and Mr. Lewis were placed under oath and this court conducted a Rule 11 colloquy.  Exhibit 5.  Assistant United States Attorney Mark Frazier provided a factual basis for the guilty pleas.   The facts recited by Mr. Frazier were "identical" for Mr. Brown and Mr. Lewis.  Ex. 5 at 29.

Mr. Frazier told the court that the government would prove at trial:

(1) that **at the direction of Chris Vialva** Mr. Bernard lit the Bagley's car on fire with a match, Ex. 5 at 35;

(2) that **at the direction of Chris Vialva** Terry Brown poured lighter fluid on the car after the Bagleys were shot, Ex. 5 at 35;



(3) that **Chris Lewis**, Terry Brown and Brandon Bernard poured lighter fluid on the car, Ex. 5 at 35;

(4) that on the night of June 20, 1999 it was **Chris Vialva** who threw a .22 pistol belonging to Tony Sparks into some bushes, Ex. 5 at 30;

(5) that Mr. Vialva retrieved the .22 pistol together with Brandon Bernard, Ex. 5 at 30;

(6) that after the carjacking occurred, Mr. Brown and Mr. Bernard "went back to their residences to wait for further instructions from Vialva," Ex. 5 at 32;

(7) that it was Bernard, Lewis, Vialva and Sparks who went to get a .40 Glock pistol from Greg Lynch, Ex. 5 at 31;

(8) that at the time the .40 Glock pistol was obtained from Mr. Lynch he was told about the carjacking plans, Ex. 5 at 31;

(9) that Mr. Bernard parked his car down the hill from where the homicides occurred in order to enable the group "to make a quick getaway," Ex. 5 at 35;

(10) that while Mr. Lewis, Mr. Sparks and Mr. Vialva were looking for someone to carjack, Mr. Brown and Mr. Bernard "maintained surveillance," Ex. 5 at 31;

(11) that when Chris Vialva said at the park that the Bagleys had to be killed, Terry Brown said they should just be let go, Ex. 5 at 34;

(12) that the reason the .40 Glock was obtained was because the .22 became wet from dew and was not working properly, Ex. 5 at 31;

(13) that Mr. Vialva, Mr. Sparks and Mr. Lewis were "three individuals associated with a local gang known as the 212 PIRU, P-i-r-u, Bloods and further identified as the 'kick door boys." Ex. 5 at 29.

Mr. Brown told the court that he had no disagreement with the factual statement as read

by Mr. Frazier. Ex. 5 at 36. Mr. Lewis indicated through his lawyer that he denied pouring lighter fluid on the car, but otherwise adopted as his own the statement of facts recited by the prosecutor. Id. at 36-37.

Mr. Brown and Mr. Lewis constitute the only possible sources of information for all of the above listed facts which the government told the court on December 16, 1999 it would prove at trial. The government had no other witnesses, admissible statements, or physical evidence which could be used to prove its version of events with respect to how the murders were committed and what Mr. Bernard knew about them in advance. Thus, when the government read its statement of facts to the court it was telling the court the facts to which it expected Lewis and Brown would testify at trial.

At the guilty plea hearing, Mr. Brown and Mr. Lewis were also questioned about their understanding of the federal sentencing guidelines. Ex. 5 at 45. Both swore that they had discussed the guidelines with their lawyers. Id. The terms of the plea agreements in their cases were placed on the record as well. Ex. 5 at 23-25. Neither plea agreement contained any provision referencing a possible substantial assistance motion by the government.

2.    **Tony Sparks' Guilty Plea**

Tony Sparks, a participant in the carjacking who had been dropped off at his residence before the murders occurred, entered a guilty plea to carjacking on April 17, 2000. At the guilty plea hearing, the prosecutor was Scott Frost, co-counsel with Mr. Frazier at Mr. Bernard's trial. Exhibit 6. Mr. Frost told the court that at a trial, the government would prove beyond a reasonable doubt essentially the same set of facts set forth in the guilty plea statements for Mr. Brown and Mr. Lewis. Ex. 6 at 7-14. Specifically, Mr. Frost assured the Court that the government would prove beyond a reasonable doubt that Brandon Bernard set the Bagleys' car

31

on fire with a match at the direction of Chris Vialva, that Chris Vialva opened the trunk of the car himself before he shot the Bagleys, that Chris Lewis poured lighter fluid on the Bagleys' car, and that Chris Vialva directed Mr. Brown to pour lighter fluid on the car after Mr. Vialva shot the Bagleys.

At Mr. Sparks' plea hearing, the government stated that it was Mr. Lewis who had thrown the .22 into the bushes on the night of June 20th and that Mr. Vialva, Mr. Bernard, and Mr. Lewis had gone to retrieve it. Ex. 6 at 8. These statements conflict with the government's claim at the December 16, 1999, plea hearing that Mr. Vialva threw the gun into the bushes and that only Mr. Vialva and Mr. Bernard went to retrieve it.

### 4.    Trial Testimony of Mr. Brown and Mr. Lewis  Conflicting with Guilty Plea

#### a.    Testimony of Terry Brown

Terry Brown's testimony at Mr. Bernard's trial differed frequently and significantly from the factual basis that he agreed to when he pleaded guilty. These differences included the following:

*(1) At trial, Mr. Brown testified that he accompanied Bernard, Lewis, Vialva and Sparks when they got the .40 Glock from Greg Lynch (T. 1875), although the plea statement did not indicate that Mr. Brown was present.*

*(2) At trial, Mr. Brown testified that the reason the group got the .40 Glock from Greg Lynch was that a .22 was not a powerful enough weapon (T. 1874), although in his plea statement he said the reason was that the .22 became wet the night before and did not work properly.*

*(3) At trial, Mr. Brown denied having had any knowledge of a plan to carjack anyone prior to the time Mr. Lynch provided the .40 Glock (T. 1875, 1868), in contrast to the plea*

32

statement in which he admitted agreeing to assist in a carjacking before the gun was retrieved from Mr. Lynch.

(4) At trial, Mr. Brown never testified that he performed any sort of surveillance while Sparks Lewis and Vialva were attempting to find a carjacking victim. He simply said that he and Bernard waited in a car. T. 1881.

(5) At trial, Mr. Brown denied having any idea about what he was to do if Mr. Vialva and the others succeeded in getting a ride from someone; according to Mr. Brown, the idea was never discussed. T. 1882. By contrast, in his statement at the guilty plea hearing, he asserted that the plan was for Mr. Bernard and Mr. Brown to follow the group once they had carjacked someone.

(6) Mr. Brown testified at trial that when he and Bernard couldn't find Mr. Vialva, Mr. Sparks and Mr. Lewis they first went to a friend's home and then to their respective houses. In contrast to his admission on plea of guilty, Mr. Brown said nothing at trail about having gone to his residence to "wait for instructions."

(7) The plea statement avers that when Chris Vialva advised the group in the park that he was going to kill the Bagleys, Mr. Brown told Mr. Vialva he should let them go. At trial, Mr. Brown gave no such testimony.

(8) Mr. Brown testified at trial that when Vialva made his statement in the park about killing the Bagleys, he (Mr. Brown) was standing beside the window of Mr. Vialva's car and Mr. Bernard was still in his own car. Mr. Brown further stated on cross examination that he never told Mr. Bernard that Mr. Vialva wanted to kill the Bagleys but only that Mr. Vialva wanted to burn their car. T. 1955.

(9) Mr. Brown stated at trial that Mr. Bernard did not drive his car up the hill on Fort

33

Hood because the car was too big. T. 1918. In his statement on his plea of guilty, by contrast, Mr. Brown indicated that Mr. Bernard left the car on the road so the group could make a quick getaway.

(10) Mr. Brown testified at trial that only he and Mr. Bernard poured lighter fluid on the Bagleys' car. T. 1919. He did not state that Mr. Lewis poured lighter fluid on the car, in contrast to the statement on plea of guilty.

(11) Mr. Brown testified at trial that he poured lighter fluid into the trunk of the car "to make sure there wasn't anything connecting to us." T. 1927. Mr. Brown did not testify, in contrast to the statement on plea of guilty, that Mr. Vialva ordered him to pour lighter fluid on the car.

(12) Mr. Brown testified at trial that he did not see who lit the car on fire, but that when the car was set on fire Mr. Bernard was standing near the passenger door of the car and Mr. Vialva was standing by the trunk. T. 1930. At his plea of guilty, Mr. Brown claimed that Mr. Bernard set the car on fire with a match.

(13) At trial, Mr. Brown never stated that Chris Vialva directed Mr. Bernard to set the car on fire, in contrast to what he had stated under oath on his plea of guilty.

(14) Mr. Brown testified at trial that Mr. Vialva asked Chris Lewis to open the trunk, but that he was not sure whether Mr. Lewis or Mr. Bernard had opened the trunk. T. 1923. In his statement on plea of guilty, he stated without qualification that Mr. Vialva opened the trunk.

(15) At trial, Mr. Brown did not testify that he told Mr. Lynch about any plans to commit a carjacking. Nor did Mr. Lynch give any such testimony. T. 2185 (testimony of Greg Lynch).

**b.    Trial Testimony of Chris Lewis**

34

Christopher Lewis' trial testimony also differed significantly from his statement on plea of guilty.   These differences included the following:

(1) At trial, Mr. Lewis testified that he was running down the hill away from the Bagleys' car and that when he turned around to look back, the Bagleys' car was already on fire.  T. 2376-77.  He did not give any testimony in conformity with his statement on plea of guilty concerning who set the fire or how the fire was set.  Similarly missing from his trial testimony is  any claim that  Mr. Vialva directed anyone to do anything.

(2)  At trial, Mr. Lewis denied knowing who opened the trunk before the Bagleys were shot.  T. 2374.  At his plea of guilty, by sharp contrast, he asserted that Mr. Vialva opened the trunk.

(3)  Mr. Lewis testified at trial that on the night of June 20th, he had the .22 pistol in his shoe and that when he saw the police he threw the .22 into some bushes.  T. 2316.   This statement  conflicted with his statement on plea of guilty that Chris Vialva threw the .22 into the bushes.

(4) Mr. Lewis testified that Chris Vialva told Mr. Lewis that he (Vialva) "got the .22 out of the bushes."  T. 2319.  Mr. Lewis did not testify,  in contrast to the statement on plea of guilty, that Mr. Bernard helped retrieve it.

(5) Mr. Lewis stated at trial that Mr. Brown accompanied the others to Greg Lynch's home to get the  .40 Glock, in contrast to his statement on plea of guilty which does not have Mr. Brown present.  T. 2325.

(6) Mr.  Lewis said at trial  that Mr. Brown, Mr. Bernard and Mr. Vialva all poured lighter fluid on the Bagleys' car.  T. 2372.  This statement conflicted with Mr. Brown's trial testimony (Mr. Brown and Mr. Bernard poured the lighter fluid),  the plea statement (Mr.

35

*Bernard, Mr. Lewis, and Mr. Brown poured the lighter fluid), and Mr. Lewis' correction of the*

*plea statement (Mr. Lewis denied pouring the lighter fluid but did not say that Mr. Vialva*

*poured lighter fluid on the car.).*

*(7) At trial, Mr. Lewis denied knowing who opened the trunk, T. 2374, in contrast to his*

*statement on plea of guilty that Mr. Vialva opened the trunk himself.*

*(8) Mr. Lewis testified that he and Mr. Brown had been together every day when housed*

*in the same jail, even though their cells were in different parts of the jail. T. 2393. He did not*

*mention at trial that he and Mr. Brown had also been together when they entered their pleas of*

*guilty and that both had admitted to the same set of facts.*

*(9) Mr. Lewis did not testify at trial that Greg Lynch was informed of a plan to do a*

*carjacking. T. 2325.*

*(10) Mr. Lewis did not testify at trial that the group obtained the .40 Glock because the*

*.22 was wet; he said instead that the .22 was not a powerful enough weapon. T. 2324.*

At trial, Mr. Bernard's counsel did not question Mr. Brown or Mr. Lewis in any way

about any aspect of the guilty plea proceedings. The jury never learned about the many stark

differences between what Mr. Brown and Mr. Lewis agreed to at their pleas of guilty and what

they testified to at trial. Nor did the jury ever learn that the government had told the court at the

guilty pleas for Mr. Brown, Mr. Lewis and Mr. Sparks that it would prove through Mr. Brown

and Mr. Lewis a version of events different than the one to which Mr. Brown and Mr. Lewis

swore at trial and that the version at trial ascribed much more culpability to Mr. Bernard. It also

never learned that Brown and Lewis had been together at the guilty plea, heard what each other

said, and agreed to an identical statement of facts (except for Chris Lewis' denial that he poured

lighter fluid on the car).

36

**5.      Evidence Which Could Have Been Obtained by Mr. Bernard's Counsel**

Mr. Bernard's lawyers could have obtained, but did not, the guilty plea transcripts for Terry Brown,  Chris Lewis and Tony Sparks.   The pleas were not transcribed until undersigned counsel requested them this year.   The defense did have in its possession a copy of the Factual Statement filed by the Government in connection with the guilty pleas for Brown and Lewis.

The defense also never made any efforts to obtain any records, pleadings or transcripts for either the detention hearings or the transfer proceedings for Mr. Lewis and Mr. Sparks.   The defense never made any effort to obtain the juvenile court criminal records for Mr. Lewis or Mr. Sparks.

The Government obtained a second superseding indictment on March 28, 2000. The defense made no effort to obtain any grand jury testimony, including Jenks Act material, in connection with the grand jury proceedings leading to the March 28, 2000 indictment.

**6.      Other Trial Testimony of Terry Brown**

In addition to his testimony conflicting with the guilty plea statement, Mr. Brown gave the following testimony.

Mr. Brown said at trial that he went back and got matches after buying the lighter fluid because Mr. Bernard needed some matches for his cigarettes.   T. 1911.   He also claimed that he poured lighter fluid on his shirt because he was "trying to prevent the act that might have occurred."   T. 1921.

Mr. Brown denied ever telling Mr. Bernard that the Bagleys were to be killed. On direct examination he stated without elaboration that he had told Mr. Bernard of the "plan" after Mr. Vialva at Long Branch Park expressed his intention to burn the car and kill the Bagleys, a statement which Mr. Brown said he "kind of doubted."   T. 1908; T. 1904.     On cross

examination, however, Mr. Brown conceded that he had never told Mr. Bernard about any plan to kill the Bagleys:

> Q. Okay. Then, after you had the conversation where you say you didn't believe that Vialva would really shoot the people, you said you got into Brandon's car, told Brandon about the plan, but certainly, you didn't tell Brandon, "We're going to the countryside and shoot these people." Right?
>
> A. No, sir.
>
> Q. Okay. You didn't mention that part of it at all.
>
> A. I just basically told him the basics. I didn't know exactly what was going to happen, but I told him the basics.
>
> Q. Okay – that you all were going to go out to the countryside?
>
> A. Not basically the countryside, but that the car would be burned.

T. 1955.

Mr. Brown testified that Mr. Vialva made his comments at Long Branch Parkabout intending to kill the Bagleys while Mr. Brown stood next to Mr. Vialva's car. T. 1903-04. Mr. Brown did not say that Mr. Bernard ever left his (Bernard's) car while at Long Branch Park.

When Mr. Brown testified, he omitted any mention of having smoked dope with Greg Lynch, even though when Mr. Lynch testified he admitted that he and Mr. Brown smoked marijuana together. T. 2187.

Mr. Brown stated that he had only given two or three statements, and that in each statement he had not changed his testimony but only added "more detail." T. 1938. The prosecutor characterized the evolution of Brown's statements as "not only . . . telling more on others but telling more on [him]self" and Mr. Brown agreed with this assessment. T. 1961.

On redirect examination, Mr. Brown testified about the statements he gave to the CID on June 22. He said that when questioned, "They [the CID] had information, and basically, he

told me – and I told him what – I just confirmed basically whatever he said." T. 1961.

### 7. Trial Testimony of Chris Lewis

In addition to Mr. Lewis' testimony which varied from the guilty plea statements, he also testified as follows.

Mr. Lewis gave an extensive account of the Long Branch Park episode. He said that Brandon Bernard left his car to ask Mr. Vialva for a cigarette, and that while Mr. Bernard was at Mr. Vialva's car, Mr. Brown and Mr. Vialva screamed at each other about whether or not the Bagleys had to be killed. T. 2363-64.

Mr. Lewis said at trial that Tony Sparks brought the .40 Glock back to Mr. Bernard's car. T. 2325.

When asked by Mr. Vialva's lawyer, Dwight Goains, how many statements he had given, Mr. Lewis replied, "I'd say three." Mr. Goains then told the court that he had only received one statement, and asked for copies of the others. Mr. Frazier responded, "There's only one, Counsel." T. 2395.

### 8. Cross Examination of Terry Brown

Mr. Russ Hunt, Jr.,'s brief cross-examination of Terry Brown did not include a single question about any of Mr. Brown's prior inconsistent statements. Other than securing from Mr. Brown the admission that he did not tell Mr. Bernard about a plan to kill the Bagleys, the examination failed to impeach any substantive aspect of Mr. Brown's testimony or Mr. Brown's overall credibility. T. 1948-59.

Mr. Hunt did not ask Mr. Brown any questions about his use of drugs on the day of the crime, or his use of drugs at other times.

Mr. Goains' cross examination did bring out that Mr. Brown made a statement on the day of the shootings in which he denied responsibility altogether and that Mr. Brown made another statement later that same day in which he said that he and Mr. Bernard were at Mr. Bernard's car when the shootings occurred. T. 1940-41. Mr. Goains did not ask a single question about any of the many later statements by Mr. Brown. Thus, the jury never learned that Mr. Brown had even given any statements after the day of his arrest – much less that any of those statements, including *sworn* statements, were inconsistent with his trial testimony.

Mr. Brown was questioned briefly about his plea agreement with the government, but neither Mr. Hunt nor Mr. Goains elicited any information about the sentencing range for the crimes to which Mr. Brown had pleaded guilty (roughly 20 years, as discussed *infra*) or the stark difference between this range and the mandatory life sentence Mr. Brown otherwise faced for first degree murder.

### 9.    Cross Examination of Chris Lewis

Mr. Russ Hunt, Sr.,'s cross examination of Chris Lewis was neither lengthy nor searching. T. 2417-26. In his examination, Mr. Hunt questioned Mr. Lewis about some aspects of his June 22 statement, but did not interrogate Mr. Lewis about any other prior statements. Neither Mr. Hunt, Sr., or Mr. Goains elicited the fact that, with an agent's assistance, Mr. Lewis had drawn a detailed diagram of the murder scene and the location of the participants, or that this diagram indicated that Mr. Bernard was not standing near the Bagleys' car when they were shot and their car set ablaze.

### 10.    Why Counsel Was Ineffective in Examining Mr. Brown and Mr. Lewis

Assessing counsel's effectiveness requires examining both the evidence and discovery which were in counsel's possession, and that which counsel could readily have acquired. The

court must then consider how, armed with this information, counsel could have impeached the government's witnesses and whether any legitimate tactical reason existed for counsel not to do so.

**a.     Counsel Was Ineffective For Not Obtaining Guilty Plea Transcripts and All Other Available Testimony and Discovery**

Reasonably effective counsel would have obtained the transcripts of the guilty pleas for Mr. Lewis, Mr. Brown, and Mr. Sparks. No possible strategic reason exists for not obtaining prior, sworn statements from the two key witnesses, as well as another participant, about what occurred. Blackburn v. Foltz, 828 F.2d 1177 (6th Cir. 1987) (counsel ineffective for not procuring transcript to impeach witness with prior inconsistent statements). What makes counsel's deficient performance in this case particularly baffling is that Mr. Hunt and Mr. Schweiger were actually present when Mr. Brown and Mr. Lewis pleaded guilty. Moreover, they had in their possession the government's written statement of facts for the guilty plea. Yet it is a certainty that Mr. Hunt did not have the transcripts because they were transcribed for the first time in 2004 at the request of present counsel. Similarly, no strategic or tactical reasons exist to justify counsel's failure to obtain the transcript of the guilty plea for Tony Sparks, a participant in the crimes.

Mr. Hunt has represented to undersigned counsel that he has furnished us his complete file on Mr. Bernard's case, but the file contains no grand jury testimony and no report from arson investigator Thomas Sing. No possible strategic or tactical reason exists for defense counsel not to have obtained and reviewed all the discovery available from the government (which claims to have had an "open file" discovery policy in the case), including all grand jury testimony which the government had to disclose pursuant to the Jenks Act and all expert reports

41

discoverable under the federal rules of criminal procedure.

No question exists that Mr. Bernard's lawyers could have obtained grand jury testimony and expert reports. Not only did the government purportedly have an open file policy, but the reports and transcripts were in the possession of Mr. Vialva's lawyers at the time of trial. Any reasonably effective lawyer would make certain that he had obtained all the discovery made available by the government and that he had mastered the discovery and had it available for use during trial. Counsel's failure to do so made it impossible for them to furnish effective assistance.

> **b.      No Reason Existed Not to Impeach Mr. Lewis and Mr. Brown As Thoroughly As Possible**

No possible strategic reason existed for not exposing, to the maximum possible extent, the ever-shifting accounts supplied by Mr. Brown and Mr. Lewis about what happened leading up to and during the murders. No possible strategic reason existed not to emphasize all the indications that their stories could not be trusted. No possible strategic reason existed not to highlight the benefits conferred on Mr. Brown and Mr. Lewis by the plea agreements. Mr. Brown and Mr. Lewis gave testimony which was critically important to the government's case against Mr. Bernard, but which was entirely self-referential. Without their testimony, the government could do no more than point to an awful crime. It could not attribute through independent evidence any specific action to any of the four individuals apprehended near the crime scene, nor could it establish beyond a reasonable doubt that Mr. Bernard knew that the murders were to occur.

The government did not introduce a scintilla of evidence, except through Mr. Brown and Mr. Lewis, as to who committed the carjacking, how the Bagleys were robbed, what Mr.

Bernard knew about any plans to commit a carjacking or murder and when he knew it, who decided to go to Fort Hood, who put lighter fluid on the car, who shot the Bagleys, who set the car on fire, what was used to set the car on fire, whether the murders were planned in advance, or where any one of the four defendants were located when the murders occurred. When the prosecutor in closing argument characterized the evidence as "overwhelming and positive and true," T. 2676, he in effect told the jury that Mr. Brown and Mr. Lewis's testimony was "overwhelming and positive and true." If the jury believed Mr. Brown and Mr. Lewis, it would convict Bernard. Conversely, to the extent that the jury found that Mr. Brown and Mr. Lewis had not told the truth, the evidence became flimsy, doubtful and false -- and no conviction would be forthcoming.

The defense had no reason to refrain from attacking Mr. Brown and Mr. Lewis out of fear that the jury would sympathize with them. Mr. Lewis and Mr. Brown were not victims, police officers, or innocent eyewitnesses; they were co-defendants whom even the government emphatically described as "criminals" and not "your friends." T. 2695. Nor can defense counsel's failure to effectively examine the witnesses be explained on the grounds that the lawyers pursued another defense. The only theory Mr. Bernard's defense advanced was that Mr. Brown and Mr. Lewis should not be believed and that Mr. Bernard had not played the role in the crime that Mr. Brown and Mr. Lewis said he did. T. 2640. Implementing that strategy required that Mr. Bernard's counsel impeach Mr. Brown and Mr. Lewis as thoroughly as possible, but counsel miserably failed in this task.

c.    **The Defense Had Ample Means to Undermine the Accounts of Mr. Brown and Mr. Lewis and**

Literally dozens of prior inconsistent statements existed with which reasonably effective

43

A reasonably effective attorney would further have established:

(1) that Chris Lewis gave a statement on June 22, 1999, in which he said Chris Vialva started the fire, probably with a cigarette;

(2) that on December 16, 1999, Mr. Lewis said that Mr. Bernard started the fire with a match at the direction of Mr. Vialva; and

(3) that at trial Mr. Lewis professed ignorance of who started the fire, claiming he had been running down the hill when the fire started.

### ii.    How the Fire Was Set

A reasonably effective attorney would also have established

(1) that the government had no proof as to how the lighter fluid was ignited;

(2) that no matches were ever found in either the Bagleys' car or Mr. Bernard's car, or taken into evidence;

(3) that the videotape from the store did not show Mr. Brown returning to get matches; and

(4) that the government's own expert had written a report in which he expressed the expert opinion that the fire had three separate points of origin.

A reasonably effective attorney would have established that Terry Brown

(1) told government agents when interviewed that he had poured lighter fluid onto his shirt to use as a means to start the fire;

(2) told agents that he handed the shirt to Mr. Lewis so that he could start the fire;

(3) at the July 26, 1999, proffer session told agents that he only applied lighter fluid to his shirt and claimed he did not put any lighter fluid on the car; but

(4) at trial, now claimed that he put lighter fluid on the shirt and on the car but insisted

45

he put lighter fluid on his shirt because he was trying to *prevent* a crime from occurring.

A reasonably effective attorney would also have established that Terry Brown

(1) in over a dozen separate statements on June 22, 1999, never said that Mr. Bernard poured lighter fluid on the car;

(2) at the July 26th proffer session said that it was only he and Mr. Bernard who poured lighter fluid on the car, but added that they did so at the direction of Mr. Vialva and further said nothing at all about having poured lighter fluid into the trunk after Mr. Vialva shot the Bagleys;

(3) at his plea of guilty, said that he, Mr. Bernard, and Mr. Lewis poured lighter fluid on the car and that Mr. Vialva directed him to pour lighter fluid on the car after the Bagleys were shot; and

(4) at trial, claimed that it was only he and Mr. Bernard -- and not Mr. Lewis -- who poured lighter fluid, and said nothing about Mr. Vialva's having told them to do so.

A reasonably effective attorney would also have established

(1) that Mr. Lewis first claimed that it was only Mr. Vialva who poured lighter fluid on the car;

(2) that at his plea of guilty, Mr. Lewis specifically disavowed the government's claim that he had poured lighter fluid on the car, saying that Mr. Brown had poured lighter fluid into the trunk after the fire at the direction of Mr. Vialva but saying nothing about Mr. Vialva himself pouring lighter fluid on the car; and

(3) that at trial, Mr. Lewis now claimed that it was Mr. Bernard, Mr. Brown and Mr. Vialva who poured lighter fluid on the car -- but failed to mention anything about seeing Mr. Brown pour lighter fluid into the trunk anything about Mr. Vialva directing Mr. Brown.

A reasonably effective attorney would have established that the government had no

46

1235

independent evidence which would have enabled the jury to determine which of any of these multiple, conflicting, and constantly changing versions of who set the fire or how it was set should be believed. In particular, a reasonably effective attorney would have established that there was not a scintilla of objective evidence showing that *Mr. Bernard* set the fire.

Mr. Bernard's attorneys did none of these things. Although Mr. Bernard's attorneys evidently grasped the importance of impeaching Mr. Brown and Mr. Lewis, their failures to obtain and effectively utilize all available impeaching material insured that the necessary impeachment would not occur. Mr. Bernard's attorneys could have destroyed the credibility of Brown and Lewis on a central aspect of the government's case. Because they failed to prepare for or perform effective cross-examination, the trial testimony of Brown and Lewis went virtually unchallenged.

### iii.    Chris Vialva as Leader

A reasonably effective attorney would have highlighted the startling change in "facts" from the guilty plea to the testimony at trial in regard to whether Mr. Vialva was the leader. The attorney would have demonstrated that at their guilty pleas, Mr. Brown and Mr. Lewis portrayed Mr. Vialva as having been in charge and the others as subordinates who took their orders from him. Counsel would have noted the admissions at the guilty plea that Brown went home to "await further instructions"; that Vialva directed Brown to pour lighter fluid on the car; and that Vialva directed Bernard to light the fire. The failure of either Brown or Lewis to testify to any of these matters would have provided the raw material for a powerful argument that, at the very least, Mr. Bernard was not as culpable as Mr. Vialva and that the government was falsely endeavoring to enhance Bernard's culpability and diminish Mr. Vialva's leadership role so that the jury would hold Mr. Bernard equally responsible.

47

### iv. Opening the Trunk of the Car

Mr. Bernard's lawyers could have but did not cross-examine Mr. Brown and Mr. Lewis on their conflicting prior testimony about who opened the trunk of the car before the Bagleys were shot.   A reasonably effective attorney would have established

(1) that in his initial statement, Mr. Lewis said that Mr. Vialva opened the trunk of the car; and

(2) that when they pled guilty, both Mr. Lewis and Mr. Brown swore that it was Mr. Vialva who had opened the trunk.

The attorney then would have impeached Mr. Lewis' trial testimony, in which he claimed not to know who opened the trunk, as well as Mr. Brown's trial testimony that he did not know who opened the trunk but that Mr. Bernard was the only person in position to do so.

Mr. Bernard's lawyers also could have questioned Agent Chadwick about his sworn grand jury testimony that Mr. Vialva opened the trunk of the car with the keys.   The basis for this testimony – an intuitively appealing explanation, since Mr. Vialva had been driving the car moments before  – must have been a statement by either Mr. Lewis or Mr. Brown.   Such examination would have impeached either Mr. Brown or Mr. Lewis and would also have undercut the government's claim that Mr. Bernard opened the trunk using the control in the glove compartment.

### v.    Reason for Obtaining Matches

At trial, Mr. Brown claimed that he went back to the store to get matches because Mr. Bernard needed them to light his cigarettes.   Mr. Bernard's attorneys could have, but did not, impeach Mr. Brown with his statement at the July 26, 1999, proffer session that he got the matches in order to be able to ignite the lighter fluid.

48

This contradiction would have exposed Mr. Brown's testimony at trial, in which he claimed he got matches as a favor for Mr. Bernard, as a self-serving fabrication. Mr. Brown would have been revealed both as a liar and as a witness capable of changing his testimony at trial in a transparent effort to look better. Such cross examination would have made ring hollow the government's claim that Mr. Brown should be believed because not only was he telling more on others but more on himself. "...they didn't tell more just on other people, they told more about what they themselves did." T. 2696. It would also have provided ammunition for the argument that Mr. Brown got the matches because *he* was the person who intended to set the car on fire.

### vi.    Mr. Brown's Knowledge About What He Was to Do if a Carjacking Occurred

At trial, Mr. Brown testified that when he accompanied Mr. Sparks, Mr. Vialva and Mr. Lewis to the store where they hoped to find a carjacking victim, he had no idea what he and Mr. Bernard were to do if they succeeded, and that the subject was never discussed. He also testified that he and Mr. Bernard merely sat in the car while Mr. Sparks, Mr. Vialva and Mr. Lewis looked for potential victims. T. 1880-81. Mr. Brown could have been impeached with his statement on plea of guilty that "Bernard and Brown were then to follow Vialva, Sparks and Lewis after they got into the victim's car..." and that he and Mr. Bernard "maintained surveillance" while Mr. Sparks, Mr. Vialva and Mr. Lewis attempted to carjack someone. Highlighting these inconsistencies would have been to Mr. Bernard's benefit. The more instances in which the defense could demonstrate Mr. Brown's inability to tell the same story twice, the less likely it became that the jury would believe Mr. Brown at all.

### vii.    Events at Long Branch Park

1238

The claim that Mr. Bernard learned of the plans to kill the Bagleys at Long Branch Park was critical to the government's depiction of Mr. Bernard as a premeditated killer.

Effective cross-examination of Mr. Lewis would have revealed the absence of any evidence that at any time before trial in any of his many meetings with government agents did Mr. Lewis ever say that Mr. Bernard got out of his car, asked Mr. Vialva for a cigarette, and then stood there while Mr. Brown and Mr. Vialva screamed at each other about whether the Bagleys needed to be killed.   Cross-examination would also have revealed the absence of any such facts in the guilty plea statement of Mr. Lewis.

Such cross examination would have been especially effective in light of Mr. Brown's testimony, which directly contradicted Mr. Lewis as to whether Mr. Bernard ever got out of his own car at Long Branch Park or heard any threats by Mr. Vialva, and the failure of the government to call either Tony Sparks or Joey Presley, the other people supposedly present during the screaming match.

### viii.    Who Threw the .22 Into the Bushes

A reasonably effective attorney would have cross-examined  Mr. Lewis to emphasize

(1) that  in Mr. Lewis' lengthy written initial statement, he failed even to mention that he had been with Mr. Sparks and Mr. Vialva on the night of June 20, 1999, or that *anyone* had thrown a .22 gun into the bushes;

(2) that in a debriefing session given after Mr. Lewis had decided to cooperate with the government, he stated that *Tony Sparks* threw the gun into the bushes;

(3) that at his plea of guilty, he swore that *Chris Vialva* threw the gun into the bushes; and

(3) that at trial he claimed that *he* had received the gun from Mr. Sparks, put it into his

shoes and then thrown it into the bushes when the police approached.

The attorney would also have been able to demonstrate that at his plea of guilty, Mr. Lewis swore that it was Mr. Vialva and Mr. Bernard who retrieved the .22 -- while at trial, Mr. Lewis said that it was Mr. Vialva alone who had retrieved the gun. T. 2320.

Such examination would have shown the jury that Mr. Lewis could not be believed. Mr. Lewis' inability to keep straight something as simple and easily remembered as who threw a gun away when the police approached would have given the jury reason to doubt the reliability of anything he said. The ease with which Mr. Lewis could switch from saying Mr. Vialva threw the gun into the bushes to claiming that he hid the gun in his shoes and then threw it into the bushes himself would also have supplied a striking example of Mr. Lewis' talent and willingness to invent or change a story.

