# No. W-99-CR-70(2)

FILED

DEC 0 8 2004

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY _____
    DEPUTY CLERK



## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

---

**UNITED STATES OF AMERICA,**
**Plaintiff-Respondent,**

**v.**                                              Criminal No.  W-99-CR-70(2)

**BRANDON BERNARD,**
**Defendant-Movant.**

---

### The Honorable Walter S. Smith, Jr.
### Chief United States District Judge

---

## RESPONSE TO MOTION TO VACATE, SET ASIDE,
## OR CORRECT SENTENCE

---

**JOHNNY SUTTON**
**United States Attorney**

**Mark R. Stelmach**
**Assistant United States Attorney**
**Western District of Texas**
**601 N.W. Loop 410, Suite 600**
**San Antonio, Texas 78216**
**(210) 384-7090**
**Attorneys For Plaintiff-Respondent**

418

## **TABLE OF CONTENTS**

**Pages**

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

**STATEMENT OF ISSUES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**ARGUMENTS AND AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . 35

**I. BERNARD HAS FAILED TO DEMONSTRATE CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE INITIAL STAGES** . . . . . . . . . . . . . . . . . . . . . 35

**II. BERNARD HAS FAILED TO DEMONSTRATE CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE GUILT PHASE** . . . . . . . . . . . . . . . . . . . 35-140

**III. BERNARD HAS FAILED TO DEMONSTRATE CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE PENALTY PHASE** . . . . . . . . . . . . . . . 141-162

**IV. BERNARD'S *BRADY* AND PROSECUTORIAL MISCONDUCT CLAIMS ARE PROCEDURALLY DEFAULTED; BERNARD HAS NOT ESTABLISHED ANY VIOLATION; BERNARD HAS NOT ANY SIGNIFICANT EVIDENCE THAT WAS WITHHELD AND THAT WOULD HAVE CAST DOUBT ON THE TESTIMONY OF BROWN AND LEWIS; BERNARD HAS NOT SHOWN PROSECUTORIAL MISCONDUCT; BERNARD HAS NOT SHOWN ANYTHING THAT UNDERMINES CONFIDENCE IN THE OUTCOME OF THE TRIAL** . . . . . . . . . . 163-174

1398

**V. BERNARD'S CHALLENGE TO APPOINTMENT OF COUNSEL, BASED ON SECTION 3005, HAS BEEN PROCEDURALLY DEFAULTED, BERNARD UTTERLY FAILED TO RAISE THIS ISSUE IN HIS DIRECT APPEAL AND AS A NON-CONSTITUTIONAL ISSUE IT IS NOT COGNIZABLE ON HABEAS REVIEW, NOR HAS HE SHOWN CAUSE AND PREJUDICE IN SUPPORT OF THIS FAILURE; NEVERTHELESS, HIS CHALLENGES ARE WITHOUT MERIT; BERNARD MADE NO TIMELY "REQUEST" UNDER SECTION 3005; NOT HAVING TWO ATTORNEYS AT THE ATTORNEY GENERAL PHASE, IF ERROR, WAS HARMLESS ERROR; BERNARD DID RECEIVE THE ASSISTANCE OF TWO ATTORNEYS AT TRIAL, HE HAS NOT SHOWN THEY WERE NOT "LEARNED IN THE LAW APPLICABLE TO CAPITAL CASES," ANY LACK OF CONSULTATION WITH THE PUBLIC DEFENDER PRIOR TO THE APPOINTMENT, IF ERROR, WAS HARMLESS ERROR** ........................ 175-191

**VI. BERNARD'S CHALLENGE, THAT A JUROR'S ALLEGEDLY INCORRECT ANSWER TO A QUESTION AS TO WHETHER HE PREVIOUSLY HAD BEEN CONVICTED OF A CRIME RESULTED IN BEING DENIED HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY, HAS BEEN PROCEDURALLY DEFAULTED, AS BERNARD UTTERLY FAILED TO RAISE THIS ISSUE IN HIS DIRECT APPEAL, AND HE HAS NOT SHOWN CAUSE AND PREJUDICE IN SUPPORT OF THIS FAILURE; NEVERTHELESS, HIS CHALLENGE IS WITHOUT MERIT** ....................... 192-198

**VII. BERNARD'S CHALLENGE, THAT THE FEDERAL DEATH PENALTY, AS APPLIED, VIOLATES THE FIFTH AND EIGHTH AMENDMENTS, HAS BEEN PROCEDURALLY DEFAULTED, AS BERNARD UTTERLY FAILED TO RAISE THIS ISSUE IN HIS DIRECT APPEAL, AND HE HAS NOT SHOWN CAUSE AND PREJUDICE CAUSE AND PREJUDICE IN SUPPORT OF THIS FAILURE; NEVERTHELESS, HIS CHALLENGE IS WITHOUT MERIT** ..... 199-208

VIII. BERNARD'S CLAIM, THAT THE GRAND JURY
DID NOT DETERMINE ALL OF THE ELEMENTS
ESSENTIAL TO ESTABLISH CAPITAL MURDER,
HAS BEEN PROCEDURALLY DEFAULTED;
ADDITIONALLY, *APPRENDI*-TYPE CLAIMS HAVE NOT BEEN APPLIED
RETROACTIVELY IN HABEAS REVIEW, SO THAT
THIS *APPRENDI-RING* CLAIM MAY NOT BE RAISED
FOR THE FIRST TIME ON SECTION 2255 REVIEW;
FURTHERMORE, IN THIS CIRCUIT, UNDER *ROBINSON*,
EVEN IN A CASE UNDER DIRECT APPEAL,
ERROR UNDER *RING* HAS BEEN HELD TO BE HARMLESS  . . . 209-215

IX.  BERNARD'S CHALLENGE, THAT THE LETHAL INJECTION
UNDER THE PROTOCOLS CURRENTLY IN FORCE
IN THE UNITED STATES BUREAU OF PRISONS AND ANY SIMILAR
PROTOCOLS WOULD VIOLATE THE EIGHTH AMENDMENT
HAS BEEN PROCEDURALLY DEFAULTED;
NEVERTHELESS, THIS GROUND IS WITHOUT MERIT;
LETHAL INJECTION HAS BEEN UPHELD
AGAINST NUMEROUS CHALLENGES  . . . . . . . . . . . . . . . . . . . . . . 216-220

X.  BERNARD'S CHALLENGE, THAT HE IS ENTITLED
TO SECTION 2255 RELIEF BECAUSE OF CUMULATIVE ERROR,
IS WITHOUT MERIT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

CONCLUSION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 222

CERTIFICATE OF SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 223

1395

# TABLE OF AUTHORITIES

**Cases**                                                    **Pages**

*Apprendi v. New Jersey,*
    530 U.S. 466 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 209, 213, 214

*Campbell v. Wood,*
    18 F.3d 662 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218-219

*Chapman v. California,*
    386 U.S. 18 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 219

*Cooper v. Rimmer,*
    358 F.3d 655 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . 218, 219, 220

*Crockett v. McCotter*
    796 F.2d 787 (5th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Dunhan v. Travis,*
    313 F.3d 724 (2nd Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*Estelle v. Gamble,*
    429 U.S. 97 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

*Furman v. Georgia,*
    408 U.S. 238 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207, 208

*Gilliard v. Scroggy,*
    847 F.2d 1141 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . 133, 154

*Hall v. United States,*
    ___ F.3d ___ (N.D.Tex. 2004) (2004 WL 1908242) . . . . . . . . . . 204, 206

*Hayes v. Maggio,*
    699 F.2d 198 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

1396

*Hughes v. Johnson*
    991 F.Supp. 621 (S.D.Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169, 174

*In Re Kemmier,*
    136 U.S. 436 (1890) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

*Kyles v. Whitley*
    514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

*Kotteakos v. United States,*
    328 U.S. 750 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 191

*LaGrand v. Stewart,*
    133 F.3d 1253 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

*Lockhart v. Fretwell*
    506 U.S. 364 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Louisiana ex. rel. Resweber,*
    329 U.S. 459 (1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 218

*McCleskey v. Kemp,*
    481 U.S. 279 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202, 203, 205

*McDonnough Power Equip., Inc. V. Greenwood,*
    464 U.S. 548 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195, 198, 199

*Millender v. Adams,*
    376 F.3d 520 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133, 154

*Ring v. Arizona,*
    536 U.S. 584 (2002) . . . . . . . . . . . . . . . . . . . . . 211, 212, 213, 214, 215

*Spence v. State,*
    758 S.W.2d 597 (Tex.Crim.App., Oct 12, 1998) . . . . . . . . . . . . . . . . . 188

*Spence v. State,*
    795 S.W.2d 743 (Tex.Crim.App., Jun 13, 1990) . . . . . . . . . . . . . . . . . . . 189

*Strickland v. Washington*
    466 U.S. 668 (1984) . . . . . . . . . . . . . . 64, 65, 66, 141, 149, 150, 159, 185

*Strickler v. Green,*
    527 U.S. 263 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

*Tanner v. United States,*
    483 U.S. 107 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 194

*Teague v. Lane,*
    489 U.S. 288 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

*United States v. Acklen*
    47 F.3d 739 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States v. Armstrong,*
    517 U.S. 456 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 202, 203, 206

*United States v. Bernard,*
    299 F.3d 467 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . 158, 212, 213, 221

*United States v. Bishop,*
    264 F.3d 535 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 195

*United States v. Boone,*
    245 F.3d 352 (4th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

*United States v. Cotton,*
    535 U.S. 625 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

*United States v. DeParias,*
    805 F.2d 1447 (11th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

1398

*United States v. Faubion*
    19 F.3d 226 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States v. Frady*,
    456 U.S. 152 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 166, 181, 193, 200, 217

*United States v. Hall*,
    152 F.3d 381 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140, 158

*United States v. Hughes*
    230 F.3d 815 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 165

*United States v. Jones*
    287 F.3d 325 (5th Cir.), *cert. denied*, 537 U.S. 1018 (2002) . . . . . . . 203, 205

*United States v. Kaiser*,
    545 F.2d 467 (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 207

*United States v. McCullah*,
    76 F.3d 1087 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

*United States v. Mendez*,
    102 F.3d 126 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

*United States v. Miranda*,
    148 F.Supp.2d 292 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 190

*United States v. Nersesian*,
    824 F.2d 1294 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*United States v. Robinson*,
    367 F.3d 278 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . 209, 211, 212, 214, 215

*United States v. Rodriguez*,
    68 Fed.Appx. 237 (2nd Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

1399

*United States v. Stewart,*
     317 F.Supp.2d 432 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 198

*United States v. Stumpf,*
     900 F.2d 842 (5th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

*United States v. Torres-Gomez,*
     62 F.Supp.2d 402 (D. Puerto Rico 1999) . . . . . . . . . . . . . . . . . . . 183, 185

*United States v. Walker*
     68 F.3d 931 (5th Cir.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*United States v. Webster,*
     162 F.3d 308 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . 203, 204, 206, 207

*United States v. Weintraub,*
     871 F.2d 1257 (5th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 181

*United States v. Williams,*
     544 F.2d 1215 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . 180, 183

*Walton v. Arizona,*
     497 U.S. 639 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 211, 212

**Statutes**

18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 206-207, 209-10, 212, 215

**Miscellaneous Authorities**

Black's Law Dictionary 889 (6th Ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 215

1400

## STATEMENT OF THE ISSUES

In his motion, Bernard lists ten grounds "on which petitioner claims he is being held unlawfully" (Bernard's Motion at 2-3). These grounds do not exactly correspond to the numbered headings in his memorandum.  The grounds in his motion raise the following issues:

1.  Whether Bernard received constitutionally ineffective assistance of counsel from the time of his counsels' appointment until the time of trial.

2.  Whether Bernard received constitutionally ineffective assistance of counsel during the guilt phase of his trial.

3.  Whether Bernard received constitutionally ineffective assistance of counsel during the penalty phase.

4.  Whether there was prosecutorial misconduct (which was not raised as an issue at trial or in his direct criminal appeal); and whether this ground has been procedurally defaulted.

5.  Whether there was an error under 18 U.S.C. § 3005, regarding appointment of Bernard's counsel (to which there was no objection or complaint either at trial or on his direct criminal appeal); whether this is a constitutional claim; and whether this ground has been procedurally defaulted.

1401

6. Whether there is any evidence of a juror being "biased" (which was not raised as an issue at trial or in his direct criminal appeal); whether this is a constitutional claim; and whether this ground has been procedurally defaulted.

7. Whether the statistics Bernard cites are sufficient to demonstrate that the federal death penalty authorization process is constitutionally infirm (which was not raised as an issue at trial or in his direct criminal appeal); and whether this ground has been procedurally defaulted.

8. Wether the indictment was constitutionally infirm because then current law did not require the grand jury to find by a preponderance of evidence certain "mental state elements and aggravating facts necessary" to be eligible for the death penalty (which was not raised as an issue at trial or in his direct criminal appeal); and whether this ground has been procedurally defaulted.

9. Whether lethal injection is unconstitutional (which was not raised as an issue at trial or in his direct criminal appeal); and whether this ground has been procedurally defaulted.

10. Whether there were any errors cognizable under § 2255; whether any errors had an unconstitutional cumulative effect.

1402

## STATEMENT OF FACTS  (GUILT PHASE)

F.B.I. Agent Daniel Chadwick received a call on June 21, 1999, at around 11:30 P.M. that a car had been burned, with two bodies in the trunk, out at Ft. Hood, near Waco, Texas.  A second vehicle was found stuck in the mud a short distance from the burned car, with four individuals accompanying the second vehicle.  These four individuals included Bernard and Vialva.

Clifford Pinkerton, and his fiancee, were out at Quarry Road, on June 21, 1999, at around 8:30 P.M., to test the four wheel drive on his Bronco (1492).  It is a remote area without much traffic (1493).  They saw a burning vehicle, up on a hill  (1494). The car was burning towards the rear of the vehicle, like it may have started towards the rear interior (1495).

Another vehicle down the road was stuck in a ditch (1494).  Pinkerton and his fiancee were flagged down by the individuals with the stuck vehicle, and Bernard asked for help to pull the car out of the mud (1497, 1500).  Pinkerton thought it odd the young man was not concerned about the car on fire, and that he said he needed to leave in a hurry (1499).

Pinkerton was nervous so he told them that he needed to get a rope and would be back in 20 minutes, but the young man (Bernard) told him they would be gone in 15-20 minutes, that "they had to get out of there now" (1499).  Pinkerton noticed 4

1403

or 5 people behind the stuck vehicle, who all appeared to be trying to help, and a tan mini-truck (1502). Some of the individuals were going back and forth from the trunk of the stuck vehicle to the bushes (1502). Those individuals were not pushing the car (1502). Pinkerton called 9-1-1 on his cell phone and reported the car on fire and the young men with the stuck vehicle (1503). He did not feel comfortable driving back by the stuck vehicle until someone else arrived (17 R. 1503). Pinkerton identified Vialva as being one of the men at the scene (17 R. 1506).

Also on the evening of June 21, Omer Hall and his friend Cleveland Shinn, were out playing in the mud with his four wheel drive truck (1513). Right before sundown, out by Quarry Road, Hall saw four people and a stuck vehicle ( 1514). Hall stopped his truck and the four young men ran up to the truck, and asked if Hall could help them pull their car out of the ditch ( 1515). The young men tried pushing the car out of the mud, but the vehicle was too large (1515). Where Quarry Road crosses the cattle guard, the property belongs to Fort Hood (1517, 1806).

When it became apparent the men could not get the vehicle unstuck, Hall offered to give them a ride into town, which they adamantly declined (1519). Hall offered to go get some help, which they also declined (1519).

Another vehicle came by, a blue truck, and the driver was equipped with chains, so that individual helped to free Bernard and Vialva's vehicle unstuck (1520).

At the time the vehicle was pulled out of the ditch, Officer Jones arrived ( 1520). The four individuals then started changing shirts, and Hall "heard things falling in the trees" and saw one of the men throw something in the trees (1521). Hall recalled the other young men whispering and acting nervous, and then Hall felt scared (1522). Officer Jones walked up and asked the group if they knew anything about the burning car (1523).

Hall departed, driving by the burning car (1524). He recalled the view as a big fire (1524). Hall felt very scared (1525). Hall and Shinn then went home and returned in Shinn's car, because Hall did not want the four suspicious men to know what vehicle he was in (1525). Hall and Shinn returned to the scene because they had a "gut feeling" that something was wrong, and wanted to talk to the officer (1526). When Hall and Shinn returned, other law enforcement officers and a fire truck were present (1527).

Cleveland Shinn confirmed in his testimony, that he and Hall saw the young men stuck on the side of the road, out by Quarry Road (1541). Shinn also confirmed that he saw the burning car up on the hill ( 1541). Shinn had recognized the four young men, since he had lived in the area for 17 years, but he did not know their names (1545). Shinn noted that one of the younger men told Shinn "if anything happens, I was with you guys" ( 1546). Shinn told the jury that Appellant Vialva

5

1405

appeared to be the leader of the group, and was telling the others what to do (1546).

Shinn knew Vialva from the streets, but not personally (1546). Shinn recognized

Vialva and Bernard as two of the men at the scene with the stuck vehicle (1549).

Shinn thought it was very unusual for the men to take off their shirts and wrap items

up and throw those items out past the fence and the bushes (1550). Shinn recognized

Government Exhibits 11 and 12, the charcoal lighter fluid cans, as being consistent

with the types of "boxes" he saw being thrown (1552). The young men were

throwing items out while they were trying to push the vehicle out of the ditch (1554).

When Officer Jones arrived, the Buick La Sabre was pulled from the ditch by the blue

truck (1555). At that point, the four young men stopped what they were doing and

appeared surprised (1556).

Michele Dade Thompson, a military police officer, was off duty and on her way

to the recreation area at the lake by Fort Hood, when she saw the young men with the

stuck vehicle (1580). She asked the young men, Vialva and Bernard, if they needed

help, and the men told her that they had it under control (1580). Thompson asked if

anyone was hurt with the burning car, and Bernard told her that no one was in that

car, and that no one needed help (1580). Thompson and her friend left, Thompson

looked over at her friend Sylvia, and they did not exchange words, only a look,

because Thompson was very nervous and "had this real creepy feeling coming over

[her]"(1582). Thompson called the military police and reported what they saw regarding the four suspicious men with the stuck vehicle, and the second burning car (1582). Thompson returned to the scene to assist the military police, and when she arrived, Officer Jones was already present (1584). The fire department arrived on the scene, and determined that two bodies were in the trunk of the burning vehicle (1584). Thompson assisted in searching the suspects (1584).

Officer Thomas Jones of the Nolanville Police Department was patrolling this area near Ft. Hood, along with a "rookie" officer, Thomas Yoder, on June 21, at around 8:30 p.m, and noticed smoke along the brush line north of Nolanville (1624). As the officers crossed the cattle guard by Quarry Road, entering the Fort Hood Military Installation, Jones saw a vehicle fully engulfed in flames (1624). About fifty yards down Quarry Road, known as Old Nolanville Road on base, was another vehicle, occupied by four males (1625). The rear end of the vehicle was in the ditch, and a young male in a truck was pulling out the stuck vehicle (1626).

Officer Jones kept the vehicle with the four young men at the scene to await military police (1628). Jones had asked the young man driving the stuck vehicle, Bernard, if he knew anything about the burning vehicle, which he denied (1628, 1629). Jones thought this was very strange, and radioed the Bell County Sheriff's Office and requested the fire department and military police (17 R. 1628). The Fort

7

1407

Hood Game Warden, officer Volk, arrived and took control of the scene (17 R. 1628).

Bernard and Vialva, along with two juveniles, Chris Lewis and Terry Brown, were detained (1631). Once the game warden arrived, the four suspects were separated (1632). When the firemen opened the trunk of the burned vehicle, to insure the fire was completely out, a body was found in the trunk (1632).

Officer Volk, the game warden, recalled coming to the scene of the burning car, and approaching the four suspects (1650). None of the four suspects were looking in the direction of the burning car (1650). One of the juveniles told Volk the other young men were taking him home (1651). Once Volk heard that a body was discovered in the burning vehicle, he detained the four suspects (1653). Mr. Shinn told Volk that the four young men were throwing things in the wood when the other two young men had arrived (1654). Officer Volk recalled that the Buick LaSabre, the burned car, was almost totally destroyed, with the exception of the rear glass and the trunk area (1659). Volk also noted that Hall was registered to take his vehicle onto Fort Hood to drive his four-wheel drive vehicles in the mud (1661). Volk noticed blood on the roadway and brought it to the attention of the investigators at the scene (1660). Volk identified Government Exhibit No. 70, a photograph of a sign by the

cattle guards which clearly notifies that the individual is entering a military installation (1662).

Jeff Booker of the Nolanville Volunteer Fire Department arrived at the scene of the burning car (1680). Booker tried to "push the fire back up toward the burnt part already and save what was left" (1680). The trunk continued to flair up with flames and the firemen pried the trunk open a bit and put more water inside the trunk to make sure the fire was out (683). Booker's partner shined the flashlight in the trunk and saw what appeared to be a body (1683). The men saw the top of a scalp (1683).

Rogelio Meraz, a military C.I.D. agent, transported Brown back to headquarters (1697). He retained Brown's clothing as possible evidence (1697). Clothing was also taken from Vialva and Bernard (1698). Duane Bestul, another military Criminal Investigation Division officer from Fort Hood, investigated the crime scene on the morning of June 22 (1725). He found the military identification of Chris Vialva thrown into a tree below the scene (1725; G.E. 127). Officer Bestual also found a Glock .40 pistol at the scene, behind some bushes (1727).

James Carlton, another military C.I.D. agent, investigated the crime scene of the burning vehicle (1733). Once the fire was extinguished, the trunk was pried open during the early morning hours of June 22 (1736). The investigators discovered there

9

were two bodies in the trunk (1737). The investigators determined there were two bodies by the two sets of teeth, initially, since the head of the male victim was imbedded in debris in the trunk that burned on the surface beyond recognition (1740).

The first victim, Mr. Todd Bagley, was literally melted into the car and the debris (1741; G.E. 97). A shell casing was discovered close to Todd Bagley's body (1741; G.E. 98). A second shell casing of the same caliber was found in the trunk, near the bodies of the victims (1745).

The female victim, Mrs. Stacie Bagley, was positioned directly behind Todd Bagley, both were lying on their right sides, on the right side of their faces, and they appeared to be in a "final embrace" (1742). Her leg was draped over Todd's leg from behind (1744). The clothing of the victims was charred and burned (1741). A stereo speaker had melted into Stacie Bagley's hand (1742).

Officer Carlton opined that Mrs. Bagley likely removed it to attempt to speak to her captors while she was held in the trunk of the automobile (1743). Todd Bagley's lace up boots still on his feet, were melted into the side of the trunk compartment; and the car jack was also melted onto Todd Bagley (1744). The body had to be cut out of the car (1744). Once the bodies were removed, the investigators could see the trunk was covered in human blood (1755).

1440

Kevin Schunk, a military C.I.D. agent, explained that the bodies of the two victims were placed in body bags intact with the items from the vehicle which were "melted" onto them, and sent to the medical examiner's office (1760-1761). A mask was found in the suspect's vehicle (1764).

Special Agent Jonathan Blair, with the Fort Hood C.I.D. used a residue absorption kit to detect residue on Bernard's clothing (1773). The agent collected samples by swabbing the hands of Bernard and Vialva, and Terry Brown (17 R. 1775). The shell casings found in the trunk were federal ammunition .40 caliber, Smith and Wesson hydra shock (1778). The weapon used in this incident was stolen from a soldier assigned to Fort Hood (1778). The soldier had additional ammunition, like the ammunition loaded in the stolen weapon (1778). The type of ammunition is a very specialized bullet that allows it to expand greater than the diameter of the original bullet to create more devastation to the tissue (1779).

David Eller, another C.I.D. agent, talked to Chris Lewis back at the C.I.D. office and collected Chris Lewis's clothing and performed a gun shot residue test on Chris Lewis's hands (1782). Chris Lewis was a juvenile, and therefore could not be questioned without waiving his rights before a magistrate or obtaining parental permission (1783).

11

Catrice Wilson, was the evidence custodian at Fort Hood ( 1786). A Glock .40 caliber pistol was found in the wooded area at the scene (1788-1789). A second weapon, a .22 caliber pistol was also found at the scene (1791). A white T-shirt and Appellant Vialva's identification card were found at the scene in the woods ( 1792).

A yellow disposable lighter was found, and two Kingsford charcoal lighter fluid cans. Two Iowa drivers licenses were found, which belonged to Todd Bagley and Stacie Lynn Bagley (1799). A Visa check card in the name of Stacie Bagley was also found (G.E. 19).

Terry Brown, entered a plea agreement with the United States regarding his involvement in the instant case (1857). Brown pleaded guilty to aiding and abetting the murder of Todd and Stacie Bagley, and to possessing the .22 caliber weapon (1858).

Brown met Vialva and Bernard at Killeen High School (1860). Brown's mother was active duty military and he lived in North Carolina and Nebraska previously ( 1861). Appellant Vialva and Appellant Bernard were both affiliated with a nation wide gang called "the Bloods" ( 1861). Brown was also affiliated with the Bloods (18 R. 1861). The members of the gangs affiliated with the Bloods, were bonded to each other as friends, and their common color was red (1862). Vialva and Bernard were part of the "Two-One-Two PIRU" gang in Killeen, which was part of

12

the Bloods (1863). Christopher Lewis, Tony Sparks, and Gregory Lynch also were members of the 212 PIRU (1863, 1867). On June 21, 1999, Brown became aware of a plan to commit a crime that was being formed by some members of the gang to go out and rob someone (1867).

Juneith Steubing of the Killeen Police Department, and her partner, were investigating a burglary, on June 21, at 2:10 a.m., and saw three juveniles out walking, which was a violation of the curfew in effect ( 2290). Those three were Tony Sparks, Christopher Lewis, and Christopher Vialva (2291). Vialva was allowed to leave since he was not a juvenile ( 2291). The officer called Spark's mother to come and pick them up ( 2292). Spark's mother took Lewis also, since he said his parents were out of town ( 2293). While they were waiting for Spark's mother to arrive, Sparks asked if he could hold the officer's .40 caliber weapon (2294). An hour or so later, the officer saw Vialva walking in the same area where the three young men were stopped (2299). The officer advised Appellant Vialva that he needed to go home ( 2300). The officer departed and saw Appellant Vialva walking back in the same direction (2300).

On the morning of June 21, Brown was riding around in Bernard's car with Appellants Vialva and Bernard, Christopher Lewis, and Tony Sparks, around noon (1868). The young men were looking for a victim coming in or out of a store ( 1868).

13

Brown was aware that they had the Glock and the .22 caliber pistols in the vehicle (1869).

Bernard was driving the Buick Park Avenue, Brown was in the front passenger seat, and the other three, Vialva, Sparks and Lewis were sitting in the back seat (1870). Brown possessed the Glock .40 caliber while at the K-Mart, then Vialva possessed it (1871). Sparks possessed the .22 caliber pistol (1871). The Glock .40 caliber weapon belonged to Bernard (1872, 1874).

The young men drove around the K-mart parking lot and did not find the appropriate victim (1871). They rode across the street to a Winn-Dixie Food store, looking for a prospective victim (1879). The young men still did not find the right type of victim "with enough money," so they went to the "Foodliner" store, also known as the IGA store (1880). At the IGA food store, Christopher Lewis, Tony Sparks, and Vialva stood in front and asked someone for a ride (1880-1881). The men had planned that once they were given a ride, they would rob the individual (1881). The plan, conceived by Vialva, was to take the victims to an ATM and get as much money as they could (1886). Lewis was the one to ask for a ride since he was younger in appearance (1887). They waited quite a while but did not get a ride (1882).

A hardware salesman testified at trial that he recognized Vialva as a young man who was rude and stepped in front of him at the Foodliner, at lunchtime on that date (2450). The group then crossed the street to Mickey's convenience store (1882).

Bernard and Brown, went in a laundromat where there were video games, while Lewis, Vialva, and Sparks went into the store part of Mickey's (1885). When Brown and Bernard emerged, the other men were gone, and therefore Brown assumed they had found a victim (1885).

Brown and Appellant Bernard then placed job applications that same afternoon at Winn-Dixie because their parents wanted them to find a job (1888). Government exhibits 39 and 40 were the job applications filled out by the two men (1890). Brown and Bernard went to another friend's house for a while, then Bernard took Brown home, then Bernard went home (1893). Brown was living with Billie Rorie, another member of the Two-One-Two PIRU gang (1894). Lewis called Brown and said that they needed help, and the young men selected a meeting place (1894). Brown could hear Vialva in the background (1895).

After the call, Brown walked to the end of the street, and Lewis, Sparks, and Vialva pulled up in the Bagley's car (1897). Brown got into the back seat of the car, and found out the men had two people in the back of the trunk, and Brown pointed the .22 caliber pistol into the back seat and asked if he should "kill them" and the

response was "no" (1898). Brown started speaking to the victims in the trunk, asking them their names and where they were from (1898). The victims stated their names were Todd and Stacie Bagley and they were from Iowa (1899). Vialva drove the car, and the other men discussed what to do with the victims (1900). Vialva possessed the .40 Glock (1901). Brown opined to the group that they should leave the vehicle in a park, and that Brown would notify police where as to its location (1901). The group then conveyed Brown to his home (1901).

Once Brown returned home, he called Bernard to come pick him up, which Bernard did, along with Joey Presley (1902). This second group, Brown, Bernard, and Presley, drove around a park looking for the other car, the Bagley's Buick (1902). They met up with the young men in the Buick, Vialva, Sparks, and Lewis, and Brown told the group to follow them (1903). Brown asked Vialva what he was doing, and Vialva told him that they could not leave the car, because it had their fingerprints (1903-1904). Vialva stated he needed to burn the car, and kill the people, all in a normal tone of voice (1903-1904). Brown doubted Vialva meant what he said, and got back into Appellant Bernard's car, to take Joey Presley home (1904).

Vialva stated that they needed to get gasoline and take the back road to Temple and burn the car there (1905). Brown dropped off Presley, and Vialva dropped off Sparks (1906). Sparks had a curfew due to his probation, and had to go home, but

16

Presley wanted to stay, and Brown told him to go home (1906). The two groups met up again near the Mickey's and Vialva reminded Brown and Appellant Bernard to get the gasoline (1906). Vialva gave Brown the money and Brown went in to purchase the gasoline (1907). Brown and Bernard decided to buy charcoal lighter fluid since they did not have "anything to put the gasoline in" (1907).

Brown informed Bernard of Vialva's plan (1908). Bernard actually purchased the lighter fluid[1] (18 R. 1908). Brown entered the store, and went to the restroom (1910). Brown obtained matches from the store (1911). They drove around and found Appellant Vialva and the two groups decided to meet on a back road and burn the car (1912). Bernard led the way, driving his car, and Vialva followed in the Bagley's Buick (1913). They headed out of town, and turned on a "little off road" leading to the Belton Lake Recreation Area (1913). Brown recalled the road as "Little Nolan road", and they crossed a cattle guard (1914).

The Bagley's vehicle, with Appellant Vialva and Christopher Lewis headed up the hill (1914). Brown had conversed with the two victims while at Billy Rorie's home, through the trunk (1915). Brown had taken Stacie Bagley's check book and told her they would be dropped off in a park, but she had better not report them

---

[1] The manager produced a receipt on June 21, 1999, showing the purchase of 2 cans of charcoal lighter fluid and a snack item at 8:03 p.m. (21 R. 2454).

because Brown knew where she lived in Iowa and would find her (1915). Stacie Bagley said she was a Christian and would not report him, and then she said "thank you" (1915).

Brown and Bernard walked up the hill with the lighter fluid they had purchased (1918). Once they reached the Bagley's vehicle, Brown could hear Stacie Bagley telling Christopher Lewis "Jesus loves you. Jesus, take care of us," and her voice had fear in it (1918).

Brown and Appellant Bernard began putting the charcoal lighter fluid in the back seat and the back of the car by the rear window, and then the back seat of the driver's side (1919). Bernard was applying the lighter fluid to the driver's seat and the front passenger's seat (1919). Brown had a T-shirt over his can of lighter fluid, letting the fluid flow onto the T-shirt, in an attempt to hinder the plan of the fire from taking place (1921). Brown kept telling Lewis not to say their names so the Bagleys would not hear it, and Appellant Vialva told the men, it did not matter because the victims were going to die (1922). Brown knew then that the people would die (1922). Brown then put lighter fluid on the outside of the trunk of the Bagley's Buick (1922). The trunk latch was inside the glove compartment, and Appellant Vialva the trunk to be opened (1923).

Bernard or Lewis opened the trunk, and Vialva put on a ski mask, then Vialva "automatically" shot Todd Bagley first, and then a second shot was fired (1923-24). Brown had turned his head after Vialva shot Todd Bagley, and heard the second shot, then Brown looked and saw blood coming from Todd Bagley's head, "like a water faucet" ( 1924). Brown did not see Stacie Bagley shot, but he heard the second shot ( 1925). Right before Vialva opened the trunk, Stacie Bagley told Vialva "Jesus loves you," and Vialva told her "Shut the fuck up, bitch, I'm about to open the trunk and I don't want to hear that shit" ( 1936).

