No.  W-99-CR-70(2)

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA,

Plaintiff-Respondent,

v.

BRANDON  BERNARD,

Defendant-Movant.

FILED

FEB 0 7 2005

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY
DEPUTY CLERK

The Honorable Walter S. Smith, Jr.
Chief United States District Judge

DEFENDANT-MOVANT  BRANDON  BERNARD'S
REPLY  BRIEF

Robert C. Owen
Owen & Rountree, L.L.P.
P.O. Box 40428
Austin, Texas  78704
(512) 804-2661
Attorney for Defendant-Movant

Robert H. Gombiner
Assistant Federal Public Defender
1601 Fifth Avenue, Suite 700
Seattle, Washington  98101
(206) 553-1100
Attorney for Defendant-Movant

424

1624

## <u>TABLE OF CONTENTS</u>

<u>Page No.:</u>

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      THE COURT SHOULD GRANT NECESSARY DISCOVERY BEFORE
CONDUCTING AN EVIDENTIARY HEARING . . . . . . . . . . . . . . . . . . . . . . . 2

II.     THE COURT MUST CONDUCT AN EVIDENTIARY HEARING . . . . . . . . . 3

III.    RELYING ON 2254 CASES IN THIS PROCEEDING IS BOTH
UNWARRANTED AND UNWISE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

IV.    THE GOVERNMENT FAILS TO REBUT  MR. BERNARD'S CLAIMS OF
INEFFECTIVE ASSISTANCE AT TRIAL . . . . . . . . . . . . . . . . . . . . . . . . . . 11

       A.     The Evidence Against Mr. Bernard Is the Testimony of Terry Brown and
Chris Lewis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

       B.     The Only Defense Strategy Was to Discredit the Claims of Brown and Lewis
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       C.     The Defense Conducted No Independent Investigation . . . . . . . . . . . . . . . . . 13

       D.     The Lack of Investigation Resulted In Prejudice . . . . . . . . . . . . . . . . . . . . . 15

       E.     The Government Misses the Mark by Examining Petitioner's Claims in Isolation
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

       F.     The Government Offers No Reason Why Defense Counsel Should Not Have
Tried to Exclude Prejudicial Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

V.     THE <u>BRADY</u> CLAIM IS NOT PROCEDURALLY DEFAULTED AND IS NOT
SPECULATIVE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI.    THE GOVERNMENT DOES NOT REBUT MR. BERNARD'S CLAIM OF
INEFFECTIVE ASSISTANCE AT SENTENCING . . . . . . . . . . . . . . . . . . . . 22

       A.     The Government's Claim that Trial Counsel's Deficient Performance at the
Penalty Phase Can Be Justified by "Strategy" Fails Because Counsel Never
Performed an Objectively Reasonable Investigation to Discover All Potentially
Available Mitigating Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

B.   Defense Counsel Performed Deficiently in Delegating All Mitigation Investigation to "Criterion Investigations," Because That Entity Did Not Conduct an Independent Investigation But Instead Limited its Inquiry To Interviewing Persons Named on a List Provided by Mr. Bernard's Mother, Rather Than Conducting an Independent Investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

C.   No Evidence Supports the Government's Claim that Defense Counsel Made a Conscious Strategic Choice to Portray Mr. Bernard in a Certain Manner; Even if that Speculative Inference is Correct, Counsel Failed to Pursue that Strategy in a Manner Consistent with the Prevailing Standard of Practice in 1999-2000 . . . . 29

D.   The Government's Claim that Defense Counsel Need Not Have Investigated the Nature of Youth Gang Activity in Killeen is Impossible to Reconcile With the Existing Standard of Practice in 1999-2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

E.   No Evidence Supports the Government's Claim that Defense Counsel Made a Tactical Choice to Waive Opening Statement at the Penalty Phase, and Such a "Choice" Would Have Been Derelict Under Prevailing Standards of Practice in Any Event . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

F.   Defense Counsel Performed Unreasonably in Failing to Investigate Because the Information Actually in Their Possession Suggested Additional Inquiries Were Necessary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

G.   The Government's Claims About Dr. Coons' Testimony are Contradicted by the Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

H.   The Government's Description of the Mitigation Case Bears Little Relationship to the Evidence Actually Presented at Trial; Perhaps as a Result, the Government Fails to Appreciate the Cumulative Prejudicial Effect of Counsel's Errors and Omissions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

VII.   THE COURT FAILED TO COMPLY WITH 18 U.S.C. § 3005 . . . . . . . . . . . . . . . . . 47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Defendant-Movant Brandon Bernard replies to the arguments in the government's Response To Motion To Vacate, Set Aside, or Correct Sentence ("Response"). Mr. Bernard re-asserts all factual and legal allegations contained in the pleadings he has filed to date in this action. In every instance in which Mr. Bernard does not reply specifically to arguments made by the government in its Response, he relies on the factual and legal allegations in his first amended § 2255 Motion and all evidentiary exhibits thereto. Mr. Bernard does not waive any challenge to his conviction and/or sentence previously asserted in this proceeding.

## INTRODUCTION

The government's Response fails to rebut Mr. Bernard's claims for relief from his conviction and sentence. Mr. Bernard has presented hundreds of pages of documents and affidavits that substantiate his allegations about, *e.g.*, his trial counsel's errors and omissions and the government's failure to fulfill its obligations under <u>Brady</u>. The government, by contrast, offers only bold speculation as to some matters and abject silence as to the rest. Conspicuous by its absence is any *evidence* whatsoever to support the government's defense of the proceedings that led to the verdict in this case. As a result, the government has done little more than muddy the waters concerning the factual and legal issues the Court must decide. Mr. Bernard will not attempt a point-by-point refutation of the government's confusing presentation, but instead will confine this Reply to addressing the broad disputes of fact and law that exist between the parties, to assist the Court in determining what further proceedings are necessary to resolve this case.

1

## I.    THE COURT SHOULD GRANT NECESSARY DISCOVERY BEFORE CONDUCTING AN EVIDENTIARY HEARING

Mr. Bernard has moved the Court for permission to conduct necessary discovery related to his claims for relief, and that motion remains pending.  Although an evidentiary hearing will be necessary to resolve the factual issues that exist between Mr. Bernard and the government, granting discovery in advance of any hearing would conserve judicial resources by sharpening and focusing the precise matters in dispute.  For example, Mr. Bernard has alleged that the government violated <u>Brady</u> by failing to disclose the fact that its key witness Terry Brown suffered from bipolar disorder at the time of the crime and was being administered psychotropic medications at the time of his testimony against Mr. Bernard.   It is at least possible, however unlikely, that documentation of these facts appeared in the government's files that were made available to Mr. Bernard's attorneys pursuant to what the government has characterized as its "open file" discovery policy in this case.  If so, then the details about Mr. Brown's condition and treatment would be relevant only to Mr. Bernard's claim of ineffective assistance of counsel, rather than constituting a <u>Brady</u> violation.  Regrettably, the government to date has unreasonably and petulantly refused to permit Mr. Bernard's current counsel the same access trial counsel enjoyed to its formerly "open" files.  Thus, without discovery Mr. Bernard must prepare to prove both theories at any hearing in this case.  Much time and effort, not to mention taxpayer dollars, could be conserved through the simple expedient of requiring the government to permit Mr. Bernard's current counsel exactly the same access to its formerly "open" files that it gave trial counsel.

The same is true regarding Mr. Bernard's other <u>Brady</u> claims, *e.g.*, his claim that the government failed to disclose information it obtained during a proffer by Terry Brown about

2



Brown's extensive and serious prior violent criminal conduct.   If Mr. Bernard is granted

discovery (*e.g.*, the names of the government agents present at this and comparable proffers), he

can interview the relevant agents and call as witnesses only those who actually possess

information relevant to this allegation.  In the alternative, Mr. Bernard will be forced to proceed

on a piecemeal basis, subpoenaing additional witnesses as each new name surfaces.  Neither

judicial economy nor the fair and reliable resolution of Mr. Bernard's claims for relief would be

promoted by adopting such an approach.

    For all these reasons, before the Court takes evidence on the merits of Mr. Bernard's

claims for relief, it should order discovery as requested in Mr. Bernard's pending motion.

## II.    THE COURT MUST CONDUCT AN EVIDENTIARY HEARING

    Mr. Bernard has pleaded detailed facts in support of his claims, and supported those

allegations with numerous affidavits and other evidentiary documents.  The government, for its

part, has offered only speculation, misstating the record and submitting not a single piece of

evidence to substantiate its defenses to Mr. Bernard's constitutional challenges. On this record,

the Court would be entitled to grant relief outright without requiring further proceedings.  At a

minimum, because the parties' pleadings reflect numerous disputes of material fact, an

evidentiary hearing will be  required once discovery is complete.  A review of the applicable

legal standards for granting evidentiary hearings under 28 U.S.C. § 2255 supports this view.

    A district court that receives a federal prisoner's motion to vacate, set aside, or correct his

sentence is obliged to "grant a prompt hearing" unless the motion itself and the files and records

of the case *conclusively* show that the prisoner is entitled to no relief.  United States v. Martinez,

181 F.3d 627, 628 (5th Cir. 1999); United States v. Bartholomew, 974 F.2d 39, 41 (5th Cir. 1992)

(same); United States v. Tubwell, 37 F.3d 175, 179 (5th Cir. 1994) (evidentiary hearing is

3

required unless the motion raises only legal claims that can be resolved without the presentation of additional evidence).[1]   While it may be possible to resolve some cases without hearing evidence, the Supreme Court has emphasized that if the "specific and detailed factual assertions of the petitioner . . .  cannot be said to be incredible," and if true would entitle him to relief, "the function of 28 U.S.C. § 2255 can be served . . . only by affording the hearing which its provisions require." Machibroda v. United States, 368 U.S. 487, 495-496 (1962).  This standard creates a robust presumption that a § 2255 proceeding will include an opportunity for the petitioner to prove his allegations in a hearing.  As the Eleventh Circuit has characterized it, the district court must conduct a hearing unless the petitioner's allegations are "affirmatively contradicted by the record or patently frivolous." Aron v. United States, 291 F.3d 708, 715 (11th Cir. 2002) (citation omitted).  Neither of those descriptions applies here.

Nor did Congress change this longstanding approach when it enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  "Although the AEDPA modified, to some extent, the [previously existing] standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel changes in § 2255 practice and evidently chose to leave intact the Townsend standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases."  Stead v. United States, 67 F. Supp. 2d 1064, 1074 n. 5 (D.S.D. 1999) (citing Townsend v. Sain, 372 U.S. 293 (1963)).  Consistent with Machibroda, under Townsend a

---

[1] See also, e.g., Grady v. United States, 269 F.3d 913, 919 (8th Cir. 2001) (district court may not deny a prisoner § 2255 relief without holding an evidentiary hearing to resolve disputed questions of fact) (citations omitted); United States v. Lopez, 100 F.3d 113, 119 (10th Cir.1996) (district court should conduct an evidentiary hearing in a § 2255 case "[u]nless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief") (quotation and citation omitted); Chang v. United States, 250 F.3d 79, 85 (2nd Cir. 2001) (district court must conduct hearing where petitioner's claim "is not so clearly bereft of merit as to be subject to dismissal on its face").

4

hearing is mandatory if the material facts have not been otherwise developed and the prisoner's "allegations, if proved, would establish the right to [the relief sought]." Townsend, 372 U.S. at 307.

