**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TEXAS**

**WACO DIVISION**

| | | |
|---|---|---|
| **CHRISTOPHER ANDRE VIALVA,** | § | |
| **Movant,** | § | |
| | § | **CIVIL NO. W-04-CV-163** |
| **v.** | § | |
| | § | **CRIMINAL NO. W-99-CR-070 (1)** |
| **UNITED STATES OF AMERICA,** | § | |
| **Respondent.** | § | |

**AND**

| | | |
|---|---|---|
| **BRANDON BERNARD,** | § | |
| **Movant,** | § | |
| | § | **CIVIL NO. W-04-CV-164** |
| **v.** | § | |
| | § | **CRIMINAL NO. W-99-CR-070 (2)** |
| **UNITED STATES OF AMERICA,** | § | |
| **Respondent.** | § | |

**O R D E R**

Defendants Christopher Andrew Vialva and Brandon Vernard were convicted of capital murder and sentenced to death. Both challenge the constitutionality of their convictions and sentences under 28 U.S.C. § 2255. Having reviewed the motions, files and record, the Court is persuaded that both motions are without merit and should be denied.

I. PROCEDURAL BACKGROUND

After a jury trial, both Defendants were found guilty of the offenses alleged in the second superseding indictment: Count One, murder committed during the

course of a carjacking; Count Two, conspiracy to commit premeditated murder; Count Three, premeditated murder of Todd A. Bagley on Fort Hood, a place within the special maritime and territorial jurisdiction of the United States; and Count Four, premeditated murder of Stacie L. Bagley on Fort Hood, a place within the special maritime and territorial jurisdiction of the United States. The Government had previously given notice of intent to seek the death penalty as to Counts One, Three and Four, which were then submitted to the jury for a determination of whether the death penalty was appropriate.

In its answers to the special findings on punishment as to Counts One, Three and Four, the jury unanimously answered "Yes" to all intent questions for each count for Vialva. The jury unanimously answered "Yes" to each of the aggravating factors identified by the Government: (1) that the murder was committed in an especially heinous, cruel or depraved manner in that it involved torture or serious physical abuse to Todd A. Bagley; (2) that the murder was committed as consideration for the receipt, or in the expectation of the receipt of, of anything of pecuniary value; (3) that the murder of Todd A. Bagley was committed after substantial planning and meditation; and (4) that Todd A. Bagley and Stacie L. Bagley were killed or attempted to be killed in a single criminal episode. The jury further found as aggravating factors: (1) that the Defendant is likely to commit criminal acts of violence in the future; (2) that the loss of Todd A. Bagley caused an impact upon his

2

family; (3) that the offense was committed for the purpose of preventing Todd A. Bagley from reporting the Defendants' crime to law enforcement authorities.

The mitigating factors raised by Defendant Christopher Vialva consisted of the following: (1) he was subjected to emotional and physical abuse as a child, and was deprived of parental guidance and protection; (2) he has responded well to structured environments in the past; (3) he was 19 at the time of the offense; (4) another defendant or defendants who may be equally culpable in the crime will not be punished by death; (5) any other factors in his background, record or character or any other circumstances of the offense that may mitigate against the imposition of the death sentence. Ten jurors selected one of the foregoing mitigating factors – Vialva's childhood abuse.

As to Count Four with Bernard, the jury unanimously answered "Yes" to the element of intent only so far as he "intentionally participated in an act, contemplating that the life of the victim, Stacie L. Bagley, would be taken or intending that lethal force would be used in connection with a person other than one of the participants in the offense, and the victim, Stacie L. Bagley, died as a result of the act," and that he "intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to someone other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and the victim, Stacie L. Bagley, died as a result of the act."

The jury unanimously answered "yes" to statutory and non-statutory aggravating factors, except when asked if Bernard intentionally killed or attempted to kill Todd A. Bagley and Stacie L. Bagley in a single criminal episode. The jurors found no mitigating factors for Bernard, although the following were submitted: (1) another defendant or defendants who may be equally culpable in the crime will not be punished by death; (2) Bernard was 18 at the time of the offense; (3) Bernard has demonstrated remorse regarding the offense; and (4) any other factors in his background or character that might mitigate against the imposition of the death sentence.

The jury determined that the aggravating factors identified outweighed any mitigating factors and sentenced both Defendants to death - Vialva on Counts One, Three and Four and Bernard on Count Four only. Their sentences and convictions were affirmed on appeal. *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002), *cert. denied*, 539 U.S. 928, 123 S.Ct. 2572, 156 L.Ed.2d 607 (2003). They now assert that their convictions and sentences should be set aside for various constitutional violations.

## II. FACTUAL BACKGROUND

Defendant Christopher Vialva ("Vialva"), co-defendant Tony Sparks ("Sparks"), and co-conspirator Christopher Lewis, members of a street gang in Killeen, Texas, concocted a plan on June 20, 1999 to commit a carjacking. Their plan consisted of obtaining a ride from an unsuspecting individual, then displaying a weapon to steal

the victim's valuables, including any ATM cards and pin numbers, then forcing the victim into the trunk of the car and abandoning the car somewhere with the victim in the trunk. Vialva had been kicked out of his home and needed money to support himself. Sparks was in possession of a .22 caliber pistol. When the three were stopped by the Killeen police and questioned for possible curfew violations, one of the three  threw the pistol into some bushes. Lewis accompanied Sparks to his house when Sparks' mother arrived after being called by the police. Vialva was sent on his way after it was determined he was not a juvenile. The police later saw Vialva returning to the area, but told him to go home.

The next day, Vialva, Sparks and Lewis enlisted the assistance of fellow gang members, Brandon Bernard ("Bernard") and Terry Terrell Brown ("Brown"). They met at Sparks' residence and discussed the plan. Bernard was the only one of the group who had a car. Vialva retrieved the .22, but the group decided it was too small to frighten anyone and thought it might have been damaged by laying overnight in the damp grass. The group thought a larger handgun was needed. Bernard had loaned a stolen Glock .40 caliber handgun to fellow gang member Gregory Lynch, and they went to his residence to retrieve it. The Glock had only two bullets in it. The five, now armed with two handguns, went in search of a victim. They went through the parking lots of several grocery stores, but were unable to find a likely victim, until they reached a Mickey's convenience store which was next door to a laundromat. A man was using the pay phone in front of the store, and Lewis, being

the youngest and the youngest looking, was the one who approached him to ask for a ride.

The man on the pay phone was Todd Bagley, an Iowa native whose wife, Stacie, waited in their car. Stacie and Todd had met at church in Killeen when Todd was stationed at Ft. Hood. After their marriage, they moved to Iowa where Todd's parents resided. They had returned to Killeen to visit Stacie's family and had extended their stay to attend a revival at their former church, Grace Christian Church. Both Todd and Stacie were heavily involved in youth ministry. Earlier that morning, they had attended morning worship service and had lunch with friends. Todd then stopped at the Mickey's to use the pay phone. When Todd agreed to give the group a ride, Lewis, Sparks and Vialva got in the backseat of the car.

Bernard and Brown, distracted by a video game, did not see the trio leave with the Bagleys. Bernard and Brown went to a number of ATM machines looking for the others, but were unable to find them. They then went to complete job applications at a Winn-Dixie and went home.

After directing Todd to a secluded location, Vialva pulled out the .40 caliber handgun, pointed it at Todd and told him "the plans have changed." Simultaneously, Sparks pointed the .22 at Stacie. Vialva ordered Todd to stop and ordered both Stacie and him to get out. The gang stole Todd's wallet, Stacie's purse, and their jewelry. Vialva demanded the pin numbers for the Bagleys' ATM cards, and then forced them into the trunk of their car.

6

With Vialva driving, the gang visited several ATM machines in Killeen and Copperas Cove attempting to withdraw money from the Bagleys' account. They succeeded in withdrawing only a small amount as the Bagleys had less than $100 in their account. With ill-gotten gains in hand, they next visited a Wendy's, where Lewis and Sparks used the Bagley's money to purchase some food. The group decided to pawn the victims' jewelry, and Vialva returned to his house to obtain an identification card.

It was  at this point that Vialva decided they would have to kill the Bagles to cover up their crime. Vialva and Sparks switched off driving the Bagleys' car. Sparks purposefully drove erratically, "banging and thrashing," veering from side to side and braking and accelerating quickly in order to roll the Bagleys around in the trunk. During the hours they were imprisoned in the trunk, the Bagleys spoke with Lewis and Sparks, asking them about their belief in God and Jesus and whether they attended church. Lewis had attended the Grace Christian Church. The Bagleys told the gangsters that they were not wealthy, but had been blessed by their faith in Jesus. They told Lewis and Sparks that God's blessings were available to anyone. After conversing with the Bagleys, Sparks told Vialva he no longer wanted to go through with the crime. Vialva insisted that it was necessary to kill them because his fingerprints were all over the car and they had seen his face. Vialva also said that if they were stopped by the police, they were going to have a shootout, to which both Lewis and Sparks agreed.

7

Numerous people saw Vialva, Lewis and Sparks in possession of the Bagleys' car. A number of them also heard the Bagleys in the trunk, but none of them called the police.

The conversations with the Bagleys continued, with them pleading with Lewis and Sparks for their lives. Vialva drove to his house and picked up a ski mask and additional clothing. Lewis had called Brown while they were in Copperas Cove and said they needed assistance. They picked Brown up at his house. At one point, Brown took the .22 from Lewis and pointed it towards the Bagleys in the trunk and asked whether he should kill them. When Vialva said no, Brown handed the weapon back to Lewis.

They then met up with Bernard and another juvenile at a nearby park. There they discussed what to do with the Bagleys, with Vialva insisting that they had to be killed because they had seen his face and that the car would have to be burned to eliminate any fingerprints. Lewis believed the Bagleys heard this conversation.

Vialva gave Brown $10 and told him to purchase some gasoline to burn the car. Vialva then left in the Bagleys car to take Sparks home. (Sparks was concerned that his probation officer would be checking up on him to make sure he wasn't violating his curfew after having been stopped by the police the night before.) Sparks took the jewelry they had been unable to pawn, which was later found after the police searched his home.

Bernard and Brown stopped at another Mickey's convenience store and purchased two cans of charcoal lighter fluid as they did not have enough money for a container to hold gasoline. After they completed their purchase, Bernard sent Brown back into the store for some matches.

