IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | CRIMINAL NO. W-99-CR-70(2) |
| v. | § | CIVIL NO. 04-CV-164 |
| | § | |
| BRANDON BERNARD | § | THIS IS A CAPITAL CASE |

**MOTION FOR RELIEF FROM JUDGMENT (FRCP 60(b)(6))**

## I.  MOTION

Brandon Bernard moves to vacate the judgment that improperly denied him collateral review of his criminal sentence, on the ground that procedural defects marred the integrity of the proceedings at both the district and appellate stages. *See* FRCP 60(b)(6); *Gonzalez v. Crosby*, 545 U.S. 524, 533 (2005).

## II.  SUMMARY OF ARGUMENT

In 2000, Brandon Bernard was convicted of three capital offenses but sentenced to death for only one. In 2004, after the Court of Appeals acknowledged constitutional error at his sentencing but dismissed it as harmless, he moved under 28 U.S.C. § 2255 to vacate the judgment. His § 2255 petition languished for more than seven years without any action being taken by the federal judge assigned to his case, the same judge who had presided at his trial. The record does not explicitly disclose why this judge ignored Mr. Bernard's petition for the better part of a decade. That judge, however, has since resigned in disgrace. Before he resigned, he was suspended from assignment to new cases, as he

1

was deemed unfit to perform judicial tasks. He was equally unfit when he presided over

Mr. Bernard's habeas case,[1] as demonstrated by the fact that when he finally took action

after his seven-year delay, he drastically misapplied § 2255's procedural protections to

deny Mr. Bernard any meaningful collateral review.

These defects to the integrity of the post-conviction process were compounded at

the appellate level, where the panel fundamentally misapplied the standard that should

have governed review of the district court's order. The irregularity of the decision

denying leave to appeal can be directly inferred from this fact: shortly after the Fifth

Circuit denied Mr. Bernard a Certificate of Appealability, the Supreme Court chastised

that court – for the third time in fourteen years – for failing to honor the procedural

safeguards that Congress put in place to ensure meaningful post-conviction review for all

prisoners, particularly those under a death sentence.[2]

These habeas proceedings lacked the reliability one would expect to attach to even

the most inconsequential federal litigation. The defects in the integrity of the post-

---

[1] Former Judge Smith was unfit when he presided over Mr. Bernard's trial, as well. As detailed below, and upon information and belief, he had a reputation for drinking and, shortly before Mr. Bernard's trial began, was reported to be "not functional" due to his drinking. Former Judge Smith's behavior since that time – *e.g.*, his handling of Mr. Bernard's § 2255 motion (as shown in Part III) and his cavalier and unethical response to the formal investigation into his ethical and legal lapses (as found by the Judicial Council of the Fifth Circuit) – demonstrates no functional improvement. Former Judge Smith's lack of functionality in a proceeding where Mr. Bernard's life hung in the balance is an additional "extraordinary circumstance" that gives this Court jurisdiction to hear this motion under FRCP 60(b).

[2] *Miller-El v. Cockrell*, 537 U.S. 322, 341-48 (2003); *Tennard v. Dretke*, 542 U.S. 274, 283-89 (2004); *Buck v. Davis*, 137 S. Ct. 759 (2017).

conviction proceedings in this case are hardly inconsequential, because Mr. Bernard – if afforded fair procedures – could easily have shown that the single death sentence that was imposed upon him at trial should not stand. This Court should grant Mr. Bernard relief from the order denying his motion under 2255; both that order and the Fifth Circuit's subsequent denial of a COA resulted from a lack of fair process that constituted a fatal defect in the integrity of the proceedings. If the Court is not immediately convinced that this motion should be granted, it should order a hearing as part of considering whether to grant Rule 60(b) relief, so that evidence may be presented concerning former Judge Smith's unfitness, and how it affected all his decisions respecting Mr. Bernard.

**III.    SUPREME COURT PRECEDENT INTERPRETING RULE 60(B) VESTS THIS COURT WITH "WIDE DISCRETION" TO VACATE THE JUDGMENT DENYING POST-CONVICTION RELIEF, SO THAT MR. BERNARD MAY BE PROVIDED THE FAIR PROCEDURES THAT WERE PREVIOUSLY DENIED HIM, WITHOUT WHICH THE COURT CAN HAVE NO CONFIDENCE IN THE OUTCOME OF HIS TRIAL.**

At the post-conviction stage of this case, courts at both levels failed to adhere to the procedural safeguards designed to prevent wrongful convictions and sentences, preventing the habeas statute from playing the "vital role" it has historically served in protecting individual constitutional rights. *See Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To cure that error, the Court should relieve Mr. Bernard from the judgment that wrongly deprived him of meaningful collateral review. Thankfully, "Rule 60(b) vests wide discretion" in this court to do just that. *Buck v. Davis*, 137 S. Ct. 759, 777 (2017). And the Court can consider a wide range of factors when deciding how to exercise its

discretion, including "the risk of injustice to the parties" and "the risk of undermining the public's confidence in the judicial process." *Buck*, 137 S. Ct. at 778 (quoting *Liljeberg v. Health Services Acquisition Corp*, 486 U.S. 847, 863 (1988)). Here, both these factors strongly support exercising the Court's discretion to grant relief.

This motion arises from two sets of extraordinary circumstances. One took place at the district court level and the other at the Court of Appeals –each deprived Mr. Bernard of the meaningful review that the habeas system as crafted by Congress requires.

Rule 60(b) identifies several bases upon which relief may be granted; the last authorizes this Court to lift the effect of "a final judgment, order, or proceeding" for "any other reason that justifies relief." FRCP 60(b)(6). This basis is sometimes called the "catchall" provision; its "whole purpose is to make an exception to finality" in circumstances where fairness demands it. *See Gonzalez*, 545 U.S. at 529.

The Supreme Court has recognized that a Rule 60(b) motion may properly be brought to cure a "defect in the integrity of [previously litigated] federal habeas proceedings," when those defects were produced by actors or factors outside the control of the petitioner or his counsel. *Gonzalez*, 545 U.S. at 532 and n. 5. Cognizable defects include the misapplication of procedural rules in ways that frustrate meaningful habeas review. *Id.* at 526. Bernard meets the standard for Rule 60(b)(6) relief because multiple procedural irregularities outside his control or his counsel's contaminated his habeas proceedings and rendered the review process fundamentally unfair and unreliable.

