**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | **CRIMINAL NO. 6:99-CR-00070-LY-2** |
| **v.** | § | **CIVIL NO. 04-CV-164** |
| | § | |
| **BRANDON BERNARD** | § | **THIS IS A CAPITAL CASE** |

**MOTION FOR RELIEF FROM JUDGMENT**

(NON-SUCCESSIVE, SECOND-IN-TIME MOTION UNDER 28 U.S.C. § 2255 OR, IN
THE ALTERNATIVE, MOTION UNDER FRCP 60(B))

**Table of Contents**

I.    Brandon Bernard deserves relief from judgment because the Government hid critical information that, if disclosed, would likely have resulted in three life sentences, instead of two life sentences and a death sentence................................. 1

II.   Brief summary of the offenses and procedural history of the case ........................... 6

      A.   In 2000, a conflicted jury sentenced Brandon Barnard to death on just one of three capital counts. Jurors struggled to determine the appropriate punishment for Bernard even though the Government had both suppressed evidence that would have supported a life sentence and actively misled the jury into believing that Bernard was as culpable as all other gang members involved in this case..................................................................................................... 6

      B.   On direct appeal, the Fifth Circuit relied on scientifically unsound future dangerousness testimony to affirm Bernard's death sentence. ......................... 8

      C.   Eighteen years after Bernard was sentenced to death, at a resentencing hearing for his juvenile codefendant Sparks, the Government introduced previously suppressed expert testimony showing that Bernard had been at the very bottom of the hierarchical structure of the 212 PIRU Bloods, while Sparks held a leadership position as an "enforcer" and two other codefendants likewise ranked significantly higher in the gang than Bernard....................................... 9

      D.   Despite having been aware in 1998 or 1999 that the 212 PIRU Bloods had a clear hierarchical structure and that Bernard was at its very bottom, the Government failed to disclose its expert testimony related to these facts to Bernard's trial attorneys, and misled the jury during the punishment phase of Bernard's trial into believing that no such hierarchy existed. ......................... 12

      E.   The Government leveraged its false characterizations of the PIRU 212 Bloods – as a gang with no hierarchy in which all members were thus equally culpable – and of Bernard's purported leadership role to convince jurors that if they spared his life, Bernard would continue to pursue violent gang-related enterprises in prison. ...................................................................................... 14

      F.   The Government's suppression of the 212 PIRU Bloods' hierarchical structure both limited Bernard's defense team at trial and denied Bernard the opportunity to allege this *Brady* claim in his original § 2255 motion. ........... 15

i

III. Claim for relief:  the Government's failure to disclose the existence of Sgt. Hunt's expert opinions regarding the hierarchy of the 212 PIRU Bloods youth gang, Mr. Bernard's rank at the very bottom of that hierarchy, and the substantially higher rankings of his codefendants Terry Brown, Christopher Vialva, and Tony Sparks, violated due process and the fair trial guarantee of the Sixth Amendment as interpreted in *Brady* and its progeny. ........................................................................... 16

A.  To ensure a fundamentally fair trial, the Government must share information in its possession that is favorable to the defendant; if it fails to do so and that information is material to guilt or punishment, a new trial is required. ......... 16

B.  The suppressed information was favorable to Bernard. ................................... 18

C.  The Government failed to disclose the favorable information in its possession, either prior to trial or since. .............................................................................. 21

D.  It is at least reasonably probable that one juror would have voted to spare Mr. Bernard's life if the favorable information had been disclosed. ....................... 24

   1.  To satisfy *Brady*'s materiality prong, a defendant need only show there is a reasonable probability – not a "more likely than not" probability – that the result of the proceeding would be different, such that the suppression of favorable evidence undermines the court's confidence in the verdict. .......................................................................................................... 24

   2.  The expert testimony interpreting the hierarchy of the 212 PIRU Bloods, which was suppressed by the Government, was material because it is reasonably probable that, had that information been presented, at least one juror would not have voted for death. ................................................ 27

      a.  The suppressed evidence was material because it directly bore on relative culpability. This truth is apparent both from this Court's analysis of the same evidence during Sparks' resentencing and from the efforts that the Government made at Bernard's sentencing hearing to mislead jurors about the true nature of the gang's leadership structure. .......................................................................... 27

      b.  Had the Government not suppressed information about the hierarchy of the 212 PIRUs, Bernard's trial counsel could have used this information to attack the Government's claim that Bernard, if sentenced to life imprisonment, would pose a serious and continuous threat to the lives and safety of others in prison. .............................. 29

c.    The suppressed evidence of 212 PIRU's hierarchy, and Bernard's position at its very bottom, would have communicated to the jury that equally culpable codefendants' lives were being spared, a significant statutory mitigating circumstance. ................................ 30

d.    Disclosure of the suppressed hierarchical structure of the 212 PIRUs would have prevented the Government from misleading the jury in violation of *Napue*. ............................................................................. 31

e.    The suppressed evidence is material because it comes from a type of source (law enforcement) that a jury typically affords significant weight. ................................................................................................... 32

f.    Because there are so many ways in which the suppressed evidence could have helped Bernard, he has more than satisfied *Brady*'s materiality requirement. ......................................................................... 34

g.    The materiality of the suppressed evidence is even plainer given this fact: even without knowing this information, the jury spent nearly as much time deciding on Bernard's one death sentence as it did on its other five sentencing verdicts put together. ................................ 35

IV. The present motion is not a second motion subject to 28 U.S.C. § 2255(h). ........... 35

A.    Allowing Bernard's new *Brady* claim to be heard is "critically important to maintaining the integrity of our judicial system"; closing the courthouse door on his claim would unfairly reward the Government for its own constitutional violation. ................................................................................................. 35

B.    In *Panetti v. Quarterman*, the Supreme Court clarified that a second-in-time application for collateral relief does not always constitute a "second or successive" motion subject to the strictures of § 2255. .................................... 37

C.    Under *Panetti*, a second-in-time motion for post-conviction relief that alleges a *Brady* claim is not "second or successive" if the Government, by continuing to conceal material evidence, made it impossible for the prisoner to include the claim in his original motion. ................................................................. 41

1.    *Scott*'s analysis of the *Panetti* considerations ........................................... 42

2.    *Scott*'s analysis of the *Tompkins* decision .................................................... 45

D.    No Fifth Circuit case has analyzed whether a previously unavailable *Brady* claim is successive under *Panetti*; *Blackman* mistakenly concluded that the Fifth Circuit had resolved that question, but relied on cases that in fact had not addressed the issue. ................................................................................. 48

E.    The *Napue* violation is also reviewable under the analysis from *Panetti* set out above. ................................................................................................ 51

V.    Even if Bernard's motion were deemed successive, he is entitled to relief. ............ 51

A.    Bernard is entitled to relief under Fed. R. Civ. P. 60(b). ................................. 51

1.    Bernard's motion meets the requirements for relief under Rule 60(b).. 51

2.    Bernard's alternative motion under Rule 60(b) is not a successive habeas motion under *Gonzalez*. ................................................................. 54

B.    If Bernard's motion is deemed successive and Rule 60(B) is deemed unavailable, then the restrictions in § 2255(h) violate the Suspension Clause of the Constitution. ................................................................................... 58

VI.   Conclusion ................................................................................................. 60

I.     **Brandon Bernard deserves relief from judgment because the Government hid critical information that, if disclosed, would likely have resulted in three life sentences, instead of two life sentences and a death sentence.**

Brandon Bernard was a non-shooting codefendant, who was eighteen years old at the time of the crime and had no serious history of prior violent crime. The jury spared his life on two of three capital counts he faced, and struggled over whether to sentence him to death at all. And it is now apparent that the Government secured Bernard's death sentence by hiding expert testimony that would have directly contradicted the theories on which the Government urged the jury to impose death.

The previously hidden expert opinion came to light on February 21, 2018, during the resentencing hearing for Bernard's juvenile codefendant Tony Sparks. At that proceeding, the Government called now-retired Killeen Police Department Sergeant Sandra Hunt, who had previously headed the KPD's Gang Unit, as an expert witness to testify to Sparks' position within the 212 PIRU Bloods, the gang that it alleged all participants in this crime belonged to.[1] Ex. 1 at 90-91.

In her 2018 testimony, Sgt. Hunt described for this Court how, through investigation in 1998 and 1999, police had managed to uncover the leadership structure of the 212 PIRU Bloods, and shared that information with the United States Attorney's Office. First, the authorities obtained from a local high school student a handwritten notebook page decorated with gang member nicknames and cryptic symbols. Ex. 1 at 92-93; Ex. 7.

---

[1] A copy of the transcript of Sgt. Hunt's testimony from Tony Sparks' resentencing is attached as Exhibit 1. Citations to this exhibit refer to the original page numbers of the transcript.

1

Confidential gang files maintained by the KPD provided the key to interpreting that document. Ex. 1 at 93-95. The result was a hierarchical pyramid chart showing numerous gang members' actual names and relative positions within the 212 PIRU Bloods. *See* Ex. 8. In 1999 or 2000, Sgt. Hunt used this chart to answer questions from the United States Attorney's Office about the role and position of particular individuals in the gang who had been charged in the murders of Todd and Stacie Bagley. *Id*. at 97.

Sgt. Hunt recounted for this Court some of the expert conclusions she had formed in 1998 and 1999 about the leadership structure of the 212 PIRU Bloods and which she had provided to federal prosecutors "at that time." *See* Ex. 1 at 97. She explained that Sparks, as an "enforcer," occupied a relatively high position, sitting at "rung 5" of the gang's hierarchical structure. *Id*. at 96. She added that codefendants Terry Brown and Christopher Vialva occupied comparable positions, on rungs 6 and 7 respectively. *Id*. at 97. And Sgt. Hunt acknowledged that Bernard, in stark contrast, occupied a much lower level in the gang's power structure – in fact, the very lowest level. As she described it, "Brandon Bernard, also known as 'Dip,' is at the very bottom of the chart of [sic] pyramid, second name in, about 30 people below Mr. Sparks." *Id*.

So the testimony before this Court in 2018 established the following:  in 1998 and 1999, Sgt. Hunt unlocked through investigation the secrets of the 212 PIRU Bloods' then-existing hierarchical structure. In response to a specific request "at that time," she provided the Government with her expert conclusions about the relative rank and status within the gang of the various individuals charged in the Bagley murders. And her expert opinion was

that three of those defendants (Sparks, Brown, and Vialva) occupied relatively high perches in the gang's hierarchy, while Bernard resided at its very lowest level.

It may dismay the Court to learn that the Government – despite having been told by a police gang expert prior to the 2000 Bernard/Vialva trial that the 212 PIRU Bloods had a hierarchical leadership structure and that Bernard occupied the gang's very bottom rung, Ex. 1 at 97 – aggressively presented a very different and fundamentally misleading picture to the jurors charged with deciding Bernard's relative culpability. At Bernard's trial in 2000, the Government depicted the gang as a criminal enterprise where all members were of equal rank and status. That characterization was completely at odds with the expert opinion Sgt. Hunt had communicated to the United States Attorney's Office only shortly before trial, and which she repeated to this Court nearly two decades later in 2018.

At the Bernard/Vialva trial, the Government did not offer Sgt. Hunt's expert opinion, nor any of the information she had consulted in reaching her view. Nor did the Government call Sgt. Hunt to advise the jury that the expert opinion of the Killeen Police Department was that Bernard occupied no position of power within the gang. Instead, during the 2000 trial, the Government repeatedly elicited testimony to suggest that Bernard was a member of a gang that had no identifiable hierarchy whatsoever, and thus that all its members should be regarded as equally culpable.[2] The Government thus misled the jury with its "all 212 PIRU Blood gang members were equal" theory, which would not have been viable but for its suppression of Sgt. Hunt's expert opinion from Bernard's trial

---

[2] As discussed in detail in Sections II.D-II.DF and III.D.2, *infra*.

counsel. It is reasonably probable that this deception and suppression led to Bernard's death sentence.

Nowhere does any known record suggest that the Government disclosed Sgt. Hunt's expert opinion to the defense, despite the Government's assurances that it was complying with the dictates of *Brady v. Maryland*[3] by maintaining an "open file" to which defense counsel were given free access.

There can be no serious dispute that this expert testimony – coming from a law enforcement officer with specialized training and knowledge – would have been helpful to Bernard's defense. The materiality of this information under *Brady* can be readily seen from this Court's oral and written rulings in connection with Sparks' resentencing:  both rulings expressly identified as an aggravating factor Sgt. Hunt's expert testimony naming Sparks as an enforcer in the gang. *Court's Memo Op. on Sparks Resentencing* at 10 ("In contrast, however, Sparks was not a tangential participant in the gang. As testified to by Sandra Hunt, Sparks was known as an enforcer by the Killeen [Police Department] gang unit."), *United States v. Sparks*, W-99-CR-070-3, 2018 WL 1415775 *6 (W.D. Tex, March 19, 2018) (attached as Exhibit 2); *see also* Oral Ruling at 12, lines 15-16, dkt. 658 (March 19, 2018) (attached as Exhibit 3). Implicit in that determination is the conclusion that Brandon Bernard, notwithstanding his involvement in the present offense*, was a tangential participant* in the gang, a low-status member who occupied no such leadership position. As such, and as his successful and entirely nonviolent adjustment to prison has proven,

---

[3] *Brady v. Maryland,* 373 U.S. 83 (1963).

