**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

UNITED STATES OF AMERICA,                    ) WA:99-CR-00070(3)-LY
                                             )
   Plaintiff,                                )
                                             )
v.                                           ) AUSTIN, TEXAS
                                             )
TONY SPARKS,                                 )
                                             )
   Defendant.                                ) FEBRUARY 21, 2018

        **********************************************
            TRANSCRIPT OF RESENTENCING HEARING
             BEFORE THE HONORABLE LEE YEAKEL
                   VOLUME 4
        **********************************************

APPEARANCES:

FOR THE PLAINTIFF:    MARK FRAZIER
                      U.S. ATTORNEY'S OFFICE
                      800 FRANKLIN, SUITE 280
                      WACO, TEXAS 76701

                      MICHAEL R. HARDY
                      ASSISTANT UNITED STATES ATTORNEY
                      601 NW LOOP 410, SUITE 600
                      SAN ANTONIO, TEXAS 78216-5512

FOR THE DEFENDANT:    DAVID K. SERGI
                      ANTHONY J. FUSCO
                      DAVID K. SERGI & ASSOCIATES, P.C.
                      329 S. GUADALUPE
                      SAN MARCOS, TEXAS 78666

COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
                      501 WEST 5TH STREET, SUITE 4152
                      AUSTIN, TEXAS 78701
                      (512) 391-8791

Proceedings recorded by computerized stenography, transcript

produced by computer.

ARLINDA L. RODRIGUEZ, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

**EXHIBIT 1**

Thank you.

MR. FRAZIER:  Pass the witness, Judge.

MR. SERGI:  I have no questions, sir.

THE COURT:  You may step down.

THE WITNESS:  (Complies).

MR. FRAZIER:  Sandra Hunt.

(Witness sworn)

### SANDRA HUNT

having been first duly sworn, testified as follows:

### DIRECT EXAMINATION

**BY MR. FRAZIER:**

Q.   And would you please introduce yourself to the Court, ma'am.

A.   Sandra Hunt.

Q.   How are you employed currently?

A.   Currently I'm an investigator with the Bell County Attorney's Office, previously a retired sergeant with the Killeen Police Department.

Q.   And how long were you with the Killeen Police Department?

A.   Twenty-nine years.

Q.   During your time with the Killeen Police Department, did you have any -- hold any special positions?

A.   I did.  I was an investigator of the Criminal Investigative Division and assigned to the Gang Unit.

Q.   How long did you work with the Gang Unit?

A.    I started working gang crimes in 1994.  The Gang Unit was initiated in 1999, and I was the supervisor over that unit when it dissolved in 2005.

Q.    And do you have any special training and experience in working with gangs and identifying gang members and activities?

A.    I do.

Q.    Tell us about that.

A.    I've probably got about 700 hours of TCLEOSE time, specific gang-related training, and I was also the first vice-president of the Texas Gang Investigators Association of Texas.

Q.    And when was that?

A.    From 1994 to 2008, I believe.

Q.    Okay.  And, based on your training and experience, are you able to look at gang writings, gang signs, and -- or identify individuals as gang members from certain criteria that you have and use?

A.    Yes.

Q.    Okay.  And, in fact, did you do that the entire time you held a position as a Gang Unit officer with the --

A.    That was my primary function.  Yes, sir.

Q.    Did Killeen Police Department during this time create a gang database?

A.    Yes, sir.  We created the gang database in 1999.

Q.    And what was the purpose of that database?

A.   The purpose of the database was to comply with a Department of Justice grant, Edward Byrne Funds Grant, that was provided to the Killeen Police Department to establish the unit.  And records had to be kept in an appropriate manner.

Q.   Okay.  And, during that time period, were you able to view and the people who worked with you able to identify gang members in the city of Killeen based on the criteria that --

A.   Yes, sir.

Q.   And what criteria, normally, did you use to identify --

A.   The criteria was originally established by the Texas Gang Investigators Association Executive Board.  There was not a specified criteria across the State of Texas that was used in decision-making.  So the criteria was established, and there was five criteria that could be met.  As an active gang member, you had to meet three of the five criteria to be active.

