**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

UNITED STATES OF AMERICA,            ) WA:99-CR-00070(3)-LY
                                     )
   Plaintiff,                        )
                                     )
v.                                   ) AUSTIN, TEXAS
                                     )
TONY SPARKS,                         )
                                     )
   Defendant.                        ) MARCH 19, 2018

**************************************************
TRANSCRIPT OF RESENTENCING HEARING
BEFORE THE HONORABLE LEE YEAKEL
VOLUME 6
**************************************************

APPEARANCES:

FOR THE PLAINTIFF:    MARK FRAZIER
                      U.S. ATTORNEY'S OFFICE
                      800 FRANKLIN, SUITE 280
                      WACO, TEXAS 76701

                      MICHAEL R. HARDY
                      ASSISTANT UNITED STATES ATTORNEY
                      601 NW LOOP 410, SUITE 600
                      SAN ANTONIO, TEXAS 78216-5512

FOR THE DEFENDANT:    DAVID K. SERGI
                      ANTHONY J. FUSCO
                      DAVID K. SERGI & ASSOCIATES, P.C.
                      329 S. GUADALUPE
                      SAN MARCOS, TEXAS 78666

COURT REPORTER:       ARLINDA RODRIGUEZ, CSR
                      501 WEST 5TH STREET, SUITE 4152
                      AUSTIN, TEXAS 78701
                      (512) 391-8791

Proceedings recorded by computerized stenography, transcript

produced by computer.

**EXHIBIT 3**

(Open court, defendant present)

THE COURT:  We are here today for the actual sentencing in Cause Number -- or resentencing in Cause Number WA:99-CR-070, *United States v. Tony Sparks*.  Beginning with the government, let me get announcements as to who is here, please.

MR. FRAZIER:  Mark Frazier and Mike Hardy for the United States.

THE COURT:  And for the defense?

MR. SERGI:  David Sergi and Tony Fusco.

THE COURT:  All right.  And the record will reflect that the defendant is present.  In the event -- well, first off, all let me ask of the defendant:  Mr. Sparks do you have anything else you would like to say to the Court before the Court pronounces sentence at this time?

THE DEFENDANT:  No, sir.

THE COURT:  And does the government know of any legal reason why the Court should not complete sentencing at this time?

MR. FRAZIER:  No, sir.

THE COURT:  And does the defense know of any legal reason why the Court should not proceed with sentencing at this time?

MR. SERGI:  No, Your Honor.

THE COURT:  All right.  Well, then if the defendant and his attorney would come forward, please, to the podium.

(Defendant and counsel comply)

In the event that I did not do this previously, I accept and adopt the presentence investigation report prepared by the probation department on July 7th, 2017, as revised January 29th, 2018, and I find that the correct total offense level is 45 and the defendant's correct criminal history category is II.

Pursuant to the sentencing guidelines, the Court is to treat a total offense level above 43 as 43.  Therefore, to extent the Court considers a guideline sentence, the correct calculation is done considering a total offense level of 43 and a criminal history category as II, which results in a guideline range of life imprisonment.

The Court has prepared in this case a memorandum opinion regarding sentencing which I will file, and it will be entered by the clerk upon the conclusion of this hearing.

However, I am going to pretty much go through that at this time in order that everyone might know, with specificity, the Court's consideration of the various factors at play in this case.  And I will not read it all verbatim, but I will read some of it in order that there is no misunderstanding. The memorandum opinion regarding sentencing as well as the comments that I make today, however, are all in the record and all constitute my findings of fact and conclusions with regard to this sentencing.

By way of brief background, on April 17th, 2000, Tony Sparks pleaded guilty to carjacking.  On March 22nd, 2001, the district court sentenced him to life in prison.  And on November 18th, 2016, with the permission of the Fifth Circuit, Mr. Sparks filed an Unopposed Successive Motion to Vacate, Set Aside, or Correct that sentence, based primarily on the Supreme Court's later decision in *Miller v. Alabama*, a 2012 decision.

On January 17th, 2017, the parties filed a joint motion with this Court in which they agreed that Sparks was entitled to resentencing under *Miller*.  This Court then granted Sparks' motion based on *Miller* and held a resentencing hearing from February the 5th through 7th and the 21st through the 22nd.  With agreement of the parties, the Court conducted that hearing in Austin, and we are hear today for sentencing.

The Court further notes that, in May of 2011, Mr. Sparks filed a subsequent Motion to Vacate, Set Aside, or Correct his sentence on the basis of the Supreme Court's decision in *Graham v. Florida*.  This Court denied the motion July 30th, 2013.  And on February 10th, 2018, the case was remanded to this court on the unopposed motion of the government, following the grant of a certificate of appealability from that order.

Rather than pursue that motion, Mr. Sparks filed the current *Miller* motion; and, in light of the Court's grant of the *Miller* motion and subsequent resentencing hearing and

action the Court will take today, the subsequent motion is dismissed and the Court proceeds on the basis of the *Miller* motion.

The facts of this case are well summarized in the United States Court of Appeal for the Fifth Circuit's opinion in the *United States v. Bernard*, which affirmed the convictions of two others charged in connection with the same crime -- or the same series of crimes as Mr. Sparks.  I will not reread or go through all of those facts and circumstances.  They were well set forth during the hearing that we had in this case.  I will, instead, address my reasons and my sentence.

