UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
WACO DIVISION

UNITED STATES OF AMERICA ) Docket No. WA 99-CR-070(1) ADA
                         )
vs.                      ) Waco, Texas
                         )
CHRISTOPHER ANDRE VIALVA ) September 3, 2020


TRANSCRIPT OF VIDEOCONFERENCE MOTION HEARING
BEFORE THE HONORABLE ALAN D. ALBRIGHT


APPEARANCES:

For the United States:    Mr. Mark Frazier
                          Assistant U.S. Attorney
                          800 Franklin Avenue, Suite 280
                          Waco, Texas 76701


For the Defendant:        Ms. Susan M. Otto
                          Assistant Federal Public Defender
                          215 Dean A. McGee Avenue,
                          Suite 109
                          Oklahoma City, Oklahoma 73102


Court Reporter:           Ms. Lily Iva Reznik, CRR, RMR
                          501 West 5th Street, Suite 4153
                          Austin, Texas 78701
                          (512)391-8792

Proceedings reported by computerized stenography,
transcript produced by computer-aided transcription.

EXHIBIT 3 pg. 001

THE COURT: Suzanne, if you would call the case, please.

THE CLERK: Sure.

Motion hearing in Criminal Action 6:99-CR-70, styled, U.S.A. vs. Christopher Andre Vialva.

THE COURT: If I could hear announcements from counsel first from whoever is going to be representing the government, as I see, Mr. Frazier, I think.

MR. FRAZIER: Yes, your Honor.

THE COURT: And then, if I could hear from whoever's going to be representing the defendant in this case.

MS. OTTO: Yes, your Honor.

Good morning. Susan Otto from the Office of the Federal Public Defender.

THE COURT: Ms. Otto, where are you?

MS. OTTO: Where am I, sir?

THE COURT: Yes, ma'am.

MS. OTTO: Yes. I'm in Oklahoma City.

THE COURT: Oh, very good. I just wasn't sure where y'all were located.

MS. OTTO: Yes, sir.

THE COURT: Okay. Good morning to you.

Thank you for taking the time for this hearing. And what I would like to do, this is my -- this is my

EXHIBIT 3 pg. 002

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

first death penalty case since I've been on the bench. That being said, I worked on one of these in the 1980s. In fact, my client was named Bernard and so -- which is very interesting. But I'm going to do my best today to understand everything that you all are bringing up and get through everything.

And I'm happy to hear, Ms. Otto, from you first, if you'd generally like to say anything. And I'd like to hear from Mr. Frazier, if he'd like to say something. But what would help me the most in making sure that I protect your client's rights is, I'd like to go through, one at a time, whatever step for relief it is that you're asking me for, you could explain why you think that you're entitled to.

I've read everything. I woke up last night around 3:00 in the morning and thought about it. So I'd like to hear anything that you've -- the way I handle my hearings is, you have -- you have whatever time you'd like to have to make whatever arguments you'd like to have. I may interrupt you, at some point, just if I have something that I think is important I want you to explain; but if I do, I always want you to finish your thought later and you'll have as much time.

Mr. Frazier obviously is going to have the same opportunity. But I want to make absolutely certain we go

**EXHIBIT 3 pg. 003**

through, make a good record, and that you have an opportunity to raise with the Court every issue that you think needs to be addressed on behalf of your client.

MS. OTTO:  Thank you, your Honor.  I appreciate the opportunity for this hearing.

Are you able to hear me?

THE COURT:  Yes, ma'am.

MS. OTTO:  Okay.  Good.  Thank you.

I would like just to begin with the fact that we're here because the Court in June of the year 2000 entered an order, entered its judgment, and very specifically said how this case was going to proceed.  Mr. Vialva, in fact, filed a notice of appeal, which activated the portion of the judgment and placed a stay in effect, and that stay is in effect until further order of the Court following a mandate.

There has been no further order of the Court lifting that stay.  The United States did not come to this court requesting an order and judgment.  The government never came back into this court requesting that the stay be lifted.  Instead, the Attorney General of the United States, through the warden at Terre Haute, Indiana, provided Mr. Vialva with a letter that advised him that he would be executed in 55 days from the date of the letter.

We have come to this court seeking an injunction,

**EXHIBIT 3 pg. 004**

seeking this Court's order enjoining the government from conducting that execution because it is in violation of the court order first; also, it's in violation of Texas law and that Texas law is incorporated into this case by the explicit provisions of the Federal Death Penalty Act.

I anticipate that the government is going to say that the Attorney General under the regulations in 28 C.F.R., Section 26.4, has the authority to set the time and date and place of the execution.  The Attorney General may, indeed, have that authority, but that authority is only derived through an order of the Court.  This is standing practice.  But in this case, the United States did not do that, and now we are faced with an execution that violates Texas law because it did not give Mr. Vialva the 91 days minimum that he would be entitled under Texas law nor did it apply --

THE COURT:  Ms. Otto, let me ask you this.

MS. OTTO:  Yes, sir.

THE COURT:  I see -- but I could be wrong.  I'm working through this.  Let me make -- but I see -- in my mind, you've raised two issues.  One is, did the U.S. -- did the Attorney General err by setting -- forget the 90 days for a second.  But my predecessor court, Judge Smith's stay order was in place, and therefore, forgetting the 90 days for a second, the Attorney General violated,

EXHIBIT 3 pg. 005

in effect, my stay order, the Court's stay order.  Also -- then we get to the 90 days issue.

So focusing just on the stay -- and if I'm wrong about this, let me know.  But what prevents me from mooting the first prong?  I'm not dealing with the 90 days.  I get why that's important.  But if I simply say I'm lifting the stay and then, we'll take it up whether or not 90 days matters or not.

But doesn't my -- doesn't decision by me to lift the stay moot your concern over that, the violation of the court order?

MS. OTTO:  I would say, sir, that it doesn't because the judgment that was entered by Judge Smith in this case clearly says -- and I'm looking at page 2 of the judgment, the section is entitled, Imprisonment.  It's the second full paragraph.  If an appeal is taken from this conviction and sentence, which it was, execution of the sentence shall be stayed pending further order of this court upon receipt of the mandate of the court of appeals.

There is a stay currently in place.  The United States has not asked this court to lift that stay.  It has not advised the Court in accordance with the requirements under the Code of Federal Regulations and the requirements of standing federal law that it's time for this court to set an execution date.

**EXHIBIT 3 pg. 006**

Had the government done that, I would have had the opportunity to come in, discuss this with the Court. We could have discussed what timing was appropriate, and what was sufficient. Essentially what the government is asking you to do is to overlook their violation of this statute, their violation of the Court's order, and simply say, okay, that doesn't matter, no matter why we're here, we're here now. Judge, just go ahead and lift the stay and let's proceed.

The government has yet to ask this court to lift the stay. They have not recognized that a stay is in place. That's why we needed the injunction. I think your question is, what do I do now? If we are at the moment that you're going to say that what the government has done up to this point is sufficient to invoke the jurisdiction of the Court, to give the Court notice of its intention of what to do and when it intends to do it, then we can move on to timing.

But the government has not complied with any portion of that. It has not complied with Title 28 -- or I'm sorry, 28 C.F.R., 26.2. It has not advised the Court of that. It has not followed the statute. The Court obviously has the authority to lift this stay if it chooses to do so as a matter of pure "do you have the jurisdiction to do that." I still believe that would be

**EXHIBIT 3 pg. 007**

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

an error under the law because the law is very specific on this.

And the Federal Death Penalty Act, as we know, is the subject of extensive litigation in other jurisdictions.  It's the subject of litigation in the Protocol cases in the D.C. Circuit.  And certainly the last denial of cert in the Mitchell case, Justice Sotomayor made it very clear that the Federal Death Penalty Act was something that the Court was going to have to construe at some point and is not a matter of just paperwork or mere technicalities that the Attorney General of the United States -- there's a little hand on my screen.  Does that mean I'm being told to be quiet?

