Received Fax :          Oct 25 2012 10:31AM      Fax Station :   DEFENSECLINIC        p. 2

409 935 8305        GALVESTON CO. M.E.                            09:51:14 a.m.   10-25-2012        2/7

## DECLARATION OF STEPHEN PUSTILNIK, M.D.

Stephen Pustilnik, pursuant to the provisions of 28 U.S.C. §1746, makes the following declaration:

1. My name is Stephen Pustilnik. I am over the age of 18, and I currently reside in Harris County, Texas. I have never been convicted of a crime and I am fully competent to make this affidavit. Unless expressly stated otherwise, I either have personal knowledge of the facts stated herein or I have described the documents from which I have acquired my information. I believe the statements made in this declaration to be true and correct.

2. I am the Chief Medical Examiner for Galveston County, Texas, and an Assistant Professor of Pathology for the University of Texas Medical Branch. I am board certified in both Anatomic and Forensic Pathology by the American Board of Pathology and I am a licensed physician in the state of Texas.

3. I received my BA from the University of Pennsylvania and my MD from the Washington University School of Medicine. I interned at the University of Connecticut and did my residency at the Yale University School of Medicine. I did my fellowship in Forensic Pathology at the Dade County Medical Examiner Office.

4. At the request of Robert C. Owen, attorney for Brandon Bernard, I have reviewed materials in the case of *United States v. Christopher Vialva and Brandon Bernard*. Those materials included the report of the autopsy of Mr. Todd Bagley, performed by Southwest Institute of Forensic Sciences, the report of the autopsy of Mrs. Stacie Bagley, performed by Southwest Institute of Forensic Sciences,

**Exhibit 2-1**

Received Fax :    Oct 25 2012 10:31AM    Fax Station :    DEFENSECLINIC    p . 3

409 935 8305          GALVESTON CO. M.E.                                   09:51:27 a.m.    10-25-2012          3 /7

photographs of the crime scene, photographs from the autopsies, and the trial testimony of Dr. Joni McClain, Dr. J.K. Townsend-Parchman, and Dr. Robert Bux.

5.  The report of the autopsy of Mrs. Bagley describes and identifies black soot as being present in Mrs. Bagley's central and distal airways. The report also notes a toxicology analysis demonstrating a carboxyhemoglobin of 45%. The report also indicates that Mrs. Bagley's brainstem was not directly affected anatomically by the projectile that caused her gunshot wound.

6.  During Dr. McClain's testimony at trial, the prosecutor asked her to describe her findings regarding Mrs. Bagley's cause of death. Dr. McClain responded that the "[c]ause of death was gunshot wound of the head associated with smoke inhalation and thermal injury." T. 2057. Asked further whether "the portions of [Mrs. Bagley's] brain that were hit with this -- by the bullet" had "cause[d] death in Mrs. Bagley immediately," Dr. McClain answered, "No," explaining that Mrs. Bagley at the time she was shot "most likely would've been unconscious." T. 2061. Asked by the prosecutor whether the bullet struck "any areas of the brain that are vital ... that would 've caused instant death," Dr. McClain responded, "No," adding that "[u]sually, the ... brain stem is the portion of the brain that is an instantaneous death, and that was not hit." T. 2061. Dr. McClain further testified that her examination during the autopsy of Mrs. Bagley's larynx, trachea, and bronchi revealed that "there was soot deposition lining [those airways], so that indicates that she's inhaling smoky, sooty material." T. 2061-62. She added



**Exhibit 2-2**

Received Fax :        Oct 25 2012 10:31AM      Fax Station :    DEFENSECLINIC              p . 4

409 935 8305        GALVESTON CO. M.E.                                  09:51:40 a.m.    10-25-2012        4 /7

that "a toxicologic examination of [Mrs. Bagley's] blood ... showed a carbon monoxide level of 45 percent," which indicated that Mrs. Bagley was "breathing in those products of smoke, and that certainly contribute[d] to [her] death." T. 2062. She later agreed with the prosecutor's characterization of this effect as "smoke inhalation" which was a "contributing cause" to Mrs. Bagley's death. T. 2062.

7.    The hypothesis that Mrs. Bagley remained alive and breathing after sustaining a gunshot to the face is one hypothesis that explains the presence of soot in her airways and the carbon monoxide in her blood. In my opinion, there is an alternative explanation which is equally possible and consistent with the evidence from the autopsy.

