

MARK A. BEZY & ASSOCIATES, LLC
CORRECTIONAL CONSULTING

3587 East Sierrita Rd.  San Tan Valley, AZ 85143
Phone. 480-588-5835 • Cell. 330-559-6079 • markabezy@gmail.com

My name is Mark A. Bezy, and I have over 36 years working as a correctional professional which involved managing and assessing male and female prisoners. My curriculum vitae is attached; for ease of reference, I note the following particularly relevant facts: At the time of my retirement from the Federal Bureau of Prisons (BOP), I maintained a Top Secret Security Clearance and of the date of this report, I still hold a Top Secret Security Clearance. From 2004 to 2006, I was Warden of the BOP Federal Correctional Complex in Terre Haute, Indiana, which housed 37 death-sentenced adult male inmates, as well as 1,500 High Security adult male inmates, 1200 Medium Security adult male inmates, and 450 Minimum Security adult male inmates. From 2002 to 2004, I was Warden of the BOP Federal Correctional Institution in Elkton, Ohio, which housed 2,400 Low Security adult male inmates. From 2006 to 2008, I was Warden of the Central Arizona Correctional Facility in Florence, Arizona, which housed 1000 Medium Custody adult male sex offenders. From 1999 to 2002, I was Associate Warden of the BOP United States Penitentiary in Leavenworth, Kansas, which housed 1,500 High Security adult male inmates. Prior to serving in those capacities, I was Captain of BOP facilities in Marion, Illinois; Lexington, Kentucky; and Ray Brook, New York. I have also served in other positions at BOP facilities in Belmont, California; Phoenix, Arizona; Duluth, Minnesota; Kansas City, Kansas; and Oxford, Wisconsin. Currently, I am the Owner and President of Mark A. Bezy and Associates, LLC, a correctional consulting company. In that role, I advise prisons in the management of inmate populations, including by providing risk assessment.

Through this work I have become an expert in conducting risk assessments of prison populations, including populations significantly comprised of inmates convicted of violent offenses and inmates who are members of Disruptive Groups and Security Threat Groups.  Managing the behavior of offenders at higher security levels presents substantial challenges, because 71 percent of offenders in high-security custody have been sanctioned for violating prison rules, and more than 90 percent of such offenders have a history of violence.  Moreover, one out of every four offenders in high-security custody is gang-affiliated.

Based on this professional experience and my analysis of the prison records of inmate Brandon Bernard, it is my assessment that Bernard has followed the program goals/requests of his Unit Team and has maintained clear conduct (*i.e.*, has not been sanctioned for a violation of prison rules) since 2000 while confined in the Special Confinement Unit (Federal Death Row).  Based on that evidence, it is my opinion that if Bernard were sentenced to imprisonment for life without parole, he could function well in a less-restrictive environment without posing a risk to institutional security and good order, or posing a risk to the safety and security of staff, inmates or the general public.

A brief summary of Bernard's prison records follows:

In July of 1998, Bernard was arrested in the Western District of Texas for Theft by Receiving Stolen Property. Those charges were later dismissed, superseded by charges for Conspiracy to Commit Murder, Carjacking, First Degree Murder on a Government Reservation, and Aiding and Abetting. Bernard was convicted on those charges, three of which carried a potential death sentence.  On June 16, 2000, a jury sentenced Bernard to death on one count of First Degree Murder and to life imprisonment without the possibility of release on each of the other death-eligible counts.

In the instant offense, Bernard was a party to a carjacking plan that involved abducting two victims in their car. Another participant in the crimes ultimately shot both victims to death in their car trunk, and their car was set on fire.

After his arrest, Bernard was housed in the McLennan County Jail Facility from June 23, 1999 to June 13, 2000. During that time, he received two (2) Disciplinary Reports. On 10-15-99, he was charged with Tampering with any Plumbing, Water, Electric or TV Fixture.  His punishment was 5 days' Segregation with Loss of All Privileges. On 12-24-99,

1

**Exhibit 4-1**

he was charged with Cursing at a Staff Member.  His punishment was 3 days' Disciplinary Segregation and Loss of all Privileges.  There were no other problems reported with Bernard at the McLennan County Jail Facility.

Bernard's record within the Bureau of Prisons likewise reflects that he is a program-compliant inmate. He has been assigned to the position of Orderly on the Special Confinement Unit on multiple occasions. Orderly is the only job position available to an inmate in the Special Confinement Unit, and there are fewer Orderly positions than there are inmates who seek to serve in them. For that reason, inmates rotate in and out of the positions over time.  Orderlies work in different locations around the unit and with unit staff, under staff supervision and wearing no restraints. Because Orderlies have access to mops, brooms, and other implements that can be turned into weapons or are inherently dangerous, that assignment necessarily entails the BOP's assessment that inmate Bernard presents no security risk and poses no danger to staff or other inmates.

The record also reflects that Bernard has had, and continues to have, a solid support base with his family and friends. Again, it should be noted that Bernard has not received a single Incident Report for violating any prohibited act in the Inmate Disciplinary Program for over 16 years on the Special Confinement Unit (Death Row).   This is remarkable. I am unaware of any other inmate who has been on the federal Death Row for at least 16 years without receiving a single incident report.

During Bernard's sentencing hearing, the government raised the issue of his gang involvement, suggesting that an inmate identified with the Bloods gang in the outside world would necessarily affiliate with the Bloods gang in prison, and cause problems in prison because of that affiliation.  The trial record suggests that whatever "gang" Bernard may have been involved with prior to his admission to the Bureau of Prisons was not terribly well organized.  Moreover, in my opinion the trial testimony that suggested that Bernard would necessarily associate with any such gang in prison was exaggerated and inaccurate.  The truth of the matter is that the Bloods lack a common leadership or council which would direct or influence all Blood sets; because of this lack of centralized leadership, an individual who may have associated himself with some Blood set in the neighborhood where he grew up will not necessarily associate himself with a similar set in prison.  And it should be noted that the Bureau of Prisons classifies the Bloods as a "Security Threat Group," which reflects a lower level of violence than that exhibited by groups that the BOP deems "Disruptive."  This fact seems to have been left out of the future dangerousness testimony presented in Bernard's trial, which suggested incorrectly that the Bloods were among the most dangerous entities that the BOP confronts.   In any event, nothing in Bernard's records suggests that he has affiliated with any gang inside the BOP.  Indeed, his record of zero disciplinary infractions in 16 years is strong evidence of no gang involvement, since gang activity in prison frequently leads directly to disciplinary infractions (indeed, simply displaying gang paraphernalia, clothing, signs, etc., is itself a disciplinary infraction).

For the above reasons, I anticipate that should Bernard's death sentence be commuted, he could and would function exceptionally well in a less-restrictive environment without posing any risk to institutional security and good order, or posing any risk to the safety and security of staff, inmates or others.

Mark A. Bezy

8/20/2016
Date

**Exhibit 4-2**