### ix.    Obtaining of Weapon from Greg Lynch

At trial, Mr. Lewis claimed that Mr. Brown was present when the group went to get the .40 Glock from Greg Lynch, but that it was Mr. Sparks who retrieved the weapon. Mr. Lewis could have been impeached with his statement on plea of guilty, in which he named only Mr. Lewis, Mr. Bernard, Mr. Sparks and Mr. Vialva as persons who went to Mr. Lynch's home to get the .40 Glock   He could also have been impeached with his statement to investigators that it was Mr. Brown who retrieved the weapon and not Mr. Sparks.   Mr. Brown could have been impeached with his statement on plea of guilty in which he agreed that he was not one of the people who went to Mr. Lynch's home to retrieve the gun -- in contrast to his testimony at trial that not only did he go to the home to retrieve the gun, but  he actually used drugs there along with Mr. Lynch.

Additionally, both Brown and Lewis could have been impeached with their statement on

51

plea of guilty that Lynch was informed of the plans to do the carjacking when the weapon was obtained.   Neither Brown nor Lewis gave such testimony at trial and Mr. Lynch said only that he was told that Mr. Vialva was on an otherwise unspecified "mission to make money." T. 2185.

### x.      Disposal of Weapons at Scene of Crime

At trial, Mr. Lewis claimed that it was Mr. Bernard who threw the .22 into the woods after the Bagleys' car was set on fire.  T. 2384.  He could have been impeached with his initial typewritten statement, in which he stated that it was Mr. Vialva who threw the .22 into the woods.  Ex. 1 at 347.  He could also have been impeached with his failure to say at any time prior to trial that Mr. Bernard had thrown a gun into the woods.

Such impeachment would have shown both Mr. Lewis' inability to tell a consistent story and his willingness to implicate Mr. Bernard at trial in activity he had not previously described.

### xi.      Instructions to Wait at Residences

Terry Brown said at his plea of guilty that he and Mr. Bernard went to their respective residences "to await further instructions" after they could not find Mr. Vialva, Mr. Sparks and Mr. Lewis. Ex. 5 at 32.  At trial, Mr. Brown gave no such testimony, saying instead that he and Mr. Bernard first filled out job applications and then eventually went home of their own accord. T. 1887.  Mr. Bernard's lawyers could have impeached Brown with this inconsistency as yet another example of Mr. Brown's penchant for telling different stories at different times.

### xii.      Other Inconsistencies

Mr. Brown and Mr. Lewis could also have been cross-examined about their statements on plea of guilty that the reason they needed the .40 Glock  was that it was a more powerful weapon – in contrast to their statements on plea of guilty that they needed the .40 Glock

52

because the .22 had become wet from dew.   Mr. Brown could have been cross-examined about his statement on plea of guilty that Mr. Bernard parked his car down the hill to "enable a quick getaway," in contrast to his trial testimony that Bernard parked the car below because he could not negotiate the hill.   T. 1918.   These inconsistencies would have supplied yet more ammunition to demonstrate that Mr. Brown and Mr. Lewis could not be relied upon to tell the same story twice.

### xiii.    Use of Initial Statements of Brown and Lewis

Reasonably effective counsel would have highlighted that,  before Mr. Brown and Mr. Lewis decided to cooperate *and* before the government had decided to pursue the death penalty against Mr. Bernard,  Mr. Brown and Mr. Lewis both separately provided extremely detailed written statements.   In neither statement is there any allegation that Mr. Bernard either set the car on fire or that he knew about any plan to kill the Bagleys.  At the time Mr. Lewis and Mr. Brown made these statements they had no motive to either inculpate or exculpate Mr. Bernard.

### ixv.    Use of Government's Own Admissions

Mr. Bernard's  lawyers could have attacked the government's case with the government's own admissions.   This type of evidence would have been particularly devastating because it would have revealed that the very prosecutors representing the government had assured the judge hearing the case on two separate occasions, one only a month before trial, that the government would prove a version of events inconsistent with the version it ultimately presented at trial.

When Mr. Frazier and Mr. Frost told the court at the guilty pleas of Mr. Lewis, Mr. Brown, and Mr. Sparks what the government would prove at trial, they were

(1) making  the equivalent of sworn representations, *see* <u>Holloway v. Arkansas</u>, 435 U.S.

53

475, 486 (1978) ("attorneys are officers of the court, and when they address the judge solemnly upon a matter before the court, their declarations are virtually made under oath") (internal quotation marks omitted);

(2) making statements of fact and not engaging in advocacy or speculation, and

(3) representing that the facts could be proved through admissible testimony, which could only be elicited from Mr. Lewis and Mr. Brown, especially as to the events surrounding the murders themselves.

Statements of a party opponent, including statements from a government prosecutor, are admissible under the federal rules of evidence. FRE 801 (d) (2) (a); United States v. Bakshinian, 65 F. Supp. 2d 1104 (C.D. Cal. 1999) (discussing when statements of prosecutor constitute admissions of party opponent and when they can be used at trial). "The jury is at least entitled to know that the government at one time believed and stated, that its proof established something different from what it currently claims. Confidence in the justice system cannot be affirmed if any party is free, wholly without explanation, to make a fundamental change in its version of the facts between trials, and then conceal this change from the final trier of the facts." United States v. GAF Corp., 928 F.2d 1253, 1260 (2nd Cir. 1991).

Here, the prior statements were made by Mr. Frost and Mr. Frazier (the same prosecutors who tried Mr. Bernard), were factual in nature, purported to represent what the government could prove with admissible evidence at a trial, were made with full opportunity for the prosecutors to consider and review what they were saying, and were made at a guilty plea hearing, which is a proceeding of special importance. Under even the most narrow theory of what constitutes an admission of a party opponent, the government's factual representations qualify.

54

Had Mr. Bernard's lawyers functioned effectively and introduced the admissions of Mr. Frazier and Mr. Frost, the effect would have been devastating. Instead of the government's being able to trumpet that Mr. Brown and Mr. Lewis were truthful, consistent and that there was no evidence of any "lies or doubts," the jury would have learned that the government itself had set forth a vastly different version of events when Mr. Lewis, Mr. Brown and Mr. Sparks pleaded guilty. The jury would have realized that the government had previously endorsed a version of events in which Mr. Vialva was in control and directing the other participants – but subsequently decided that in order to convict Mr. Bernard and secure the death penalty, it needed to make paint him as equally culpable. Consistent with this aim, the story from Mr. Lewis and Mr.Brown miraculously transformed itself so that Mr. Vialva's role diminished and Mr. Bernard's increased..

The government would have had to explain its willingness to accept contradictory testimony. It would have had to explain, for example, how it first could tell the court that Chris Lewis poured lighter fluid on the car, listen without comment while Mr. Lewis denied doing so, reiterate to the court four months later that Chris Lewis poured lighter fluid on the car, and then elicit and endorse testimony at trial from Mr. Lewis that he did not put lighter fluid on the car. The government would have had to explain its change in direction without being able to point to any new evidence which supported the different versions.

The government's statement at Mr. Sparks's guilty pleas would have been extremely useful. The government told the court at the guilty plea for Mr. Brown and Mr. Lewis that Mr. Vialva and Mr. Bernard retrieved the .22 pistol from the bushes – while at Mr. Sparks' plea, the government insisted that it was Vialva, Bernard, and Lewis who retrieved the .22. Yet, at trial, Mr. Lewis testified that Mr. Vialva alone retrieved the .22. The logical inference is that Mr.

Lewis told three different stories and that the government was willing to say that all three were true depending on the circumstances.

Mr. Sparks pled guilty on April 17, 2000. Yet, with few exceptions the government recited largely the same facts as at the guilty pleas for Mr. Brown and Mr. Lewis. That the government told the same story twice before trial and was now putting on a different version of events at trial would have cast serious doubt on the credibility of both the government and its witnesses.

The government's theory that Mr. Lewis' initial statement, which so thoroughly contradicted his trial testimony, was a lie, could have been contradicted by the government's own comment to the grand jurors at the July 14, 1999, grand jury proceeding that Agent Chadwick's testimony relied on this same statement. Agent Chadwick's grand jury testimony occurred after Chris Lewis had given a proffer to the government. The jury should have known that, far from running away from Mr. Lewis' typewritten June 22 statement, the government chose to embrace it when Agent Chadwick testified in front of the grand jury.

Had Mr. Bernard's lawyers acted effectively, the jury would have learned that the government placed expedience over truth. The jury would have realized that instead of insisting that its witnesses tell the truth, the government was willing to accept and endorse whatever story they happened to tell at any particular time, depending on the government's own needs as a litigant. A jury aware of the government's sharp practice would almost certainly have reached a different result.

### D.    Failure to Cross Examine on Benefits of Plea Agreements

Mr. Brown and Mr. Lewis were juveniles and not eligible for the death penalty under federal law. Mr. Bernard and Mr. Vialva were 18 and 19 years old, respectively, and death-

eligible. The government commenced plea negotiations with Mr. Brown and Mr. Lewis shortly after their arrests. Both Brown and Lewis gave proffers with their attorneys present before the end of July. On September 15 and 16, 1999, Brown and Lewis signed identical plea agreements in which they agreed to plead guilty to reduced charges in exchange for their agreement to testify for the government. The plea agreement provided that any untrue testimony or statements to government agents would void the plea agreements and that the government retained the sole discretion to determine whether they had told the truth. The plea agreements contain no reference to the possibility of the government filing a motion for substantial assistance pursuant to USSG 5K1.1.

Both Mr. Brown and Mr. Lewis testified that their plea agreements involved pleas to second degree murder for which they could get up to life in prison and that they were not subject to the death penalty. Both also testified that no promises had been made about what sentence they would receive and that their lawyers had told them that a life sentence was possible. T. 1858, T. 2303; T. 2424. On redirect examination Mr. Lewis stated that he had discussed the sentencing guidelines with his lawyer but that no one had guaranteed him any particular sentence. T. 2430.

Reasonably effective counsel would have cross examined both Mr. Brown and Mr. Lewis to bring out (1) that both had sworn at their own pleas of guilty that they had discussed with their attorneys the sentencing guidelines and their impact on their cases, and (2) that the sentencing guidelines provided for a sentence vastly less for second degree murder than the mandatory life sentence for the first degree murder charges they had bargained down. Reasonably effective counsel would have either elicited from Mr. Brown and Mr. Lewis that their attorneys had told them that their guideline ranges provided for a total punishment of less than 22 years (in Mr.

Brown's case) and less than 27 years (in Mr. Lewis' case).[3]    Had Mr. Brown and Mr. Lewis denied under oath that they were well aware of their likely sentences,  their attorneys could have been called to establish what they told Brown and Lewis.

Because of a lack of effective cross-examination, the jury gained the false impression that Mr. Brown and Mr. Lewis had received little benefit from the government when in fact the benefit was very substantial and both Mr. Brown and Mr. Lewis knew this to be the case.  This false impression prevented the jury from accurately assessing the incentive that Brown and Lewis had to please the government.

### E.    Failure to Impeach Terry Brown With Use of Drugs on Day of Crime

At the time of trial, the defense knew or should have known that Terry Brown had admitted to agents that he smoked  marijuana with Greg Lynch on the day of the murders.  Ex. 1 at 859.  Mr. Lynch himself testified, later in the trial,  that he and Mr. Brown smoked marijuana together.  T. 2187.  Mr. Brown omitted from his direct testimony any mention of using drugs.

Mr. Bernard's lawyers acted ineffectively in failing to cross-examine Mr. Brown about his use of drugs or question Greg Lynch about Mr. Brown's use of drugs.

Cross-examination would have served at least two important purposes.  First, it would have shown how Brown tailored his testimony to make himself look better.   Second, and even more important, Mr. Brown's use of drugs bore directly on his ability to perceive and remember the events of June 21, 1999.   Direct evidence about the impact of drug use on Mr. Brown comes from Mr. Brown himself.  *See* Exhibit 7 at 6 (Brown to the court, at sentencing: "I  feel I was not in my right mind due to all the drugs I involved myself with").

_____

[3]  The standard sentence ranges for the crimes to which Mr. Brown and Mr. Lewis pled guilty can be easily arrived at by consulting a federal sentencing guidelines manual.

**F.    Failure to Develop Evidence About Contacts Between Government Agents and Witnesses and Contacts Between Witnesses**

The prosecutor disparaged as groundless any claim that its witnesses had been told what to say. T. 2677. Not only did this argument misrepresent the evidence (see below), but the defense had in its possession admissions from the agents that they had deliberately not taken statements from the witnesses at various interviews. If the defense had brought these facts to the jury's attention, the jury would have realized that the so-called consistency of the witnesses was manufactured by the government and not an indication of the witnesses' truthfulness.

The government also rejected any notion that Mr. Brown and Mr. Lewis had any opportunity to "concoct" a story. This statement misrepresented the trial testimony. Moreover, a reasonably effective attorney would have brought to the jury's attention that Brown and Lewis, far from being separated from each other prior to trial and unaware of each others' stories, had been sitting right next to each other while the prosecutor recited an "identical" statement of facts and that both had agreed to this "identical" statement. Such knowledge would have vitiated any inference that to the extent their testimony agreed it was mutually reinforcing.

**G.    Cumulative Effect of Impeachment**

The failure to take advantage of all these means with which to undermine the believability of Mr. Brown and Mr. Lewis must be considered cumulatively. Every example of inconsistent and self-serving testimony on the part of Mr. Brown and Mr. Lewis gave the jury another tangible reason to doubt the truth of anything they said. Exploration of such matters as the government's own admissions, the benefits conferred by the plea agreements, and Brown's

59

1248

drug use would have given the jury further reason to entertain reasonable doubts. Had Mr. Bernard's attorneys acted effectively the outcome of the trial would probably have been different.

### H.    Other Aspects of Ineffective Assistance

The failures in impeachment of Mr. Brown and Mr. Lewis must be viewed in the context of the overall performance of Mr. Bernard's counsel. The evidence already known and that which will emerge from an evidentiary hearing shows a pervasive failure to engage in effective advocacy, including failures to prepare, to investigate, to file pretrial motions, and to prevent the introduction of prejudicial and irrelevant testimony. Individually and cumulatively these failures fell below the threshold of performance for a reasonably competent criminal defense attorney and prejudiced Mr. Bernard.

### 1.    Failure to Spend Adequate Time Preparing for Trial

The time records of Mr. Hunt Sr. and Mr. Hunt Jr. reveal that neither lawyer devoted sufficient time preparing for trial to allow for effective representation of Mr. Bernard.

Mr. Hunt Sr. was the only lawyer representing Mr. Bernard between his appointment on June 23, 1999 until Mr. Hunt Jr. was appointed in March of 2000.

The total number of hours spent by Mr. Hunt Sr. and Jr. is far below the average amount of time spent by lawyers in federal capital cases.

The Spencer Report, issued in May 1998, was authored by three federal judges on the Committee on Defender Services: Hon. Robert Spencer (E.D. Va.), Hon. Robin J. Cauthron (W.D. Okla.), and Hon. Nancy Edmunds (E.D. Mich.). Exhibit 9. The Report contains statistics showing that in federal capital cases that proceeded to trial, the average amount of attorney time was 1,889 hours including 1,480 out-of- court hours. Id.



The Spencer Report assumes that an attorney representing a defendant in a federal capital case will probably have to devote most if not all of his practice to the case during its pendency. Here, an evidentiary hearing will show that Mr. Hunt, Sr., maintained a busy trial practice from the time he was appointed as Mr. Bernard's counsel through trial, and gave correspondingly short shrift to his representation of Mr. Bernard.

The lack of basic preparation reflects the inadequate time Mr. Bernard's counsel invested in the case. Mr. Hunt, Sr., did not ask his investigator to interview any of the guilt phase witnesses and he interviewed none himself. He did not retain an arson expert and he did not familiarize himself with, or even obtain, the report of the government's arson expert. He did not obtain readily available transcripts of prior proceedings, including the guilty plea transcripts for Mr. Sparks, Mr. Brown and Mr. Lewis. He seems to have proceeded to trial without having in his possession the grand jury testimony of the witnesses. He made no effort to seek discovery of any of the juvenile proceedings against Mr. Brown and Mr. Lewis, including for example the transcripts of their detention hearings. He did not conduct any investigation into the background of any of the witnesses, including Mr. Lewis and Mr. Brown. Although he received and utilized some materials from the Federal Death Penalty Resource Counsel, he did not consult with anyone from the FDPRC about Mr. Bernard's case. Mr. Hunt filed some motions contesting the aggravating factors in a death penalty case but the motions appear to have been copied virtually without change from motions sent to Mr. Hunt by the FDPRC and are not geared to the particulars of Mr. Bernard's case. All of these failings are indicia of indifference and inactivity and fall below the level of advocacy which should be provided by reasonably effective counsel.

2.    **Failure to Engage in Effective Advocacy to Persuade the Government Not to Seek the Death Penalty**

Mr. Hunt did not provide effective representation with respect to the government's decision to seek the death penalty against Mr. Bernard. From the moment he was appointed, Mr. Hunt knew that the government might seek the death penalty for Mr. Bernard and that the authority to do so rested with the Attorney General. He also knew that one of the most important components of effective advocacy was to demonstrate to both the local U.S. Attorney and then to the Attorney General why a sentence less than death was justified. In a motion for appointment of co-counsel filed on February 25, 2000, Mr. Hunt wrote, "One of defense counsel's most important functions is to present information first to the local U.S. Attorney and then to the Justice Department that would justify a lesser sentence. Effective advocacy requires counsel to explore all of the issues that are likely to enter into the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors." Ex. 1 at 4580-84.

Unfortunately for Mr. Bernard, when Mr. Hunt wrote these words the government had already decided to seek the death penalty against Mr. Bernard and Mr. Hunt had done none of the things which he said effective advocacy required.

On August 17, 1999 James Blagg, the U.S. Attorney for the Western District of Texas, wrote Mr. Hunt a letter stating that he intended to recommend to the Justice Department that Mr. Bernard be subject to the death penalty. Mr. Blagg invited Mr. Hunt to respond either orally or in writing. Ex. 1 at 4266.

Mr. Hunt did not make an oral presentation. Instead, on August 31, 1999, Mr. Hunt responded with a one and one-half page letter stating that Mr. Vialva was the instigator and leader, that Mr. Bernard had attempted to persuade Mr. Vialva to release the victims unharmed, and that Mr. Bernard was not a leader. Ex. 1 at 4264-65. The sole bit of evidence Mr. Hunt

1251

offered to support these points was an unspecified newspaper article quoting the opinion of the principal of a high school attended by Mr. Bernard that Mr. Bernard was a follower type. Mr. Hunt also said that Mr. Bernard's mother had given him a list of at least 80 people who would say that Mr. Bernard was not violent and would not have initiated the murders. Finally, Mr. Hunt offered to have Mr. Bernard cooperate and testify about Mr. Vialva's actions. Id.

At the time Mr. Hunt wrote his letter, he had worked on the case for less than 25 hours. He had not retained a mitigation investigator. He had not had any psychological testing performed on Mr. Bernard or obtained any of Mr. Bernard's school or medical records.

Sometime in January or February of 2000, Mr. Hunt participated in a telephone conversation with attorneys from the Justice Department in Washington, D.C. An evidentiary hearing will show that Mr. Hunt said little at this hearing and did not address either the evidentiary problems with the government's case or say anything specific about mitigating factors for Mr. Bernard. He still had not retained a mitigation specialist. His efforts to develop mitigation consisted of his investigator conducting brief telephone interviews with some of the people mentioned by Mr. Bernard's mother. He still had not had any testing performed on Mr. Bernard and still had not obtained Mr. Bernard's school or medical records.

Mr. Bernard suffered prejudice because of his attorney's failure to effectively advocate during the certification process. The people who ultimately made the decision to authorize the death penalty for Mr. Bernard did so without receiving vital input about the government's case and Mr. Bernard's background. It is probable that if they had been aware of the complete picture, authorization would not have been granted.

A capital defendant is constitutionally entitled to effective representation during the death penalty authorization process. United States v. Pena-Gonzalez, 62 F. Supp. 2d 358 (D.

P.R. 1999) (right to counsel attaches during certification process and denial of counsel compels striking certification).  Pena-Gonzalez, which was decided just months before Bernard's death penalty certification, cites statistics showing that the Attorney General sought the death penalty in only one of five death eligible cases.  Pena-Gonzalez, 62 F. Supp. 2d at 365.  Mr. Bernard was represented by a lawyer who had done extremely little work on the case, conducted almost no mitigation investigation, and failed to familiarize himself or investigate the government's evidence.  The Constitution entitled Mr. Bernard to more.

### 3.    Failure to Investigate

The records obtained by current counsel do not indicate that Mr. Bernard's counsel conducted any investigation of the case or that they retained any experts.[4]  At most, counsel appear to have confined their investigation to interviews with the defendant and a review of the indictment and the prosecution files.  This Circuit has repeatedly held that failure to perform an independent pretrial investigation is deficient performance.  Anderson v. Johnson, 338 F.3d 382 (5th Cir. 2003) and cases cited therein.  Here, independent investigation was particularly crucial. There were few facts which were not open to question, and the case involved both a large number of witnesses and expert and forensic testimony and opinions.

The failure of Mr. Bernard's lawyers to conduct adequate investigation prejudiced Mr. Bernard.  An evidentiary hearing will show that Terry Brown, if asked, would have agreed to talk with the defense.  See Exhibit 10.  The defense would have been able to obtain information that Mr. Brown was under the influence of powerful, mind-altering drugs both at the time of the

---

[4] The defense did move for appointment of an investigator and in that motion noted that it was essential that witnesses, including the co-defendants, be interviewed. See Dkt. 51. Criterion Investigators was appointed.  However, their efforts appear to have been confined to interviewing potential witnesses for the penalty phase.

1253

crime and when he testified; that Mr. Brown suffered from mental illness and was medicated by jail authorities between the time of his arrest and the conclusion of Mr. Bernard's trial, and that the Government was aware of those facts; that Mr. Brown's testimony was heavily influenced by details supplied to him by government agents, and that Mr. Brown had been assured by his lawyer that he would not get more than 15 years in prison if he satisfied the government. The defense would also have been able to obtain information about Mr. Brown's other criminal activities. Greg Lynch would have talked to the defense if requested, and would have told the defense that he had information that Terry Brown had confessed that he set the Bagleys' car on fire, and that both Lewis and Brown told him that Chris Vialva had "gone crazy" on the day of the crimes but that no one except Vialva knew in advance that the Bagleys were to be killed. Exhibit 11. Tony Sparks would have spoken with the defense if he had been asked, and would have told the defense that he did not hear any conversation in Long Branch Park about killing the Bagleys.

Reasonably effective counsel would also have made an effort to interview Joey Presley. Mr. Presley was present at Long Branch Park when Mr. Vialva allegedly screamed that he was going to kill the Bagleys. He was a potentially critical witness to rebut Mr. Lewis' testimony. Yet the defense appears to have made no effort to contact him. Had he been interviewed, Mr. Presley would have confirmed that no such screaming match took place and that Mr. Bernard remained in his own car the whole time.

Adequate investigation would have greatly benefited Mr. Bernard. Without investigation, the trial was a one-sided presentation in which the defense neither called any witnesses of its own nor meaningfully challenged the government's witnesses. With investigation, the defense could have produced its own witnesses to rebut the accounts of Lewis

1254

and Brown and would also have been much better situated to cross-examine Mr. Lewis and Mr. Brown. The defense failure to investigate thus satisfies both the deficient performance and prejudice prongs of the test for ineffective assistance of counsel.

### 4.    Failure to Make an Opening Statement

Mr. Bernard's lawyers did not give an opening statement. The government gave a detailed opening statement outlining what it expected the evidence would prove. While it is not *per se* ineffective to eschew an opening statement, given the circumstances here, Mr. Bernard's lawyers acted ineffectively in not making an opening statement. *See* Exhibit 12 at 15-18.

Reasonably effective counsel would have been aware that the government's case rested almost exclusively on the testimony of Mr. Lewis and Mr. Brown, and that the physical or forensic evidence shed little light on the respective roles, acts or knowledge of the alleged participants in the carjacking and murders. Id. at 15. Counsel would also have been aware that Brown and Lewis had given conflicting statements prior to trial, so that no matter what they testified to at trial, their testimony would be inconsistent with at least some of their prior statements. Id. Reasonably effective counsel would have understood that it was essential at the outset to point out the shortcomings of the government's case including the facts which demonstrated the lack of credibility of the government's witnesses. There was no tactical reason not to make an opening statement highlighting these points.

### 5.    Failures Regarding Forensic Evidence

If the defense had either retained its own experts or bothered to obtain and read the report of the government's expert, Mr. Sing, it would have learned that the fire in the Bagleys' car originated on the hood of the car and the top of the trunk of the car as well as inside the car. *See* Exhibit 4. Cross-examination of Mr. Sing concerning his own report showing multiple

66

sources of origin for the fire would have cast doubt on the prosecutor's tenuous theory that because Mr. Bernard was standing in a certain place he was the only one who could have set the car on fire.

The defense also could have demonstrated through Mr. Sing that Mr. Lewis' June 22nd statement describing the places where Mr. Vialva poured lighter fluid was consistent with Mr. Sing's findings.  Ex. 1 at 346 (Vialva pours lighter fluid inside car, on trunk of car, on hood of car, and sprays lighter fluid on engine compartment).   Since Mr. Lewis' statement predated Mr. Sing's observations, this would have been powerful evidence to refute the goverment's claim that Mr Lewis's statement was merely a self-serving lie.

Instead, Mr. Bernard's lawyer did not ask a single question of Mr. Sing because counsel failed to prepare for his testimony and lacked the basic tools to conduct a cross-examination. The failure to cross examine Mr. Sing was  rooted in incompetence, not strategy.

The defense also had in its possession a report which showed that the day after the murders, government agents had taken a tracking dog to the scene of the crime along with the underwear worn by Mr. Brown, Mr. Lewis, Mr. Vialva, and Mr. Bernard.   The tracking dog (1) could not locate a "complete scent" for Mr. Bernard near the area where the car was burned, and (2) indicated that the scents in that area were strongest for Mr. Vialva and Mr. Lewis.   Exhibit 1 at 735-36.  The dog scent evidence is especially important because the government placed so much emphasis on where Mr. Bernard was supposedly standing as proof that he was the only one who could have set the fire and opened the trunk.

These matters would have undermined the government's case and the credibility of Mr. Brown and Mr. Lewis, and would probably have led to a different outcome.   In closing argument, the government asserted that the jury should believe Brown and Lewis "Because we

can corroborate their testimony with the physical evidence." T. 2691. Effective investigation and presentation of the forensic evidence by the defense would have shown that this "corroboration" was no more reliable than the testimony of Brown and Lewis themselves.

### 6.    Failure to Prepare for Gang Testimony

The defense also conducted no investigation into Mr. Bernard's alleged gang affiliations and took no steps to familiarize itself with gang evidence in general. As a result, the defense was unprepared to effectively counteract the tidal wave of gang evidence introduced at trial. Had counsel performed effectively, they would have been able to argue persuasively for the exclusion of gang evidence in the first instance and, even if such evidence had been admitted, would have been able to meaningfully cross-examine the gang evidence. Counsel could have deflated the government's overblown depiction of the gangs to which the participants belonged. *See* Exhibit 13 at 45-46. Instead, because counsel did not investigate, they did not take steps prior to trial to exclude or at least limit gang evidence and floundered about once the evidence was admitted.

### 7.    Failure to File Motions

Mr. Bernard's lawyers filed either superannuated boilerplate motions (the motion for discovery, for example, does not cite to a case decided after 1980, twenty years before Mr. Bernard's trial) or motions copied verbatim from other sources. They failed to make any *in limine* motions to exclude prejudicial evidence or hearsay, and they failed to take any steps to insure that a joint trial with Mr. Vialva would not prejudice Mr. Bernard. They also failed to file any motions regarding the scope of the victim impact evidence the government could introduce in the penalty phase. The failure to file any such motions meant that counsel squandered their best opportunity to make the trial as free as possible from emotion and prejudice. Any

68

1257

reasonably effective defense attorney would understand that *in limine* motions alert the court in advance to evidentiary issues and allow for a full presentation of the defendant's position at a time when the court can consider such presentation deliberately rather than in the heat of trial, and any reasonably effective attorney would have foreseen that the facts of this case had the capacity to arouse emotion and unfair prejudice.

### 8.   Failure to Pursue Gang Issue In Jury Questioning

Mr. Bernard's lawyers made a cursory suggestion to the court that it ask about gang membership or activity in the jury questionnaire.   *See* Exhibit 14 (counsel's "Suggested Additions to Jury Questionnaire," asking that such question be asked and noting that Mr. Vialva's lawyers had already made such a request).

The questionnaire actually submitted did not ask *any* questions about gangs, even thought it inquired about such arcane subjects as prospective jurors' bumper stickers.   Mr. Bernard's lawyers did not object to the absence of any questions about gangs in the questionnaire, and did not ask any questions about gangs during their own voir dire.

Mr. Bernard's lawyers acted ineffectively by not objecting to the court's failure to include any questions about gangs in the questionnaire and by not asking any questions about gangs themselves.   As discussed below,  gang evidence permeated both the guilt and penalty phases of the trial and posed a significant danger of prejudice.   A reasonably effective lawyer would have understood the likelihood that such evidence would be introduced at either the guilt or penalty phase or, as actually happened here, at both, and would have taken steps to find out whether prospective jurors would be unduly influenced by such evidence or harbored a bias about gangs which made it impossible for them to be impartial.

### 9.  Failure to Object to the Prosecution's Misstatements of the Evidence

1258

In his rebuttal closing argument, the prosecutor made several egregious misstatements about the evidence. The defense failure to object to these statements was ineffective assistance of counsel. *See* Ex. 12 at 42-45. Misstatements of evidence in a rebuttal closing are particularly damaging because the defense has no opportunity to respond. No reasonable trial strategy can account for the failure to object to the misstatements. Because the misstatements related to crucial aspects of the government's case the failure to object prejudiced Mr. Bernard.

These misstatements included the following:

(1) Mr. Frazier told the jury that Brandon Bernard was guilty and particularly culpable because Mr. Bernard lit a match and set the car on fire. "You bet he did, **he lit that match**. And at that point there is no distinction between **lighting that match** and pulling that trigger." T. 2689 (emphasis supplied). There was not a shred of evidence in the case that the fire started with a match or that Mr. Bernard lit a match. The fire investigator Mr. Sing gave no such testimony; neither Mr. Brown nor Mr. Lewis said they saw the fire started; Mr. Brown did not even know whether Mr. Bernard had any matches with him when he was at the car (T. 1931); and no matches from any source were introduced into evidence. Mr. Frazier's statement thus did not have any possible basis in the evidence. The statement was also not inadvertent, since Mr. Frazier repeated the same false statement in his penalty phase closing. Mr. Bernard "lights the match, puts in the vehicle, and sets it on fire, and that is as lethal an act." T. 3266. The defense failed to object to this blatantly false statement regarding what the prosecution claimed was the most damning evidence against Mr. Bernard. Mr. Frazier's false statement prejudiced Mr. Bernard because it conjured up for the jury a vivid image of Mr. Bernard starting the fire when, even if Terry Brown's testimony was fully credited, the government only had evidence as to where Mr. Bernard was standing when the fire began.

(2) Mr. Frazier sought to rebut any implication that Mr. Brown and Mr. Lewis could have concocted their testimony, arguing that they had been housed in separate wings of the same jail. "But recall what the testimony was from Mr. Brown. They were in the same juvenile facility but housed in different wings. Not in the same place. Different wings within the same facility." T. 2694. This statement was false in two respects. First, Mr. Brown said nothing at trial as to where he was jailed following his arrest. Mr. Lewis did testify on cross-examination by Mr. Goains about where he was housed as follows:

Q. Where were you before that.

A. Killeen, sir.

Q. All right. In Killeen, was Mr. Brown there at the Killeen Detention Center?

A. At a point in time, sir.

Q. With Mr. Sparks.

A. Yes, sir.

Q. Did – were you guys basically in the same – how -how do they have that set up, were you in the same cell area or....?

A. No sir.

Q. **Did you see each other every day.**

A. **Yes, sir.**" T. 2393 (emphasis supplied).

Thus, not only did Mr. Frazier make this statement knowing full well that Mr.Brown and Mr. Lewis had been together when they pleaded guilty to the same set of facts, he misstated the evidence about their opportunity to get together in the jail. No strategic reason existed for the defense to not object to such a misstatement.

(3) Mr. Frazier denied that there was any evidence that Brown or Lewis had been told

what to say. "Did you ever hear any evidence or testimony that any investigator coached anybody and told them what to say. Of course not." Mr. Brown, however, testified on cross-examination as follows: "Q. The CID office. A. Yeah, the CID office. They had information, and, basically, he told me–and I told him what–I just confirmed basically whatever he said." T. 1961.

The defense thus failed to object to Mr. Frazier's bolstering the credibility of the witnesses with false testimony about whether they had been told what to say. Again, no tactical reason exists for defense counsel's failure to object.