Brown walked down the hill (1926, 1956). A few seconds passed and he then saw the vehicle on fire (1926, 1930). Appellant Bernard stood by the car when the Bagleys were shot by Vialva (1928). Christopher Lewis was running down the hill while the Bagleys were shot (18 R. 1928). Vialva was close to the trunk, where he stood when Vialva shot the Bagleys, and Bernard was the only person positioned to light the fire inside the vehicle (1930). Brown could not recall when the trunk was closed, but he did not close it (1930).

Brown switched clothes with Lewis because Brown's T-shirt contained lighter fluid  (1931). Lewis threw the T-shirt soaked with lighter fluid into the woods (1932). After Vialva and Bernard, Brown, and Lewis had run down the hill, they got

into Bernard's Buick Park Avenue ( 1932).  Brown explained that as Bernard drove down the road, the car turned perpendicular and ended up in the ditch (1933).

Patricia Retzloff, the criminalist with the Texas Department of Public Safety Crime Lab, tested the ski mask recovered from the Bernard's Park Avenue for DNA, and out of the four suspects, only Vialva's DNA could not be excluded (1980).  There is a one in 67, 000 probability that a person would have the type of DNA found on the ski mask, which was consistent with Vialva's DNA (1992).

A white T-shirt found at the scene had Christopher Lewis' own blood on it (19 R. 1986).  The trunk and items taken from the trunk were burned, therefore, the criminalist was unable to recover DNA from those items since the cells were broken down and destroyed by the fire (1987).

Charles Parker, a criminalist with the Texas Department of Public Safety, did a fingerprint analysis of the prints found on the .40 Glock recovered from the scene (G.E. 2), and the .22 caliber handgun (G.E. 3), and determined that no suitable latent prints appeared on the weapons ( 2006).  No suitable latent prints were found on the identification card belonging to Appellant Vialva or the lighter fluid cans, the Bible, or the Bagley's driver's licenses (2007-2008).  Likewise, the Bagley's wallets, the vehicle registration papers, and fragments of the burned vehicle's tail lights, did not reveal suitable latent prints (2009-2010).

20

Alton Stuart, a special investigator with the United States Army, attended the medical examination of the bodies of Todd and Stacie Bagley (2017). Bullets were retrieved from the bodies also (2020). Ronald Crumley, a Firearm and Tool Mark Examiner with the Texas DPS Crime Lab in Austin, explained that the DPS crime lab was unable to determine whether the two .40 caliber bullet fragments taken from the two victim's bodies were fired from the .40 Glock found at the scene (2026). Glock barrels are smoother and will leave very few individual marks (2027). The .22 caliber weapon found at the scene required 17 pounds of pressure to fire it, whereas the .40 Glock only required 5 pounds of pressure (2030-2031). Anyone attempting to fire the .22 caliber weapon would see that it was not functioning properly (2030-2031). When the .40 Glock is fired, the shell casing is ejected to the right (2031). Therefore the shooter would have to be to the left of where the shell casings land (2031).

Dr. Janice Townsend-Parchmann, a Forensic Biologist employed as a Medical Examiner by Dallas County, performed the autopsy on Todd Bagley ( 2035). The autopsy showed that Todd Bagley had been shot in the left side of his forehead, causing the bullet to enter his brain ( 2039-2040). With the damage of Todd Bagley's brain stem and the pons portion of the brain, he likely died very quickly (2043).

Blood was inhaled into Todd Bagley's lungs, so he inhaled at least once after being shot, but was instantly unconscious and died very quickly ( 2043). The shot was not fired at contact range, but likely a foot or so away (2046).

Dr. Joni McClain, a medical examiner with Dallas County, performed the autopsy upon Stacie Bagley (2056). Stacie died of a gunshot wound to the head, smoke inhalation and thermal injury (2057). Stacie Bagley was shot in the face, on the right side, just below her nose ( 2057). The bullet entered Stacie's face front to back, just slightly right to left, slightly upward ( 2058). The bullet went through her facial bones, the right lobe of the cerebellum, and then a projectile penetrated into the right occipital or back portion of her brain ( 2058). There was no exit wound for the bullet, and the damage to Stacie's brain did not kill her right away ( 2061). An examination of Stacie Bagley's throat and lungs indicated that she inhaled smoky sooty material (2062). A toxicologic examination of her blood revealed a carbon monoxide level of 45%, which indicated that the inhalation of the smoke contributed to her death (2062). She also had severe thermal injuries ( 2063). The positions of the Bagley's bodies were consistent with lying in the trunk, when the shots were fired (2064).

1422

Thomas Sing, an arson investigator with the Texas State Fire Marshal's Office, determined through his investigation, that the burned vehicle, the Buick LaSabre, was not accidental ( 2075). The fire was of incendiary origin, that is, intentionally set by a person (2075). Someone poured accelerant on the hood of the vehicle, which ran over the side of the vehicle and down towards the wheel well (2082). The vehicle was severely damaged by the process of the fire, which burned from the hood towards the trunk, although the prevailing winds at that time would have been moving from the trunk towards the hood ( 2081). The flammable liquid was poured on the top of the trunk lid as well ( 2082). The point of origin of the flame was inside the interior vehicle, on the lower side behind the driver's seat, which is where the fire burned the hottest ( 2083-2084). It is possible someone could light the fire standing on the side of the vehicle to toss a match to light the material, which burned the hottest behind the driver's seat due to a large amount of accelerant (2086). It engulfed the passenger compartment, then moved to the outside of the car ( 2091-2095). The trunk area also had incendiary material inside it (2087). The trunk also may have contained gasoline vapors ( 2098).

Samples were taken from the two charcoal lighter fluid cans found at the scene were collected and sent to the crime lab ( 2101). The arson investigator opined that the accelerant used to burn the Bagley's vehicle was consistent with a medium

23

1423

petroleum distillate like charcoal lighter fluid ( 2102). The T-shirt found at the scene (G.E. 4), tested positive for a medium petroleum distillate, which would be consistent with charcoal lighter fluid (2129).

On June 21, 1999, the banking records from the Bagley's credit union show that there was an attempt to withdraw $300, using the Bagley's check cashing card (ATM card) ( 2120). A few minutes later, someone attempted again to withdraw money, at the same location using the Bagley's card, and $40 was withdrawn, which left a balance of $2.60 ( 2120). Within one minute, the user attempted to withdraw another $40, which was unsuccessful (2120-2121). Two more attempts to withdraw $40 occurred within the next few minutes, which were also unsuccessful ( 2121). There were numerous other attempts (2155-56).

Sergeant Jeff Fholer, with the Killeen Police Department, executed a search warrant at the home of Tony Sparks on July 7, 1999, and found a ladies watch hidden in the jacket pocket of an article of Sparks' clothing (19 R. 2165).

Gregory Lynch identified the Glock .40 caliber found at the scene, as one belonging to Appellant Brandon Bernard (2183). Lynch borrowed the weapon from Bernard, before the killing ( 2183). Lynch knew there were only two bullets left in the gun, because he removed the clip ( 2183). The bullets looked different because of the design i( 2183). On June 21st, Vialva and Tony Sparks called Lynch, and

asked for the gun (2184).  Lynch argued with Appellant Vialva on the phone over the

gun ( 2185).  Vialva stated to Lynch that he was on a "mission to make money"

(2185).  Later that day, Bernard and Vialva, along with Chris Lewis, Tony Sparks,

and Terry Brown, came to Lynch's house in Bernard's car, and Lynch gave Tony

Sparks the gun ( 2186).  After Brown put the gun in his waistband, Lynch spoke with

Terry Brown at the front door for about two minutes, while Brown smoked a "blunt"[2]

( 2187).  The day after the killing, Lynch remarked to Sparks and other friends, that

he should not have given them the gun (2189).

Ramona Berry knew Bernard and Vialva, and "hung out" with them as part of

the "Two-One-Two PIRU" gang ( 2203).  On June 21, 1999, she went with friends

named "Roshon" and "Tiffany" to Tony Spark's residence ( 2204). Bernard, Vialva,

Lewis, and Sparks were at Sparks' home (2205).  As Bernard left, Vialva told Bernard

"don't forget to come back" (2206).  Ramona asked Vialva what were they doing and

Vialva replied "plotting" ( 2207).

Curtis Magee, another co-hort of the gang, was present when Tony Sparks

asked Greg Lynch if he had any guns ( 2230).  Greg Lynch told Sparks that he gave

Vialva the guns and he did not have them any more (2232).

---

[2]A blunt is a cigar with marijuana in it (20 R. 2187).

25

Ernest Rowell, a soldier in the United States Army, identified Government Exhibit no. 2, the Glock .40 caliber found at the scene, as a weapon he purchased (2244). This weapon was stolen out of his vehicle (2245). The gun was not loaded when it was stolen, however, a loaded magazine was stolen along with the gun (2245). The clip had ten rounds of federal hollow tip bullets (2247).

Billy Rorie, another member of the "Two-One-Two PIRU" gang, explained that Terry Brown was living with him at the time of the offense ( 2251). On June 21, at six or seven in the evening, Brown received phone calls from "Chris" ( 2251). Rorie was not sure if it was Chris Vialva or Chris Lewis ( 2251). He stepped outside with Brown and saw a big maroon Buick pull up (2252). In the car was Vialva, Lewis and Sparks ( 2252). While the group chatted at the curb, Vialva told Rorie, they had $40 from the person in the trunk, and "Little Tony" told him "they got them from Mickey's" ( 2257). Vialva told Rorie they would leave the victims in the park "and go about their business" (2258).

The group talked at the curb, and Rorie heard a lady's voice in the trunk (2253). The woman's voice sounded frightened and scared and asked "do you believe in Christianity?" ( 2254). Sparks then told her " I don't give a fuck, because we thugs" (2254). Rorie went back in the house to wash dishes because he knew "something was up" ( 2253).

26

Brown came back in the house a few minutes later, and stated that Appellant Bernard was coming to pick him up to go grocery shopping (2 225). Rorie believed that Brown left with Bernard approximately 15 minutes later ( 2256).

Henry Amen, a criminalist with the Texas Department of Public Safety Crime Lab in Austin, explained the gun shot residue tests performed on Appellants Vialva and Bernard, Terry Brown, and Chris Lewis, were useless and would not provide any meaningful evidence due to the elapse of time (20 R. 2281-2282).

Raymond Pagel, of Pagel & Sons Jewelers, Killeen, Texas, performed an appraisal of a wedding band sold to Todd Bagley in November 1995, at the request of law enforcement ( 2284). The wedding ring, worn by Stacie Bagley, had a value of $2250 in 1995, which increased to $2700 by 1999 (20 R. 2286).

Christopher Lewis was convicted of car jacking, possession of firearms (the .22 caliber gun), and aiding and abetting the murder, as a result of a plea bargain for Lewis' truthful testimony ( 2301). Sparks was on probation previously for an assault, prior to the killings ( 2304). He was also a member of the "Two-One-Two PIRU" affiliate of the Bloods gang ( 2307). This gang included Brandon Bernard, Tony Sparks, Craig Lynch, Christopher Vialva, Billy Rorie, and Terry Brown ( 2307). Their colors were red and green, and members would wear clothing with that color (2309).

1427

On June 20, Christopher Lewis was staying with Tony Sparks, because he was "kicked out" of his home ( 2310). At Spark's home that day, Vialva came over and the three discussed the idea of robbing someone for money (2310). Vialva needed money because he had been kicked out of his home ( 2311). The three young men were waiting until Sparks' mother fell asleep and Lewis and Vialva walked to Christopher Vialva's house to get something to eat ( 2314). Vialva, and Lewis then went to an abandoned house next door to Sparks' home ( 2314). Sparks came out of his home and joined them, and they walked to Billy Rorie's home ( 2315).

Lewis had the .22 caliber weapon (2316). They were then approached by the police, and Lewis threw the gun in the bushes ( 2317). Sparks' mother had to pick them up from the police, and Vialva was let go because he was an adult (2318).

The next morning, June 21, Lewis went back to Tony Sparks' home, and Appellant Vialva called ( 2319). Vialva told Sparks he was coming over and that he had retrieved the .22 out of the bushes ( 2319). Vialva came over to Sparks' home with Bernard ( 2320).

After other activities, Vialva, Lewis, Sparks, Bernard and Brown all discussed planning a robbery (2324). Bernard and Brown made fun of the .22, saying that "if you pulled that on anybody, they'll laugh at you" ( 2324). They decided they needed a different gun and called Gregory Lynch ( 2324). Sparks called Lynch and the two

28

1428

argued over the gun, since it belonged to Brandon Bernard, and they decided to go over to Lynch's home and retrieve the gun (2325).

After they got the gun, they went to a Winn-Dixie store, and an IGA grocery store, and could not find anyone to rob so they went to Mickey's across the street (2327). Vialva was frustrated there was no one worthy of robbing at the grocery stores and was determined to find someone to rob at Mickey's (2337). Lewis, Vialva, and Sparks got out and approached Todd Bagley for a ride (2328). Bagley agreed to give them a ride, and they got in and left in the Bagleys' car (2329). Vialva told Bagley where to turn and that they were going to an uncle's home, and while the car was moving, Vialva pulled out the .40 Glock[3] and pointed it at the back of Todd Bagley's seat and told him there was a change of plans (2330). Mr. Bagley knew there was a gun pointed at him, since he could see it through the rear view mirror (2330). Sparks pulled out the .22 caliber gun (2331).

Vialva took the wallet from Mr. Bagley, and Sparks took the purse from Stacie Bagley (2332). They took out the Bagley's identification cards, their ATM cards, and their money (2332). Sparks handed Lewis the .22 and Lewis had to hand it back to Sparks because a bullet had "popped up" or jammed (2333, 2425). Once they got

---

[3]All of the conspirators knew there were only two bullets in the gun, because it had been discussed while planning the robbery (2343).

A29

to a dirt road behind some houses in Killeen, Vialva told them to stop, get out, and open the trunk ( 2335).  The guns were pointed at Todd and Stacie Bagley (2335). Sparks demanded the jewelry the Bagleys had on and they gave it to them ( 2335). The Bagley' were forced into the trunk; Vialva drove the Bagleys' car ( 2336).

Vialva demanded the PIN number for the ATM cards, and then went to an ATM to use the cards (2337).  Vialva covered his face while at the ATM ( 2338).

While Vialva was out of the car, Lewis had a conversation with the Bagleys (2338).  The Bagleys told Lewis they gave Vialva the wrong PIN number, and when Vialva got back in the car, he threatened to kill them if it was not the right number (2338).  Todd Bagley had suggested that they could pawn his wife's ring, that it was worth some money ( 2339).

The group then went to Wendy's hamburgers, and Lewis and Sparks went inside ( 2340).  Vialva, waited in the car, and the men purchased food and drinks (2340).  Lewis and Sparks argued over who was to hold the money taken from the Bagleys and Lewis made a comment "are you going to kill me too?" ( 2341).

After Wendy's hamburgers, the men and their hostages drove to Copperas Cove to pawn the wedding ring taken from Mrs. Bagley (2344).  They returned to Killeen since Vialva needed his I.D. to purchase cigarettes and to pawn the rings (2345).  They stopped for Vialva's I.D. and went to a pawn shop to pawn Stacie

1430

Bagley's wedding ring (2348).  Vialva went to the pawn shop in Killeen, which only offered $500 for the ring, which he did not accept (2348). They stopped at some ATM machines, and were unsuccessful in retrieving money (2348).

When Vialva returned to the car from the pawn shop, Sparks told him that he did not want to go through with it (because of his conversation with the Bagleys), and Vialva told them if they were stopped by police they would have to have a shoot out ( 2351). ialva thought killing the Bagleys was necessary since they saw his face, and burning the car was necessary to hide their fingerprints (2352).  The discussions about a shoot out "got Sparks back in the mood then" (2352).

After leaving an ATM in Copperas Cove, Lewis called Terry Brown, at the direction of Vialva, to meet them at a place behind Rancier Street in Killeen ( 2353). They spotted Brown on the way and picked him up ( 2354).  Terry Brown put the .22 in the back of the seat and questioned the Bagleys, and told the other men he was going to kill the Bagleys (2354).  Vialva told Brown not to do it ( 2355).  They dropped Terry Brown off with Billy Rorie, and Rorie said they were crazy ( 2355). Brown had suggested to Vialva just to wipe down the car, leave it in "long branch" and just call the police, and not to kill the people ( 2356).

31

They then drove to Vialva's home, and waited in the car for him (2358). While in the car, Lewis had a conversation "about God again," with the Bagleys ( 2358). The Bagleys begged them to spare their lives, and the men could have the car and everything they had ( 2358). Vialva returned to the car with a black and red mask and a shirt ( 2359). Vialva ordered them to all be quiet because he could hear the Bagleys outside (2359).

From Vialva's home, Vialva drove and stopped by Lynch's house for a minute or two, and then by the middle school, because the Bagleys were kicking on the trunk trying to get out (2361). Vialva was angry at the Bagleys and told them " I was about to let you out, but now you fucked up" ( 2362).

They drove around and then met up with Brandon Bernard, Joey Presley and Terry Brown, in Brandon Bernard's car ( 2363). Bernard came up for a cigarette, and Brown screamed out the door to Vialva "just leave them in the park," that he would call the police and just wash the car and not to kill them ( 2363). Vialva told Brown "no, they seen my face," and that he had to kill them ( 2364). Bernard went to drop Joey Presley off, and Vialva told Bernard to get gasoline to burn the car (2365).

The group with Vialva then went by Tony Sparks' house and he got out with the jewelry and the "black and mild" cigars ( 2366). Vialva asked if he could keep the .22, and that he would go with Sparks the next day to pawn the jewelry, which

1432

included a woman's watch, two rings, and a necklace ( 2367). Sparks reluctantly let Vialva hang on to the gun ( 2367).

After Sparks and Presley were dropped off,  Lewis, Vilava, Brown, and Bernard, drove towards Westcliff ( 2367). Vialva gave Brown money to purchase gas to burn the car, and he returned with the purchase and got in Bernard's  car with Bernard ( 2368). Lewis and Vialva were in the Bagley's car (2368).  Driving up the hill, the road was very rough and the Bagleys were banged around in the trunk (2372). Vialva acted happy and laughed and said "that was a bumpy ride" ( 2377).

They followed Vialva out to the scene of the killing, and Lewis and  Vialva got out of the car ( 2370).  Brown and Bernard ran up the hill to the Bagley's car, with lighter fluid in their hand ( 2371).  Brown and Bernard poured lighter fluid on the car, while the Bagleys sang and prayed ( 2372).  Vialva was yelling at the Bagleys, saying "he was about to let them out and to shut up" ( 2373).  Bernard wanted Lewis to open the trunk but Lewis refused ( 2373).

Terry Brown chastised Lewis for calling Bernard by his nickname "Dip" (2373).  Vialva told them it did not matter because he was about to kill the Bagleys ( 2373). Lewis began walking down the hill, turned around, and saw Vialva with the mask on, shoot the victims in the trunk (2374).  Vialva did not hesitate at all (2376). Vialva shot the man first and then the woman (2374).

33

1433

Lewis ran down to Bernard's car, and wanted to run away ( 2378). Vialva and Brown got in Bernard's car, along with Lewis, and Bernard drove ( 2379). The car became stuck in a ditch ( 2379).

They tried to push the car out, and threw the charcoal lighter fluid cans in the ditch (2381). Bernard and Vialva threw the guns in the woods ( 2384). Eventually a truck with a chain pulled them out of the ditch ( 2386). The Bagley's car was still burning on the hill ( 2386). A police car arrived as Bernard's car was pulled from the ditch ( 2386).

A pawn dealer in Killeen recalled Appellant Vialva bringing Stacie Bagley's wedding ring in to pawn, on June 21, around 6:00 P.M.; the dealer only offered $200 because he wanted to get the guy out of the store, because the ring looked too nice to belong to the young man ( 2440). The dealer noted that when "a young kid comes in with a real high dollar ring and it just doesn't fit," and believed the ring was likely stolen (2441, 2443).

Charles Woodard, Stacie Bagley's father, a criminal investigator with the Texas Department of Criminal Justice, spent 20 years with the Killeen Police Department (2472). The watch hidden in the jacket pocket of an article of Sparks' clothing (2165), was identified by Woodard as belonging to his daughter ( 2473).

34

# ARGUMENTS AND AUTHORITIES

## I.  BERNARD HAS FAILED TO DEMONSTRATE CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE INITIAL STAGES

As noted above, the first ground in Bernard's motion is that his two attorneys were constitutionally ineffective from the time of their appointment until the time of trial (Bernard's Motion at 2).  Although this is a separate issue in his motion, instances initial stage ineffective assistance are contained within other claims within his brief.

## II.  BERNARD HAS FAILED TO DEMONSTRATE CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE GUILT PHASE

### (Responsive To Bernard's Motion, Ground 2, at 2, (his memorandum heading "III"), 7-74)

### Nature Of The Claim

The second ground in Bernard's motion is that his two attorneys were constitutionally ineffective "during the guilt phase portion of the trial" (Bernard's Motion at 2).  This is the first issue that Bernard discusses in his memorandum.  The first two sections of his motion "I" and "II," are introductory, as are his initial sections in "III" (Bernard's Motion at 5-32).  Bernard's first specific claims occur after the statement "The following shows what a reasonably effective attorney would

1435

have established using available and/or readily discoverable materials" (Motion at 33).

As shown below, Brown and Lewis were first cross-examined by Mr. Goains, one of Vialva's attorneys. Following this cross-examination it was the turn of Bernard's counsel. The answer to most of Bernard's complaints in his motion is that his current suggestions as to areas of examination he now thinks would have been fruitful would have been cumulative to what had already been brought out on direct and cross. Additionally, the evidence against both defendants was overwhelming, and strategically, there was a potential for more harm than good regarding further inquiry into a number of areas. Certainly, nothing Bernard raises approaches his necessary showing that the outcome of the proceeding would have been different had his second-guessing suggestions been followed.

### Examination And Cross-Examination Of Brown

To examine the complaints regarding the cross-examination of Brown, his specific testimony should be reviewed. The following contains Brown;'s essential testimony.

36

Brown's Direct Testimony

The testimony from Terry Terrell Brown was that he had pleaded guilty to aiding and abetting the murder of Todd and Stacie Bagley, and to possession of a .22 caliber pistol (1855-58). At the time of his testimony, he was awaiting sentencing on these charges (1857). Brown had received no promises as to his sentence; it was "strictly up to the judge" (1858-59). In exchange for the plea, he had agreed to truthfully testify (1859).

Brown discussed his prior criminal conviction for trespassing, one or two years prior to this testimony, for which he had gone to jail and paid a fine (1859-60). He had no other prior convictions (1860). On June 21, 1999, Brown had been seventeen years old, and he was not then on probation or supervision (1855, 1860). At the time of this testimony in May of 2000, he was eighteen years old (1855). Brown had accompanied his family on their arrival in Killeen; they had previously lived in Nebraska and North Carolina (1860-61).

Brown had met Christopher Vialva and Brandon Bernard at Killeen High School (1860). Brown lived in the same neighborhood as Vialva and Bernard (1856).

Vialva and Bernard were members of a Killeen gang, the "Two-One-Two PIRU," which was affiliated with the national "Bloods" gang (1861). Brown also became a member of the "Bloods" gang, after he had joined the "Duce-Nine Bloods" in Omaha, Nebraska (1861-62). Brown testified that he felt a "bond" with other "Bloods" gang members (1862). The color that the "Bloods" sometimes wore was red (1862). Two other juveniles from the neighborhood, Christopher Lewis and Tony Sparks were also members of the "Two-One-Two PIRU" (1863), as well as Gregory Lynch (1867).

Brown said that he became friends with the "Two-One-Two PIRU" gang members "because we shared a lot of the same personalities" (1864). This gang's territory included the Heather Glen and Long Branch neighborhoods (1864-65). The Mickey's store, on Rancier Drive, where the kidnaping occurred, was "in between" their territories (1864-65). Other gangs in Killeen were the "Crypts," "Folks," and "Vice-Lords" (1865).

It was "common" for members of the same gang to join together in committing crimes (1866-67). Brown testified, however, that "just because a person's a Blood doesn't mean you do a crime with that person" (1866).

Brown related that on June 21, 1999, he was with Bernard, in Bernard's vehicle, a Buick Park Avenue, along with Vialva, Lewis, and Sparks (1867-68, 1870).

38

1438

The Buick was being driven by Bernard; Brown also was in the front seat, and Vialva, Lewis, and Sparks were in the back seat (1870).

Brown testified that "we were out looking for, I guess you could say, victims" (1867). The plan was "that they would just rob someone coming or going into a store" (1868). They drove through the K-Mart parking lot on Fort Hood Road (1869).

Brown was aware of two weapons being possessed in Bernard's Buick: A .40 caliber semi-automatic Glock pistol (1869, 1872; G.Ex. 2), and a .22 caliber semi-automatic pistol (1869; G.Ex. 3). The .40 caliber Glock was Bernard's firearm (1872).

Approximately one week before the offenses, Bernard and Brown had gone out to practice shooting the .40 caliber Glock; they shot at a mailbox in their neighborhood (1872). Brown remembered that after their practice, they only had two rounds remaining (1873).

Prior to the offenses, Brown had possessed the .40 caliber Glock at his residence (1872). Then, on the night of June 20, 1999, Lynch had borrowed the weapon from Brown, to use for self-protection, after Brown had retrieved it from its hiding place in the washing machine (1872-74). Brown first had asked permission from Bernard to transfer the firearm to Lynch: Brown testified that "Bernard said that it was okay" (1874). Brown explained that, shortly thereafter, they rode out to

39

1439

Lynch's residence to pick up the .40 caliber Glock (1872).  Brown recalled that "Sparks, I believe, got out to get the gun" (1875), and that Lewis "knew that we were coming to get the gun" (1877).

Later on June 20, Vialva, Lewis, and Sparks were walking down the street, when they were observed by the police (1875).  Brown stated that "they had to throw the gun" (1875).  The .40 caliber Glock subsequently was retrieved (1876).

On June 21, 1999, as they were riding through the K-Mart parking lot looking for victims (1867, 1871), Brown initially possessed the .40 caliber Glock (1871).  Sparks was carrying the .22 caliber pistol (1871).

After they left the K-Mart parking lot, they proceeded across the street to the parking lot of the Winn-Dixie (1878).  Brown testified: "we were looking for victims once again" (1879).  Brown transferred the .40 caliber Glock to Vialva (1879).  They did not find anyone "that would have any money" (1880).

They decided to "ask people for rides," and "while the person was giving them a ride . . . that's when they would do the robbery" (1880-81, 1886, 1935).  Brown observed Lewis approaching people and asking for a ride (1935).

The group left the Winn-Dixie, and proceeded to the IGA or "Foodliner" store (1880).  After a "good amount of time," they departed, again without finding a victim (1882).

At sometime between 2:00 and 4:00 p.m., Bernard, Vialva, Lewis, Sparks, and Brown then proceeded across the street to the Mickey's store (1883, 1893). This establishment contained a laundromat section and a store section (1883). Brown testified that he and Bernard went into the laundromat's restroom, and Vialva, Lewis, and Sparks went into the store (1884). Brown stated that when he and Bernard came out, "we realized [the others] were gone" (1884). Brown explained: "At that point we realized that they had found a victim" (1885).

Part of the plan, as related to the others by Vialva, had been that once they were with the victim in the victim's car, they would proceed to an "ATM" and obtain as much money as possible from the victim's account (1886). Additionally, Vialva also had come up with the idea of Lewis being the one to approach people to ask them for rides because Lewis was the younger-looking and he was "more likely to get a ride than the rest of them" (1886-87). After Lewis found a person willing to give him a ride, the plan called for the others, without invitation, to get into the same car (1887, 1935). Accordingly, as Brown and Bernard left the Mickey's store, driving in Bernard's car, they searched for their associates by riding around and looking "at some ATMs" (1886).

Brown and Bernard "rode past a money machine on Martin Luther King" (1887). Then, they went back to the Winn-Dixie, where they filled out applications

41

for employment (1889).[4]  Subsequently, they proceeded to "Clee's home," where

Bernard dropped off Brown (1887, 1892).

Later, Brown received a telephone call from Lewis, who said "that they were

out at Copperas Cove and they needed help" (1894).  Brown could hear Vialva's

voice in the background (1893).  Brown walked out of the residence and waited for

them at the end of the corner, when "they pulled up in an automobile (1896).

Brown entered the vehicle and joined Vialva, Lewis, and Sparks (1897).

Vialva was driving (1899).

Brown initially had a conversation with Sparks (1898, 1900).  Sparks told

Brown there were "people in the trunk" (1898).  Brown said that "I started to speak

to the people," and "[t]hey just told me their names and where they were from"

(1898).  The woman was Stacie Bagley, and the man was Todd Bagley (1899).

Brown testified that he decided to find out "if they were trying to harm these

people or not," so he "grabbed the .22 caliber" and pointed it toward the back seat,

meaning did they want the people killed (1899). They responded "no" (1899). Brown

then handed the .22 caliber pistol back to Lewis (1900).  Vialva still had the .40

caliber Glock in his possession (1901).

---

[4] This testimony was corroborated by the applications for employment Brown and Bernard
filled-out at the Winn-Dixie (1889-92; G.Ex.s 39 and 40).

Brown's advice to the others was to leave the car at the Long Branch Park (1901). Later, Brown would notify the police so that the Bagleys could be released (1901).

Brown told the Bagleys, still situated in the trunk, that they were going to be dropped off in the park and the police would be notified (1915). Brown testified that he then had Stacie Bagley's checkbook, which contained her address and personal identification, and he warned her that he knew where she lived in Iowa, and she replied that she was a Christian and that she was not going to report him (1915).

Vialva dropped off Brown one block from Brown's residence (1901). Brown made an unsuccessful attempt to make a telephone call to Bernard (1902). Brown then received a call from Bernard (1902). Bernard picked up Brown (1902). Also in Bernard's vehicle was Joey Presley (1902). They all drove down to Long Branch Park to look for the Bagleys' car (1902). Brown testified that at approximately 7:30 p.m., "we seen them coming" (1902).

After Vialva parked near the pool, Brown walked up to the Bagleys' car and told this group to "come on" (1902). Vialva, speaking in a normal tone of voice, "said that they could not leave the car, because they had [their] fingerprints on it" (1904). Vialva then said that: "he had to burn the car and kill the people" (1902, 1904).

43

A43

At the park, Vialva also said to Brown "that we needed to get some gasoline, and that we would take the back road to Temple, I believe, and burn the car, or something like that" (1905). It was discussed and decided that Bernard would first take Presley home (1904-05).

Brown returned and got back into Bernard's car (1904). Brown informed Bernard about Vialva's plan (1905).

At the same time that Bernard was taking Presley home, Vialva dropped off Sparks because he had an 8:00 p.m. curfew (1906). The two destinations were close together, so Bernard, driving his vehicle, followed Vialva, who was driving the Bagleys' car (1906).

Presley, also a member of the "Two-One-Two PIRU" gang, did not want to go home (1904). Brown, however, urged Presley "that he needed to go home" (1904).

As the two vehicles approached the Mickey's store on Westcliff, Vialva approached Brown and Bernard, and Vialva reminded them "that we had forgot to get the gas" (1906, 1909-10). After both vehicles parked at the Mickey's store, Brown approached Vialva, sitting in the driver's seat of the Bagleys' vehicle, and Vialva provided Brown with $12 to buy gasoline (1907).

While in the Mickey's store, Brown and Bernard realized that they did not have a container for gasoline, so they looked down the aisles for flammable materials

1444

(1907, 1910-11). Brown found charcoal lighter fluid (1907, 1911). Brown gave the money to Bernard to purchase the cans of charcoal lighter fluid, while Brown went to the restroom (1907-08).[5]

After Bernard paid for both the cans of charcoal lighter fluid and a package of "Lemon Heads" for Brown, they went back out to Bernard's car (1911-12). When Bernard said he did not have a lighter for his cigaretts, Brown went back into the store and got a free pack of book matches (1911-12).

Bernard and Brown saw Vialva and Lewis "riding down the street" (1912). Brown explained that "we pulled up to the car, and that's when it was discussed that we would go down – we would go down some road that was supposed to be a back road and, I guess, burn the car there" (1912). Bernard's car led the way, followed by Vialva in the Bagleys' car (1913-14).

Brown related that as they were riding out of town, "Christopher Vialva had signaled to us to turn onto a side road" (1913). This road led to the "BLRA," the Belton Lake Recreation Area (1913). Brown referred to the road that they took as the

---

[5] Brown's testimony was corroborated by a photograph taken from an ATM machine showing Brown walking towards the restroom (1909-10; G.Ex. 37). The photograph shows that Brown was wearing a tank-top T-shirt, and that he had another T-shirt on his head (1910). Brown identified G.Ex. 178 as the T-shirt he was wearing in that photograph (1910).

"Little Nolan" road (1913). Brown identified the road from an aerial photograph (1913-14; G.Ex. 76). Brown remembered that they went across a cattle guard (1914).

Brown noticed that Vialva, driving behind them in the Bagleys' vehicle, "went off to the side up a hill" (1914). Bernard's car could not make it up the same hill, so they backed down (1918).