Further, an evidentiary hearing is mandatory because almost all Mr. Bernard's claims concern events which took place outside the Court's presence and which do not appear on the trial record. In such circumstances, only an evidentiary hearing can ensure the fair and reliable determination of the underlying facts. Machibroda v. United States, 368 U.S. 487, 494-95 (1962) (evidentiary hearing necessary where petitioner's allegations "relate[]primarily to purported occurrences outside the courtroom and upon which the record could, therefore, cast no real light"); White v. United States, 366 F.3d 291, 302 (4ᵗʰ Cir. 2004) (same, citing Machibroda); Armienti v. United States, 234 F.3d 820, 825 (2ⁿᵈ Cir. 2000) ("[A]ctions taken by counsel outside the presence of the trial judge . . . [can] not ordinarily be resolved by him without . . . a hearing"); United States v. Cervantes, 41 Fed. Appx. 918, 920 (9ᵗʰ Cir. 2002) (a hearing is "usually required if the motion . . . states a claim based on matters outside the record or events outside the courtroom"). In particular, because a claim of ineffective assistance of counsel typically "involves off-the-record interactions [between the movant and] his trial counsel," such a constitutional challenge "cannot be determined by examining the motion, files, and records before the district court." Chang v. United States, 250 F.3d 79, 85 (2ⁿᵈ Cir. 2001) (citation omitted).

Mr. Bernard need not demonstrate conclusively that he is entitled to relief in order to trigger this Court's duty to hold an evidentiary hearing. *See* United States v. Rodrigues, 347 F.3d 818, 824 (9ᵗʰ Cir. 2003) ("section 2255 imposes a fairly lenient burden on the petitioner" to obtain an evidentiary hearing); Smith v. United States, 348 F.3d 545, 551 (6ᵗʰ Cir. 2003) ("We

5

1631

have observed that a Section 2255 petitioner's burden for establishing an entitlement to an

evidentiary hearing is relatively light," citing <u>Turner v. United States</u>, 183 F.3d 474, 477 (6th Cir.

1999)). Mr. Bernard's burden at this stage of the proceedings is simply to allege facts which, if

true, would entitle him to relief. He has not only done so, but has supported his allegations with

extensive documentary evidence including sworn declarations. A hearing should follow.

  A hearing is also necessary because the pleadings raise disputes of material fact which

cannot be resolved without the Court's taking evidence. Some of these disputes of fact are

implicit, since the government has utterly failed to offer any evidence in support of its

characterizations of various events, actions, motivations, intentions, etc., relevant to Mr.

Bernard's claims for relief. To take just one example, the government has repeatedly denied that

Mr. Bernard's defense counsel performed deficiently at both phases of trial. Mr. Bernard has

submitted the sworn declaration of David Ruhnke, an expert in the prevailing standard of

practice for defending federal capital cases in 1999-2000, which enumerates in detail many

specific ways in which defense counsel's performance in Mr. Bernard's case fell below that

standard. The conflict between Mr. Bernard's allegations, supported by sworn evidence, and the

government's unsupported denials cannot be resolved (or, at least, cannot be resolved *against*

Mr. Bernard) without a hearing. *See* <u>Peavy v. United States</u>, 31 F.3d 1341, 1346 (6th Cir. 1994)

(finding petitioner entitled to an evidentiary hearing because he had presented an affidavit

supporting his claims, in response to which the government had failed to "present evidence in

support of its position;" the government's "unverified responses . . . were plainly inadequate" to

justify denial of relief without a hearing); <u>United States v. Aiello</u>, 814 F.2d 109, 114 (2nd Cir.

1987) ("[L]ike a motion for summary judgment in civil cases, both the petitioner's and

government's affidavits -- taken together -- are used to determine the existence of genuine issues

6

of material fact. If the affidavits disclose such material issues, . . . [a] ruling that summarily

disposes of the petition is error") (citations omitted).

As noted, numerous disputes of material fact exist with respect to Mr. Bernard's claims

for relief, including but not limited to the following:

- What steps trial counsel took to investigate in preparation for the guilt phase of trial, and when those steps were taken;

- What reasons trial counsel had, if any, for not performing particular investigation;

- How much time trial counsel spent preparing for the guilt phase of trial;

- Whether lead counsel Russ Hunt, Sr., considered any lawyer other than his son Russ Hunt, Jr., as potential second chair trial counsel for Mr. Bernard;

- Why trial counsel did not consult any forensic experts, including specifically an arson expert;

- Whether trial counsel obtained and examined the report prepared by the government's arson expert;

- Whether and to what extent trial counsel relied on investigation and/or other preparation for trial by counsel for Christopher Vialva, rather than conducting their own investigation;

- Trial counsel's strategy, if any, in attempting to avert authorization of this case as a death penalty prosecution by the Attorney General;

- What efforts, if any, trial counsel made to interview any witnesses, including but not limited to Terry Brown, Christopher Lewis, Tony Sparks, and Joey Presley;

- What qualifications trial counsel possessed for appointment in a federal death penalty case, including but not limited to: prior training and experience in federal criminal trials; training in the defense of capital cases in federal court; and any other death penalty training and/or experience;

- Whether the Court or any member of its staff consulted with the Federal Public Defender for the Western District of Texas prior to appointing trial counsel;

- What documents, information, and/or materials the government made

7

available to trial counsel through its alleged "open file" discovery policy, and whether the government provided any other information to the defense;

- The nature and extent of the mental illness suffered by key government witness Terry Brown, both at the time of the events underlying the indictment, during the period prior to trial, and during trial;

- The nature of any treatment provided to key government witness Terry Brown for his mental illness, including but not limited to: the nature of all medications Brown was taking, the dosages in which they were administered, and the nature of any associated side effects; any counseling or therapy in which Brown participated; and any other treatment of whatever kind;

- What the government knew about Terry Brown's mental illness and/or any treatment he was receiving for that condition;

- What impeaching information the government possessed about Terry Brown but did not disclose to trial counsel, including but not limited to: Brown's involvement in other violent crimes, such as the ones to which his attorney's notes indicate Brown admitted during a proffer session with government agents; Brown's mental illness and treatment, including the treatment documented by the jail records Mr. Bernard has submitted as exhibits in support of his § 2255 Motion; Brown's membership in gangs; Brown's use of drugs; Brown's expectation that he would benefit in return for cooperating with the prosecution, and any other impeaching information;

- Any impeaching information the government possessed about other prosecution witnesses, but did not disclose to trial counsel;

- Any exculpatory or impeaching information the government possessed regarding any other person, including but not limited to Tony Sparks and Joey Presley;

- The names of all government agents present at any of the proffers with Terry Brown and Chris Lewis;

- Whether the government agents present at the proffers with Terry Brown and Chris Lewis took any notes during any of those proffers;

- If the government agents present at any of the proffers with Terry Brown and Chris Lewis took no notes, why they did not;

- Any mental impressions and/or observations formed or made of those proffers by any of the government agents present;

8

- What steps trial counsel took to investigate potential mitigating evidence;

- What mitigating evidence a reasonable and timely investigation would have uncovered;

- What strategy trial counsel was pursuing at the guilt phase;

- What strategy trial counsel was pursuing at the penalty phase;

- Why trial counsel chose not to make an opening statement at the penalty phase;

- Whether the steps trial counsel claim they took to investigate potential mitigating circumstances were consistent with the prevailing standard of practice for defending capital cases in 1999-2000;

- Who decided which witnesses would be called at the penalty phase, and on what basis that decision was made; and

- What steps, if any, trial counsel took to prepare the witnesses actually called to testify during the defense case at the penalty phase.

The foregoing is a representative list of the disputes of material fact reflected in the pleadings, and does not purport to exhaust the issues that must be resolved.[2]  Mr. Bernard's point is simply that the Court cannot resolve these contested issues "on paper." Montgomery v. United States, 469 F.2d 148 (5th Cir. 1972) ("contested issues of fact" that are "bona fide"

---

[2] The government repeatedly asserts – in the absence of any evidence to support such a claim – that the actions taken (or not taken) by Mr. Bernard's trial attorneys reflected tactical or strategic judgments. But "the noun 'strategy' is not an accused lawyer's talisman that necessarily defeats a charge of constitutional ineffectiveness." Miller v. Francis, 269 F.3d 609, 616 (6th Cir. 2001).  Whether trial counsel's actions were actually the product of strategy or tactics, and whether any claimed "strategy" was one which a reasonably competent attorney defending a federal capital case in 1999-2000 would have pursued, are questions of fact which demand a hearing.  Bryan v. Mullin, 335 F.3d 1207, 1221 n.17 (10th Cir. 2003) (en banc) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact") (citing Provenzano v. Singletary, 148 F.3d 1327, 1330 (11th Cir. 1998).

must be resolved on the basis of an evidentiary hearing); *see also* <u>United States v. Hughes</u>, 635 F.2d 449, 451 (5th Cir. Unit B 1981) (contested fact issues in § 2255 case ordinarily may not be decided on affidavits alone). The Court should grant an evidentiary hearing.

## III.     RELYING ON 2254 CASES IN THIS PROCEEDING IS BOTH UNWARRANTED AND UNWISE

Before Mr. Bernard addresses the government's responses to the merits of his claims for relief, one observation is in order. The government relies on a number of cases arising from habeas corpus proceedings under 28 U.S.C. § 2254, applicable to *state* prisoners. *See, e.g.*, Response at 66 (citing <u>Dunhan v. Travis</u>, 313 F.3d 724 (2nd Cir. 2002); <u>id</u>. at 149 (citing <u>Rutherford v. Crosby</u>, 385 F.3d 1300 (11th Cir. 2004)); <u>id</u>. at 149 n.11 (citing <u>Dowthitt v. Johnson</u>, 230 F.3d 733 (5th Cir. 2000); <u>id</u>. at 154 (citing <u>Millender v. Adams</u>, 376 F.3d 520 (6th Cir. 2004). In each case, the issue for the federal court on habeas review was not whether the state court *correctly* interpreted and applied federal constitutional law, but whether it *unreasonably* applied such law. <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24-25 (2002) ("[A] federal habeas court [reviewing a state-court judgment] may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied <u>Strickland</u> incorrectly" (citation omitted)).

This important distinction is apparent from even a cursory glance at the relevant opinions cited by the government. *See* <u>Rutherford</u>, 385 F.3d at 1309 (acknowledging that state prisoner claiming ineffective assistance of counsel must overcome "another layer of deference," imposed by 28 U.S.C. § 2254, beyond <u>Strickland</u> itself); <u>Dowthitt</u>, 230 F.3d at 740 (court is "viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)"); <u>Millender</u>, 376 F.3d at 523 (state court must have applied

federal law in an objectively unreasonable manner before federal court may grant relief). As the Supreme Court has emphasized, an "unreasonable" application of clearly established federal law is more than an "erroneous" one, <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000), and indeed even more than a "clearly erroneous" one. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75 (2003) (warning federal habeas courts against "conflating error (even clear error) with unreasonableness"). Thus, these cases involve "highly deferential" review of state court judgments, <u>Visciotti</u>, 537 U.S. at 24, rather than a straightforward application of federal constitutional principles to the facts of the underlying trial. They stand for nothing more than that the state courts in question did not apply clearly established federal law in an objectively unreasonable way. As a result, the Court should exercise caution in determining how much weight to accord these cases, as they represent an additional and significantly higher level of deference to the judgment than is required in a § 2255 proceeding.[3]

## IV.    THE GOVERNMENT FAILS TO REBUT  MR. BERNARD'S CLAIMS OF INEFFECTIVE ASSISTANCE AT TRIAL

The government's response to Mr. Bernard's claims of ineffective assistance at the guilt-innocence phase of trial rests on three inaccurate assumptions.   First, the government asserts that counsel's performance at trial reflects strategic choices.  Second, the government dismisses Mr. Bernard's specific claims of ineffectiveness as representing no more than isolated and trivial miscues.   Third, the government believes that any possible

---

[3] The government mistakenly characterizes some of the holdings of these cases in any event. For example, although the government says "[t]he Eleventh Circuit affirmed the denial of habeas relief [in <u>Rutherford</u>] based on a lack of <u>Strickland</u> prejudice," Response at 150, in fact the <u>Rutherford</u> court never reached that question at all. <u>Rutherford</u>, 385 F.3d at 1311 ("We need not reach the question of whether that alternative basis for the state court decision, the lack of [<u>Strickland</u>] prejudice, passes muster under § 2254(d)").

ineffectiveness does not warrant relief in view of what it characterizes as "overwhelming" evidence against Mr. Bernard. The government offers no evidence to support its positions. This is unsurprising, since they are contradicted by the trial record and by the evidence submitted by Mr. Bernard in support of his § 2255 Motion.