Vialva and Lewis, in the Bagleys' car, followed Bernard and Brown, in Bernard's car, to an isolated spot close to the Belton Lake Recreation Area, which was located on the Fort Hood military reservation. Vialva parked the Bagleys' car at the top of a hill, while Bernard parked his car at the bottom. After parking at the top of the hill, Vialva laughed, and said, "That was a bumpy ride."

Bernard and Brown came up the hill carrying the lighter fluid, then proceeded to pour the lighter fluid in the interior of the Bagleys' car as well as on the exterior. While preparing the car, Lewis kept saying Bernard's name (or his nickname, "Dip"), loud enough for the Bagleys to hear. When Brown told Lewis to shut up, Vialva told Lewis it didn't matter because they were going to die.

The Bagleys continued to plead for their lives, and asked them to read passages from their Bible. In response to Stacie's last words of "Jesus loves you" and "Jesus take care of us," Vialva cursed and responded, "Shut up, Bitch." Vialva then donned the ski mask and told Lewis to open the trunk. Vialva shot Todd in the head with the Glock, killing him instantly. He then shot Stacie in the right side of her face, knocking her unconscious but not killing her. Vialva told Brown to put more lighter fluid in the trunk area, which he did, and slammed the trunk closed. Bernard

then set the car on fire.  A subsequent autopsy revealed that Stacie died as a result of smoke inhalation.

All four then ran to Bernard's car.  As they were attempting to turn around, the car slid off the road into a muddy ditch.  When they saw a vehicle approaching, they threw the cans of lighter fluid, the guns, and the Bagleys' ID and credit cards into the bushes beside the road.  Lewis also threw the white t-shirt Brown had doused with lighter fluid.

A number of civilians drove by and offered to help get them out of the ditch. One of the individuals recognized Vialva, Bernard and Sparks.  An officer from the Nolanville Police Department then arrived, having been advised of a fire.  The defendants were detained for questioning and were arrested after firemen discovered the bodies of the Bagleys in the trunk of the car.

## III.  GROUNDS OF ERROR

Defendants Vialva and Bernard have raised numerous grounds of error, some identical.  The issues raised by both Defendants are as follows:

A.    Both Defendants:

1.    The trial court failed to comply with 18 U.S.C. § 3005 when appointing counsel.

2.    The federal death penalty is unconstitutional as applied in violation of the Eighth and Fifth Amendments and Equal Protection Clause of the United States Constitution since it has been pursued and imposed disproportionately against people of color.

3.    The lethal injection protocols currently in use by the Bureau of Prisons violates the Eighth Amendment prohibition against cruel and unusual punishment.

4.    The Government failed to disclose exculpatory evidence in violation of *Brady v. Maryland* (as it relates to other statements and interviews with Terry Brown and Christopher Lewis).

B.    Defendant Vialva additionally presents the following issues:

1.    Trial counsel was acting under a conflict of interest at the time of trial, violating Defendant's Sixth Amendment right to effective assistance of counsel.

2.    Counsel provided ineffective assistance during the guilt phase by failing to obtain necessary funding for expert witnesses, failing to subject the government's case to adversarial testing through cross examination, objections and challenges, and failing to present a coherent defense, all of which undermined confidence in the outcome of the proceedings.

3.    The jury's consideration of "future dangerousness" as an aggravating factor resulted in the arbitrary and capricious imposition of the death penalty, in violation of the due process of law secured by the Fifth Amendment, as assessments of future dangerousness cannot be predicted accurately and rely on generalizations about conduct rather than facts specific to the defendant and deprive the defendant of the individualized sentencing required by the Eighth Amendment.

4.    Ineffective assistance of counsel as counsel's motion for severance of the penalty phase was raised inadequately at trial and argued ineffectively on direct appeal, violating his Sixth Amendment right to effective assistance of counsel and Eighth Amendment right to an individualized sentencing.

11

5.      Ineffective assistance of counsel during the penalty phase as counsel failed to obtain adequate funding resulting in a failure to develop and present readily available mitigation evidence, including information about Vialva's mental state, upbringing, character and potential, and failure to counter the Government's allegations of future dangerousness and presentation of other aggravating factors, which individually and cumulatively undermined confidence in the outcome of the sentencing proceedings.

6.      The indictment did not include the aggravating factors which would support imposition of the death penalty.

7.      The death sentence was substantially influenced by the cumulative errors in both the guilt and penalty phases.

8.      In amended briefs, Vialva also asserts that his sentence of death should be vacated in light of *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) due to his "mental" age.

C.    Defendant Brandon Bernard asserts the following errors:

1.      Ineffective assistance of counsel at the guilt/innocence phase, in that counsel failed to adequately prepare and investigate, failed to adequately cross examine witnesses, and failed to prevent the introduction of prejudicial and irrelevant evidence.

2.      Ineffective assistance of counsel at the penalty phase by failing to investigate, develop, and present readily available mitigating evidence.

3.      Juror Calvin Kruger, who was the presiding juror, was biased against the Defendant, in violation of his Sixth Amendment right to an impartial jury.

4.      The cumulation of errors resulted in an unreliable trial and sentencing process.

IV.  DISCUSSION

A.  Procedural Bar.  After a conviction has been presumed final, as in the present case, a defendant may seek relief under § 2255 when

> (1) his sentence was imposed in violation of the Constitution or laws of the United States, (2) the sentencing court was without jurisdiction to impose the sentence, (3) the sentence was in excess of the maximum authorized by law, or (4) the sentence is otherwise subject to collateral attack.

*United States v. Seyfert*, 67 F.3d 544, 546 (5th Cir. 1995).  A collateral challenge to a conviction or sentence, as the Supreme Court has noted, "may not do service for an appeal."  *United States v. Frady*, 456 U.S. 152, 164 (1982).

> After conviction and exhaustion or waiver of any right to appeal, "we are entitled to presume that [the defendant] stands fairly and finally convicted."

*United States v. Shaid*, 937 F.2d 228, 231-232 (5th Cir. 1991), *cert. denied*, 502 U.S. 1076, 112 S.Ct. 978 (1992), *quoting United States v. Frady*, 456 U.S. at 164.  Section 2255 is not available for errors that are not of constitutional or jurisdictional magnitude and which were or could have been raised in a direct appeal.  *United States v. Stumpf*, 900 F.2d 842, 845 (5th Cir. 1990).  Many of the issues raised by the Defendants were, or could have been raised, on appeal.  They are, therefore, not cognizable in the present motion.

A defendant additionally "may not raise an issue for the first time on collateral review without showing both 'cause' for his procedural default, and 'actual prejudice' resulting from the error." *United States v. Shaid*, 937 F.2d at 232. *See also United States v. Webster*, 392 F.3d 787, 799 (5th Cir. 2004). This cause and actual prejudice test applies even when the defendant alleges a fundamental constitutional error, and when the default was the result of inadvertent attorney errors as well as deliberate tactical decisions. *Id*. A narrow exception exists when a constitutional violation "has probably resulted in the conviction of one who is actually innocent." *Dugger v. Adams*, 489 U.S. 401, 412 n. 6 (1989), *quoting*, *Murray v. Carrier*, 477 U.S. 478, 496 (1986). *See also McCleskey v. Zant*, 499 U.S. 467, 111 S.Ct. 1454 (1991); *United States v. Shaid*, 937 F.2d at 232.

The following issues are procedurally barred as they were, or could have been, raised on appeal:   (1) the violation of 18 U.S.C. § 3005; (2) the disproportionate imposition of the death penalty to minorities; (3) the cruel and unusual nature of the death penalty protocol; (4) the prosecution's violation of *Brady v. Maryland*; (5) the failure of the indictment to include the aggravating factors which would support the death penalty; (6)  Defendant Vialva's assertion that his counsel had a conflict of interest; (7) Defendant Vialva's assertion that a severance was not

properly raised and addressed; and (8) Defendant Bernard's allegation that juror Calvin Kruger was biased.[1]

Even assuming that the Defendants established cause and prejudice through their allegations of ineffective assistance of counsel, their claims are still without merit.[2]

B. 18 U.S.C. § 3005. Defendants argue that the Federal Public Defender was not consulted prior to counsel being appointed and, in the case of Defendant Bernard, that two attorneys were not appointed for him as soon as it was obvious that the death penalty was being sought against him.

Section 3005 provides, in pertinent part:

> Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases, and who shall have free access to the accused at all reasonable hours. In assigning counsel under this section, the court shall consider the recommendation of the

---

[1]    Additional other claims are mentioned in passing in Defendants' motions and are also procedurally defaulted, such as the claim of prosecutorial misconduct in vouching for certain witnesses.

[2]    Vialva asserts that the procedural bar should not apply for any of his appellate issues because Schwieger represented him on appeal. However, attorney Steven C. Losche was also appointed for the appeal. He was an "independent counsel" who could have raised various issues on appeal. Vialva also asserts that Losche had various problems which affected his ability to effectively represent him. Although Losche is now deceased, Vialva's own records indicate that the appellate brief was filed six months prior to the surgery from which Losche's wife asserts Losche never recovered.

Federal Public Defender organization, or, if no such organization exists
in the district, of the Administrative Office of the United States Court.

It is undisputed that the Court did not confer with the Federal Public Defender
in the Western District of Texas prior to appointing counsel in this case.  However,
failure to confer with the federal public defender prior to appointing counsel in a
death penalty case does not equate to a constitutional violation in the absence of a
showing of prejudice.  *See United States v. Fields*, 483 F.3d 313 (5th Cir. 2007), *cert.
denied*, 552 U.S. 1144, 128 S.Ct. 1065, 169 L.Ed.23 814 (2008) (rejecting the view
that a failure to comply with § 3005 is a "structural" error that requires reversal
without a showing of prejudice).  As the Court will address later, Defendants have
shown no prejudice as a result of their attorneys' actions in this case.