Both Mr. Bernard's capital trial and his challenge to his conviction under 28 U.S.C. § 2255 were adjudicated by then-District Judge Walter Smith. As this Court is no

4

doubt aware, Smith was accused in 2014 of judicial unfitness, based on allegations that in 1998 he had sexually assaulted a member of the courthouse staff. After a lengthy investigation, he was ultimately reprimanded for physical sexual assault and other violations of the norms of judicial conduct; deemed unfit to preside over new cases, he was prohibited from assignment to new cases for a year. *See Order of Reprimand and Memorandum of Reasons*, Judicial Council of the Fifth Circuit (December 4, 2015) (attached as Exhibit A); *In re Waco Division, Order Concerning Waco Division Criminal and Civil Cases Filed December 3, 2015 and Thereafter and Order of Referral* (December 11, 2015) (attached as Exhibit B). As a consequence of the public outcry over these allegations, Smith eventually resigned. *See* John Council, "Disgraced Ex-Waco Judge Has Been Punished Enough, US Judicial Committee Rules," Texas Lawyer (Jan. 27, 2017) (noting that by submitting his resignation "before [the] Fifth Circuit was set to complete its investigation," Smith "essentially beat them to the punch," allowing him "to go quietly in the night without any further ado — and keep his $200,000 a year lifetime salary" (attached as Exhibit C).

The investigation into Smith's sexual misconduct revealed that in his role overseeing federal judicial proceedings, he routinely failed to adhere to even the most obvious of standards designed to assure the integrity of those proceedings. For example, Smith allowed the lawyer who was representing him in the judicial misconduct investigation to continue to appear before him on other matters. Not only did Smith fail to recuse himself from those cases, he did not even properly disclose to counsel for the other party that their opposing counsel was simultaneously serving as the Judge's own personal

attorney. *See Order of Reprimand* at 2-3, Exhibit A. It seems incredible that it would be necessary to order a federal judge to stop engaging in such patently improper behaviors, but this is exactly what the Judicial Council of the Fifth Circuit was forced to do; it found that Smith completely failed to "understand the gravity of such inappropriate behavior and the serious effects that it has on the operation of courts," see *id*. at 2-3. Smith also "contributed greatly to the duration and cost of the investigation" into his own misconduct by failing to timely tender his admissions and – strikingly – by knowingly allowing others to make "false factual assertions . . . in response to the complaint." *Id*. at 2.

The allegations that led to Smith's reprimand, and likely to his resignation, included not only the charge that he had sexually assaulted a courthouse employee, but also a report that on the day of that assault, Smith appeared to have been drinking alcohol during the court day. *Oral Deposition of [victim's name redacted], Commission for Lawyer Discipline v. Clevenger* at 5-6 (D. Ct, 380th Judicial District, Collin County Texas, March 7, 2014) (pages cited from the deposition are attached as Exhibit D).[3] The victim of Smith's sexual assault also testified that Smith had a reputation for drinking and for having a temper. Exh D. at 10. She stated under oath that Smith's law clerk had telephoned her during this time frame, complaining that Smith was "not functioning,"

---

[3] In an effort to best protect the victim's privacy, counsel has redacted the victim's name in its entirety and attached only the deposition pages that are cited here, using the page numbers of the full deposition.

was "falling apart," and was unable even to get himself to the courthouse, adding that his condition had forced him to cancel court obligations. Exh D at 19.

Given the Judicial Council's findings and the other allegations of serious impropriety, Walter Smith's hurried departure from the bench is no surprise. But this story cannot end with Smith's eviction from the courthouse. This Court has a vital role to play in repairing the damage for which Smith was responsible, and Rule 60(b) gives the Court the tools necessary to do so.

Smith's indifference and hostility to mechanisms designed to ensure procedural fairness are on vivid display in his own case. Those attitudes are likewise reflected in Smith's dismissive treatment of Bernard's case. For example, in one of his very first actions in the case, Smith gave Congress the back of his hand by refusing to follow a procedural statute specifically designed to ensure that a federal defendant on trial for his life would have the guiding hand of specially qualified counsel – a lawyer "learned in the law applicable to capital cases." 18 U.S.C. § 3005. Where, as here, a capital prosecution is brought in a district that has a Federal Public Defender organization (FPD), § 3005 requires the presiding judge to consult with the FPD in assigning counsel. *Id.* Without explanation, cause, or concern, Smith spurned the opportunity to consult with the FPD in order to identify appropriately qualified counsel for Mr. Bernard, and instead appointed a local attorney of his acquaintance.[4]

---

[4] Smith has likewise violated § 3005 in two other capital cases, and both of those defendants also ended up on federal death row. *See United States v. Christopher Vialva*, Cr. No. W-99-CR-70(10), Civ. No. 04-CV-163, *Motion for Relief from Judgment*, dkt.

This defect profoundly impacted the integrity of the proceedings, as a long list of substantial and prejudicial violations of Mr. Bernard's rights trace directly to Smith's refusal to honor the appointment statute. The lawyer appointed by Smith to serve as Mr. Bernard's primary advocate, and the lawyer Smith later appointed as second-chair counsel (the son of first-chair counsel), committed a string of errors that made a shambles of Mr. Bernard's defense; they barely prepared for trial and they waived opening statements at both phases. Perhaps the most troubling error related to the case in mitigation of punishment. This was unquestionably the most important part of this trial, because any reasonable lawyer would have had doubts about the chances for an acquittal. Yet Mr. Bernard's trial counsel largely delegated responsibility for the mitigation case to Mr. Bernard's mother, a practice squarely condemned by the Supreme Court in *Sears v. Upton*, 561 U.S. 945 (2010). While Smith himself was responsible for other errors,[5] the

---

no. 553 at 13, *see also id.*, dkt. no. 553-1 (supporting exhibit); *United States v. Fields*, 483 F.3d 313, 347-48 (5th Cir. 2007).