Bernard was hardly the irredeemable gang member that the Government at trial portrayed him to be.[4]

Had Sgt. Hunt's expert opinion been provided to Bernard's trial counsel, they could have relied upon it as valuable support for that important conclusion. Disclosure of her expert opinion would have created a reasonable probability of a different sentencing outcome because, in deciding whether to spare Bernard's life, the jurors were called on to evaluate both his own future dangerousness and whether other equally culpable criminal actors were not facing death. Given that the vote of just one juror could have created a different result, it is evident that the suppressed expert opinion of former Sgt. Hunt is material. This motion therefore presents a prima facie case that the Government wrongly withheld evidence favorable to the accused, in violation of *Brady*, which in turn enabled it to mislead the jury, contrary to *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

The Court should not allow these newly revealed constitutional violations to go uncorrected. First and foremost, of course, failing to provide relief would mean sending Bernard to his death on the basis of an unlawfully obtained sentence. But it would also incentivize the Government in future capital cases to do exactly as it did here – unconstitutionally hide evidence that it is duty-bound to disclose, undermining not just the jury's ability to return a just verdict but also the defendant's ability to seek collateral review of the original *Brady* violation. The Court should vacate the judgment and order a new sentencing hearing for Brandon Bernard.

---

[4] This conclusion is discussed in further detail below, relative to the declarations of former BOP Warden Marc Bezy (Exhibit 4), and David and Michael Boyd (Exhibits 5 and 6).

5

In the following sections, we will first briefly summarize the facts of the case and its procedural background, then detail the facts of the *Brady* violation and demonstrate its materiality, and ultimately explain why this motion can properly be considered by this Court, despite a previous § 2255 motion having been filed and denied.

## II.    Brief summary of the offenses and procedural history of the case

### A. In 2000, a conflicted jury sentenced Brandon Barnard to death on just one of three capital counts. Jurors struggled to determine the appropriate punishment for Bernard even though the Government had both suppressed evidence that would have supported a life sentence and actively misled the jury into believing that Bernard was as culpable as all other gang members involved in this case.

In 2000, Brandon Bernard and Christopher Vialva were jointly tried in the Western District of Texas on charges arising from a carjacking that ended in murder.[5] The case involved a plan by five teenagers – Vialva (then aged 19), Bernard (18), Terry Brown (17), Tony Sparks (16), and Christopher Lewis (15) – to abduct and rob someone. The plan did not end as Bernard anticipated. Instead, Vialva shot victims Todd and Stacie Bagley in the head at close range, after which their car was set on fire. The Government sought the death penalty against both Vialva and Bernard, who were convicted on all counts.[6] Recognizing Bernard's lower level of participation and diminished culpability – he was absent when the

---

[5] The charges were (1) carjacking resulting in death, *see* 18 U.S.C. § 2119; (2) conspiracy to commit murder, *see* 18 U.S.C. § 1117; and (3 and 4) the murders of Todd and Stacie Bagley, *see* 18 U.S.C. § 1111(a).

[6] The three other teenagers were too young to face a death sentence under federal law. Brown and Lewis cooperated with the Government and testified at the Bernard-Vialva trial. Brown was released from federal custody on April 20, 2018, and Lewis was released on June 23, 2017. Sparks, who pleaded guilty separately, was resentenced by this Court in 2018 to a term of forty years' imprisonment; his projected release date is October 2030.

Bagleys were abducted, took no part in robbing them, and did not fire the bullets that killed them – the jurors spared his life on two of the three capital counts, ROA.5706-07,[7] while sentencing Vialva to death on all three death-eligible counts, ROA.5703-04. Jurors wrestled with deciding the appropriate sentence for the third capital count even after being misled by the Government into believing that Bernard and the other participants in the crime held equal status in the gang. While jurors quickly returned his two life verdicts (as well as the three death sentences for Vialva),[8] the third capital count required more deliberation, and included a request for more evidence.[9]

---

[7] Citations to "ROA" are to the most recent Record on Appeal in Fifth Circuit case number 18-70008.

[8] Jurors retired to deliberate at about 4:15 p.m. on June 12, working until 7:00 p.m. that day. *See* ROA.5700, 832, 834. In that interval, they sentenced Vialva to death on all three death-eligible counts, and sentenced Bernard to life imprisonment on two of those three. *See* ROA.309, 322, 335 (Vialva death verdicts, all dated June 12); ROA.349, 362 (Bernard life verdicts, same date). Deliberations resumed the following morning at 9:00 a.m., *see* ROA 834, with only Bernard's final sentence to determine. That verdict required two additional hours of deliberations, which concluded at about 11:15 a.m. on June 13. ROA 835.

[9] Jurors asked to see Stacie Bagley's autopsy report, but their request was denied because it had not been admitted into evidence. ROA.834. This question and the length of the jurors' deliberations suggest that jurors ultimately imposed Bernard's single death sentence largely because they accepted the Government's assertions that Ms. Bagley, unlike her husband, had suffered a painful death from the fire that the Government claimed Bernard had set. *Compare* ROA.5686 *with* ROA.5691. The Government's position, however, was at odds with the trial evidence, which showed that Ms. Bagley was unconscious from the moment Vialva shot her, ROA.4480, 4486, and thus did not suffer in dying. Bernard's trial counsel did not mention this fact in argument, nor did they obtain any independent forensic opinion about the cause of Ms. Bagley's death. Such an analysis would have shown that Ms. Bagley likely died when she was shot, and that the Government's suggestions to the contrary were scientifically unsound, or at the very least debatable. ROA.1988-2003.

**B. On direct appeal, the Fifth Circuit relied on scientifically unsound future dangerousness testimony to affirm Bernard's death sentence.**

On appeal, the Fifth Circuit affirmed Bernard's death sentence in an opinion that explicitly relied on since-debunked[10] future dangerousness testimony that was not even offered against him, but only against Vialva.[11] Not only was the Government's proffered future dangerousness testimony scientifically unsound, but ensuing events have shown the concern to be demonstrably false. Mark Bezy – formerly the warden at the very institution where Bernard is now incarcerated – reviewed Bernard's entire BOP file and concluded that he has been fully compliant with his prison programming, and that prison authorities' decision to give him work as an orderly reflects their confidence in his good behavior. In fact, Warden Bezy declared that Bernard's behavior in prison truly has been remarkable, since he had served his time (then 16 years) without incurring a single disciplinary infraction, a highly unusual achievement. *See Declaration of Warden Mark Bezy (ret'd)* at

---

[10] The Government called Dr. Richard Coons to testify about future dangerousness. Coons is no longer allowed to offer such "expert" opinion in Texas state courts because his methodology was wholly unscientific, rendering his conclusions no more than subjective guesses. *See Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010).

[11] *See United States v. Bernard*, 299 F.3d 467, 482 n. 11 and accompanying text (5th Cir. 2002) (twice asserting that Dr. Richard Coons' trial testimony had tended to show *Bernard's* "propensity for violence in prison"). Later, Bernard challenged his trial counsel's failure to seek a limiting instruction to warn jurors against making the same mistake that the Fifth Circuit itself had made on direct appeal. In response, the Fifth Circuit admitted that jurors may well have held Dr. Coons' testimony about Vialva's future dangerousness against Bernard, but dismissed the IAC allegation by focusing on the Government's closing argument rather than Dr. Coons' testimony itself. *United States v. Bernard*, 762 F.3d 467, 475 (5th Cir. 2014) ("Contrary to Bernard's assertion, the Government's closing argument did not conflate Dr. Coons' testimony with Bernard's future dangerousness, although a juror could have drawn inferences. *See Bernard*, 299 F.3d at 482 n. 11").

8

2 (August 20, 2016) (attached as Exhibit 4). And beyond simply staying out of trouble,

Bernard has used his time in prison constructively, counseling other youth not to be led

astray. *See Declarations of David and Michael Boyd and accompanying magazine article*

*documenting Bernard's good works while in prison* (attached as Exhibits 5 and 6).

> **C. Eighteen years after Bernard was sentenced to death, at a resentencing hearing for his juvenile codefendant Sparks, the Government introduced previously suppressed expert testimony showing that Bernard had been at the very bottom of the hierarchical structure of the 212 PIRU Bloods, while Sparks held a leadership position as an "enforcer" and two other codefendants likewise ranked significantly higher in the gang than Bernard.**

In early 2017, this Court granted relief from the mandatory sentence of life

imprisonment without parole previously imposed on Bernard's juvenile codefendant Tony

Sparks. *See Sparks*, 2018 WL 1415775 at *1 and n.1 (citing *Miller v. Alabama*, 567 U.S.

460 (2012), which had barred such sentences for juvenile offenders). Sparks' resentencing

hearing was conducted in February 2018. During that hearing, Sandra Hunt, formerly a

sergeant with the police department that investigated the Bagleys' deaths, and who had

special expertise investigating gangs, testified that Bernard was at the bottom of the gang

hierarchy. Exhibit 1 at 95-96). To explain and support Sgt. Hunt's testimony, the

Government introduced two one-page documents. The first was obtained by law

enforcement from a Killeen high school student in 1998. *See Sparks*, *supra*, dkt 581-11 at

7 (Government Exhibit 66 from that proceeding, attached here as Exhibit 7); Ex. 1 at 93-

97. This single sheet was decorated with arcane gang symbols and initials,[12] and contained

---

[12]The randomly placed decorations include a five-pointed star with the letters "B," "G," and "B" at three of its points; a six-pointed star with "2," "1," "2," "B," G," and "B" at its

the nicknames of gang members arranged roughly in the shape of a triangle or pyramid, with the nickname "Dip" appearing on the longest line. Ex. 7. The second one-page document was created by the police themselves the following year, and Sgt. Hunt consulted it when she was asked by the United States Attorney's Office, then preparing for Bernard's trial, whether and where certain names appeared in the document. *See Sparks*, *supra*, dkt 581-11 at 1 (Government Exhibit 65 from that proceeding, attached here as Exhibit 8); Ex. 1 at 94-95. This second one-page document was based on confidential information in Killeen Police Department gang intelligence files; it omitted most of the gang ephemera, and replaced the gang members' nicknames with their true names. *Id.*

Sgt. Hunt explained that the document obtained from the student and subsequently analyzed and refined by the police was actually a graphic representation of the gang's hierarchy; it showed that Sparks had held a relatively powerful position as an enforcer, occupying "rung 5" of the hierarchical structure. Ex. 1 at 96-97. She identified the nickname "Dip" as referring to Bernard and acknowledged that Bernard, in stark contrast to Sparks, occupied the lowest level in the array. As she described it, "Brandon Bernard, also known as 'Dip,' is at the very bottom of the chart of [sic] pyramid, second name in, about 30 people below Mr. Sparks." Ex. 1 at 97. In fact, according to that reading of the chart, Bernard was located 35 people below Sparks:  Sparks occupied position "10" in the hierarchy; while Bernard occupied position "46."

---

points, plus the letter "P" at its center and two down-pointing pitchforks; a cross with four dots; the letters "CK" with a slash through the "C;" and the phrases "5 * Time," "212 PIRU Blood," "5 * Deuce Villain," "Texas Boys," "311," "415," and "550."

Until its existence was disclosed in Sparks' resentencing hearing, Bernard was unaware of Sgt. Hunt's investigation and conclusions regarding the structure of the gang. And the substance of her expert conclusions is, of course, highly favorable to him.[13] In resentencing Sparks, this Court expressly credited Sgt. Hunt's testimony. *See Court's Memo Op. on Sparks Resentencing*, *Sparks*, 2018 WL 1415775, at *6 ("In contrast, however, Sparks was not a tangential participant in the gang. As testified to by Sandra Hunt, Sparks was known as an enforcer by the Killeen [Police Department] gang unit."); *see also* Oral Ruling at 12, lines 15-16 (March 19, 2018). Bernard, located at the very periphery of the pyramid, occupied no similar position of leadership.

---

[13] The record is unclear whether the Government disclosed either of the exhibits it submitted to support Sgt. Hunt's testimony in 2018 to Bernard's attorneys prior to his trial in 2000. Even if the documents themselves were disclosed, Bernard is still entitled to relief from his death sentence under *Brady* and *Napue*. Nothing indicates that the Government ever disclosed to Bernard's attorneys that Sgt. Hunt, an experienced law enforcement officer specializing in criminal gangs, had interpreted the chart as an accurate portrayal of the relative leadership positions of different individuals within the gang. In fact, the trial record strongly suggests the contrary. Otherwise, Bernard's trial counsel surely would have used Sgt. Hunt's conclusions to challenge Ranger Aycock's claim that no hierarchy existed within the 212 PIRU Bloods, which Aycock offered in response to a specific request from the Government that he address "who's in charge of Two-One-Two PIRU." ROA.5240. Untested by Sgt. Hunt's expert opinion, Ranger Aycock's testimony likely left the jurors with a false impression about the nature of the gang. That false impression probably influenced the jurors' evaluation of the relative culpability of the various actors in the crime, a statutory mitigating factor that they were legally obligated to consider.