Q.   Okay.  And do you know who Tony Sparks is?

A.   I do.

Q.   And how do you know Tony Sparks?

A.   He was identified by one of our investigators previously. He was also identified through a confidential informant that was a 212 PIRU Blood member.  And that information was provided to one of the school district police officers, and that's how his file was initiated.

Q.   All right.  And, as part of that file, did you obtain paperwork from the school district that had been seized from

another student that laid out sort of an organizational hierarchy of the 212 PIRU?

A.   We did.

Q.   I'm going to show you what's been marked for identification and previously introduced into evidence as Government's Exhibit 66.  Do you recognize that?

A.   I do.

Q.   What is it?

A.   That is the documentation that was provided through the school district police department originally identifying the hierarchy of the 212 PIRU Bloods in Killeen.

Q.   And did you in fact, after you received this, using your information that you'd obtained on your database, able to identify all of the individuals named on this?

A.   We were.

Q.   I'm sorry?

A.   We were.

Q.   We were.  Okay.

          What is it?  First of all, it looks like there's a pyramid.  There's some stars.  Can you tell the Court what the significance of these items are?

A.   There is.  There's a pyramid that depicts the five points. The Blood gangs use the number five as a synonymous number for identifying purposes.  A five-point star is a very common identifier.  The pyramid has five points, the four points

leading up to the top cone and the bottom layer.  And then, from the top to the bottom, it identifies the leader and the status of the members as it goes down.

Q.   Okay.  So before I get that, I want to ask you:  Have you testified as an expert before on gangs?

A.   I have.

Q.   Few or many occasions?

A.   Probably ten or more.

Q.   Okay.  And -- and, based on your training and experience, do you believe you're qualified to give opinions regarding gang writings, gang symbols, gang identification?

A.   I do.

     MR. FRAZIER:  Your Honor, we tender the witness as an expert and be allowed to give her opinion for purposes of this hearing.

     THE COURT:  The witness will be allowed to give opinions.

     MR. FRAZIER:  Thank you.

Q.   So, if you will, please, now, how did you take Government's Exhibit 66 and identify the names of the individuals on that?

A.   The original document was the drawing.  And at that time the Gang Unit had a Gang Unit clerk, and we maintained records to include identifying information for also known as, AKAs, street names, et cetera.  A lot of the stuff that was provided

was first names on this document, and we had to correlate the first names to identifier information that we had on our records.

Q. And did this particular Document 66 come into your possession sometime in 1998?

A. It did.

Q. And so Government's Exhibit Number 65, which is --

MR. FRAZIER: If you'll pull that up, 65.

Q. Can you tell us what that is?

A. That would be the document that was provided -- excuse me -- by our Gang Unit clerk, correlating the names to the identifying names that was usually used by the gang members as they committed whatever -- their participation.

Q. Did you personally investigate the activities of the 212 PIRU?

A. I did.

Q. Did you do that for a number of years?

A. I did.

Q. And are you satisfied that the identities that are named on this Government's Exhibit 66 and translated here or identified in 65 are accurate?

A. Yes.

MR. FRAZIER: Okay. First of all, going back to Government's Exhibit Number 66, if you would, please.

Q. At the top of Government's Exhibit Number 66, there is one

name and then, from there, there appears to be others.  What can you tell us about how those names are organized?

A.   Those names are organized by the structure of the gang -- leaders, the originators -- "Phat" being the originator. "Phat," "Jay," "Tweety," they're all three brothers.

Q.   What are their names?

A.   "Phat" is Prince Presley; "Jay" being James Presley; "Tweety" being Bryant Presley.  And then Joseph Presley was also one of the originators, to include Eric Tinsley directly beneath that.

Q.   Okay.  That's the first three lines?

A.   That is correct.

Q.   All right.  Okay.  I want you look down at line number 5 from the top.  It looks like it started off with --

A.   Clefton Evans.

Q.   Okay.

A.   Yes, sir.

Q.   There's a person named Tony there.  Who is that individual?

A.   Tony Sparks.

Q.   And can you, from looking at this -- this diagram, tell anything that would be of significance to the Court regarding Tony Sparks' placement on Government's Exhibit Number 66 at that location?