Sparks has been in custody since August the 2nd, 1999.  On April 17th, 2000 he pleaded guilty to carjacking, and on July 31st, 2000, while in prison at the Bell County Juvenile Detention Center, awaiting sentencing, he participated in an escape attempt with another inmate, Christopher Kirvin.

Kirvin lured a correctional officer into Kirvin's cell, choked her, took her keys.  She regained consciousness and began screaming, and, at that point, Sparks in an adjacent cell began flushing his toilet repeatedly to mask her screams.

At the time Sparks was sentenced, the federal sentencing guidelines had not yet been ruled advisory by the Supreme Court in the *Booker* opinion.  Sparks's total offense level and criminal history, including the adjustments for his role in the escape attempt, led to a range including just one

sentence: life in prison without the possibility of parole.

At the time of the offense, Sparks was sixteen years old.  The guidelines at that time stated that age, including youth, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range.  On March the 22nd, 2001, in accordance with the guidelines, the district court sentenced Sparks to life in prison.

Vialva and Bernard, two of the other individuals charged with regard to this case were tried, found guilty of first-degree murder, carjacking and conspiracy to commit murder, and sentenced to death.  Lewis and Brown, two other defendants, testified at the trial of Vialva and Bernard.  As result of their cooperation, Lewis and Brown signed plea agreements whereby they pleaded guilty to two counts of second-degree murder, aiding and abetting; one count of carjacking; and possession of a firearm during the commission of a crime of violence.  The district court sentenced both Lewis and Brown to 248 months.

In recent years the Supreme Court has addressed juvenile sentencing issues in several cases, beginning with *Roper v. Simmons*, in 2005.  In *Roper* the Supreme Court found that juveniles were not eligible for the death penalty because of their diminished culpability and their capacity for change In *Graham v. Florida* the Court held that juveniles could not be sentenced to life without parole in crimes that did not involve

homicide.  In *Miller v. Alabama* the Court held that juveniles could not be sentenced to mandatory life without parole.  And in *Montgomery v. Louisiana* the Court held that the *Miller* decision was retroactive to cases on collateral review.

In each of these decisions, the Court addressed the rationale for punishing juveniles differently from adults.  In *Miller* the Court summarized the state of its Eighth Amendment jurisprudence as it relates to juveniles.

As the Court explained, *Roper* and *Graham* establish that children are constitutionally different from adults for purposes of sentencing.  Because juveniles have diminished culpability and greater prospects for reform, we explained, they are less deserving of the most severe punishments.

Those cases relied on three significant gaps between juveniles and adults:  First, children have a lack of maturity and an underdeveloped sense of responsibility, leading to recklessness, impulsivity, and heedless risk-taking;

Second, children are more vulnerable to negative influences and outside pressures, including from their family and peers, they have limited control over their own environment, and lack the ability to extricate themselves from horrific crime-producing settings; and

Third, a child's character is not as well formed as an adult's.  His traits are less fixed and his actions less likely to be evidence of irretrievable depravity.

As I mention the Supreme Court cases, I am refraining from saying what are quotes and what's not, but that is all set forth in my memorandum opinion.

Identifying a juvenile as among the worst offenders is a suspect classification because the susceptibility of juvenile to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of an adult.  In addition, youth can be a mitigating factor because the signature qualities of youth are transient.  As individuals mature, the impetuousness and recklessness they may dominate in younger years can subside.

Furthermore a sentence of life without parole is the second most severe penalty permitted by law.  Such a sentence for a juvenile means denial of hope; it means that good behavior and character improvement are immaterial; it means that whatever the future might hold in store for the mind and spirit of the convict, he will remain in prison the rest of his days.

To justify life without parole on the assumption that the juvenile offender forever will be a danger to society requires the sentencer to make a judgment that the juvenile is incorrigible.  The characteristics of juveniles make that judgment questionable.  It is even more difficult -- it is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate

yet transient immaturity and the rare juvenile offender whose crime reflects irreparable corruption.  The distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.

Although the Supreme Court declined to declare all life-without-parole sentences for juveniles unconstitutional, it cautioned that such sentences would be appropriate only in rare circumstances.

Given all we have said in *Roper*, *Graham,* and this decision about children's diminished culpability -- this is the Supreme Court speaking in *Miller* -- and heightened capacity for change, we think appropriate occasions for sentencing juveniles to the harshest possible penalty will be uncommon.  This is especially so because of the great difficulty we noted in *Roper* and *Graham* of distinguishing at this early age between the juvenile offender whose crime reflects unfortunate yet transient immaturity and the rare juvenile offender whose crime reflects irreparable corruption.  Although we do not foreclose a sentencer's ability to make that judgment in homicide cases, we require it to take into account how children are different and how those differences counsel against irrevocably sentencing them to a lifetime in prison.

In light of these issues, the Supreme Court outlined five factors for a court to when conducting the individualized

determination that must be performed before a juvenile offender may be sentenced to life without parole.  Those factors include:  The juvenile's chronological age and its hallmark features, among them, immaturity, impetuosity, and failure to appreciate risks and consequences; the family and home environment that surrounds the juvenile and from which the juvenile cannot usually extricate himself, no matter how brutal or dysfunctional; the circumstances of the homicide offense, including the extent of the juvenile's participation in the conduct and the way familial and peer pressures may have affected him; whether the juvenile may have been charged and convicted of a lesser offense, if not for incompetencies associated with youth, for example, the juvenile's inability to deal with the police officers or prosecutors, including on a plea agreement, or his incapacity to assist his own attorneys and the possibility of rehabilitation, including the extent or absence of the juvenile's criminal history.