SPEAKER:  No.

MS. OTTO:  Oh, okay.  Just asking.  I see a hand up.  I'm going, well, maybe they want me to shut up now.

It is not a matter of just mere paperwork.  This is a matter of the Court's jurisdiction, it's a matter of process, and it's a matter of how does the Federal Death Penalty Act work.  If we allow the United States Attorney General to simply start this process by randomly sending out letters to people through the warden, then we have abandoned essentially a part of the statute that ensures due process.

It is not too much to ask the government to

EXHIBIT 3 pg. 008

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

follow its own rules. And the Court lifting a stay right now would be essentially saying that what they've done up to this point, no matter how egregious the violation will be forgiven because it just doesn't matter. We take the position that it does.

THE COURT: Okay. Let me hear from Mr. Frazier, if I could.

Mr. Frazier, I don't want you to yet get into the 90-day issue. But I would like you to explain why you believe Ms. Otto is wrong and that I can -- that I can, in fact, go ahead and lift the stay.

I'm of the -- on one level, I am of the opinion that I'm going to have to treat this as though I were the judge, that I'm modifying -- since Judge Smith has -- I've taken his place, I'm going to treat this as though I had entered the original order for purposes of deciding it. I have to say, I'm of the mind that I have the power to do in this respect anything I want. But I certainly understand Ms. Otto's position that there's a due process interest in allowing the defendant to have a say in why I should or should not lift the stay.

So, Mr. Frazier, I'll hear from you.

MR. FRAZIER: Thank you, Judge. Can you hear me okay?

THE COURT: Yes, sir.

EXHIBIT 3 pg. 009

MR. FRAZIER: Okay. So the argument or, rather, the position the Court has just articulated regarding lifting of the stay is certainly something we believe the Court has the authority to do, but we're not sure the Court even needs to reach that decision in this particular case: it's because of the language that's not only used in the judgment, but what that language actually means.

So in this particular point, let's talk about the stay itself. In actuality, Judge, the stay just isn't even in effect anymore, and here are the reasons why we say that. I understand the judgment says that the stay has been provided for pending further order of the Court. However, that's not to mean that that language is to be read that the stay would persist indefinitely, or forever, or long after the appeal process was already over, which has been for some time now unless the Court had issued some contrary order.

In this particular case, the judgment also states that Vialva's death sentence, quote, will be implemented, end quote, upon exhaustion of the all appeal -- the appeals, rather, and it specifically directs the Bureau of Prisons and the Marshal Service to do that. In any event, the Court -- not this court, but the prior court, Judge Smith, has issued several orders, including the denial of the defendant's 2255 motion, his 60(b) motion, and all his

denials of certificates of appealability to the Fifth Circuit.  Those actions are all incompatible with the continued existence of a stay in this particular case.

And as the Court is aware, Mr. Vialva bears the burden in this particular case of making a strong showing of likely success.  So technically, Judge, we're arguing the stay does not exist at this point, but the Court could lift it now if the Court wanted to, to do that.  If they wanted to do so.

THE COURT:  And, Mr. Frazier, I guess from the government's perspective, going in order, if Judge Smith's order entering this stay, if the intent of it was simply to preclude any -- obviously the execution itself until other rights were exhausted by the defendant, and those included the ones you just said, the Rule 60 motion, 2255, obviously he had an appeal.  There's going to be an appeal in every one of these cases.

If I were to find that no stay were necessary, then that would moot the -- or make the -- Ms. Otto's argument without merit.  But it would also -- it could also lend to an argument that if I were to lift the stay today, it would be consistent with the intent of the original court, and there would be no due process violation by me simply lifting the stay.  And in the end, the result would be essentially identical, correct?

EXHIBIT 3 pg. 011

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

MR. FRAZIER:  Yes.

THE COURT:  I would either determine that Judge Smith's intent was simply to make sure that no action was taken with respect to the defendant until all of his rights -- appellate rights were exhausted.  He didn't intend for a stay to interfere with any conduct that occurred after the appellate rights had been exhausted.  But if there's a question whether the stay does or does not exist, then it would be appropriate for the Court to resolve that ambiguity by removing the stay.

MR. FRAZIER:  Yes, sir.  That's correct.

That's our argument we've made to the Court in our reply -- in our response, rather.  Excuse me.

THE COURT:  Ms. Otto, if I could hear a response to that, please.

MS. OTTO:  Yes, your Honor.

I believe what the government is doing is basically cutting and pasting from the language in the original judgment.  The section that -- of the judgment Mr. Frazier is reading from, upon exhaustion of appeals, is actually in the first paragraph of the judgment, and it describes upon exhaustion of appeals, a sentence of death will be implemented by the defendant being released from the custody of the Bureau of Prisons to the custody of the marshals, who shall supervise the execution of the

EXHIBIT 3 pg. 012

defendant in the manner prescribed by the laws of Texas. So the laws of Texas govern that eventuality in this case.

The next paragraph says, the time, place and manner are to be determined by the Attorney General, and that's this not less than 60 and not more than 90 days from the date of the judgment. Next sentence: If an appeal is taken, execution of this sentence shall be stayed pending further order of this court upon receipt of the mandate of the court of appeals.

The government is essentially arguing that because Judge Smith entered final orders in our successive pieces of litigation that we've pursued in postconviction, that that's somehow inconsistent with a stay, it is entirely consistent with there being a stay. The government did not attempt to execute Mr. Vialva while those pieces of the litigation were pending nor should they. The case was still in process.

The order of this court must be consistent with the laws of Texas. And the laws of Texas are explicit. There has to be an order of the Court setting the execution. Simply lifting the stay is not sufficient. This court is -- will be entering the order of execution. The Attorney General of the United States does not possess that authority. The Attorney General can determine the time, place and manner, provided it's prescribed in the

**EXHIBIT 3 pg. 013**

laws of the state of Texas.  That's the Federal Death Penalty Act.

The Federal Death Penalty Act requires this court and every other court before whom a federal death penalty is pending to either use the law that exists in that jurisdiction, if it's a jurisdiction that has the death penalty, or to select another jurisdiction and use that jurisdiction's rules.

We don't have to engage in that process here. The state of Texas has an execution process, and their process is explicit.  Only the Court can direct the execution.  Lifting the stay would be part of directing that execution, but it has to be done in accordance with the laws of the state of Texas.  A fact that the United States Attorney has not acknowledged.  It was required to request that the Court set the order of execution, and certainly as long as the stay was in place, that wouldn't happen.

We sort of got -- we got multiple carts before the horse here, and now we're in a mess, and the government wants to say, don't worry, Judge, just vacate the stay and we can just proceed onward.  They have never requested that this court enter an order of execution, and that is required under the law of Texas.

THE COURT:  Mr. Frazier.

EXHIBIT 3 pg. 014

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

MR. FRAZIER:  Yes, your Honor.

To address one of the points, this is sort of combining a couple of the points that she made -- that counsel made in her brief regarding the Attorney General's authority.  She indicated earlier the standing practice that there must be an order of the Court allowing the Attorney General to set a date for execution, but that's not entirely correct.  The Court -- the only thing the Court must do is issue a judgment sentencing the defendant to death, which has been done in this case.  The executive branch then has the duty, both constitutional and statutory, to carry out that sentence.

The judgment does not preclude the Attorney General from setting an execution date.  The judgment requires -- the judgment as it's written requires the Attorney General to set this date, as it states, between 61 and 90 days from the date of judgment.  Using the logic that Mr. Vialva is arguing in his brief on this -- for this injunction that the Attorney General would forever be forfeited -- would ever forfeit his ability to set a date at all because it didn't fall within 61 to 90 days, that just doesn't make any sense.