8.    To understand this alternative explanation, it is necessary to appreciate the distinction between medical death and forensic death. An individual is medically dead when either brain death or cardiac death has occurred, even though other autonomic functions may still be ongoing. Those functions are physiochemically driven, not voluntarily mediated. For example, the heart can continue to beat for 30-45 minutes after a fatal head injury, such as a gunshot wound. Medical death marks an important point because, for example, an organ donor who is medically dead can have his organs removed for donation and transplantation.

9.    While the heart is beating, blood is circulating in the body and carbon dioxide levels in the bloodstream are rising. The medically dead body's physiochemical response to rising carbon dioxide levels in the blood stream,

**Exhibit 2-3**

Received Fax :        Oct 25 2012 10:31AM        Fax Station :    DEFENSECLINIC            p . 5

409 935 8305        GALVESTON CO. M.E.                    09:51:52 a.m.    10-25-2012        5 /7

in the presence of a persistent agonal heartbeat, is to produce diaphragmatic movement which is mediated through the peripheral chemical receptors in the cardiovascular system and the respiratory centers in the brainstem.. This diaphragmatic movement, in turn, produces persistent agonal diaphragmatic movement and respiratory effort – a "bellows" effect that results in the movement of air from the surrounding environment into the airways of the medically dead body. This agonal respiratory effort is a deep primitive reflex and has nothing to do with consciousness or any higher brain function.

10. By contrast to medical death, an individual is forensically dead only when all physiologic and agonal activity has ceased.

11. Mrs. Bagley suffered a gunshot wound to the head that did enter her brain. Any gunshot wound to the brain can be both immediately incapacitating and immediately fatal whether or not it directly damages the brain stem.

12. One may reasonably conclude from the evidence I have reviewed that Mrs. Bagley, who had suffered an unsurvivable gunshot wound that damaged the structures of her brain, was medically dead after sustaining that injury. That Mrs. Bagley would ultimately arrive at forensic death, as a result of the damage from this gunshot, was a foregone and inevitable conclusion.

13. Even if Mrs. Bagley was medically dead after sustaining this gunshot injury, physicochemically driven autonomic functions were taking place for some period of time. As noted, the heart can continue to beat for 30-45 minutes after a fatal head injury. This continuing, but inexorably slowing heartbeat is called a "persistent agonal heartbeat." In the circumstances of

**Exhibit 2-4**

Received Fax :        Oct 25 2012 10:31AM    Fax Station :    DEFENSECLINIC          p . 6

409 935 8305        GALVESTON CO. M.E.                        09:52:06 a.m.    10-25-2012        6 /7

Mrs. Bagley's case, this agonal respiratory effort and agonal circulation, occurring in the wake of traumatic brain injury and in an environment of high carbon monoxide and high soot, could lead to soot being deposited throughout the airways, as well as high levels of carbon monoxide in the blood. All these effects would be subsequent to fatal traumatic brain injury, *i.e.*, traumatic brain injury that caused medical death.

14.    This scenario is, in my opinion, an equally possible and more likely explanation for the postmortem finding of soot in the airways of Mrs. Bagley's body, as well as carboxyhemoglobin of 45% in her blood. In this situation, the fire may not have contributed to Mrs. Bagley's death. I do not believe that there was passive diffusion of the smoky environment down through the airways of Mrs. Bagley after she was shot.

15.    If Mr. Bernard's attorneys had contacted any reasonably competent pathologist in 1999-2000, that person could have explained to counsel the distinction between medical death and forensic death, and how the autopsy findings with respect to the soot in Mrs. Bagley's airways and the carbon monoxide in her blood are consistent with physiological processes occurring in the wake of medical death from traumatic brain injury. That information, in turn, could have supported an argument that the person who set fire to the Bagleys' car did not cause Mrs. Bagley's death.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at ⟨SCMEO⟩    (place) on ⟨10-25-2012⟩(date).



KIMBERLY J. GLASS
Notary Public, State of Texas
My Commission Expires
August 12, 2016

**Exhibit 2-5**

Received Fax :        Oct 25 2012 10:31AM        Fax Station :    DEFENSECLINIC            p . 7

409 935 8305        GALVESTON CO. M.E.                09:52:19 a.m.    10-25-2012            7 /7

Stephen Pustilnik

**Exhibit 2-6**