(4) Mr. Frazier assured the jury that Mr. Brown had told Mr. Bernard about a plan to murder the Bagleys. "Terry Brown, himself, on his testimony, indicated that after they left Long Branch Park, he told Brandon Bernard what the plan was." T. 2686. Mr. Frazier went on to argue that "Brandon Bernard had to be the person who bought the lighter fluid, knowing what they were going to do to the Bagleys." T. 2687. Mr. Frazier misstated what Mr. Brown said about Mr. Bernard's knowledge. Mr. Brown stated on cross-examination that he only told Mr. Bernard about a plan to burn the car. He did not say that he told Bernard that the Bagleys were to be killed: "A. I just basically told him the basics. I didn't know exactly what was going to happen, but I told him the basics Q. Okay – that you all were going to out to the countryside. A. Not basically the countryside, **but that the car would be burned.**" T. 1955 (emphasis supplied).

The defense lodged no objection to this misstatement of crucial evidence about what Mr. Bernard knew in advance. No tactical reason exists to excuse this failure to object. The result of the failures to object was that the government was able to shore up a weak case against Mr. Bernard by the simple trick of making up facts, and did so at a time – in rebuttal – where the

72

defense would have no opportunity to respond to the misstatements.

### 10.    Failure to Object to Prejudicial Evidence About Gangs

In a pretrial hearing, Mr. Vialva's lawyers moved to prohibit evidence of gang membership. The government asserted that it needed to introduce gang evidence because all four defendants were "members of the same gang and they planned this crime together. And the fact that they are members of the same or associated with the same gang is probative to show association." T. (April 28, 2000, hearing) at 38.

The court deferred ruling on the motion, stating that it understood the government's need to prove association but that "...whether gang membership or activity or association would be so prejudicial that it – it shouldn't be admitted is – is something that I need to know more about the specific evidence, I think." Id. at 40.

Mr. Bernard's lawyers did not file any *in limine* motion on gangs (or on anything else) and did not join in Vialva's motion concerning gangs.

Immediately before opening statements and before any evidence had been taken, Mr. Vialva's lawyers again raised the issue of gang evidence. The court then indicated that it would not exclude the evidence of association: "For the record, [counsel for Mr. Vialva] is presenting argument on his motion to exclude evidence of gang membership. And, for the record, when the Government alleges a conspiracy, as it has in this case, I think of any kind of association that belongs to the defendants [sic] is admissible and it is not more prejudicial than probative, and that evidence will be admitted, and the objection is overruled." T. 1471. Mr. Hunt, Sr., offered no argument but did join in Mr. Vialva's motion .

When Mr. Frazier first mentioned gangs in his opening statements, Mr. Schweiger objected. The court overruled the objection, and stated, "You may have a running objection on

73

that throughout the trial, counsel." T. 1476. Mr. Bernard's lawyers did not object.

The evidence at trial did not establish or even suggest that the carjacking and murders involved gang activity. No evidence showed that the motive or opportunity for the crime were gang-related. While the evidence showed that the participants in the crime claimed gang ties, it did not show that this membership either instigated or facilitated the crimes.

The government's professed reason for introducing gang evidence was to show the "association" of the alleged participants. However, the government's questioning of witnesses went far beyond merely demonstrating "association." The government asked Terry Brown "what it means to be in a gang" and then had Mr. Brown provide information about the territory controlled by the 212-Piru "Bloods," the clothing they wore, that other gangs operated in Killeen (including the "Crypts [sic], Folks and Vice-Lords") and that each had its own "turf." Mr. Frazier then asked, "All right. And is it common for there to be violence and fights between gangs and gang members?" T. 1865. He followed this question up with another inquiry about violence. "All right. And, in fact, you've used the term "disrespect" or "respect." If a member of one gang disrespects a member of another gang, does violence usually follow." T. 1866. Mr. Frazier also asked questions about gang members committing crimes: "All right. Now from your own experience and your own association with the Two-One-Two PIRU, do members of gangs commit crimes together, from your experience in Two-One-Two." T. 1866

None of these questions was objected to by Mr. Bernard's lawyers, even though all of them concerned matters other than "mere association," the government's ostensible reason for bringing up gangs in the first place. Instead of objecting on the basis that the government was introducing evidence far beyond that needed to show "association," that the additional evidence was irrelevant, and that the evidence was far more prejudicial than probative, Mr. Bernard's

74

1263

lawyers did nothing.

Gang-related evidence saturated the trial.   In addition to questioning Mr. Brown, the government also questioned Chris Lewis at length about gangs,  including asking him about rivalries with other gangs, T. 2308, whether gang members were reluctant to "rat" on other gang members, T. 2308, and whether gang members "commit crimes together, certain crimes together, if they choose to do that." T. 2309.   Mr. Frazier even elicited that PIRU supposedly stood for "Pimps in Red Uniforms." T. 2390.

Far from confining itself to establishing that the participants in the crime belonged to gangs, the government questioned  many other witnesses about whether they were gang members.  T. 2177 (Greg Lynch);  T. 2203 (Ramona Berry);  T. 2220 (Greg Rousseau);  T. 2250 (Billie Rorie);   The government elicited information about topics such as getting "jumped into" a gang,  T. 2209, and elicited testimony from Greg Lynch that threats from another gang were the reason he possessed a weapon. T. 2181.

In calling  Ricky Lynch as a witness to testify that Chris Vialva had called him after the crimes to ask, "Do people think I'm real?",  the government tried to insinuate that this statement had to do with Mr. Vialva being in a gang, even though Mr. Lynch stated that Mr. Vialva's comment did not mean anything to him and even though Mr. Lynch did not say Mr. Vialva ever mentioned gangs  to him. T. 2274.

The defense objected to none of the government's gang questions,  most of which involved topics that had nothing to do with showing "association."   The defense also did not ask for any limiting instructions on the gang evidence and none were given, either at the time the evidence was introduced or in the court's instructions at the close of the case.

The defense passivity in the face of extraordinarily prejudicial testimony constitutes

75

1244

ineffective assistance of counsel.    Federal courts have repeatedly recognized the prejudice caused by gang evidence since most jurors are likely to view a defendant's gang affiliation with disfavor and fear.  "Gangs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior.  There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict.  Guilt by association is a genuine concern whenever gang evidence is admitted."  United States v. Irvin, 87 F.3d 860, 865 (7th Cir. 1996); see also United States v. Jobson, 102 F.3d 214 (6th Cir. 1996); United States v. Jernigan, 341 F.3d 1273 (11th Cir. 2003).   In this case, gang testimony posed a particularly severe potential for prejudice because the trial involved the horrific and senseless murders of a young white couple with the alleged perpetrators being four young black men.  Blackmon v. Booker, ___F. Supp. 2d.___, 2004 WL 554809 (E.D. Mich. 2004), citing United States v. Hendrix, 52 F.3d 326, 1995 WL 218472 (unpublished disposition) (6th Cir. 1995) (reversing conviction when no proof that crime involved gang activity and gang evidence seemed intended to "appeal to juror's prejudices about the young black men, rather than to their disinterested judgment of guilt or innocence of the charged crime."

None of the government's evidence about turf wars, gang violence, gang colors, or gangs committing crimes together shed any light on any of the disputed issues in the case.  Instead, the government introduced this evidence in a blatant effort to appeal to fear, prejudice, and racism.  Any reasonably effective lawyer would have taken every possible step to exclude the gang evidence in the first instance, objected when the Court when the government reneged on its promise that the evidence would be used only to show association, and proposed limiting instructions.  Instead, Mr. Bernard's lawyers sat mute and Mr. Bernard suffered prejudice.

### 11. Failure to Object to Irrelevant and Extraordinarily Prejudicial Testimony About Todd and Stacie Bagley

The government was not content to demonize the defendants with the use of irrelevant gang evidence. Its calculated strategy to arouse the passions and sympathy of the jury and to divert the jury's attention from the case's evidentiary weakness including making the Bagley's religious belief and characters a centerpiece of the case. In pursuit of this objective, the government introduced a wealth of irrelevant but emotionally charged evidence about the character. Perhaps most astonishingly, the government went so far as to elicit testimony that God was responsible for the defendants being caught. Yet Mr. Bernard's lawyers made no effort to prevent or ameliorate the government's efforts to inflame the jury. Once again they failed to make any *in limine* motions, failed to object, and failed to request curative instructions.

#### a. Testimony from Chris Lewis

The government questioned Mr. Lewis at length about what the Bagleys said when they were in the trunk of their car. T. 2349-50. When Mr. Lewis testified that the Bagleys told him that God got "them different items and about how he gave people different stuff too," the government followed up by asking, "Okay, what did you take it to mean when they said God had gotten them stuff? A. That they were blessed, sir. Q. That they were blessed. A. Yes, sir." T. 2349-50. The government brought out that the Bagleys had asked what church Lewis and Sparks attended and then elicited testimony from Mr. Lewis about when he had attended Grace Christian Church. T. 2350.

Mr. Lewis was also led to recount statements from the Bagleys in which they said that they did not have a lot of money and that friends had given them money for car tires. Mr. Frazier asked "Q. They had given the tires or they gave them money for the tires or do you

recall?   A.  I think it was money for the car–I mean, for the tires.   Q.  Was that at the same time they were telling you that God provided for them what they needed?  A. Yes, sir."  T. 2389-90. Mr. Frazier then dropped this line of questioning and immediately turned to the task of establishing that PIRU stood for "Pimps in Red Uniforms."  T. 2390.

Mr. Frazier questioned Mr. Lewis about how Mr. Bernard's car got stuck in the ditch.

Q.  Well, how did the car get stuck in the ditch?

A.  Are you – can you explain yourself.

Q.  How did the car get stuck in the ditch.  I'm – I'm trying to understand.  You said you turned around and the car—you said it felt like it was in neutral.

A.  Yes, sir.

Q.  How did the car end up in the ditch?

A.  God put it there, sir.

Mr. Frazier made sure that the jury understood that supernatural intervention was involved:

Q.  You pulled up, turned around, and then the car felt like it was in neutral and then it just slid off.

A.  It felt like someone pushing it, sir.

Q.  Was there anybody out there pushing it?

A.  No, sir."

T. 2380.

### b.  Testimony From Other Witnesses

The government elicited testimony from Terry Brown about what Stacie Bagley said just before the trunk opened and Mr. Vialva shot her:  "Her words was – that's when she said that, 'Jesus loves you,' and 'Jesus, take care of us.'   Those were the last words that she had said."  T.

1936.

Mr. Brown also testified that Mr. Vialva said in response, "Shut the fuck up, bitch, I'm about [to] the open the trunk and I don't want to hear that shit."[5]  T. 1936.

The government elicited testimony from Billy Rorie that "The lady [Stacie Bagley] asked, you know, do we believe in Christianity?  That's all she said," and that Tony Sparks responded, "I don't give a fuck, because we thugs."  T. 2254.

The government also elicited  testimony about the Bagleys' religious beliefs and their characters.  The government called Robert Rimes to testify about his relationship with the Bagleys at Grace Christian Church, ostensibly to establish that the Bagleys were engaged in ministering to youths, to explain why they would have offered a ride to Vialva and the others. Mr. Goains objected that Mr. Rimes' testimony would constitute irrelevant victim impact evidence.  T. 2140.  The court agreed that why the Bagleys would have given someone a ride was irrelevant.  Mr. Bernard's attorney did not join in the objection.  Despite the court's ruling, the government promptly elicited without objection testimony from Mr. Rimes that he met the Bagleys at a "home group Bible study" and that the Bagleys attended a week long revival service right before the murders.  Mr. Rimes also testified that he took the Bagleys to lunch and that they talked about "their families and why they were there that week.... and kind of opened the door to their life to be me briefly."  T. 2143.  The government also brought out that Todd and Stacie talked to Mr. Rimes about opening a "Christian gym."  The court sustained an objection to this question, but no request was made to strike the testimony or for a curative instruction.  T. 2144.

---

[5]This testimony, if true, compels the inference that Mr. Vialva opened the trunk of the car.

### c. In Life Photographs of the Bagleys

Directly following Mr. Rimes' testimony, the government put on Pastor Timmerman, who testified to knowing the Bagleys through the church. Pastor Timmerman identified two photographs of Todd and Stacie Bagley taken at Sea World and said this was how the Bagleys looked just prior to June 21, 1999. T. 2151. The government, however, refrained from moving the pictures into evidence at that point. Rather government showed the photographs to Mr. Charles Woodward, Stacie Bagley's grieving father. First, the government questioned Mr. Woodward about his employment, establishing that he worked as a criminal investigator for the Texas Department of Criminal Justice and had previously spent 20 years on the Killeen Police Department. Mr. Frazier then elicited testimony that Stacie Bagley was the Woodwards' only child. T. 2473. Next, Mr. Frazier had Mr. Woodward identify a watch belonging to Stacie Bagley. Finally, the government asked Mr. Woodward about the Sea World photographs. Mr. Frazier established that the Sea World trip had taken place a few days before June 21, 1999. He then asked "Q. All right. And was this a trip, in fact, you had sent them on?" Mr. Woodward responded, "Yes, sir. We wanted to do something special for them. So my wife and I bought the tickets for them for Sea World." T. 2474.

### d. Prejudice Resulting from Failures to Object to Irrelevant Victim Testimony

Neither what the Bagleys said about their religious beliefs nor what they looked like in the days preceding their deaths was relevant to any of the issues in the case. The only reason the government elicited the testimony was to arouse the sympathy of the jury and to inject religion into the case.

The in life photographs of the Bagleys were not introduced for any legitimate purpose,

including establishing identity.. The government established the identity of the Bagleys through the testimony of Dr. McCain and Ronald Parchman. Moreover, the government introduced numerous autopsy photographs of the Bagleys. While in life photographs may be admissible to prove identity, courts recognize that such photographs can pose a significant danger of prejudice. *See, e.g.* Wilks v. State, 49 P.3d 975 (Wy. 2002). Here, the government had no need to introduce the photographs and used them as a pretext for eliciting irrelevant but emotional testimony from Stacie Bagley's father about Stacie Bagley being his only child, about Mr. Woodward's having been a police officer, and about the Woodwards wanting to "do something special" for Todd and Stacie.

Almost all the testimony about the Bagleys' conversations with their captors was irrelevant to the charges. What Chris Vialva said right before he shot the Bagleys arguably bore on the issue of his premeditation. On the other hand, whether Stacie Bagley said "Jesus loves you" does nothing to establish any of the elements of any of the offenses or to refute any defense. The subject matter of the conversations the Bagleys had while being driven around is equally irrelevant. The government had a legitimate basis to present evidence that the Bagleys were in the car and that people heard them speaking. However, the extensive accounts of religious comments by the Bagleys had no probative value and were entirely inflammatory. The evidence was offered not to help the government prove its case, but only to let the jury know about the Bagleys' good character and to arouse the jury's anger against the defendants.[6]

The introduction of the Sea World photographs represents an equally blatant appeal to

---

[6] The Government may claim that the statements were admissible as *"res gestae."* Such an argument is unavailing. *See, e.g.* State v. Hansen, 989 P.2d 338 (Sup. Ct. Mont. 1999) (finding out-of-court statements of victim inadmissible, and explaining why *"res gestae"* is not a substitute for analysis of admissibility under the rules of evidence).

the jury's sympathy.   The government had no need to call Mr. Woodward  to get the photographs into evidence.   Even if the Sea World photographs had any relevance, they could have been introduced through Pastor Timmerman.   Instead, the government deliberately called Mr. Woodward to inject unfairly prejudicial and irrelevant testimony.   Not only did the government introduce  the pictures into evidence, but in questioning Mr. Woodward they managed to inject the irrelevant but emotionally  compelling testimony that Mr. Woodward was a life-long police officer, that Stacie was his only daughter and that the Sea World trip was an effort to do "something special" for Todd and Stacie.

The Government's penalty phase closing erases any doubt  about why the government introduced the Sea World photographs.   In urging death for Mr. Bernard and Mr. Vialva, the government argued, "When you think about them and you think about this case,  if you **do not think this case is heinous**, go back and re-look at some of those pictures.  We **did that intentionally.**  We want **everyone to remember Todd and Stacie at Sea World**.  Look at those pictures.  Remember them that way."  T. 3209  (emphasis supplied.)   Because the photographs were introduced during the guilt phase, however, the jury was encouraged to focus on the Bagleys' personal qualities and the impact of their deaths at a time when such considerations were irrelevant.   The prosecutor's own words offer irrefutable proof of why the Sea World pictures were introduced, why they were so harmful, and why it was ineffective for counsel to not object to the pictures' introduction.

The Fifth Circuit recognizes that failure to object to irrelevant and prejudicial testimony about victims can constitute ineffective assistance of counsel.   *See* Vela v. Estelle , 708 F.2d 954 (5th Cir. 1983) (counsel ineffective for failing to object to inadmissible, prejudicial testimony concerning victim) ; *see also* Westley v. Johnson, 83 F.3d 714 (5th Cir. 1996) (counsel performed

deficiently in failing to object to inadmissible victim impact testimony, but error harmless).

In this case, Mr. Bernard's lawyers failed to take *any* steps to avoid the avalanche of irrelevant but prejudicial testimony and evidence elicited by the government. Even when Mr. Vialva's lawyers made an occasional objection, Mr. Bernard's attorneys did not join in the objection. The prejudice to Mr. Bernard is obvious and extreme. It is difficult to imagine a more heart-rending contrast than between the smiling faces of the Bagleys at Sea World and their burned, mutilated corpses, or a contrast more designed to arose hatred and anger than that between devout young missionaries "blessed" by God and menacing "thugs" who don't give a fuck."

The government's success in introducing such testimony created a situation in which the jury was likely to overlook any deficiencies in the government's proof or its reliance on highly unreliable witnesses in favor of an emotional desire to exact revenge on the gangster slayers of two "blessed" missionaries. Its success is directly attributable to the failure of Mr. Bernard's lawyers to effectively represent their client.

Counsel's failure to object to Mr. Lewis' testimony about God having put the car into the ditch was uniquely harmful.[7] The testimony implied that Mr. Bernard and the others would have been able to drive away and escape had God not wanted them to be punished. The Government deliberately elicited and exploited this testimony. There was no dispute that the car ended up in the ditch, and Mr. Brown had already explained that Mr. Bernard's car went into the ditch when he tried to turn around.

---

[7] Counsel also performed ineffectively by not cross-examining Mr. Lewis about his statement on June 22, 1999 in which he lucidly explained that the car became stuck because Mr. Bernard was trying to back out toward the cattle guard. Ex. 1 at 347. Notably, Mr. Lewis said nothing in his written statement regarding any unseen force pushing the vehicle.

When Mr. Frazier asked Mr. Lewis to help him "understand" why the car ended up in the ditch, he did so with the full intent of putting God on the side of the Government. Indeed, in the Government's penalty phase closing, Mr. Frost argued: ".They almost got away with it, but *something* put them in the mud." T. 3207. Given the absence of any evidence that any tangible "something" put them in the mud, the jury could only have understood Mr. Frost to be referring to, and endorsing, Mr. Lewis' testimony that the hand of God put the car in the ditch. Testimony invoking God as a cause for events is quintessentially prejudicial and inadmissible. It was particularly devastating in a case in which the Government had taken such pains to introduce evidence about the Christian beliefs of the victims. Mr. Bernard's lawyers did not act effectively when they did nothing to object to this testimony.

### 13. Cumulative Effect of Failures to Object

Counsel's failures to object to egregious misstatements of the evidence, to irrelevant but prejudicial evidence about gangs, and to irrelevant but prejudicial evidence about the Bagleys are mutually reinforcing. The trial took on the trappings of a morality play in which irrelevant testimony diverted the jury's attention from the lack of solid evidence against Mr. Bernard and the shortcomings of the goverment's main witnesses.

### 14. Cumulative Impact of Ineffective Assistance

Counsel's failures do not represent isolated miscues in the context of a generally competent performance. Rather, the evidence already available and the facts which will emerge at an evidentiary hearing overwhelmingly point to a pervasive breakdown in representation. Mr. Bernard's lawyers both failed to protect him from an onslaught of irrelevant but prejudicial evidence and failed to adequately confront the witnesses against him. Their representation shows none of the hallmarks of effective lawyering but instead displays from start to finish a

84

lack of competency and commitment.  The Supreme Court has long recognized that an attorney's obligation is to provide zealous representation.  Strickland v. Washington, 466 U.S. 668 (1984).   Mr. Bernard did not receive such representation and was prejudiced by its absence.  He is entitled to relief.

## IV.    COUNSEL FAILED TO PROVIDE EFFECTIVE REPRESENTATION AT THE PENALTY PHASE.

The government's case for the death penalty against Mr. Bernard was weak.  He was eighteen years old, as young as a defendant can possibly be and still face the death penalty under federal law.  18 U.S.C. § 3591.  His prior criminal history was minor and included little violence other than a couple of fistfights.  It was undisputed that he had been absent during most of the time during which the Bagleys were held captive in their car by Mr. Vialva, Mr. Sparks, and Mr. Lewis.  Indeed, the evidence indicated that Mr. Bernard had no idea what the other defendants were doing during that interim, or even if they had carjacked anyone at all.  No one suggested, at any time in any statement, in court or out, that Mr. Bernard had shot either of the Bagleys.

As these facts suggest, the jury appears to have struggled to decide on an appropriate sentence for Mr. Bernard.  The jury retired to begin deliberating around 4:15 p.m. on June 12, and sent a note indicating it intended to "work until 7:00 p.m."  T. 3278; Exhibit 15  The jury appears to have retired about that time on June 12 and renewed deliberations the next morning.  Exhibit 15 (jury note dated June 12 at 6:55 p.m., indicating the jury's "need  to return 9:00 a.m. 6/13").  The special findings forms reflect that on the first day of deliberations, June 12, the jury decided on all three of Mr. Vialva's death sentences *and* reached its decision about Mr. Bernard's two life sentences.  Only after deliberating for approximately two more hours on the morning of June 13 did the jury finally reach its sole death verdict regarding Mr. Bernard.

The record thus indicates that this was a close case as to the appropriate sentence for Mr. Bernard. This conclusion is the more remarkable given the paucity of the case in mitigation presented on his behalf. Mr. Bernard's attorneys called only eight witnesses. Five offered only the vaguest recollections of Mr. Bernard, and could not provide any insight about his character and development, how he ended up taking part in this crime, or what might make his life worth sparing. The remaining witnesses, Mr. Bernard's boyhood friend Matthew Mitchell, his girlfriend Sherise Scott and his mother Thelma Bernard, provided some background information about Mr. Bernard but little emotionally compelling detail. The rushed, flat quality of their testimony was worsened by counsel's examination, which basically placed on the witnesses the burden of identifying what they knew that was important to the jury.

It is precisely because this was not an "open and shut" case for the death penalty that counsel's deficient performance at the punishment phase is so likely to have resulted in an unreliable sentencing verdict. Mr. Bernard's trial counsel failed to investigate both potentially mitigating evidence and the government's case for the death penalty, failed to respond effectively at trial to the government's presentation of its case in aggravation, and failed to adequately present Mr. Bernard's case at the punishment phase. The information counsel never developed would have permitted them to present a richly textured, humanizing portrait of Mr. Bernard that would offered a compelling case for sparing his life. Had counsel not performed deficiently, there is a reasonable likelihood that at least one juror would have concluded that a death sentence was not warranted. Mr. Bernard accordingly is entitled to relief from his death sentence.

**Counsel unreasonably failed to investigate, develop, and present readily available mitigating evidence.**

86

Counsel failed to conduct an investigation into all potentially available and relevant mitigating circumstances. The standard of practice for defending capital cases in 1999-2000 required defense counsel to conduct a far-reaching investigation into the client's social history. Such an investigation needed to encompass, *inter alia*, the client's medical history, family and social history, experience of traumatic events, experiences of racism or other social or ethnic bias, cultural or religious influences, lost opportunities for ameliorative intervention (*e.g.*, by government agencies), educational history, work history, prior criminal history, prior incarceration, and prior experience with formal supervision (*e.g.*, probation or parole). *See* Ex. 12 at 46-50.

Bernard's trial counsel should have been aware of the existing standard of practice and the duties it placed upon them. Moreover, counsel had actual notice of the scope and extent of mitigation investigation demanded of them, because they had received from the federal Death Penalty Resource Counsel project (an arm of the Administrative Office of the U.S. Courts) extensive information regarding their duty to investigate potential mitigating circumstances, and what such an investigation would involve. Bernard's counsel's files contain a 200-plus page guide to developing mitigation produced by the DPRC; it covers such topics as gang involvement, turbulent family background, drug use, social and cultural factors, etc.

Reasonably effective counsel in 1999-2000 would have understood that much of the investigation required to prepare properly for a potential penalty phase, because of its nature and scope, is extremely time-consuming and accordingly must be undertaken promptly upon entry into the case. Ex. 12 at 49. Mitigation investigation demands time because it may involve asking the client or other potential witnesses to discuss matters they perceive as intimate, personal, embarrassing, or shameful. Such inquiries are impossible unless counsel or his

87

representative has forged a relationship of trust with the client and the witness(es).   For this reason, among others, it was generally understood among counsel defending capital cases in 1999-2000 that the assistance of a person specially trained in recognizing and overcoming such barriers, and having the skills necessary to help the client cope with the emotional and psychological impact of such painful disclosures, was essential to investigating the client's background.

The prevailing standard of practice in 1999-2000 required counsel to locate and interview Bernard's immediate family members and others who had known Bernard during his eighteen years. Ex. 12 at 47.  Such persons would have included neighbors, other relatives, teachers, clergy, case workers, doctors, correctional officers (including probation or parole officers or supervisors), and others.  The prevailing standard of practice also required counsel to seek and obtain all available documentary records concerning Bernard's educational history, work history, medical history, family history, and criminal history. Ex. 12 at 47.

The only investigation undertaken by Bernard's trial counsel was to hire "Criterion Investigations," a private investigations firm. *See* Ex. 1 at 3394-3418. Counsel directed Criterion to interview individuals named on a list provided by Bernard's mother, Thelma Bernard. Id. at 3418 (noting that investigator is "continuing to work on the names provided by Thelma Bernard"), 4252-4261.  Many of these persons reported little personal knowledge of Bernard, or at most recalled vaguely that he was a "good boy" when he was younger.  The employees of "Criterion Investigations" lacked specialized knowledge or training in the area of investigating or developing mitigating evidence in capital cases.  As a result, their interviews of even the limited number of people whose names were provided by Thelma Bernard failed to uncover significant mitigating information about Bernard.  Such an investigation into potential

88

mitigating circumstances was inadequate and fell below the standard of practice for defending capital cases in 1999-2000.

Counsel conducted no other investigation into Bernard's background.

Counsel's failure to conduct any other investigation was unjustified because at least some of the persons interviewed by Criterion Investigations recounted events and circumstances that would have alerted reasonably effective counsel in 1999-2000 to the need for additional investigation into certain areas, such as the relationship between Bernard's parents, his relationship with his father, and so on. *See generally* Ex. 1 at 3394-3418. They also vouched for other mitigating aspects of Bernard's personality that reasonably effective counsel would have pursued and developed. Counsel did not conduct any such follow-up investigation.

Jail records indicate that trial counsel visited Mr. Bernard in person only eleven times in the approximately one year that passed between his arrest in June 1999 and the beginning of his trial. *See* Exhibit 16. This minimal client contact fell below the prevailing standard of practice, which obliged counsel to engage in a continuing interactive dialogue with Bernard concerning all matters that might have a material impact on the case. Ex. 12 at 48-49. In addition, the prevailing standard of practice recognized that close and frequent contact with the client is necessary to create and maintain the trust relationship essential to developing potential mitigating evidence. Reasonably effective counsel in 2000 would also have understood that significant racial and cultural barriers stood between them and Bernard, such that a substantial investment of time would be necessary to create a fully functional attorney-client relationship.

Any reasonably competent attorney handling a capital case in 1999-2000 would have recognized that the preparation of a social history is a time-consuming and often delicate process. For that reason, Mr. Bernard's original attorney, Russell Hunt, Sr., performed

deficiently both in failing to initiate such an investigation immediately upon his appointment in June 1999, and in failing promptly to seek the appointment of second-chair counsel to assist him. Even if Mr. Hunt, Sr., hoped a plea deal would ultimately be struck with the government under which Mr. Bernard would avoid the death penalty, he was obliged to begin, from the earliest moments of entry into the case, to prepare to try both the guilt-innocence and punishment phases. Ex. 12 at 49-50.

Counsel's failure to complete an adequate investigation prior to trial also hamstrung their ability to perform adequately in jury selection. Ex. 12 at 50-51. If they anticipated that Mr. Bernard would likely be convicted of a death-eligible offense, counsel's primary goal at *voir dire* was to seek jurors who might be persuaded not to impose the death penalty. Identifying such jurors was impossible in this case because Mr. Bernard's attorneys had only the vaguest idea during jury selection what kind of information about Mr. Bernard's character and background they would present at a punishment phase, and had no idea what punishment-phase witnesses they would call on Mr. Bernard's behalf or what the content of those witnesses' testimony would be.

The attached report of Jill Miller, M.S.S.W., represents the results of a substantially completed social history investigation. *See generally* Exhibit 13. It shows that extensive mitigating evidence was readily available. Reasonably effective counsel would have uncovered that evidence and it would have persuaded the jury not to sentence Mr. Bernard to death. *See* Ex. 12 at 80-82. Among other facts, investigation has revealed the following:

> Brandon Bernard suffered from depression through much of his adolescence. This was probably related to the fact that his parents' marriage, and thus the family unit, disintegrated around the time Mr. Bernard entered adolescence. He witnessed frequent loud and angry arguments between his parents, and was the target of verbal

abuse from his father.  On one occasion, Brandon was present when his father physically assaulted his mother, resulted in his father's being arrested and prosecuted, and later barred from the family home. Brandon bore a great burden of guilt arising from this incident because he blamed himself for his parents having fought.  He was also haunted by the fear that his father was homeless and living in the streets after being barred from the home (which was, in fact, true from time to time). Fellow church members noticed that Brandon was withdrawn and deeply sad following his parents' separation.

After his father left the home, Brandon had to assume a lot of responsibility for the care of his younger siblings.  He was, by all accounts, a responsible care-giver to Quiona and Max.  He also took care of other relatives' children from time to time, and all report that he was trustworthy.

Brandon Bernard had not been in any trouble in the community until his cousin Melsimeon Pollock moved into the Bernard family home, after Brandon's parents separated.  Melsimeon Pollock admits he was a negative influence on Brandon and that he (Pollock) was the prime mover behind the burglaries that he and Brandon committed, and which led to Brandon's being referred to juvenile court in 1995.  The facility in which Brandon was ultimately placed for rehabilitation, "Catch-22," failed to provide the counseling services ordered by the juvenile court. Nevertheless, Brandon behaved well while in Catch 22, and was discharged from the program after only six months.  Records, however, indicate that his treatment needs had not been met.

Brandon Bernard had a commitment to educating himself, as evidenced by his having earned a high school equivalency certificate (GED), his continuing efforts to obtain a high school diploma, and his desire to attend college.

All who knew him universally describe Mr. Bernard as a follower, who was easily led by others and prone to suggestion.

Brandon's father disciplined him using methods which were severe and bordered on physical abuse (including whipping Brandon on his bare buttocks with the buckle end of a leather belt). Punishment was sometimes meted out arbitrarily, for minor infractions.

Around age sixteen, Mr. Bernard began to use alcohol and drugs.

91

Family disintegration as he entered adolescence; disparate parenting practices between his harshly strict father and overly lenient mother; low self-esteem, anxiety and depression all were likely contributors to his abuse of alcohol and drugs. This use further impaired his judgment, decision-making and problem solving ability.

Mr. Bernard made some efforts to get his life on a better track in 1997-1998, recognizing that he was adrift. Some efforts were made by Brandon, and by his parents, to extract him from this situation. He tried to enlist in the military. His parents sent him to visit relatives in Louisiana for a few weeks. Finally, they sent him to live with relatives in Michigan. He did work and attend school in Michigan, but the pregnancy of a girlfriend led him back to Killeen. He had planned to stay only a short time, but ended up staying instead. Within a few months of his return to Killeen in early 1999, he was involved in the instant offense.

During the first few months of 1999, Mr. Bernard experienced a number of stressors. He returned to Killeen concerned about how he could handle the responsibilities of parenthood. Shortly after his return, his maternal grandmother died. He had spent a great deal of time in her home during his childhood. He was still determined to earn a high school diploma, but felt he couldn't do it at Killeen High School. In order to enroll at Ellison High School, he rented a small apartment in the Ellison district. He did this with his mother's help, but was ill equipped to live on his own. Left to his own devices, and subject to the vulnerabilities of youth, his drug and alcohol use escalated. He began using cocaine heavily in the spring, as well as using alcohol and marijuana. He tried other substances, including marijuana dipped in embalming fluid, a substance that can have a damaging effect on the brain. His daughter by Shay Grimstead was born in late March 1999. Though he said he looked forward to having a child, he clearly felt the pressures of parenthood at such a young age, and with little ability, financially or emotionally, to take on such responsibility.

In late March, 1999, Brandon sustained a serious head injury, resulting in a loss of consciousness. He had several prior head injuries, including two as a very young child. Shortly after this, he was informed by Sherise Scott that she was pregnant with his baby. While there is a question as to whether this is really his child, Brandon decided to accept Sherise's assertions. This created added pressures for him. He was injured in a motor vehicle accident in late May, 1999, less than one month before the offense.