Brown stated that he and Bernard "walked up the hill with the lighter fluids that we had brought" (1918). Once Brown and Bernard reached the top of the hill they began to pour the charcoal lighter fluid inside the car (1918).

At that point, Stacie Bagley told Lewis: "Jesus loves you," and then "Jesus, take care of us" (1918).

Brown and Bernard opened the front and rear passenger doors of the Bagleys' vehicle (1920). Brown started pouring the charcoal lighter fluid in the back seat; first on the driver's side and then on the passenger's side (1919-20). Brown was still "trying to prevent the act," and he said that he was trying to minimize his actions by putting the T-shirt he had on his head over the can to absorb some of the combustible fluid (1921). Meanwhile, Bernard poured the charcoal lighter fluid in the front seat (1919-20).

Brown related that Lewis kept saying Bernard's name loud enough for the Bagleys to hear it, and Brown told Lewis to "shut up" (1921). Brown testified (1922):

> At that time, Christopher Vialva told him [Lewis] it didn't matter because they wasn't going to say nothing, because they was going to die. And at that point, I knew that the people would die.

Brown put charcoal lighter fluid on the outside of the trunk (1922).

Vialva then told Lewis to open the trunk through the glove box (1922). Before the trunk was opened, Vialva put on a face mask that covered his mouth and parts of his nose (1923). Brown identified G.Ex. 13 as the mask that Vialva had placed on his face (1923-24; G.Ex. 13).

Just before the trunk was opened, Stacie Bagley said "Jesus loves you," and Jesus, take care of us" (1936). Brown testified that, in response, Vialva said: "Shut the fuck up, bitch. I'm about to open the trunk and I don't want to hear any of that shit" (1936).

The trunk was opened, and Brown observed Vialva shoot Mr. Bagley in the head while Mr. Bagley was still in the trunk (1924-25). Brown turned his head away from the spectacle (1924). Brown then heard a second shot (1924).

When Brown turned back, he saw a stream of blood "shoot straight up" as a result of the shot to Mr. Bagley's head (1924-25). It was a "constant stream" (1924).

Brown indicated his vantage point at the time of the shooting for the jury on Government's Exhibit 171 (1925-26). Brown "backed up" at the time of the shooting (1925).

Brown testified that when he turned to look back at the trunk, he could see only the body of Mr. Bagley, who "was lying in the trunk with his head by the . . . left tail light" (1924-26). Brown could not see Mrs. Bagley because she was further back in the trunk (1925-26).

After Vialva had shot the Bagleys, Brown put lighter fluid into the trunk (1927). Brown then proceeded to run down the hill away from the vehicle (1926, 1928).

Brown explained that "everything happened fast" (1927). Brown was in a "fearsome, scared, panicking state of mind" (1927). Still, Brown knew what he was doing by putting the lighter fluid into the trunk before fleeing (1927).

While running down the hill, Brown looked back and he observed that the Bagleys' vehicle had been set on fire (1926, 1928-29); he also saw that the trunk had been closed, but he did not see who had closed it (1930). At the time of the shooting, Lewis was running down the hill (1925). After Brown saw that the car was on fire,

48

1448

he observed Bernard start to run away from the car (1929). Vialva's position remained behind the trunk of the car (1930). Brown testified that, based on these observations, the only person who could have lit the Bagleys' vehicle on fire was Bernard (1930).

As Brown came down the hill, Brown handed to Lewis the T-shirt that Brown previously had been wearing on his head, but now was saturated with charcoal lighter fluid (1930-32). Lewis threw this shirt onto "the wood line" (1932).

Additionally, Brown and Lewis switched shirts (1931). Brown put on Lewis' green "Chaps" shirt (1931).

Bernard also had run down the hill (1931). Brown noticed the book of matches they had obtained from the Mickey's store were on the front passenger's side of Bernard's Buick (1931). Brown could not say whether Bernard had then put the matches into the car, or whether the matches had been there already (1931).

Bernard related that other items were thrown into the wood line (1932). All four individuals, Bernard, Vialva, Brown, and Lewis, got into Bernard's Buick (1932). Bernard was driving, and Brown was in the passenger seat (1932). Brown stated that Vialva and Lewis were in the back seat, but he could not remember which side each person was sitting (1932).

1449

Bernard drove his car into a ditch, where it became stuck (1933).  The vehicle ended up perpendicular to the roadway (1933).  The four individuals tried and failed to push Bernard's car out of the mud (1933).

Brown testified that "two boys in a yellow truck came up, and they tried to help us," but they were unable to free the vehicle (1933).  Brown related that, subsequently, "some guy in a two-tone blue truck pulled up," and that he was pulling Bernard's Buick out of the mud when an officer arrived (1933).

Cross-Examination Of Brown
By Vialva's Counsel, Mr. Goains

First to cross-examine Brown was one of Defendant Vialva's attorneys, Mr. Goains.  Brown testified that in the "Duce-Nine Bloods," as in the  Two-One-Two PIRU" gang, there were no leaders; "[e]veryone is considered equal" (1937).

The defense went on to examine Brown's motivation, eliciting from Brown that he agreed to cooperate "a short while" after he was arrested "for the purpose of getting a lesser sentence" (1937).  While his plea agreement required him to testify truthfully, Brown agreed with defense counsel believing that "the U.S. Attorney had the sole discretion to determine whether you're telling the truth" (1937-38).

Next, the defense explored perceived inconsistencies in Brown's prior statements (1938-40). Defense counsel elicited from Brown that it was true that he had given several prior statements (1938).

Defense counsel asked Brown: "And in each of these statements, you changed your statements, didn't you?" (1938). Brown responded: "In each statement, it wasn't a matter of changing it. It was a matter of adding more detail . . . of "being more specific" (1938).

Defense counsel replied (1938-39):

> Okay. We're going to go through those in just a minute. But my question to you, isn't it true that each of those statements are dramatically different?

Brown responded "No, sir" (1939).

Defense counsel then produced Defendant's Exhibit 5, Brown's statement at the Army's CID office (1929). Counsel read portions from this statement, and Brown agreed that he said in this statement that: he was at a friend's house (Billy Rorie's house), when Brandon Bernard came by in his car, a Buick Park Avenue, and picked him up; at "18:30 or 19:00," which would be "about 6:30 to 7:00 o'clock" (1940). Defense counsel asked, based on Brown's prior statement that the first time he saw Vialva was between 6:30 and 700 p.m., "That's not even close to the information you just gave this jury, correct? (1940). Brown responded (1940):

51

1457

> The first statement that I made was like I said in the CIA
> (sic) office, that was before the deal was even approached,
> and this was before any information was known on the
> matters.

It was then reiterated that Brown's statement "was before they cut you any kind of

deal," and "before anything was even known" (1940).

Defense counsel focused on further inconsistencies. Initially, in this statement,

Brown denied knowing: who set "the car on the hill" on fire; how the vehicle found

to be on fire had arrived at that spot; and who killed the people found in the trunk of

the vehicle found burned (1941). Defense counsel made the point: "[That is a] little

different statement that you just gave to the jury, wouldn't you agree with me?"

(1941). Brown replied (1941):

> Yes. And like I noted, that was way before any of this had
> came into action , before the deal was offered. And like I
> said, that was before that they even knew that we had did
> the crime.

Brown testified that he did not make his "deal" with the government until "a few

months" after his arrest (1942).

Defense counsel then turned to another voluntary statement given by Brown

"a little bit later," at 12:30 on June 22 (1941-42, 1944; Def.Ex. 6). Defense counsel

first reviewed a portion of Brown's direct testimony (1942-43):

1450

Now, if I heard you correctly, when you just testified to the
jury, you told them that you were standing approximately
in this area (Indicating), is that correct, when the first shot
was made?

Brown replied: "No sir. . . . I stated that I was standing on that side of the car, but

further back" (1942) . . . "I said that's the position that I was standing there when they

– when he was talking to Christopher Lewis and Brandon Bernard" (1943).

Defense counsel asked: "How far back" (1943). Brown responded: "Far back

enough where I couldn't see the back of the trunk. I had a good view of Mr. Bagley,

though" (1943). Brown estimated his distance from the car as: "I imagine about from

here to the big-screen TV, maybe" (1943).

As to Vialva's position in relation to the Bagleys' vehicle, the following

exchange took place (1943):

Q. Okay. And where did you state Mr. Vialva was?

A. Right by the – by the tail light of the – that side, yes.

Q. Right here, sir (Indicating)? How far back?

A. It wasn't far back.

Q. A foot, two foot?

A He was pretty close.

As to the position of Mr. Bagley, and Brown's position at the time of the shootings, the following exchange took place (1943-44):

> Q.  Now, you said you could see Mr. Bagley.  What position was Mr. Bagley in?
>
> A.  He was laying down on his right side.
>
> Q.  Okay.  Now that's what you just told the jury, correct?
>
> A.  Yes, sir.
>
> Q.  Isn't it true that you stated in your other statement, "I could see the trunk was shut.  Vialva was outside of the car, behind the trunk, and was yelling at the man and the woman to be quiet.  I stopped because I could not take it anymore.  I turned around and started to walk down towards Brandon's car."  Do you remember making that statement?
>
> A.  On the day that – the day after we were arrested?

Defense counsel then confronted Brown with other statements in Defendants' Exhibit 6, relating to the jury that Brown had stated in this statement: that "'When I got there, Brandon was already waiting at the car,'" and thus, that Brown "had totally left this position and went back to where Mr. Brandon's car was parked" (1944). Brown agreed that he previously had made statements to that effect (1944).

1454

Defense counsel continued by reading Brown's statement of June 22, which included the assertion: "'Once I arrived at the car, I heard two shots.' Isn't that what you said" (1944). Brown agreed he had made that statement on June 22 (1944).

Defense counsel asked Brown to again "show us . . . where was Mr. Brandon's vehicle?" (1944). Brown replied that "it was on the – on the right side, right past the cattle guard" (1944). The spot was indicated to the jury on the map (1944-45).

Defense counsel reiterated that: "And you were all the way back here (Indicating), in this area, before you heard the two shots, correct?" (1945). Brown responded: "Yes, sir, that's what I said at that period of time" (1945).

Defense counsel then asked whether Brown had made the statement that "a car was carjacked at Mickey's" (1945). Brown replied: that he and Brandon had gone into the laundromat, they had come out, and the others were gone (1945).

Defense counsel established that Brown knew Andrea York (as his girlfriend that he "live[d] with") and Billy Rorie, and that Christopher Lewis was sometimes referred to as "Little Chris" (1945-46). Counsel asked Brown (1946):

> Isn't it true that you told Billy Rorie and Andrea York, "They said that 'Little Chris,' who is "Chris" Lewis, "had pulled a gun on the man and woman," isn't that what you told them?

1455

Brown denied making that statement (1946). Brown denied making the statement that "'Little Chris' put the people in the trunk of the car'" (1947). Brown maintained that: "To this current day, I still don't know who put them in the car" (1947).

Defense counsel asked whether Brown's trial testimony, that he had conversations with Mrs. Bagley at Billy Rorie's house, was reflected in any of his prior statements (1947). Brown replied that he had provided this information in giving prior statements but that he did not know whether it was included by those who drafted those statements (1947).

Counsel asked for a reason why "someone" would "put a mask on if they were fixing to shoot someone" (1947). Brown responded that he did not know such a reason (1948).

Brown again testified that the .22 caliber firearm belonged to Sparks, and the .40 caliber handgun belonged to Bernard (1948).

Finally, Brown could not estimate the time between purchasing the lighter fluid and the shootings (1948). Brown did say that they went "straight out that way" after he and Bernard met up with Vialva and Lewis (1948).

1456

## Cross-Examination Of Brown
## By Bernard's Counsel, Mr. Hunt

One of Bernard's attorneys, Mr. Russell D. Hunt, Jr., next cross-examined

Brown (1948). Bernard's counsel reminded Brown that he had testified that merely

because someone is a member of a gang, that does not mean that he will join with

another gang member to commit a crime (1949). Brown agreed, and explained that:

> What was said is, just like – let's say, for instance, you're
> a Blood and I'm a Blood. Just because you're a Blood
> doesn't mean I'm going to do a crime with you. I can
> choose – you know, I might choose [to be] a regular
> person, so to speak. Just because you're with the
> organization doesn't mean that you do crimes together.

Counsel also elicited from Brown that merely because a person is a member of such

an organization does not mean that the person commits any crimes (1949). Brown

agreed with defense counsel that being a member of a gang can be "kind of like a

neighborhood thing" with the "kids in the neighborhood," and that there are lots of

different neighborhood gangs, and different neighborhood "Bloods" gangs (1950).

Bernard's counsel next pointed out that Brown's trial testimony had been that

Bernard was a member of the "Two-One-Two PIRU" gang (1950). Defense counsel

asked: "and that's not right, is it?" (1950). Brown agreed with counsel, Bernard

instead was a member of the "Four-One-Five" Bloods gang (1950-51).

Defense counsel asked whether, when they were riding around the grocery store parking lots, "you certainly didn't encourage them to find somebody to rob, and tell them it would be a good idea to do that, did you?" (1951). Brown, however, admitted that "[a]t the IGA parking lot, I'd – I pointed out somebody that was riding [past]" (1951).

Counsel asked (1952):

> Okay. After there were a couple of abortive attempts where they sort of tried to talk to some people, didn't never get a ride, didn't do anything like that, and after you went to Mickey's the first time, did you all say anything to them like, "oh, you guys aren't really going to rob anybody. You aren't really going to jack anybody"

Counsel received the favorable reply from Brown that (1952):

> I can't recall if we had said it to them, but me and Brandon, I know we had discussed it. I don't remember if they were in our presence at the time.

Counsel recapitulated: "So, maybe when they were out running around, talking to people, you were talking to each other, saying, "oh, they're not really going to rob anybody," – (1952). Brown responded: "Yes" (1952).

Next, counsel's questions recounted that after they went to Mickey's, and the laundromat next to Mickey's, "and saw that the three young men, the two "Chris'" and Tony were not there anymore," Brown and Bernard went to the IGA parking lot,

1458

where there was an ATM machine, and then went to the Winn-Dixie where "[y]ou guys," "actually put in a job application" (1953). Counsel elicited that the purpose for applying was that they both really "wanted to get jobs" (1953).

Counsel again brought out that while Brown was in the park and Vialva said he was going to have to kill the people, Brown "doubted" Vialva "was actually going to do that" (1954). Counsel probed Brown for the basis of that knowledge, and Brown responded that he had known Vialva for "quite a while," and "I knew that wasn't the type of person that he was," and that he believed Vialva would not "go to that extent" (1954).

Counsel then focused on what Brown had told Bernard regarding his intentions toward the Bagleys (1955). Counsel asked Brown (1955):

> Okay. Then, after you had the conversation where you say you didn't believe Vialva would really shoot the people, you said you got into Brandon's car, and told Brandon about the plan, but certainly, you didn't tell Brandon, "We're going to go out in the countryside and shoot these people," right?

Counsel received the response "No sir" (1955).

The following colloquy then took place (1955):

> Q. Okay. You didn't mention that part of it at all?

59

A. I just basically told him the basics. I didn't know exactly what was going to happen, but I told him the basics.

Q. Okay. That you all were going to go out to the countryside?

A. Not basically the countryside, but that the car would be burned.

Counsel then recounted Brown's direct testimony that Brown put lighter fluid in the back seat and Bernard put lighter fluid in the front seat (1955). Counsel got Brown to agree that "after the shooting occurred," Brown "poured lighter fluid in the trunk" (1955).

Brown agreed that he thought the people were dead already (1956). Brown did not put lighter fluid into the trunk to "torture" the people in some way (1956).

Counsel clarified that "Chris" Lewis was called "Little Chris" to differentiate him from "Chris" Vialva (1957). Also, Tony Sparks was known as "Little Goldie" to differentiate him from Vialva, who was known as "Goldie" (1957).

Finally, Bernard's counsel focused on the benefits Brown received from his plea agreement and his motivation for cooperation (1957-59). Counsel was able to get Brown to agree that "the bottom line" of his plea agreement was so Brown "would get a lower sentence (1957).

1460

Counsel also said: "Certainly, you know you're not going to be put to death for these cases, as long as you comply with your plea agreement, is that right?" (1958). Brown replied affirmatively (1958).

Bernard's counsel asked Brown some questions concerning Brown's counsel's advice (1958-59). Brown revealed that his counsel advised him that taking the plea agreement "was a lot better than what I would get, you know, trying to take it to trial" (1958-59).

Redirect-Examination Of Brown

The prosecutor's redirect touched on only a few points, which was covered in less than three pages of transcript (thereby limiting further re-cross examination) (1959-61). Brown agreed that as part of his plea agreement he had waived his status as a juvenile (1959). Brown understood that under federal law, juveniles could not be executed (1959).

As to the two statements he made right after he was arrested, Brown agreed that he "did not tell the full truth in those statements" (1960). Brown was asked whether he also omitted in those statements the fact that he "had poured lighter fluid on the car and in the trunk of the vehicle" (1960-61). Brown asserted that when he made the first statement, the authorities had little to no information (1961). And when he made

the second statement, the authorities in the Army's CID office had some information, and that Brown "just confirmed, basically, whatever he said" (1961).

Brown agreed that the information in his trial testimony about what he himself did in committing this crime, he "didn't even put in those statements" (1961). In his trial testimony he was "not only telling more on other people," but he was "telling more" on himself (1961).

<u>Re-Cross</u> <u>Examination</u> <u>Of</u> <u>Brown</u>

Finally, Vialva's counsel asked "[j]ust a couple of follow-up questions (1961). Brown acknowledged that although, at trial, he was admitting to more conduct than he did in his earlier statements, he was now "protected" by his "plea bargain agreement" (1962).

Vialva's counsel quoted part of one of Brown's prior statements where he said "'I told them that we would take them to the park, then call the police and tell them where they were'" (1962). He further quoted from the statement that Brown said "I told both Lewis and Vialva to take them to the park and leave them there and we would call the police" (1962). Counsel asked; "Does that sound like – I mean, you're basically the one giving the orders?" (1962). Brown replied that they had asked him what course of action to follow, and "that was the only thing that I could think of" (1962).

Counsel followed up on Brown's assertion that for the second statement he had "basically just confirmed what the officer had said" (1963). Counsel asked Brown if he made the statement or the officer made the statement (1963). The following colloquy then took place (1963):

> A. He just told me that basically I knew the information that they knew, and that's what I said. I didn't tell them about me doing anything. I didn't make those statements until later on.
>
> Q. So, you're saying the officer told you what happened, you agreed with it, and that's what's in this statement?
>
> A. Not actually told me everything that happened, but he knew who the shooter was.
>
> Q. And you agreed with that?
>
> A. Yes.

63

14e3

## Standards For Evaluating An Ineffective Assistance Claim

In *Strickland v. Washington*, the United States Supreme Court established a two-prong test for evaluating claims of ineffective assistance of counsel: a convicted defendant seeking relief must demonstrate that counsel's performance was deficient *and* that the deficient performance prejudiced the defense. If a court finds that petitioner has made an insufficient showing as to either one of the two prongs of inquiry, i.e., deficient performance or actual prejudice, it may dispose of the claim without addressing the other prong. *Strickland*, 466 U.S. at 697; 104 S.Ct. at 2069.

Under the deficient performance prong of the *Strickland* test, "it is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." ' *Lockhart v. Fretwell,* 506 U.S. 364, 371, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993) (*citing Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066). "An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable." *United States v. Walker,* 68 F.3d 931, 934 (5th Cir. 1995), (*quoting United States v. Acklen*, 47 F.3d 739, 742 (5th Cir. 1995). The petitioner must prove that the conduct of trial counsel fell below the constitutional minimum guaranteed by the Sixth Amendment. *United States v. Faubion*, 19 F.3d 226, 228 (5th Cir. 1994) *citing Strickland*, 466 U.S. at 686, 104 S.Ct. at 2063. Analysis of counsel's performance must take into account the

14e4

reasonableness of counsel's actions in light of all the circumstances. *Strickland*, 466

U.S. at 688-89, 104 S.Ct. at 2065. Petitioner "carries the burden of proof ... and must

overcome a strong presumption that the conduct of his trial counsel falls within a

wide range of reasonable professional assistance." *Crockett v. McCotter*, 796 F.2d

787, 791 (5th Cir.) (citations omitted), *cert. denied*, 479 U.S. 1021, 107 S.Ct. 678, 93

L.Ed.2d 728 (1986); *Hayes v. Maggio*, 699 F.2d 198, 201-02 (5th Cir. 1983).

To prove prejudice under the *Strickland* standard, petitioner "must show that

there is a reasonable probability that, but for counsel's unprofessional errors, the

result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104

S.Ct. at 2068. The *Strickland* court defined a reasonable probability as "a probability

sufficient to undermine confidence in the outcome." *Id.* In making a determination

as to whether prejudice occurred, courts must review the record to determine the

"relative role that the alleged trial errors played in the total context of [the] trial."

*Crockett*, 796 F.2d at 793.

## Standards For Evaluating A Claim Of Ineffective Assistance
## On Cross-Examination Claims

It has long been recognized that "[d]ecisions about 'whether to engage in cross-examination and if so to what extent and in what manner, are . . . strategic in nature' and generally will not support an ineffective assistance claim." *Dunhan v. Travis*, 313 F.3d 724, 732 (2nd Cir. 2002) (quoting *United States v. Nersesian*, 824 F.2d 1294, 1321 (2nd Cir. 1987)). The mere fact that new counsel identifies alternative avenues of inquiry does not evidence objectively unreasonable representation, for "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *United States v. Rodriguez*, 68 Fed.Appx. 237 243 (2nd Cir. 2003) (quoting *Strickland v. Washington*, 466 U.S. at 689).

## Bernard's Specific Criticisms Of The Cross-Examination Of Brown Are Meritless

Bernard's background sections relate a number of sources for prior statements made by Brown that he believes contradict Brown's trial testimony, Bernard's specific criticisms of his counsel's cross-examination of Brown and Lewis are contained on pages 33 to 49, where he states what he believes "a reasonably effective attorney would have established" (Motion at 33).

"<u>Who</u> <u>Set</u> <u>The</u> <u>Fire</u>" (Motion at 33, subsection i)

Bernard first contends that:

"[a] reasonably effective attorney would have established that Terry Brown[:]

(1) initially said he knew nothing whatsoever about the crime;

(2) was interviewed over a dozen times on June 22 and never said that Mr. Bernard set the car on fire;

(3) gave a written statement in which he said Mr. Bernard was down the hill beside his own car when the shootings and fire occurred;

(4) on July 26, 1999, gave a proffer to government agents in which he denied knowing who set the car on fire and made no statements about where Mr. Bernard was when the car was set on fire;

67

(5) on December 16, 1999, said under oath that Mr. Bernard set the car on fire with a match at the direction of Mr. Vialva;

(6) at trial, claimed that Mr. Bernard was standing next to the passenger side of the car when the fire erupted, which was information he had never given before;

(7) at trial, said that he did not even know whether Mr. Bernard had any matches while at the Bagleys' car; [and]

(8) at trial, omitted the vital fact that Mr. Vialva directed Mr. Bernard to start the fire.

These contentions are entirely without merit. First, as discussed above, decisions as to the scope of cross-examination are strategic in nature, and generally will not support an ineffective assistance claim. Also as discussed above, both of the defense counsel that cross-examined Brown, Mr. Goains and Mr. Hunt, cumulatively did an outstanding job in exposing Brown's motivation in testifying, Brown's initial denial, until he had made his deal with authorities, of his involvement in the offenses and knowledge of the gang members' activities, and his prior inconsistent statements. The problem for defense counsel, however, was that Brown's testimony was corroborated in so many respects by circumstantial evidence, for example by film and records from ATM machines, and by the evidence from the other witnesses. The gang was apprehended literally yards from their incinerated victims as they were throwing away weapons, victims' property, and other evidence. There was no

deficient performance.  Nor has Bernard established the prejudice prong that there was a reasonable probability of a different result. He has shown nothing to undermine confidence in the outcome.

The short answer to this first group of contentions is that the conflicting testimony and prior statements as to who set the fire was fully argued to the jury (see 2629).

Specifically, as to Bernard's first contention that a reasonably effective attorney would have established that Terry Brown "(1) initially said he knew nothing whatsoever about the crime," that matter was, in fact, essentially established by Brown's testimony.  As discussed above, Mr. Goains explored with Brown on cross-examination that in comparing his first two statements to his trial testimony, Brown had "changed" the information from his statements and previously had provided information in his statements that were "not even close to the information [Brown] gave this jury" (1938, 1940). Brown explained that the evolution of his statements was a matter of "adding more detail" (1938).  Brown testified, and then reiterated, that he made his initial statements "before any information was known on the matters," "before anything was ever known," and months before "they cut you any kind of deal" (1940, 1942).

On redirect, Brown testified that as to the statements he made right after he was arrested, he agreed that he "did not tell the full truth in those statements" (1960). Brown was asked about an omission in a prior statement, and Brown explained again that when he made the first statement, the authorities had little to no information (1961). When Brown made the second statement, the authorities in the Army's CID office had some information, and that Brown "just confirmed, basically, whatever he said" (1961).

Brown agreed that the information in his trial testimony he "didn't even put in those statements" about what he himself did in committing this crime (1961). In his trial testimony, he was "not only telling more on other people," but he was "telling more" on himself (1961).

On re-cross, defense counsel followed up on Brown's assertion that for the second statement he had "basically just confirmed what the officer had said" (1963). Counsel asked Brown if he made the statement or the officer made the statement (1963). Brown replied (1963):

> He just told me that basically I knew the information that they knew, and that's what I said. I didn't tell them about me doing anything. I didn't make those statements until later on.

Brown explained that he was not just agreeing with the officer, but that the officer "knew who the shooter was," and Brown "agreed" or confirmed that information (1963).

Thus, Brown testified over and over again that he did not initially provide entirely truthful information about the offense, his participation in the offense, or the participation of others, because the authorities had little to no information about the offense. As the authorities gained more knowledge, Brown only confirmed the information they had, and did not elaborate. Brown was willing to tell the full story about the offenses at the trial, based on his plea agreement. Bernard's counsel was not ineffective for deciding not to reiterate multiple times Brown's explanation for initially denying involvement and the development of his debriefing as authorities gained information and he got closer to a deal. The questions that Bernard now proposes in this motion in hindsight would have been cumulative. It was not ineffective assistance to decide not to reiterate these matters. In fact, it probably would have been tactically ineffective to provide Brown with yet another chance to explain Brown's quite common initial reluctance to incriminate himself prior to making a plea agreement.

Bernard's second contention that a reasonably effective attorney would have established that Terry Brown "(2) was interviewed over a dozen times on June 22 and

never said that Mr. Bernard set the car on fire" is also without merit.  At the trial, Brown quite candidly acknowledged that the Bagleys' car had been set on fire while he was running down the hill, and thus, he did not see who lit the fire.  Based on Bernard's position in relation to the vehicle, however, it could have been reasonably concluded that Bernard set the fire.  As fully discussed in the above paragraphs, Brown testified over and over again that he did not initially provide truthful information about the offense, his participation in the offense, or the participation of others, because the authorities had little to no information about the offense, and he had not yet decided to cooperate. The questions that Bernard now proposes in this motion in hindsight would have been cumulative.  It was not ineffective assistance to decide not to reiterate these matters.

Bernard's third contention that a reasonably effective attorney would have established that Terry Brown "(3) gave a written statement in which he said Mr. Bernard was down the hill beside his own car when the shootings and fire occurred;" is also without merit. Again, as more fully discussed in the above paragraphs, Brown testified over and over again at the trial that he did not initially provide truthful information about the offense, his participation in the offense, or the participation of others in the offense, because the authorities had little to no information about the offense, and he had not yet decided to cooperate. Therefore, his later statements

72

provided additional information.  The questions that Bernard now proposes in hindsight in this motion would have merely provided this same cumulative answer. It was not ineffective assistance to decide not to reiterate the reasons Brown initially did not cooperate and fully debrief.

Bernard's fourth contention that a reasonably effective attorney would have established that Terry Brown "(4) on July 26, 1999, gave a proffer to government agents in which he denied knowing who set the car on fire and made no statements about where Mr. Bernard was when the car was set on fire" is also without merit. Brown's trial testimony, where he acknowledged that the Bagleys' car had been set on fire while he was running down the hill, and thus, he did not see who lit the fire, but he could describe the participants relative positions, is not necessarily inconsistent with this prior statement. Again, as more fully discussed in the above paragraphs, Brown testified over and over again at the trial that he did not initially provide truthful information about the offense, the extent his participation in the offense, or the participation of others in the offense, because the authorities had little to no information about the offense, and he had not yet decided to cooperate. Therefore, his later statements provided more and more details.  The questions that Bernard now proposes in hindsight in this motion would have merely provided this same cumulative answer.  It was not ineffective assistance to decide not to reiterate

73

the reasons Brown initially did not cooperate and fully debrief as to every single detail.

Bernard's fifth contention that a reasonably effective attorney would have established that Terry Brown "(5) on December 16, 1999, said under oath that Mr. Bernard set the car on fire with a match at the direction of Mr. Vialva" is also without merit. Brown testified at trial that he advised the others to leave the car, with the Bagleys alive in the trunk, at the Long Branch Park (1901). After Bernard drove to the park, and Brown had walked up to Vialva, who was sitting in the Bagleys' car, Brown told this group to "come on," but Vialva, "said that they could not leave the car, because they had [their] fingerprints on it" (1902-04). Vialva then said that: "he had to burn the car and kill the people" (1902, 1904).

Although Brown poured the charcoal lighter fluid in the back seat, he was still "trying to prevent the act," and minimize his actions by putting the T-shirt he had on his head over the can to absorb some of the combustible fluid (1919-21). Meanwhile, Bernard poured the charcoal lighter fluid in the front seat (1919-20). Brown testified that Lewis kept saying Bernard's name loud enough for the Bagleys to hear it, and Brown told Lewis to "shut up" (1921). However, "at that time, Christopher Vialva told him [Lewis] it didn't matter because they wasn't going to say nothing, because

74

1474

they was going to die," and at that point, Brown "knew that the people would die" (1922).

Thus, the evidence indeed showed that the Bagleys' car was set on fire based on the Vialva's plan and "at the direction of Mr. Vialva." According to the relative positions of the individuals, it was reasonably concluded that Bernard was the person that set the car on fire. There was no material inconsistency. Further, asking Brown if his prior statement was correct would have been either a dangerous question, that might have produced further evidence against Bernard, or at least a bad question, in letting Brown reiterate his trial testimony. Finally, as provided above, Brown added more detail to his statements as time went on, which had been fully explored.

Bernard's sixth contention that a reasonably effective attorney would have established that Terry Brown "(6) at trial, claimed that Mr. Bernard was standing next to the passenger side of the car when the fire erupted, which was information he had never given before" is also without merit. This complaint is answered, as above, by the fact that Brown testified over and over again at the trial that he did not initially provide entirely truthful information about the offense, his participation in the offense, or the participation of others in the offense, because the authorities had little to no information about the offense, and he had not yet decided to cooperate. Therefore, his later statements provided more and more details. This question, that

75

1475

Bernard now proposes in hindsight, would have merely provided this same cumulative answer. It was not ineffective assistance to decide not to reiterate the reasons Brown initially did not cooperate and fully debrief as to every single detail.

Bernard's seventh contention, that a reasonably effective attorney would have established that Terry Brown "(7) at trial, said that he did not even know whether Mr. Bernard had any matches while at the Bagleys' car," is also without merit. Brown said just that at trial. Having Brown repeat that evidence would have been cumulative.

Brown testified that although he went back into the Mickey's store to get a book of matches for Bernard, and he saw those matches in Bernard's car after they all had come down from the hill, Brown could not say for sure whether the matches had been removed from Bernard's car to start the fire or whether they had remained in Bernard's car throughout the relevant period. It was not ineffective assistance to fail to have Brown repeat that cumulative evidence. To the extent Bernard is complaining that Brown's trial testimony is different form his statements, the answer is the same: that his later statements and trial testimony provided more and more details. It was not ineffective assistance to decide not to reiterate the reasons Brown initially did not cooperate and fully debrief as to every single detail.

Bernard's eighth contention, that a reasonably effective attorney would have established that Terry Brown "(8) at trial, omitted the vital fact that Mr. Vialva

1476

directed Mr. Bernard to start the fire," is also without merit. Bernard's defense was that there was not enough evidence of his participation. Adding the fact that Vialva directed Mr. Bernard to start the fire would not have helped his case. Furthermore, as discussed above, Brown testified that it was Vialva's plan and decision to set the car on fire. Vialva reminded Brown and Bernard to obtain the gasoline, and Vialva provided purchase money. That Vialva directed Bernard to start the fire is a reasonable conclusion from the evidence. It was not ineffective assistance to fail to have Brown repeat that cumulative evidence (cumulative unfavorable evidence). To the extent Bernard is complaining that Brown's trial testimony is different from his statements, it was not ineffective assistance to decide not to have Brown reiterate the reasons he initially did not cooperate and fully debrief as to every single detail.