### A.    The Evidence Against Mr. Bernard Is the Testimony of Terry Brown and Chris Lewis

The government's claim of "overwhelming" evidence against Mr. Bernard finds no support in the record, and appears to reflect simply the fact that Mr. Bernard was admittedly present with his car when the Bagleys were killed.   The entirety of the evidence about Mr. Bernard's *participation in the murders or advance knowledge of them* derives from the testimony of Terry Brown and Chris Lewis.   It was only Brown and Lewis who provided any evidence about what Chris Vialva said about murdering the Bagleys or when or where he said it.  Only Brown and Lewis provided any evidence about what Mr. Bernard knew about a carjacking.  Only Brown and Lewis gave any evidence about what Mr. Bernard did to spread lighter fluid on the Bagleys' car.  Only Brown and Lewis claimed to know where Mr. Bernard was standing when the car was set on fire; and only Brown and Lewis offered any support for the accusation that Mr. Bernard set it.  Not a shred of forensic evidence implicated Mr. Bernard and not one other witness gave testimony relating to either Mr. Bernard's advance knowledge of the murders or what ,if anything, he did to assist in their commission.

Mr. Bernard has explained in detail why the testimony of Brown and Lewis was so critically important to the government's case. *See* first amended § 2255 motion at 20-21. The government's response points to no facts which show otherwise.  The evidence against

\1638

Mr. Bernard was "overwhelming" only to the extent that the jury credited their testimony. *See* United States v. Bernard, 299 F.2d 467, 471 n.1 (noting that "most of the facts" in the government's case came from the testimony of Brown and Lewis.).   Only by mischaracterizing the evidence can the government plausibly assert that Mr. Bernard did not suffer prejudice from trial counsel's ineffective performance.

**B.     The Only Defense Strategy Was to Discredit the Claims of Brown and Lewis**

"The scope of a defense counsel's pretrial investigation necessarily follows from the decision of what the theory of defense will be."   Soffar v. Dretke 368 F. 3d 441, 472 (5th Cir. 2004).   The government does not dispute that the only strategy available to Mr. Bernard's trial counsel was to attack the credibility of the government's key witnesses,  Terry Brown and Chris Lewis.   Success at trial depended entirely on discrediting the government's witnesses and revealing the lack of objective support for the witnesses' testimony.

**C.     The Defense Conducted No Independent Investigation**

Supported by exhibits and citations to the record, Mr. Bernard has alleged that his trial counsel did not conduct any investigation for the guilt phase of the trial, did not obtain the transcripts of the guilty plea hearings for Terry Brown, Chris Lewis, or Tony Sparks, did not retain any forensic experts or conduct any investigation of the claims made by the government's forensic experts, and spent little time prior to trial familiarizing themselves with the discovery furnished by the government.  The government offers no evidence to rebut these claims. Its answer is unaccompanied by any affidavits disputing Mr. Bernard's allegations and exhibits, or offering any explanation as to why a thorough investigation was not undertaken.   Nor has the government even attempted to offer any explanation as to why trial counsel should not have done everything possible to acquire material to impeach the

government's witnesses.

Trial counsel's complete failure to investigate forecloses any argument that their deficiencies in cross-examining Brown and Lewis can be defended as strategic choices. Quite obviously, defense counsel could not make a "strategic" choice to not cross-examine Brown or Lewis about statements which counsel never obtained or reviewed. Similarly, trial counsel could not make a reasoned strategic decision not to confront the witnesses regarding drug use or prior criminal activity of which counsel were unaware. And, defense counsel was in no position "strategically" to determine whether to call witnesses who might cast doubt on the statements of Brown and Lewis, since counsel had performed no investigation or made any effort to interview such witnesses.

Nor can the government point to any alternative actions pursued by trial counsel that might have obviated the need for investigation of the government's witnesses and for obtaining and studying all of their prior statements. Despite the fact that defense counsel had the maximum incentive to investigate the government's witnesses, especially Terry Brown and Chris Lewis, the evidence shows that counsel did nothing.

The government can offer only speculation that investigation would have been fruitless or conclusory statements that investigation would not have changed anything. Neither by way of affidavits, expert opinion, or citation to the record does the government provide any meaningful justification for the Hunts' inaction. Such unadorned theorizing is particularly unconvincing in the face of Mr. Bernard's documentary evidence, which proves that investigation would have uncovered information dramatically undercutting the credibility of the government's witnesses. The Fifth Circuit consistently has held that a lawyer falls below the standard of reasonable professional assistance by not performing adequate investigation.

1640

*See, e.g.*, <u>Anderson v. Scott</u>, 338 F.2d 382 (5th Cir. 2003); <u>Byrant v. Scott</u>, 28 F.3d 1411 (5th Cir. 1994). The government's failure to submit any facts or explanations for the lack of investigation is striking given this precedent.

### D.    The Lack of Investigation Resulted In Prejudice

Unable to rebut Mr. Bernard's claims that counsel did not investigate or prepare, the government devotes most of its energy to an effort to show that, despite not having done any investigation, counsel still performed adequately and counsel's errors or omissions were not prejudicial.   In pursuit of these objectives, the government paraphrases at great length the cross-examinations of Brown and Lewis – indeed, its description of the examinations is actually longer than the examinations themselves.   The government depicts defense counsel as relentlessly exposing the prior lies told by Brown and Lewis. It concludes that any deficiencies about which petitioner complains are either trivial or cumulative.   The rosy picture drawn by the government does not mirror reality.

The government claims that "Brown testified over and over again at the trial that he did not initially provide truthful information about the offense, his participation [or] the participation of others in the offense, because the authorities had little or no information about the offense [and Brown] had not yet decided to cooperate." Response at 72.[4]   The government argues that Lewis provided the same explanation for originally having given a false statement to the police.   The government goes on to assert that the specifics of these initial untruthful statements were painstakingly elicited by the defense. *See* Response at 75

---

[4] The government is so enamored of this description that it repeats it verbatim several times. *See* Response at 73, 75, 80-81, 81-82.

(Brown's prior statements "fully explored"); 116  (Lewis' prior inconsistent statements "exposed for the jury in a highly professional manner")

The trial record shows that Mr. Bernard's lawyers did not ask Brown a single question about any of his initial statements or the reasons why he initially lied.  In fact, Mr. Bernard's lawyers did not confront Brown with *any* prior inconsistent statements of *any* sort.  *See* T. 1949-59.  Even including the cross-examination by Mr. Vialva's attorney[5] and the redirect by the prosecution,   Brown was questioned only briefly about any prior statements, and got away with giving only brief, vague responses.  T. 1937-45.

Far from having his credibility meaningfully challenged  by use of his initial prior statements,  Brown was not confronted at all by Mr. Hunt and drew just a few glancing blows from Mr. Vialva's lawyers.  Palpably false explanations – such as Brown's claim that his statements did not contradict each other, but only expanded to include additional details – went unchallenged, T. 1938, while the ever-shifting nature of his account of the crime remained unexplored.

The cross-examination of Lewis by Mr. Bernard's lawyers was just as tepid and had just as little effect.  Other than asking one question about Lewis' having said in his written statement that Vialva popped open the trunk – in contrast to his trial testimony, in which Lewis denied knowing who had opened the trunk – Mr. Hunt asked no questions about Lewis' detailed written statement.  Mr. Hunt did nothing to highlight the fact that Lewis'

---

[5] The government suggests that the efforts of Vialva's lawyers accrued to Mr. Bernard's benefit. This argument ignores the very different interests of the codefendants. Vialva's lawyers needed to minimize *Vialva's* role, not Mr. Bernard's.  *See* Rios v. Rocha, 299 F.3d 796, 807-08 (unreasonable for counsel to rely on investigation performed by a codefendant, because the codefendant's interests may conflict with those of the client).

initial statement both exculpated Mr. Bernard and contradicted Brown. Nor did Mr. Hunt direct the jury's attention to the detailed diagram, drawn by Lewis himself, which placed Mr. Bernard well away from the car when the Bagleys were shot and their car set on fire. The jury also never learned that key parts of Lewis' trial testimony, such as his claim that Mr. Bernard must have heard Vialva at Long Branch Park announcing his plans to kill the Bagleys, were nowhere to be found in Lewis' initial statement – even though the government argued, and indeed Lewis testified, that his initial statement was crafted to inculpate Vialva as much as possible.

The most illogical aspect of the government's defense of trial counsel's lackluster performance is its claim that any further impeachment of Brown and Lewis would have been cumulative and fruitless. According to the government, Brown and Lewis admitted at trial that they had initially lied to the police, but explained that they told those lies *before* they agreed to cooperate and tell the truth, and consistently maintained that they stopped lying once they agreed to cooperate. According to the government, this set of propositions insulated Brown and Lewis from effective attack; the government posits that at trial Brown and Lewis were "very believable" and gave a "true , complete narrative" of the events surrounding the murders. Response at 113-14. Moreover, says the government, any prior inconsistent statements by Brown and Lewis were easily explained away as having occurred before their incentive to tell the truth (allegedly, their decision to cooperate with the government) arose.

The government appears not to realize that its own argument underscores why Bernard's lawyers were ineffective in not obtaining, reviewing and utilizing all of the statements made by Brown and Lewis after they began to cooperate. Mr. Bernard has presented detailed and

17

overwhelming evidence that in proffers to the government, statements to psychiatrists and in sworn statements on plea of guilty in open court, *all made after they decided to cooperate with the prosecution,* Lewis and Brown continued to provide information dramatically at odds with their eventual trial testimony.   Further, these post-cooperation statements of Brown and Lewis, far from evidencing a greater willingness to implicate themselves, were rife with attempts to shift the blame to others and minimize their own responsibility.   Due to the ineffectiveness of Mr. Bernard's trial counsel, the jury remained entirely ignorant of any of these matters.

If the pre-cooperation statements of Brown and Lewis did not suffice to undermine their credibility, then Mr. Bernard's lawyers needed to use their post-cooperation statements and in particular their post-cooperation statements made under oath.   United States v. Cuffie, 80 F.3d 514, 518 (D.C. Cir. 1996) (disclosure that witness lied under oath in open court "is almost unique in its detrimental effect on [the] witness' credibility").   This is, however, exactly what counsel did *not* do and it is a deficiency which the government can neither explain as strategic or dismiss as harmless.