The complaint against the Defendants was first filed on June 23, 1999.  That
same day, attorney Stanley L. Schwieger ("Schwieger") was appointed to represent
Defendant Vialva, and Russell David Hunt, Sr. ("Hunt, Sr.") was appointed to
represent Defendant Bernard.  The first indictment against the Defendants was
returned on July 13, 1999, at which time it was apparent that the Defendants had
been charged with offenses which carried the death penalty.  On July 16, 1999,
Schwieger moved for appointment of co-counsel, suggesting B. Dwight Goains
("Goains")  who had extensive death penalty experience in state court.  The motion
was granted, and Goains was appointed on July 21, 1999.  Hunt, Sr. did not request
appointment of co-counsel until February 25, 2000, after the Department of Justice

16

("DOJ") had approved the decision to seek the death penalty.  Hunt, Sr. recommended appointment of his son, Russell David Hunt, Jr. ("Hunt, Jr."), who was appointed on March 14, 2000.  While Hunt, Jr. did not have experience in death penalty cases, Hunt, Sr. had extensive experience.

Defendants' complaints that the attorneys were unsuccessful in halting the DOJ from seeking the death penalty or in preventing the jury from imposing the death penalty in this case does not mean that they were not "learned in the law applicable to capital cases."  Both Goains and Hunt, Sr. fit the definition of "learned in the law" due to their extensive state court experience in capital cases, which is the reason this Court sanctioned their appointment.  The fact that they may not have tried a case under the Federal Death Penalty Act does not make them ineligible as "learned" counsel.  *United States v. Fields*, 483 at 348, n. 32.  Section 3005 and the guide to Federal Death Penalty cases promulgated by the Judicial Conference make no distinction between state or federal experience when considering the appointment of counsel in a federal death penalty case.  *Id*.

Defendant Bernard additionally complains that the failure of Hunt, Sr. to request the appointment of additional counsel prior to presentation of this case to the DOJ amounted to ineffective assistance of counsel.  However, he offers only conclusory allegations that the outcome of the DOJ proceeding would have been different if additional counsel had been appointed.  The guilt of the Defendants was so obvious, and the facts of the offense so heinous, there can be no doubt that the

death penalty would have been authorized for Bernard regardless of what additional counsel could have brought to the case.

Bernard additionally complains that Hunt, Sr.'s letter to the DOJ did not contain sufficient information, and he did not confer with a mitigation specialist prior to submitting it. However, the letter included the following salient points in support of leniency for Bernard: Vialva was the instigator and leader; Bernard had attempted to persuade Vialva to release the victims unharmed; Bernard was a follower; Bernard was not violent, as a number of witnesses would attest; and Bernard was prepared to cooperate and testify against Vialva if the death penalty were not sought. Bernard presents nothing to establish that a longer or more detailed response would have been any more effective.

C.  Unconstitutionality of Federal Death Penalty Due to Unequal Imposition.

Both Defendants offer statistics compiled by the Federal Death Penalty Resource Counsel ("FDPRC"), an arm of the Defender Services Division of the Administrative Office of the United States Courts, which they assert establish that the DOJ's selection of those defendants who will face the death penalty is impermissibly influenced by the defendants' race, in violation of equal protection and the Fifth and Eighth Amendments. Defendants' submission indicates that out of a pool of 1,845 potential capital defendants, a total of 318 (or 17%) have actually been authorized for capital prosecution. Out of that group, 164 (52%) were African-American. Out of the 38 defendants who have been sentenced to death since 1988, 23 (or 61%)

were African-American.   Affidavit of Kevin McNally, Exhibit 28 to Defendant's

Bernard's motion and Exhibit X-A to Vialva's motion.

The Fifth Circuit has previously rejected Defendants' argument.  *See United

States v. Jones*, 287 F.3d 325 (5th Cir.), *cert. denied*, 537 U.S. 1018 (2002).  Quoting

*United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 134 L.Ed.2d 687

(1996), the Fifth Circuit noted the appropriate standard: "The requirements for a

selective-prosecution claim draw on ordinary equal protection standards.   The

claimant must demonstrate that the federal prosecutorial policy had a discriminatory

effect and that it was motivated by a discriminatory purpose.   To establish a

discriminatory effect in a race case, the claimant must show that similarly situated

individuals of a different race were not prosecuted."  *United States v. Jones*, 287

F.3d at 333.  As in the *Jones* case, Defendants' reliance on statistics demonstrating

that defendants of all races were selected for prosecution and prosecuted fails to

meet the standards for identifying a selective prosecution claim.[3]  *See also United

States v. Hall*, 455 F.3d 508 (5th Cir. 2006), *cert. denied*, 549 U.S. 1343, 127 S.Ct.

2029, 167 L.Ed.2d 772 (2007), rejecting a similar claim.  The *McCleskey* case relied

upon by Defendants is not inapposite.  *See McCleskey v. Kemp*, 481 U.S. 279, 293

(1987) ("[T]o prevail under the Equal Protection Clause, McCleskey must prove that

the decisionmakers in *his* case acted with discriminatory purpose") (emphasis in

---

[3]      The *Jones* case also rejected Defendants' other argument that geography played
an inappropriate role in determining what defendants are sentenced to death, such that states
which pursue the death penalty vigorously have more federal death penalty cases.

original).   Accordingly, to the extent Defendants' claim regarding discriminatory prosecution is not procedurally barred, it is without merit.

     D.  Lethal Injection Protocol is Cruel and Unusual Punishment.  Defendants assert that the three-drug protocol currently approved as the method of execution by the Bureau of Prisons should be determined to violate the Eighth Amendment's prohibition of cruel and unusual punishment.   Defendants present affidavits which indicate the possibility that errors in the administration of the drugs through intravenous lines could occur, resulting in pain and suffering to the inmate being executed.   However, the protocol currently in use has been determined to not constitute cruel and unusual punishment.  *See Baze v. Rees*, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008).  *See also Raby v. Livingston*, 600 F.3d 552 (5th Cir. 2010), which rejected arguments similar to those made by Defendants as related to the Texas lethal injection protocol.   Accordingly, Defendants' claim related to the lethal injection protocol is without merit.

     E.  Aggravating Factors in Indictment.  Defendants argue that the indictment was faulty because it did not include the aggravating factors which the Government alleged supported the death penalty.   Although not included in the indictment, the Government presented the aggravating factors in a separately filed document, returned prior to trial.  At the time this case was tried, it was controlled by *Walton v. Arizona*, 497 U.S. 639 (1990), which determined that the aggravating factors were not independent offenses, but only standards used to help the jury decide between

death and life imprisonment. It was not until *Ring v. Arizona*, 536 U.S. 584, 609

(2002), that the Supreme Court held that the aggravating factors which render a

defendant eligible for death, are "the functional equivalent of an element of a greater

offense," and most be proven to a jury beyond a reasonable doubt. This was

characterized by the Fifth Circuit as "a new rule of constitutional criminal procedure."

*United States v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004). The absence of an

indictment charging the aggravated factors is not "structural error and is susceptible

to harmless error review." *Id*., at 286. As with *Ring*, the jury's unanimous findings

in this case were, at a minimum, persuasive evidence of what a grand jury would

have found if the government had charged the aggravating factors it intended to

prove to make the defendants eligible for the death penalty. *Id*. at 287-89.

Bernard raised this issue on appeal, but it was rejected by the Fifth Circuit.

*United States v. Bernard*, 299 F.3d at 488-89. Vialva could have raised the issue on

appeal.[4] Accordingly, the claim has been procedurally defaulted. The opinions in

*Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) and

*Ring* were issued while the direct appeal was pending in this case. Accordingly,

Defendants have failed to show cause for their procedural default. Defendants have

also established no prejudice because any *Ring* error would be harmless error.

---

[4]    Vialva raises his appellate attorneys incapacitation to excuse this failure. As previously noted, Losche received the record on appeal on March 26, 2001 and filed a corrected brief on May 30, 2001. He could have raised the *Apprendi-Ring* issues, which were decided in 2000, if he thought there was a reasonable chance of success. They also could have been rasied by Schwieger.

21

Additionally, *Ring* is not applicable retroactively.  *Foster v. Quarterman*, 466 F.3d 359, 369-70 (5th Cir. 2006), cert. denied, 550 U.S. 906, 127 S.Ct. 2099, 167 L.Ed.2d 817 (2007).

F.  Brady Violation.  Defendants assert that the Government violated the precepts of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in that they were not provided with all recorded statements and interviews between Government agents and Terry Brown and Christopher Lewis.  The allegations also include interviews which were not recorded or reduced to written statements, information contained in pre-sentence investigation reports, and information provided to an expert witness who was evaluating Brown for eligibility to stand trial as an adult.  The Defendants allege that suppression of this information prevented trial counsel from effectively cross examining these witnesses and effectively impeaching their testimony.

As previously noted, this claim could have been raised on direct appeal but was not.  It is, therefore, procedurally defaulted as there has been no cause and prejudice established for that failure.  Even if not procedurally defaulted, Defendants have failed to establish that any material was suppressed by the Government, or that the failure to provide any information constitutes a *Brady* violation.

In every criminal trial, the prosecution has a duty to turn over exculpatory evidence to the accused.  The duty also includes "impeachment evidence favorable to an accused when 'there is a reasonable probability that, had the evidence been

disclosed to the defense, the result of the proceeding would have been different.'"

*United States v. Hughes*, 230 F.3d 815, 819 (5th Cir. 2000) (quoting *United States*

*v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)).  *See*

*also United States v. Infante*, 404 F.3d 376, 387 (5th Cir. 2005).  In order to prove

such a violation, a defendant must establish that there was evidence favorable to

him which was not disclosed by the Government and that he suffered prejudice as

a result.  *United States v. Hughes*, 230 F.3d at 819.  Evidence is material when it

"could reasonably be taken to put the whole case in such a different light as to

undermine confidence in the verdict."  *Id*. (quoting *Kyles v. Whitley*, 514 U.S. 419,

435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).  The burden is on the defendant

to establish "a reasonable probability that the evidence would have changed the

result."  *Id*.  If it is alleged that more than one violation has occurred, the court must

"consider the cumulative effect of the suppressed evidence."  *Id*.

In regard to the additional unrecorded and untranscribed interviews Brown and

Lewis had with government agents which contradicted their testimony at trial, these

are merely cumulative of the information that was included in their written

statements.  Reviewing the record it is clear that both of these witnesses originally

denied any involvement in the murders.  When confronted with contradictory

information provided by other witnesses, they eventually truthfully admitted more and

more details of the events leading up to the murders.  These contradictory

statements were fully explored through cross-examination at the time of trial.