[5] Over objection, then-Judge Smith improperly instructed the jury at the penalty phase with an aggravating factor that was unsupported by the evidence, allowing jurors to consider against Mr. Bernard whether the crime had been committed for "pecuniary gain." *See United States v. Bernard*, 299 F.3d 467, 483-84 (5th Cir. 2002) (finding error); *see also* 18 U.S.C. § 3592(c)(8) (making it an aggravating factor that the offense was "committed … as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value"). Having been improperly instructed, the jurors wrongly found that this unsupported aggravating factor applied against Mr. Bernard. They then did what Judge Smith directed them to do – they weighed this unlawful aggravating factor when deciding Bernard's fate. Judge Smith also committed plain error when he allowed the mother of Stacie Bagley, in her victim impact testimony, to characterize the defendants as hard-hearted and lacking any regard for human life, testimony which the Court of Appeals concluded could "serve no other purpose than to inflame the jury and divert it from deciding the case on relevant evidence concerning the crime and the

Government committed its fair share as well, including *Napue* and *Brady* violations, as alleged in detail in Mr. Bernard's § 2255 petition.[6]

Mr. Bernard's comprehensive § 2255 motion was accompanied by extensive evidence substantiating his allegations concerning matters outside the trial record.[7] The Government opposed the motion without offering any evidence whatsoever to dispute the showing Mr. Bernard had made in his § 2255 motion.[8] The matter sat on Smith's desk, fully briefed, for *seven and one-half years*, with no explanation from Smith for his delay in taking action. The record cried out for an evidentiary hearing: the Government's response left unrebutted all of Mr. Bernard's factual allegations, including those supporting his claim of ineffective assistance of trial counsel. These allegations were fleshed out by affidavits from mitigation witnesses who acknowledged that trial counsel had never prepared them to testify; an 82-page sworn declaration from the nation's foremost federal capital defense attorney, specifically identifying each of the many ways in which trial counsel had fallen below the minimum standard of practice for defending

---

defendant." *Bernard*, 299 F.3d at 480. Although the Court of Appeals found these errors insufficiently harmful to warrant reversal, such departures from the standard of heightened reliability that is constitutionally mandated for procedures in a death penalty case are troubling, and Judge Smith was responsible for both of them.

[6] *Sec. 2255 Motion of Brandon Bernard*, dkt. no. 377, Exhibit 12 (June 14, 2004); *Amended § 2255 Motion of Brandon Bernard*, dkt. no. 416, Exhibits 12, 33-34 (December 8, 2004).

[7] *Sec. 2255 Motion of Brandon Bernard*, dkt. no. 377 (June 14, 2004); *Amended § 2255 Motion of Brandon Bernard*, dkt. no. 416 (December 8, 2004).

[8] *Government Response*, dkt. no. 418 (December 8, 2004).

federal capital cases in 1999-2000; and the reports of medical and scientific experts, who cast grave doubt on the factual underpinnings of the sole death sentence imposed on Mr. Bernard.[9] But ignoring the procedural necessity to resolve these factual matters through a full and fair evidentiary hearing, *see* 28 U.S.C. § 2255(b), Smith summarily denied Mr. Bernard's 2255 motion. He also refused the "certificate of appealability" necessary to authorize an appeal, *see* 28 U.S.C. 2253(c)(1)(B), leaving Mr. Bernard to seek a COA from the Court of Appeals.

That procedural defect was followed by another set of extraordinary circumstances, this time at the appellate level. The extraordinary quality of these events can only be appreciated by viewing them in the context of recent history. The Fifth Circuit was first rebuked by the Supreme Court for seriously misapplying the COA requirement in 2003. See *Miller-El v. Cockrell,* 537 U.S. 322, 341-48 (2003). There, the Supreme Court concluded that, while the Fifth Circuit had purported to apply the plain language of § 2253(c)(2) (a COA should issue if the prisoner can make a "substantial showing" that his constitutional rights were violated), it was in fact imposing a higher standard – in effect, refusing any opportunity to appeal unless the prisoner could demonstrate at the threshold that he would prevail if the merits were reached. *See Miller-El*, 537 U.S. at 341.

---

[9] *See, e.g., Amended § 2255 Motion of Brandon Bernard*, dkt. no. 416, Exhibits 12, 13, 17, 28-29, 32-33; *Memorandum of Law in Support of Motion to Alter or Amend Judgment*, dkt. no. 453, at 5-6, Exhibits B and C.

The following year, in *Tennard v. Dretke*, 542 U.S. 274 (2004), the Supreme

Court again took the Fifth Circuit to task for unreasonably denying COA on a substantial

constitutional claim. Tennard had raised an as-applied challenge to the pre-1991Texas

capital sentencing statute, a claim essentially indistinguishable from the one sustained in

*Penry v. Lynaugh*, 492 U.S. 302 (1989), *abrogated on other grounds*, *Atkins v. Virginia*,

536 U.S. 304 (2002). Nevertheless, the Fifth Circuit – invoking its own idiosyncratic

reading of *Penry* – refused even to grant COA on Tennard's claim. The Supreme Court

was sharply critical of the lower court's treatment of Tennard's claim, holding that the

Fifth Circuit had merely "pa[id] lipservice to the principles guiding issuance of a

COA[.]" *Tennard*, 542 U.S. at 283.

Despite this clear guidance from the Supreme Court, the Fifth Circuit continued to

systematically misapply the COA standard after both *Miller-El* and *Tennard*, as

demonstrated by the subsequent decision in *Buck*, 137 S. Ct. 759. In *Buck*, the Supreme

Court was once again called upon to review the Fifth Circuit's treatment of a habeas

petitioner's motion for COA, and once more the Court found it necessary to rectify the

Circuit's failure to enforce the protections in place to ensure meaningful review of

substantial constitutional claims.[10]

---

[10] In the years prior to *Buck*, the Fifth Circuit had never granted a COA on *any* issue in
*any* of the nine capital § 2255 appeals from death-sentenced federal prisoners that it had
reviewed under the Anti-Terrorism and Effective Death Penalty Act of 1996, even on the
issue of whether the low threshold for an evidentiary hearing had been met. *See Brandon
Bernard v. United States*, S. Ct. no. 14-8071, "Brief *Amicus Curiae* of the Federal Capital
Habeas Project in Support of Petitioner" at 14-16 (attached as Exhibit E).

In *Buck*, the Court rebuked the Fifth Circuit for effectively "invert[ing] the statutory order of operations" required by 28 U.S.C. § 2253 when it treated a habeas applicant who had not shown that he should prevail on the merits as *ipso facto* not entitled to a COA. *Buck*, 137 S. Ct. at 774. The Fifth Circuit's approach, the Court held, placed "too heavy a burden on the prisoner *at the COA stage*." *Id.*, citing *Miller-El*, 537 U.S. at 336-337 (emphasis in *Buck*). As the Court explained,

> The dissent … argu[es] that a reviewing court that deems a claim nondebatable "must necessarily conclude that the claim is meritless." *Post*, at 781 (opinion of THOMAS, J.). Of course *when a court of appeals properly applies the COA standard* and determines that a prisoner's claim is not even debatable, that necessarily means the prisoner has failed to show that his claim is meritorious. But the converse is not true. That a prisoner has failed to make the ultimate showing that his claim is meritorious does not logically mean he failed to make a preliminary showing that his claim was debatable.

*Buck*, 137 S. Ct. at 774 (emphasis added). Having found that the Fifth Circuit had demanded too great a showing of error from Buck in denying him a COA, the Court went on to address the merits and grant relief. *Id.* at 780. In refusing to grant a COA to Mr. Bernard, the Fifth Circuit followed exactly the same path that it did in *Buck*.