**D. Despite having been aware in 1998 or 1999 that the 212 PIRU Bloods had a clear hierarchical structure and that Bernard was at its very bottom, the Government failed to disclose its expert testimony related to these facts to Bernard's trial attorneys, and misled the jury during the punishment phase of Bernard's trial into believing that no such hierarchy existed.**

During the punishment phase of Bernard's trial, the Government made no mention of this hierarchy and actively misled the jury into believing that no such hierarchy even existed. Indeed, the Government claimed the gang in question – the so-called 212 PIRU Bloods – had no hierarchy at all. Terry Brown, Bernard's codefendant and an important prosecution witness at trial, testified that according to one of the gang's founding members, everyone in the gang was considered equal. ROA.5225. The Government also introduced testimony from Texas Ranger John Aycock, who told the jury that the gang's founding members wanted to avoid a hierarchical structure, because such a structure would cause too much confrontation within the gang. Aycock testified that 212 PIRU was a gang that did not assign titles or crowns to its members. ROA.5240. The Government, although aware of Sgt. Hunt's expert analysis to the contrary, never sought to admit the document showing the gang's hierarchy. Nor did they call Sgt. Hunt to advise the jury of the Killeen Police Department's expert opinion that some members of 212 PIRU *did* occupy positions of power within the gang, but that Bernard, who existed on the gang's periphery, was not one of them. Despite repeatedly misleading the jury that the gang had no hierarchical organizational structure, the Government worked to paint Bernard as an irredeemable

12

gangster, inconsistently and illogically contending that Bernard longed to be the "top dog" of what it claimed was a leaderless gang. ROA.5677.[14]

The Government's contention that Bernard deserved to die because he was an irredeemable gang member was a central theme of its case. The Government began to paint this picture during its direct examination of FBI Agent Dan Chadwick. ROA.5203. Chadwick described an incident in March 1999 when 212 PIRU gang members crashed an invitation-only birthday party. ROA.5203-04. According to Chadwick, a fight broke out among gang members, and Bernard was among the gang-affiliated individuals arrested on that occasion. ROA.5204.

The Government also called cooperating witness Terry Brown in its effort to portray Bernard as a relentless gangster. The Government invited Brown to describe a series of photographs that showed Bernard throwing gang signs and flashing his gold teeth (engraved with the letters "CK," for "Crip Killer"). ROA.5218-19. Later, the Government called Killeen School District Gang Officer John Bowman to repeat Brown's testimony regarding the photograph. Brown also recounted an incident when Bernard was discovered at school wearing his "CK" gold teeth and "rubbing" them to provoke a rival gang member.

---

[14] Despite testimony from the Government's own witnesses that all members were equal in the gang and that there were no crowns to be won, the Government contended that Bernard shared with Vialva a thirst to rise to the top of 212 PIRU, which motivated him to take part in the crime that led to the Bagleys' deaths: "Just like a little boy who tortures a frog, who is very pleased with the pain that he caused the frog, he wanted some recognition, Mr. Vialva did, in this case from his gang. He wanted to be the top gangster in Killeen. You need to recognize him for that. *And you need to recognize Brandon Bernard for his assistance in that. Because if they want to be the top dogs and be the top gangsters, then give them the recognition that's earned them their seats* right here in the courtroom." ROA.5677 (emphasis added).

13

ROA5229-30. (As documented in Bernard's original § 2255 motion, trial counsel inexplicably failed to introduce evidence that Bernard had distanced himself from these behaviors by having the "CK" caps removed from his teeth. ROA.1358, 1441.) Bowman also insinuated that Bernard had played a leadership role within the 212 PIRU, by describing an incident when a victim was "jumped" by Bernard "and a few other of *his gang members*, five kids, to be exact." ROA.5231 (emphasis added).

**E. The Government leveraged its false characterizations of the PIRU 212 Bloods – as a gang with no hierarchy in which all members were thus equally culpable – and of Bernard's purported leadership role to convince jurors that if they spared his life, Bernard would continue to pursue violent gang-related enterprises in prison.**

Through the testimony of Anthony Davis, an intelligence officer for the Federal Bureau of Prisons, the Government convinced the jury that Bernard would continue to pursue violent gang-related activities in prison. ROA.5588-89. Davis told the jury: "The Bloods operate by – once they're incarcerated, they get as many numbers as possible. They recruit as many members as they possibly can, or just inmates that they possibly can, to have the numbers to continue their criminal behavior and activity, just like they did out in the streets. If they're unable to get the numbers and recruit the members to have their own Blood gang, they will eventually have to join a prison gang, which is a more violent and more sophisticated gang in the prison system." *Id.* (As noted, the specific allegation that Bernard would engage in gang activity in prison has been conclusively proven false by his good behavior over the last eighteen years. And Davis' more general suggestions that Bernard would involve himself in "criminal behavior and activity" are also contradicted by Warden Bezy, *see* Ex. 4 at 2, and *supra* n. 4 and accompanying text.

14

**F. The Government's suppression of the 212 PIRU Bloods' hierarchical structure both limited Bernard's defense team at trial and denied Bernard the opportunity to allege this *Brady* claim in his original § 2255 motion.**

Because of the Government's failure to disclose the information in its possession about Sgt. Hunt's analysis of the hierarchy of the 212 PIRU gang, Bernard's trial counsel were unaware at the time of trial that expert testimony was available from a law enforcement witness to show that the Government's claims about the structure of the 212 PIRU Bloods and Bernard's role in that gang were false. Had that information been disclosed, Bernard could have presented Sgt. Hunt's testimony, demonstrating that 212 PIRU had a vertical hierarchy and that Bernard was at its very bottom. That evidence would also have bolstered the testimony of a number of Bernard's mitigation witnesses that he was a follower and not a leader. ROA.5299; 5548; 5561; 5574.

Moreover, had the Government not suppressed Sgt. Hunt's expert opinion concerning the gang's hierarchical structure and her admission that Bernard occupied a position well below his codefendants Sparks, Vialva, and Brown, Bernard could have alleged this *Brady* violation in his original § 2255 motion in 2002. ROA.1820-2006. With that motion, Bernard submitted documentary evidence showing that the Government had concealed vital facts about the prior violent criminal history of Terry Brown and Brown's inconsistent representations regarding who had been responsible for lighting the match that set fire to the Bagleys' car. Although the Government represented that it had maintained an open file policy during the original trial, ROA.1608, it pointedly reversed that policy during the collateral review proceedings, refusing to allow Bernard's current counsel the

15

same access to its files that it had purportedly given his trial counsel. *See* ROA.1210. Accordingly, Bernard requested that the district court permit discovery and grant an evidentiary hearing so that Bernard could further develop his known *Brady* claim. *Id*. That motion was denied, and the court explicitly cited the Government's supposed open file policy from the pretrial period as a basis for denying Bernard's post-conviction discovery request. ROA.1772. As a consequence, the *Bra*dy claim that forms the basis for this motion was allowed to remain hidden.[15]

**III.    Claim for relief:  the Government's failure to disclose the existence of Sgt. Hunt's expert opinions regarding the hierarchy of the 212 PIRU Bloods youth gang, Mr. Bernard's rank at the very bottom of that hierarchy, and the substantially higher rankings of his codefendants Terry Brown, Christopher Vialva, and Tony Sparks, violated due process and the fair trial guarantee of the Sixth Amendment as interpreted in *Brady* and its progeny.**

**A. To ensure a fundamentally fair trial, the Government must share information in its possession that is favorable to the defendant; if it fails to do so and that information is material to guilt or punishment, a new trial is required.**

One of the most cherished principles of our criminal justice system is that the Government's "interest … in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935), *overruled on other grounds, Stirone v. United States,* 361 U.S. 212 (1960). Consistent with the Government's "special role … in the search for truth in criminal trials," *Strickler v. Greene*, 527 U.S. 263, 281 (1999), "[i]t is as much [the Government's] duty to refrain from improper methods

---

[15] ROA.1748-1811, 1820-31, 2041-45. Bernard unsuccessfully appealed the denial of his original 2255 motion to the Fifth Circuit, and the Supreme Court declined review. *See Bernard*, 762 F.3d 483 (denying a COA); *cert. denied*, 163 S. Ct. 892 (2016).

calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger*, 295 U.S. at 88. Based on that overarching principle, the Supreme Court has long held that a defendant's right to due process is violated if the Government withholds favorable evidence that is material to a defendant's guilt or punishment, *see Brady*, 373 U.S. at 87, or knowingly uses false evidence to procure a conviction or sentence, *see Giglio v. United States*, 405 U.S. 150, 153 (1972); *Napue v. Illinois*, 360 U.S. at 269.

The prosecution's responsibility to disclose evidence under *Brady* extends to exculpatory and impeachment evidence alike. *See*, *e.g.*, *United States v. Bagley*, 473 U.S. 667, 676-677 (1985). It also encompasses evidence relevant to mitigation of punishment. *See Brady*, 373 U.S. at 87; *Cone v. Bell*, 556 U.S. 449, 470-75 (2009) (evidence that defendant "was impaired by his use of drugs around the time his crimes were committed" constituted *Brady* information; case remanded for assessment of its materiality to the defendant's sentence). The prosecution has an "affirmative duty" to disclose any such evidence "regardless of request" by the defense. *Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995). *Brady* encompasses all favorable evidence known not only to the prosecutors personally but "to the others acting on the Government's behalf in the case, including the police." *Kyles*, 514 U.S. at 437; *see also id*. at 438. This collective is commonly described as "the prosecution team."[16]

---

[16] *See* (then) Deputy Attorney General David Ogden's January 4, 2010 memo, "Guidance for Prosecutors Regarding Criminal Discovery" (hereinafter "DAG Guidance Memo"), describing the relevant Department of Justice policy regarding the *Brady* obligations of the "prosecution team": "It is the obligation of federal prosecutors, in preparing for trial, to

17

*Brady* extends to information of all types, and requires the prosecution to disclose material favorable information even if that information has not previously been recorded and has only been communicated orally to a member of the prosecution team. *United States v. Rodriguez*, 496 F.3d 221, 226 (2d Cir. 2007); *see* DAG Guidance Memo Step 1.B.5 (acknowledging that "the format of the information does not determine whether it is discoverable"; the Government must search for favorable information in "factual reports," "factual discussions," or "factual information obtained during interviews"; and "information that the prosecutor receives during a conversation with an agent or a witness is no less discoverable than if that same information were contained in an email.")

A *Brady* claim has three elements:  first, "[t]he evidence at issue must be favorable to the accused"; second, the "evidence must have been suppressed by the [Government]"; and third, "prejudice must have ensued" from the suppression. *Strickler*, 527 U.S. at 281-282. As shown below, each of those elements is satisfied here.

### B.  The suppressed information was favorable to Bernard.

Before Bernard ever went to trial, a gang expert in the Killeen police department, Sgt. Sandra Hunt, applied her expertise, specialized knowledge of the local gangs, and confidential information maintained by the Killeen Police Department to ascertain the

---

seek all exculpatory and impeachment information from all members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant." The DAG Guidance Memo is now codified at Section 165 of the United States Attorney's Criminal Resource Manual and available at: http://www.justice.gov/usao/eousa/foia_reading_room/usam/title9/crm00165.htm

hierarchy of leadership and status within the 212 PIRU Bloods gang. Sgt. Hunt determined that the gang's organizational structure had thirteen discrete levels and formed a pyramid. The power of each member diminished, from top to bottom and from left to right. The gang's founder was at the apex, enforcers and recruiters who "put in a lot of work" (*i.e.*, committed a lot of crimes with the gang) occupied the mid-levels, and the members with little or no status were stuck at the bottom. Ex. 1 at 94 ("from the top to the bottom, it identifies the leader and the status of the members as it goes down"), *id*. at 98 (explaining what it meant to "put in work" for the gang). She concluded that Bernard was at the very bottom of the gang hierarchy. Ex. 1 at 97 ("Brandon Bernard, also known as 'Dip,' is at the very bottom of the chart of [sic] pyramid, second name in, about 30 people below Mr. Sparks").

The record unequivocally shows that this information was communicated to the Government in advance of Mr. Bernard's trial. Sgt. Hunt's 2018 testimony shows that she was contacted by the Government in 1999, as it prepared for the 2000 trial. Ex. 1 at 97. Federal prosecutors then asked her to consult her chart to see whether it contained the names of the various defendants charged in connection with that case. Ex. 1 at 97 (Assistant United States Attorney Frazier asked Sgt. Hunt to "go back to see if any of the identities of any of the other people who were involved in [the Bagley murders] were on this chart").[17] In addition to the relative positions of power she ascribed to Sparks and

---

[17] This sequence of events (calling to ask a question about the contents of the chart), of course, implies earlier contacts between the federal prosecution team and either Sgt. Hunt or the Gang Unit, in which the existence of the chart was made known to the Government.

Bernard as detailed above, Sgt. Hunt informed AUSA Frazier that she had identified the hierarchical positions of two other defendants in the then-pending case: Terry Brown, who was positioned in rung 6, and Christopher Vialva, who was positioned in rung 7.