A.   On that row those four individuals were the enforcers or

the recruiters or both titles for the organization.

Q.   All right.  Did you at my request look to see if there were other gang individuals -- let me back up.

You're familiar with the incident that took place on June 21st, 1999 in Killeen where Todd and Stacie Bagley were kidnapped and murdered?

A.   I am.

Q.   Did you at that time, at our request, go back to see if any of the identities of any of the other people who were involved in that were on this chart?

A.   Yes, I did.

Q.   Okay.  In particular, if you could, please, using Government's Exhibit Number 66, indicate where Christopher Vialva is located on this particular chart?

A.   He is on Row Number 7, second individual in, two rungs below Mr. Sparks.

Q.   All right.  And did you also likewise locate an individual by the name of Terry Brown on this particular chart?

A.   I did.  He's on Row Number 6, the third individual in, one rung below Tony Sparks.

Q.   And did you locate the individual known as Brandon Bernard on this chart?

A.   I did.  Brandon Bernard, also known as "Dip," is at the very bottom of the chart of pyramid, second name in, about 30 people below Mr. Sparks.

Q.   All right.  And did you indicate an individual by the name of Billy Rorie on this particular chart?

A.   Yes, sir.  Billy Rorie is on the same line as Terrance Brown, the first name.

Q.   And then, finally, Joseph Presley?

A.   Joseph Presley is on Rung Number 3 as one of the originators of the organization, first name.

Q.   Now, what does this tell you regarding the organizational structure of the 212 Piru back in the late '90s?

A.   That tells me that the organization was originally started by a bunch of brothers and friends that got together and decided that they were going to do something different with their world.  And, as the pyramid goes down, it just increases the membership.

        Where Mr. Sparks is, on that level, indicates to me that Mr. Sparks put in what they call "work."  He put in a lot of work into the organization and became a very trusted member of the group.

Q.   And what does "work" mean?

A.   It could be a lot of different things.  It could be licks, robberies, assaults, shootings, thefts, burglaries, all of which have been notated on his gang file.

Q.   And the fact that he's located above individuals who may be older than him, does that occupy -- have any significance to you?

A.   No.

Q.   It does not?

A.   No.

Q.   Okay.  Can you tell the Court what types of activities 212 Piru was involved in during the late 1990s in the Killeen area?

A.   When we first started documenting them, they were involved in mostly property type crimes: criminal mischief, burglaries. And that escalated; it escalated quickly.  They've been involved in numerous aggravated assaults, they've been involved in numerous robberies and in numerous homicides in Killeen and Harker Heights.

Q.   In fact, does 212 still exist?

A.   It does.

Q.   Is it as active as it was in the late '90s?

A.   It is not.

Q.   And what is the reason for that?

A.   I don't believe the structure exists that existed at the time that this organization was being dealt with.

Q.   Why is that?

A.   I don't really have a way of saying why that is.  It's very loose knit.  There aren't as many Bloods in the Killeen area as there were at one point in time.  And the Gang Unit dissolved, and so, therefore, the documentation isn't kept as 100 percent -- I guess I would say 100 percent as it should

have been.

Q.   All right.   You've had the opportunity to view some paperwork that was seized out of Mr. Sparks' bedroom back in July of 1999, right?

A.   Correct.

Q.   And do those writings have any significance to you?

A.   They're gang writings, documents, pictures, five-point stars, the words *Piru*, *Damu*, names of other individuals that are in the organization.

Q.   Okay.   What does Piru mean?

A.   It originally is from California.   That's where Pirus originated.   And they -- they originated in that area on Piru Street.   Just like when you're talking about the Crip gang members, a lot of time the Crip gang members have a moniker of Hoover involved with that, and that's intersecting street for their area of concentration.

Q.   And did the 212 Piru have a territory in Killeen?

A.   They have a territory in Killeen, a claimed territory, which is the northeast corner of Killeen, from W S Young East and Business 190 North.