The Supreme Court's juvenile-sentencing jurisprudence from *Roper* forward instructs sentencing courts to painstakingly examine all facts and circumstances of a juvenile's crime and impose a penalty of life without parole only in the rarest of cases.  This Court cannot read the Supreme Court's writing in any way other than to presume that juvenile lawbreakers, no matter how heinous their crime, are to receive a lesser sentence than life without parole, except where the record as a

whole, including the nature of the crime, indicates that the juvenile offender is irreparable corrupt.  This is a high bar. This court's examination of the *Miller* factors will explore which factors lead away from and which lead toward leaving Sparks's existing sentence in place.

The probation department completed an amended presentence investigation report for this Court in preparation for Sparks's resentencing.  The report calculates Sparks's total offense level as 45, leading to a recommended sentence under the United States Sentencing Guidelines of life in prison.  The resentencing hearing included a presentation of evidence relevant to all of the *Miller* factors.

Because Sparks was sixteen years of age at the time of the offense, his culpability is tempered due to the immaturity of youth.  As stated in *Roper*, the susceptibility of juveniles to immature and irresponsible behavior means their irresponsible conduct is not as morally reprehensible as that of adults.  In addition, because of his age, Sparks lacked the ability to fully appreciate the risk and consequences of his actions.

Sparks's own behavior at the time of the offense also supports these general conclusions.  Testimony at the resentencing hearing and the presentence investigation report indicate he was a member of the 212 Piru gang, an affiliate of the much larger Bloods gang.  Largely in connection with

assorted gang activities, Sparks had developed a lengthy juvenile criminal record.  This led him to being placed on juvenile probation, which was the reason for his 8 p.m. curfew, the rationale he gave for being dropped off at home prior to the murder of the Bagleys.

Sparks had thus exhibited a lack of appreciation for the risks and consequences of his behavior, including sneaking out of his house while under probation and continuing to proceed with the planned carjacking, despite being picked up by police during the first attempt.  Furthermore, his desire to avoid another curfew violation was in stark contrast to his criminal behavior of the previous several hours.  This indicates an immature understanding of the risks and severe consequences associated with his actions.

In contrast, however, Sparks was not a tangential participant in the gang.  As testified to by Sandra Hunt, Sparks was known as an enforcer by the Killeen gag unit. Sparks's nickname was "Little Gotti," and he played at least some leadership role in the gang.  Arguably, Sparks's lengthy juvenile record indicates that he was familiar with the risks and consequences of his actions, since he had faced such consequences.  Sparks's actual behavior, however, indicates a hallmark of his age.  Despite a path that was clearly headed toward much more severe consequences, Sparks continued to plan, participate in, and even lead, in part, the carjacking and

abuse of the Bagleys.

Two expert witnesses, Dr. John Fabian and Dr. Marisa Mauro, concur that brain development in juveniles is not fully complete.  As Fabian explained, juveniles as a class are scientifically less culpable than adults due to the way in which juvenile brains work differently from adult brains.  This factor weighs against irreparable corruption.

Another factor the Court must consider is the family and home environment of Sparks and the extent to which it may have affected his development.  The resentencing testimony painted a complicated picture of Sparks's upbringing.  Sparks was born in Germany to a German mother, Daniele Brown, and then Daniele Gerber, and an American father, Tony Sparks, Sr.  Sparks's father was in the United States military and stationed in Germany at the time of Sparks's birth.  Sparks's parents were unmarried, and Sparks's father separated from Sparks's mother when Sparks was three or four years old.  While in Germany, Sparks had used the name Tony Gerber, his mother's name.

While Daniele was at work, her sister took care of Sparks.  Daniele testified that she was not a good mother because she was too young.  She testified she went out to clubs in the evenings, occasionally not bothering to go back to her sister's house for Sparks.  Other times she would go out in the evenings with friends after she was sure Sparks was asleep.

Carmen Lapiccirella testified that Sparks was friends with her daughter Yvonne and would regularly come over to work on homework and stay for meals. She indicated Sparks was obedient, agreeable, and never aggressive.

Sparks was sexually molested by an American soldier on several occasions during the ages of seven and eight. The soldier was tried by a court-martial and found guilty of indecent acts upon a child, indecent assault upon a child, enticing a child to commit lewd acts, and lewd gestures towards a minor. The soldier was confined in correctional custody for six years and given a punitive discharge.

Sparks began acting out. He spray-painted his name on the wall of a house, killed chickens, shoplifted candy, displayed a brutal attitude towards his classmates on occasion, including kicking them in the heads while they were lying down, and exhibited unacceptable sexual behavior, grabbing girls by the leg and groping them. Daniele testified she did not abuse Sparks, but admitted to frequently spanking him and, on at least one occasion, hitting him with a belt and leaving marks on his back. A neighbor saw the marks and, eventually, German Child Protective Services was notified.

After a few discussions between Daniele and Thomas Klose, a German Child Protective Services worker, Sparks was placed in a children's home, with Daniele's consent. At the time Sparks was nine years old. Several individuals testified

that Sparks thrived in the children's home.  One of his teacher, Christiane Nicola-Hager, testified that he was a well-behaved child, a good student, and was willing to help others.  Christiane Carton, another teacher, testified that she supervised the house in which Sparks and other children resided and lived with the children.  She testified Sparks was a normal child who was funny and liked to help in the kitchen.  After two years in the children's home, Daniele withdrew Sparks in the summer of 1994.