But instead, pointing to those paragraphs that Ms. Otto just pointed out, the time, place and manner of execution are to be determined by the Attorney General.

EXHIBIT 3 pg. 015

That's part of the judgment that was entered in this particular case. And that provision, that language that sets this time period from between 60 -- 61 and 90 days is language that was taken from the sentencing language used in the old death penalty provision under Title 21, United States Code, Section 848, and that was all repealed. That was the death penalty under the drug statute. That was repealed in 2006.

But the commentary in that language made clear what that 61 to 90 days was about. It was meant only to give a defendant time to appeal, and it didn't suggest the same time limits were meant to apply even if a defendant did appeal. There's no way an appeal would ever be resolved within that time period. It's not possible.

Instead, and in fact, in other language which is also in Mr. Vialva's judgment says that if a defendant appeals, his death sentence is stayed, and the Bureau of Prisons and the marshals have to wait until exhaustion for the procedures for appeal of the judgment and conviction and review of the sentence takes place before those be carried out. And that's also statutory in Title 18, United States Code, Section 3596(a).

So therefore, to read this together, the best reading of this is not that the stay was in effect, but that the Attorney General's discretion about when to set a

EXHIBIT 3 pg. 016

date apply only when it's the defendant's appeals have run, not just to the 61 and 90-day provision that's in the judgment; otherwise, it wouldn't make sense to read it in a way that it would.

And again, in the alternative, as we've argued in our response, the Court could simply ratify the date that has been set by the Bureau of Prisons, as directed by the Attorney General in the notice that we filed with the Court.  There's no reason why the Court couldn't just adopt that if it wanted to in the alternative.

Now, regarding the argument that the defendant is making in this case regarding the -- that a further order is necessary for this court to -- for the marshals to supervise the execution, the letter that was provided -- counsel had argued initially that the letter that was provided to Mr. Vialva from the warden at Terre Haute was insufficient because it didn't comply with the requirement that a warrant be issued.

But that letter, Judge, that notice that she was given that -- I'm sorry, Judge.  I just wanted to make sure I -- sorry about that.  That letter serves as notice, the functional equivalent of a warrant that an execution date was set.  And to suggest that there needed to be some additional compliance, some other type of document issued, putting the defendant on notice that the government was

EXHIBIT 3 pg. 017

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

seeking a specific execution date is just incorrect.

In fact, that same notice was given in another case, and a court construed it as sufficient notice in another case, in a death penalty case, in the Mitchell case in the Ninth Circuit, which is cited in our response that was -- that was cited in our response in this point number three that was raised by counsel.

And also, Judge, in addition to whatever process counsel is arguing may need to be issued by this court in order for the marshals or the Bureau of Prisons to effectuate and carry out the death penalty, there's already a statutory requirement for them to do so now. The duty exists -- already have a statutory and reg -- have statutory and regulatory authority under 18 U.S.C. 3596(a) and 28 C.F.R. 26.3(a)(4) to supervise the execution, and the Court's original judgment specifically directs them to do so.

The final point that I wanted to make regarding the Texas procedures that counsel argues that the execution as it's laid out in the judgment and paragraphs -- this is on page 2 of the judgment, docket 289, paragraphs number two and number three, that the government must implement a sentence in the manner prescribed by the laws of the state in which the sentence was imposed.

**EXHIBIT 3 pg. 018**

In this particular case, Judge, that's already been interpreted for you.  Several courts have already considered this issue, and they indicate that the word "manner," which the same language was used in the judgment that basically the -- Mr. Vialva's judgment has the same language entered, or very similar language, that the manner of implementing a death sentence refers to the manner effectuating death, not the pre-execution procedural requirements.  That's cited in the Mitchell case that we cited in our reply.  That's also in the Peterson vs. Barr and in one of the Protocol cases, the decision, as well, that are also cited in our response.

Our position is, Judge, that when we're talking about the manner of the execution and not all of the pre-execution procedural requirements, it's covering only the choice of the means of the execution, whether by lethal injection, hanging, firing squad, things of that nature.  That would be consistent with the reading of Title 18, United States Code, Section 3596.  And likewise, even the other cases where there were -- have read that to have a broader interpretation of the manner, it's still limited just to execution-related details such as the choice of the drugs, dosage, who can be present, things of that nature.  No one has held that it includes pre-execution procedures such as the issuance of a

EXHIBIT 3 pg. 019

warrant, choice of the date, notification, things of that nature.

And that's also in the Mitchell case, which was cited in our response to the motion in this particular case. So the bottom line is, Judge, the government is arguing that the judgment essentially is interpreted through other -- through opinions in other courts. But also in what it actually means based on the litigation and the history that's taken place would mean that the Attorney General has complied and the Bureau has complied with the requirements that are necessary to effectuate a death sentence. And in fact, that those same requirements have been done in other cases recently where the death penalty was also imposed and effectuated.

Indeed, does the Court have any other question on that? Have I addressed all the Court's points? Was there anything -- any other question the Court has that I could address on that?

THE COURT: No. I'll hear from Ms. Otto.

MS. OTTO: Thank you, your Honor.

To begin with, I would agree with the government that it would be strange to argue that if you didn't execute someone within 90 days after the date of the judgment, that would be a ridiculous position to take. That's why we didn't take it.

EXHIBIT 3 pg. 020

What we're saying is, the second portion of that paragraph is what is applicable, and this whole thing has been stayed pending further order of the court.  Now, the government says that there's no requirement under the rules for the Attorney General to ask for an order.  I would direct the Court's attention to 28 C.F.R., Section 26.2(a), which says whenever this part becomes applicable, the attorney for the government shall promptly file with the sentencing court a proposed order and judgment.  And the order and judgment shall state, in addition to any other matters required by law or otherwise appropriate; and then, it sets out that the sentence shall be executed by the marshal, the sentence shall be executed by intravenous injection; the sentence shall be executed on a date and at a place designated by the Director of the Bureau of Prisons; and that the prisoner under the sentence of death shall be committed to the Attorney General or his authorized representative for appropriate detention pending execution of the sentence.

That's what I was referring to when I said standing practice.  This has been in the C.F.R.  This has been a requirement for the Department of Justice.  I agree with Mr. Frazier that a number of cases have touched on the issues of what does the manner of execution mean.  All of the cases that have addressed this have been Protocol

**EXHIBIT 3 pg. 021**

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

cases, that is, how do we execute someone?  How much access does the lawyer have to the person?  Are we allowed to see the manner in which the intravenous line is set?  Who gets to witness?  All of those details.

The -- as Judge -- Justice Sotomayor noted, the Protocol case at 955 F. 3d is the case that has done the most to examine this.  It's the D.C. Circuit's opinion.  There are three judges, there are three different opinions.  One of the judges says, you have to follow everything down to the pin, down to the minutia.  One judge says, well, I think what you have to do is, you have to follow the general rules about this.  One judge worries:  Well, how hard is this going to be to apply?  But all of the judges indicate that you must follow the statutes.

I understand that it may be very difficult for the United States of America to suss out through all of the various protocols and all of the various jurisdictions where they have chosen to prosecute people federally for homicides, how can they go about doing this?

But we don't have to reach that issue here.  That's not what is before this court.  The minutia of the protocol process is for the Protocol case.  We have that pending in the district right now.  That's not the problem right now.  The problem right now is that the government

**EXHIBIT 3 pg. 022**

has jumped past a plain and simple requirement of the statute.