He was prescribed Flexiril and Advil 3 for treatment of neck pain. Brandon held two short term jobs in the spring of 1999, but was unable to maintain them. He was feeling pressure to find work in the weeks preceding the offense, and his alcohol and drug use escalated.

During the weeks preceding the offense, Brandon was taking Theodur, in pill form, and Alupent, in an inhaler, for treatment of his asthma; and had been prescribed Flexiril and Advil 3 for injuries sustained in the car accident. He was also heavily abusing drugs and alcohol. He regularly consumed malt liquor, Brandy and Cisco, a fortified wine with a high alcohol content. On occasion, he drank gin. He regularly smoked marijuana, and at times, marijuana dipped in embalming fluid. Theodur and Alupent can have interactive effects with other drugs, including alcohol. Flexiril, a muscle relaxant, can also have interactive effects, including with central nervous system depressants like alcohol and marijuana. Flexiril can enhance the effects of alcohol. Advil 3 is an analgesic pain reliever containing codeine. Codeine is derived from opium/morphine, and adds to the effect of central nervous system depressants such as alcohol and marijuana. Codeine is contraindicated for head injury. All these substances can act to impair brain functioning. They can impair judgment, memory, concentration and cognitive functioning; they can inhibit emotional control and increase risk-taking behavior.

One of the most dangerous substances Brandon used during this period was marijuana dipped in embalming fluid, which can (depending on the actual chemicals with which the marijuana is combined) have disorienting and hallucinogenic properties.

Mr. Bernard's use and abuse of alcohol and drugs appears to have been a function of several factors. It was certainly a part of adolescent experimentation and a product of peer influence. However, it was also a form of self-medication for underlying anxiety and depression. The use of these substances, with their concomitant effects, combined with Mr. Bernard's young age, were contributors to his actions in the offense.

A number of indicators in Mr. Bernard's history indicate that he had rehabilitative potential and the capacity to make a positive adjustment to incarceration. He had only a minor history of assaultive behavior (involvement in a few fistfights) prior to the instant offense. He was viewed by all who knew him as someone who would not, under normal circumstances, harm others.

93

Psychological testing at age fifteen, in 1995, indicated that he was responsive to the needs and concerns of others; was compassionate and empathetic in relationships; and had appropriate regard for authority.

Ties to conventional norms are indicators of rehabilitative potential. In Mr. Bernard's case, this includes: strong religious upbringing and faith; positive motivation for education as evidenced by earning GED, efforts to obtain high school diploma, and desire to attend college; and positive attachment to his family. His family remained attached to and supportive of him even after the crime. His parents have reconciled and remarried; they were together at the time of his trial. Except for a couple of minor infractions, which were early in his pre-trial confinement and typical for his age, Brandon made a generally positive adjustment to incarceration. He was respectful of rules and staff, did not engage in confrontations, and made constructive use of his time. He regularly attended Bible studies, and counseled with the pastor from his church and other spiritual advisors. He would have been expected to continue to make a positive adjustment to incarceration in the federal prison setting. Brandon appreciates the wrongfulness of his actions in this offense and has expressed remorse and a desire to make amends to his church and family.

*See generally* Exhibit 13.

In failing to conduct an investigation into all potentially available and relevant mitigating circumstances, counsel performed deficiently. First, it is well-settled that counsel must conduct a reasonable investigation in order to provide effective assistance under the Sixth Amendment. Strickland v. Washington, 466 U.S. 668, 690-91 (1984); *see also, e.g.*, Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985) ("[A]t a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case"); United States v. Gray, 878 F.2d 702, 711 (3rd Cir. 1989) ("counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made").

In a capital case, counsel's duty to investigate includes the responsibility to seek out

94

1283

mitigating evidence for use in the penalty phase, in the event the defendant is convicted of a death-eligible crime. <u>Wiggins v. Smith</u> 539 U.S. 510, 123 S. Ct. 2527, 2537 (2003) (counsel is bound to undertake "efforts to discover all reasonably available mitigating evidence"); <u>Williams v. Taylor</u>, 529 U.S. 362, 396-97 (2000) (trial counsel in a capital case must "conduct a thorough investigation of the defendant's background") (citing 1 ABA STANDARDS FOR CRIMINAL JUSTICE § 4-4.1 & commentary, § 4-55 (2nd ed. 1980)). "[I]n the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a reasonably substantial, independent investigation into potential mitigating circumstances." <u>Lewis v. Dretke</u>, 355 F.3d 364, 367 (5th Cir. 2003) (citing <u>Neal v. Puckett</u>, 286 F.3d 230, 236 (5th Cir. 2002) (*en banc*)). Because of "the overwhelming importance of mitigation evidence to the just imposition of the death penalty," courts must "scrutinize carefully any decision by counsel that deprived [the defendant of such] evidence." <u>Holloway v. Horn</u>, 161 F. Supp. 2d 452, 566 (E.D. Pa., 2001), *rev'd on other grounds*, <u>Holloway v. Horn</u>, 355 F.3d 707 (3rd Cir. 2004). It is only reasonable for counsel to limit their investigation into mitigating evidence "if counsel has a basis for believing that further investigation would be counterproductive or fruitless." <u>Lewis</u>, 355 F.3d at 367. Mr. Bernard's counsel had no such basis for foreclosing their investigation. "Generally, any lawyer who tries capital murder cases knows that he or she has a duty to investigate the client's life history and emotional and psychological make-up through an inquiry into the client's childhood, upbringing, education, relationships, friendships, formative and traumatic experiences, personal psychology, and present feelings." <u>Valdez v. Johnson</u>, 93 F. Supp. 2d 769, 780-81 (S.D. Tex. 1999), *aff'd in part and vacated in part sub nom.* <u>Valdez v. Cockrell</u>, 274 F.3d 941 (5th Cir. 2001) (internal quotation marks omitted; citation omitted). *See also* <u>Powell v. Collins</u>, 332 F.3d 376 (6th Cir. 2003) (counsel performed deficiently, *inter alia*, in "fail[ing] to investigate, research, or collect

pertinent records regarding [the defendant's] background or history for mitigation purposes, and made no attempt to locate significant persons from [his] past who may have provided valuable testimony regarding mitigating factors"); White, *Effective Assistance of Counsel in Capital Cases: The Evolving Standard of Care*, 1993 U. ILL. L. REV. 323, 341 (1993) ("Constructing the capital defendant's complete social history is necessary in every capital case").

Similarly, because "the acquisition of mitigation evidence is so critical in any capital case," reasonably effective counsel understand that "preparation for the sentencing phase must begin when counsel is first appointed." Valdez, 93 F. Supp. 2d at 781; *see also, e.g.*, Mason v. Mitchell, 320 F.3d 604, 621 n.8 (6th Cir. 2003) (remanding for evidentiary hearing on sentencing phase ineffectiveness and noting that, although trial counsel had appropriately prepared for the guilt phase during the eight months preceding the trial, petitioner's claim of inadequate preparation at punishment was bolstered by counsel's acknowledgment that that "as late as a week or two before the trial . . . he had not personally interviewed any of the witnesses for either phase of the trial"). Mr. Bernard's counsel failed to comply with the prevailing standard of practice in this regard.

The point made by capital defense expert David Ruhnke - that someone on the defense team, by whatever title, must fulfill the *function* of a "mitigation specialist," *see* Ex. 12 at 47, was clearly established by 1995 and remains true today. *See* Sullivan, *et al., Raising the Bar: Mitigation Specialists in Military Capital Litigation*, 12 GEO. MASON U. CIV. RTS. L.J. 199, 206-09 (Spring 2002) (because "law school prepares one to be an advocate, not an investigator," and a complete social history of the defendant is essential in every capital case, defense counsel "should assign the momentous task of compiling a psychosocial history" to an experienced penalty phase investigator "whose sole role is to research, obtain, evaluate, and coordinate the

use of all potentially mitigating information from the accused's life"); Treuthart, Branstad, and Kite, *Mitigation Evidence and Capital Cases in Washington: Proposals for Change*, 26 SEATTLE U. L. REV. 241, 290 (Fall 2002) (an investigator appropriately qualified to perform the function of developing mitigating evidence "should be appointed in every potential capital case").

Counsel also specifically failed to perform effectively in developing and presenting readily available mitigating evidence of Mr. Bernard's remorse. Ex. 13 at 40-41. Such evidence would have rebutted the prosecutors' claim that Mr. Bernard lacked any genuine regret for his crime. *See* T. 3273. Counsel's errors and omissions in this regard were prejudicial because of the special importance capital jurors attach to sincere expressions of regret and remorse by the defendant. Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 CORNELL L. REV. 1557, 1584 (1998) ("[W]here the evidence support[ed] the sincerity of a defendant's purported regret, many jurors [from juries which imposed life sentences] identified the defendant's testimony as securing the life sentence"); Eisenberg, Garvey, and Wells, *But Was He Sorry? The Role of Remorse in Capital Sentencing*, 83 Cornell L. Rev. 1599 (1998) (concluding that if jurors believe the defendant is remorseful, that can improve his chances of receiving a life sentence in certain cases).

**Counsel performed deficiently with respect to confronting and explaining Mr. Bernard's involvement in gang activity.**

Counsel were ineffective in dealing with the entire issue of gangs as it related to the penalty phase. Reasonably effective counsel would have appreciated the importance of explaining for the jury why young people become involved in gangs in the first place. Counsel should have been aware of, and made the jury aware of, research showing that those reasons include the desire for a sense of family, belonging or acceptance; for protection; for material

subsistence; for respect; and as a response to strong peer pressure. Reasonably effective counsel would also have emphasized the relationship between typical adolescent behaviors and experiences, on the one hand, and youth involvement in gangs on the other. That is, reasonably effective counsel would have presented evidence to explain to the jury that gang involvement is consistent with and likely a consequence of, such characteristic traits of adolescence as risk-taking, impulsivity, vulnerability to peer pressure, problems with judgment and problem-solving, and a need for a sense of group identity. *See* Ex. 13 at 45.

Equally important, reasonably effective counsel would have been aware that the United States Department of Justice, through its Office of Juvenile Justice and Delinquency Prevention (DOJ - OJJDP), has studied gangs for a number of years, and that the research it has sponsored demonstrates that by the time gang activity had spread to smaller cities like Killeen, it bore only a superficial resemblance to the highly organized, large-scale gang activity in large U.S. cities. Reasonably effective counsel would have understood the need to demonstrate for the jury, through information like the DOJ-OJJDP research, that the threat posed by the kind of gang activity in which Mr. Bernard and his teenage friends of both sexes engaged was far different from, and significantly less serious than, the danger posed by formally organized gangs in urban areas. Reasonably effective counsel would have employed such scientific data to combat the popularly held, media-influenced misconceptions about modern day youth gangs which very likely influenced the jury and affected its verdict. *See generally* Ex. 13 at 45-47.

Reasonably effective counsel would also have presented such information to show that although the members of Mr. Bernard's youth gang may have self-identified as "Bloods," the fact that they were informally organized, non-hierarchical, and open to both boys and girls indicates that their gang had no resemblance or ties to the formally organized "Blood" gangs

operating in large urban areas (*e.g.*, Los Angeles), such that the latter would not even recognize them as members of the "Bloods." The Department of Justice's research, showing that many comparable teens in smaller cities around the country affected a similar identification without having any relationship to the national "Bloods" gang, would have helped rebut the inference, vital to the government's case for Mr. Bernard's "future dangerousness" in prison, that he would necessarily join the established "Bloods" operating in any federal prison to which he might be sent. T. 3162, 3166-70. Simply put, the "Bloods" to which Mr. Bernard claimed to belong and the "Bloods" that pose a genuine security threat in certain federal prisons are wholly different types of gangs, and the fact that Mr. Bernard once claimed identification with the former would. not dictate that he would join the latter. Counsel performed deficiently in not explaining that urgently important fact to the jury.

**Counsel performed deficiently with respect to selecting and using mental health experts for the defense.**

Counsel performed deficiently with respect to securing the assistance of mental health expertise for the defense. Counsel waited until May 22, 2000 - two days before testimony began in the guilt-innocence phase of Bernard's trial - to have Bernard evaluated by psychologist Dr. James Shinder. For several reasons, counsel's actions in this regard fell below the prevailing standard of practice in 1999-2000.

First, the prevailing standard of practice for defending capital cases required counsel to complete a thorough social history investigation before deciding whether to have Mr. Bernard submit to a mental health evaluation at all, much less deciding what sort of mental health expert was appropriate, because the results of such an investigation are necessary to provide the evaluating expert with context for interpreting, *e.g.*, current or prior test data or information

1288

obtained in clinical interviews. Mr. Bernard's attorneys fell below the standard of practice by engaging an expert and submitting their client to an evaluation without first having compiled the necessary body of information about Mr. Bernard's background and history. *See* Ex. 12 at 51. Counsel's decision to have Dr. Shinder assess Mr. Bernard's "overall psychological functioning" in the absence of a comprehensive social history was objectively unreasonable.

Second, counsel also apparently wanted to have Dr. Shinder evaluate Mr. Bernard because of concerns about his "intelligence quotient." No reasonable attorney familiar with the many available records of Mr. Bernard's academic performance would have believed that he was a person with mental retardation, as his records do not reflect intellectual functioning in that range.

Had counsel waited until a social history investigation of Mr. Bernard was complete to determine whether to have him evaluated by an expert, as required by the prevailing standard of practice, they would have chosen a different expert. Had they performed reasonably, counsel would have been aware that Mr. Bernard's background includes facts and circumstances that suggested he should be evaluated by a qualified neuropsychologist, as opposed to having his "overall psychological functioning" measured. Ex. 12 at 53-54; Exhibit 17 at 2, 6. For example, the fact that Mr. Bernard had experienced several head traumas, including two that resulted in his being rendered unconscious (one of those occurring in the spring of 1999), was a clear indicator of a need for neuropsychological evaluation, and would have been recognized as such by reasonably competent capital defense counsel in 1999-2000. Id. Similarly, the fact that Mr. Bernard had regularly smoked marijuana dipped in formaldehyde or embalming fluid would have suggested to reasonably effective counsel in 1999-2000 that neuropsychological evaluation was in order. Id. Such an evaluation would have shown that Mr. Bernard suffers from neuro-

100

cognitive dysfunction which, along with all the other mitigating circumstances counsel failed to develop or present, would have been reasonably likely to result in a life sentence at the punishment phase. *See* Ex. 17 at 3; *see also* Ex. 12 at 80-82.

Even if counsel had a reasonable strategic justification for submitting Mr. Bernard to a generic psychological evaluation of the type conducted by Dr. Shinder, counsel performed deficiently in waiting until trial had begun to do so. Dr. Shinder's report reveals many potentially mitigating facts that would require additional investigation and development before counsel could make an appropriate judgment about whether to introduce them at the penalty phase, and by the time counsel received the report there was insufficient time to accomplish such an investigation. Reasonably effective counsel would have been aware of these facts, having uncovered them well in advance of trial in the course of a properly conducted social history investigation, and that investigation would have led reasonably effective counsel to seek the assistance of a neuropsychologist rather than submit their client to an evaluation of his "overall psychological functioning."

Reasonably effective counsel would have been aware, or would have learned from the consultation with an appropriately qualified neuropsychologist to which a properly conducted investigation would have led them, that brain development does not correspond neatly or precisely to chronological age, *i.e.*, that the brain does not necessarily attain a fully mature level of organization or function by age eighteen. *See* Ex. 17 at 5-7. As a result, some deficits in brain development and functioning may exist throughout an individual's late adolescence and even into his early twenties. Id. Such deficits are not due to injury or damage or congenital impairment, but simply to the pace at which the physical structures of the brain assume their

101

1290

mature form. Id. Counsel would further have learned that, with respect to these changes in the brain that accompany maturation, the prefrontal cortex is among the last areas of the brain to mature, and in many persons may not be fully developed by age eighteen. Id. This area includes those centers within the brain which are responsible for abstract reasoning, judgment, the ability to understand "if - then" relationships or to plan adaptive and socially acceptable/adaptive behavior, and to anticipate the consequences of ones' actions. Counsel would further have learned that these aspects of neurocognitive functioning, sometimes called "executive functions," play a supervisory role in monitoring, initiating, inhibiting, and shifting of behaviors and cognitive sets. Id. They are the brain centers and abilities needed to exercise judgment, to plan independently and successfully, and to autonomously make and implement decisions which are goal-directed, appropriate, and conform to societal expectations. Id. Reasonably effective counsel would have presented all this information to Mr. Bernard's jury to provide context for assessing the mitigating significance of his age and his neurocognitive dysfunction. Such evidence would have been mitigating in its own right and would also have rebutted the government's argument that the fact of Mr. Bernard's youthfulness should be given little mitigating weight in light of his history of criminal activity.

An appropriate neuropsychological evaluation of Mr. Bernard would have demonstrated that he suffers from mild neurocognitive dysfunction. *See* Exhibit 17 at 3. Even though the degree of Mr. Bernard's impairment is in the mild range, it is clinically significant that Mr. Bernard consistently scored lowest on tests measuring one particular area of brain functioning, which strongly suggests that the test results reflect an impairment that has significance for Mr. Bernard's functioning in the world. Id. Mr. Bernard's performance in the evaluation indicated that "[t]he more complicated and detail-oriented the task, the more compromised Mr. Bernard's

performance," and that as a result "Mr. Bernard's ability to confront and solve complex problems, especially when under time constraints or in emotionally charged situations, is impaired." Id. As Michael Gelbort, Ph.D., sums up his expert opinion,

> [T]he results of [this] neuropsychological evaluation suggest that at the time of the offense in June 1999, Mr. Bernard was less capable than a *normal* individual - one operating with an undamaged brain whose structures had assumed their fully mature form, and free from the debilitating influence of drugs and alcohol -- would have been to respond sensibly to the perceived crisis surrounding how to resolve the carjacking-kidnapping. The specific nature of Mr. Bernard's neurocognitive deficits would have undermined his ability to solve what presented itself to him as a complex and emotionally charged problem demanding immediate resolution. Mr. Bernard is someone who can work his way to an acceptable answer to such a problem if the circumstances permit him multiple opportunities to make mistakes and then correct them, or a substantial amount of time to evaluate alternative courses of action. When the circumstances are not so forgiving, however, Mr. Bernard's neurocognitive impairment creates a risk that Mr. Bernard will fail to reason his way to an appropriate decision, or defer to others who take command of the situation.

Id.

Counsel performed deficiently in failing to complete a comprehensive social history of Mr. Bernard before selecting an appropriate mental health expert. *See* Douglas S. Liebert & David V. Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J. FORENSIC PSYCHIATRY 4:43 (1994) (thorough social history is prerequisite for reliable mental health evaluation). Instead, simply chose Dr. Shinder and asked him to assess Mr. Bernard's "overall psychological functioning." Wiggins makes clear that retaining a mental health expert is not a substitute for conducting a proper social history investigation, as the Supreme Court found counsel in that case ineffective for not conducting such an investigation even though counsel consulted with a psychologist. *See* Wiggins, 123 S. Ct. at 2536, 2541. Reasonably effective counsel in 1995, placed on actual notice of the facts which confronted trial counsel in this case, would have pursued an appropriate neuropsychological evaluation of Mr. Bernard.

*See, e.g.,* <u>Collier v. Turpin</u>, 177 F.3d 1184, 1196 (11th Cir. 1999) (counsel ineffective at sentencing for, *inter alia*, failing to present expert testimony regarding petitioner's "diffuse organic brain damage."); <u>People v. Ruiz</u>, 686 N.E.2d 574, 580 (Ill. 1997) (counsel ineffective in failing, *inter alia*, to present expert evidence that defendant had cognitive dysfunction and diffuse brain impairment).

Even though Mr. Bernard's neuropsychological impairments might not necessarily be readily apparent to a layperson, there is a reasonable probability that the jury would have found that they, in combination with the other facts and circumstances of Mr. Bernard's life history, made a life sentence appropriate.   As the Eleventh Circuit recently observed, "[t]here is a great difference between failing to present evidence sufficient to establish incompetency at trial and failing to pursue mental health mitigating evidence at all.  One can be competent to stand trial and yet suffer from mental health problems that the sentencing jury . . . should have had an opportunity to consider." <u>Hardwick v. Crosby</u>, 320 F.3d 1127, 1163 (11th Cir. 2003) (quoting <u>Blanco v. Singletary</u>, 943 F.2d 1477, 1503 n. 147 (11th Cir. 1991)); *see also* Ex. 12 at 80-82.

**Counsel unreasonably failed to make an opening statement at the punishment phase**.

Counsel performed deficiently in failing to make an opening statement at the penalty phase.  Any reasonable attorney defending this capital case would have taken the opportunity to explain to the jury why the evidence would show that death was not the appropriate punishment for Mr. Bernard. Ex. 12 at 54-56.  Counsel's decision not to make an opening statement at the penalty phase resulted from counsel's deficient investigation and preparation (*i.e.,* counsel could not make an opening statement at the punishment phase because counsel had no idea what evidence in mitigation they would present on Mr. Bernard's behalf).  Such a failure was

objectively unreasonable.

**Counsel unreasonably failed to select defense witnesses with due care, unreasonably failed to prepare the defense witnesses to testify, and conducted their witness examinations in a professionally deficient and objectively unreasonable manner.**

Mr. Bernard's counsel failed to prepare the witnesses they actually called to testify at the penalty phase, and examined those witnesses in a manner that was objectively unreasonable and deficient. Counsel did not prepare the witnesses they called on Mr. Bernard's behalf by explaining to them the purpose of their testimony or what they would be asked on direct or cross-examination. Counsel had not interviewed these witnesses and had no idea what they might know that would be relevant to Mr. Bernard's case in mitigation. Counsel's examination of each witness followed the same pattern: a handful of questions directed to identifying the witness and establishing how long they had known Mr. Bernard, followed by an open-ended plea that the witness come up with something helpful, *e.g.*:

> [T]his part of the trial is really for a very specific purpose, and that's for these twelve good folks here on the jury to decide whether to give Brandon Bernard the death penalty, or life in prison without the possibility of release. What kinds of things can you - what kind of information can you give to the jury that you think would help them in making that decision about Brandon Bernard?

T. 3117 (to Billy Spiller). Counsel's failure to prepare their witnesses individually for their testimony, and to do so sufficiently in advance of the penalty phase to exercise reasonable professional judgment about whom to call and whom not to call, fell below the prevailing standard of practice in 2000. Reasonably effective counsel would have interviewed the witnesses in advance, identified the information they possessed which counsel wanted to elicit before the jury, and then structured the examination to elicit that information. Ex. 12 at 56-58. Counsel chose instead simply to call the witnesses to the stand, without knowing what they

105

might say, in the hope they might volunteer something to "help" the jury make its sentencing decision.

Counsel's actions in this regard fell below the prevailing standard of practice. Counsel have a duty to prepare defense witnesses so that counsel can elicit all relevant mitigating information from the witnesses actually called to testify. As the evidence developed in post-conviction proceedings makes clear, witnesses such as Mr. Bernard's mother actually had a wealth of important information about his life to impart, which counsel's deficient preparation and investigation denied the jury. *See generally* Exhibit 13. *See also* Lewis v. Dretke, 355 F.3d 364, 368 (5th Cir. 2003) (finding that district court clearly erred in upholding counsel's performance at trial on the ground that counsel had presented some mitigating evidence; noting that the "skeletal testimony" was "wholly inadequate to present to the jury a true picture" of the defendant's life); Cargle, 317 F.3d at 1210 (defense counsel's only mitigation witness provided testimony that was "brief, unprepared, personally remote, and fairly generic"); Collier, 177 F.3d at 1201 (granting habeas relief as to sentence where counsel failed to elicit relevant mitigating facts from the witnesses actually called at trial; trial counsel's examination of the mitigation witnesses was "minimal," and he "sought to elicit very little relevant evidence about Collier's character"); Douglas v. Woodford, 316 F.3d 1079, 1088-89 (9th Cir. 2003) (defense counsel, *inter alia*, did not adequately prepare the few witnesses he called so that counsel could present their testimony in a sufficiently detailed and sympathetic manner); Mayfield v. Woodford, 270 F.3d 915 (9th Cir. 2001) (*en banc*) (finding trial counsel ineffective for failing adequately to investigate and present other available mitigating evidence, such as testimony about the defendant's good qualities and the specific difficulties he endured growing up, despite acknowledging that "the mitigating evidence presented at trial was substantial"); *cf.* Alcala v.

106

Woodford, 334 F.3d 862 (9th Cir. 2003) (finding counsel performed deficiently in presenting alibi defense, even though counsel did present some witnesses to support the defense).

Counsel also failed to exercise due professional care in the selection of which witnesses would be called to testify at the penalty phase. Counsel did not select witnesses in advance and secure their presence by subpoena, but appear to have chosen the witnesses who would testify based simply on which of the potential witnesses came to court that day when solicited to do so by Thelma Bernard. Exhibit 18. The prevailing standard of performance in 2000 required counsel to select their witnesses with care and not to delegate to any person outside the defense team the responsibility for communicating with those witnesses, and to secure the attendance of defense witnesses in court via subpoena.

Counsel also failed to exercise due professional care in choosing to call Billy Spiller and Isolde Rorie-Cody as defense witnesses at the punishment phase. Ex. 12 at 58. Because counsel had never interviewed these witnesses or performed any meaningful investigation, counsel had no idea that Spiller and Rorie-Cody's own children were members of the same informally organized youth gang as Mr. Bernard. The credibility of both witnesses was devastated when the government elicited this admission on cross-examination. Reasonably effective counsel would have been aware of this fact and would have either (1) developed this fact on direct examination as part of a broader mitigating explanation for how teenage African-Americans of both sexes became involved in gangs in Killeen, or (2) chosen not to call these witnesses at all. The effect of this cross-examination was not simply to undermine the credibility of Spiller and Rorie-Cody as witnesses for Mr. Bernard, but by extension to suggest to the jury that *none* of the evidence being proffered by Mr. Bernard's attorneys could be trusted, since defense counsel were so plainly and painfully unaware of basic facts about their own witnesses.

Counsel failed in their obligation to Mr. Bernard when they called witnesses at the penalty phase whose testimony affirmatively harmed the credibility of their case for life when those witnesses were subjected to devastating cross-examination which defense counsel would have anticipated had they conducted a reasonable investigation. Moore v. Johnson, 194 F.3d 586, 611-12 (5th Cir. 1999) (counsel's deficient performance included the fact that while cross-examining the first state witness during the guilt phase, counsel elicited damaging evidence far beyond the scope of direct examination); Hooper v. Mullin, 314 F.3d 1162, 1171 (10th Cir. 2002) (counsel ineffective for presenting expert testimony which opened door to damaging report and for presenting psychological evidence "in an unprepared, uninformed and, thus, disastrous manner"); Berryman v. Morton, 100 F.3d 1089 (3rd Cir. 1996) (finding counsel ineffective, despite testimony that he acted pursuant to a "game plan," where counsel opened the door to irrelevant and damaging evidence, and failed to investigate available defenses); Sager v. Maass, 84 F.3d 1212 (9th Cir. 1996) (defense counsel "fatally tainted" the trial by introducing the complaining witness' entire victim impact statement into evidence); Gardner v. State, 96 S.W.3d 120 (Mo. App. 2003) (defense counsel performed deficiently in calling a witness whose testimony opened the door to damaging rebuttal evidence that undermined defendant's claim of self-defense).

**Counsel unreasonably failed to investigate, develop, and present evidence of Bernard's successful adjustment to incarceration while awaiting trial and his positive response to supervision while on juvenile probation.**

Counsel performed deficiently in failing to investigate, present and argue available, powerful mitigating evidence of Mr. Bernard's successful adjustment to incarceration while awaiting trial, as well as his positive response to intensive supervision as a juvenile probationer. The government had served notice that it would seek to prove that Mr. Bernard was "likely to

108

\12⁴7

commit criminal acts of violence in the future which would be a continuing and serious threat to the lives and safety of others." Dkt. 173. Reasonably competent capital defense counsel accordingly would have looked for such evidence, or for ways to rebut any such attempt by the government to portray Mr. Bernard as a danger *in prison*. Ex. 12 at 58-62. Trial counsel failed to undertake any investigation in this area.

McLennan County Jail records demonstrate that in the approximately one year that Mr. Bernard spent in custody there, he was disciplined for misbehavior on only two occasions. Exhibit 19. Neither incident involved violence against another inmate or against correctional staff, possession of any sort of contraband or weapons, or any gang-related activity whatsoever. Id. As a result, these records would have provided concrete evidence to rebut the government's primary speculation about Mr. Bernard's "future dangerousness" - that Mr. Bernard would be dangerous in prison because, having been a gang member in the "free world," he would inexorably be drawn into gang-related violence in prison. Reasonable counsel would have developed and presented this evidence.

Counsel also performed deficiently in failing to investigate and present available lay witnesses who could have testified to Mr. Bernard's successful adjustment to incarceration. Michael Cherry, then a fellow jail inmate and now an ordained minister, would have testified, *inter alia*, that Mr. Bernard was deeply remorseful and ashamed about his role in the crime; that Mr. Bernard was an active and enthusiastic participant in the jail Bible study group; that Mr. Bernard had a positive influence on the behavior of other inmates; that Mr. Bernard constantly expressed concern about his family, especially his younger brother Max, and how his actions had hurt them; that Mr. Bernard was haunted by the photographs of the victims that he saw during trial; and that Mr. Bernard was distraught that his involvement in the crime was going to result in

109

his being separated forever from his own children. *See* Ex. 13 at 39-41. Comparable testimony was available from Rev. Jackie Hetzel, a "free world" minister who came into the jail to minister to the prisoners there and who had frequent contact with Mr. Bernard. Counsel performed deficiently in not developing and presenting this evidence, which would not only have been mitigating in its own right but would have rebutted the government's claim that Mr. Bernard showed no remorse for having been involved in the events that led to the Bagleys' deaths.

Counsel performed deficiently in failing to investigate Mr. Bernard's juvenile criminal history. Had they done so, they would have discovered that juvenile probation officer Novotny Baez, who had supervised Brandon Bernard about two years before the Bagley murders, found that he responded very positively to supervision. Ms. Baez would have testified, *inter alia*, that Brandon, who was on "intensive supervision," duly reported to her 2-3 times per week and was always at home when she made her unannounced visits to the family home once each week; that nothing about his character suggested a capacity for violence; that she felt extremely safe around Brandon and would have gone with him anywhere unaccompanied; that he was quiet, respectful, and well-mannered; that he had a calming presence; that she never thought twice about making her visits to the family home late at night, because she was completely confident that Brandon posed no threat to her; and that during this period of intensive supervision Brandon kept curfew, went to school as required, and worked regularly and successfully at a local Burger King restaurant. *See* Ex. 13 at 25. Ms. Baez could also have testified that although the juvenile court originally ordered that Mr. Bernard reside in the "Catch-22" residential facility in Brownwood for a full year, he was released after only six months despite the fact that he still had treatment needs. Ex. 13 at 24-25.

Counsel plainly erred in failing to investigate and present evidence of Mr. Bernard's

110

successful adjustment to incarceration prior to trial and his progress under supervision as a juvenile probationer. Ex. 12 at 62. Even before the Supreme Court confirmed that the Constitution entitles a capital defendant to present such mitigating evidence, Skipper v. South Carolina, 476 U.S. 1 (1986), reasonably competent capital defense counsel recognized the importance of showing jurors that a defendant had lived peacefully and productively in a prison environment. This was certainly true at the time of Mr. Bernard's trial, nearly fifteen years after Skipper. Counsel's failure to investigate, develop, and present such evidence was deficient and prejudicial. See, e.g., Williams, 529 U.S. at 395 (counsel ineffective for, inter alia, failing to present favorable prison records and failing to present "the testimony of prison officials who described Williams as among the inmates 'least likely to act in a violent, dangerous, or provocative way'"); Moore v. Johnson, 194 F.3d 586, 614 (5th Cir. 1999) (counsel ineffective for not presenting evidence to help jurors interpret and understand defendant's penitentiary records), id. at 618 (counsel ineffective for "failing to capitalize on the opportunity to argue Moore's early release from prison as a factor mitigating against an affirmative response on the special issue of future dangerousness"); Valdez, 93 F. Supp. 2d at 784 (counsel was ineffective in part for not having investigated whether witnesses were available to testify concerning the defendant's good behavior in the county jail); Ex parte Land, 775 So. 2d 847, 854 (Ala. 2000) ("[T]rial counsel may be found ineffective for failing to present evidence of adjustment to incarceration ...."); Horton v. Zant, 941 F.2d 1449, 1463 (11th Cir. 1991) (finding Strickland prejudice from counsel's failure to present evidence that defendant had, inter alia, "successfully adjusted to previous stays in prison").

Defense counsel's failure to develop and present such "Skipper evidence" in Mr. Bernard's case is also particularly noteworthy because the government was asking the jury to

111

condemn Mr. Bernard to death based on his alleged "future dangerousness." The Supreme Court emphasized in <u>Skipper</u> that evidence of a defendant's successful adjustment to confinement can powerfully rebut a prosecutorial claim of future dangerousness. *See also* <u>Moore</u>, 194 F.3d at 618 (same). In addition, research and experience alike confirm that capital jurors regard the defendant's possible future dangerousness as a vital consideration in choosing between life and death. *See, e.g.*, Blume, *et al.*, *Future Dangerousness in Capital Cases: Always "At Issue,"* 86 CORNELL L. REV. 397, 398-99 (2001).