Next, Bernard complains that a reasonably effective attorney would further have established: (1) that Chris Lewis gave a statement on June 22, 1999, in which he said Chris Vialva started the fire, probably with a cigarette; (2) that on December 16, 1999, Mr. Lewis said that Mr. Bernard started the fire with a match at the direction of Mr. Vialva: and (3) that at trial Mr. Lewis professed ignorance of who started the fire, claiming that he had been running down the hill when the fire was started. (Motion at 33-34).

"<u>How</u> <u>The</u> <u>Fire</u> <u>Was</u> <u>Set</u>" (Motion at 34, subsection ii)

Next, Bernard complains that "[a] reasonably effective attorney would further have established" "(1) that the government had no proof as to how the lighter fluid was ignited" (Motion at 34). There was no mistake, however as to this point. From Brown's testimony it is clear that: First, Brown went back into the Mickey's to get a book of matches for Bernard; Second, Brown did not claim to have seen Bernard set the Bagleys' car on fire; Third, based on the positions of the actors it could be concluded that Bernard set the car on fire; and Fourth, after returning to Bernard's car, Brown saw the matches, but he did not know if they had been removed to start the fire. There was no clarification necessary. There was no ineffective assistance. There was no prejudice.

Next, Bernard complains that his counsel should have established: "(2) that no matches were found in either the Bagleys' car or Mr. Bernard's car, or taken into evidence" (Motion at 34). There was no mistake at the trial, however, as to this point as well. There was no claim that matches had been found or taken into evidence. It was clear that the evidence of matches was based on Brown's testimony. There was no clarification necessary. There was no ineffective assistance. There was no prejudice.

1478

Furthermore, there is no mystery about the presence of matches. Bernard was a cigarette smoker. Just before the Bagleys' car was set on fire, Brown had obtained matched for Bernard at the "Mickey's" store. Vialva was a cigar and cigarette smoker (2348). Hours before the Bagleys' car was set on fire, Vialva had purchased "Black & Milds" cigars and "Newports" cigarettes at the "Race Track" market (2348). Lewis was a cigarette smoker; when the group met at the Long Branch Pool, Bernard asked Vialva for a cigarette, but instead Lewis provided the cigarette to Bernard (2363).

Next, Bernard complains that his counsel should have established: "(3) that the videotape from the store did not show Mr. Brown returning to get matches" (Motion at 34). There was no mistake at the trial, however, as to this point as well. There was evidence from a camera located in the ATM in the Mickey's store that corroborated Brown's testimony that he went back into the restroom, and he identified the photograph of himself wearing a particular T-shirt. There was no evidence the ATM camera was situated to capture the image of someone returning to get matches from the front counter. There was no clarification necessary. There was no ineffective assistance. There was no prejudice.

Next, Bernard complains that his counsel should have established that "(4) that the government's own expert had written a report in which he expressed the expert opinion that the fire had three separate points of origin" (Motion at 34). This point,

79

1479

however, would not have materially helped Bernard's case. The evidence showed that the Bagleys' car was indeed set on fire in accordance with Vialva's plan, after Brown and Bernard first obtained and then poured lighter fluid in and on the car. According to the relative positions of the individuals, it was reasonably concluded that Bernard was the person that set the car on fire. It does not matter whether Bernard set the fire in one spot or three spots or even whether he could have had assistance in setting the fire. There was no clarification necessary. Indeed, making the strategic decision of further inquiry into this area potentially would have been even more damaging to the defense. There was no ineffective assistance. There was no prejudice.

Next, Bernard complains that "[a] reasonably effective attorney would further have established" four points in cross-examination: that Brown previously had said that he had poured lighter fluid onto his shirt to use as a means to start the fire," "handed the shirt to Mr. Lewis so that he could start the fire," and that "he only poured lighter fluid on to his shirt and claimed that he did not put lighter fluid on the car," but that his trial testimony was that "[h]e put lighter fluid on the shirt and on the car but insisted he put lighter fluid on his shirt because he was trying to *prevent* a crime from occurring" (Motion at 34). Questions concerning these points, however, would not have materially helped Bernard's case. As discussed above, Brown testified over and over again at the trial that he did not initially provide truthful

80

1480

information about the offense, his participation in the offense, or the participation of others in the offense, because the authorities had little to no information about the offense, and he had not yet decided to cooperate. Brown admitted that previously he had not been truthful about his participation. Therefore, with any further inquiry into this area Brown likely would have said that his statements about pouring the lighter fluid on his shirt and giving it to Lewis, and his statement about not putting lighter fluid on the car were an attempt to minimize his role; and as he reiterated a number of times, he did not decide to tell the entire truth until after making his agreement with the government. The evidence showed that the Bagleys' car was set on fire in accordance with Vialva's plan, after Brown and Bernard first obtained lighter fluid with money provided by Vialva, and then poured lighter fluid in and on the car. Further inquiry into this area would have, at best, produced a further reiteration of Brown's testimony (including that he was trying to prevent the fire) and, at worst, would have produced testimony even more damaging to the defense. There was no ineffective assistance. There was no prejudice.

Next, Bernard complains that "[a] reasonably effective attorney would further have established that Terry Brown (1) in over a dozen separate statements on June 22, 1999, never said that Mr. Bernard poured lighter fluid on the car" (Motion at 35). Again, as discussed above, Brown testified over and over again at the trial that he did

not initially provide truthful information about the offense, his participation in the offense, or the participation of fellow gang members in the offense, because the authorities had little to no information, he had not yet decided to cooperate, and his cooperation was months after the arrests. It was not ineffective assistance to decide not to reiterate the reasons Brown initially did not cooperate and fully debrief as to every single detail. There was no prejudice.

Bernard also complains that "[a] reasonably effective attorney would further have established that Terry Brown . . . (2) at the July 26th proffer session said that it was only he and Mr. Bernard who poured lighter fluid on the car, but added that they did so at the direction of Mr. Vialva and further said nothing at all about having poured lighter fluid into the trunk after Mr. Vialva shot the Bagleys." There was no ineffective assistance, however, as to this point. That only he and Bernard poured the lighter fluid is consistent with his trial testimony. That they did so at Vialva's direction is consistent with Brown's trial testimony that it was Vialva's plan to burn the car, that Vialva reminded them to get the lighter fluid at the Mickey's store, and that Vialva gave them money to obtain the lighter fluid. There was no mistake that burning the car was part of Vialva's plan. That Brown testified as to putting lighter fluid in the trunk after the shootings is an additional detail. The reasons for Brown providing additional details is fully discussed above, and were discussed at the trial.

82

1482

Next, the motion complains that Brown should have been cross-examined as to Brown's guilty plea, where he implicated Lewis as well in pouring the lighter fluid. Whether Lewis poured lighter fluid in assisting Brown and Bernard has little or no mitigating effect on Brown's responsibility. Its small impeachment value as a prior statement would have been outweighed by the potential for discussion of further evidence of Bernard's guilt.

Again, the motion complains that Brown's testimony was different from debriefings in that his testimony omitted that Vialva instructed them to pour the lighter fluid when they arrived at the Bagleys' vehicle. Brown's testimony, however, consistently conveyed that it was Vialva's plan to burn the car in order to eliminate evidence. Brown testified at trial that it was Vialva's plan to burn the car, that Vialva reminded them to get the lighter fluid at the Mickey's store, and that Vialva gave them money to obtain the lighter fluid. There was no mistake or ambiguity as to the point that burning the car was part of Vialva's plan.

1483

## Examination And Cross-Examination Of Lewis

<u>Lewis' Direct Testimony</u>

The testimony from Christopher Lewis was that he had pleaded guilty to aiding and abetting murder, carjacking, and illegal possession of a firearm (the .22 caliber pistol) (2301). As part of his plea agreement, Lewis agreed to testify (2302). Lewis understood that if he lied in his testimony, the plea agreement would be voided (2302). Lewis had not been promised any particular sentence in exchange for his cooperation (2303).

Also as part of his plea agreement, Lewis agreed to be tried as an adult (Lewis was fifteen years old at the time he committed the offenses and he was sixteen years old when he testified) (2311-12). Lewis understood that he was not subject to the death penalty because he was under eighteen years of age at the time he committed the offenses (2312).

Lewis had a criminal record of offenses committed prior to committing the offenses against the Bagleys (2302). Previously, Lewis had committed the offense of Assault with Bodily Injury, resulting from getting into a fight (2303-04). He was on supervision for this offense when he was arrested (2303).

84

Lewis gave a signed, sworn statement at the office of the Army's CID in the early morning hours after he was arrested (2304-05). That statement provided that Christopher Vialva had killed Todd and Stacie Bagley (2304-05). Lewis acknowledged, however, that this statement was not "the complete truth," and that he had "minimized his participation in the crime" (2304-05). Lewis explained that since his statement, he has come forward with more information about his involvement and the involvement of the other defendants in this case (2306).

Lewis belonged to the Two-One-Two PIRU gang, which was a "Bloods" gang (23060. Also affiliated with that gang were Vialva, Sparks, Rorie, and Bernard (2306-07). The individuals in this gang "hung together" (2306).

These gang members occasionally committed crimes together (2309). Also, if one gang member told another member of a crime he had committed, he would expect that other gang member to keep this information a secret (2308).

On June 20, 1999, the day before the offenses and arrests, Lewis had been staying, as he had for the last few days, at Sparks' house, because Lewis had been "kicked out" of his own house (2309-10). When Vialva visited Sparks' house they all "talked about robbing somebody for some money to help ourselves" (2310).

Lewis testified that the "plan" was (2311):

85

1485

To ask somebody for a ride, to get in and then put a gun to them and ask them for their – their ATM card and their money and get their PIN number from them, put them in the trunk, and to get the money out of the ATM machines and to drive somewhere and leave them there.

Later that night (on June 20), the group went out to look for a robbery victim (2313, 2316). After waiting for Spark's mother to fall asleep, Vialva, Lewis, and Sparks walked past "the park" and "the cemetery" (2315-16). They were armed with Spark's .22 caliber pistol, Government's Exhibit 3(2315-16). They proceeded to Billy Rorie's house so that Vialva could obtain a hat in order to cover his face during the robbery they had planned ("He didn't want no one to see him") (2316). After Vialva got a hat, they were walking down a street, and after either Sparks or Vialva had handed him the .22 caliber pistol, Lewis concealed it in his footwear (2316-17).

The group then observed the approach of a police officer (2316-17). Lewis threw the .22 caliber pistol into the brush (2316).

The officer asked why they were out past curfew (2317). The officer called Spark's mother, and she came to pick up Sparks and Lewis (2317-18). The police let Vialva go "because they said he was considered an adult" (2317). Lewis testified that this interruption ended their robbery plan for that night (2318). When they got back to Spark's house, Spark's mother would not allow Lewis to remain (2318). Lewis spent the night in a nearby abandoned house (2318-19).

86

1486

The next morning (the day of the shootings), Lewis went over to Sparks' house after Sparks' mother had left for work (2318-19). Lewis testified that Vialva called and reported that he had retrieved "the .22 out of the bushes" (2319). Vialva said he was coming over to Sparks' residence (2319). Vialva arrived with Bernard in Bernard's car (2320). The group (Sparks, Lewis, Vialva, and Bernard) discussed the .22 caliber handgun: it was not working properly so Sparks "was cleaning it with WD-40" (2320, 2321).

Vialva asked Bernard for a ride, but Bernard said that he first had to do something with his mother, and then he would return (2321, 2323). Three women accompanied by their children visited Sparks' residence (2322). Bernard then left on his errand (2322). The women and their children departed (2322).

Lewis testified that after the women left, Bernard returned with Terry Brown, and Vialva, Sparks, Bernard, Brown, and himself spoke about committing a robbery (2323-24):

> We had talked about robbing somebody, ask for a ride, getting in the car with them, pulling a gun on them and taking their ATM card and their money and getting their PIN number and put them in the trunk.

While they were discussing a robbery at Spark's residence, Bernard understood that there was going to be a robbery and he agreed to assist the endeavor by providing the

1487

transportation (2390-91). As part of the plan, if the carjacking was successful, Bernard and Brown were supposed to use Bernard's car to follow them in the victims' car "[s]o they could give us a ride back" (2391).

It was further discussed that the ".22 caliber gun" was "too little to pull on somebody," that it would not be intimidating (2314). Someone performed a vignette, stating "'Pow, I shot you'" "making fun" of the .22 caliber gun (2314). They decided that they "needed a different gun" (2324). Therefore, they decided to call Gregory Lynch; Sparks made the call (2324-25).

In the telephone conversation, Lynch argued that the weapon, "the black gun" (2330), did not belong to Sparks (2325). Therefore, they decided to all go over to retrieve the black gun (2325). Lewis testified that the black gun was "Brandon Bernard's gun" (2325, 2330). Sparks and Brown obtained the black gun from Lynch (2325).

The group, with Bernard driving his car, Brown in the front seat, and Lewis, Vialva, and Sparks in the back seat, then proceeded to the "Winn-Dixie" grocery store "[l]ooking for someone to rob" (2326). They did not find a suitable candidate for a victim at this location (2326). Bernard suggested that they could find carjacking victims at "[t]he Mall" (2392).

1488

Next, the group proceeded to the "IGA" or "Foodliner" store (2326). There, Vialva, Lewis, and Sparks got out of the car (2327). Lewis testified that he and Sparks approached three different people asking for a ride (2327). None of the three offered them a ride (2327).

The group then proceeded to the "Mickey's" store across the street (2327). Lewis testified that Vialva was "getting impatient" because they had not found anyone to rob (2336). Vialva said "That we're going to get somebody here at the Mickey's" (2336). Lewis related that he got out of Bernard's car with Vialva and Sparks (2328). Lewis saw Mr. Bagley, with a newspaper in his hand, just getting off the telephone (2328-29). Sparks asked Mr. Bagley for a ride, and Mr. Bagley replied "yes" (2328-29). It was not explained to the victims that Vialva also was going to ride, Vialva just "came out and got in[to] the vehicle" (2329).

Lexis explained that Vialva told Mr. Bagley that they were going to "our uncle's house" (2330). Then, Vialva "pulled out a – a gun and told them 'there has been a change in plans'" (2330). Vialva pointed the gun to the back of the driver's seat, near Mr. Bagley's head (2330). Vialva was employing "the black gun," Government's Exhibit 2, that they previously had obtained from Lynch's house (2330-31). Sparks pulled out the other gun, "the silver one," the .22 caliber handgun,

148°

Government's Exhibit 3 (2331).  Lewis testified that Mr. and Mrs. Bagley were "shocked and scared" (2331).

Vialva obtained Mr. Bagley's wallet (2331).  Sparks obtained Mrs. Bagley's purse (2331-32).  After Lewis got the wallet from Vialva, Lewis testified that he looked through it, taking out the cash (about $60), the ATM card, and the identification card (2331-34).  After Lewis got the purse from Sparks, he also took out the cards (2332-33).  Lewis put the cards in his pocket (2333).

Sparks handed the .22 caliber gun to Lewis (2333).  Lewis pulled back the slide, and one of the .22 rounds "popped up a little bit" (2333).  Sparks "fixed it." (2333).

They proceeded in the Bagleys' car to a dirt road behind some houses in Killeen (2334).  Vialva told the driver, Mr. Bagley, "to stop and get out, to open the trunk" (2334-35).  Lewis acknowledged that guns were pointed at Mr. and Mrs. Bagley by both Vialva and Sparks (2335, 2345-46).  Sparks asked for and received the jewelry Mrs. Bagley was wearing (2335).  The Bagleys were ordered into the trunk; Lewis could not remember who gave that order (2335).  Mrs. Bagley got into the trunk first, and then it was Mr. Bagley's turn (2346).  They were both "laying the same way," with their heads on the driver's side (2346).  They had to push the car to get it started (2335).

90

The group, Vialva, Sparks, and Lewis, with the Bagleys in the trunk, drove back to the Mickey's store to see if Bernard and Brown were still there (2335). Vialva was now driving the Bagleys' car; he was "[e]xcited and anxious" (2336).

Lewis testified that they then went to an "ATM machine" at "W. S. Young and Airfield Plaza" (2337). Vialva previously had asked for the Bagley's "PIN number for the ATM card" (2337). Vialva put on a piece of clothing to cover his face because there was "a camera on the ATM machine" (2338).

When Vialva returned from the ATM, "he was mad" (2338). The Bagleys had told Brown that they had provided the wrong PIN number (2338). Vialva was informed of the PIN number and "he threatened to kill them if it wasn't the right number" (2338). Lewis testified that Vialva made a second attempt to withdraw money from the ATM, "but he still didn't get no money out of it" (2338).

While in the trunk, Mr. Bagley was able to communicate with the individuals inside of the vehicle and he suggested that they pawn Mrs. Bagley's ring (2339). Mr. Bagley believed that they could receive over $2,000 for it (2339-40; G.Ex. 161). Sparks was then holding the ring (2340).

They then proceeded to "the Wendy's" and obtained some food (2339-40). Lewis and Sparks went into the restaurant, and Lewis testified that (2341):

> We had got in an argument about who was going to hold
> the money and who wasn't. I made a comment to Tony
> Sparks and asked him if he was going to kill me too. He
> had got mad and told me he was going to tell Christopher
> Vialva when we got back in the car.

Lewis explained that when they were planning this robbery, it was anticipated that the

proceeds were to be divided equally (2341-42).

Lewis also explained that they had all engaged in a prior conversation about

how many bullets they had for the black gun, Government's Exhibit 2, and that they

all knew there were only two bullets in the gun (2342-43).

After obtaining the food, in accordance with Vialva's idea, they proceeded to

a pawn shop in "Copperas Cove" in order to pawn Mrs. Bagley's ring (2343). Vialva

was the only one of the group that "was the age to pawn" (2344).

When Vialva tried to buy "some cigarettes and Black & Milds" cigars at "a 7-

11," Vialva realized that "he didn't have his I. D. card or license with him, so he

turned around the Bagleys' car and drove to his residence (2344-45). Lewis

identified Government's Exhibit 10 as the card Vialva went back to retrieve (2344-

45). On this leg of the trip Sparks drove, and Lewis testified that Sparks drove

"reckless," turning the steering wheel from side to side so that the Bagleys were

"[s]winging and banging" around in the trunk (2360).

The group, Vialva, Sparks, and Lewis, with the Bagleys in the trunk, then headed back toward Copperas Cove, but first stopped at a pawn shop in Killeen (2347). Vialva went into the shop to try to pawn Mrs. Bagley's ring (2347). Vialva told Lewis and Sparks that the shop would not offer enough money for the ring (2348).

The group next proceeded to a "Race Track" store, near the pawn shop, where Vialva again tried to obtain money at the ATM with the Bagleys' card (2348). They bought "Black & Milds" cigars and "Newports" cigarettes (2348).

The group then were en route to the Copperas Cove pawn shop, when they had a conversation with the Bagleys through the wall between the back seat and the trunk (2348-49). Lewis testified that: "They [the Bagleys] were asking about, do we go to church, telling us about God and about why they were down here" (2349). The Bagleys asked them if they had ever attended Grace Christian Church, and Lewis answered affirmatively (2350). The Bagleys indicated that they considered themselves "blessed," as God had "got them different items" (23349). The effect of this conversation was that Sparks then told Lewis "that he didn't want to have nothing to do with this any more" (2349, 2350).

On the way to Copperas Cove, Sparks told Vialva that he was "scared about going through with it" (2351). Vialva responded that "if we get stopped by the

93

police, that we were going to have to have a shootout with them" (2351). Vialva asked if they agreed and would support him, and both Sparks and Lewis responded "Yes" (2351).

Lewis revealed that Vialva then "began to talk about killing them [the Bagleys]" (2351). Vialva spoke [a]bout burning the car and different ways how to kill them and get rid of evidence" (2351). Vialva thought it was necessary to kill the Bagleys because "[t]hey had seen his face" (2351-52). Vialva thought it was necessary to burn the car "[b]ecause of fingerprints" (2352). Vialva did not ask the opinion of the other gang members regarding killing the Bagleys and burning their car (2352). Lewis testified that speaking "about the shootout" and the "comments about how to kill them," "that seemed to get Tony Sparks back in – in the mood then" (2352). At a Race Track store, Sparks used a ATM and obtained a little money with the Bagleys' card (2352).

They used a telephone to call Brown (2353). They arranged to meet him "at the place where they smoked and he shot at" (2353).

They returned to Killeen, saw Brown, and picked him up (2354). Lewis testified that "[w]e just started driving around the neighborhood and Christopher Vialva was telling him [Brown] about how it ["the carjacking"] had all happened with Mr. Bagley and Mrs. Bagley" (2354). Brown spoke through the seat to the Bagleys

94

in the trunk, asking them if they knew where they were and how many people were in the car, and the Bagleys replied that they did not know (2354).

Lewis then gave the .22 caliber pistol to Brown (2345). Brown then made the comment to "[t]he people inside the car," that "he was going to, you know, kill them" (2354). Brown pointed the weapon towards the trunk, on the side where their legs were (2367). Vialva said "No, don't do it" (2354). Brown handed the weapon back to Lewis (2355).

Brown then suggested that "just wipe it [the vehicle] down" and that they not kill the people (2356). Vialva said "no, they had seen his face, he had to kill them" (2356).

Lewis further related that Brown and Vialva had a conversation (2355). It was decided to drop off Brown "at the place where he was staying at," and they would call Brown in 30 minutes (2355). They dropped off Brown (2356). When they stopped in front of Billy Rorie's house, they saw and spoke to Rorie (2355). Rorie used a colloquial expression to Vialva, which meant the guys he was with were "like crazy" (2355). They gave Rorie a cigarette (2356). Remaining in the vehicle were Vialva, Sparks, and Lewis (2356).

They went back to Vialva's house (2357). While Vialva went in his house, Lewis agreed that Mrs. Bagley asked them "to spare their life, that they just wanted

95

their lives" (2358). When Vialva came out of his house he had "[a] black and red mask" and a shirt (2359; G.Ex. 13). Vialva directed them to be quiet because he could hear the Bagleys from outside the vehicle (2359).

They began to drive back toward Rorie's house (2360, 2362). They stopped in front of Jason Lacy's house, and spoke to Lacy and Gregory Lynch (2361).

They stopped in front of Rancier Middle School because the Bagleys were kicking the trunk "trying to get out" (2361). Lewis testified that Vialva was "mad" (2362). Vialva told the Bagleys: "I was about to let you out, but now you fucked up" (2362).

Vialva, Sparks, and Lewis drove the Bagleys' car, with the Bagleys still in the trunk, to Long Branch Park (2356, 2361-62). There, they saw Bernard's car, with Bernard, Presley, and Brown (2362).

The two vehicles parked near the swimming pool (2363). Bernard left his vehicle, came up to the Bagley's car, and "asked for a cigarette" from Vialva (2363). Lewis gave Bernard a cigarette (2363).

Brown yelled to Vialva, from a distance Lewis estimated for the jury, to "[j]ust leave them in the park," to "just wash the car down and not to kill them," and that he would call the police (2363, 2364). Vialva said: "no, he had to kill them, that they had seen his face" (2364). Lewis believed the Bagleys heard this exchange (2365).

96

Vialva talked to Bernard "about going and get[ting] some gasoline" (2365). Bernard returned to his car (2365).

Lewis further related that the two cars drove together, and while they passed the Mickey's store, "Vialva like waived his hands and he asked why they didn't stop at the Mickey's across the street" (2365). The group in the Bagleys' vehicle went on to Sparks' house; they needed to drop him off "before curfew" (2366). Sparks "took the jewelry and the "Black & Milds" cigars (2366, 2367). Vialva told Sparks that he would "go pawn it with him tomorrow" (2367). The jewelry was a woman's watch, two rings, and a necklace (2367). Vialva asked Sparks "could he keep the .22" (2366). After at first saying no, Sparks said to Vialva "Okay, bring it back tonight" (2366).

After they dropped off Sparks, this group went by Presleys' house, and they saw him being dropped off from Bernard's vehicle (2367). The two vehicles now drove together back toward the Mickey's store; they stopped "on Westcliff" (2367). Brown approached their vehicle (2367). Lewis testified that he observed Vialva give Brown "some money to go get the gas," he believed it was ten dollars (2367-68). They drove around until they saw Bernard's car again (2368).

97

1497

They proceeded in the two vehicles "to the place where it happened" (2368). Vialva was driving the Bagleys' car, with Lewis as a passenger, and Bernard and Brown were in Bernard's car (2368-69).

Lewis explained that they drove down a dirt road, and they "came by a little hill" (2369). Vialva drove up the very rough road on the hill and parked on top (2369-70, 2372). Lewis believed the Bagleys were thrown all around" on the way up (2372). Vialva laughed, and said "That was a bumpy ride" (2377).

Vialva and Lewis exited the vehicle (2370). Lewis "took the .22" and one of Vialva's music tapes from the tape deck (which Vialva had brought when he returned to his house to retrieve "his I.D. card") (2370). Lewis indicated on a diagram where Bernard had parked his car at the bottom of the hill (2370-71).

Lewis then observed "Terry Brown and Brandon Bernard running up the hill" on the road (2370-71). In their hands they had "[t]he lighter fluid," and this was the first time Lewis had seen the lighter fluid (2371).

Brown and Bernard "[t]hen began pouring lighter fluid on the car," as well as inside the car (2372). Mr. and Mrs. Bagley "started praying and singing" (2372). Lewis believed Vialva also poured lighter fluid (2372).

While Brown and Bernard were spraying the lighter fluid, Vialva was yelling at Mr. and Mrs. Bagley (2372-73). He told them he was about to let them out and to "shut up" (2373).

Bernard asked Lewis to open the trunk (2373). Lewis testified "I told him I would not do it" (2373).

Lewis was using Bernard's nickname "Dip," and Brown admonished "not to say his name out loud like that" (2373). Vialva said, however, that "it didn't matter, he was about to kill them" (2373).

Lewis began to walk "away from it," and he "got a little bit down the hill," turned around, and he saw the trunk had been opened, and "he [Vialva] shot them" (2373-74). Vialva was wearing something (an exhibit Lewis identified) when he shot them (2374). Lewis did not know who opened the trunk of the vehicle (2374).

Lewis showed the jury on the diagram where he was when he stopped and turned around (2374). From his position he could see clearly to the back of the vehicle (2374).

Lewis reiterated that he saw that "'Chris" Vialva shot that man and the lady" (2374). Lewis testified "I seen the body pop up, the man – Mr. Bagley's body pop up" (2374). Lewis saw Vialva fire another shot, but he could not see Mrs. Bagley in the back of the trunk (2375).

1499

Lewis demonstrated for the jury the manner Vialva was holding the gun when he shot the Bagleys (2375). His arm was at a down angle, with his wrist slightly bent (2375). The gun was almost inside the trunk as he fired (2375). Brown heard the shots one immediately following the other (2376). Vialva did not hesitate at all when he killed the Bagleys (2376).

The trunk was closed, and Lewis ran down the hill (2376). About halfway down the hill (indicating on the diagram for the jury), Lewis turned around again, and he saw the car in flames (2376). Lewis was the first one down the hill (2377).

Lewis thought about running away, because he "didn't want to be a part of it," but instead, he went over to Bernard's car (2378). Lewis got in the back seat, and sat behind the passenger seat; Brown sat next to him (2378-79). Vialva sat in the passenger seat in front of him (2379).

Bernard, driving his car, got stuck in a ditch (2379). They were unable to push the car out (2381). When a truck approached, Lewis threw cans of lighter fluid into the bushes (2381). Lewis threw "Mr. Bagley and Mrs. Bagley's I.D. cards" into the bushes (2382). These cards included a Visa card; the ATM card that they used at the ATM machines (2383; G.Ex.s 17-19). Lewis indicated to the jury on a diagram where he threw items into the bushes or shrubs (2382). Lewis further testified that he threw the Bagleys' cards over a ridge and "[t]hey hung onto a tree" (2383). Thus,

100

Lewis "[s]tarted throwing rocks at [the cards] trying to make them fall" (2383).

Lewis also threw a white T-shirt into the brush (2384).

Lewis testified that Bernard threw the .22 caliber gun into the brush (2384).

Vialva threw the .40 caliber Glock into the brush or tree line (2384). Lewis indicated

to the jury on a diagram where they threw the firearms into the brush (2384).

A "white man and an African-American man" stopped in a truck to try and help

them by pushing Bernard's car (2385). They said they would return with help (2386).

A man in a blue truck assisted them by pulling Bernard's car out with a chain

(2386). As they were working on freeing their truck, the fire in the burning car was

getting bigger (2386). As the blue truck pulled them out of the ditch, a police car

arrived (2386).

Lewis related that when they were planning this robbery and when they went

out to commit this robbery they were wearing red and green clothing, the colors of

the Two-One-Two PIRU gang ("Pimps In Red Uniforms"), a part of "[t]he

Bloods"(2390).

<u>Cross-Examination Of Lewis</u>

One of Vialva's attorneys, Mr. Goains, had the first turn in cross-examining

Lewis (2392). Mr. Goains elicited that, initially, Lewis was with Brown and Sparks

at the Killeen Detention Center, and that they saw each other every day (2393).

Lewis answered affirmatively that when the crime was committed he did not realize that, because of his age, he was not subject to the death penalty (2394). After his arrest he learned that "the only two people that could receive the death penalty were the two individuals over the age of 18, "Brandon Bernard and Christopher Vialva" (2394).

Counsel tried to elicit that the investigators and interrogators had been "mad" or harsh with him (2395-96). Lewis disagreed, and said that he had not been threatened (2395).

Lewis was asked how many "statements" he had made to authorities, and he estimated "three," although he was not "sure" (2395). Counsel indicated that he had seen only one statement, and the prosecutor indicated that there was only one statement, presumably meaning one written statement (2395). Lewis indicated he had not testified before the grand jury (2396).

Counsel reviewed Lewis' testimony that the defendants were associated with the "Two-One-Two's" and "the Bloods" (2396). Lewis claimed that he did not know who was the "leader" of the Two-One-Two PIRUs, or who "held the crown" (2397).

Counsel reviewed Lewis' testimony that on the morning of June 21, 1999, after staying overnight in an abandoned house, Lewis ate a bowl of cereal at Sparks' house

1502

(2397).   Counsel highlighted that, however, "that's not what you put in your statement" (2397).

Lewis was shown his written statement that he gave on June 22, 1999, where, instead, Lewis said that he had stayed overnight at "Tom's house," after first arriving there "[a]round eleven" (2398).  Counsel got Lewis to admit that "nowhere in here the statement]" did he ever say that he had gone to Sparks' house (2398).

Counsel reviewed Lewis' testimony that they were at Sparks' house when they received word that Vialva had recovered the .22 caliber pistol from the bushes (2398). Lewis could not remember, or approximate, the time that happened (2399).  Lewis could not remember the time that "some girls came over" (2399). Counsel chided Lewis for providing details on direct examination but claiming not to remember times on cross (2399).

Counsel pointed out that as to the facts in Lewis' trial testimony, that Vialva "had gotten the .22 out of the bushes," and the girls had come over to Sparks' house, "that's not in your statement either, is it, Mr. Lewis?" (2399).   Counsel also highlighted that their trip to Mickey's store and to the IGA had also been omitted from his statement (after giving Lewis time to examine his statement) (2399-2400).

Counsel emphasized more of Lewis' omissions from his statement (2400). Lewis admitted that his trial testimony on direct that Vialva pulled out one gun and

103

that Sparks held the .22 caliber handgun was not contained in his written statement, even though Lewis agreed that this fact "would be a very important part of this case" (2400-01). Lewis admitted his trial testimony about taking the victims' wallet and purse also was not contained in his written statement (2400-01). Lewis did not know what time this occurred, only that it was still light outside (2401).

Lewis admitted that his trial testimony about going to a couple of locations to pawn the jewelry, and going back to get Vialva's identification, was not contained in his written statement (2400-01).

Upon being questioned as to their use of ATM machines, Lewis provided the additional details: that they were located in Killeen and Copperas Cove; one was located in the Airfield Plaza, and another at a Race Track Store (2402). Counsel got Lewis to agree that to use these machines they had to park in outside parking lots where "anyone could have walked past that vehicle, [and] Mr. and Mrs. Bagley, if they would've hollered, someone could've heard them" (2402-03).

Counsel reviewed Lewis' testimony that he and Sparks had argued "over who was going to hold the money" (2403). Lewis was holding it and Sparks wanted to hold it (2404). Lewis could not remember the time this occurred or what the temperature was at the time (2404-05).

104

Lewis further admitted that his trial testimony, concerning the location where they had put the Bagleys in the trunk of their vehicle, at the back of some houses in Killeen, or the details as to how they put them in the trunk, was not contained in his written statement (2405). Lewis further admitted that his trial testimony, concerning a conversation about having a shootout with the police, was not contained in his written statement (2406).

In further cross-examination, Lewis agreed that Vialva had given money to Brown to buy lighter fluid, and that Brown had made that purchase (2406-07). Counsel compelled Lewis to agree, however, that in his statement, on the other hand, he had asserted that "Chris" went into the store to get lighter fluid saying that he was getting it "for a barbecue" (2407). Counsel further compelled Lewis to admit that this part of his statement was "a lie" (2407). Lewis did not know what time of day that the lighter fluid was purchased (2408).

Lewis denied ever seeing Brown's statement (2407). He did not recall whether agents had told him of the substance of Brown's statement (2407).