In Cargle v. Mullin, 317 F. 3d 1196, 1213 (10th Cir.  2003) the court granted relief "in a case resting almost entirely on the credibility [of] two inherently vulnerable prosecution witnesses" because  defense counsel could have, but did not, implement "an effective overall defense strategy"  that would have showed that "the case involved such a tangle of inter and intra-witness inconsistency that the jury could not be confident enough in any person's word to justify [convicting the defendant of] first degree murder beyond a reasonable doubt." These comments apply with full force to this case.  *See also* Beltran v. Cockrell, 294 F.2d 730, 734-35 (5th Cir. 2002) (counsel ineffective for failing to impeach key prosecution

witness with prior inconsistent statement); <u>United States v. Tucker</u>, 716 F.2d 576, 584 (9th Cir. 1983) (counsel ineffective for, among other things, having "failed to make a thorough examination of the documentary evidence in the case," including prior statements of government witnesses in preparation for cross-examination, leaving counsel "completely unprepared to question those witnesses particularly when their trial testimony differed in any significant respect from their prior statements."

### E.    The Government Misses the Mark by Examining Petitioner's Claims in Isolation

Although the government spills much ink attempting to show why specific failures in cross-examination are not prejudicial, its efforts miss the mark. The government analyzes each bit of impeachment separately, argues that no such item, by itself, would necessarily have shown the witness to be incredible, and then triumphantly concludes that this demonstrates that the impeachment is trivial or cumulative. This unrealistic approach does not refute Mr. Bernard's claims.

Mr. Bernard has shown that reasonably effective defense counsel could have impeached Brown and Lewis with numerous inconsistent statements but that trial counsel, because of their ineffectiveness, did not have these statements available. Although Mr. Bernard has set forth numerous specific inconsistencies, he does not claim that trial counsel's failure to highlight each and every one of these inconsistencies compels a finding of ineffectiveness. Instead, trial counsel's ineffectiveness emerges from an evaluation of their overall performance, including their failure to obtain or use *any* of the available inconsistencies to impeach these vital prosecution witnesses. The government's insistence on examining each instance of ineffectiveness in pristine isolation is designed to obscure trial counsel's

19

performance rather than to meaningfully analyze it.

**F.    The Government Offers No Reason Why Defense Counsel Should Not Have Tried to Exclude Prejudicial Evidence**

The government fares no better in its attempts at responding to Mr. Bernard's claims

regarding trial counsel's failure to take any action to exclude irrelevant but prejudicial

evidence about gangs, their failure to protest the prosecutor's misstatements of the evidence,

and their failure to protect Mr. Bernard against irrelevant testimony and photographs

calculated to engender an emotional response and inflame the jury.   Nowhere does the

government offer any affidavit or expert opinion that trial counsel acted strategically or

reasonably by not mounting any challenge either by way of *in limine* motions or objections

to such testimony.   The government also provides no reasoned explanation of why the

complained of evidence was probative and even less as to why it was not prejudicial.   *See,*

*e.g*, Kennedy v. Lockyer, 379 F.3d 1041, 1055 (9th Cir. 2004) ("evidence relating to gang

involvement will almost always be prejudicial").

**V.    THE BRADY CLAIM IS NOT PROCEDURALLY DEFAULTED AND IS NOT SPECULATIVE**

The government specifically assured trial counsel that it was aware of its Brady

obligations; that it had an open file policy;  and that it would make available to the defense

any Brady material. T. 4658, 4664. Mr. Bernard has alleged that despite these assurances,

the government breached its Brady obligations and failed to disclose exculpatory information

to defense counsel prior to trial.   Mr. Bernard has supported his Brady claim with

transcripts, affidavits, and other exhibits.

The government argues that Mr. Bernard's Brady claims are procedurally defaulted.

This argument cannot survive Strickler v. Greene, 527 U.S. 263, 283 and n. 23-24 (1999)

(where prosecution has "open file" discovery policy, "defense counsel may reasonably rely on that file to contain all materials the [prosecution] is constitutionally obligated to disclose under <u>Brady</u>" and petitioner is excused for not having previously challenged the suppression of any exculpatory or mitigating evidence not included in the "open file") and <u>Banks v. Dretke</u>, 540 U.S. 668, 691-93 (2004) (same).

Remarkably, the government has refused to allow Mr. Bernard's current counsel to examine its files and has also failed to include with its response any affidavits or other materials disputing that it possessed but failed to reveal the <u>Brady</u> material cited by the defense. Even when Mr. Bernard has submitted as evidence the very notes taken by Brown's attorney at proffer sessions with the government – sessions in which Brown provided <u>Brady</u> material –, the government does no more than complain that Mr. Bernard has not shown that the statements were noted by agents "either mentally or in writing," or suggest that the attorney's notes might not be accurate. It offers no affidavits from any of the agents present at Brown's proffer to dispute the accuracy of the contemporaneous notes taken by Brown's lawyer. Nor does it provide any contradictory notes taken by the agents nor even a denial that they took notes or formed mental impressions. The government also tries to stave off scrutiny of Mr. Bernard's <u>Brady</u> claims by asserting that some of the matters identified by Mr. Bernard, including Brown's criminal history, could have been discovered through investigation. This argument, of course, contradicts the government's insistence that Mr. Bernard's lawyers didn't need to do any investigation. More important, if trial counsel failed to uncover readily available exculpatory evidence, then Mr. Bernard is entitled to relief on grounds of ineffective assistance of counsel. <u>Carriger v. Stewart</u>, 132 F.3d 463, 480 (9th Cir. 1997) ("To the extent defense counsel's failure to request the file [containing

1647

exculpatory evidence], was a cause of the state's failure to disclose it, that failure constituted

clear ineffective assistance of counsel").   As explained *supra*, an evidentiary hearing is

needed to establish the full story of what evidence the government possessed, when it

possessed it, and what the government did or did not turn over to the defense.   The specific

and non-speculative nature of Mr. Bernard's Brady claims compels such a hearing.   The

government cannot short-circuit an inquiry merely by making unsupported global denials

when Mr. Bernard has already submitted strong and specific evidence corroborating his

allegations.

The government, almost parenthetically, contends that the Brady issues involve

matters which caused no prejudice.   It does not even mention Mr. Bernard's allegations,

supported by the government's own records, that the government concealed evidence of Mr.

Brown's drug use and history of mental illness.   Such matters, however, are highly relevant

and the government's failure to reveal such information violates Brady.   United States v.

Smith, 73 F.3d 511, 516 (D.C. Cir. 1996 (records of witnesses' mental health  condition "can

be material as impeachment evidence because they cast doubt on the accuracy of [his]

testimony";   Freeman v. United States, 284 F. Supp. 217 (D. Mass. 2003) (that witness

suffered from bipolar disorder relevant impeachment, but Brady  claim failed because

prosecution team unaware of witness' condition); see also East v. Scott, 55 F.3d 996,1002

(5th Cir. 1995) (noting materiality and impeaching nature of evidence of mental illness of star

government witness).

## VI.    THE GOVERNMENT DOES NOT REBUT MR. BERNARD'S CLAIM OF INEFFECTIVE ASSISTANCE AT SENTENCING

The government's entire defense of Mr. Bernard's death sentence reduces to a single

22

premise: that Mr. Bernard's counsel had "selected . . . [a] strateg[y]," namely, to portray Mr. Bernard as "basically a good person, a follower who was led astray," but who "still retained some decency [and] could be rehabilitated." Response at 148. According to the government, the fact that trial counsel allegedly chose such a "strategy" immunizes their substandard performance from review. As we explain below, the government's premise is grievously flawed and the record compels the conclusion that Mr. Bernard's trial attorneys failed to provide effective assistance at the penalty phase.

A.    **The Government's Claim that Trial Counsel's Deficient Performance at the Penalty Phase Can Be Justified by "Strategy" Fails Because Counsel Never Performed an Objectively Reasonable Investigation to Discover All Potentially Available Mitigating Evidence**

The central flaw in the government's premise that Mr. Bernard's attorneys selected and pursued a reasonable penalty-phase strategy is that counsel cannot reasonably "select a strategy" in a capital case before completing a thorough investigation into all potentially available mitigating evidence. "It is axiomatic – particularly since Wiggins – that such a decision [not to adduce certain facts in mitigation for the jury] cannot be credited as calculated tactics or strategy unless it is grounded in sufficient facts, resulting in turn from an investigation that is at least adequate for that purpose." Lewis v. Dretke, 355 F.3d 364, 368 (5th Cir. 2003) (citing Wiggins v. Smith, 539 U.S. 510 (2003)). Unless counsel have "conducted a sufficiently thorough investigation" into a potential area of mitigation, they cannot be "in a position to make a strategic decision not to use [that] evidence." Id. The government's claim that Mr. Bernard's attorneys made a "strategic" decision thus puts the cart before the horse. "[A]ttorney strategy is not a shield or panacea for failure to investigate all mitigating evidence in a capital case." Hardwick v. Crosby, 320 F.3d 1127, 1185-86 (11th

23

Cir. 2003).  A decision by counsel not to present mitigating evidence can only be made "after having investigated the defendant's background," and even then such a choice must have been "reasonable under the circumstances." Id. (citations omitted); *see also, e.g.*, Moore v. Johnson, 194 F.3d 586, 615 (5th Cir. 1999) ("Strickland does not … require deference to decisions that are not informed by an adequate investigation into the controlling facts and law"); Powell v. Collins, 332 F.3d 376, 399-400 (6th Cir. 2003) (defense counsel must first perform necessary investigation before the decision of whether to present evidence may be considered trial strategy); *In re* Lucas, 94 P.3d 477, 505 (Cal. 2004) ("a thorough investigation is the foundation for a sound trial strategy") (citation omitted).  For the same reason, the Court is not entitled to speculate that defense counsel would not have presented certain parts of this mitigating evidence even if they had uncovered it.  Soffar v. Dretke, 368 F.3d 441, 474 (5th Cir. 2004) ("[A]n actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results.").  The bottom line is that no claim of "strategic" justification by trial counsel is entitled to deference unless counsel actually performed a reasonably thorough investigation, and then exercised informed judgment about which facts uncovered by that investigation should be presented to the jury.  As Mr. Bernard will prove at an evidentiary hearing, his attorneys did neither.  *See* Exhibit 12 to §2255 Motion at ¶¶ 103-111.

Wiggins powerfully illustrates this point.  In Wiggins, the Court considered, *inter alia*, whether capital trial counsel reasonably decided to limit investigation into their client's personal history for purposes of developing potential mitigating evidence.  The Court concluded – despite the fact that Wiggins' trial counsel actually conducted *some* investigation into potential mitigating evidence, including having Wiggins examined by a

24

psychologist and obtaining Department of Social Services records about his childhood – that

trial counsel nevertheless fell far short of the standard of practice for preparing for a likely

capital sentencing hearing.  As the Court explained:

> Counsel's conduct [fell] short of the standards for capital defense work
> articulated by the American Bar Association (ABA) – standards to which
> we long have referred as "guides to determining what is reasonable."
> [Citations omitted].  The ABA Guidelines provide that investigations into
> mitigating evidence "should comprise efforts to discover *all reasonably
> available* mitigating evidence and evidence to rebut any aggravating
> evidence that may be introduced by the prosecutor."  ABA Guidelines for
> the Appointment and Performance of Counsel in Death Penalty Cases
> 11.4.1(C), p. 93 (1989) (emphasis added).  Despite these well-defined
> norms, however, counsel abandoned their investigation of petitioner's
> background after having acquired only rudimentary knowledge of his
> history from a narrow set of sources. Cf. *id.,* 11.8.6, p. 133 (noting that
> among the topics counsel should consider presenting are medical history,
> educational history, employment and training history, *family and social
> history,* prior adult and juvenile correctional experience, and religious and
> cultural influences) (emphasis added); 1 ABA Standards for Criminal
> Justice 4-4.1, commentary, p. 4-55 ("The lawyer also has a substantial and
> important role to perform in raising mitigating factors both to the
> prosecutor initially and to the court at sentencing . . . Investigation is
> essential to fulfillment of these functions").