Defendants fail to explain how any additional contradictory statements could have more effectively impeached these two witnesses. Any additional evidence would not have been material, but merely cumulative of the evidence that was disclosed.

Defendant Vialva additionally appears to claim some error due to agents not recording all of Brown's statements. However, he points to no authority which would obligate a government agent to reduce an interview to a written statement, particularly when the agent is convinced that a suspect is not being truthful, nor that failure to provide such information constitutes a *Brady* violation. In any regard, the unrecorded and untranscribed statements were described in the Government's "Final CID report," which has not been alleged to have been suppressed.

Bernard argues that Brown's "criminal history" was not disclosed. It appears that he is referring to Brown's involvement in numerous burglaries, when he was involved with the "kick door" gang. However, many of these criminal acts were committed in concert with Bernard and Vialva. Even if the government somehow failed to provide this information, it would not have been material nor exculpatory. Cross-examining Brown regarding those activities would have opened the door for the Government to introduce Defendants' involvement.

Defendant Vialva additionally asserts that information regarding Brown's drug use before and during the times relevant to his conviction was withheld by the Government. One document identified is Brown's pre-sentence investigation report, which more fully documents Brown's drug usage. Of course, there is no indication

24

that this pre-sentence report was available at the time Vialva and Bernard went to trial or were sentenced.  Both Brown and Lewis were sentenced in March, 2001, almost nine months after Vialva and Bernard were sentenced.  Even without this information, there was testimony at trial from Gregory Lynch that Brown had smoked a "blunt" sometime during the course of the day of the murders.  Even assuming Brown's faculties were somehow impaired, his testimony was corroborated by the testimony of Lewis, Sparks, Lynch and others.  Therefore, there is nothing to indicate that there was a document in existence for the Government to "suppress" or that it would have been material rather than merely cumulative of other evidence.

Defendants further appear to argue that the Government withheld the factual bases supporting the guilty pleas of Brown and Lewis, which also contradicted their trial testimony.  The Government in this case, as in all cases in this Division, has an open file policy through which the foregoing information was available.  Those documents were also publicly filed in Brown's and Lewis's criminal cases.  Additionally, attorneys for both Vialva and Bernard were present at the rearraignment proceedings of Brown and Lewis, thereby disproving any allegation of suppression of their factual bases.

As to any other types of information, Defendants have not presented anything other than unsupported allegations that information has been suppressed and/or that it is material.  This is true as to Vialva's claim that Brown provided false information to Dr. James N. Shinder when Brown was evaluated for certification as an adult.

25

Vialva fails to indicate, however, how this information provided any more favorable information than what was previously provided or how it is material to his case.

As to Lewis and Brown, counsel for both Vialva and Bernard were able to extensively cross-examine them on the contradictory statements they made to Government agents, as is subsequently described.

No other documents identified by Defendants were either material or suppressed. Accordingly, Defendants' *Brady* claims are without merit.

G.  Biased Juror.  Bernard asserts that he was denied an impartial jury because one of the jurors in this case did not truthfully answer the juror questionnaire that inquired into previous convictions for any crime other than a traffic ticket. Bernard asserts that Calvin Kruger, juror 126, was previously convicted of DUI (presumably misdemeanors) in 1977 and 1994.

Once a trial is complete, evidence that a juror gave an incorrect answer during voir dire is not an automatic basis to have a conviction overturned. "The defendant must demonstrate that the juror was actually biased or fundamentally incompetent." *United States v. Bishop*, 264 F.3d 535, 554 (5th Cir. 2001), *cert. denied*, 535 U.S. 1016, 122 S.Ct. 1605, 152 L.Ed.2d 620 (2002). "Actual bias exists when a juror fails to answer a material question accurately because he is biased." *Id*. Defendant has failed to make any showing that Kruger was biased; he offers only speculation in this regard.

H.  Roper v. Simmons.  Defendant Vialva asserts that his sentence of death should be vacated in light of the Supreme Court opinion in *Roper v. Simmons*, wherein the majority ruled the Eighth and Fourteenth Amendments prohibited the execution of defendants who are under the age of 18 when they committed the offense eligible for the death penalty.  Although Vialva as 19 at the time he murdered the Bagleys, he argues that expert witness testimony reflects that his mental age at the time was much younger.  There is no legal basis for Defendant's argument.

This argument has been rejected by the courts.  *See Parr v. Quarterman*, 472 F.3d 245, 261 (5th Cir. 2006), *cert. denied*, 551 U.S. 1133, 127 S.Ct. 2974, 168 L.Ed.2d 707 (2007); *In re Garner*, 612 F.3d 533, 535-36 (6th Cir. 2010) ("The *Roper* Court did not hold that the Eighth amendment prohibits a death sentence for an offender with a 'mental age' of less than 18."); *United States v. Mitchell*, 502 F.3d 931, 981-82 (9th Cir. 2007), *cert. denied*, 553 U.S. 1094, 128 S.Ct. 2902, 171 L.Ed.2d 843 (2008); *Jasper v. Thaler*, 466 Fed.Appx. 429 (5th Cir. 2012), *cert. filed* (Sept. 4, 2012) (No. 12-6160).

As the *Roper* Court noted:  "the qualities that distinguish juveniles from adults do not disappear when an individual turns 18. . . .  For the reasons we have discussed, however, a line must be drawn. . . .  The age of 18 is the point where society draws the line for many purposes between childhood and adulthood.  It is, we conclude, the age at which the line for death eligibility ought to rest."  *Roper*, 543 U.S. at 574.

Even if this were a viable claim, it would be barred by the nonretroactivity doctrine of *Teague v. Lane*, 489 U.S. 288, 310, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). As the claim has no merit, Vialva's attorneys additionally could not have rendered ineffective assistance by failing to raise the issue during either phase of the trial.

I.   Ineffective Assistance of Counsel.   The Defendants assert that they received ineffective assistance during both the guilt/innocence and punishment phases of the trial. Basically, Defendants argue that everything done by counsel constituted ineffective assistance.[5] Both Vialva and Bernard assert that trial counsel was ineffective in failing to obtain funding for experts, which resulted in inadequate investigation and inadequate preparation during both phases. They also allege that their attorneys failed to subject the Government's case to appropriate adversarial testing and failed to put on a coherent defense. They also both assert that the cumulative errors in both phases resulted in an unreliable trial and sentencing process.

The Sixth Amendment to the Constitution provides that the accused in a criminal prosecution has the right to assistance of counsel for his defense. The purpose of this guarantee is "not to improve the quality of legal representation . . .

---

[5]    Defendants include numerous allegations in support of their claim, including failing to object to various evidence and/or testimony, failing to file motions, etc. To the extent these claims are not specifically mentioned in the Court's Order, they are denied as are all other claims related to ineffective assistance of counsel. The challenged actions all fall within the categories of strategy and tactics and cannot form the basis for an ineffective assistance of counsel claim.

[but] simply to ensure that cirminal defendants receive a fair trial." *Cullen v. Pinholster*, ___ U.S. ___, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011) (quoting *Strickland*, 466 U.S., at 689, 104 S.Ct. 2052).    In evaluating whether counsel's performance is inadequate, the Supreme Court has developed a two-prong test. *Strickland v. Washington*, 466 U.S. 668 (1984).  Under this test, a defendant must establish:  (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced the defense so as to deprive him of a fair trial.  *Id*.  The proper standard for evaluating counsel's performance is that of reasonably effective assistance, considering all of the circumstances existing as of the time of counsel's conduct.  *Hill v. Lockhart*, 474 U.S. 52 (1985).  Scrutiny of counsel's performance is "extremely deferential;"  *Bell v. Lynaugh*, 828 F.2d 1085, 1088 (5th Cir. 1987); and counsel's conduct is "strongly presumed to fall within the wide range of reasonable professional assistance."  *Strickland*, 466 U.S. at 690.  Counsel's advice need not be perfect -- it need only be reasonably competent within the "range of competence demanded of attorneys in criminal cases."  *McMann v. Richardson*, 397 U.S. 759, 771 (1970).  "The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'"  Harrington v. Richter, ___ U.S. ___, 131 S.Ct. 770, 788, 178 L.Ed.2d 624 (2011) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. 2052).

The standard used to evaluate counsel's conduct is necessarily a general one. *Bobby v. Van Hook*, 558 U.S. 4, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009) (*per*

*curiam*).  "'No particular set of detailed rules for counsel's conduct can satisfactorily take into account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.'" *Id*. (quoting *Strickland*, 466 U.S., at 688-689, 104 S.Ct. 2052).  Such things as restatements of professional standards may be "useful as 'guides' to what reasonableness entails, but only to the extent they describe the professional norms prevailing when the representation took place."  *Id*.  This includes the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases ("ABA Guidelines"), which are treated only as a guide to what reasonableness means, "not its definition."  *Id*.  See also, *Druery v. Thaler*, 647 F.3d 535, 541 n. 2  (5th Cir. 2011), *cert. denied*, ___ U.S. ___, 132 S.Ct. 1550, 182 L.Ed.2d 180 (2012).

As to the second prong of the *Strickland* test, in order to establish prejudice, the defendant must show that his attorney's errors were so serious that they rendered "the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 362, 372 (1993).  "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052.  The *Strickland* court further noted that "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id*.  The likelihood of a different result must be "substantial," not just "conceivable."  *Cullen*, 131 S.Ct. at

1403 (quoting *Harrington v. Richter*, 562 U.S. ___, ___, 131 S.Ct. 770, 791, 178 L.Ed.2d 624 (2011)).  "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct *so undermined* the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland*, 466 U.S. at 686, 104 S.Ct. 2052 (emphasis added).   It is insufficient for a defendant to "show that the errors had some conceivable effect on the outcome of the proceeding"  *Richter*, 131 S.Ct. at 787 (quoting *Strickland*, 466 U.S. at 693).  "Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'"  *Richter*, 131 S.Ct. at 787-88 (quoting *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052).

> Although courts may not indulge "post hoc rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions.  There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." . . . After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome.  *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

*Richter*, 131 S.Ct. at 790 (citations omitted).

*Strickland* and its progeny do not guarantee perfect representation, only a '"reasonably competent attorney."'  *Id*., at 791 (citation omitted).  "Just as there is no

expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Richter*, 131 S.Ct. at 791.