These two sets of extraordinary circumstances, in both the district court and Fifth Circuit, call for Rule 60(b) relief. First, the problems that led to Judge Smith's abrupt resignation, his casual disregard for vital procedural protections during his tenure on the bench, and the fact that he simply ignored Mr. Bernard's compelling § 2255 petition for more than seven years without explanation all support the conclusion that Smith was unable to, and did not, fairly consider Mr. Bernard's motion. To remedy Smith's failure to provide fair process and give meaningful consideration to Mr. Bernard's constitutional

challenges to his death sentence, this Court should vacate the judgment denying that motion and order new proceedings thereon. At a minimum, the Court should hold a hearing on Smith's condition and behavior, to determine whether either provides a basis for consideration of this Motion under Rule 60(b).

An identical conclusion flows from the fact that Mr. Bernard was denied a fair opportunity to seek appellate review of Smith's unreasonable decisions. Mr. Bernard lost that chance because the Fifth Circuit applied to his case its then-prevailing interpretation of the COA requirement, which has since been squarely repudiated. At the time of Mr. Bernard's § 2255 appeal, as at the time of Mr. Buck's, the Fifth Circuit "pa[id] lipservice" to the proper standard, *see Tennard*, 542 U.S. at 283, but in fact made a COA unavailable unless a petitioner showed conclusively that he was entitled to relief. The Supreme Court in *Buck* rejected that interpretation as imposing "too heavy a burden[.]" 137 S. Ct. at 774. The duty now rests on this Court to ensure that the Fifth Circuit's application of that improper standard to Mr. Bernard's claims, which foreclosed meaningful appellate review, does not become the instrument of Mr. Bernard's execution.

## IV.    THE URGENT RISK OF INJUSTICE TO MR. BERNARD DEMANDS THAT THE JUDGMENT BE VACATED AND HIS CASE REOPENED.

Mr. Bernard understands that his underlying claims for relief from his death sentence, however strong, cannot themselves constitute "extraordinary circumstances" that would make relief available under FRCP 60(b).[11] As set out *supra*, the

---

[11] At the same time, however, the fact that the present 60(b) motion anticipates eventual reconsideration of the prior merits decision does not transform this 60(b) motion into a successive habeas application. The Supreme Court affirmed in *Gonzalez* that a Rule 60(b)

"extraordinary circumstances" that warrant Rule 60(b) relief in this case are the defects that sapped the post-conviction proceedings of their integrity.

Assuming the Court agrees that "extraordinary circumstances" have been shown, however, it will still have to decide whether to exercise its discretion to reopen the judgment. In exercising that discretion, "the risk of injustice to the parties" is a key consideration. *Buck*, 137 S. Ct. at 778 (citation omitted). To put it bluntly, the risk of injustice could not be any greater. As the following discussion illuminates, Mr. Bernard now faces execution as the direct consequence of an unjustly imposed judgment that would have been set aside if he had been afforded meaningful collateral review.

### A.  Statement of Proceedings

On June 14, 2004, Mr. Bernard filed a motion challenging his conviction and death sentence under 28 U.S.C. § 2255. Mr. Bernard's initial motion enumerated nine grounds for relief, including a claim of cumulative error; it was accompanied by substantial evidence, including detailed affidavits from both lay witnesses and experts.[12]

---

motion in a habeas proceeding is permissible where it "challenges a defect in the integrity of the federal habeas proceeding, provided that such a challenge does not itself lead inextricably to a merits-based attack on the disposition of a prior habeas petition," 545 U.S. at 532. The Tenth Circuit has recognized that this statement "should not be read too expansively. [It] certainly should not be read to say that a motion is an improper Rule 60(b) motion if success on the motion would ultimately lead to a claim for relief under § 2255. What else could be the purpose of a 60(b) motion? The movant is always seeking in the end to obtain § 2255 relief. The movant in a true Rule 60(b) motion is simply asserting that he did not get a fair shot in the original § 2255 proceeding because its integrity was marred by a flaw that must be repaired in further proceedings." *In re Pickard*, 681 F.3d 1201, 1206 (10th Cir. 2012).

[12] *Sec. 2255 Motion of Brandon Bernard*, dkt. no. 377 (June 14, 2004).

He filed an amended motion on December 8, 2004.[13] The Government's response did not include a single declaration or other document challenging or contradicting the declarations that Bernard had submitted in support of his claims.[14]

The last pleading pertaining to Mr. Bernard's § 2255 motion, his Reply to the Government's Response to his motion, was filed on February 7, 2005.[15] The docket reflects no further activity (other than one CJA payment) for the ensuing seven and one-half years. In September 2012, then-Judge Smith summarily denied all requested relief, including all then-pending motions for factual development, such as discovery and a hearing, and preemptively denied a COA.[16] The Order could cite no proof rebutting Mr. Bernard's evidentiary submissions, as the Government had submitted no evidence. To a great degree, the Order relied on speculation about the purportedly strategic bases for trial counsel's decisions and omissions, including their failure to investigate, despite the fact that the record was devoid of any evidence about trial counsel's actual motivations.[17] And in his subsequent Order reflexively denying Mr. Bernard's detailed motion for

---

[13] *Amended § 2255 Motion of Brandon Bernard*, dkt. no. 416 (December 8, 2004).

[14] *Government Response*, dkt. no. 418 (December 8, 2004).

[15] *Reply of Petitioner Bernard*, dkt. no. 424 (February 4, 2005).

[16] *Order Denying Petition* at 62-63, dkt. no. 449 (September 28, 2012).

[17] *Id.* at 28 n. 5, 40-54.

reconsideration,[18] Smith simply shut his eyes to the existence of additional expert

evidence demonstrating the errors in his original Order.

For example, in denying the motion itself, Smith – without having allowed any

factual development via a hearing – excused trial counsel's unexplained failure to secure

funds for experts who could have challenged the Government's forensic evidence.[19]

Smith contended that "with limited funds available for experts nothing would have been

accomplished except a decrease in funds if trial counsel had attempted to retain experts to

contest the experts presented by the Government."[20] Smith's phrasing is somewhat

opaque but suggests the view that it would have been pointless for trial counsel to seek

their own experts, because no favorable evidence could have been developed through

them.