That this information was highly favorable to Bernard cannot be reasonably debated: Sgt. Hunt, a law enforcement officer with specialized knowledge about gangs, had reached the expert opinion that Bernard was at the very lowest level of status and authority within the 212 PIRU Bloods, the gang at the center of the murders of Todd and Stacie Bagley, the crime for which Bernard now awaits execution. As set forth in greater detail in Section III.D.2, *infra*, this information would have shown the jury that Bernard was a follower within the gang, rather than a leader or decision-maker, which was mitigating because it showed Bernard's diminished culpability and relative immaturity; it also portrayed Bernard, if sentenced to life imprisonment without the chance of release, as far less likely to pose a threat of "future dangerousness," which was a specific aggravating factor alleged by the Government and ultimately found by the jury. And Sgt. Hunt's opinions about the relative status and authority within the gang of the other defendants in the case – Sparks, Vialva, and Brown – were also favorable to Bernard, because in her expert view, those individuals all ranked significantly higher in the gang than Bernard, meaning that some codefendants who arguably posed *more* serious threats to society were escaping with *less* harsh punishment than Bernard himself. Indisputably, the information Sgt. Hunt developed concerning the leadership structure of the 212 PIRU Bloods, and shared with the Government as it prepared to seek a death sentence for Bernard, was favorable to Bernard within the meaning of *Brady* and its progeny.

20

**C. The Government failed to disclose the favorable information in its possession, either prior to trial or since.**

Prior to trial, Mr. Bernard's attorneys filed a motion demanding that the Government disclose any favorable evidence. Citing *Brady*, they requested "any and all material known to the Government or which may become known, or which through due diligence may be learned from the investigating officers or the witnesses or persons having knowledge of this case, which is exculpatory in nature or favorable to the accused or which may lead to exculpatory or favorable material or which might serve to mitigate punishment, including any evidence impeaching or contradicting testimony of Government witnesses …" ROA.71; *see also* ROA.72-73 (setting out in detail the legal basis for these requests). The Government responded that it would "provide open file discovery to defense counsel to the extent that it will comply with Rule 16, Federal Rules of Criminal Procedure, the Jencks Act (18 U.S.C. 3500), and the dictates of *Brady v. Maryland*, 373 U.S. 83 (1963)." ROA.102.

No known evidence suggests that the Government ever disclosed to Mr. Bernard's trial counsel the favorable information that is described in Section III.B, *supra*, and now memorialized by the transcript of Sgt. Hunt's 2018 expert testimony, as reflected in Exhibit 1. To the best of undersigned counsel's knowledge and belief, nothing contained in the materials made available to Mr. Bernard's trial counsel (the so-called "open file") contained or reflected then-Sgt. Hunt's expert opinion regarding the hierarchy of the 212 PIRU Bloods, where any of the defendants in this case fell in that hierarchy, or what significance might attach to any particular defendant's position in that hierarchy. *See*

21

*Declaration of Robert C. Owen* (attached as Exhibit 9). Nor did the Government otherwise take any steps to communicate its information about Sgt. Hunt's expert opinions on these subjects to Mr. Bernard's trial counsel.[18] *Id*.

The Government also never disclosed Sgt. Hunt's expert opinions regarding the 212 PIRU Bloods when Mr. Bernard's initial proceeding under 28 U.SC. § 2255 was pending before this Court. On the contrary, the Government resolutely refused to provide undersigned counsel any information whatsoever. ROA.1210 (Bernard's motion for discovery, noting that the Government had "verified to undersigned counsel that no discovery w[ould] be produced by agreement").[19] With respect to whether it had honored

---

[18] In the circumstances of this case, the fact that Sgt. Hunt was a Killeen police officer rather than a federal law enforcement agent is immaterial for *Brady* purposes. Her expert opinion and assistance was solicited by the United States Attorney's Office in connection with its investigation of the Bagley murders, meaning that the entirety of her knowledge about the hierarchy of the 212 PIRU Bloods and the status within that gang of each of the defendants in this case is imputed to the federal prosecution team under *Brady*. *See United States v. Antone*, 603 F.2d 566, 569-70 (5th Cir. 1979) (imputing knowledge in state hands to federal prosecutors because of degree of cooperation and interaction among the various authorities during the general course of the investigation). Nor does it matter whether Sgt. Hunt ever reduced to writing her opinion and analysis concerning the hierarchy of the 212 PIRU Bloods gang prior to Bernard's trial, or whether the Government's attorney who spoke with her about these topics prior to Bernard's trial memorialized their conversations on the subject. Oral statements of a witness which are exculpatory or mitigating and known to the Government must be disclosed to the defense. *See United States v. Hughes*, 230 F.3d 815 (5th Cir. 2000) (discussing *Brady* requirements in context of oral statement of witness to customs agent).

[19] *Brady* and its progeny impose a continuing obligation that was itself violated by the Government's failure to disclose Sgt. Hunt's expert conclusions during Bernard's initial § 2255 proceeding. *See, e.g., Monroe v. Butler*, 690 F. Supp. 521, 525 (E. D. La. 1988), *aff'd* 853 F.2d 924 (5th Cir. 1988) ("Clearly, such nondisclosure [of exculpatory information] is as unfair where it prevents a defendant from taking full advantage of postconviction relief as it is when it results in the forfeiture of the defendant's right to a fair trial."); *Thomas v. Goldsmith*, 979 F.2d 746, 749-50 (9th Cir. 1992) (referencing the

its *Brady* obligations at trial, the Government continued to insist that it had kept an "open file." *See* ROA.1608 ("The prosecution provided open file discovery [to Mr. Bernard's trial counsel]"); ROA.1630 ("Prior to trial, the government had an 'open file' discovery policy for the two defense teams").

Defense counsel is entitled to rely on the prosecution's representations concerning compliance with *Brady*. In *Strickler*, the Supreme Court rejected the prosecution's arguments that the habeas petitioner's *Brady* claim was procedurally defaulted because he had not been "diligent" in discovering the exculpatory information himself. 527 U.S. at 283 n.23, 284. Diligence is not an element of *Brady*. If defense counsel relies on the Government's representations, implicit or explicit, that no *Brady* material exists or that all *Brady* material has been provided, the law neither expects nor requires the defense to investigate further to find out if the Government is lying about that. *Id*. at 284 ("[I]t was reasonable for trial counsel to rely on, not just the presumption that the prosecutor would fully perform his duty to disclose all exculpatory materials, but also the implicit representation that such materials would be included in the open files tendered to defense counsel for their examination."). As the Court reemphasized in *Banks v. Dretke,* 540 U.S. 668 (2004), a defendant need not "scavenge for hints of undisclosed *Brady* material" where prosecutors "represented at trial and in … post-conviction proceedings that [they] had held

---

State's "present duty to turn over exculpatory evidence relevant to the instant habeas corpus proceeding"). Whether or not the Government committed a separate constitutional violation when it continued to conceal this information during Bernard's initial § 2255 action, its conduct is plainly relevant to whether Bernard should be allowed to litigate the claim now. *See* Sections IV and V.

nothing back," because "[a] rule . . . declaring 'prosecutor may hide, defendant must seek' is not tenable in a system constitutionally bound to accord defendants due process." *Id.* at 695, 698, 696 (citation omitted). In denying the request for discovery that accompanied Bernard's § 2255 motion, this Court appears to have assumed that the Government must have disclosed all relevant evidence prior to trial pursuant to its supposed "open-file" policy. As the present motion shows, that assumption was improvident. ROA 1772.

> **D. It is at least reasonably probable that one juror would have voted to spare Mr. Bernard's life if the favorable information had been disclosed.**
>
> > **1. To satisfy *Brady*'s materiality prong, a defendant need only show there is a reasonable probability – not a "more likely than not" probability – that the result of the proceeding would be different, such that the suppression of favorable evidence undermines the court's confidence in the verdict.**

To satisfy the third element of a punishment-phase *Brady* violation, the defense must show that, had the suppressed information been timely disclosed to trial counsel, there is a "reasonable probability" that the result of the sentencing proceeding would have been different. *Bagley*, 473 U.S. at 682. Put another way, a "reasonable probability" of a different result is shown when the prosecution's evidentiary suppression "undermines confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

*Kyles* clarified several key aspects of the materiality analysis under *Bagley* that are worth repeating here. First, a "reasonable probability" does not mean more likely than not:

> *Bagley*'s touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.

*Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

Second, a materiality analysis is not a sufficiency analysis. "A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict," *id*. at 434-35 – or, as here, to support a death sentence. *See also id*. at 453 ("the question is not whether the [prosecution] would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same").

Third, the reviewing court must consider the materiality of the favorable information "collectively, not item by item." *Kyles*, 514 U.S at 436. In other words, individual items of information should not be considered in isolation. Even if a single piece of favorable information might on its own be deemed immaterial, the combination of two or more pieces of favorable information may pass the threshold of materiality.

As will be explained in more detail below, multiple pieces of information must be aggregated in this case, *i.e.*, the fact that Mr. Bernard occupied the lowest level of authority or leadership in the gang must be combined with the fact that three of his codefendants occupied considerably higher perches in the group. In addition, not only would these pieces of information have been valuable to trial counsel in and of themselves, but by keeping the information hidden, the Government knowingly misled the jury as to the true organizational structure of the gang, contrary to *Napue* and its progeny. Thus, the

Government unjustly benefited from its suppression in two ways:  it prevented Bernard from eliciting powerful mitigating testimony from a respected law enforcement officer, while it allowed the Government to wrongly convince the jury that no such evidence of Bernard's bottom-floor status in the gang could possibly exist. This *Napue* violation constitutes an independent ground for reversing Bernard's death sentence, but also should be considered along with the *Brady* violation, since the *Napue*-based prejudice that Bernard suffered at trial heightens the materiality of the suppressed evidence.

Finally, there is no "harmless error" analysis under *Brady*. If a reviewing court determines that the prosecution failed to disclose favorable information and that the withheld information was material, it must afford relief from the unconstitutionally obtained judgment without further inquiry. *Kyles*, 514 U.S. at 436 (once the *Bagley* materiality threshold is crossed, a *Brady* violation "cannot subsequently be found harmless").

There is one last point particular to death penalty cases. Where – as here – the governing statute "requires unanimity in a jury's sentence of death," the "proper frame of reference" for the materiality of a punishment-phase *Brady* violation is "whether the mind of one juror could have been changed" with respect to the penalty determination. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 and n.33 (5th Cir. 1993) (discussing Louisiana capital sentencing law, which like the Federal Death Penalty Act bars a death sentence unless the jury unanimously agrees that death is appropriate).[20]

---

[20] The same point has been acknowledged by courts assessing punishment-phase prejudice in the *Strickland* context, where the same prejudice standard ("reasonable probability of a

26

With those observations, we now turn to "the value of the [suppressed] evidence relative to the other evidence mustered by the [Government]" in Bernard's case. *Spence v. Scott*, 80 F.3d 989, 995 (5th Cir. 1996) (citation omitted).

> **2. The expert testimony interpreting the hierarchy of the 212 PIRU Bloods, which was suppressed by the Government, was material because it is reasonably probable that, had that information been presented, at least one juror would not have voted for death.**
>
> > **a. The suppressed evidence was material because it directly bore on relative culpability. This truth is apparent both from this Court's analysis of the same evidence during Sparks' resentencing and from the efforts that the Government made at Bernard's sentencing hearing to mislead jurors about the true nature of the gang's leadership structure.**

This Court's reliance on Sgt. Hunt's testimony in resentencing Tony Sparks is strong evidence that the Sergeant's conclusions about Bernard's lowly status in the gang are material under *Brady*. The Court credited Sgt. Hunt's testimony that Sparks was "known as an enforcer" by the Gang Unit, accepted her corollary opinion that Sparks "was not a tangential participant in the gang," and for those reasons found that Sparks warranted more serious punishment. *See Court's Memo Op. on Sparks Resentencing*, 2018 WL

---

different outcome") applies. *Bagley*, 473 U.S. at 682 (adopting *Strickland* "prejudice" standard for purposes of evaluating "materiality" under *Brady*); *see, e.g.*, *Jermyn v. Horn*, 266 F.3d 257, 309 (3rd Cir. 2001) (where state law requires jury's capital sentencing determination to be unanimous, it is appropriate in applying *Strickland* to consider the potential effect on "one juror" of mitigating evidence trial counsel failed to present); *Mak v. Blodgett*, 970 F.2d 614, 620-21 (9th Cir. 1992) (same). Likewise, where a single juror's vote could have precluded imposition of a death sentence, courts have found it appropriate in assessing harm from an erroneous jury instruction to ask whether even one juror may have been misled by the charge. *Kubat v. Thieret*, 867 F.2d 351, 371 (7th Cir. 1989).

1415775, at *6; *see also* Exhibit 3 at 12, lines 15-16. Given this Court's reasoning, a juror plainly could have found a death sentence unnecessary for Bernard, who Sgt. Hunt concluded was at the lowest level of the 212 PIRU Bloods and thus the very definition of a "tangential participant" in the gang. While lack of a leadership position is not necessarily correlated with lesser culpability, most would agree that the two concepts tend to be related, as this Court did when it resentenced Mr. Sparks. And the Government's having labored to convince the jurors that all the defendants held equal positions of power in the 212 PIRU, while still suggesting that Bernard sought to capture a leadership position, reveal that the Government itself understood that attributing a leadership position to an individual would demonstrate that such an individual was both more culpable and more likely to pose a continuing threat to society.[21]

Given all the foregoing facts, it is reasonable to suggest that at least one of the twelve jurors – had they been fully informed and not deceived – would have found that Bernard possessed a lesser culpability and therefore could be adequately punished with a sentence of natural life in prison with no chance for release, rather than being put to death. And the fact that jurors plainly found Bernard less culpable than Vialva, as illustrated by their verdicts sparing his life on two of the three capital counts while affording no similar leniency to Vialva, further buttresses the argument that there is a reasonable possibility that disclosure of the suppressed evidence would have resulted in a different sentencing outcome.