Q.   Does Long Branch Park have any particular significance to them?

A.   Directly in the middle of that part of the city.

Q.   Okay.   What goes on -- are there any type of activities that go on there that are gang-related?

A.    A lot of meetings, a lot of things that they call "church," which is meetings.  They don't typically call it "meetings."  They call it "church."

Q.    All right.  What was Tony Sparks' -- or what is Tony Sparks' nickname?

A.    "Little Gotti."

Q.    And what does that mean in the gang -- *Gotti*, is it used often?

A.    *Gotti* is used often as a term of physical enforcement.  Go back to John Gotti through the Mafia.

Q.    John Gotti, like the --

A.    The Gambino crime family, yes.

Q.    Gambino crime family boss.  Okay.

A.    Yes.

Q.    Okay.  On the streets, the street gangs like in Killeen and other places, when you hear that term *Gotti* being used, what is it meant to convey to others?

A.    That is a person to be feared.

Q.    Okay.

         MR. FRAZIER:  Ninety-three.

Q.    I'm going to show you a series of photos I've marked for identification as Government's Exhibit 93.  They've not been introduced at this time.  I just want you to look at them --

A.    Okay.

Q.    -- and ask you if you could look at them first, if you

will.  Can you see 93 from your screen?

A.    I can.

          MR. FRAZIER:  Okay.  Go to the next page, please.
The next page.  The next page.  The next page.  I think that's
the last page.  Thank you.

Q.    What are we looking at on those photographs marked
Government's 93?

A.    On all five of them, sir.

Q.    Yes.  Generally, what are they?

A.    Generally --

Q.    What are they a picture of?

A.    Gang-related tattoos.

Q.    On who?

A.    On Mr. Sparks.

Q.    And what are the significance, in any, of the tattoos that
you just observed?

A.    It gives identifier information.  It lets people know
exactly who they are affiliated with.

          MR. FRAZIER:  Okay.  Go back to the first picture, if
you would, please.

Q.    What do you -- what in there is affiliation for
Mr. Sparks?

A.    On that particular picture, you have the red flag draped
over his shoulders.  "Thug life" is not necessarily strictly
gang-related.  It can be rap music-related also, but it's very

typical on gang-related tattoos.

Q.   All right.  The second photograph?

A.   On the second photograph there's a couple of different identifiers that are there.  You have the "Central Texas TC" in the middle of that tattoo.  On that tattoo it also has the Roman numeral 2 and the Roman numeral for the "V," which would indicate 12.  And then on the right side of that it shows "212," which is the gang identifier for the organization he belongs to.

Then you also have a pit bull face, which is a half human -- appears to be half human-half pit bull face, which is also very common among the 212 Piru Bloods, with the pit bull being an identifier and "PB," which is Piru Bloods.

Q.   And the third photograph?

A.   In the third photograph, you have the identifiers of the ball cap with the "P" for Piru.  You have, of course, the -- the veiled face with the handgun being pointed.  Other than that, there's really not much identifiers on that particular tattoo.

Q.   Okay.  And what does this appear to be holding that's around the hand?

A.   A handgun.

        MR. FRAZIER:  Okay.  Next photograph, please.

A.   On the next photograph, there's also several identifiers on that photograph.  Starting from the big center portion, you

have the words -- world's Little Gotti, which starts all the way down to the bottom part of the I, which would be Mr. Sparks' nickname.  You also have the five-point star just at the top of that.

Q.    Right there?

A.    Correct.

Q.    I circled it with white.

A.    Correct.  You also have the words, "Rest in peace, Fat," which is going to be Prince Presley.  He was killed in a gang-related activity.  He was the original leader.

Q.    And that took place several years ago?

A.    Yes.

          MR. FRAZIER:  Okay.  And the next photograph, please.

A.    In the next photograph, that is just basically a gang lifestyle.  Everything about that tattoo is gang-related.  We'll start at the top.  We've got the remaining drape of the red bandanna.  We also have the five-point star made with his hands.  We have the red vehicle that's involved in a drive-by type shooting.

          If you go all the way to the left, you have the red bandanna-draped face with the Boston ball cap, all in red in color.  You also have a handgun sticking out from underneath the arm of that individual.  To the very right of that, you have "212 Piru" at the top.  Underneath that you have "Damu," which is a typical name for association of Blood gang members.