Daniele told school officials that she was removing Sparks because she had married Antonio Brown, an American soldier, and they would be moving to Texas.  Daniele and Antonio did move to Texas but left Sparks behind.  Sparks moved in with his father, who was still in Germany.  Approximately six months later, Sparks joined Daniele and Antonio in Killeen, Texas.  From the beginning, Antonio was violent toward Daniele, injuring her frequently.  He would bring other women to the house as well.  Sparks's aunt visited and saw Antonio throw things at Sparks if he did not obey.  Antonio and his younger brother were both in the Bloods, and Antonio would take Sparks to places where gang members would hang out.  Daniele testified that she believes Antonio and his brother, who lived with them for a period of time, convinced Sparks to join the gang.

Sparks started acting out again at home, sneaking out at night to visit friends and disobeying his mother.  Daniele

asked Sparks's father, who had then returned to the United States, if he could look after Sparks.  Sparks moved to Kentucky and lived with his father, stepmother, and half brother for a year, from 1996 to 1997.  At the time Sparks would wear red, a Bloods gang color, and told his half brother that his stepfather was in a gang and he had to join.  Sparks moved back to Daniele and Antonio in Killeen, Texas, at their request.

Fabian, a forensic psychologist, testified for Sparks.  He interviewed Sparks and reviewed Sparks's childhood records, including the records of sexual abuse suffered by Sparks.  He testified that the trauma and abuse Sparks experienced as a child would have affected his brain development.  He also testified that juveniles generally have poor decision-making ability because the front of the brain does not fully develop until around age 23, but that psychological risk factors like abuse and poverty can alter or delay the development even further.

Sparks's home environment was not the sort of brutal one present in *Miller*, where a 14-year-old had been in and out of foster homes because his mother was an alcoholic and drug addict, his stepfather abused him, and he had attempted suicide four times, including the first time at six years of age. However, the Court notes the chronology of Sparks's behavior and how it coincided with the sexual abuse he suffered.

Sparks's stepfather influenced Sparks's joining the Bloods gang.  The record is clear that, by the time of Sparks's crime, he was deeply committed to the 212 Piru gang.  But even this comes up short of irreparable corruption.

There is a significant amount of agreement between Sparks and the government about his participation in the crime.  Sparks, Lewis, and Vialva worked together to concoct their plan to carjack someone in order to obtain money.  Sparks and Lewis both approached potential victims in parking lots, asking for a ride, and Sparks was eventually the person who approached Todd Bagley.

Sparks possessed a .22 handgun.  When Sparks, Lewis, and Vialva got into the Bagleys' car, Sparks pointed his gun at Stacie Bagley's head in the front seat.  Sparks and Vialva together got the Bagleys out of the car, pointing weapons at them, took the Bagleys' wallets and jewelry, and forced the Bagleys into the trunk of the car.  The group then drove to various locations for approximately five hours with the Bagleys in the trunk of the car the entire time.

At one point Vialva indicated there might be a shootout with the police.  At a different point, Sparks indicated he no longer wanted to be part of the crime, yet Sparks remained in the vehicle with the others while they continued to drive around and when the group met with other gang members.  Sparks bragged about bein a "master thug."

Sparks eventually told the others he needed to be dropped off at his house before his 8 p.m. Curfew.  Sparks took the Bagleys' jewelry with him and agreed with Vialva to pawn it the next day.  Vialva also requested that Sparks' leave his .22 handgun with Vialva.  After initially refusing, Sparks' agreed.

Sparks and the government disagree, however, on whether Sparks knew that Vialva was going to kill the Bagleys prior to Sparks' leaving the group.  Even assuming that Sparks was not present at the moment that Vialva said the Bagleys would have to be killed, Sparks, at a minimum, had a strong suspicion that the murder would transpire, based on the chain of events before he left the group.

Even before he separated from the group, Sparks had participated in a violent and disturbing crime.  It was June in Texas, and he drove the car with the Bagleys in the trunk for five hours.  In addition, based on Vialva's request for the gun and the previous discussion about the possibility of a shootout, Sparks was not oblivious to the possibility that the Bagleys would be killed and he did nothing to prevent that from occurring.  On the other hand, Sparks was not present at the time of the murders.  Nonetheless, his participation in the crime favors a significant sentence.

Sparks was a member of a gang.  The 212 Piru gang and the Bloods exert extreme pressure on their members to avoid incriminating one another.  As Hunt, a former Killeen police

officer in the gang unit testified, Sparks was known as an enforcer in the gang, his nickname was "Little Gotti," and he had put in a lot of "work," which is what the gang calls violent acts in support of the gang, both in and outside of prisons.  In short, Sparks has become a prominent gang member. Sparks's stepfather introduced Sparks to gang life, and pressure from the gang and its structures likely played a role in Sparks's participation in this crime.

Charles Meyer, a retired federal agent, testified that, while the Bagleys were in the trunk, Sparks, Vialva, Brown, Bernard, Lewis, and Joey Presley met at Long Branch Park, which was the main meeting point for the 212 Piru gang. Meyer also testified that Presley was one of the founders of the 212 Piru gang.  The presence of one of the founders during the commission of the crime is significant and likely increased any pressure that Sparks felt to impress the gang.  Fabian testified that Sparks's membership in the gang was likely an attempt to find a supportive family environment where one had been missing.  He also testified this made Sparks more susceptible to outward influences.  Fabian further observed that Sparks was likely influenced by pressure from Vialva, focusing on the moment when Vialva asked Sparks for Sparks's gun and Sparks initially refused, only to change his mind and give the gun to Vialva.