It is required for a court to issue a death warrant. The government is saying, don't worry about that, we'll just send a letter and you can ratify it later. They're citing the Mitchell case. I certainly think the Mitchell case deserves to be looked at. Mr. Mitchell wasn't talking about the warrant in that case. If he complained about it, he complained too late. Mr. Mitchell received 139 days notice that he was going to be executed back in 2019. That didn't happen because there was a litigation that engendered a stay, and the government was precluded from executing him.

This last round of litigation occurred when the government decided to attempt to execute him again and, of course, they succeeded. But the fact that the government succeeded is not the same thing as saying what the government is doing in this case is correct.

We have timely raised this. Perhaps Mr. Mitchell may have waived his right to challenge the absence of a warrant. He didn't raise the issue appropriately. That does not govern this court's determination, and it certainly does not excuse the government's failure and refusal to follow the rules.

In Texas, the court issues the warrant. In other

jurisdictions, the chief executive does.  If we were in one of those jurisdictions where the chief executive issued the order of execution, we would be having this discussion with the President of the United States.  But we are in a jurisdiction where the Court issues the order.

The United States is asking you to look past all of its procedural failures, to look past all of its attempts to bypass a very simple, very plain, very ordinary request that could have been submitted to this court in February when our last round of litigation concluded in the United States Supreme Court from the Rule 60(b) motion.

We received notice that Mr. Vialva was going to be executed July the 25th of this year, 55 days from the date of his scheduled execution.  We have not delayed.  We have been steady and stedfast in our request that the Attorney General of the United States follow the law.

I respectfully submit that the government's suggestion that this court ratify its violation of law flies in the face of statutory rules, and it certainly flies in the face of the rule of law.  It is not too much to ask the Attorney General of the United States through the United States Attorney in the Western District of Texas to submit a proposed order and judgment that would have given us notice.

**EXHIBIT 3 pg. 024**

Ratifying it at this point is I don't believe structurally an option for this court, and that's why I'm so reluctant to say that simply vacating a stay at this point would cure the problem. We still don't have a proper request from the United States.

THE COURT: Mr. Frazier, anything else on this point or any of those points?

MR. FRAZIER: Yes, your Honor. Just a few things.

First of all, other than just counsel's asserting that the procedures that are set out under 18 U.S. -- or 28 U.S.C. 3596 require us to comply with Texas procedures, she's never explained why that's correct. We've explained at length in our response that the manner of pre-execution -- the manner of execution doesn't apply to the pre-execution procedures, and every court has agreed with that. There's no court opinion that's interpreting the law the way Vialva is interpreting it in this particular case.

You know, alleging that we not follow the rules, or not follow the statute, or we've engaged in procedural failures is simply wrong because the other courts just don't agree with that interpretation. I think it's interesting, too, Judge, that counsel now, today in an issue raising 26.2 of 28 C.F.R. that we didn't submit a

EXHIBIT 3 pg. 025

proposed judgment and order has never been raised in the previous 20 years of litigation prior to it being inserted in the reply brief. I don't believe it was raised in the original petition for an injunction in this particular court. I may be wrong about that, but I do recall it being in the reply brief that's being asserted now for the first time.

If it truly were a procedural issue that counsel -- or that Mr. Vialva believed was appropriate, then it should have been raised years ago, but wasn't. But in any event, even that particular regulation makes clear under 26.2 that the proposed judgment and order is really for the convenience of the Court.

The Court has already issued a judgment and order in this particular case. The Court doesn't have to adopt everything -- if the government -- even if the government provided a proposed order and motion at this point, the Court wouldn't have to adopt it. And the code section provides no sanction if we fail to comply with that. Especially not an injunction in this particular case precluding the government from carrying out its particular sentence.

We cite for the Court, Dolan vs. United States, Supreme Court case at 560, U.S. 605, where the Supreme Court said where a statute does not specify a consequence

EXHIBIT 3 pg. 026

LILY I. REZNIK, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

for noncompliance with its timing provisions, federal courts will not in the ordinary course impose their own coercive standard.

The final thing I want to point out to the Court is the legal framework under which Vialva's operating in right now, and that's the injunction.  That's the motion for an injunction.  So one of the standards which really haven't been mentioned -- and I know the Court is aware of these that we put in our response as to what Mr. Vialva has to show in order to get this extraordinary remedy.  In page 5 of our brief, we show, number one, that the defendant must show the use of existing methods or procedures, rather than proffered alternatives, will cause him irreparable injury.  And the mere existence of a death sentence is not enough.  That's the standard in the Fifth Circuit.  The fact that there's a death sentence is insufficient.

And the Court must also take into account the state's very strong interest in enforcing its criminal judgments without undue interference from courts, particularly where a capital defendant brings a claim shortly before his sentence is due to be carried out.  And we cite <u>Murphy vs. Collier</u>, Fifth Circuit case in our particular reply.

Those standards simply have not been met in this

**EXHIBIT 3 pg. 027**

particular case, Judge.  Mr. Vialva has not reached the level -- the very high level that he has to acquire to make the showings that will entitle him to an injunction at this point.  If I could have just a moment, your Honor.  I don't think I have anything else on this point unless the Court has any questions.

THE COURT:  I don't.

Ms. Otto, if you'd like to shift -- if you have anything else you'd like to say, of course, you can.  But if you'd like to shift to the issue of the 90 days, that will be fine, as well.

MS. OTTO:  Yes, your Honor.

Just on the point that the government has made about the timing of this.  The timing of this has been driven entirely by Mr. Vialva being advised after being on death row for a considerable period of time, 20 years, that the government was going to execute him in 55 days.  This is not the sort of last-minute action that where we waited.  I think that was one of the issues in Mitchell, that this was coming really right on the day of the execution.

And, of course, the Supreme Court has made it clear that they look at those last-minute stays with great disfavor.  That's why we brought this to the Court's attention as promptly as we did.  We have come into court

EXHIBIT 3 pg. 028

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

as quickly as we possibly could.  We are requesting injunctive relief simply because that appears to be the only way to stop the government from proceeding with its intentions.

THE COURT:  Ms. Otto.

MS. OTTO:  Yes.

THE COURT:  Let me put that on the record, number one, I don't think I heard Mr. Frazier arguing this is a last-minute -- and he can correct me.  But I worry a little bit that you're arguing about something -- you're responding to an argument I don't think the government's making in terms of this clearly is not a we're about to have -- we're about to have the execution at 5:00 today and you filed it yesterday.

In fact, I commend you for filing it when you did.  And part of the reason I set the hearing now was so that if I were to make a decision adverse to your client, I wanted to be doing it quickly enough so that I will give you as much opportunity to have appellate relief from any decision I make.

So I'm saying this not to -- I'm not criticizing or chastising you.  I'm actually complimenting you.  I think you all moved with great dispatch and this court is -- I think we moved -- not that they wouldn't have done it, anyway.  The government responded very quickly, and we

**EXHIBIT 3 pg. 029**

wanted to get this hearing done to give your client every opportunity.

So I just wanted to make the record clear that I don't view this as a last-minute -- it is, in some sense, a last -- last-minute's the wrong word. It is clearly a last -- an effort to prevent the final act of the play, as it were, since the government now wants to actually have the capital punishment take place. But I think this is taking place in a very orderly way, and I commend what you all are doing. I don't find it -- the issues that have been raised by others as a last-minute effort.

But if there's anything else you'd like to say about what Mr. Frazier has argued, that's fine. And then, if you would like to explain to me why you believe that I've gotta make sure that there are 90 -- or more than 90 days, that will be great.

MS. OTTO: Yes, your Honor. I'm happy to do that.

I just simply wanted to make it clear that since the government has raised the specter that if we had a complaint about anything, we should have raised it during these 20 years. That this is really the first time that the issue has become ripe for litigation and ripe for decision.

I believe that where we are at this point is that

EXHIBIT 3 pg. 030

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

Mr. Vialva has received notice that the government intends to execute him on September the 24th.  We have raised the issue that we have only received this notice 55 -- giving us 55 days and that it does not comport with Texas law.