**Counsel unreasonably failed to investigate, rebut or explain the evidence offered in aggravation by the government.**

Mr. Bernard's attorneys performed deficiently with respect to rebutting and explaining the evidence offered in aggravation by the government. *See* Ex. 12 at 62-70. They had a duty to conduct a reasonable investigation into facts and circumstances upon which they had actual notice the government would rely, or which reasonable counsel would have anticipated the government would attempt to introduce, and to take steps to challenge them. *See, e.g,*, American Bar Association, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES, Guideline 10.11(A) ("[C]ounsel ... have a continuing duty ... to seek information that supports mitigation *or rebuts the prosecution's case in aggravation*") (emphasis added); Guideline 10.11(H) ("Trial counsel should determine at the earliest possible time what aggravating factors the prosecution will rely upon in seeking the death penalty and what evidence will be offered in support thereof"): Guideline 10.11(I) ("[C]ounsel ... should carefully consider whether all or part of the aggravating evidence may appropriately be challenged as improper, inaccurate, misleading, or not legally admissible"). Had counsel performed effectively, they would have uncovered evidence to exclude some of the government's case in

1301

aggravation, or at least blunt its impact by rebuttal.

As noted, Mr. Bernard's counsel performed deficiently in failing, in advance of trial, to investigate and research available information about the nature of the "gang activity" upon which so much of the government's evidence focused.  For example, prosecution expert Anthony Davis testified essentially that any person who had been a member of the "Bloods" in the free world would necessarily associate with the "Bloods" in the Bureau of Prisons, and join them in committing violent mayhem on officers and other inmates alike.  T. 3166-70. Reasonably effective counsel would have demonstrated through evidence that this was not the case for teenagers like Brandon Bernard, whose purported self-identification as a "Blood" was demonstrably casual and impermanent.  That evidence would have provided an important contrast to Davis's testimony, which described a formal relationship to an organized entity - a relationship in which aspirants must "make their bones" and then follow orders from higher-ranking "shot callers" in the gang hierarchy.  T.  3168-69.  Nothing about the gang activity in which Mr. Bernard took part suggested that he would align himself with such a group if sent to prison.

Defense counsel also performed deficiently with respect to cross-examining Terry Brown at the penalty phase regarding his claim that he, Mr. Vialva, and Mr. Bernard, as the "Kick-Door Boys," had committed a large number of residential burglaries. Ex. 12 at 63.  These burglaries formed an important part of the government's case for Bernard's "future dangerousness." Reasonably effective counsel would have conducted an independent investigation into these allegations to determine if there were any documents or other records concerning these burglaries that implicated Mr. Bernard, which counsel unreasonably failed to do.  Reasonably effective counsel would have impeached Mr. Brown with his sworn statement from his plea of



guilty, in which he stated that the "Kick-Door Boys" consisted of himself, Mr. Vialva, and *Tony Sparks*, rather than Mr. Bernard. *See* Ex. 12 at 63.

Reasonably effective counsel would also have objected to the form of many of the prosecutor's questions and much of Mr. Brown's testimony. The absence of any objections from defense counsel made it possible for Mr. Brown from time to time to testify in the form of a narrative, without having to respond to questions from the government, and also allowed the prosecutor to frame many of his questions to lead Mr. Brown to the desired response, including by asking the same question repeatedly when Mr. Brown failed to answer as the prosecutor hoped. *See, e.g.*, T. 2790-91 (narrative); 2792 (leading, *e.g.*, by suggesting that stolen items might have been pawned in "some town outside of Kileen"); *id.* (rephrasing Brown's answer to the prosecutor's liking: "In other words, no one was excluded from profiting from the burglary?"), 2795 (repeatedly asking about who was involved in trading the murder weapon for a gun allegedly stolen in one of the "Kick-Door" burglaries; Brown's initial answer is that he "was not there at the time of the trade and [does] not know;" the government asks the same question three more times without objection, eventually eliciting Brown's assent to the answer it wants, albeit with the same qualification Brown started with: "I would guess - I mean, if I said so, I would be guessing. I don't know."). Reasonably effective defense counsel would have objected to the prosecutor's persisting in this line of questioning and to Mr. Brown's speculative response.

Counsel also performed deficiently by permitting government witness Jeff Fholer to suggest in his testimony that Mr. Bernard at age 15 committed "several" burglaries in July 1995 and that Mr. Bernard had gained entry to several of the burgled sites by smashing windows. T. 2730. Reasonably effective counsel would have been aware, from a complete investigation of

114

130

Mr. Bernard's background, that (1) there were only two such burglaries in July 1995 - one on Pickwick Street and one on Dickens Street; (2) all four crimes in which Mr. Bernard was involved that year (a shoplifting incident in January, a burglary in March, and two burglaries in July) were instigated by Bernard's cousin Melsimeon Pollock; (3) Melsimeon Pollock, along with his mother and sister, lived in the Bernards' home at the time; (4) Mr. Bernard was involved in each of those incidents only because he was following Pollock's lead; and (5) Melsimeon Pollock, not Mr. Bernard, was the person who smashed the windows to gain entry. Reasonably effective counsel would have introduced evidence to this effect to rebut the misleading inferences in Fholer's testimony. *See* Exhibit 13 at 20-21, 44.

Counsel performed deficiently in failing to object when police officer Alex Gerhardt testified that although Mr. Bernard and his cousin Melsimeon Pollock were apprehended after the Dickens Street burglary with a single Nintendo game cartridge in their possession, they had had "plans to take other things." T. 2742. Counsel unreasonably failed to object when the prosecutor asked a leading question of Mr. Gerhardt to suggest that the victim in the Pickwick Street burglary was next door "helping a neighbor out" at the time of the burglary - a fact both irrelevant and unsupported by any evidence. T. 2760. Throughout Mr. Gerhardt's testimony, defense counsel unreasonably failed to object to what was essentially a running narrative by Mr. Gerhardt about the July 1995 burglaries.

Counsel unreasonably failed to object to speculative hearsay testimony from sheriff's investigator David Wical concerning an incident in which someone apparently rang the doorbell of a local woman and then got into a vehicle and drove away after she looked out. T. 2766. Reasonably effective counsel would have objected to Mr. Wical's testimony. Reasonable counsel would also have investigated to confirm the alleged value of the items taken in the

115



burglaries Mr. Wical described ("around $16,000").

Counsel performed deficiently in failing to challenge the testimony of government witness John Bowman, called to testify that Mr. Vialva and Mr. Bernard had engaged in confrontations with other students at school as a result of their identification with the 212 PIRU gang. Reasonably effective counsel would have objected to Mr. Bowman's irrelevant testimony that Hispanic teenagers affiliated with the "Thirteeners" gang, "if they [go] to the penitentiary, [would] be Mexican [M]afia associate kids." T. 2807. The government had presented no evidence that Mr. Bowman was qualified to testify about what gang, if any, Hispanic teenagers on the street might join if sent to prison, and any such testimony was both speculative and irrelevant by its own terms in a case involving African-American defendants. Moreover, this testimony was highly prejudicial to Mr. Bernard, as it provided specious corroboration for the testimony of Dr. Richard Coons that a teenager who belonged to any gang in the "free world" would necessarily associate himself with a gang in prison. T. 3162. Reasonably effective counsel would have asked for a Daubert hearing to test Mr. Bowman's qualifications to make any such "expert" pronouncements, about these matters and others related to Mr. Bowman's asserted specialized knowledge about gangs, and such a hearing would have resulted in their having been excluded.

Counsel also performed deficiently in cross-examining Mr. Bowman about the particulars of the incident in which Mr. Bernard was issued a citation for provoking another student by showing him Mr. Bernard's gold teeth, which bore the letters "C.K." ("Crip Killer"). In questioning Mr. Bowman, defense counsel suggested that Mr. Bernard had told the officer that "C.K." were his girlfriend's initials. T. 2811-12. Mr. Bowman denied ever having been told that, although he stated that Mr. Bernard "apparently" had made such a claim "in his campus-

116

1305

level hearing" after the incident. T. 2812. Defense counsel never introduced any evidence to show that Mr. Bernard ever had a girlfriend with the initials "C.K." Reasonably effective defense counsel would have known through investigation that Mr. Bernard never had a girlfriend with the initials "C.K." Introducing this suggestion through cross-examination of Mr. Bowman created an expectation in the jury that such proof might be forthcoming; when it was not, the jury could only have drawn the conclusion that Mr. Bernard had lied in his campus-level hearing (and presumably to defense counsel as well). Reasonably effective counsel would not have pursued such a line of questioning without any factual basis for doing so, and an attorney who had reasonably investigated and prepared for trial would have known that no such factual basis existed.

Counsel performed deficiently in failing to object to narrative testimony from Ranger Aycock, based on hearsay, concerning how the .40 Glock used in the murders originally came into Mr. Bernard's possession. T. 2813-14. Counsel performed deficiently in failing to object to irrelevant and prejudicial hearsay testimony from Ranger Aycock regarding the gang affiliation of the "Bell brothers," as well as to Ranger Aycock's wholly unsupported claim that Mr. Bernard and the "Bell brothers" were "rivals" and "had problems." T. 2814. Counsel also performed deficiently in failing to object to testimony from Ranger Aycock about his conversations with other members of the 212 PIRU gang and/or other persons, in which Aycock described having asked those persons for their opinions "rating" the four persons "charged in this crime" (apparently Vialva, Bernard, Lewis, and Brown). T. 2819. This testimony was objectionable on multiple grounds (*e.g.,* hearsay, inadmissible opinion, irrelevant, unduly prejudicial, etc.) and reasonably effective counsel would have objected to it. Ex. 12 at 67-68.

Reasonably effective counsel would have objected to Aycock's long hearsay narrative

117

regarding what he was told by James Presley with respect to a fatal shooting on December 31, 1998, at which Vialva was alleged to have been present. T. 2820-22. Ranger Aycock's irrelevant narrative contained prejudicial and inflammatory characterizations of the shooting victim in that incident, whom Aycock claimed was "as square a fellow as you ever saw," with "no gang connection" and "no criminal history," and wholesale speculation about what thoughts ran through the mind of the deceased during the incident (*e.g.*, "he didn't know exactly how to react to it"). T. 2820-21  This testimony was prejudicial because it had nothing to do with Bernard and because it paralleled the elaborate overall comparison the prosecution had developed, and was continuing to develop, between the lawless defendants on one hand and the "square" Bagleys on the other. Reasonably effective counsel would also have known that Bernard was living with his relatives hundreds of miles away in Michigan at the time of that shooting on December 31, 1998, and would have made the jury aware of that fact.

Reasonably effective counsel would also have objected to Aycock's being allowed to testify that Bernard and Melsimeon Pollock committed "numerous" burglaries when Bernard was fifteen (the number of burglaries, as noted, was three), T. 2822, or at a minimum would have cross-examined Aycock to ensure that this mischaracterization did not mislead the jury. Similarly, reasonably effective counsel would have objected to Aycock's speculative testimony that "some" of the so-called "Kick-Door Boys" "may have been" involved in other burglaries that did not involve the rest of the "Kick-Door Boys." T. 2823-24.

Counsel's cross-examination of Ranger Aycock at the punishment phase was deficient. Counsel permitted Aycock to speculate about matters concerning which he had no personal knowledge (*e.g.*, T. 2828: "my understanding...") and invited a lengthy and damaging narrative including hearsay testimony supposedly expressing the views of other gang members concerning

118

Vialva, Bernard, Lewis, and Brown. T. 2828 (counsel gives Aycock an open-ended invitation to "[g]o ahead" and say what he likes), 2830-31 (in response to question about Terry Brown, and without objection by defense counsel, Aycock volunteers non-responsive hearsay that Mr. Bernard "would assist and help and would not run from a fight," a characterization both false and directly at odds with testimony they later presented from Matthew Mitchell, *see* T. 2875).

As a result of having failed to conduct a reasonable investigation into the case, counsel were also unprepared to challenge Ranger Aycock's claim to have seen Mr. Bernard wearing gold teeth bearing the letters "C.K." at the time of his arrest in June 1999. Reasonably effective counsel would have been aware that Mr. Bernard had his family dentist replace those teeth with plain ones in March 1999, *see* Exhibit 20, and would have made it clear to the jury that Ranger Aycock's recollection was either faulty or contrived. Likewise, reasonably effective counsel would have been aware through investigation that FBI Agent Chadwick's testimony that Mr. Bernard had been "detained and released" following the fight in which Chadwick claimed Mr. Bernard had been involved at a party on Ft. Hood was either distorted or mistaken, because Mr. Bernard had left that party unconscious and in an ambulance, and was released to his mother after receiving emergency-room medical care. *See* Exhibit 13 at 35.

### Counsel performed deficiently in defending Bernard against the government's "victim impact" evidence.

Counsel failed to represent Mr. Bernard effectively in responding to the "victim impact" evidence presented by the government. Ex. 12 at 70-74. Counsel's failures in this regard were pervasive, with the result that the entire trial ultimately amounted to an invidious comparison between the Bagleys and the defendants. Specific examples of counsel's deficient performance in this regard include the following.

119

138

Counsel failed to file appropiate *in limine* motions seeking to limit the nature and extent of the "victim impact" evidence the government would be permitted to introduce at the penalty phase. *See* Ex. 12 at 70. This failure was especially striking because the government had disclosed the written statements of potential victim impact witnesses to defense counsel before they ever testified. As a result, defense counsel were aware that some witnesses had expressed very strongly the view that the death penalty was the only appropriate sentence for Bernard. For example, Donna McClure (mother of Stacie Bagley) had included in her written victim impact statement the phrase "Although it saddens me I know the death penalty is right." Reasonable defense counsel would have recognized that the testimony of witnesses with such strongly held opinions about the appropriate punishment presented a significant risk of rendering the sentencing hearing fundamentally unfair, and would have attempted to limit the scope and character of the "victim impact" testimony to be offered by filing appropriate motions in advance of trial. Reasonably effective counsel would have been aware that similar efforts in other federal capital trials around the country had resulted in trial courts' placing significant limits on the scope and character of such evidence.

Counsel unreasonably failed to object to "victim impact" testimony that exceeded the scope of such evidence permissible under <u>Payne v. Tennessee</u>, 501 U.S. 808 (1991). A substantial part of the testimony of Donna McClure was irrelevant and inflammatory, and would have been excluded upon a timely objection, and other "victim impact" testimony was admitted that improperly characterized the defendants and their offense. <u>Bernard</u>, 299 F.3d at 480-81. Defense counsel performed deficiently in failing to make appropriate and necessary objections to such testimony.

Counsel failed to object to evidence that was irrelevant under <u>Payne</u> and which, even if

120

1309

marginally relevant, was so inflammatory that it should have been excluded. For example, witness Anastasio Torres, himself a police officer with the Killeen ISD, was allowed to recount without objection a conversation about Todd Bagley's having considered becoming a police officer, including how Stacie Bagley had expressed her desire that Todd "[not] get involved in any of that violence that's out there," to which Torres had responded that violence could happen anywhere, but that if Todd pursued a career in law enforcement he would be "trained" and could "spot bad things" and "protect [her]." T. 2776. This testimony was objectionable and reasonable counsel would have objected to it. Torres' testimony, at least as to his speculation about how Todd, properly "trained," might have responded to "bad things" and "protect[ed]" Stacie, was speculative, irrelevant, and highly prejudicial. It contributed significantly to the government's overall campaign to paint the deaths of the Bagleys as a particularly cruel irony - as with the government's argument that the Bagleys were victimized precisely *because* they had "reached out" to the defendants - both in the beginning (in agreeing to give them a ride, failing to "spot" the "bad thing" that was about to ensnare them) and at the very end (as they went to their deaths singing praises to their Lord).

Counsel unreasonably failed to object to "victim impact" testimony that had the obvious effect of communicating to the jury that the victims desired a death sentence for Bernard. For example, Georgia Bagley was permitted to address the jury directly, rather than answering questions from the prosecutor, and stated, "Please, I beg you, let justice be done for my children." T. 2858. Reasonably effective counsel would have objected to this improper testimony before Ms. Bagley took the stand (since counsel had been provided with a copy of the statement Ms. Bagley was allowed to read to the jury) and sought to exclude it.

Counsel unreasonably failed to object to testimony from Rick Bagley that characterized

121

1310

the defendants as "brutal" and "gutless." T. 2834 (victims hurt "because someone wants to be brutal;" expressing hope that the defendants "had the guts to" look at the victims' photographs). Counsel failed to object to leading questions from the prosecutor on direct examination that had the effect of permitting the prosecutor to add to the witnesses' characterizations the credibility of his own personal opinion. *E.g.*, T. 2840 (Question: "Tell us about Todd's character. Was he the type of person that would throw himself totally into whatever he was asked to do? In other words, whether it be in the military, or any other type of endeavor, that he gave it his all, it was a hundred and ten percent for him, or nothing?"). Counsel failed to object, at both phases of trial, to the prosecution's improper use of testimony about the victims' lack of concern for material possessions to encourage the jury to compare the moral worth of their lives to that of the defendants'. *See, e.g.*, T. 2865; T. 2349-50.

As noted, counsel also unreasonably failed to object to irrelevant and highly inflammatory "victim impact" evidence offered by the government during the *guilt* phase. *See* T. 2140, 2143, 2144, 2151, 2473, 2474. Mr. Bernard was prejudiced at the penalty phase by the continuing and cumulative impact of this improper admission of "victim impact" evidence. Counsel's deficient performance in failing to defend Mr. Bernard meaningfully against the onslaught of "victim impact" evidence presented by the government was highly prejudicial.

Mr. Bernard notes that the "victim impact" evidence that the Fifth Circuit determined on direct appeal should never have been admitted, even if harmless when considered in isolation and under the demanding "plain error" standard, is relevant to this court's examination of Mr. Bernard's claim of ineffective assistance of counsel at the penalty phase. As the Tenth Circuit has pointed out, even where "Payne error … will not support habeas relief on its own, it is still relevant to our analysis of cumulative penalty-phase error;" because "the adverse effect of the

victim impact evidence becomes significant when [it] is considered within the context of the meager amount of mitigating evidence put on by Petitioner's trial counsel, and the fact that counsel's constitutionally ineffective investigation and capital-stage presentation failed to develop and put on a substantial amount of additional mitigating evidence." Cargle, 317 F.3d at 1229 (internal quotation marks omitted).  That is the case here.

**Counsel unreasonably failed to seek limiting instructions to segregate the prejudicial effect of aggravating evidence offered against co-defendant Mr. Vialva, or otherwise to protect Mr. Bernard's right not to be sentenced based on evidence about Mr. Vialva which was both irrelevant to Mr. Bernard's personal culpability and highly inflammatory and prejudicial.**

Counsel failed to seek appropriate limiting instructions to ensure that the jury would not consider evidence against Mr. Bernard that was offered by the government against co-defendant Mr. Vialva.  Federal criminal prosecutions routinely involve the joint trial of co-defendants, and the standard of practice requires defense counsel to object and/or seek appropriate limiting instructions to cabin the jury's consideration of evidence offered against other defendants but not against one's own client.  Mr. Bernard's counsel unreasonably failed to discharge this duty.  Ex. 12 at 74-77.

For example, the government presented the testimony of John Bowman, a police officer with the Killeen ISD.  *Inter alia*, Mr. Bowman described an incident in which Mr. Vialva had provoked another student by making allegedly gang-related taunts.  T. 2805-2807.  That testimony was particularly prejudicial to Mr. Bernard because the government "paired" it with testimony from Mr. Bowman about Mr. Bernard's having similarly taunted another student with Bernard's gold teeth, which bore the letters "C.K." (allegedly an abbreviation for "Crip Killer," *i.e.*, a member of a Bloods gang).  T. 2807-08.  Reasonably effective counsel would have objected to the testimony about Mr. Vialva and sought a limiting instruction to prevent it from

123

1312

being considered against Mr. Bernard, and further would have presented available evidence to rebut the inference that the incident involving Mr. Bernard revealed him to be a hard-core gangster. Reasonably effective counsel would have been aware through investigation that shortly after *and in response to* this incident, Mr. Bernard went *the next day* to his family dentist and had these gold caps (the ones with "C.K." on them) replaced with plain ones, with no letters on them. That fact is documented by Mr. Bernard's dental records and should have been presented to rebut the inference that Mr. Bernard was incorrigible or a willfully "hard-core" gang member. Exhibit 20.

Counsel performed deficiently in not seeking a limiting instruction regarding the testimony of Dr. Richard Coons, who testified that he had "examine[d] ... the offense report records and the medical records as [to] Christopher Vialva," T. 3156, and who proceeded to testify at length about his opinion regarding "Mr. Vialva's future dangerousness." T. 3161. Mr. Bernard's counsel evidently understood Dr. Coons' testimony to be offered only against Mr. Vialva, because they conducted no cross-examination of Dr. Coons.

Under such circumstances, however, the standard of practice required that Mr. Bernard's attorneys seek appropriate limiting instructions to inform the jury specifically that Dr. Coons' testimony could not be considered against Mr. Bernard. Ex. 12 at 75-76. In the absence of such an instruction, there was no legal bar against the jury's doing so, or the government's arguing for the death penalty for Mr. Bernard based on facts that came into evidence through Dr. Coons, as it did. For example, Dr. Coons set the stage for his opinion by saying that it would apply to a hypothetical person who "was capable of planning a situation that [would] place other people in danger," who could commit "theft for [his] own benefit," and who could participate in "deliberation about the execution of people, ... discussing it with co-conspirators and making a

124

decision to execute people." T. 3162. If the jury credited other testimony presented by the government in the course of the trial, each of these descriptions could apply to Mr. Bernard as well as to Mr. Vialva. Dr. Coons then delivered the devastating opinion that this hypothetical offender would be "highly dangerous," "not have a conscience," and "present a significant danger in the penitentiary system." T. 3162. Reasonably effective counsel would have sought limiting instructions to keep the jury from considering Dr. Coons' conclusions against Mr. Bernard.

Similarly, Dr. Coons testified that "[i]f [someone is] a member of a gang on the outside, they'll be a member of the gang inside." T. 3162. Reasonably effective counsel would have objected that the government had laid no foundation to show that Dr. Coons had any professional expertise related to gangs or prisons, or that he had any basis of knowledge whatsoever for offering such an opinion. This testimony was so prejudicial to Mr. Bernard that reasonable defense counsel had a duty to lodge an objection and/or move for a mistrial even if the testimony was nominally offered only against Mr. Vialva, if the court admitted it over their objection, they should have sought an instruction specifically limiting its consideration to Mr. Vialva. In addition, the government presented extensive testimony regarding a fatal shooting on December 31, 1998, which it alleged had been committed by Antonio Jackson, who was accompanied at the time by Mr. Vialva. This testimony was unconnected to Mr. Bernard, yet his counsel failed to lodge an objection or seek an instruction that the jury was not entitled to consider it against Mr. Bernard. Indeed, Mr. Bernard's trial counsel failed to inform the jury that on December 31, 1998, Mr. Bernard was not even in Texas.

**Counsel performed deficiently in closing argument.**

Counsel failed to object to improper argument by the government during closing

125

argument at the punishment phase. A "central theme" of the government's penalty-phase presentation, T. 3274, was its claim that Mr. Bernard had freely chosen to commit the various actions attributed to him by the government. Because Mr. Bernard had acted freely, voluntarily, and on his own initiative, the government insisted, the only appropriate sentence was death. *See, e.g.,* T. 3252 ("the criminal justice system deals with … *choices* [and] those are the things that … Mr. Bernard ha[s] to live with, based on [his] actions"); T. 3254 (Mr. Bernard "could have gone home, but he *chose* not to do that. He made a *choice*. He *chose* to participate…."); T. 3255 ("[N]one of us put them there, they put themselves there, that was their *choice*"); T. 3266 (Mr. Bernard "couldn't see [into the trunk], but he knew what he was going to do, and he did it anyway. His decision. His *choice*"); T. 3271 ("[T]his crime was a *choice*"); T. 3274 ("the central theme of this whole closing argument [is that nothing presented in mitigation] change[s] the *choice* that both the defendants made"); T. 3274 (Mr. Bernard "*chose* to participate"); T. 3275 (Mr. Bernard "*chose* to go up that hill and do the things that he did…"); T. 3276 ("[N]othing in Brandon Bernard's background … outweighs his decision and this particular *choice*") (all emphases supplied).

Reasonably effective counsel, having conducted a thorough investigation, would have been aware that this line of argument presented a serious risk of misleading the jury. In two different court proceedings in December 1999 and April 2000, the government had vouched for the truthfulness of three different witnesses - Terry Brown, Chris Lewis, and Tony Sparks - who claimed that, far from acting on his own initiative, Mr. Bernard had actually been following orders from Mr. Vialva when he set fire to the Bagleys' vehicle. *See* Exhibit 5, Exhibit 6. These same witnesses had portrayed Mr. Vialva as giving directions to all participants in the crime. Id. Because the government knew that its own witnesses' testimony described Mr. Bernard as a

126

"follower" with respect to his role in the Bagleys' deaths, the government acted improperly in repeatedly and vigorously denying that any evidence supported that mitigating characterization. *See, e.g.*, T. 3274 ("the facts in this case don't indicate that [Mr. Bernard] was merely a follower"). Reasonably effective counsel would have been aware of this highly prejudicial subterfuge and, by taking appropriate steps, have prevented it.

Counsel also unreasonably failed to object when the government's attorneys repeatedly expressed their personal belief that they had proven their case, and attempted to impart their personal prestige to the government's case. *See, e.g.*, T. 3200 ("we believe we have met the intent factors"), T. 3204 ("we believe we have [proved our case]"); T. 3210 ("This case is important. That's why we had all the evidence. That's why we took our time to show you everything, to let you know all the evidence").

Counsel failed to object when the government made arguments that were unsupported by the evidence and/or misstated or mischaracterized the evidence. For example, the government stated in argument, as if it had been proven by the evidence, that Mr. Bernard set the fire with a match. T. 3266 (Mr. Bernard "lights the match, puts it in the vehicle, and sets it on fire"). The government further argued that this was as "lethal an act" as Mr. Vialva's shooting the Bagleys. As discussed in part I, *supra*, there was no evidence that Bernard lit the fire with a match. The government argued, without objection, that Mr. Bernard poured lighter fluid on or in the trunk, which was directly contrary to the testimony of Terry Brown that Mr. Bernard sprayed lighter fluid only into the passenger compartment of the car and that it was *Brown* who poured lighter fluid on the trunk. *See* T. 3266; *cf., e.g.*, T. 1955-56. Similarly, the government mischaracterized Mr. Brown's testimony about what Mr. Bernard knew about the "plan" after the meeting at Long Branch Park. *See, e.g.*, T. 3254 (claim that Mr. Brown "told [Brandon

Bernard] what the plan was ... to kill Todd and Stacie Bagley"). This argument is impossible to square with Mr. Brown's actual testimony - that Mr. Bernard was told that the car would be burned, but *not* that Mr. Vialva intended to kill the Bagleys. T. 1955. The government also, without objection, argued that the jury should "recognize" Mr. Bernard for having "assist[ed]" Mr. Vialva in pursuing his desire to be "top gangster." T. 3255. No evidence supported the argument that Mr. Bernard had engaged in any actions whatsoever with the intent of promoting Mr. Vialva's reputation as a "gangster." Finally, the government claimed that Mr. Bernard's mitigation witness Matthew Mitchell never testified that Mr. Bernard said "that he was sorry for what he did." T. 3273. In fact, testimony indicated that Mr. Bernard told Mr. Mitchell that his lawyers had instructed him not to talk about the crime with anyone. *See* T. 2879.

Reasonably effective counsel would also have objected to the prosecutor's arguments suggesting that the jury should consider the testimony of Dr. Coons and Anthony Davis as evidence against Mr. Bernard. The prosecutors' closings included many references which plainly invoked the testimony of Coons and Davis, and which blurred the line between Mr. Bernard and codefendant Vialva, against whom that testimony was offered, by using the word "they." *See, e.g.*, T. 3251 ("*[t]hey* don't have a conscience"); T. 3260 (prosecutor's argument that "there's been a steady escalation in the types of crimes committed by both Brandon Bernard and Christopher Vialva. *They* become more violent. *They* become more risky ... [t]his constant progression ... indicate[s] that *they* would continue to be a danger"); T. 3261 ("[H]ow can [the defendants be dangerous] if *they* are in prison? Well, that's why the [g]overnment presented rebuttal evidence to you to indicate that that would continue even in prison. Remember Tony Davis, the BOP officer. Recall Dr. Coons"); id. ("[P]eople can commit violence in the prison system .... *They*'re not foreclosed. *They* still go on"). The government stressed repeatedly that

128

Davis and Coons' testimony "all point specifically to this issue, and this issue only," but identified that issue as "this issue of future dangerousness," not the issue of *Mr. Vialva's* future dangerousness. Mr. Bernard was harmed by his counsel's failure to take appropriate steps to protect him from this "spillover" effect of the government's evidence in aggravation.

Reasonably effective counsel would have objected to these baseless, misleading and prejudicial arguments.

**Mr. Bernard was prejudiced by counsel's deficient performance.**

The prejudice Mr. Bernard suffered as a result of counsel's deficient performance at the penalty phase is most apparent in the stark contrast counsel's errors and omissions permitted the government to draw between the defendants on one hand and the victims on the other. Indeed, the prosecution's entire case at the penalty phase amounted to an extended exercise in contrasting the lives, good qualities, and religious devotion of the decedents with the criminal conduct, bad character, and apparently escalating sociopathy of the defendants. Such a comparison, implicit or explicit, is improper and unfairly prejudicial, and violates the defendant's rights under the Fifth, Eighth, and Fourteenth Amendments. *See* Humphries v. Ozmint, 366 F.3d 266, 272 (4th Cir. 2004) (a "comparative worth argument" that "call[s] for a death sentence based on the relative value of [the defendant's] life versus [the victim's] falls squarely within the category of prosecutorial conduct that may be so prejudicial that it renders a trial fundamentally unfair"). Reasonably effective counsel would have taken appropriate steps by motion and/or objection to preclude the government from making such invidious comparisons and the jury from relying on them in determining punishment. Had Mr. Bernard's attorneys performed effectively, they would have both challenged the government's reliance on improper evidence such as excessive "victim impact" testimony, and presented an affirmative case in

1318

mitigation that would have shown that Mr. Bernard was not a faceless monster but a human being like the Bagleys, albeit a flawed one - and one deserving of mercy.

Mr. Bernard re-alleges all facts set forth in support of his claim that counsel failed to provide effective assistance with respect to the guilt-innocence phase of trial. The prosecution expressly urged the jury to consider, in determining Bernard's sentence, all the evidence from the guilt-innocence phase of trial. T. 3200. The prosecution directed the jury's attention to that evidence because its case for the death penalty for Mr. Bernard depended on its claims about the specific actions he committed in the course of the crime (*e.g.*, that he set the fire that consumed the Bagleys' car). The testimony supporting the government's allegations was offered during the guilt phase through the testimony of cooperating co-defendants Terry Brown and Chris Lewis.

Reasonable counsel would have mounted an aggressive challenge to the credibility of Mr. Brown and Mr. Lewis at the guilt phase. Such an attack - even if it had not resulted in an outright acquittal for Mr. Bernard - would have left the jury full of doubt about Mr. Bernard's specific role in the offense and unpersuaded that his moral culpability was uniquely deserving of death. In that event, it is reasonably likely that at least one juror, having heard the rest of the case in mitigation which reasonable defense counsel would have developed and presented, would have concluded that imprisoning Mr. Bernard for the rest of his natural life was sufficient punishment. In addition, effectively investigating and cross-examining Mr. Brown at the guilt phase would have dramatically undermined his usefulness to the government at the punishment phase, as it would have shown Mr. Brown to be a mentally ill, drug-addled, opportunistic liar.

In much the same fashion, counsel's deficient performance in failing to invoke in a timely manner Mr. Bernard's right to the appointment of a second attorney under 18 U.S.C. §

3005 prejudiced Mr. Bernard with respect to both phases of trial. The support and participation of a second properly qualified attorney would have assisted lead counsel in preparing for the guilt phase of trial. Unreasonably foregoing such readily available and statutorily mandated assistance was even more prejudicial with respect to Mr. Bernard's sentence. The absence of second counsel meant that vitally important mitigating evidence went undeveloped at a time at which it could potentially have persuaded the government not to seek the death penalty, and was unavailable later for the punishment phase.

For all these reasons, Bernard re-alleges as a basis for relief from his death sentence each instance of deficient performance detailed in support of his claim that counsel failed to provide effective assistance at the guilt phase, *and* also alleges the cumulative impact of those instances of deficient performance and the ones that occurred at the punishment phase proper. Courts have recognized that it is impossible to assess the prejudice a defendant suffered at the punishment phase in isolation from the continuing destructive consequences of his counsel's deficient performance at the guilt phase. The prejudice analysis required under <u>Strickland</u> requires the court to consider how the *cumulative* impact of counsel's errors and omissions at *both* phases of trial may have undermined the reliability of the sentencing verdict. <u>Moore</u>, 194 at 619 (rejecting "the premise that deficient performance occurring at the guilt phase of a capital trial may not be deemed to prejudice a capital defendant during the punishment phase of a capital trial;" where same jury decides guilt and punishment, the question is whether the cumulative errors of counsel rendered the jury's findings, either as to guilt or punishment, unreliable"); <u>Cargle</u>, 317 F.3d at 1208 (same, citing <u>Moore</u>); <u>Smith v. Wainwright</u>, 741 F.2d 1248, 1255 (11th Cir. 1984) (failure to impeach witness effectively at guilt phase can prejudice defendant at punishment phase).