Lewis did not recall when Vialva put on his mask (2408). Lewis did not recall where Vialva and Bernard were standing when the shots were fired (2408-09).

In further cross-examination, Lewis reviewed his testimony that Brown and Bernard had come running up the hill carrying the cans of lighter fluid (2411).

105

Counsel compelled Lewis to agree, however, that in his statement he had asserted that Vialva "just reached under the driver's seat, pulled out . . . the bag with the two bottles of lighter fluid and lit a cigarette with a disposal [sic] lighter" (2411).

Counsel reviewed Lewis' testimony that Brown, Bernard, and Vialva put lighter fluid on the Bagleys' vehicle (2412). Lewis testified that they put it "[a]ll over the car," and also the inside of the car, in the front seat, the back seat, by the passenger's side, and by the driver's side (2412). Counsel highlighted, however, that Lewis never mentioned in his statement that anyone other than Vialva had poured lighter fluid (2412).

Lewis reiterated his testimony that Vialva fired the shots, and that he saw Mr. Bagley's body "pop up" after the shot (2413). Lewis did not remember how Mr. Bagley was lying in the trunk (2413).

Lewis did not remember where Mr. Bagley was shot (2414). In his statement, however, he had said Mr. Bagley was shot in the center of his forehead (2414).

Lewis said he did not remember where Brown was standing for the shootings (2414). In his statement, however, he had said that "Terry" was standing by "Chris" near the left rear quarter panel of the car (2414-15). On the other hand, Lewis' trial testimony had been that Vialva was standing at the back of the trunk (2414-15).

In further cross-examination, Lewis testified that he did not know who lit the Bagleys' vehicle on fire (2415). In his statement, however, Lewis said that: "I don't know exactly what was used to light the fire. It might have been the cigarette lit when he first got out of the car" (2416).

Finally, as to Mr. Goains' inquiry, Lewis said that he threw a T-shirt, belonging to Brown, into the woods (2417). Also, Lewis and Brown changed shirts, because Brown did not want his tattoo to be visible (2417).

Cross-Examination By Mr. Hunt

Next to cross-examine Lewis was Mr. "Russ" Hunt, Sr. (2417). Counsel explained that he was going to "jump around" because of the questions already asked by Mr. Goains (2418).

Lewis confirmed that when the Bagleys were shot, Bernard possessed the .22 caliber pistol that he had received from Lewis (2418).

Bernard's counsel also focused on Lewis' statement of June 22, the day after the shooting (2418). Lewis agreed with counsel that: "In that statement you know that you told the police a number of lies" (2418-19).

Lewis' assertion in his statement, that Vialva said that he was stopping for lighter fluid to have a barbecue, was also a lie (1419).

Lewis' assertion in the written statement, that when Vialva "pulled up that dirt road to go up the hill, he said he was going to "his cousin's house." was also a lie (1419).

Counsel then pointed out one matter in his statement that was true, the fact that the second gun was a Glock; Lewis said, however, that he could not remember that detail (2420).

Counsel then reminded Lewis that in his statement he said that at the shooting Vialva "called us all scared," or accused them of being cowards (2420). Lewis, however, admitted under cross-examination that this part of his statement also was a "lie" (2421).

Counsel reminded Lewis that in his statement he said that "Chris popped the trunk open" (2421). Lewis, however, admitted that his trial testimony was that he did not know who opened the trunk (2421).

Counsel reminded Lewis that in his statement he said that Vialva shot Mr. Bagley in the center of his forehead, and that he saw the woman shot in the side of her head (2421-22). Lewis, however, admitted that during the shootings he was walking down the hill, and that he had not seen the locations of the shots, testifying that "[i]t was a lie, sir" (2422).

Bernard's counsel again emphasized that "The truth is . . . you lied about a number of different things" (2422). Lewis agreed (2422).

Bernard's counsel clarified that Bernard was not a member of the "Two-One-Two PIRU" gang, but "hung around them" (2423). Bernard was instead a member of the "Four-One-Five Treetop Blood" (2423).

Lewis reviewed his belief that he was not subject to the death penalty (2423). Counsel asked if his attorney had given him a "ballpark figure" of how much time he expected to spend in prison (2424). Lewis responded: "one to life" (2424).

Counsel elicited that Bernard had not been present when they "talked about the split of the money" (2425).

Counsel also elicited that when Sparks was driving the Bagleys' vehicle in a manner that swung and banged the Bagleys around in the trunk, Bernard was not present and did not see what happened (2426).

Lewis reiterated that he did not recall when Vialva put on his mask; and he did not know who was the leader of the Two-One-Two PIRU (2426).

Redirect

On redirect, the prosecutor elicited that although Lewis did not recall when Vialva put on his mask, Vialva was wearing the mask when the trunk was opened and when he shot the Bagleys (2426).

1509

Lewis testified that no one had ever suggested to him about what he should say (2427).

As to "[t]he statement that we've spent a great deal of time reviewing," Lewis testified that this statement was "basically a lie" (2427).

In that statement, Lewis never mentioned Tony Sparks (2427). Lewis said the reason was that: "I was covering up for him," because at that time Sparks was not even in custody (2427).

In that statement, Lewis basically "put it on" Vialva (2427). The reason was "because he did it" (2428). "He had shot Mrs. Bagley and Mr. Bagley" (2428).

Although Lewis could not testify as to what time of day certain events occurred, he did know the order in which they occurred (2428). Lewis knew that they went to the Airfield Plaza ATM, and then they went to the Wendys (2428). Thus, if the ATM records reflected transactions at 4:11 in the afternoon, they went to Wendys thereafter (2429).

When Lewis turned around after partially running down the hill, and saw Vialva standing at the trunk "shooting Todd and Stacie Bagley," he did not notice where Brown or Bernard were standing (2429). That was because he "focused just on Christopher Vialva" (2429).

Lewis reiterated that no one had promised that he was going to receive a particular sentence.


Re-cross

On re-cross, although Lewis testified on re-direct that during the shootings he could not testify as to the location of Brown because he was focusing on Vialva, Lewis had to again admit that he could not even testify as to the location of Vialva (2431).

Lewis further acknowledged that he did "expect to have his time cut for testifying today" (2432).

111

### Bernard's Specific Criticisms Of The Cross-Examination Of Lewis Are Meritless

Bernard's first specific criticism of the cross-examination of Lewis is that a reasonably effective attorney would further have established: "(1) that Chris Lewis gave a statement on June 22, 1999, in which he said Chris Vialva started the fire, probably with a cigarette" (Motion at 34). Bernard, fails to recognize, however, that this information was, in fact, presented to the jury.[6]

As noted above, under cross-examination, defense counsel compelled Lewis to admit that in his June 22 statement, he had asserted that Vialva "just reached under the driver's seat, pulled out . . . the bag with the two bottles of lighter fluid and lit a cigarette with a disposal [sic] lighter" (2411). In further cross-examination, Lewis testified that he did not know who lit the Bagleys' vehicle on fire (2415). Lewis, however, was then confronted with his June 22 statement, where Lewis had stated that: "I don't know exactly what was used to light the fire. It might have been the cigarette lit when he [Vialva] first got out of the car" (2416). In later cross-

---

[6] Not only was all of the information presented to the jury, but it was fully argued that the different accounts of who started the fire meant that the witnesses fabricated their testimony and should not be believed. For example, in closing arguments, Mr. Goains argued that: "Brown testified that Bernard started the fire. Well, what did Lewis' statement say? Lewis' statement was that, 'I don't know exactly what he, Vialva, used to light the fire. It might have been the cigarette he had lit when he first got out of the car.' Of course, again, Ladies and Gentlemen, their testimonies have changed. And, of course, none of these witnesses were coached to say anything" (2629).

112

examination regarding the June 22 statement, Bernard's counsel again emphasized that "The truth is . . . you lied about a number of different things" (2422). Lewis agreed (2422). And finally, on redirect, as to "[t]he statement that we've spent a great deal of time reviewing," Lewis testified that this statement was "basically a lie" (2427). Lewis explained that he never mentioned Tony Sparks in his statement, for the reason was that: "I was covering up for him," because at that time Sparks was not even in custody (2427). In his statement, Lewis basically "put it on" Vialva (2427), "because he did it" (2428). "He had shot Mrs. Bagley and Mr. Bagley" (2428).

Therefore, if Bernard is complaining that defense counsel should have pummeled Lewis with a multitude of Lewis' prior "lies" on his June 22 statement, including the fact that he originally blamed Vialva for starting the fire with a cigarette, the answer is that this was, in fact fully accomplished, repeatedly, by both Vialva's counsel and Bernard's counsel, and emphasized for the jury.

If Bernard is complaining that Brown should have been confronted with Lewis' prior lies on Lewis' June 22 statement, Brown was confronted with his own lies on a number of prior statements, and he certainly would have repeated that initially both of them were not admitting every detail. Brown's explanation was the same as Lewis' explanation: they both initially lied and minimized their own conduct and the conduct of others. They came forth with the true, complete narrative of the events at

113

1513

trial, where they were very believable. At trial, Lewis testified that he did not see who set the fire. There was no ineffective assistance as to this point. There was no prejudice.

Next, Bernard complains "(2) that on December 16, 1999, Mr. Lewis said that Mr. Bernard started the fire with a match at the direction of Mr. Vialva." If Bernard is complaining that defense counsel should have emphasized yet another inconsistent statement, the answer is that Lewis was confronted with at least 25 facts that were in his prior statement but which he had said were not true in his trial testimony. One more inconsistent statement would have had no marginal value. On the other hand, it would have been a dangerous question to ask Lewis about whether Bernard started the fire. The answer might have been the same as that given by Brown: that he did not see who started the fire, but circumstances pointed to Bernard.

If Bernard is complaining that Brown should have been confronted with Lewis' prior statement, that Bernard started the fire with a match at the direction of Vialva, this would not have been a strategically sound question. Brown testified that he did not see who started the fire, but circumstances pointed to Bernard. He would have reiterated that answer, perhaps providing another detail incriminating Bernard. At trial, Lewis testified that he did not see who set the fire (as did Brown). This was as

good as Bernard could hope for. There was no ineffective assistance as to this point.

There was no prejudice.

Next, Bernard argues that "[a] reasonably effective attorney would also have established (1) that Mr. Lewis first claimed that it was only Mr. Vialva who poured lighter fluid on the car" (Motion at 35). Bernard is again completely mistaken with this claim. This information, in fact, was fully developed in the examination of Lewis at the trial. As discussed above, under cross-examination, defense counsel compelled Lewis to admit that in his June 22 statement, he had asserted that it was Vialva that pulled out "the bag with the two bottles of lighter fluid and lit a cigarette with a disposal [sic] lighter" (2411). In further cross-examination, Lewis testified that in his June 22 statement, he also stated that: "I don't know exactly what was used to light the fire. It might have been the cigarette lit when he [Vialva] first got out of the car" (2416). In later cross-examination regarding the June 22 statement, Bernard's counsel again emphasized that "The truth is . . . you lied about a number of different things" (2422). Lewis agreed (2422). And finally, on redirect, as to "[t]he statement that we've spent a great deal of time reviewing," Lewis testified that this statement was "basically a lie" (2427). In his statement, Lewis basically "put it on" Vialva (2427), "because he did it" (2428). "He had shot Mrs. Bagley and Mr. Bagley" (2428). There was no ineffective assistance as to this point. Lewis' prior inconsistent

statements were exposed for the jury in a highly professional manner. There was no prejudice.

Next, Bernard complains that the following should have been established "(2) that at his plea of guilty, Mr. Lewis specifically disavowed the government's claim that he had poured lighter fluid on the car, saying that Mr. Brown had poured lighter fluid into the trunk at the direction of Mr. Vialva but saying nothing about Mr. Vialva himself pouring lighter fluid on the car." This complaint also is meritless.

At trial, Brown admitted that he poured lighter fluid inside the Bagleys' vehicle. Brown testified that Bernard also poured lighter fluid in and on the car. Lewis also testified that Brown and Bernard poured lighter fluid on the car. Lewis added Vialva to this group, however, both Brown and Lewis testified that Vialva put on his mask before shooting the victims.

Thus, Lewis' testimony was consistent with his plea, that he did not pour lighter fluid. Even if Lewis or Vialva or both also had poured lighter fluid, this would not have helped Bernard, as witnesses Brown and Lewis convincingly established that Bernard was one of the individuals that poured the lighter fluid that was used to incinerate the Bagleys.

The fact that "Brown had poured lighter fluid into the trunk," before he ran down the hill, was admitted by Brown at the trial (1927, 1960-61).

1516

Although Brown did not testify that this action was at the immediate direction of Vialva, Brown testified that it was Vialva's idea to burn the car, that Vialva reminded Brown and Bernard to buy a flammable liquid, and that Vialva produced the money to buy the lighter fluid. Thus, pouring the lighter fluid was either based on Vialva's prior direction, his immediate direction, or both. If a detail was left out of Lewis' factual basis, that would not be significant. Lewis need only admit facts establishing his own guilt at his plea hearing. There was no ineffective assistance as to this point. There was no prejudice.

Next, Bernard complains that the following should have been established "(3) that at the trial, Mr. Lewis now claimed that it was Mr. Bernard, Mr. Brown, and Mr. Vialva who poured lighter fluid on the car- but failed to mention anything about Mr. Brown pouring lighter fluid into the trunk [or] anything about Mr. Vialva directing Mr. Brown." This complaint also is meritless. This detail would not help Bernard one way or the other. Both Brown and Lewis convincingly established that Bernard was one of the individuals that poured the lighter fluid that was used to incinerate the Bagleys. There was no inconsistency that Bernard participated in pouring the lighter fluid.

### Vialva As Leader

Next, Bernard claims that his attorneys should have highlighted that Vialva was the leader of this offense, through the use of guilty plea testimony that Brown and Lewis took orders from Vialva. This would have established that "Mr. Bernard was not as culpable as Mr. Vialva" (Motion at 36). This claim is without merit. There was plenty of evidence elicited that Vialva was the leader.

Brown's testimony was replete with examples of Vialva's leadership. For example, Brown testified that it was part of Vialva's plan that once they obtained a ride, they would proceed to an ATM and obtain as much money as possible from the victim's account (1886). It was Vialva who selected Lewis as the most likely "to get a ride" (1886-87). When Brown received his call from Lewis to join them, he heard Vialva's voice in the background (1893). Brown testified that it was Vialva who made the decision, related in a normal tone of voice, that "he had to burn the car and kill the people" (1902, 1904). Vialva told Brown that they needed to get gasoline (1905). Vialva reminded them that they had forgotten "to get the gas" (1906, 1909-10). After they poured the gasoline, Vialva said "they was going to die" (1922). Brown observed Vialva shoot Mr. Bagley in the head (1924-25).

118

Furthermore, Lewis' testimony also showed Vialva's leadership. Lewis' original statement the day after the shootings, provided that Vialva had killed Todd and Stacie Bagley (2304-05). Lewis testified that the "plan" was to ask somebody for a ride, kidnap them, and use their ATM card (2311). It was part of Vialva's plan to cover his face during the robbery (2316). It was Vialva that retrieved the .22 caliber pistol from the bushes (2319). The next day, while they were looking for victims, Vialva was "getting impatient" because they had not found anyone to rob (2336). When they obtained a ride from the Bagleys, it was Vialva who "pulled out a gun," the larger, "black gun," and pointed it at the back of the driver's seat, near Mr. Bagley's head (2330). Vialva took Mr. Bagley's wallet (2331). It was Vialva who first used the ATM card, and got "mad" when the Bagleys provided the wrong PIN number, threatening "to kill them" if they did not provide the correct number (2337-38). When Lewis and Sparks got into an argument, Sparks said "he was going to tell Christopher Vialva when we got back in the car," further indicating Vialva's status (2341-42). In accordance with Vialva's idea, they went to pawn shops to sell the victims' jewelry (2343). After Sparks seemed to relent and want to withdraw from the plan, after talking with the Bagleys, it was Vialva who got Sparks back in "the mood" (2349-52). Lewis revealed that it was Vialva who first "began to talk about killing them [the Bagleys]" (2351). Vialva spoke [a]bout burning the car and

119

different ways how to kill them and get rid of evidence" (2351). Vialva thought it was necessary to kill the Bagleys because "[t]hey had seen his face" (2351-52). Vialva thought it was necessary to burn the car "[b]ecause of fingerprints" (2352). Vialva did not ask the opinion of the other gang members regarding killing the Bagleys and burning their car (2352). Later, Vialva would not be persuaded just to leave the Bagleys in the park; instead, Vialva again insisted "no he had to kill them, that they had seen his face" (2363-64). It was Vialva who talked to Bernard about getting gasoline, and who gave purchase money to Brown (2365-67). It was Vialva who made the final decision that it did not matter that the Bagleys had heard Lewis using Bernard's nickname, because "he was about to kill them" (2373). And it was Vialva who put on his mask and shot Mr. and Mrs. Bagley (2374-75).

There was plenty of evidence of Vialva's leadership. There was no ineffective assistance. There was no prejudice.

120

1520

## Opening The Trunk Of The Car

At the trial, both Brown and Lewis admitted that they did not see who opened the trunk of the Bagleys' car. Both Brown and Lewis testified that it was Vialva who ordered that the trunk be opened.

Bernard's next complaint is that Brown and Lewis should have been impeached with prior statements by someone at their plea hearings that Vialva opened the trunk. And he believes an agent should have been impeached with his grand jury testimony that he thought Vialva opened the trunk. This complaint is without merit. Lewis painstakingly explained that when he gave his first statement, before the authorities knew about the participation of others, he was putting it all on Vialva, because Vialva had shot the victims. As noted above, at a plea hearing the focus is on the facts the defendant admits that demonstrate the guilt of that defendant. Agent Chadwick did not testify at the guilt stage. Calling the agent would have risked further incriminatory evidence. According to Brown's trial testimony, Bernard was in the best position to open the trunk. Vialva ordered the trunk to be opened and was putting on his executioners' mask. The materials Bernard cites could not seriously weaken this conclusion. There was no ineffective assistance. There was no prejudice.

121

1521

### Reason For Obtaining Matches

Next, Bernard claims that his attorneys "could have, but did not, impeach Mr. Brown with his statement at the July 26, 1999, proffer session that he got the matches in order to be able to ignite the lighter fluid." This complaint is without merit. Brown and Bernard got the lighter fluid because Vialva had directed then to get "gas." The purpose of obtaining flammable materials was to set the Bagleys' car on fire. Bernard believed, but could not be sure, that these matches could have been used to start the fire. All of the defendants were cigarette and cigar smokers. There was no material contradiction here to exploit. There was no ineffective assistance. There was no prejudice.

### Brown's Knowledge Of The Plan

Next, Bernard argues that Brown's claim of being ignorant of the carjacking plan could have been impeached by the statement at his plea hearing that he and Bernard were to follow the gang if they successfully found a victim (Motion at 38). This argument is without merit. Brown admitted in his direct testimony, however, that part of Vialva's plan was that once they were with the victim in the victim's car, they would proceed to an ATM and obtain as much money as possible from the victim's account (1886). Brown further testified that once he and Bernard emerged from the Mickey's store, they realized the others were gone and "[a]t that point we

1522

realized that they had found a victim" (1884-85).    Brown also admitted that

previously, at the IGA parking lot, he pointed out somebody that was riding past as

a candidate to rob (1951).  There was no material contradiction here to exploit. Brown

was a fellow conspirator.   There was no ineffective assistance.   There was no

prejudice.

### Events At Long Branch Park

Next, Bernard argues that Brown could have been impeached with his lack of

previously mentioning his attempt while in the park to persuade Vialva to just leave

the Bagleys in the trunk and not to kill them and burn the car.  The fact that Brown

did not fully debrief in his prior statements, however, was extensively developed at

the trial.  One more detail that was inconsistent or had not been previously mentioned

would not have made an impact.   Numerous omissions from Brown's previous

statements had already been highlighted. Further discussion of omissions would have

been cumulative and would not have been a fruitful area here to further exploit. This

point would not have helped Bernard.  There was no ineffective assistance.  There

was no prejudice.

### Who Threw The .22 Caliber Handgun Into The Bushes

Next, Bernard argues that Lewis could have been impeached by emphasizing

that in his initial statement "he failed even to mention that he had been with Mr.

123

Sparks and Mr. Vialva on the night of June 20, 1999, or that *anyone* had thrown a .22 gun into the bushes" (Motion at 39 (emphasis original )). This argument is entirely without merit. As discussed above, Lewis testified that as to "[t]he statement that we've spent a great deal of time reviewing," this statement was "basically a lie" (2427). In that statement, Lewis never mentioned Tony Sparks (2427). Lewis said the reason was that: "I was covering up for him," because at that time Sparks was not even in custody (2427). In that statement, Lewis basically "put it on" Vialva (2427). The reason was "because he did it" (2428). "He had shot Mrs. Bagley and Mr. Bagley" (2428).

In this section, Bernard also argues that Lewis could have been impeached with statements that different gang members threw the .22 caliber gun into the bushes: Sparks; Vialva; and then himself, after receiving the gun from Sparks. The evidence was, however, from a number of witnesses, that the gang members passed firearms back and forth to each other. The .22 caliber gun was not the murder weapon. This is a relatively unimportant point. Whoever threw the gun into the bushes, it was certainly Vialva that recovered it. There was no fruitful area here to exploit. There was no ineffective assistance. There was no prejudice.

## Obtaining A Weapon From Greg Lynch

At trial, Lewis testified that Brown was present when the group went to get the .40 caliber Glock from Lynch. Bernard complains that Lewis could have been impeached with the statement, apparently in the factual basis, that named Lewis, Sparks, Bernard, and Vialva as the persons on this errand. He also complains that Brown could have been impeached with the factual basis of his guilty plea which apparently provided that he did not accompany the group to get this weapon. Of course, the important fact is that the group, in fact, obtained what became the murder weapon. The .40 caliber weapon belonged to Bernard (1948). There was no confusion that the .40 caliber weapon was used by Vialva to shoot both Mr. and Mrs. Bagley. Leaving out a member of the large group that retrieved Bernard's gun is not an important fact. There was no fruitful area here to exploit. There was no prejudice.

## Disposal Of Weapons

At trial, Lewis testified that Bernard threw the .22 caliber gun into the bushes. Bernard's next complaint is that Lewis should have been impeached with his initial statement in which he stated that Vialva threw the .22 caliber gun into the bushes (Motion at 41). This complaint is without merit. As discussed above, Lewis painstakingly explained that when he gave his first statement, before the authorities knew about the participation of others, he was putting all the blame on Vialva,

because the authorities did not know all the individuals involved, and because Vialva had shot the victims. There was no fruitful area here to exploit. There was no ineffective assistance. There was no prejudice.

### Instructions To Wait At Residences

Bernard next complains that in the factual basis for Brown's plea, after they could not find the others, he and Bernard went to their residences to await further instructions, but that Brown gave no such testimony at trial, saying instead that they filled out job applications before going home, and that Brown could have been "impeached with this inconsistency" (Motion at 41). On the contrary, the fact that they filled out job applications, as testified to by Brown, was completely corroborated by the actual job applications. After he went home, Brown indeed was contacted by Sparks and Vialva with instructions to meet them. There was no inconsistency. There was no fruitful area here to exploit. There was no ineffective assistance or prejudice.

### Other Matters

Bernard complains that the trial testimony that they wanted the .40 caliber Glock because it was more powerful was inconsistent with factual basis material that they needed the other weapon because "the .22 had become wet from dew" (Motion at 41). There was no inconsistency. The Glock was more powerful. The trial

testimony was in agreement: that the .22 caliber jammed (2333); and that Sparks had

to clean it with WD-40 (2320-21).

Bernard complains that Brown and Lewis should have been impeached further

with their initial statements. This has been fully discussed above: both Brown and

Lewis initially did not tell the entire story to protect fellow gang members.

## Benefits Of The Plea Agreements

Bernard next complains that Brown and Lewis could have been cross-examined

on the benefits of their plea agreement, including the parameters of their sentences

under the sentencing guidelines (Motion at 45-47). This complaint is without merit.

Defense counsel indeed painstakingly highlighted their benefits and incentives for

testifying. As noted above, Brown testified he did not know what his sentence would

be; it was "strictly up to the judge" (1858-59). On cross-examination, Bernard agreed

that he decided to cooperate "for the purpose of getting a lesser sentence" (1937).

Brown acknowledged that he believed "the U. S. Attorney had the sole discretion to

determine whether you're telling the truth" and would receive the benefits of the

agreement (1937-38). Brown agreed that "the bottom line" of his plea agreement was

for him to get "a lower sentence' (1957). Brown agreed that he would not be put to

death as long as he complied with his plea agreement (1958). Brown said that his

counsel advised him that taking the plea agreement was better than the sentence he would get "trying to take it to trial" (1958-59).

Lewis also testified that he had not been promised a particular sentence in exchange for his cooperation (2303). Lewis acknowledged that he had talked to his counsel about how the guidelines might apply in his case (2430). On cross-examination Lewis acknowledged that he did "expect to have his time cut for testifying today" (2432).

There was no ineffective assistance. Defense counsel significantly exposed the strong incentives Brown and Lewis possessed for trying to reduce their sentences by entering pleas and cooperating. There was no prejudice.

### Brown's Smoking Marijuana

Bernard next complains that defense counsel failed to impeach Brown with his use of drugs "on the day of the murders," which would have "shown how Brown tailored his testimony to make himself look better," and would have borne "directly on his ability to perceive and remember" the events (Motion at 47). Lynch, however, provided the testimony at trial that when the group went to pick up Bernard's Glock .40 caliber handgun that Lynch was then possessing, Brown was smoking a "blunt," which was "[a] cigar with 'weed' [marijuana] in it" (2186-87). Thus, those two arguments against Brown's testimony were available. There was no ineffective

128

assistance.  There was no prejudice.  Strategically, having the evidence come from another witness is preferable in many respects.

## Evidence Of Witness Contacts

Next, Bernard complains that the defense failed to develop evidence: about contacts between government witnesses; and that agents had ceased taking statements from witnesses at interviews.  These arguments are without merit.  The very first point made by one of Vialva's attorneys, Mr. Goains, when he had the first turn in cross-examining Lewis, was that, initially, Lewis was with Brown and Sparks at the Killeen Detention Center, and that they saw each other every day (2392-93).[7]  At closing arguments, defense counsel argued collusion and fabrication by government witnesses.  For example, regarding testimony of Brown and Lewis, defense counsel commented: "Of course, again, Ladies and Gentlemen, their testimonies have changed.  And, of course, none of these witnesses were coached to say anything" (2629).  As to agents not taking notes when they believed witnesses were lying, as fully discussed above, both Brown and Lewis admitted, repeatedly, that they initially

---

[7]  Bernard's lawyer had the second turn in cross-examining both Brown and Lewis. Bernard's counsel mentioned that he had to jump around with his questioning because of the points already covered by Vialva's counsel.  Of course, the majority of the points made by any of the defense counsel benefitted both defendants.

1529

lied to protest themselves and other gang members. This evidence would have been cumulative. There was no ineffective assistance. There was no prejudice.

## Preparation For Trial

Next, Bernard complains that his two attorneys did not spend "adequate time" preparing for trial (Motion at 49-50). He speculates that an arson expert would have been helpful. There could have been no doubt, however, that the defendants kidnaped, robbed, and then murdered the Bagleys, and then set their car on fire. He does not specifically suggest how an arson expert would have made a difference in the outcome of a proceeding. Bernard also suggests that further records would have aided in the impeachment of Brown, Sparks, and Lewis. The fact that these co-defendants had prior criminal records, were gang members, and had made prior inconsistent statements was, in fact, developed for the jury. Bernard has not made his required showing of specific grounds of ineffective assistance and outcome altering prejudice. Bernard's two board-certified criminal defense specialists spent hundreds of hours in preparation. They worked closely together as a father-and-son team. This complaint is without merit.

1530

## Advocacy Before The DOJ Committee

Next, Bernard complains that counsel was ineffective in advocacy before the Department of Justice committee that authorizes death penalty prosecutions (Motion at 50-53). Specifically, he complains that the letter written by Mr. Russell Hunt, Sr., on August 31, 1999, was too short, providing only that: Vialva was the instigator and leader; Bernard had attempted to persuade Vialva to release the victims unharmed; Bernard was a follower, as stated by Bernard's high school principal, and not a leader; counsel had a list of 80 individuals who would attest that Bernard was not violent and would not have initiated the murders; and counsel offered cooperation and testimony against Vialva (Motion at 51-52). He also complains that this lawyer's conference call with lawyers from the Department of Justice in February of 2000 was ineffective.

Bernard's complaint that a longer letter would have been better is not necessarily true. The letter highlighted Bernard's essential position: that Vialva was the leader and the most culpable; and Bernard was just a follower.

Bernard complains that the letter was too late. As discussed *infra*, in the § 3005 issue, these committee decisions are subject to reconsideration. The letter on behalf of Bernard was sent well before, seven months before, the government's notice to seek the death penalty was filed.

131

1531

Actually, the prospect of Bernard pleading guilty, cooperating and testifying against Vialva would have been the best strategy (as followed by counsel for Brown and Lewis).

The evidence against Bernard was absolutely overwhelming. Bernard has not shown that his lawyer's work and strategic decisions at this stage constituted ineffective assistance. Bernard has not shown prejudice, that with a different submission the agency or trial outcome would have been different.

## Investigation; Opening Statement; Forensic Evidence

Next, Bernard complains that his counsel failed to adequately investigate his case (Motion at 53-55). The prosecution provided open file discovery. Bernard and his confederates were apprehended yards away from the incinerated bodies of their victims. The only real issue was relative responsibility. Bernard has not shown that his lawyers' investigation of the case constituted ineffective assistance. Bernard has not shown prejudice, that with different investigation or retention of experts the trial outcome would have been different.

Bernard proposes that co-defendants Brown, Lynch, Sparks, and Presley, who entered plea agreements and cooperated with the government, would have spoken to Bernard's counsel prior to trial and provided information that Brown was under the influence of drugs and suffered from "mental illness," that it was Brown who set the

car on fire, and that they had no idea that Vialva was going to kill the Bagleys.

Bernard has offered no evidence that the co-defendants would have assisted

Bernard's counsel in such a manner. Statements by co-defendants, after they have

already been sentenced and have received the benefits of their plea agreements, years

after the fact, do not establish that they would have acted against their self-interests

prior to trial. Bernard provides no statements from co-defendants' counsel that they

would have advised or allowed their clients to interview with Bernard's counsel.

Bernard has not shown that his lawyers' investigation of the case constituted

ineffective assistance. Bernard has not shown prejudice, that with different

investigation, or interviews with witnesses who were actually available for interview,

the trial outcome would have been different.

Bernard also complains that his counsel provided ineffective assistance by not

making an opening statement. A trial counsel's decision not to make an opening

statement in a death penalty case is a strategic or tactical choice, and not ineffective

assistance of counsel. *See Gilliard v. Scroggy*, 847 F.2d 1141, 1147 (5th Cir. 1988)

("Gilliard's counsel chose not to make an opening statement. That is the essence of

a strategic choice. In addition, no prejudice is demonstrated.") *See also, e.g.,*

*Millender v. Adams*, 376 F.3d 520, 525-26 (6th ir. 2004) (An attorney's decision not

to make an opening statement is ordinarily a mere matter of trial tactics and will not

constitute a claim of ineffective assistance of counsel (citations omitted)). In the instant case, Bernard's next-best strategy to pleading guilty was to let the jury focus on Vialva's role in planning the crime, and Vialva's role in shooting the Bagleys, and to try to remain in the background. Bernard has not shown that his board certified lawyers' decision not to make an opening statement constituted ineffective assistance. Bernard has not shown prejudice, that with an opening statement, the trial outcome would have been different.

Bernard complains that counsel should have cross-examined the government's expert, Mr. Sing, and emphasized that his analysis showed multiple sources of origin for the fire which "would have case doubt on the prosecutor's tenuous theory that because Mr. Bernard was standing in a certain place he was the only one who could have set the car on fire" (Motion at 56). He further claims that the expert's analysis supports evidence that Vialva sprayed lighter fluid in multiple places. This complaint is without merit.

Arson investigator Thomas B. Sing testified that the cause of the fire was incendiary, set by a person (2075), that a canine detected some ignitable liquid near where the Bagleys' car was found (2077); and that the burn patterns indicated that there had been an accelerant on the hood (2082), and running off the top of the trunk, (2083).

The expert's analysis, however, was that the "area of origin" of the fire, the "source of the flames," was in the "interior" of the vehicle, in the passenger compartment (2084).[8]

With an origin of the fire in the inside of the vehicle, it would take from five to fifteen minutes for a fire to totally involve the vehicle (2095).

This testimony is completely consistent with a single person starting the fire from the passenger side. This testimony was completely consistent with the testimony of Brown and Lewis who discussed pouring lighter fluid in the interior as well as the exterior of the vehicle (1919-20, 2372). This was not a fruitful area for cross-examination. It would not have been wise to emphasize the point of origin testimony which was imbedded within long descriptions of burn patterns. Bernard has not shown that lawyers' decision not to cross-examine the expert constituted ineffective assistance. Bernard has not shown prejudice, that with an opening statement, the trial outcome would have been different.