Wiggins, 539 U.S. at 524 (emphasis in original).  As the Supreme Court points out, these

national norms of professional performance in capital cases were "well-defined" by 1989,

when they were reflected in the original ABA Guidelines.  *A fortiori*, the same standards

applied to trial counsel's performance in preparing for Mr. Bernard's penalty hearing in

2000.  *See* Exhibit 12 to §2255 Motion at ¶¶ 103-105 (describing scope of mitigation

investigation required by prevailing standard of practice in 1999-2000).  Mr. Bernard's

attorneys were obliged to perform the same kind of wide-ranging and detailed investigation

into his background and personal/social history described in the ABA Guidelines endorsed

by the Supreme Court in Wiggins.  Such an investigation was "essential" to fulfilling

counsel's constitutional function of ensuring that the best case was made for sparing Mr. Bernard's life.

The question for this Court thus becomes, as the Fifth Circuit phrased it in <u>Lewis</u>, whether Mr. Bernard's trial attorneys conducted an investigation "adequate for [the] purpose" of identifying all potentially available relevant mitigating evidence – in light of <u>Wiggins</u>' clear teaching that such an investigation is "adequate" precisely to the extent that it complies with the norms established by the ABA Guidelines for defending death penalty cases. <u>Hamblin v. Mitchell</u>, 354 F.3d 482, 486 (6th Cir. 2003) (<u>Wiggins</u> "stands for the proposition that the ABA standards for counsel in death penalty cases provide the guiding rules and standards to be used in defining the 'prevailing professional norms' in ineffective assistance cases;" "[t]his principle adds clarity, detail, and content to the more generalized … language of <u>Strickland</u>"); *see also id.* at 487 (ABA standards are "not aspirational" and do not represent "norms newly discovered after <u>Strickland</u>," but are "common-sense principles of representation understood by diligent, competent counsel in death penalty cases"). For the reasons set out more fully in the paragraphs that follow, counsel's mitigation investigation was objectively unreasonable in light of prevailing standards of practice for defending capital cases in 1999-2000.[6]

---

[6] It is worth noting that although the government argues (in the text accompanying the heading "Investigation") that Mr. Bernard's trial counsel conducted an adequate investigation into potential mitigating evidence, it cannot cite *a single case* where counsel guilty of comparable omissions were found to have performed effectively. *See* Response at 150-52 (citing no cases whatsoever).

**B.    Defense Counsel Performed Deficiently in Delegating All Mitigation Investigation to "Criterion Investigations," Because That Entity Did Not Conduct an Independent Investigation But Instead Limited its Inquiry To Interviewing Persons Named on a List Provided by Mr. Bernard's Mother, Rather Than Conducting an Independent Investigation**

Contrary to the government's assertion that Mr. Bernard "has not shown that the use of the agency 'Criterion Investigations' to interview individuals" constituted deficient performance by defense counsel, Response at 151, Mr. Bernard has submitted evidence of precisely that. Capital defense expert David Ruhnke[7] specifically states in his sworn declaration that trial counsel "fell below the minimum standard of practice for defending capital cases in 1999-2000" in relying on an investigation "limited to having Criterion Investigations interview [persons named on] a list of persons provided by Mr. Bernard's mother," because an investigation so limited in scope was "wholly inadequate" to identify the broad range of potential mitigating evidence. Exhibit 12 to § 2255 Motion at ¶ 106.[8]

Trial counsel's wholesale reliance on the minimal work performed by "Criterion Investigations" was unreasonable for other reasons as well. Notably, the only member of Mr. Bernard's immediate family interviewed by "Criterion Investigations" was his mother;

---

[7] Mr. Ruhnke recently served as Program Co-Chair for "Capital Trial Advocacy – The Defense," a continuing legal education program in capital defense held from January 26 to 29, 2005, at the Center for American and International Law in Plano, Texas. Mr. Ruhnke's leadership role in this Texas-based program, funded in part by a grant from the Texas Court of Criminal Appeals, suggests that his views regarding the standard of practice for defending capital cases deserve great weight.

[8] Without a hearing, it is impossible to know whether thus constricting the scope of the investigation (*i.e.,* relying solely on the list of names provided to trial counsel by Mr. Bernard's mother) was trial counsel's idea, or an idea that originated with Criterion Investigations. Regardless of whose idea it was, the limitation was objectively unreasonable under prevailing professional standards for conducting a mitigation investigation in a capital case in 1999-2000. *See* Exhibit 12 to § 2255 Motion at ¶¶ 105-106.

27

no one ever interviewed Mr. Bernard's father or his siblings. This limitation alone renders trial counsel's mitigation investigation deficient under then-prevailing professional standards. *See* Exhibit 12 to §2255 Motion at ¶ 105 ("the type of mitigation investigation demanded by the prevailing standard of practice in 1999-2000 required counsel to locate and interview the client's immediate family members"); *see also, e.g.*, Clayton v. Gibson, 199 F.3d 1162, 1178 (10th Cir.1999) (assuming, without deciding, that defense counsel "rendered deficient assistance by not contacting family members during the course of conducting a second stage investigation"); Baxter v. Thomas, 45 F.3d 1501, 1513 (11th Cir.1995) (reasonable investigation would have included interviews with defendant's sister and neighbor, as well as defendant's mother and brother).

Equally important, *counsel* are responsible for ensuring that an appropriately wide-ranging investigation is conducted, and may not delegate that responsibility in its entirety to a hired surrogate. "Counsel's duty is to discover such [mitigating] evidence through his own efforts. . . ." Commonwealth v. Malloy, 856 A.2d 767, 788 (Pa. 2004). It is the attorney's responsibility, and no one else's, to "know what investigation to undertake, what leads to pursue, and what evidence to look for." Id. at 787. Indeed, this obligation rests on defense counsel even if both the client and the potential mitigation witnesses are "uncooperative," which neither Mr. Bernard nor any of his available witnesses were. Commonwealth v. Moore, 860 A.2d 88, 99-100 (Pa. 2004). *See also, e.g.*, Mason v. Mitchell, 320 F.3d 604, 620 (6th Cir. 2003) (rather than relying solely on the client to "volunteer" relevant information, counsel "must make some effort at independent investigation in order to make a reasoned, informed decision as to [what evidence to develop and present]"); Carter v. Bell, 218 F.3d 581, 596 (6th Cir. 2000) (same); Thomas v. Lockhart, 738 F.2d 304, 308 (8th Cir.

1984) (counsel's mitigation investigation was deficient where counsel relied solely on medical report and interviews with defendant ).  Just as counsel may not rely solely on the client to "volunteer" helpful information, counsel may not rely solely on the client's mother to identify potential mitigation witnesses, as Mr. Bernard's trial attorneys did in this case. Defense counsel alone is personally and ultimately responsible for ensuring that a sufficiently broad and independent investigation is accomplished; the "buck" stops with counsel.

> **C.    No Evidence Supports the Government's Claim that Defense Counsel Made a Conscious Strategic Choice to Portray Mr. Bernard in a Certain Manner; Even if that Speculative Inference is Correct, Counsel Failed to Pursue that Strategy in a Manner Consistent with the Prevailing Standard of Practice in 1999-2000**

Not a shred of evidence supports the government's claim that defense counsel's actions at the penalty phase reflect a particular "strategic" choice to portray Mr. Bernard in a certain light.  Even if Mr. Bernard's attorneys made a conscious strategic choice to portray him as "basically a good person," however, they failed to pursue that strategy in an objectively reasonable manner.  *See, e.g.*, Hooper v. Mullin, 314 F.3d 1162, 1171 (10th Cir. 2002) (counsel ineffective where they "specifically chose to present [certain] mitigating evidence," but presented that evidence "without any further investigation, in an unprepared and ill-informed manner").

For example, counsel failed to develop and present extensive and readily available evidence that Mr. Bernard was deeply remorseful for his role in the events that led to the Bagleys' deaths and wanted to redeem himself for his actions through his religious faith.  *See* Exhibit 13 to §2255 Motion at 39-41.  That evidence would certainly have been consistent with a strategy of emphasizing Mr. Bernard's positive qualities, and reasonable defense

29

counsel in 1999-2000 would have discovered and presented it).[9]

Similarly, the readily available evidence that Mr. Bernard had successfully adjusted to incarceration and had proved himself a non-violent inmate was perfectly consistent with the "strategy" defense counsel had, according to the Government, chosen. The Fifth Circuit has recognized that such evidence can be powerfully mitigating and that counsel performs deficiently by failing to investigate it. Moore v. Johnson, 194 F.3d 586, 614 (5th Cir. 1999). Nevertheless, Mr. Bernard's attorneys utterly failed to investigate, much less present, that evidence.

In addition, the Court should not be misled by the government's attempt to minimize the significance of Mr. Bernard's evidence regarding the gold letters ("C.K.") he once wore on his front teeth to signify his allegiance to the "Bloods." Response at 158 n.15 (calling the question of when Mr. Bernard had those letters removed from his teeth a "minor matter[]"). Reasonably effective counsel would have discovered through investigation that *just one day* after Mr. Bernard got in trouble at school for having the offending letters on his teeth, he had his family dentist remove them. *See* Exhibit 20 to § 2255 Motion (dental records). That evidence would have fit perfectly with a strategy of portraying the "positive" side of Mr. Bernard. Trial counsel's failure to discover or present it strongly suggests that no such

---

[9] Such evidence, moreover, is reasonably likely to have persuaded jurors that a sentence of life imprisonment for Mr. Bernard was appropriate. *See* Sundby, *The Capital Jury and Absolution: The Intersection of Trial Strategy, Remorse, and the Death Penalty*, 83 CORNELL L. REV. 1557, 1584 (September 1998) at 1584 ("[W]here the evidence support[ed] the sincerity of a defendant's purported regret, many jurors [from juries which imposed life sentences] identified the defendant's testimony as securing the life sentence"); Eisenberg, Garvey, and Wells, *But Was He Sorry? The Role of Remorse in Capital Sentencing*, 83 CORNELL L. REV. 1599 (September 1998) (jurors' belief that defendant is remorseful can improve his chances of receiving a life sentence).

strategy existed.

Simply put, Mr. Bernard is entitled to relief whether or not the government is correct in claiming (without any evidence to support the inference) that trial counsel were pursuing "a plan to humanize Bernard," Response at 155, because counsel failed to pursue such a strategy in a fashion consistent with the prevailing standard of practice in 1999-2000.

**D.    The Government's Claim that Defense Counsel Need Not Have Investigated the Nature of Youth Gang Activity in Killeen is Impossible to Reconcile With the Existing Standard of Practice in 1999-2000**

The government suggests that Mr. Bernard is arguing that his attorneys "should have presented *more of an explanation* for [his] involvement in gang activity." Response at 153 (emphasis added). The first problem with this description is that trial counsel presented **no** explanation whatsoever for Mr. Bernard's involvement in gang activity. Thus, the question is not whether counsel should have done "more," but why counsel did nothing. As with all of trial counsel's errors and omissions at the penalty phase, the problem starts with the fact that counsel conducted no investigation whatsoever into the possibility of presenting evidence about Mr. Bernard's gang involvement.