Even if counsel may be construed to have performed deficiently, relief for ineffective assistance is not available unless the defendant also establishes prejudice. In the present case, both Defendants have failed to establish either ineffectiveness or prejudice.

1. Conflict of Interest. Defendant Vialva asserts that counsel Goains was ineffective in that he applied for employment with the U.S Attorney's Office while the trial was pending without first securing Defendant's consent or without securing an effective waiver after the conflict had arisen. Defendant asserts that this claim was not raised previously due to the ineffectiveness of trial and appellate counsel.

As previously noted, this claim is procedurally barred by the failure to raise it on appeal. To the extent it is not barred, it is without merit.

The record reflects that Goains applied for a position with the U.S. Attorney's Office in early February, 2000, but his application was rejected in early March, 2000. He sent a letter expressing his continued interest on March 6, 2000. Goains obtained a waiver of conflict from Vialva on May 3, 2000 and requested a hearing, which was held on May 12, 2000, three days before the start of trial. At the hearing Goains explained that there were two additional open positions with the U.S.

32

Attorney's Office, and he thought he had an excellent chance of receiving an offer. After being advised by the Court of his options, Vialva confirmed his waiver of conflict and opted to continue with Goains as his attorney. Vialva stated that he understood that he was waiving his right to subsequently complain about any conflict. After the trial was over and Goains withdrew from case, he was offered and accepted one of the open positions.

As previously noted, the Sixth Amendment provides a right to counsel for a criminal defendant, and "a criminal defendant has an absolute right under the Sixth Amendment to be represented by an attorney who has no conflict of interest." *Holloway v. Arkansas*, 435 U.S. 475, 482, 98 S.Ct. 1173, 1177-78, 55 L.Ed.2d 426 (1978). However, a defendant may waive the right to proceed with conflict-free counsel after a hearing before the trial court. *Id.*, at 483 n. 5. *See also Edward v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883-84, 68 L.Ed.2d 378 (1981) (finding of adequate waiver of Sixth Amendment right to counsel depends on particular facts and circumstances surrounding the case). If an actual conflict exists, the question is whether the defendant "freely and validly waived his right to representation by a conflict-free attorney." *United States v. Newell*, 315 F.3d 510, 516 (5th Cir. 2002). The issue of prejudice does not arise. *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). "Prejudice is presumed upon a showing of an actual conflict, not waived by the defendant." *Newell*, 315 F.3d at 516.

Not all conflicts which may affect an attorney's "duty of loyalty" have the same consequences and "are not suited to *Cuyler's* stringent rule." *Beets v. Scott*, 65 F.3d 1258, 1269 (5th Cir. 1995) (*en banc*), *cert. denied*, 517 U.S. 1157, 116 S.Ct. 1547, 123 L.Ed.2d 650 (1996). In all situations other than multiple client representation, the analysis is the same as for ineffective assistance under *Strickland* – ineffectiveness plus prejudice. *Newell*, 315 F.3d at 517. *See also United States v. Infante*, 404 F.3d 376 (5th Cir. 2005); *Lockhart v. Johnson*, 104 F.3d 54 (5th Cir.), *cert. denied*, 521 U.S. 1123, 117 S.Ct. 2518, 138 L.Ed.2d 1019 (1997).

In this case, no actual conflict existed because Goains was not offered and did not accept a job from the U.S. Attorney's Office during his representation of Vialva. "The mere fact of [defense counsel's] future emloyment plans did not create an actual confliclt." *Garcia v. Bunnell*, 33 F.3d 1193, 1199 (9th Cir. 1994), *cert. denied*, 514 U.S. 1024, 115 S.Ct. 1374, 131 L.Ed.2d 229 (1995). *See also United States v. Jenkins*, 943 F.2d 167 (2d Cir.), *cert. denied*, 502 U.S. 1014, 112 S.Ct. 659, 116 L.Ed.2d 751 (1991).

Even if somehow an actual conflict did exist, Vialva effectively waived the right to pursue such a claim. Assuming for the sake of argument that Vialva's waiver was ineffective, he has not presented the type of conflict which would excuse proof of prejudice. There is nothing in the record to reflect that the situation affected the adequacy of Goains' representation of Vialva.

In attempting to establish prejudice, Defendant alleges various "failures" that he has raised in connection with his other claims of ineffective assistance of counsel. As will be discussed subsequently, these examples are insufficient to establish prejudice as they do not indicate a failure of counsel to contest the Government's case, but rather strategic decisions based upon limited funds and the experience of counsel. Accordingly, Vialva's conflict of interest claim is without merit.

2. Severance. Defendant Vialva asserts that his trial counsel was ineffective for failing to persuade the court to grant his motion for severance and that his appellate counsel was ineffective for failing to argue the severance issue on appeal. Vialva's attorneys moved for severance at both the guilt/innocence and punishment phases of the trial, and his appellate attorney raised the denial of severance as an issue on appeal. Vialva argued that the jury would not be able to give him the individualized consideration required by the Eighth Amendment because the Defendants' mitigating evidence was mutually exclusive. The motion was denied, as were his two renewals of the motion. Defendant's assertion that Bernard's mitigating evidence was mutually antagonistic to his was raised on appeal and dismissed. *United States v. Bernard*, 299 F.3d at 475. Bernard proffered evidence at the punishment phase of his Christian up-bringing as a mitigating factor. Vialva argued that this evidence prejudiced the jury against him because he had no comparable mitigating evidence. The Fifth Circuit determined that Bernard's

mitigating evidence "was not sufficiently 'mutually antagonistic' or 'irreconcilable' to [Vialva] to suggest, much less compel, severance at the penalty phase." *Id.*

This issue, as previously noted, is procedurally defaulted as it was raised on direct appeal. Additionally, since the Fifth Circuit has ruled that Bernard's mitigating evidence was not mutually antagonistic to Vialva's, the law of the case doctrine precludes reconsideration. Even if viable, Defendant's claim is still without merit as Defendant has failed to establish that either his trial counsel or his appellate counsel committed errors so serious that he was deprived of the right to a fair trial.

While counsel may be held ineffective for failing to file a specific motion, in very rare circumstances is counsel determined to be ineffective for failing to obtain a desired result. *See United States v. Rocha*, 109 F.3d 225, 229-30 (5th Cir. 1997) (when appellate court rejected claim regarding severance, could not be ineffective assistance for counsel to fail to obtain something to which the defendant was not entitled). In support of this claim, Vialva identifies some information which he asserts could have been included in his severance motion: (1) a study which identifies problems that occur in multi-defendant capital cases that do not occur in typical criminal trials (the "Bronson study"); (2) Ohio and Georgia laws which provide separate trials for capital co-defendants upon request of the defendant; and (3) a declaration which indicates that severance has occurred in 70% of multi-defendant capital prosecutions.

36

The Supreme Court has held that "[m]utually antagonistic defenses are not prejudicial per se." *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993). This is because '[j]oint trials play a vital role in the criminal justice system. . .," and the "general rule or preference is that defendants indicted together should be tried together." *Id*., and *Puiatti v. McNeil*, 626 F.3d 1283, 1309 (11th Cir. 2010), *cert. denied*, ___ U.S. ___, 131 S.Ct. 3068, 180 L.Ed.2d 904 (2011). *See also United States v. Daniels*, 281 F.3d 168 (5th Cir.), *cert denied*, 535 U.S. 1105, 122 S.Ct. 2313, 152 L.Ed.2d 1067 (2002). The trial court may, in its discretion, grant a severance if a defendant proves that "(1) a joint trial would actually prejudice the defendant *and* (2) a severance is the proper remedy for the prejudice, rather than jury instructions or another remedy." *Puiatti*, 626 F.3d at 1309 (emphasis in original). *See also United States v. Mitchell*, 484 F.3d 762, 775 (5th Cir.), *cert. denied*, 552 U.S. 923, 128 S.Ct. 297, 169 L.Ed.2d 212 (2007) ("the defendant bears the burden of showing specific and compelling prejudice that resulted in an unfair trial, and such prejudice must be of a type against which the trial court was unable to afford protection."). A district court should grant a severance "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zaviro*, 506 U.S. at 539, 113 S.Ct. at 938. Only two circumstances mandate severance: "where there is a serious risk that a joint trial (1) 'would compromise a specific trial right of one of the defendants,' or (2) would

37

'prevent the jury from making a reliable judgment about guilt or innocence." *Puiatti*, 626 F.3d at 1310 (quoting *United States v. Thompson*, 422 F.3d 1285, 1292 (11th Cir. 2005)).

None of the grounds listed by Defendant mandate severance. In regard to the Bronson study, the courts have noted that the "prejudice" which may be demonstrated through social science data is insufficient in and of itself to justify severance in the absence of a constitutional violation. Additionally, state law is not binding on the federal courts and also is insufficient in and of itself to justify severance. Finally, the declaration regarding the percentage of capital multi-defendant prosecutions in which defendants have been severed likewise does not mandate severance. From that study it is equally clear that severance is *denied* 30% of the time. All the foregoing taken together does not mandate severance. Accordingly, Defendant Vialva has failed to establish that his trial or appellate counsel were ineffective for failing to include the foregoing arguments in their severance arguments.

Even if Defendant had somehow established ineffectiveness, he has failed to establish prejudice either at the guilt/innocence phase, at the punishment phase, or on appeal. As previously noted, the evidence against Defendant was overwhelming as to his guilt. The same result would have occurred whether Defendant was tried jointly or separately. Further, the punishment imposed would likewise have been the same whether tried jointly or separately. When analyzing prejudice as a result of a

38

failure to move for severance prior to the punishment phase, the defendant must show that "there is a reasonable probability that [had severance been granted] the sentencer . . . would have concluded that the balance of aggravating and mtiigating circumstances did not warrant death." *Rastafari v. Anderson*, 278 F.3d 673, 691 (7th Cir. 2002) (quoting *Strickland*, 466 U.S. at 695). As in *Rastafari*, the jury in this case was given specific instructions that they could only consider the aggravating and mitigating factors that applied to the specific defendant under consideration. As the *Rastafari* court noted: "[Defendant's] argument that he looked more deserving of the death penalty than [his co-defendant] because of [the co-defendant's] additional mitigating evidence is belied by the fact that the jury also recommended the death sentence for Williams." *Id.* Vialva's argument that Bernard's mitigating evidence made the jury look on him more favorably is clearly without merit since the jury assessed the death penalty against both.