Seeking reconsideration, Mr. Bernard submitted affidavits from two prominent

forensic experts challenging the very underpinnings of the single death sentence he had

received.[21] In response, and without even acknowledging the existence of these

affidavits, Smith dismissed Mr. Bernard's motion under FRCP 59(e) as "present[ing]

nothing beyond what was presented in [his] original § 2255 motion" in support of his

---

[18] *Order Denying Reconsideration*, dkt. no. 473 (February 8, 2013); *Memorandum of Law in Support of Motion to Alter or Amend Judgment*, dkt. no. 453 (October 25, 2012).

[19] *Order Denying Petition* at 41, dkt. no. 449.

[20] *Id.*

[21] *Memorandum of Law in Support of Motion to Alter or Amend Judgment* at 5, Exhibits B & C, dkt. no. 453 (October 25, 2012)

claims of ineffective assistance of counsel.[22] That characterization was simply false. These affidavits showed specifically that independent experts would have disputed the Government's forensic evidence on key points. Mr. Bernard's evidence thus firmly rebutted the view, expressed in Smith's original order, that trial counsel would have accomplished nothing helpful by seeking their own experts. At a minimum, given the evidentiary picture at that juncture, any reasonable jurist would have found Bernard's IAC claims worthy of further factual development.

Mr. Bernard applied to the Fifth Circuit for a COA. He briefed the issue properly presented by that motion, namely, whether "reasonable jurists could debate . . . whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack*, 529 U.S. at 483-84 (internal quotation marks omitted). Nevertheless, the court of appeals, as it did in *Buck*, placed "too heavy a burden on [Mr. Bernard] at the COA stage." *Buck*, 137 S. Ct. at 774. This conclusion is demonstrated by the fact that Bernard's § 2255 motion (as summarized above and below) plainly contained issues which a reasonable jurist could believe warranted further development.

### B.  A Very Brief Introduction to the Facts of the Case.

The crime that led to Mr. Bernard's death sentence involved the deaths of Todd and Stacie Bagley, a young married couple, after they were kidnapped by three teenagers, Christopher Vialva, Christopher Lewis, and Tony Sparks. The kidnapping plan had been

---

[22] *Order Denying Reconsideration* at 3, dkt. no. 473.

hatched earlier among a group of five teenagers that included Mr. Bernard. After soliciting a ride from the Bagleys, Mr. Vialva, Mr. Lewis, and Mr. Sparks forced them into the trunk of their own car and then drove around for several hours. Eventually, they drove the Bagleys' car to a remote location, where Vialva shot both of the Bagleys in the head at close range. Their car was then set on fire. Mr. Bernard – only 18 years old at the time and with no serious criminal history – was not present during the kidnapping, was never in the Bagleys' car as they were held captive for hours, and did not fire any of the fatal shots.

At trial, Mr. Bernard and Mr. Vialva each faced possible death sentences on three separate counts. The jury sentenced Vialva to death on all three counts, but spared Mr. Bernard's life on two. The sole count for which Mr. Bernard received a death sentence was for Stacie Bagley's murder. This death sentence likely resulted because the jury was led to believe at least three things that, as later sections of this motion will establish, could have been strongly rebutted, had Mr. Bernard's trial counsel performed effectively: (1) that only Mr. Bernard could have started the fire, (2) that the fire contributed to Ms. Bagley's death, and (3) that Mr. Bernard – who had, unknown to the jury, been a model inmate while awaiting trial – was a committed gang member who would inevitably commit more crimes of violence even if incarcerated for the rest of his life.

Mr. Bernard's § 2255 motion presented nine claims, including claims of ineffective assistance of trial counsel under *Strickland*[23] and of prosecutorial misconduct

---

[23] *Strickland v. Washington*, 466 U.S. 668 (1984).

under *Napue* and *Brady*.[24] His COA motion to the Fifth Circuit raised six issues. Here, he

will describe four specific aspects of his *Strickland* and *Napue* claims:

> Bernard was denied his Sixth Amendment right to effective
> assistance of counsel at both stages of the trial due to counsel's
> failure to obtain arson and pathology experts;

> Bernard was denied effective assistance of counsel during the
> penalty phase of his capital trial by counsel's failure to investigate
> and present the available mitigation evidence;

> Bernard was denied effective assistance of counsel during the
> penalty phase, as it related to evidence of "future dangerousness."

> The Government knowingly presented false testimony by a critically
> important cooperating witness regarding his own criminal history,
> affecting both the guilt and penalty phases.

**C.  At a Bare Minimum, the Proof Mr. Bernard Offered in the Post-
Conviction Proceedings Should Have Entitled Him to an Evidentiary
Hearing, Which then-Judge Smith Improperly Denied; and at the
Very, Very Least, the Question of Whether a Hearing was Required
Under § 2255 Warranted a COA.**

### 1.  Mr. Bernard's arson/pathology IAC claim

The Government's theory was that Mr. Bernard set fire to the car and that,

although Ms. Bagley had already been shot in the head at close range, the fire contributed

to her death and caused her to suffer. Mr. Bernard's § 2255 motion presented evidence –

not simply allegations, but sworn statements by experts – that (1) reasonable defense

counsel would have sought expert assistance in addressing where the fire started and

whether it had contributed to Stacie Bagley's death; (2) a qualified arson expert would

have strongly disputed the Government's claim that the location of the fire's origin could

---

[24] *Napue v. Illinois*, 360 U.S. 264 (1959); *Brady v. Maryland*, 373 U.S. 83 (1963).

be reliably determined (which was essential to the claim that Mr. Bernard had started the fire); and (3) a qualified pathologist interpreted the forensic evidence as showing that it was more likely Ms. Bagley was in fact medically dead as soon as Vialva shot her in the head, and that the soot in her airways resulted from postmortem autonomic biological processes rather than from live breathing.[25]

That is sufficient proof, if true, to establish both prongs of an IAC claim under *Strickland*: counsel's deficient performance and the resulting prejudice. The prejudice is apparent from the trial record, both from the arguments urged by the prosecutors as a basis for a death sentence for Mr. Bernard and from the findings actually made by the jury in determining Mr. Bernard's sentence. Having presented allegations which, if taken as true, would require relief, Mr. Bernard was entitled to a hearing to prove them. *See Machibroda v. United States*, 368 U.S. 487, 495-496 (1962).

At trial, the Government used its expert testimony to argue forcefully that only Mr. Bernard could have set the fire and that he deserved to die because the fire had contributed to Mrs. Bagley's death.[26] Had jurors heard the evidence submitted with Mr.

---

[25] *Amended § 2255 Motion of Brandon Bernard*, dkt. no. 416, Exhibits 12, 13, 17, 28-29, 32-33 (December 8, 2004); *Memorandum of Law in Support of Motion to Alter or Amend Judgment*, dkt. no. 453 at 5, Exhibits B & C (October 25, 2012).