---

[21] The materiality of this evidence with respect to the jury's consideration of Bernard's "future dangerousness" is discussed in more detail in the next section, III.D.2.b.

**b. Had the Government not suppressed information about the hierarchy of the 212 PIRUs, Bernard's trial counsel could have used this information to attack the Government's claim that Bernard, if sentenced to life imprisonment, would pose a serious and continuous threat to the lives and safety of others in prison.**

The suppressed information was also material because it bore directly and favorably on the issue of Bernard's "future dangerousness," a topic to which the Government devoted much of its punishment-phase presentation. As we have explained in detail, II.E, *supra*, the Government's "future danger" claim rested on painting Bernard as a hard-core, "thug for life" gang-banger, someone who wore his allegiance to the Bloods not just on his red sleeve but on his gold teeth, who aspired to high status in the gang and would naturally ally himself with other "Bloods" in federal prison to commit further violent crimes. That frightening and false portrayal almost certainly played a key role in the jury's erroneous determination that Bernard would pose a "continuing and serious threat to the lives and safety of others" even in a prison setting. ROA.367. The information from Sgt. Hunt that the Government failed to disclose would have cast this aspect of the sentencing hearing in an entirely different light, by rightly showing that Bernard was not hopelessly enmeshed in this gang, but operating on its periphery and thus unlikely to seek out an affiliation with "Bloods" in prison if his life were spared (something that we now know to be true, *see* Ex 4-6).

29

**c. The suppressed evidence of 212 PIRU's hierarchy, and Bernard's position at its very bottom, would have communicated to the jury that equally culpable codefendants' lives were being spared, a significant statutory mitigating circumstance.**

The suppressed information was likewise material because it bore directly on a statutory mitigating circumstance with which the jury was charged, whether equally culpable codefendants were escaping the death penalty. *See* 18 U.S.C. § 3592(a)(4) (establishing as a mitigating factor for federal capital sentencing hearings that "[a]nother defendant or defendants, equally culpable in the crime, will not be punished by death"). The jurors charged with determining Bernard's sentence gave this mitigating factor zero votes, despite the fact that only Bernard and Vialva were facing a capital prosecution, while Sparks, Lewis, and Brown – notwithstanding their very substantial roles in the events leading up to and including the murder of the Bagleys – were not. *See* ROA.369 (special findings form for Count Four, reflecting zero votes for the mitigating factor that "[a]nother defendant or defendants who may be equally culpable in the crime will not be punished by death").

The importance of a thorough and fair presentation of evidence related to this mitigating factor cannot be overstated. Indeed, the Government itself has implicitly conceded this point by acknowledging that the question of relative culpability was the key issue to the entire case. *See* ROA.1599 (Government's response to Bernard's initial § 2255 motion: "The only real issue [in the case] was relative responsibility").

Had the Government disclosed Sgt. Hunt's expert opinion about the relative status and leadership within the 212 PIRU Bloods of the four defendants named in her chart,

30

jurors would have had a strong basis for finding that this factor had been established, given Sgt. Hunt's unequivocal conclusions that two defendants held much higher positions within the gang's leadership structure than Bernard, yet they did not face the death penalty: *i.e.*, Tony Sparks (rung 5, now serving a 40-year sentence) and Terry Brown (rung 6, only months younger than Bernard, recently released from prison after serving a 20-year sentence for this offense, for conduct that was comparable to Bernard's).[22] Sgt. Hunt's expert testimony on this point would have substantially increased the likelihood of an affirmative finding on this statutory mitigating factor.

> **d. Disclosure of the suppressed hierarchical structure of the 212 PIRUs would have prevented the Government from misleading the jury in violation of *Napue*.**

The suppressed information was also material because it would have flatly rebutted the Government's repeated and forceful claim that the 212 PIRU Bloods had *no* hierarchy or leadership structure, and thus that everyone in the gang should properly be regarded as equally culpable. The Government made this point through the testimony of cooperating codefendant Terry Brown, who attributed to one of the gang's founders the notion that all members were of equal status, so the gang would not have "crown holders *or any other forms of levels*." ROA.5225 (emphasis added). The Government reemphasized the point through testimony from Texas Ranger John Aycock, who went so far as to say that the founders of the 212 PIRU Bloods did not want a hierarchy because "somebody on *the bottom of the pyramid scheme* – [who] was on the *bottom of the pyramid scheme* – that guy

---

[22] See n.6, *supra*.

31

could cause problems for the man on top, and they didn't want that kind of problems."
ROA.5240 (emphasis added). Sgt. Hunt's testimony before this Court demonstrates that
the testimony the Government elicited at Bernard's trial to "prove" a lack of hierarchy in
the 212 PIRU Bloods was utterly vulnerable to attack. Had the Government disclosed the
real opinion of its gang expert, the jury would have learned that the 212 PIRUs in fact had
well-defined levels of authority (contrary to Brown's account) and had conceptualized their
hierarchy as a pyramid (contrary to Aycock's testimony). Perhaps most important, jurors
would have learned the twin facts that three of Bernard's codefendants occupied relatively
high places in the gang's hierarchical structure, while Bernard himself was at its very
bottom. The Government thus denied critically important evidence to the jurors via its
*Brady* violation, and then affirmatively misled them in violation of *Napue*. These actions
render the result of Bernard's capital sentencing hearing intolerably unreliable.

> **e. The suppressed evidence is material because it
> comes from a type of source (law enforcement) that
> a jury typically affords significant weight.**

The suppressed information was material not only because of its substance, but
because of its source. Bernard's personality as a "follower" was already part of the case in
mitigation, and two defense witnesses at punishment spoke to this trait. *See* ROA.5298
(Bernard's childhood friend Matthew Mitchell); ROA.5574 (Bernard's mother); *see also*
ROA.1598 (Government, in responding to Bernard's initial § 2255 motion, calls this theme
– that "Bernard was just a follower" – the "essential position" advanced by Bernard's trial
attorneys in attempting to persuade the Department of Justice not to seek their client's
execution). But these defense witnesses were close to Bernard, and jurors may have

32

believed that their descriptions of him were colored by bias. Moreover, the Government consistently impeached each of Bernard's mitigation witnesses by highlighting their proximity to or personal involvement with the 212 PIRU Bloods. *See* ROA.5306 (cross-examination of Matthew Mitchell); *see also* ROA.5550 (cross-examination of Isolde Rorie-Cody).

Sgt. Hunt, by contrast, would have enjoyed the enhanced credibility and stature of a law enforcement officer with specialized expertise, and her testimony would have carried correspondingly greater weight. *See, e.g., Shelton v. Marshall,* 796 F.3d 1075, 1089 (9th Cir.), *amended on reh'g,* 806 F.3d 1011 (9th Cir. 2015) (rejecting State's contention that suppressed secret deal with prosecution witness was cumulative to impeachment evidence at trial, stating, "the undisclosed evidence was not duplicative of the impeachment evidence actually presented, but rather was of a different kind. It would have provided the defense with a new and different ground of impeachment") (quotations and internal citations omitted); *Bailey v. Rae*, 339 F.3d 1107, 1116 (9th Cir. 2003) (noting the significant difference between testimony of a discredited teenaged witness and the suppressed clinical assessment provided by a disinterested professional therapist: "Cumulative evidence is one thing. Unique and relevant evidence offered by a disinterested expert is quite another"); *Boss v. Pierce,* 263 F.3d 734, 745 (7th Cir. 2001) (stating that "[i]ndependent corroboration of the defense's theory of the case by a neutral and disinterested witness is not cumulative of testimony by interested witnesses, and can undermine confidence in a verdict."); *Skipper v. South Carolina*, 476 U.S. 1, 7-8 (1986) (finding that jailers' testimony about defendant's good behavior in jail was not "merely cumulative" of similar testimony

33

from the defendant and his wife, because jurors would "quite naturally" give "much greater weight" to the testimony of "disinterested witnesses" like the jailers, who "would have had no particular reason to be favorably predisposed toward [the defendant].")

> **f. Because there are so many ways in which the suppressed evidence could have helped Bernard, he has more than satisfied *Brady*'s materiality requirement.**

While the crime against the Bagleys was indisputably horrible, that fact alone is insufficient to excuse as non-material the patent *Brady* violation presented by these facts. The Fifth Circuit has cautioned strongly against concluding, in examining a claim of punishment-phase constitutional error, that "the heinous and egregious nature of the crime would have ensured assessment of the death penalty [in any event]." *Gardner v. Johnson*, 247 F.3d 551, 563 (5th Cir. 2001). In this case, where so many circumstances made a death sentence for Bernard inappropriate, it is simply not possible to have confidence that the same sentencing verdict would have resulted if the jury had been presented with the information from Sgt. Hunt that the Government suppressed. The Fifth Circuit has suggested that in a capital case where the question of *Brady* materiality is one of "agonizing closeness," the severity of the punishment alone might be sufficient to tip the balance toward the defendant. *See Lindsey v. King*, 769 F.2d 1034, 1043 (5th Cir. 1985). The case for materiality here, however, is not agonizingly close but overwhelmingly in Bernard's favor, and demands that the Court order a new sentencing hearing.

34

**g. The materiality of the suppressed evidence is even plainer given this fact: even without knowing this information, the jury spent nearly as much time deciding on Bernard's one death sentence as it did on its other five sentencing verdicts put together.**

The above discussion shows that the suppressed evidence in this case was material, in light of the evidence presented at trial and in the penalty phase. But the result is even clearer, given that the jury's decision to impose death on one count was hardly open-and-shut. As the Supreme Court has emphasized, in a close case the suppression of "additional evidence of relatively minor importance" can be material. *United States v. Agurs*, 427 U.S. 97, 113 (1976); *see also Strickland v. Washington*, 466 U.S. 664, 696 (1984) ("A verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). Given Bernard's youth, lack of any serious prior violent criminal history, and lesser role in the crime, one cannot say that the record shows "overwhelming … support" for a death verdict. Moreover, the jury spared Bernard's life on two of three death-eligible counts and took additional time to reach its decision on the third. *See* nn. 8 and 9, *supra*. In light of that additional fact, the case for *Brady* materiality is overwhelming.

**IV. The present motion is not a second motion subject to 28 U.S.C. § 2255(h).**

**A. Allowing Bernard's new *Brady* claim to be heard is "critically important to maintaining the integrity of our judicial system"; closing the courthouse door on his claim would unfairly reward the Government for its own constitutional violation.**

Ordinarily, a federal court need not entertain an application for post-conviction relief from a federal prisoner whose detention has survived a previous collateral attack,

35

except as provided in 28 U.S.C. § 2255. *See* 28 U.S.C. § 2244(a). And § 2255(h) bars review of "[a] second or successive motion" for relief unless it (1) contains newly discovered evidence sufficient to establish the prisoner's innocence, or (2) relies on a previously unavailable and retroactive "new rule of constitutional law."

Bernard's *Brady* claim rests on evidence the Government hid during his trial *and* during his prior habeas proceedings, thereby preventing him from raising the issue in his original petition. Because the suppressed evidence undercuts the factual basis for his death sentence rather than his conviction, Bernard's *Brady* claim does not satisfy a literal reading of the criteria of § 2255(h).[23] If his current motion is deemed successive, Bernard will be denied any judicial review of this stark violation of his fundamental rights. In the following sections, Bernard will analyze the Supreme Court precedent establishing that his petition is not subject to the bar on "second or successive" applications imposed by 28 U.S.C. §§ 2254(a) and 2255(h). Before doing so, it is worth considering the implications of a contrary holding.

In *Scott v. United States*, 890 F.3d 1239 (11th Cir. 2018), the court examined the situation where a prosecutor not only hides material exculpatory or mitigating evidence prior to trial, but manages to keep the suppression secret up through a ruling on the defendant's first post-conviction proceeding. The court started with the indisputable: *Brady* "established that a prosecutor's suppression of material evidence favorable to the

---

[23] There is authority for the proposition that the § 2255(h) gateway should nevertheless be available to Bernard. *See Thompson v. Calderon*, 151 F.3d 918, 924 (9th Cir. 1998), *as amended* (July 13, 1998) (en banc), *but see In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010). *See infra* n. 27.

accused amounts to a foul blow." 890 F.3d at 1243. A *Brady* violation "deprives the defendant of a fundamentally fair trial." *Id.* As a result, allowing valid *Brady* claims to proceed "is critically important to maintaining the integrity of our judicial system." *Id.*

But the injury to the legitimacy of the legal system inflicted by an initial *Brady* violation is compounded where the prisoner could not reasonably have been expected to discover the violation before filing his initial § 2255. In that context, "precluding the filing of a second-in-time petition addressing the newly discovered violation is doubly wrong." *Id.* at 1244. Specifically, barring such a second-in-time motion "rewards the Government for its unfair prosecution" by immunizing the improperly obtained judgment from correction. *Id.* A contrary conclusion "eliminates the sole fair opportunity for these petitioners to obtain relief," and not only "corrodes faith in our system of justice" but "undermines justice itself," such that it "cannot be allowed." *Id.* at 1243.