And then at the very bottom portion, you have the state of Texas with the five-point star underneath the words 'Blood' written out in his fingers. All of that -- every part of that tattoo, every part of that entire -- well, I can't think of what it's called, exactly. But everything involved in that has gang ties -- Blood gang ties.

Q. That was going to be my next question. These tattoos that you just identified are all tied to the Blood gang?

A. All of them. Yes, sir.

MR. FRAZIER: I'll pass the witness, Judge.

**CROSS-EXAMINATION**

**BY MR. SERGI:**

Q. Now, if you would look at Government's Exhibit Number 66 and you would go down to the fifth line, you see the word "Tony," correct? That's the original hand-drawn org. chart, correct?

A. Correct.

Q. And it does not say "Tony Sparks," does it?

A. Not on the original pyramid, no.

Q. Okay. Now there's another Tony, correct? Antonio Tony Jackson?

A. Antonio Jackson.

Q. Yes.

A. That would be Gotti, yes.

Q. So would you agree with me that, on the original chart,

Tony shows up -- there's a "Tony" that shows up on line 5, correct?

A.    Correct.

Q.    And you already said that my client's nickname was "Little Gotti," and there's a "Little Gotti" that shows up on the bottom line, correct?

A.    A Little Gotti, Antonio Jackson.  Yes, sir.

Q.    But there's no way to really determine -- my client's called "Gotti," you have a "Gotti" here, and he's on the bottom line, correct?

A.    I'm sorry.  What?

Q.    If you look at the original Gotti --

A.    Yes.

Q.    -- which would be also Tony, is on the bottom line, correct?

A.    Gotti is at the bottom line, Antonio Jackson.  He does not go by "Tony."

Q.    It does not say "Antonio Jackson" here.  It simply says "Gotti."

A.    On the original document.  Yes, sir.

Q.    Okay.  And why was the Gang Unit disbanded?

A.    Funding.  Government funding.

Q.    There was some problems with that Gang Unit, weren't there, ma'am?

A.    No, sir.

Q.   So you're telling me it was only because of funding?

A.   That is correct.

        MR. SERGI:  Okay.  No further questions.

        MR. FRAZIER:  If you'll go back to 66.

                    **REDIRECT EXAMINATION**

**BY MR. FRAZIER:**

Q.   Okay.  At the bottom, the very last line of Government's Exhibit 66, directing your attention to this word "Gotti" I'm drawing a circle around here, do you see that?

A.   I do.

Q.   Is Gotti and Little Gotti, are they different people?

A.   They are.

Q.   And who is Gotti?

A.   Gotti is Antonio Jackson.

Q.   Okay.  Completely different individual?

A.   That is correct.

Q.   Tony, on the other hand, who goes by the nickname "Little Gotti," that's on line 5?

A.   That is correct.

Q.   Okay.

        MR. FRAZIER:  Pass the witness.

        MR. SERGI:  Nothing further, Your Honor.

        THE COURT:  You may step down.

        THE WITNESS:  (Complies).

        MR. FRAZIER:  And our next witness would be

Randal Calhoun.

(Witness sworn)

**RANDAL CALHOUN**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. FRAZIER:**

Q.    Would you please introduce yourself to the Court.

A.    My name is Randal Calhoun.

Q.    How are you employed, sir?

A.    I am with the Special Investigative Services, also known as SIS, with the Department of Justice Federal Bureau of Prisons, stationed in the Federal Detention Center in downtown Houston.

Q.    And how long have you been employed by the BOP?

A.    It will be 15 years in April.

Q.    All right.  And what did you do prior to that?

A.    I was employed by the Texas Department of Criminal Justice in the Texas State Prison System for almost nine years before that.

Q.    Okay.  And what do you do for the Bureau of Prisons in the SIS Division?

A.    It's kind of twofold:  Half of what I do involves gang intelligence and dealing with the gangs; the other half deals with investigations, investigating different incidents of rules violations and potential -- any acts of violence and potential