Peer pressure played a significant part in Sparks's

decision to become involved with the gang, generally, and to participate in the crime.  Peer pressure also played a role in his failure to take any action to prevent the murder.  On the other hand, Sparks chose his peers and was comfortable in the gang environment.

The record is unclear as to the extent to which Sparks's youth affected his ability to deal with police or prosecutors.  Once arrested for the crime for which he was sentenced, Sparks refused to cooperate with the prosecution, but his reasons for refusing are unknown.  He also pleaded guilty without a plea agreement.  Again, the record is silent on whether Sparks's youth played a role in his decision.

There is an indication that Sparks may have been under the impression at the time he entered his guilty plea that his sentence would be in the 10- to 15-years-of-incarceration range.  Any discussion of a proposed sentence before Sparks entered his plea of guilty was altered by Sparks's involvement in the escape attempt prior to his sentencing.

Although the Court finds it plausible that a potential 10- to 15-year sentence was discussed, the record contains no evidence that Sparks refused to cooperate because of the assurance of such a sentence.  The record further supports a conclusion that he refused to cooperate based on his strong ties to his gang.

In this regard, the Court notes that the government has filed a Motion to Compel the Disclosure of Information, seeking the affidavits of Sparks's former attorneys on this issue.  The Court does not require additional information to analyze this factor and has analyzed it, as previously stated.  Thus, the government's motion is denied.  However, the Court notes that neither party has called or attempted to call Spark's former attorneys as witnesses in the proceeding in this case.

There is some evidence that Sparks, while in Killeen, was not able to adequately understand the English language because he was more comfortable speaking German.  The psychological evaluation of Sparks at that time indicates low proficiency in verbal communication.  However, the evaluator notes that it appears Sparks may not have put forth significant effort.

Mauro testified that she conducted tests on Sparks that indicated Sparks's verbal comprehension in his earlier examination is likely due to low effort, though it is possible that Sparks lacked verbal comprehension because he was less comfortable speaking English than German.  Further, the Court notes that Sparks is bilingual, even when he lived in Germany, and had been living in Texas for nearly five years at the time of the offense.

The Court -- the record does not support that

Sparks's comprehension of English at that time was so low as to render him unable to understand his lawyer or sentencing judge. It is possible, however, that his English proficiency combined with his youthfulness impeded his decision-making before his guilty plea and sentencing. Sparks's youthfulness clearly played a role in his dealings with his lawyer and the prosecution, including his decision not to cooperate.

The possibility of Sparks's rehabilitation in this case is complex and calls for a detailed analysis. On the one hand, the Supreme Court has said that sentencing a juvenile to life in prison without parole is too harsh because such a sentence fails to account for the malleability of a youth's character and the possibility that even the most heinous crimes may not indicate that a youth is irredeemable. Thus, at least initially, this factor weighs in favor of a sentence other than life.

In *Miller*, for example, the Supreme Court reviewed the convictions of two 14-year-old offenders who had been convicted of murder for separate crimes. The first, Kuntrell Jackson and his friends decided to rob a video store. Jackson learned that one of the group had a gun, and Jackson decided to stay outside the store while the others went in. Jackson then went into the store. When the clerk threatened to call police, a youth other than Jackson shot and killed the clerk.

In the second crime, Evan Miller was at home when a

neighbor came to buy drugs from his mother.  Miller and a friend drank alcohol and smoked marijuana with the neighbor.  The neighbor passed out, and Miller stole his wallet.  When the neighbor woke up, Miller repeatedly beat the neighbor with a baseball bat, saying "I am God.  I've come to take your life," before delivering the fatal blow.

Yet the Supreme Court found each juvenile entitled to individualized sentencing, accounting for the possibility of rehabilitation due to his youth.

If this Court considers the possibility of rehabilitation for Sparks at the time of Sparks's original sentencing, this factor weighs in favor of a sentence other than life because Sparks's crime alone does not indicate irreparable corruption.  The fact that Sparks backed out of the crime before the murders indicates, at a minimum, a window of possible rehabilitation.  Sparks, at the time of his conviction, was at least as amenable to rehabilitation as any youth and certainly as amenable as the youths in *Miller*.

After being sentenced, however, Sparks's prison record for his first seven or eight years of federal custody starkly reflects irreparable corruption.  During that time, when Sparks was 17 to 25 years old, he was heavily involved in the Bloods and committed numerous disciplinary violations.

Sparks was disciplined for violations associated with either producing or consuming alcohol.

Of greater consequence, in 2004, Sparks participated in a riot involving approximately 600 inmates and was carrying a baseball bat during the fighting.

In January of 2007 Sparks was punished for assaulting another inmate, causing seven puncture wounds and requiring the inmate to be transferred to a local hospital.

In March 2007 Sparks was disciplined for throwing fecal matter at an officer's face and stating, "I can't wait to see you in the compound.  I'm going to kill you."

In November 2007 Sparks was disciplined for another assault with serious injury.

In January of 2009 Sparks was disciplined for an attempt to kill by stabbing.  The victim had numerous stab wounds, including one which penetrated his skull, damaging his right eye and his brain.  The victim lost his eye due to the severity of the injury.

Further, on three additional occasions, Sparks was disciplined for possession of a dangerous weapon.