I will agree that this is, I believe, a case of first impression.  I agree that this precise issue about the timing of the warrant, the issuance of the warrant, the manner of the warrant being challenged so directly, so succinctly, and so clearly, has not been presented.  It wasn't presented in Danny Lee's case.  It wasn't presented in Lezmond Mitchell's case.

THE COURT:  Ms. Otto, let me ask you this, too.  And again, I'm trying to be -- I want my question to be clear.

MS. OTTO:  Yes, sir.

THE COURT:  Because when I say this, I will be paraphrasing the way that someone else famously said about what difference does it make.

But my question here is, what issues -- what prejudice will you suffer, will your client suffer because it's 51 days, instead of 90 days?  What issues would you not be -- I have something in the record this has been 20 years, it's been litigated every way in, I think -- every issue that I could think of has been raised.  You all are not arguing that I've seen, but if you are, please put it

EXHIBIT 3 pg. 031

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

on the record now -- that I get that you're saying it's Texas by fate, you know, the defendant was convicted in Texas, Texas law applies, Texas law requires 90 days.

But I don't know what you're saying is the prejudice that would accrue to your client because if we had 40 more days, we could get X done, but because we only had 51 days, is your argument -- is there anything more to your argument than -- in terms of actual prejudice to your client than it happened to have been Texas, Texas requires 90 days, there are -- what the Attorney General did, it was fewer days than that, and we are going to be prejudiced because the shortage of days we would have gotten would have allowed us to raise an issue that we won't be able to raise.  I haven't seen that in any of the papers.

MS. OTTO:  Well, your Honor, I believe in our reply, we did note in a footnote that we have a matter pending in the Southern District of Indiana at this point. We have raised a claim about the constitutionality of proceeding with the execution of Mr. Vialva, and we have raised that in the context of Title 28, United States Code, Section 2241.

I believe I see that the government's lawyer who is representing the United States in that case is present for this hearing, and we are certainly pursuing that

EXHIBIT 3 pg. 032

LILY I. REZNIK, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

litigation.  The timing --

THE COURT:  But -- you were about to say.  I'm sorry.  You were about to answer my question.  Please, go ahead.

MS. OTTO:  Yes.

So the timing of this is that we have filed that.  We are proceeding in the Southern District of Indiana.  I don't know if we're going to get a hearing or not in that case, but of course, it is now September the 3rd and we are looking at 20 -- functionally, 21 days left to do this litigation.

The clemency procedures that exist for federal prisoners allow you to submit a clemency petition.  You have 30 days to do that from the date of the notice of your execution, and additional 15 days after that 30 days to submit anything else.  Had we waited for our entire 45 days to submit our matters to the Office of Pardon Attorney, that would have left 10 days for all that to go through the procedure in Washington and for us to seek executive clemency in this case.

The President of the United States, of course, has an independent authority, separate and apart from the Attorney General and the Department of Justice, to grant clemency.  He's allowed to do that by the Constitution.  The procedure says that we are supposed to go through the

EXHIBIT 3 pg. 033

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

Department of Justice, and we are doing that. The fact that --

THE COURT: Well, Ms. Otto.

MS. OTTO: Sorry.

THE COURT: Ms. Otto, help me out here.

Because, again -- and I want to be careful how I say this, but it is just fate that Texas has 90 days. It could have been 120. It could have been 60. It could have been whatever. It's fate that your client was in Texas. Again, I'm trying to focus on, it seems to me, that to the extent that the issues you've raised with the Indiana court -- but I'm over my skis here because I don't do this a lot. But I'm just -- but I did do federal court practice for 40 years, so I'm hoping I'm right.

But if the issues you're raising with the Indiana court, which I'm sure are foresighted on because that's where the execution's going to be and there are specific issues you're raising there, wouldn't they be able to postpone the execution or stay the execution if they thought your claims were meritorious? And how is any shortage of the number of days of what I'm doing, how does it impact that? How are you prejudiced by not getting the 90 days with respect to what the Indiana court can do?

I just don't know. I would love for you to educate me.

MS. OTTO: Well, I wish I could, your Honor. I -- of course, there's no way of knowing whether the Indiana court is going to issue an injunction or not. The government predictably is vigorously opposing any injunction, and that can't be counted on. We have the lethal injection Protocol case that's pending in the District of Columbia. The few cases that have obtained injunctions out of that litigation, those injunctions have been very swiftly dissolved.

But I would like to just return to the point that I understand that there is -- there's a certain amount of serendipity to where one is prosecuted and the law of the state where one is prosecuted. I know that there have been a number of attempts, certainly Janet Reno, all those years ago when all of this started with the federal death penalty, had asked if it weren't possible for the Attorney General to simply be able to draft up a plenary execution protocol.

I think this is one of the things that Justice Sotomayor is concerned about is that how do we -- how do we fairly and uniformly apply a federal death penalty statute that depends, in part, on the law of the jurisdiction where the conviction occurred? That is certainly an issue that might be certworthy.

What concerns me is that when the United States

EXHIBIT 3 pg. 035

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

decided to start executing people again, initially they gave 137 days notice, 139 days notice, which is quite a bit of time and you can do a lot of litigating. You could go into many jurisdictions and you could raise many, many issues. There is no explanation for why we received 55 days, and I think that the prejudice to us flowing from that is twofold.

First, the less time you have -- this is obvious, but I'm going to say it, anyway. The less time you have, the less time there is to do things in a timely fashion. And the closer you come to that edge with the United States Supreme Court, or with an appellate court, or with a district judge of saying you have delayed too long, you have waited until the last minute and this is just a desperate attempt not to be executed.

I think there is a larger question at stake here. It may be serendipitous that we are in Texas. It may be just a matter of Texas law that we get a minimum of 90 days. But as we noted in our pleading, Texas courts routinely give substantially more than 90 days for executions, and we do this for a reason. It's so that you can pursue executive clemency in an orderly fashion. It's so you can pursue any claims that you may have about the niceties, the minutia, as they refer to it in the Protocol cases.

EXHIBIT 3 pg. 036

THE COURT:  Ms. Otto, let me ask you this.

MS. OTTO:  Yes, sir.

THE COURT:  Again, this is -- I'm showing my ignorance here.  I'm not questioning you all's good faith and the way that you've handled this.

What prevented your ability to begin the clemency procedure?  This ability to ask for clemency only began when -- look, I get -- it seems to me, and certainly the President has this authority.  You know, that's why he's the President to -- through his Attorney General to decide to start having capital punishment, having the executions if he wants to, but I'm also aware that we haven't had any for a while.

So -- but what, if anything -- why -- let me ask it this -- were clemency -- were you asking for clemency all along?  Does that -- when does that begin?  You raised the issue of the shortage of days might -- that might could affect your ability to ask for clemency, but I don't really -- I know what clemency is, but I don't know how one goes about asking for that in this context.

MS. OTTO:  Certainly, I can answer that question.  Uh-oh.  Oh, there you are.  You moved.  It threw me off.

All right.  I can answer that question pretty simply.  The rules of the Department of Justice are that you can ask for clemency once.  We actually petitioned the

EXHIBIT 3 pg. 037

last administration for clemency and submitted our clemency packet. It did not ever make it out of the Office of Pardon Attorney, as far as we can tell. It was never even opened in the Office of Pardon Attorney, and we withdrew it before Mr. Trump was inaugurated as President Trump. Because we withdrew it, it was not considered a tabletop or a desktop denial. So we still have the right to raise that.

During this administration, during the nearly four years of this administration, there was no apparent effort to execute anyone until very recently. Certainly requesting executive clemency can be submitted, but you have to be out of court. You can't have pending court actions while you're doing that.