As noted, under <u>Strickland</u>, the prejudice inquiry does not focus on whether any

particular piece of evidence would have "tipped the scales," but whether the *cumulative* effect of *all* the mitigating evidence trial counsel failed to develop or present undermines this Court's confidence that all twelve jurors would reach the same sentencing decision. Indeed, in the course of about two pages of the United States Reports, the Strickland court referred at least ten times to the "error*s*" of counsel, in the plural, in describing the appropriate prejudice inquiry. This was no accident. A standard based on the ultimate reliability of the verdict cannot achieve its purpose unless the reviewing court is obliged to weigh the collective impact of all counsel's errors. Thus, this court must consider the *collective* impact of *all* mitigating circumstances trial counsel failed to develop or present (*e.g.*, "turbulent home environment," "successful adjustment to incarceration," "acts of kindness and devotion," and "neuro-cognitive dysfunction," as well as any other mitigating information, in conjunction with the evidence presented at trial) on the jury's ultimate judgment about the appropriateness of a death sentence.

This conclusion is evident from the language and reasoning in Strickland. *See, e.g.*, Wiggins, 539 U.S. at ___, 123 S.Ct. at 2542 ("In assessing prejudice, we reweigh the evidence in aggravation against the *totality* of available mitigating evidence") (emphasis added); Williams, 529 U.S at 397-398 (reviewing court assessing prejudice under Strickland must consider mitigating evidence cumulatively, rather than piece-by-piece); Cargle, 317 F.3d at 1212 (decision to grant relief on ineffective assistance grounds "is a function of the prejudice flowing from all of counsel's deficient performance -- as Strickland directs it to be"); Moore, 194 F.3d at 619 (reviewing court must consider "the cumulative errors of counsel"); Livingston v. Johnson, 107 F.3d 297, 308-09 (5th Cir. 1997) (same); Silva v. Woodford, 279 F.3d 825, 834 (9th Cir. 2002) ("[C]umulative prejudice from trial counsel's deficiencies may amount to sufficient grounds for a finding of ineffectiveness of counsel").

132

Moreover, the law requires that this court's inquiry focus on whether there exists a reasonable probability that *a single juror's* mind could have been changed by the cumulative impact of all the mitigating evidence trial counsel failed to develop and present. *See, e.g.,* Lewis, 355 F.3d at 369 ("had this [mitigating] evidence been produced, it is quite likely that it would have affected the sentencing decision of *at least one juror*") (emphasis supplied); Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993) ("[G]iven the unanimity required at the Louisiana punishment phase, the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of one juror could have been changed with respect to the imposition of the sentence of death"); Loyd v. Smith, 899 F.2d 1416, 1426 (5th Cir. 1990) (before concluding "no prejudice" under Strickland, reviewing court "must be confident that at least one juror's verdict would not have been different had the new evidence been presented"); Foster v. Johnson, 293 F.3d 766, 782 (5th Cir. 2002) (same, citing Loyd). Given the wealth of compelling mitigating evidence Mr. Bernard's attorneys failed to develop and present, that standard is met here. *See* Exhibit 13, Exhibit 17, Exhibit 12 at 80-82.

## V.    PROSECUTORIAL MISCONDUCT DENIED MR. BERNARD A FAIR TRIAL

Prosecutorial misconduct denied Brandon Bernard a fundamentally fair trial.

The government deliberately misrepresented to the jury the credibility, prior statements, and background of its two star witnesses, Christopher Lewis and Terry Brown, while at the same time suppressing, in violation of Brady v. Maryland, crucial impeaching evidence about them. In so acting, the government forgot the admonition that its job is "not to tack as many skins of victims as possible to the wall [but to] vindicate the right of people as expressed in the laws and give those accused of crime a fair trial." Donnelly v. DeChristoforo, 416 U.S. 637, 648-49 (Douglas, J., dissenting).

133

1322

## A.    The Prosecutor's Defense of the Credibility of Brown and Lewis

In closing argument, the prosecutor vehemently defended the credibility of Mr. Brown and Mr. Lewis and vouched for their truthfulness. He argued that their testimony had "the ring of truth about it," that they were "believable," and that the defense "couldn't establish through cross examination of any of the government's witnesses that . . . there were lies or there were doubts or anything like that." T. 2677. The prosecutor derided as unfounded acts of desperation the suggestion that Mr. Brown and Mr. Lewis had "concocted a story" or that the two men had any opportunity to get together to make up a story. Id. He specifically directed the jury's attention to the plea agreement provision that lying "in any way, shape, or form would forfeit the agreement and leave Brown and Lewis to "start all over" facing "more serious charges." T. 2695. This argument was deployed to persuade the jurors that Brown and Lewis had told the complete truth since entering into these agreements. Mr. Frazier conceded that Mr. Brown and Mr. Lewis had lied when first arrested, but, reassured the jurors that they need not be concerned about this because both had told the truth once they decided to cooperate and had told more not just about others but about themselves as well. T. 2696.

As an example of how the jury could see that Mr. Brown and Mr. Lewis told the complete truth, the prosecutor referred to their testimony about how the fire started:

> Now, if Mr. – Terry Brown and Chris Lewis are going to lie about
> their testimony, about what they saw, let's make it a little better
> lie. Why not say they saw Brandon Bernard start the fire? They
> didn't do that, though, did they? They didn't tell you they saw
> him start the fire. . . . But if it was to benefit him [sic], because,
> based on their theory, they're making all this up and they're
> getting their stories together, – which there's no evidence of at all
> – they're putting these together in order to come up with a story,
> why wouldn't he say Brandon Bernard started the fire? It's
> because he didn't see it. Factually, it didn't – he can't relate it
> because he didn't see it happen. Although we all know that's what

1323



the evidence is, he didn't say it.

T. 2693-94.

### B.    The Government Deliberately Misrepresented the Credibility of Brown and Lewis

Aware that the jury had no inkling of the contradictions between what Mr. Brown and Mr. Lewis admitted to when they pleaded guilty or of what the government itself claimed was true when it addressed the court during the guilty pleas for Mr. Brown, Mr. Lewis and Mr. Sparks, the government assured the jury that no reason existed not to believe Mr. Brown and Mr. Lewis. In so doing the government presented a deliberately and materially false impression of the reliability and truthfulness of its two key witnesses.

To convict Mr. Bernard, the government had to rely on the testimony of two co-defendants. The government knew that it did not have other evidence which would corroborate the accounts of Mr. Brown and Mr. Lewis and it knew that their trial testimony contradicted both their initial statements and their under oath statements when they pleaded guilty. The government could have chosen to recognize the obvious: the truth could never be established based on what Christopher Lewis and Terry Brown said. Instead, the government chose to present Mr. Brown and Mr. Lewis as believable and consistent by omitting what they had said was true on other occasions.

When Mr. Frazier evinced unqualified belief in the truth of what Brown and Lewis said at trial, he did so despite not only knowing that their testimony differed in key respects from what they admitted to when they pleaded guilty, but also knowing that he himself had written a statement of "facts" which was not at all what his witnesses had testified to. Just as important, Mr. Frazier made his closing argument knowing that no new facts from other sources could

135

account for the changes in the testimony of Brown or Lewis, and that there was no more reason to believe one version of the story than the other – or, for that matter, to believe either version.

A prosecutor may not lie to the jury. Permissible advocacy does not include making deliberate misrepresentations, even if the misrepresentations involve facts of which the jury is not aware. In the unlikely event that the government genuinely believed that Mr. Brown and Mr. Lewis were telling the truth at trial despite the wholesale changes in their testimony from the time they had pled guilty, it could offer their testimony at trial. However, the government stepped over the line when it presented arguments in support of their credibility knowing that these arguments were not true.

Due process forbids the government from making "knowing use of false evidence." This prohibition includes making knowingly false use of non-testimonial evidence. Miller v. Pate, 386 U.S. 1 (1967); Napue v. Illinois, 360 U.S. 264 (1959); Davis v. Zant, 36 F.3d 1538 (11th Cir. 1994) (reversible error for prosecutor to argue that defendant made up story at last minute blaming co-participant, when prosecutor knew that excluded evidence showed that co-participant had confessed to crime months before); United States v. Valentine, 820 F.2d 565 (2nd Cir. 1987) (denial of fair trial when prosecutor disingenuously created false impression about grand jury testimony not introduced at trial). The prosecutor's conduct is not excused simply because an effective defense could have exposed the prosecutor's misrepresentation. United States v. Mason, 293 F.3d 826 (5th Cir. 2002) (defense counsel's failure to read plea agreement before trial did not relieve prosecutor of duty to correct false testimony about agreement); Valentine, 820 F.2d at 571(even if defense failed to take steps which could have allowed it to refute misrepresentation, the misrepresentation was still reversible error).

Mr. Frazier knew that Mr. Brown and Mr. Lewis had admitted under oath, at the same

time and at a time when their plea agreements were in effect, facts which contradicted their trial testimony in numerous and important ways. He knew that Mr. Brown and Mr. Lewis had agreed under oath that Mr. Bernard set the fire with a match and that he himself had told the Court that the Government would prove this fact at trial with the testimony of Mr. Brown and Mr. Lewis – but that at trial both Brown and Lewis denied knowing how the fire was started or having seen anyone start it. He knew that at their pleas of guilty both Lewis and Brown said that Mr. Vialva had directed the pouring of the lighter fluid and the setting of the fire but that at trial their dramatic accounts of the murders failed to include this information. When Mr. Frazier told the jury that "Brandon Bernard had to have opened the trunk," he knew that both Mr. Lewis and Mr. Brown had stated at their guilty pleas that it was Mr. Vialva who opened the trunk and that Mr. Frost had told the court at Mr. Sparks' guilty plea the same thing not a month before. When Mr. Frazier told the court that there was no evidence of any lies or any reasons to doubt, he knew that Chris Lewis had told the court when he pled guilty that Chris Vialva threw a .22 pistol into the bushes but that Mr. Lewis at trial told the jury that he (Lewis) threw the gun into the bushes.

At the time Mr. Frazier adamantly denied that Mr. Brown and Mr. Lewis had ever had the chance to "concoct" a story, he knew that not only had Mr. Brown and Mr. Lewis been together every day while in jail, but that they had been together when they pleaded guilty and both swore to the truth of an identical statement of facts. When Mr. Frazier stressed to the jury the provision of the plea agreements obliging Mr. Brown and Mr. Lewis to tell the complete truth, and implied in the strongest fashion that the government was satisfied they had done so, he knew that Brown and Lewis had lied either at trial or in their guilty pleas and that in either event they had violated their plea agreements.

Perhaps the most cynical example of the government's willingness to capitalize on what it knew but the jury did not is Mr. Frazier's argument that the jury could be confident that Brown and Lewis were believable because if they wanted to falsely implicate Mr. Bernard, they would have said he set the fire with a match.   Not only is the argument that a witness should be believed because if he wanted to lie he would implicate the defendant prosecutorial misconduct in and of itself (United States v. Martinez-Medina, 279 F.3d 105, 119 (1st Cir. 2002) and cases cited therein), in this case the argument was made with Mr. Frazier fully aware that both Brown and Lewis had previously sworn that Bernard had lit the fire with a match and that the government itself had told the court on two occasions that it would prove this at trial.

The impact of these misrepresentations undermines confidence in the jury's verdict.   The jury considered Mr. Brown's  and Mr. Lewis' testimony unaware of overwhelming evidence that Brown and Lewis must have committed perjury either at their trial or when they pleaded guilty, and unaware that the government had twice in open court promised to prove an entirely different version of events than testified to at trial.   As a result, the jury could not meaningfully assess the credibility of Mr. Brown and Mr. Lewis or critically  evaluate the government's exhortations to believe them.

**C.      The Government Deliberately Misled the Jury About the Criminal Records of Mr. Brown and Mr. Lewis**

The government exacerbated its misconduct by eliciting testimony which created a deliberately false impression about the criminal histories of Mr. Brown and Mr. Lewis

**1.      Terry Brown's  Criminal History  .**

On direct examination of Terry Brown, the government elicited that his criminal history consisted of one juvenile adjudication for a misdemeanor trespass for which he had received

only a minor penalty and for which he was not on any form of parole or probation. T. 1859. The government elicited this information knowing that such an adjudication could not under any circumstances be used to impeach Mr. Brown. FRE 609.

Establishing that Terry Brown had an extremely minor and nonviolent criminal record bolstered the government's case in several ways. It helped to assure the jury that although Mr. Brown was a gang member and an admitted participant in a violent crime, he was not generally so bad or so violent. His lack of prior crimes or violence made the government's deal with Brown more palatable. Mr. Brown's lack of prior violence also made more plausible his claim that when he pointed a gun at the Bagleys and asked if he should kill them, he was not serious about doing so but just trying to verify whether they were in danger from Vialva. By showing that Mr. Brown was not on parole or probation, the government showed that Brown had nothing else hanging over his head which might affect his testimony.

When Mr. Frazier asked Terry Brown about his criminal history, however, he knew that Mr. Brown had admitted in debriefings by government agents that he had (1) committed a drive-by shooting, (2) pointed and pumped a loaded shotgun at a group of people, (3) beaten someone with a sledgehammer, and (4) admitted to committing at least 25 residential burglaries in which he kicked in the doors of homes. Exhibit 21. Mr. Frazier had not revealed any of these admissions to the defense. He also knew that nothing prevented the state of Texas for prosecuting Mr. Brown for these crimes, but that the state had not initiated any prosecutions.

Because of Mr. Frazier's deliberately misleading conduct, the jury gained a false and unwarrantedly benign impression of Mr. Brown's criminal behavior. This misconduct was another part of the government's overarching effort to make the jury believe Brown and Lewis based on misrepresentations about who they were and what they had said.

139

### 2.    Chris Lewis Criminal History

The government also brought out on direct examination Chris Lewis' criminal record, which according to Mr. Lewis consisted of juvenile adjudications for assault with bodily injury. T. 2303. The government sought to minimize the significance of this conviction by eliciting testimony that the offense was really nothing more than "fighting." T. 2304.

Current counsel has not been able to obtain Mr. Lewis' juvenile criminal history records and it appears that the government did not make these records available to the defense. However, at his own sentencing, Mr. Lewis was placed in criminal history category II, meaning that he must have received a sentence of at least 60 days confinement for the assault with bodily injury conviction (assuming the truth of his statement that this is his only criminal history). Petitioner believes that it is extremely unlikely that someone 15 years or younger with no prior criminal history would be adjudicated a felon and receive two months or more confinement for "fighting." Petitioner also does not know what, if any, additional criminal behavior Mr. Lewis admitted to the government but the government concealed from the defense. Petitioner will move for appropriate discovery to further explore the matter of Mr. Lewis' criminal history and record of criminal misconduct.

As with Mr. Brown, the government elicited information about Mr. Lewis' criminal history on direct examination despite his not being subject to impeachment with his record. Juvenile adjudications are generally inadmissible and neither Mr. Vialva nor Mr. Bernard made any motion to have the assault conviction admitted for impeachment. FRE 609 (d). The government did not introduce evidence about Lewis' record to draw the sting of anticipated impeachment but acted instead to improperly burnish Lewis' character and to assure the jury that Lewis was not really a bad person.

140

### D.    Vouching for Mr. Brown and Mr. Lewis By Referring to Plea Agreements

When Mr. Frazier focused the jury on the plea agreement provision that Brown and Lewis would breach the agreement if they lied in any way after signing it (*see, e.g.*, T. 2303), he unmistakably signaled to the jury that in the government's view Brown and Lewis had lived up to the agreement and were telling the complete truth.   This type of vouching is prosecutorial misconduct even when the prosecution has a good faith belief that the witness has adhered to his agreement.   *See* United States v. Francis, 170 F.3d 546, 550-51 (6th Cir. 1999).   In this case, the sharp conflicts between what Brown and Lewis admitted to at their pleas and what they testified to at trial impels the conclusion that the prosecutor knew that Mr. Brown and Mr. Lewis had lied at one proceeding or another or were lying at both. Moreover, Mr. Brown and Mr. Lewis directly contradicted each other at trial about the Long Branch Park incident and about who poured lighter fluid on the car.   In any case, they had not fulfilled their plea agreements and the prosecutor knew it.

### E.    Misleading the Jury About Terry Brown's Eligibility for the Death Penalty

The government had particular and justified concerns about how the jury would perceive the deal offered Mr. Brown.   After all, it was Mr. Brown who, by his own testimony, pointed a gun at the Bagleys and asked if he should kill them,  Mr. Brown who bought lighter fluid,  and Mr. Brown who poured lighter fluid on the car both before and after the murders.   Jurors might well wonder why Mr. Brown should be allowed to plead to reduced charges while Mr. Bernard faced the death penalty when, even under the government's version,  Brown appeared just as culpable.

One avenue the government took to justify  giving  Mr. Brown a deal was to repeatedly contend that Mr. Brown could not get the death penalty.  "As counsel knows, this defendant is

141

not subject to the death penalty." T. 1959. "And did you also learn from your attorney that juveniles, under federal law, cannot be executed?" Id. The court even gave an instruction that Mr. Brown was not subject to the death penalty under federal law.

The government's assertion about Mr. Brown's eligibility for the death penalty was misleading. Mr. Brown was subject to prosecution in Texas state court because the murders took place in a portion of Fort Hood where the state had concurrent jurisdiction. T. 1808. As the government well knew, 17 year olds in Texas can and do receive the death penalty, and nothing prevented the state from pursuing the death penalty against Brown.

In assessing Mr. Brown's motivations for testifying and trying to please the government and in evaluating the government's defense of its decision to offer Mr. Brown leniency, the jury was entitled to know that the state could but had not sought to charge Mr. Brown and pursue the death penalty. Instead, the jury was affirmatively misled into thinking that Mr. Brown had pled guilty to a charge involving the most severe possible maximum penalty and that the death penalty was not an option.

### F.    The Government Suppressed Material Exculpatory Evidence

The government suppressed a tremendous amount of Brady material, despite its representations to the court and the defense that it understood and would comply with its Brady obligations. The Brady violations here are particularly harmful and unacceptable because they relate to the credibility of Mr. Brown and Mr. Lewis The result undermines confidence in the reliability of Bernard's conviction because the defense was deprived of crucial information with which to impeach Mr. Brown and Mr. Lewis.

### 2.    Suppression of Statements Made by Terry Brown to Government
###           Agents

142

1331

The government suppressed statements made by Mr. Brown at a proffer session with government agents on July 26, 1999.   The notes of Mr. Brown's attorney Mr. Rob Swanton show that at the session Mr. Brown said that he  "put lighter fluid in the trunk right after the shooting — then Brandon threw the match through the front window of passengers seat." Ex. 21. The statement that Mr. Bernard threw a match through the front window reveals Mr. Brown to be untruthful, in view of the undisputed evidence at trial that the car windows were rolled up when the fire started.  T 2094.

At the same proffer session, Mr. Brown admitted to being in a fight at a carnival in which he beat a person with a sledgehammer, committing residential burglaries, doing a drive-by shooting in which he shot at a person named "killer," and being in a fight in which he "pumped a shotgun at [the] Willow Springs crowd" but did not shoot.   All of this information bore on Mr. Brown's credibility and undercut the government's portrayal of Mr. Brown as an individual with a minor, non-violent criminal past.

### 4.    Other Statements By Terry Brown

An evidentiary hearing will further show that Mr. Brown met on numerous occasions with prosecutors and that in those meetings he made statements inconsistent with either his sworn statements on plea of guilty and/or his trial testimony.  The government failed to disclose oral statements made by Mr. Brown to government agents that contained exculpatory information.

The notes of Rob Swanton, Mr. Brown's attorney, contain references to apparent meetings between Brown and the government in the months between Brown's guilty plea and the trial. Ex. 21. Yet, so far as undersigned counsel can determine, the government's discovery as provided to Mr. Bernard's trial counsel does not mention any such meetings.   In view of the

143

differences between Mr. Brown's trial testimony and his statement at plea of guilty, it is likely if not certain that Mr. Brown changed his story when talking to agents after the guilty pleas. Such changes in testimony constitute impeachment evidence falling within the scope of Brady.

The government seems to have believed that it could avoid its Brady obligations by choosing not to take written statements from its witnesses if it did not like what the witnesses were saying. However, Brady's requirements are not so easily circumvented. Oral statements of a witness which are exculpatory and known to the government must be disclosed to the defense. See United States v. Hughes, 230 F.3d 815 (5th Cir. 2000) (discussing Brady requirements in context of oral statement of witness to customs agent).

### 5. Failure to Disclose Full Extent of Plea Agreements

The government suppressed off-the-record agreements with both Mr. Brown and Mr. Lewis to consider filing a substantial assistance motion in exchange for their testimony.

The government took great pains to elicit from Mr. Brown and Mr. Lewis that their plea agreements involved crimes which carried a life maximum and that their sentences were strictly up to the court. Moreover, the government represented to the court, the defense, and the jury that the entire benefit that Mr. Brown and Mr. Lewis were to receive from their testimony was the agreement to reduce the charges.

However, the evidence thus far available to undersigned counsel indicates that the government concealed off-the-record agreements that it would consider filing, and in Mr. Lewis' case did file, "substantial assistance" motions pursuant to USSG 5K1.1.

When Mr. Lewis was sentenced, his guideline range was 210-262 months. However, the government filed a U.S.S.G. § 5K1.1 motion which the court granted. Exhibit 23 at 3. The court reduced Mr. Lewis's offense level from 36 to 34, resulting in a new range of 168-210 months,

1333

and sentenced Mr. Lewis to 188 months, the same sentence given Mr. Brown.   The sole reason the government offered for the motion was Mr. Lewis' testimony at the Vialva-Bernard trial

At trial, Mr. Lewis testified that his attorney told him he was looking at anything between one and life.  T. 2424.   In view of the guidelines range for Mr. Lewis' offenses, if Mr. Lewis' attorney did make such a comment, the only reasonable inference is that the government had told him that a substantial assistance motion was possible.

Discovery and an evidentiary hearing will be necessary for this court to determine precisely what occurred in respect to substantial assistance motions for Mr. Lewis and Mr. Brown.   The facts thus far known to Mr. Bernard indicate that the government concealed from the court and the defense oral agreements to consider making substantial assistance motions and that it actually did make such a motion for Mr. Lewis.  The government's deliberate concealment of such agreements prevented the jury from adequately assessing the benefits Mr. Lewis and Mr. Brownstood to receive and their motivation to please the government with their testimony.

### 6.    Statements  of Christopher Lewis

An evidentiary hearing will also show that the government suppressed exculpatory information regarding statements made by Chris Lewis.

Mr. Lewis gave a proffer to the government on July 2, 1999.   The CID report of this interview indicates that Mr. Lewis "omitted several facts concerning the events of 21 Jun 1999 and failed to fully confess his involvement."  Ex. 1 at 276.  The government never furnished to the defense the substance of Mr. Lewis' oral statements at this proffer.   Mr. Lewis gave another proffer on July 6, 1999.   The government did not furnish to the defense any indication of what Mr. Lewis said at this proffer but Agent Chadwick specifically requested that no written statement be taken from Mr. Lewis.  Ex. 1 at 276-77.  An evidentiary hearing will show that Mr.

1334

Lewis made statements at these meeetings which were inconsistent with his testimony at both

Mr. Bernard's trial and/or at Mr. Lewis' own guilty plea hearing.

Mr. Lewis was debriefed by the government on other occasions currently unknown to

Mr. Bernard. At one of these sessions, he evidently told the government that it was Tony Sparks

who threw the .22 into the bushes. Ex. 1 at 750. An evidentiary hearing will show that agents

and prosecutors met with Mr. Lewis on numerous occasions prior to his testimony at trial, that

Mr. Lewis made statements which were inconsistent with his trial testimony and/or his testimony

when he pled guilty, and the government suppressed this exculpatory information.

Discovery and an evidentiary hearing will show that the Government suppressed

evidence relating to Chris Lewis' criminal history, including the underlying facts of Mr. Lewis'

assault conviction. Such evidence would have impeached Mr. Lewis' minimization of his

felony offense as merely involving "fighting."

The court also ordered a psychiatric evaluation for Mr. Lewis in connection with his

proposed transfer to adult court. Petitioner's counsel does not have a copy of this evaluation.

Petitioner believes that the report – like the report of Dr. Shinder's evaluation of Mr. Brown –

contains exculpatory information and will seek its disclosure through discovery.

### 7.    Suppression of Exculpatory Statements from Tony Sparks

An evidentiary hearing will also show that co-defendant Tony Sparks was interviewed by

government agents. A hearing will demonstrate that at one or more such meetings, Mr. Sparks

made statements that exculpated Mr. Bernard, including statements that when the group met at

Long Branch Park, Mr. Bernard was not made aware that Mr. Vialva planned to kill the Bagleys.

The government failed to inform the defense about these exculpatory statements.

### E.   Cumulative Impact of Prosecutorial Misconduct

146

1339

Mr. Bernard's trial was rendered fundamentally unfair because the prosecution deliberately and through a variety of means concealed from the jury crucial information about its two main witnesses. The impact of unrevealed <u>Brady</u> evidence must be examined cumulatively. <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995); <u>United States v. Freeman</u>, 164 F.3d 243, 248 (5th Cir. 1999). Prosecutorial misconduct claims in general are subject to cumulative error analysis. <u>United States v. Herberman</u>, 583 F.2d 222 (5th Cir. 1978) (even though one instance of prosecutorial misconduct might not have impelled reversal, cumulative effect of misconduct denied defendant fair trial); <u>Cargle v. Mullin</u>, 317 F.3d 1196 (10th Cir. 2003).

Here, the cumulative impact of prosecutorial misconduct and the suppressed evidence undermines confidence in the jury's verdict. The prosecution affirmatively urged upon the jury a knowingly false representation with respect to the consistency and reliability of Mr. Brown's and Mr. Lewis' prior statements, concealed crucial evidence which would have impeached their trial testimony and their credibility, and made knowingly false statements about whether they were together prior to trial. The government knowingly misled the jury about their criminal records and about the nature of their plea agreements and whether they had adhered to them. All of the misconduct detailed above had the common goal and effect of making the jury believe beyond a reasonable doubt two witnesses whom the government knew could not tell a straight story.

The misconduct here conflicts with the prosecutor's overriding obligation to see that justice is done. "It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate method to bring about one." <u>Berger v. United States</u>, 295 U.S. 78, 88 (1935), *overruled on other grounds*, <u>Stirone v. United States</u>, 361 U.S. 212 (1960). In this case, the government employed a variety of improper methods and

147

deprived Mr. Bernard of his right to a fair trial and due process.

## VI.    THE COURT FAILED TO COMPLY WITH 18 U.S.C. § 3005

Mr. Bernard did not receive the legal assistance to which he was entitled because the

Court failed to comply with the mandatory provisions of 18 U.S.C. § 3005 and because Mr.

Hunt, Sr., failed to make a timely request for the appointment of second counsel or to advise

Mr. Bernard of his rights under the statute.

### A.    Failure To Appoint Two Counsel Promptly Upon Indictment Is Reversible Error

Section 3005 was violated in at least three ways in Mr. Bernard's case.  First, second

counsel was not appointed until March 9, 2000, after Mr. Hunt, Sr., moved as February 25, 2000,

for appointment of co-counsel.  This appointment came nearly eight months after Mr. Bernard

was originally indicted and shortly after Mr. Hunt, Sr., was informed that the government would

seek the death penalty against Mr. Bernard.   Mr. Bernard was entitled to two counsel, including

one "learned in the law applicable to capital cases," from the time he was indicted for a capital

crime.  Section 3005 takes effect upon indictment and notwithstanding that the government's

decision to seek the death penalty is made later in the proceedings.  *See, e.g.*, United States v.

Boone, 245 F.3d 352, 359 (4th Cir. 2001) (the language of Section 3005 is clear that the

requirement of two attorneys is triggered upon indictment); *see also*  In re Sterling-Suarez, 306

F.3d 1170 (1st Cir. 2002) (construing "promptly" to mean "reasonably soon after the indictment

and prior to the time that submissions are to be made to persuade the Attorney General  not to

seek the death penalty").

The court in Boone recognized that the plain language of Section 3005 "complements the

authorization process for death penalty prosecutions."  Boone, 245 F.3d at 360.  The Attorney

General authorizes all death penalty prosecutions, and prior to that decision defense counsel can present mitigating factors that might persuade the government not to seek the death penalty. Id. "[A]ppointment of a second lawyer helps the defendant during this preliminary process when the investigation into relevant factors and presentment of information to the United States Attorney occurs." Id. *See also* Sterling-Suarez, 306 F.3d at 1173 (construing "promptly" as relating to time of indictment is consistent with the role learned counsel can serve "in making and supporting arguments about mitigating and aggravating factors, primarily made at the stage when the Attorney General is determining whether or not to seek the death penalty . . . ").

In Mr. Bernard's case, the Court did not appoint second counsel until *after* the Attorney General decided to seek the death penalty. The Court's failure to appoint second counsel constitutes *per se* reversible error. *See* Boone, 245 F.3d at 361 n.8 ("harmless error review is not applicable to a violation of 18 U.S.C. § 3005 because § 3005 provides an absolute statutory right to two attorneys . . . . Congress' mandate is unequivocal, and application of harmless error analysis would undermine Congress' clear intent in capital cases." (citation omitted)). *See also* United States v. Vasquez, 7 F.3d 81 (5th Cir. 1993) (mandating reversal upon failure to appoint counsel in a § 2255 proceeding under Rule 8, 28 U.S.C. § 2255, creating statutory right to appointed counsel if an evidentiary hearing is required); United States v. Pena-Gonzalez, 62 F. Supp. 2d 358 (D. P. R. 1999) (defendant denied right to counsel where counsel provided no assistance in connection with preparations for certification hearing before Attorney General because of personality conflicts with defendant; striking death penalty certificate was the only appropriate remedy).

Mr. Bernard's failure to request the appointment of additional counsel at an earlier stage of the proceedings does not affect his entitlement to relief. The court is required to appoint two

149

133

counsel even in the absence of such request, or at least to advise a defendant indicted for a capital crime of his rights under the statute. *See* <u>Smith v. United States</u>, 353 F.2d 838, 845-46 (D. C. Cir. 1965) (failure to advise defendant of his right to two counsel under Section 3005 created a presumption of prejudice; the right to additional counsel in a capital case "should not, of course, be lost solely because of lack of awareness of its existence"). Even if a defendant's rights under the statute might in some cases turn on a request for counsel, under the circumstances of this case no such earlier request was necessary. *See* <u>United States v. Williams</u>, 544 F.2d 1215, 1218-19 (4th Cir. 1976) (court not required to bring statutory right to counsel to attention of defendant, and waiver will be presumed unless there has been a request for two counsel "*or an equivalent circumstance which would clearly demonstrate that the Defendant required additional counsel.*" (footnote omitted; emphasis added)). The need for second counsel was particularly apparent in this case, where several potential mitigating factors were present, such as the defendant's age and the participation of other individuals who may have had an equally culpable if not greater role; where the facts were complex; and where the circumstances of the crime created the likelihood that particular and consistent care would have to be taken to protect the defendants from undue prejudice.

Moreover, by July 21, 1999 two counsel were assigned to represent codefendant Mr. Vialva. This fact strongly suggests the Court should have appointed two counsel in Mr. Bernard's case as well. There is no reason why Mr. Bernard was not at least equally deserving of, and in need of, qulified co-counsel.

In any event, Mr. Bernard is entitled to relief because Mr. Hunt, Sr.,'s failure to request the appointment of co-counsel at an earlier stage of the proceedings or to inform Mr. Bernard of his right to have a second counsel appointed promptly after indictment constitutes ineffective

1339

assistance of counsel. Although Mr. Hunt, Sr., was advised by letter dated August 17, 1999, that based on the information then available, the United States Attorney intended to recommend to the United States Attorney General that the death penalty be sought, Mr. Hunt, Sr., did not seek appointment of co-counsel until February 25, 2000. In his belated motion Mr. Hunt, Sr., himself recognized the importance of the authorization process:

> [I]t creates another forum in which defense counsel must advocate on behalf of the client facing a possible death sentence. One of Defense counsel's most important functions is to present information first to the local U.S. Attorney and then to the Justice Department that would justify a lesser sentence. Effective advocacy requires counsel to explore all of the issues that are likely to enter into the Attorney General's decision whether to authorize a federal death penalty prosecution, including the nature and strength of the federal interest, the evidence of guilt, and the aggravating and mitigating factors.

*See also* <u>Boone</u>, 245 F.3d at 360 (describing authorization process).

The prejudice to Mr. Bernard from Mr. Hunt, Sr.,'s failure to invoke Section 3005 at an earlier stage is apparent. Despite the critical importance -- which Mr. Hunt, Sr., himself recognized -- of attempting to persuade first the United States Attorney and then the United States Attorney General not to seek the death penalty, Mr. Hunt, Sr.,'s efforts in this regard were woefully inadequate. For example, in response to the United States Attorney's written invitation to Mr. Hunt, Sr., on August 17, 1999 that he make a written submission with supporting documentation addressing why the death penalty should not be sought, Mr. Hunt, Sr., sent a letter less than two pages long asserting in conclusory terms and without supporting documentation that Mr. Bernard was not the instigator or leader and that he tried to persuade the shooter, Mr. Vialva, to release the victims. It is unclear what Mr. Hunt Sr. did to prepare for his telephone conference with attorneys from the Justice Department in Washington, D.C. but the

151

inadequacy of his preparation is clear. *See* Section II *supra*, describing Mr. Hunt, Sr.,'s efforts on Mr. Bernard's behalf during the authorization process, including his failure to conduct investigation or hire appropriate experts.