---

[8] Later, the expert agreed that the interior of the vehicle, including the rear of the driver's seat could be the possible origin of the fire (2085). He noted that burn patterns indicated the "origin of the fire" was on the "floor of the rear seat" (2091).

1535

### Motions And Gang Testimony

Next, Bernard complains that counsel filed insufficient pre-trial motions (Motion at 57). The docket sheet, however, indicates that Bernard's counsel filed motions: to extend time for filing motions (21); for disclosure of agreements with government witnesses (23); for notice of government's intent to use evidence (25); to disclose surveillance (26); for discovery of transcripts of grand jury testimony (28); and for appointment of co-counsel (137).

Bernard lists motions he thinks should have been filed. He does not show that any of the proposed motions had merit or that they would have made a difference in the outcome of the trial.

Bernard acknowledges that his counsel made a suggestion to this Honorable Court to add to the jury questionnaire a question about gang membership or gang activity (Motion at 58). He argues, however, that counsel was ineffective because such a question did not appear, and counsel should have been more strident regarding this matter. Bernard has not shown that reurging this suggestion or objecting would have been meritorious or would have been outcome affecting.

### Failure To Object

Bernard complains that his counsel was ineffective for failing to object to what he thinks are misstatements by the prosecutor in closing argument. The first is the

136

prosecutor's statement that Bernard lit a match and set the car on fire. This argument was consistent with the evidence, and reasonable inferences therefrom, that Bernard requested that Brown obtain matches at the Mickey's store, that Brown and Bernard poured the charcoal lighter fluid into and on the vehicle, that the fire started in the interior of the vehicle, and that Brown saw Bernard in position to start the fire.

Bernard complains of the prosecutor's statement in closing argument that Brown and Lewis were housed in separate wings of the same jail (2694). He states that this must be wrong because of the cross-examination of Lewis to the effect that, initially, when they were in the Killeen Detention Center, they were able to see each other on a daily basis (2393). But this cross also reveals that the defendants were in different detention centers at different times (2392-93). Bernard has not shown that the prosecutor's argument was referring to the Killeen Detention center.

Bernard also complains of the prosecutor's statement at argument that Brown and Lewis had not been instructed or coached as to their testimony. This statement was consistent with Lewis' statement that no one had ever suggested to him about what he should say (2427). Contrary to Bernard's assertion, that evidence is not contradicted by Brown's testimony in cross-examination that, initially, he was willing to concede only the information that the agents already knew (1961).

Bernard also complains of the prosecutor's statement at argument that Bernard knew of the plan to kill the Bagleys. Brown testified that he told Bernard that the car would be burned (1955). Bernard was present when Brown tried to talk Vialva out of killing the Bagleys. Bernard assisted in buying the lighter fluid. Bernard poured the lighter fluid. Bernard was present when Vialva said that saying Bernard's nickname out loud did not matter because the Bagleys would be killed. The prosecutor's argument was a fair interpretation of the evidence.

Finally as to all of these four complaints. As can be seen from the transcript, after an objection that the attorney was misstating the evidence, the most common ruling was: "The Jury will remember the evidence" (*see*, *e.g.* 2644). Bernard has not shown that it was ineffective to fail to object. He has not made the required showing of prejudice.

### Gang Membership

Bernard complains of evidence of gangs. The defendants, however, were in the same or related gangs. The defendants' gang associations and affiliations were part of their concert of action.[9] Vialva's counsel moved to prohibit evidence of gang

---

[9] As one example, Lewis related that when they were planning this robbery and when they went out to commit this robbery they were wearing red and green clothing, the colors of the Two-One-Two PIRU gang ("Pimps In Red Uniforms"), a part of "[t]he Bloods" (2390). The red and green clothing, requiring the gang aspect to add significance, was evidence against them.

138

membership, and prior to opening statements again raised the issue of gang membership. This Honorable Court ruled that gang association was part of the conspiracy and overruled the objection. In his Motion, Bernard claims his counsel was ineffective for failing to make motions similar to those made by Vialva's counsel. Bernard, however, has not demonstrated that this Honorable Court's decision was incorrect. He has failed to show ineffective assistance or prejudice.

### Testimony About The Bagleys; Photographs

Bernard alleges that counsel was ineffective in failing to object to what he believes was irrelevant testimony. He complains of Lewis' testimony concerning what the Bagleys said to the defendants through the trunk wall. The statements included aspects of their religion and included their last words: that "Jesus loves you" and "Jesus take care of us." This was not irrelevant evidence. The Bagleys' attempt to dissuade the defendants from taking their lives was one of the events of the offense.

Next, Bernard complains of Lewis' response to the question of how Bernard's car "end[ed] up in the ditch" (Motion at 67). Lewis surprisingly answered: "God put

it there." Counsel was effective in not objecting, and having this statement receive any greater or added emphasis.[10]

As to evidence of the Bagley's church activities, this evidence was difficult to separate from their activities a few days prior and immediately prior to their abduction. Arguably, it was intertwined with other evidence of the offense.

Finally, instead of complaining of gruesome death photographs, Bernard instead complains of photographs taken of Mr. and Mrs. Bagley, taken at Sea World, just days before their murders. He cites no authority that ordinary photographs identifying victims are inadmissible. The photographs were introduced to establish their identity (2474). *See, e.g., United States v. Hall*, 152 F.3d 381, 400-02 (5th Cir. 1998) (photographs of victim's body in grave after its removal were admissible in penalty phase even though defendant offered to stipulate to identity of victim and her cause of death) (*abrogated on other grounds*); *United States v. De Parias*, 805 F.2d 1447, 1453 (11th Cir. 1986) ("Photographs of homicide victims are relevant in showing the identity of the victim . . . or any other element of the crime") (admission during trial). Bernard has failed to show ineffective assistance. He has failed to show prejudice.

---

[10] Saying that the car's falling into a ditch felt like someone pushing is not a reference to the supernatural. The force of gravity could feel like a push.

140

## BERNARD'S GROUND THREE

## III.  BERNARD HAS FAILED TO DEMONSTRATE CONSTITUTIONALLY INEFFECTIVE ASSISTANCE OF COUNSEL DURING THE PENALTY PHASE

(Responsive To Bernard's Motion, Ground 3, at page 2,
(his memorandum heading "IV"), 74-122)

### Nature Of The Claim

The third ground in Bernard's motion is that his two attorneys were constitutionally ineffective at "the penalty phase" (Bernard's Motion at 2, 74). Bernard, however, has failed to establish either *Strickland* prong for any of his claims.

### Evidence At The Punishment Phase

The Government's Presentation

On January 20, 1995, Bernard was "picked up" when he was 15 years old, for shoplifting a pair of bolt cutters (2727-29).

On March 9, 1995, Bernard "committed a burglary of a building," an "army surplus store" located near the IGA and Mickey's store discussed above (2729). Bernard took combat knives.  The burglary was committed by smashing a window (2730).

141

1541

On January 6 and 9 of 1995, Bernard was involved in two burglaries of habitations (2759). Bernard used stolen cards to obtain money from an ATM machine (2760).

On July 4, 1995, Bernard was taken into custody with regard to multiple burglaries committed with his cousin (who was the same age as Bernard) (2730, 2732). He was apprehended after committing the burglary of a habitation, after throwing a rock through the door at 4:00 a.m.; the officer yelled for him to stop, but he kept running; he possessed jewelry and a "small pry bar"; this was related to another, earlier, burglary (2739-42). On cross-examination, Bernard's collaboration with his cousin was emphasized (271-32).

On May 24, 1999, Bernard, in collusion with Terry Brown, was involved in two burglaries (2765). Computer equipment worth $16,000 was stolen (2767). Vialva tried to sell the stolen merchandise (2769).

Terry Brown testified that, working with Bernard and Vialva, they committed approximately 25 burglaries starting in April of 1999 (2787). Brown explained that they would "ride around," knock on a door, and if no one answered, "We'd kick in the door" (2788).

Vialva named the three the "Kick-Door Boys" (2793). Vialva had T-shirts made with this name (2793).

In one burglary, Brown found a 9 millimeter handgun (2794). Brown gave the gun to Bernard (2794). Bernard traded this gun for the .40 caliber Glock that was the weapon used to kill the Bagleys (2794).

One officer, a specialist in the area of gangs, testified that Bernard had "CK" engraved in gold on his teeth (2807-08). The officer explained that "CK" "is a derogatory term" towards a rival gang, the CRIPS, and that it meant "CRIP Killer" (2808).

The officer described an incident that took place on October 22, 1998, as "kids were getting out of school at Killeen High School," a young man named Renaldo Goody, a member of the CRIPS, was confronted by another young man who was a member of the Bloods (2908). The altercation was broken up by school officials, but when Renaldo emerged from his bus, "a carload of Bloods from Two-One-Two PIRU" arrived, including Bernard, and "an assault ensued" (2810).

This officer first noticed Bernard when he confronted a rival gang member from the "Four-One-Three CRIPS, and the two threw up gang signs (2810). Bernard "started rubbing his teeth at him" (2810).

143

1593

### Bernard's Presentation

Billy Mack Spiller, Sr., testified that Bernard was his next-door neighbor and that he had known Bernard for approximately eight years (3116). Spiller was a school bus driver (3116). Spiller's perceptions of Bernard were that Bernard had "been a very respectful person to me and my family, as well as in the neighborhood"; Bernard was "a good church-going person"; he was a "hard worker," and he would always go to Spiller for help with his homework "to make sure he kept up his grades in order to play basketball "(3117-18).

Isolde Cody, Billy Rorie's mother, testified that she had known Bernard for three years (3125). She believed that Bernard was: "very respectful"; "very kind"; nice to her younger children; "a very good person"; and not a leader (3125-26).

Jimmy Olarte, a member of the military in Chemical Operations, testified that he knew Bernard and his family from 1993 (3130). Olarte was one of Bernard's Bible teachers (3130). Olarte's impressions of Bernard were that he was "just a normal kid, pretty much, with a smiling face in church" (3131). Olarte spoke to the jury saying that nothing could bring back the lives of the couple, but that they should give Bernard "a chance" (3131).

Oliver Cole, a UPS truck driver, testified that he had known Bernard since Bernard was three or four years old (3135). Cole lived on the other side of the same street as Bernard (3135). Cole thought Bernard was "a very good young man" (3136).

Sherise Scott, who worked in a nursing home, testified that she was Bernard's girlfriend (3139). She had been dating him for five years (3139). Scott characterized Bernard as "always helpful and respectful," and "fun" (3140). She thought Bernard has a great sense of humor (3140). She believed that he is not a leader or follower, but his own person (3140). Bernard would never "hurt nobody" (3140).

According to Scott, Bernard "was real nice" (3141). If someone needed a ride, Brandon would come with his car (3141). In her opinion: "I think he just made a wrong mistake and was scared, because I know that he knew that it was a family of those people, and he didn't want to hurt them" (3141-42).

Milton Rios, who worked for the Killeen School District, testified that he knew Bernard through the church Pathfinder Club (3144-45). Rios thought Bernard "was a good kid, and given the opportunity, he can maybe be a good kid again, or a good man by that time" (3145-56).

145

Next to testify was Bernard's mother, Thelma Louise Bernard (3146). She is a registered nurse "with the Scott & White Health Plan" (3147). Ms. Bernard related that "I'm a Lieutenant Colonel" in the United States Army reserves (3147).

Bernard's mother made an emotional appeal to the jury, first trying to put herself in the position of the victims, and "it hurts" (3148). Portions of Bernard's mother's appeal to the jury were that:

> God blessed me with three beautiful children, Brandon, my nineteen-year-old, Keona, my twelve-year old, Max my nine-year-old, and two grandchildren from Brandon, Tierra and Tinnai. If I failed to instill those Christian principles in my son, Brandon, then, yes, he must pay for his crime. The penalty must not be death. The greatest sentence that can come out of here is compassionate, and I thought and I said "Jesus wouldn't do lethal injection." . . . Brandon has been tried and found guilty, but the punishment needs to fit the crime. My son was involved with this – with this young man, Vialva, in a horrible crime. . . . However, God is not vindictive. . . .

(3148-49).

Bernard's mother explained in background that Bernard was born in San Antonio, then they moved to Alaska, where she and her husband were on active duty (3151). Then they moved to Fort Sam Houston (3151). Bernard went to church school from first through eighth grade, and then he went to Rancier Middle School,

1546

where he played basketball and football. When he got into trouble, he went to live with his father (3151-52).

Brandon "got his GED" and "even though after he got his GED, he even went back to the high school, trying to get his high school diploma" (3152). Lieutenant Colonel Bernard said that she and Bernard's father advised him "we want you to get your high school diploma so you can go to college and be that neurosurgeon that we talked about before" (3152).

Brandon's mother characterized him as "a follower" (3152). Her final plea to the jury was: "let's not perpetuate the same madness" by imposing the death penalty (3153).

Government's Rebuttal

The prosecution presented the testimony of Dr. Richard E. Coons, a forensic psychiatrist (3154). He testified only about Vialva.

Anthony Davis, an intelligence officer for the Bureau of Prisons, testified that the "Bloods" gang operates in the federal prison system (3166). The gangs operated the same inside of prison as outside: "they prey on the weak" (3166). Those gang members that rise in status "become the shot-callers," they "can call hits" on an individual, and "they run all of the drugs inside the prison" (3169).

## Overview: Bernard Has Not Demonstrated Ineffective Assistance At The Penalty Phase; Counsel Selected A Reasonable Strategy

At the penalty phase, Vialva and Bernard selected two different strategies. Vialva's lawyers chose to portray Vialva as a broken vessel: the product of an abusive home, and having Attention Deficit Disorder. Vialva and the government had a battle of experts as to future dangerousness. Bernard's counsel, instead, portrayed Bernard as basically a good person, a follower who was led astray; but, who still retained some decency, and who could be rehabilitated. Bernard's counsel brought in a parade of individuals that had known Bernard as his neighbors, through his church, and through his school. Bernard's counsel also called Bernard's girlfriend of five years. All of these witnesses uniformly portrayed Bernard as "kind," "respectful," and someone who was not inclined to hurt anybody. Finally, the defense presented Bernard's mother, a registered nurse, a lieutenant colonel in the military, and as well as attesting to the above attributes of her son, she made an emotional, heart-to-heart appeal to the jurors to spare Bernard's life. She invoked Christian principles to these central Texas jurors that just punishment should not involve retribution. It was a humanized, direct strategy, as opposed to an academic battle-of-the-experts strategy. Bernard has not demonstrated that counsels' choice constituted ineffective assistance or that a different strategy would have been better or produced a different result.

## Some Cases

Counsel may make a strategic choice as to the approach to take at the penalty phase. As discussed above, to demonstrate that counsel's performance was constitutionally deficient a movant must show errors so serious that counsel was not functioning as the counsel guaranteed to the defendant by the Sixth Amendment. *Strickland*, 466 U.S. at 687. The presumption is that counsel has made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 690. Bernard's criticisms in hindsight are without merit. Bernard's counsel chose a human approach. He has not shown that it was constitutionally ineffective to follow this plan.[11]

In *Rutherford v. Crosby*, 385 F.3d 1300, (11th Cir. 2004) the Florida courts determined that counsel's decision, that is was unnecessary to engage a mental health expert or to obtain and present more detailed mental health evidence, was sensible in light of the punishment-phase strategy to "humanize" defendant and portray him as

---

[11]    In *Dowthitt v. Johnson*, 230 F.3d 733, 751 (5th Cir. 2000), the courd denied petitioner's claim that trial counsel was deficient during closing arguments during the penalty phase. Dowthitt faulted counsel for arguing that: Dowthitt suffered from a disease that resulted in his acting in a "frenzy, like the feeding of a shark or something," and Dowthitt would not be a future danger by positing that his only victims in prison would be "effeminate men." *Id* The court emphasized that while they would not endorse every aspect of counsel's statements, taken in full context, counsel was arguing that Dowthitt's actions were not deliberate and he did not present a continuing danger. *Id.* The court would not second-guess strategic decisions based on *Strickland.Id.*

1549

a hard-working, family oriented, "Boy Scout" type. The Eleventh Circuit affirmed the denial of habeas relief, based on a lack of *Strickland* prejudice.[12]

## Investigation

Bernard contends that counsel performed an insufficient investigation, and that it was not undertaken in a sufficiently prompt manner (Motion at 74-77). He complains that the hiring of the agency "Criterion Investigations," to interview individuals named on a list provided by Bernard's mother, provided insufficient mitigating information. He also complains of 11 visits from counsel from the time of his arrest in June of 1999, until the beginning of the trial as being insufficient.

Bernard proposes that trial counsel should have undertaken the same social history investigation as to the one made by Jill Miller for use in this § 2255 proceeding. Among other matters, this investigation report provided that (Motion at 81-82): Bernard was depressed during much of his adolescence; he came from a broken home; he witnessed loud arguments between his parents; he was verbally and physically abused, particularly by his father; as a result of his father's departure from

---

[12] In *Walton v. Angelone*, 321 F.3d 442, 465 (4th Cir. 2003), Walton claimed that his counsel failed to investigate and present mitigating mental health evidence. Specifically, he asserted that his counsel was ineffective for failing to pursue a sentencing strategy to show that Walton was a schizophrenic who could be treated with medication to reduce his dangerousness and that it was mental illness that accounted for his behavior at sentencing. *Id.* Instead counsel presented a mitigation case that presented him as a good young man despite what he had done. *Id.* The Court determined that Wilson could not show that his counsel's performance fell below an objective standard of reasonableness. *Id.*

the home, he assumed the role of caregiver to his younger siblings and relatives' children; he was led astray into the burglaries by his cousin; he had a commitment to educating himself, as reflected by his earning a GED, his continuing efforts to obtain a high school diploma, and his desire to attend college; he began to use alcohol and drugs at age 16; he later used cocaine and marijuana dipped in embalming fluid; he was under stress by the responsibilities of parenthood from having a daughter; he had even more stress when his girlfriend in Texas also became pregnant; he had a head injury; he had a car accident; he was taking pain medication; his illegal drug use escalated; he had only a minor history of assaultive behavior; he was not viewed by those who knew him as someone who would harm others; he was responsive to the needs of others; he was respectful of others; he regularly attended Bible classes; and these "ties to conventional norms are indicators of rehabilitative potential"; he appreciated the wrongfulness of his actions and wanted to make amends.

Bernard has not shown that his counsels' investigation and approach were inadequate, or constituted ineffective assistance. He has not shown that the use of the agency "Criterion Investigations" to interview individuals constituted ineffective assistance. He has not shown that the 11 visits from counsel, from his arrest to the beginning of the trial, and the additional consultations during the trial and penalty phases, constituted ineffective assistance through insufficient contact. Much of the

151

positive information from the social history report was, in fact, presented to the jury through counsels' approach: that Bernard was basically a good person with this one, atypical, violent episode. He has not shown prejudice, that a different result would have ensued with a different approach.

## Lack Of Discussion Of Gang Activity

The next complaint second-guessing his counsel's strategy is that Bernard's counsel should have presented more of an explanation for Bernard's involvement in gang activity. He says the jury should have been presented with research showing that gang membership reflects a desire for sense of family, belonging or acceptance, protection, material subsistence, respect, and as a response to strong peer pressure (Motion at 87). As discussed above, however, Bernard's trial counsel selected a positive approach: that Bernard, with good family ties, good church ties, and good educational ties (in wanting to better himself) had just this one excursion into violent activity, by following Vialva, and that he was basically a good, respectful, non-violent person, and therefore not a future danger to society. Arguing that Brandon Bernard was driven into gang activity as a refuge from Lieutenant Colonel Bernard's terrible family was incongruous with the presentation they were making. Counsel decided to use the family as allies, rather than attacking them. Trial counsel's selection of this strategy was not ineffective.

152

Finally as to this section, the motion argues that trial counsel should have made the presentation at the punishment phase that the Killeen gangs were milder than inner-city gangs and "bore only superficial resemblance to the highly organized, large-scale gang activity in large U.S. cities" (Motion at 87). As discussed above, however, this presentation was not congruent with the positive approach selected by counsel. Also, it does not comport with the evidence in the instant case. The defendants in the instant case, these Bloods gang members from Killeen, were involved in various crime sprees, the equivalent of those in big cities. Vialva was in a car when fellow gang members murdered a man after they thought they were cut off by him on the highway.

### Mental Health Experts

The next complaint is that Bernard's counsels' engagement of psychologist Dr. James Shindler was too late and ineffective. The further complaint is that, instead, a neuropsychologist should have been employed and presented to the jury. According to the motion, "an appropriate neuropsychological evaluation would have revealed that Bernard has a "mild neurocognitive dysfunction" resulting in a difficulty with more complicated detail-oriented tasks (Motion at 91). Bernard as mentally impaired, however, was not congruent with the positive approach selected by trial counsel. A "mild" impairment also is perhaps not the best excuse or mitigating

factor. Trial counsels' selection of a different strategy was not ineffective. Bernard

has not established that taking the neurocognitive approach would have produced a

different result.

## Opening Statement

The next complaint is that the failure to make an opening statement at the

punishment was objectively unreasonable (Motion at 93). Again, a trial counsel's

decision not to make an opening statement is a strategic or tactical choice, and not

ineffective assistance of counsel. *See Gilliard*, 847 F.2d at 1147; *Millender*, 376 F.3d

at 525-26 (An attorney's decision not to make an opening statement is ordinarily a

mere matter of trial tactics and will not constitute a claim of ineffective assistance of

counsel). Bernard has not shown that his board certified lawyers' decision not to

make an opening statement constituted ineffective assistance. Bernard has not shown

prejudice, that with an opening statement, the outcome would have been different.

## Selection Of Witnesses; Presentation

The next complaint is that counsel was ineffective in their selection and

presentation of witnesses. This complaint is without merit. As noted above, counsel

engaged "Criterion Investigations," to interview a list of individuals provided by

Bernard's mother.

1554

As can be seen above, counsels' presentation had order and momentum. The first witnesses were: Spiller, a school-bus driver and Bernard's next-door neighbor; Cody, the mother of Bernard's friend; Olarte, a military man and Bernard's Bible teacher; and Cole, a UPS driver and close neighbor. They uniformly portrayed Bernard as "kind," "respectful," a "very good person," and someone who was not inclined to hurt anybody. Following these witnesses, Bernard's girlfriend also testified to Bernard's good qualities, adding that he was very helpful to others. She thought Bernard had made a mistake out of fear. Finally, Bernard's mother spoke about Bernard's positive qualities and also made a powerful emotional appeal to spare her child the death penalty. Finding all these individuals to say good things about Bernard was a great accomplishment, not a deficiency.

The instant case is far different from cases cited by Bernard such as *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003), where defense counsel in a capital case offered only one witness in the penalty phase, the defendant's pastor, who offered personally remote and generic testimony. The instant case, on the other hand, employed a plan to humanize Bernard, with personal and emotional testimony, portraying him as a family-oriented, kind person, who, because of following Vialva, made a terrible mistake.

## Other Evidence

The next complaint is that counsel was ineffective for failing to present evidence of Bernard's "positive response to supervision while on juvenile probation" two years before the murders, and "successful adjustment to incarceration" (Motion at 97). This complaint is without merit. Bernard's response to supervision while on juvenile probation was not so positive that it prevented his commission of further crimes, such as the heinous crime against the Bagleys. It was better to ignore this prior failure. As to his jail behavior, Bernard's motion acknowledged that in a one-year period in the McLennan County Jail, he was disciplined for misbehavior on two occasions. This fact would have been a two-edged sword. It was also better to ignore these infractions. At least, it was not unsound strategy. Bernard has shown no prejudice.

## The Government's Evidence

Under this section, Bernard complains that counsel should have presented evidence that Bernard's identification as a Blood "was demonstrably casual and impermanent." This position, however, does not comport with the evidence. Bernard committed dozens of crimes with his fellow Bloods gang members. Bernard had the "CRIP Killers" sign in his teeth. There was nothing casual about this gang activity.

The next complaint is that Brown should have been heavily cross-examined as to the 25 burglaries in which Bernard was a participant. This evidence, however, was corroborated by agents' testimony and Bernard's prior burglary arrests and convictions. Counsel's choice not to emphasize and highlight this testimony, and the testimony of agents as to other burglaries, was correct.

Bernard proposes that counsel should have challenged John Bowman's qualifications to make expert pronouncements as to gang activity, and should have requested a *Daubert* hearing (Motion at 105). This argument is without merit. Officer Bowman was "a specialist in the area of gangs" (2805). He had taught classes "[t]hroughout the State of Texas" as to gangs and how to identify gangs and their members" (2805-06).[13] There was no valid basis for such a challenge.

Next, Bernard complains that his counsel was ineffective for failing to object to "hearsay" at the penalty phase regarding: the manner in which the .40 caliber Glock came into Bernard's possession; gang evidence as to the "Bell brothers; Texas Ranger Aycock's information concerning the opinions of other gang members;[14] the

---

[13] A further criticism is that counsel should not have suggested to Officer Bowman that Bernard had told the officer that the initials "C.K." were his girlfriend's initials. This was a reasonable attempt, however, to try to offer an alternative explanation to "CRIPT Killer."

[14] Bernard complains about Ranger Aycock's statements at 2818 (Motion at 106). Bernard is not mentioned on this page. Instead, the opinion of other gang members was that Vialva was "scary." This did not harm Bernard.

shooting of the man traveling with his family after the traffic dispute in which Vialva

was in the car; testimony concerning burglaries with Pollock and the "Kick-Door

Boys"; and allegedly non-responsive hearsay (Motion at 106- 08).[15]

This complaint is without merit.  The federal death penalty statute does not

require that evidence of aggravating and mitigating factor be admissible under the

rules of evidence, only that its probative value is not outweighed by the danger of its

confusing, misleading, or prejudicing the jury.  *See* 18 U.S.C. § 3593(c); *United

States v. Johnson*, 223 F.3d 665, 674-75 (7th Cir. 2000).[16]  The balancing is committed

to the discretion of the district judge.  *United States v. Hall*, 152 F.3d 381, 397 (5th

Cir. 1998).

### Victim Impact

Next, Bernard complains about the victim testimony that was ruled

inadmissible by the Fifth Circuit in his direct criminal appeal. In *Bernard*, 299 F.3d

---

[15] Complaints regarding when the Ranger saw Bernard with the "CK" on his teeth and how Bernard returned after the party altercation are minor matters not calling for further action (Bernard does not deny he had the "CRIP Killer" insignia; or disrupted the party).

[16] In *Johnson*, at 674, the warden of a prison "testified that a member of the Aryan Brotherhood, the most notorious of U.S. Prison gangs, had while imprisoned at Florence managed to convey an order to members of the gang at another prison to kill two inmates of that prison, and the order had been carried out."  Allowing this hearsay testimony was permissible because the warden was in a good position to judge the reliability of the information "which went directly to the issue of the ability of the prison system to defang the murderers in its custody."  *Id.*

158

1558

at 480-81, however, the Fifth Circuit determined that there was insufficient prejudice to meet the plain-error standard. Thus, there is insufficient prejudice to meet the *Strickland* prejudice standard.

## Limiting Instruction

Next, Bernard complains that counsel was ineffective for failing to seek a limiting instruction to segregate aggravating evidence offered against Vialva. There was no ineffective assistance. There was no doubt as to the applicability of the testimony. The mitigating factors that each defendant was relying on were separately delineated (Charge at 19-20.). The charge further provided that: "The death penalty may only be imposed on the basis of a defendant's own individual conduct, character, background, and record" (Charge at 21).

## Closing Argument

Finally, Bernard complains that his counsel was deficient during closing argument by failing to object to many of the prosecutor's arguments. "A decision not to object to closing argument is a matter of trial strategy." *Drew v. Collins*, 964 F.2d 411, 423 (5th Cir. 1992). As the court explained in *United States v. Linsday*, 157 F.3d 532, 536 (7th Cir. 1998), "a competent lawyer would make a strategic decision between leaping up and objecting to borderline statements (thereby calling them sharply to the jury's attention)."

159

In determining whether the prosecutor's closing argument violated a defendant's due process rights, the pertinent inquiry is whether the argument so infected the trial with unfairness as to make the resulting conviction a denial of due process. *See, e.g., Sublett v. Dormire*, 217 F.3d 598,600 (8th Cir. 2000) (citations omitted). Habeas corpus relief may be granted only if the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial. *Id.* The district court has a more reliable vantage point for gauging the impact of closing argument on the overall fairness of the trial. *Id.*

Bernard first believes that the prosecutor's argument that Bernard chose to participate in the offenses, and had acted freely, voluntarily, and on his own initiative, was improper, and that counsel was ineffective for failing to object (Motion at 115). This is entirely incorrect. The evidence certainly showed Bernard's intent, and voluntary participation in the crimes, and it indeed was true that Bernard made those choices. Bernard's belief that the factual basis' of the guilty pleas of co-defendants, may have contained errors or inconsistencies, does not detract from the facts the jury was entitled to accept from the testimony of the witnesses who appeared before them, facts that established Bernard's guilt and his responsibility under the special issues.

Bernard next complains of the prosecutor's arguments such as "we believe we have met the intent factors." Based on the context, however, these statements were in the nature of argument, not vouching. Nevertheless, these matters are squarely within the idea that a competent lawyer would make a strategic decision and not leap up and object to borderline statements and thereby calling them sharply to the jury's attention.

Bernard complains that it was improper argument to say that Bernard lit the match that started the Bagleys' car on fire. This statement, however, was certainly supported as a reasonable inference from the evidence, particularly Brown's testimony that he obtained matches for Bernard and the relative positions of the defendants. The jury was entitled to believe Brown's sworn trial testimony, notwithstanding what Bernard believes were prior inconsistent statements and admissions. There was no legitimate basis for an objection as to this matter. As to the argument that counsel should have objected to the statement that Bernard poured fluid on the trunk, there is no doubt Bernard poured fluid into the car, and thus, this is a minor point, not worthy of objection. As to when Bernard knew about the plan to kill the Bagleys, the evidence showed that he was present and could hear Vialva's murder plan at the pool, where Bernard tried to convince him to instead just leave the Bagleys in the trunk.

The next complaint is that the prosecutor conflated situations of Vialva and Bernard, such as the argument that their crimes had steadily escalated. This analysis, however, was true concerning Bernard, based on the evidence. Bernard started as a shoplifter, then conducted strings of burglaries, then committed this carjacking and murders. The prosecutor's arguments as to Bernard's future dangerousness were fair.

Bernard's counsel's decisions not to object to closing arguments were matters of trial strategy. He has shown no arguments that so infected the trial with unfairness as to make the result a denial of due process. Any objection would have most likely produced that ruling that it was up to the jury to remember the evidence. There was no ineffective assistance or result-altering prejudice.

162

# BERNARD'S GROUND FOUR

**BERNARD'S *BRADY* CLAIMS AND PROSECUTORIAL MISCONDUCT
CLAIMS ARE PROCEDURALLY DEFAULTED;
BERNARD HAS NOT ESTABLISHED ANY VIOLATION;
BERNARD HAS NOT SHOWN ANY SIGNIFICANT EVIDENCE
THAT WAS WITHHELD THAT WOULD HAVE CAST DOUBT
ON THE TESTIMONY OF BROWN AND LEWIS;
BERNARD HAS NOT SHOWN PROSECUTORIAL MISCONDUCT;
BERNARD HAS NOT SHOWN ANYTHING THAT UNDERMINES
CONFIDENCE IN THE OUTCOME OF THE TRIAL**

(Responsive To Bernard's Motion, Ground 4, at page 2,
(his memorandum heading "V"), 122-37)

## General Background And Overview

Claims that the prosecution engaged in withholding material information or of

other prosecutorial misconduct are routinely made in direct appeal. Bernard had fine

appellate counsel with plenty of time to investigate these matters. No such claims

were raised, and these claims have been procedurally defaulted. Nevertheless, they

are without merit. Prior to trial, the government had an "open file" discovery policy

for the two defense teams. The essence of the first part of this claim seems to be that

the trial testimony of Brown and Lewis was different from their initial statements to

authorities and different, in certain details, from the factual basis they agreed with at

their guilty pleas. It was abundantly clear, however, discussed and reiterated many

times at the trial in the testimony of Brown and Lewis, that they both initially lied in

163

their statements and debriefings to agents. They were confronted with dozens of these prior inconsistent statements, which they agreed were "lies." Defense counsel were present for the rearraignments of Brown and Lewis. Thus, there was no suppression of material evidence in violation of *Brady*. Also under this section, is the claim that the prosecution withheld information of Brown's prior uncharged violent conduct. Much of this information, however, would have been available by investigation. There was no *Brady* violation.

Bernard has not shown a reasonable probability that any evidence he now points to would have changed the result of the trail. As discussed elsewhere, there was an avalanche of evidence against Bernard. Bernard and the other defendants were apprehended literally yards from the charred bodies of their victims. Bernard and Brown obtained the lighter fluid with money received from Vialva. The murder weapon belonged to Bernard. The getaway car was Bernard's car being driven by Bernard. Brown and Lewis saw Vialva shoot one or both of the victims. Brown and Lewis were unequivocal that Bernard helped pour lighter fluid in the Bagleys' vehicle. The result of the trial was fair and correct beyond doubt.