The government maintains, in the absence of any supporting evidence, that counsel chose to limit the defense presentation at penalty to what it calls a "positive approach." Response at 152. Even if that were true, however, imposing such limitations on the mitigation presentation was objectively unreasonable on the facts of this case because it gave the jury no way to understand who Mr. Bernard was or why he became involved in the crime in the first place. The government presented a lot of evidence suggesting that Mr. Bernard was *not* "basically a good, respectful, non-violent person," and vigorously urged the jury to infer that he was, instead, a violent and unrepentant thug.

31

Faced with such evidence, reasonably effective defense counsel cannot simply ignore the bad facts contained in the government's case and hope that the jury will credit the brief, vaguely positive recollections of a self-selected handful of mitigation witnesses. Instead, counsel must investigate in an attempt to uncover evidence to provide a mitigating context for the otherwise aggravating facts. American Bar Association, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003), Guideline 10.11 ("The Defense Case Concerning Penalty"), subpart F(2) ("In deciding which witnesses and evidence to prepare concerning penalty, [counsel should consider how] to rebut or explain evidence presented by the prosecutor"). The government's Response itself shows how important it was for Mr. Bernard's attorneys to detail for the jury the reality of youth gang activity in Killeen and Mr. Bernard's relationship to it. *See* Response at 153 (arguing that Killeen gangs were "the equivalent of those in big cities" because "Vialva was in a car when fellow gang members murdered a man after they thought they were cut off by him on the highway"). First, the government's argument misses one of the most important reasons competent defense counsel would have presented evidence to educate the jurors about the structure and operation of youth gangs in the local area. The purpose of such evidence is not to show that members of informally organized youth gangs in smaller cities never commit violent crimes, but to show that the lack of formal structure, etc., characteristic of such gangs makes it likelier that a teenager like Mr. Bernard will be able to leave the gang in the future (*i.e.*, not to join a gang in prison, as the government predictably insisted he likely would).

The government also inadvertently emphasizes one of the overarching problems Mr. Bernard's attorneys faced – and failed to deal with effectively – at the penalty phase: the



natural tendency to judge Mr. Bernard by reference to the more serious and violent crimes

committed by *Vialva*. As Mr. Bernard pointed out in his § 2255 Motion, Mr. Bernard was

hundreds of miles from Killeen when that shooting took place, and had no involvement

whatsoever in that incident. The government's reflexive citation of that event simply

highlights the unfair prejudice Mr. Bernard suffered as a result of his attorneys' failure

adequately to investigate and present mitigating evidence at the penalty phase.

Finally, it is disingenuous at best for the government to dispute the factual accuracy of

the information upon which this part of Mr. Bernard's claim relies. Response at 153. The

opinions and conclusions in question are those of the Office of Juvenile Justice and

Delinquency Prevention of the Department of Justice, which vouches for the integrity of the

conclusions. It is precisely because this information represents the *government*'s thoughtful

analysis of the best available evidence about youth gang activity that it would have been

virtually impossible for the prosecution to rebut at trial.

**E.    No Evidence Supports the Government's Claim that Defense Counsel Made a Tactical Choice to Waive Opening Statement at the Penalty Phase, and Such a "Choice" Would Have Been Derelict Under Prevailing Standards of Practice in Any Event**

The government suggests that in all circumstances a decision not to make an opening

statement is "a strategic or tactical choice" by counsel. Response at 154. First, of course,

there is no evidence in this case indicating why trial counsel made no opening statement at

the penalty phase. While it is theoretically possible that counsel made a "tactical" decision

to waste a valuable opportunity to preview the case for sparing Mr. Bernard's life, that would

have been inconsistent with the prevailing standard of practice in 1999-2000. *See* Exhibit 12

to §2255 Motion at ¶¶ 119-120 (no reasonable attorney would "forfeit the important

33

opportunity to outline [the] case [in mitigation] for the jury;" counsel has a duty to ensure, to the extent possible, that jurors "assume a different mind-set with respect to the penalty phase than they had assumed during the first phase of trial"); *see also, e.g.,* American Bar Association, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003), Guideline 10.11 ("The Defense Case Concerning Penalty"), subpart L ("Counsel at every stage of the case should take advantage of all appropriate opportunities to argue why death is not suitable punishment for their particular client"). At least in a capital sentencing hearing under the Federal Death Penalty Act, where the defendant bears the burden of proving mitigating circumstances, it is objectively unreasonable not to make an opening statement.[10]

**F.    Defense Counsel Performed Unreasonably in Failing to Investigate Because the Information Actually in Their Possession Suggested Additional Inquiries Were Necessary**

Defense counsel also performed unreasonably in failing to conduct a thorough investigation because they did not follow up on information actually in their possession suggesting that additional inquiries were necessary. For example, several persons

---

[10] The government cites two cases in support of its argument that failure to make an opening statement cannot constitute ineffective assistance of counsel. *See* Response at 154 (citing Gilliard v. Scroggy, 847 F.2d 1141 (5th Cir. 1988), and Millender v. Adams, 376 F.3d 520 (6th Cir. 2004)). Millender is a non-capital case involving counsel's decision not to make an opening statement at the guilt-innocence trial, and thus provides no relevant guidance on the question whether defense counsel performs deficiently in failing to make an opening statement at a death penalty sentencing hearing. Gilliard is a capital case, but the opinion does not make clear whether the defendant's challenge to counsel's failure to make an opening statement involved the guilt-innocence or penalty phase. Thus, neither case provides much support for the government's sweeping argument. As Mr. Bernard has noted elsewhere, the government conspicuously fails to provide any evidence (*e.g.*, an affidavit from a qualified expert in defending capital cases) to support its claim or dispute the evidence submitted by Mr. Bernard.

34

interviewed by "Criterion Investigations" offered clues to the existence of substantial

mitigating circumstances – *e.g.*, they reported explosive tension between Mr. Bernard and his

father when Mr. Bernard was a teenager, described how depressed and withdrawn Mr.

Bernard became when his parents' marriage broke apart, suggested that Mr. Bernard might

have been led into criminal activity by others, and attested to some of Mr. Bernard's positive

character traits. *See, e.g.,* Exhibit 1 to § 2255 Motion at 3398 (Mr. Bernard "was the type of

person who would do anything for anyone, asking nothing in return"); 3399 (Mr. Bernard

changed after his parents' divorce, becoming more withdrawn); id. (Mr. Bernard and his

father got into an argument at church and "some of the church members had to break up the

confrontation"); 3400 (Mr. Bernard and father in altercation); id. (Mr. Bernard wrote a letter

to his church after his arrest, saying he "felt remorse for his actions," which was read aloud

and had "a positive effect on many of the members of the congregation"); 3401 (Mr. Bernard

often picked up his younger brother and sister at school); 3402 (Mr. Bernard in mid-teens

was "running with the wrong crowd and was easily influenced"); 3403 (when Mr. Bernard's

parents separated, it was "a hard time for him"); 3405 (parents' separation had "a definite

negative effect" on Mr. Bernard); id. (Mr. Bernard's cousin Melsimeon Pollock exercised a

destructive influence over him); 3411 (neighbor trusted Mr. Bernard to take care of her

children, ages six and ten).

All of this information would have led reasonably effective counsel to investigate further,

and Mr. Bernard's attorneys performed deficiently in failing to follow up on any of these

significant leads. *See* Wiggins, 539 U.S. at 527 ("[a reviewing] court must consider not only

the quantum of evidence already known to counsel, but also whether the known evidence

would lead a reasonable attorney to investigate further"); Douglas v. Woodford, 316 F.3d

1079, 1088 (9th Cir. 2003) (counsel performed deficiently in not pursuing further

investigation into defendant's background once counsel was "on notice" that defendant had a

difficult childhood); <u>Smith v. Stewart</u>, 140 F.3d 1263, 1269 (9th Cir. 1998) (counsel deficient

for failing to "perform any real investigation into mitigating circumstances, even though that

evidence was rather near the surface"); <u>*In re* Lucas</u>, 94 P.3d 477, 504-05 (Cal. 2004)

("[D]efense counsel acted unreasonably in failing to conduct a thorough investigation of

facts relating to petitioner's social history, considering the suggestive evidence in their

possession, including a probation report and the statements of petitioner's sister, both of

which should have alerted counsel to the need for further investigation").

### G.    The Government's Claims About Dr. Coons' Testimony are Contradicted by the Record

The government implicitly attempts to evade the question of counsel's ineffectiveness in

dealing with prosecution expert witness Dr. Richard E. Coons by asserting in passing that Dr.

Coons "testified only about Vialva." Response at 147.  The government's characterization of

Dr. Coons' testimony is contradicted by the record.  To take just one example, Dr. Coons

testified that if someone is a member of a gang in the free world, "they'll be a member of the

gang inside [prison]." T 3162.  No reasonable juror would have understood this testimony

to refer exclusively to Vialva, especially in the absence of any objection from Mr. Bernard's

counsel.  Indeed, on direct appeal the Fifth Circuit found the evidence of Mr. Bernard's

future dangerousness legally sufficient based in part on Dr. Coons' testimony, which it

treated as having been offered against Mr. Bernard.  *See* <u>United States v. Bernard</u>, 299 F.3d

467, 482 (5th Cir. 2002).  If the judges of the Fifth Circuit made this connection in the

absence of an objection by Mr. Bernard's attorneys, reasonable jurors undoubtedly drew the

same link.  The Government's argument is not just factually unsupported but disingenuous, because the prosecutors themselves, in closing argument, made the same sleight-of-hand argument, repeatedly linking Dr. Coons' testimony to predictions about what "they" would do in prison.[11]

Finally, and most important, the Government utterly fails to acknowledge, much less rebut, the fact that Bernard has presented expert testimony establishing what reasonably effective counsel should have done when faced with Dr. Coons' testimony.  *See* Exhibit 12 to §2255 Motion at ¶¶ 153-56 ("Regardless of whether this testimony was nominally offered against Mr. Vialva, it had an immediate and prejudicial relevance to Mr. Bernard and [his] attorneys should have objected to it [and, if necessary] sought an instruction limiting its consideration to Mr. Vialva").  For all these reasons, the Government's claim that Dr. Coons "testified only about Vialva," and the implicit conclusion that as a result Mr. Bernard cannot show deficient performance or resulting prejudice from his own attorneys' failure to contest Dr. Coons' testimony, is incorrect.

---

[11] The prosecutors' closings repeatedly invoked the testimony of Dr. Coons and blurred the line between Mr. Bernard and codefendant Vialva by using the word "they."  *See, e.g.*, T. 3251 ("*[t]hey* don't have a conscience"); T. 3260 (prosecutor's argument that "there's been a steady escalation in the types of crimes committed by both Brandon Bernard and Christopher Vialva.  *They* become more violent.  *They* become more risky . . . [t]his constant progression . . . indicate[s] that *they* would continue to be a danger"); T. 3261 ("[H]ow can [the defendants be dangerous] if *they* are in prison?  Well, that's why the [g]overnment presented rebuttal evidence to you to indicate that that would continue even in prison.  Remember Tony Davis, the BOP officer.  *Recall Dr. Coons*"); id. ("[P]eople can commit violence in the prison system . . . *They*'re not foreclosed.  *They* still go on").