Even if considered as some sort of Eighth Amendment violation because of the argument that Defendant was not given the required individualized consideration because of the joint trial, Defendant's claim is without merit. *See United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996), *cert. denied*, 520 U.S. 1253, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997). As previously noted, this issue is procedurally barred because Defendant did not raise the issue on appeal. Even if not defaulted, the claim is without merit. Rule 8(b) of the Federal Rules of Criminal Procedure provides for the joint trial of two or more defendants who are alleged to have participated in the same

act or transaction, and there is no exception in the rule for capital co-defendants in the Federal Death Penalty Act or the case law.

       3.  Guilt Phase.  As noted, both Defendants assert that their attorneys did not effectively represent them during the guilt/innocence phase of the trial.  The allegations of ineffective assistance include the following: (a) counsel did not subject Government's case to meaningful adversarial testing; (b) counsel did not effectively cross-examine witnesses; (c) counsel did not obtain funding for experts; and (d) counsel did not request sufficient time to obtain expert reports, to fully investigate the case, and to prepare for trial.

       a.  Adversarial Testing and Investigation.  In this regard, Defendants assert that counsel did not cross-examine a number of the Government's experts, did not obtain experts of their own, and did not do a sufficient investigation.  When a Defendant alleges a failure to investigate, he "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Druery*, 647 F3d. at 541 (quoting *Nelson v. Hargett*, 989 F.2d 847, 850 (5th Cir. 1990)).  "An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Richter*, 131 S.Ct. at 789-90.  Much of what Defendants assert should have been investigated falls into this category.

       The record in this case reflects that there was little scientific evidence linking the Defendants to the scene of the murder.  Gun shot residue was collected but not tested due to the passage of time.  No fingerprints or trace evidence were obtained

linking the Defendants to the Bagleys' vehicle. The only DNA evidence obtained was from the ski mask Vialva wore when he shot the Bagleys. Deciding not to cross-examinine such scientific witnesses constitutes a reasonable strategic decision when no evidence was offered which was prejudicial to either Defendant.

It was also not unreasonable for counsel not to seek their own experts in regard to these scientific matters. Any number of hypothetical experts may be useful in preparing a defense, such as "specialists in psychiatry, psychology, ballistics, fingerprints, tire treads, physiology, or numerous other disciplines and subdisciplines. . . ." *Richter*, 131 S.Ct. at 789. However, there "comes a point at which evidence . . . can reasonably be expected to be only cumulative, and the search for it distractive from more important duties." *Bobby*, 130 S.Ct. at 19. Counsel is entitled to formulate a reasonable strategy and "to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 131 S.Ct. at 789.

With limited funds available for experts, nothing would have been accomplished except a decrease in funds if trial counsel had attempted to retain experts to contest the experts presented by the Government. Under a worse case scenario, these experts could find evidence which did provide a physical link between the Defendants and the murder scene. The lack of evidence was the basis for closing argument, which counsel used to establish for the jury how little physical evidence connected the Defendants to the scene and to the murders. "An attorney

need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." *Richter*, 131 S.Ct. at 789-90. "To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Id*.

In this case not taking certain measures was a reasonable trial tactic pursued by counsel. "There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" *Richter*, 131 S.Ct. at 790 (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003) (*per curiam*)).

Counsel for Vialva did seek some expert representation by filing an *ex parte*, sealed motion outlining a proposed litigation budget for expert, investigative, and other necessary services. Counsel listed eight categories of experts the defense proposed to retain. Some of these were identified by name, while others were described by function. Counsel also filed a separate motion requesting appointment of Leon Cheney as an investigator, which was granted by the Court. In a separate order, the Court approved a portion of the initial budget. Neither order approved specific rates, hours, or total amounts for each expert, or an overall total for the litigation. Counsel did not seek clarification of the sealed order.

In an *in camera*, unrecorded meeting, the Court apparently directed counsel to substantiate their request for resources in April, 2000. Counsel were pursuing five

additional areas for which funding was being requested, but their request was denied. Counsel filed an *ex parte* application for writ of mandamus, and the Fifth Circuit remanded the motion for further consideration. This Court then conditionally granted counsel's requests immediately preceding the beginning of jury selection. Counsel did not request additional time to complete the experts' work, even though counsel detailed several critical areas of inquiry that remained uncompleted on the day jury selection began.

None of the foregoing supports a finding of ineffectiveness on the part of Vialva's lawyers merely because they were originally unsuccessful in their request for financial assistance for experts. Counsel for Vialva did what was required – requesting experts for the various areas identified in Defendant's § 2255 motion, for which they ultimately received approval for payment. Defendant asserts that counsel should have then requested a continuance in order for the experts to prepare for trial. It is mere supposition that a continuance, if filed, would have been granted.

One of the areas which Vivalva argues that trial counsel should have obtained assistance during the guilt/innocence phase was an expert as to his mental state. Defendant argues that counsel "simply did not recognize that evidence of Mr. Vialva's cognitive disorders might be useful in efforts to rebut the government's presentation regarding premeditation and substantial planning." There is nothing to indicate that the outcome would have been different had Defendant's request for funding been granted and had evidence of Vialva's "cognitive" disorders been

presented at the guilt/innocence phase. As previously noted, the evidence of the Defendants' guilt was overwhelming. There was nothing in the crime that required lengthy premeditation or intricate planning. In fact, it was the lack thereof that led to the Defendants' arrest and eventual conviction. But, lack of detailed planning on the part of the Defendants does not necessarily indicate a lack of maturity or intelligence. There was sufficient planning on Vialva's part to override an expert's opinion regarding his "cognitive" disorders and possible poor impulse control. It did not take sophisticated or intricate planning to complete the carjacking and the murder in this case. Vialva was able to control his impulses long enough to carjack the Bagleys, take their valuables, obtain his ID, attempt to pawn their valuables, and carry out their execution.

Defendant Vialva also argues that counsel did not examine the crime scene as soon as possible after the discovery of the murder, nor did counsel request a forensic expert to develop evidence related to other suspects or alternate theories of how the crime may have occurred. Once again, these allegations run into the reality of a federal Criminal Justice Act appointment – appointed counsel has limited funds with which to work and must allocate them to the most viable and helpful areas. There was no credible evidence of other suspects, and counsel rightly concluded that efforts to generate evidence in this regard would be a waste of limited resources. Vialva's investigator, Cheney, did contact the two men who attempted

to pull Bernard's car out of the ditch, but they were not considered strong suspects by him.

b.  Time Spent in Preparation.  Defendants additionally argue that counsel did not spend sufficient time investigating and preparing for trial.  Brevity of consultation time alone is insufficient to support a claim of ineffective assistance of counsel.  *Schwander v. Blackburn*, 750 F.2d 494 (5th Cir. 1985).  Defendant has to show what additional evidence could have been produced had additional conversations with counsel taken place.  Defendants offer nothing in this regard.

To support their claim, Defendants offer statistics regarding the average length of pretrial preparation in federal capital cases.  The total hours spent by the attorneys in this case is less than the average out of court hours spent by attorneys in federal capital cases.  However, no specific time can be mandated for every capital trial.  The amount of time spent in investigation and preparation is dependent upon what needs to be investigated, the experience of the attorney, and the evidence to be introduced against the Defendant.  Defendants do not identify how more time would equate with a different outcome in this case.

c.  Opening Statement.  Bernard asserts that his counsel were ineffective for failing to make opening statements at either the guilt/innocence or penalty phase.  "[T]he decision whether to make an opening statement and when to make it is ordinarily a matter of trial tactics and strategy which will not constitute the incompetence basis for a claim of ineffective assistance of counsel." *United States*

*v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct.

357, 98 L.Ed.2d 382 (1987); *Murray v. Maggio*, 736 F.2d 279, 283 (5th Cir. 1984) (*per

curiam*).  *See also Gilliard v. Scroggy*, 847 F.2d 1141, 1147 (5th Cir. 1988), *cert.

denied*, 488 U.S. 1019, 109 S.Ct. 818, 102 L.Ed.2d 807 (1989) (the decision not to

make an opening statement "is the essence of a strategic choice.").  His counsel was

not, therefore, ineffective for failing to make opening statements.

        <u>d.  Cross-examination of Brown</u>.  Defendants argue that counsel

was ineffective for failing to obtain all of Brown's prior inconsistent statements and

to effectively cross-examine him.  Generally, decisions regarding cross-examination,

as in whether to engage and to what extent, are strategic in nature and "will not

support an ineffective assistance claim."  *Dunham v. Travis*, 313 F.3d 724, 732 (2d

Cir. 2002).  As noted in regard to Vialva's *Brady* argument, counsel for both

Defendants vigorously cross-examined Brown and established that he had made

numerous inconsistent statements.  Through cross-examination, counsel was able

to elicit:  (1) there was no "leader" of the gang of which the Defendants were

members; (2) membership in a gang did not necessarily mean that a member would

commit crimes or assist another member in committing a crime; (3) Brown had a

motivation to testify as the Government wanted him to in hopes of obtaining a lesser

sentence, including not being subjected to the death penalty; (4) Brown had made

numerous inconsistent statements regarding the events on the night of the murders;

(5) his testimony contradicted the testimony of other witnesses; (6) Brown and

Bernard were not convinced that the others were actually going to carjack someone; (7) Bernard was actually a member of the "Four-One-Five" Bloods gang rather than the "Two-One-Two PIRU" gang; (8) Brown and Bernard were not present when the others carjacked the Bagleys; (9) when everyone met up at the park, Brown doubted that Vialva was actually going to kill the Bagleys; (10) Bernard was in his car while the others were discussing what to do with the Bagleys and their car; (11) Brown did not specifically tell Bernard that they were going out to the country to shoot the Bagleys; (12) Brown did not see who opened the trunk of the car; (13) Brown thought the Bagleys were dead when he put lighter fluid in the car and had no intention of trying to torture them; (14) Brown did not see Bernard set the Bagleys' car on fire. Defense counsel elicited the information from Brown that Defendants claim should have been elicited.