[26] The following citations are to the trial transcripts, using volumes numbers created for the record used by the Fifth Circuit, employing a Volume#:Page# format. This record was returned to the District Court on or about August 21, 2014, *see* dkt. no. 493. The first citation to any particular volume is accompanied by the date. *See* Trial Transcript for May 25, 2000, 19:1930 (Government suggests that "only" Mr. Bernard was "positioned…to light the fire"); May 26, 2000, 20:2062-63 (questioning to establish that Mrs. Bagley "inhal[ed]" smoke and suffered "thermal injuries" while "still alive"); 20:2086 (leading question to arson investigator, highlighting that someone standing

Bernard's § 2255 motion, it is at a minimum "reasonably likely" that they would have been skeptical of the Government's claims that only Bernard could have set the fire and that the fire "tortured" Mrs. Bagley. Any such skepticism would have resulted in a life sentence for Mr. Bernard.

The inference of a different outcome at sentencing is unusually strong, given the facts here. In making their special sentencing findings with respect to Mr. Bernard, jurors found identical intent and aggravating factors for all three death-eligible counts and found no mitigating factors for any of those counts.[27] Yet, they recommended life sentences for Mr. Bernard on the first two counts – the carjacking and Todd Bagley's murder – while recommending a death sentence only for Stacie Bagley's murder. In addition, the jurors during their deliberations asked for the report of Ms. Bagley's autopsy (it was not provided, as it had not been admitted into evidence).[28] Given the jurors' identical findings

where co-defendant Terry Brown's testimony had placed Mr. Bernard could have "throw[n] a match" to light the fire inside the car); June 1, 2000, 23:2610, lines 10-11 (guilt phase closing: "[Mr.] Bernard ... lit the fire [and was] the only person … in position to light the fire"); 23:2610, lines 16-17 (guilt phase closing: the "only person who could have lit the fire [was Mr.] Bernard" and when "[Mr.] Bernard lit that fire, Stacie Bagley was still living"); 23:2610-11 (guilt phase closing: when Mr. Bernard "lit that fire," "Stacie was not dead"); June 12, 2000, 26:3202-03 (penalty phase closing: "Stacie was still living when that fire was set [and] continued to live for a period of time"; in lighting the fire, Mr. Bernard "intentionally … brought about [her] death"; Mrs. Bagley "die[d] from a gunshot wound and also from the smoke inhalation"); 26:3269 (penalty phase closing: same); 26:3270 (penalty phase closing: emphasizing that Mr. Bernard "set the fire"); 26:3272 (penalty phase closing: "[Mr.] Bernard set the fire"). Parallel citations to the Court of Appeals record will be provided below, where believed to be helpful the court, using the abbreviation: "USCA5."

[27] Special Findings for Brandon Bernard, dkt. no. 286, USCA5 2:348-378.

[28] Jury Note No. 4 (June 13, 2000), dkt. no. 278, USCA5 2:298 and 5:1039

on each count regarding the aggravating and mitigating factors, their specific request to review the report of Ms. Bagley's autopsy, and the different sentence they imposed on that count (death, as opposed to life imprisonment), the only logical explanation is that the jurors accepted the Government's theory that Mr. Bernard set fire to the car, that the fire contributed to Ms. Bagley's death, and that a death sentence for Mr. Bernard was justified on that basis. Had counsel performed properly, there is a reasonable probability the jurors would have rejected those inferences and spared Mr. Bernard's life.[29]

---

[29] The Fifth Circuit found Mr. Bernard's new forensic evidence immaterial, calling both the forensic evidence at trial and the views of Mr. Bernard's post-conviction experts "equivocal." *Bernard*, 762 F.3d at 473. The record, however, shows that the Government hardly treated its forensic evidence as "equivocal" at trial. *See* USCA5 19:1930 (Government suggests that "only" Mr. Bernard was "positioned…to light the fire"); 20:2062-63 (questioning to establish that Mrs. Bagley "inhal[ed]" smoke and suffered "thermal injuries" while "still alive"); 20:2086 (leading question to arson investigator, highlighting that someone standing where co-defendant Terry Brown's testimony had placed Mr. Bernard could have "throw[n] a match" to light the fire inside the car); 23:2610, lines 10-11 (guilt phase closing: "Bernard ... lit the fire [and was] the only person … in position to light the fire"); 23:2610, lines 16-17 (guilt phase closing: the "only person who could have lit the fire [was] Bernard" and when "Bernard lit that fire, Stacie Bagley was still living"); 23:2610-11 (guilt phase closing: when Mr. Bernard "lit that fire," "Stacie was not dead"); 26:3202-03 (penalty phase closing: "Stacie was still living when that fire was set [and] continued to live for a period of time"; in lighting the fire, Mr. Bernard "intentionally … brought about [her] death"; Mrs. Bagley "die[d] from a gunshot wound and also from the smoke inhalation"); 26:3269 (penalty phase closing: same); 26:3270 (penalty phase closing: emphasizing that Mr. Bernard "set the fire"); 26:3272 (penalty phase closing: "Bernard set the fire"). And both Mr. Bernard's post-conviction experts, for their part, submitted declarations to the reasonable degree of certainty applicable to their respective fields. The Fifth Circuit's treatment of this evidence reflects its application of a "heightened" COA burden – demanding that a petitioner show conclusively that he is entitled to relief before a COA may issue – that the Supreme Court struck down in *Buck*.

## 2.  Mr. Bernard's *Wiggins* IAC claim[30]

As with his arson/pathology IAC claim, Mr. Bernard in district court offered evidence – not just allegations, but documentary evidence including declarations from both experts and lay witnesses. This evidence showed that counsel failed to conduct a reasonable mitigation investigation, and that had they done so, they could have presented the jury with extensive information about Mr. Bernard's background that bore favorably on his moral culpability and the appropriateness of a death sentence. This information went far beyond the bare biographical facts about Mr. Bernard that jurors heard at sentencing. Taken as true, that is sufficient proof to establish both counsel's deficient performance and resulting prejudice.