### B. In *Panetti v. Quarterman*, the Supreme Court clarified that a second-in-time application for collateral relief does not always constitute a "second or successive" motion subject to the strictures of § 2255.

The logic of *Panetti v. Quarterman*, 551 U.S. 930 (2007), compels the conclusion that this Court has jurisdiction to entertain the motion that Bernard brings here. In *Panetti*, the Supreme Court analyzed the question of what constitutes a second or successive motion in light of both the purposes of Congress's 1996 amendments to the federal habeas statutes (collectively, the Anti-Terrorism and Effective Death Penalty Act, or "AEDPA") – *i.e.*, "to further the principles of comity, finality, and federalism" – and "the practical effects" of its own holdings, including the "implications for habeas practice" and the abuse of the writ doctrine. 551 U.S. at 945-47. The Court observed that focusing on these considerations was

37

especially appropriate in situations where a proposal to impose a particular procedural hurdle would threaten a petitioner, as here, with "forever losing [his] opportunity for any federal review . . ." of a particular constitutional claim. *Id*. at 945-46.

*Panetti* involved a claim under *Ford v. Wainwright*, 477 U.S. 399 (1986) (Eighth Amendment prohibits executing a prisoner who is presently mentally incompetent). However, its analysis is directly relevant to a second-in-time motion alleging a *Brady* claim that could not have been previously presented due to the Government's continued concealment of material evidence; *Panetti*'s analysis leads to the conclusion that such a motion is likewise not properly labeled "successive."

The Court began by observing that the implications of a contrary conclusion for habeas practice would be "far reaching and seemingly perverse." *Panetti*, 551 U.S. at 943 (quoting *Stewart v. Martinez-Villareal*, 523 U.S. 637, 644 (1998)). Specifically, a petitioner would have to raise a *Ford* claim in his initial habeas motion, even if the claim was not yet ripe, or forgo the opportunity ever to raise it in federal court. *Id*. at 943. This dilemma would apply even to a prisoner with no apparent mental problems at the time of his initial habeas filing, since every prisoner is at risk of having his mental state deteriorate. *Id*. Such a requirement would force conscientious defense attorneys to file an unripe and often meritless *Ford* claim in each and every habeas application. *Id*. The Court rightly called this approach "counterintuitive," *Id.*, and found that it would "add to the burden imposed on courts, applicants, and the States, with no clear advantage to any." *Id*. at 931.

The Court then explained that "[t]he phrase 'second or successive' is not self-defining," but instead takes its meaning from the case law, including the dense web of

habeas corpus decisional law that predated AEDPA. *Id.* at 943-44. The Court noted that it had already recognized in other contexts that second-in-time habeas applications are often not "second or successive." It emphasized that its precedent required looking to the "implications for habeas practice" when interpreting the term "second or successive." *Id.* at 945.

In reaching its conclusion that the petition presenting Panetti's *Ford* claim was not "second or successive," the Court looked to the AEDPA's purposes (which, as noted, are to "further the principles of comity, finality, and federalism.") *Panetti*, 551 U.S. at 945 (quoting *Miller–El v. Cockrell*, 537 U.S. 322, 337 (2003).[24] It sought to balance those goals with the need to avoid "forever" denying petitioners the opportunity for any federal review

---

[24] *Panetti* concerned a state prisoner's claim brought under § 2254, while the present case concerns a federal prisoner's claim brought under § 2255. Thus, the concerns of comity and federalism that underlie AEDPA's restrictions on the availability of relief – the desire to give appropriate respect to state-court judgments and to reduce friction between state courts and federal courts exercising their habeas jurisdiction – are not in play here. The *Panetti* Court's analysis applies to Bernard's situation notwithstanding those differences; if anything, the absence of concerns over comity and federalism in a § 2255 case like this one dictate a rule that is more protective of a prisoner's ability to seek relief in a second-in-time motion. This point is made clear by *Panetti* itself, which explicitly declared that concerns for finality are "not implicated" by a rule that vests district courts with jurisdiction to hear previously unreviewable claims. *See Panetti*, 551 U.S. at 946 ("AEDPA's concern for finality, moreover, is not implicated, for under none of the possible approaches would federal courts be able to resolve a prisoner's *Ford* claim before execution is imminent"). In making this point, Bernard recognizes that the Fifth Circuit has indicated that "second or successive" is a term of art that carries the same meaning for both § 2254 and § 2255 petitions. *See In re Lampton*, 667 F.3d 585, 587-88 (5th Cir. 2012); *Leal Garcia v. Quarterman*, 573 F.3d 214, 220 n. 32 (5th 2009). Bernard contends that these cases mistakenly failed to recognize that the absence of comity and federalism concerns in the § 2255 context dictate that a more lenient definition of "second or successive" ought to apply to federal prisoners. While he concedes that those decisions constitute binding precedent, he notes their logical shortcomings here to preserve the issue for further appellate review.

39

of their new claims. *See Panetti*, 551 U.S. at 945-46 (quoting *Rhines v. Weber*, 544 U.S. 269, 275 (2005)). The Court noted that it had "resisted an interpretation of the [habeas] statute that would 'produce troublesome results,' 'create procedural anomalies,' and 'close our doors to a class of habeas petitioners seeking review without any clear indication that such was Congress' intent.'" *Id.* at 946 (quoting *Castro v. United States*, 540 U.S. 375, 380 (2003)).

The Court then elaborated on its view that requiring prisoners to file unripe *Ford* claims would not further the goals of the AEDPA. Such a mandate would not "conserve judicial resources, 'reduc[e] piecemeal litigation,' or 'streamlin[e] federal habeas proceedings.'" *Id.* (quoting *Burton v. Stewart*, 549 U.S. 147, 154 (2007) (per curiam) (bracketing in *Panetti*).

In finding jurisdiction, the Court noted that AEDPA's restrictions on successive litigation were designed to act as "a restraint on what is called in habeas corpus practice 'abuse of the writ.'" *Id.* at 947 (quoting *Felker v. Turpin*, 518 U.S. 651, 664 (1996)). The "abuse of the writ" doctrine was governed by equitable principles designed to prevent, *inter alia*, prisoners bringing repeated habeas motions without good grounds for failing to bring a claim earlier. *See, e.g.*, *McCleskey v. Zant*, 499 U.S. 467, 484-85 (1991). Panetti, of course, had good grounds for not bringing his claim earlier, since it was unripe. Thus, allowing Panetti's second-in-time petition in no way advanced AEDPA's goal of curtailing such "abuse."

40

The Court summed up its discussion by emphasizing its reluctance to interpret the relevant statutory language in a manner at odds with the realities of post-conviction practice, and concluding that Panetti's claim was properly before the federal district court:

> We are hesitant to construe a statute, implemented to further the principles of comity, finality, and federalism, in a manner that would require unripe (and, often, factually unsupported) claims to be raised as a mere formality, to the benefit of no party.

> The statutory bar on 'second or successive' applications does not apply to a *Ford* claim brought in an application filed when the claim is first ripe. Petitioner's habeas application was properly filed, and the District Court had jurisdiction to adjudicate his claim.

*Id.* at 947.

### C. Under *Panetti*, a second-in-time motion for post-conviction relief that alleges a *Brady* claim is not "second or successive" if the Government, by continuing to conceal material evidence, made it impossible for the prisoner to include the claim in his original motion.

Although *Brady* and *Ford* claims differ in their substance, the *Panetti* analysis applies in the same way to each. The *Scott* court addressed this issue, both in terms of the impact of barring late-discovered *Brady* claims on the integrity of the judicial system and in the specifics of why *Panetti* compels the conclusion that a second-in-time motion alleging a *Brady* claim is not "successive" if the prisoner, acting with reasonable diligence, could not have discovered the violation at the time of his first motion.

*Scott*, like the case at bar, involved a § 2255 petition. A previous panel of the Eleventh Circuit addressing the same issue in the § 2254 context had already reached the opposite conclusion. *Tompkins v. Secretary, Department of Corrections*, 557 F.3d 1257 (11th Cir. 2009). The *Scott* panel ultimately determined that it was bound by *Tompkins*. As

41

a result, *Scott*'s well-reasoned conclusions about why the *Panetti* analysis should apply to *Brady* claims are not the law of the Eleventh Circuit. However, a comparison of the analysis in *Scott* with the conclusion in *Tompkins* shows that *Tompkins* did not even apply the *Panetti* analysis and thus ultimately is "fatally flawed[.]" 890 F.3d at 1258.

### 1.  *Scott*'s analysis of the *Panetti* considerations

The *Scott* court first looked to how the *Panetti* Court analyzed the issue of what constitutes a "second or successive" petition as to *Ford* claims. *Scott* observed that the Supreme Court had "looked solely to three considerations: (1) the implications for habeas practice if the Court found it lacked jurisdiction over Panetti's claim; (2) the purposes of AEDPA; and (3) the pre-AEDPA abuse-of-the-writ doctrine." *Scott*, 890 F.3d at 1248 (citing to 551 U.S. at 943-47). It then addressed the question of *Brady* claims in light of those three considerations.

As to the first consideration, the *Scott* court concluded that "precluding *Brady* claims that a prisoner could not have discovered through due diligence would adversely affect habeas practice." *Id.* at 1250. The nature of *Brady* claims – that they involve evidence that was not properly and timely disclosed by the Government prior to trial – means that even diligent prisoners often cannot discover them unless the Government discloses them or provides access to its files. Just as with *Ford* claims, such a regime would require "conscientious defense attorneys … to file unripe (and, in many cases, meritless) [*Brady*] claims in each and every [first § 2255] application [(and direct appeal)]." *Id.* at 1250 (quoting *Panetti*, 551 U.S. at 943) (brackets in *Scott*). Counsel would have to do this "to preserve then-hypothetical claims on the chance that the Government might have

42

committed a material *Brady* violation that will eventually be disclosed." *Id.* Thus, as with *Ford* claims, such an inflexible rule would force the courts to address an "avalanche of substantively useless *Brady* claims[.]" *Id.* at 1250-51. In fact, the effect on habeas practice of treating *Brady* claims in this manner would be "even more deleterious" than with *Ford* claims, since *Ford* applies only in capital cases, while *Brady* applies to any case, thus dramatically increasing the size of the avalanche. *Id.* at 1251.

The *Scott* court then turned to the second *Panetti* consideration, finality interests. For two separate reasons, it concluded that "the second-in-time filing of a *Brady* claim that a prisoner could not have discovered earlier through the reasonable exercise of due diligence does not negatively implicate AEDPA's finality concerns any more than does the second-in-time filing of a *Ford* claim[.]" *Id.*

For one thing, the *Scott* court pointed out, finality is generally important because a new trial can prejudice the Government, given the difficulty in prosecuting a long-past offense. But because "the government alone holds the key to ensuring a *Brady* violation does not occur" in the first place, any such problem would be of the Government's own making. *Id.* "Whatever finality interest Congress intended for AEDPA to promote, surely it did not aim to encourage prosecutors to withhold constitutionally required evidentiary disclosures long enough that verdicts obtained as a result of government misconduct would be insulated from correction." *Id.*

Second, the court observed that precluding a remedy in this situation could actually undermine the deterrent effect of the criminal law, one of the values that emphasizing finality is supposed to serve. *Id*. at 1251. As the court pointed out, "[p]rocedural fairness is

43

necessary to the perceived legitimacy of the law," and "legitimacy affects compliance." *Id.*at 1252. In other words, one who fears that the Government will cheat to win at trial "actually has less incentive to comply with the law because, in his view, compliance makes no difference to conviction." *Id.*

The third *Panetti* consideration is the abuse-of-the-writ doctrine. Under that doctrine, a claim presented in a second habeas application was not abusive (*i.e.*, was entitled to review on the merits) if the prisoner could demonstrate cause for not raising the claim sooner and prejudice from the alleged violation of his rights. *McCleskey*, 499 U.S. at 490. "A petitioner satisfies the cause requirement where he can demonstrate 'interference by officials that makes compliance with the ... procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel.'" *Scott*, 890 F.3d at 1253 (quoting *McCleskey*, 499 U.S. at 493-94) (ellipsis in *Scott*). A *Brady* violation that a petitioner could not reasonably have discovered meets that criterion. *Id.* (citing *Strickler*, 527 U.S. at 289). *See Strickler*, 527 U.S. at 283 ("it is just such factors [nondisclosure of exculpatory material and an open file policy] that ordinarily establish the existence of cause"). And given the materiality component of a *Brady* claim – that there is no violation unless the timely disclosure of the evidence would have created a reasonable probability of a different outcome – it also meets the prejudice requirement. *Id.* Thus, there is no abuse of the writ where a prisoner brings a second motion based on a *Brady* violation that he could not reasonably have known about at the time of his first motion.

The *Scott* court summarized its discussion of the considerations addressed in *Panetti* as follows:

44

In short, all the *Panetti* factors – the implications for habeas practice, the purposes of AEDPA, and the abuse-of-the-writ doctrine – compel the conclusion that second-in-time *Brady* claims cannot be "second or successive" for purposes of § 2255(h). And nothing *Panetti* teaches us to consider so much as hints otherwise.

*Id.* (footnote omitted).