And yet, further complicating the issue, since being punished for possessing intoxicants in March 2010, the last eight years of Sparks's prison record are free of violent conduct.  In part, this is due to his transfer to ADX Florence, the highest security unit in the Bureau of Prisons, as a result of his violent conduct culminating in the attempt to kill.  ADX Florence houses only 490 inmates out of approximately 185,000

in the prison system, according to the testimony of Randall Calhoun. In addition, Sparks was placed in the Control Unit at ADX Florence, which houses the 78 most dangerous offenders.

Sparks was at ADX Florence for five years, and during that time he obtained his GED, took over 100 classes, some of which were required in order to transfer out of ADX Florence, and participated in a reentry group session with Dr. Francis Davis in 2014. Davis testified that Sparks was particularly engaged with the group.

Dr. John Huber is a forensic psychologist who testified for Sparks. His conclusion is that Sparks is a moderate risk for offending again. He also testified that Sparks has problems with anger control and exhibited aggressive behavior. He testified that Sparks had found religion in prison and that his time in ADX Florence, along with his desire not to hurt his chances at his resentencing, may have accounted for the reduction in his violent behavior.

He testified that Sparks was approaching the possibility of resentencing in a rational way. He stated that Sparks's improved behavior in preparation for resentencing indicated he may have hope, an emotion that he would not previously have experienced in prison due to his life sentence.

However, Huber's report regarding Sparks's dangerousness and his psychological assessment was largely discredited on cross-examination. It was revealed that Huber

was not provided the entirety of Sparks's criminal history or prison disciplinary records. He testified that his conclusion might be different if he had all of Sparks's records. The Court gives little weight to Huber's testimony.

Fabian, on the other hand, analyzed the decline in Sparks's violent conduct in prison and testified that it is likely due to the higher security facility, making such behavior more difficult, and Sparks's growing maturity. He also testified that aging affects brain development and offered that the complete picture of Sparks indicates a marked change in the development of his brain from his youth to present day.

In his professional opinion, Sparks finally experienced less chaos in his life for the first time when he was placed in ADX Florence in isolation. It may have been the first time that Sparks would have felt safe in prison. Fabian testified that he believes Sparks suffers from posttraumatic stress disorder due to both the trauma suffered in his youth and the traumas, some even arising from violent acts of Sparks himself, that Sparks has suffered in prison.

He admitted that it is difficult to ascertain whether Sparks had PTSD at the time of the carjacking and murders. He testified, however, that Sparks had symptoms and trauma in his background that could have led to PTSD at the time. Fabian concluded that Sparks has the capacity for change, based on the evidence of Sparks's disciplinary improvement in the last

decade.

Calhoun, a Special Investigative Services officer for the Bureau of Prisons, testified that Sparks is a validated member of the Bloods based on Sparks's self-admission, tattoos, and association with other known members.  He testified that the Bloods in prison require members to do their "work" -- that is, violent acts and other actions advancing the illicit admissions of that gang -- in order to build the respect of other members.  Sparks's action in prison indicate that he has significant respect and support from the Bloods.

Calhoun testified that Sparks's actions may indicate he is approaching "shot caller" level, where he no longer needs to do bad acts himself, but can direct others to do them. Calhoun further testified that Sparks's tattoos covering his entire back all relate to membership in the Bloods and indicate that Sparks is in the gang for life.

Finally, Calhoun testified that Sparks had not been prosecuted for his violent acts in prison because the Bureau generally finds that the resources -- their resources are not well spent to prosecute when a prisoner is already serving a life sentence.

Mauro, a forensic psychologist, testified for the government regarding Sparks's mental health and future dangerousness.  Her conclusion is that Sparks falls within the 91 to 94th percentile for psychopathy.  In other words, Sparks

has more psychopathic traits than 91 to 94 percent of the population. On that basis, she found that Sparks is at a high risk for future violence. She noted, however, that he is a low risk for immediate violence, because violence would jeopardize his chance at a lower sentence.

She indicated that she did not believe Sparks felt remorseful. Instead, he spoke about the carjacking and murder in a cold and distant manner. She admitted, however, that during her interview with Sparks, he stated he was extremely sorry and wished he had never left the car because he believes he could have prevented the Bagleys from being killed.

Mauro testified that she had access to all of Sparks's records. She also testified that she was unable to compare her analysis to Huber's because Huber did not have access to all of Sparks's records.

Finally, as the Supreme Court has explained, a life sentence, particularly for a juvenile, is a sentence which invites lack of hope. Considering Sparks's gang connections prior to entering prison, his youthfulness, and his lack of hope due to the life sentence, it is perhaps unsurprising, though certainly still reprehensible, that Sparks continued on a violent path with the Bloods. His record might be cited as an example of the potential negative consequences of sentencing a juvenile to life without parole. The evidence is inconclusive as to Sparks's current propensity for violence and

reflects that, at the time of his initial incarceration, he maintained the violent, lawless, gang-influenced lifestyle pattern on which he had embarked at the time of the crime for which he was sentenced.

This Court has very little guidance in applying the Supreme Court's juvenile sentencing jurisprudence at resentencing, particularly after the passage of seventeen years. Much has occurred in Sparks's life since his original sentence was imposed. For the first several years of his incarceration, Sparks did nothing to indicate that he could ever be integrated back into lawful society. The government argues that this is reason enough to keep Sparks's life sentence in place.