And we were litigating the 60(b) motion. That was only denied in -- very early in this year in 2020. And so, we were actively litigating matters. And traditionally, you don't request executive clemency until everything's finished in court. I'm in the state of Oklahoma. We have a clemency process here, and clemency isn't entertained by the Pardon and Parole Board until there's an execution date set.

This could be a flaw in, again, in the way we administer the federal death penalty. Perhaps there should be some clarity about that from the Department of

**EXHIBIT 3 pg. 038**

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

Justice or from each administration when it comes in.  But it's certainly -- for death penalty practitioners, it would be odd for you to be requesting clemency while you were still pursuing some form of relief in the court.

So part of our decision has been driven by the fact we were actively litigating the 60(b); and part of it was simply a practical matter of not asking for clemency during the administration because there was no real threat until recently that Mr. Vialva would be executed.  He was not one of the five men selected last year and notified of the government's intention to execute him.

I suppose we could have submitted a clemency petition then, but frankly, I don't think that it would have received very much attention, for one thing, and it would be -- would have been very strange for us to be doing that while we were still pursuing the 60(b) motion.  Had the 60(b) motion been granted, clemency would not have been necessary because we would have been granted relief.

Every substantive thing that we're litigating is a substance thing we're litigating.  We're not litigating about the niceties of, you know, where a venous access is obtained in any of our pleadings in the 2241.  The Protocol case is where we're litigating the issues about the execution process.  So we are presenting substantive issues in our 2241.

**EXHIBIT 3 pg. 039**

And argument could be made, well, why are you presenting clemency now since you have the 2241?  Quite frankly, 2241s are statistically a long shot.  And I didn't feel that it was effective assistance of counsel for Christopher Vialva to live on hope that I might get a stay from the Southern District of Indiana.  So instead, we pursued executive clemency, and that's why we were doing it in this manner.

No matter what decision you make in these cases -- I've been doing this for a while.  No matter what decision you make, you always feel that it's the wrong one, that you should have done something else or something different.  What we're doing here is, we are trying to enforce Mr. Vialva's rights under the laws of Texas and under the Federal Death Penalty Act, which incorporate the laws of Texas, as inconvenient and vexatious as that might be, and to ask this court to hold the government to its burden and to hold the government to the law.

We will be asking the Court in Indiana to take a look at the procedure.  And we are asking the President of the United States to look hard at this case and grant us executive clemency.  We are trying to do everything we can obviously to save Christopher Vialva's life, and that's my job and that's why I'm doing this.  So I certainly understand why I could be criticized for not having

**EXHIBIT 3 pg. 040**

presented a petition for executive clemency to President Trump when he came in the door the first day of office, but it seemed premature to us, and it also seemed like we had a basis for hope that the 60(b) might be granted.

I hope that answers your questions about the timing.

THE COURT:  It does.

Let me ask you this and this is -- I don't know this has even a legal implication.  But what -- it seems illogical to me that unless the Attorney General is -- it seems illogical to me that the Attorney General is in this time pursuing a capital -- to have your client executed and that there is a realistic hope for clemency.  Could you explain -- again, I don't -- I've never had to deal with this, but why would there be any reasonable expectation of clemency while the Attorney General is -- obviously there are a lot of attorneys on this Zoom call who are all working hard to make sure that the -- that execution date is met.

It seems illogical to me that you would have a shot at clemency.  Could you explain why you think you do?

MS. OTTO:  Absolutely, your Honor.  I'd be happy to do that.

We believe that we have a very legitimate case for clemency for a number of very compelling reasons.  I

**EXHIBIT 3 pg. 041**

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

would like to point out that the Office of Pardon Attorney, although it is within the Department of Justice, is somewhat separated from the rest of the Department of Justice, and it is my understanding that they make their reviews and their recommendations independently. They certainly seek like -- they will be seeking Mr. Frazier's opinions. They did in the past when we -- when we submitted the clemency application during the Obama administration. I'm certain that the United States' interest in executing Mr. Vialva will be very vigorously and very ably presented by the United States.

What we're saying is -- as far as Christopher Vialva is concerned, that he is different from the men who have been executed up to this point. And by up to this point, I can go all the way back to Timothy McVeigh. Mr. Vialva is very representative of a section of the men who are on death row because a significant group of them were charged and convicted before their 21st birthday. If you expand that out from the age of 25, it jumps from one statistical point to another statistical point.

So although Mr. Vialva certainly isn't a teenager anymore, he was 19 years old when he was charged in this capital case. He was 20 years old when he was convicted. He has grown up on death grow, literally. There are very few services that are provided on death row. It's

EXHIBIT 3 pg. 042

LILY I. REZNIK, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

essentially you're put there to await death.  You're in a single cell.  There's not a lot of rehabilitative opportunities for you.

But over the course of Mr. Vialva's incarceration during these past 20 years, he's lived long enough and he's lived under circumstances that have allowed his brain to mature.  He is now a fully functioning adult.  He has used his adult brain to make very excellent choices while he has been on death row.

He pursued one faith practice for a period of time that I think was completely transformative for him.  It was a practice that required him to literally put his head to the floor five times a day, to bend his stiff neck before God, and to ask for forgiveness, and to ask to humble his heart.

Since that time, he has moved on, and he is now a practitioner of Messianic faith, which means that he has accepted -- he refers to Jesus as Yeshua by his Hebrew name.  He has accepted Yeshua as his messiah, as his redeemer, and he is conducting his life in accordance with those precepts.  He has a faith community.  He was actually allowed to start a little faith group, and he has nine people that he was practicing with before he was moved over to the A range.

I think that Mr. Vialva was convicted by a jury

that never heard the most salient parts of his life, the most salient features of his life. We believe strongly that we've made an excellent case for ineffective assistance of counsel. His learned in law counsel was deeply conflicted at the time with a conflict that could not be waived.

We believe that his jury didn't hear very important things that were available that could have explained and contextualized what happened that horrible night. And we believe that at least one juror probably could have been persuaded that his life was worth saving. We believe that if we are given the opportunity, we can show the President, if he will give us that chance and we hope that he will, we can show him that the idea that we can judge at 19 years old a person to be unworthy of life, that they're irredeemable, and that there is no hope for anybody to ever do anything good again is wrong.

That future dangerousness is, in fact, wrong as many times as it is right. And Christopher Vialva is a living, breathing example of how you say you know somebody, and you really don't, based on the worst thing that they've ever done. I believe that this President understands that. I believe that the Department of Justice understands that.

The rule of law exists so that everyone has an

EXHIBIT 3 pg. 044

opportunity to fully litigate their claims, and that did not happen in this case. If you look at this from a purely legal standpoint, I think we have a basis for executive clemency. If you look at this from a purely humanitarian standpoint from the question, does this man deserve to die and is his death necessary, I believe that we can make a case for clemency.

We have been granted a hearing in font of the Office of Pardon Attorney, and they're going to accommodate us on September 10th. We'll have to be appearing by Zoom. I hope I get better at it between now and then, but we will be appearing by Zoom. One of his attorneys who has been assisting us in this, Michael Williams from Kirkland & Ellis, is also participating in that presentation to the Office of Pardon Attorney.

I do not believe this is hopeless. I never believe it's hopeless, even in front of the Oklahoma Pardon and Parole Board, because we have obtained clemency from the Oklahoma Pardon and Parole Board in the past. And some of our governors have granted clemency, and I will be honest with you, Judge, it's been with people exactly like this. People where we could demonstrate that they were changed, that prison had done its duty and had done its job. It had broken them of their bad behavior and that they were changed men.

EXHIBIT 3 pg. 045

We will not be asking the President of the United States to turn Mr. Vialva loose.  We will be asking for a term of life in prison without he possibility of parole, which should be more than sufficient and not greater than necessary to do justice in this case.  I hope that answers your question.