It does not appear that Mr. Hunt, Sr., offered any information relevant to those factors which might have persuaded the Attorney General to forego the death penalty even though ample evidence was available to him or could have been developed. *See generally* Boone, 245 F.3d at 360 (statutory right to second counsel helps defendant during the authorization process for death penalty prosecutions, when investigation into relevant factors and presentment to Attorney General occurs); Sterling-Suarez, 306 F.3d at 1173 (whether or not the preliminary submissions to the Attorney General constitute a "critical" stage of the proceedings for Sixth Amendment purposes, there is a statutory right to counsel and opportunity for learned counsel to persuade the Attorney General); Pena-Gonzalez, 62 F. Supp. 2d at 361 (hearing before Attorney General "requires many elements of preparation, each of which is time-consuming").

Further, had second counsel been appointed promptly as required by statute, trial counsel would have been better prepared for the penalty phase, where arguments about mitigating and aggravating factors also are made. *See* Sterling-Suarez, 306 F.3d at 1173. *See also* Smith, 353 F.2d at 845 (by enacting section 3005 Congress "meant to insure that a sufficient number of attorneys would be appointed so the defense would not suffer from insufficient manpower" (citation omitted)). An evidentiary hearing will show that Mr. Bernard was never informed of his statutory right to have second counsel appointed promptly upon indictment, that he would have invoked that right if he had been properly advised, and that he was prejudiced by the absence of such appointment.

**B.     The Court's Failure to Consult With The Federal Public Defender Violates**

152

**Section 3005**

Section 3005 also was violated because the Court never consulted with the Federal Public Defender prior to appointing either Mr. Hunt, Sr., or Mr. Hunt, Jr.   The statutory requirement that the Court consider the recommendation of the Federal Public Defender organization is mandatory ("the court shall consider the recommendation of the Federal Public Defender organization." (emphasis added)).   The attached affidavit from Lucien B. Campbell, the Federal Public Defender for the Western District of Texas, shows that Mr. Campbell was never consulted by this Court.[8]  Exhibit 26.

The input provided by the Federal Public Defender is critical to Section 3005's statutory entitlement to counsel.  *See* Sterling-Suarez, 306 F.3d at 1173 & n.2.   Consultation with the Federal Public Defender ensures not only that qualified counsel are appointed but also that counsel have the ability and desire to provide the intensive and extensive representation required in a capital case.   The Federal Public Defender may be uniquely suited to help select counsel because of his knowledge of available counsel and his ability to consult with other defender organizations to locate qualified and committed counsel.  *See* United States v. Miranda, 148 F. Supp. 2d 292, 296-97 (S.D.N.Y. 2001) (Guide to Judiciary Policies and Procedures recommends that Federal Public Defender consult with counsel, if already appointed, and the court about the case, and consider the standards set forth in 28 U.S.C. § 848(q) and 18 U.S.C. § 3005, standards

---

[8] If the government disputes whether the Court consulted with the Federal Public Defender, an evidentiary hearing would be necessary, and it may also become necessary at that point to consider whether this Court must recuse itself from adjudicating Mr. Bernard's 2255 petition.  The possibility that recusal may be required may also arise if there is a dispute regarding other material issues relating to the Court's compliance with Section 3005, such as the Court's reasons for appointing two counsel for the co-defendant, Mr. Vialva, but not for Mr. Bernard.

1342

endorsed by bar associations, the recommendations of other defender organizations, proposed counsel's commitment to the defense of capital cases, and proposed counsel's availability and willingness to accept the appointment "and to represent actively the interests of the client").

### C.    The Failure To Appoint "Learned" Counsel Violates Section 3005

Section 3005 was violated in yet a third way: neither Mr. Hunt, Sr., nor Mr. Hunt, Jr., was "learned in the law applicable to capital cases." The statute requires that at least one of the two counsel appointed be so qualified. In determining whether counsel satisfies this requirement, the court should consider whether counsel has "distinguished prior experience in the trial, appeal, or post-conviction review of federal death penalty cases, or distinguished prior experience in *state* death penalty trials, appeals or post-conviction review that, in combination with co-counsel, will assure high quality representation." Spencer Report[9] Recommendation 1(b). *See also* United States v. Miranda, 148 F. Supp. 2d 292 (discussing factors court should consider in appointing counsel in federal capital case); In re Sterling-Suarez, 323 F.3d 1, 6 (1st Cir. 2002) (Torruella, J., dissenting from majority's dismissal of motion to enforce mandamus following district court's appointment of the Federal Public Defender as lead counsel in death penalty case despite Defender's argument that he was not qualified and that the appointment would unduly strain the limited resources of his office; quoting American Bar Association study explaining that the "complex death penalty procedures articulated by § 3591, *et seq.*, require that counsel 'be knowledgeable about a complex body of constitutional law and unusual procedures that do not apply in other criminal cases.'" (citation omitted)).

Neither of Mr. Bernard's trial counsel was "learned in the law applicable to capital

---

[9] The Spencer Report is described in Section II, *supra*. Its recommendations were adopted by the Judicial Conference of the United States on September 15, 1998.

1343

cases." Counsel believes an evidentiary hearing will show, among other deficiencies, that neither counsel had received training in federal death penalty cases even though training was available.

### D.    The Court's Failure To Comply With Section 3005 Mandates Reversal

The Court's failure to consult with the Federal Public Defender prior to appointing counsel and his appointment of counsel who were not "learned in the law applicable to capital cases" constitute reversible error. The purpose of Section 3005 is to guarantee that a defendant charged with a capital crime receive effective representation from counsel able and willing to defend a federal capital case. *See* Sterling-Suarez, 306 F.3d at 1173 (being learned in the law applicable to capital cases is "especially useful in making and supporting arguments about mitigating and aggravating factors, primarily made at the stage when the Attorney General is determining whether or not to seek the death penalty and (still later) when the jury is determining the sentence"). This purpose is served through the statutory requirements that the defendant in a capital case be assigned two counsel, that at least one such counsel have experience in capital cases, and that the court consult with the Federal Public Defender organization (or the Administrative Office of the United State Courts if there is no Federal Public Defender in the district). In the absence of strict compliance with all of these requirements, the defendant in a federal capital case is denied his statutory right to competent counsel and he is entitled to a new trial without a showing of prejudice. *See* Boone, *supra*. The capital defendant's right to counsel must be scrupulously observed. Caldwell v. Mississippi, 472 U.S. 320, 323 (1985) (heightened need for reliability that death is appropriate punishment).

Even if a showing of prejudice is required, however, an evidentiary hearing will demonstrate that Mr. Bernard was prejudiced by, among other things, counsel's inadequate and

hasty attempts to persuade the government not to seek death penalty despite having been informed in mid-August 1999 that the United States Attorney intended to recommend that the Attorney General authorize the death penalty. Moreover, although this was a fairly complex case involving multiple alleged participants, counsel spent very little time in pretrial preparation, thereby demonstrating in dramatic fashion a lack of commitment to Mr. Bernard's case whether because of unavailability or disinterest or both. According to the Spencer Committee, the average number of attorney out-of-court hours in federal capital cases proceeding to trial is 1,480.

As described above, multiple instances of deficient representation marred the pretrial, guilt and penalty phases of Mr. Bernard's case, all of which prejudiced him. The Court's failure to comply with Section 3005 in the appointment of counsel entitles Mr. Bernard to relief.

**VII. JUROR CALVIN KRUGER, WHO WAS THE FOREPERSON OF THE JURY THAT CONVICTED MR. BERNARD AND SENTENCED HIM TO DEATH, WAS ACTUALLY BIASED AGAINST MR. BERNARD, DENYING MR. BERNARD HIS SIXTH AMENDMENT RIGHT TO AN IMPARTIAL JURY.**

On his juror questionnaire, Calvin Kruger, juror 126, stated "No" in response to question 86. Question 86 asked, "Have you, your spouse, any family member, or close friend ever been accused, arrested, indicted, charged by any means, or convicted (including probation, deferred adjudication, conditional discharge, etc.) of a crime other than a traffic ticket?" Exhibit 27. Mr. Kruger signed the questionnaire declaring "under penalty of perjury" that the information it contained was "true and correct." Id.

Mr. Kruger's answer to question 86 was false. In fact, Mr. Kruger had twice been convicted of driving under the influence (DUI): once in January, 1977, in McLennan County, and once in October, 1994, in Ellis County. Mr. Kruger intentionally concealed his two prior

1345

convictions because he had an actual bias against Mr. Bernard and wanted to get onto the jury. He not only made it onto the jury, but was the foreperson. Mr. Bernard was thus denied his Sixth Amendment right to an impartial jury.

In McDonough Power Equipment, Inc. v. Greenwood, 464 U.S. 548, 556 (1984), the Supreme Court held that a party may "obtain a new trial...[upon proof] that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for challenge for cause." Though McDonough involved a civil suit, the Fifth Circuit applied McDonough to criminal cases in United States v. Scott, 854 F.2d 697, 699 (5th Cir. 1988) (juror's failure to disclose fact that his brother was a deputy sheriff reveals bias and entitles defendant to new trial under McDonough.) *See also id.* at 699 ("Certainly, when possible non-objectivity is secreted and compounded by the untruthfulness of a potential juror on voir dire, the result is the deprivation of the defendant's right to a fair trial.") (quoting United States v. Perkins, 748 F.2d 1519, 1533 (11th Cir 1984), (quoting United States v. Bynum, 634 F.2d 768, 771 (4th Cir. 1980))).

Courts that have addressed the issue are in broad agreement that a juror's dishonesty during voir dire – measured by an untruthful response to a specific inquiry – is strong evidence of impermissible bias and can establish the basis for relief. *See, e.g.*, United States v. Boney, 977 F.2d 624, 633-34 (D.C. Cir. 1992) (hearing into possible bias required where juror failed to acknowledge prior felony conviction on juror qualification form; juror's lack of candor "presents serious … concerns," because it "raises at least the inference that the juror had an undue desire to participate in a specific case, perhaps because of partiality"); Dyer v. Calderon, 151 F.3d 970, 982 (9th Cir. 1998) (*en banc*) ("the individual who lies in order to improve his chances of serving has too much of a stake in the matter to be considered indifferent"); Burton v. Johnson, 948 F.2d

157

1346

1150 (10th Cir. 1991) (Juror's failure to disclose history as abuse victim in prosecution of woman who allegedly murdered abusive husband warrants habeas relief); United States v. Colombo, 869 F.2d 149 (2nd Cir. 1989) (juror who fails to disclose fact that brother-in-law was attorney for the government is presumptively biased against accused; case remanded for evidentiary hearing); Rogers v. McMullen, 673 F.2d 1185, 1189 (11th Cir. 1982) ("a state criminal defendant who can demonstrate that a member of the jury which heard his case was biased ... is entitled to federal habeas corpus relief"); McCoy v. Goldston, 652 F.2d 654, 659 (6th Cir. 1981) ("A district judge shall presume bias where juror deliberately concealed information").

Mr. Bernard is entitled to a hearing on this issue and is entitled to relief from his conviction and death sentence.

## VIII. THE FEDERAL DEATH PENALTY, AS APPLIED, VIOLATES THE FIFTH AND EIGHTH AMENDMENTS.

More than a decade ago, the federal death penalty was reintroduced; in the four years since Mr. Bernard was indicted in this matter, it has been used as a tool of federal law enforcement with escalating frequency. Statistics maintained by the Federal Death Penalty Resource Counsel (FDPRC), an arm of the Defender Services Division of the Administrative Office of the United States Courts, as a part of its mandate to facilitate the effective defense of federal capital cases, demonstrate that the authorization process by which the Department of Justice (DOJ) selects those defendants who will face the death penalty, and subsequent Government decision-making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the defendant's race, in violation of equal protection and the Fifth and Eighth Amendments. *See* Exhibit 28 (Affidavit of Kevin McNally). The statistics maintained by FDPRC indicate the following:

1347

Of the six hundred eighty-two (682) defendants reviewed under the death penalty decision-making procedures of the Department of Justice in the period 1995-2000, 134 (twenty percent) were white, 324 **(forty-eight percent)** were African-American, and 195 (twenty-nine percent) were Hispanic. Id.

A supplemental report by the DOJ identified a broader pool of cases involving 973 defendants; of that larger pool, 408 **(forty-two percent)** were African-American. Id.

Three hundred eighteen (318) defendants have been authorized by the DOJ for a capital prosecution. Of these, 164 **(fifty-two percent)** have been African-American. Id.

In the overall pool of defendants reviewed by Attorney General Ashcroft, there are 199 African-American defendants, representing **forty-five percent** (45%) of the total. Id.

The chances of an African-American's facing the death penalty after having his or her case reviewed by Attorney General Ashcroft are **twenty-nine percent** (29%); for all other defendants, the chances are twenty-two percent (22%). Id.

**Fifty-two percent** (57 of 109) of the defendants Attorney General Ashcroft has authorized for a capital prosecution have been African-American. Id.

Of those 109, Attorney General Ashcroft has required capital prosecutions (*i.e.*, has insisted that local prosecutors, against their judgment, seek the death penalty) for 41 defendants. Twenty-six **(63%)** of those defendants have been African-American. Id.

Of the 38 defendants who have been sentenced to death in federal court since 1988, twenty-three **(61%)** have been African-American. Id.

Of the 30 defendants currently on the federal death row, 20 **(67%)** are African-American.

These numbers create a startlingly strong inference that government decisions regarding who will face the death penalty are impermissibly influenced by the race of the defendant. The

159

disparate impact of these decisions is clear - despite the fact that whites are arrested for homicide in roughly the same numbers as blacks, African-Americans account for *nearly seventy percent* of the federal death row.

Given these statistics regarding the application of the federal death penalty, it is no longer possible to dismiss this claim on the basis that the "small" number of cases renders statistical disparities inconsequential. The Supreme Court has held that a court may not infer from broad statistical studies involving different decision-makers (*i.e.*, prosecutors, judges, or juries across an entire state) that the decision to seek or impose the death penalty in a particular case was based on a racially discriminatory motive. McCleskey v. Kemp, 482 U.S. 920 (1987). However, McCleskey can be distinguished from the situation presented here. A single decision-maker - the Attorney General of the United States - is responsible for each and every decision to seek the death penalty in a court of the United States. This distinction alone renders the numbers revealed by the attached statistics all the more probative of discrimination. The Court should grant relief from Mr. Bernard's death sentence because the government's charging and plea practices are influenced by the race of defendants and homicide victims, in violation of the Fifth, Eighth, and Fourteenth Amendments.

Additionally, the infrequent use of the federal death penalty means that the federal death penalty is unconstitutional under binding existent precedent. In Furman v. Georgia, 408 U.S. 238 (1972), the key to the decision was the Justices' conclusion that the death penalty was imposed only very rarely. All five Justices focused on the infrequency of death sentences and executions. Furman , 408 U.S. at 248 n.11 (Douglas, J., concurring); id. at 291-95 (Brennan, J., concurring); id. at 309-10 (Stewart, J., concurring); id. at 313 (White, J., concurring); id. at 354 n.124, 362-63 (Marshall, J., concurring). The Justices believed that only fifteen to twenty percent of convicted

1349

murderers who were death-eligible were being sentenced to death. Chief Justice Burger, writing for the four dissenters, adopted that statistic, citing to four sources. Furman, 408 U.S. at 386 n.11 (Burger, C.J., dissenting). Justice Powell, also dissenting, cited similar statistics. Id. at 435 n.19 (Powell, J., dissenting). Justice Stewart, in turn, cited to the Chief Justice's statement as support for his conclusion that the imposition of death was "unusual." The key opinions in Furman were those of Justices Stewart and White, who "focused on the infrequent and seeming randomness with which, under the discretionary state system, the death penalty was imposed." Walton v. Arizona, 497 U.S. 639, 658 (1990) (Scalia, J., concurring) .

In Gregg, the plurality reiterated this understanding: "It has been estimated that before Furman less than 20% of those convicted of murder were sentenced to death in those States that authorized capital punishment." Gregg v. Georgia, 428 U.S. 153, 182 n.26 (1976) (plurality opinion). The plurality relied on the same statistic in Woodson v. North Carolina, 428 U.S. 280, 295 n.31 (1976) (plurality opinion).

In contrast, the contemporary federal death penalty is rarer still, being authorized by the Attorney General in only about seventeen percent (17%) of the cases in which it could have been sought (318 defendants authorized out of a pool of 1,845 potential capital defendants). Exhibit 29. The federal death penalty thus is unconstitutional as applied under the binding precedent of Furman v. Georgia, supra, because of the extraordinary infrequency with which it is used.

In addition, the federal death penalty is applied arbitrarily and in violation of the Eighth Amendment because of the geographical distribution of federal capital prosecutions since 1988. Of the 318 defendants authorized since 1988, more than a third (121) were authorized to be brought in the states of the old Confederacy (Alabama, Arkansas, Florida, Georgia, Louisiana, Mississippi, North Carolina, Tennessee, Texas, and Virginia). Exhibit 29. Another nineteen (19)

161

1356

were authorized in the "border states" of Kentucky, Maryland, and Oklahoma. This pattern reveals that the federal death penalty is not being administered evenhandedly around the country. Such geographical maldistribution is quintessentially arbitrary and capricious, and therefore violates equal protection and the Fifth and Eighth Amendments.

## IX. THE INDICTMENT IN THIS CASE VIOLATED THE FIFTH AMENDMENT.

The Federal Death Penalty Act (FDPA) requires that the trial jury find both that the defendant acted with a particular culpable mental state and that at least one statutory aggravating factor has been proven beyond a reasonable doubt before he may be sentenced to death (*i.e.*, is "death eligible"). *See* 18 U.S.C. §§ 3591(a)(2) (requisite mental state), 3592-3593 (no death sentence unless at least one aggravating factor is found). Under the reasoning of Ring v. Arizona, 536 U.S. 584 (2002), the Fifth Amendment requires that the indictment in a federal capital prosecution allege these "gateway" mental state factors or any aggravating circumstances.

The Fifth Circuit resolved this issue against Mr. Bernard on his direct appeal. Bernard, 299 F.3d at 488 ("Ring did not hold that indictments in capital cases must allege aggravating and mental state factors"). Mr. Bernard respectfully submits that this holding is impossible to reconcile with the Supreme Court's acknowledgment in Ring that aggravating factors in a capital case operate as the "functional equivalent" of elements of the offense, and its recent affirmations that the Fifth Amendment requires all elements of a federal offense to be "*charged in the indictment*, submitted to a jury, and proven by the Government beyond a reasonable doubt." Jones v. United States, 526 U.S. 227, 251-52 (1999) (emphasis added). Because the Supreme Court has not spoken to this issue since Ring, and because when it does Mr. Bernard believes its holding will demonstrate that the indictment in this case was constitutionally defective, we raise this challenge here to preserve the issue for further review.

162

## X. THE LETHAL INJECTION OF MR. BERNARD UNDER THE PROTOCOLS CURRENTLY IN FORCE IN THE UNITED STATES BUREAU OF PRISONS AND ANY SIMILAR PROTOCOLS WOULD VIOLATE THE EIGHTH AMENDMENT.

The Government proposes to execute Mr. Bernard by lethal injection. Lethal injection by the protocols currently in force, or any similar protocols, violates the Eighth Amendment.

Although Mr. Bernard raises his objection to lethal injection in this 2255 motion, Mr. Bernard believes an action under Title 42, section 1983 of the United States Code, is the appropriate remedy to challenge the method of execution. *Cf.* Preiser v. Rodriguez, 411 U.S. 475, 498-99 (1973); *see also* Nelson v. Campbell, No. 03-6821, __ S. Ct. ___, 2004 WL 1144374 (May 24, 2004) (holding method of execution claims which do not result in invalidation of execution methodology may be raised in 1983 actions, but not deciding whether claims that result in permanent injunctions or bars of execution would require presentation as habeas claims).

This claim is similar to challenges to the accused's competency to be executed. The Supreme Court has held those claims may be preserved by raising them in an initial habeas corpus proceeding, although resolution of the issue is deferred appropriately to a subsequent proceeding. Stewart v. Martinez-Villareal, 523 U.S. 637, 643-44 (1998). Mr. Bernard believes he is entitled to relief on the other claims in his Motion and this issue will be rendered moot as this Court rules on those other claims.

The Bureau of Prisons' lethal injection protocols create a substantial risk that Mr. Bernard will consciously suffocate and/or suffer excruciating pain as he is put to death. The principal reason for this concern is that there is no assurance the protocol used by the Bureau of Prisons will render and maintain Mr. Bernard unconscious while suffocating and painful drugs are injected to cause his death. Such failures appear to have occurred during lethal injection

163

procedures across the nation and, under the current procedures used by the Bureau of Prisons, there is a reasonable likelihood that they will occur again during Mr. Bernard's execution.

The Eighth Amendment proscribes the infliction of unnecessary pain in the implementation of a sentence of death. Estelle v. Gamble, 429 U.S. 97, 102 (1976) (Eighth Amendment prohibits "physically barbarous punishments"); Hope v. Pelzer, 536 U.S. 730, 738 (2002) (Eighth Amendment prohibits "unnecessary pain" and conduct that "create[s] a risk of particular discomfort and humiliation").  Any evidentiary hearing will show that the methods employed by the Bureau of Prisons for executing prisoners risk unnecessary pain, torture and lingering death, and thus violate the Constitution.

## XI. MR. BERNARD IS ENTITLED TO RELIEF FROM HIS CONVICTION AND SENTENCE ON THE GROUND THAT CUMULATIVE ERROR INFECTED THE JUDGMENT.

The combination of constitutional and statutory violations in this case resulted in a profoundly unreliable trial and sentencing process which cannot satisfy the Fifth or Eighth Amendments or 18 U.S.C. § 3595(c)(2)(A). Caldwell v. Mississippi, 472 U.S. 320, 340 (1985); see also Gardner v. Florida, 430 U.S. 349, 359 (1977) ("consideration must be given to the quality, as well as the quantity," of the information on which the judgment rests).  Mr. Bernard is entitled to a new trial and/or sentencing hearing under the doctrine of cumulative error even if the court finds that any of the errors enumerated above, standing alone, did not alone result in an unreliable or arbitrary conviction or sentence. Guidroz v. Lynaugh, 852 F.2d 832, 837-38 (5th Cir. 1988); see also Cargle v. Mullin, 317 F.3d 1196, 1220-21 (10th Cir. 2003) (granting habeas relief on basis of cumulative effect of errors including Brady violations and instances of ineffective assistance of counsel).

### PRAYER FOR RELIEF

Wherefore, petitioner Brandon Bernard respectfully moves this Court to:

1. Vacate his conviction and death sentence;

2. Permit Mr. Bernard sufficient time to file such amendments to this Motion as may be necessary to bring all proper matters before this Court and ensure a reliable and fair resolution of his claims for relief;

3. Grant Mr. Bernard an evidentiary hearing on all claims raised herein;

4. Grant Mr. Bernard leave to pursue such discovery as may be necessary to fully develop the facts in support of his claims for relief; and

5. Grant such other relief as may be appropriate.

Respectfully submitted,

ROBERT C. OWEN
TEXAS BAR NO. 15371950
OWEN & ROUNTREE, L.L.P.
P.O. BOX 40428
AUSTIN, TEXAS 78704
512-804-2661 voice
512-804-2685 fax

ROBERT H. GOMBINER
FEDERAL PUBLIC DEFENDER
1601 FIFTH AVENUE, STE. 700
SEATTLE, WASHINGTON 98101
206-553-1100 voice
206-553-1027 fax

COUNSEL FOR PETITIONER
BRANDON BERNARD

1354

ROBERT H. GOMBINER
FEDERAL PUBLIC DEFENDER
1601 FIFTH AVENUE, STE. 700
SEATTLE, WASHINGTON 98101
206-553-1100 voice
206-553-1027 fax

COUNSEL FOR PETITIONER
BRANDON BERNARD

BY: _____

## CERTIFICATE OF SERVICE

This is to certify that I have caused a true and correct copy of the foregoing Motion to be served on counsel for the government by having the same sent via United States Mail, first-class postage prepaid, addressed to:

AUSA Mark Stelmach
816 Congress Avenue, Suite 1000
Austin, TX    78701

On the 6th day of December, 2004.

_____

1355

# EXHIBIT 30

| Inmate Name | Brown  Terry | | | County | by US Marshall |
|---|---|---|---|---|---|
| Allergic Reactions | | Booking Number | Cell Number | Attending Physician | |

| Date Ordered | Date Discontinued | ORDERS |
|---|---|---|
| 3/13/00 | | 1) Depakote 250mg ī PO @ HS c̄ |
| | | Depakote 500mg ī PO @ HS |
| | | 2) Wellbutrin SR 150mg ī PO BID |
| | | |
| | | |

| Signature of Nurse Receiving Order | | Time | Signature of Physician | US Marshall Date |
|---|---|---|---|---|

ORIGINAL COPY - Inmate file

approved in full ER

| Inmate Name | Brown, Terry | | | County | |
|---|---|---|---|---|---|
| Allergic Reactions | | Booking Number | Cell Number | Attending Physician | |

| Date Ordered | Date Discontinued | ORDERS |
|---|---|---|
| 3-11-00 | | Prevident toothpaste  1-tube  No Refill |
| | | Phiso Hex - scrub face once daily. No Refill. |
| | | Gel - Kam. oral rinse - No Refill. |
| | | Ibu 800mg ī Q 6°. (#24) No Refill |

| Signature of Nurse Receiving Order | | Time | Signature of Physician | Date |
|---|---|---|---|---|

ORIGINAL COPY - Inmate file

1357

Case 6:99-cr-00070-ADA   Document 416   Filed 12/08/04   Page 168 of 202

1358

US Marshall approved

**B.C.J. MEDICATION RECORD**

| DATE | NAME | CELL NO. | DOCTOR |
|------|------|----------|--------|
| 3/14/00 | Brown, Terry | D# 2 | |
| | Wellbutrin SR 150mg ī PO BID | | |
| | Depakote 250mg ī @ HS c̄ | | |
| | Depakote 500mg ī @ HS | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Case 6:99-cr-00070-ADA    Document 416    Filed 12/08/04    Page 169 of 202

1358

INMATE: Brown Terry    CELL: D#2    MONTH: March '00
NURSE: J. Kelley LVN    J. Sweet LVN    E. [illegible] M
OFFICER: _____    _____    K. Zavek LVN

| MEDICINE | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wellbutrin SR | AM | | | | | | | | | | | | → | → | → | JK | EW | JK | EW | EW | EW | EW | JK | EW | EW | JK | EW | EW | JK | EW | JK | JK |
| 150mg | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| ī BID | PM | | | | | | | | | | | | → | → | JK | EW | EW | EW | EW | JK | EW | EW | EW | JK | EW | EW | EW | JK | EW | | | |
| DEPAKOTE | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 250mg ī @ HS | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 500mg ī @ HS | PM | | | | | | | | | | | | → | → | JK | EW | EW | EW | EW | JK | EW | EW | EW | JK | EW | EW | EW | JK | EW | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

Case 6:99-cr-00070-ADA    Document 416    Filed 12/08/04    Page 170 of 202

1300

**IMATE:** Brown, Terry    **CELL:** D-2    **MONTH:** April 2000

**URSE:** J. Kelly LVN    Elvira Pearson    K. Fauer LVN

**FFICER:** _____



| MEDICINE | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wellbutrin | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SR 150mg | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Bid | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Depakote | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 750mg | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| @HS | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

Case 6:99-cr-00070-ADA   Document 416   Filed 12/08/04   Page 171 of 202

1301

ATE: ____ Brown, Terry    CELL: D7 2    MONTH: May 2000

SE: J. Kelly LVN        Elvira Reeves LVN    K. Farrell LVN

ICER: ____



| MEDICINE | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wellbutrin | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| SR 150mg | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| BID | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| DEPAKOTE | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 750mg | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| @ HS | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | AM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | N | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| | PM | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | | |

FAX 254-150 1313

## REQUEST FOR MEDICAL / DENTAL TREATMENT     US/Marshall

FACILITY: _____Bell Co Jail_____     DATE: _3-14-2000_

Contact Person: _Ellwestr_     Phone #: _254)9335455_

INMATE NAME: _Brown Terry_     Reg. No.: _91907080_

PRD: _____

MEDICAL SERVICE(S) REQUESTED: T/m Transferred from Juvenile Detention Center
with continuous orders for : 1) Wellbutin SR 150mg one twice
daily and 2) Depakote 250mg one bedtime; 3) Depakote 500mg one
at bedtime - 1)Wellbutin $91.65/month 2)Depk 250mg $26.60/m
3)Depk 500mg $49.05/mo

Estimated Cost(s): _$167.30/MONTH_     Circle Category: ((1))   (2)   (3)   (4)

Request for: ___Drs Exam   ___Dental   ___X-ray   ___Lab   _✓_Other

CAT 1=MED MANDATORY
CAT 2=MED NECESSARY
CAT 3=NON-MED MANDATORY
CAT 4=I/M CONVENIENCE

### DO NOT WRITE BELOW THIS LINE

## RESPONSE TO REQUESTS FOR REIMBURSEMENT OF
## EMERGENCY MEDICAL TREATMENT

faxed 3/14/00 EP

REIMBURSEMENT:     ___APPROVED     ___DENIED

COMMENTS: _____

_____

_____

Reviewed by ▮ _____

Date

1362

MAR.-14'00(TUE) 14:17   US MARSHAL SERV WACO          TEL:254 7� 1575          P.002

FROM : BELL CO INFIRMARY          FAX NO. : 254 9335132          Mar. 14 2000 02:02PM P2

fax 254-750-1575

## REQUEST FOR MEDICAL/DENTAL TREATMENT

FACILITY: _Bell Co Jail_          DATE: _3-14-2000_

Contact Person: _Edwards_          Phone #: _254) 9335455_

INMATE NAME: _Brown Terry_          Reg. No.: _91907080_

PID: _____

MEDICAL SERVICE(S) REQUESTED: Transferred from Juvenile Detention Center
T/m ___ with continuous orders for : ① Wellbutrin SR 150mg one twice
daily and ② Depakote 250mg tru bedtime, ③ Depakote 500mg one
at bedtime. ① Wellbutrin $91.65/month ② Dept 250mg $26.60/m
③ Dept 500mg $49.05/mo

Estimated Cost(s): _$167.30/month_   Circle Category: ① ② ③ ④

Request for: ___ Drs Exam ___ Dental ___ X-ray ___ Lab ✓ Other

CAT 1=MED MANDATORY
CAT 2=MED NECESSARY
CAT 3=NON-MED MANDATORY
CAT 4=J/M CONVENIENCE

### DO NOT WRITE BELOW THIS LINE

## RESPONSE TO REQUESTS FOR REIMBURSEMENT OF
## EMERGENCY MEDICAL TREATMENT

REIMBURSEMENT:   ✓ APPROVED          ___ DENIED

COMMENTS: _____

Reviewed by ___   _3-14-00_          _Linda K Cask_
                   Date

1363

APR. -17' 00 (MON) 13:14    US MARSHAL SERV WACO         TEL:254 750 1575         P. 003

FROM : BELL CO INFIRMARY        FAX NO. : 254 9335132       Apr. 17 2000 12:48PM P2

## REQUEST FOR MEDICAL / DENTAL TREATMENT

FACILITY: _Bell Co. Jail_                      DATE: _4-15-00_

Contact Person: _O Kelly WN_                   Phone #: _(254) 933.5455_

INMATE NAME: _Brown, Terry_                    Reg. No.: _91907_

                                               PRD: _____

MEDICAL SERVICE(S) REQUESTED:

_Needs refill of monthly medication_
_Depakote 250mg I @ HS_

Estimated Cost(s): _$23.14_          Circle Category: (1)  (2)  (3)  (4)

Request for: ___ Dr. Exam  ___ Dental  ___ X-ray  ___ Lab  _✓_ Other

CAT 1 = MED MANDATORY
CAT 2 = MED NECESSARY
CAT 3 = NON-MED MANDATORY
CAT 4 = I/N CONVENIENCE

### DO NOT WRITE BELOW THIS LINE

## RESPONSE TO REQUESTS FOR REIMBURSEMENT OF EMERGENCY MEDICAL TREATMENT

REIMBURSEMENT:     _✓_ APPROVED          ___ DENIED

COMMENTS: _____

_____

_____

Reviewed by CCM _____    _____
                      Date              DAN SIMPSON

Contact Deborah Crockett at (210) 472-6225, if you have any questions.