# Standards Of Analysis

The starting premise is that "the prosecution has a duty to turn over impeachment evidence favorable to an accused when 'there is a reasonable probability that, had the evidence been disclosed, to the defense, the result of the proceeding would have been different.'" *United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "There are three components to a *Brady* violation. First, the evidence must be favorable to the accused, a standard that includes impeachment evidence. Second, the State must have suppressed the evidence. Third, the defendant must have been prejudiced" (which is "the materiality component"). *Id.* (citing *Strickler v. Green*, 527 U.S. 263, 281-82 (1999)).

"The materiality inquiry turns on the question of whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'" *Id.* (quoting *Kyles v. Whitley*, 154 U.S. 419, 435 (1995)). It is the defendant that "has the burden to establish a reasonable probability that the evidence would have changed the result." *Id.* (citing *Strickler* at 291). If there is more than one violation, the cumulative effect must be considered. *Id.* (citing *Kyles* at 421-22). If a reviewing court finds that the defendant did not

establish a reasonable probability that the evidence in question would have produced a different result, the other *Brady* components need not be considered. *Id.*

## Bernard Has Not Avoided Procedural Default On These Claims

A defendant's collateral attack on a conviction "may not do service for an appeal." *United States v. Frady*, 456 U.S. 152, 165-70 (1982). Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his procedural default and actual prejudice due to any such errors. *Id.* Significantly, the cause and prejudice standard is more rigorous than the plain error standard used on direct review. *Id.* at 170. Bernard had the assistance of two fine appellate lawyers for his direct appeal. Bernard failed to raise these claims on direct appeal. He has not shown cause and prejudice regarding this failure. These *Brady* and other misconduct claims have been procedurally defaulted.

## Credibility Of Brown And Lewis

As noted above, Bernard's first claims that the trial testimony of Brown and Lewis was different from their initial statements to authorities and different, in certain details, from the factual basis they agreed with at their guilty pleas. It was abundantly clear, however, discussed and reiterated many times at the trial in the testimony of Brown and Lewis, that they both initially lied in their statements and debriefings to agents. They were confronted with dozens of these prior inconsistent statements, which they agreed were "lies." Defense counsel were present for the rearraignments of Brown and Lewis.  Thus, there was no suppression of material evidence in violation of *Brady*.

To the extent Bernard is making, in addition to a *Brady* claim, a claim that the prosecutor knowingly used false evidence, this claim too has been procedurally defaulted, with no showing of cause and prejudice, and is without merit.  The prosecutor was perfectly justified, as was the jury, in believing that the spotlight of their testimony under oath at trial had caused Brown and Bernard to reveal the truth of what happened that day as they remembered it. There is no doubt or confusion that Bernard poured lighter fluid into the Bagleys' vehicle. It was a reasonable inference from the evidence that Bernard set the fire with a match, based on Brown's trial testimony that he obtained matches at the Mickeys at the request of Bernard, and the

relative positions of Bernard and Vialva as Brown and Lewis went down the hill. The factual basis is in essential agreement with the details from the trial.[17] There was no knowing use of false evidence. There was no prejudice to Bernard

## Criminal Records

Next, Bernard complains that although the prosecutor introduced Brown's testimony with his convictions, he omitted the uncharged crimes Brown had committed. Bernard alleges that Brown was responsible for 25 kick-in-doors burglaries, beating someone with a sledgehammer, participating in a drive-by shooting, and pointing a gun at a group of people.

The evidence demonstrated, however, that Brown, Bernard, and Vialva had together committed 25 burglaries. In fact, a weapon that was taken in one of these burglaries was traded for the murder weapon; Bernard's Glock. Furthermore, Bernard and Brown were in the same gang, or at least were in related gangs and they operated together. Thus, the evidence of the burglaries, and most likely the other gang violence, was known by Bernard; it was known by the defense or could have been obtained with reasonable diligence. Certainly, it would not have been wise to cross-

---

[17] Bernard stated that the prosecutor "knew that both Mr. Lewis and Mr. Brown had stated at their guilty pleas that it was Mr. Vialva who opened the trunk . . ." (Motion at 126). The combined factual basis for Brown and Lewis, however, states that Vialva "then put on a mask over his face and walked to the trunk, and **when it opened** he took the .40 caliber pistol and shot Todd Bagley in the head and Stacie Bagley In the face." *See* the Factual Basis, filed on December 16, 1999 (emphasis added).

examine Brown about crimes committed with Bernard.  Bernard has not shown that any criminal history was withheld by the prosecution.  He has not shown that he could have impeached Brown with juvenile bad conduct. He has not shown a reasonable probability that the evidence would have changed the result of the trial.

Furthermore, Brown's gang membership, past involvement in criminal activity, and his involvement in the instant offenses was explored before the jury.  Any additional past bad conduct would not have had any additional marginal effect. Bernard has not shown suppression of material evidence that could have had an influence on the outcome of the trial.

As to Lewis, the prosecutor brought out Lewis' conviction for assault with bodily injury.  Bernard speculates that Lewis must have had more of a criminal history and that there was a *Brady* violation.  This is a complete fishing expedition.

In *Hughes v. Johnson*, 991 F.Supp. 621, 639 (S.D.Tex. 1998), the habeas petitioner speculated that there had been an undisclosed "internal DPS investigation" which allegedly yielded information inconsistent" with a state trooper's testimony, in violation of *Brady*.  The court explained that these claims were not worthy of an evidentiary hearing to develop evidence, as there was no evidence of such an investigation, and petitioner had not made the required showing under *Brady*. *Id.* Similarly, Bernard has not made the required showing.

## Vouching

Bernard next claims that the prosecutor engaged in improper vouching for Brown and Lewis by asking them in direct examination what would happen if they lied (with the answer that the plea agreement would be "throw[n] away") (2302). This claim has been procedurally defaulted. Nevertheless, this claim is incorrect. This is not improper vouching.

The case cited by Bernard under this section (Motion at 130) is *United States v. Francis*, 170 F.3d 546, 550-51 (6th Cir. 1999). In *Francis*, the prosecutor explained in opening statement that if two witnesses testified truthfully, she would recommend lighter sentences for them. *Id.* The prosecutor told the jury that her recommendation depended on whether she personally believed them. *Id.* During direct examination, the prosecutor questioned one witness in detail about the negotiation of the plea agreement emphasizing that the agreement materialized only after the prosecutor believed the witness. *Id.*

In the instant case, there was no such injection of the prosecutor's personal judgment. The prosecutor did not say that their pleas depended on his personal belief of their testimony. Bernard has not established prosecutorial misconduct.

170

## Brown's Exposure To The Death Penalty

Next, Bernard argues (Motion at 131) that it was prosecutorial misconduct to ask Brown: "And did you also learn from your attorney that juveniles, under federal law, cannot be executed" (1959). He believes this was misleading because Brown was subject to the death penalty under state law. Bernard overlooks the obvious. What the prosecutor said was correct: Brown was not subject to the death penalty "**under federal law**," as he stipulated. The trial was in federal court. This question and statement was not misleading.

## Brown's Prior Statements

Bernard complains that Brown's statement at a proffer session, as reflected in Brown's attorney's notes, that he put lighter fluid in the trunk after the shooting and that Bernard then "threw a match through the front window of passenger's seat," were not turned over to counsel (Motion at 132). Bernard has not shown that Brown's attorney's notes are perfectly accurate. Bernard has not shown that this statement was noted by any agent either mentally or in writing. Nevertheless, at trial, Brown said that he put lighter fluid on the outside of the trunk (1922), and then after the shooting he put lighter fluid in the open trunk of the Bagleys' vehicle (1927). As to the match through the window, it is more likely the match went through the open door. This discrepancy does not demonstrate a *Brady* violation. He also speculates that Brown

171

gave more inconsistent statements than the considerable number that were disclosed.

Bernard has not shown that the prosecution suppressed evidence. He has not shown the evidence was material. He has not shown evidence that could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

### Extent Of Plea Agreements

Bernard next speculates that the government suppressed off-the-record-agreements with Brown and Lewis that the government would make motions under U.S.S.G. 5K1.1 in exchange for their testimony. Bernard has not shown that the prosecution suppressed evidence. He has not shown the evidence was material. He has not shown evidence that could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. In his testimony Lewis acknowledged that he did "expect to have his time cut for testifying today" (2432). In Brown's testimony, Brown explained that he was awaiting sentencing on the federal charges (1857), and he had received no promises as to his sentence; it was "strictly up to the judge" (1858-59). On cross-examination, Bernard's counsel explored the benefits Brown received from his plea agreement and his motivation for cooperation (1957-59). Counsel was able to get Brown to agree that "the bottom line" for entering into his plea agreement was so Brown "would get a lower sentence

172

(1957).[18] Bernard's counsel also asked Brown some questions concerning Brown's counsel's advice (1958-59). Brown revealed that his counsel advised him that taking the plea agreement "was a lot better that what I would get, you know, trying to take it to trial" (1958-59). Thus, Brown's belief that his testimony could lower his sentence was fully explored before the jury.

### Lewis' Statements

Next, Bernard alleges that there were omitted facts from debriefings on July 2, and July 6, 1999 (in which he acknowledges that the agent took no notes). This issue has been procedurally defaulted. Bernard has not shown that the prosecution suppressed evidence. He has not shown the evidence was material. He has not shown the evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

Bernard also complains that Lewis stated Sparks threw the .22 caliber pistol into the weeds. This claim has been procedurally defaulted. Bernard has not shown that the prosecution suppressed evidence. He has not shown the evidence was material. He has not shown the evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

---

[18] Bernard's counsel also said to Brown: "Certainly, you know you're not going to be put to death for these cases, as long as you comply with your plea agreement, is that right?" (1958). Brown replied affirmatively (1958).

## Spark's Statements

Finally, Bernard speculates that Sparks provided exculpatory evidence. This claim has been procedurally defaulted. This is more *Brady* speculation and fishing expeditions rejected in *Hughes*, 991 F.Supp at 639. Bernard has not shown that the prosecution suppressed evidence. He has not shown the evidence was material. He has not shown any evidence that could reasonably put the whole case in such a different light as to undermine confidence in the verdict.

174

## BERNARD'S GROUND FIVE

### BERNARD'S CHALLENGE TO APPOINTMENT OF COUNSEL, BASED ON SECTION 3005, HAS BEEN PROCEDURALLY DEFAULTED, BERNARD UTTERLY FAILED TO RAISE THIS ISSUE IN HIS DIRECT APPEAL AND AS A NON-CONSTITUTIONAL ISSUE IT IS NOT COGNIZABLE ON HABEAS REVIEW, NOR HAS HE SHOWN CAUSE AND PREJUDICE IN SUPPORT OF THIS FAILURE; NEVERTHELESS, HIS CHALLENGES ARE WITHOUT MERIT; BERNARD MADE NO TIMELY "REQUEST" UNDER SECTION 3005; NOT HAVING TWO ATTORNEYS AT THE ATTORNEY GENERAL PHASE, IF ERROR, WAS HARMLESS ERROR, BERNARD DID RECEIVE THE ASSISTANCE OF TWO ATTORNEYS AT TRIAL, HE HAS NOT SHOWN THEY WERE NOT "LEARNED IN THE LAW APPLICABLE TO CAPITAL CASES," ANY LACK OF CONSULTATION WITH THE PUBLIC DEFENDER PRIOR TO THE APPOINTMENT, IF ERROR, WAS HARMLESS ERROR

(Responsive To Bernard's Motion, Ground V, at 2,
(his memorandum heading "VI"), 137-45)

(This Ground Has Some Similarity To Vialva's Ground I, Vialva's Motion, 3-13)

### Background And Nature Of The Claim

The Statute

The statute providing for appointment of counsel in a capital case provides, in

relevant part that:

the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall

175

consider the recommendation of the Federal Public Defender organization, or, if no such organization exists in the district, of the Administrative Office of the United States Courts. . . .

18 U.S.C. § 3005.

Background And Nature Of The Claim

In the instant case, Bernard had his first appearance on June 23, 1999, and on the same day, Russell David Hunt, Sr., was appointed to represent Bernard.

On February 2, 2000, the government filed a notice of intent to seek the death penalty as to co-defendant Vialva.

On February 25, 2000, a motion was filed on behalf of Bernard seeking the appointment of co-counsel in a death penalty case.

On March 9, 2000, an order was entered granting Bernard the appointment of co-counsel. Russell David Hunt, Jr. was appointed to act as co-counsel with his father.

On March 28, 2000, the second superseding indictment was filed.

On March 30, 2000, the government filed a notice of intent to seek the death penalty as to Bernard.

Voir dire was begun on May 15, 2000. The jury trial was held between May 24, and May 31, 2000. Guilty verdicts were received on June 1, 2000. The penalty phase was concluded on June 13, 2000.

In his § 2255 motion, Bernard makes three arguments relating to § 3005. First, Bernard argues that, under § 3005, he was entitled to two counsel, including one "learned in the law applicable to capital cases," from the time he was indicted for a capital crime, and that this Court's error rendered his capital conviction *per se* reversible (Bernard's Motion at 137-41). He further argues that with two lawyers at this earlier stage he would have had a better chance of persuading the Death Penalty Committee of the Department of Justice not to seek the death penalty, and the defense team would have had better preparation.

Second, Bernard argues that his capital conviction is fatally flawed because this Honorable Court erred in assigning counsel under this section by not considering the recommendation of the Federal Public Defender (Bernard's Motion at 141-43).

Third, Bernard argues that his capital conviction is fatally flawed because this Honorable Court erred by not ensuring that one member of the team was "learned in the law applicable to capital cases" Bernard's Motion at 143-45).

177

Bernard's § 3005 claim is entirely without merit. First, this claim (under Bernard's heading "The Court Failed To Comply With 18 U.S.C. § 3005" and not ineffective assistance of counsel) and the three sub-claims, could have been raised in Bernard's direct criminal appeal by his two highly skilled appellate counsel, he has made no showing of cause and prejudice, or actual innocence, and thus, the entire claim has been procedurally defaulted. Second, Bernard did not make any "request" that triggered satisfaction of any of his sub-claims under § 3005 ("the court . . . shall promptly, **upon the defendant's request**, assign 2 such counsel. . ." (emphasis added)). Third, the purpose of the statute, that Bernard receive the assistance of two attorneys "of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours," was satisfied without the need for consultation with the Federal Public Defender. The need for consultation was obviated by having a qualified, willing, and immediately available counsel, who would be able to work with initial counsel, his father. Any error in lack of consultation was harmless. Finally, one member of the team was, in fact, "learned in the law applicable to capital cases"; one of the Hunts had Texas state-court capital experience at both the trial and appellate levels. Any error would have been harmless.

**The Three Aspects Of This Claim Have Been Procedurally Defaulted**

The Statutory Claims Under § 3005

As discussed above, in this ground, under Bernard's heading "The Court Failed To Comply With 18 U.S.C. § 3005," he complains that: first, this Court erred under § 3005 in not appointing second counsel at an earlier date or "promptly" under the statute; second, this Court erred in assigning counsel under § 3005 by not considering the recommendation of the Federal Public Defender; and third, this Court erred in failing to assign counsel under this section by not ensuring that one member of the team was "learned in the law applicable to capital cases." These three sub-claims all involve perceived statutory violations of § 3005.

The § 3005 Statutory Claims Could Have Been Raised
Both Before The Trial Court And On Direct Criminal Appeal

These three sub-claims could have been raised at the trial level by Bernard's trial team, but they were not raised.

Certainly, Bernard's fine appellate team could have raised these three sub-claims, technical § 3005 omissions, as issues in his direct appeal. This was not a statute that had recently changed. There was no impediment to raising this issue on direct appeal, except for this issue being a technical, very minor issue, with little prospect for success.

1579

### The § 3005 Statutory Claims Are Outside The Scope Of § 2255 Review

As noted above, the basis for these three sub-claims is § 3005. As one court has observed, section "3005 does not embody a fundamental constitutional right." *United States v. Williams*, 544 F.2d 1215, 1218-19 (4th Cir. 1976).[19] Thus, the claims of these violations are not of constitutional or jurisdictional magnitude.

Errors that are not constitutional or jurisdictional in magnitude cannot be raised in a section 2255 motion, if those errors could have been raised on direct appeal. *United States v. Stumpf*, 900 F.2d 842, 845 (5th Cir. 1990). For example, violations of Rule 11 that could have been raised on direct appeal may not be presented in a collateral attack upon the defendant's sentence, unless the defendant shows that the error resulted in a complete miscarriage of justice or in a proceeding inconsistent with the rudimentary demands of fair procedure. *Id.* (citations omitted). Likewise, claims that a trial court violated Rule 32 in the course of imposing a sentence may not be

---

[19] In *Williams*, 544 F.2d at 1218-19, a defendant, indicted for first-degree murder and convicted of second-degree murder, contended that his conviction should be reversed because he was entitled to the appointment of two counsel for the trial. The district court found that no request for two counsel had been made. *Id.* The Fourth Circuit, in interpreting a previous version of § 3005, held that "the right to two counsel granted by § 3005 does not embody a fundamental constitutional right of the sort which can be deemed waived only under the strict standard of *Johnson v. Zerbst. . .*". *Id.* (citation omitted). The Fourth Circuit further held that "since the right is merely statutory, the [trial court] is not required to call it to the attention of the Defendant; and no prejudice to the Defendant will necessarily be presumed from a failure to do so." *Id.*

1580

brought pursuant to section 2255 when such claims could have been raised on direct appeal. *United States v. Weintraub*, 871 F.2d 1257, 1266 (5th Cir. 1989).

Therefore, these claims that are "merely statutory," and not of constitutional or jurisdictional magnitude, may not be raised by Bernard for the first time in § 2255 review. Bernard has made no showing that any "error" resulted in a complete miscarriage of justice or in a proceeding inconsistent with the rudimentary demands of fair procedure.

<u>Bernard Has Failed To Show Cause And Prejudice For His Failure To Raise The § 3005 Statutory Claims On Appeal, Even If Deemed Constitutional,</u>

Furthermore, a defendant's collateral attack on a conviction "may not do service for an appeal." *United States v. Frady*, 456 U.S. 152, 165-70 (1982). Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his procedural default and actual prejudice due to any such errors. *Id.* Significantly, the cause and prejudice standard is more rigorous than the plain error standard used on direct review. *Id.* at 70. Thus, even if the technical § 3005 lack-of-consultation violation is somehow considered to be of constitutional magnitude, Bernard has not shown both cause for his procedural

1581

default and actual prejudice due to any such error. He certainly has not attempted to demonstrate "actual innocence." Nevertheless, his arguments are without merit.

### Bernard's First Sub-Claim, That § 3005 Was Violated By Not Having Second Counsel Before March 9, 2000, Is Without Merit; Any Possible Error Would Have Been Harmless

As noted above, Bernard first argues that, under § 3005, he was entitled to two counsel, including one "learned in the law applicable to capital cases," from the time he was indicted for a capital crime, and that this Court's error in failing to appoint a second attorney until March 9, 2000, rendered his capital conviction *per se* reversible (Bernard's Motion at 137-41). He further argues that with two lawyers he would have had a better chance of persuading the Death Penalty Committee of the Department of Justice not to seek the death penalty, and the defense team would have had more time which he believes would have resulted in better preparation.

Bernard's arguments are entirely without merit. It was not until February 25, 2000, that Bernard requested a second attorney. Only 13 days later, on March 9, 2000, an order was entered granting Bernard the appointment of co-counsel.

The statute, 18 U.S.C. § 3005, provides that "the court . . . shall promptly, **upon the defendant's request**, assign 2 such counsel. . ." (emphasis added). Bernard did not make any "request" for additional counsel until February 25, 2000. This Court promptly granted that request. Thus, even if the request for second counsel is

considered a request under § 3005, there was no violation according to the plain language of the statute.

As discussed above, in *Williams*, the Fourth Circuit held that "since the right [for second counsel under § 3005] is merely statutory, the [trial court] is not required to call it to the attention of the Defendant; and no prejudice to the Defendant will necessarily be presumed from a failure to do so." *Id.*

Alternatively, Bernard suffered no prejudice from the March appointment, and any error was harmless error. Bernard cites to cases in which violations of § 3005 have been held to be *per se* reversible. *See, e.g., United States v. Boone*, 245 F.3d 352 (4th Cir. 2001). These § 3005 violations, however, involve the failure to have second counsel at a trial. The instant case, of course, involved no such violation. Also, in these cases the issue is raised on direct appeal, and not, as here, raised belatedly for the first time in § 2255 review.

Compliance with some aspects of § 3005 has been found by at least one district court to be, as an alternative ruling, harmless error. In *United States v. Torres Gomez*, 62 F.Supp.2d 402 (D. Puerto Rico 1999), the defendant argued that he did not have the benefit of appointment of learned counsel prior to "the administrative hearing at the Death Penalty Committee of the DOJ" and thus, the subsequent appointment of learned counsel did not meet the "promptly" provision of § 3005 (where the court

183

"shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases"). The court held that the appointment of learned counsel within 15 days of the notice of intent to seek the death penalty comported with the "promptly" statutory requirement. *Id.* at 407-08. The court further determined that: "Even assuming, *arguendo*, that the Court has failed to comply with § 3005, the same has been a harmless error, since defendant already has learned counsel, well before trial, and is free to rely on his assistance for a reconsideration hearing before the DOJ's Death Penalty Committee." *Id.* at 408 n.7.

In the instant case, this Court appointed second counsel on March 9, 2000, 21 days **before** the government filed a notice of intent to seek the death penalty as to Bernard. The "promptly" requirement was fulfilled, and any possible error would have been harmless. *Id.*

Furthermore, Bernard has shown no prejudice or harm. Bernard complains that with two lawyers he would have had a better chance of persuading the Death Penalty Committee of the Department of Justice not to seek the death penalty. Bernard acknowledges that his counsel, Mr. Russell D. Hunt, Sr., wrote a letter arguing that the death penalty was not appropriate based on the assertions that Bernard "was not the instigator or leader and that he tried to persuade the shooter, Mr. Vialva, to release

184

the victims"(Bernard's Motion at 140).[20] Counsel also had a telephone conference with Justice Department attorneys. Bernard does not assert how a second attorney would have made any difference in the process. Additionally, as in *Torres Gomez*, the defense team was free to rely on additional counsel's "assistance for a reconsideration hearing before the DOJ's Death Penalty Committee." *Id.* at 408 n.7.

Finally, Bernard alleges that second counsel from the time of the indictment would have somehow resulted in better trial preparation. Second counsel assisted the defense team from March 9, 2000, until the trial began on May 15, 2000. This time was the result of continuances granted by this Court. Bernard does not show how additional preparation would have made any difference in the conduct of the case.

---

[20] As discussed above, this issue, titled "The Court Failed To Comply With 18 U.S.C. § 3005," is couched in terms of section 3005 error by this Honorable Court. Almost parenthetically, Bernard asserts that Mr. Russell D. Hunt, Sr., in his efforts in submitting his letter to the Attorney Generals committee, was "woefully inadequate," because his letter was less than two pages long and conclusionary (Motion at 140). Bernard, of course, is under the *Strickland* standard with this argument, which is entirely without merit. First, Bernard's statement that the letter could have been better is itself conclusionary. Second, his assumption that more is better is not necessarily true (the instant motions and responses are good counter-examples for the proposition that longer is better). Third, the evidence against Bernard was absolutely overwhelming, and there was no evidence at trial that he tried to dissuade Vialva from the murders. Thus, a short, general letter was actually good strategy. Fourth, Bernard has not shown that this strategic decision was ineffective assistance. Finally, Bernard has not shown prejudice, that with a different submission the agency or trial outcome would have been different.

### Bernard's Second Sub-Claim, That § 3005 Was Violated By This Honorable Court Failing To Consult With The Public Defender Is Without Merit; Any Possible Error Would Have Been Harmless

As noted above, Bernard's second sub-issue is that his capital conviction is fatally flawed because this Honorable Court erred in assigning counsel under this section by not considering the recommendation of the Federal Public Defender (Bernard's Motion at 141-43). This issue is without merit.

First, as noted above, Bernard did not make any "request" under § 3005 that triggered the statute.

Second, the evident purpose of the consultation provision of the statute is to find qualified and experienced counsel "learned in the law applicable to capital cases," and who would be immediately available for appointment. As discussed below, prior to the appointment of second counsel, Bernard already had the assistance of learned counsel. Russell D. Hunt, Sr., had significant capital litigation experience, he was a qualified and experienced attorney, who was very familiar with handling federal cases before this Honorable Court. The need for the consultation aspect of the process was obviated by already having a qualified attorney who had worked on the case from the first appearance. Additionally, the experienced Russell D. Hunt, Jr, also familiar to this Honorable Court, was a qualified attorney ready to be appointed.

186

Qualified counsel was appointed under the statute. There was no error. If there was an error it was harmless.

As discussed in connection with Vialva's motion, no court has ever reversed a conviction or granted post-conviction relief based on the consultation-with-the-Federal-Public-Defender provision of section 3005.

As discussed above, the benefit provided under § 3005 is, upon request, the assistance of two attorneys "of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours." The consultation with the Federal Public Defender provision facilitates the appointment of qualified and available counsel. In the instant case, qualified and available counsel, Russell D. Hunt Sr., had already been appointed, and later suggested, Russell D. Hunt, Jr., to this Honorable Court. If initially appointed or suggested counsel was unsatisfactory or if selection from a greater range of choices was deemed necessary, this Court could have undertaken further investigation and consultation. With qualified counsel available who could work as closely as possible together, as father and son, a perfunctory call to the Federal Public Defender should not be absolutely mandated. Qualified counsel was appointed under the statute. There was no error. If there was an error it was harmless.

187

## Bernard Received The Assistance Of Counsel
## "Learned In The Law Applicable To Capital Cases"

As noted above, the current version of the relevant statute, § 3005, ensures that a defendant charged with a capital offense will be assigned, upon request, counsel "learned in the law applicable to capital cases." As discussed in a case that applied the version of § 3005 prior to the 1994 amendment, "[t]he plain meaning of the phrase 'learned in the law' refers to a person who has received a regular legal education, generally signified by admission to the bar." *United States v. McCullah*, 76 F.3d 1087, 1098 (10th Cir. 1996) (citing Black's Law Dictionary 889 (6th ed. 1990)). With the amended language, "learned in the law applicable to capital cases," Congress has added the requirement that counsel have prior capital litigation experience.

In the instant case, the attorney appointed on the day of Bernard's first appearance, Russell D. Hunt, Sr., had significant capital litigation experience. Attorney Russell D. Hunt, Sr. was one of the two trial lawyers in the very high profile "Lake Waco" murders (the *Spence* case). He also was involved in the appellate process of this case.

The published opinion of *Spence v. State*, 758 S.W.2d 597 (Tex.Cr.App. 1988), provides that Attorney Hunt was one of two appellate attorneys that won a remand to the trial court to make a record as to the basis for exclusion of defense evidence.

188

The Court of Criminal Appeals determined that trial counsel had "fervently and continuously requested the opportunity to make an offer of proof, but were just as fervently precluded from doing so." *Id.*

In *Spence v. State*, 795 S.W.2d 743 (Tex.Cr.App. 1990), the Court of Criminal Appeals resolved some of the appellate issues regarding this capital case. Again in this proceeding, Attorney Hunt, Sr., was one of the two appellate lawyers. *Id.* In this case, Spence was convicted of participating in the murders of a man and two women. *Id.* "Their bound and tortured bodies" exhibited multiple knife wounds as well as human bite marks, and showed evidence of being raped. *Id.* Some of the issues raised by counsel involved: undue pre-indictment delay, admissibility of bite-mark patterns where there was lack of agreement among forensic odontologists as to the minimum number of concordant points of similarity sufficient for identification, testimony connecting a third party to the crime, voir dire instructions, admission of hypnotically enhanced witness testimony, offers of rewards to prosecution witnesses, evidence of extraneous, unadjudicated offenses during the punishment phase, and admission of psychiatric examination testimony without prior advice of rights. *Id.*

Thus, Attorney Russell D. Hunt, Sr. was involved in this large and high-profile capital case that involved cutting-edge issues. This state capital experience was a

189

1589

solid foundation for being "learned in the law applicable to capital cases" under the statute.

Both Attorney Russell D. Hunt, Sr. and Attorney Russell D. Hunt, Jr., as reflected in published and unpublished opinions. had a significant amount of experience with federal criminal cases before this Court in Waco, Texas. This Court could make findings of fact as to their prior appearances as well as their effectiveness.

Also both Attorney Russell D. Hunt, Sr. and Attorney Russell D. Hunt, Jr. are board certified in "Criminal Law."[21]

In *United States v. Miranda*, 148 F.Supp.2d 292, 294 (S.D.N.Y 2001), the court discussed standards for appointment of "learned counsel" under § 3005. In *Miranda*, a federal death penalty case, the district court cited the Spencer Committee Report that described the experience of the learned counsel referred to in the statute as distinguished prior experience in federal death penalty cases **or** "distinguished prior experience in state death penalty trials, appeals, or post-conviction review that, in

_____

[21]As this Court is aware, the Texas Board of Legal Specialization certifies practitioners in certain fields, including criminal law. *See* Texas Board of Legal Specialization, General Questions, at http://www.tbls.org/FAQs/General.asp.  To become board certified in a particular specialty area, an attorney must meet the following requirements: (1) have been licensed to practice law for at least five years; (2) have devoted a required percentage of practice to the specialty area for at least three years; (3) have handled a wide variety of matters in the area to demonstrate experience and involvement; (4) attended continuing education seminars regularly to keep legal training up to date; (5) been evaluated by fellow lawyers and judges; and (6) pass a 6-hour written examination. *Id.*

combination with co-counsel, will assure high quality representation." *Id.* The *Miranda* court recognized that it would have to look at practitioners from New Jersey to find counsel qualified in state death penalty cases. *Id.* at 294-97.

In the instant case, the attorney initially appointed for Bernard's first appearance, Mr. Russell D. Hunt, Sr., had participated in a complex and high-profile Texas death penalty case, at both the trial and appellate levels, was board certified in criminal law, and was a regular practitioner in the federal district court in Waco, and thus was well-qualified as someone "learned in the law applicable to capital cases."

## Any Error Would Have Been Harmless

The benefit provided under § 3005 is the assistance of two attorneys "of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours." Qualified counsel was appointed. There was no error under the statute or otherwise. Even if there was an error, and Bernard had objected in the district court, any error was harmless. An error is harmless in some contexts if it is "harmless beyond a reasonable doubt,"[22] and in other contexts if the error did not have a "substantial and injurious effect or influence" vis-a-vis the judgment.[23]  In the instant case, both standards are met.

---

[22] *See Chapman v. California*, 366 U.S. 18, 24 (1967).

[23] *See Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

191

Bernard received the assistance of two experienced board-certified attorneys, including "learned counsel" experienced in capital litigation.

## BERNARD'S GROUND SIX

### BERNARD'S CHALLENGE, THAT A JUROR'S ALLEGEDLY INCORRECT ANSWER TO A QUESTION AS TO WHETHER HE PREVIOUSLY HAD BEEN CONVICTED OF A CRIME, RESULTED IN BEING DENIED HIS CONSTITUTIONAL RIGHT TO AN IMPARTIAL JURY, HAS BEEN PROCEDURALLY DEFAULTED, AS BERNARD UTTERLY FAILED TO RAISE THIS ISSUE IN HIS DIRECT APPEAL, AND HE HAS NOT SHOWN CAUSE AND PREJUDICE IN SUPPORT OF THIS FAILURE; NEVERTHELESS, HIS CHALLENGE IS WITHOUT MERIT;

(Responsive To Bernard's Motion, Ground VI, at 2,
(his memorandum heading "VII"), 145-47)

### Background And Nature Of The Claim

Bernard alleges that Calvin Kruger, juror 126, who was selected for the jury and ultimately became the foreperson, inaccurately answered Question 86 as to whether he or any family member had ever been charged or convicted "of a crime other than a traffic ticket," where Kruger previously had been convicted of DUI (driving under the influence) (presumably misdemeanors) in 1977 and 1994. Bernard makes the pure speculation that "Mr. Kruger intentionally concealed his two prior convictions because he had an actual bias against Mr. Bernard and wanted to get on the jury" (Motion at 146). This challenge is without merit.

192

## This Claim Has Been Procedurally Defaulted; Bernard Has Failed To Show Cause And Prejudice For His Failure To Raise This Claim On Appeal, Even If Deemed Constitutional

As noted above, a defendant's collateral attack on a conviction "may not do service for an appeal." *Frady*, 456 U.S. at 165-70. Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his procedural default and actual prejudice due to any such errors. *Id*. Significantly, the cause and prejudice standard is more rigorous than the plain error standard used on direct review. *Id.* at 70. If this alleged error is considered to be of constitutional magnitude, Bernard has not shown both cause for his procedural default and actual prejudice due to any such error.

As noted above, Bernard had the assistance of two fine appellate attorneys for his direct criminal appeal. The same effort to delve into jurors' backgrounds could have been made on direct appeal as it was made for § 2255 review. This background information concerning Mr. Kruger could have been discovered with reasonable diligence. Bernard cannot establish "cause" for his failure to raise this issue in his direct appeal, and, thus, it has been procedurally defaulted.