**H.    The Government's Description of the Mitigation Case Bears Little
Relationship to the Evidence Actually Presented at Trial; Perhaps as a
Result, the Government Fails to Appreciate the Cumulative Prejudicial
Effect of Counsel's Errors and Omissions**

The government's description of the mitigation case at trial – that it had "order and

momentum," Response at 155, that it "humanized" Mr. Bernard, id. at 148, and that trial

counsel had performed a "great accomplishment" in assembling the cast of mitigation

witnesses and eliciting their testimony, id. at 155, makes the defense case sound like a

masterpiece of advocacy.  Regrettably, the government's description is so at odds with the

record as to be unrecognizable.  The trial record reflects that several of the witnesses who

were called to testify could offer almost nothing in response to trial counsel's plaintive plea

that they volunteer something that might help the jury make its decision. *See, e.g.,* T. 3117

(examination of Billy Spiller).  The witnesses' reticence should come as no surprise, as

counsel had not interviewed them and had no idea what they might know that would be

relevant to Mr. Bernard's case in mitigation.  Moreover, counsel did not make a reasoned,

deliberate selection to call certain witnesses, and indeed did not even subpoena any

mitigation witnesses; instead, they delegated to Mr. Bernard's mother the task of identifying

the potential mitigation witnesses and getting them to court.  The jury learned only the

sketchiest facts about Mr. Bernard's personal history and nothing at all about the experiences

that shaped him as a teenager, the neurocognitive impairment that influences his reaction to

stressful situations, the motivations that might have led him to associate with a youth gang,

and many other potentially mitigating circumstances that trial counsel never bothered to

investigate, develop, or present.  Far from being a masterpiece of advocacy, the mitigation

case presented for Mr. Bernard was a mess.[12]   There is, at a minimum, a "reasonable

probability" that, had counsel performed in a manner consistent with the prevailing standard

of practice for defending federal capital cases in 1999-2000, that Mr. Bernard would have

received a life sentence.[13]

The government's claim that Mr. Bernard suffered "no prejudice" from his counsel's

errors and omissions reflects both a failure to accurately describe the record, and a

fundamental misunderstanding of the applicable legal principles.  We will address each in

turn.

---

[12]  Indeed, notwithstanding the government's praise for trial counsel's presentation at
sentencing, the Fifth Circuit on direct appeal stated that, "[v]iewed objectively," the
evidence of Mr. Bernard's religious conversion as presented at trial was not strong.
Bernard, 299 F.3d at 476.  Moreover, the Court of Appeals said of the testimony of Mr.
Bernard's mother that "[c]onsidering the circumstances of the crime, her plea [for his life
on the basis of his religious devotion] appears desperate."  Id.

[13]  Numerous cases caution the Court against concluding that Mr. Bernard was not
prejudiced by his counsel's deficient performance simply because the jury heard a
handful of inadequately prepared mitigation witnesses offer some vague and poorly
developed testimony about Mr. Bernard.  Hamblin, 354 F.3d at 491 (counsel ineffective
at penalty phase for, inter alia, failing to prepare defendant to give statement in
allocution "explaining his background;" defendant's statement as a result was "relatively
short," "rambling," and "almost incoherent"); Jermyn v. Horn, 266 F.3d 257, 310-311
(3rd Cir. 2001) (finding it "largely beside the point" that "counsel presented some
mitigating evidence of a different nature and quality" at trial than that presented in post-
conviction proceedings; presence of "some" mitigating evidence in the trial record does
not mean counsel performed adequately or that defendant was not prejudiced); Collier v.
Turpin, 177 F.3d 1184, 1199-1201 (11th Cir. 1999) (counsel performed deficiently in
conducting "minimal" examination of defense witnesses at penalty phase, which
"elicit[ed] very little relevant evidence about [the defendant's] character" and left jury
with the impression that the witnesses called "knew little or nothing about" him); see
also, e.g., Mayfield v. Woodford, 270 F.3d 915, 929 (9th Cir. 2001) (en banc)
(unanimously concluding that trial counsel were ineffective for failing adequately to
investigate and present other available mitigating evidence despite acknowledging that
"the mitigating evidence presented at trial was substantial").

First, the government simply rehashes the evidence from trial without acknowledging that there was extensive other evidence available which would have put that trial evidence in an entirely different light. *See* Response at 141-147. The government's assertions of "no prejudice" collapse as a result of its failure to compare the totality of the mitigating evidence not developed or presented with the case actually heard by the jury.

In addition, the government several times asserts (without citation to authority) that presenting additional mitigating evidence would not have been "congruent" with the "positive" approach defense counsel allegedly was pursuing. *See, e.g.*, Response at 153 (presenting evidence of Mr. Bernard's mild neurocognitive impairment "was not congruent with the positive approach selected by trial counsel.").[14] The government apparently takes the view that mitigating evidence that a defendant possesses positive character traits and mitigating evidence that he suffers from impairments are mutually exclusive, and cannot be combined in a single mitigation presentation. Unsurprisingly, the government offers no authority for this proposition, because it represents a complete misunderstanding of the role of mitigating evidence in a capital sentencing hearing. *Cf.* Response at 153-54 (asserting, without citation to authority of any kind, that "a 'mild' impairment ... is perhaps not the best excuse or mitigating factor").

Contrary to the government's assumption, a thoroughly developed and carefully presented mitigation case can certainly include both the defendant's strengths and weaknesses. Indeed, a social history that portrayed a defendant as "all good" or "all bad"

---

[14] Of course, the primary point to be made is that trial counsel failed to conduct a proper investigation and thus were unaware of this evidence in the first place. Only after an appropriate investigation, which would have led to discovery of these impairments, could counsel have made an informed judgment about whether to present such evidence.

would be unlikely to persuade any reasonable juror, particularly in light of the evidence

already before them from the first phase of trial.  Counsel's goal is to provide a "fully

developed portrait" of the defendant, to show "the full picture of [his] life story."  Exhibit 12

to § 2255 Motion at ¶ 167.  As the Tenth Circuit has described it, defense counsel's

> responsibility . . . is to walk a mile in the shoes of the client, to see who he is,
> to get to know his family and the people who care about him, and then to
> present that information to the jury in a way that can be taken into account in
> deciding whether the client is so beyond redemption that he should be
> eliminated from the human community.

Battenfield v. Gibson, 236 F.3d 1215, 1229 (10th Cir. 2001) (citation omitted).  Truly

"humanizing" the defendant requires not simply presenting the testimony of four or five

casual acquaintances who claim to know him as "respectful" or "well-mannered," but

presenting numerous witnesses who can offer firsthand accounts and anecdotes about all the

events of his life, so that the jury, like defense counsel, comes to know "who he is" and *why*

people care about him.   Knowing "who he is" means knowing his frailties – such as Mr.

Bernard's mild neurocognitive impairment and how it affects him – as well as his strengths.[15]

There is no fatal inconsistency in presenting both as separate aspects of his character and

background which he is entitled to have the jury consider in mitigation.

The government's misguided defense of trial counsel's failure to discover that Mr.

Bernard adjusted successfully to supervision as a juvenile probationer illustrates this point.

The government argues that Mr. Bernard's "response to supervision … was not so positive

---

[15] For this same reason, it is no answer that counsel feared a wide-ranging investigation
might uncover unhelpful information.   Simply "because counsel does not know what an
investigation will reveal is no reason not to conduct the investigation;" counsel are
"obligated to find out the facts, not to guess or assume or suppose some facts may be
adverse."  Hamblin, 354 F.3d at 492.

that it prevented his commission of further crimes, such as the heinous crime against the

Bagleys," and thus it was "better to ignore" this "failure."  Response at 156.  While true, that

is of course irrelevant – because it would be equally true of *any* prior good character or

conduct offered in mitigation by a defendant already found beyond a reasonable doubt to

have committed an aggravated murder.[16]  Reasonable counsel would have offered the

evidence of Mr. Bernard's successful experience as a juvenile probationer to combat the

inference that he has no redeeming qualities and is beyond rehabilitation – which was

precisely what the government was arguing in support of a finding of "future

dangerousness."[17]

    For much the same reason, the government misleadingly describes as an "academic

battle-of-the-experts strategy" the compelling case in mitigation which could have been, but

was not, developed and presented on Mr. Bernard's behalf.  Response at 148.  Certainly, the

---

[16]  The government appears not to notice the contradiction between this argument and its
earlier claim that trial counsel chose an effective mitigation strategy of portraying Mr.
Bernard in a "positive" light by having witnesses testify to his good character traits.  Those
traits, of course, were "not so positive that [they] prevented his commission of future
crimes;" by the government's own reasoning, it would have been "better to ignore [them]."
Response at 156.

[17] Similarly, the government errs in asserting that because Mr. Bernard had two
disciplinary "write-ups" during the year he spent in jail awaiting disposition of his case,
his generally good conduct in jail had no mitigating value and was "better … ignore[d]."
Response at 156.  As the ABA Guidelines recognize, evidence that a defendant has not
acted out violently while in custody can be powerfully mitigating even if his disciplinary
record is not absolutely unblemished.  American Bar Association, GUIDELINES FOR THE
APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES
(2003), Guideline 10.11 ("The Defense Case Concerning Penalty"), commentary
("Evidence that the client has adapted well to prison and has had few disciplinary
problems can allay jurors' fears and reinforce other positive mitigating evidence").  Mr.
Bernard had "adapted well" and had "few" disciplinary problems, none involving
violence or gang-related activity.

prevailing standard of practice in 1999-2000 required counsel to explore the possibility of using appropriate experts, and in failing to do so Mr. Bernard's attorneys fell below the standard of objective reasonableness that defines effective assistance. American Bar Association, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES (2003), Guideline 10.7 ("Investigation"), commentary ("The circumstances of a particular case will often require specialized research and expert consultation"); Guideline 10.11 ("The Defense Case Concerning Penalty"), commentary ("Expert witnesses . . . may assist the jury in understanding the significance" of events in the client's life; "[c]ounsel should choose experts who are tailored specifically to the needs of the case"). And, there is no doubt that presenting the testimony of some such experts (*e.g.,* regarding Mr. Bernard's mild neurocognitive deficits, juvenile brain development, the effects of certain drugs, the lack of long-term formal structure in local Killeen youth gangs, etc.) would have been part of any minimally effective penalty-phase case in mitigation. But Mr. Bernard is hardly arguing that reasonable counsel would have *limited* the defense presentation to expert testimony. Mr. Bernard's point is, first, that his counsel had conducted no investigation and thus had no idea what potential mitigation evidence was available; and second, that the available mitigating evidence in this case included powerful testimony by both expert and lay witnesses. The Court should not accept the government's caricature of Mr. Bernard's arguments.[18]

---

[18] In the same vein, the government sarcastically suggests that Mr. Bernard is arguing that his lawyers should have claimed he was "driven into gang activity as a refuge from Lieutenant Colonel Bernard's terrible family." Response at 152. Nothing of the sort is true. Our point is that some tragic things happened in the Bernard family, not that the family itself (or Mr. Bernard's mother) was "terrible." Jurors would understand that people – like some of the people in Mr. Bernard's family – can love one another and still

Finally, the Government's response also reflects three different mistakes of law regarding Mr. Bernard's burden to show prejudice. First, the Government's argument assumes that the Court should assess "prejudice" on an item-by-item basis, considering in isolation the potential mitigating impact of each fact, circumstance, document, etc., that trial counsel failed to discover, develop, or present. *See, e.g.*, Response at 154 ("Bernard has not established that taking the neurocognitive approach would have produced a different result;" id. ("Bernard has not shown ... that with an opening statement, the outcome would have been different"). Under Strickland, the "prejudice" inquiry does not focus on whether any particular piece of evidence or mistake by counsel would have "tipped the scales," but whether the *cumulative* effect of *all* the mitigating evidence trial counsel failed to develop or present, in light of any other errors or omissions by counsel, undermines this Court's confidence in the sentencing verdict. Williams v. Taylor, 529 U.S. 362, 397-398 (2000) (reviewing court assessing "prejudice" under Strickland must consider mitigating evidence cumulatively, rather than piece-by-piece); Wiggins, 539 U.S. at 534 ("In assessing prejudice, we re-weigh the evidence in aggravation against the totality of the available mitigating evidence").[19] A standard based on the ultimate reliability of the verdict cannot achieve its

_____

hurt one another, and that the depression and heartsickness Mr. Bernard experienced as a teenager when his parents' marriage collapsed contributed to his becoming involved in a gang and eventually taking part in the events that led to the Bagleys' deaths. Mr. Bernard is not denying responsibility for his own choices; the question is whether a reasonable jury, given the "complete picture" of Mr. Bernard's childhood and adolescence, could have understood how those choices were constrained and shaped by Mr. Bernard's life experiences, and judged him accordingly.