Defendants assert that there was information not elicited from Brown, such as the heavy drugs he was taking at the time of the murders and at the time of trial. As previously noted, Gregory Lynch did testify at trial that Brown was smoking a "blunt" (a cigar with marijuana in it) when Brown and Sparks came to pick up the Glock. However, there obviously was nothing in Brown's manner to put anyone on notice during his testimony at trial that he was not competent to testify. While Brown (and other Government witnesses) have offered post-conviction statements to the effect that he would have spoken with Defendants' attorneys if they had interviewed him before trial, there is nothing to indicate that Brown's attorney (or any other witness's

attorney) would have allowed such a conference.[6]   There is, therefore, no basis for their claims regarding ineffectual cross-examination of Brown.

      e.  Cross-Examination of Lewis.  Defendants argue that counsel was ineffective for failing to obtain all of Lewis's prior inconsistent statements and to effectively cross-examine him.  As noted in regard to Vialva's *Brady* argument, counsel for both Defendants vigorously cross-examined Lewis and established that he had made numerous inconsistent statements.   Through cross-examination, counsel was able to elicit:  (1) Lewis was housed with Brown and Sparks at the Killeen Detention Center and saw them every day, with the implication that they had the opportunity to fabricate consistent stories; (2) Lewis did not know who was the "leader" of the "Two-One-Two PIRU's;" (3) Bernard was not a member of the "Two-One-Two PIRU" gang; (4) Lewis had made numerous inconsistent statements about where he was and what he was doing on the day of the murders; (5) Lewis acknowledged that his testimony at trial included events and incidents that were not included in his earlier statement to Government agents; (6) Lewis acknowledged that he "lied" in his prior statement regarding numerous aspects of his trial testimony,

---

[6]     Bernard asserts that other witnesses, Lynch, Sparks, and Presley, would also have spoken with Bernard's counsel prior to trial and provided information regarding Brown's drug use and "mental illness," that Brown set the Bagleys' car on fire, and that they had no idea Vialva was going to kill the Bagleys.  He presents nothing, however, from the witnesses' counsel that they would have advised or allowed their clients to interview with Bernard's counsel.  As the Government's brief notes, "[s]tatements by co-defendants, after they have already been sentenced and received the benefits of their plea agreements, years after the fact, do not establish that they would have acted against their self-interests prior to trial."  Government's Response to Bernard's § 2255 motion, p. 133.

such as when he said that Vialva had gone into the store to buy the lighter fluid for a barbecue and when he said that Vialva had done "everything" in relation to the murders; (7) Lewis never mentioned Tony Sparks in his statement, not wanting to implicate him since he was not in custody; (8) Lewis hoped to receive a lesser sentence in exchange for his testimony; (9) Lewis did not see who opened the trunk of the Bagleys' car; (10) Lewis did not see Bernard start the fire in the Bagleys' car.

The record is clear that counsel for both Vialva and Bernard rigorously cross-examined Lewis. There is, therefore, no basis for a claim of ineffective assistance of counsel in this regard.

    <u>f. Coherent Defense Theory</u>. Finally, Defendants assert that their counsel failed to present a coherent theory for the defense. Their challenge is to the strategy employed by counsel. "Such a challenge does not establish ineffective assistance." *Coble v. Quarterman*, 496 F.3d 430, 437 (5th Cir. 2007). However, as previously noted, counsel vigorously challenged the Government's case and witnesses. A defendant's "desire to have a specific defense theory presented does not amount to ineffective assistance. . . ." *Ries v. Quarterman*, 522 F.3d 517, 529 (5th Cir.), *cert. denied*, 555 U.S. 990, 129 S.Ct. 485, 172 L.Ed.2d 351 (2008) (quoting *Coble*, 496 F.3d at 437). "In many instances cross-examination will be sufficient to expose defects in an expert's presentation. When defense counsel does not have a solid case, the best strategy can be to say that there is too much doubt about the State's theory for a jury to convict. And while in some instances 'even an isolated

error' can support an ineffective-assistance claim if it is 'sufficiently egregious and prejudicial,' *Murray v. Carrier*, 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy." *Richter*, 131 S.Ct. at 791. "To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Id*., at 790.

It is clear in this case that counsel for both Defendants had little defense other than vigorously challenging the Government's case and attempting to establish that the Government had not proved the Defendants' guilt beyond a reasonable doubt. There is, therefore, no basis for Defendants' claims regarding a lack of a coherent defense theory.

4. Punishment Phase.  As the Government notes, counsel for Vialva and Bernard took separate paths during the punishment phase. "Vialva's lawyers chose to portray Vialva as a broken vessel: the product of an abusive home, and having Attention Deficit Disorder.  Vialva and the government had a battle of experts as to future dangerousness.  Bernard's counsel, instead, portrayed Bernard as basically a good person, a follower who was led astray; but, who still retained some decency, and who could be rehabilitated."  Government's Response to Bernard's § 2255, p. 148.  The strategy counsel chose is not subject to an ineffective assistance claim.

a.  Character Witnesses.  Bernard asserts that it was ineffective of his counsel not to call additional character witnesses.  During the punishment phase, Bernard's counsel presented several witnesses who testified that Bernard was a nice young man, had attended church, was respectful and kind, and was not a leader. Bernard's mother also testified about his background, with her and her husband both active duty military when Bernard was born.  Bernard was sent to church school through the eighth grade, when he transferred to public school in Killeen.  After getting into trouble, he went to live with his father.  She further testified that she had tried to instill Christian principles in Bernard, and that he should be punished for his crimes but not executed.

Bernard's post-conviction counsel asserts that trial counsel should have retained the services of a mitigation expert and presented additional witnesses.  In support of this claim, Bernard's post-conviction counsel retained the services of Jill Miller, a mitigation specialist.  She identifies a number of witnesses who would testify about the following subjects:  Bernard's good nature, his non-violent tendencies, his drug and alcohol use, and his tendency to follow the lead of stronger personalities like his cousin Melsimeon Pollock.  The witnesses also would have testified regarding the divorce of Bernard's parents, their strained relationship which included some incidents of violence, and a violent confrontation between Bernard and his father.

The testimony of the witnesses identified by Miller are merely cumulative of the testimony which was offered at trial. The decision not to present such cumulative testimony does not constitute ineffective assistance of counsel. *Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007) ("Complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.)" (quoting *Boyd v. Estelle*, 661 F.2d 388, 390 (5th Cir. 1981)).

b. Expert Witnesses. Finally, Defendants argue that counsel were ineffective for failing to obtain increased funding for developing social, medical, mental and emotional histories during the punishment phase. In regard to mitigation evidence, "the Supreme court has said the proper inquiry is 'not whether counsel should have presented a mitigation case,' but 'whether the investigation supporting counsel's decision not to introduce mitigating evidence of [the defendant's] background was itself reasonable.'" *Clark v. Thaler*, 673 F.3d 410, 418-19 (5th Cir. 2012) (quoting *Wiggins v. Smith*, 539 U.S. 510, 523, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)).

Bernard's defense team secured the services of Criterion Investigations, who interviewed a number of witnesses whose names were supplied by Bernard's mother. Vialva's defense team secured the services of Ms. Francis, as a mitigation expert. Both also presented expert psychological evidence.

(i) Bernard's experts. At trial, Bernard presented the testimony of Dr. James Shinder. Bernard's post-conviction attorneys retained the services of a mitigation expert, Jill Miller, for purposes of this § 2255 proceeding. In the social history investigation she completed, she ascertained that Bernard was depressed during much of his adolescence; he came from a broken home; he witnessed loud arguments between his parents; he was verbally and physically abused, particularly by his father; when his father left the home, Bernard assumed the role of caregiver to his younger siblings; his cousin led him astray but persuading him to commit burglaries; he was committed to educating himself, as reflected by earning a GED; he continued to work at pursuing a high school diploma so he could attend college; he abused alcohol and drugs beginning at age 16, and later used cocaine and marijuana dipped in embalming fluid; he was under stress due to impregnating two separate women; he suffered a head injury in a car accident for which he was taking pain medication; he was respectful and responsive to the needs of others; he had only a minor history of assaultive behavior; he was not viewed as someone who would hurt others; he regularly attended Bible classes; and he appreciated the wrongfulness of his actions and wished to make amends.

As previously noted, much of the positive information identified by Miller was presented to the jury at trial – that Bernard was a good person who had been led into committing an atypical, violent act. Also noted previously, this information would merely have been cumulative of the information already presented. As such, the

failure to retain a mitigation specialist such as Miller could not constitute ineffective assistance of counsel.  The decision *not* to retain an expert is as much a tactical decision as the decision *to* hire one, particularly when the strategy is to "humanize" the defendant.  As such, it cannot form the basis for a claim of ineffective assistance of counsel.  See Rutherford v. Crosby, 385 F.3d 1300 (11th Cir. 2004).

Bernard additionally asserts that the retention of Dr. James Shinder came too late and was ineffective.  Post-conviction counsel argues that a neuropsychologist should have been retained, who would have diagnosed Bernard's "mild neuorocognitive dysfunction," which results in a difficulty with complicated, detail-oriented tasks.  The presentation of such a witness could have lessened the impact of the positive approach counsel adopted by taking away from the impact of the attempt to "humanize" Bernard for the jury.  Additionally, Bernard's "dysfunction" is apparently so mild that it is possible it would have made no difference in the jury's decision.

(ii) Vialva's Experts.  Vialva's defense team secured the services of Ms. Francis as a mitigation expert who was paid $5,760 and was authorized an additional $3,000.  Vialva also had the assistance of Dr. Cunningham, who testified longer than any witness during the penalty phase.  Vialva complains that the funding he received was inadequate for the completion of an adequate social history.

Vialva claims that an adequate investigation and social history would have discovered the following to be offered at the punishment phase:  (1) Vialva was raised in chaotic circumstances; (2) the chaos was the result of his mother's illness; (3) that his mother suffered mental and emotional disorders which caused her to engage in self-destruction behavior; (4) that his half-sister was impacted by their mother's illness; (5) that the siblings had to fend for themselves at a very young age; (6) that Vialva's mother was involved in a series of abusive relationships that had negative effects on both children; (7) that Vialva's biological father was excluded from his life at a young age; (8) that Vialva had problems in school and at home; (9) that Vialva had symptoms of bi-polar disorder; (10) that the family moved to keep Vialva from gang activity, but they moved into a gang infested area; (11) despite his background, Vialva was able to form friendships and attachments; (12) Vialva was well-liked by his positive peer group; and (13) Vialva treated his girlfriends with respect and concern.  Additional information Vialva asserts counsel was ineffective for not investigating and presenting includes:  (1) Vialva had physical trauma at birth; (2) Vialva had a history of serious illness as an infant; (3) he developed behavioral disturbances; (4) he had a number of injuries, particularly head injuries; (5) he had bi-polar disorder; (6) he had ADHD (Attention Deficit Hyperactivity Disorder); (7) he had depression, inability to concentrate, irritability, and impulsiveness; and (8) his chaotic home life exacerbated his medical problems.