The evidence supporting Mr. Bernard's *Wiggins* IAC claim included, but was not limited to, a detailed declaration from a nationally prominent federal capital defense lawyer whose familiarity with the relevant standard of practice cannot fairly be questioned, as he has tried more federal capital cases to verdict than any other living

---

[30] *Wiggins v. Smith*, 539 U.S. 510 (2003).

lawyer and has taught for years at national training programs.[31] His declaration explains in detail how counsel's performance fell below prevailing standards.[32]

Perhaps the most troubling aspect of trial counsel's deficient mitigation investigation was their decision to delegate to Mr. Bernard's mother the key task of identifying potential mitigation witnesses and, even then, failing to follow leads that reasonable counsel would have pursued.[33] The Supreme Court has specifically condemned as constitutionally deficient a mitigation investigation consisting solely of "talking to witnesses selected by [the defendant's] mother[.]" *Sears*, 561 U.S. at 952. Given the remarkable similarity of *Sears*'s facts to those of Mr. Bernard's case, there can

---

[31] Mr. Ruhnke's own record bears out his judgment about what constitutes adequate performance by defense counsel in a federal capital case. Just four months ago, Mr. Ruhnke obtained a life verdict in *United States v. Con-Ui*, where his client, a prison inmate with a prior homicide on his record, stabbed a prison guard to death in an incident that was captured on videotape. *See* https://timesleader.com/news/667029/jury-spares-jessie-con-uis-life-for-federal-prison-guards-murder. And the jury's choice to spare the defendant's life in such a case eloquently refutes then-Judge Smith's claim that the single death sentence imposed on Mr. Bernard was inevitable.

[32] *Amended § 2255 Motion of Brandon Bernard* at pages 7-12 and 46-51 of Exhibit 12, dkt. nos. 377, 416 (declaration of David A. Ruhnke, USCA5 4:875-78; 5:914-18). Contemporaneous capital defense training materials from 1999-2000, establishing the contours of an adequate mitigation investigation and highlighting the deficiencies in the investigation conducted by Mr. Bernard's trial counsel, further corroborated this expert declaration. *Memorandum of Law in Support of Motion to Alter or Amend Judgment* at 5, Exhibits A1-A7, dkt. no. 453, USCA5 at 9:179-334

[33] *Compare Amended § 2255 Motion of Brandon Bernard*, pages 33 to 64 of Exhibit 1, dkt. nos. 377, 416 (report of trial counsel's mitigation investigation as directed by client's mother, USCA5 3:610-4:624) *with id.* at pages 46-54 and 58-62 of Exhibit 12 (declaration of David A. Ruhnke), USCA5 5:914-922, 926-930 and *id.* at pages 1-51 of Exhibit 13 (Report of Jill Miller, MSSW, USCA5 5:964-1014).

be no question that Mr. Bernard's *Wiggins* IAC claim, at a minimum, entitled him to an evidentiary hearing. The fact that the Court of Appeals did not even cite *Sears*, much less distinguish it, *see United States v. Bernard*, 762 F.3d 467 473-76 (5th Cir. 2014), again reflects the Fifth Circuit's improperly steep standard for granting a COA in the pre-*Buck* era.[34]

While space does not permit a complete recounting of all the mitigating evidence a reasonable investigation would have uncovered, Mr. Bernard's counsel failed to discover or present any evidence of Mr. Bernard's turbulent upbringing or mild neurocognitive dysfunction; psychological testing from his early adolescence that revealed Mr. Bernard to be compassionate and empathetic, lacking any anti-social tendencies; or evidence of Mr. Bernard's positive and constructive adjustment to confinement prior to trial.[35]

In particular, Mr. Bernard was prejudiced by his counsel's failure to develop and present a full social history at sentencing, because the jury failed to find that his youth constituted a mitigating factor warranting leniency.[36] Had jurors known about Mr. Bernard's turbulent family background, they likely would have concluded that Mr.

---

[34] *See Bernard's Opening Brief to the Fifth Circuit in Support of COA*, CA5 case no. 13-70013, doc. no. 00512311466 (July 17, 2013) at 34-35, 70-71; *Bernard's Reply Brief in Support of COA*, CA5 case no. 13-70013, doc. no. 00512501331 (January 15, 2014) at 17-22; and *Bernard's Petition for Rehearing En Banc*, CA5 case no. 13-70013, doc. no. 00512779941 (September 23, 2014) at 5-8.

[35] *Amended § 2255 Motion of Brandon Bernard*, pages 46-54 and 58-62 of Exhibit 12 (declaration of David A. Ruhnke), dkt. nos. 377, 416, USCA5 5:914-922, 926-930 and *id*. at pages 1-51 of Exhibit 1 (Report of Jill Miller, MSSW, USCA5 5:964-1014).

[36] *Judgment and Commitment as to Brandon Bernard*, dkt. no. 290 (jurors' findings regarding mitigating factors appear at USCA5 2:378, 383).

Bernard – being at age eighteen barely removed from his adolescence in a household marked by discord and violence between his parents – lacked the maturity and moral culpability of a normal young adult.[37]

 "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by [counsel's] errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. Given Mr. Bernard's youth, lack of any serious prior criminal history, and decidedly less prominent role in the crime, as well as the jury's struggle to reach its final sentencing decision after having imposed non-death sentences on two of the three death-eligible counts, the death verdict against Mr. Bernard enjoys anything but "overwhelming record support." Accordingly, the case for *Strickland* prejudice here is strong.

### 3.  Mr. Bernard's "future dangerousness" IAC claim

The Government presented the testimony of Dr. Richard Coons, who purportedly was called to rebut earlier testimony about Mr. Vialva, but actually testified broadly that "free world" gang members always became gang members in prison. Coons' methodology has since been deemed unreliable and inadmissible by the Texas Court of

---

[37] *See*, *e.g.*, *Cooper v. Sec'y, Dept. of Corrections*, 646 F.3d 1328, 1354 (11th Cir. 2011) (although the trial judge had explicitly rejected Cooper's young age at the time of the crime as a mitigating factor, trial counsel's failure to present the "full story" of Cooper's troubled family background at sentencing was nevertheless prejudicial under *Strickland*; because Cooper had committed his crimes at eighteen, when he was "barely removed" from the damaging circumstances of his upbringing, it was reasonably likely that the judge, if fully informed about Cooper's background, would have found the statutory mitigator of age at the time of the crime).

Criminal Appeals.[38] Bureau of Prisons officer Anthony Davis aggravated the prejudicial impact of Dr. Coons' unscientific testimony by testifying similarly about how all gang members "commit big crimes" in prison.[39] Mr. Bernard's trial counsel did not seek a limiting instruction regarding either Coons' or Davis' testimony, nor did they object when the Government argued that testimony against their client.

Mr. Bernard's "future dangerousness" IAC claim was supported by the sworn opinion of an expert capital defense attorney that reasonable counsel would have sought to exclude Dr. Coons' testimony (and that strong legal grounds existed for doing so),[40] and, if unsuccessful, would have sought and obtained limiting instructions to keep jurors from considering Coons' extraordinarily prejudicial opinion testimony against Mr. Bernard.[41] It was also supported by the extensive and readily available affirmative evidence of Mr. Bernard's non-dangerousness, including testimony of probation officers, teachers, and counselors describing his positive and peaceable adjustment to confinement while awaiting trial (including taking part in the jail's Bible study group and exerting a

---

[38] *See Coble v. State*, 330 S.W.3d 253 (Tex. Crim. App. 2010).