The court also expressed concern that any contrary holding would violate the Suspension Clause of the U.S. Constitution, Art. I, § 9, cl. 2. *Id.* at 1243. It summarized its analysis as follows: "Supreme Court precedent, the nature of the right at stake here (the right to a fundamentally fair trial), and the Suspension Clause . . . require the conclusion that a second-in-time collateral claim based on a newly revealed actionable *Brady* violation is not second-or-successive for purposes of AEDPA." *Id.* at 1259.

### 2. *Scott*'s analysis of the *Tompkins* decision

The court then turned to the holding in *Tompkins*, which involved minimal discussion or analysis (in fact, the *Scott* court criticized the *Tompkins* panel for its "failure to adhere to – or even to attempt to apply – the *Panetti* factors[.]". 890 F.3d at 1258).

First, the *Scott* court rejected *Tompkins*' conclusion that the Supreme Court in *Panetti* had restricted its analysis to *Ford* claims. The *Scott* court carefully scrutinized the *Panetti* decision to demonstrate that "[n]either *Panetti*'s language nor its analysis supports such a conclusion." *Id.* at 1254. *Panetti* spoke in the plural of multiple "exceptions" to the rule that second-in-time petitions are not necessarily second or successive. It also spoke generally of multiple factors relevant to its conclusion, none of which apply exclusively to *Ford* claims. Finally, the *Panetti* Court had pointed to various aspects of its prior decisions, not directly involving the "second or successive" question, in which it had taken a broader

45

view of petitioners' rights to the habeas remedy. This analysis reaffirmed that as to each such question about the scope of procedural restrictions on post-conviction review, a court must consult the implications for habeas practice and for AEDPA's purposes. *Id.* at 1254-55.

Second, the *Tompkins* court had looked to *Panetti*'s statement that "*Ford*-based incompetency claims, as a general matter, are not ripe until after the time has run to file a first federal habeas petition." *Tompkins*, 557 F.3d at 1259-60 (quoting *Panetti*, 551 U.S. at 942) (internal quotation marks omitted). In the view of the *Tompkins* court, *Brady* claims are ripe when the violation occurs (*i.e.* when the material information is initially withheld). But, as *Scott* points out, *Panetti* did not define the term, and in fact "ripeness" is generally defined contrary to the *Tompkins* definition. "'Ripeness' refers to '[t]he state of a dispute that has reached, but has not passed, the point when the facts have developed sufficiently to permit an intelligent and useful decision to be made.'" *Scott*, 890 F.3d at 1256 (quoting *Ripeness*, Black's Law Dictionary (10th ed. 2014)).

*Scott*'s definition of "ripeness" is consistent with the Supreme Court's and the Fifth Circuit's. *See, e.g., Texas v. United States*, 523 U.S. 296, 300 (1998) (claim is not ripe "if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all") (internal quotation marks and citation omitted); *Shields v. Norton*, 289 F.3d 832, 835 (5th Cir. 2002) (to be ripe, a claim "must not be premature or speculative"); *Monk v. Huston*, 340 F.3d 279, 282 (5th Cir. 2003) ("A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required"; a claim is not ripe "when the case is abstract or hypothetical") (citation

46

omitted); *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) ("Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review.").

Under each of these tests, a *Brady* claim, brought when a defendant has no knowledge that material was suppressed, is not ripe. Such a claim "rests upon contingent future events," which may not occur, namely discovery that any material information was, in fact, suppressed. Such a claim would be "speculative." Not only would further "factual development [be] required," the claim would be fully "hypothetical." In short, a *Brady* claim made at a time when no suppression had been discovered fits squarely within *Panetti*'s explanation of what constitutes an unripe claim.

Furthermore, as *Scott* points out, the exact definition of "ripeness" does not matter. *Panetti* referred to ripeness only in terms of analyzing the implications on habeas practice of treating a claim as second or successive. *Id.* at 1256 (citing *Panetti*, 551 U.S. at 943-45). Specifically, *Panetti*'s concern was that holding such claims to be second or successive would require counsel to file then-unripe claims in the hope that they might later ripen, forcing courts to address them prematurely. Regardless of whether a *Brady* claim is called "ripe" before it is discovered, it stands in the same posture as *Ford* claims – treating them as second or successive would have the exact same negative impact on habeas practice as that treatment would for *Ford* claims (and in fact, as discussed earlier, the negative impact would be even greater for *Brady* claims than for *Ford* claims). *See Scott*, 890 F.3d at 1256.

In short, as *Scott* succinctly put it, "*Tompkins* got it wrong[.]" *Id.* at 1243.

47

The judges in the unanimous panel in *Scott* are not the only judges to so conclude. In *Allen v. Mitchell*, No. 02-4145 , __ Fed.App'x.__, 2018 WL 6335415 (6th Cir. Dec. 5, 2018), Judge Moore in dissent stated, "treating Allen's *Brady* claim as second or successive would incentivize state prosecutors to withhold materially exculpatory evidence until after a petitioner exhausts his initial federal habeas claims; . . . foreclosing adjudication unnecessarily restricts federal habeas review of *Brady* violations." *Id.* at \*4.

**D. No Fifth Circuit case has analyzed whether a previously unavailable *Brady* claim is successive under *Panetti*; *Blackman* mistakenly concluded that the Fifth Circuit had resolved that question, but relied on cases that in fact had not addressed the issue.**

The above discussion shows that, under *Panetti*, Bernard's petition is not second or successive. The Fifth Circuit briefly addressed the second or successive question in the context of *Brady* claims in *Blackman v. Davis*, 909 F.3d 772 (5th Cir. 2018), *as revised* (Dec. 26, 2018). The *Blackman* panel did not independently analyze Blackman's assertion that a *Brady* claim was not a successive petition, when it could not have been raised during a first habeas petition due to the Government's continued suppression of the exculpatory information. Instead, it stated that Blackman's position "has been rejected conclusively by this court." *Id.* at 778. In reaching that conclusion, the court cited to three prior decisions.

The first, *In re Davila*, 888 F.3d 179 (5th Cir. 2018), provides no support for *Blackman*'s conclusion. It is true that in *Davila*, the court "applied this statutory provision [the "second or successive" gateway] to a petitioner's *Brady* claims and held that the requirements for pursuing a successive petition were not fulfilled." *Blackman*, 909 F.3d at 778. But Davila never contended that the second or successive gateway did not apply; he

48

argued only that he met the gateway requirements. *Davila*, 888 F.3d at 182. Unsurprisingly, the court therefore did not address whether the petition was second or successive, only whether Davila met the standard for second or successive petitions. *Id.* at 182-87. However, "'a question not raised by counsel or discussed in the opinion of the court' has not 'been decided merely because it existed in the record and might have been raised and considered.'" *De La Paz v. Coy*, 786 F.3d 367, 373 (5th Cir. 2015) (quoting *United States v. Mitchell*, 271 U.S. 9, 14 (1926). Thus, *Davila* is not precedent on the question of whether *Brady* claims are governed by the second or successive gateway.

The second case that the *Blackman* panel said was "clear precedent" on the issue was *Leal Garcia v. Quarterman*, 573 F.3d 214 (5th Cir. 2009). But *Leal* did not address a *Brady* claim and actually concluded that Leal's claim (pertaining to guarantees of consular access) was not second or successive. In the course of reaching that conclusion, the court made various general pronouncements about what types of claims might be second or successive. The court was careful not to issue definitive rulings about the types of claims not before it, instead speaking in general language, *e.g.* stating that certain claims "tend to be labeled successive," "tend to be deemed non-successive," or "may be non-successive." *Id.* at 222.

In fact, the *Leal* court made one comment strongly supporting Bernard's position. It observed that if "the purported defect did not arise, *or the claim did not ripen*, until after the conclusion of the previous petition, the later petition based on that defect may be non-successive." *Id.* at 222 (emphasis added). As discussed above, the usual definition of "ripen" requires that the facts be "developed sufficiently to permit an intelligent and useful

decision to be made." *Scott*, 890 F.3d at 1256 (quoting *Ripeness*, Black's Law Dictionary (10th ed. 2014)). In the case of a *Brady* claim, that point does not occur until the defendant becomes aware of the favorable information that the Government has withheld. *Id.* As previously noted, this conclusion is consistent with the various definitions of "ripeness" the Fifth Circuit has used, *see* cases cited at pp. 46-48, *supra,* namely, *Panetti, Scott, Texas, Shields, Monk, United Transp. Union and Allen.*

The *Leal* court did state, as quoted in *Blackman*, that "AEDPA forbids such a reading:  Section 2244(b)(2)(B)(i) states that claims based on a factual predicate not previously discoverable are successive." 573 F.3d at 221. But the "reading" that *Leal* was rejecting was an assertion that *any* new evidence would be sufficient to foreclose labeling a petition "second or successive." A *Brady* issue, though, is not like every claim of new evidence; it involves Government suppression of evidence – *i.e.*, misconduct by one of the parties to the litigation, intended to deprive the other party of a fair determination of the merits. The *Leal* court did not consider *Panetti*'s analysis, looking to the "implications for habeas practice" of a determination that a particular type of claim was successive or not, and it especially did not do so in the context of *Brady* claims. *Panetti*, 551 U.S. at 945. This is hardly surprising – it had no occasion to undertake that sort of inquiry, given the limited question before it. In short, the one passage in *Leal* quoted by *Blackman* is hardly "clear precedent" for determining whether *Brady* claims are successive under *Panetti*.

The final case cited by *Blackman* was *Johnson v. Dretke*, 442 F.3d 901 (5th Cir. 2006). As in *Davila*, the prisoner in *Johnson* never argued that he was exempt from having to satisfy the criteria for consideration of a second or successive petition. The court

50

therefore had no reason to rule on that question, nor did it. With the "question not raised by counsel or discussed in the opinion of the court," *Johnson* never decided whether *Brady* claims are governed by the second or successive requirements. *See De La Paz*, 786 F.3d at 373. *Johnson* is not precedent at all, let alone clear precedent, on that distinct issue.

### E. The *Napue* violation is also reviewable under the analysis from *Panetti* set out above.

As discussed in Section III.D.1, the Government also violated *Napue* by intentionally misleading the jury into believing that the gang was devoid of any hierarchical organization structure. For the reasons discussed above, when a *Napue* violation could not be discovered due to a continuing *Brady* violation, a § 2255 motion raising that *Napue* violation should also not be deemed second or successive. *See Panetti* and *Scott*. And it should also be noted that the Fifth Circuit has recognized that the burden of showing prejudice sufficient to warrant relief for a *Napue* violation is "considerably less onerous" than that for a *Brady* violation. *Kirkpatrick v. Whitley*, 992 F.2d 491, 497 (5th Cir. 1993).

## V.    Even if Bernard's motion were deemed successive, he is entitled to relief.

### A. Bernard is entitled to relief under Fed. R. Civ. P. 60(b).

#### 1. Bernard's motion meets the requirements for relief under Rule 60(b).

If this Court concludes, notwithstanding the arguments laid out above, that the present motion is successive, it should grant the requested relief under Rule 60(b). Various subsections of that Rule allow the court to grant relief from a final judgment for, *inter alia*, (1) mistake or excusable neglect; (2) "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule

51

59(b)"; (3) fraud, misrepresentation, or misconduct by an opposing party; or (6) any other reason that justifies relief.

This last provision provides a "grand reservoir of equitable power[.]" *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 501 (5th Cir. 2015). "[I]t provides courts with authority 'adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice,'" so long as there are "extraordinary circumstances." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988) (citation omitted).

Subsections (1) – (3) require that the motion be filed within a year of the underlying judgment. But in a case such as that presented here – where the moving party could not have filed its motion within a year of the judgement because an opposing party had successfully and wrongfully hidden the evidence necessary to support the motion – the triggering date for filing the Rule 60(b) motion should run not from the date of judgment, but from the date the moving party discovered the previously hidden evidence. As noted above, that date was February 21, 2018, when the Government called Sgt. Sandra Hunt to publicly testify in Tony Sparks' resentencing hearing.

Admittedly, counsel have located no cases applying the one-year requirement to the date of the discovery of the suppressed evidence, as opposed to the date of the underlying judgment itself. The rule does, however, enlarge the time for filing to "within a reasonable time," Rule 60(c)(1), in circumstances governed by Rule 60(b)(6).

In the ordinary situation, "an action cannot be brought through the catch-all provision of Rule 60(b)(6) if it could have been brought through one of the Rule's first five subsections." *United States v. Fernandez*, 797 F.3d 315, 319 (5th Cir. 2015). But as

summarized by the leading treatise on federal civil practice and procedure, courts have followed a "flexible approach" in applying this provision. *See* 11 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. Civ. § 2864 (3d ed.). "The courts have echoed, as they must in the light of *Ackermann* [*v. United States*, 340 U.S. 193 (1950)], the view that clause (6) is reserved for cases involving extraordinary circumstances, and they have said that that clause and the other clauses of the rule are mutually exclusive." *Id.* (footnote omitted). "At the same time they have acted on the premise that cases of extreme hardship or injustice may be brought within a more liberal dispensation than a literal reading of the rule would allow." *Id.*

For example, in *Jung Ai Shin v. U.S. Citizenship & Immigration Servs.*, No. CV 12-2839-GHK SSX, 2013 WL 571781 (C.D. Cal. Feb. 13, 2013), the court granted a Rule 60(b)(6) motion to order the Immigration Service to amend the plaintiff's naturalization certificate. The Government had objected that the motion was properly brought under Rule 60(b)(1) or (2), because it was based on newly discovered evidence about Shin's true birth date, and that those subsections are mutually exclusive with Rule 60(b)(6). *Id.* at *2. The court concluded that "there was no way Plaintiff could have filed a timely Rule 60(b)(1) motion. Thus, we conclude that Plaintiff is seeking relief for reasons other than those enumerated under the first five clauses of Rule 60(b)." *Id.* (footnote omitted).