Sparks argues that his ill behavior as a prisoner is exactly what worries the Supreme Court about destroying all hope of release in a juvenile offender. Sparks argues that his more recent history of not engaging in violent acts should be the primary consideration of the Court.

But to do that would relegate this Court to examining this case through the eyes of a parole board and considering whether Sparks's sentence should be reduced by virtue of his activities arguably showing rehabilitation. But there is no parole in the federal system.

The Court concludes that it must place itself in the position of the original sentencing court at the time of

original sentencing.  The November 1st, 2000 Guidelines Manual was used by the sentencing court in computing a guidelines sentence for Sparks.  The result was a total offense level of 45 and a criminal history category of II, which yielded a life sentence.  But the calculation was derived after considering Spark's presentencing escape attempt.

This most likely caused an increase of five criminal history points, as Sparks was assessed two points for obstruction of justice and did not receive a three-point reduction for acceptance of responsibility.  Had these adjustments been made, the sentencing judge would have been considering total offense level of 40 and a criminal history category of II, resulting in a range of incarceration of 324 to 405 months, not a mandatory life sentence.

Does the addition of the escape attempt lead inexorably to a finding that, in 2001, Sparks was irretrievably depraved?  This Court thinks not.  Yet the escape attempt may not be ignored.  It was before the Court at the time the Court imposed the original sentence.

When the Court considers both the guidelines and the Supreme Court's juvenile sentencing jurisprudence, this Court is left with a firm belief that the Court must step outside the guidelines and impose a sentence that is sufficient but not greater than necessary to satisfy the Sentencing Reform Act of 1987 while, at the same time, recognizing that Sparks was a

juvenile at the time he committed the crime.

The Court has previously discussed the juvenile sentencing factors and now turns to the factors set forth in the Sentencing Reform Act of 1987.

The Court does note that the determination not to adjust Sparks's offense level for acceptance of responsibility at the original sentencing was upheld on appeal because the district court did not clearly err.

This Court has considered each factor in Sentencing Reform Act of 1987, found in Title 18 of the United States Code, Section 3553, but will discuss only those that need discussion beyond consideration and have not already been subsumed in the Court's discussion of the juvenile sentencing factors.

First and foremost, the nature and circumstances of the offense are that Sparks was convicted of a final -- a violent felony.  His participation in the crime resulted in the deaths of two wholly innocent people whose willingness to help others and provide a ride to three kids was exploited by Sparks and his associates to kidnap and rob them, with fatal effect.

Sparks terrorized the Bagleys for five hours, both driving and riding in the Bagleys' vehicle with the Bagleys in the trunk while the Bagleys pleaded for their lives.  In addition, Sparks failed to take any action to prevent the death of the Bagleys.  The Court cannot imagine a worse offense, nor

can the Court imagine a more callous perpetrator than this defendant.

Combining several of the factors, the Court considers what would instill in Sparks a respect for law, what would afford adequate deterrence to criminal conduct by Sparks and others, and what will protect the public from further crimes of Sparks. The Court finds that Sparks has no respect for the law and did not at the time of the crime. The Court finds that he is more likely than not to re-offend upon release from imprisonment. There is no easy answer to what sentence will provide adequate deterrence to Sparks from committing future crimes.

Sparks has not separated himself from the Bloods gang. His lack of specific activity with the gang over the past several years is best explained by the amount of time he spent in isolation and the fact that he is now seeking release from imprisonment. The Court has no confidence that he will not go back in the gang life upon release.

Sparks argues that the Court must avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. He directs the Court's attention specifically to his accomplices Lewis and Brown, each of whom received a sentence of 248 months, and has now either been released from prison or is soon to be released.

But there are profound differences between Lewis and

Brown on the one hand and Sparks on the other.  Lewis and Brown cooperated with the government and entered into plea agreements.  Before sentencing, neither attempted to escape.  Thus, they were given credit for acceptance of responsibility and no enhancement for the obstruction of justice.

The Court concludes that, considering all of the factors and overlaying them with the Supreme Court's juvenile sentencing jurisprudence, a sentence of less than life, but one that takes into account the nature and circumstances of Sparks's background and the crime for which he has been convicted is appropriate.

The Court concludes that the following sentence is tailored to meet the facts and circumstances of Sparks's background and the crime for which he was convicted; that this sentence adequately accounts for all of the factors in Title 18 of the United States Code, Section 3553, some of which are discussed in this opinion and have been discussed here in the courtroom today, but all of which have been carefully considered by the Court; that this sentence takes into account all of the Supreme Court's juvenile sentencing jurisprudence; and, finally, that this sentence is a reasonable sentence to impose.

The Court will impose a sentence of 420 months confinement followed by supervised release term of five years.

For the reasons previously stated on the record and

in this Court's memorandum opinion regarding sentencing and pursuant to the Sentencing Reform Act of 1984, it is the judgment of this Court that you, Tony Sparks, are hereby committed to the custody of the Bureau of Prisons for a term of 420 months.  It is ordered that this sentence shall commence on August the 2nd, 1999.

Upon release from imprisonment, you shall be placed on supervised release for a term of five years.  Within 72 hours of release from the custody of the Bureau of Prisons, you shall report in person to the probation office in the district to which you are released.

While on supervised release, you shall not commit another federal, state, or local crime, and you shall comply with the mandatory and standard conditions adopted by this Court on November 28th, 2016.