THE COURT:  With great eloquence.  Is there anything else you'd like to add before I turn to Mr. Frazier?

MS. OTTO:  No, sir.

THE COURT:  Mr. Frazier.

MR. FRAZIER:  Yes, sir.

I know the Court is familiar with the facts of this case, but Mr. Vialva was judged by a jury 20 years ago for the actions he did back on June 21st, 1999.  Unanimous recommendation for the death penalty.  Let me remind the Court, as the Court is aware, that the defendant executed Todd and Stacie Bagley in the trunk of their own vehicle after kidnapping -- assisting in kidnapping them, parading them around town to show them off to their gang buddies, and then, made the cool, calculated decision that Todd and Stacie Bagley had to die because they had seen his face.

This was not a decision, Judge, that took place over the course of a few minutes.  It took hours.  He

**EXHIBIT 3 pg. 046**

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

deliberated on it.  He had friends, gang members who were with him who tried to dissuade him, and he still wanted to go forward and kill the two people who were not only begging for their lives, but trying to pray with them to not only release themselves but just to give up what they had been trying to do to them, the robbery and the carjacking.

And at the moment when Chris Vialva opened the trunk of that vehicle, Stacie Bagley pleaded with him and told him, "Jesus loves you, Jesus forgives you," and his words to her were to the effect of "shut up, bitch, I'm about to open the trunk."  And when he did that, he shot and killed -- he shot Stacie Bagley, who did not die, who later died based on the fire that the codefendant set, but did kill Todd Bagley instantly with a single bullet to the head in the trunk.

That decision of the jury, Judge, came after not only hours of testimony from an expert that Chris Vialva had a deprived childhood, had deficiencies in his upbringing, had hours and hours of testimony about the background of Chris Vialva.  The jury got to hear all of that, evaluated all of that, and took that in consideration in determining that the statutory and non-statutory aggravating factors outweighed the mitigating factors, and sentenced him to death.

**EXHIBIT 3 pg. 047**

Chris Vialva's raised these issues regarding ineffective assistance of counsel, conflict of counsel, repeatedly over the years. Those same requirements, those claims that he's made have been unanimously rejected by every court that's heard it. In this particular case, Judge, counsel is alleging that they really haven't had -- or they need additional time, and when the Court inquired, the Court inquired about what you would do with the additional time.

But, Judge, the Rule 60(b) motion -- counsel will correct me if I'm wrong, but I believe the Rule 60(b) motion, which was the last litigation that was pending before the 2241, cert was denied on that back in January or February, but it was earlier this year. That 2241 motion could have been filed long before the notice that was filed on July 31st of this year.

And as counsel has pointed out, they had already previously sought clemency and, for whatever reason, withdrew that petition. And now, after the notice of execution has been filed on July 31st, they have petitioned the attorney -- the President for clemency in this case.

And Mr. Vialva's not alleging that they've been unable to raise claims related to the execution or any other issues. In fact, the fact that we're here today

**EXHIBIT 3 pg. 048**

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

arguing this motion on the injunction is, indeed, proof that they have had opportunity. There's litigation now pending, I believe, in two other jurisdictions regarding Mr. Vialva in either the Protocol or the 2241 motion where essentially -- I'm not going to rehash the allegations, but counsel will correct me if I'm wrong, but basically the allegation that the 2255 was inadequate to raise certain claims that they're raising now before the judge, and yet, they've had ample opportunity to do that since the legislation ended in this particular case.

The only requirement under federal law regarding timing, Judge -- and because we've had this issue come up, it's been talked about -- is whether or not the execution should be stayed to give the defendants more time to do something, whatever that may be. We don't know what that would be. As counsel admits, more time you have, the more time you have to see what you don't know or whatever the argument was. I know I'm not artfully rephrasing what she said, but the Court heard it and relied on what she had said.

But the only requirement under federal law in this particular case is that the defendant be given 60 days from the date of judgment to set an execution. And that's under 26.3 -- 28 C.F.R. 26.3. The judgment in this case, Judge, is 20 years old. The judgment is not being

EXHIBIT 3 pg. 049

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

issued by the Court today.  It's not being issued back when the cert was denied on the 60(b) motion in January.  The judgment was entered in June of 2000.  More than 60 days have passed.

The only other requirement is that Mr. Vialva be able to exhaust all of his appeals and all of his collateral review before a date has been set, and he has done that.  That 60 days has passed.  Once the defendant has done -- has exhausted all of his remedies, he has no further right to delay under federal law, and we are past that.  We are at the stage now where Mr. Vialva's execution -- the judgment is ripe to be executed at this particular point.

I would also point out to the Court that the clemency petition that's pending in this case certainly -- as counsel's pointed out, it sounds like the Office of the Pardon Attorney is going to not only consider the petition fully, but give Mr. Vialva a hearing.  And counsel's right, they have consulted with us, and we will be submitting information, you know, to them, as well, as part of that process.

But the fact that there's a mere pending clemency petition does not, in and of itself, give the right for a stay.  Does not give the right to extend the time for the date of execution.  And in fact, a similar petition was

**EXHIBIT 3 pg. 050**

denied in district court in the Mitchell case because the regulations didn't give Mr. Mitchell a protected liberty interest in a decision on his clemency petition from the President.

The execution can take place without -- while the clemency petition is pending, if it is, but it doesn't sound like that's going to be the case in this particular instance. So in order, Judge, we're at the end of the litigation. We're at the end of the stage where there is nothing left for Mr. Vialva to litigate, to raise, to claim. He's had every fair opportunity to do that.

I go back to what I argued earlier. I'm not going to repeat it. But the point that was made in counsel's -- in Vialva's original motion that we replied to regarding BOP's compliance with Texas procedures is limited strictly to the manner of the execution and not the preexisting procedural requirements, which are governed by federal law, and we've complied with those.

So pending any other questions from the Court, that's all I have.

THE COURT: Ms. Otto, anything else you'd like to add?

MS. OTTO: Your Honor, just very, very briefly. The 2241 that we have filed in the Southern District of Indiana became ripe when the United States decided to try

**EXHIBIT 3 pg. 051**

to execute Mr. Vialva.  The substance of that claim is, it will be unconstitutional to execute Mr. Vialva because of the procedural posture of this case.

Mr. Frazier has characterized the fact that we had an opportunity for a 2255, that we had a 60(b), I would just like to make the record clear that the hearing that you are conducting today is the first hearing that has ever been conducted during the postconviction process of Mr. Vialva's case.  We've raised multiple substantive issues about ineffective assistance of counsel, issues that --

THE COURT:  Ms. Otto, we've lost you.

MS. OTTO:  You've lost me?  Okay.  Wait.

THE COURT:  Ms. Otto, we've lost your connection. Okay.  Hold on.  Okay.  Just a minute.

Let me just make sure, Ms. Otto --

MS. OTTO:  Okay.

THE COURT:  -- that Lily was able to hear.  I was breaking up, but I wanted to make sure Lily got everything, and she's shaking her head yes.  So please go ahead.  Thank you.

MS. OTTO:  All right.  I'm just responding very briefly to Mr. Frazier's comments about the adequacy of all of the procedure that Mr. Vialva has received, and I simply want the record to reflect that this is the first

**EXHIBIT 3 pg. 052**

hearing that's taken place during a postconviction. We raised multiple series of claims about ineffective assistance of counsel. We never received an evidentiary hearing.

This is the first time I've had a chance in 17 years that I've been representing him to speak up for Mr. Vialva before any United States District Judge. So to the extent that we're relying on all of the process that he has received, and all the court hearings that he's had, and all of his opportunities, I think it's fair to note that our opportunities have, in fact, been greatly limited.