FAX TO: (210) 472-6224

Need to ask I/M where
he got his meds filled?
juvenile detention Center
when?
What he takes them for?
Can someone bring them up
here?     per Kathy @
Dr. Howell's office.     JK 3/10/00

1365

To see Dr Howell
STARTS MEDS
AS it is now 3/13/2000 EN

D-2-PM 5-17-00

USM

## BELL COUNTY LAW ENFORCEMENT CENTER
## INMATE ADMISSION RECORD

Name: Brown, Terry T.    Age: 18    Date of Birth: 08-31-81

Date Admitted: 3-6-2000    Charge: CAR JACKING - ARMED    Cell Assigned: Proc

Booking Officer: J² Pale    Inmate's Signature: X Terry Brown

| | Yes | No |
|---|---|---|
| Is the inmate conscious? | ✓ | |
| Does the inmate have obvious pain or bleeding or other symptoms suggesting need for emergency service? | | ✓ |
| Are there visible signs of trauma or illness requiring immediate emergency or doctor's care? | | ✓ |
| Is there obvious fever, swollen lymph nodes, jaundice, or other evidence of infection which might spread? | | ✓ |
| Is the skin in good condition and free of vermin? | ✓ | |
| Does the inmate appear to be under the influence of alcohol? | | ✓ |
| Does the inmate appear to be under the influence of barbiturates, heroin, or other drugs? | | ✓ |
| Are there any visible signs of alcohol/drug withdrawal? | | ✓ |
| Does the inmate's behavior suggest the risk of suicide? | | ✓ |
| Does the inmate's behavior suggest the risk of assault to staff or other inmates? | | ✓ |
| Does the inmate have fever, sweats, high dry cough, appetite loss, diarrhea, swollen lymph nodes or glands, unexplained skin lesions, or yeast infections as described in Chapter 19.03 of the jail operational plan? | ✓ | |
| Is the inmate carrying medication or does the inmate report being on medication which should be continuously administered or available? If answer is "yes" the jail doctor must be contacted to approve such medication.    INFIRMARY | ✓ | |
| Has the individual ever been incarcerated here before? In answer is "yes", when? 12/19/98 | ✓ | |

Does the inmate have medical insurance or assistance?

| | Yes | No |
|---|---|---|
| A. Veteran's Administration? | | ✓ |
| B. Military? | | ✓ |
| C. Blue Cross? | | ✓ |
| D. Scott and White Health Plan? | | ✓ |
| E. Medicare / Medicaid? | | ✓ |
| F. Indigent Health Care Plan? | ✓ | |
| G. Other? If so, name TRICARE - Prime | ✓ | |

Obtain policy and/or group number _____

Name of relative to contact in event of emergency or death? Alice Brown

Relation Mother    Address? 155-1 SAF, FT. Hood, TX 76544

Telephone (including area code) (254) 539-0598

Remarks _____

Booking Officer's Signature J² Pale    Date 03-06-2000

HCJA - 35

June 21st '99

Rx - Wellbutrin ; Depakote
Med Problems — the Asthma

Taken meds for mood swings + depression - Depakote
Mood swings Wellbutrin + depression -
will call Mom and Dad
Darnell complained
See if Monday
if Mon — Fri
Wednesday
Monday

## HAVE YOU EVER HAD OR HAVE YOU NOW ·

| | | Yes | No | Don't Know |
|---|---|---|---|---|
| 1. | Asthma | X | | |
| 2. | Tuberculosis | | X | |
| 3. | Cancer or Tumor | | | X |
| 4. | Diabetes | | X | |
| 5. | Ear, Nose, throat Trouble | X | | |
| 6. | Hearing Loss | | X | |
| 7. | Hay Fever | | X | |
| 8. | Severe Tooth or Gum Trouble | X | | |
| 9. | Shortness of Breath | | X | |
| 10. | High Blood Pressure | X | | |
| 11. | Pain in Chest | | X | |
| 12. | Venereal Disease | | X | |
| 13. | Fractures (broken bones) | X | | |
| 14. | Bone, Joint, or other Deformity | | X | |
| 15. | Foot Trouble | | X | |
| 16. | Back Trouble | | X | |
| 17. | Swollen or Painful Joints | | X | |
| 18. | Kidney Trouble | | X | |
| 19. | Frequent or Painful Urination | | X | |
| 20. | Blood in Urine | | X | |
| 21. | Recurrent Infections | | X | |
| 22. | Rupture or Hernia | | X | |
| 23. | Recent gain or Loss of Weight | | X | |
| 24. | Stomach Trouble or Ulcer | X | | |
| 25. | Hepatitis or Jaundice | | X | |
| 26. | Head Injuries | X | | |
| 27. | Epilepsy or Seizure | | X | |
| 28. | Loss of memory or amnesia | | X | |
| 29. | Periods of Unconsciousness | | X | |
| 30. | Paralysis, Numbness, Weakness | | X | |
| 31. | Dizziness, Fainting Spells | X | | |
| 32. | Nervous Problem of Any Type | | X | |
| 33. | Alcoholism | X | | |
| ~~34. Pregnancy, Abortion, Miscarriage~~ | | | | |
| ~~35. Female Trouble~~ | | | | |
| 36. | Thyroid Trouble | | | X |

**DO YOU HAVE:**

| | | Yes | No | Don't Know |
|---|---|---|---|---|
| 37. | Vision in Both Eyes | X | | |
| 38. | A specially Prescribed Diet | | X | |

**HAVE YOU EVER:**

| | | Yes | No | Don't Know |
|---|---|---|---|---|
| 39. | Lived with anyone who had TB | | | X |
| 40. | Coughed Up Blood | X | | |
| 41. | Bled Excessively | | X | |
| 42. | Attempted Suicide | X | | |
| 43. | Have you ever taken (or do you now take) alcohol or drugs? If so, what kind, and when did you last take it and are you in a treatment program? | X | | |
| 44. | Are allergic to any Medication? | | X | |

## TIENE UD O HA TENIDO:

| | | | | |
|---|---|---|---|---|
| 1. | Asma | | | |
| 2. | Tuberculosos | | | |
| 3. | Cancer o Tumor | | | |
| 4. | Diabetes | | | |
| 5. | Problemas Audiencia Nariz o Garganta | | | |
| 6. | Perdida Audiencia | | | |
| 7. | Fiebre de Heno | | | |
| 8. | Problemas Severo diente Encia | | | |
| 9. | Escasez de Aliento | | | |
| 10. | Hipertension | | | |
| 11. | Dolor de Pedro | | | |
| 12. | Enfermedad Venerea | | | |
| 13. | Fracturas de Hueso | | | |
| 14. | Deformacion de Hueso Coyuntura, etc. | | | |
| 15. | Problemas del Pie | | | |
| 16. | Problemas de la Espalda | | | |
| 17. | Conyunturas Delolosas o Hinchadas | | | |
| 18. | Problemas del Rinon | | | |
| 19. | Accion de Orinar Frequente a Doloroso | | | |
| 20. | Sagre en la Orina | | | |
| 21. | Infecciones Periodicas | | | |
| 22. | Rotura o Hernia | | | |
| 23. | Perdida o Admento Reciente de Pesa | | | |
| 24. | Ulcera o Problemas del Estomago | | | |
| 25. | Ictericia o Hepatitis | | | |
| 26. | Heridas de la Cabeza | | | |
| 27. | Epilepsia o el acto de Asir | | | |
| 28. | Amnesia o Perdida del Recuerdo | | | |
| 29. | Periodos de Inconsciencia | | | |
| 30. | Paralisis Torpor Dehilidad | | | |
| 31. | Periodos de Desmayo | | | |
| 32. | Problemas de Nervios | | | |
| 33. | Alcoholismo | | | |
| 34. | Embarazo, aborto Malparto | | | |
| 35. | Enfermedad Femenina | | | |
| 36. | Problemas de Tiraideo | | | |

**TIENE UD:**

| | | | | |
|---|---|---|---|---|
| 37. | Vision en ambos Ojos | | | |
| 38. | Dieta Prescrita Especial | | | |

**HA UD:**

| | | | | |
|---|---|---|---|---|
| 39. | Vivido con Alguien que Tuviera el Tuberculosis | | | |
| 40. | Expulsado Sance por la Bolca | | | |
| 41. | Sangrado Excisivament | | | |
| 42. | Intentado el Suicidio | | | |
| 43. | Ha Ud Tomado (o Toma Ud actualmente en alcohol o las drogas? Acaso que si cuando allimanente lo tomo Ud y pertenece Ud a un programa de tratamiento? | | | |
| 44. | Esta Ud alergico a cualquier Medicamento? Si acaso que si Quales? | | | |

Inmate Signature ᾳ.. _Jim Brown_         Staff Signature _J² De le_



1362

_Bell_ County
## Mental Disability/Suicide Intake Screening

NAME _Brown_ _Terry_ _T_ DATE OF BIRTH _8/31/81_
     Last        First      MI

STATE ID # _136359_ DATE _3/16/2000_ COMPLETED BY: _J² Dele_

☞ Was inmate a medical, mental health, or suicide risk during any prior contact or confinement with department? Yes _____ No __✓__ If Yes, when? _____

☞ Does arresting or transporting officer believe that the inmate is a medical, mental health, or suicide risk? Yes _____ No __✓__

### A. QUESTIONNAIRE FOR DETAINEE

1. Have you ever received MHMR Services or other mental health services? If yes, what services? _____ — Yes / **No**

2. Do you know where you are? — **Correct** / Incorrect

3. What season is this? — **Correct** / Incorrect

4. Is there a difference between a lawyer and an attorney? — **Correct** / Incorrect

5. (a) Sometimes people tell me they hear noises or voices that other people don't seem to hear. What about you? — Yes / **No**

   (b) If yes, ask for an explanation: "What do you hear?" _____

### B. OBSERVATION QUESTIONS

6. Does the individual act or talk in a strange manner? — Yes / **No**

7. Does the individual seem unusually confused or preoccupied? — Yes / **No**

8. Does the individual talk very rapidly or seem to be in an unusually good mood? — Yes / **No**

9. Does the individual claim to be someone else like a famous person or fictional figure? — Yes / **No**

10. (a) Does the individual's vocabulary (in his/her native tongue) seem limited? — Yes / **No**

   (b) Does the individual have difficulty coming up with words to express him/herself? — Yes / **No**

### C. SUICIDE RELATED QUESTIONS / OBSERVATIONS

11. Have you ever attempted suicide or had thoughts about killing yourself? If yes, When? _____ Why? _____ How? _____ — Yes / **No**

12. Are you thinking about killing yourself today? — Yes / **No**

13. (a) Have you ever been so down that you couldn't do anything for more than a week? (If no, go to 14.) — Yes / **No**

   (b) Do you feel this way now? — Yes / **No**

14. When not on drugs or drinking, have you ever gone for days without sleep or had a long period in your life when you felt very energetic or excited? — Yes / **No**

15. Have you experienced a recent loss or death of family member or friend or are you worried about major problems other than your legal situation? — Yes / **No**

16. Does the individual seem extremely sad, apathetic, helpless, or hopeless? — Yes / **No**

COMMENTS _____

_A SINGLE INAPPROPRIATE RESPONSE, EXCEPT AS APPROPRIATE IN A.3., INDICATES ADDITIONAL EVALUATION RECOMMENDED._

h:\lynn\mhmr.tbi

TCJS/MD/5/98

13568

SCOTT & WHITE HOSPITAL AND CLINIC
DIVISION OF CLINICAL PATHOLOGY

Name:  BROWN, TERRY
MRN: R300737      Loc: CSC BELL COUN
Age: 35      Sex: M
DOB:
Add:

DAILY REPORT
FINAL

Phone:

PHYSICIAN INFORMATION

Ordered by: CSC BELL COUNTY, .

Deliver to: CSC BELL COUNTY, .

Order Date&Time: 01/25/2000 18:36
Print Date&Time: 01/26/2000 06:22
Lab Order #: 13252608

## CHEMISTRY PROFILES

| TEST-NAME | RESULTS | AB REF-RANGE | UNITS | SITE |
|---|---|---|---|---|
| **HEPATIC PROFILE** | | | | |
| COLLECTED 01/25/00 00:01 | | | | |
| ALBUMIN | 3.9 | 3.4-5.0 | gm/dL | A |
| BILIRUBIN, TOTAL | 0.4 | 0.2-1.0 | mg/dL | A |
| BILIRUBIN, DIRECT | 0.1 | 0.0-0.4 | mg/dL | A |
| ALKALINE PHOS. | 80 | 30-115 | IU/L | A |
| SGOT(AST) | 21 | 0-40 | IU/L | A |
| SGPT(ALT) | 14 | 0-29 | IU/L | A |

## DRUG MONITORING

| TEST-NAME | RESULTS | AB REF-RANGE | UNITS | SITE |
|---|---|---|---|---|
| **OTHER DRUG MONITORING** | | | | |
| COLLECTED 01/25/00 00:01 | | | | |
| VALPROIC ACID | 84.9 | 50.0-100.0 | ug/mL | A |

ON 750 MG

## HEMATOLOGY

| TEST-NAME | RESULTS | AB REF-RANGE | UNITS | SITE |
|---|---|---|---|---|
| **HEMOGRAM** | | | | |
| COLLECTED 01/25/00 00:01 | | | | |
| WBC | 5.2 | 4.8-10.8 | x10^3/mm3 | A |
| RBC | 4.88 | 4.70-6.10 | x10^6/mm3 | A |
| HGB | 14.4 | 14.0-18.0 | gm/dL | A |
| HCT | 43.1 | 42.0-52.0 | % | A |
| MCV | 88.3 | 80.0-94.0 | fL | A |
| MCH | 29.5 | 27.0-34.5 | uug | A |
| MCHC | 33.4 | 32.0-36.0 | gm/dL | A |
| RDW | 12.8 | 11.0-15.0 | % | A |
| PLT | 281 | 150-450 | x10^3/mm3 | A |
| MPV | 8.4 | 7.4-10.4 | fL | A |

continued on next page

Page: 1 of 2
** ABNORMAL FLAGS PRESENT **

Reviewing Physician:_____

EAB 1/26/2000

MR 802-9/99

1369

B E _ _ L   C O U N T _ _   _ A _ _ _

BK NO. JA0136359    LAST UPDATE 03/06/00    MARRIAGE  S_    AGE 18    ACTIVE
NAME    BROWN . . . . . . . .    TERRY . . . .    TERRELL . . . . . . . .   SEX M  RACE N  DOB 08/31/81

OFFN    000001F
B$
CAUSE 91907080
  62 U. S. MARSHAL . . . . . . .

BOOKING DATE.. 03/06/00   TIME. 12:45       1 AGENCY. AO     OFFICER.
ARREST OFFICER MCNAMARA    SEARCHED BY. FALLIS      COMM-AUTH. USM
DPS INCIDENT NBR
SENTENCE: DATE... BEG                END                 FINES/COSTS
   DAYS: CONFINEMENT         CREDITED        TO SERVE
OBSERVATION..   (Y/N)  BEGIN DATE           CODE      EVALUATION DATE
LOCATION IN JAIL       CELL # PROCESSING  MISMATCH    ATTORNEY
PAGE NO.        MILITARY     FINGER PRT
AMOUNTS...CURRENCY               CHANGE        CHECKS          TOTAL
. . . . . . . . . . . M E D I C A L / E D U C A T I O N . . . . . . . .
 TB  LAST TEST DATE           TEST RESULTS
                                                              BOOK    1
 READING: ADMIN      LEVEL      GED

| ALIAS | BONDS | CAPIAS | CASES | HIST | NOTE | CELL | CORR REC | MSTR | MONEY | FINES | MED | WORK |
|-------|-------|--------|-------|------|------|------|----------|------|-------|-------|-----|------|
|       |       |        | 1     | 1    |      | 1    |          |      |       |       |     |      |
| PF1   | PF2   | PF3    | PF4   | PF5  | PF6  | PF7  | PF8      | PF9  | PF10  | PF11  | PF12| PF13 |

1370

# MEDICAL SUMMARY OF FEDERAL PRISONER/ ALIEN IN TRANSIT
## U.S. Department of Justice

TB Clearance ☑ Yes ❑ No

1) PPD Completed: _____ / Date
   Results: _____ /

2) CXR Completed: _____ / Date
   Results: _____

3) Health Authority
   Clearance: _____

   Sign          Date

Note:
Dates listed above must be within one year of this transfer.

## I. PRISONER/ALIEN

Name:

Prisoner/Alien Reg. #

D.O.B:

Departed From:

Date Departed:

Destination:

Reason for Transfer:

Dist. Name:

Dist. #

Date in Custody:

## II. Current Medical Problems

1. _____   4. _____
2. _____   5. _____
3. _____   6. _____

| Medication | Dose | Route | Medication Required For Care En Route | Stop |
| | | | Instructions For Use (Include proper time for Administering) | |
| --- | --- | --- | --- | --- |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Additional Comments:

## III. SPECIAL NEEDS AFFECTING TRANSPORTATION

Is prisoner medically able to travel by BUS, VAN or CAR?   ☑ Yes   ❑ No   If no, Why not?

Is prisoner medically able to travel by airplane?   ☑ Yes   ❑ No   If no, Why not?

Is prisoner medically able to stay overnight at another facility en route to destination?   ☑ Yes   ❑ No   If no, Why not?

Is there any medical reason for restricting the length of time prisoner can be in travel status?   ❑ Yes   ❑ No   If yes, state reason:

Does prisoner require any medical equipment while in transport status?   ❑ Yes   ❑ No   If yes, What equipment?

Sign & Print Name- Certifying Health Authority:

Phone Number:

Date Signed:

Blue - Medical File at Jail

Form USM-553
(Rev. 11/98)

1371

# EXHIBIT 31

1322

## DECLARATION OF TERRY BROWN

Terry Brown, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.      My name is Terry Terrell Brown. I am 22 years old. I am in the custody of the Federal Bureau of Prisons. I am making this statement voluntarily. No one has threatened me in any way to get me to make this statement. No one has given or promised me anything in return for making this statement. I understand that this statement may be used in legal proceedings involving Brandon Bernard.

2.      I was never contacted by Brandon Bernard's attorneys prior to Brandon's trial. If I had been contacted, I would have been willing to speak with them about the matters contained in this statement and in my statement dated April 29, 2004. I would have spoken to Brandon's attorneys even if my own lawyer had advised me not to do so.

3.      Brandon and I met in 1997. I met him through his cousin Jordan, whose birth name is Melsimeon Pollock. Brandon and I spent a lot of time together. I would describe him as "a character" – he has a good sense of humor and is friendly and warm. He loved his little brother and sister and took care of them when his mother was working. He would pick them up at the Seventh Day Adventist school and then take them home and watch after them. All the children in the Bernard family, including Brandon, had to do their chores and homework before they could watch T.V. or go outside and play. Their mother also made sure they all went to church. Because the Bernards were Seventh Day Adventists, their church was on Saturday. More than once, Brandon

**DECLARATION OF TERRY BROWN**
**PAGE 1**

132

would leave me by myself on Friday night because he had to go to church. I didn't always like it, but there was no talking Brandon out of it. He went to church faithfully.

4.    On the day of the carjacking, Brandon and I put in job applications at the Winn-Dixie grocery store. We were really trying to find work. Our mothers had been getting on us about it, and Brandon was also eager to get a job because he wanted to have more money to buy things for his two babies and their mothers, Sherise and Shay. Sherise had not had her baby yet, but Brandon was trying to handle the responsibility of being a father. She would call him for whatever she needed, and he would take her places and comfort her when she was upset. He was also regularly in touch with Shay, who by June 1999 was in North Carolina with their baby. Brandon wanted to go see them and in fact was planning a trip to do that the week we got locked up. He really does love his kids, and goes out of his way to please people. In some ways, I think Brandon may be easily taken advantage of, because he's loyal and tends to avoid conflict where he can.

5.    Brandon worked at a number of different jobs for short stretches of time. He worked at a Burger King in Temple and a market in Michigan while he lived up there. On one occasion when I was with him, Brandon went to the military recruiting office and tried to enlist, but they refused to take him.

6.    During the months immediately preceding June 1999, both Brandon Bernard and I were regularly using drugs and drinking alcohol. We drank almost every day. Among the things we drank often were E & J brandy and "Cisco," which people also called "liquid crack." We also drank a lot of beer. From about April to June, we were also smoking marijuana cigarettes that had been

**DECLARATION OF TERRY BROWN**
**PAGE 2**

1374

dipped in formaldehyde or embalming fluid. We would smoke 2 or 3 sticks of that a day, and it had a powerful effect. You would be high all day. When we had it, we also used powder cocaine. I sometimes took PCP, as well.

7.    In March or April 1999, Brandon and I were both at a party at the Officers' Club on Fort Hood. We were both drinking and were high. We had a 40-oz. bottle of Old English malt liquor mixed with gin, plus some marijuana and a gram of cocaine. As we were leaving, a fight broke out. I went to the car but was told by a girl that Brandon had been knocked out. I went over and found Brandon unconscious on the concrete with blood on his forehead. He was taken to Darnell Army Hospital in an ambulance. I followed the ambulance to the hospital. I remember Brandon's mother coming up and that the doctors said Brandon had alcohol in him. He was treated in the emergency room and released, and later had to pay a fine for the drinking.

8.    Brandon and I also were involved in two car accidents. In one, Brandon was driving and was hit by a bus. We were both smoking marijuana dipped in formaldehyde that day.

9.    On the day of the carjacking, Brandon and I smoked marijuana dipped in embalming fluid. Brandon was drinking, as well. I understand he had been at Sherise's mother's house during the afternoon, and he usually got high when he was there. Sherise's mother at that time was a heavy drug user. She smoked a lot of crack, and there was usually cocaine or other drugs at her home.

10.    I think that Brandon's drug and alcohol use may have been a way of escaping from his problems. I don't think he was just taking the drugs to get high. It seemed to calm his nerves when he was anxious or hyper. He may have been depressed some of the time, as well. I know he was

**DECLARATION OF TERRY BROWN
PAGE 3**

1375

concerned and upset about the tension between his parents and that he had been very negatively affected by their divorce.

11.   I would describe myself as an alcoholic. I have also been told that I suffer from bipolar disorder, which I believe runs in my family. I have experienced dramatic emotional swings, from being hyper or mad to being in a very deep depression. While incarcerated prior to trial, I was given various combinations of medications to treat my mental condition. The medications I was prescribed were changed from time to time and I cannot remember the names of all the drugs I was given, but I believe that they included Wellbutrin, Trazodone, Doxepin, and Elavil. A nurse once commented to me in the jail that she thought I was receiving high doses of some of these medications. I was taking these medications when I met with law enforcement agents to discuss what I knew about the case and when I actually testified at trial. The medications sometimes made it hard to stay alert and affected my ability to think clearly.

12.   I met with law enforcement agents several times before I testified. There were always several people present. My mother was present for at least some of these meetings. During these meetings, the police said there were other crimes they could pin on me. One of the crimes they talked about was a drive-by shooting.

13.   My attorney urged me to plead guilty and testify for the Government. He told me he could get me a deal where I would only do 15 years as long as I testified. At some point after that, I was told that the Government was going to tack on another charge for possession of a firearm during commission of a crime that would add more time, but that I was still looking basically at a range of

**DECLARATION OF TERRY BROWN**
**PAGE 4**

1376

15 to 17 years.

I have been given an opportunity to read the foregoing declaration, with paragraphs numbered 1 through 13, and to make any corrections I wanted. I declare under penalty of perjury that this declaration is true and correct.

Executed on _____ MAY 26 204 (date).

_____
Terry Brown

**DECLARATION OF TERRY BROWN**
**PAGE 5**

1372

# EXHIBIT 32

1378

## DECLARATION OF JACK HETZEL

Jack Hetzel, pursuant to the provisions of 28 U.S.C. §1746, makes

the following declaration:

1.    My name is Jack Hetzel. I live at 3801 Huaco Lane in Waco, Texas. I am making this statement voluntarily. No one has threatened me in any way to get me to make this statement. No one has given or promised me anything in return for making this statement. I understand that this statement may be used in legal proceedings involving Brandon Bernard.

2.    I am an Archbishop and original founder of the Moments of Faith International Church. I am an ordained minister and have been preaching for the past sixty some-odd years. About six or seven years ago, I decided to reach out and minister to people in jail. I began a ministry at the Waco Jail, since it was close to my home. I led a program at the Waco Jail for four years. During those four years, I ministered to more than four hundred people, five days a week. It was through my ministry at the Waco Jail that I met Brandon Bernard.

3.    Brandon Bernard had heard about me from another inmate at the Waco Jail and asked me if I would see him. I visited with Brandon for the first time when he had been in jail for about six weeks.

4.    I remember that the very first time Brandon and I met, he asked me how he could possibly get forgiveness for what had happened. Brandon was very remorseful for all the hurt he was putting his mother and his family through. Brandon felt he had embarrassed his mother so much and wanted me to know that Brandon's mother was a good mother and had raised him to be a good person. Brandon told me that his mother did not want him hanging with the group of young men he ended up with, but he would not listen to her. It seemed very important to Brandon that I understand how much he loved his mother and that he did

1

not blame her for his situation.

5. I continued to minister to Brandon for almost a whole year, while he waited at the Waco Jail for his trial and sentencing. Our visits were limited to twenty minutes, I probably visited with Brandon thirty or forty times, as I was trying to speak to him at least once each week.

6. My impression was that Brandon made a positive adjustment to being in jail. He probably experienced some frustration from time to time, on account of his understandable anxiety in facing such serious charges, but I think he was generally well-behaved in jail. I had regular contact with the correctional staff at the jail, on account of being such a frequent visitor, and I never heard anyone say anything negative about Brandon. In fact, one of the correctional staff members named Morris (last name unknown) told me that Brandon was a dedicated Christian and believed Brandon was sincere in his interest in religious study and repentance.

7. The sole purpose of my meetings with Brandon was to minister to him and pray with him. As time went on, though, Brandon shared a great deal of his feelings with me. He spoke of his love for his family, his regret and shame at the grief he had caused his loved ones, and his hopes for the future.

8. I understand how it could have been difficult for Brandon. He and I talked a lot about what Brandon hoped to do if he ever got out of prison. Brandon wanted to join the ministry and work with teenagers like himself. Brandon wanted to counsel them about the evils of drugs and how easy it was to fall in with the wrong crowd. Brandon felt that teenagers might hear what he had to say because of what had happened to him. He told me he knew he had let the devil into his heart by hanging out with the friends who ultimately committed these murders and by using illegal drugs.

9. I was a teenage boy myself once myself, and I understood exactly how he could have been led astray by these supposed friends. As a young man, you don't want to be called a "sissy" or a "mama's boy" by your peers. Brandon

2

1380

told me that he had tried to back out of the robbery that ended in the victims' deaths, but his friends needed him because he was the only one with a car, and he did not have the maturity to resist the pressure or to figure out how to say no. I think he was trying to be a man in his friends' eyes, even though he made a terrible mistake in the way he went about it. At the same time, my conversations with Brandon suggested that up until the very last moment, Brandon believed that his friends were just going to rob the victims and then let them go. Even though that did not make sense to me, I got the impression that Brandon really believed it.

10.    I believed Brandon Bernard was very sincere both about his remorse and his interest in ministering to young people. I thought he would make a fine minister; he is intelligent and he has a good heart. He even took a correspondence Bible course that I offered to jail inmates. My recollection is that he did very well with the course and was very conscientious about it, unlike a lot of prisoners who failed to apply themselves.

11.    Over time, Brandon came to realize that his own actions and lack of action at the end had led to the victims' deaths, and Brandon felt strongly that it was only right that he be punished for his actions. Brandon told me that he wanted to apologize to the victims' families and ask for forgiveness, but did not know how to reach them or if the victims' families wanted to hear from him at all. Brandon did not want to add to their hurt. It was not easy for Brandon to talk about what happened around the murders, but I know that he wanted to talk about it and it was an enormous relief to him to be able to get some of those feelings off his chest by talking to me and praying with me.

12.    While Brandon accepted the idea that he would be punished, and sought forgiveness from God, his own family, and the families of the victims, I do not believe he understood how much punishment might be in store for him. Once, before his trial, Brandon told me that his lawyers had told him he was probably facing one to ten years' imprisonment. He was shocked when he finally understood that his life was at stake in the case.

3

13. I have not heard from Brandon since the end of 2000; after he was sentenced to death, he was taken from the Waco Jail. I did receive about three letters from him after he was taken to prison.

14. Brandon's attorneys never contacted me and I never contacted them. If I had been contacted by Brandon's attorneys or anyone working with them, I would have told them the same things I am saying in this statement today. I would have been willing to testify as a witness for Brandon. The main thing I would like to have communicated to the jury was that Brandon was full of grief about what he had done and asked God for forgiveness every time I saw him.

15. I finally had to tell Brandon that God had heard him, and that he didn't need to keep asking Him for forgiveness. I also would have wanted the victims' family members to have known about Brandon's regret and sorrow for his actions, and his concern for their well-being. I was very glad to have had the opportunity to minister to this young man. In my professional opinion, based on years of ministering to people, Brandon Bernard would have been a good minister. Given an opportunity, I believe Brandon could have made something of his life and could have made a positive contribution to society, even if he spent the rest of his natural life in prison. I was shocked by the death sentence and would like to have shared with the jury the young man I came to know over the year we spent talking and praying together in the Waco Jail. That young man's life is worth saving.

4

1382

I have been given an opportunity to read the foregoing declaration, with paragraphs numbered 1 through 15, and to make any corrections I wanted. I declare under penalty of perjury that this declaration is true and correct.

Executed on _November 17, 2004_ (date).

Jack Hetzel

NANCY GOEBEL
Notary Public
STATE OF TEXAS
My Commission
Expires 01/16/2006

State of Texas
County of _M Lennan_
Subscribed and sworn before me this
_17_ day of _Nov_ , _2004_

NOTARY PUBLIC

5

1383

# EXHIBIT 33

1384

## DECLARATION OF MILTON RIOS

Milton Rios, pursuant to the provisions of 28 U.S.C. § 1746, makes the following declaration:

1.     My name is Milton Rios. I currently live at ~~1612 Missouri Avenue~~ 5742 ONION ROAD MR., Killeen, Texas. I am making this statement voluntarily. No one has threatened me in any way to get me to make this statement. No one has given or promised me anything in return for making this statement. I understand that this statement may be used in legal proceedings involving Brandon Bernard.

2.     I have known the Bernard family and Brandon Bernard since 1994. They attended the same church I did. Brandon Bernard was very involved in teen church activities and I wanted the court to know about the Brandon Bernard I knew, ~~so I asked~~ ASKED MR. Thelma Bernard, Brandon Bernard's mother, if I could testify on behalf of Brandon Bernard at his sentencing hearing.

3.     I showed up at Brandon Bernard's sentencing hearing and I testified on his behalf. I never talked to Brandon Bernard's attorneys about the substance of my testimony before I took the stand. I did not know what I should say about Brandon Bernard, so I just answered what I was asked. My testimony was short. I do not know if my testimony was even useful as a result.

/ / /

**DECLARATION OF MILTON RIOS**
**Page 1**

1385

I have been given an opportunity to read the foregoing declaration, with paragraphs numbered 1 through 3, and to make any corrections I wanted. I declare under penalty of perjury that this declaration is true and correct.

Executed on _____ _May 27, 04_ _____ (date).


_____
Milton Rios

**DECLARATION OF MILTON RIOS**
**Page 2**

1386

# EXHIBIT 34

1387

## DECLARATION OF JIMMY DURAN OLARTE

Jimmy Duran Olarte, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1.  My name is Jimmy Duran Olarte. I am retired from the U.S. Army. I currently live at 2903 Sierra Drive in Killeen, Texas. I am making this statement voluntarily. No one has threatened me in any way to get me to make this statement. No one has given or promised me anything in return for making this statement. I understand that this statement may be used in legal proceedings involving Brandon Bernard.

2.  I have known the Bernard family and Brandon Bernard since 1993. I told Thelma Bernard, Brandon Bernard's mother, that I wanted to testify on behalf of Brandon Bernard at his sentencing hearing.

3.  I showed up at Brandon Bernard's sentencing hearing and I testified on his behalf. I was surprised that Brandon Bernard's attorneys never talked to me first before I testified. I had never testified before this time. I would like to have talked to Brandon

**DECLARATION OF JIMMY DURAN OLARTE**
**Page 1**

Bernard's attorneys before I took the stand to know what was going to happen. I was not told what I would be asked by Brandon Bernard's attorneys and was not told what kind of questions I might be asked by the prosecutor. My testimony was very short. I could have said more about Brandon Bernard, but I was not asked. I do not know if my testimony was even useful as a result.

I have been given an opportunity to read the foregoing declaration, with paragraphs numbered 1 through 3, and to make any corrections I wanted. I declare under penalty of perjury that this declaration is true and correct.

Executed on ___June 4, 2004___ (date).

_____
Jimmy Duran Olarte

**DECLARATION OF JIMMY DURAN OLARTE**
**Page 2**

# EXHIBIT 36

1390





*Wayne E. Pundt, D.D.S.*

**421 NORTH 38TH STREET**

**KILLEEN, TEXAS  76543**

---

**TELEPHONE: (817) 634-0234**

July 30, 2004

RE: Brandon Bernard

Federal Public Defenders
Attn: Royce Rutherford
1601 5th Ave.
Suite 700
Seattle, WA 98101

Dear Ms. Rutherford:

I spoke with you on 07/29/04 regarding the copy of the picture we sent for Brandon previously.  When I relayed the message to the doctor of how the pictures were not of good quality, he went to a photo shop and had better quality pictures made.  Since the doctor must keep the original for his record, we can only send you a copy.  I hope you find the new copies of better quality and can use them in your case.  If you have any questions you may call our office at (254) 634-0234.

Sincerely,

Amanda Adkins
Office Assistant

139