Bernard also has not shown anything in the way of prejudice. With the overwhelming evidence against him as to guilt, and all of the aggravating factors, he

cannot show that a different result would have been reached had the juror accurately answered the question, or if there had been a different juror.

Actually, this Honorable Court could find that the usual practice is for the government to strike jurors with a criminal background. Bernard has no basis for twisting the standard reasoning around, and asserting that a person with a criminal background would somehow be prejudiced against a fellow defendant or biased in favor of the prosecution. As noted above, his assertion that Mr. Kruger intentionally concealed his two prior convictions because he had an actual bias against Mr. Bernard and wanted to get on the jury is wholly speculative. Bernard cannot establish "prejudice" for his failure to raise this issue in his direct appeal, and, thus, for this reason as well, it has been procedurally defaulted.

Finally, Bernard has not attempted to demonstrate "actual innocence." This claim had been procedurally defaulted for failure to demonstrate "cause and prejudice." Nevertheless, even if he had raised this claim in a timely manner as a motion for a new trial or on appeal, it is without merit.

### Standards Of Analysis

A defendant who seeks a new trial on the basis of allegations of juror misconduct faces a very high hurdle; the community's trust in the jury system would "be undermined by a barrage of postverdict scrutiny of juror conduct." *Tanner v.*

194

*United States* 483 U.S. 107, 120-21 (1987). If a party moves for a new trial in light of a juror's criminal history and juror bias, the moving party must demonstrate that a juror failed to answer a material voir dire question honestly, and that a correct response would have been a valid basis for a challenge for cause. *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001) (citing *McDonnough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 556 (1984)). "Motivations for concealing information may vary, but only those affecting a juror's impartiality can truly be said to affect the fairness of a trial." *Id.* (citing *McDonnough*). "Therefore, once the trial is complete, a felon's serving as a juror is not an automatic basis for a new trial. The defendant must demonstrate that the juror was actually biased or fundamentally incompetent." *Id.* (citations omitted). The *Bishop* court further explained that "[a]ctual bias exists when a juror fails to answer a material question accurately **because he is biased.**" *Id* (citing *McDonnough*) (emphasis added). The complaining party must demonstrate bias. *Id.* (citations omitted). Bias may be implied or presumed in extreme circumstances, such as when the juror is employed by the prosecuting agency, is a close relative of a participant in the trial, or was somehow involved in the transaction that is the subject of the trial. *Id.* (citations omitted).

## Bernard Has Not Established Bias
## Or That He Is Entitled To A New Trial

### Bernard Has Not Demonstrated That Mr. Kruger Failed To Answer Material Question Honestly

Bernard alleges and assumes that Mr. Kruger, juror 126, failed to answer Question 86, as to whether he or any family member had ever been charged or convicted "of a crime other than a traffic ticket," honestly. It is more likely, however, that Mr. Kruger, inadvertently answered the question incorrectly. "[I]naccurate responses to voir dire questions are excused when caused by inattention." *Id.* at 555. This was part of a very long series of questions. The juror may have read "felony" into the question. In any event, Bernard has failed to show Mr. Kruger's motive was dishonest.

### Bernard Has Not Demonstrated That A Correct Response Would Have Been A Valid Basis For A Challenge For Cause

As noted above, to prevail on this type of claim, under an ordinary standard of review, had he made a timely objection or motion, Bernard must show that the juror making a correct response "would have been a valid basis for a challenge for cause." *Id.* Bernard has completely failed to make this showing. Bernard has cited no case in which there has been a valid challenge to a juror for cause for new or old convictions for driving under the influence.

196



<u>Bernard</u> <u>Has</u> <u>Not</u> <u>Demonstrated</u> <u>That</u> <u>The</u> <u>Juror</u>
<u>Failed</u> <u>To</u> <u>Answer</u> <u>The</u> <u>Question</u> <u>Because</u> <u>He</u> <u>Was</u> <u>Biased</u>

Next, as discussed above, "[m]otivations for concealing information may vary, but only those affecting a juror's impartiality can truly be said to affect the fairness of a trial," and "[t]herefore, once the trial is complete, a felon's serving as a juror is not an automatic basis for a new trial." *Id.* at 554. Here, as well, the juror's old DUI convictions would not have been an automatic basis for a new trial had they been timely raised. Bernard was required to have demonstrated that the juror was actually biased, in that he failed to answer a material question accurately **because he was biased.** *Id.* Furthermore, this is not a case where bias may be implied or presumed in extreme circumstances, such as when the juror is employed by the prosecuting agency, is a close relative of a participant in the trial, or was somehow involved in the transaction that is the subject of the trial. *Id.* Bernard has failed to make such a demonstration. Moreover, as noted above, Bernard's entire "development" and "demonstration" of bias is the pure speculation that "Mr. Kruger intentionally concealed his two prior convictions because he had an actual bias against Mr. Bernard and wanted to get on the jury." This desire to undertake a fishing expedition to possibly uncover some bias is not worthy of a hearing or further analysis (*See* n.17, *infra*).

## Some Cases Involving Motions For New Trial

As noted above, in *Bishop* an appellant appealed the district court's ruling to the Fifth Circuit denying a motion for new trial in light of a juror's criminal history. Thus, Bishop was in a more advantageous posture than Bernard, who is raising this issue for the first time on habeas review. The Fifth Circuit found in *Bishop* that the juror's deferred adjudication for embezzlement was equivalent to a pending charge and that her status was an appropriate basis for a challenge for cause. *Id.* at 556. The court held, however, that a new trial was not warranted because Bishop did not demonstrate that the juror was biased. *Id.* Where the juror made a simple mistake, or actually lied in order to escape her past, her motivations appeared to have been purely personal and not indicative of bias or prejudice. *Id.*[24]

---

[24] Also, recently, in the Martha Stewart case, *United States v. Stewart*, 317, F.Supp.2d 432, 436-44 (S.D. New York 2004), she sought a new trial because a juror deliberately concealed material information in his jury questionnaire. *Id.* The basis for the motion was that a juror: was once arrested and arraigned for assault, he had previously been sued, his son had been convicted of attempted robbery, he had been accused of embezzlement, and he had been terminated from a job for wrongdoing. *Id.* After noting that no verdict had ever been overturned in the Second Circuit on the basis of nondisclosure under the *McDonnough* test, the district court held that the defendant had failed to establish all of requirements of the *McDonnough* test, and that the vague, speculative assertions of bias were not worthy of a hearing. *Id.* To permit such an inquiry on scant evidence "would do serious damage to the policies that justify limitations on postverdict juror scrutiny." *Id.* (footnote omitted).

Conclusion

Bernard failed to raise this issue before the trial court and on direct appeal. He cannot demonstrate cause and prejudice for this failure. The issue has been procedurally defaulted. Nevertheless, Bernard has not demonstrated any of the requirements of the *McDonnough* test. His vague and speculative postulation of bias is not worthy of a hearing.

## BERNARD'S GROUND SEVEN

## BERNARD'S CHALLENGE, THAT THE FEDERAL DEATH PENALTY, AS APPLIED, VIOLATES THE FIFTH AND EIGHTH AMENDMENTS, HAS BEEN PROCEDURALLY DEFAULTED, AS BERNARD UTTERLY FAILED TO RAISE THIS ISSUE IN HIS DIRECT APPEAL, AND HE HAS NOT SHOWN CAUSE AND PREJUDICE IN SUPPORT OF THIS FAILURE; NEVERTHELESS, HIS CHALLENGE IS WITHOUT MERIT

(Responsive To Bernard's Motion, Ground VII, at 2,
(his memorandum heading "VIII"), 147-51)

### Background And Nature Of The Claim

In his Motion (at 147-48), Bernard first recites some statistics from Federal Death Penalty Resource Counsel, some of which are the following:

Three hundred eighteen (318) defendants have been authorized by the DOJ for a capital prosecution. Of these, 164 (fifty-two percent) have been African-American.

199

> Fifty-two percent (57 of 109) of the defendants Attorney General Ashcroft has authorized for capital prosecution have been African American.
>
> Of the 38 defendants who have been sentenced to death in federal court since 1988, twenty-three (61%) have been African American.
>
> Out of the 30 defendants currently on the federal death row, 20 (67%) are African-American.

Bernard argues that these and other statistics demonstrate that the authorization process by which the Department of Justice selects those defendants who will face the death penalty, and subsequent government decision making regarding whether to accept pleas to sentences less than death, are impermissibly influenced by the defendant's race, in violation of equal protection and the Fifth and Eighth Amendments.

Bernard's selective prosecution argument is entirely without merit.

### This Claim Has Been Procedurally Defaulted; Bernard Has Failed To Show Cause And Prejudice For His Failure To Raise This Claim in His Direct Appeal

As noted above, a defendant's collateral attack on a conviction "may not do service for an appeal." *Frady*, 456 U.S. at 165-70. Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his

procedural default and actual prejudice due to any such errors. *Id*. The cause and prejudice standard is more rigorous than the plain error standard used on direct review. *Id*. at 70. Bernard has not shown both cause for his procedural default and actual prejudice due to any such error.

As noted above, Bernard had the assistance of two fine appellate attorneys for his direct criminal appeal. Bernard could have made the same argument using the statistics from 1988 through May of 2001 (his appellate brief was filed on May 7, 2001). The cases he relies on were well known at that time. Bernard cannot establish "cause" for his failure to raise this issue in his direct appeal, and, thus, it has been procedurally defaulted.

Bernard also has not shown anything in the way of prejudice. With the overwhelming evidence against him as to guilt, and all of the aggravating factors, he cannot show that a different result would have been reached .

Finally, Bernard has not attempted to demonstrate "actual innocence." This claim had been procedurally defaulted for failure to demonstrate "cause and prejudice." Nevertheless, this claim is entirely without merit.



# Standards Of Analysis

### <u>Armstrong</u>

In *United States v. Armstrong*, 517 U.S. 456 (1996), the Supreme Court addressed the appropriate standard for establishing a constitutional selective-prosecution claim. The *Armstrong* Court first noted that, absent clear evidence to the contrary, there is a presumption that prosecutors have properly discharged their duties. *Id.* at 464-65. The Court explained that in order for a criminal defendant to dispel this presumption and establish that he has been selectively prosecuted on the basis of his race, he must show that the federal prosecutorial policy had a discriminatory effect and that it was motivated by a discriminatory purpose. *Id.* In order to establish a discriminatory effect, the defendant must show that similarly situated individuals of a different race were not prosecuted. *Id.*

### <u>McCleskey</u>

Bernard states he is relying on *McCleskey v. Kemp*, 481 U.S. 279, 294-97 (1987). The holding of *McCleskey*, however, is entirely against his position.

In *McCleskey*, the petitioner made a claim of selective prosecution based on the "Baldus Study," which reported that the Georgia prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims, 32% of the cases involving white defendants and white victims, 15% of the cases involving black

defendants and black victims, and 19% of the cases involving white defendants and black victims. *Id.* at 287. The Court in *McCleskey* determined that a court may be allowed to make a finding of a constitutional violation (or *prima facie* finding thereof) in very limited circumstances if the data presents a "stark" enough picture, but that the Baldus report did not so qualify. In the instant case, Bernard has not presented statistics more stark than in *McCleskey*.[25]

### Bernard Has Failed To Meet His Burden Under *Armstrong*, *McCleskey*, *Webster*, And *Jones*; This Issue Is Foreclosed By The Law Of This Circuit

#### *Jones*

In *United States v. Jones*, 287 F.3d 325, 333-35 (5th Cir.), *cert. denied*, 537 U.S. 1018 (2002), the Fifth Circuit was presented with a report by an appellant titled "Department of Justice, The Federal Death Penalty System: A Statistical Survey (1988-2000)," prepared by the Department of Justice, in support of a selective prosecution claim. The report provided that, between 1995 and 2000, the Attorney General of the United States authorized 159 death-penalty prosecutions from 682 potential death-penalty cases, and that of those 159 cases, there were 44 white defendants, 71 black defendants, 32 Hispanic defendants, and 12 "other" defendants.

---

[25] Bernard tries to sidestep this case by arguing that under former Attorney General Ashcroft, more unfavorable decisions had been made. Again, however, the statistics cited within the last four years are not vastly different from those of the previous years.

*Id.* The Fifth Circuit held that this evidence was insufficient to establish a *prima facie* case for selective prosecution. *Id.*

### Webster

In *United States v. Webster*, 162 F.3d 308, 333-35 (5th Cir. 1999), the appellant presented statistical evidence in support of a claim of selective prosecution, that 66% of federal death penalty cases involved African-American defendants. The Fifth Circuit denied this claim and held that because Webster had not shown that other similarly situated individuals of other races were not prosecuted for the death penalty, he failed to establish a discriminatory purpose on the part of the Department of Justice. *Id.* The Fifth Circuit further held that his 66% African-American-defendants statistics did not rebut the presumption of good faith on the part of the prosecution. *Id.*[26]

### Hall

In *Hall v. United States of America*, __ F.3d __ (N.D.Tex. 2004) (2004 WL 1908242), Hall made a selective-prosecution claim for relief under § 2255 that the government violated his constitutional rights because it used ethnicity as a basis for

---

[26] The court in *Webster* explained that to establish the claim of selective prosecution the defendant must show: first, that he has been singled out for prosecution but others similarly situated of a different race were not prosecuted; and second, that the discriminatory selection of him is invidious or in bad faith, in that it rests on an impermissible consideration such as race. *Webster*, 162 F.3d at 333-34) (citations omitted).

seeking the death penalty against African-Americans such as himself. In support of his claim, Hall cited statistics maintained by the Federal Death Penalty Resource Center that purportedly indicate that the Department of Justice has authorized the death penalty in 199 cases, 76% of which had non-white defendants and 52% of which involved an African-American defendant (*see* page 27-28 of the Westlaw opinion). Further, of these defendants, 47.5% of white defendants obtained a plea deal for a lesser sentence, while 27.2% of African-Americans obtained such plea deals. *Id.* The district court held, however, that this statistical evidence was insufficient to establish a *prima-facie* selective-prosecution case. *Id.* (citing *Jones*, 287 F.3d at 333-35. Furthermore, the district court held that his statistical evidence was not sufficient to establish the "some evidence" standard necessary to establish good cause for discovery. *Id.* at n. 11.

<u>Conclusion</u>

In *McCleskey*, the Supreme Court rejected a claim of selective prosecution based on statistical reporting that the Georgia prosecutors sought the death penalty in 70% of the cases involving black defendants and white victims, finding that this data did not present a "stark" enough picture. In *Jones*, the Fifth Circuit held that a report, providing that between 1995 and 2000, the Attorney General of the United States authorized 159 death-penalty prosecutions, of which approximately 45% were

black defendants, was insufficient to establish a *prima facie* case for selective prosecution. In *Webster*, 162 F.3d 308, 333-35 (5th Cir. 1999), the Fifth Circuit held that statistical evidence, showing that 66% of federal death penalty cases involved African-American defendants, did not rebut the *Armstrong* presumption of good faith on the part of the prosecution, and did not show that other similarly situated individuals of other races were not prosecuted for the death penalty, nor a discriminatory purpose on the part of the Department of Justice. And in *Hall*, the court rejected a selective-prosecution claim for relief under § 2255, based on statistics maintained by the Federal Death Penalty Resource Center that purportedly indicated that the Department of Justice has authorized the death penalty in 199 cases, 76% of which had non-white defendants and 52% of which involved an African-American defendant, as this statistical evidence was insufficient to establish a *prima-facie* selective-prosecution case. In the instant case, using very similar statistics, such as that 67% of defendants currently on the federal death row are African-American, Bernard has failed to establish a *prima-facie* selective-prosecution case. Just as in *Webster*, Bernard has failed to show: first, that he has been singled out for prosecution but others similarly situated of a different race were not prosecuted; and second, that the discriminatory selection of him is invidious or in bad faith, in that it

rests on an impermissible consideration such as race. *Webster*, 162 F.3d at 333-34).

His claim is foreclosed by Fifth Circuit authority.

### *Furman* Infrequence Argument

Finally, Bernard postulates that the infrequent imposition of the death penalty

(to 20% of those convicted for murder) was a "key" reason in some of the concurring

opinions for overturning the death penalty statute in *Furman v. Georgia*, 408 U.S.

238 (1972) (and related cases), and was a consideration in *Gregg v. Georgia*, 428

U.S. 153 (1776) (Bernard's Motion at 150-51). He therefore argues that the federal

death penalty is constitutionally infirm for being authorized in about 17% of the cases

in which it could have been sought.

This sub-issue has been procedurally defaulted; Bernard's fine appellate

counsel could have raised this issue. Nevertheless it is without merit.

Subsequent authorities have determined that infrequency was not the key

constitutional concern in *Furman*. For example, in *United States v. Kaiser*, 545 F.2d

467, 473-74 (5th Cir. 1977), the Fifth Circuit explained that the Supreme Court's

"opinions also demonstrate that *Furman* was neither founded on nor limited to cases

containing empirical evidence of arbitrariness, discrimination, or infrequency in the

imposition of the death penalty." Instead, *Furman* is founded on the necessity of

suitably guided, narrowed discretion and particularized consideration by the sentencer in capital punishment laws. *Id.*

In the instant case the jury was required to consider listed and unlisted aggravating and mitigating circumstances so that their discretion was suitably directed and limited so as to minimize the risk of arbitrary and capricious action, and was not in violation of *Furman*.

## BERNARD'S GROUND EIGHT

## BERNARD'S CLAIM, THAT THE GRAND JURY DID NOT DETERMINE ALL OF THE ELEMENTS ESSENTIAL TO ESTABLISH CAPITAL MURDER, HAS BEEN PROCEDURALLY DEFAULTED; ADDITIONALLY, *APPRENDI*-TYPE CLAIMS HAVE NOT BEEN APPLIED RETROACTIVELY IN HABEAS REVIEW, SO THAT THIS *APPRENDI-RING* CLAIM MAY NOT BE RAISED FOR THE FIRST TIME ON SECTION 2255 REVIEW; FURTHERMORE, IN THIS CIRCUIT, UNDER *ROBINSON*, ERROR UNDER *RING* HAS BEEN HELD TO BE HARMLESS

(Responsive To Bernard's Motion, Ground VIII, at 2,
(his memorandum heading "IX"), 151-52)

(This Ground Is Similar To Vialva's Ground I, 3-13)

### Background And Nature Of The Claim

The Indictment And Trial Took Place In 2000;
The Jury Ruled On The Aggravating Factors And The Special Issues

The last of the superseding indictments against Vialva and Bernard were filed

on March 28, 2000.  The trial of Vialva and Bernard was conducted and completed

in May and June of 2000.

At the conclusion of the trial, this Honorable Court read the decision of the

jury, which included determinations that as to Count One: that Bernard intentionally

participated in an act, contemplating that the life of the victim, Todd Bagley, would

be taken, or intending that lethal force would be used in connection with a person

other that one of the participants in the offense, and the victim, Todd Bagley, died as

209

a result of the act; that Bernard intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to someone other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and the victim, Todd Bagley, died as a result of the act; that Bernard, committed the offense in an especially heinous, cruel, or depraved manner, and that it involved torture or serious physical abuse to the victim, Todd Bagley; that Bernard, committed the offense as consideration for the receipt or in the expectation of the receipt of anything of pecuniary value; that Bernard committed the offense after substantial planning and premeditation to cause the death of Todd Bagley; that Bernard, is likely to commit criminal acts of violence in the future, which would be a continuing and serious threat to the lives and safety of others; that Bernard has caused injury, harm, and loss to the family of the victim, Todd Bagley, because of the victim's personal characteristics as an individual human being and the impact of the death on the victim's family; that Bernard, committed the offense for the purpose of preventing the victim, Todd Bagley, from providing information and assistance to law enforcement authorities in regard to the investigation or prosecution of the defendants; and that there was not a mitigating factor.

Thus, although the petit jury was presented with and ruled upon the aggravating factors, beyond a reasonable doubt, Bernard complains that the grand

jury was not presented with and did not initially find the aggravating factors by a preponderance of the evidence.

### In 2000, The Instant Case Was Controlled By The Supreme Court's *Walton* Decision

As the Fifth Circuit has explained in *United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004), prior to the *Ring* decision in 2002, *infra*, "our analysis of the use of sentencing factors in a capital case was controlled by *Walton v. Arizona*, 497 U.S. 639 . . . (1990), wherein the Court determined that aggravating factors are not independent offenses, but only standards used to help a jury decide between death and life imprisonment."

### In 2002, In The *Ring* Decision, The Supreme Court Announced A New Rule Of Constitutional Procedure

As the Fifth Circuit further explained in *Robinson*, 367 F.3d at 284, in 2002, in *Ring v. Arizona*, 536 U.S. 584 (2002), "[t]he Court held that where an aggravating factor renders a defendant eligible for death, it is 'the fundamental equivalent of an element of a greater offense' and therefore must be proven to a jury beyond a reasonable doubt." *Robinson* (citing and quoting *Ring* at 609). The Fifth Circuit characterized the change as "a new rule of constitutional criminal procedure". *Robinson* at 284.

1611

In *Robinson*, the appellant, in a direct criminal appeal, argued that the pre-*Ring* indictment was constitutionally defective because it failed to allege the statutory aggravating factors that made Robinson eligible for the death penalty. *Id.* at 283. The Fifth Circuit held that "the absence of an indictment on the aggravating factors used to justify a death sentence is not structural error and is susceptible to harmless error review." *Id.* at 286. The Fifth Circuit further held in *Robinson* that the district court had "properly relied on the then-binding *Walton* decision," and that the *Ring*-error was mere harmless error, as the petit jury's unanimous findings were, at a minimum, persuasive evidence of what a grand jury would have found if the government had charged the aggravating factors it intended to prove to render the defendant eligible for the death penalty. *Id.* at 287-89.

In the instant case, just as the appellant in *Robinson*, Bernard makes the argument that his pre-*Ring* indictment was constitutionally defective because it failed to allege the statutory aggravating factors that made him eligible for the death penalty. In a similar manner to *Robinson*, in this case this Honorable Court "properly relied on the then-binding *Walton* decision."

## This Issue Was Decided Against Bernard In His Direct Appeal

As he acknowledges: "The Fifth Circuit resolved this issue against Mr. Bernard on his direct appeal" (Motion at 151). In *Bernard*, 299 F.3d at 488, because Bernard

failed to object on this ground before the district court, the Fifth Circuit analyzed the

issue, whether the indictment was insufficient for not alleging mental state and

aggravating factors required by the FDPA for imposition of the death penalty, for

plain error. *Id* The court reasoned that even if an indictment error was *Apprendi*

error, it did not amount to plain error. *Id.* (citing *United States v. Cotton*, 535 U.S.

625 (2002) (where the Supreme Court held that a defective indictment does not

deprive the court of jurisdiction and that plain error review applies if the defendant

fails to object) (and where *Apprendi* error for failing to allege drug quantity in an

indictment was not plain error because evidence of drug quantity was overwhelming).

   The Fifth Circuit's ruling on Bernard's *Ring* issue is the law of the case. As

explained in *United States v. Mendez*, 102 F.3d 126, 131 (5th Cir. 1996), the doctrine

of the law of the case is that courts generally refuse to reopen what has been decided,

because once a court decides upon a question of law, that decision should continue

to govern the same issues in subsequent stages of the same case (citations

omitted).Bernard has not demonstrated that his issue presents an exception to the

doctrine. Nevertheless, where the *Bernard* case held that there was no plain error

213

under *Ring*, and *Robinson* held that *Ring* error was harmless, Bernard cannot qualify for § 2255 relief on this same issue.[27]

## The *Ring* Decision Does Not Have Retroactive Application

In his § 2255 motion, Bernard is attempting to apply the *Ring* decision retroactively to his pre-*Ring* indictment and trial. In *Teague v. Lane*, 489 U.S. 288, 310 (1989), the Supreme Court held that new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rule is announced, unless the new rule places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe.[28] In *Robinson*, 367 F.3d at 284, the Fifth Circuit characterized the *Ring* extension of *Apprendi* as "a new rule of constitutional criminal procedure." The *Ring* procedural rule should not be applied retroactively to Bernard's case on habeas review; it is *Teague* barred.

---

[27] To the extent he is raising a different issue, he had procedurally defaulted on the different issue.

[28] The *Teague* doctrine is founded on the notion that one of the principal functions of habeas corpus is to assure that no man has been incarcerated under a procedure which creates an impermissibly large risk that the innocent will be convicted. *Teague*, 489 U.S. at 312-13. Consequently, unless a new rule of criminal procedure is of such nature that without it the likelihood of an accurate conviction is seriously diminished, there is no reason to apply the rule retroactively on habeas review. *Id.* In the instant case, the petit jury found the aggravating factors beyond a reasonable doubt; there was no risk that the innocent would be convicted or a diminishing of the likelihood of an accurate conviction; there is no reason to apply the rule retroactively on habeas review.

214

## Even In A Direct Appeal, *Robinson* Holds *Ring* Error Was Harmless

As noted above, In *Robinson*, the appellant, in a direct criminal appeal, made the same argument as Bernard makes here in his habeas motion, that the pre-*Ring* indictment was constitutionally defective because it failed to allege the statutory aggravating factors that made Robinson eligible for the death penalty. *Id.* at 283. The Fifth Circuit held in *Robinson* that "the absence of an indictment on the aggravating factors used to justify a death sentence is not structural error and is susceptible to harmless error review." *Id.* at 286. The Fifth Circuit further held in *Robinson* that the *Ring*-error was mere harmless error, as the petit jury's unanimous findings were, at a minimum, persuasive evidence of what a grand jury would have found if the government had charged the aggravating factors it intended to prove to render the defendant eligible for the death penalty. *Id.* at 287-89. Thus, in the instant case, *Robinson* holds that any *Ring* error would have been harmless. *Id.*

## BERNARD'S GROUND NINE

## BERNARD'S CHALLENGE, THAT THE LETHAL INJECTION UNDER THE PROTOCOLS CURRENTLY IN FORCE IN THE UNITED STATES BUREAU OF PRISONS AND ANY SIMILAR PROTOCOLS WOULD VIOLATE THE EIGHTH AMENDMENT HAS BEEN PROCEDURALLY DEFAULTED; NEVERTHELESS, THIS GROUND IS WITHOUT MERIT; LETHAL INJECTION HAS BEEN UPHELD AGAINST NUMEROUS CHALLENGES

(Responsive To Bernard's Motion, Ground IX, at 2,
(his memorandum heading "X"), 152-53)

### Background And Nature Of The Claim

Bernard next contends that his lethal injection under the protocols currently in force in the United States Bureau of prisons and any similar protocols would violate the Eighth Amendment (Motion at 152-53). Bernard is not very specific as to the protocols he believes are unconstitutional. His entire set of general allegations are that:

> The Bureau of Prisons' lethal injection protocols create a substantial risk that Mr. Bernard will consciously suffocate and/or suffer excruciating pain as he is put to death. The principal reason for this concern is that there is no assurance the protocol used by the bureau of Prisons will render and maintain Mr. Bernard unconscious while suffocating and painful drugs are injected to cause his death. Such failures appear to have occurred during lethal injection procedures across the nation and, under the current procedures used by the Bureau of Prisons there is

216

a reasonable likelihood that they will occur again during
Mr. Bernard's execution.

## This Claim Has Been Procedurally Defaulted;
## Bernard Has Failed To Show Cause And Prejudice For His Failure
## To Raise This Claim in His Direct Appeal

As noted above, a defendant's collateral attack on a conviction "may not do service for an appeal." *Frady*, 456 U.S. at 165-70. Therefore, a defendant who raises a constitutional or jurisdictional claim for the first time on collateral review, when those claims could have been asserted on direct appeal, must show both cause for his procedural default and actual prejudice due to any such errors. *Id.* The cause and prejudice standard is more rigorous than the plain error standard used on direct review. *Id.* at 70. Bernard has not shown both cause for his procedural default and actual prejudice due to any such error.

As noted above, Bernard had the assistance of two fine appellate attorneys for his direct criminal appeal. Bernard could have made the same argument he now makes. The cases he relies on were well known at that time. Bernard cannot establish "cause and prejudice" for his failure to raise this issue in his direct appeal, and, thus, it has been procedurally defaulted. Nevertheless, this claim is entirely without merit.

Lethal injection is the method used in 37 of the 38 states with the death penalty.

217

16l7

## Standards Of Analysis

The Eighth Amendment prohibits punishments that involve the unnecessary and wanton inflictions of pain, or that are inconsistent with evolving standards of decency that mark the progress of a maturing society. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Punishments are cruel when they involve torture or a lingering death. *In re Kemmier*, 136 U.S. 436, 447 (1890).

The constitutionality of lethal injection has been continuously upheld as a method of execution. *See, e.g., Cooper v. Rimmer*, 358 F.3d 655, 657 (9th Cir. 2004) (rejecting challenge to the California protocols for lethal injection); *LaGrand v. Stewart*, 133 F.3d 1253, 1265 (9th Cir. 1998) (rejecting challenge to the Arizona protocols for lethal injection). In fact, as noted in *Cooper*, "[e]xecution by lethal injection is now used by 37 of the 38 states with the death penalty." *Cooper*, 358 F.3d at 559 and n. 3 (collecting statutes).

The Supreme Court has recognized that unforseeable accidents do not add a constitutionally impermissible element of cruelty to an execution. *Louisiana ex rel. Resweber*, 329 U.S 459, 464 (1947). Thus, "[t]he risk of accident cannot and need not be eliminated from the execution process in order to survive constitutional review." *Campbell v. Wood*, 18 F.3d 662, 682 (9th Cir. 1994) (en banc).

## Bernard's Abbreviated Claim Is Without Merit

As noted above, Bernard challenges the Bureau of Prisons lethal injection protocols because he believes there is no assurance the protocol used by the Bureau of Prisons will render and maintain him unconscious during the injection of the lethal drugs, and thus, the speculation is that a painful death might result.

A similar challenge was made in *Cooper*, a § 1983 case, where the court explained that "[l]ike other states, California uses a combination of three chemicals to carry out an execution by lethal injection: sodium pentothal, a barbiturate sedative; pancuronium, a neuromuscular blocking agent; and potassium chloride, which stops the heart." *Cooper*, 358 F.3d at 657 (citing statute). The court further explained that a condemned inmate is administered five grams of thiopental sodium which renders the inmate unconscious, and thus, the inmate will not experience pain for the time period necessary to complete the execution. *Id.* at 658. The court in *Cooper* determined that Cooper's allegation of unnecessary pain and suffering was "purely speculative." *Id.* at 658-59 (citing *Campbell*, *supra*, that risk of accident cannot and need not be eliminated from the execution process ). Cooper did not show that he was subject to an unnecessary risk of unconstitutional pain or suffering. *Id.*

Similarly, Bernard's allegation of unnecessary pain and suffering is purely speculative. The risk of accident cannot and need not be eliminated from the execution process. Bernard has not shown that he is subject to an unnecessary risk of unconstitutional pain or suffering.

The federal death penalty protocol follows the procedure of the state where sentence was imposed. 18 U.S.C. § 3596. The Texas state protocol is nearly the same as the California protocol (with sodium thiopental instead of sodium pentothal (the same substance), and the same pancuronium and potassium chloride) (*see* Texas Department of Criminal Justice, Death Row Facts). Just as in *Cooper*, Vialva's allegation of unnecessary pain and suffering is "purely speculative." *Cooper*, at 658-59. Lethal injection using sodium thiopental does not constitute cruel and unusual punishment. *Wools v. McCotter*, 798 F.2d 695, 697-98 (1986). This claim is without merit.

220

## BERNARD'S GROUND TEN

## BERNARD'S CHALLENGE, THAT HE IS ENTITLED
## TO SECTION 2255 RELIEF BECAUSE OF CUMULATIVE ERROR,
## IS WITHOUT MERIT

(Responsive To Bernard's Motion, Ground X, at 2,
(his memorandum heading "XI"), 153-54)

Bernard's claim of cumulative error is without merit. Just as in the direct appeal, there was no significant cumulative error impact. *See Bernard*, 299 F.3d at 488. Counsel's overall performance was not outside the wide range of professionally competent assistance. Any errors, viewed separately and cumulatively did not render the result of either the guilt or penalty phase unreliable. Bernard has not demonstrated either deficient performance by his trial counsel or any cumulative errors approaching constitutional dimension. *See Livingston v. Johnson*, 107 F.3d 297, 309-10 (5th Cir. 1997). As discussed above, the evidence of his guilt and the aggravating factors was absolutely overwhelming. Bernard cannot show that he received an unfair trial or that the conviction and sentence was unreliable.

221

## CONCLUSION

For the foregoing reasons, Movant's motion for § 2255 relief should be denied.

Respectfully submitted,

JOHNNY SUTTON

United States Attorney

By: _____

Mark R. Stelmach
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas  78216
(210) 384-7090

222

# CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing Response for the United States of America have been mailed to Robert Co. Owen, Owen & Roundtree, L.L.P., P.O. Box 40428, Austin, Texas 78704 and Robert H. Gombiner, Federal Public Defender, 1601 Fifth Avenue, Ste. 700, Seattle, Washington 98101 on this the 8th day of December, 2004.

Mark R. Stelmach
Assistant United States Attorney
Western District of Texas
601 N.W. Loop 410, Suite 600
San Antonio, Texas 78216
(210) 384-7090
(512) 916-5858

1623