[19] *See also, e.g.*, Cargle v. Mullin, 317 F.3d 1196, 1212 (10th Cir. 2003) (court must consider "the prejudice flowing from all of counsel's deficient performance -- as Strickland directs"); Moore v. Johnson, 194 F.3d 586, 619 (5th Cir. 1999) (reviewing court must consider "the cumulative errors of counsel"); Livingston v. Johnson, 107 F.3d

purpose unless the reviewing court weighs the collective impact of all counsel's errors

together.  Hence, this Court must consider the *collective* impact of *all* the mitigating

circumstances trial counsel failed to develop or present (*e.g.*, "turbulent home environment,"

"successful adjustment to prison," "acts of kindness and devotion," and "organic brain

impairment," as well as any other mitigating information, in conjunction with the evidence

presented at trial) and the impact of other unreasonable errors by counsel (*e.g.,* counsel's

failure to object to inadmissible "victim impact" testimony) on the jury's ultimate judgment

about the appropriateness of a death sentence.[20]

Second, the Government fails to acknowledge that under <u>Wiggins</u>, this Court's inquiry

must focus on whether is reasonably likely that *a single juror's* mind could have been

-------------------------------------------------

297, 308-309 (5th Cir. 1997) (same); <u>Hough v. Anderson</u>, 272 F.3d 878, 891 (7th Cir. 2002) ("Although a specific error, standing alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may [also] be sufficient"); <u>Silva v. Woodford</u>, 279 F.3d 825, 834 (9th Cir. 2002) ("[C]umulative prejudice from trial counsel's deficiencies may amount to sufficient grounds for a finding of ineffectiveness of counsel"); <u>Williams v. Washington</u>, 59 F.3d 673, 682 (7th Cir.1995) (considering prejudice from "cumulative effect of counsel's individual acts or omissions").

[20]  This is also why the government errs in asserting that because the Fifth Circuit on direct appeal found insufficient prejudice from the wrongful admission of "victim impact" testimony to require reversal as "plain error," "there is insufficient prejudice to meet the <u>Strickland</u> ... standard." Response at 159.  If the improper admission of this testimony were considered in isolation (*i.e.*, if trial counsel's failure to object to its admission were the only instance of deficient performance during Mr. Bernard's trial), that might be correct.  <u>Strickland</u>, however, requires that the harmful impact of this improperly admitted testimony be considered *cumulatively* with the effect of all other errors and omissions of counsel.  The prior finding by the Fifth Circuit simply expedites the first step of this Court's review, since by finding the testimony obviously inadmissible, the Court of Appeals has effectively answered the question whether reasonably effective counsel would have objected to it.  *See also* Exhibit 12 to § 2255 Motion at ¶¶ 145-151 (identifying numerous instances of deficient performance by trial counsel in dealing with "victim impact" evidence in Mr. Bernard's case).

changed by the cumulative impact of all the mitigating evidence trial counsel failed to develop and present, assuming counsel had not committed other errors at the penalty phase (*e.g.,* failing to object to inadmissible and unfairly prejudicial evidence and argument). Wiggins, 539 U.S. at 537 (prejudice test is whether "there is a reasonable probability that *at least one juror* would have struck a different balance" between aggravation and mitigation) (emphasis added); *see also, e.g.,* Neal v. Puckett, 239 F.3d 683, 691-92 (5th Cir.2001) (under a statute requiring a unanimous vote to impose death, to find Strickland prejudice "there need only be a reasonable probability that at least *one juror* could reasonably have determined [that] death was not an appropriate sentence") (emphasis added); Kirkpatrick v. Whitley, 992 F.2d 491, 497 (5th Cir. 1993) ("[G]iven the unanimity required at the Louisiana punishment phase, the proper frame of reference, at least with regard to the punishment assessed, is whether the mind of *one juror* could have been changed with respect to the imposition of the sentence of death") (emphasis added).[21]

Third, the Government fails even to acknowledge that counsel's errors at the guilt phase

---

[21] *See also* Loyd v. Smith, 899 F.2d 1416, 1426 (5th Cir.1990) (before concluding "no prejudice" under Strickland, reviewing court "must be confident that at least *one juror*'s verdict would not have been different had the new evidence been presented") (emphasis added); Foster v. Johnson, 293 F.3d 766, 782 (5th Cir. 2002) (same, citing Loyd); Marshall v. Hendricks, 307 F.3d 36, 103 (3rd Cir. 2002)(under a "weighing" scheme, "the application of the second prong of Strickland [has] a somewhat more subtle application in the penalty phase;" namely, "[g]iven the unanimity requirement, the 'reasonable probability of a different outcome' would mean that only *one juror* need weigh the factors differently" and conclude that the factors in aggravation did not outweigh those in mitigation) (emphasis added); Jermyn v. Horn, 266 F.3d 257, 305 (3rd Cir. 2001) (where vote to impose death must be unanimous, and weighing "is not a simple arithmetic process," prejudice is shown if defendant proves that "*one juror*" might have voted differently in light of the mitigating evidence trial counsel failed to develop and present) (emphasis added).

(*e.g.*, in failing effectively to cross-examine Christopher Lewis and Terry Brown) must be weighed along with their mistakes at the penalty phase in determining whether Mr. Bernard was prejudiced as to the jury's sentencing determination. Moore v. Johnson, 194 F.3d 586, 619 (5th Cir.1999) ("reject[ing the] notion" that "deficient performance occurring at the guilt phase of a capital trial may not be deemed to prejudice a capital defendant during the punishment phase of a capital trial"); Cargle v. Mullin, 317 F.3d 1196, 1208 (10th Cir. 2003) (the "commonsense notion that sentencing proceedings may be affected by errors in the preceding guilt phase is not novel") (citing Moore); Smith v. Wainwright, 741 F.2d 1248, 1255 (11th Cir.1984) (counsel's failure to impeach witness during guilt phase "may not only have affected the outcome of the guilt/innocence phase [but] may have changed the outcome of the penalty trial").

These authorities demonstrate that the view of "prejudice" urged by the Government significantly overstates Mr. Bernard's burden. If this Court finds that the cumulative effect of all the mitigating evidence trial counsel failed to present, in a hearing not tainted by counsel's other errors at both phases of trial, might have persuaded *one juror* that Mr. Bernard would be appropriately punished by sending him to prison for the rest of his natural life without possibility of release, then confidence in the sentencing verdict has been undermined, Strickland prejudice is shown, and relief is required.

## VII.     THE COURT FAILED TO COMPLY WITH 18 U.S.C. § 3005

Contrary to the government's argument in its Response, the Court's violations of 18 U.S.C. § 3005 have not been procedurally defaulted and are within the scope of § 2255 proceedings. *See* Response at 178-81. The government's argument relies on its assertion that Mr. Bernard's claims could have been raised on direct appeal. *See* Response at 178-81.

47

This, however, is simply not the case. Claims that require the development of facts outside the trial record cannot be fully presented in a direct appeal and may only be adequately developed and considered in collateral proceedings. *See Massaro v. United States*, 538 U.S. 500 (2003) (explaining that many ineffective assistance of counsel claims can be fully presented only in collateral proceedings and holding that these claims "may be brought in a collateral proceeding under § 2255, whether or not the petitioner could have raised the claim on direct appeal"). In Mr. Bernard's case, it is evidence outside the trial record which reveals the § 3005 violations. For example, whether Mr. Hunt Sr., informed Mr. Bernard of his right to have a second lawyer appointed promptly after indictment is evidence outside the trial record. Similarly, one must look outside the record to determine whether the Court consulted with the Federal Public Defender as required by § 3005. *See, e.g.,* Ex. 26 (Affidavit of Lucien B. Campbell, Federal Public Defender for the Western District of Texas). In addition, whether Mr. Hunt, Sr., or Mr. Hunt Jr., was "learned in the law applicable to capital cases" requires consideration of their training and experience, information not contained within the trial record. Accordingly, the government's argument that the claims are procedurally defaulted and fall outside the scope of § 2255 because they could have been raised on direct appeal, must fail.

Addressing the merits of Mr. Bernard's § 3005 claims, the government does not dispute that the Court did not consider the recommendations of the Federal Public Defender before appointing counsel for Mr. Bernard. *See* Response at 186-87. Despite this concession and the statutory mandate that courts "shall consider the recommendation of the Federal Public Defender organization," the government makes the startling assertion that there was no error. *See* Response at 187; 18 U.S.C. § 3005. To arrive at this conclusion the government violates

the basic tenets of statutory construction: it ignores the clear directive contained in the language of the statute and instead looks to its own understanding of the "evident purpose" of the statute.  *See* Response at 186.  Whether the "need for the consultation aspect of the process was obviated" (Response at 186) in this case is irrelevant to whether the Court actually complied with the requirement to consider the recommendation of the Federal Public Defender regarding the appointment of counsel in federal death penalty cases.  The consultation requirement is not discretionary or limited to situations where the courts deem it necessary.  *See* 18 U.S.C. § 3005 ("the court *shall* consider the recommendation of the Federal Public Defender organization" (emphasis added)).  Moreover, the government's understanding of the "evident purpose" of the statute was not served in this case where assigned counsel lacked the necessary training, experience and time.  The Court's failure to consider the recommendation of the Federal Public Defender when appointing counsel for Mr. Bernard violated 18 U.S.C. § 3005.

## CONCLUSION

For the foregoing reasons, the Court should grant the relief requested in Mr. Bernard's § 2255 petition.

DATED this 4th day of February, 2005.

Respectfully submitted,

ROBERT C. OWEN
TEXAS BAR NO. 15371950
OWEN & ROUNTREE, L.L.P.
P.O. BOX 40428
AUSTIN, TEXAS 78704
512-804-2661 voice
512-804-2685 fax

ROBERT H. GOMBINER
FEDERAL PUBLIC DEFENDER
1601 FIFTH AVENUE, STE. 700
SEATTLE, WASHINGTON 98101
206-553-1100 voice
206-553-0120 fax

COUNSEL FOR PETITIONER
BRANDON BERNARD

BY: _____

## **CERTIFICATE OF SERVICE**

This is to certify that I caused a true and correct copy of the foregoing Reply to be served

on counsel for the government by having the same sent via United States Mail, first-class

postage prepaid, addressed to:

> Mark R. Stelmach
> Assistant United States Attorney
> Western District of Texas
> 601 N.W. Loop 410, Suite 600
> San Antonio,  Texas 78216

DATED this 4th day of February, 2005.


_____
Barbara Hughes