Much of the foregoing was presented to the jury through the testimony of Vialva's friends and family and through the testimony of Dr. Cunningham. Vialva's friend Cedrick Young, testified that Vialva had been his next-door neighbor and that Vialva "made people laugh"; he got along with everybody; he never caused any trouble, and was helpful to his family. Vialva's step-father, Richard Brown, testified that Vialva had helped him build a patio and that Vialva was trying to improve his life and distance himself from the gang activity. Vialva also had a serious girlfriend and had taken a test to join the Navy. Vialva had also finished high school, his attitude was good, and he was a "really good boy." Brown also testified that Vialva had a short memory, he had ADHD, and would forget things quickly.

Vialva's mother, Lisa Brown, gave a detailed description of their chaotic home life and her history of being abused by Vialva's father, her second husband. She also related Vialva's childhood illnesses and injuries, as well as her own physical ailments, and the abuse they both suffered at the hands of her first husband (who she reconnected with after leaving Vialva's father). When they moved back to Texas, she worked a number of jobs which required the children be cared for by baby sitters. She spent very little time with the children. Vialva experienced trouble at school due to his ADHD and he had problems with his racial identity. While in middle school, he began taking medication for his ADHD.

After divorce, Vialva's mother entered a series of relationships which disrupted their family. As Vialva would become accustomed to one step-father, another would

move in.  When Vialva was 14, he stopped taking the ADHD medication because of medical complications.  Vialva's grades dropped, and he got into trouble at school.

Dr. Cunningham's testimony highlighted mitigating factors and risk factors for Vialva.  He discussed Vialva's home life, his mother's physical problems, his family's history of criminal behavior and substance abuse, and the presence of mild physical abnormalities or brain damage.  He also noted that Vialva was not disciplined nor set appropriate limits; Vialva's mother was basically absent from his life due to her jobs and pursuit of romantic relationships; and he was exposed to domestic violence because of her relationships.  Vialva's home life was marked by chaos and violence.  He developed ADHD (which Cunningham calls a mild brain disorder).  His mother precluded doctors from prescribing medication which was less effective for his ADHD and which ultimately caused some cardiac problems for him.

Dr. Cunningham also identified emotionally damaging factors to Vialva, which included:  multigenerational family distress; rejection and abandonment from his father and stepfathers; his emotional development was disrupted by ADHA; he had emotional disturbances or psychological disorders, as well as head injuries; he observed domestic violence; he had identity confusion; and disrupted attachments damaging his ability to bond with others and value other people.

Cunningham also identified several healthy attributes Vialva possessed:  He finished high school despite his problems; he continued to be bonded to his mother,

despite the dysfunctional relationship; he was protective of his younger sister; and he had a long-term dating relationship with his girlfriend.

Dr. Cunningham offered statistical models to counter the Government's testimony regarding future dangerousness.  Vialva asserts that counsel was ineffective for offering this testimony because the doctor was subjected to heavy cross-examination which challenged his statistical model as to future dangerousness.  Regardless of the cross-examination, the decision to call Dr. Cunningham was not ineffective as he presented strong evidence of Vialva's physical problems and chaotic and abusive home life.

Vialva identifies other experts who should have been retained for trial. However, as previously noted, the appointed attorneys did not have unlimited funds. Additional witnesses or experts would be merely cumulative of the information that was already provided.  The Fifth Circuit has "refused to allow the omission of cumulative testimony to amount to ineffective assistance of counsel." *United States v. Harris*, 408 F.3d 186, 191 (5ᵗʰ Cir.), *cert. denied*, 546 U.S. 919, 126 S.Ct. 297, 163 L.Ed.2d 259 (2005).  Vialva has failed to prove that his counsel was ineffective, because the vast majority of the information he wanted the jury to know was presented to them during the punishment phase.  He has failed to establish that his attorneys were ineffective.

Counsel faced the proverbial double-edged sword in this case.  If they introduced even more evidence of mental and/or brain disorders, the jury could very

well have concluded from that alone that Vialva would continue to be a danger to others, whether incarcerated or not.

More to the point, Vialva has failed to prove that he was prejudiced. As stated many times previously, the evidence against the Defendants was overwhelming. It also established that Vialva was the ringleader of the operation. He decided that the Bagleys had to be killed because they had seen his face. He also was the one who decided to burn the vehicle. He was the one who mercilessly shot the Bagleys in their heads after they begged for their lives. The murders were committed in a terrible manner, as a continuation of the carjacking and robbery of the Bagleys. The murders were committed after substantial planning (although it may not have been very effective or intelligent planning) and in order to cover-up the crimes from law enforcement.

At the punishment phase, there was additional evidence that Vialva was a affiliated with a violent street gang. He committed dozens of burglaries with Bernard and Brown, which were accomplished by kicking in the residences' doors. Vialva was also in a car with other gang members when one of them murdered a man in a "road rage" incident. He had a history of violence, from which the jury was entitled to find that he would constitute a continuing danger.

Overall, Defendants have failed to establish either ineffective assistance of counsel or any resulting prejudice.

c.  Victim Impact.  Bernard asserts that counsel was ineffective for failing to object to the victim testimony that was ruled inadmissible by the Fifth Circuit in his direct appeal.  This includes testimony from the Bagleys' families, "with the result that the entire trial ultimately amounted to an invidious comparison between the Bagleys and the defendants."  Bernard's Redacted § 2255 Motion, p. 108.  Only a few remarks were identified by the Fifth Circuit as "troubling," including the statement of Stacie Bagley's mother, Donna McClure, wherein she personally addressed the Defendants, "warned them that heaven and hell are real, and called on them to put their faith in Jesus Christ for the forgiveness of their sins."  *United States v. Bernard*, 299 F.3d at 479.  Further troubling to the Fifth Circuit was another statement by McClure, wherein she said to the Defendants:  "I'm sorry for you, for your heart to be so hard, you couldn't even see the innocence of the two you've killed."  *Id*., at 480.  Stacie Bagley's father further testified:  "I truly believe that on June 21ˢᵗ, 1999, our children were tragically and recklessly stolen from us.  There was no profit to be gained, no angry exchange, it was just a useless act of violence and a total disregard of life.  Stacie and Todd saw a chance to witness to two young people placing themselves in harm's way."  *Id*.

The Fifth Circuit noted that such statements "characterize the [Defendants], and offer opinions about the nature of their crime.  We are bound by *Booth* to find such evidence inadmissible."  *Id*.  While *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) overruled prior cases which prohibited victim

impact statements in a capital trial, it "did not alter *Booth*'s holding that admitting evidence of the victims' opinions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment; rather *Payne* only allows evidence of the victim's personal characteristics and the harm inflicted upon the victim's family and community." *Humphries v. Ozmint*, 397 F.3d 206, 217 (4th Cir. 2005) (*en banc*). "The Payne Court did not hold that *all* comparative worth arguments are unconstitutional.  At most, the Payne Court disapproved of comparisons between the victim and other victims of society." Id., at. 224.

The Fifth Circuit further determined, however, that those brief statements "did not alone unduly prejudice the jury." *Id*., 480-81. "[A]ny prejudice that did result from the statements was mitigated by the district court's instructions to the jurors not to be swayed by passion, prejudice or sympathy." *Id*.  Accordingly, there was no prejudice to the Defendants, and, therefore, no ineffective assistance of counsel in failing to object to the victim impact statements.

To the extent Bernard is complaining about the testimony regarding the professions of faith by the Bagleys while trapped in the trunk of their own car, there is no basis for such a claim. "More importantly, the Payne Court did not disapprove of comparisons between the defendant and the victim." *Humphries*, p. 224.  Still prohibited, however, is a comparison or a decision based upon the race or religion of the defendant.  As there was a limiting instruction given at trial and the jurors signed attestation that race and religion had no part in their decision, there was no

prejudice to the Defendants based upon the failure to object to that testimony.  There is also no indication that an objection as to that testimony would have been granted as it constituted "contextual facts," which "are not inadmissible simply because they concern religion."  *United States v. Bernard*, 299 F3d. at 479.

    d.  Gang Testimony.  Defendants additionally argue that it was ineffective for counsel not to object to the testimony regarding gangs.  This evidence likewise constitutes "contextual facts" as it identified the Defendants for the jury and the individuals with whom the they chose to associate.  As such, there was no prejudice for counsel's failure to object.

  K. Cumulative Error.  Defendants argue that the cumulative effect of all of the errors committed by counsel during the trial rendered the result unreliable.  However, as the foregoing establishes, Defendants have failed to demonstrate deficient performance by their counsel, either trial or appellate, or "any cumulative errors approaching constitutional dimension."  *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir.), *cert. denied*, 522 U.S. 880, 118 S.Ct. 204, 139 L.Ed.2d 141 (1997).  *See also Coble v. Quarterman*, 496 F.3d at 440.  In light of the foregoing, it is

  **ORDERED** that the Motions to Vacate, Set Aside, or Correct Sentence filed by Christopher Andrew Vialva and Brandon Bernard are **DENIED** and these actions is **DISMISSED**.  It is further

  **ORDERED** that any motions to amend are **GRANTED** as the Court has considered the amended motions and briefs.  It is further

**ORDERED** that any motions for discovery are **DENIED** as they do not request information which would be relevant to the decision in this case.  It is further

**ORDERED** that any additional motions not previously ruled upon by the Court are **DENIED**.

Additionally, having considered the findings and conclusions set forth above and the requirements of 28 U.S.C. § 2253, the Court finds, *sua sponte*, that a certificate of appealability should not issue, as Movant has failed to make a substantial showing of the denial of a constitutional right.

**SIGNED** on this 28th day of September, 2012.

_____

WALTER S. SMITH, JR.
UNITED STATES DISTRICT JUDGE

63