[39] Trial Transcript for June 9, 2000, USCA5 25:3166-67.

[40] *Amended § 2255 Motion of Brandon Bernard*, pages 74-77 of Exhibit 12 (declaration of David A. Ruhnke), dkt. nos. 377, 416, USCA5: 942-45; *see also Coble*, 330 S.W.3d at 271-80.

[41] *Amended § 2255 Motion of Brandon Bernard*, pages 74-77 of Exhibit 12 (declaration of David A. Ruhnke), dkt. nos. 377, 416, USCA5: 942-45. Whether or not Davis' testimony could have been excluded outright, Mr. Ruhnke emphasizes that reasonable counsel likewise would have sought and obtained limiting instructions to preclude the jury from considering Davis' testimony against Mr. Bernard. *Id.*

positive influence on other inmates' behavior), and his successful response to structured

environments and supervision earlier in life. Given trial counsel's complete failure to

undertake any such investigation or litigation, and the distorted sentencing profile of Mr.

Bernard that the jury considered as a result, this claim entitled Mr. Bernard to an

evidentiary hearing. The conclusion that Coons' testimony (supposedly applicable only to

Vialva) was treated as applying equally to Mr. Bernard cannot be denied, given the fact

that the Fifth Circuit improperly relied upon it as a basis to uphold Bernard's sentence on

direct appeal, *United States v. Bernard*, 299 F.3d 467, 482 (5th Cir. 2002)  although it

later tried to distance itself from this error, *Bernard*, 762 F.3d at 475.

### 4.  Mr. Bernard's *Napue* claim

Mr. Bernard's *Napue* claim was supported by one set of facts the Government did

not dispute (that co-defendant Terry Brown admitted during a pretrial proffer that his

prior criminal conduct included beating someone with a sledgehammer, shooting

someone during a "drive-by," and threatening a crowd with a shotgun)[42] and one set of

facts the Government could not dispute because they are plain on the face of the record

(that the Government called Brown as a witness at trial, elicited from him that his prior

criminal conduct was trivial and non-violent, and did not correct this false testimony).[43]

This claim was strengthened by the applicable materiality standard, requiring reversal if

"any reasonable likelihood" exists that the knowingly presented false testimony "could

---

[42] Amended § 2255 Motion of Brandon Bernard, Exhibit 2 (notes from Terry Brown's
proffer taken by his defense attorney), dkt. nos. 377, 416, USCA5 5:1076

[43] Trial Transcript for May 25, 2000, USCA5 19:1859-60.

have affected" the jury's judgment. *United States v. Agurs*, 427 U.S. 97, 103 (1976).

Given the important role Brown played at trial – he was one of only two witnesses who

recounted "who did what" during the unfolding of the crime, and he was the sole witness

who placed Mr. Bernard where, according to the Government, Mr. Bernard could have lit

the fire that consumed the Bagleys' car – there is no question that knowing the truth

about Brown's criminal history "could have affected" the jury's judgment about whether

to credit his most damaging testimony.

More important, the Government's misleading portrait of Brown may have

affected the jury's view of the mitigating factor that asked them to determine whether

others "equally culpable" in the murders were escaping a death sentence.[44] Certainly, the

Government's studied omission of the full details of Brown's prior violent crimes could

have affected jurors' judgment about Brown's culpability relative to Mr. Bernard's.[45]

This claim, too, entitled Mr. Bernard to an evidentiary hearing. *Cf. Napue*, 360 U.S. at

269 ("The jury's estimate of the truthfulness and reliability of a given witness may well

be determinative of guilt or innocence"); *Banks v. Dretke*, 540 U.S. 668, 700-01 (2004)

(undisclosed evidence about a particular witness was not "cumulative" of in-trial

---

[44] Special Findings, dkt. no. 286, USCA2:352 (special findings on mitigating factors for Count 1), 365 (special findings on mitigating factors for Count 3), 378 (special findings on mitigating factors for Count 4).

[45] Notably, notwithstanding their very similar roles in the crime, Terry Brown was recently released from prison, while Mr. Bernard continues to face execution.

impeachment, *inter alia* because the prosecution relied on his testimony in urging a death sentence).

## V.   CONCLUSION

Brandon Bernard's post-conviction proceedings were marred by procedural defects at both the district court and appellate court level. Judge Smith was unfit to preside over the proceedings, as illustrated by the fact that he "presided" over them for more than seven years by doing absolutely nothing. What other cause could possibly lie behind such an unreasonable delay? And once Smith finally did rule, he failed even to acknowledge, much less engage with, the critically important evidence that Mr. Bernard presented.

The fundamental lack of integrity that characterized the post-conviction process in district court went uncorrected on appellate review. The Fifth Circuit applied to Mr. Bernard – as it did to Mr. Buck, before the Supreme Court intervened – an illegal standard that placed "too heavy a burden on [him] at the COA stage." *Buck*, 137 S. Ct. at 774. With the application of this improperly burdensome standard to Mr. Bernard's request for permission to appeal, Judge Smith's serious errors were insulated from meaningful scrutiny.

In the face of these "extraordinary circumstances," this Court has the power to provide Mr. Bernard with the fair process that any individual sentenced to death deserves. It should do that by vacating the judgment that terminated the habeas proceeding and considering Mr. Bernard's § 2255 Motion anew. Alternatively, the Court should find that "exceptional circumstances" have been shown, and let Mr. Bernard brief why the Court

should exercise its discretion to reopen the judgment. If the Court is not yet satisfied that "exceptional circumstances" warrant its intervention, it should allow Mr. Bernard to present evidence at a hearing to prove that former Judge Walter Smith was unfit to preside over Mr. Bernard's post-conviction proceedings.

DATED this 28th day of November, 2017.

Respectfully submitted,

Robert C. Owen
Bluhm Legal Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611-3069
312.503.0135 voice
312.503.8977 fax
robert.owen@law.northwestern.edu

John R. Carpenter
Asst. Federal Public Defender
1331 Broadway, Suite 400
Tacoma, Washington 98402
253.593.6710 voice
253.593.6714 fax
John_Carpenter@fd.org

**CERTIFICATE OF SERVICE**

I hereby certify that on November 28, 2017, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all registered parties.

*s/ Amy Strickling*, Paralegal
Federal Public Defender Office