Technically, that statement from the court might be slightly incorrect, since the plaintiff in *Jung Ai Shin* was clearly bringing her motion based on either mistake or newly discovered evidence, which are the first and second enumerated clauses of Rule 60(b). Nevertheless, the court rightly ruled that the flexible approach of Rule 60(b) allowed it to

53

grant relief: it recognized that because of the unusual posture of the case, "adjudication of Plaintiff's application under Rule 60(b)(6) is appropriate." *Id.* Indeed, the same court later explicitly recognized this, characterizing its decision in *Jung Ai Shin* as "grant[ing] Rule 60(b)(6) relief in a situation that 'logically must fall under Rule 60(b)(1) or (b)(2),' when 'the unique circumstances of th[e] case [and] balance of equities' necessitated a less harsh result." *Karam v. Corinthian Colleges, Inc.*, No. CV106523GHKPJWX, 2015 WL 13593539, at *3 (C.D. Cal. Mar. 4, 2015) (brackets in *Karam*). *See also, Trinh v. United States Citizenship & Immigration Servs.*, No. 14-MC-80337-MEJ, 2015 WL 2088766, at *4 (N.D. Cal. May 5, 2015) (granting relief under Rule 60(b)(6) under same analysis as in *Shin*); *Ampadu v. U.S. Citizenship & Immigration Servs., Dist. Dir.*, 944 F. Supp. 2d 648, 656 (C.D. Ill. 2013) (same); *Ho v. Dep't of Homeland Sec.*, No. SACV12805JLSRNBX, 2014 WL 12572927, at *4 (C.D. Cal. Feb. 11, 2014) (finding court has jurisdiction to hear motion under Rule 60(b)(6)).

As noted in the passage from Wright and Miller, Rule 60(b)(6) requires a finding of "extraordinary circumstances." *Accord, Wooten*, 788 F.3d at 501. Certainly, the prospect of someone being put to death – when the Government withheld from him material that creates a reasonable probability that the jury would have voted against the death penalty – constitutes such extraordinary circumstances.

### 2. Bernard's alternative motion under Rule 60(b) is not a successive habeas motion under *Gonzalez.*

In *Gonzalez v. Crosby*, 545 U.S. 524 (2005), the Supreme Court held that some Rule 60(b) motions brought regarding rulings on habeas petitions should be deemed to be

successive habeas petitions, rather than Rule 60(b) motions, and thus must be tested against the gatekeeping standards of §§ 2244 or 2255(h). However, a Rule 60(b) motion may properly be brought to cure a "defect in the integrity of [previously litigated] federal habeas proceedings," when those defects were produced by actors or factors outside the control of the petitioner or his counsel. *Gonzalez*, 545 U.S. at 532 and n. 5.

In this case, the defect in the integrity of the proceedings was the Government's continued withholding of the *Brady* material previously identified, combined with its representation to the Court that it had provided open file discovery. ROA.1599. The Court specifically cited this supposed open file policy in its order denying Bernard's § 2255 motion and his request for discovery. ROA.1772. Absent the Government's representation that all exculpatory material had been disclosed, Bernard would have learned of the *Brady* material through Court-ordered discovery.[25] Bernard then could have amended his motion to include this particular *Brady* violation, and that would have led the Court to vacate Bernard's death sentence.

The Government may argue that the pending motion is really a substantive challenge to the conviction, rather than an allegation of a defect in the proceedings. To make this argument, the Government may try to equate the two, given that the facts underlying the two violations are similar. Any such argument must fail because the challenges are in fact distinct. The first violation (the constitutional violation) was the

---

[25] *Cf. Strickler*, 527 U.S. at 283 n. 23 (1999) ("if a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*.")

Government's withholding of the *Brady* material at trial. That violation led to an unfair penalty phase proceeding. If that were Bernard's sole allegation, then it would be one directed to the original trial.

But the second violation was the Government's representation during the § 2255 proceeding. That violation undermined the integrity, not of the trial, but of the post-conviction proceeding. The second violation is what entitles Bernard to reopen his original § 2255 proceeding; the first violation will entitle him, in that reopened proceeding, to relief from his unconstitutionally obtained death sentence.[26]

*In re Pickard*, 681 F.3d 1201 (10th Cir. 2012), supports Bernard's position that forever preventing him from litigating the instant *Brady* claim would unfairly reward the Government for suppressing favorable expert testimony. In *Pickard*, the court addressed dictum in a prior panel's decision, which had stated that if the fraud alleged in a Rule 60(b) motion "includes (or necessarily implies) related fraud on the state court (or the federal district court that convicted and/or sentenced the movant in the case of a § 2255 motion), then the motion will ordinarily be considered a second or successive petition because any ruling would inextricably challenge the underlying conviction proceeding." *Id.* at 1206

---

[26] The fact that the defect in the § 2255 proceedings might ultimately lead to a reversal of Bernard's death sentence does not transform a Rule 60(b) motion into a successive petition. As stated in *In re Pickard*, 681 F.3d 1201, 1206 (10th Cir. 2012), it is incorrect to say "a motion is an improper Rule 60(b) motion if success on the motion would ultimately lead to a claim for relief under § 2255. What else could be the purpose of a 60(b) motion? The movant is always seeking in the end to obtain § 2255 relief. The movant in a true Rule 60(b) motion is simply asserting that he did not get a fair shot in the original § 2255 proceeding because its integrity was marred by a flaw that must be repaired in further proceedings."

(quoting *Spitznas v. Boone*, 464 F.3d 1213, 1216 (10th Cir. 2006)). The court rightly rejected that dictum, explaining that it could not "accept the proposition that the government has a free pass to deceive a habeas court into denying discovery just because it similarly deceived the trial court." *Id.* at 1207.

The court elaborated that it would "compound a substantial injustice" to let the Government's misconduct during the original § 2255 proceeding force the court thereafter to treat a motion raising belatedly discovered "prosecutorial deceit" from trial as second or successive. 681 F.3d at 1207. In that event, the court noted, the defendants would face a far higher burden than under the Rule 60(b) standard, which would require them only to show "that the false statement had improperly forestalled discovery in the § 2255 proceedings." *Id.* (And, as discussed at n.27 and accompanying text, *infra*, under Fifth Circuit precedent giving a literal reading to § 2255(h)(1), at least, the standard for a successive motion cannot be met where the Government violations affected "only" the death penalty, not the conviction.) The court concluded, "We doubt that the governing procedural rules permit the government to gain such an advantage by its own fraudulent conduct." *Id.*

Another case supporting Bernard's position that this pleading can be construed as a proper Rule 60(b) motion is *In re Coleman*, 768 F.3d 367, 372 (5th Cir. 2014). In that case, the Fifth Circuit addressed a prisoner's attempted Rule 60(b) motion, where he alleged defects in the proceedings based on ineffective assistance of counsel. In holding such a motion to be a successive petition, the court carefully distinguished Coleman's allegations from the kind of allegations that Bernard presents:

57

> Coleman *does not allege that the* court or *prosecution prevented her from presenting such evidence*, but rather argues that her own counsel was ineffective in failing to present such evidence. The Supreme Court has held that such an argument sounds in substance, not procedure.

*Id.* at 372 (footnote omitted).

In contrast, Bernard has alleged that a defect in the proceedings "prevented [him] from presenting [the relevant] evidence" in his initial § 2255 motion. Thus, under the logic of *Coleman*, the instant motion is properly brought under Rule 60(b). The appropriate remedy therefore is to allow Bernard to file a Second Amended § 2255 motion, incorporating the new *Brady* claim. This Court should deem the present pleading to constitute additional allegations timely amending Bernard's previously filed Amended Motion.

### B. If Bernard's motion is deemed successive and Rule 60(B) is deemed unavailable, then the restrictions in § 2255(h) violate the Suspension Clause of the Constitution.

If this Court concludes that Bernard's motion is successive under § 2255(h), and also deems it outside the purview of Rule 60(b), then his claims could only be heard if he can satisfy the gatekeeping restrictions of § 2255(h). In relevant part, that provision allows a successive petition only if the court of appeals certifies it as containing:

> newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense.

28 U.S.C. § 2255(h)(1). In short, evidence relevant to punishment cannot justify a successive petition, even if it would lead any reasonable factfinder to reject the death

penalty.[27] In the unique situation of *Brady* violations, the Government need only withhold exculpatory information through the pendency of an initial habeas proceeding (which itself must be brought within one year of the judgment's becoming final) to forever insulate that constitutional violation from review through a habeas proceeding. And if the one-year requirement for Rule 60(b)(1)-(3) motions is held to be inflexible (*i.e.*, if Rule 60(b)(6) motions cannot be based on the discovery of *Brady* violations), then those violations become immune from *any* judicial review, if the Government can only manage to hide the exculpatory information for one calendar year.

The *Scott* court concluded that it would violate the Suspension Clause[28] to interpret § 2255(h) as preventing a prisoner from ever raising a *Brady* claim, simply because the Government succeeded in hiding the violation until after a first petition was resolved. 890 F.3d at 1243. The *Scott* court was correct on the point:  the need for finality underlying AEDPA cannot be held to allow the Government itself to determine, through constitutional violations, whether a prisoner can ever bring a particular claim. Where the Government has hidden exculpatory material through a trial and then concealed the fact of that violation through the conclusion of an initial habeas proceeding, it is necessary either to interpret "successive" consistent with *Scott*'s interpretation, or alternatively to hold that § 2255(h)

---

[27] *See In re Webster*, 605 F.3d 256, 257 (5th Cir. 2010). Bernard recognizes the controlling authority of *Webster*, but argues for purposes of further appellate review that the contrary authority, *Thompson v. Calderon*, 151 F.3d 918, 924 (9th Cir. 1998), *as amended* (July 13, 1998) (en banc), is correct. Under *Thompson*'s analysis, Bernard's motion would satisfy the § 2255(h) gateway even if it were deemed successive.

[28] United States Constitution, Art I, § 9, cl. 2.

(if interpreted to bar such a motion) violates the Suspension Clause. Either way, Bernard is entitled to relief.

## VI.    Conclusion

The facts outlined in this case ought to disturb this Court. This pleading documents that the Government took mutually exclusive positions before this Court in 2018 and before the trial jury in 2000, relative to whether the members of the 212 PIRU Bloods occupied different positions in its hierarchy, or indeed whether the gang had any hierarchical structure at all. In each instance, the Government adopted and advanced the position it believed would serve its desired ends – which in both instances was to extract the most severe punishment possible for the particular defendant appearing before this Court. For Tony Sparks, the truth that the Government decided to portray was that the gang had a well-defined hierarchical structure, one within which Sparks was not a tangential participant, but a powerful enforcer. The Court relied on the Government's representations in fashioning its punishment for Sparks.

But before the jury that it ultimately persuaded to order Brandon Bernard's execution, the Government took a completely different position. There, it adamantly maintained that the 212 PIRU Bloods had no vertical structure whatsoever, and accordingly that Bernard should be adjudged equally culpable for all the gang's terrible crimes. The Government knew these claims to be false when it argued them to the jury in its successful effort to see Bernard sent to Death Row. Because the Government hid the actual truth of its 1999 investigation from Bernard's trial counsel, from the jury, and from this Court,

Bernard was denied a fundamentally fair sentencing hearing. This Court can have no confidence in the resulting death sentence. This is not how capital cases should be tried.

To right this injustice, this Court should determine that the present motion for post-conviction relief is not successive, and then address its merits, either granting it on the pleadings or granting it after ordering discovery and a hearing. Should the Court conclude that the present motion is successive, it should grant relief under Rule 60(b) via reopening the judgment from Bernard's original § 2255 proceeding and treating the allegations in the present motion as further amending his previously filed Amended Motion, and then addressing the present *Brady* claim on the merits.

///

///

///

///

///

///

///

///

///

///

///

///

61

Finally, should the Court conclude that the present motion is successive and that relief under Rule 60(b) is unavailable, it should conclude that the limitations on successive petitions for valid *Brady* allegations (where the *Brady* violation also prevented the prisoner from raising the allegation at the time of his earlier motion for post-conviction relief) constitute an unconstitutional suspension of the Great Writ under Art. I, § 9, cl.2 of the United States Constitution. It should then address the merits of Bernard's *Brady* claim on that basis. If it denies relief on any of these issues, it should grant a Certificate of Appealablity on the question.

DATED this 4th day of February, 2019.

Respectfully submitted,

Robert C. Owen
Bluhm Legal Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, Illinois 60611-3069
312.503.0135 voice
312.503.8977 fax
robert.owen@law.northwestern.edu

John R. Carpenter
Asst. Federal Public Defender
1331 Broadway, Suite 400
Tacoma, Washington 98402
253.593.6710 voice
253.593.6714 fax
John_Carpenter@fd.org

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of filing to all registered parties.

*s/ Amy Strickling*, Paralegal
Federal Public Defender Office