In addition, you shall comply with following special condition:  Due to your drug involvement in prison, you shall participate in a substance abuse treatment program and follow the rules and regulations of that program.  The program may include testing and examination during and after program completion to determine if you have reverted to the use of drugs.  A probation officer may supervise your participation in the program.  You shall pay the costs of treatment under the program, to the extent you are financially able.  While on supervised release, you shall refrain from the use of drugs or

alcohol.

If you have not already done so, you shall pay a fine -- pardon me.  Let me repeat that.

If you have not already done so, you shall pay the $100 special assessment originally imposed by the Court on March the 22nd, 2001.  That assessment is re-imposed.  If you have not already done so, you shall pay the $5,000 fine originally imposed by the Court on March 22nd, 2001.  That fine is re-imposed, and payment shall begin immediately.

It is further ordered that you shall make restitution, as originally imposed by the sentencing court, as follows:  To Georgia A. Bagley $2,511.50; to Rick D. Bagley, $4,771.26; to CGU Insurance Company, PO Box 1848, Des Moines, Iowa, 50306-1848, $4,300, reference Claim Number 72-245-321-00 and 92-466491-00; to the Crime Victims Compensation Division, PO Box 12198, Austin, Texas 78711-2198, the sum of $11,186.42, reference Claim Numbers VC99140708 (Todd Bagley) and VC99140717 (Stacie Bagley).

You shall be jointly and severally liable for this restitution which totals $22,769.18 with the following defendants:  Terry Terrell Brown, Docket Number W:99-CR-061(1); Christopher Michael Lewis, Docket Number W:99-CR-061(2), and Gregory Hardin Lynch, Docket Number W:99-CR-071.

No further payments shall be required after the sum of the amounts actually paid by all defendants has fully

covered the compensable injury.  Any payment made by you shall be divided among the persons named in proportion to their compensable injuries.  Payment of this restitution shall begin immediately and is payable through the Clerk, United States District Court, 800 Franklin Avenue, Room 303, Waco, Texas, for transfer to the payees.

This Court determines that you do not have the ability to pay interest on the special assessment, the fine, and the restitution, all as originally imposed by the Court and re-imposed today; therefore, the Court waives the interest requirement on each amount pursuant to Title 18 of the United States Code, Section 3612(f)(3).

Because you are in custody, voluntary surrender is not an issue.

Mr. Sparks, at this time I am handing to the clerk of this court the presentence investigation report prepared by the probation department in this case and to which we have referred during this proceeding.  I'm ordering that that report be sealed.  That means that no one may come to the District Clerk's Office and read about you or any member of your family or any of the facts and circumstances surrounding the crime for which you have been resentenced today which may be contained in that report.

However, I wish to advise you that if there is an appeal from the sentence that I have just imposed, both you and

the government may use your copies of the presentence investigation report for purposes of appeal and, in that event, the presentence investigation report will become part of the record on appeal.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  You have a right to appeal the sentence that I have just imposed.  However, I wish to tell you at this time that if for any reason you feel you have a right to appeal that sentence or if for any reason you desire to appeal that sentence, you may only do so if you first file with the clerk of this court within fourteen days -- that's two weeks from today, fourteen days from right now -- a written Notice of Appeal.  That's a written document called a "Notice of Appeal."

If you do not file such a written Notice of Appeal with the clerk of this court within 14 days, you can never appeal the sentence that I have just imposed and you will forever waive your right to appeal that sentence.  Do you understand that?

THE DEFENDANT:  Yes, sir.

THE COURT:  Is there anything further to come before the Court in this case at this time?

MR. FRAZIER:  Your Honor, for purposes of the record, and just because it's required under law, as this Court is aware, in the Fifth Circuit, if the government disagrees with the reasonableness of the sentence, we object to the

reasonableness of the sentence in this particular case.

We believe it is unreasonable and respectfully disagree with the Court regarding whether or not it adequately addresses the factors under 3553, those in particular being: The severity and seriousness of this offense; the need to respect -- promote respect for the law; the need to provide just punishment; the need to afford adequate deterrence and to deter criminal conduct; and the need to protect the public from further crimes of this defendant.

We object to the sentence on those grounds, Your Honor, respectfully do that. And, for purposes of the record, we now want to conclude -- to have those statements on there as to the reasons why we make those objections.

THE COURT. Anything further, Mr. Frazier?

MR. FRAZIER: No, sir.

THE COURT: Mr. Sergi, anything further on behalf of government?

MR. SERGI: Your Honor, on behalf of defense, I anticipate --

THE COURT: Pardon me. On behalf of the defendant?

MR. SERGI: I anticipate we'll be filing a Notice of Appeal shortly, Your Honor. And then we have some funding issues we still need to address after or in the interim.

THE COURT: All right. There being nothing further to come before this Court, the Court noting the comments of

both the government and the defendant, the Court passes to the clerk of this court for entry the Court's Memorandum Opinion Regarding Sentencing and the Amended Judgment in a Criminal Case.

At this time the court's in recess.

(End of transcript)

**UNITED STATES DISTRICT COURT        )**

**WESTERN DISTRICT OF TEXAS          )**

I, Arlinda Rodriguez, Official Court Reporter, United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

WITNESS MY OFFICIAL HAND this the 17th day of May 2018.

```
                          /S/ Arlinda Rodriguez
                          Arlinda Rodriguez, Texas CSR 7753
                          Expiration Date:  12/31/2018
                          Official Court Reporter
                          United States District Court
                          Austin Division
                          501 West 5th Street, Suite 4152
                          Austin, Texas 78701
                          (512) 391-8791
```