What will happen in the Southern District of Indiana, who knows. We may be denied this afternoon. I have no way of knowing that. We may get a hearing. There may be an injunction. But that's not the reason we're here today. And the reason we're here today is because the United States has not complied with the statute.

Now, Mr. Frazier again wants to say that the only thing that's required is 60 days, but respectfully disagree with him, and I believe that both the judgment in this case and the rules are contrary to that.

I am requesting that this court ratify the prior judgment that was entered by Judge Smith and say that there is a stay in place until further order of the Court.

**EXHIBIT 3 pg. 053**

If the Court then wishes to proceed and say, and here's my further order of the Court, I request that this court, if it is inclined to take what has happened up to this point as sufficiently formal from the United States Attorney to qualify as a request for order and judgment to say that any execution of Christopher Vialva may take place in accordance with the time and place designated by the Attorney General of the United States and the Director of the Bureau of Prisons at a date not less than 120 days from today's date, not 90 but 120, to afford us the same fair opportunity that Mr. Mitchell received and that Mr. Lee received when they were noticed back in July of last year that the government intended to execute them.

I really don't know of any procedure under -- certain practice or any other where I can simply go into court without an imminent threat of some harm and ask the Court to relieve me of the burden of that harm.  I believe that we have proceeded in an orderly fashion.  To the extent Mr. Frazier says that we should have done this years ago, or we should have done it in February, or we should have done it right after the clemency petition was withdrawn, we should have resubmitted it to the Trump administration, all of that is just really a make-way argument that offers no cogent explanation for the government's failure to simply follow the rules.

**EXHIBIT 3 pg. 054**

I respectfully ask the Court to enjoin the government, to preclude them from executing Mr. Vialva as they have scheduled on September the 24th, and to enter whatever appropriate order the Court feels is necessary at this point. But I am requesting not just my minimum of 90 days, but 120 days, which under Texas law, I could request and which appears to be somewhat standard practice in Texas that execution dates are set well off.

Why haven't we done it up to this point? Because this is the point when the government has made it clear they intend to execute our client. It's ripe for review at this time, and I respectfully request the Court enter an appropriate order.

THE COURT: Mr. Frazier, anything else?

MR. FRAZIER: Yes. Just one last point, Judge.

Essentially, Ms. Otto's asking for an extension of the execution date, and in this particular case, that's effectively granting a temporary stay of execution. And she's failed to make any showing on success on the merits or any equitable entitlement to that remedy, as we've talked about earlier, that we discussed earlier. That's all I have.

THE COURT: Is there anything else you'd like to add about any point?

MR. FRAZIER: Are you speaking to me, Judge?

EXHIBIT 3 pg. 055

THE COURT: Yes, sir.

MR. FRAZIER: I don't have anything else. I believe we've covered everything adequately. I'm not going to be repetitive.

THE COURT: Ms. Otto, is there anything else you'd like to say on behalf of your client with respect to any issue that you've raised with the Court?

MS. OTTO: Your Honor, on the point of have I shown a likelihood of success, I believe the government has basically admitted that they didn't follow the rules. They're just asking you to overlook it. I think I've won on that point, and I think I'm entitled to an injunction at this particular moment in time. Thank you.

THE COURT: Anything else?

MS. OTTO: That's it, sir.

THE COURT: Okay. I'm going to put you on -- I'm going to go off screen and mute you all. I'm going to check with my clerk on a couple of things. If you all would just be patient and wait for me, I'll be back in just a couple of minutes. Don't go anywhere because my screen turns black. And if you can still hear what I'm saying, someone yell out that you can still hear what I'm saying. Thank you.

MS. OTTO: Okay.

(Recess.)

EXHIBIT 3 pg. 056

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

THE COURT:  If we could go back on the record, please.

So I've heard everything I think I need to to help me write up a decision and that we'll get out hopefully by middle of next week, end of the week at the latest.

Let me ask you all this.  My understanding, there is another motion that has to do with unsealing that also involves another defendant.  When -- I would like to have a hearing on that.  I worry about getting it done by tomorrow, so I was thinking Tuesday, if everyone were available.

Let me hear first from Mr. Frazier.

MR. FRAZIER:  Yes, sir.  You said Tuesday?

THE COURT:  Yes, sir.

MR. FRAZIER:  Yes, sir.  That's fine with me.

THE COURT:  Ms. Otto.

MS. OTTO:  I'll be here Tuesday.  No problem.

THE COURT:  Okay.  I would do it Monday, but Monday's a federal holiday, and I'm just not sure I could get everyone coordinated that needs to be coordinated, given the additional logistics we have of getting the people who we need to be available.

And then, I think Mr. Bernard's counsel is attending the call.  If he is --

EXHIBIT 3 pg. 057

MR. OWEN:  That's correct, your Honor.

THE COURT:  Would you be available on Tuesday?

MR. OWEN:  Yes, your Honor.  The only time I would ask the Court if it were possible to accommodate, I have a scheduled phone call with an inmate who is incarcerated at twelve noon central time.  So if we would do it sometime besides the lunch hour, I would certainly be available and appreciate the Court's accommodating that, if it's possible.

THE COURT:  I'm absolutely certain we can accommodate not doing it at lunchtime.  So that's --

MR. OWEN:  Thank you, Judge.

THE COURT:  That's an easy accommodation to make. Thank you for giving us the heads up.  And my law clerk will coordinate with that.

With my great thanks to everyone for their hard work and their great arguments this morning, again, let me make -- just because it's so hard to get these together, let me give everyone one more opportunity.

Ms. Otto, if there's anything else you'd like to say on behalf of your client, I invite you to do so at this time.

MS. OTTO:  Thank you, your Honor.

The only thing that I would like to place on the record is, the administration in Terre Haute made it

EXHIBIT 3 pg. 058

LILY I. REZNIK, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

possible for us to dial in, and Mr. Vialva has been able to listen to this hearing on a speaker phone here in my office. I notified the chambers, your Honor. I had advised Ms. Miles about this earlier today. I would like the record to reflect that Mr. Vialva, although he was not present with his counsel, was able to listen, and I thank you very much for that.

THE COURT: Well, and we did everything we could to make that. I mean, that's very important to me. As I said, I've -- you know, I understand the position you're in. I've done -- I've traveled to Huntsville. Obviously we'll try and do the same thing for both of the gentleman on Tuesday whenever the call takes place. It is very important to me that they -- if we can, that they be allowed to hear what we're discussing, and they hear your arguments, and they hear Mr. Frazier's arguments, and they hear what I'm asking.

So anything else from you, Ms. Otto?

MS. OTTO: No, sir. Thank you.

THE COURT: Mr. Frazier?

MR. FRAZIER: No, sir.

THE COURT: Okay. We'll get back together on Tuesday. Thank you so much. Have a good weekend. Take care.

(Proceedings concluded.)

**EXHIBIT 3 pg. 059**

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*



**EXHIBIT 3 pg. 060**

*LILY I. REZNIK, OFFICIAL COURT REPORTER*
*U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)*

* * * * * *

UNITED STATES DISTRICT COURT  )

WESTERN DISTRICT OF TEXAS)


   I, LILY I. REZNIK, Certified Realtime Reporter, Registered Merit Reporter, in my capacity as Official Court Reporter of the United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

   I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.

   WITNESS MY OFFICIAL HAND this the 28th day of October, 2020.


                              /s/*Lily I. Reznik*
                              LILY I. REZNIK, CRR, RMR
                              Official Court Reporter
                              United States District Court
                              Austin Division
                              501 W. 5th Street,
                              Suite 4153
                              Austin, Texas 78701
                              (512)391-8792
                              SOT Certification No. 4481
                              Expires:  1-31-21

**EXHIBIT 3 pg. 061**